BOARD OF FIRE AND POLICE COMMISSIONERS
OF THE CITY OF MILWAUKEE

**In the Matter of the Appeal of Shannon Lewandowski**

___

| | |
|---|---|
| Hearing Dates: | August 10, 2016 |
| | August 11, 2016 |
| | |
| Hearing Location: | City Hall, 200 E. Wells Street, Milwaukee, Wisconsin, |
| | August 10, A.M., Room 301-B, P.M., Room 301-A, |
| | August 11, Room 301-B |
| | |
| Commissioners: | Kathryn A. Hein |
| | Angela McKenzie |
| | Ann Wilson |
| | |
| Hearing Examiner: | Rudolph M. Konrad |
| | |
| Appearances: | For the Milwaukee Police Department, |
| | Assistant City Attorney Robin A. Pederson |
| | |
| | For Shannon Lewandowski, |
| | Attorney Steven C. McGaver, Gimbel, Reilly, Guerin, and Brown, LLP |

## PROCEDURAL HISTORY

In an order dated December 16, 2015, Chief of Police Edward A. Flynn found Shannon Lewandowski guilty of violating the following Milwaukee Police Department rules and regulations:

- Core Value 1.00, *Competence*, Referencing Guiding Principle 1.03: Failure to use time to accomplish the mission of the Department.

- Core Value 1.00, *Competence*, Referencing Guiding Principle 1.05: Referencing Standard Operating Procedure relating to Department Owned Vehicles and Property, Section 640.15(A)(2): Failure to operate a Department vehicle in a safe manner.

- Core Value 3.00, *Integrity*, Referencing Guiding Principle 3.10: Failure to be forthright and candid in connection with any administrative inquiry or report.

For these violations the Chief suspended her for 5 days for failure to accomplish the mission of the Department, 30 days for failure to operate a Department vehicle in a safe manner, and discharged her for failure to be forthright and candid in connection with an administrative inquiry or report. (Exs. 4 & 6). Shannon Lewandowski appealed the Chief's order to the Milwaukee Fire and Police Commission and a hearing was held.

## SUMMARY OF HEARING PROCEEDINGS

A hearing was conducted on August 10th and 11th 2016. The hearing was recorded by a stenographic reporter.

On August 10th testimony was taken from the following witnesses:

| | |
|---|---|
| For the Police Chief: | Sergeant Cody Smith, Village of Shorewood |
| | Lieutenant Sean Hanley |
| | Police Sergeant Adam Zieger |
| | Lieutenant Steven Kelly |
| | |
| For the Appellant: | Detective Juanita Carr |
| | Jordan Lewandowski |
| | Police Officer Debra Stacey |
| | Police Officer Jessie Vollrath |
| | Denise Brown-Rogers |
| | Shannon Lewandowski |

The written statement of Detective Melanie Beasley was admitted by stipulation. (Ex. 7).

On August 11th testimony was taken from the following witnesses:

| | |
|---|---|
| For the Police Chief: | Assistant Chief of Police Carianne Yerkes |
| | |
| For the Appellant: | Police Officer Chad Boyack |
| | Shannon Lewandowski |

## FINDINGS OF FACT

We find the following facts have been established by a preponderance of the evidence.

1. Shannon Lewandowski joined the Milwaukee Police Department (MPD) on June 7, 1999, and served as a Police Officer until February 13, 2005, when she was promoted to Detective. She served as a detective until she was discharged on December 16, 2015. (Exs. 4 & 19).

2

2.  On January 19, 2015, at approximately 2:00 a.m., Shorewood Police Officer Cody Smith (now a sergeant) responded to a noise complaint in Shorewood, Wisconsin. Upon arrival, he stopped a vehicle that was leaving the scene of the noise complaint. The driver of the vehicle was Shannon Lewandowski's 19-year old son, Jordan Lewandowski. Smith testified that Jordan gave him his driver's license and either gave him or permitted him to see his mother's business card, which indicated that she was a detective on the Milwaukee Police Department. Jordan told him his mother was on her way to their location. Smith noticed the odor of alcohol in Jordan's car and, accordingly, administered a breath test and obtained a breath alcohol concentration of 0.09. Jordan then received a phone call informing him his mother had been in an automobile accident. Either Jordan or a person on the phone told Smith that Jordan's mother had been in an automobile accident, and that someone from MPD was going to pick him up and take him to the hospital. (See Ex. 14). Smith then decided not to process the case and left the scene so that Jordan could be taken to the hospital. The stop took 15 to 20 minutes. (Smith testimony).

