STATE OF WISCONSIN          CIRCUIT COURT          MILWAUKEE COUNTY

SHANNON Lewandowski

      Petitioner,

v.                                                      Case no. 2016-CV-9243

BOARD of FIRE and POLICE COMMISSIONERS
of the CITY OF MILWAUKEE,

      Respondent.

---

## BRIEF OF RESPONDENT

Respondent, the Board of Fire and Police Commissioners of the City of Milwaukee, hereby responds in opposition to Petitioner's brief. For the following reasons, Respondent requests that the decision of the Fire and Police Commission be affirmed.

### I.     BACKGROUND

#### a.  PROCEDURAL BACKGROUND

On December 16, 2015, Milwaukee Police Chief Edward Flynn found Petitioner, Shannon Lewandowski ("Lewandowski"), guilty of violating three Milwaukee Police Department ("MPD") Core Values: (1) Core Value 1.00, Guiding Principle 1.03, for failing to use time to accomplish the mission of the department; (2) Core Value 1.00, Guiding Principle 1.05, for failure to abide by MPD standard operating procedure 640.15(A)(2) which requires MPD personnel to operate department vehicles in a safe manner; and (3) Core Value 3.00, Guiding Principle 3.10, for failure to be forthright and candid. (R-1.) Lewandowski was correspondingly disciplined with a five day suspension for the first offense, a 30 day suspension for the second offense, and discharged for the third offense. (R-1.)

1

Pursuant to Wis. Stat. § 62.50(13), Lewandowski appealed her discipline to the Board of Fire and Police Commissioners for the City of Milwaukee (hereinafter "Board"). (R-3.) A two-day appeal hearing was conducted pursuant to Wis. Stat. § 62.50(17) on August 10 and August 11, 2016. The Board affirmed the discharge. (R. 71 at 14.) On November 28, 2016, Lewandowski filed an appeal of the Board's written decision. (R. 73.) The Board consequently filed the administrative record with the circuit court on December 5, 2016 as required by Wis. Stat. § 62.50(21), thus initiating the statutory appeal of the Board's decision. On January 13, 2016, Petitioner filed her statutory appeal brief. (Pet. Brief.) The Board now responds in opposition and asks that the Board's decision be affirmed.

**b. EVIDENCE IN THE RECORD**

This matter stems from a motor vehicle accident which occurred at approximately 2:17 a.m. on January 19, 2015, in which the MPD vehicle driven by Lewandowski was struck by another vehicle. It is Lewandowski's conduct leading up to the accident, and subsequent dishonesty about the circumstances surrounding the incident that resulted in her discipline. The factual background relevant this matter is somewhat difficult to set forth in a linear fashion—mostly owing to the fact that Lewandowski initially provided one version of events to explain her actions, then, after the initiation of a disciplinary investigation, provided an irreconcilably different narrative. Respondent will therefore present the evidence in as close to a chronological fashion as possible for simplicity, noting when necessary any discrepancies in Lewandowski's narratives. The evidence in the record is as follows.

1. EVENTS OF JANUARY 19, 2015 AND ENSUING TRAFFIC ACCIDENT INVESTIGATION OF LT. HANLEY

At some time between 12:30 a.m. to 1:00 a.m. on January 19, 2015, MPD Lieutenant Sean Hanley, was investigating a recently reported self-inflicted shooting. (R-74 at 30:23 –

32:2.) After interviewing the victim at the hospital, Lt. Hanley became suspicious about the victim's story and decided to retrieve the firearm involved from the victim's residence as evidence before the victim could return home. (*Id.*) Upon returning to the MPD District 3 building, Lt. Hanley ordered Det. Juanita Carr to immediately proceed to the victim's house to conduct a consent search for the firearm involved. (*Id.* at 32:5-33:23.) The target residence was only a 5 minute drive from District 3. (*Id.* at 33:23.) Lt. Hanley specifically informed Det. Carr that time was of the essence as the victim would soon be released from the hospital, and further directed that Det. Carr take a second officer to ensure officer safety. (*Id.*) Lewandowski, who was also present at District 3, volunteered to go with Det. Carr.

Shortly after these events at District 3, at approximately 2:00 a.m., Shorewood Police Officer Cody Smith pulled over a vehicle driven by Jordan Lewandowski (hereinafter "Jordan"), the then 19-year-old son of Petitioner. (*Id.* at 13-18.) When Officer Smith approached the vehicle, Jordan gave Officer Smith Lewandowski's MPD business card, informed Officer Smith that his mother was an MPD detective, and told Officer Smith that his mother was coming to meet them. (*Id.*) While speaking with Jordan, Officer Smith smelled alcohol emanating from the vehicle. He therefore conducted field sobriety tests and a preliminary breath test which indicated that Jordan had a B.A.C. of 0.09. (*Id.* at 18:3.)

At approximately 2:17 a.m., the MPD vehicle containing Lewandowski and Det. Carr was struck by another vehicle as it crossed through the intersection at 35th Street and North Avenue. Lewandowski was driving at the time of the accident. MPD standard operating procedures (SOP) require an accident investigation to be conducted in the event of an officer involved traffic accident. (*Id.* at 35:13-14.) Pursuant to this SOP, Lt. Hanley responded to the scene at approximately 2:32 a.m. (*Id.* at 34:14 – 35:14.)

When Lt. Hanley arrived on the scene, he briefly spoke to Lewandowski who was receiving medical treatment from paramedics, and also checked on Det. Carr who was already in an ambulance. (*Id.* at 39:15-17.) MPD Sergeants Wade Grubich and Adam Riley—who were some of the first officers on scene—reported to Lt. Hanley. (*Id.* at 36:20-25.) Sgt. Riley told Lt. Hanley that others at the scene had reported to him that Lewandowski was on her way to UWM because her son had been pulled over. (*Id.*) Sgt. Riley also reported that Lewandowski's vehicle appeared to have been struck as it was crossing eastbound through the intersection on a green light, with the vehicle's emergency lights activated. (*Id.*) Sgt. Riley told Lt Hanley he was not aware of any assignment which would have required Lewandowski to use emergency lights. (*Id.*) MPD SOP required Lt. Hanley to complete his accident investigation within 3 days. (*Id.* at 39:23 – 40:2.) Lt. Hanley therefore ordered two detectives to interview witnesses on scene. (*Id.* at 38:20-21.) MPD SOP requires a Lieutenant conducting a traffic accident investigation to interview the officers involved in the accident. (*Id.*)

Lt. Hanley then stopped by the MPD District 5 building to pick up MPD medical forms, and drove to Froedert Hospital to meet with Lewandowski and Carr. (*Id.* at 40:14-22.) At the hospital, Lt. Hanley spent about 20 minutes speaking with Lewandowski about the process to be followed by an officer injured on duty. (*Id.* at 42:16 – 43:16.) Lt. Hanley did not ask about the circumstances surrounding the accident but instead informed Lewandowski that they would talk about the accident later. (*Id.*; 62:2-4.) Lewandowski complained to Lt. Hanley about an injury in her foot, but was walking on it and otherwise seemed in good spirits. (*Id.*) Lewandowski was speaking normally and did not give Lt. Hanley any indication that she may not be lucid or that she was having trouble

4

communicating. (*Id.*)  Lt. Hanley then provided Det. Carr with the same information and subsequently left the hospital around 6:22 a.m.  (*Id.* at 44:4-11.)

At 6:38 a.m., while driving to District 5, Lt. Hanley received an unsolicited call from Lewandowski. (*Id.* at 44:16 – 46:4.)  Lewandowski asked if Lt. Hanley wanted to know about the accident. (*Id.*)  Lt. Hanley responded in the affirmative, and pulled over to take her statement. (*Id.*)  Lewandowski stated that prior to the accident, she was assisting Det. Carr on her assignment when she (Lewandowski) was contacted by another MPD officer, Officer Melanie Beasley, concerning a personal matter. (*Id.* at 50:10 – 51:8.)  The personal matter concerned a restraining order Officer Beasley had apparently secured against another MPD Officer. (*Id.* at 50:10 – 51:8.)  Beasley, who was at District 5, apparently felt unsafe and asked Lewandowski if she would meet her at District 5 for support. (*Id.*)  Lewandowski did not report Officer Beasley's concern to a supervisor.

