UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

SHANNON LEWANDOWSKI
1121 North Waverly Place #307
Milwaukee, WI 53202

        Plaintiff,

      v.                          Case No: 16-CV-1089

CITY OF MILWAUKEE
City Hall, Room 205
200 East Wells Street
Milwaukee, WI 53202

        Defendant.

---

## AMENDED COMPLAINT

---

COMES NOW the Plaintiff, Shannon Lewandowski, by her counsel, HEINS EMPLOYMENT LAW PRACTICE LLC, by Attorney Janet L. Heins, as and for a claim against the Defendant, alleges and shows to the court as follows:

### JURISDICTION AND VENUE

1.      This is a 42 U.S.C. §§ 1983 and 1988 *et seq*., and 42 U.S.C. § 2000e *et seq.,* statutory action, *inter alia,* seeking back pay, damages, attorney fees, and all other damages available from the Defendant for violations of the Plaintiff's rights to equal employment and equal protection of the laws of the United States.

2.      This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this case involves a federal question under Title VII of the Civil Rights Act of 1964, as amended, (Title VII), 42 U.S.C. §2000e *et seq.;* the Family & Medical Leave Act ("FMLA"), 29 U.S.C. §825 *et seq.*; and

28 U.S.C. § 1343, as this case involves the deprivation of civil rights.

3.      The unlawful employment practices giving rise to the Plaintiff's claims occurred within the Eastern District of Wisconsin, and venue is therefore proper in this District pursuant to 28 U.S.C § 1391(b), *inter alia.*

## THE PARTIES

4.      Plaintiff, Shannon Lewandowski, is an adult female resident of the State of Wisconsin, residing in Milwaukee County at 1121 North Waverly Place #307, Milwaukee, WI 53202.

5.      Defendant, City of Milwaukee was, at all times material herein, a Wisconsin municipal corporation, with a principal address of City Hall, Room 205, 200 East Wells Street, Milwaukee, WI 53202.  At all times material herein, Defendant acted "under color of law" within the meaning of 42 U.S.C. § 1983.

## THE FACTS

6.      Defendant is a covered employer for purposes of Title VII and the FMLA.

7.      Defendant's sworn officers and detectives are majority male.

8.      Plaintiff was hired by Defendant's Police Department in June 1999 as a police officer, and she was employed by Defendant in various positions for over 17 years. In 2005, Plaintiff was promoted to detective and spent the majority of her career assigned to violent crimes.

9.      Throughout most of her career, Defendant assigned Plaintiff to undesirable tasks at work because she is female and later because she complained of discrimination and retaliation.

10.     Because Plaintiff would not back down from complaining about injustice and discrimination when she saw it, other department members and command staff called her derogatory names such as "pitbull" and "black cloud."

2

11.     At all times material herein, Plaintiff performed her work duties in accordance with the reasonable expectations of the Defendant.

12.     In her performance review for 2011, her supervisor noted, "Detective Lewandowski shows exceptional skill in her thoroughness to investigate a felonious crime. Detective Lewandowski exhibits tenacity and is relentless when conducting follow-up to track down known and unknown criminals for any type of crime. Detective Lewandowski shows independence in her investigations and willingly accepts any assignment given to her without complaint. Detective Lewandowski is a reliable and dependable investigator."

13.     In her performance review for 2014, her supervisor noted, "Detective Lewandowski is very passionate bout [sic] her work and genuinely cares about the victims. She takes ownership of all her cases, and completes the required follow up in order to obtain criminal charges AND a convention. Detective Lewandowski is skilled at using social media to identify suspects and gather evidence against them. During this rating period, she chaired a trial in which the defendant was a high value target. At the conclusion of the trial, the defendant was found guilty of Attempt-1st Degree Intentional Homicide, and he was sentenced to 37 years in prison." He concluded by stating in part, "Detective Lewandowski is undoubtedly one of the most dedicated detectives on the department – her ability to follow through with her investigations from start to finish is impressive."

14.     While employed by Defendant, Plaintiff received Early Intervention Training to assist fellow officers on the Department with personal issues or situations that came up during their employment.

15.     On November 1, 2006, Plaintiff submitted a memo to Captain Dubis regarding "Harassment by neighbor." She noted that "Since the summer of 2005, I have had multiple problems with my neighbor.… I have spoken to Sgt. Staton of District Three." She added, "In

3

August of 2006, Lawrence Poggenburg threatened my job and my reputation. He stated to me that 'people like me do not belong on the Police Department' and would do whatever it took to either, 'make me move or get me fired, whichever comes first.' I am a single parent and the provider for my children. This threat caused me great concern. Lawrence Poggenburg has continually harassed me verbally, as well as using the power of the Police Department to further harass me. He has also used other agencies by giving me unfounded parking citations."

16.     When Plaintiff obtained a temporary restraining order against Poggenburg on November 15, 2011, Defendant refused to serve it on him despite its legal obligation to do so.

17.     On November 28, 2011, Plaintiff wrote a letter to Defendant's Chief of Police asking for help with her neighbor situation and detailing all the ways that his male officers had refused to help her over the years.

18.     During 2011, Defendant's male Police Officer Daniel Culver, after going off-duty for Defendant, solicited prostitutes who later beat him up, stole his car, and set his car on fire. When questioned about it, he lied during the internal investigation while he was on paid leave for nearly a year. Even though the Chief fired him, Culver was reinstated by the Fire & Police Commission and remained a supervisor. He was never criminally charged.

19.     On August 30, 2012, Plaintiff submitted a memo to Captain Wagner about "Workplace Harassment," describing the discrimination and harassment she was receiving from male detectives. She added, "I feel endlessly persecuted because I am a female, my reputation constantly attacked, and this is distressing and would [sic] appreciate if the matter is well looked into. In the past I have written two other complaints, which have never been formally addressed, but have been confronted by the supervisor of whom I made the complaint about. I was later asked to transfer, and view that transfer as retaliation. This work environment does not promote a

4

professional atmosphere, respect or teamwork, but rather creates an environment that makes me upset, intimidated and causes me other issues that I would like to address."

20.     On August 5, 2013, Plaintiff submitted a memo to Captain Wagner about continued harassment from Lawrence Poggenburg that Defendant refused to assist her with.  She wrote, "Since the year 2005 I have been dealing with a harassing neighbor, a situation that most of District three, and my supervisors throughout the years have been made aware of.  I did get a restraining order in 2011, and for the first year the behavior has ceased for the most part.  However this summer, my neighbor has re-started his intentional and offensive behavior and direct this at me again."  She closed by stating, "Lawrence Poggenburg has a compulsive preoccupation with having to make contact with me whenever he sees me home, and cannot leave me or the front of my home alone as ordered.  Since I did not get any assistance from District Three Supervision in the past, and was told that this problem is a CIB problem to handle, I am coming to you to take appropriate action."  No one responded.