3.  Lieutenant Sean Hanley has served on the MPD for 20 years. He was promoted to lieutenant in February 2013 and assigned to the Criminal Investigation Bureau covering Districts 3 and 5. On the evening of January 18/morning of January 19, 2015, he was the only investigative lieutenant on duty and was at St. Joseph's Hospital where a shooting victim was being treated, ascertaining how the shooting occurred. The victim's story did not make sense to him and he decided to recover the gun used in the incident as evidence prior to the victim being released. He proceeded to District 3 to find a detective who could recover the gun. (Hanley testimony).

4.  At District 3, between 12:30 and 1:00 a.m., Hanley directed Detective Juanita Carr to go to the shooting victim's residence to obtain consent for a search and attempt to recover the gun. He directed Carr to do this quickly, prior to the release of the victim from the hospital. The victim's residence was located about five minutes away from District 3. Hanley instructed her to take someone with her. Lewandowski was not present when this conversation occurred. Hanley then drove to District 5. (Hanley testimony).

5.  At approximately 2:17 a.m., on January 19th, Detectives Shannon Lewandowski and Juanita Carr were involved in a traffic accident at 35th Street and North Avenue. (Ex. 1). Pursuant to standard operating procedures (SOP), Hanley responded to the scene to check on the welfare of the officers and conduct a traffic accident investigation. He arrived at 2:32 a.m. (Hanley testimony; Hanley Aff.).

6.  At the scene, Hanley spoke briefly to Lewandowski who was receiving medical treatment, and checked on Carr, who was already in an ambulance. He was briefed by Sergeants Wade Grubich and Adam Riley. Grubich told him the detectives' squad was eastbound on North Avenue and entered the intersection on a green light and was struck by a vehicle going northbound on 35th Street that drove through the red light. Riley told

3

him he had heard from others at the scene that Lewandowski was going to UWM because her son had been stopped by police. Riley also told him the squad's emergency lights were on but that he did not know of any assignment that required the use of the emergency lights. Hanley assigned two detectives to conduct interviews at the scene. Under SOP 650.40(A), Hanley was required to complete the accident investigation in three days. (Exs. 1 & 3; Hanley testimony; Hanley Aff.).

7. Hanley returned to District 5 to pick up department medical forms and proceeded to Froedtert Hospital where the officers were being treated. He arrived at the hospital at 5:20 a.m. He explained to Lewandowski the process to be to be followed by officers injured on duty and told her they would talk about the accident later. She complained about an injury to her foot but was walking on it and seemed in fairly good spirits. He spent about 20 minutes with Lewandowski. She walked him to Carr's room and he explained the injury on duty process to her too. He had no difficulties communicating with her either. He did not conduct any interviews at the hospital because of the presence of family, friends and medical staff. He left the hospital at 6:22 a.m. to return to District 5. (Hanley testimony; Hanley Aff.).

8. At 6:38 a.m., while driving to District 5, Hanley received an unsolicited call from Lewandowski. (Ex. 14, p. 13.). She asked him if he wanted to know about the accident. Hanley responded "yes", pulled over, and took her statement. (Ex. 1, p. 6). Lewandowski told Hanley that she was going to assist Carr with her consent-search assignment, when she was contacted by Police Officer Melanie Beasley (now Detective) at District 5 concerning a personal matter and a restraining order against another officer. Rather than going to pick up the gun as assigned, she and Carr decided to go to District 5 so she could provide support and protection for Beasley. While driving to District 5, Lewandowski received a phone call from her son telling her he had been stopped by the UWM police. (Ex. 14, p.12). She then began driving to the UWM area to find him. He was to call her back once he ascertained his location. She told Hanley that she had given her phone to Carr to find something in it. She was driving 45 mph eastbound on West North Avenue approaching 35th Street and using her emergency lights to make cars get out of her way. As she drove into the intersection on a green light, the squad was struck by a vehicle running a red light traveling northbound on 35th Street. (Hanley testimony; Ex. 1, p. 6; Hanley Aff.).