Lewandowski told Lt. Hanley that rather than proceeding to the consent search assignment, Lewandowski and Det. Carr decided to go to District 5 to meet Beasley. (*Id.*)  Lewandowski further reported that while she was en route to District 5, Lewandowski received a call from her son who told Lewandowski that he had been pulled over by the UWM police. (*Id.*)  Lewandowski stated that she told her son to call back with a specific location and that she then proceeded to the UWM area to find him. (*Id.*)  Lewandowski reported that she was driving approximately 45 miles-per-hour eastbound on West North Avenue approaching 35th Street using her emergency lights to make cars get out of her way. (*Id.*)  Lewandowski's reported basis for having the emergency lights activated was to get to UWM quickly. (*Id.*)  As she entered the intersection at 35th Street on a green light, a vehicle traveling northbound on 35th Street ran the northbound red light and struck her vehicle. (*Id.*)  During this conversation, Lewandowski did not state—as she would later

claim—that her emergency lights were activated to prevent an accident with a vehicle in the parking lane that appeared to be about to pull in front of her. (*Id.* at 51:9-13.) In speaking to Lt. Hanley, Lewandowski appeared lucid and responsive to Lt. Hanley, and had neither any reservation about speaking with him, nor any difficulty communicating. (*Id.* at 52:16-25.) Lt. Hanley ascertained during this conversation that the search assignment he had given Det. Carr had not been carried out. (*Id.* at 52:8-11.)

On January 21, 2015, Lt. Hanley interviewed Det. Carr at her home. (*Id.* at 46:15 – 47:4; R-49 at 6.) Det. Carr stated as follows. Det. Carr stated that Lewandowski had agreed to assist her with the search assignment. (*Id.*) Once they were in the squad, however, Lewandowski requested that they instead go to District 5 to help a friend, and complete the search later. (*Id.*) Det. Carr agreed. Det. Carr stated that Lewandowski activated the MPD vehicles emergency lights while Eastbound on North Avenue. (*Id.*) Det. Carr recalled Lewandowski doing this to scare off prostitutes on the sidewalk, but that Lewandowski may have left the lights on after that. (*Id.*) Det. Carr stated she did not remember specifically because at the time she was focused on Lewandowski's phone, which Lewandowski had given Det. Carr after requesting that Det. Carr look up "Melanie" in the phone's directory. (*Id.*) During this interview, Det. Carr did not mention UWM. (*Id.*) Lt. Hanley did not raise the issue because he did not want to bias Det. Carr's recollection in light of the fact that she had indicated she was having problems with her memory since the accident. (R-74 at 78:5-8.)

Lt. Hanley completed his accident report on January 22, 2015 and forwarded it to acting Captain Johnny Sgrignuoli. Lt. Hanley did not recommend discipline against either Det. Carr or Lewandowski. (*Id.* at 78:12-16.) Capt. Sgrignuoli, however, forwarded the report to Internal Affairs for further investigation.

6

## 2. INTERNAL AFFAIRS INVESTIGATION

Internal Affairs Sergeant Adam Zieger received the assignment to investigate the incident. Sgt. Zieger interviewed Det. Carr and Lewandowski, Officer Smith, and third party witnesses, and also reviewed the police reports and accident report. (*Id.* at 91:15-21.) His investigation revealed as follows.

During a PI-21 interview of Lewandowski conducted on April 14, 2015, Lewandowski stated that she had left the assignment to search for the gun in order to meet with Officer Beasley at District 5. (*Id.* at 112:12-21.) Lewandowski stated she did not believe there was any urgency to retrieve the firearm but was aware that they were supposed to go and conduct the search for the firearm. (*Id.* at 112:22 -25.) Lewandowski did not mention going to UWM to assist her son. Lewandowski did not provide any reason for going to District 5 other than to support Officer Beasley. (*Id.* at 9-11.) Lewandowski further told Sgt. Zieger that she had activated the vehicles emergency lights as she neared 36th Street because she saw a car in front of her, off to the side of the street in a bicycle lane. (*Id.* at 116:5-13.) Lewandowski told Sgt. Ziegler that that she thought the vehicle might pull out into traffic in front of her so she activated the squad lights as a warning. (*Id.*) Lewandowski gave no other reason for activating the emergency lights. Lewandowski admitted she had left the emergency lights on, and that they were activated at the time of the accident. (*Id.* at 120:6-9.) She did not provide any reason for why the lights were still activated as she entered the intersection at 36th Street. (*Id.*)

During this interview, Lewandowski now claimed that Lt. Hanley's statements attributed to her in Lt. Hanley's accident report were untrue. (*Id.* at 120:10-15.) Lewandowski expressly disclaimed that she ever told Lt. Hanley that she was going to UWM to pick up her son. (*Id.* at 92:14-25; R-56 at 19-22.) She admitted to receiving a

7

phone call from her son informing her that he had been pulled over, but stated that she merely told her son to call back when he knew specifically where he was. (*Id.* at 92:14-25; R-56 at 19-22.)

On that same day, April 14, 2015, Sgt. Ziegler also interviewed Det. Carr. (*Id.* at 92:14-25; R-56 at 17-19.) Det. Carr stated that she recalled being on task to retrieve the gun, but could not remember if she had been assigned to do so, or had decided to conduct the search herself. (*Id.*) Regardless, she recalled that Lewandowski had asked her to go to District 5 on what Det. Carr assumed was legitimate law enforcement business. (*Id.*) Det. Carr remembered Lewandowski handing her Lewandowski's phone and asking her to find a number. (*Id.*) Det. Carr also recalled Lewandowski telling Det. Carr to answer the phone if Jordan called. (*Id.*) Det. Carr stated that when they were traveling eastbound between North Sherman Boulevard and North 35th Street, Lewandowski had activated the emergency lights to prompt a car on the road to move over. (*Id.*) Det. Carr recalled that Lewandowski had mentioned something about prostitutes at the time. (*Id.*) Det. Carr could not recall if Lewandowski had deactivated the emergency lights by the time of the accident. (*Id.*)

Sgt Ziegler also interviewed several police officers who had responded to the accident scene. (R-56.) Officer Boehlke stated that at the scene, Lewandowski appeared very distraught, worrisome, and slightly agitated. Officer Kuspa stated that Lewandowski was very incoherent and kept yelling "Go get my son." (*Id.* at 12.) Officer Deb Stacey also recalled Lewandowski telling her to go get her son. (*Id.* at 14.)

Sgt. Ziegler then interviewed Jordan Lewandowski on June 11, 2015. (*Id.* at 92:14-25; R-56 at 8.) Jordan admitted to being stopped on January 19, 2015 at approximately 1:00 a.m. or 1:30 a.m. a few blocks away from UWM's Sandburg Hall. (*Id.*) Jordan admitted

8

to calling his mother and telling her about the stop, but claimed that he simply told his mother he would call her after the stop was over. (*Id.*) Jordan denied telling his mother he was near UWM. (*Id.*) Jordan stated that his mother said "Alright, bye." (*Id.*) In contradiction with his mother's PI-21 interview statements, Jordan denied that his mother asked him to call back with a more specific location. (*Id.*) Jordan stated that the next time his phone rang, Officer Smith picked it up and was informed about Lewandowski's accident. (*Id.*) Jordan was released without charges, and was taken to the hospital to meet his mother by two other police officers. (*Id.*)

### 3. LEWANDOWSKI'S AFFIDAVITS

Lewandowski was served with charges on or about October 7, 2015 and November 20, 2015. Lewandowski submitted three separate written responses to the charges. Lewandowski submitted the first written response on October 11, 2015. (R-57.) In that document, Lewandowski claimed for the first time that her purpose in going to District 5 on January 19, 2015 was not only to provide personal assistance to Officer Beasley, but also to assist Officer Beasley with filing a felony case. (*Id.*)

Lewandowski's second written response, filed on November 12, 2015, can best be described as a vitriolic assault by Lewandowski against virtually every person involved in her investigation. In that document, Lewandowski brazenly claimed that it was not her, but rather Lt. Hanley and Sgt. Riley (the officer who reported to Lt. Hanley at the accident scene) who were guilty of misconduct. (R-58 at 1.) Lewandowski expressly accused Lt. Hanley of lying about the content of the 6:38 a.m. phone call the morning of the accident—claiming it was "false evidence and…just as unethical as perjury." (*Id.* at 1, 4.) Lewandowski unabashedly accused both Lt. Hanley and Sgt. Riley (as well as Capt. Sgrignuoli) of "abuse of process, abuse of authority, [and] lack of courtesy and

9

professionalism," and asserted that their "lies" were "slanderous at a minimum." (*Id.* at 1-2.)  Lewandowski went on to carp that "[i]f [she] were to conduct an investigation as this one was handled, [she] would be reprimanded," and that Internal Affairs was "[c]ircling the drain with biased speculations instead of conducting a proper investigation…" (*Id.* at 2-3.)  In between the sniping of her second written response, Lewandowski claimed that the accident knocked her unconscious, and that her comments to the officers on scene about her son were merely a request to have her son brought to the hospital to meet her, rather than an admission that she was headed to UWM. (*Id.*)  She expressly denied making any statements to any person indicating that she was on her way to UWM to meet her son.