21.     During her employment with Defendant, Plaintiff became friends with another female police officer, Melanie Beasley.  In the fall of 2014, Plaintiff became aware that Beasley was having some personal issues.

22.     On or about October 5, 2014, after receiving a text from Beasley showing a paper shooting target shot up from her boyfriend, Plaintiff asked her supervisor, Lt. Hanley, if that looked to him like "foreplay."

23.     Plaintiff obtained permission from Lt. Hanley to go to Beasley's house while on duty to ask what was going on with her in an official capacity, and she did so.

24.     On that date, Plaintiff learned that Beasley had been suffering in an abusive relationship with another Milwaukee police officer and member of a tactical unit, Robert Wilkinson,

5

male.

25.     Beasley told Plaintiff that she attempted to end the relationship numerous times after learning that Wilkinson was married but that he had made threats to her and that she was afraid for her safety.

26.     After visiting Beasley on or about October 5, 2014, Plaintiff returned to the District 5 police station of Defendant to speak to Lt. Hanley, and Plaintiff advised him what she had learned from Beasley, including that Beasley feared for her life from Wilkinson.

27.     Plaintiff showed Lt. Hanley a picture of a used firing target that Wilkinson had sent to Beasley, and Plaintiff told Lt. Hanley that she believed it was a threat against Beasley.

28.     Lt. Hanley said he also believed it was intended as a threat, and he suggested to Plaintiff that Beasley get a restraining order against Wilkinson.

29.     As a supervisor at Defendant, Lt. Hanley and Lt. Leitzke are both mandatory reporters of violence by Defendant's employees.

30.     Lt. Leitzke told Beasley, "if you tell me his name, I have an obligation to report it."

31.     Lt. Leitzke and Wilkinson, at all times material herein, were personal friends.

32.     As soon as Beasley told Lt. Leitzke that her stalker was Wilkinson, he asked Beasley if she had anything in writing and attempted to dissuade her from reporting Wilkinson.

33.     Throughout October 2014, Plaintiff continued to stay in touch with Beasley and counsel her about reporting the situation to her superiors.

34.     Wilkinson told Beasley he was watching her, and "I can take you out from 1,000 yards."

35.     Wilkinson sent Beasley a text message asking what she would do if he "ripped my panties off, whipped it out, and stuck it in me."

6

36.     Wilkinson raped Beasley days later on or about November 10, 2014, while his duty gun was nearby, and he choked and threatened her if she reported him to Defendant.

37.     Wilkinson also made multiple threats that he would kill Beasley, particularly if he ever found out about her starting a relationship with another man.

38.     On or about October 14, 2014, while at Beasley's personal residence, Plaintiff overheard Wilkinson speaking to Beasley on her speaker phone, and he said, "If you leave me, I will kill you."

39.     In late 2014, Plaintiff approached Lt. Hanley and told him that the abusive situation with Beasley and Wilkinson was ongoing and included death threats against Beasley, and Plaintiff asked if Beasley could come speak to him directly, to which he agreed.

40.     On or about December 6, 2014, Plaintiff received a confidential informant tip on where to find a wanted person who was believed to be armed and dangerous and possibly suicidal. The suspect killed his wife by shooting her in the head, and he had fled after escaping by injuring an officer on the Department.

41.     Plaintiff could not find a warrant, though there should have been one filed.

42.     Plaintiff was very worried about the possible consequences if she did not arrest him immediately, as this was shortly after the anti-police riots in Ferguson and nationwide unrest, and she wanted to avoid a "suicide by cop" situation with the suspect that might touch off similar unrest and riots in Milwaukee against the Department.

43.     On that date, Plaintiff first called Lt. Hanley to ask for assistance regarding the wanted person and explained the urgency of the situation.  He responded that he was "too busy."

44.     Plaintiff then texted Lt. Lough for assistance with the warrant, but he did not respond.

7

45.     Plaintiff then went to Metro and banged on the door for assistance; she was told they were in a meeting, and they did not assist her.

46.     Plaintiff contacted other police agencies involved to obtain assistance, but they did not assist her.

47.     Finally, after making those and other unsuccessful attempts from various male members of the Department to obtain assistance, and due to the exigent circumstances, Plaintiff emailed Lt. Sgrignuoli, Lt. Lough, Lt. Hanley, Capt. Smith, Lt. Armbruster and Chief Flynn in an effort to get the attention needed to obtain a warrant, availing herself of the chief's stated "open door policy".

48.     About an hour after sending the email, Plaintiff finally was given clearance to arrest the suspect, but he got away because she could not act on the tip immediately.

49.     Approximately one hour after sending the "open door" email, Lt. Hanley ordered Plaintiff into his office and verbally reprimanded her for sending the email; Lt. Hanley told Plaintiff she must apologize for the "open door" email because "it made the command staff angry."

50.     Plaintiff knew that she had acted correctly and refused to apologize for sending the email.

51.     Plaintiff learned later a male detective handling the case regarding the wanted person was derelict and neglected to obtain a warrant.  He was not disciplined or reprimanded for his dereliction of duty.

52.     Plaintiff also learned that a female officer was reprimanded for not putting a warrant into the system for sexual assault.

53.     A few days after Plaintiff sent the "open door" email, Lt. Sgrignuoli ("Acting Captain") confronted her in the hallway regarding the email.  Lt. Sgrignuoli asked Plaintiff, "What

the hell is wrong with you, why would you write the Chief?" Lt. Sgrignuoli told Plaintiff not to write any more emails to the Chief and not to "cross him" again.

54.     On or about December 10, 2014, Beasley spoke to Lt. Hanley and told him that she was afraid for her life from Wilkinson, that she thought he was going to kill her, that he was having rage issues, that his wife knew about their relationship and told Beasley he's crazy, and that Beasley should be afraid.

55.     Lt. Hanley did nothing to address Beasley's concerns.

56.     On or about December 11, 2014, Beasley spoke to her own supervisor, Lt. Leitzke, who came in while he was off duty, about the death threats, intimidation, and sexual harassment she was suffering at the hands of Wilkinson.

57.     Beasley told Lt. Leitzke that she had told Lt. Hanley about the about the death threats, intimidation, and sexual harassment she was suffering at the hands of Wilkinson, the previous day.

58.     Lt. Leitzke told Beasley not to let Wilkinson surprise her, and that if Wilkinson came to her house, Beasley should drive away.

59.     Lt. Leitzke told Beasley that if Wilkinson ever showed up at Walmart while she was there, it was not a coincidence and she should leave right away.

60.     Lt. Leitzke encouraged Beasley not to file a report and to keep the situation secret.

61.     Lt. Leitzke hit on Beasley in the meeting.

62.     Lt. Leitzke did nothing to address Beasley's concerns.

63.     At no time after the reporting of this incident to either Lt. Hanley or Lt. Leitzke did Defendant ever take any steps to limit Wilkinson's duties, police powers or contact with the victim, Beasley. Instead, the Department retaliated against Beasley for reporting the death threats,

9

intimidation, and sexual harassment she was suffering at the hands of Wilkinson.