9. During the conversation, Lewandowski sounded lucid and responsive to Hanley, and had no hesitation or reservation speaking with him, nor any difficulty communicating with him. It was during this conversation that Hanley learned the search for the gun he had ordered had not occurred. (Hanley testimony). Hanley testified that it was concerning to him that the gun search had not occurred prior to the time of the accident because of the exigency of the assignment. When Lewandowski agreed to assist Carr with her assignment, she effectively put herself on the assignment and was obligated to carry it out in a timely fashion. When Lewandowski chose to go to two other locations prior to completing the assignment, she was pushing off the assignment without permission and

4

into overtime. Detectives are not permitted to change or rearrange their assignments without permission from a supervisor. Lewandowski's decision to go to District 5 to support Beasley was not an appropriate use of police time. In addition, permission is also required if an officer wants to assist a family member while on duty. Hanley testified he would not have given Lewandowski permission to go to Shorewood to interfere with a police investigation. (Hanley testimony).

10. On January 21, 2015, Hanley interviewed Carr at her home. Carr stated that Lewandowski volunteered to assist her with the consent search for the gun. However, once they were in the squad, Lewandowski asked to go to District 5 to help a friend first and do the consent search later. Carr agreed to do that. Carr stated that Lewandowski turned on the emergency lights while eastbound on North Avenue at Sherman Blvd. (4200 block) to scare off prostitutes on the sidewalk and might have left the lights on. She was not paying attention because Lewandowski had given Carr her cell phone and asked her to find "Melanie" in it. Carr did not mention UWM and Hanley did not ask her about it because he did not want to color her view of what had occurred. Carr made no mention to him of an earlier attempt to recover the gun by herself. She indicated her memory had suffered from the accident causing her to forget things she easily remembered before the accident. (Hanley testimony; Ex. 1, p. 6).

11. Hanley completed his report on January 22, 2015, and forwarded it to Acting Captain Johnny Sgrignuoli for review. He did not recommend discipline against either Carr or Lewandowski. Sgrignuoli then forwarded the report to Internal Affairs for further investigation. (Hanley testimony; Ex. 1; Hanley Aff.).

12. On January 29, 2015, Sergeant Adam Zieger in Internal Affairs received the assignment to conduct an investigation into allegations of rule violations by Lewandowski. Zieger prepared a summary report of his investigation. He interviewed witnesses, the detectives involved, and the Shorewood police sergeant. He also reviewed the police reports, CAD reports, the Squad Accident report filed by Hanley, citations, inventory, and the Department of Justice alcohol report. (Zieger testimony; Ex. 8).

13. Zieger conducted a PI-21 interview of Lewandowski on April 14, 2015. She admitted that she was going to District 5 to meet Beasley instead of proceeding to attempt to pick up the gun. She believed there was no urgent need to recover the gun. Lewandowski stated she was going to District 5 because Beasley had asked her to come. She intended to pick up the gun after she had met with Beasley. She believed helping Beasley was a legitimate police purpose that took precedence over recovery of the gun because the gun recovery was not her assignment, and she was only helping Carr fulfill her assignment. Zieger testified that if Lewandowski had provided any other reason as to why she was going to District 5, he would have noted it in his report. (Zieger testimony; Ex. 8).

14. Lewandowski told Zieger that she used the emergency lights when she neared 36th Street and saw a car in the parking lane that appeared about to pull into traffic. She briefly

5

sounded her siren and turned on her emergency lights but had not turned them off before the accident occurred. The only reason she gave for turning on the emergency lights was to warn the car in the parking lane not to pull out. She gave Zieger no explanation why she still had the emergency lights on as she went through the 35th Street intersection. (Zieger testimony; Ex. 8, p. 22).