Lewandowski repeated the accusations of untruthfulness against Lt. Hanley and Sgt. in her third written response filed on November 27, 2015.  This time, however, Lewandowski disclaimed that she had ever even mentioned to any person that her son had been stopped by an officer near UWM.  Lewandowski closed by asserting that she had "been honest and straightforward, open and frank about … what occurred." (R-59 at 4.)

### 4.   FPC Hearing and Board's decision

#### A.   August 10 and 11 Hearing before the Board

The Board conducted a two day hearing on August 10 and 11, 2016.  At the hearing, evidence was adduced that it is a violation of MPD SOPs to utilize emergency lights outside of specific situations, or in a non-emergency situations. (*Id.* at 37:11-16.)  Lt. Hanley testified that Lewandowski did not have a legitimate reason for having her emergency lights activated at the time of the accident. (*Id.* at 37:11-16l 51:1-17.)  Lt. Hanley testified that Lewandowski's initial statement regarding the use of emergency lights was that she was going to UWM to meet her son and she wanted cars to move out of her way so she could travel more quickly. (*Id.*)  Even accepting Lewandowski's *second* story about why her

emergency lights were activated—that she was trying to prevent a vehicle in the bike lane from pulling in front of her—Lewandowski's action of leaving the emergency lights activated as she travelled into the intersection (when they take just one second to deactivate) was a violation of policy. (*Id.* at 118:18-19; 119:2-9.) Lt. Hanley also testified that Lewandowski's first statement was that she had travelled through the intersection at 45 miles per hour—15 miles per hour over the posted speed limit. (*Id.* at 51:1-4; 71:14-16.)

Furthermore, the Board heard evidence that when Lewandowski put herself on Det. Carr's assignment, she was obligated to carry it out in a timely fashion. (*Id.* at 74:19 – 77:19; 81:9 – 81:12.) MPD officers are not permitted to switch assignments without securing permission from a supervisor. (*Id.* at 38:10-13; 66:13-18; 74:19 – 77:19.) Similarly, MPD officers are required to request permission to assist a family member while on duty, and, regardless of such permission, MPD officers are prohibited from interfering with investigations from other departments. (*Id.*) Lt. Hanley testified he would not have given Lewandowski permission to go to Shorewood to interfere with a lawful police stop. (*Id.* at 66:13-18; 74:19 – 77:19.) Similarly, Going to District 5 to assist Officer Beasley with a personal matter was not an appropriate use of police time. (*Id.*) Lewandowski did not request permission to divert from her assignment to undertake *either* action. Therefore, regardless of whether Lewandowski was going to UWM to help her son (as she initially stated), or whether she was going to District 5 to meet Officer Beasley for a personal matter as she would later claim, she was inappropriately leaving the assignment without permission in violation of MPD SOP. (*Id.* at 66:13-18; 74:19 – 77:19.)

B.  THE BOARD'S DECISION

After hearing all the evidence, the Board affirmed the Chief's discipline of Lewandowski. (R-71.) It is clear from the Board's written decision that they found

Case 2:16-cv-01089-WED   Filed 01/03/18   Page 11 of 36   Document 38-9

Lewandowski was not credible. (*Id.*) The Board noted that Lewandowski's story had drastically changed over time, and her final narrative was contradicted by both her previous statements and numerous witnesses. (*Id.* at ¶¶ 24 and 28.) Most notable was Lewandowsky's insistence that Lt. Hanley had not just *misunderstood* her initial statements made during their 6:38 a.m. phone call on January 19, 2015, but that Lt. Hanley had *completely fabricated* the phone call and its contents. (*Id.* at ¶ 28.) The Board noted that Lewandowski had not presented the Board with evidence which would show a bias of Lt. Hanley that would explain why he would undertake the serious actions of fabricating evidence and committing perjury. (*Id.*)

Furthermore, the Board found that evidence *other* that Lt. Hanley's testimony provided a more than adequate independent basis for disbelieving Lewandowski's later-developed narrative. Specifically, Shorewood Police Officer Cody Smith—whom the Board found had no reason to be untruthful—testified that Lewandowski's son had informed him that his mother was on the way to meet them at the scene of the traffic stop. Moreover, Lewandowski herself admitted that she asked her son to call her back with an exact location of where he was stopped—a fact the Board found Ms. Lewandowski could not adequately explain. Consequently, the Board determined the only logical explanation for asking such a question would be that Lewandowski was trying to ascertain an exact location of her son so she could meet him there. The Board also noted numerous other examples of Lewandowski's testimony being directly contradicted by other evidence. For example, Lewandowski took the bizarre step of denying that she *ever* spoke to or even saw Lt. Hanley while at Froedert hospital (*See* R-74 at 258:24 – 259:6)—a claim directly contradicted by her own son, Jordan Lewandowski, and also Lt. Kelly, both of whom were at the hospital. Finally, the Board noted that both Lt. Hanley and Officer Smith presented

12

"straight forward and professional [testimony], whereas, Lewandowski's testimony was at times combative and evasive." (*Id.* at ¶ 29.)

### c. Lewandowski's Motions to the Board

Prior to the August 10 and 11 hearing, Lewandowski filed two motions with the Board. Lewandowski's current statutory appeal is essentially a regurgitation of the arguments made in these motions. The first of these motions was filed on April 4, 2015, and was a "Motion for a More Definite Statement." (R-22.) Citing the Federal Rules of Criminal Procedure, Lewandowski urged the board to apply federal pleading standards to the administrative appeal. Claiming that the charges against her were "ambiguous" Lewandowski demanded that the Chief be forced to "provide a more definite statement of the charges setting forth precisely how and when she violated the Code of Conduct." (*Id.*) The Chief responded in opposition on April 21, 2016, and Lewandowski replied on April 29, 2016. (R-33 and 35.) On May 4, 2016, the Board declined to utilize the suggested federal pleading standards, and instead analyzed the charges against Lewandowski under the appropriate administrative rules and due process standards. The Board concluded that the charges and specifications complied with the rules and denied Lewandowski's motion. (R-40.)

On April 22, 2015, Lewandowski filed an additional motion, this time seeking to suppress Lewandowski's statements made to Lt. Hanley during their 6:38 a.m. phone call on January 19, 2015. (R-34.) In that motion, Lewandowski argued that statements she made during the phone call to Lt. Hanley should not have been offered as evidence to the Board because Lt. Haley failed to inform Lewandowski of her rights under Wis. Stat. § 164.02 prior to taking those statements. (*Id.* at 4-5.) § 164.02 governs law enforcement officers who are under "interrogation" for "disciplinary" reasons. Wis. Stat. 164.02(1)(a). Lewandowski again relied heavily on *federal* and *criminal* law in an effort to support her

13

contention that her phone call with Lt. Hanley was really an "interrogation" for disciplinary reasons. (*Id.*) The Chief responded in opposition on April 29, 2016, and Lewandowski replied on May 4, 2016. In a decision issued on May 19, 2016, the Board denied Lewandowski's motion finding that Lt. Hanley was conducting an *accident* investigation, not a *disciplinary* investigation. (R-41 at 3.) The hearing examiner further noted that Lewandowski's proposed broad definition of "interrogation" was inappropriate, and that the cases relied on by Lewandowski to support such an enlarged meaning were inapplicable as they specifically applied only to federal law and criminal cases. (*Id.*)

Lewandowski now appeals pursuant to Wis. Stat. § 62.50(21) for virtually the same reasons stated in the above motions. For the reasons set forth herein, the Board asks this Court to affirm its determination.