64. On or about December 12, 2014, only six days after Plaintiff could not find a warrant to arrest the armed, dangerous and possibly suicidal suspect, that suspect killed himself while being arrested, as Plaintiff had feared.

65. On or about December 13, 2014, Lt. Sgrignuoli took Plaintiff off her preferred shift and transferred her to a new assignment in retaliation for her "open door" email to the Chief, to work on ballistic cases under Lt. Armbruster.

66. Lt. Sgrignuoli told Plaintiff that this transfer was an "opportunity" for her.

67. Such a change in duties would confine Plaintiff to the office, and she and Lt. Armbruster agreed that the change was actually a punishment for Plaintiff's emailing the Chief.

68. Plaintiff also believed that the change was intended to keep her from assisting or advocating for Beasley.

69. In January 2015, Beasley filed for a restraining order against Wilkinson.

70. On or about January 1, 2015, Plaintiff made a misdemeanor arrest of a female relating to the first shooting of the year.

71. While Plaintiff was attempting to finish necessary paperwork for the January 1st arrest, Lt. Sgrignuoli told Plaintiff to punch out, go home, and finish the remaining paperwork in the morning because no overtime was to be paid for a misdemeanor offense. Plaintiff complied.

72. On January 1, 2015, at the direction of Lt. Sgrignuoli, Lt. Lough wrote Plaintiff up for not completing the misdemeanor paperwork on the night of the January 1, 2015 arrest, despite her following Lt. Sgrignuoli's orders at the time to go home and complete the paperwork later to avoid overtime prohibited on misdemeanors.

73. Plaintiff asked Captain Sgrignuoli why she was written up when he told her to go

10

home; he responded, "you don't make the rules, I do; this is what happens when you go against me."

74.     Plaintiff addressed this situation with Lt. Hanley, who stated that this punishment was obviously a direct consequence to Plaintiff for emailing the Chief, and thus retaliation.

75.     Further, Plaintiff complained to Lt. Hanley about the treatment and threats against Plaintiff's career that she was experiencing from Lt. Sgrignuoli.

76.     Defendant never took action on any of Plaintiff's complaints about any male members of Defendant's Police Department.

77.     Plaintiff made numerous verbal complaints to her other Lieutenants about harassment and retaliation she was receiving from Sgrignuoli for emailing the Chief about a male officer's dereliction of duty, but Plaintiff received no assistance and told to "lay low."

78.     In January 2015, Plaintiff was assigned to the Power Shift at Defendant's District Three.

79.     On or about January 5, 2015, Beasley met with Sergeant Estacio and Sergeant Klein from Internal Affairs to discuss the abuse she suffered by Wilkinson, but they treated Beasley like a criminal during this meeting and issued a "no contact" order for Beasley as to Wilkinson, instead of taking any action against Wilkinson.

80.     Beasley called Lt. Leitzke after her meeting with Internal Affairs; he told Beasley not to document anything and leveraged a potential promotion against her in attempts to convince her to not to file a report on Wilkinson.

81.     On or about January 11, 2015, Plaintiff was the victim of a break-in at her home while she was present and off-duty.  Plaintiff caught the suspect after a foot chase and arrested him.

82.     When the break-in suspect was taken to the Department that day, he falsely accused

11

Plaintiff of using the "N" word against her. He later recanted in court.

83. In January 2015, Plaintiff asked Lt. Hanley about potential additional steps that could be taken to protect Beasley, who was now living with Plaintiff because she feared for her life. Plaintiff also updated Lt. Hanley about the emotional distress Beasley was experiencing from Wilkinson.

84. When Beasley went to Internal Affairs about the abuse she was experiencing by Wilkinson, she was told to get a restraining order and then the threat could be looked into.

85. In January 2015, Plaintiff wrote a memo to Internal Affairs and Lt. Hanley regarding death threats Wilkinson made to Beasley, and Plaintiff demanded to know why nothing was being done to protect Beasley.

86. On or about January 15, 2015, Beasley obtained a temporary restraining order against Wilkinson with Plaintiff's assistance and support.

87. After receiving the temporary restraining order against Wilkinson, Beasley emailed a copy to District Five Captain Stigler, asking for Defendant's assistance. Captain Stigler did not help Beasley.

88. Plaintiff also informed Captain Stigler about Beasley's situation, but Captain Stigler refused to listen and stated that it was none of Plaintiff's business.

89. Defendant never arrested Wilkinson, took away his gun, or ordered him into the district attorney's office to discuss the allegations against him, even though the assistant district attorney admitted to Beasley that there was probable cause to arrest Wilkinson based on her report.

90. On or about January 18, 2015 at approximately 8 p.m., Plaintiff and Beasley were discussing Beasley's filing for and receiving a restraining order against Wilkinson in front of witnesses at the Department.

12

91.     On or about January 19, 2015, while on Plaintiff was on duty and driving with her police lights activated to District Five to assist Beasley with her concerns about Wilkinson's death threats against her, Plaintiff's squad car was involved in an accident that totaled her squad car.

92.     Plaintiff was seriously injured on January 19, 2015, when a drunk driver ran a red traffic light and struck the squad car she was driving and in which Detective Juanita Carr was a passenger.

93.     Plaintiff suffered very serious head injuries in the accident, including a concussion and lingering memory problems.  In her employee report on the accident on January 28, 2015, Plaintiff reported "neck & back aches, unable to sit long time. Severe headache, short term memory loss, therapy for R foot, dizziness, L knee pain."

94.     Detective Carr, who had not complained to Defendant about discrimination, was also seriously injured in the accident.

95.     After Plaintiff's traffic accident, Lt. Hanley got involved in the investigation of the January accident and intentionally made false statements in the report about Plaintiff's accident, leading to multiple investigations of Plaintiff by Defendant.

96.     Lt. Hanley did not make false statements about Detective Carr or place her under investigation.

97.     Lt. Hanley then questioned Plaintiff, while she was suffering from a concussion, without providing notice that she was under investigation for alleged departmental violations related to the accident.

98.     Defendant refused to pay Plaintiff's medical bills from the January accident, denied her worker's compensation claim, refused to pay her medical bills, and held its investigation open for months longer than any investigations into male officers or officers who did not complain of

13

discrimination.

99.     Defendant accepted the worker's compensation claim of Detective Carr, (who had not complained of discrimination) and paid her medical bills.

100.     Plaintiff submitted a memo to the Department at its request, asking to be carried by the Defendant as being injured-on-duty until she was able to return to work, as Detective Carr was, but Defendant refused.

101.     On or about January 23, 2015, Plaintiff appeared off-duty at Milwaukee County Children's Court, at the victim's request, in a public hearing of a victim's armed robbery and shooting incident crime that Plaintiff solved.