15. During the PI-21 interview, Lewandowski told Zieger that nearly all of the statements attributed to her in Hanley's report were not true. Specifically, the statement attributed to her about going to meet her son. She told Zieger she knew her son Jordan had been stopped before she left District 3 because he had called her as she entered the squad. When he called her, he was unsure of where he was and she told him to call her when he knew his location. She then gave her phone to Carr to look up Beasley's number and to answer the phone if it rang. (Zieger testimony; Ex. 8, p. 21, para. 3).

16. Zieger also interviewed Carr on April 14, 2015. She indicated that she was still suffering from a concussion and was receiving treatment and had not returned to work. She did not recall if she was instructed to recover the gun or if she decided to do it on her own. Lewandowski offered to go with her but she had a prior task to perform that Carr assumed involved a police matter. She did not see how the accident occurred because she was looking for a telephone number in Lewandowski's cell phone. She did not know why Lewandowski needed the number but was told to answer the phone if Jordan called. She recalled that when they were between North Sherman Blvd. and North 35th Street there was a car on the road and Lewandowski turned on her emergency lights to prompt the car to move over. Lewandowski mentioned something about prostitutes. She does not know if the lights were turned off before the accident occurred. (Zieger testimony; Ex. 8, pp. 17-19).

17. Zieger interviewed officers who responded to the scene. Officer Boehlke stated he was located further down the scene and from a distance, Lewandowski appeared distraught, very "worry-some", and slightly agitated. Officer Kuspa told Zieger that Lewandowski had an apparent leg injury, was very incoherent, and kept yelling, "Go get my son." Officer Deb Stacey told Zieger that she briefly spoke with Lewandowski and she was not making any sense and told her to go get her son. Officer Vollrath acknowledged to Zieger that there was discussion among officers about Lewandowski going to meet her son but none of the statements were from Lewandowski. Officer Beasley told Zieger that she had attempted to talk in person to Lewandowski earlier in the day at District 5, but Lewandowski did not have time. They agreed to meet later at District 5 at 2:00 or 3:00 a.m., and when Lewandowski did not arrive, Beasley called Lewandowski at 3:00 a.m., but there was no answer. Beasley wanted to talk to Lewandowski about "a lot of things", including a report. (Zieger testimony; Ex. 8; Ex. 7).

18. Zieger interviewed Jordan Lewandowski on June 11, 2015. Jordan acknowledged to Zieger he was stopped by a law enforcement agency on January 19, 2015, at about 1:00 or 1:30 A.M., a few blocks away from UWM's Sandburg Hall. He called his mother and

6

told her he had been pulled over by police and would call her when he was done. She replied "Alright, bye," and there was no further conversation. Jordan denied that his mother asked him to call her back after he had determined his location and stated his mother did not say she wanted to meet him. He stated he did not inform his mother he was near UWM. He told Zieger that his phone was answered by the officer who conducted the stop. The officer told him his mother was involved in an automobile accident and then left. Jordan then obtained an exact address of his friend's residence, and two unknown officers picked him up and brought him to the hospital. (Zieger testimony; Ex. 8, p. 22).

19. Lewandowski was served with charges on or about October 7, 2015 and November 20, 2015. After department members are served with charges, they may submit a written response to the charges. Lewandowski responded to the first two charges, 1) failure to use time to accomplish the mission of the department, and 2) failure to operate a department vehicle in a safe manner, on October 11, 2015. (Ex. 9). She stated that Beasley requested her help to file a felony case, and to help her deal with the fear and stress she was experiencing during work because of an earlier assault by a co-worker. On November 12, 2015, Lewandowski filed an additional response to the initial charges. (Ex. 10). In her second response, she stated that she was knocked unconscious and when she gained consciousness, she asked officers at the scene to bring her son to the hospital. She denied ever making any verbal statements that she was driving to UWM when the accident occurred and criticized the lack of any written reports substantiating the allegation. She also accused Hanley of lying about the content of the phone call she made to him after the accident. On November 27, 2015, Lewandowski responded to the third charge, "failure to be forthright and candid, orally or in writing, in connection with any administrative inquiry or report". (Ex. 11). In her third response, she again asserted the statements Hanley made regarding her cell phone call to him after the accident were untrue. She denied stating she traveled 45 mph. She denied stating her son had been stopped by UWM police. She further questioned the investigative integrity of the internal investigation.