## II. STANDARD OF REVIEW

Wis. Stat. § 62.50 establishes the administrative process that must be followed when a member of either the police force or fire department is disciplined with discharge, reduction, or suspension for more than 30 days.[1] Wis. Stat. 62.50. Pursuant to those procedures, in the event a board of fire and police commissioners approves such discipline, the member is permitted to seek judicial review of that decision by filing a statutory appeal under Wis. Stat. § 62.50(20). The scope of that appeal is expressly limited by statute. Specifically, "[i]n determining the question of fact presented, the court shall be limited in the review thereof to the question: 'Under the evidence is there just cause, as described in sub. (17) (b), to sustain the charges against the accused?'" Wis. Stat. § 62.50(21).

"Just cause" as referenced in § 62.50(21), is defined by seven enumerated factors which are set forth in Wis. Stat. 62.50(17)(b). These seven standards are:

---

[1] Wis. Stat. § 62.50 applies only to "[p]olice and fire departments in 1st class cities" and therefore applies to the City of Milwaukee., WI.

14

1. Whether the subordinate could reasonably be expected to have had knowledge of the probable consequences of the alleged conduct.

2. Whether the rule or order that the subordinate allegedly violated is reasonable.

3. Whether the chief, before filing the charge against the subordinate, made a reasonable effort to discover whether the subordinate did in fact violate a rule or order.

4. Whether the effort described under subd. 3. was fair and objective.

5. Whether the chief discovered substantial evidence that the subordinate violated the rule or order as described in the charges filed against the subordinate.

6. Whether the chief is applying the rule or order fairly and without discrimination against the subordinate.

7. Whether the proposed discipline reasonably relates to the seriousness of the alleged violation and to the subordinate's record of service with the chief's department.

Wis. Stat. § 62.50(17)(b).

The statutory language thus makes clear that an appeal under § 62.50(21) is rather narrow in scope. It is limited to the question of whether the evidence before the board was sufficient to support the board's conclusion that the seven just cause standards were satisfied. *Gentilli v. Bd. of Police & Fire Comm'rs of City of Madison*, 2004 WI 60, ¶ 34, 272 Wis. 2d 1, 17, 680 N.W.2d 335, 34[2] (describing the appeal as a "sufficiency of the evidence" analysis). *See* also *Slawinski v. Milwaukee City Fire & Police Comm'n*, 212 Wis. 2d 777, 802, 569 N.W.2d 740, 749 (Ct. App. 1997)*; Clancy v. Bd. of Fire & Police Com'rs of Milwaukee*, 150 Wis. 630, 635-36, 138 N.W. 109 (1912). As the Wisconsin Court of Appeals

---

[2] Although *Gentilli v. Bd. of Police & Fire Comm'rs of City of Madison* dealt with Wis. Stat. § 62.13—which is the sister statute to § 62.50 dealing with non-1st class cities—jurisprudence related to § 62.13 is generally applicable to § 62.50 in the judicial review context as the statutes contain virtually identical language and are "similar in form and function." *See e.g. Milwaukee Police Ass'n v. Flynn*, 2011 WI App 112, ¶ 20, 335 Wis. 2d 495, 509, 801 N.W.2d 466, 473–74.

15

has phrased it, a § 62.50(21) appeal merely requires a Circuit Court "to ensure that the Board's decision is supported by the evidence that the Board found credible." *Younglove v. City of Oak Creek Fire & Police Comm.*, 218 Wis. 2d 133, 141, 579 N.W.2d 294 (Ct. App. 1998).

Circuit Court review under § 62.50 is not only limited, but also deferential. Both Wisconsin Courts and the Supreme Court of the United States have recognized that the hearing before the Board is the "main event," not a "tryout on the road." *Id.* (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) (internal quotation marks omitted). As such, Circuit Courts must give "deference to the Board's findings." *Younglove*, 218 Wis. 2d at 141. Similarly, the Circuit Court must likewise defer to the Board's witness credibility determinations as the Board had a "superior opportunity…to observe the demeanor of witnesses and to gauge the persuasiveness of their testimony." *Id.* at 140 (quoting *Kleinstick v. Daleiden,* 71 Wis.2d 432, 442, 238 N.W.2d 714, 720 (1976)).

The level of deference afforded the Board's determinations was established long ago in *Clancy v. Bd. of Fire & Police Com'rs of Milwaukee*, 150 Wis. 630, 138 N.W. 109 (1912).

> . . . [I]t is plain that the legislative purpose was to require the board not only to decide whether the charges are sustained, but to make a decision which is reasonable under the evidence taken. The object evidently was to require that the decision should not be whimsical, capricious, or merely partisan, but a decision founded on some rational view of the evidence.
>
> It is equally plain, we think, that the legislative idea further was that as a further safeguard against purely partisan decisions or predetermined decisions founded on no substantial grounds, the circuit court should have power to summarily review the trial and decision, not for the purpose of deciding whether the officer was in fact guilty of the charges made, or whether the court would decide the same way upon the evidence, but simply whether the board had performed its statutory duty and made a reasonable decision upon the evidence, i.e. had acted not necessarily wisely but as reasonable men upon the evidence placed before them.

*Clancy, supra* at 635-36.

16

Thus, Wis. Stat. § 62.50(21) does not provide for a *de novo* review of the Board's decision. Instead, it authorizes only a limited judicial review directed to the reasonableness of the Board's decision. *See Id.*; *Younglove*, 218 Wis. 2d at 141. As such, so long as the board's decision was reasonably grounded upon the evidence before it, the board's decision must be upheld. *Id*.

## III. ARGUMENT

Petitioner's brief essentially sets forth two main arguments. Lewandowski does superficially assert a third argument, however, for reasons which will become clear below, the third argument is merely a repackaging of the previous two and is wholly subsumed by their analysis. As stated above, both of Lewandowski's arguments on appeal are essentially regurgitations of the complaints asserted in Lewandowski's Motion to Suppress (R-34) and Motion for a More Definite Statement (R-22). As to the former, Lewandowski again asserts that the Board should not have considered Lewandowski's statements to Lt. Haley during their 6:38 a.m. phone call on January 19, 2015 because the conversation was an "interrogation" subject to the restrictions of Wis. Stat. § 164.02. Lewandowski's second grievance is her assertion that the charges and specifications levied against her were so "ambiguous" as to "taint[] the entire proceeding." (Pet. Brief at 17.) Lewandowski thus urges this Court to reverse the Board's decision. For the following reasons, Lewandowski's arguments are unavailing and the decision of the Board should be affirmed.

### a. LEWANDOWSKI HAS NOT PRESENTED ANY COGNIZABLE ARGUMENT UNDER WIS. STAT. § 62.50

Having just articulated the issues Petitioner raises in this appeal, Respondent believes it is perhaps even more useful to articulate those arguments that Petitioner did *not* raise. With one limited exception which will be addressed below, Lewandowski has not challenged the evidentiary sufficiency of the Board's findings. Rather, Lewandowski

17

presents the argument that certain evidence should not have been presented to the board for *legal* reasons. In other words, Lewandowski tacitly concedes that the factual record is sufficient for the Board to have reasonably concluded that the just cause standards were satisfied. Lewandowski instead rests this appeal on a *legal* argument for why the evidentiary record should have been pared down.

As such, Lewandowski's arguments are improper and are not cognizable under the purely factual review permitted by Wis. Stat. § 62.50. In other words, § 62.50 provides only for consideration of "question[s] of *fact*," and on its face does not authorize review of claimed *legal* errors. Wis. Stat. § 62.50(21)l *See* also *Gentilli* 680 N.W.2d at 343. While Respondent will address Lewandowski's legal arguments for the sake of thoroughness, because Lewandowski's entire appeal is premised on legal errors—rather than evidentiary shortcomings—Petitioner's appeal should be denied outright as she asks this Court to grant relief based on issues that exceed the scope of this review.