102.     Now-Captain Sgrignuoli wrote a memo about the court appearance containing false information negative to Plaintiff.  Captain Sgrignuoli then ordered that Plaintiff be investigated for allegations of misconduct.

103.     Captain Sgrignuoli wrote a false memo to IAD for the investigation, stating: "Judge Swanson apologizes for not seizing the phone or holding Detective Lewandowski in contempt as an incident like this had never happened to him before.  Judge Swanson went on to describe Detective Lewandowski's behavior as extremely unprofessional and contemptuous."

104.     A day after the January 23, 2015 court hearing, on January 24, 2015, Captain Sgrignuoli confronted Plaintiff at her home and informed Plaintiff that she was "making bad decisions," and stated words to the effect:

a.      "You had a cell phone in court, and the judge called me and told me he wanted to hold you in contempt of court and decided not to as a favor."

b.      "You called a burglary suspect the N-word."

c.      "I am taking your gun and badge."

14

d.       "You have no police powers."

e.       "You are under suspension."

f.       "You cannot take the Lieutenant's exam."

g.       "You cannot testify for Beasley."

h.       "You are not to possess any firearm outside of your home."

i.       "You are not to make any arrests."

j.       "Do you understand you cannot testify in court for Melanie either?"

105.    After Captain Sgrignuoli's false memo was submitted to IAD, Sergeant Hines conducted an investigation into the incident and stated in a March 24, 2015 memo repeating many of Captain Sgrignuoli's false allegations and negative information about the Plaintiff, "Judge Swanson stated that he did not confiscate Detective Lewandowski's phone because she was a police member and did not think it was necessary.  He stated even if Detective Lewandowski was not a police member, he would not have held her in contempt but he probably would've asked for her phone."

106.    Other witnesses at the court hearing on January 23, 2015, stated that Plaintiff was never uncooperative and the incident was not a big deal.

107.    On or about January 26, 2015, Plaintiff testified for Beasley as a witness who heard Wilkinson tell Beasley "If you leave me, I will kill you" on or about October 14, 2014.

108.    In retaliation for that truthful testimony in support Beasley, in February 2015, Captain Sgrignuoli again confronted Plaintiff at her house and informed her that she violated rules by testifying in court for Beasley while Plaintiff was suspended.  He also stated again that Plaintiff could not take the Lieutenant's exam.

109.    As a result of the threats and retaliation against Plaintiff by Captain Sgrignuoli,

15

members of her central division, as well as male detective Troy Johnson, distanced themselves from Plaintiff for fear of retaliation against themselves.

110. On February 11, 2015, Plaintiff wrote a memo to Judge Swanson, apologizing for interrupting the proceeding and explaining the reasons that she wanted to record the hearing.

111. Plaintiff took FMLA leave from February 15, 2015 to May 9, 2015 for the injuries from her January accident.

112. On or about February 6, 2015, Beasley made an official written report on Wilkinson to Sgt. Schroeder of Internal Affairs at Defendant; Defendant's Internal Affairs Division did not contact her about the complaint until on or about March 29, 2015.

113. When IAD finally contacted Beasley about her complaints of death threats and controlling and abusive behavior by Wilkinson, they asked her dismissively, "What do you want? A bodyguard?"

114. After submitting her complaint, Beasley met with Internal Affairs Criminal Detective Christopher Zimmerman. During her second meeting with Detective Zimmerman, he questioned if Beasley really wanted an investigation done and threatened that if she continued to push for an investigation, that Internal Affairs would begin investigating her for wrongdoing she did not commit.

115. Defendant never took away Wilkinson's gun, badge or police powers, it never investigated Beasley's reports that he stalked and raped her, and it never disciplined Wilkinson in any way for his outrageous behavior toward a female member of the Department. The Department noted in a November 11, 2015 position statement in this case to the Wisconsin Equal Rights Division: "No finding of wrongdoing was made against PO Wilkinson by [Defendant] in its employment investigation, or the district attorney's office which declined to issue charges against

16

him based on the allegations of Ms. Beasley."

116.    Instead, the Defendant's "good ol' boys club" rallied around Wilkinson and protected him, while leaving Beasley and Plaintiff to fend for themselves.

117.    Captain Sgrignuoli and the Department made multiple attempts to ruin Plaintiff's reputation while she was out on medical leave, including:

a.   In March 2015, Plaintiff was forced to go to court and testify without pay. After she arrived home from court, Plaintiff found a sergeant at her house, who accused her of being drunk in court and forced Plaintiff to blow into an intoxometer. Despite no signs of alcohol, a POST member, Detective Isla Wallich, came to Plaintiff's home to discuss the incident. Plaintiff was still suffering from concussion side effects resulting from her January 2015 accident.

b.   While Plaintiff was in court to testify in April and May 2015, the Department told one of the lawyers in a case that she was suspended. This was brought up in court. However, Plaintiff was not suspended—only her police powers were suspended.

c.   In another incident during which Plaintiff was forced to testify in court in May and August 2015, the Department told a probation agent involved in the case that Plaintiff was suspended and gave the agent Plaintiff's home phone number.

d.   In another case, Plaintiff was forced to testify while still experiencing severe health effects from a head injury suffered during her January accident. Plaintiff was not able to testify successfully due to her injuries, and the case was lost.  The Department accused Plaintiff of being drunk in court, even though Plaintiff was suffering from her head injuries and sober.  Detective Carr also worked on that case, but Defendant never forced her to testify in the case.

17

118.    In February 2015, Captain Sgrignuoli ordered Plaintiff to write a memo for an involuntary transfer or face more consequences for her complaints.

119.    As a result, Plaintiff contacted union president Mike Crivello, who came to her home to meet with her.

120.    While meeting with Crivello, Plaintiff explained the threats, retaliation, and intimidation tactics Captain Sgrignuoli was using against her, and she also informed him about the suspension of Plaintiff's police and arrest rights.

121.    Crivello then talked to Sgrignuoli, who stated, "When [Plaintiff] is ready to come back she can, but she made me look bad in the eyes of the Big Guy," presumably referring to the Chief of Defendant's Police Department.

122.    On or about February 26, 2015, Defendant advised Plaintiff by letter that her worker's compensation claim was still under review by Defendant's Office of Employee Benefits and the vehicle accident was under review by Defendant's Internal Affairs Division.

123.    On or about March 5, 2015, Mayor Barrett received a letter from the family of a victim (the same victim that Plaintiff appeared in court off-duty and tried to audio record for the family) that Plaintiff assisted and solved a crime regarding, praising Plaintiff for her work in several resulting cases and recommending that she receive an award for these actions.

124.    Plaintiff did not receive an award for her actions.

125.    Defendant continued to force Plaintiff to testify without pay in court on cases of hers while she was off-duty after the January accident on unpaid leave.