## CONCLUSIONS OF LAW

20. This appeal is governed by the seven "just cause" standards set forth in Wis. Stat. sec. 62.50(17) (b). The Commission must find by a preponderance of the evidence that there is just cause to sustain the charges. Preponderance of the evidence means "more likely than not," rather than just possible. See, e.g., *U.S. v. Johnson*, 342 F.3d 731, 734 (7th Cir. 2003). We conclude that all seven standards are satisfied with respect to the charges against Shannon Lewandowski.

21. The first just cause standard asks, "whether the subordinate could reasonably be expected to have knowledge of the probable consequences of the alleged conduct." Shannon Lewandowski had been a police officer for 15 years, 10 of which she held the rank of detective; accordingly, she should know that integrity and honesty are fundamental to

7

police work. Likewise, she should know that while on duty, officers are expected to do police related work and when given an assignment, they are expected to perform the assignment and are not to deviate without permission from their supervisor. Also, officers are expected when driving police vehicles to observe the traffic laws, as every civilian driver, and the particular laws governing police vehicles, including those governing the use of emergency lights. These principles are clearly established in Milwaukee Police Department rules and are currently embodied in the core values and referencing guiding principles noted above under Procedural History. Moreover, Lewandowski never testified or argued that she did not know the consequence of being untruthful, or of violating the rules governing use of police vehicles, or not using time to accomplish the mission of the Department. We conclude the Chief has satisfied the first standard by a preponderance of the evidence.

22. The second just cause standard asks, "whether the rule or order the subordinate allegedly violated is reasonable." Core Value 3.00 – Integrity, tells department members their conduct must be beyond reproach and worthy of public trust. This requires them to be honest and truthful in word and deed. Reference Guiding Principle 3.10, requires department members to be "forthright and candid in connection with any administrative inquiry or report." (Ex. 1). We have no difficulty concluding that the integrity policy is reasonable. It is not necessary to explain at length the self-evident reasons that the integrity policy is reasonable. The subject is also addressed in Paragraph 31 of this decision. The reasonableness of the remaining two rules are also self-evident. Police officers are subject to the general traffic laws as are other drivers. Certain specific laws grant police officers additional authority to handle emergencies under strictly limited conditions. These judgments have been made for the most part by the Legislature and, therefore, are as a matter of law "reasonable." Using department time to accomplish the mission of the department is basic not only to police work but to all employment. Finally, Lewandowski made no argument that these three rules are in any way unreasonable. We conclude the Chief has satisfied the second standard by a preponderance of the evidence.

23. The third just cause standard asks: "whether the Chief, before filing the charge against the subordinate, made a reasonable effort to discover whether the subordinate did in fact violate the rule or order." Zieger testified regarding the effort made to investigate this case, which is recorded in Exhibit 8. Moreover, Lewandowski submitted three memoranda to the Chief responding to each charge. (Exs. 9, 10 & 11). We conclude the Chief has satisfied the third standard by a preponderance of the evidence

24. The fourth just cause standard asks, "whether the effort was fair and objective." Reviewing the entire record in this matter, we find no evidence pointing to any animus directed against Shannon Lewandowski. Lewandowski makes three accusations of bias against her. First, she accuses Lieutenant Hanley. She testified that his summary of her phone call to him in the Incident Report of the squad accident was false and made in retaliation against her for helping Beasley, but when pressed she could cite no facts in support of her allegation. Hanley testified he never supervised Beasley, who was a police

8

officer and not a detective; never received any reports from Beasley alleging a sexual assault; and was never informed of any allegations by Lewandowski. He had no idea there had been an allegation of sexual assault by Beasley until he was contacted by Internal Affairs. Lewandowski also attempted to impeach Hanley's credibility by claiming he did not visit or talk to her at Froedtert Hospital. This attempt at impeachment was refuted by the testimony of Lieutenant Kelly, who responded to the scene as a forensic supervisor and rode in the ambulance transporting Lewandowski to the hospital. He checked in with both detectives when they were situated in their rooms and obtained information needed for reports that Hanley would need to complete. When Hanley arrived, he briefed him and showed him the location of the rooms. While he waited for his forensic investigator to pick him up from the hospital, he saw Hanley enter Lewandowski's room. Jordan Lewandowski also testified that Hanley spoke to his mother at Froedtert just before she was discharged. We find Lewandowski's accusation and evidence of bias on the part of Hanley not to be credible. (Hanley testimony; Kelly testimony).