### b. LEWANDOWSKI'S UNDERDEVELOPED CLAIM THAT THE EVIDENCE DOES NOT SUPPORT THE BOARD'S CONCLUSION IS UNFOUNDED

As noted above, there is one exception to Plaintiff's wholesale dedication of this appeal to legal arguments. This exception—which is the only appropriate argument Lewandowski asserts in this appeal—ironically appears to have been made inadvertently. In the section of her brief labelled "Argument," Lewandowski spends the first three pages introducing her three main arguments, which each subsequently appear in their own sections identified by a roman numerical heading (I, II, and III). In those uncaptioned first three pages of introduction, however, Lewandowski appears to set forth an independent sufficiency of the evidence argument. (Pet. Brief at 8-11.) While the context of that section renders it doubtful that this was Lewandowski's intent, Respondent will nonetheless address the apparent argument for the sake of thoroughness.

18

The crux these arguments is that the Board's determination that Lewandowski was either travelling to UWM or to District 5 to assist Officer Beasley with a personal matter was based on an unreasonable interpretation of the evidence. Lewandowski presents two distinct arguments in this respect. First Lewandowski asserts that her statements immediately after the accident which seemed to indicate that she was heading to UWM to meet her son should not have been considered by the board. According to Lewandowski, these statements were the result of "hysteri[a]" brought on by the "horrific traffic accident" and therefore that officers on the scene "misunderstood what she was saying." (Pet. Brief at 9.) Unfortunately for Lewandowski, any request for relief premised on this complaint collapses because the Board did *not* consider those statements for precisely the reason Lewandowski elucidates in her brief. In its written findings, the Board stated: "The reported statements of the TAC officers at the scene of the accident are ambiguous, reported via hearsay, and purport to be reports of what Lewandowski said immediately after she sustained injuries in the accident…Accordingly…the commission does not rely on those statements in reaching its conclusions." (R-71 at ¶ 25.) No further discussion is therefore required as to this issue.

Next, Lewandowski asserts that the Board's conclusion that she was going to UWM is unreasonable because the testimony of Lewandowski, Det. Carr, and Officer Beasley was that Lewandowski was actually going to District 5. This argument rests entirely on Lewandowski's incorrect assertion that the Chief "presented no evidence contradicting" the statements of Lewandowski, Carr, or Beasley. (Pet. Brief at 10.) The record is in fact replete with such evidence. As has been set forth in detail above, just hours after the accident, Lewandowski *herself* admitted to Lt. Hanley that she had been going to UWM at the time of the accident. It was only after Lewandowski was under disciplinary investigation that she changed her story to claim that she was going to District 5 (and in

19

the process accused Lt. Hanley of a wholesale fabrication of the conversation). Doubling down on her narrative reversal, Lewandowski likewise refused to even admit she had spoken to Lt. Hanley at the hospital—a claim contradicted by two other witnesses including her own son. Given Lewandowski's "combative and evasive" testimony, it is no surprise that the Board expressly determined that Lewandowski was not credible. (R-71 at ¶ 29.)

Moreover, the Board did not rely solely on Lewandowski's admissions to Lt. Hanley during their 6:38 a.m. phone call to support their conclusions. The most persuasive—and indeed conclusive evidence—was the testimony of Shorewood Police Officer Cody Smith. Officer Smith testified that Lewandowski's son unequivocally informed him that Lewandowski was coming to meet them at the scene of the traffic stop. The Board concluded that Officer Smith had no reason to lie and that his testimony was "straight forward…professional" and "credible." (R-71 at ¶ 29.) The Board further noted that Officer Smith's testimony was corroborated by Lewandowski's own testimony that she had asked her son to call her back with a more specific location. Lewandowski could not explain why, if she was not going to meet her son, she would have requested to know his exact location— leading the Board to reasonably conclude that she had intended to meet her son and was now providing untruthful testimony. (*Id.*)

As to the testimony of Carr, the Board noted that like Lewandowski, Carr's testimony had changed (albeit to a lesser degree than Lewandowski's) from the time Lt. Hanley initially interviewed her during the accident investigation, to the time Carr gave her PI-21 interview to internal affairs. The Board noted that Carr's testimony was contradicted by documentary evidence (the CAD) and that her narrative "strained credibility." (R-71 ¶ 29.) To top it all off, Det. Carr herself admitted that her memory had suffered from injuries sustained in the accident. (R-71 at ¶ 10.) Lewandowski similarly alleges that the Board inappropriately ignored Office Beasley's testimony indicating that

20

Beasley had wanted to meet Lewandowski at District 5 to discuss "a lot of things" including a report. (Pet. Brief at 10.) Contrary to Lewandowski's claim, the Board did consider the statement (*See* R-71 at ¶ 17), but instead of blindly accepting it, the Board compared it to Lewandowski's own admission to Lt. Hanley that her purpose in going to District 5 was to assist Officer Beasley with a personal matter. (*Id.* at ¶ 27.) The Board also considered the related inconsistency in Lewandowski's statements made during her Internal Affairs interview with Sgt. Ziegler. Most notably, Lewandowski did not mention anything about needing to meet with Officer Beasley about a report during that interview despite having every opportunity to do so. It was only later that Lewandowski began claiming there was to be some discussion about a report. Finally, the Board took the testimony of Lt. Hanley that Lewandowski's stated reason for going to District 5 was not a legitimate law enforcement objective. In consideration of the foregoing, Lewandowski's assessment that the Chief "presented no evidence contradicting" the statements of Lewandowski, Carr, or Beasley is a fallacy. (Pet. Brief at 10.) The Board's decision in this respect was clearly "supported by the evidence that the Board found credible" and as such, must be affirmed. *Younglove*, 579 N.W.2d 294.

### c. LEWANDOWSKI'S ARGUMENT THAT THE BOARD'S DECISION SHOULD BE REVERSED BECAUSE IT FAILED TO EXCLUDE LEWANDOWSKI'S PRIOR STATEMENTS IS NOT SUPPORTED BY LAW OR FACT

#### 1. THE 6:38 A.M. PHONE CALL WITH LT. HANLEY WAS NOT AN "INTERROGATION" WHICH WOULD TRIGGER WIS. STAT. §164.03

As stated above, the first of Lewandowski's two main arguments is that the statements made by Lewandowski during her 6:38 a.m. phone call with Lt. Hanley should have been excluded. Lewandowski argues (as she did in her previous Motion to Suppress) that these statements were taken in violation of Lewandowski's rights under Wis. Stat. § 164.02 and therefore, should not have been used against her. In her brief, Petitioner

correctly states the provisions of Wis. Stat. § 164.02, which provide that "[i]f a law enforcement officer is under investigation and is subjected to interrogation for any reason which could lead to disciplinary action" the law enforcement officer must be apprised of the nature of the investigation and upon request by the officer, may have a representative present during the interrogation. If these procedures are not followed, evidence obtained during such interrogation is inadmissible in a subsequent disciplinary hearing. Wis. Stat. § 164.02.

Petitioner also correctly points out that where a member under investigation is to be interrogated, MPD policy requires that the member be provided with a form PI-21 which, inter alia, states the allegations of wrongdoing against the member. MPD SOP, General Order 2009-33 at 6-7. Lewandowski argues that her 6:38 a.m. phone call with Lt. Hanley was an "interrogation" as defined by the statute, and, consequently, because she was not given a PI-21 form her statements should have been suppressed at the hearing. Petitioner's arguments thus center around the meaning of "interrogation" as it is used in Wis. Stat § 164.02. Petitioner makes several arguments urging this Court to accept an expansive understanding of the term. Respondent notes that Petitioner has not identified any specific just cause standard that is supposedly called into question by this issue. Instead, Petitioner asserts the vague and unsupported conclusion that the "actions of the Chief's designees in investigating this matter…violated the just cause standards." Petitioner's failure to articulate what standard was supposedly violated frustratingly deprives Respondent and this Court of the opportunity to frame its response within the appropriate context. Nonetheless, for the reasons set forth below, Lewandowski's argument is ineffective.