126.    Defendant did not force Detective Carr to testify without pay, because Defendant placed her on injury leave from the Department.

127.    On or about March 8, 2015, Defendant's male officer Clayton Amborn was arrested

18

for drunken driving while he was still a probationary employee, but Captain Stigler used his rank to keep the male officer from properly getting fired according to policy. Captain Stigler did not assist female probationary officers or even female officers in general this way.

128. On March 24, 2015, Sgt. Hines submitted a report to Deputy Inspector Brunson regarding Plaintiff, beginning, "On January 27, 2015, Captain of Police Timothy Heier instructed members of the Internal Affairs Division to investigate an allegation of misconduct on the part of Police Detective Shannon Lewandowski," nothing that the allegation being investigated regarded, "On January 23, 2015, Detective Shannon Lewandowski, while off-duty, was observed recording a juvenile court proceeding with her cell phone and was argumentative with court deputies when asked to stop." In the memo, Sgt. Hines repeated lies told by Lt. Sgrignuoli in an attempt to further retaliate against Plaintiff for complaining about discrimination.

129. In March 2015, Plaintiff met with Deputy Inspector Terrence Gordon about the retaliation and intimidation she was experiencing from Captain Sgrignuoli, her suspension, and the lies Sgrignuoli wrote about her interaction with Judge Swanson. In that meeting, Gordon told Plaintiff, "Get a lawyer. Sgrignuoli is after your reputation and career."

130. In a court hearing on or about March 12, 2015, the break-in suspect at Plaintiff's home in January stated in court that Plaintiff did not use the "N" word in chasing and apprehending him, and he acknowledged that he had lied about it at the time of his arrest.

131. In March 2015, Plaintiff contacted Captain Sgrignuoli to inquire why her gun was taken away and her police powers suspended, and she told Captain Sgrignuoli that she felt that she was being retaliated against.

132. On or about March 24, 2015 and again in May 2015, Plaintiff contacted Captain Sgrignuoli to find out why she was still suspended, and she asked why she was suspended but

19

Wilkinson was not.

133.    Sgrignuoli denied writing the complaint that led to Plaintiff's suspension and claimed to have no knowledge of why she was suspended.

134.    This contradicts a previous memo from Sgt. Hines stating that Sgrignuoli wrote the complaint for Plaintiff's suspension that was submitted to IAD.

135.    On or about March 31, 2015, fellow officer Nancy Nelson's husband made an unsubstantiated and unfounded 911 call to Defendant to report her for domestic violence.  When male officers of the Department responded to the scene, they accepted her husband's lies and arrested Nancy Nelson.

136.    On or about April 8, 2015, Plaintiff was notified that she was being investigated by the Department regarding her January accident for "operating a department vehicle, with emergency lights activated, while not accomplishing the mission of the department."

137.    Plaintiff was then interviewed by IAD on or about April 14, 2015, regarding the allegations that she was operating her squad car while not accomplishing the mission of the department on January 19th, when she was hit by a drunk driver running a red light.

138.    On April 15, 2015, Defendant issued charges against Plaintiff regarding integrity, referring to the January 23, 2015 court hearing at which Plaintiff was off-duty.

139.    On or about April 29, 2015, Lt. Armbruster instructed Plaintiff to go to court for subpoenas, contradicting earlier instructions from Captain Sgrignuoli that Plaintiff was not supposed to attend court.

140.    Armbruster informed Plaintiff that Sgrignuoli was ordering her to attend court, and if she did not, she would be written up.

141.    On or about May 3, 2015, Plaintiff submitted a memo to the Chief about this

20

incident in response to being charged with integrity violations.

142.    On or about May 6, 2015, Lt. Armbruster informed Plaintiff that she had to be at work on May 10, 2015, and that if she could not return to work, Plaintiff would need to see another doctor.

143.    Plaintiff informed Lt. Armbruster that she was not able to afford to see another doctor because she was not receiving IOD pay while still under investigation regarding her accident.

144.    On or about May 21, 2015, Plaintiff was given an official reprimand as discipline for allegedly "behaving in such a way that created the appearance of impropriety."

145.    This discipline was given to Plaintiff based on false statements of Captain Sgrignuoli, who wrote lies in retaliation for Plaintiff's email to the Chief.

146.    On or about May 26, 2015, Defendant prepared a Restitution Worksheet regarding Plaintiff's January accident showing the drunk driver who ran a red light and hit Plaintiff's squad car was expected to pay the Department $4,884.22 in restitution for the value of the wrecked squad car, a damage appraisal, and towing from the accident.

147.    On or about June 1, 2015, Plaintiff submitted a memo to Captain Sgrignuoli regarding her forced unpaid medical leave instead of being considered injured on duty, requesting information on the status of the investigation, requesting specific days off, and noting that she was aware she would be transferred.

148.    On or about June 1, 2015, Defendant transferred Plaintiff without notice in retaliation for her complaints of discrimination.

149.    On or about June 3, 2015, Captain Sgrignuoli and Lt. Armbruster disciplined Plaintiff for having a phone in court.

150.    After administering Plaintiff's discipline, Sgrignuoli told Plaintiff he did not like her

21

attitude and stated, "I was prepared to give you your gun and badge back but now I am not. I don't like your attitude. How are you feeling?"

151.    Plaintiff responded that she still had headaches from her accident. Captain Sgrignuoli replied, "Hmm, now I decided that you are not getting it back. Leave my office."

152.    On or about June 11, 2015, Nancy Nelson was arrested for her first OWI charge, and the Department put her on desk duty and would not allow her to even ride as a passenger until she got her occupational license in October 2015.

153.    Male officers in similar situations were not put on desk duty or stripped of their ability to ride in squad cars with other officers, and were not investigated.

154.    In June 2015, Plaintiff called IAD to see what date Lt. Hanley wrote on the memo quoting Plaintiff about her January accident, which contained numerous lies. IAD refused to give Plaintiff the date of the memo.

155.    In March, April, May, June, July, and August of 2015, Plaintiff called LaMonica Salles from Defendant's Human Resources about the still ongoing investigation of Plaintiff's January accident when she was hit by a drunk driver running a red light. Salles refused to provide Plaintiff with any information and refused to call IAD.

156.    Plaintiff attempted to call IAD's Sgt. Zeigler several times from March to July 2015. Plaintiff was told that the investigation into her accident was done and on Sgt. Hines' desk.

157.    Plaintiff told Sgt. Hines that she needed to return to work because her bills were going to collection, that she was being retaliated against, she was being made to use sick time, and not injury on duty time because of the investigation, and that her partner who was in the car with Plaintiff at the January 19 accident (but who had not complained of discrimination) was not facing similar treatment.

22

158.	On or about June 26, 2015, Plaintiff underwent knee arthroscopic debridement and chondroplasty related to the January accident.