25. Her second accusation of bias is against the TAC squad officers who reportedly said at the scene of the accident that she had been going to UWM to meet her son who had been stopped by the police. However, according to her own testimony at the hearing, she made similar-sounding statements to Officers Stacey, Krumnow and Vollrath. She testified that she told them to get her son at UWM. She meant, however, to get her son to take him to the hospital, not that she had been on her way there before the accident. Lewandowski objected to the statements of the TAC officers as hearsay, but also argued that the statements were evidence of their bias against her. The statements of the TAC officers, however, are either true, or the product of confusion on their part, or of misunderstanding or mistake by those reporting them. The Commission, nevertheless, has disregarded those statements to the extent they imply Lewandowski was proceeding to meet her son before the accident occurred. The Commission relies on other evidence to support this conclusion. See paragraphs 8, 24, above. The reported statements of the TAC officers at the scene of the accident are ambiguous, reported via hearsay, and purport to be reports of what Lewandowski said immediately after she sustained injuries in the accident. Accordingly, whether the TAC officers' statements were the product of bias or not is irrelevant, because the Commission does not rely on those statements in reaching its conclusions. We note, however, the record contains no evidence of any bias on the part of the TAC officers.

26. Her third accusation of bias appears to be against Sergeant Zieger and other officers who conducted the investigation. It is unclear, however, if she claimed officers were biased against her, or if the investigative process they employed exhibited bias, or if the investigation was done in an unprofessional manner. In any case, there is no evidence in the record of bias or unprofessionalism on the part of Zieger or the other officers who conducted the investigation. The Chief has satisfied the fourth standard by a preponderance of the evidence.

27. The fifth just cause standard asks, "whether the Chief discovered substantial evidence that the subordinate violated the rule or order as described in the charges filed against the subordinate." This appeal presents two diametrically opposed versions of the events of January 19, 2015. The first version is essentially summarized in Hanley's Incident Report. In her statement to Hanley at 6:38 A.M., after she had been discharged from the Froedtert Hospital, she admitted two of the three violations. She admitted she was not on her way to recover a gun as directed, but rather was first on her way to District 5 to assist Officer Beasley with a personal matter, and then deviated from that detour to drive to the eastside of Milwaukee to meet her son who had been stopped, she believed, by UWM police. She also admits in her statement to Hanley that after she received the phone call from her son informing her that he had been stopped by police, she activated her emergency lights to move cars out of the way and commenced driving 45 mph in a 30 mph zone. The second version is the statement she gave to Zieger in her PI-21 interview, which is essentially the same as she testified at the hearing. In this version she admits she was proceeding to District 5 to support Beasley, but maintains her mission to aide Beasley was a police purpose. She denies she was going to the eastside to meet her son at the scene of the police stop. She denies she was speeding or that she used her emergency lights improperly. The Chief concluded that she told the truth to Hanley and was untruthful in her PI-21 interview. Accordingly, he charged her with untruthfulness.

28. The two statements cannot be reconciled by finding that the disparity was the result of either a misunderstanding or mistake by Hanley, or of misstatements by her caused by her injuries. The most compelling reason for rejecting these possibilities is that Lewandowski herself rejected them. She did not testify that Hanley correctly recorded her statement but misunderstood her when she explained "get her son" meant to take him to the hospital after the accident, or he heard 45 when she said 35, or did not fully understand her reasons for turning on her emergency lights or for going to District 5. She did not testify that Hanley correctly recorded her statement, but what she told him was incorrect because she was still dazed and confused by her injuries and told him things that she later realized were incorrect. She testified he lied and made bias accusation against him that she could not prove. In addition, she accused the investigators of bias, or incompetence, and misconduct, none of which she proved.