First, Lewandowski attempts to broadly define "interrogation" by arguing that Wis. Stat. § 164.02 is a state codification of the federal labor standards considered in the case of

*N.L.R.B. v. J. Weingarten, Inc.*, 420 U.S. 251, 251 (1975). This argument requires very little discussion. As the Board correctly pointed out in its written decision denying Lewandowski's Motion to Suppress, neither *Weingarten* nor the National Labor Relations Act ("NLRA") upon which the *Weingarten* decision was based are applicable to this case as the NLRA does not apply to the states or their political subdivisions. 29 U.S.C. § 152(3). Furthermore, Lewandowski does not cite—nor does there exist—any authority to support the proposition that § 164.02 was designed as a wholesale adoption of the *Weingarten* standards. In fact, the language used in § 164.02 itself directly belies Petitioner's assertion. Most notably, while the *Weingarten* standard applies to any "investigatory interview," Wisconsin's statute applies only to "interrogations." As such, Lewandowski has provided no support for (and language of § 164.02 itself directly contradicts) Petitioner's assertion that § 164.02 should be interpreted broadly based on *Weingarten*.

Lewandowski next cites two Wisconsin state cases in support of her argument. Petitioner first cites *Slawinski v. Milwaukee City Fire and Police Com'n* but only the proposition that statements obtained in violation of § 164.02 should be suppressed at a later disciplinary hearing. (Pet. Brief at 11); 212 Wis. 2d 777, 784, 569 N.W.2d 740, 742 (Ct. App. 1997). Petitioner does not appear to cite *Slawinski* in support of a broad reading of "interrogation"—nor should she considering *Slawinski* does not discuss the meaning of "interrogation" or attempt to define its boundaries. Furthermore, *Slawinski* itself contained an easily distinguishable factual scenario from the instant case which involved a police chief "order[ing]" an employee to his office to "confront[]" him with information the chief had received indicating that the member had made comments threatening physical violence against department members. *Id.* at 786. Therefore, *Slawinski* is unavailing to Petitioner's argument.

The second case cited by Lewandowski is *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). In that case the Supreme Court considered the meaning of term "interrogation" as it related to criminal *Miranda* warnings. *Id.* As petitioner correctly pointed out, the *Innis* Court defined "interrogation" within that context as "express questioning or its functional equivalent." (Pet. Brief (citing *Innis*, 446 U.S. at 300-01).) Lewandowski again, however, does not provide any authority which would support the proposition that the heightened criminal law *Miranda* standard for "interrogation" should be applied in an employment law context. Instead, Petitioner seeks to quickly proceed without discussion to the conclusion that Lt. Hanley's conversation was an "interrogation." Lewandowski's actions in this respect are telling. As the Board correctly pointed out in its written decision denying Lewandowski's motion, the *Innis* decision specifically defines "interrogation" within the context of an arrest, and the word's meaning is colored by the understanding that the questioning involved is specifically designed to elicit an incriminating response. (R-41 at 4.) As the Board also pointed out, applying the heightened *Miranda* meaning of "interrogation"—which was specifically crafted to preserve an enumerated right protected by the Constitution—would "practically destroy the ability of supervisors to do their duties." (*Id.* at 5.) As the Chief argued and the Board held, adopting the omnibus definition urged by Petitioner would mean that virtually "[a]ny discussion between a police supervisor and a police officer [would] raise[] the possibility that a rule violation might be uncovered." *Id.* Lewandowski has presented no authority that this was the intended meaning of "interrogation" in § 164.02. (*Id.*)

Having determined that the cases offered by Lewandowski are not helpful on the issue, it is necessary to turn to some authority that is. Although there does not appear to be any case which expressly defines "interrogation" as used in § 164.02, perhaps the most

24

instructive is *Oddsen v. Bd. of Fire & Police Comm'rs for City of Milwaukee*, 108 Wis. 2d 143, 149, 321 N.W.2d 161, 165 (1982). There, the Supreme Court of Wisconsin considered whether prior statements made by two officers were appropriately used against them at a later disciplinary hearing, or whether the statements should have been excluded. *Id.* In *Oddsen*, two officers suspected of adultery were repeatedly subjected to questioning at police headquarters, were told they could not leave until they told the truth, and were denied permission to leave even when one began vomiting blood. *Id.* The underlying incident occurred before the implementation of § 164.02 but the decision was rendered after the statute was put in place. The *Oddsen* Court specifically addressed § 164.02 and, after first recognizing that it was not technically applicable as it postdated the incident under review, the Court stated that the statute nonetheless "reflect[ed] the rationale [the Court] use[d] [t]here." *Id.* The Court ultimately concluded that the questioning of the officers was a "coerced interrogation." *Id.* Most important to the instant case, was the *Oddsen* court's rejection of the proposition that the "interrogation" was merely an investigation. The essential distinction drawn by the Court was that the questioning of the officers was not "*investigatory*" but was rather "*accusatory*." *Id.* at 155 (emphasis added). The Court explained that it "was apparent" that the questioning of the officers was focused on the officers as "likely suspects of an adulterous relationship." *Id.* The "purpose was not merely investigatory but was to sew up and confirm their preconceptions of guilt for punitive purposes." *Id.* The Court correspondingly refused to permit the officer's statement to be used against them at a later disciplinary hearing.

*Oddsen*, more than any case cited by Lewandowski, explains when an investigatory inquiry becomes an "interrogation." The transformation occurs when a supervisor is undertakes questioning that is "accusatory" in nature and whose purpose is to "sew up and

confirm … preconceptions of guilt for punitive purposes." *Id.* Given that the Wisconsin Supreme Court expressly noted that § 164.02 "reflect[ed] the rationale [it] use[d] [t]here," the term "interrogation" as used in § 164.20 should be interpreted in accordance with the distinctions drawn in *Oddsen.*

Now equipped with an instructive roadmap of what an "interrogation" is under § 164.02, it is clear Lewandowski's assertion that she was "interrogated" by Lt. Hanley during their phone call is unfounded. Lewandowski presents essentially two relevant arguments. First, Lewandowski asserts that an annotation in Lt. Hanley's incident report "confirm[s] his intent to conduct an investigation of whether Lewandowski had violated any department rules." (Pet. Brief at 14.) That annotation assert that Lt. Hanley called two detectives to the scene "because of the possibility of serious injuries to the detectives involved in the accident *and the need for detailed interviews due to the possibility of violations of Rules and Regulations and SOP.*" (Pet. Brief at 14 (citing R-50 at Bates #184.) Second, Lewandowski argues that "the very fact of the accident could raise questions as to whether Lewandowski was properly operating the squad car." (Pet. Brief at 13.)

Taking the latter argument first, it is clear that Lewandowski is urging this Court to adopt a meaning of "interrogation" that would—as the Board put it— "practically destroy the ability of supervisors to do their duties." (R-41 at 4-5.) Under this interpretation, Petitioner urges us to *imply* suspicion of wrongdoing into virtually every conversation between an employer and employee. In an example raised by the Chief during briefing, if we were to accept Lewandowski's interpretation, a supervisor's questioning of why a report was late would be considered an "interrogation" and would require a formal PI-21 interview because any response "*could* raise questions" as to whether a rule or SOP was violated. (Pet. Brief at 13 (emphasis added).) This virtually limitless reading of "interrogation" is as impractical as it is unsupported by any authority. Rather, *Oddsen* instructs us that an

26

"interrogation" is not implicated until the questioning is inherently "accusatory" in nature, and is designed to "confirm preconceptions of guilt for punitive purposes." *Oddsen*, 321 N.W.2d at 165.

Returning to Lewandowski's former argument, it is clear that despite the language in Lt. Hanley's report, Lt. Hanley was conducting an *accident* investigation, not a *disciplinary* investigation. One need look no further for evidence of this than the fact that Lt. Hanley testified as such. (R-74 at 35:8-9.) Lt. Hanley's testimony established that he was required, pursuant to SOP, to immediately initiate an accident investigation for any traffic accident involving an on-duty MPD officer. (*Id.* at 35:11-14; 39:23 – 40:2.) He further testified that his order for two detectives to investigate was purely in compliance with that SOP. (*Id.*) Moreover, Lt. Hanley confirmed that he did not have the authority to even initiate a disciplinary investigation, and most conclusively, he did not recommend Lewandowski for discipline in his accident investigation. (*Id.* at 78:12-16.) Totally absent from these facts is any indication that Lt. Hanley's motive was "accusatory" rather than "investigatory." In no event can it be said that he was trying to "confirm … preconceptions of guilt for punitive purposes." As such, Lewandowski's attempt to recharacterize a conversation undertaken pursuant to an accident investigation as a disciplinary interrogation is unsuccessful.