159.	As of August 2015, the investigation into Plaintiff's accident was still pending, leaving Plaintiff on unpaid leave with huge medical bills, in retaliation for her complaints of discrimination.	Defendant has never taken so long to resolve an investigation into a drunken driving accident.

160.	Defendant never sent Plaintiff for a psychiatric or "fit for duty" evaluation, and she never had her gun returned to her even after she returned to work.

161.	On or about August 30, 2015, Plaintiff was again reassigned in retaliation for her complaints of discrimination.	Despite telling Plaintiff that she was not able to make good decisions, Defendant assigned Plaintiff to work with the ATF and FBI doing ballistics cases and to interview recruits for hiring onto the Department.

162.	On September 9, 2015, Sgt. Zieger submitted a memo to Deputy Inspector Brunson regarding Plaintiff's January accident, noting that he did not interview Plaintiff's son—whom the Defendant claimed Plaintiff had been driving to help at the time of the accident—until June 11, 2016, six months after the accident.	The memo notes that "Mr. Lewandowski stated he tells his mother when he gets 'pulled over.' Mr. Lewandowski described he called his mother, informed her he was 'pulled over,' and he would call her (Detective Lewandowski) when he was done.	Detective Lewandowski responded, 'Alright, bye.'	Mr. Lewandowski denied that his mother requested him (Mr. Lewandowski) to call her back when he determined where he was.	Mr. Lewandowski responded that his mother did not state she wanted to meet him or tell him where she was going. Mr. Lewandowski stated, 'I would never put my mom in that position to come like get me.'	Mr. Lewandowski stated he did not inform his mother that he was by UWM."	Sgt. Zieger further noted

23

that it was in fact Shorewood Police who pulled over African-American Mr. Lewandowski for a field interview. He noted that an officer on the scene of the accident stated that Plaintiff "was very incoherent" and he "thought she may have hit her head." The memo notes "Detective Beasley acknowledged she intended to meet Detective Lewandowski at District Five at about the time the accident had occurred…. Detective Beasley stated Detective Lewandowski never told her of an intention to meet her son before the accident." He noted that "Officer Goggins recalled Detective Lewandowski was disorientated [after the accident] and requested him to contact her son." The memo stated, "Detective Carr explained she had investigated a shooting in which the suspect lived on North 52nd Street, and was going to check for the firearm used in the offense. Detective Lewandowski was going to meet an officer at District Five and then go with Detective Carr to the residence so they did not have to call for another squad to meet them. Detective Lewandowski informed Detective Carr she was meeting "Melanie," but did not state why. Detective Carr stated they both left in the same vehicle from District Three. Detective Carr did not know if Lieutenant Hanley had assigned the follow up or asked if she was going to check for the firearm, or if she had spoken to Lieutenant Hanley before leaving District Three." The memo noted, "Detective Carr stated she was never told by Detective Lewandowski she was trying to meet her son. Detective Carr stated if she would have observed Detective Lewandowski utilize the emergency lights without accomplishing a mission of the police department, she would have either turned them off or told Detective Lewandowski to turn them off…. Detective Carr stated she did not know exactly what Detective Lewandowski was going to handle at District Five, but she was then going to respond with Detective Carr, which would have saved time by 'not pulling other officers into their assignment.' Detective Carr stated if she knew Detective Lewandowski was going to District Five to do something not work related she would not have went, adding she was trying to 'get off

work.'"  "Detective Carr stated if she would have been ordered by Lieutenant Hanley to conduct the follow-up, she would have still gone to District Five first."  The memo noted, "Detective Carr added, 'Detective Lewandowski was driving normal [at the time of the accident], and she didn't seem like she was responding to anything urgent.'"  Finally, the memo stated: "Detective Lewandowski described why she went to meet Officer Beasley instead of aiding in the retrieval of the firearm.  Detective Lewandowski stated, 'A, that wasn't my assignment to do with the gun that was just something I was going to help her with.  It took precedence because that was where I was going to go in the first place.'  Detective Lewandowski described the police purpose that she was serving, by going to District Five, was to help a coworker.  Detective Lewandowski stated, 'My co-worker called me and asked me to come there; I'm gonna come there.'"  Lastly, the memo noted, "Detective Lewandowski indicated she did not inform Lieutenant Hanley of many of the details he reported in the squad accident report, and those details were not true."

163.    On September 11, 2015, Lt. Wurth submitted a memo to Deputy Inspector Brunson regarding allegations of misconduct against Plaintiff.  In that memo, Lt. Wurth repeated the lie that Plaintiff was responding to her son stopped by UWM Police at the time of the accident.  Then she reiterated portions of Lt. Hanley's report, noting, "Detective Lewandowski intended to assist with follow-up assigned to Detective Carr, but received a call from Police Officer Melanie Beasley who had … reported to her that she was "afraid" and had asked her to come to District Five."  She also noted, "Detective Lewandowski's son, Jordan Lewandowski, was interviewed and acknowledged he called to inform his mother he had been stopped by a police officer, though he denied that his mother was meeting him."  Lt. Wurth stated, "Detective Lewandowski described she was going to District Five to help Officer Beasley, and there was not an urgency to complete the follow-up [on Detective Carr's case].  Detective Lewandowski added it was the third time going to Distrctive Five

25

that shift, and she had met Officer Beasley regarding the same issue earlier in the night. Detective Lewandowski reported she was not going to meet her son, and did not tell that to Lieutenant Hanley." Despite these contradictions, Lt. Wurth recommended upholding the charges against Plaintiff.

164. Throughout 2015, many of Plaintiff's fellow officers told her that she was "nuts" for complaining about discrimination and "bucking the system."

165. Defendant transferred many of the male officers and command staff who were the subject of Plaintiff's discrimination and retaliation complaints to Defendant's Internal Affairs Division, where they filed charges against her repeatedly.

166. On or about October 7, 2015, Plaintiff was charged with further violations of the code of conduct stemming from the January accident.

167. On October 11, 2015, Plaintiff wrote a memo to the Chief rebutting the charges against her stemming from her January accident, noting that Beasley "requested my help with the filing of a felony case, additionally, and most importantly, to help her with the fear and stress she was experiencing while working, due to an assault by a co-worker [Wilkinson]. I explained that I would return before her shift ended at approximately 2:00 a.m., to which she agreed."

168. On October 13, 2015, Plaintiff wrote a memo to the Milwaukee Fire & Police Commission, titled "Discrimination, Misconduct in Office," which the Commission eventually accepted. In the memo, after identifying herself, Plaintiff began, "This is the second attempt via memo to report the intentional disparate treatment in direct action due to gender; I and others have been discriminated [sic] within this department because we are women." Plaintiff also noted that "[t]here is collusion in the ranks of the male Milwaukee Police Department" and went on to detail specific instances of discrimination. Plaintiff stated that she worked "in an oppressive environment

26

with a different set of rules of men and women," and that "Captain Stigler has discriminated against more than one female under his supervision, with different standards for men and women." Plaintiff noted that Capt. Stigler went to great lengths to assist a male probationary office while ignoring "females who actually needed him to be a leader and provide a safe work environment or at least equal treatment."