29. Because the two versions of events were not the result of misunderstanding or confusion, the question is who was telling the truth. For the following reasons, the Commission concludes that Hanley's version of events is true and Lewandowski's PI-21 version is false.

> (1) Hanley had no reason to lie. Lewandowski was unable to prove that he acted with any bias or ill will. See paragraph 22, above. The Commission found his testimony to be credible. Lewandowski, once she realized the implications of what she had told Hanley, could avoid discipline only by denying in her testimony and in her PI-21 interview what she had told Hanley. She had to deny she was on her way to meet her son, she had to deny she was speeding and used her emergency lights to clear the

10

way. Moreover, she had to find a reason for not retrieving the gun immediately after leaving District 3.

(2) Although she denied in her testimony and her PI-21 statement that she was on her way to meet her son, her statement was contradicted by the testimony of Shorewood Sergeant (then Officer) Cody Smith, who had no reason to lie and whose testimony the Commission found to be credible. Jordan Lewandowski's testimony and statement to Zieger that his mother did not ask him to call him back when he had a better idea of his location is contradicted by her own testimony. She testified she asked him to call her back when he knew his location. Her explanation of why she needed to know her son's exact location when she already knew he had been stopped on the eastside was not convincing. A more likely explanation is that she planned to meet him at that location.

(3) Lewandowski testified that while at District 5 she placed herself on the gun retrieval assignment because she heard on her radio the dispatch of Carr to St. Joseph's Hospital to assist in the shooting investigation. She cut her conversation with Beasley short and proceeded to drive to St. Joseph's Hospital. While on her way, Carr told her that her help was not needed and Lewandowski, apparently, proceeded to District 3. The CAD report, which captured all calls related to the shooting, does not record a dispatch of Carr to St. Joseph's Hospital, nor do the dispatch records of her squad. There was no dispatch for Lewandowski to hear. Moreover, according to Hanley, Carr was never at St. Joseph's Hospital, and, had she gone there, she would have reported her location to the dispatcher.

(4) At District 3 Hanley briefed Carr about the shooting and directed her to attempt to retrieve the gun. When Lewandowski met Carr at District 3, Carr was writing reports when a sergeant - neither could name but whom Lewandowski described as a black sergeant - asked if the gun had been retrieved. Lewandowski and Carr teamed up to retrieve the gun. Lewandowski, however, wanted to go to District 5 first and Carr agreed. There is no reasonable explanation from Lewandowski as to why the gun retrieval assignment was delayed.

- First Carr and Lewandowski claim they did not know the case was not simply a self-inflicted gunshot wound and was more urgent than it appeared to them at the time. Hanley, however, had fully briefed Carr at District 3 and it was incumbent on Carr to fully brief Lewandowski.

- Second, both Carr and Lewandowski testified a sergeant's question at District 3 prompted them to do a second search rather than leave it to the next shift. Lewandowski described the sergeant as a black sergeant. Police records, however, disclose that there was likely no black sergeant at District 3 at that time. (Hanley testimony; Ex. 15; Ex. 16)

11

- Third, Carr and Lewandowski later claimed Carr had attempted to retrieve the gun earlier; that is, she had stopped at the house after she left St. Joseph's Hospital and before she returned to District 3. Because she had made an earlier attempt, the timing of the second event was less urgent. As part of this explanation, in order to create time for the purported first attempt to occur, Carr claims Hanley briefed her earlier at St. Joseph's Hospital, however, she was never dispatched to St. Joseph's Hospital, never reported her location at St. Joseph's Hospital, and Hanley did not see her there and would not have had to brief her at District 3 had he briefed her earlier or at St. Joseph's Hospital.

- Fourth, Carr claims she went to the house, knocked on the door, but no one answered. Carr, however, was told by Hanley to not undertake the assignment alone. He told her to take someone with her. Moreover, the CAD report does not record her either proceeding the that location or reporting her arrival at that location. It strains credibility to believe an experienced police detective would try to conduct a search for a gun recently used in a shooting, alone, in the middle of the night, without reporting his or her location. Asked about this, she explained that she would have reported her location and asked for backup had someone answered the door. Under numerous scenarios, that would have been too late for her own safety.