Finally, Respondent notes that in addition to the utter lack of evidence indicating that Lt. Hanley's motive in speaking to Lewandowski was in furtherance of an accusatory investigation, the circumstances surrounding the 6:38 a.m. phone call further deflate Petitioner's argument of any substance. It is important to recognize that the phone call itself occurred because Lt. Hanley purposefully decided *not to* ask any questions of Lewandowski at the hospital. It was Lewandowski *herself* that initiated the phone call

27

with Lt. Hanley—not the other way around. Officer Hanley testified that Lewandowski provided her narrative with very little prompting from him, and that she was not hesitant or apprehensive in speaking to him. Moreover, Lt. Hanley never focused the conversation on any potential misconduct, but merely recorded her story relevant to the accident in order to complete his accident investigation report. As the Board put it, Lt. Hanley was "conducting an accident investigation and was not asking questions to elicit an admission of a rule violation." (R-41 at 5.) Therefore, considering the plain language of § 164.02 and the holding of the Wisconsin Supreme Court in *Oddsen*, it cannot be said that Lewandowski self-initiated phone call with Lt. Hanley, in which the conversation was never directed at any supposed wrongdoing of Lewandowski, was an inappropriate "interrogation" taken in violation of Petitioners § 164.02 rights. As such, Petitioner's argument should be rejected and the Board's decision affirmed.

### 2. EVEN ASSUMING LEWANDOWSKI'S PRIOR STATEMENTS WERE SUPPRESSED, THE EVIDENCE BEFORE THE BOARD WAS SUFFICIENT TO SUPPORT A FINDING OF JUST CAUSE

Lewandowski essentially argues that if Lewandowski's phone call statements had been suppressed, the Chief would not have been able to sustain the charges. She argues that the Chief's case was "rooted" in the evidence obtained during that phone call and that the case "relied almost entirely" on those statements. (Pet. Brief at 13-15.) Once again, Lewandowski's arguments are based on an intentionally selective assessment of the evidentiary record. A review of the Board's decision indicates that it went through great lengths to identify evidence *outside* of the phone conversation to substantiate the charges.

As for the first charge for her inappropriate use of time, the Board relied on the testimony of Officer Cody Smith, whom the Board found credible, to establish that Lewandowski was on her way to meet her detained son. In the same vein, Lewandowski's own admission in her later PI-21 interview that she had asked her son to call her with an

28

exact location was a glaring confirmation that she was attempting to get the traffic stop. Moreover, even if Lewandowski's story that she was going to District 5 to meet Beasley was accepted, she would still be guilty of the violation as Lt. Hanley testified that her stated purpose was not a legitimate law enforcement objective. Finally, Lt. Hanley stated that in either case Lewandowski would have inappropriately removed herself from an assignment by failing to proceed to the consent search residence.

Turning to the second charge for failing to operate a vehicle appropriately, Lewandowski attempts to frame the only evidence supporting this charge as being Lewandowski's statement during the phone call that she was going 15 m.p.h. over the speed limit. Lewandowski thus seeks to distract from the fact that the Board also heard evidence from multiple sources—including Lewandowski—that she had left the vehicle's emergency lights activated as she entered the intersection. As both Lt. Hanley and Sgt. Ziegler testified, leaving the emergency lights on in this fashion is a violation of the rules and not a permitted use of MPD vehicles, and therefore sustains the charge.

Finally, Petitioner asserts the nearly laughable argument that were it not for the admission of the phone conversation into evidence, Lewandowski "would not have been in a position where she felt compelled to assert that other department members misrepresented the facts and the third charge involving the integrity issue would never have arisen." (Pet. Brief at 15.) In other words, Lewandowski asserts that by not excluding her own statements, she was left with no recourse but to lie, and to retract her previous statements by untruthfully accusing virtually everyone else of lying. As interesting as it would be to dissect this unsympathetic gripe, doing so is not necessary. As stated above, the Board took significant effort to note the numerous disparities between the evidence and the various irreconcilable statements given by Lewandowski. This included evidence which directly contradicted even the statements Lewandowski made in her PI-21 interview. Officer

29

Smith's straightforward and credible testimony alone destroys Lewandowski assertion that she was not going to UWM. Furthermore, Lewandowski would not even admit that she ever spoke to or even saw Lt. Hanley while at Froedert hospital. (*See* R-74 at 258:24 – 259:6). As such, it is clear that based on the evidence before the Board which the Board found credible, it was reasonable to conclude that the just cause standards were satisfied. *See Gentilli*, 680 N.W.2d at 334.

### d. LEWANDOWSKI WAS NOT ENTITLED TO A MORE DEFINITE STATEMENT

Petitioner's second main argument is that the charges levied against Lewandowski were ambiguous and "failed to specify which act or acts are alleged to have violated the MPD's Code of Conduct." (Pet. Brief at 16.) Lewandowski argues that denying her Motion for a More Definite Statement "taint[ed] the entire proceeding." (*Id.* at 17.) This argument presents the rare occurrence in Lewandowski's brief where Petitioner actually links her argument to one of the seven just cause standards as required by Wis. Stat. § 62.50(21). In that respect, Petitioner asserts that the Board's failure to grant the motion, "violated the just cause requirement that the Chief or his designees make a reasonable effort to discovery whether Lewandowski did, in fact, violate a rule or order and that the investigative process was fair and objective." (*Id.* at 16.) In an effort to explain this assertion, Lewandowski asks "[h]ow can the Board have concluded [as such]…when the Chief could not be bothered to articulate the specific conduct that allegedly violated the department rules prior to the hearing?" (*Id.*) Lewandowski then goes on to complain that the Chief's charges and specifications were inadequately "vague." (*Id.*)

It is obvious that Lewandowski's argument in this respect is a purely *legal* claim that Petitioner now seeks to shoehorn into this *evidence*–based statutory appeal by ineffectively attempting to tie it to an unrelated just cause standard. Lewandowski points

Case 2:16-cv-01089-WED   Filed 01/03/18   Page 30 of 36   Document 38-9

to no authority which demonstrates that her assertion of vagueness is a violation of *any* just cause standard—let alone the one claimed. Indeed, Lewandowski seemingly wishes to gloss over the fact that the initial basis upon which she raised this issue was her misplaced insistence that the Board comply with *federal criminal* pleading standards. (*See* R-22 at 3 (urging the Board to comply with Federal Rule of Criminal Procedure 7(f) which directs that a bill of particulars can be requested in federal criminal cases).) Similarly, Lewandowski fails to address the relevant caselaw cited by the Board in its written decision denying Lewandowski's Motion for a More Definite Statement. Because the Board's prior decision adeptly summarized the appropriate standard, Respondent will quote from it here at length.

> When a fire and police commission conducts an administrative proceeding for the dismissal of a police officer, due process requires "(1) the right to seasonably know the charges or claims preferred…" *State ex rel. Richey v. Neenah Police and Fire Commission,* 48 Wis. 2d 575, 580, 180 N.W. 2d 743, 746 (1970). To meet these requirements, a municipality conducting an employee discharge hearing must provide notice that is ". . . reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *DeLuca v. Common Council of City of Franklin,* 72 Wis. 2d 672, 680, 242 N.W. 2d 689, 694 (1976). The charges "need not be technically drawn nor meet the requirements of a criminal indictment." *State ex rel. Richey,* supra, 48 Wis. 2d at 582, 180 N.W. 2d at 746. Moreover, as long as a party is aware of the allegations sufficiently to defend against them, the employer is not required to recite the provisions of the allegedly violated regulations. *State ex rel. Messner v. Milwaukee County Civil Service Commission,* 56 Wis. 2d 438, 445, 202 N.W. 2d 13, 18 (1972).

(R-40 at 1-2.)