169.    On October 21, 2015, Plaintiff wrote a memo to the Chief rebutting the charges against her of untruthfulness and threats.

170.    On October 26, 2015, Plaintiff wrote a memo to Captain Salazar requesting an update on the investigation and noting that mistakes were made in recording her time off work.

171.    On November 12, 2015, Plaintiff submitted another memo to Defendant's Fire & Police Commission detailing additional concerns with the charges against her.

172.    On November 20, 2015, Defendant charged Plaintiff with allegations pertaining to integrity, stemming from her January accident.  Defendant told Plaintiff to talk to Sgt. Zieger if she had questions, but he was gone.

173.    On November 23, 2015, because Plaintiff and Beasley had recorded meetings with supervisors to document the ongoing discrimination and retaliation against them, Defendant amended its policy and prohibited recording without the consent of all parties or the approval of the Chief, contrary to Wisconsin law.

174.    On November 27, 2015, Plaintiff submitted a memo to the Chief, rebutting charges regarding her integrity, stemming from her January accident.  Plaintiff's memo noted that "Lieutenant Sean Hanley and Lieutenant Timothy Leitzke at that time were aware that Officer Melanie Beasley alleged the sexual assault by TEU Police Officer Robert Wilkinson.  Officer Beasley often cried at work, suffered panic attacks, and had been reaching out for help."  Plaintiff

27

stated that she believed she was not put on injury on duty leave was retaliation.

175. In her November 27, 2015 memo, Plaintiff also noted specific incidents of male officers being treated far more favorably under similar circumstances, and she detailed specific errors in the investigation of her, such as Defendant failing to interview key witnesses that might have supported Plaintiff's account of the January accident.

176. When Nancy Nelson called 911 on or about November 29, 2015 because her husband Grant Nelson (a fellow member of the Department) was in an uncontrollable, intoxicated rage with a knife, threatening to kill her, and complained about domestic violence and threats by her husband, Defendant responded by:

    a. Refusing to arrest Grant Nelson, even though Nancy Nelson took video of his threatening her life in an intoxicated rage and showed it to the responding officers from Defendant, and despite Wisconsin's mandatory arrest law in domestic violence situations;

    b. Allowing Grant Nelson to keep the knife that he threatened his wife with;

    c. Taking Grant Nelson outside the house and telling him to drive somewhere else, even though he was obviously intoxicated and could not drive legally; and

    d. Ignoring Nancy Nelson's concerns and leaving the scene without assisting her; and

    e. Charging Nelson with disorderly conduct and domestic violence but issuing no charges against Grant Nelson.

177. On December 4, 2015, Sgt. Zieger wrote a memo to Deputy Inspector Brunson regarding Plaintiff, responding to Plaintiff's November 27, 2015 memo. He noted that Plaintiff said she had proof that "Internal Affairs members, who investigated her case, are unethical and conducted a biased investigation based on gender."

28

178.    Several officers told Plaintiff over the course of 2015 that she would be fired.

179.    Defendant issued Plaintiff a 5-day suspension, a 30-day suspension, and terminated her, all for alleged infractions stemming from her January 19, 2015 squad accident.

180.    Defendant terminated Plaintiff's employment on December 16, 2015.

181.    Male employees of Defendant who committed worse offenses than Plaintiff were not terminated.

182.    Defendant's male and female employees who did not complain of discrimination but committed worse offenses were not terminated.

183.    Defendant routinely holds female members of the Department to higher standards than male members, treating the female department members worse than male officers in violation of their right to Equal Protection of the laws.

184.    Defendant maintains a "good ol' boys club" atmosphere at the Department that has persisted throughout Plaintiff's career in law enforcement with the Defendant, regardless of the official policies allegedly prohibiting such conduct.

185.    Defendant repeatedly investigated Plaintiff over the course of her career for minor offenses and even no wrongdoing at all, looking for anything with which to terminate her employment after she complained about sex discrimination in the Department.

186.    Over the course of her career at Defendant, it investigated Plaintiff nearly 40 times for unfounded and unproven allegations against her.

187.    Plaintiff committed no wrongdoing worthy of discipline or termination at any time during her employment by Defendant in 2014 and 2015.

188.    On or about September 10, 2015, Plaintiff filed a sex discrimination and retaliation complaint against Defendant with the Wisconsin Equal Rights Division ("ERD"), designated as

29

ERD Case No. CR201502561, and cross-filed with the U.S. Equal Employment Opportunity Commission ("EEOC") as EEOC Case No. 26G201501284C. The EEOC issued Plaintiff a Notice of Right to Sue for this case on May 16, 2016, which she received on May 18, 2016.

189.    On or about December 21, 2015, Plaintiff filed a sex discrimination and retaliation complaint against Defendant with the ERD, designated as ERD Case No. CR201503613, and cross-filed with the EEOC as EEOC Case No. 26G201600334C. The EEOC issued Plaintiff a Notice of Right to Sue for this case on June 23, 2016, which she received on June 27, 2016.

190.    Plaintiff has exhausted all of her administrative remedies and has satisfied all conditions precedent to bringing this action.

191.    At the present time, Defendant continues to treat male members of the Department more favorably than females.

192.    Lt. Dennis Trzcinski was fired from Defendant for submitting fraudulent time cards showing overtime he had not worked and thus stealing overtime pay, but Defendant's Fire & Police Commission reinstated Trzcinski with a demotion from lieutenant to sergeant, so that he remained a supervisor of police officers.

193.    In late April 2016, a family took their dog Coco to Pet U, owned and operated by Trzcinski, while they went away for the weekend. Sunday night the owners got the call that Coco had died of old age. The Milwaukee Journal Sentinel reported the owner's reaction in a story on April 20, 2016: "They brought Coco in on a cart. They had a blanket up to his neck. I folded the blanket over and I just seen [sic] blood everywhere." "I was angry, and I was mad. Because they lied to us and they did not protect my baby," said the dog's owner. The article noted, "According to vet records, Coco died of blood loss. He had puncture wounds, cracked ribs and bruising." Two days later, in a story reported by the Milwaukee Journal Sentinel on April 22, 2016, Kristin Iselin

30

said she boarded her dog Allie Saturday, planning to pick her up Sunday. Iselin said she got a call Saturday night that her dog had gotten loose. The dog was picked up by Milwaukee County Sheriff's deputies Saturday around midnight. Pet U owner Angela Trzcinski picked Allie up Sunday morning. Iselin said the owners of Pet U, Milwaukee Police Sergeant Dennis Trzcinski and his wife, told her Allie had injured her paw, but wasn't in pain and was walking fine. She was surprised to see her dog's condition Sunday. "She wasn't able to walk, she was limping, she was crying, her fur was a mess, she had burrs all over," explained Iselin. Iselin said the owners had a different story each time she spoke with them. She claims they refused to refund her money, even though the dog was not boarded at their facility. Iselin said they also refused to pay veterinary bills. Trzcinski was never disciplined by Defendant for these off-duty actions, including his lies to clients and the public about what had happened.