- Exhibit 15 is the CAD report of all calls related to the shooting victim at St. Joseph's Hospital from 10:37 P.M., January 18, 2015, until 3:50 A.M., January 19, 2015. The CAD report shows Detective Troy Johnson was dispatched to St. Joseph's Hospital at 10:58. The CAD contains no entry indicating Detective Carr, Squad 9288, was either dispatched or reported to St. Joseph's Hospital, or that Carr ever reported to the house she was directed to search. Had Carr called to report she was going to or arrived at St. Joseph's Hospital, it would have been noted on the CAD report. Moreover, if Lewandowski's testimony is true that she heard Carr being dispatched to the hospital, the dispatch of Carr's squad would have appeared on the CAD. It would be an unbelievable oversight if she had been called and it was not recorded on CAD. Had Carr gone to the house to obtain permission to search for the gun and had no one answered her knock at the door, there should be a CAD report of her arriving at the house and she should have filed a supplement in the report system stating she knocked on the door and there was no answer. (Hanley testimony)

- Fifth, neither Lewandowski nor Carr mentioned an earlier search to Hanley when he first interviewed them. Both Lewandowski and Carr first mentioned the earlier search after they became subject to an Internal Affairs investigation. Additionally, when Lewandowski was interviewed by Zieger, the report of the interview made no reference to Lewandowski going to

12

District 5 to help Beasley. Lewandowski testified she thought she told him of the dual purpose. She did not tell him, however, that Carr had made an earlier attempt to recover the gun. She first mentioned that Carr had gone earlier to attempt to recover the gun in her October 11, 2015, memorandum in response to charges. (Lewandowski testimony)

(5) Finally, Hanley's and Smith's testimony was straight forward and professional; whereas, Lewandowski's testimony was at times combative and evasive.

The Chief has satisfied the fifth standard by a preponderance of the evidence.

30. The sixth just cause standard asks, "whether the Chief is applying the rule or order fairly and without discrimination against the subordinate." As discussed above, we find a thorough investigation was conducted with no credible evidence of animus against Lewandowski. The testimony of Assistant Chief Carianne Yerkes, the Discipline Review Summary, and the supporting documents establish the considerations - both aggravating and mitigating - that were presented for the Chief's consideration. We find nothing unfair or improper about any of them. (Ex. 18, 19, 20, 21). We conclude the Chief has satisfied the sixth standard by a preponderance of the evidence.

31. The seventh and final just cause standard asks, "whether the proposed discipline reasonably relates to the seriousness of the alleged violation and to the subordinate's record of service with the department." We noted earlier that the need for police officers to follow the directives of their supervisors, obey the rules governing the use of police vehicles, and most importantly, be truthful in the performance of their duties, in writing official reports, and in answering question during an inquiry, is self-evident. Lewandowski, although she claims she did not violate these rules, did not challenge the importance of these rules to police department operations. We find the testimony of Assistant Chief Yerkes, explaining how police officers' untruthfulness damages the effectiveness of the police department particularly and law enforcement generally, to be credible and convincing. The seriousness of this violation cannot be understated. When questioned about it by her superior officers, Lewandowski was untruthful and evasive. Rather than holding herself accountable for her actions, she attacked the credibility of others. When asked by Commissioner McKenzie if she now realizes that the priority of her assignments is decided by her supervisor and not by her, she did not clearly answer the question until her own counsel asked her again on redirect. We conclude the Chief has satisfied the seventh standard by a preponderance of the evidence. We further conclude that the good of the service requires that Shannon Lewandowski be disciplined in accordance with the Chief's order and discharged from the Milwaukee Police Department for the charges have been sustained.

13

## DECISION

The Appellant, Shannon Lewandowski, is ordered suspended for 5 days without pay for the first charge, 30 days without pay for the second charge and discharged from the Milwaukee Police Department for the third charge in accordance with the Chief's order.

_____  
Commissioner Kathryn A. Hein

11/17/16  
Date

_____  
Commissioner Angela McKenzie

11/17/16  
Date

_____  
Commissioner Ann Wilson

11/17/16  
Date