Lewandowski's refusal to address these correct standards is again telling. As the Board noted, its "rule governing complaints comports with the due process standard held to be applicable in *DeLuca* and *Richey*." (R-40 at 2.) "Commission Rule XVI, sec. 4, requires the department to file with the Commission a 'complaint … outlining the specific conduct which serves as the basis of each rule violation alleged.'" (*Id.*)

Applying these standards it is evident that the October 7 and November 20, 2015 charges easily surpass the required threshold. As to the first charge alleging improper use of a vehicle, the specification states that

> *Detective LEWANDOWSKI was operating a department vehicle eastbound on West North Avenue with the emergency lights activated* [d]uring a PI-21 interview, Detective LEWANDOWSKI stated she had previously activated the emergency lights and siren to prevent a vehicle from pulling out and striking her vehicle. *Detective LEWANDOWSKI stated she…left the emergency lights on. Detective LEWANDOWSKI indicated there was no other reason for the emergency lights to be activated…*Detective Shannon LEWANDOWSKI failed to operate the vehicle in a safe and courteous manner while complying with all traffic laws.

(R-54 (emphasis added.) Petitioner asserts that this specification does not "cite a single law violated by Lewandowski and does not state how her conduct in operating the squad was unsafe, discourteous, or illegal." (Pet. Brief at 18.) The fallacy of this argument is based on Petitioner's refusal to acknowledge the controlling caselaw which holds that the MPD "is not required to recite the provisions of the allegedly violated regulations." *Messner*, 202 N.W. 2d at 18.

Next, Petitioner seeks to attack the charge alleging that that Lewandowski failed to properly use her time. The relevant excerpts of this specification are:

> *Detective LEWANDOWSKI volunteered to assist the other detective*, both of whom were in the same vehicle for that assignment. Instead of responding to the location to attempt the firearm recovery, Detective LEWANDOWSKI was responding to a location for reasons not related to aid in the recovery of the firearm. *Detective LEWANDOWSKI admitted she was not responding to recover the firearm at the time of the accident, but going to District Five to help an officer with a personal issue.*

Lewandowski's primary complaint with the language in this specification is that it describes Lewandowski as going to assist Officer Beasley with a "personal issue." (Pet. Brief at 19.) Lewandowski apparently takes umbrage with the charge's characterization of Officer Beasley's situation as a "personal issue." (Pet. Brief at 19-20.) Lewandowski cites no authority as to how this somehow reduces the sufficiency of the charge. Moreover, it is

32

clear that the specification alleges that Lewandowski "was responding to a location for reasons not related to aid in the recovery of the firearm," thereby providing her with adequate notice of the basis for the charge. *See Richey*, 180 N.W.2d 743.

Finally, Lewandowski asserts that the third charge is "unclear as to how she failed to be forthright and candid." (Pet. Brief at 20.)  That charge and specification sets forth facts demonstrating that Officer Smith and (initially) Lewandowski confirmed that Lewandowski was going to UWM to assist her son at the time of the accident and had her emergency lights activated for that purpose. (R-54.)  The specification goes on to allege facts that Lewandowski, in a later PI-21 interview denied that she was going to UWM or that her emergency lights were activated for that purpose. (*Id.*)  There cannot be a strait faced argument that this is not sufficient language to have made Lewandowski "aware of the allegations sufficiently to defend against them." *Messner*, 202 N.W. 2d at 18.

Although the language of Lewandowski's charges and specifications alone is sufficient to demonstrate their adequacy, comparing them to other charges Wisconsin courts have previously upheld easily demonstrates the hollowness of Petitioner's argument. Most notably, the case of *State ex rel. Richey*, which is frequently cited by courts examining this issue found that a "general allegation charging a policeman with 'conduct unbecoming an officer' gave sufficient notice." 180 N.W.2d 743; *See* also *Messner*, 202 N.W.2d at 18.  In light of this patently low bar, it is no surprise then that courts uphold charges where, as here, "[t]he defect arguably present in *Richey*, … that there was not a particularization of the acts charged, is wholly absent." *Id.*  Thus, where an employee is notified of the "factual allegations she would have to disprove in order to set aside the proposed order of discharge" the charges are clearly adequate. *Id.*  Furthermore, courts decline to accept such arguments where—again, as here—"[n]o attempt has been made to demonstrate that [the Petitioner's]

33

ability to defend herself was in any way impaired." *Id.* Lewandowski may superficially claim so here, but the record evidences that Lewandowski was able to present a thorough and competent defense tailored to the allegations contained in the written charges. Contrary to any claim Lewandowski may make otherwise, it was the overwhelming evidence of guilt—not any purported vagueness of the charges—that thwarted her defense. Therefore, considering that the charges here went well above the factual specificity found in other cases to be sufficient, and based on a plain reading of the specifications, the charges clearly notified Lewandowski of the "factual allegations she would have to disprove in order to set aside the proposed order of discharge." *Messner*, 202 N.W.2d at 18. Consequently, Lewandowski's argument should be discarded and the decision of the Board affirmed.

### e. LEWANDOWSKI'S ARGUMENT THAT THE CHIEF'S PUNISHMENT VIOLATED THE JUST CAUSE STANDARDS IS NOT SUPPORTED BY LAW OR FACT

The last half-page of Lewandowski's brief contains a throw-away argument that the Chief's discipline violates the just cause standards. The wholesale lack of explanation of precisely *how* this is supposedly so, and the obvious afterthought nature of the argument demonstrates that Lewandowski was simply attempting to add another superficial noodle to her proverbial spaghetti throw at the wall. Lewandowski has provided no basis to support her assertion other than reasserting the now long defunct argument that the case against Lewandowski was premised entirely on the 6:38 a.m. phone call with Lt. Hanley. Even assuming that were true, Lewandowski presents no authority to support her contention that such a decision would violate the just cause standards.

Wis. Stat. Subsection (a) of § 62.50(17) states in relevant part as follows: "If the board or panel determines that the charges are sustained, the board shall at once determine whether the good of the service requires that the accused be permanently discharged or be suspended without pay for a period not exceeding 60 days or reduced in

rank." Subsection (b) of § 62.50(17) states that no police officer may be disciplined under subsection (a) unless the Board determines there is just cause, as set forth in subsection (b) "to sustain the charges." Therefore, in deciding a disciplinary appeal, § 62.50(17) requires the Board to determine not only whether the seven just cause standards were met, but also what disciplinary action is warranted for the "good of the service."

The Board's decision to discharge Lewandowski was based on the evidence as it relates to the statutory requirement to consider the "good of the service." In this statutory review, this Court's limited role is to review the record to determine whether the Board fulfilled its statutory responsibility and made a decision that was reasonable. Here, the Board determined that:

> We noted earlier that the need for police officers to follow the directives of their supervisors, obey the rules governing the use of police vehicles, and most importantly, be truthful in the performance of their duties, in writing official reports, and in answering question during an inquiry, is self-evident. Lewandowski, although she claims she did not violate these rules, did not challenge the importance of these rules to police department operations. *We find the testimony of Assistant Chief Yerkes, explaining how police officers' untruthfulness damages the effectiveness of the police department particularly and law enforcement generally, to be credible and convincing. The seriousness of this violation cannot be understated. When questioned about it by her superior officers, Lewandowski was untruthful and evasive. Rather than holding herself accountable for her actions, she attacked the credibility of others.* When asked by Commissioner McKenzie if she now realizes that the priority of her assignments is decided by her supervisor and not by her, she did not clearly answer the question until her own counsel asked her again on redirect. We conclude the Chief has satisfied the seventh standard by a preponderance of the evidence. *We further conclude that the good of the service requires that Shannon Lewandowski be disciplined in accordance with the Chiefs order and discharged from the Milwaukee Police Department for the charges have been sustained.*

(R-71 at 13.) The Board therefore clearly identified the evidentiary basis for determining that Lewandowski's actions and dishonesty warranted discharge. Lewandowski has not presented any evidence or argument to the contrary. Therefore, the Board's affirmation of punishment did not violate the just cause standards.

35

## IV.    CONCLUSION

For the reasons set forth above, there was clearly just cause to find Lewandowski guilty of the charges and discharge her from service under the evidence presented.  The decision of the Board should therefore be affirmed.

Signed at the City of Milwaukee, this 13th day of February, 2017.

GRANT F. LANGLEY
City Attorney


s/ PATRICK J. MCCLAIN
Assistant City Attorney
State Bar No. 1100896
Attorney for Defendant
Milwaukee City Attorney's Office
800 City Hall
200 East Wells Street
Milwaukee, WI  53202
Telephone: (414) 286-2601
Fax: (414) 286-8550
Email: pmccla@milwaukee.gov

36