194.    Plaintiff learned in late 2017 and early 2018 that married Captain Sgrignuoli had been having a secret, illicit affair with the married female Executive Director of the Fire and Police Commission (MaryNell Regan) at the time he was investigating Plaintiff following her January 2015 traffic accident.

195.    During his affair with Regan, Captain Sgrignuoli was caught requesting to view surveillance footage at Regan's office for "personal reasons not related to any official police business or investigation," violating Department policies Integrity 3.00; Guiding Principle 3.06 and Competence 1.00; and Guiding Principle 1.03."

196.    At the time he was caught improperly viewing the surveillance video, Captain Sgrignuoli had eight (8) "sustained offenses for other violations." An official record noted that "This is the member's first offense of using their official position to unnecessarily interfere in the personal business of another," for which he received a 3-day suspension without pay, and "This is

31

the member's second offense of failing to use time to accomplish the mission of the department," for which he had previously received a 2-day suspension without pay.

197.    In February 2018, Chief Flynn publicly accused Regan, as Executive Director of the Fire & Police Commission, of asking him to interfere with the investigation into Captain Sgrignuoli's misconduct in public office (improperly viewing the surveillance video of Regan's office) and asking Flynn to reduce or eliminate Captain Sgrignuoli's punishment for that offense.

198.    Captain Sgrignuoli's discipline for his proven misconduct was substantially less than Plaintiff's discipline for the same alleged misconduct he falsely accused Plaintiff of, including "failing to use time to accomplish the mission of the department," especially when prior discipline records are considered.

199.    While Regan was working to reduce Captain Sgrignuoli's discipline, she was working to prosecute and sustain Captain Sgrignuoli's false allegations of misconduct against Plaintiff, which led to Plaintiff's termination and confirmation of Plaintiff's termination by the Fire & Police Commission that Regan headed.

200.    At all times material herein, Defendants knew or should have known that Plaintiff was entitled to the full protection of federal and state laws against sex discrimination and retaliation.

201.    Defendant knew, or should have known, that it had a duty to evaluate whether federal and state laws were being violated in its treatment of the Plaintiff's situation, but they, with deliberate indifference and without rational basis, disregarded that duty in allowing the Plaintiff to be treated less favorably than others outside her protected classes without taking into account her protected status under federal and state law.

202.    Defendant had a duty to consider whether the Plaintiff's treatment was appropriate under their own policies and under the federal and state laws prohibiting discrimination in Plaintiff's

32

employment with them, but they ignored that duty in allowing the harassment, discrimination and retaliation to continue.

203.    The discriminatory customs, policies and practices referred to in the above paragraphs were a proximate cause of Plaintiff's injuries.

## FIRST CLAIM FOR RELIEF—42 U.S.C. §§ 1983, 1988

204.    Plaintiff realleges and incorporates paragraphs 1-203 of this complaint by reference.

205.    Defendant unlawfully discriminated, harassed and retaliated against Plaintiff on the basis of her sex in violation of her equal employment rights and equal protection rights under the First and Fourteenth Amendments to the United States Constitution, as protected by as protected by 42 U.S.C. §§ 1983, 1988 *et al.*

206.    As a direct, foreseeable, and proximate result of Defendant's unlawful discrimination, harassment and retaliation, Plaintiff has suffered injury and damages in the form of lost wages, lost employment benefits, loss of reputation among her co-workers, damage to her career, physical pain and suffering, and emotional distress. These damages continue into the present and will continue into the foreseeable future.

## SECOND CLAIM FOR RELIEF – TITLE VII SEX DISCRIMINATION

207.    Plaintiff realleges and incorporates paragraphs 1-206 of this complaint by reference.

208.    Defendant discriminated against Plaintiff based on her sex in her terms and conditions of employment and in terminating her in intentional and/or reckless disregard of her

33

federally protected rights under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §2000e *et seq.*

209.　　As a result of Defendant's intentional discrimination, Plaintiff has suffered damages in the form of lost wages, lost employment benefits, loss of reputation among her co-workers, damage to her career, physical pain and suffering, and emotional distress. These damages continue into the present and will continue into the foreseeable future.


**THIRD CLAIM FOR RELIEF – TITLE VII SEX RETALIATION**

210.　　Plaintiff realleges and incorporates paragraphs 1-209 of this complaint by reference.

211.　　Defendant intentionally retaliated against Plaintiff in the terms and conditions of her employment and by terminating her employment for opposing sex discrimination in the workplace in intentional and/or reckless disregard of her federally protected rights under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §2000e-3 *et seq.*

212.　　As a result of Defendant's intentional retaliation, Plaintiff has suffered damages in the form of lost wages, lost employment benefits, loss of reputation among her co-workers, damage to her career, physical pain and suffering, and emotional distress. These damages continue into the present and will continue into the foreseeable future.


**WHEREFORE**, Plaintiff respectfully requests that this Court:

1.　　Issue a declaratory judgment that the acts, policies, practices and procedures of Defendants violated the rights of the Plaintiff under the First and Fourteenth Amendments to the United States Constitution, as protected by 42 U.S.C. § 1983, *et seq.*;

34

2. Issue a declaratory judgment that the acts, policies, practices and procedures of Defendant violated the rights of the Plaintiff under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*;

3. Issue a permanent injunction against future acts, policies, practices and procedures that violate the First and Fourteenth Amendments to the United States Constitution, as protected by 42 U.S.C. § 1983, *et seq.*, by Defendant;

4. Issue a permanent injunction against future acts, policies, practices and procedures that violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, by Defendant;

5. Order Defendant to make Plaintiff whole by providing appropriate back pay, front pay and/or reinstatement, compensatory and punitive damages, pre-judgment and post-judgment interest, and reimbursement for other benefits and expenses in an amount to be shown at trial;

6. Grant to Plaintiff her attorney fees, costs and disbursements as provided by 42 U.S.C. § 2000e-5(k), and all other applicable statutes and provisions; and

7. Grant to Plaintiff whatever other relief this Court deems just and equitable.

Dated this 19th day of February, 2018.

HEINS EMPLOYMENT LAW PRACTICE LLC
Counsel for the Plaintiff


_s/ Janet L. Heins_ .
Janet L. Heins, State Bar No. 1000677

HEINS EMPLOYMENT LAW PRACTICE LLC
1001 West Glen Oaks Lane, Suite 103
Mequon, WI 53092
(262) 241-8444 voice
(262) 241-8455 facsimile
e-mail: jheins@heinslawoffice.com

35