1                        BEFORE THE

2              MILWAUKEE FIRE AND POLICE COMMISSION

3       - - - - - - - - - - - - - - - - - - - - - - - - - -

4       In Re the Appeal of:            MPD Personnel
                                        Order No. 2015-150
5       SHANNON LEWANDOWSKI

6       - - - - - - - - - - - - - - - - - - - - - - - - - -

7

8
                 MILWAUKEE POLICE & FIRE COMMISSION
9
                          Ann Wilson
10                       Kathryn Hein
                         Angela McKenzie
11

12            Hearing Examiner:  Rudolph Konrad

13

14      HEARING HELD:                    TRANSCRIPT PAGES

15                                          1 - 290
        200 E. Wells Street
16      Milwaukee, Wisconsin           EXHIBITS IDENTIFIED:

17                                          1 - 21
        Date: August 10, 2016
18                                       EXHIBITS ADMITTED:
19

20

21

22

23

24

25

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                            1
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 1 of 501  Document 80-5

```
 1                    A P P E A R A N C E S:

 2


 3


 4        THE COMMISSION:

 5                          COMMISSIONER ANN WILSON
                            COMMISSIONER KATHRYN HEIN
 6                          COMMISSIONER ANGELA MC KENZIE

 7


 8        Hearing Examiner:  Rudolph Konrad

 9


10        For the Milwaukee Police Department:

11            MILWAUKEE DISTRICT ATTORNEY'S OFFICE
              By: ROBIN A. PEDERSON
12            200 E. Wells Street  #800
              Milwaukee, Wisconsin 53202
13
          The Appellant in Person and By:
14
              GIMBEL REILLY GUERIN BROWN, LLP.
15            By: STEVEN C. MC GAVER
              Two Plaza East
16            330 E. Kilbourn Avenue #1170
              Milwaukee, Wisconsin 53202
17

18

19

20

21

22

23

24

25
```

1

## E X A M I N A T I O N   I N D E X

3

WITNESS                                          PAGE NO.

4

CODY SMITH

5

Direct Exam by Mr. Pederson                         12
6    Cross-Exam by Mr. McGaver                           24

7

SEAN HANLEY

8

Direct Exam by Mr. Pederson                         29
9    Cross-Exam by Mr. Mc Gaver                          54
Redirect Exam by Mr. Pederson                       78
10   Recross-Exam by Mr. McGaver                         84
Re-Redirect Exam by Mr. Pederson                    89

11

12   ADAM ZIEGER

13   Direct Exam by Mr. Pederson                         90
Cross-Exam by Mr. McGaver                          140
14   Redirect Exam by Mr. Pederson                      155
Recross-Exam by Mr. McGaver                        156
15   Re-Redirect Exam by Mr. Pederson                   156

16

17   JUANITA CARR

18   Direct Exam by Mr. McGaver                         159
Cross-Exam by Mr. Pederson                         175
19   Redirect Exam by Mr. McGaver                       193

20

21   JORDAN LEWANDOWSKI

22   Direct Exam by Mr. McGaver                         195
Cross-Exam by Mr. Pederson                         206
23   Redirect Exam by Mr. McGaver                       212
Recross-Exam by Mr. Pederson                       213
24

25

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
3
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 3 of 501   Document 80-5

1

DEBORA STACEY
2
Direct Exam by Mr. McGaver                    215
3       Cross-Exam by Mr. Pederson                    223
4

5       JESSE VOLLRATH

6       Direct Exam by Mr. McGaver                    224
        Cross-Exam by Mr. Pederson                    230
7
8       DENISE BROWN-ROGERS

9       Direct Exam by Mr. McGaver                    232
        Cross-Exam by Mr. Pederson                    237
10      Redirect Exam by Mr. McGaver                  238
11

12      SHANNON LEWANDOWSKI

13      Direct Exam by Mr. McGaver                    239
14

15

16

17

18

19

20

21

22

23

24

25

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                          sueT@wi.rr.com
                                                                     4
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 4 of 501   Document 80-5

1

E X A M I N A T I O N   I N D E X

2

3      WITNESS                                    PAGE NO.

4      SHANNON LEWANDOWSKI

5      Cross-Exam by Mr. Pederson                 292
       Redirect Exam by Mr. McGaver               356
6

7      SEAN HANLEY

8      Direct Exam by Mr. Pederson                363
       Cross-Exam by Mr. McGaver                  381
9      Redirect Exam by Mr. Pederson              386
       Recross-Exam by Mr. McGaver                388
10

11     STEVEN KELLY

12     Direct Exam by Mr. Pederson                390
       Cross-Exam by Mr. McGaver                  396
13

14     ADAM ZIEGER

15     Direct Exam by Mr. Pederson                400
       Cross-Exam by Mr. McGaver                  409
16

17
                            PHASE II
18
       CARIANNE YERKES
19
       Direct Exam by Mr. Pederson                440
20     Cross-Exam by Mr. McGaver                  459

21
       CHAD BOYACK
22
       Direct Exam by Mr. McGaver                 464
23

24     SHANNON LEWANDOWSKI

25     Direct Exam by Mr. McGaver                 467
       Cross-Exam by Mr. Pederson                 471

```
 1              MR. KONRAD:        Good morning.  This
 2       is Wednesday, August 10, 2016 at approximately 8:37 a.m.
 3       We are here in the matter of a disciplinary appeal of
 4       Police Detective Shannon Lewandowski from the Milwaukee
 5       Police Department Personnel Order No. 2015-150.  My name
 6       is Rudolph Konrad and I am the hearing examiner for this
 7       matter and will serve as the chair of the hearing today.
 8       I am joined by Fire and Police Commissioners Kathy Hein,
 9       Ann Wilson and Angela McKenzie.  This will be Phase I.
10       In the Phase I hearing, Detective Lewandowski disputes
11       the charges against her.
12              Could we have the appearances of counsel
13       for the record, please?  City first.
14              MR. PEDERSON:        Thank you.  Good
15       morning, Commissioners and Mr. Konrad.  I am Robin
16       Pederson, Assistant City Attorney.  I am representing
17       Chief Flynn today and today with me as my court officer
18       will be Lieutenant Lipski.
19              MR. MC GAVER:        Good morning.  My
20       name is Steven McGaver of the law firm of Gimbel Reilly
21       Guerin & Brown.  Shannon Lewandowski is present at the
22       hearing today as well as a law clerk of mine, Brianna
23       Meyer, although she is not formally appearing.
24              MR. KONRAD:        Thank you.  Are there
25       any matters we need to attend or address before the
```

```
1       opening statements?

2                       MR. PEDERSON:       I don't believe so.

3                       MR. KONRAD:         Counsel may make an

4       opening statement if they choose, starting with the

5       city.

6                       MR. PEDERSON:       Thank you, Mr.

7       Konrad.

8                       Commissioners, I expect the chief's case

9       to be relatively straightforward.  I expect to call

10      three witnesses.  That would be Sergeant Cody Smith of

11      the Shorewood Police Department, Lieutenant Hanley of

12      the Milwaukee Police Department and finally, Sergeant

13      Zieger who is the investigator in the Internal Affairs

14      matter.  Through those witnesses, I expect to establish

15      all the facts necessary for the chief's side of the

16      case.  We are scheduled for two days, so I guess things

17      might get a little more complicated as we go forward,

18      but when I say the chief's case is straightforward, I

19      mean it in that, you know, there are three charges here.

20      One of them relate to operating a vehicle in a manner

21      that was not consistent with the law as required by

22      SOPs and to that extent we are going to -- operating,

23      Detective Lewandowski was operating a squad car as an

24      emergency vehicle contrary to law.  It is as simple

25      as that.  There is a charge relating to effective and
```

SUSAN K. TAYLOR          262-553-1058        COURT REPORTER
                         sueT@wi.rr.com
                                                                    6
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 7 of 501   Document 80-5

1    efficient time -- use of time in completing the mission

2    of the department.  To that extent, we are going to put

3    on evidence that shows that she was engaged in a

4    personal -- personal concerns.  That is, she was en

5    route to attend to matters that were not concerns of the

6    department.  There is two possibilities here.  The facts

7    are going to come out that she was either going to see

8    her son, who had been pulled over by a police officer,

9    or heading to District 5 for a to assist a fellow

10   officer for a matter that was, again, personal.

11                So to that extent, it doesn't matter what

12   the truth is.  The chief is going to maintain she was on

13   her way to the scene where her son had been stopped.  I

14   expect that they are going to maintain she was on her

15   way to District 5.  So the chief's position on that is

16   that it doesn't matter which one it is.  It was not

17   effectively and efficiently a matter or a concern of the

18   department.  So that is sustains -- that is the evidence

19   we will present to sustain that rule violation.

20                Finally, the most significant charge is

21   the integrity charge.  For that, I expect to put up

22   evidence which will demonstrate that the detective

23   changed her story substantively.  That is to say, that

24   when, on a night that the accident -- the squad accident

25   at issue here occurred, it was -- she was interviewed by

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                            7
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 8 of 501   Document 80-5

```
1      Lieutenant Hanley regarding that to gather facts as part
2      of the accident investigation and she gave one version
3      of the events to Lieutenant Hanley.  On subsequent
4      occasions, she completely recanted everything that she
5      said and gave entirely different facts.  Not a matter
6      if this is confusion or anything, but flatly said that
7      Lieutenant Hanley was lying, that he misrepresented
8      purposely.  Now, this is going to largely be a credi-
9      bility concern because the only witness to that original
10     statement provided from Lewandowski to Lieutenant Hanley
11     are the two people involved; the detective and the
12     lieutenant.  So I don't know how you are going to make
13     your credibility determination, but I think there are
14     going to be enough supporting circumstantial facts to
15     support the chief's position that the detective did
16     fabricate, retract her story in a manner that was
17     inconsistent with integrity rules of the department.
18                  So that is the evidence I expect to
19     present and that is all.  Thank you.
20                  MR. MC GAVER:     This is a strange
21     case, although the city intends to present it in a
22     relatively straightforward matter.  I say it is strange
23     because it is involving a car accident and it is strange
24     in that Ms. Lewandowski, former Detective Lewandowski
25     didn't cause the car accident.  She was hit by a driver
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    8
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 9 of 501   Document 80-5

       1       who ran a red light, who was drunk, impaired with both
       2       marijuana and alcohol, knew that the car she was driving
       3       had bad brakes and collided into the squad car that
       4       Lewandowski was driving.  Lewandowski entered the inter-
       5       section.  The evidence will show she had a green light
       6       and she didn't do anything wrong, what I mean by that is
       7       there is going to be evidence that the lights were on,
       8       the squad lights.  Ms. Lewandowski's position is that
       9       the squad lights were on because she was using them as
      10       hazard lights to make sure there was not a collision
      11       with a car pulling out in front of her before she
      12       entered the intersection.  She entered the intersection
      13       and she was slammed into by a different car that no one
      14       saw coming.  The other allegation is that she was
      15       engaging in what my office has come to call frolic and
      16       detour, that she wasn't using her time for the purposes
      17       of the department.  Well, that is nonsense.  It is
      18       nonsense for -- in either scenario that the city
      19       presents.  It is nonsense that she was not -- the city
      20       might present some evidence showing that she was on her
      21       way to intervene in a traffic stop where her son was
      22       pulled over by Shorewood police, although there is a lot
      23       of statements that apparently, it was UWM police who had
      24       nothing to do with anything and that Lewandowski was
      25       on her way to intervene.

You are going to hear from Lewandowski

2        herself, you are going to hear from her son Jordan as

3        well as a couple other witnesses, including Juanita

4        Carr, the detective in the car with Lewandowski, and no

5        one will say that she was on her way to intervene in the

6        traffic stop that her son was involved in.

7                    The other scenario is also nonsense, but

8        for a different reason.  You will hear testimony and

9        Lewandowski will say that she was on her way to District

10       5.  Through counsel, another officer by the name of

11       Melanie Beasley.  Now, you won't hear from Detective --

12       then-Officer Beasley, but we have some stipulated

13       testimony, so you will read about a statement that she

14       made.  Lewandowski was having some trouble completing

15       some police reports and she asked for -- I'm sorry.

16       Beasley was having some trouble completing some police

17       reports and she asked for Lewandowski's assistance,

18       which I think is a pretty fair use of police resources;

19       aiding another officer.  And she was having a personal

20       problem with another member of the police department

21       who, at best, was engaging in some harassing and

22       stalking behavior.  At worst, sexual assault.  And

23       Lewandowski's aim -- one of her aims was to counsel

24       that Officer, now Detective Beasley about what should

25       be done.  You will hear about how, as a result of the

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                          sueT@wi.rr.com
                                                                    10
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 11 of 501  Document 80-5

```
1        accident, Ms. Lewandowski still has some lingering
2        health issues.  She was unconscious for a period of
3        time in the car.  She was pulled out of the car and any
4        statement that she made shortly thereafter, I think the
5        evidence will be pretty clear that she had no idea what
6        she was saying, at least then and there.
7                    So at the end of all of this, the
8        investigation into Lewandowski's conduct commenced and
9        I will see that it was pretty sloppily done.  It was
10       sloppy for a couple reasons.  Number one, a number of
11       the key witnesses weren't interviewed until four, five,
12       six, sometimes seven months after this accident took
13       place.  That is a lot of time to pass.  People's
14       memories fade.  They don't recall exactly what happened,
15       so it is not the most reliable recollection of what
16       occurred.  There were only a handful of witnesses that
17       were interviewed at the scene of the accident.  None of
18       them by Internal Affairs.  If you are going to conduct
19       an Internal Affairs investigation which is ultimately
20       going to result in the loss of a detective's job, the
21       investigation must be better.
22                   So at the end of this case, I am
23       confident that we will be able to show you that there
24       were no rule violations committed by Ms. Lewandowski and
25       that termination of her and other penalties associated
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 12 of 501   Document 80-5

```
 1    with these alleged rule violations were in error.  Thank

 2    you.

 3                  MS. WILSON:        You said somebody

 4    knew they had bad brakes.  Was it --

 5                  MR. MC GAVER:      The driver of the --

 6    the drunk driver.

 7                  MS. WILSON:        Okay.

 8                  MR. KONRAD:        Mr. Pederson, you may

 9    call your first witness.

10                  MR. PEDERSON:      The chief would call

11    Sergeant Cody Smith.

12                  CODY SMITH, having been first duly sworn

13    on oath to tell the truth, the whole truth, and nothing

14    but the truth testified as follows:

15                  MR. KONRAD:         The witness is sworn.

16    DIRECT EXAMINATION BY MR. PEDERSON:

17  Q   Please state your name and spell your name for the

18      record.

19  A   Cody.  C-o-d-y.  Last name is Smith.  S-m-i-t-h.

20  Q   Mr. Smith, how are you employed?

21  A   I am a late shift sergeant with the Village of Shorewood

22      Police Department.

23  Q   How long have you had that position?

24  A   I have been a sergeant since March of 2015.

25  Q   Were you on duty January 1, 2015?
```

SUSAN K. TAYLOR       262-553-1058       COURT REPORTER
                      sueT@wi.rr.com
                                                              12
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 13 of 501   Document 80-5

```
1    A    I was.

2    Q    What time did you start your shift that day?

3    A    I believe it was 10:45 p.m.

4    Q    That would have been the day before on the 18th, I

5         assume?

6    A    Yes.

7    Q    Were you on duty at approximately 2:00 a.m.?

8    A    I was.

9    Q    Do you recall receiving a call for service at around

10        that time?

11   A    I do.

12   Q    Can you please indicate what that call was?

13   A    A disturbance in the 3500 block of North Maryland

14        Avenue.

15   Q    What did you do when you received that call?

16   A    I responded to the 3500 block of Maryland.

17   Q    What happened when you arrived there?

18   A    I observed a vehicle leaving the scene of a house

19        that I believe the disturbance was coming from.

20   Q    What did you do next upon making that observation?

21   A    Conducted a field interview on that vehicle.

22   Q    I presume that you first had to stop the vehicle.

23        Is that right?

24   A    Correct.

25   Q    Was there any issues with stopping the vehicle?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com

```
1    A    No.

2    Q    How far did the vehicle get from the point where you

3         first saw it until you stopped it?

4    A    I don't remember.

5    Q    Was it very far at all?

6    A    No.  It was still in the 3500 block of Maryland.

7    Q    Thank you.  What happened after you actually conducted

8         the stop?

9    A    I made a driver's side approach on that vehicle.

10   Q    Did you identify the driver?

11   A    I did.

12   Q    Who was the driver?

13   A    Jordan Lewandowski.

14   Q    Was there anyone else in the car?

15   A    No.

16   Q    After you identified him, what happened next?

17   A    He had a business card that he made me aware of.

18   Q    How did he make you aware of it?

19   A    I don't remember if he showed it to me or if it was on

20        his lap, but I remember seeing specifically a gold

21        colored badge business card with a name on it for

22        "Detective".

23   Q    Did he give you that or just show it to you?

24   A    I don't remember if he handed it to me or showed it to

25        me.
```

```
 1   Q   Did you see the card?

 2   A   Yes.

 3   Q   Did you read the card?

 4   A   I did.

 5   Q   What did the card say?

 6   A   Detective Shannon Lewandowski, Milwaukee Police

 7       Department.

 8   Q   Did he say anything in connection with that card?

 9   A   That his mom was on the way.

10   Q   What did you understand that to mean?

11   A   That she was going to be arriving at our traffic stop.

12   Q   Did you ask him any questions as to why she was coming

13       or anything?

14   A   Not that I can recall.

15   Q   Is there a reason why you didn't ask him why his mom was

16       on the way?

17   A   I was going to grab his ID and continue on with my

18       business.

19   Q   What was your thought processes related to the

20       possibility of a Milwaukee police detective coming to

21       the scene?  How was that going to affect anything in

22       your mind?

23   A   That is the first time I had ever experienced anything

24       like that, so I was kind of working my way through it.

25       I went back to my squad car and ran the ID that was
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                       sueT@wi.rr.com
                                                                    15
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 16 of 501   Document 80-5

```
 1         provided to me.

 2    Q    When you had this contact with Jordan Lewandowski,

 3         did you make any observations that related to your

 4         investigation or created any other concerns?

 5    A    I did observe an odor of intoxicants coming from inside

 6         the vehicle.

 7    Q    Why was that an issue?

 8    A    For one, the vehicle was operated and two, Jordan

 9         Lewandowski was 19 years old.

10    Q    I believe you already testified that after you got his

11         information, you went back to your squad car.  Is that

12         right?

13    A    Yes.

14    Q    What happened then?

15    A    I am not sure when, but another officer arrived on the

16         scene, Officer Michael Kerr.

17    Q    Is this a Milwaukee officer or Shorewood?

18    A    Shorewood officer.

19    Q    I'd like to backtrack a little bit.  Upon your first

20         contact with him, was he ever on his phone or anything

21         like that?

22    A    Not that I can recall.

23    Q    Do you have an approximate time of the actual stop of

24         the vehicle contact?

25    A    No.
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                      sueT@wi.rr.com
                                                              16
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 17 of 501   Document 80-5

```
 1   Q   Are you able to give us some indication of how long it
 2       took from the 2:00 a.m. hour?  I believe we -- around
 3       2:00 a.m. that you received the call for service?
 4   A   Yes.
 5   Q   How long after that?  Are you able to approximate at
 6       all?
 7   A   I'd just be guessing.
 8   Q   How far did you have to travel from the point that you
 9       received the call till you got to the scene?
10   A   Shorewood is very small, so I would say less than five
11       minutes.
12   Q   Okay.  Let's go forward now to where the other officer
13       arrived at the scene.  What happens next?
14   A   I make a second approach on the vehicle that was
15       stopped.
16   Q   What is your intent at that point?
17   A   I established field sobriety tests on Jordan
18       Lewandowski.
19   Q   What happened next?
20   A   After the field sobriety tests, I had Jordan conduct
21       a preliminary breath test.
22   Q   What is a "preliminary breath test"?
23   A   It is a device that you use on the street to get
24       somebody's breath alcohol concentration.
25   Q   Did you actually have him perform that test?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                17
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 18 of 501   Document 80-5

```
1    A    Yes.

2    Q    What was the result of that test?

3    A    0.09 BRAC.

4    Q    What is "BRAC"?

5    A    Breath alcohol concentration.

6    Q    So what did that indicate to you?

7    A    Exactly that.  A 19-year-old kid is a .09 and operating

8         a motor vehicle.

9    Q    What happened next?

10   A    I believe Jordan's phone rang.  He answered the phone

11        and stated that his mom had been in a car accident.

12   Q    After that?

13   A    It was brought to my attention that somebody from the

14        Milwaukee Police Department was going to be coming to

15        pick up Jordan.

16   Q    How did you become aware of that?

17   A    I don't remember if I talked to somebody on the phone or

18        if he had mentioned it to me.

19   Q    If you talked to somebody on the phone, would it have

20        been what phone?

21   A    His phone.

22   Q    Do you know who it was that that information came from?

23   A    I don't know.

24   Q    What was -- what was your understanding what was going

25        to happen when somebody picked him up?
```

```
 1    A    That they were going to take him to the hospital to see
 2         his mom.
 3    Q    Did you have an understanding of who was going to pick
 4         him up?
 5    A    I don't.
 6    Q    Did you have an understanding whether it was going to
 7         be Milwaukee Police Department officers or a private
 8         citizen?
 9    A    That was my understanding, that somebody from the
10         Milwaukee Police Department was coming.
11    Q    What did you do at that time?
12    A    I don't remember what happened next.  I don't remember.
13    Q    Going back to the point where he indicated that his mom
14         was on the way, is there any doubt in your mind, because
15         I understand you have had some trouble recalling, is
16         there any doubt in your mind at all that he indicated
17         that his mother was on the way to the scene?
18    A    No doubt.
19    Q    Is there any other source of that information than
20         Jordan Lewandowski?
21    A    No.
22    Q    You testified -- I believe you testified already that
23         you had decided that you were going to allow him to
24         leave the scene.  Is that right?
25    A    Correct.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                19
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 20 of 501   Document 80-5

```
1    Q    What did you base that decision on?

2    A    That his mother had just been involved in a serious

3         car accident and was on her way to the hospital.

4    Q    That was just a discretionary call on your part, fair to

5         say?

6    A    Yes.

7                   MR. PEDERSON:      That is all I have

8         for this witness on direct.

9                   MR. KONRAD:      Commissioners with

10        any questions?

11                  MS. WILSON:      What is the process

12        for any officer that gets hurt on duty to notify the

13        family?  Does another officer do it?  Take them to the

14        hospital?  What is the process?

15                  MR. PEDERSON:      Who are you asking?

16                  MS. WILSON:      What is the process?

17        I am sorry.  If an officer gets hurt on duty, what is

18        the process of notifying the family or getting the

19        family to where the officer is, or is there a process?

20                  MR. KONRAD:      I think that is an

21        excellent question.  I don't think this witness can

22        testify as to what the Milwaukee police process is.

23        However, counsel perhaps can take note of that and

24        answer the question with the appropriate witness.

25                  MR. PEDERSON:      At a future time?
```

```
 1                    MR. KONRAD:        In the course of this
 2        hearing.
 3                    MR. PEDERSON:      I will be happy to
 4        address that with an appropriate witness, Commissioner.
 5                    MS. HEIN:          From the time you got
 6        your initial phone call for service till the time Jordan
 7        indicated that his -- he got the phone call indicating
 8        his mother was in an accident, can you give me an
 9        approximate amount of time that elapsed?
10                    THE WITNESS:       Any approximation
11        would be simply a guess.
12                    MS. HEIN:          You said it took less
13        than five minutes to get there.  So, I guess, I am
14        looking for a --  Would it take a half hour from the
15        time you got there till he got that phone call?
16                    THE WITNESS:       No.
17                    MS. HEIN:          A matter of, like,
18        maybe five or ten minutes?  Even an approximate would
19        be helpful.
20                    THE WITNESS:       Just based on
21        standard field sobriety tests and how long those take
22        and just a straightforward traffic stop where nothing
23        else is going on, I would say the field sobriety tests
24        take somewhere around seven to nine minutes.  For me to
25        get to the location was five minutes.  I would say
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
                                                                    21
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 22 of 501  Document 80-5

```
 1      between 15 and 20 minutes would be the entirety of this
 2      whole thing.
 3                      MS. HEIN:           Thank you.
 4                      MS. MC KENZIE:      You stopped the car.
 5                      THE WITNESS:        Yes.
 6                      MS. MC KENZIE:      You approached the
 7      driver.
 8                      THE WITNESS:        Yes.
 9                      MS. MC KENZIE:      The driver was in the
10      car with the card either on his lap or in his hand to
11      show or give to you.
12                      THE WITNESS:        I don't know if his
13      intention was to give it to me or for me to see it.
14                      MS. MC KENZIE:      But you saw a card.
15                      THE WITNESS:        Yes.
16                      MS. MC KENZIE:      The driver said to
17      you, "my mom is coming."
18                      THE WITNESS:        Yes.
19                      MS. MC KENZIE:      So after that, you
20      still continued to do your job, which is the field
21      sobriety tests.  Is that correct?
22                      THE WITNESS:        Yes.
23                      MS. MC KENZIE:      At what point did the
24      phone interaction happen where you on the phone with
25      someone?  Before or after the sobriety test?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                                    22
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 23 of 501   Document 80-5

```
 1                    THE WITNESS:        It was after the PBT,

 2          the breath test.

 3                    MS. MC KENZIE:    After the breath

 4          test -- I'm sorry.  Do you also have a person come out

 5          of the car and walk and do those types of things?

 6                    THE WITNESS:    Yes.

 7                    MS. MC KENZIE:    You engage the driver

 8          that way.

 9                    THE WITNESS:    Yes.

10                    MS. MC KENZIE:    So after that is when

11          you received the call.

12                    THE WITNESS:    Yes.

13                    MS. MC KENZIE:    And, then, just so I

14          am clear, after you received the call, you let the

15          driver go.

16                    THE WITNESS:    Yes.

17                    MS. MC KENZIE:    In the car.  So he

18          drove away.

19                    THE WITNESS:       He didn't drive away.

20                    MS. MC KENZIE:    How did you let him

21          go?

22                    THE WITNESS:       I don't recall.  All I

23          know is I wasn't going to let a 19-year-old kid drive

24          a vehicle who is over the legal limit.

25                    MS. MC KENZIE:    Was there someone who
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                    sueT@wi.rr.com
                                                         23
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 24 of 501   Document 80-5

```
 1      came at the time to pick him up?  Do you recall that.
 2                      THE WITNESS:        I don't recall that.
 3                      MS. MC KENZIE:      Okay.
 4                      MR. KONRAD:         Cross?
 5      CROSS-EXAMINATION BY MR. MC GAVER:
 6   Q  Sergeant Smith, remind everybody here when you were
 7      promoted to sergeant.
 8   A  March of 2015.
 9   Q  So that was after this incident.  Correct?
10   A  Yes.
11   Q  You were a patrol officer at the time?
12   A  Yes.
13   Q  Have you ever met Shannon Lewandowski?
14   A  No.
15   Q  Have you ever spoken to Shannon Lewandowski either in
16      person or on the phone?
17   A  No.
18   Q  Isn't it true that you were called to this scene and
19      your interaction with Jordan Lewandowski was because of
20      a noise complaint?
21   A  Yes.
22   Q  Isn't it true that there was nothing in the initial CAD
23      report or any information that you initially received
24      involving a car that caused you to report to that scene.
25      Correct?
```

```
 1   A    Not that I can remember.

 2   Q    As far as you know, there was no car involved when --

 3        Strike that.  Your understanding, approaching the scene

 4        of Jordan Lewandowski, your understanding was that there

 5        was no car involved.  Is that fair?

 6   A    That is not fair.

 7   Q    What is not fair about it?

 8   A    The vehicle is leaving the area where a noise complaint

 9        was called in.

10   Q    But that is not the reason you were initially dispatched

11        there.  Correct?

12   A    A noise complaint.  Correct.

13   Q    At some point, your testimony was a little unclear.

14        You got ahold of Jordan Lewandowski's phone.  Is that

15        true?

16   A    Not that I can recall.

17   Q    Whose phone did you speak to a representative of the

18        Milwaukee Police Department on?

19   A    I don't remember if I spoke to somebody on the phone or

20        Jordan told me his mom was in an accident.  I can't

21        remember.

22   Q    Jordan did tell you his mother was on the way.  Correct?

23   A    Correct.

24   Q    Do you remember the exact words he used?

25   A    I don't.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    25
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 26 of 501   Document 80-5

```
 1   Q    Is there a squad dash cam in the vehicle you were

 2        driving?

 3   A    There is.

 4   Q    Were you able to consult that footage?

 5   A    I was not.

 6   Q    Why not?

 7   A    We have had the squad video crash multiple times since

 8        then.

 9   Q    Even though footage may have been taken at the time, it

10        was not available?

11   A    It has never been available for me to view.

12   Q    When were you first interviewed about this incident?

13   A    I don't recall.

14   Q    If I told you it was -- we'll call it several months --

15        How about June 12, 2015?  Would you quarrel with me?

16   A    I don't remember what day it was.

17   Q    But you wouldn't dispute that.

18   A    I wouldn't dispute it.

19   Q    If Detective Lewandowski had shown up to the scene,

20        would it have impacted or changed anything that you

21        would have done with Jordan Lewandowski?

22   A    It never happened, so I can't answer that question.

23   Q    I think you might have testified to this, but I am not

24        sure.  Has another officer ever intervened in a traffic

25        stop that you were conducting?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                26
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 27 of 501   Document 80-5

```
 1   A   No.

 2   Q   At the end of all of this, did anybody remain on scene

 3       with Jordan Lewandowski?

 4   A   Not that I can recall.

 5   Q   Is that because no representative of the Shorewood

 6       Police Department was present with Jordan Lewandowski

 7       when you left?

 8   A   Not that I can remember.

 9   Q   So your testimony today is that you took the word of a

10       19-year-old who was on the phone with somebody and told

11       you that his mother was in a car accident and that got

12       him off the hook for a potential OWI charge.  Is that

13       true?

14   A   That is not what I am testifying to.

15   Q   What is wrong with that statement?

16   A   You are accusing me of doing something when I am not the

17       one that is here on trial.

18   Q   I just asked you what you did.

19   A   I didn't have a chance to do what I was going to do

20       because that was obviously derailed by some other set of

21       circumstances.

22   Q   But the cause of that was a phone call that Jordan took

23       and you don't know whether you even spoke to the person

24       on the other end of the phone?

25   A   Correct.  I don't recall if I spoke to them or not.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    27
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 28 of 501   Document 80-5

```
 1   Q    You don't know whether that person was a Milwaukee
 2        police officer?
 3   A    Correct.
 4   Q    Did you generate a police report as a result of this
 5        incident?
 6   A    No.
 7   Q    Did you write anything down in your memo book?
 8   A    Not that I can remember.
 9   Q    Did you bring your memo book here today?
10   A    No.
11   Q    Once Jordan Lewandowski left your custody, I will call
12        it "custody" because it is the easiest word to use,
13        although I don't think he was in formal custody.  True?
14   A    True.
15   Q    We'll change the word, then.  After Jordan Lewandowski
16        left your presence, you don't know what happened to him.
17   A    Correct.
18   Q    And you don't know whether anybody from Milwaukee police
19        came to pick him up.
20   A    Correct.
21   Q    You don't know whether his mother ever reported to the
22        scene.
23   A    Correct.
24   Q    Or if he got in the car and drove away.
25   A    I don't know.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                          sueT@wi.rr.com
                                                                    28
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 29 of 501   Document 80-5

```
1              MR. MC GAVER:      Nothing further.
2    Thank you.
3              MR. PEDERSON:      I have no redirect.
4              MR. KONRAD:        Thank you.
5    (Witness excused)
6              MR. PEDERSON:      The chief next calls
7    Lieutenant Hanley.
8              SEAN HANLEY, having been first duly sworn
9    on oath to tell the truth, the whole truth, and nothing
10   but the truth testified as follows:
11   DIRECT EXAMINATION BY MR. PEDERSON:
12  Q  Could you please state your name for the record and
13     spell your name?
14  A  Sean Hanley.  H-a-n-l-e-y.
15  Q  How are you employed?
16  A  Lieutenant with the Milwaukee Police Department.
17  Q  How long have you been with the police department?
18  A  20 years.
19  Q  How long have you been a lieutenant?
20  A  Since February of 2013.
21  Q  To your recollection, were you working on the evening
22     of January 18/morning of January 19, 2015?
23  A  Yes, I was.
24  Q  What were you doing that day?
25  A  I was a lieutenant in CIB for Central.
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 30 of 501   Document 80-5    29

```
1    Q    What was your job in that capacity?

2    A    Central covers -- at that time, covered Districts 3 and

3         5.  It was my job to supervise detectives and crime

4         scenes that occurred in that area.

5    Q    Was there a call that evening related to a person who

6         was shot?

7    A    Yes.

8    Q    Could you please provide some facts related to that

9         incident?

10   A    A person showed up at St. Joseph's Hospital shot through

11        the hand -- he had a holster, but didn't have a gun with

12        him -- stating that he accidentally had shot himself

13        while trying to help a female that was being chased on

14        17 and North.

15   Q    Was this incident responded to or addressed or

16        investigate in any way by Milwaukee police personnel?

17   A    Yes.

18   Q    Why?

19   A    We investigate all shootings in the city.

20   Q    Were you involved in that investigation in any capacity?

21   A    Yes.

22   Q    How so?

23   A    I responded to the hospital because at the time he

24        showed up at the hospital, we didn't have a scene, we

25        didn't know where the incident occurred.
```

```
 1   Q    What happened next as a part of that investigation?

 2   A    His statement of how he shot himself was very question-

 3        able and the fact that he no longer possesses his gun,

 4        which he has a holster for, two magazines for, is also

 5        very suspicious and we believe that the circumstances

 6        he is giving us are not truthful at that point.

 7   Q    So what is the safety or police concern?

 8   A    The police concern is one, he shot himself, so he had

 9        his gun in his hand brandishing it.  Two, if he is being

10        untruthful, that is a crime.  It is a crime to shoot a

11        gun in the city unless you fall under -- the district

12        attorney rules it self-defense or something like that,

13        but just on the outside, you can't shoot a gun in the

14        city.

15   Q    All right.  Was there any other police concerns related

16        to that?

17   A    We wanted to recover the gun.  He is a permit holder,

18        the gun was just used in an incident, so we would like

19        to recover the gun as evidence of that.

20   Q    Did you have any facts to know for certain that the

21        story he was providing was the whole truth and there

22        was nothing more to it?

23   A    He became --  He couldn't explain where his gun was.

24        He had a holster, he had two magazines and he couldn't

25        explain the whereabouts of his gun, although he said he
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    31
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 32 of 501   Document 80-5

```
 1        drove straight from the shooting incident to the
 2        hospital.
 3    Q   So what did you decide needed to happen next in this
 4        investigation at that time?
 5    A   I directed Detective Juanita Carr to go to his house and
 6        do a "knock and talk" to try to get a consent search to
 7        try to locate his gun before he was released from the
 8        hospital.
 9    Q   I think you might have said -- Juanita Carr is a
10        detective.  Is that right?
11    A   Yes.
12    Q   Where were you when you gave this directive to Detective
13        Carr?
14    A   District 3.
15    Q   Where was Detective Carr?
16    A   At District 3.
17    Q   Face to face?
18    A   Yes.
19    Q   Do you have an approximate time that you gave her this
20        task?
21    A   Probably between 12:30 and 1:00 a.m.
22    Q   Again, I believe it is in the record, but I want to make
23        sure it is clear.  What was the assignment specifically
24        given to her?
25    A   To go directly to the house, which was close to St.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                     sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 33 of 501   Document 80-5        32

```
 1        Joe's -- it is 2765 North 52nd Street -- and to try to
 2        obtain consent from this person's girlfriend to search
 3        the house for the gun before he is discharged from the
 4        hospital.
 5   Q    So was this time-sensitive?
 6   A    Yes.
 7   Q    Why was it -- why in your mind was it a time-sensitive
 8        issue?
 9   A    Because this type of gunshot injury, many times, results
10        in a very quick release from the hospital and I wanted
11        to --  We might have a higher chance of compliance if he
12        is not -- has not returned home yet.
13   Q    I believe you gave the address, but I am not sure it was
14        clear to me.  Can you provide the address of the house
15        again?
16   A    2765 North 52nd.
17   Q    Are you familiar with District 3?
18   A    Yes.
19   Q    Are you familiar with how long it might take to drive
20        from District 3 to this address you just provided?
21   A    Yes.
22   Q    How long would it take, approximately?
23   A    Five minutes or less.
24   Q    When you gave Detective Carr this assignment, did you
25        let her know that you wanted it done quickly?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 34 of 501   Document 80-5          33

```
 1    A    Yes.

 2    Q    To your knowledge, what happened next?

 3    A    What I discovered later or what I assumed?

 4    Q    What is the next thing you know personally?

 5    A    The next thing personally is I reported back to District

 6         5.

 7    Q    Was that immediately after giving Detective Carr the

 8         instruction or sometime after that?

 9    A    It was immediately after giving it to her.

10    Q    What happened after you arrived at District 5?

11    A    I become aware there was a traffic accident involving

12         two detectives on 35th and North.

13    Q    Do you have an approximate time for that?

14    A    The accident was initiated at 2:17 a.m.  I wasn't

15         notified immediately.  I was probably notified within

16         five minutes -- five to ten minutes.

17    Q    What did you do when you received that information?

18    A    I immediately went to my squad and started responding

19         to 35th and North.

20    Q    Why did you do that?

21    A    Well, one, it is in Central, but two, it is after mid-

22         night and in the geographic divisions we had at the

23         time, that would be -- I would be the only lieutenant

24         working in the regular section of the investigative

25         bureau after midnight.  It would be my responsibility
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                        sueT@wi.rr.com
                                                              34
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 35 of 501   Document 80-5

| 1 | | to respond to that, no matter where I am. |
| 2 | Q | What would be your function once you responded to the |
| 3 | | scene? |
| 4 | A | To supervise a fair and impartial investigation of the |
| 5 | | scene and to check on the welfare of the injured |
| 6 | | parties. |
| 7 | Q | What type of investigation? |
| 8 | A | Traffic accident. |
| 9 | Q | You don't respond to every traffic accident. |
| 10 | A | No. |
| 11 | Q | So why was it required for a supervisor to be at this |
| 12 | | traffic accident? |
| 13 | A | For standard SOPs, supervisors have to respond to every |
| 14 | | traffic accident involving a duty member. |
| 15 | Q | Did you know who was involved in the accident? |
| 16 | A | No, I didn't. |
| 17 | Q | When did you discover that? |
| 18 | A | When I arrived on scene. |
| 19 | Q | When did you arrive on the scene? |
| 20 | A | 2:32 a.m. |
| 21 | Q | What happened when you arrived on the scene? |
| 22 | A | I was approached by Sergeant Wade Grubich who told me |
| 23 | | who was involved in the accident and witness statements |
| 24 | | pertaining to the direction of travel of the vehicles. |
| 25 | Q | Who was involved in the accident? |

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 36 of 501   Document 80-5        35

```
1    A    A citizen, Debrielle Johnson, and the two detectives,
2         Shannon Lewandowski and Juanita Carr.
3    Q    What information were you provided at that time and
4         in conjunction with your observation did you come to
5         understand what happened?
6    A    Sergeant Grubich told me there were witnesses stating
7         that the squad car was traveling eastbound on West North
8         Avenue going through an intersection which had a green
9         light and that a Mitsubishi was traveling northbound on
10        north 35th Street and disregarded a red light causing
11        the squad car to hit the Mitsubishi.
12   Q    So based on those preliminary facts, it is your under-
13        standing the squad car was not at fault and that the
14        citizen-driven vehicle was at fault?
15   A    Yes.
16   Q    Were you given any information or make any observations
17        consistent with whether the squad car was being operated
18        as an emergency vehicle at the time of the accident?
19   A    Yes.
20   Q    What did you see or observe or learn regarding that?
21   A    Sergeant Adam Riley told me that Detective Lewandowski
22        had been making a statement that she was going to UWM
23        because her son had been stopped in a traffic accident
24        and he told me that she was operating with her lights
25        on, activated.
```

SUSAN K. TAYLOR         262-553-1058        COURT REPORTER
                       sueT@wi.rr.com

```
 1   Q    Was that of concern to you when you were provided that
 2        information?
 3   A    Originally, he said the lights on, yes.  That was a
 4        concern because we are limited in the capacity that we
 5        can use our emergency lights.  So I asked him if he knew
 6        of any call that would require emergency lights.  He
 7        said no.  Then reporting to the area of UW-Milwaukee,
 8        her son was stopped by the police was a concern.
 9   Q    You said you are limited in how you can use your
10        emergency lights.  Can you please expand on that?
11   A    State statute and SOP give very direct criteria for
12        us to use our emergency lights, being responding to
13        emergency situations, exigent circumstances or in
14        pursuit of a vehicle or making a traffic stop, you can
15        use your lights for an escort, but you can't use them to
16        report to a non-emergency situation.
17   Q    What about the distinction of having just lights and
18        no siren?  Does that make a difference?
19   A    Yes.  There is very few situations where you can use
20        just your emergency lights without your sirens acti-
21        vated.  That being, you can for an escort, like an over-
22        sized load or something.  You can on what is -- what we
23        call a "silent run".  It relates to getting to a scene
24        of a felony where the sound of the sirens may cause harm
25        to the victim, may cause evidence to be destroyed, may
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              37
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 38 of 501   Document 80-5

```
 1        cause the perpetrator to flee.  In those cases, you can
 2        use your lights without your siren, but you can't dis-
 3        regard a red light.  Those are only felony cases.
 4    Q   So you said that was a concern you had related to the
 5        emergency lights.  What about the information you were
 6        provided regarding she may have been on her way to UWM
 7        or something -- something regarding her son?
 8    A   That is a concern.
 9    Q   Why was that?
10    A   We are not allowed by SOP to interfere with the investi-
11        gation of other departments.  Plus, they were on an
12        assignment.  I was not notified they were not responding
13        to the assignment, which is required.
14    Q   In your role as the supervisor at the scene, did you
15        make any decision at that time regarding how the acci-
16        dent investigation should proceed based on the informa-
17        tion you received?
18    A   Yes.
19    Q   What decision did you make?
20    A   I called two detectives to the scene to do detailed
21        citizen interviews.
22    Q   Anything else?
23    A   I notified acting Captain Johnny Sgrignuoli just due
24        to the injuries, which is standard.  The whole protocol
25        when a squad accident, you know, they are taken to the
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              38
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 39 of 501   Document 80-5

```
 1            hospital, I am going to need to bring support to the
 2            hospital, do comp reports.  I mean, there is a whole
 3            process.
 4    Q       Is it your job to oversee to make sure that all of that
 5            takes place properly?
 6    A       Yes.  It is my job on the scene to make sure it is done
 7            properly and to ensure a fair and unbiased investigation
 8            to all parties involved.
 9    Q       Including officers?
10    A       Including officers.
11    Q       Speaking of officers, did you check in on the two
12            detectives?
13    A       Yes.
14    Q       What observations did you make about them?
15    A       Originally, I talked to both of them on the scene
16            briefly.  They were being treated medically.  Later,
17            I went to the hospital, to Froedtert.
18    Q       Is it your --  Do you have any specific task as it
19            relates to conducting interviews?
20    A       Yes.
21    Q       What is your role as the supervisor as it relates to
22            interviews?
23    A       My role as a supervisor is I am responsible for inter-
24            viewing the department members and I have three days
25            from the time of the incident to complete my accident
```

SUSAN K. TAYLOR         262-553-1058        COURT REPORTER
                        sueT@wi.rr.com
                                                              39
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 40 of 501   Document 80-5

```
1        report per SOP.  I have to start it the night of the
2        accident and have it completed within three days.
3   Q    You said you spoke to them on the scene.  What did you
4        speak to them about?
5   A    I asked them if they were all right, if they need any-
6        thing.
7   Q    Were you looking to conduct the interview that you
8        needed to conduct at that time?
9   A    No.  They were receiving medical treatment.
10  Q    I believe you already testified that they were trans-
11       ferred to a medical facility.  Is that correct?
12  A    To Froedtert.
13  Q    What happened after they were transported?
14  A    What do you mean?  I stayed on the scene for a while to
15       oversee the investigation, I had detectives respond to
16       there to do the citizen witnesses.  Some citizens were
17       Good Samaritans.  They helped pull the detectives out of
18       the car and get them to safety.  They thought the car
19       was going to go up in flames.  Then I reported to
20       District 5 to get some necessary paperwork because I
21       have to turn them over to the doctors.  It is preferable
22       we give them our department medical form so they can
23       fill them out and, then, report to Froedtert.
24  Q    How about the gun search assignment that you gave to
25       Detective Carr?  Did you get any information regarding
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 41 of 501   Document 80-5          40

```
1       whether that was done at that time or not?
2                       MR. MC GAVER:      I will object.
3       The question is vague.  What time are we talking about?
4                       MR. PEDERSON:      I can limit it to the
5       time when he is at the scene.
6                       MR. MC GAVER:      Thank you.
7                       MR. KONRAD:        You may proceed.
8       Answer the question.
9    A  At the scene, I didn't know it had not been done, no.
10   Q  Was there a time that came that you discovered it had
11      not been done yet?
12   A  Yes.
13   Q  When did you first discover that?
14   A  At the hospital.  I don't remember if it was at the
15      hospital or when Detective Lewandowski called me when
16      I first realized it had not been done.
17   Q  Are you aware of when -- if the search was ever done?
18   A  I am not aware that it was ever done, no.
19   Q  Do you know definitively if it was done by Detective
20      Carr and Detective Lewandowski at any time?
21   A  It was not.
22   Q  So after you are at District 5, what happens next after
23      you left the scene?
24   A  I reported to District 5 to pick up the necessary paper-
25      work.  Then I reported to Froedtert Hospital.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                        sueT@wi.rr.com
                                                              41
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 42 of 501  Document 80-5

```
1   Q    Why did you do that?

2   A    Because there is forms that we have to give the medical

3        personnel that they fill out regarding when they come

4        back to work, if they come back, are they going to be

5        limited duty.  Department forms.

6   Q    Do you know what time you arrived at the hospital?

7   A    At, I believe, 5:21 p.m.  I went out -- I go in at 4:51.

8        I ran into some construction and arrived on scene at

9        5:20.

10  Q    What did you do when you arrived at the hospital?

11  A    I entered the hospital and located first Detective

12       Lewandowski.

13  Q    What happened when you located her?

14  A    I talked to her.

15  Q    What did you talk to her about?

16  A    I asked her if she was all right, explained to her the

17       process of "injured on duty."  I told her I will talk to

18       her at a later time regarding her accident.

19  Q    Did you make any observations regarding her physical

20       condition?

21  A    Her right foot, I believe, seemed hurt.  Other than

22       that, she seemed in fairly good spirits.  She was

23       walking on her foot that seemed hurt -- one of her feet.

24       I believe it was her right foot.

25  Q    How much time did you spend with her?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    42
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 43 of 501   Document 80-5

```
1   A    I was at the hospital till 6:22.  That included time
2        with Detective Lewandowski and time with Detective Carr
3        and talking to medical staff.
4   Q    Are you able to approximate how much of that approximate
5        hour or so you spent with -- in the company of Detective
6        Lewandowski?
7   A    Probably 20 minutes.
8   Q    During that time, was she speaking?  Was she awake?
9   A    Yes.
10  Q    Did you make observations of her that indicated to
11       you that she might not be lucid or might have trouble
12       communicating, anything like that?
13  A    No.  She was talking fine, she was walking.
14  Q    Was there a point where you went and visited Detective
15       Carr?
16  A    Yes.
17  Q    What happened there?
18  A    Detective Lewandowski walked me to the room Detective
19       Carr was in and she had family or friends in her room.
20       I talked to her for a little while, explained again the
21       process, asked if she was all right.  I told her I would
22       talk to her at a later time regarding the accident.
23  Q    Did you make any observations of her?  Was she able to
24       communicate at the time or was there any difficulty
25       regarding that?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 44 of 501   Document 80-5    43

```
1   A    No difficulty.  She communicated fine.

2   Q    Did you consider the possibility of interviewing either

3        or both of the detectives at that time?

4   A    Both had family or friends with them and they had

5        medical staff coming in and going, so I decided at that

6        time to not do it at that time.

7   Q    Does that correlate with the time you left?

8   A    Yes.

9   Q    I believe you already testified you left the hospital

10       at approximately 6:22 a.m.?

11  A    Yes.

12  Q    So you were there approximately one hour.  Is that

13       right?

14  A    Yes.

15  Q    All right.  What happened when you left the hospital?

16  A    I was driving back to District 5 to start the necessary

17       reports and I received a phone call from Detective

18       Lewandowski.

19  Q    Was this your personal cell phone you received a phone

20       call on?

21  A    Yes.

22  Q    Did you know where the call came from?

23  A    No.  It showed up as "restricted".

24  Q    But you answered it and it was Detective Lewandowski.

25       Is that right?
```

1    A    Yes.

2    Q    Okay.  And what happened when you answered the phone and

3         spoke to her?

4    A    She asked me if I would like to know what happened and I

5         said yes.

6    Q    Do you have an approximate time that she called you?

7    A    6:38 a.m.

8    Q    Had you told her to give you a call right away or

9         anything like that?

10   A    No.

11   Q    Were you expecting her to call you?

12   A    No.

13   Q    Did you ask her when she called -- I want to be more

14        clear.  When you spoke to her, how did that conversation

15        go?  Did you ask her at that time, "hey, can I talk to

16        you", or did she offer?  How did that happen?

17                      MR. MC GAVER:        I will object.

18        Compound.

19                      MR. KONRAD:        Sustained.

20        BY MR. Pederson:

21   Q    When you received the call, can you clearly state what

22        Detective Lewandowski said to you?

23   A    She said, "would you like to know what happened", words

24        to that effect.

25   Q    Did you have an understanding of what she was referring

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                                    45
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 46 of 501   Document 80-5

```
 1      to?

 2   A  She said the accident.

 3   Q  So what happened after that?

 4   A  I said yes, and I pulled over.

 5   Q  Did you take a statement from her at that time?

 6              MS. WILSON:        You said yes and then

 7      what?

 8              THE WITNESS:       I said, "yes, I would

 9      like to know what happened", and I pulled over.

10              MS. WILSON:        Pulled over.  Okay.

11      BY MR. Pederson:

12   Q  Did you take a statement from her at that time?

13   A  Yes, I did.

14      (A document was marked as Exhibit No. 1)

15   Q  Lieutenant, I have presented you a document marked for

16      identification as Exhibit 1.  Are you familiar with that

17      document?

18   A  Yes, I am.

19   Q  What is this document?

20   A  This is the AIMS report for the accident.

21              MR. KONRAD:        I don't have a copy

22      of number one.  It says two on it.

23      (Discussion off the record)

24      BY MR. PEDERSON:

25   Q  Does this document relate to the statement that you took
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    46
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 47 of 501   Document 80-5

```
 1          from Detective Lewandowski?

 2    A     Yes, it does.

 3    Q     How so?

 4    A     This is my putting onto paper what was said.

 5    Q     I will direct your attention to Page 5 and Page 6 of the

 6          document.  Do you see that?

 7    A     Yes.

 8    Q     What is contained on those two pages?

 9    A     My narrative of the original investigation.

10    Q     What part of the investigation does this specifically

11          relate to?

12    A     The traffic accident.

13    Q     When did you write this narrative?

14    A     January 22.

15    Q     As I look right above it, it says "Date Reported:

16          1/29/2015".  Can you explain how that is?

17    A     On what page?

18    Q     I am on Page 5.

19    A     January 29 is when Michele Pagan assigned it to Tyronda

20          Williams.  This time, it is completely out of my hands.

21          I don't have any contact with this report anymore.

22    Q     Is there anything on this document that relates to

23          January 22 or indicates January 22?

24    A     On Page 4, kind of the middle of the page under

25          "Assignments", it is assigned to me by me.  "Assign
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    47
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 48 of 501   Document 80-5

1     Date, 1/19/2015", which is the date of the accident,
2     the date we open the report and do what is considered
3     a phase, put preliminary names and stuff in it.  I
4     completed it on January 22, which I would have tracked
5     it -- what we call "tracked it" to Johnny Sgrignuoli,
6     who was a lieutenant, but he was the acting captain of
7     Central at that point.
8  Q  To someone who is not familiar with the AIMS reporting
9     system that you are describing, this looks a little
10    confusing because you are saying that the January 22
11    date that is on Page 4, there is a lot of separation to
12    the narrative.  Why is that?
13 A  That is a confusing system.  There is a separate tab
14    for tracking, totally different than the narrative which
15    is on a tab called "Notes".  We do the narrative.  When
16    we are done with the reports, we go back to tracking,
17    put a completed date, saying, "I am done with this",
18    and I send it to the next person in the chain that needs
19    to see it.
20 Q  As you sit here today, when it comes to the narrative
21    to Pages 5 and 6, is there any doubt that you submitted
22    that on January 22?
23 A  No.
24 Q  Just another thing just to cover.  On Page 4, there is
25    another smaller narrative that starts with, "Michelle,

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              48
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 49 of 501   Document 80-5

```
1          I am concerned".  Do you see that?

2    A     Yes.

3    Q     Did you write that?

4    A     No.

5    Q     Is it correct to say that the narrative contained on

6          Pages 5 and 6 relates specifically to the statement that

7          you took from Detective Lewandowski when she called you

8          at approximately 6:38 in the morning on January 19,

9          2015?

10   A     Yes.

11   Q     All right.  Is the information that you convey in this

12         report true and accurate?

13   A     Yes.

14   Q     Did you truthfully record the statements as you under-

15         stood them as they were provided to you by Detective

16         Lewandowski?

17   A     Yes.

18   Q     In review of the document that you have in front of you,

19         does that appear to be a true and accurate copy of the

20         report that you generated back on January 22?

21   A     Yes.

22                    MR. PEDERSON:      I move this document

23         into evidence.

24                    MR. MC GAVER:      I'll object.  There

25         is multiple levels of hearsay within the document which
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                                  49
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 50 of 501   Document 80-5

1    really calls question to the reliability therein.  For
         2    that reason, I don't believe it should be offered for
         3    the truth of the matter as asserted therein and I would
         4    object.
         5                    MR. KONRAD:          Overruled.  The
         6    document is admitted.
         7    BY MR. PEDERSON:
         8    Q   Please indicate what Detective Lewandowski advised you
         9        during that phone call.
        10    A   She advised me that she was teaming up with Juanita Carr
        11        to go do -- to try to get the consent search and when I
        12        instructed Detective Juanita Carr to get the consent
        13        search, I also told her, "either have officers or
        14        another detective go with you.  It is a two-person
        15        assignment."  So she said that she was contacted by
        16        Officer Melanie Beasley, who is a District 5 officer,
        17        stating that she had a restraining order on a TAC
        18        officer, a different TAC officer in District 5, and she
        19        was concerned something might happen, so Shannon started
        20        to go to District 5 to help Melanie and, then, got a
        21        phone call from her son saying he was stopped in the
        22        area of UWM by the police -- UWM police and she was
        23        going to respond to that area first while trying to
        24        figure out exactly where he was and, then, go to
        25        District 5 and when all of that was done, do the consent

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    50
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 51 of 501  Document 80-5

```
1        search.  She also indicated she was going about 45 miles
2        an hour eastbound and turned her lights on, but not her
3        sirens and she was not using her vehicle as an emergency
4        vehicle.  She just wanted the cars in front of her to
5        get out of her way and that she had handed her phone to
6        Detective Juanita Carr because she doesn't mess with her
7        phone while she is driving and the accident, she didn't
8        have time to respond.  The car ran a red light.
9   Q    At that time, did she make any statements to you regard-
10       ing turning on the lights because she wanted to prevent
11       an accident with another vehicle that might pull out of
12       North Avenue or anything like that?
13  A    No.
14  Q    Again, to be clear, did she tell you why the emergency
15       lights were on?
16  A    To have cars move out of her way so she could get to the
17       area of UWM.
18  Q    As you sit here today, is there any doubt in your mind
19       whatsoever that she said she was going to the scene of
20       her son?
21  A    No doubt, no.
22  Q    Was there any confusion on that at all?
23  A    No.
24  Q    At the time that she said she was going to District 5
25       to assist Detective Melanie Beasley, did she indicate to
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              51
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 52 of 501   Document 80-5

1      you at that time any official police business that she

2      would be doing in relation to that?

3   A  No.

4   Q  Was there any other purpose that she reported to you at

5      that time of her going to District 5 other than this

6      support function for Officer Beasley?

7   A  No.

8   Q  As it relates to the search that you were talking about,

9      is that the time you found out that the search was not

10     done?  Am I correct?

11  A  Yes.

12  Q  Did you talk to her about that at all?

13  A  What do you mean?  She told me she had not done it

14     because they were going to do it and, then, the other

15     things occurred.

16  Q  When she was talking to you, did she seem to have any

17     trouble communicating?

18  A  No.

19  Q  Was she lucid?

20  A  Yes.

21  Q  Was she responsive to your questions?

22  A  Yes.

23  Q  Was she hesitant or express any concern or reservation

24     about speaking to you at the time?

25  A  No.

```
 1   Q    To any of your questions?

 2   A    No.

 3   Q    Did she make any statement at that time about the

 4        possibility of video capturing the accident?

 5   A    Yes.

 6   Q    What did she say?

 7   A    She said the Subway sub shop on 35th and North has video

 8        that probably captured the accident.

 9              MR. PEDERSON:        That is all I have

10        for this witness.

11              MR. MC GAVER:        Could we take a five-

12        minute break?

13              MR. KONRAD:          Certainly.  We will

14        break for five minutes.

15        (Discussion off the record)

16              MR. KONRAD:          We are back in ses-

17        sion.  Before you start your cross, there is a question

18        pending as to whether or not the police department has a

19        procedure for notifying family members when officers are

20        injured on duty and what that procedure is.

21              So I will ask, Lieutenant, are you aware

22        of any -- do you have knowledge of any such procedure?

23              THE WITNESS:         I don't know if there

24        is a standard operating procedure.  I assume there is.

25        Typically, when we do these, we make notification
```

1     whenever possible in person and we offer family members
 2     rides to the hospital.
 3                    MR. KONRAD:        Thank you.
 4                    Mr. McGaver, you may proceed.
 5                    MR. MC GAVER:      I think with the
 6     first witness, we had commissioners ask questions before
 7     cross-examination.  Do you want to do that again or
 8     would you prefer --
 9                    MR. KONRAD:        Do you have any
10     questions for the lieutenant?
11                    MS. HEIN:          I do.  When you took
12     the report when you were in your car and you pulled
13     over, are those reports recorded or do you just take
14     notes and, then --
15                    THE WITNESS:       Take notes and, then,
16     this is the recorded report.  Do you mean audio
17     recorded?
18                    MS. HEIN:          Yes.
19                    THE WITNESS:       No.
20                    MR. KONRAD:        You may proceed.
21                    MR. MC GAVER:      Thank you.
22     CROSS-EXAMINATION BY MR. MC GAVER:
23  Q  Lieutenant, as of January 19, 2015, you were then-
24     Detective Lewandowski's immediate supervisor.  Correct?
25  A  Yes.

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                          sueT@wi.rr.com
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 55 of 501  Document 80-5          54

```
 1    Q    And you were also Detective Carr's immediate supervisor
 2         at that time.  Correct?
 3    A    Yes.
 4    Q    And in your capacity as Detective Carr's immediate
 5         supervisor, you personally ordered her to conduct --
 6         I will call it a "knock and talk".  Is that a fair term?
 7    A    Yes.
 8    Q    That was related to a shooting earlier that evening at
 9         2765 North 52nd?
10    A    Yes.
11    Q    That was to recover -- or attempt to recover the firearm
12         involved in that incident.  Correct?
13    A    Yes.
14    Q    Did you direct her to do so in person?
15    A    Yes.
16    Q    At District 3?
17    A    Yes.
18    Q    How long did that interaction last?
19    A    Probably ten minutes.
20    Q    Where within District 3 did the conversation take place?
21    A    I believe it was in --  Well, it was in the Captain's
22         office.
23    Q    Was Shannon Lewandowski present for that conversation?
24    A    No.
25    Q    Was she in the building, if you know?
```

```
 1   A    I don't know.

 2   Q    Did you ever directly order Shannon Lewandowski to

 3        participate in that investigation?

 4   A    No.  I told Detective Carr to take somebody with her,

 5        whether it was an officer or another detective.  I never

 6        told Detective Lewandowski --

 7   Q    So you never told Lewandowski in person to participate

 8        in the investigation.  Right?

 9   A    Yes.

10   Q    And you never told Detective Carr to relay to Detective

11        Lewandowski that she was to participate in that investi-

12        gation.  True?

13   A    No.  She was to relay the person going with her.

14        Detective Lewandowski's name never came up in that

15        conversation.

16   Q    You testified earlier that you reported to the hospital

17        to participate in the investigation of the shooting.

18        Is that true?

19   A    Yes.

20   Q    And why did you do that yourself instead of sending a

21        detective to do that?

22   A    A detective was there.  As an investigative lieutenant,

23        we have to respond to every shooting.  We don't always

24        respond to the hospital, but in this case, when he

25        showed up at the hospital, we didn't know where the
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    56
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 57 of 501   Document 80-5

```
1        scene was, so I responded to the hospital.

2    Q   I am going to fast-forward to the accident.  We have

3        been over that it occurred at roughly 2:17 in the

4        morning on January 19.  Right?

5    A   Yes.

6    Q   When, approximately, did you respond?

7    A   I arrived on the scene at 2:32.

8    Q   And you testified that when you arrived on the scene,

9        you spoke with Sergeant Wade Grubich?

10   A   Yes.

11   Q   Was he the first person you talked with?

12   A   Yes.

13   Q   Sergeant Grubich told you that Lewandowski was going

14       to the UWM area because her son had been stopped by UWM

15       police.  Is that what you heard from Grubich?

16   A   No.

17   Q   Did Grubich mention anything about Lewandowski heading

18       to the UWM area?

19   A   No.

20   Q   What about Sergeant Riley?  Did he say anything about

21       Lewandowski headed to the UWM area?

22   A   Yes.

23   Q   Did Riley tell you where he received this information?

24   A   Yes.

25   Q   And who told Sergeant Riley about Lewandowski going to
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
                                                              57
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 58 of 501   Document 80-5

```
 1        UWM?

 2   A    He said officers on the scene told him that Detective

 3        Lewandowski told them and the witnesses, so he at that

 4        point -- that is what he -- he didn't specify which

 5        officers.

 6   Q    He didn't give you any names?

 7   A    No.

 8   Q    And he didn't say that that information came from

 9        Lewandowski to him.  True?

10   A    Correct.

11   Q    So at that point, you don't know who Lewandowski

12        supposedly told that she was going to the UWM area at

13        that time.  Right?

14   A    I don't know which officers.  He also said witnesses.

15   Q    Just because I missed something here, when you were at

16        District 5 before responding to the traffic accident,

17        was Melanie Beasley present at District 5?

18   A    I don't remember seeing her.

19   Q    Do you know Melanie Beasley?

20   A    Yes.

21   Q    Do you know whether she was working at all that day?

22   A    I don't know if she was or not.

23   Q    You testified you spoke with Lewandowski once you

24        arrived on scene.  What did she say to you?

25   A    I asked her if she was all right.  She said, "what does
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    58
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 59 of 501  Document 80-5

```
 1      it look like?"  She was getting medical attention.  She
 2      was on a stretcher.  She was concerned that her bag may
 3      have been taken.
 4   Q  So how much time did you spend with Lewandowski on the
 5      scene?
 6   A  Probably four or five minutes, but there were a lot of
 7      medical personnel tending to her, so there wasn't a lot
 8      of conversation at that time.
 9   Q  I am sorry I interrupted you.  Did Lewandowski, in those
10      four or five minutes, tell you anything about what the
11      cause of the traffic accident was?
12   A  No.
13   Q  You spent some time with Detective Carr on scene, too.
14      Right?
15   A  Yes.
16   Q  How long did you spend with Detective Carr?
17   A  Maybe three minutes.
18   Q  Did Detective Carr tell you anything about how the --
19      what the cause of the accident was while you spent the
20      three or four minutes on scene with her?
21   A  No.
22   Q  Both Detective Carr and Detective Lewandowski were
23      conveyed to Froedtert in ambulances.  Right?
24   A  Yes.
25   Q  Separate ambulances?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              59
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 60 of 501   Document 80-5

1   A    Yes.

2   Q    Do you know who rode with Lewandowski, which members of

3        the police department?

4   A    No.

5   Q    Do you know who rode with Carr?

6   A    No.

7   Q    You testified that you eventually made your way to

8        Froedtert and you spoke to Detective Lewandowski.

9        Correct?

10  A    Yes.

11  Q    We, kind of, have been over this, but I want to pin it

12       down.  How much time did you spend with Detective

13       Lewandowski at the hospital?

14  A    I would estimate 20 minutes.

15  Q    Where in the hospital did you spend this time with

16       Lewandowski?

17  A    In her room and then partly, because she walked me to

18       Detective Carr's room, so partly there.

19  Q    Who was in Lewandowski's hospital room with her?

20  A    I believe one of her sons.

21  Q    Anyone else?

22  A    Not that I recall.  Medical personnel was in and out.

23  Q    Was her mother there?

24  A    Maybe.

25  Q    Was her sister there?

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 61 of 501   Document 80-5    60

```
1    A    I don't know.

2    Q    Were any officers in the room with her?

3    A    Not that I recall.

4    Q    Were any officers waiting outside the room?

5    A    I don't recall.

6    Q    So your testimony is, despite the fact that Detective

7         Lewandowski had family and friends with her, she still

8         walked you to Detective Carr's room?

9    A    Yes.

10   Q    I would assume, but I will just ask, did her family and

11        friends or whoever was in the room with her accompany

12        her while escorting you to Detective Carr's room?

13   A    I don't believe so, no.  I wasn't paying a whole lot

14        of attention to that, so it is possible they did.

15   Q    You asked Lewandowski how she was doing?  She responded

16        that her foot was injured, but she was otherwise okay.

17        True?

18   A    I don't know that she said she was "otherwise okay."

19   Q    Did you know at that point in time, visiting Shannon

20        Lewandowski in the hospital, whether she had been

21        unconscious earlier that morning?

22   A    No.  I never heard that.

23   Q    You told Lewandowski that you eventually needed to speak

24        with her to complete your -- what we have referred to as

25        the AIMS report.  Correct?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                    sueT@wi.rr.com
                                                              61
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 62 of 501   Document 80-5

```
 1   A   Yes.

 2   Q   And you added that you wouldn't do it there, but you'd

 3       follow up with her in a day or two.  Right?

 4   A   Yes.

 5   Q   And you did follow --  Actually, she followed up later

 6       that day -- later that morning with a phone call that

 7       occurred somewhere around 6:30, 6:38 I think?

 8   A   6:38, yes.

 9   Q   After that phone call, did you participate in any more

10       interviews or conduct any more interviews of Lewandowski

11       relative to this incident?

12   A   No.

13   Q   How long did that phone call last?

14   A   I would guess five to ten minutes.

15   Q   If I told you seven minutes, would you dispute that?

16   A   No.

17   Q   I am going to eventually hand you what's been marked as

18       Exhibit 2.  I will represent to you this is a report

19       prepared by Sergeant Adam Zieger.  It is 22 pages in

20       length.  It's dated September 9, 2015.  Is anything I've

21       started untrue so far?  It is an excerpt of the report.

22       Is that what it is?

23   A   Yes.

24   Q   On the bottom, it says "Page 16 of 22."  Let me know

25       when you are there.
```

```
 1   A     I am there.

 2   Q     It is the third paragraph from the bottom starting with,

 3         "Lieutenant Hanley indicated he responded."  Are you

 4         with me?

 5   A     Yes.

 6   Q     Okay.

 7               "Lieutenant Hanley indicated he responded to

 8         the hospital and spoke to both Detective Lewandowski and

 9         Detective Carr.  Detective Carr was 'under medication,'

10         and did not make any statements about what happened.

11         Detective Lewandowski was also receiving treatment and

12         'under medication.'  Lieutenant Hanley was unable to

13         obtain a response about what happened from Detective

14         Lewandowski."

15         Do you remember making those statements to Sergeant

16         Zieger when he interviewed you as a result of this

17         investigation?

18   A     Do I remember saying that?

19   Q     Yes.

20   A     No.

21   Q     Did I read it accurately?

22   A     I probably said it.  Do I remember saying it?  No.

23   Q     When the call came in about the accident initially, at

24         least some caller to the 911 system reported it as a

25         fatal accident.  Do you know anything about that?
```

```
 1    A    I know that was --

 2    Q    Is that true?

 3    A    Yes.

 4    Q    So when you reported to the scene, you were initially

 5         under the impression that somebody had died.

 6    A    I was under the impression there was a high likelihood

 7         that somebody had died, but citizens often get those

 8         wrong.

 9    Q    Talk a little bit about the phone call that you received

10         from Shannon Lewandowski at 6:38 in the morning.  You

11         testified earlier that at 6:22 or thereabouts, you left

12         the hospital and, then, this phone call came in roughly

13         at 6:38.  Is my timing correct?

14    A    Yes.

15    Q    And do you remember Shannon Lewandowski telling you

16         about any phone calls that she received while she was

17         on her way to wherever she was going at District 5 or

18         the UWM area?

19    A    Yes.

20    Q    What did she tell you about the first phone call she

21         received in the squad car traveling to District 5?

22    A    To clarify, she said she was contacted by Melanie

23         Beasley and that is why she was going to District 5,

24         so I don't know whether that was a phone call or a text.

25         I don't know how she was contacted.  So as far as while
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                      sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 65 of 501   Document 80-5        64

```
 1      driving, I am only aware of one phone call from her son.

 2  Q   Fair point.  But she did tell you that while she was in

 3      the squad car, Melanie Beasley had contacted her in some

 4      way.  Correct?

 5  A   Yes.

 6  Q   Have you ever ridden in a squad car while Shannon

 7      Lewandowski is driving?

 8  A   No.

 9  Q   So you don't know anything about Shannon's -- I'll call

10      it an "internal policy" about handing her phone off to

11      the passenger while she is driving?

12  A   No.

13  Q   Then you mentioned that you are aware of a second phone

14      call that she received from her son while she was in the

15      squad en route to District 5 or UWM.

16  A   Again, to clarify, I don't know if she received a phone

17      call from Melanie as far as --

18  Q   I am talking about her son.

19  A   I am only aware of one phone call.

20  Q   Let's talk about the Melanie situation a little bit.

21      Were you aware at that point at 6:30 or so in the

22      morning on the 19th, that Shannon had previously --

23      Detective Lewandowski had previously been at District 5

24      discussing matters with Melanie Beasley earlier in her

25      shift?  Did you know that?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    65
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 66 of 501   Document 80-5

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | If Detective Lewandowski was discussing matters related |
| 3 | | to department business with then Officer, now Detective |
| 4 | | Beasley, would that be acceptable use of time as a |
| 5 | | police department member? |
| 6 | A | You mean after the assignment or before? I am not quite |
| 7 | | clear on what -- |
| 8 | Q | I mean before. Let's say -- |
| 9 | A | If she is not on an assignment, sure. |
| 10 | Q | What about counseling Beasley relative to a personal |
| 11 | | matter related to another member of the police depart- |
| 12 | | ment? Would that be acceptable use of company time? |
| 13 | A | Again, it depends if you are on assignment. Officers |
| 14 | | and detectives are not banned from talking to each |
| 15 | | other, but if it is pulling them away from an assign- |
| 16 | | ment, then, it is not appropriate. If they are not on |
| 17 | | an assignment, if they have downtime, then, of course, |
| 18 | | they can talk. |
| 19 | Q | You never placed Lewandowski on assignment at all that |
| 20 | | morning. Correct? |
| 21 | A | Correct. |
| 22 | Q | You don't know whether she was on an assignment or not. |
| 23 | | Strike that. I will withdraw that question. Did you |
| 24 | | know anything about a particular officer being served |
| 25 | | with a temporary restraining order against -- by Melanie |

```
 1           Beasley on the morning of January 19, 2015?

 2     A    Not till the phone call at 6:38.

 3     Q    Have you ever heard of temporary restraining orders or

 4           restraining orders being served on department members

 5           while they are at work?

 6     A    While they are at work?

 7     Q    Yes.

 8     A    Not that I have personally observed.

 9     Q    Do you know anything about a temporary restraining order

10           being served at District 5 on January 16, 2015?

11     A    No.

12     Q    Do you know anything -- did you that morning know

13           anything about Melanie Beasley's situation relative to

14           an unnamed TEU or Tactical Enforcement Unit officer?

15     A    I had been told she was seeing one.  That was it.

16     Q    Did you know anything about some abuse or harassment

17           that occurred in the relationship?

18     A    No.

19     Q    You were a supervisor at District 5?

20     A    No.

21     Q    I am sorry.  At CIB?

22     A    Yes.

23     Q    You are stationed out of District 5.  Correct?

24     A    Yes.

25     Q    Primarily, or you were at that time?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                                67
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 68 of 501   Document 80-5

```
 1   A    At that time.

 2   Q    In your capacity as a supervisor, wouldn't you like to

 3        know that there was a restraining order served at

 4        District 5 against one of the members in the department?

 5   A    It sounds like maybe I should know, but really, I didn't

 6        supervise officers.  I supervised detectives.  So the

 7        supervisors at Five responsible for the personnel at

 8        Five, don't have any obligation to tell me there was a

 9        restraining order served.

10   Q    So you never instructed Melanie Beasley to get a

11        restraining order against this officer?

12   A    No.

13   Q    You testified some about the limits of what an officer,

14        driving a squad car, can use lights and sirens for.  Do

15        you recall that testimony?

16   A    Yes.

17   Q    And if there is a traffic hazard, a car pulling out into

18        traffic -- let's just call it a traffic hazard in front

19        of an officer's squad car, would that be an acceptable

20        use of squad lights?

21   A    Yes.

22   Q    Are you familiar with the particular squad car that

23        Shannon Lewandowski was driving on the morning of

24        January 19, 2015?

25   A    I am familiar with it.
```

```
 1    Q     Have you ever been in that car?

 2    A     No.

 3    Q     Are you familiar with vehicles equipped with the same

 4          features as that car?

 5    A     Yes.

 6    Q     Do you know how the lights and sirens operate on that

 7          particular car, or cars like it?

 8    A     We have, like, four different systems out there.

 9    Q     Do you know what system that car utilizes?

10    A     No, I don't.  As far as you mean where the buttons are?

11    Q     Yes.

12    A     No.

13    Q     What are the options for where buttons could be located?

14    A     Some of them are on the dash, some of them are on the

15          console.

16    Q     The ones on the center console, do they operate on what

17          I will call a toggle switch?

18    A     Yes.

19    Q     So, for instance, the squad car equipped with lights and

20          sirens operated from the center console, what would one

21          have to do to turn the lights on?

22    A     Hit the toggle switch, which is sometimes an old-

23          fashioned metal switch, sometimes it is an electric

24          two-stage button.

25    Q     What would an officer have to do to operate the sirens
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    69
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 70 of 501   Document 80-5

```
 1       on a car like that?
 2   A   Usually, you hit the toggle switch to the next position.
 3   Q   If I wanted -- if I was an officer driving that car and
 4       wanted to change the sound of the siren that was being
 5       employed, how would I do that?
 6   A   Usually, you hit the horn.
 7   Q   Tap the steering wheel?
 8   A   Yes.
 9   Q   Are those squad cars equipped with horns, so to speak?
10   A   Well, they are equipped with regular horns.  They are
11       also equipped with air horns.  When the sirens are
12       running, if you hit the horns --
13   Q   You mean if the lights are running?
14   A   Sorry.  No, if the sirens are running, if you hit the
15       horn, it changes the tone of the horn.  I mean, if you
16       hit the horn, it changes the tone of the siren if the
17       siren is on, or the cadence of the siren.
18   Q   Are you now aware of what department was involved with
19       the traffic stop of Jordan Lewandowski?
20   A   Now, I am.
21   Q   You said you might have seen or you think Jordan
22       Lewandowski was with Shannon Lewandowski at the
23       hospital.  Correct?
24   A   It is possible one of her sons were there.  I don't
25       remember which one.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                                70
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 71 of 501   Document 80-5

```
 1    Q    Do you know Shannon Lewandowski's sons?

 2    A    I have met them.

 3    Q    Do you know what Jordan Lewandowski looks like?

 4    A    Yes.

 5    Q    So if he was at the hospital, you would know he was

 6         there.  Right?

 7    A    Yes.

 8    Q    Was he at the hospital?

 9    A    I don't remember.

10    Q    Shannon Lewandowski told you she was traveling at 45

11         miles an hour in her telephone conversation with you the

12         morning of the 19th.  Correct?

13    A    Yes.

14    Q    Do you know the speed limit going eastbound on North

15         Avenue on the corner of 35th and North Avenue?

16    A    30.

17    Q    So it is your testimony that she admitted to speeding

18         to you while she was on the phone on the morning of

19         January 19, 2015?

20    A    Yes.

21    Q    The seven-minute phone call on the 19th, that is the

22         last time you spoke with Shannon Lewandowski.  Correct?

23    A    Yes.

24    Q    You never visited her at home to check up on her to

25         see how she was recovering from her injuries?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                          sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 72 of 501   Document 80-5          71

```
 1   A      No.  I sent her a detective.

 2   Q      When did you send the detective?

 3   A      A few days after that.

 4   Q      So she made no other statements to you relative to this

 5          incident.  Correct?

 6   A      No.

 7   Q      When you received the phone call from Lewandowski in the

 8          early morning hours of the 19th, you said you pulled

 9          over.  Right?

10   A      Yes.

11   Q      Why did you pull over?

12   A      To talk on the phone and take notes.

13   Q      You took notes?

14   A      Yes.

15   Q      What happened to the notes?

16   A      I used them to compile my report.

17   Q      Do you have them with you?

18   A      No.

19   Q      What did you do after you compiled the report with the

20          notes?

21   A      Keep the steno pad until it was used up.

22   Q      Are the notes available?

23   A      No.

24   Q      Where are they right now?

25   A      We don't retain them.
```

SUSAN K. TAYLOR        262-553-1058       COURT REPORTER
                       sueT@wi.rr.com
                                                              72
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 73 of 501   Document 80-5

```
 1   Q    Is that against department policy?

 2   A    No.

 3   Q    Was an accident reconstructionist used at the scene of

 4        the accident?

 5   A    No.

 6   Q    So no skid mark measurements were taken?

 7   A    I don't know if skid mark measurements were taken.

 8   Q    You don't know whether they were or not?

 9   A    I don't know if there were skid marks.

10   Q    Were any measurements taken on scene?

11   A    I don't know.  District squad handled the accident.

12        We handled the interviews.

13   Q    You interviewed Detective Carr a few days after the

14        accident.  Correct?

15   A    Yes.

16   Q    Where did that interview take place?

17   A    At her house.

18   Q    Did she say anything about Shannon Lewandowski going to

19        intervene at a traffic stop by UWM or any other police

20        department, in that interview with you?

21   A    No, she didn't.

22   Q    Did you ask her?

23   A    No.

24   Q    She didn't mention it at all?

25   A    No.
```

```
 1   Q    Where did Detective Carr say that Shannon Lewandowski

 2        was going when she got into the accident?

 3   A    To District 5.

 4   Q    Did Detective Carr express a problem that she had with

 5        her going to District 5 instead of going to attempt to

 6        recover the gun that you ordered her to do?

 7   A    Did she express a problem?

 8   Q    Did she express a problem?

 9   A    No.

10   Q    Was there any discipline to Detective Carr for failing

11        to recover the gun?  Did you take any action to disci-

12        pline Detective Carr for failure to recover the gun?

13   A    No.

14                    MR. MC GAVER:      Nothing further.

15                    MR. KONRAD:        Commissioners, do you

16        have any questions?

17                    MS. MC KENZIE:     I have a couple

18        questions.

19                    When you were supervising detectives and

20        you told one detective to perform a certain assignment

21        and also, to choose another detective to go with, does

22        that other detective, then, fall within your juris-

23        diction of the assignment?  In other words, they should

24        follow the assignment?

25                    THE WITNESS:       Yes.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              74
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 75 of 501   Document 80-5

| 1 | MS. MC KENZIE: Do you normally, in |
| 2 | any way, brief that second detective? |
| 3 | THE WITNESS: If they are not on |
| 4 | the scene, they brief the first detective and she is |
| 5 | expected to brief the second, at that point, depending |
| 6 | on the availability, because it very well could have |
| 7 | ended up an officer going with her. |
| 8 | MS. MC KENZIE: When you gave that |
| 9 | assignment to Detective Carr, did you emphasize the |
| 10 | importance of the -- that it was time-sensitive? |
| 11 | THE WITNESS: Yes. |
| 12 | MS. MC KENZIE: In your experience, |
| 13 | are detectives allowed to prioritize assignments? So |
| 14 | for example, you give a detective an assignment and they |
| 15 | say, "well, I understand I have to do this, but I am |
| 16 | going to do X before that." Do they have that flexi- |
| 17 | bility? |
| 18 | THE WITNESS: No. They have to |
| 19 | discuss that with you because in the Bureau, we actually |
| 20 | take the function of dispatching them. So we have to |
| 21 | know what they are doing when they are on an assignment. |
| 22 | MS. MC KENZIE: And so is it your |
| 23 | experience -- I don't know you would know this. Do |
| 24 | Detective Carr and Detective Lewandowski, do they |
| 25 | normally ride together? For example, if you tell Carr, |

```
 1          "I need you to do this", do you often find that she

 2     chooses Lewandowski and vice-versa?

 3                    THE WITNESS:      No, not necessarily.

 4     This was weekend staffing because although it happened

 5     on a Monday morning, it falls under Sunday night's

 6     staffing because we start at Sunday night and at that

 7     time, weekend staffing was low.  You grab who you can.

 8                    MS. HEIN:         If a detective or

 9     officer were to receive word from a family member that

10     there was an issue that they need -- that needed their

11     attention, what would be the procedure to assist that

12     relative?

13                    THE WITNESS:      Either way, they would

14     have to -- if they want to assist, they would have to

15     ask their supervisor.

16                    MS. HEIN:         If they wanted to

17     leave.  What if Detective Lewandowski wanted to go to

18     Shorewood to assist her son?  What would be the correct

19     procedure?

20                    THE WITNESS:      She would have had to

21     ask me if it is all right.

22                    MS. HEIN:       That is all?

23                    THE WITNESS:      Well, there is an SOP

24     prohibiting us from interfering officially in police

25     matters of other jurisdictions.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                     76
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 77 of 501   Document 80-5

```
 1              MS. HEIN:          So if they needed to
 2     go home for some reason --
 3              THE WITNESS:       She has to clear it
 4     through a supervisor.
 5              MS. HEIN:          That would be you in
 6     this case.
 7              THE WITNESS:       In this case, yes.
 8              MR. KONRAD:        Did that happen in
 9     this case?
10              THE WITNESS:       No.
11              MS. WILSON:        If an officer is on
12     duty and a family member -- I am trying to figure out --
13     if a family member is stopped by another officer, be it
14     Milwaukee or Chicago, whatever, does, then, that family
15     member -- can that family member, then, get permission
16     to go and see about the other individual?
17              THE WITNESS:       You can ask per-
18     mission of the supervisor, but I never heard of it being
19     granted.
20              MS. WILSON:        That was going to be
21     my next question.  I have nothing else.
22              MS. MC KENZIE:     When you interviewed
23     Carr, you didn't ask her about whether or not Detective
24     Lewandowski was heading toward UWM.  Is that correct?
25              THE WITNESS:       Correct.  I asked her
```

```
1       her recollection of what happened that night.
2                   MS. MC KENZIE:     Let me ask you, why
3       is it that you did not?  Did you not think it was
4       important?
5                   THE WITNESS:      No.  I wanted -- I
6       didn't want to bias her memory.  She was saying she was
7       having problems with her memory since the accident and
8       writing a lot of notes.
9                   MS. MC KENZIE:     There was a question
10      about whether or not Detective Carr was disciplined.
11      In your assessment, why didn't that occur?
12                  THE WITNESS:      I didn't recommend
13      discipline for anybody in this case.  Whether this
14      turned into an Internal against Detective Carr, I have
15      no idea.  Once it goes to Internal Affairs, the only
16      time we find out is if they call us out to interview us.
17                  MR. KONRAD:       Mr. Pederson?
18                  MR. PEDERSON:      Just a few points to
19      follow up on.
20      REDIRECT EXAMINATION BY MR. PEDERSON:
21   Q  I believe the first time you testified, I think --
22      you said you had given this assignment to Detective Carr
23      around 12:30 to 1:00.  Since then, we have kind of
24      nailed down the time of 2:00 a.m.  I am just wondering,
25      now that your memory is a little refreshed -- or my
```

1    memory of your testimony is wrong, is there any

2    correction or would you affirm the time that you gave?

3  A  12:30 to 1:00.

4  Q  So is there any concern about why she wasn't even going

5    somewhere until 2:00 in the morning?

6  A  Yes.  When the accident occurred, I had no idea who was

7    in it and it never occurred to me that it was her.

8  Q  Another question.  You were asked if Detective

9    Lewandowski ever asked for permission to go to the

10   scene.  I am not asking you to speculate, but based on

11   your knowledge of SOPs, would you have granted such a

12   request?

13 A  No.

14 Q  Why not?

15 A  Because it would be interfering with a traffic stop from

16   another department.

17 Q  Were you familiar with Detective Lewandowski's caseload

18   at that time?

19 A  Yes.

20 Q  Was she a busy person?

21 A  Detective Lewandowski, if she was not on an active

22   shooting, she usually remained quite busy with other

23   investigations.

24 Q  Now, specifically around the early morning hours of

25   January 19, did she have work that she could be doing?

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              79
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 80 of 501   Document 80-5

```
1    A    Yes.

2    Q    You previously testified that if a department member has

3         downtime and decides to spend a few minutes, whatever,

4         speak to another department member about personal

5         matters, whatever, that would be okay.  Do you recall

6         that testimony?

7    A    Yes.

8    Q    All right.  In your opinion, based on your knowledge of

9         that evening and Detective Lewandowski's caseload and

10        workload, did she have that kind of downtime to travel

11        from District 3 to District 5 to talk to --

12   A    Let me specify this to you.  We don't ban people from

13        talking when they run into each other and if she

14        responded to District 5, even though her office at that

15        time was in District 3 and mine was Five, we were all

16        still Central.  That was our geographic area.  It was

17        called "Central" at that time, which covered Three and

18        Five.  So Five is still in her area.

19   Q    Okay.  My question to you is, given whatever knowledge

20        you have of that evening and her workload, if she was

21        traveling specifically from District 5 to District 3 to

22        speak to Officer Beasley on a personal matter when she

23        had already decided to join up and conduct this search

24        for a gun as part of the assignment given to Detective

25        Carr, is that following procedure?   Is that a concern
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                80
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 81 of 501   Document 80-5

```
 1        in terms of being a supervisor?

 2    A   Going from Three to Five.  Let me correct you on that.

 3        She wasn't going from Five to Three, but that is a

 4        concern.

 5    Q   If I said Five to Three, I was wrong.  I am sorry.

 6        Was your opinion based on that?

 7    A   That is a concern.

 8    Q   Why is it a concern?

 9    A   Because I gave Detective Carr an assignment.  So it is

10        really incumbent on her to go to the assignment and if

11        they agreed Detective Lewandowski would go to that

12        assignment, she is basically putting herself on that

13        assignment, also.

14    Q   If she instead decided, "I am going to prioritize this

15        trip to District 5 to talk to my -- Officer Beasley

16        instead", would that be an effective and appropriate use

17        of police time?

18    A   No.

19    Q   Specifically, were you aware when Detective Carr and

20        Detective Lewandowski were supposed to end their tour of

21        duty that day?

22    A   4:00 a.m.

23    Q   All right.  And did that play into your concerns also

24        regarding what they were doing and how they were

25        prioritizing?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              81
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 82 of 501   Document 80-5

```
 1   A     Yes.

 2   Q     How?

 3   A     We are monitored very closely on overtime.  So if I have

 4         an assignment at 1:30, even if it results in search and

 5         recovery of a weapon, you may still end up with some

 6         overtime with the inventory reports.  But now, if you go

 7         to two other locations before you go to that assignment,

 8         aside from the exigency of getting there before the

 9         person was released from the hospital, now, you are

10         basically pushing the assignment off and doing it on

11         overtime.  We are monitored in our department on over-

12         time very closely.

13   Q     Do you have any personal bias against Detective

14         Lewandowski?

15   A     No, not at all.

16   Q     Do you have any personal bias against Juanita Carr?

17   A     Not at all.

18   Q     Were you truthful in your report that was submitted as

19         Exhibit 1?

20   A     Yes.

21                   MR. PEDERSON:      That is all I have.

22                   MR. KONRAD:       I have a question.

23         If an officer is on an assignment and is contacted by

24         another officer who indicated there is some personal

25         crisis and ask that officer to intervene or assist, is
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                          82
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 83 of 501   Document 80-5

```
 1      it proper procedure to be for the first officer to call

 2      you for permission to be relieved of one assignment and

 3      pursue this other matter?

 4                      THE WITNESS:        Yes.  In a case of if

 5      they are in a district, the district has other officers

 6      and supervisors there, so it shouldn't require somebody

 7      coming from an outside location.

 8                      MR. KONRAD:        That didn't happen in

 9      this case, did it?

10                      THE WITNESS:       No.

11                      MR. KONRAD:        Had it happened, you

12      could have assigned someone to --  If you believed that

13      the crisis was of sufficient significance that it should

14      take precedence over recovery of the gun, then you could

15      have assigned someone else to recover the gun.

16                      THE WITNESS:        If that would have

17      happened and I would have decided it would have been

18      that important, then, I wouldn't have had them both go

19      to Five.  I would have had Juanita go with a different

20      detective or officer to conduct the search, but in this

21      case, I didn't see the reason to go there at all,

22      authorizing anybody to go do that.

23                      MR. KONRAD:        Any redirect (sic)?

24                      MR. MC GAVER:      Yes, a couple

25      questions.
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
                                                          83
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 84 of 501  Document 80-5

```
 1        RECROSS-EXAMINATION BY MR. MC GAVER:

 2   Q    On January 19, 2015, do you know whether Detective Carr

 3        was at 2765 North 52nd Street prior to the accident that

 4        occurred at about 2:17 a.m.?

 5   A    Now, I do.

 6   Q    She was there before, wasn't she?

 7   A    No, she wasn't.

 8   Q    This was not a follow-up stop at that house?

 9   A    I am sorry?

10   Q    She was not at --  Let me rephrase.  Detective Carr, as

11        far as you know, never went to 2765 North 52nd Street.

12        True?

13   A    Correct.  Well, if she did as part of the initial

14        investigation, I don't remember.  I know she never went

15        there after I gave her the assignment that night.

16   Q    You are not aware of Detective Carr knocking on the

17        front door of 2765 North 52nd Street and nobody

18        answering the door.  Is that true?

19   A    That is true.

20                  MR. PEDERSON:      I'm going to object

21        to the foundation of the question.  When are we talking

22        about?

23                  MR. MC GAVER:      At any time.

24                  MR. KONRAD:        Counsel, do you plan

25        on bringing evidence that Detective Carr went to that
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    84
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 85 of 501   Document 80-5

```
 1        house?
 2                     MR. MC GAVER:       I do.  I anticipate
 3        calling Detective Carr as a witness and I believe she
 4        will testify that she was present at that house and
 5        knocked on that door?
 6                     MR. KONRAD:         Contingent on you
 7        connecting it up, you can answer the question.
 8   A    I am not aware.
 9        BY MR. MC GAVER:
10   Q    In connection with this case, you provided sworn
11        testimony in the form of an affidavit.  Correct?
12   A    An affidavit?
13   Q    Do you know what an affidavit is?
14   A    Yes.
15   Q    Yes, you did?
16   A    I don't recall.
17   Q    I am going to hand you a document marked as Exhibit 3.
18        Can you tell me what that is?
19   A    Yes.
20   Q    Is that your signature on the second page?
21   A    Yes.
22   Q    Before you signed it, did you swear that the contents of
23        the document was the truth, the whole truth and nothing
24        but the truth before a notary public?
25   A    Yes.
```

```
1   Q    As far as you know, this is testimony given under oath.

2        Correct?

3   A    Correct.

4   Q    The contents of the affidavit are still substantially

5        true and correct today?

6   A    Yes.

7                 MR. MC GAVER:        I will offer Exhibit

8        3.

9                 MR. KONRAD:          Admitted.

10                MR. MC GAVER:        Nothing further.

11                MR. PEDERSON:        I object to the

12       admission of this.  What's the relevance?

13                MR. MC GAVER:        Prior testimony that

14       he's given.  I think the Commission can make their own

15       conclusion as to whether it is similar or the same as

16       testimony he's given in connection with his interview

17       with Sergeant Zieger on the AIMS report and in this

18       hearing here today.

19                MR. PEDERSON:        I maintain my objec-

20       tion.  If he thinks there is an inconsistency, he should

21       confront the witness with the inconsistency and give him

22       an opportunity to explain if there is an inconsistency

23       or --

24                MR. MC GAVER:        I think we are

25       dealing with a sophisticated group of commissioners who
```

```
1        can draw that conclusion themselves.

2                        MR. KONRAD:        I assume you are

3        offering this as impeachment?

4                        MR. MC GAVER:      Yes, and as

5        substantive evidence of the actions that Lieutenant

6        Hanley took in the course of the investigation related

7        to the accident and the follow-up.

8                        MR. KONRAD:        Through a prior

9        statement of --

10                       MR. MC GAVER:      Correct.

11                       MR. KONRAD:        It will be admitted.

12                       MS. WILSON:        Usually, don't you

13       all need one a little bit different than the other one

14       or you put them all together?  Okay.

15                       MS. HEIN:          I have a question of

16       logistics.  You were -- Detective Lewandowski was going

17       from Three to Five.  Right?

18                       THE WITNESS:       Yes.

19                       MS. HEIN:          Three is at, like,

20       45th and Fond du Lac.  Correct?

21                       THE WITNESS:       No.  49th and Lisbon.

22                       MS. HEIN:          Okay.  And where is

23       Five?

24                       THE WITNESS:       It is on Fourth and

25       Locust.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              87
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 88 of 501  Document 80-5

```
 1                    MS. MC KENZIE:      When is it that you
 2       did this affidavit?  When was this affidavit done and
 3       what purpose was your understanding?
 4                    THE WITNESS:        It was done April 27.
 5                    MS. MC KENZIE:      Why is it that you
 6       did this affidavit as opposed to the fact that we have
 7       your investigative information in the report that you
 8       completed for the police department?  Why did you need
 9       to do an affidavit?
10                    THE WITNESS:      I don't know the
11       reason why I needed to do one.  We typically don't do
12       these in criminal cases like this when we have a report.
13                    MS. MC KENZIE:      Who told you to do an
14       affidavit?
15                    THE WITNESS:        City attorney.
16                    MR. KONRAD:        For the record, I
17       think the record is clear this affidavit was filed in
18       support of a brief that was filed in opposition to a
19       motion to exclude the Hanley statement.  Had Officer
20       Carr gone to that house, would there be any kind of
21       report required or would the CAD report indicate she had
22       been there or what evidence would there be other than
23       her statement?
24                    THE WITNESS:      She should be on the
25       CAD as going there.  Plus, she should have done a supp
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
                                                                88
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 89 of 501   Document 80-5

```
 1      in our report system stating she went there and knocked
 2      on the door and received no answer.
 3                      MR. PEDERSON:       I guess a follow-up.
 4      RE-REDIRECT EXAMINATION BY MR. PEDERSON:
 5   Q  To your knowledge, does a supp report exist?
 6   A  No.
 7                      MR. KONRAD:         Thank you.
 8      (Witness excused)
 9                      MR. KONRAD:         Mr. Pederson?
10                      MR. PEDERSON:       The chief will call
11      Sergeant Zieger.  I have one matter to attend to.  For
12      the record, I would move a number of documents in.  The
13      personnel order, the Complaint and the charging spec
14      into evidence.  As was indicated, the Commission likes
15      to have those documents as part of the record.  So if
16      there is no objection --
17                      MR. MC GAVER:       No.
18                      MR. PEDERSON:       -- I would like to
19      move them at this time.
20                      MR. KONRAD:         Do they have numbers?
21      Four, five, six?
22                      MR. PEDERSON:       Yes.  For the record,
23      three additional documents have been marked into
24      evidence.  Number four is Personnel Order 2015-150.
25      As number five, the Complaint in the matter of the
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                    sueT@wi.rr.com
                                                         89
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 90 of 501   Document 80-5

```
 1        appeal of Shannon Lewandowski.  Number six, Charges and
 2        Specifications, three rule violations -- as they relate
 3        to the three rule violations in this matter marked as
 4        number six.
 5                        Mr. Examiner, additionally, counsel has
 6        raised my attention at this time, since we are handling
 7        housekeeping matters, that we had agreed to a stipula-
 8        tion in this matter regarding a statement of Melanie
 9        Beasley.  I would enter that into evidence at this time
10        marked as number seven.
11                        MR. MC GAVER:        No objection to
12        that.
13                        MR. PEDERSON:        I think that
14        handles the housekeeping up to this point.
15                        So I think we are ready to swear in the
16        witness and proceed.
17                        ADAM ZIEGER, having been first duly sworn
18        on oath to tell the truth, the whole truth, and nothing
19        but the truth testified as follows:
20                        MR. KONRAD:        The witness is sworn.
21        DIRECT EXAMINATION BY MR. PEDERSON:
22   Q    Would you please state your name and spell your last
23        name for the record?
24   A    Adam Zieger.  Last name is Z-i-e-g-e-r.
25   Q    How are you employed?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                                90
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 91 of 501  Document 80-5

| 1 | A | Milwaukee Police Department, police sergeant. |
| 2 | Q | How long have you been with the police department? |
| 3 | A | 2003. |
| 4 | Q | Where are you currently assigned? |
| 5 | A | Internal Affairs. |
| 6 | Q | How long have you been there? |
| 7 | A | Since a day in November -- I am not sure exactly what |
| 8 | | day of November -- of 2014. |
| 9 | Q | What do you do in the Internal Affairs Division? |
| 10 | A | I am assigned investigations and, then, I investigate |
| 11 | | them. |
| 12 | Q | Did you conduct an investigation in this matter? |
| 13 | A | Yes. |
| 14 | Q | What specifically did you do? |
| 15 | A | I interviewed witnesses, who witnessed the accident, I |
| 16 | | interviewed two detectives involved and subsequently |
| 17 | | after that, interviewed people that responded to the |
| 18 | | accident as well as the sergeant from Shorewood Police |
| 19 | | Department. |
| 20 | Q | Did you review any reports? |
| 21 | A | Yes. |
| 22 | Q | What reports did you review? |
| 23 | A | I reviewed reports from the RMS system -- it's either |
| 24 | | Records Management System or Reports Management |
| 25 | | System -- pertaining to this case.  CAD records, |

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                        91
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 92 of 501   Document 80-5

```
 1        Lieutenant Hanley's vehicle accident report.  An acci-
 2        dent report, a few supplementary reports from that
 3        accident report, citations, inventory, a report from
 4        submitting a sample of a test for alcohol to the
 5        Department of Justice, a subsequent report from the
 6        Department of Justice.
 7                        MR. PEDERSON:        I think that is a
 8        sufficient list for now.  Thank you, Sergeant.
 9   Q    Is it correct to say that you were the primary investi-
10        gator in this matter?
11   A    Yes.
12   Q    Did you conduct a full investigation?
13   A    Yes.
14   Q    When you completed your investigation, did you create a
15        summary report of your findings?
16   A    Yes.
17   Q    I direct your attention to a document that has been
18        placed in front of you marked for identification as
19        Exhibit 8.  Do you see it?
20   A    Yes.
21   Q    Are you familiar with that document?
22   A    Yes.
23   Q    What is that document?
24   A    It is a copy of a memorandum that I submitted, which is
25        my summary report of this investigation.
```

| 1 | Q | Is it true that this document is dated September 9, |
| 2 | | 2015? |
| 3 | A | Yes. |
| 4 | Q | It purports, on the first page, to have 22 pages? |
| 5 | A | Yes. |
| 6 | Q | Could you please just take a quick look through that |
| 7 | | document in front of you and ensure that that is a true |
| 8 | | and correct copy of the report that you submitted? |
| 9 | A | I believe it to be. |
| 10 | | MR. PEDERSON:      I will admit it into |
| 11 | | evidence. |
| 12 | | MR. MC GAVER:      I will object.  I |
| 13 | | know hearsay is admissible, but there are several |
| 14 | | statements attributed to numerous witnesses where the |
| 15 | | actual source of the statement is completely undeter- |
| 16 | | mined and indeterminable, so for those reasons, I will |
| 17 | | object. |
| 18 | | MR. KONRAD:      One of the elements |
| 19 | | of proof that the chief has to meet is that he conducted |
| 20 | | a thorough and complete investigation of the incident. |
| 21 | | So for that purpose, obviously, the report is admissible |
| 22 | | for that purpose.  In addition, large parts of the |
| 23 | | report do contain statements that would be admissible |
| 24 | | under the "exception to hearsay" rule.  For example, |
| 25 | | statements of Shannon Lewandowski herself.  Other parts |

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
sueT@wi.rr.com
93
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 94 of 501   Document 80-5

```
1        of hearsay that has been corroborated, in part, by the

2        testimony of the lieutenant.  Of course, we have not

3        looked at everything in the report.  If there is hearsay

4        that is uncorroborated or in other ways, not reliable,

5        the Commission will ignore that -- those entries in its

6        decision and its decision, when it writes its Findings

7        of Fact, will articulate the parts of the record that

8        the Commission is relying on.  So with those

9        limitations, the report is admitted.

10       BY MR. PEDERSON:

11    Q  Sergeant Zieger, did you review the CAD reports related

12       to this matter?

13    A  Yes.

14    Q  What is a CAD report?

15    A  I believe it stands for Computer Automated Dispatch

16       Report.  It's an dispatch record of the activity

17       involving the assignment.  It could be -- maybe a better

18       word than "assignment" might be a complaint that comes

19       through the communications division or radio trans-

20       missions from personnel on patrol.

21    Q  Did you check to see at the time or approximate time of

22       the accident, if Detective Lewandowski or Detective Carr

23       were on assignment according to CAD?

24    A  I did.

25    Q  What did you find?
```

SUSAN K. TAYLOR          262-553-1058       COURT REPORTER
                         sueT@wi.rr.com
                                                                94
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 95 of 501   Document 80-5

```
 1    A    I did not find a record of a unit history.

 2    Q    Can you please indicate, what is the obligation of

 3         members of the department to call in what they are

 4         doing?

 5    A    When officers make contact with a citizen or someone

 6         makes contact with a citizen, they need to report it to

 7         a dispatcher.  Generally, as they make location changes

 8         throughout their day, you notify the dispatcher so the

 9         dispatcher knows where you are and they can allocate the

10         resources that are needed.

11    Q    If Detectives Carr and Lewandowski were on their way,

12         for example, to the house to conduct a search, would

13         they be generally ordinarily expected to call that in

14         and record that with CAD?

15    A    I don't think it would be uncommon for them to notify

16         the dispatcher when they got there.  I mean, it wouldn't

17         be uncommon to not notify them while en route.

18              MR. KONRAD:         What was the last --

19         Wouldn't be uncommon, what?

20              THE WITNESS:        I am not familiar

21         with every single -- what every detective, how they

22         handle it, but I don't think it is uncommon for a

23         detective not to notify them before they get there.

24              MR. KONRAD:         In other words, it is

25         common for them to notify --
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              95
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 96 of 501   Document 80-5

```
 1                    THE WITNESS:        They might notify
 2       somebody, but they may not notify the dispatcher, "hey,
 3       I am going to a specific location", as they travel
 4       within --  Patrol officers travel within and look for
 5       things to do and things like that.
 6                    MR. KONRAD:        You said "it is not
 7       uncommon."  So it is common.
 8                    MR. PEDERSON:      I can clarify it.
 9       BY MR. PEDERSON:
10   Q    If I understand your testimony correctly --  And please
11       don't let me put words in your mouth.  It is my under-
12       standing you are saying -- your testimony is that it
13       is -- it would not be unusual for a detective not to
14       report to dispatch that they are on their way to conduct
15       a search and rather, wait until they got to the place
16       and, then, report it themselves.  Is that what your
17       testimony is?
18   A    Correct.
19                    MR. KONRAD:        Thank you.
20   Q    If the detectives were on their way to District 5 on
21       an official business matter, similarly, when would you
22       expect a report to CAD be made, if at all?
23   A    I don't think there would be --  Depending if they were
24       assigned to something, for instance, a homicide or a
25       shooting and they were part of that assignment, I think
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              96
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 97 of 501   Document 80-5

```
 1        they would have an obligation to notify dispatch, but at
 2        that time, many of the detectives were operating out of
 3        districts and I don't know that they necessarily
 4        informed the dispatcher when they are in or out of the
 5        district.  I don't know.
 6   Q    Then again, just assuming, the last possibility here,
 7        I want you to assume that they were on their way -- in
 8        fact, Detective Lewandowski was on her way, at least,
 9        to Shorewood to assist her son.  Would there be any
10        obligation on the part of a department member to report
11        that?
12   A    Yes.
13   Q    What is your understanding of what the obligation would
14        be?
15   A    If they are responding to a particular matter within the
16        course of duty of that nature, they need to tell the
17        dispatcher that they were part of that, that they were
18        going to that.
19   Q    When you searched the CAD records, were you specifically
20        looking for those different possible entries to be made
21        in relation to them reporting their location?
22   A    I did.  I searched for their unit history and didn't
23        find anything.
24   Q    Did you search the CAD for reports of the traffic
25        accident that the detectives were involved in?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                    sueT@wi.rr.com
                                                            97
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 98 of 501   Document 80-5

```
 1  A    Yes.

 2  Q    What did you find?

 3  A    I found more than one CAD assignment created or CAD

 4       complaint created; one initiating at 2:17, I believe it

 5       was, and there was maybe 23 seconds or 30-some seconds.

 6       I am not sure on the seconds, but I believe it is 2:17

 7       a.m. for an accident.  I don't remember what it was

 8       titled originally.

 9  Q    So if I understand you correctly, you are indicating

10       that two different dispatchers recorded the same event

11       roughly around the same time?

12  A    Separate -- I don't know if they were dispatchers or

13       telecommunicators, but persons within the communications

14       TCD received calls related to the same incident.

15  Q    How can that happen?  How could two different communi-

16       cations personnel be recording information on the same

17       matter?

18  A    There is multiple persons, particularly, that answer 911

19       calls.  There is not just one person that answers 911

20       calls, there is several people working and there is

21       ability for several calls to come in at one time.

22  Q    Was that the case in this matter?

23  A    I don't know if they were at the exact same time, but

24       they were within close proximity.

25  Q    I believe you testified that those multiple entries from
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    98
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 99 of 501   Document 80-5

```
 1         the different communications personnel were at 2:17.  Is
 2         that right?
 3    A    I believe, off the top of my head, that that was the
 4         created time for that complaint.
 5    Q    I direct your attention to the top of Page 2 of your
 6         report, if that refreshes your recollection.
 7    A    Yes.
 8    Q    Based upon the recording of 2:17, are you able to deduce
 9         from the facts of the investigation any other knowledge
10         that you may have a rough estimate of when the accident
11         must have occurred?
12    A    It had to have occurred before 2:17 and the amount of
13         seconds that were on the created time on the CAD.
14    Q    Based on any other facts, are you able to, then, deduce
15         how much earlier than 2:17 it may have happened or would
16         you have expected to have happened?
17    A    Based on the nature of the calls that were coming in
18         and how the first entry on the CAD appeared that the
19         dispatcher or telecommunicator entering preliminary
20         information, basic information, about what location
21         and what they possibly had immediately into the CAD.
22    Q    Had you gained knowledge of what happened at the acci-
23         dent?
24    A    Yes.
25    Q    How did you obtain this knowledge?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 100 of 501   Document 80-5          99

```
 1   A      Viewed the records management reports, RMS reports, I

 2          viewed the accident report itself and I interviewed a

 3          witness to the accident as well.

 4   Q      Based upon that knowledge, we will come back to some

 5          details, but just give me an overview, please, of your

 6          understanding of what happened in the accident.

 7   A      In the accident, my understanding is the department

 8          vehicle was traveling east on North Avenue and as it

 9          approached the 35th Street intersection, had its

10          emergency lights activated and collided with a citizen

11          vehicle, I believe, traveling south on 35th Street.

12   Q      Do you have knowledge of who was at fault in the

13          accident?

14   A      I didn't make a determination of who was at fault in the

15          accident.

16   Q      Do you have any information about who crossed against a

17          red light?

18   A      Yes.

19   Q      What information do you have?

20   A      I have information that the citizen vehicle was --

21          the witnesses either indicated that the citizen vehicle

22          either traveled into the intersection ignoring the red

23          light or was speeding trying to travel through the

24          intersection through a yellow light to try to make it

25          through the intersection before a red light.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                        sueT@wi.rr.com
                                                              100
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 101 of 501   Document 80-5

```
 1   Q    Were there witnesses to this?

 2   A    Yes.

 3   Q    How many witnesses are you aware of?

 4   A    I am aware of, for sure, two that witnessed the accident

 5        and a third that may have witnessed the accident, but

 6        reported that she had and, then, at one time, indicated

 7        she hadn't.

 8   Q    Are you aware whether or not those witnesses called

 9        immediately after observing the accident?  Strike that

10        question.  Do you have knowledge whether or not those

11        witnesses called and reported to 911 having observed an

12        accident?

13   A    There was several people that called 911 to report the

14        accident.  I am not sure, from my memory, if it was the

15        people that actually saw the vehicles collide or if it

16        was people that were nearby and were obviously aware

17        that an accident just occurred and immediately called

18        the police through hearing the accident or whatever

19        happened.

20   Q    Are you aware whether or not those calls reporting the

21        accident were close in time to when the accident

22        occurred?

23   A    Yes.

24   Q    So based on that information and the fact that it was

25        entered at 2:17, are you able to give a very rough
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                101
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 102 of 501   Document 80-5

```
 1        approximation of how much earlier than 2:17, based on

 2        the information you have, that you would expect that the

 3        accident occurred?

 4   A    Approximately one minute.

 5   Q    Are you aware of a witness having been traveling in the

 6        opposite direction of the detectives on North Avenue?

 7   A    Yes.

 8   Q    Are you aware of what their location was?

 9   A    I believe I obtained that.  I don't recall.  I don't

10        remember what it was, but I do believe I obtained that

11        information.

12   Q    Okay.  Do you have a recollection of whether they were

13        eastbound -- strike that -- whether they were east or

14        west of the intersection of 35th Street?

15   A    I believe they were east of 35th Street.

16              MR. PEDERSON:      I would direct your

17        attention to the last paragraph of Page 4 of your

18        report.  If you would give that a quick review.  Let me

19        know when you are done.

20              THE WITNESS:      I have read it.

21   Q    Does that paragraph relate to the questions I am asking

22        you right now?

23   A    Yes.

24   Q    All right.  Does this refresh your recollection?

25   A    Yes.
```

SUSAN K. TAYLOR          262-553-1058       COURT REPORTER
                        sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 103 of 501   Document 80-5    102

```
 1   Q    Who was operating that vehicle?

 2   A    Juan Perez.

 3   Q    Was he east or west of 35th Street?

 4   A    He reported that he was east of 35th Street.

 5   Q    I suppose another way of saying that is, he was

 6        approaching 35th Street westbound on North Avenue.

 7        Is that right?

 8   A    Yes.

 9   Q    If I have the scene right, detectives would have been

10        traveling toward him.  Again, they also were approaching

11        35th Street on North Avenue.  Is that right?

12   A    Yes.

13   Q    In your review of the reports, did Mr. Perez make any

14        statements regarding observing emergency lights on the

15        detective's vehicle?

16   A    Yes.

17   Q    What did he say?

18   A    He reported that he observed flashing red and blue

19        lights.

20   Q    What did he do in response to that?

21   A    Started to pull over, or did pull over.

22   Q    Was it your testimony that he did or tried?

23   A    He was either starting to pull over, in the process of

24        pulling over or he had pulled all the way over.  I don't

25        remember which one of the two.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                        sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 104 of 501   Document 80-5          103

```
 1    Q    I direct your attention to the third line up in the last
 2         paragraph.  I will read into the record.
 3              "Mr. Perez stated he pulled over to allow the
 4         squad to have the right-of-way."
 5         Do you see that?
 6    A    You said the third sentence?
 7    Q    Third line up from the bottom.  Sorry if that wasn't
 8         clear.
 9    A    I see it.
10    Q    Did I read that correctly?
11    A    Can you read it again?
12    Q    "Mr. Perez stated he pulled over to allow the squad to
13         have the right-of-way."
14    A    Yes.
15    Q    Okay.  To be clear, this wasn't a statement that
16         Mr. Perez said to you.  Right?
17    A    Correct.
18    Q    This is a statement that you pulled from a report of
19         someone else who interviewed Mr. Perez.  Is that right?
20    A    Correct.
21    Q    Was there anyone that you personally interviewed that
22         was a witness?
23    A    Yes.
24    Q    Who was that?
25    A    Ms. Hernandez.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                          sueT@wi.rr.com
                                                                  104
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 105 of 501   Document 80-5

```
 1   Q    When were you able to interview her?

 2   A    I don't recall what the date was.

 3   Q    What did she advise you that she observed?

 4   A    She advised me that she observed the vehicle traveling

 5        with the emergency lights activated and that she

 6        observed the collision.  Then she observed either the

 7        citizen vehicle travel through the red -- I am going off

 8        of my recollection of her statement that's reported --

 9        that she traveled -- or that the citizen vehicle either

10        traveled through the red light or she was reporting that

11        it was speeding trying to make it through the inter-

12        section before the light turned red.

13   Q    Did she give you any indications of how the long

14        emergency lights had been on?

15   A    Not that I remember, no.

16   Q    But she did definitely tell you that they were on.

17   A    Yes.

18   Q    Did she make any other statements as regards to

19        statements of Shannon Lewandowski that she heard?

20   A    Yes.

21   Q    What did she say?

22   A    I reviewed a report of a statement that was obtained

23        from her and I also obtained a statement, so I'd have to

24        look to be sure which one is which for sure, but in both

25        scenarios, both times, she indicated that she heard
```

SUSAN K. TAYLOR          262-553-1058     COURT REPORTER
                    sueT@wi.rr.com
                                                    105
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 106 of 501   Document 80-5

```
1          something related to the detective's concern about her
2          son -- getting to her son.  Those are not the exact
3          words.  That is from my memory.
4     Q    To your knowledge, were there any other individuals
5          present at the scene that indicated that they
6          specifically heard from Detective Lewandowski any
7          statements related similarly about her son?
8     A    Yes.
9     Q    Who else?
10    A    There was officers that heard statements similar to that
11         nature.  There were citizen witnesses.  If I interviewed
12         some that heard, I don't recall another citizen witness
13         from my memory that said that.
14    Q    And again, is it accurate to say you can't tell
15         specifically what they heard or what they reported?
16         Right?
17    A    I can tell -- I can tell you what they said, but it
18         is fair that they didn't recall specifically the exact
19         words.
20    Q    Tell me what they said.
21    A    Subject Hernandez -- and again, I am not sure if it was
22         in the first interview with the detective or my inter-
23         view -- said that she observed the detective on the
24         phone and indicated something about her needing to get
25         to her son and I believe something mentioning UWM might
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    106
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 107 of 501   Document 80-5

```
 1        have been in that as well.

 2   Q    Is it accurate to say that there were multiple witnesses

 3        of unknown sources who indicated that there were some

 4        statements made by Detective Lewandowski regarding her

 5        son being stopped at UWM, etc.?

 6   A    Yes.  There was -- Mr. Perez, I believe also informed

 7        the detective that he heard a statement regarding that.

 8   Q    Did you have an opportunity to interview Lieutenant

 9        Hanley?

10   A    Yes.

11   Q    When you interviewed Lieutenant Hanley, were you aware

12        of his prior report that's been contained in Document

13        No. 1?

14                 THE WITNESS:        I'm pretty sure I

15        know what you are talking about, but I will look at it

16        to make sure.

17                 MR. PEDERSON:       Please do.

18   A    Yes.

19   Q    Did you review that prior to your interview with him?

20   A    Yes.

21   Q    Did you discuss the contents of that report with him?

22   A    Yes.

23   Q    What did he have to say regarding that?

24   A    He confirmed that the information in it was true and

25        that Detective Lewandowski called and reported that she
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
                                                          107
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 108 of 501   Document 80-5

```
1        was initially responding to District 5 prior to the
2        accident and she had her lights activated, not to act
3        as an emergency vehicle, but to move cars out of her
4        way, and that at some point, she said was traveling to
5        meet or to locate her son at UWM, or in that area of
6        UWM.
7                        MR. PEDERSON:       I want to take a step
8        back.  I have some clean-up questions on a few things.
9    Q   Are you aware of the other driver, the citizen driver,
10       the other person who was involved, the other vehicle
11       that was involved in the accident?
12   A   Yes.
13   Q   What was that person's name?
14   A   I would like to look to be sure, but I think it was
15       Debrielle Johnson.
16                        MR. PEDERSON:       You can confirm and
17       if you do refer to the document, just point to us what
18       you are looking at.
19   A   Sure.  Page 3 of the summary report, Exhibit 8.  And
20       yes, it's Debrielle Johnson.
21   Q   It is the second-to-the-last paragraph there?
22   A   Yes.
23   Q   Where you report that the driver is Debrielle Johnson.
24       Is that right?
25   A   Yes.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    108
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 109 of 501   Document 80-5

```
 1  Q  Are you aware whether she was issued some citations on
 2     the scene?
 3  A  On the scene, I don't think she was issued any cita-
 4     tions, but probably at the hospital.
 5  Q  I direct your attention to Page 9 of your report, second
 6     full paragraph.  Are you reporting there in your report
 7     regarding citations issued to Ms. Johnson?
 8  A  Yes.
 9  Q  What are you reporting and what are you aware of?
10  A  That she was issued a citation for operating under
11     suspension and the fact that she had a finding of guilt
12     on that charge.  The charge may be an inappropriate term
13     on that citation.  And she was also issued for operating
14     a motor vehicle without insurance and for operating a
15     vehicle after suspension of registration and for illegal
16     right turn on red was also listed.  Those -- I don't
17     believe those are the total encompassing citations that
18     she was issued altogether.
19  Q  What else was she issued?
20  A  I believe she was also issued a citation for OWI.  I am
21     not for sure.
22  Q  Okay.  I would direct your attention to the next para-
23     graph there.  What are you reporting in the next para-
24     graph?  Strike that.  Are you aware whether a blood
25     sample was taken from Ms. Johnson on the evening in
```

```
 1      question?

 2   A  Yes.

 3   Q  Was it sent to the Department of Justice laboratory for

 4      BAC analysis?

 5   A  Yes.

 6   Q  Did the Department of Justice send a report back

 7      indicating that they had conducted an analysis and what

 8      the results were?

 9   A  Yes.

10   Q  What were the results of that analysis according to the

11      Department of Justice?

12   A  That it was ethanol at a level of .064.

13   Q  Is that a prohibited BAC level?

14   A  No.

15   Q  What is a prohibited BAC level?

16   A  I believe it starts at .08.

17                 MS. WILSON:        I didn't hear what

18      you said.

19                 THE WITNESS:       I believe it starts

20      at .08.

21   Q  Did you check records to indicate --  Strike that.  Did

22      you review any databases or records that are available

23      to you in relation to the OWI charge?

24   A  Yes.

25   Q  What did you find?
```

```
 1   A    I didn't find a criminal charge issued for it.  I found,
 2        I believe, a report indicating that a conference had
 3        been done and I believe I located the actual citation --
 4        or a copy of the citation.
 5   Q    So is it correct to say that Ms. Johnson was never
 6        actually charged with an OWI?
 7   A    I don't think so, no.
 8   Q    Certainly, are you able to testify today that Ms.
 9        Johnson was ever convicted of an OWI?
10   A    It's been some time since I checked that, but I don't
11        believe she has.
12   Q    Going back to your interview of Lieutenant Hanley, did
13        he say anything in his interview that was inconsistent
14        with his report?
15   A    Not that I am aware of.
16   Q    Did you become aware of any inconsistency that you
17        needed to investigate?
18   A    No.
19   Q    Was there a point in time that you interviewed Detective
20        Lewandowski?
21   A    Yes.
22   Q    Is that interview documented in the summary report?
23   A    Yes.
24   Q    I direct your attention to Page 19 of your summary
25        report.  I direct your attention to the third full
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 112 of 501   Document 80-5   111

1      paragraph.  Is it accurate to say that is a portion of

     2      the report here where you document -- you start to

     3      document the interview you had with her?

     4   A  Yes.

     5   Q  During that interview, did you discuss -- what did you

     6      discuss?

     7   A  We discussed what happened prior to the accident, what

     8      happened during the accident and we also discussed the

     9      phone call between Detective Lewandowski and Lieutenant

    10      Hanley.

    11   Q  Let's start at the beginning.  What did she tell you?

    12   A  She told me that relating to going to the accident, that

    13      she had mentioned that a sergeant told Detective Carr or

    14      discussed with Detective Carr about the gun not being

    15      recovered and that Detective Carr was going to go

    16      recover the firearm and she asked Detective Carr if she

    17      would like her to go with her and I don't know if she

    18      said yes, but they agreed they were going to go together

    19      and they discussed that she was going to attend to a

    20      matter at District 5 first and that they would go after

    21      that.

    22   Q  Based on her statements there, she was aware at the time

    23      what specifically the assignment was that Detective Carr

    24      was responsible for carrying out.  Is that right?

    25   A  Yes.

     SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                          sueT@wi.rr.com
           Case 2:16-cv-01089-WED  Filed 04/22/19  Page 113 of 501  Document 80-5          112

```
 1    Q    And by agreeing to assist her with it, she had assumed
 2         some professional responsibility to see that it was
 3         carried out.  Is that an accurate statement?
 4    A    I typically -- I don't know if I make that decision, but
 5         I feel, yes.
 6    Q    Based on your understanding of SOPs and work rules and
 7         your experience as a police officer, is that statement
 8         true?
 9    A    Correct.
10    Q    Did she tell you what this -- this side thing she wanted
11         to do at District 5 first, what it was?
12    A    We discussed that.
13    Q    What did she tell you?
14    A    She told me that she had previously in the evening
15         spoken with Detective Melanie Beasley and, I believe,
16         that Detective Lewandowski informed me that there was a
17         situation where Detective Beasley was at the district to
18         conduct a search of a female and that she didn't want to
19         be there and they finished that encounter and she was
20         going to talk to her again, because she had contacted
21         her and wanted her to come meet her there.
22    Q    Did she indicate whether or not she advised Detective
23         Carr of those details or facts?
24    A    It was clear that she advised Detective Carr that she
25         was meeting someone at District 5.  I don't believe she
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 114 of 501   Document 80-5   113

```
 1        told me that she provided those details to her.
 2    Q   Did you ask her why she decided to go to District 5
 3        first, why that was a greater priority than to go find
 4        this gun?
 5    A   I asked her why she went to District 5 first.  That may
 6        not have been the exact question, but we did discuss why
 7        she went to District 5.
 8    Q   I now direct your attention to Page 20 of your report,
 9        the last paragraph.  Is this the paragraph where you
10        document asking that question to her?
11    A   Yes.
12    Q   Is it true that you wrote a quote attributed to her
13        which was her response?
14    A   Yes.
15    Q   What was her response?
16    A   "That wasn't my assignment to do with the gun.  That was
17        just something I was going to help her with.  It took
18        precedence because that was where I was going to go in
19        the first place", and then it continues on the next
20        page.
21                    THE WITNESS:      Would you like me to
22        read it in its entirety?
23                    MR. PEDERSON:     No, that was fine.
24    Q   Did you then ask her what police purpose she was serving
25        by going to District 5?
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                        sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 115 of 501   Document 80-5   114

```
 1   A    Yes.

 2   Q    Did she respond?

 3   A    She responded,

 4            "my co-worker called me and asked me to come

 5        there; I'm gonna come there."

 6   Q    Is that a quote you also attribute to her in the body

 7        of your summary report?

 8   A    Yes.

 9   Q    Did she at that time indicate to you any other purpose

10        other than going to support then-Officer Beasley?

11   A    During that interview, I don't think so, no.

12   Q    Had she given you another reason why, would you have

13        documented it?

14   A    I think so.

15   Q    If she, for example, had told you at that time that in

16        addition to this support function, whatever it was, that

17        Officer -- with Officer Beasley, that she was also going

18        there on police business to assist with the filing of a

19        felony arrest, would you have documented that?

20   A    I don't recall her telling me that during that inter-

21        view.

22   Q    My question is, if she had, would you have documented

23        that she said that?

24   A    I think I would have, yes.

25   Q    Did Detective Lewandowski make any statements to you
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                    sueT@wi.rr.com
                                                            115
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 116 of 501   Document 80-5

```
1         regarding why she had emergency lights on while she was
2         on North Avenue?
3    A    Yes.
4    Q    What did she say?
5    A    She described that while she was near 35th Street --
6         I'm sorry, near 36th Street, she observed a vehicle on
7         the side of the road, she described it in the bicycle
8         lane, and that the vehicle had its brake lights on and
9         she thought the vehicle might pull out and strike her
10        vehicle, so to prevent the vehicle from striking her,
11        she activated her emergency lights and she described
12        that the siren -- she activated the siren for a very
13        short period of time, a second or less than a second.
14   Q    I believe you indicated that she testified that she did
15        this near 36th Street?
16   A    It was during the interview testimony, but yes, near
17        36th Street.
18   Q    It is probably obvious, but that would be a full one
19        block before 35th Street where -- the intersection where
20        the accident occurred.  Is that right?
21   A    36th Street would be one full block away from 35th
22        Street.  During her interview, she stated she was near
23        36th Street.  I don't remember if I got clarification
24        whether that was west of 36th Street, east of 36th
25        Street.  I may have.  I just don't remember.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 117 of 501   Document 80-5   116

1   Q     Are you familiar with Milwaukee Police Department squad

2         cars?

3   A     Yes.

4   Q     You heard testimony earlier today about the type of

5         buttons and how to function and operate the lights in

6         that particular car at issue?

7   A     I heard some of that.

8   Q     Are you familiar with that type that was described?

9   A     I don't remember what specific type.  I don't remember

10        the exact testimony.  But I am familiar with the type of

11        vehicle that detectives drive and how their emergency

12        lights are operated.

13   Q    Have you, yourself, operated detective vehicles?

14   A    I have operated identical vehicles that weren't assigned

15        to detectives, but we have them in patrol as well, or we

16        used to.

17   Q    In operating these vehicles, have you had occasion to

18        turn on the lights and turn on the siren and do all of

19        those things?

20   A    Yes.

21   Q    Have you had an occasion to do a quick -- I'll call it

22        a burst of turning on a light for some reason to alert

23        someone or something like that?  Have you had occasion

24        to do that?

25   A    I am sure I have.

```
 1    Q    Based on your experience and your knowledge of what was
 2         provided to you today, is Shannon Lewandowski's expla-
 3         nation consistent with the evidence that we have here
 4         today?
 5                        MR. MC GAVER:       I will object.  It
 6         goes to the ultimate question of the case.  I think
 7         there is a lack of foundation for this witness to answer
 8         that particular question.
 9                        MR. KONRAD:         We will hear the
10         answer and decide what it is worth.
11    A    Can you repeat that?
12    Q    I will break it down and make it a little easier.  What
13         I am wondering is --  Let's start with you.  On those
14         occasions when you have had an opportunity to turn on
15         and off a light, are you able to do this in a quick
16         fashion?
17    A    Yes.
18    Q    How long would it take you?
19    A    Less than a second.
20    Q    We are assuming the purpose of doing that is to alert
21         someone who you fear might come out.  Would there be any
22         reason to turn it on and just leave it on?  The lights,
23         that is?
24    A    If you were going to make contact with a car or block
25         the car off, but I wouldn't see a reason to turn it on
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
sueT@wi.rr.com
                                                              118
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 119 of 501   Document 80-5

1    and off as they passed a car.

2  Q  What I am wondering is if Lewandowski, if she was

3     turning on and off -- turning on the lights, at least --

4     that is what she told you -- to attempt to alert a

5     vehicle of her presence to avoid an accident.  Right?

6  A  Yes.

7  Q  Once she passed that vehicle, would there be any reason

8     to continue having the lights on?

9  A  No.

10 Q  When she got to the intersection of 35th Street and was

11    going through that intersection with the emergency

12    lights on, given the explanation she gave you as to why

13    she turned them on, in your knowledge of how it all

14    works, is there any reasonable reason why those

15    emergency lights should have still been on at that time?

16                MR. MC GAVER:       Same objection.

17                MR. PEDERSON:       I think I have laid

18    an adequate foundation.

19                MR. KONRAD:         Your line of ques-

20    tioning is a little more like a closing argument.  I

21    think the facts of what occurred are pretty well in the

22    record.  I think the Commission can judge the evidence

23    at this point.  You are certainly welcome to make --

24    you're piecing together arguments of the facts in your

25    closing argument.  So we can move on.

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 120 of 501   Document 80-5      119

```
 1                    MR. PEDERSON:      If I may ask one
 2         summation question related to this and if you want
 3         to --
 4                    MR. KONRAD:        Go ahead.
 5         BY MR. PEDERSON:
 6    Q    Did Detective Lewandowski ever provide an explanation to
 7         you as to why she still had the emergency lights on when
 8         she was going through the intersection of 35th Street?
 9    A    I don't believe so, no.
10    Q    Did you ask her or confront her about the statements
11         attributed to her by Lieutenant Hanley?
12    A    Yes.
13    Q    What did she say?
14    A    She said that the majority of the statements, nearly all
15         of them were not true.
16    Q    Did you ask her if she was aware, at the time of the
17         accident, that her son had been stopped by some police
18         agency?
19    A    I don't know if that is an exact -- you know, if that is
20         an exact phrasing of the question, but she reported to
21         me that she did know that her son was stopped by a
22         police agency prior to the accident.
23    Q    Did she tell you when she became aware of that?
24    A    Well, she told me before she entered the squad car at
25         District 3, I believe, just prior to.
```

SUSAN K. TAYLOR          262-553-1058       COURT REPORTER
                         sueT@wi.rr.com
                                                              120
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 121 of 501   Document 80-5

```
1    Q    Did she tell you how she became aware?

2    A    A telephone conversation from her son.

3    Q    Are you familiar with the District 3 area?

4    A    I am familiar with it.

5    Q    Are you familiar with the location of District 3

6         station?

7    A    Yes.

8    Q    Are you familiar with where the location of this

9         accident was?

10   A    Yes.

11   Q    Assuming that someone were to travel a direct route down

12        North Avenue, are you able to give an approximation of

13        how long, just roughly, it may take someone to drive

14        from the Third District station to 35th Street?

15   A    Obviously, it can be done based differently upon how

16        fast someone is going, but at a normal driving rate,

17        I'd say that could be accomplished certainly around five

18        minutes.

19   Q    Do you know how long it would take to drive to this

20        house where the search was supposed to take place?

21   A    I don't remember what the address was.

22   Q    It was previously indicated in the 2700 block of 52nd

23        Street.

24   A    Not much time at all.

25   Q    So a matter of about five minutes, something like that?
```

```
 1   A    Probably less.

 2   Q    Given the location of the vehicle, are you able to

 3        indicate whether or not they were headed in the direc-

 4        tion of the house?

 5   A    I don't think they were headed in the direction of the

 6        house.

 7                  MS. WILSON:        They were or they

 8        weren't?

 9                  THE WITNESS:       They were not.

10        Sorry.

11        BY MR. PEDERSON:

12   Q    In fact, they were already past the house and were

13        headed east on North Avenue.  Is that right?

14   A    Yes.

15   Q    Did you ask Detective Lewandowski if she was going to

16        the scene of where her son was?

17   A    I did.

18   Q    What did she say?

19   A    She said she was not, that she was going to District 5.

20   Q    Did she tell you when she last spoke to her son after

21        the initial time before she left the station?

22   A    After that?

23   Q    Yes.

24   A    I don't know that she said she spoke to him again.  She

25        may have, she may not have.
```

```
1    Q    Did she tell you what she told her son when she spoke to

2         him on the phone at the station before she left?

3    A    I believe she did, but I don't remember what that was.

4    Q    Did she indicate whether or not --  Strike that.  I want

5         to direct your attention to Page 21 of your report.

6    A    I am there.

7    Q    Third full paragraph.  I'd ask you to read that and see

8         if it refreshes your recollection.

9    A    I read it.

10   Q    Does that refresh your recollection?

11   A    I believe I read the wrong paragraph.

12   Q    I am on Page 21, the third full paragraph.

13   A    I see which paragraph.  Yes.

14   Q    Does that refresh your recollection as to what she had

15        said to her son?

16   A    Yes.

17   Q    What did she say?

18   A    To call her when he knew something.

19   Q    Is it accurate to say at the time she was traveling in

20        her car, she was expecting another phone call from her

21        son.  Is that right?

22   A    She asked him to call her back.  I don't know what her

23        expectation was, if she expected she was going to get a

24        call when she was driving or not.  It seemed reasonable

25        that someone would know that something would happen when
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 124 of 501   Document 80-5    123

```
1       she was still driving the car.

2    Q  Did the detective tell you anything about what she was

3       doing with her phone at or around the time that the

4       accident occurred?

5    A  Yes.

6    Q  What did she tell you?

7    A  She told me she didn't have her phone, that she had

8       given it to Detective Carr.

9    Q  Why did she do that?

10   A  She wanted Detective Carr to find, I believe, Melanie's

11      number in it -- in the phone.  But she wanted Detective

12      Carr to answer the phone, I believe, and, I believe, she

13      wanted her to look for a phone number.  I am not sure

14      from my memory if Detective Carr stated that she was

15      looking for a number in the phone or if that was

16      Detective Lewandowski.  But she had given the phone to

17      her and she was supposedly looking at the phone or

18      looking for a number.

19   Q  You have had a number of documents placed in front of

20      you for identification.  I direct your attention to the

21      first one marked for identification as number nine.  Can

22      you tell me what that document is?

23   A  It is a memorandum from Detective Lewandowski to Chief

24      of Police Edward Flynn dated October 11, 2015.

25   Q  Have you seen this document before?
```

```
 1   A   Yes.

 2   Q   Could you please give it a quick look-over and indicate

 3       whether it is appears to be a true and correct copy of

 4       the report it purports to be?

 5   A   Yes, it appears to be.

 6               MR. PEDERSON:        I move this into

 7       evidence.

 8               MR. MC GAVER:       No objection.

 9               MR. KONRAD:          Admitted.  Exhibit 9

10       is admitted.

11   Q   What is your understanding of why this document was

12       filed?  What is the purpose of this document?

13   A   When a member is served, the proper term would be

14       "charges", they have an opportunity to submit a response

15       to those charges in writing.

16   Q   You are talking about the charge and specifications that

17       are provided to members after a determination has been

18       made that they may have committed a rule violation?

19   A   Yes.

20   Q   We have had those entered into evidence today, or at

21       least a portion of them.  I direct your attention to

22       Document --  You will have to tell me.  Oh, number six.

23       Do you have that in front of you?

24   A   Yes.

25   Q   Is that what you are talking about?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                   sueT@wi.rr.com
                                                                125
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 126 of 501   Document 80-5

```
 1   A   Yes.

 2   Q   Is it correct to say that all the charges that are

 3       contained here today were not in front of her at that

 4       time?  Is that right?

 5   A   Correct.

 6   Q   What was different?

 7   A   She was served with two or three charges that day.

 8   Q   Which one was she not charged with then that she is

 9       charged with here today in this packet?

10   A   It would be -- the common word we use of untruthfulness.

11       I don't know the exact wording of the charge.  Integrity

12       charge.

13   Q   I direct your attention to the fourth page of this

14       document where it indicates "integrity".

15               MS. MC KENZIE:     Document 6?

16               MR. PEDERSON:     Yes.

17   Q   Is it correct to say that that page -- the three pages

18       relating to that charge were not present at that time?

19   A   Yes.

20   Q   Why is that?

21   A   That was not part -- the integrity charge was not part

22       of the charges at that time.  It was determined later.

23   Q   That has nothing to do with you.  You don't decide what

24       charges are issues.

25   A   Right.
```

SUSAN K. TAYLOR        262-553-1058       COURT REPORTER
                       sueT@wi.rr.com
                                                              126
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 127 of 501   Document 80-5

```
 1   Q   I suppose another point of clarification, as far as
 2       differences, the memo in number nine is dated
 3       October 11, 2015.  Is that right?
 4   A   Correct.
 5   Q   So for example, on Page 3 of Document 6 where it has
 6       the decision of Chief Flynn occurring December 15, 2015,
 7       those notations, obviously, wouldn't have been there.
 8       Is that a correct assumption?
 9   A   Correct.
10   Q   All right.  So this is what she is responding to in this
11       memo that is marked number nine.  Is that right?
12   A   Yes.
13   Q   Did you review this document?
14   A   Yes.
15   Q   Were her statements in this document consistent with the
16       interview that she gave you?
17   A   Some of them were.
18   Q   Are there any specific inconsistencies that you are
19       aware of?
20   A   I am not aware of a positive THC or marijuana test.
21       I was not --
22   Q   I want you to stop there and back up.  What are you
23       referring to?  What portion of this document?
24   A   I guess, that would be the -- I guess I would call it
25       the third full paragraph where it begins, "as Detective
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                    sueT@wi.rr.com
                                                                127
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 128 of 501   Document 80-5

```
 1        Carr."  In the paragraph, it says,

 2                "the driver had a blood level of .06 and

 3        tested positive for THC."  THC is the active ingredient,

 4        I believe, in marijuana.

 5   Q    What was the inconsistency there?

 6   A    I wasn't aware of a positive test for marijuana.

 7   Q    Any others?

 8                THE WITNESS:        Can I review it?

 9                MR. PEDERSON:        Yes, please.

10   A    In the second paragraph, it states,

11                "this officer requested my help with the

12        filing of a felony case.  Additionally, and most

13        importantly, to help her with the fear and stress she

14        was experiencing while working, due to an assault by a

15        co-worker."

16        I don't recall being informed during the interview that

17        she was helping with a filing of a felony case with her

18        and that she was responding at that time because she had

19        asked her to come.  She indicated earlier in the night,

20        that she did not want to be there regarding the matter.

21        It wasn't that --  It was for something that was on-

22        going, was my impression, not to deal with fear and

23        stress she was experiencing.

24   Q    Was this made part of her file as a formal response to

25        charges?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 129 of 501   Document 80-5    128

1   A    Yes.

2   Q    This was forwarded to the chief?

3   A    I believe so, yes.

4   Q    I now direct your attention to Document No. 10 marked

5        for identification.  Are you familiar with this docu-

6        ment?

7   A    Yes.

8   Q    What is this document?

9   A    It is a memorandum that she filed dated November 12.

10       It is dated November 12.  I believe she attached it to

11       her second Response to Charges.  I am not fully certain

12       on that, but I think she attached it to her second

13       Response to Charges.

14  Q    Let's talk more about this document.  What is it, to

15       your knowledge?

16  A    She is providing more information regarding the state-

17       ments of Sergeant Riley and her perception of those

18       statements and she is also addressing claims of whether

19       she was meeting her son or not.

20  Q    In here, does she level allegations of misconduct toward

21       specific department members?

22  A    Yes.

23  Q    Who does she level those allegations towards?

24  A    There is quite a few.

25  Q    Please indicate to the extent you are able.

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              129
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 130 of 501   Document 80-5

```
 1    A      Lieutenant Hanley, Sergeant Riley, I believe -- I am not

 2           sure if it is acting Captain Sgrignuoli or Captain

 3           Sgrignuoli.

 4    Q      I direct your attention to the second page from the

 5           bottom, fifth paragraph up.  Let me know when you are

 6           there.  It starts, "Lieutenant Sean Hanley."

 7    A      Yes.

 8    Q      I'll read that.

 9                  "Lieutenant Sean Hanley also lied about the

10           phone call contents that I made to him the night of the

11           accident."

12           Did I read that correctly?

13    A      Yes.

14    Q      Was this made part of the investigative file?

15    A      Yes.

16                       MR. PEDERSON:      I move that into

17           evidence, please.

18                       MR. MC GAVER:      No objection.

19                       MR. KONRAD:        It is admitted.

20           BY MR. Pederson:

21    Q      Finally, I direct your attention to Document No. 11

22           marked for identification.  Are you familiar with this

23           document?

24    A      Yes.

25    Q      What is this?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    130
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 131 of 501   Document 80-5

```
 1    A    I believe this is her second Response to Charges that
 2         she submitted.
 3    Q    Is this another response she was provided when she was
 4         provided the integrity charge?
 5    A    That is what my understanding of what it was for, yes.
 6    Q    Directing your attention to Document No. 6, before, I
 7         had indicated that starting with Page 3, for three
 8         pages, that was not present at that time.  She
 9         resubmitted this and, then, that charge was there?
10         Is that the difference for this one?
11    A    Can you re-ask that?
12    Q    You previously testified that with her prior -- her
13         first response, the integrity document, the documents
14         related to the integrity charges weren't there.  Right?
15    A    Yes.
16    Q    As they appear today in Document No. 6.  Right?
17    A    Yes.
18    Q    So this memo is a response to the portions that relate
19         to integrity.  Is that correct?
20              MS. WILSON:        Can you refer to the
21         number?  The number?  You are saying "this document".
22         I got all these documents.
23              MR. PEDERSON:        Sure.  I am
24         referring to Document No. 6, which is the charge and
25         specifications, and Pages 4, 5 and 6.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                               131
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 132 of 501   Document 80-5

```
 1   Q   Is it accurate to say, Sergeant, that Pages 4, 5 and 6

 2       of Document 6 relate to the integrity charge?

 3   A   Yes.

 4   Q   And that these are the pages that were not present when

 5       she filed her first response memo?

 6   A   Yes.

 7   Q   And with the second response memo dated November 27,

 8       Document 11, this is the document when she was provided

 9       Pages 4, 5, and 6, Document 6.  Right?

10   A   Just to clarify, I wasn't present when she was provided

11       those charges.

12                   MR. PEDERSON:      Maybe that is only

13       clear to me.  I try to make it as clear as possible, but

14       let's proceed.

15   Q   Did you review this document?

16   A   Yes.

17   Q   All right.  In this document, does she raise any new

18       issues or anything that was concerning your investiga-

19       tion?

20                   THE WITNESS:      May I review it?

21                   MR. PEDERSON:      Yes, please.

22   A   Yes, there is a line.

23   Q   Go ahead.  What jumps out at you?

24   A   Page 2, second-to-the-last paragraph.

25                   "Additionally, Officer Melanie Beasley needed
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              132
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 133 of 501   Document 80-5

```
 1          my assistance on reports regarding a RES on the date of

 2          the accident as I stated in my PI-21, but that too was

 3          never investigated."

 4     Q    What is concerning about that statement?

 5     A    I don't believe she indicated in her PI-21 that she was

 6          assisting Officer Beasley with an RES report.

 7     Q    Anything else?

 8     A    No.

 9     Q    I would direct your attention to the next page, the

10          second-to-the-last page of this document, Document 11,

11          where she makes some statements about you.  Do you see

12          that?

13     A    Yes.

14     Q    In here, she makes a number of statements regarding your

15          history of who you work for.  Do you see all of this?

16     A    Yes.

17     Q    I will direct your attention to the second-to-the-last

18          paragraph in here.  It starts, "it should also."

19          Do you see that?

20     A    Yes.

21     Q              "It should also be noted that the acts of

22          Sergeant Adam Zieger, Sergeant Roberta Klien constitute

23          misconduct in public office and guilty of a class I and

24          H felony."

25          Do you see that?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    133
Case 2:16-cv-01089-WED    Filed 04/22/19    Page 134 of 501    Document 80-5

```
1    A    Yes.

2    Q    Did I read that correctly?

3    A    Yes.

4    Q    Did that cause you to -- provoke you to have any sort of

5         response to what she stated there?

6    A    As far as the investigation goes, no.

7    Q    Do you know what she is referring to there?

8    A    I am sorry?

9    Q    Do you know what she is referring to when she says you

10        committed misconduct, what allegations she is making?

11   A    I assume the ones that she laid out beforehand.

12   Q    Can you summarize your understanding of what the allega-

13        tions are there?

14   A    That during portions of the PI-21, I deduced an officer

15        to admit the acts of violations of an officer's lawful

16        conduct.

17   Q    Have you ever been investigated for any misconduct in

18        relation to your investigation in this matter?

19   A    I don't know.

20   Q    Not to your knowledge, I guess.  Right?

21   A    No.

22   Q    Is there anywhere in this document where she denies

23        having been on her way to her son?

24   A    It is a few pages in.  I am not sure.  I would have to

25        review it.
```

```
 1   Q    Is it fair to say that the majority of this document is

 2        criticizing the investigation that was conducted and

 3        calling its -- well, the integrity of the investigation

 4        itself into question?  Is that right?

 5   A    Yes.

 6   Q    When you received this, don't you have a responsibility

 7        to review it and determine if any follow-up investiga-

 8        tion is necessary due to issues that might be raised in

 9        it?  Is that part of your job?

10   A    That is typically what is done with a typical Response

11        to Charges.

12   Q    Was there anything specific in here that you needed to

13        do to continue the investigation?

14   A    I believe I obtained -- after this, I think I obtained

15        a memorandum from the medical section.

16   Q    Do you recall what the memo was regarding?

17   A    I believe it was just the initial memorandum that a

18        sergeant filed indicating that she was injured.

19   Q    Nothing else.  Am I right?

20                    THE WITNESS:        I need one more

21        second, please.

22                    MR. PEDERSON:       Maybe there is a

23        simple way I can ask this question.

24   Q    Is there anything contained, to your knowledge, in

25        Document No. 11 that fundamentally changed the nature of
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
sueT@wi.rr.com
                                                                    135
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 136 of 501   Document 80-5

```
 1        the investigation or required any sort of significant

 2        work on you to address new issues raised?

 3   A    I don't believe from that document, no.

 4               MR. KONRAD:        Counsel, it is now

 5        l2:00, noon.

 6               MR. PEDERSON:      I am actually going

 7        to be wrapping up very quickly.  I have one more area

 8        that I know off the top of my head.  It won't take long,

 9        so I would prefer to continue.

10               MR. KONRAD:        What is "rather

11        quickly"?

12               MR. PEDERSON:      Ten minutes.

13               MR. KONRAD:        All right.

14        (Discussion off the record)

15        BY MR. PEDERSON:

16   Q    I just want to talk about Juanita Carr.  Did you inter-

17        view her?

18   A    Yes.

19   Q    What did you discuss with her?

20   A    I discussed what happened with the decision to go try

21        to make a gun recovery and where they were going before

22        they were involved in the accident and the accident

23        itself.

24   Q    What did she tell you regarding what started this whole

25        thing?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                            136
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 137 of 501  Document 80-5

```
 1   A    She didn't recall whether she was instructed to do this,
 2        the follow-up, or she thought to do it on her own and
 3        that she decided to take -- or to be accompanied by
 4        Detective Lewandowski and Detective Lewandowski told her
 5        that she had a matter at District 5 she needed to take
 6        care of and they were going there first before going to
 7        do the follow-up.
 8   Q    What happened next?
 9   A    She said she wanted to do the follow-up.  She wanted to
10        leave and go home.  Those weren't her exact words, but
11        she said she wanted to leave on time or something to
12        that effect.  And that she -- they were traveling on
13        North Avenue.  At some point after Sherman Boulevard
14        before 35th Street, there was something going on on the
15        side of the road which may involve prostitution and that
16        the emergency lights were activated on the squad.
17   Q    Why was that?
18   A    I would have to look and see what her exact response to
19        that was, but it had to do with the vehicle on the side
20        of the road.
21   Q    Did she tell you what happened next?
22   A    That they continued and that she was not sure if the
23        emergency lights were still on and that they got into
24        the accident.
25   Q    Did she tell you what she, herself, was doing at the
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                137
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 138 of 501   Document 80-5

```
 1        time the accident occurred?

 2    A   She did.  It had to do with Detective Lewandowski's

 3        operating her phone.  I don't remember if she was

 4        looking to get a number out of the phone or if she was

 5        trying to -- waiting for a call to answer.  From my

 6        memory, I believe, it was she was looking for a number

 7        in the phone.

 8                      MS. MC KENZIE:     On whose phone?

 9                      THE WITNESS:     Detective

10        Lewandowski's phone.

11        BY MR. Pederson:

12    Q   So you are not sure exactly whether she was looking for

13        a number or not, but you know for sure that she had

14        Detective Lewandowski's phone for some purpose.

15    A   Yes.

16                      MR. PEDERSON:     That is all I have on

17        direct.

18                      MR. KONRAD:     Do the commissioners

19        have any questions?

20                      MS. MC KENZIE:     No.

21                      MS. WILSON:     I may have missed

22        something.  When two people are riding in a squad car

23        and they are not assigned different assignments,

24        they go to one and go to another one, do they?

25                      THE WITNESS:     That could be a
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                               138
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 139 of 501   Document 80-5

1    complicated answer depending on the situation, but I
2    don't think it would apply to this situation.
3                    MS. WILSON:        The lights.  When you
4    turn on the lights, my understanding is the light was
5    turned on to keep another car from hitting the squad
6    car.  Is that what we said?  How fast --  I guess in
7    your estimation, could you get a light on to keep some-
8    body from hitting you, because it seems to me if some-
9    body is coming that way, them lights must move real fast
10   and the person must respond real fast.
11                   THE WITNESS:        Commissioner, if I
12   felt the vehicle was going to probably hit me, I don't
13   think I would react and turn the lights on.  I would
14   probably hit my brakes.  But if you actually were
15   reacting to turn the lights on, it is physical.  It's
16   just reaching --  I believe the center console would be
17   somewhere maybe a few inches away from the knee area.
18   You could just reach down and you would just have to
19   literally flip that toggle switch all the way over, if
20   someone was choosing to do that.
21                   MR. KONRAD:        All right.  That
22   completes the morning session.  We will reconvene in
23   Room 301B.
24                   MS. WILSON:        "A".
25                   MR. KONRAD:        "A".  Excuse me.

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                           139
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 140 of 501   Document 80-5

```
 1         It's at the end of this hallway.  We will reconvene at

 2         1:10.  Does that give you enough time?

 3                         MR. PEDERSON:       I assume we will

 4         reconvene with the witness back on the stand?

 5                         MR. KONRAD:       Yes.

 6         (Lunch break was taken)

 7                         MR. KONRAD:       All right.  We are

 8         ready to proceed with our afternoon session.

 9                         Mr. Pederson, do you have any more

10         witnesses?

11                         MR. PEDERSON:       I do not.

12                         MR. MC GAVER:       I have not been able

13         to cross-examine this witness.

14                         MR. KONRAD:         Sorry.  You are still

15         under oath.

16         CROSS-EXAMINATION BY MR. MC GAVER:

17    Q    Sergeant, how many years of experience do you have

18         leading investigations?

19    A    I have been conducting investigations ever since I have

20         been trained as a police officer.

21    Q    How much training have you received in conducting

22         interviews?

23    A    I don't remember specifically.  I am sure there is

24         training at the academy.

25    Q    After the academy?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                   140
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 141 of 501   Document 80-5

| | | |
|---|---|---|
| 1 | A | I am sure there's been -- I'm sure there's been in- |
| 2 | | service training on it, but a specific recollection of |
| 3 | | what that was -- and for the academy, I had formal |
| 4 | | schooling which included an interview class for criminal |
| 5 | | investigation -- interrogation. |
| 6 | Q | Have you ever held the rank of detective? |
| 7 | A | No. |
| 8 | Q | You testified a little bit about the CAD reports in |
| 9 | | this case.  Just a couple of questions about that. |
| 10 | | Every time any officer leaves a police station, is |
| 11 | | that supposed to be reported on a CAD entry somewhere? |
| 12 | A | No. |
| 13 | Q | Can you give me an example of a time where that wouldn't |
| 14 | | be required to be reported? |
| 15 | A | As an example, for an officer on patrol looking for |
| 16 | | maybe a contact, driving around looking for some -- |
| 17 | | trying to find, you know, an investigation or something |
| 18 | | to do, it is not a designated assignment, it wouldn't |
| 19 | | have a CAD generated for that. |
| 20 | Q | But if you are an officer going to a specific location |
| 21 | | for a specific reason, you should probably have that |
| 22 | | reported on a CAD entry.  Is that fair? |
| 23 | A | It could or could not.  An officer could be going to a |
| 24 | | house for some sort of follow-up on what they were going |
| 25 | | to do, but they are going to keep themselves available |

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
sueT@wi.rr.com
141
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 142 of 501   Document 80-5

```
 1        until they get there and they may not put themselves

 2        until they get there and they may not tell the dis-

 3        patcher where they are headed.  They might, say, remain

 4        available for in-service.

 5   Q    In the course of your investigation, are you aware of

 6        any Tactical Enforcement or TEU officers who were on the

 7        scene of the accident, even though there is no entry

 8        reported in CAD records?

 9   A    I am not sure one way or another.

10   Q    You came into this investigation a little bit after

11        it happened.  In fact, ten days -- is that roughly

12        correct -- after the accident occurred, you started your

13        investigation?

14   A    I believe it was one of the last days of January.

15        January 28 seems to stand out to me.

16   Q    So you didn't have the opportunity to interview any

17        witnesses on the scene.  Correct?

18   A    At the actual scene of the accident?

19   Q    Correct.

20   A    No.

21   Q    You interviewed one citizen witness, Jasmine Hernandez

22        after the fact.  Why only her?

23   A    That is not the only person I interviewed.

24   Q    Citizen witness.

25   A    That is not the only citizen I interviewed.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    142
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 143 of 501   Document 80-5

```
 1  Q    Who else did you interview?

 2  A    Should be --  There was another subject that partially

 3       identified themselves.  I believe, instead of providing

 4       her first name, she provided her middle name, Yvette.

 5       Then there were two male subjects.  I believe her first

 6       name or last name was Kadima.  Kadima with a "K".  And I

 7       don't remember the other subject's name.

 8  Q    You interviewed detective Carr as part of the investi-

 9       gation.  Correct?

10  A    Yes.

11  Q    And you didn't interview detective Carr until April 14,

12       2015.  Is that right?

13  A    I am not sure that is the exact date, but I wouldn't

14       dispute that that is the date.

15  Q    85 days after the accident?

16  A    Is that 85?

17  Q    Do you trust my math?

18  A    If that is 85 days.

19  Q    Same question with regard to Shannon Lewandowski.  I

20       believe -- correct me if I'm wrong -- that you inter-

21       viewed her on April 14 as well.

22  A    I wouldn't dispute that that is the correct date.

23  Q    Jordan Lewandowski, you interviewed him.  Correct?

24  A    Yes.

25  Q    That occurred on June 11, 2015?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                        sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 144 of 501   Document 80-5    143

```
 1   A    Correct.

 2   Q    143 days later?

 3   A    If your math is right.

 4   Q    I hope so.  Otherwise, I will look like a fool.

 5        June 12, Sergeant Smith, did you interview him?

 6   A    Yes.

 7   Q    On June 12?

 8   A    I don't remember -- the exact date, but June sounds

 9        appropriate.

10   Q    144 days after, if my math is correct?  Would you

11        dispute that?

12   A    No.

13   Q    Then you completed -- I will skip ahead a little bit.

14        You completed your memo -- or at least it is dated

15        September 9, 2015.  Is that right?

16   A    Yes.

17   Q    That is 233 days, if my math is right, after the acci-

18        dent.  Correct?

19   A    Sure.

20   Q    While you were conducting interviews with officers who

21        reported to the accident scene, did anyone give you any

22        observations about how Shannon Lewandowski was acting?

23   A    Yes.

24   Q    Do you remember what Officer Boehlke said about Shannon

25        Lewandowski?
```

```
 1   A     I don't remember what he specifically said --

 2                  MR. MC GAVER:       For the record, it's

 3         B-o-e-h-l-k-e.

 4   A     -- about her actions.  Correct.

 5   Q     Correct.  About how she was acting, what he observed

 6         about Shannon Lewandowski.  I will direct you to your

 7         report.  Do you still have it in front of you?

 8   A     Yes.

 9   Q     That is Exhibit No. 8.  I will direct you to Page 12 of

10         22, the second full paragraph.

11                  THE WITNESS:       Can you give me the

12         page number?

13                  MR. MC GAVER:       12 of 22.  Let me

14         know when you are there.

15                  THE WITNESS:       Okay.

16                  MR. MC GAVER:       Second full

17         paragraph, the last full sentence starts with "Officer

18         Boehlke described."  If you could read that sentence

19         and let me know when you are finished.

20                  THE WITNESS:       "Officer Boehlke --"

21         I will read it to myself.

22   Q     Does it refresh your memory as to what he said about

23         what he observed about Shannon Lewandowski?

24   A     I read the wrong paragraph.

25                  MR. MC GAVER:       Let me know when you
```

```
 1      are ready.

 2                    THE WITNESS:       Yes.

 3  Q   So Officer Boehlke describes Shannon Lewandowski as

 4      being what?

 5  A   "Distraught, very 'worri-some' and slightly agitated."

 6  Q   Do you have any recollection of Officer Kuspa making

 7      observations to you about Shannon's condition, what he

 8      observed about Shannon's condition?

 9  A   I don't have an independent memory of it.

10                    MR. MC GAVER:       I direct you to the

11      last paragraph, the sentence starting with "Officer

12      Kuspa described."  Let me know when you are there.  I

13      will read it for you.

14             "Officer Kuspa described the detective had

15      an apparent leg injury, was very incoherent, and kept

16      saying, 'Go get my son.'"

17      Did I read it correctly?

18  A   Yes.

19  Q   Is that your recollection of what Kuspa told you?

20  A   I don't have an independent memory of it, but.

21  Q   Do you have any reason to dispute it?

22  A   No.

23  Q   Go ahead, if you would, to Page 14 of 22.  Did you

24      interview Officer Deb Stacey in connection with this

25      investigation?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 147 of 501   Document 80-5        146

1   A      Yes.

2   Q      Second-to-the-last paragraph on Page 14 of 22.  Do you

3          see what I am looking at?

4   A      Yes.

5   Q      Second-to-the-last sentence there, it starts with

6               "Detective Lewandowski 'wasn't making any

7          sense' and told us to go get her son."

8          Did I read that correctly?

9   A      Yes.

10  Q      Any reason to dispute that is what Deb Stacey told you?

11  A      No.

12               MR. MC GAVER:       Page 15 of 22.  Let

13          me know when you are there.

14               THE WITNESS:       I am there.

15  Q      Last paragraph.  Start of a new sentence.

16               "Officer Vollrath acknowledged there was

17          discussion that he -- next page -- heard amongst

18          officers related to going to meet her son, but none

19          of the statements were from Detective Lewandowski."

20          Did you interview Vollrath in connection with the

21          investigation?

22  A      Yes.

23  Q      Do you have any quarrel with that being what he told

24          you?

25  A      No.

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                    sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 148 of 501   Document 80-5        147

1  Q  Go to -- page over to 13 of 22. I think you are going

2     backward now. Did you interview then-Officer, now-

3     detective Melanie Beasley in connection with the

4     investigation?

5  A  Yes.

6  Q  Do you remember whether Melanie Beasley told you

7     anything about Shannon Lewandowski -- a conversation

8     that she wanted to have -- "she" being Melanie, wanted

9     to have with Shannon Lewandowski about finishing

10    reports?

11 A  Yes.

12 Q  What do you remember about that?

13 A  I remember that she stated that she wanted to talk to

14    Detective Lewandowski about several things and one of

15    them included a report that she was working on.

16 Q  Did she give any more details about what the report was

17    or what she wanted help with?

18 A  Not that I remember, no.

19 Q  Did you ask her?

20 A  I may have. I don't know.

21 Q  Did you interview -- Obviously, you testified that you

22    interviewed Detective Lewandowski in connection with the

23    incident. Correct?

24 A  Yes.

25 Q  What, if anything, did Detective Lewandowski explain to

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                     sueT@wi.rr.com
                                                        148
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 149 of 501   Document 80-5

1    you as to why Jordan would hand a business card to an
         2    officer who is pulling him over?
         3  A  That we didn't discuss that.
         4  Q  What about phone calls she would -- what about phone
         5    calls that she would -- would have instructed Jordan
         6    Lewandowski to make to her in the event that he was
         7    pulled over by a police officer?
         8  A  Which statements --  Could you repeat the question?
         9  Q  Did Shannon, in her interview with you, explain any
        10    rationale or reasoning behind wanting her son to call
        11    her if he was pulled over by police?
        12  A  She said that -- I don't know if I remember it as a
        13    "rationale."
        14  Q  What did she say?
        15  A  She said that he gets pulled over quite frequently and
        16    she is worried about his safety.
        17                  MS. MC KENZIE:     That is what she
        18    said to you in the interview?
        19                  THE WITNESS:     Yes.
        20    BY MR. MC GAVER:
        21  Q  In your interview with Detective Lewandowski, I am going
        22    to ask you to assume her explanation of why she flipped
        23    the toggle switch on her car and put her emergency
        24    lights on as true.  Do you remember the explanation that
        25    she gave you for that?

         SUSAN K. TAYLOR       262-553-1058      COURT REPORTER
                            sueT@wi.rr.com
                                                        149
         Case 2:16-cv-01089-WED   Filed 04/22/19   Page 150 of 501   Document 80-5

```
 1   A    Yes.

 2   Q    If you assume that explanation were to be true, do you

 3        have an opinion as to whether that would violate an

 4        approved reason why emergency lights should be used?

 5   A    An opinion?

 6   Q    Yes.  What is your take on it?

 7   A    My opinion is that the lights of an authorized emergency

 8        vehicle can be activated when responding to an emergency

 9        and there is a slew of things as far as delivering

10        organs and assisting with that kind of thing as well

11        as --

12   Q    Observing a traffic hazard in the middle of the road?

13   A    I would agree if you were -- the lights would certainly

14        be an appropriate use if you were blocking traffic for a

15        traffic hazard.

16   Q    There's been testimony earlier today about the squad

17        lights being activated around 36th Street.  Do you

18        remember either hearing that or saying it?

19   A    I said near 36th Street.

20   Q    That is one block away from 35th Street, obviously.

21        Correct?

22   A    35th Street to 36th Street is certainly one block, yes.

23        I don't remember if there was an elaboration as to what

24        side of 36th Street, but 35th Street to 36th Street is

25        about one block.
```

```
 1   Q    There is no quarrel that the accident occurred at the
 2        intersection of 35th and North.  Right?
 3   A    No.
 4   Q    Okay.  Did you ever find out over the course of your
 5        investigation whether Shannon Lewandowski was uncon-
 6        scious at any time?
 7   A    It was reported to me that she was.
 8   Q    Do you remember who reported it?
 9   A    I believe she did.  I believe it may have been reported
10        to an officer of court administration who filed a
11        supplementary report and it may have been included in
12        there as well, but I am not for certain.  I believe
13        Detective Lewandowski said she was informed that she had
14        lost consciousness.
15   Q    Do you know who told Lewandowski that she went
16        unconscious?
17   A    I don't remember.
18   Q    What about detective Carr?  Do you know whether she
19        ever lost consciousness?
20   A    I don't remember her saying or ever reporting that she
21        lost consciousness.
22   Q    Did Detective Lewandowski ever report to you in the
23        process of you interviewing her that she had a hard
24        time articulating herself because of the nature of her
25        injury?
```

```
1   A      Yes.

2   Q      What about having issues with short-term memory?

3   A      Yes.

4   Q      Did you notice any slurred speech or -- slurred speech

5          in your interview with Lewandowski?

6   A      No.

7   Q      Did she indicate that she was having problems with

8          slurred speech?

9   A      I don't remember if that was one of the things she said

10         or not.

11  Q      Earlier today, there was testimony about then-officer,

12         now-detective Melanie Beasley having an incident or a

13         problem with a Tactical Enforcement officer.  Do you

14         have any independent knowledge of that investigation,

15         if one existed?

16  A      I think so.

17  Q      What do you know about it?

18  A      I know that the Special Investigation Section had an

19         investigation for that.

20  Q      Were you involved in the investigation?

21  A      Yes.

22  Q      What was your role?

23  A      I was interviewed briefly once.

24  Q      What was the topic of the discussion in your interview?

25  A      If I received a phone call from a sergeant at a
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    152
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 153 of 501   Document 80-5

```
 1       district.
 2   Q   Can you elaborate?  I don't understand.
 3   A   They wanted to confirm that I received a phone call from
 4       a sergeant at District 5, being Sergeant Gawin.
 5   Q   Regarding what?
 6   A   Well, there was -- it was regarding then-Officer Beasley
 7       coming and talking to her after at a hearing that day at
 8       court.
 9   Q   Do you have any knowledge what that hearing would have
10       been about?
11   A   I believe it was regarding a restraining order.
12   Q   Do you have any independent knowledge about a restrain-
13       ing order that affected Officer Beasley being served
14       upon the District 5 police station?
15   A   I have no idea what you are asking.
16   Q   Do you know whether a restraining order was ever served
17       on any officer at District 5 regarding the Melanie
18       Beasley situation?
19   A   I am aware that I believe someone was served with a
20       restraining order, but I wouldn't have received that
21       information.
22               MR. KONRAD:        Could we clarify?
23       Are we talking about some sort of confidential investi-
24       gation?  By your answers, I see you are hesitating.
25               THE WITNESS:       I believe it is --
```

```
 1      there is still a pending investigation.

 2                   MR. MC GAVER:      I have not asked for

 3      the officer's name and I won't ask for the officer's

 4      name involved in it.

 5                   THE WITNESS:      I don't believe there

 6      is a pending criminal investigation.

 7      BY MR. MC GAVER:

 8   Q  Do you know whether that investigation is closed?

 9   A  I believe what you are referring to is the Special

10      Investigation Section investigation is closed, yes.

11                   MR. KONRAD:      If this is an

12      internal investigation, I don't think it is appropriate

13      for discussion.

14                   MR. MC GAVER:      That is fine.  I have

15      nothing else.

16                   MR. PEDERSON:      Just a brief

17      redirect, if I may.

18                   MR. KONRAD:      Well, you have a

19      problem.

20                   MR. PEDERSON:      What's that?

21                   MR. KONRAD:      We don't want any

22      more discussion of that investigation.

23                   MR. PEDERSON:      I wasn't going to ask

24      about that.

25                   MR. KONRAD:      Then, you don't have
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                        sueT@wi.rr.com
                                                        154
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 155 of 501   Document 80-5

1    a problem.

2                    MR. PEDERSON:        Thank you,

3    Mr. Konrad.

4                    I just want to quickly ask you about

5    Jordan Lewandowski.

6    REDIRECT EXAMINATION BY MR. PEDERSON:

7    Q    This would be Detective Lewandowski's son.  Am I right?

8    A    Yes.

9    Q    You indicated you interviewed him?

10   A    Yes.

11   Q    I believe you were asked some questions and you said you

12        didn't talk about that.  What did you talk about with

13        Jordan?

14   A    Can you repeat that?

15   Q    What was the subject matter of your discussion with

16        Jordan Lewandowski?

17   A    The subject matter was the accident involving his mother

18        and his interaction with a police officer that night.

19   Q    Did you ask him whether or not he had a conversation

20        about his mom -- with his mom at that time?

21   A    Yes.

22   Q    What did he say?

23   A    He said he did have a short conversation with his mom.

24   Q    Did you ask him whether or not he had arranged with his

25        mother to have her come and pick him up -- or show up at

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
                                                        155
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 156 of 501   Document 80-5

| 1 | | the scene, I should say? |
|---|---|---|
| 2 | A | That was part of the discussion, yes. |
| 3 | Q | What did he say? |
| 4 | A | He said no. |
| 5 | Q | Did he say anything else more specifically in relation |
| 6 | | to that? |
| 7 | A | He said that he wouldn't ever put her in that position. |
| 8 | Q | What position is that? |
| 9 | A | To ask her to come meet him at a traffic stop. |
| 10 | | MR. PEDERSON:    That is all I have. |
| 11 | | MR. MC GAVER:    One question. |
| 12 | | RECROSS-EXAMINATION BY MR. MC GAVER: |
| 13 | Q | The interview you conducted with Jordan, how was that |
| 14 | | conducted? |
| 15 | A | Over the telephone. |
| 16 | | MR. MC GAVER:    That's it.  Thank |
| 17 | | you. |
| 18 | | MR. PEDERSON:    I am sorry.  Can I |
| 19 | | have a little leeway? |
| 20 | | MR. KONRAD:    Go ahead. |
| 21 | | RE-REDIRECT EXAMINATION BY MR. PEDERSON: |
| 22 | Q | I want to talk about the timeline here.  There were some |
| 23 | | questions raised about how many days, how long it took. |
| 24 | | Do you have an explanation as to why it took that long? |
| 25 | A | Yes.  The interview and investigation, Detective |

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
156
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 157 of 501   Document 80-5

```
 1          Lewandowski and detective Carr were -- had not returned
 2          to work.  They were not coming to work.  There was a
 3          little bit of difficulty -- I can't say for sure how
 4          long it was -- with me contacting one or both of them.
 5          And several of the interviews were interviews that were
 6          asked for me to complete after reviewing the status of
 7          the case with my current lieutenant.
 8      Q   How about the issue of the integrity charge coming later
 9          than the other two charges?  Did that have any effect on
10          the timing?
11      A   That submission of the charge itself?  It didn't affect
12          the timing of the investigation, the actual issuing of
13          the charge.
14      Q   Okay.  Any other factors that caused the interviews --
15          the investigation to be extended, to your knowledge?
16      A   There is -- it is common we don't just look at one case,
17          we have several cases that we are working on at one
18          time.  I work at night and I also respond to critical
19          incidents that occur in the city and I have additional
20          official responsibilities there on a daily basis.
21      Q   In terms of sequence, was it important to interview
22          anybody first or early on before you interviewed other
23          persons?
24      A   I tried to interview the witnesses that actually saw the
25          accident before the detectives.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                       sueT@wi.rr.com
                                                                    157
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 158 of 501  Document 80-5

```
1    Q    Is there anyone you were reserving until after you spoke
2         to the detectives?
3    A    No.
4    Q    Would it be accurate to say you couldn't begin to
5         investigate an integrity charge until she provided an
6         inconsistent statement to you?  Is that right?
7    A    Correct.
8                        MR. PEDERSON:      That is all I have.
9                        MR. MC GAVER:      Nothing further.
10                       MR. KONRAD:        Thank you.
11        (Witness excused)
12                       MR. PEDERSON:      The only housekeeping
13        matter is I need to move Exhibit 11 into evidence.
14                       MR. MC GAVER:      What is 11?
15                       MR. PEDERSON:      The third -- the
16        second Response to Charges.
17                       MR. MC GAVER:      No objection.
18                       MR. PEDERSON:      Other than that,
19        I think everything has been entered and with that,
20        the chief would rest his case.
21                       MR. KONRAD:        11 will be admitted.
22                       Mr. McGaver, do you have any witnesses?
23                       MR. MC GAVER:      I do.  I call
24        Detective Juanita Carr.
25                       JUANITA CARR, having been first duly
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                     158
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 159 of 501   Document 80-5

```
 1     sworn on oath to tell the truth, the whole truth, and

 2     nothing but the truth testified as follows:

 3               MR. KONRAD:        She is sworn.  You

 4     may proceed.

 5     DIRECT EXAMINATION BY MR. MC GAVER:

 6  Q  State your name for the record.

 7  A  My name is Juanita Carr.

 8  Q  You are a Milwaukee Police detective.  Correct?

 9  A  Yes.

10  Q  What year did you start working for the Milwaukee Police

11     Department?

12  A  1996.

13  Q  What year were you promoted to detective?

14  A  2005.

15  Q  Where were you assigned on January 19, 2015?

16  A  I was assigned to the Criminal Investigation Bureau

17     working out of District 3.

18  Q  What hours did you work?

19  A  8:00 p.m. to 4:00 a.m.

20  Q  Did you work on January 19?

21  A  Yes.

22  Q  Did you have any contact with Lieutenant Sean Hanley

23     during that shift?

24  A  Yes.

25  Q  Who is Hanley in relation -- in professional relation-
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              159
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 160 of 501   Document 80-5

```
 1         ship to you, or who was he on January 19, 2015?

 2    A    One of the lieutenants out of the detective bureau.

 3    Q    Was he your supervisor?

 4    A    One of my supervisors.

 5    Q    Where did you have this first contact with Lieutenant

 6         Hanley?

 7    A    Where?

 8    Q    Where?  Where did you meet with him?

 9    A    I believe at the hospital.  Saint Joe's Hospital,

10         I believe.

11    Q    What did he tell you?

12    A    In regard to what?

13    Q    In that meeting.  You met with him at Saint Joe's

14         Hospital.  What were you talking about?

15    A    I don't recall exactly what our conversation was.

16         I was there investigating a shooting.

17    Q    Did he send you to a specific assignment at that time?

18    A    I am not understanding your question.

19    Q    What was the purpose of the conversation with Lieutenant

20         Hanley at St. Joseph's Hospital on January 19, 2015?

21         What did you guys talk about?

22    A    About the shooting and, then, recovering the weapon.

23    Q    What time did that conversation take place?

24    A    I don't recall the time.

25    Q    Can you tell me a little bit about the shooting you were
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                          160
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 161 of 501   Document 80-5

```
 1        investigating?

 2   A    I believe it was a shooting where a male had shot

 3        himself.

 4   Q    Do you know any of the circumstances under which the

 5        male shot himself?

 6   A    No, I don't.  I don't recall.

 7   Q    At any point in time, did you report to the 2700 block

 8        of 52nd Street?

 9   A    I don't know the exact time, but I know it would have

10        been right after leaving the hospital.  That is the

11        location I believe the victim -- the male person who

12        shot himself, that is where he resided.

13   Q    What was the purpose of visiting that address?

14   A    I went there to try and recover the weapon that he used.

15   Q    Did you come into contact with anyone at that address?

16   A    No.

17   Q    What happened?

18   A    I didn't get an answer.

19   Q    Did you knock on the door?

20   A    Yes.

21   Q    Did you announce yourself as a member of the Milwaukee

22        Police Department?

23   A    No.  No one answered, so I didn't respond to anything.

24   Q    Did Lieutenant Hanley at any point or anyone else for

25        that matter direct you to return to that address to
```

```
 1        follow up with that investigation?

 2   A    Yes.

 3   Q    Who told you?

 4   A    I don't recall.  It was one of the other supervisors out

 5        of the district.

 6   Q    It was not Lieutenant Hanley?

 7   A    No.  I don't recall.  I don't believe it was.  I

 8        remember another supervisor at District 3 asking if I

 9        recovered the weapon and I told him no.

10   Q    Did you notice or believe there was any sense of urgency

11        to retrieve the gun used -- allegedly used in the shoot-

12        ing?

13   A    The urgency that I had noticed was after leaving the

14        hospital and that is when I went to try and recover

15        the weapon.

16   Q    Why was there some urgency?

17   A    So that I could make it to the house before the person

18        was released from the hospital.  That would have been

19        the urgency.

20   Q    You were unsuccessful in locating the gun when you went

21        to the address.  Fair?

22   A    Correct.

23   Q    Did you have any contact with Detective Lewandowski

24        during that shift?

25   A    Yes.
```

SUSAN K. TAYLOR          262-553-1058        COURT REPORTER
                         sueT@wi.rr.com
                                                                162
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 163 of 501   Document 80-5

```
 1   Q    Where did you first have contact with her?

 2   A    At District 3.

 3   Q    Approximately what time was that contact?

 4   A    I don't remember the time.

 5   Q    You make any plans to go anywhere with Detective

 6        Lewandowski?

 7   A    Yes.

 8   Q    What were those plans?

 9   A    I had plans to go back and check for the -- if I could

10        get inside the house to check for the gun that was used

11        in the incident and Detective Lewandowski said that she

12        had to go to District 3 to meet with another officer or

13        something, so we got in the car together so that we

14        could both handle both incidents or both locations.

15        She could go to District 5 and I could go to the

16        victim's location and see if I could recover the gun.

17   Q    Just to be clear, this would be the second attempt you

18        made to track down the gun at the location of the

19        shooting.  Fair?

20   A    Yes.

21   Q    Did detective --  Did you notice Detective Lewandowski

22        take any phone calls before she got in the car with you?

23   A    I don't remember.

24   Q    Who drove the car?

25   A    She did.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                        sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 164 of 501   Document 80-5      163

```
 1   Q    Is there any reason why she was driving the car as
 2        opposed to you?
 3   A    No.
 4   Q    What, if anything, did Detective Lewandowski do with her
 5        phone when she got into the car?
 6   A    I don't know what she did with it immediately, but I
 7        know I did have her phone in my hand.
 8   Q    What was the purpose of you having Lewandowski's phone
 9        in your hand?
10   A    I was looking through her cell phone.  I remember
11        looking through it.
12   Q    Prior to your departure from the District 5 police
13        department with Detective Lewandowski, did she tell
14        you anything about an incident with her son?
15   A    We never left District 5.  We left out of District 3.
16                    MR. MC GAVER:      I apologize.  You are
17        correct.
18                    MR. KONRAD:        The same question
19        except District 3?
20                    MR. MC GAVER:      Right.
21   Q    Did she mention her son at all?
22   A    When she passed me her phone, I remember her asking me
23        to look for his number so she could get in contact with
24        him.
25   Q    Did she explain to you why?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              164
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 165 of 501   Document 80-5

```
1    A    I don't believe so.

2    Q    What was your understanding of where you were planning

3         on going immediately?

4    A    Immediately?

5    Q    Immediately.  Where was the first stop?

6    A    District 5.

7    Q    And what was the purpose of you going to District 5?

8    A    She was going to meet with another officer.

9    Q    Who was the officer?

10   A    I didn't know at that time.  I believe the young lady's

11        name is Melanie.  I don't know her last name.

12   Q    Do you know anything about the purpose of Lewandowski's

13        planned meeting with Melanie?

14   A    No.

15   Q    To be clear, what was the plan after you departed from

16        District 5?

17   A    To go and pick up the gun, see if we could get inside

18        the house.

19   Q    How did Detective Lewandowski become involved in the

20        attempt to pick up the gun inside that house?

21   A    I told her that I was going to go and try and recover

22        the gun from that victim's residence, so she had to go

23        into District 5 and she was going to ride with me so we

24        could try and get inside the residence and recover the

25        gun.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                  165
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 166 of 501   Document 80-5

```
 1   Q   As far as you know, did anyone order Detective
 2       Lewandowski to participate in that investigation?
 3   A   Not that I am aware of.
 4   Q   Prior to you approaching the intersection of 36th Street
 5       and North Avenue, did Detective Lewandowski receive any
 6       phone calls on her phone?
 7   A   No.  I had her cell phone in my hand.
 8   Q   And it didn't ring?
 9   A   I don't believe so.
10   Q   As you approached the intersection of 36th Street and
11       North Avenue, what did you see?
12   A   I didn't see anything.  I was looking down at her phone.
13       I just heard her say, "oh, N", some cuss word, but
14       before I could look as high up as the bottom of the
15       window on the passenger's side or the driver's side,
16       our car had been hit.  I didn't know which direction we
17       were hit from.
18   Q   Prior to the collision --
19                   MS. MC KENZIE:     I'm sorry.
20                   She said, "oh, N"?
21                   THE WITNESS:     She said, "oh", just
22       "oh", and, then, she used a cuss word.  I don't recall
23       which cuss word she used.
24                   MS. MC KENZIE:     Okay.  Go ahead.
25       BY MR. MC GAVER:
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                       sueT@wi.rr.com
                                                          166
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 167 of 501   Document 80-5

```
1   Q   At any point prior to the collision, do you know whether
2       Detective Lewandowski activated the squad lights?
3   A   Yes.  I believe that the lights were on.
4   Q   Can you explain the circumstances under which she
5       activated those lights?
6   A   I can't explain it.  I do know that there are -- during
7       that time, there are a lot of prostitutes out in certain
8       areas and a lot of times, people will activate the
9       lights to let people know that, "hey; police are paying
10      attention to what you are doing, so you all stop doing
11      stuff like that," but I don't know why she specifically
12      may have activated the --
13  Q   Did Detective Lewandowski alter the manner in which she
14      was driving once the squad lights were activated?
15  A   No, I didn't notice anything different.
16  Q   Do you remember whether she activated the siren prior to
17      the collision?
18  A   I don't recall.
19  Q   Do you remember whether the siren was on at the time of
20      the collision?
21  A   No, I don't remember hearing the siren at all.
22  Q   Do you remember whether the lights were on -- the
23      emergency lights were on at the time of the collision?
24  A   I don't recall if they were on.
25  Q   Can you explain where the squad was impacted?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                    sueT@wi.rr.com
                                                             167
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 168 of 501   Document 80-5

```
 1  A    We were struck from the front side of the vehicle on the
 2       passenger's side.
 3  Q    You were a passenger at that time?
 4  A    Yes.
 5  Q    What did the impact do, if anything, to Shannon
 6       Lewandowski's position in the car?
 7  A    She was actually on -- she was in the center of the
 8       driver and passenger's seat with her head laying back
 9       and her eyes were looking up toward the ceiling.
10  Q    Was she conscious?
11  A    She didn't look conscious, so I started screaming right
12       away.
13  Q    Did she respond to you?
14  A    Not initially.
15  Q    How long did it take for her to respond to you?
16  A    I don't recall.
17  Q    Do you know whether you lost consciousness at any point?
18  A    I don't think so.
19  Q    At any point, were you and/or -- were you removed from
20       the squad car?
21  A    Yes.
22  Q    How did that happen?
23  A    I believe there was a citizen that helped.
24  Q    At any point, did you witness whether Shannon
25       Lewandowski was removed from the squad car?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              168
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 169 of 501   Document 80-5

```
 1   A   I don't recall.

 2   Q   So you don't know --

 3   A   I believe she was, though.

 4   Q   Do you know how it happened?

 5   A   No, I can't recall.

 6   Q   Do you remember who the first responders -- the first

 7       emergency responder to the scene was?

 8   A   No.

 9   Q   Do you remember how long it took for emergency

10       responders to report to the scene?

11   A   No.

12   Q   Did you call 911?

13   A   No.

14   Q   Do you know who did?

15   A   No.

16   Q   Do you remember anything that you said to anyone

17       immediately following the collision?

18   A   No.  I don't remember saying anything.

19   Q   Do you remember any officers reporting to the scene

20       while you were still on the scene?

21   A   Yes.

22   Q   Can you tell me who was there?

23   A   No.

24   Q   Do you remember speaking to any of the officers on

25       scene?
```

```
 1    A    No.

 2    Q    Do you remember -- did you witness Shannon Lewandowski

 3         say anything to any of the officers on scene?

 4    A    No.  I was not near Shannon, so I don't know if she

 5         said anything or not.  I can't recall hearing anything.

 6    Q    Did you tell anyone to contact next of kin or relatives?

 7    A    Excuse me?

 8    Q    Did you tell anyone to contact your relatives after the

 9         collision?

10    A    Yes.  Someone did come to me and asked if there was

11         somebody that they could call.  I can't remember who

12         that was.

13    Q    Do you know whether they got ahold of your relative?

14    A    Yes.

15    Q    How long were you on the scene after the accident?

16    A    It couldn't have been long, because I was taken off to

17         the hospital.

18    Q    In an ambulance?

19    A    Yes.

20    Q    Who rode with you in the ambulance?  Did any members of

21         the police department ride with you in the ambulance?

22    A    I can't recall.  I am sorry.

23    Q    Do you remember seeing Lieutenant Hanley at the scene of

24         the accident?

25    A    No.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                  170
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 171 of 501   Document 80-5

```
1   Q   Once you reported to the hospital, do you remember any
2       officers speaking with you?
3   A   There were officers there, yes.
4   Q   Do you remember who?
5   A   No.
6   Q   Do you remember seeing Hanley at the hospital?
7   A   Yes.
8   Q   Did Lieutenant Hanley come speak to you at the hospital?
9   A   Yes.  I believe he came in the room and spoke.
10  Q   What did you say to Hanley at that time?
11  A   I don't know.
12  Q   Do you remember what he said to you?
13  A   No.
14  Q   Did you ever see Lieutenant Hanley speak with Detective
15      Lewandowski at the hospital?
16  A   No.
17  Q   Did Lieutenant Hanley enter your room at the hospital
18      with Shannon Lewandowski?
19  A   I don't remember.
20  Q   Did Shannon Lewandowski ever come into your room at the
21      hospital?
22  A   At the end of the night when she was leaving, I remember
23      her stopping by to check on me.
24  Q   Was Lieutenant Hanley with her?
25  A   I don't believe so.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                           171
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 172 of 501   Document 80-5

```
 1   Q    What time were you discharged from the hospital?

 2   A    I don't remember.

 3   Q    Do you know who left with you?

 4   A    I had someone, one of my family members that was there.

 5   Q    Do you know your diagnosis when you were discharged from

 6        the hospital?

 7   A    No.

 8   Q    Did Lieutenant Hanley come to your house or visit you

 9        after the accident?

10   A    Yes.

11   Q    Do you know approximately how many days after the

12        accident he visited you at your house?

13   A    I know it wasn't -- it wasn't immediately.  It was --

14        I don't remember how long it was, but I know it wasn't,

15        like, right away.

16   Q    What was the purpose of that visit?

17   A    I don't recall.  I know he came, him and Lieutenant

18        Paul Lough came and interviewed me at my house, but I

19        don't remember which day that was.

20   Q    Were you given what is called a PI-21 form prior to that

21        conversation with Lieutenant Hanley?

22   A    No, I don't believe so.

23   Q    Do you know what a PI-21 form is?

24              MR. PEDERSON:     I will object to this

25        line of questioning.
```

SUSAN K. TAYLOR       262-553-1058       COURT REPORTER
                      sueT@wi.rr.com
                                                          172
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 173 of 501   Document 80-5

```
1                    MR. KONRAD:        What is your
2       objection?
3                    MR. PEDERSON:        I am objecting to the
4       line of questioning.  He is asking if she was provided a
5       PI-21 before interviewed by Lieutenant Hanley.  I think
6       that was -- you know, that issue was disposed of, I
7       guess, obliquely by her own motion.  I don't see how
8       that is relevant.
9                    MR. MC GAVER:        The motion that
10      was filed earlier in the case had to do with Shannon
11      Lewandowki.  It had nothing to do with Juanita Carr.
12                   MR. KONRAD:        I think the testimony
13      is to elicit the nature of the visit, so go ahead.
14      BY MR. MC GAVER:
15   Q    Do you know what a PI-21 is?
16   A    Yes.
17   Q    What is it?
18   A    It is a form informing the member to contact PPD in
19       order to give a statement regarding a matter.
20   Q    PPD is now known as IAD?
21   A    Yes.
22   Q    Internal Affairs?
23   A    Yes.
24                   MS. WILSON:        Commissioner McKenzie
25      is new.  I am old.  You all are sliding acronyms around
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              173
Case 2:16-cv-01089-WED    Filed 04/22/19    Page 174 of 501    Document 80-5

```
 1        here like nobody's business.  You have to --

 2   Q    What does PPD stand for?

 3   A    I will call it IAD.

 4   Q    What does IAD stand for?

 5   A    Internal --

 6   Q    Affairs?

 7   A    Internal Affairs.

 8   Q    All right.  PPD is Professional Performance Division if

 9        I am not mistaken?

10   A    Yes.

11   Q    Is it fair that IAD is now -- or PPD is now IAD?

12   A    Yes.

13   Q    Thank you.  Did you ever return to work after the

14        accident?

15   A    Yes.

16   Q    How long were you off?

17   A    About eight, nine months.

18   Q    What kind of injuries did you suffer from the accident?

19   A    I had a concussion, a back -- back pain, neck pain,

20        wrist pain and headaches.

21   Q    Do you still have any of those issues?

22   A    Yes.

23   Q    Do you know who had the green light at the intersection

24        of 35th and North at the time just before the collision?

25   A    I believe Detective Lewandowski.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                        sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 175 of 501   Document 80-5      174

1    Q    How do you know that?

2    A    That is what I was told.  I didn't see, so I didn't

3         know.

4    Q    How fast --  Do you have any idea how fast the squad

5         that you were in was going at the time of the accident?

6    A    No.  We couldn't have been going fast because I was

7         looking down at the phone that I had in my hand.  It was

8         Detective Lewandowski's.  And if she would have been

9         going fast, I wouldn't paid attention to what she was

10        doing.  But I wasn't -- she was not doing anything that

11        startled me or that made me -- that I need to raise my

12        head up and look and see what she was doing.

13                      MR. MC GAVER:      Nothing further.

14                      MR. KONRAD:        Mr. Pederson?

15                      MR. PEDERSON:      Thank you,

16        Mr. Konrad.

17        CROSS-EXAMINATION BY MR. PEDERSON:

18   Q    I would like to start, detective, with your testimony

19        indicating that you had gone to the house to conduct

20        a search earlier in the evening.  Do you recall the

21        testimony that I am referring to?

22   A    Yes.

23   Q    When you did that, did you go alone or were you with

24        anyone?

25   A    I was probably alone.

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              175
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 176 of 501   Document 80-5

```
1    Q    Is that consistent with department policy?

2    A    To check for a gun?

3    Q    Yes.

4    A    I believe so.

5    Q    So if I were to indicate to you that those -- typically,

6         those searches are supposed to be conducted with more

7         than one department member at a time, you would say you

8         are not aware of that fact?

9    A    No, I wouldn't say that.  I am saying at that time, the

10        only person that was supposed to be at that residence

11        that I recall would have been his girlfriend or his wife

12        or a female that would have been there.

13   Q    How does that relate to whether or not you were going to

14        try to conduct the search alone or someone with you?

15        How did those two things connect?  I don't understand.

16   A    I am not understanding your question.

17   Q    Maybe we are both misunderstanding each other.  My

18        question to you was that you were at the house by

19        yourself.  There was no other department member with

20        you at that house.  Right?

21   A    Correct.

22   Q    And you knocked on the door and no one answered.  Right?

23   A    Right.

24   Q    And my question to you was, at that time, let's say

25        someone did answer.  Was it your intent to go into that
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              176
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 177 of 501   Document 80-5

1      house alone to conduct -- to request to do a consent
2      search and to conduct a search of the home?
3   A  No, I'm sorry. No. Had I gotten an answer at the door,
4      I would have called for another squad to respond there,
5      but seeing that I didn't get an answer, I didn't have to
6      call for anyone to come out. So the second time that --
7      because Detective Lewandowski was going to ride with me,
8      we would have been able to handle the search together.
9   Q  So my follow-up question to you is, do you agree with me
10     that had you gone into the house alone and conducted the
11     search alone, that that would not have been consistent
12     with department policy?
13  A  I wouldn't have done that search alone.
14  Q  Very good. Did you write a report that you did that?
15  A  That I did what?
16  Q  That you went to the house, that you knocked on the door
17     and attempted to conduct a consent search, but no one
18     answered?
19  A  I would have put that in my report.
20  Q  So you did report that?
21  A  No. After the accident, I didn't file any report.
22  Q  So after you left the house, you went to District 3?
23  A  Correct.
24  Q  It is your testimony that while you were at District 3,
25     some supervisor instructed you to go back to the house

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                            177
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 178 of 501   Document 80-5

```
 1        and try and conduct another search?

 2   A    There was a supervisor at District 3 that I remember

 3        asking if I had gotten the gun out of the house and I

 4        said no, but, then, Detective Lewandowski and I were

 5        going to go back -- we were going to back over to the

 6        house so I could check for the gun.

 7   Q    Did this supervisor you had the conversation with have

 8        knowledge that you had already attempted to conduct a

 9        consent search?

10                    MR. MC GAVER:        Objection.  Calls

11        for speculation.

12                    MR. PEDERSON:        I can rephrase.

13   Q    Did you advise the supervisor that you had the conver-

14        sation with that you had already attempted to search the

15        house?

16   A    I don't remember if I actually advised the person, but

17        I do believe that -- I remember -- I remember, kind of,

18        saying that I had gone to the house and didn't recover

19        the gun out of there.  They should have been aware.

20                    MS. MC KENZIE:       I am sorry.  One

21        quick question because I think --

22                    Who sent you to the house originally the

23        first time?

24                    THE WITNESS:        That would have been

25        Lieutenant Hanley.  But that is follow-up that we would
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                    sueT@wi.rr.com
                                                        178
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 179 of 501   Document 80-5

```
1        have done in the first place.  Even if he wouldn't have
2        said, "go to the house and check for the gun", it would
3        have been done naturally.
4        BY MR. PEDERSON:
5    Q   Lieutenant Hanley -- it is your testimony Lieutenant
6        Hanley gave you that directive while you were both at
7        the hospital, though.  Right?
8    A   Yes.  I think I remember him being at the hospital.
9    Q   So when you were at District 3, it sounds to me what
10       you are saying that you have a conversation with the
11       supervisor.  You don't recall who.  You didn't
12       necessarily get a directive from that supervisor to go
13       again, but you decided on your own to do that because
14       that is what you do as a detective.  Correct?  Is that
15       your testimony?
16   A   You are confusing me.
17   Q   Let's take it in smaller pieces.  You have testified
18       that you don't remember who the supervisor is that you
19       had a conversation with at District 3.  Right?
20   A   Correct.
21   Q   And you are not sure if it was Hanley or not.  Is that
22       true?
23   A   I don't believe it was Hanley.  I believe it was another
24       supervisor from District 3 that was asking -- I am not
25       sure which supervisor that was.  I don't believe it was
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              179
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 180 of 501   Document 80-5

1          Lieutenant Hanley.

2     Q    How many supervisors do you have?

3     A    There is a lot of lieutenants, but District 3, there

4          was supervisors at District 3 in the detective bureau.

5     Q    Let me limit it, then.  How many supervisors, to your

6          knowledge, who had knowledge of the investigation that

7          you were conducting were present and there and working

8          that night?

9     A    I don't know.

10    Q    Do you recall having any interaction with Lieutenant

11         Hanley at District 3 that night at all?

12    A    I don't remember.

13    Q    So when you have this conversation with the supervisor,

14         whoever it was, did that supervisor give you an assign-

15         ment to go back to the house and search it again, or try

16         to search it again?

17    A    Yes, I believe so.

18    Q    I think you have already testified, but do you know

19         approximately what time that was?

20    A    No.

21    Q    How did it come to pass that Detective Lewandowski was

22         aware of your assignment?

23    A    We were actually sitting right next to each other and we

24         always talk about the assignments that we have or were

25         actually sent to and I told her that that is what I was

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
sueT@wi.rr.com
                                                                    180
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 181 of 501   Document 80-5

```
 1            going to go and do.  I remember -- I think I remember
 2            discussing that the gun -- discussing the gun with her
 3            and rather than taking a squad out of service to go and
 4            do the search, Lewandowski was going to go with me.
 5    Q       So what happens next is you go outside and get ready to
 6            go, I assume.  Is that right?
 7    A       Yes.
 8    Q       Was there much length of time between the time that you
 9            talked to the supervisor that you get in the car?
10    A       I don't remember.
11    Q       At some point, you are in the car and you are driving
12            away from District 3.  Right?
13    A       Yes.
14    Q       At some point, you become aware that you are making this
15            quick run to whatever it is, to District 5 before you go
16            to the house.  Is that right?
17    A       Yes.
18    Q       So when do you become aware that you are going to
19            District 5?
20    A       I don't remember, but I do know that the plan was to go
21            to District 5 so she could handle whatever was going on
22            at District 5 and, then, I was going to come back to the
23            house where the gun probably was on the way back,
24            because that was, like, a block away from District 3.
25            So we were going to make a circle out of it, I guess you
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                        sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 182 of 501   Document 80-5    181

```
 1        could say.
 2   Q    So this house was extremely close, the house that needed
 3        to have the search performed on it, or at least try to
 4        search.  It was very close.
 5   A    Yes.
 6   Q    It would be a true statement, then, that before you left
 7        District 3, you knew you were going to District 5 first.
 8   A    I am not sure.  I do know that we had -- that I had
 9        already checked for the gun and to go right back there,
10        I was -- I wanted to put a little time in there.
11                      MR. PEDERSON:      That is not my
12        question.
13   A    I believe we were probably going straight to District 5.
14        I am not real sure.
15   Q    But you would agree with me if the house is a block or
16        two away as you indicated, if you are going to go there
17        first when you left the district, you would have got
18        there right away, but you didn't.
19   A    Right.
20   Q    You were heading eastbound on North Avenue, so the
21        deduction there, the reasonable conclusion is that when
22        you got in the car with the detective, you knew at that
23        time, you were going to District 5 first.  Right?
24   A    I knew once we were taking a left turn on North Avenue,
25        that we were going to District 5.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              182
Case 2:16-cv-01089-WED    Filed 04/22/19    Page 183 of 501    Document 80-5

```
 1   Q    I think this is already in testimony.  I want to make
 2        sure.  The first time you went to the house, what was
 3        the police purpose?
 4   A    To the house where the gun was?
 5   Q    Yes.
 6   A    To recover the gun.
 7   Q    Okay.  To ask for a consent search and see if you could
 8        find it.  Is that right?
 9   A    Yes.
10   Q    Any other police purpose?
11   A    No.
12   Q    So when you are in the car, are you having any conver-
13        sation related to what she is going to District 5 for?
14   A    No.
15   Q    When you are in the car, it is about 2:00 a.m.  Right?
16   A    Yes.
17   Q    And you are getting off at 4:00.  Right?
18   A    Yes.
19   Q    If you get into the house and you find the gun, there is
20        going to be some work and some paperwork and it is going
21        to take some time.  Right?
22   A    Yes.
23   Q    So given that set of facts, did you have any concerns
24        about how long this detour to District 5 was going to
25        take?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 184 of 501   Document 80-5    183

```
 1   A    No, I didn't.  I didn't know, but I knew if there was
 2        work at my location, that I did have help.
 3   Q    So you didn't have any discussion with Detective
 4        Lewandowski about how long it might take or when you
 5        might expect to get back to the house or anything like
 6        that?
 7   A    No, I don't believe so.
 8   Q    Do you recall being interviewed by Sergeant Zieger in
 9        this matter?
10   A    Yes.
11   Q    Did you tell him about how you went to the house already
12        first?
13   A    I am sure I would have.
14   Q    When you have the phone in your hands, this is when you
15        have Detective Lewandowski's phone in your hands and you
16        are looking up the numbers, do you know why you are
17        doing that?
18   A    I was looking for her son's phone number.
19   Q    Did she tell you why, what she wanted to do?
20   A    I don't believe so.
21   Q    Was it the idea that you were going to call the number
22        for her?  Is that what was going to happen, from your
23        understanding?
24   A    I don't remember.
25   Q    When the accident occurred, you had the phone in your
```

SUSAN K. TAYLOR          262-553-1058         COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 185 of 501   Document 80-5    184

```
 1       hands.  Right?

 2   A   Yes.

 3   Q   What happened to the phone?

 4   A   I have no idea.  That phone was the last thing on my

 5       mind at the time of the accident.

 6   Q   Sure.  That is entirely reasonable.  You didn't hang

 7       onto the phone to your knowledge, did you?

 8   A   I am sure I probably didn't.

 9   Q   But at that point, the phone is returned immediately to

10       Detective Lewandowski, isn't it?

11   A   I have no idea.

12   Q   You indicated that Lieutenant Hanley had come to your

13       house at some point to have a discussion with you.  Do

14       you recall that testimony?

15   A   Yes.

16   Q   If I were to indicate to you that Lieutenant Hanley

17       reported that he went to your house on Wednesday,

18       January 21, 2015 at approximately 8:30 p.m., with

19       Lieutenant Paul Lowe, would you have any reason to

20       dispute that?

21   A   I don't know.  If he would have come in, I am sure I

22       wouldn't have been interviewed at that time.  I was

23       still suffering from a very bad concussion.

24   Q   So I need to understand your testimony.  Are you saying

25       that that is not true, that can't be true?
```

```
 1   A      No, I am not saying that can't be true.  I am saying
 2          that I don't know for sure.  I don't remember if he
 3          did come a couple days --  I don't remember him coming
 4          a couple days after the accident.
 5   Q      But you have no specific facts or knowledge that you can
 6          point to to indicate that must be wrong.  Is that true?
 7   A      Correct.
 8   Q      And if he reported in the same report that at that time
 9          that he had a conversation with you regarding your
10          recollection of the events that led up to the accident
11          and surrounding it, would that -- would you have any
12          reason to dispute that that was true or not true?
13   A      I don't remember discussing the accident with him at
14          that time.  I really don't remember discussing the
15          accident with anyone for a few weeks of being home from
16          the hospital.
17                      MR. PEDERSON:        That is all I have.
18                      MR. KONRAD:          Commissioners with
19          any questions?
20                      MS. WILSON:          When you asked the
21          question about Lieutenant Hanley at the hospital, were
22          you talking about at the hospital about the shooting or
23          at the hospital that you were in the accident?
24                      MR. PEDERSON:        I was talking about
25          regarding the shooting.  It is my understanding she
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                        sueT@wi.rr.com
                                                            186
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 187 of 501  Document 80-5

```
 1       testified that she got that directive from Lieutenant
 2       Hanley while investigating the shooting investigation
 3       to go search the house.
 4                      MS. WILSON:        You may not know,
 5       but does anybody know how many lieutenants are on any
 6       given shift at any given time?  Or nobody knows, just as
 7       many as we need?
 8                      MR. PEDERSON:        I believe there had
 9       been prior testimony that there was one other lieutenant
10       that was on duty at that time.
11                      MS. MC KENZIE:        Do you recall whether
12       or not you were working on the weekend shift?
13                      THE WITNESS:        On the weekend?
14                      MS. MC KENZIE:        The weekend shift
15       that you were working on?
16                      THE WITNESS:        I believe so.  At
17       that time, we were working one weekend.  Every third
18       weekend, we were off.
19                      MS. MC KENZIE:        Do you normally work
20       with Detective Lewandowski?
21                      THE WITNESS:        No.  I normally work
22       by myself.
23                      MS. MC KENZIE:        So when you were given
24       the assignment by whoever your supervisor was at the
25       time to go retrieve the gun and you sat back down at
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              187
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 188 of 501   Document 80-5

```
1        your desk, were you the person who initiates the
2        discussion of, "let's go do this together"?
3                    THE WITNESS:        I don't recall, but
4        I know between the two of us, we would sit there and
5        talk about our assignments and if there was something
6        that needed to be done, you know, we would make sure
7        that it got done.
8                    MS. MC KENZIE:      My question is, do
9        you work together often?
10                   THE WITNESS:        We don't ride in the
11       same car.  We may end up at the same assignment, but we
12       are not, like, partnered in the same vehicle.  But we --
13       Just as this young lady is sitting right next to me,
14       this is pretty much how Detective Lewandowski and I were
15       sitting in the assembly at District 3.
16                   MS. MC KENZIE:      I guess, outside of
17       this date, which is January 19, normally do you guys sit
18       together on weekends?
19                   THE WITNESS:        Yes.
20                   MS. MC KENZIE:      And so when you
21       initiated the discussion with Detective Lewandowski and
22       you said, "this is the assignment that I have," did you
23       say, "come with," or did she say to you, "I have some-
24       thing to do, I am going to go over" -- if you can.
25                   THE WITNESS:        I don't remember who
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              188
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 189 of 501   Document 80-5

```
 1        initiated that, you know, "you go with me, I go with
 2        you", but I do know that we both came to the conclusion
 3        that she had something that she needed to do and I had
 4        something that I needed to do, so I was actually trying
 5        to not call and have a squad meet me there.  Since she
 6        was going to go out of the building, she could actually
 7        go and do the follow-up with me to see if we could both
 8        get inside of the house and once we got inside the
 9        house, we could both handle the follow-up, either --
10        you know.
11                    MS. MC KENZIE:     Was that her car that
12        you were in?
13                    THE WITNESS:     I don't believe that
14        car was assigned to anyone.  I don't know what car she
15        is assigned.
16                    MS. MC KENZIE:     That is fine.  I
17        guess my question was going to be, why is it that she
18        ended up driving and not you, if you can recall?
19                    THE WITNESS:     I don't know.  She
20        probably had the keys.  I don't know.
21                    MS. MC KENZIE:     Okay.  When you are
22        in the car driving with her, it is my understanding from
23        your testimony that a supervisor, whoever the supervisor
24        was, told you to go retrieve the gun.  Is that correct?
25                    THE WITNESS:     Yes.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                           189
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 190 of 501   Document 80-5

```
 1                    MS. MC KENZIE:     Were you under the
 2        impression that Detective Lewandowski had an assignment
 3        from a supervisor?
 4                    THE WITNESS:       No.  I remember her
 5        saying that she was going to go to District 3 to meet
 6        with another officer.  I don't know -- I didn't know at
 7        that time if a supervisor had sent her to District 3 or
 8        what.  I just knew she was going to meet with another
 9        officer.
10                    MS. MC KENZIE:     I guess my question
11        is, did you, in some sense, feel like your assignment
12        was more of a priority than what she was doing?
13                    THE WITNESS:       No.  I believe all
14        police work is equal.
15                    MS. WILSON:        And I want to follow
16        up on that.  Do you believe that all police work is
17        equal or are you talking about this specific case?
18                    THE WITNESS:       No.  I'm saying that
19        the way I respond, I respond to all of my assignments
20        with care, so I usually take as much care as possible
21        from one assignment to the next.  I have to put myself
22        in the position.  I have four children.  Is this the way
23        I would want my children to be handled if a police
24        officer had to respond to one of their homes?  So I
25        always -- I have a large family and I want it to be
```

```
1        taken care of -- I want people to be taken care of,
2        so I do my job in the same way.
3                    MS. WILSON:        "Care" is a wonderful
4        word.  "Equal" is a little bit --  Homicide is not equal
5        with a robbery.
6                    THE WITNESS:        The crime is not
7        equal, but police work is.
8                    MS. WILSON:        I got you.
9                    MS. MC KENZIE:      You earlier testified
10       not knowing what you were diagnosed with.  What were the
11       nature of your injuries?
12                   THE WITNESS:        I had been diagnosed
13       with a severe concussion.  Generally, concussions are
14       gone within ten days, but I was still -- I am still
15       suffering from a concussion today.  Part of the con-
16       cussion is the headaches that I still have.  I have a
17       lot of instability where a person who is not under the
18       influence of alcohol or drugs -- I am not an alcohol or
19       drug user, but a person who is not under the influence
20       or alcohol or drugs can maintain their stability, walk
21       a straight line, stand on one foot without wobbling,
22       you know, doing different things.  I couldn't do any of
23       that and it really makes you feel stupid when something
24       like that happens because you are supposed to be the
25       strong person.  I had traumatic carpal tunnel in my left
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              191
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 192 of 501   Document 80-5

1    wrist, low back pain, neck pain and upper back pain.

2                    MS. MC KENZIE:      Are you currently

3    working?

4                    THE WITNESS:      I am working on

5    limited duty status.

6                    MS. MC KENZIE:      So you are still an

7    employee of MPD?

8                    THE WITNESS:      Yes.

9                    MR. KONRAD:        When you responded to

10   2765 North 52nd Street, which was the location where the

11   gun was to be recovered, did you report your location to

12   the dispatch?

13                   THE WITNESS:      I don't recall.

14   Sometimes, detectives, and probably officers as well,

15   will leave the building, maybe knock on a door and if

16   you get a response or something, you may go over the air

17   at that point.  Sometimes we are in a hurry and I know

18   we probably shouldn't be, but I don't recall thinking

19   that maybe I probably didn't, but had I gotten inside

20   the house, I would definitely have notified the dis-

21   patcher that put me out with a follow-up at that point.

22                   MR. KONRAD:        If you don't notify

23   the dispatcher before you get out of your squad and go

24   to the house, something happens, they have no way of

25   knowing where you are.  Isn't that right?

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                            192
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 193 of 501   Document 80-5

```
 1                      THE WITNESS:       I would assume that

 2           they are able to pinpoint our location through the cars,

 3           but I know that is not what actually --  I am not sure.

 4           I don't know if I would have gone out at that time with

 5           my location.

 6                      MR. KONRAD:        Thank you.

 7                      THE WITNESS:       You are welcome.

 8                      MR. MC GAVER:      A few questions on

 9           redirect.

10                      MR. KONRAD:        Go ahead.

11                      MR. MC GAVER:      Thank you.

12           REDIRECT EXAMINATION BY MR. MC GAVER:

13      Q    Was Shannon Lewandowski present for the conversation

14           that you had, you think, with Lieutenant Hanley at Saint

15           Joseph's Hospital?

16      A    No, I don't believe so.

17      Q    Was she present for the conversation that you had at

18           District 3 with an unknown supervisor?

19      A    I believe she was sitting at her desk.  I am not sure.

20      Q    Did the supervisor order Lewandowski to participate in

21           the investigation?

22      A    No.  She volunteered.

23      Q    Did she do that from time to time?

24      A    All the time.

25      Q    Before or during your squad ride on January 19, 2015
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
                                                                    193
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 194 of 501   Document 80-5

```
 1        with Shannon Lewandowski, was there any talk of going to
 2        the UWM area?
 3   A    No.
 4                    MR. MC GAVER:        Thank you.  Nothing
 5        further.
 6                    MS. WILSON:          I have a question.
 7        There was no conversation about UWM.  Was there a con-
 8        versation about where you were going when you got in the
 9        car and left?  Did she say, "let's go to a ball game"?
10        I mean, did you know where you were going?
11                    THE WITNESS:         I believe I knew that
12        we were probably going to go to District 5 first.  If I
13        didn't know that, I was hoping that because I had just
14        gone to knock on the door at the victim's residence and
15        didn't get an answer, so I was trying to let a little
16        time lapse.  I am sure that would have been the case.
17        But I don't remember if we had a conversation that we
18        were definitely going to District 5 first.
19                    MR. KONRAD:          No further questions
20        or examinations, thank you for testifying.
21                    MR. MC GAVER:        May the witness be
22        excused?
23                    MR. KONRAD:          Yes.
24        (Witness excused)
25                    MR. MC GAVER:        I call Jordan
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                        sueT@wi.rr.com
                                                          194
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 195 of 501   Document 80-5

```
 1        Lewandowski to the stand.

 2                          JORDAN LEWANDOWSKI, having been first

 3        duly sworn on oath to tell the truth, the whole truth,

 4        and nothing but the truth testified as follows:

 5                          MR. KONRAD:        You are now sworn.

 6        DIRECT EXAMINATION BY MR. MC GAVER:

 7   Q    State your name and spell your last name for the record.

 8   A    Jordan Lewandowski.  L-e-w-a-n-d-o-w-s-k-i.

 9   Q    Shannon Lewandowski is your mother.  Correct?

10   A    Yes.

11   Q    You also have another brother?

12   A    Yes.

13   Q    What is his name?

14   A    Kasey Lewandowski.

15   Q    Where does he live?

16   A    San Diego, California.

17   Q    Was he involved in any of -- anything surrounding the

18        accident occurring January 19, 2015?  Was he involved?

19   A    No.

20   Q    How old were you on January 19, 2015?

21   A    I was 19.

22   Q    How old are you now?

23   A    22.

24   Q    At any point, did you encounter a squad car?

25   A    Yes, I did.
```

```
1   Q   Tell me how that happened.

2   A   I was moving -- at the time, I was moving my car from

3       the middle -- by a friend's driveway.

4   Q   Why were you doing that?

5   A   Because I would have got a parking ticket because my

6       bumper was out on the sidewalk, so I was going to move

7       it from one side of the street to the other.

8   Q   Tell me about how it came to be that you encountered the

9       squad car.

10  A   I was out with a few friends and I came back to the

11      house.  We were drinking water.  I told my friend

12      Michael that I was moving my car from one side of the

13      street to the other so I didn't get a ticket.  So I

14      proceeded to move my car out of the driveway and since

15      the street is narrow on Maryland, I put my emergencies

16      on because there were three cars coming from my direc-

17      tion, so I let the two cars -- one car passed, another

18      car passed and a third car was sitting behind me and I

19      was waiting for it to go and, then, that is when I found

20      out it was a squad car with lights on and I assumed that

21      I was going to be pulled over.

22  Q   Have you been pulled over in the past?

23  A   Yes.

24  Q   Approximately how many times?

25  A   Approximately four.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              196
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 197 of 501   Document 80-5

```
 1   Q    Do you have a policy or procedure that you follow when
 2        you are pulled over by a squad that might be different
 3        from someone else?
 4   A    One thing I always do is I follow their directions to
 5        comply.  I give them my ID and I give them my mother's
 6        business card.
 7   Q    Who told you to give the officer your mother's business
 8        card?
 9   A    My mother.
10   Q    Do you know why she wants you to give officers her
11        business card?
12   A    One thing that my mom told me when I first got my
13        driver's license was that when I am pulled over, being a
14        black male, that one of the most dangerous, one of the
15        most confusing or complicated issues with being pulled
16        over is that -- it is a complicated deal and the reason
17        why she told me to do that was to let the officers know
18        that I know my rights, and that is pretty much the
19        reason why.
20   Q    Do you have a practice of making any phone calls when
21        you are pulled over by the police?
22   A    I call my mom every time to tell her that I am getting
23        pulled over.
24   Q    Have you ever asked your mother to report to the scene
25        where you were pulled over by a police officer?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              197
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 198 of 501   Document 80-5

```
1    A    Never.

2    Q    Has she ever asked you to come to the scene where you

3         are being pulled over by a police officer?

4    A    Never.

5    Q    Has she ever shown up?

6    A    Never.

7    Q    Did she -- did you ask her to come to the scene of

8         3616 North Maryland on January 19, 2015?

9    A    No.

10   Q    Did she tell you she was coming there?

11   A    No.

12   Q    Did you ever tell --  Do you know who Sergeant Cody

13        Smith is?

14   A    I believe he was the man who pulled me over initially.

15   Q    Did you tell Sergeant Smith that your mom was on her way

16        there?

17   A    No.

18   Q    Walk me through what happened with Sergeant Smith.  He

19        approaches the car.  What did he say to you?

20   A    The first question was, "why are you making all this

21        noise outside?"  I say, "I don't know what you are

22        talking about."  He, then, proceeds to ask me if this is

23        my vehicle or not and what I was doing in that area and

24        I told him that I have no idea what he is talking about,

25        I just was just moving my car from one side of the
```

```
 1        street to the other and he then asked me for my driver's
 2        license and that is when I gave him my driver's license
 3        and my mom's business card and he went back to the car
 4        and he came back and asked me if I was able -- he asked
 5        me to step out of the car, so I turned my -- I don't
 6        remember if the car was on, but I got out of the car
 7        and, then, he asked me to step out of the car, so I
 8        stepped out of the car and he then asked me to do a
 9        series of sobriety tests, but before he did that, he
10        searched me and took my wallet and my phone away from me
11        as well as my keys.
12   Q    He ran you through some field sobriety tests.  Did he
13        conduct any other tests?
14   A    Not to my knowledge.
15   Q    Did he have you blow into a preliminary breath machine?
16   A    Yes, he did.
17   Q    Do you know what you blew?
18   A    I believe a .08.
19   Q    What were you doing at 3616 North Maryland to begin
20        with?
21   A    I was just with two of my friends -- four of my friends,
22        rather, and we were talking and there were two young
23        ladies who were leaving and so I walked them outside
24        and they got in their car and they left.
25   Q    So does somebody you know live at that address?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              199
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 200 of 501   Document 80-5

```
 1   A    Yes.

 2   Q    At what point during the interaction with the officer

 3        did you call your mother?

 4   A    Initially.  I called her once I saw that the lights were

 5        on.

 6   Q    Was this before the officer took your phone away?

 7   A    Yes.

 8   Q    What did you say to your mom?

 9   A    I told her, "hey, I am pulled over at a traffic stop.

10        I will call you when I am done."

11   Q    What did she say to you?

12   A    "Okay."

13   Q    Was there anything more to the conversation?

14   A    No.

15   Q    Did your mother ask you where you were?

16   A    No.

17   Q    Did you know where you were?

18   A    No.

19             MS. WILSON:        I didn't hear you.

20             THE WITNESS:       No.

21   Q    What do you mean, "no"?  Did you think you were in

22        Detroit or --

23   A    I knew I was in Milwaukee, Wisconsin.  I didn't know

24        what house I was at or my exact location.

25   Q    Because you probably had a couple of cocktails?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                          200
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 201 of 501   Document 80-5

```
 1   A    Not just that.  It is just I didn't -- I am not aware
 2        of what house numbers, what -- where I was.
 3   Q    At any point in time, did a second officer arrive at the
 4        scene?
 5   A    I don't know if there was a -- I don't remember if there
 6        was a second squad or if there was a partner or not.
 7   Q    Did you have any interaction with the second officer?
 8   A    Not that I recall.
 9   Q    At any point in time when the officer who you were
10        speaking with had your phone, did it ring?
11   A    Yes.
12   Q    Tell me about what happened.
13   A    I don't remember exactly why he had my phone, but he
14        answered it and I got -- I didn't know who was on the
15        other line, but he said a series of yeses, okays, and,
16        then, immediately, he gave me my phone back, my wallet,
17        my keys and told me, "your mom is in a neck brace" or
18        something, and he left the scene.
19   Q    Did any Shorewood police officers remain on the scene?
20   A    No.
21   Q    What did you do after everybody left?
22   A    I panicked.  I went back inside and was trying to find
23        out who I could call to see what was going on, seeing
24        why my mother was in a neck brace.
25   Q    Did you try and call your mom's phone?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 202 of 501   Document 80-5          201

```
 1    A    Yes.

 2    Q    Multiple times?

 3    A    Yes.

 4    Q    Did you finally get ahold of someone?

 5    A    Yes.

 6    Q    Who?

 7    A    I believe Officer Deb Stacey.

 8    Q    You called her or she called you?

 9    A    I believe she called me.

10    Q    What did she say to you?

11    A    She asked me what my location was and I asked the house

12         owner where we were and, then, I repeated what he said

13         to me to Deb Stacey.

14    Q    Is Officer Stacey is a Milwaukee police officer?

15    A    Yes.

16    Q    What is the next thing you remember happening?

17    A    I remember panicking and asking -- very confused and I

18         remember going outside and not seeing a cop car pick me

19         up yet, or a police car, and I went back inside and I

20         went back outside again and at that time, Deb Stacey

21         arrived with another officer.  I don't remember his

22         name, but she took me -- they took me to where my mother

23         was and I remember asking if my mom was alive or not and

24         I remember seeing on the police screen that it said --

25         I believe it was a police screen that that Lewandowski
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 203 of 501   Document 80-5   202

| | | |
|---|---|---|
| 1 | | was -- it said "deceased" on there and at that time, at |
| 2 | | that point, I began to panic even more. |
| 3 | Q | Had you met Officer Stacey prior to that interaction? |
| 4 | A | I believe an interaction where my mom and -- I run into |
| 5 | | police officers all the time, so she was a familiar |
| 6 | | person. |
| 7 | Q | Did Officer Stacey take you anywhere? |
| 8 | A | Other than to the hospital located around -- |
| 9 | Q | What hospital? |
| 10 | A | I believe it was Children's Hospital on Bluemound and |
| 11 | | Wauwatosa. |
| 12 | Q | Froedtert? |
| 13 | A | Froedtert, yes. |
| 14 | Q | Any other family members report to the hospital? |
| 15 | A | There was my -- Denise Rogers, who is part of our |
| 16 | | family, and Jondalyn Rogers, I believe, their last name |
| 17 | | is. |
| 18 | Q | What is the Rogers women's relationship to you? |
| 19 | A | My grandmother and my cousin. |
| 20 | Q | Once you arrived at the hospital, where did you go? |
| 21 | A | Immediately to my mother's room. |
| 22 | Q | Is there any point that you left the company of your |
| 23 | | mother once you got to the hospital that night -- I |
| 24 | | should say that morning? |
| 25 | A | I believe I left to go -- I knew my mother -- there was |

```
 1        a lieutenant or a sergeant in the hospital, so I went to

 2        go look for them.  I needed to find out more information

 3        from talking to my mother, too.

 4   Q    Do you know the person's name that you were looking for?

 5   A    At the time, I did, because somebody informed me who the

 6        sergeant was, or lieutenant, but at the time, I knew.

 7        Not right now, I don't.

 8   Q    Do you know who Lieutenant Sean Hanley is?

 9   A    Yes.

10   Q    Who is he?

11   A    He is a boss of my mother's, a lieutenant, someone my

12        mother reports to.

13   Q    Did you see Lieutenant Hanley at the hospital at all?

14   A    I don't remember.

15   Q    Did Lieutenant Hanley -- do you remember seeing

16        Lieutenant Hanley speak with your mother at the

17        hospital?

18   A    No.

19   Q    Is there any possibility that Lieutenant Hanley spent

20        20 or 30 minutes with your mother at the hospital?

21   A    There is a possibility.

22   Q    When could that have happened?

23   A    Either before I was in the room or -- I don't remember

24        the particulars about the hospital or where we were at,

25        but he could have been in the room.  I remember going
```

SUSAN K. TAYLOR          262-553-1058        COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 205 of 501   Document 80-5   204

```
 1        to look for him, though, because I knew he would have

 2        known -- whoever her sergeant or lieutenant was, they

 3        would have known.

 4   Q    Did you see Lieutenant Hanley speak with your mother at

 5        the hospital?

 6   A    Yes.

 7   Q    You did.

 8   A    I believe so.  I think once we got up to leave out

 9        the -- my mother was being discharged, I saw him.

10   Q    What did he say?

11   A    I don't remember.

12   Q    Do you remember what your mom said to him?

13   A    No.

14                    MR. MC GAVER:      Nothing further.

15                    MR. KONRAD:        Commissioners, any

16        questions?  We will take a ten-minute break.

17        (Discussion off the record)

18                    MR. KONRAD:        Mr. McGaver, are

19        you --

20                    MR. MC GAVER:      I was finished.

21                    MR. KONRAD:        You were finished

22        with your direct.

23                    Do you have any cross?

24                    MR. PEDERSON:      Very briefly, just a

25        few points.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                     sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 206 of 501   Document 80-5    205

```
 1              MR. KONRAD:        The witness remains
 2    under oath.  Conduct your cross.
 3              MR. PEDERSON:      Thank you, Mr.
 4    Konrad.
 5    CROSS-EXAMINATION BY MR. PEDERSON:
 6  Q  Mr. Lewandowski, I have a few questions for you.
 7    On your testimony, if I recall correctly, you said that
 8    you had put your ID and your mom's business card to-
 9    gether and handed that to Sergeant Smith.  Is that
10    right?
11  A  Yes.
12  Q  That occurred on the first interaction with him.  Right?
13  A  Yes.
14  Q  Did you say anything to him in conjunction with that?
15  A  No.
16  Q  So you didn't mention to him that your mom is a detec-
17    tive for the police department, anything like that?
18  A  I don't recall.  I assume that the business card that
19    says Milwaukee Police Department would speak for itself.
20    I don't recall saying my mom is a police officer.  I
21    don't recall saying that.
22  Q  He took it from you.  Right?
23  A  Yes.
24  Q  Did he look at it right there?  Did you see him look at
25    it or anything like that?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                    sueT@wi.rr.com
                                                        206
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 207 of 501   Document 80-5

```
 1    A    Not that I recall.

 2    Q    Did he ever ask you about the card, "why did you give me

 3         this card?"  "What does this card have to do anything?"

 4         Did he ever ask any questions like that?

 5    A    Not that I recall.

 6    Q    So you are saying that at no point, neither you nor

 7         Sergeant Smith had any discussion whatsoever about your

 8         mom and the business card and why you handed it to him.

 9    A    I don't remember specifically an interaction.

10    Q    What was the name on your driver's license?  How does

11         your name appear on your driver's license?

12    A    Jordan Lewandowski.

13    Q    How did your mom's name appear on her business card?

14    A    Shannon Lewandowski.

15    Q    Are you testifying today that it was your belief that

16         just based from that, the sergeant was supposed to

17         assume that Shannon Lewandowski was your mom and that

18         was --  Let's start there.  Was that your assumption?

19    A    Yes.

20    Q    What did you expect him to conclude based on that fact?

21    A    I wasn't assuming that he would conclude anything, but

22         again, what I said before was the reason why I do that;

23         because I want them to know that I know my rights as a

24         citizen and that I respect police.

25    Q    He returned to his vehicle and, then, he came back and
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                           207
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 208 of 501   Document 80-5

1   asked you to step out.  Right?

2   A   Yes.

3   Q   How long was he gone?

4   A   Approximately five minutes.

5   Q   When did he get your phone?

6   A   After he asked me to step out of the vehicle and he

7       searched me.

8   Q   You performed a number of field sobriety tests.  Right?

9   A   Yes, but I also wasn't sure why.  I was never told why I

10      was being pulled over except for the interaction that --

11      What was said before me stepping out of the car was what

12      was the noise that I was making or why was I being so

13      loud, what was the noise, and I responded in saying,

14      "I have no idea what you are talking about."  So to this

15      day, I don't know why I was pulled over.  I read the

16      reports that supposedly, it was a nuisance and that I

17      got caught leaving from the scene, but at the same time,

18      there was also two cars behind me, so I don't know why I

19      was pinpointed out of the three cars on that street and

20      even the two cars that were in front of the police

21      officers that were behind me.

22  Q   My question for you was, did you perform field sobriety

23      tests?

24  A   Yes.

25  Q   Had you been drinking that evening?

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                    sueT@wi.rr.com
                                                    208
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 209 of 501   Document 80-5

```
 1   A     Yes.

 2   Q     And did you fail the field sobriety tests?

 3   A     I passed them.

 4   Q     How do you know that?

 5   A     The other officer that was not Smith -- I forgot his

 6         name -- he said that, "I think he passed them", and at

 7         that point, that is where Officer Smith gave me the

 8         Breathalyzer.

 9   Q     Did he ask you to do that, consent to a Breathalyzer?

10   A     Yes, I believe so.

11   Q     It is an important point.  Did he tell you, "you are?

12         Taking this PBT", or did he tell you, "do you consent to

13         a breath test?"

14   A     From what I recall, he said, "are you familiar with what

15         this is.," and I said, "yes, it is a Breathalyzer", and

16         I don't recall if he said, "do you consent to taking

17         this or do you not", or not even saying it.  All I

18         remember is that I did take the test.

19   Q     Do you believe you were in good condition to drive that

20         evening?

21   A     Yes, but I wasn't planning on driving.

22   Q     You were going to move your car.  Right?

23   A     Yes.

24   Q     That is driving, isn't it?

25   A     Yes.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
        Case 2:16-cv-01089-WED   Filed 04/22/19   Page 210 of 501   Document 80-5   209

```
 1   Q   Okay.  You said you blew a .08, from your recollection.

 2   A   Yes.

 3   Q   At some point, the phone rings and the sergeant hands

 4       you back your phone.  I want to get a better under-

 5       standing.  What does he tell you at that time?

 6   A   The phone rings, he answers it and he says a series of

 7       yeses and okays and gives me back my phone and says,

 8       "your mother is in a neck brace", and I said -- I was

 9       confused -- "what do you mean?" He is, like, "I don't

10       know, but your mother is in a neck brace," gave me my

11       phone, my keys and wallet and left the scene.

12   Q   What did the other officer do?

13   A   Got in the car as well.

14   Q   His own car?

15   A   I don't remember if it was his own or if it was --

16       or if he was in the same car.

17   Q   Did the sergeant tell you that MPD is on their way or

18       did you talk to someone on the phone yourself?

19   A   No.  I was left unattended and with zero knowledge of

20       anything else that happened.

21   Q   So are you saying that Sergeant Smith had somebody on

22       the phone, he took all that information and, then, he

23       hung up and gave you your phone back?

24   A   Yes.

25   Q   So you never had an opportunity to talk to anybody?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                    sueT@wi.rr.com
                                                              210
Case 2:16-cv-01089-WED    Filed 04/22/19   Page 211 of 501   Document 80-5

```
 1   A   No.

 2   Q   At the time that the sergeant left, all you knew is

 3       something happened to your mom and that is it, period.

 4   A   Yes.

 5   Q   Did the sergeant tell you why he was leaving?

 6   A   No.

 7   Q   How long until a police officer showed up after the

 8       sergeant left?

 9   A   Approximately ten minutes, 15 minutes.

10   Q   And you testified that they took you to Froedtert.

11       Right?

12   A   Yes.

13   Q   There was some concern on your part, because you didn't

14       know what state your mother was in, but at some point,

15       you had contact with her.

16   A   Yes.

17   Q   You spoke with her?

18   A   Yes.

19   Q   How was she at that time?

20   A   She was not making sense, but the -- the first things we

21       were saying -- she was saying to me is, "I'm okay, I'm

22       okay."  She was -- her words weren't making sense.  She

23       was slurring.  I could tell she had a head injury from

24       the way she was speaking.

25   Q   Did you observe any injuries on her?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                        sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 212 of 501   Document 80-5   211

```
 1   A    I saw her ankle.  I forgot what ankle it was.  One of
 2        them was very bruised.
 3   Q    Any other injuries you observed on her?
 4   A    No, not that I recollect.
 5   Q    How about just looking at her?  You've indicated that
 6        she was talking in a way that made you concerned, but
 7        how about just looking at her?  Did she look like she
 8        was dazed and confused?   How was she composed in her
 9        appearance?
10   A    I would say she looked tired as if she just woke up or a
11        very confused manner.
12                    MR. PEDERSON:        That is all I
13        have.
14                    MR. MC GAVER:        Follow-up.
15        REDIRECT EXAMINATION BY MR. MC GAVER:
16   Q    By giving your mom's business card to then-Officer
17        Smith, were you expecting any special favors or con-
18        sideration from him?
19   A    No.
20   Q    With the benefit hindsight --
21                    MR. KONRAD:        Do commissioners have
22        any questions based on that examination?
23                    MS. MC KENZIE:      No.
24                    MR. KONRAD:        Go ahead.
25        BY MR. MC GAVER:
```

SUSAN K. TAYLOR          262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 213 of 501   Document 80-5    212

```
 1   Q    With the benefit of hindsight, you were 21 at the time.
 2        You know now you shouldn't have been driving.  Right?
 3   A    Absolutely.
 4   Q    In your interaction and conversation with your mother
 5        at the hospital, did you tell her where you were or what
 6        happened with the traffic stop?
 7   A    No.  I didn't, I don't believe so.  The first things
 8        that were said was -- was me asking if she was okay and
 9        just us having conversation saying, "everything is going
10        to be okay."
11   Q    Did you ever tell her where you were and what happened
12        with the traffic stop?
13   A    Not until -- I don't recall saying anything at the
14        hospital.  I don't recall.
15                  MR. MC GAVER:        Nothing further.
16                  MR. KONRAD:          Anything further?
17                  MR. PEDERSON:        I have one question.
18                  If you don't mind me using your phone
19        records.
20                  MR. MC GAVER:        Please.
21        RECROSS-EXAMINATION BY MR. PEDERSON:
22   Q    You previously testified that you called your mom just
23        to let her know and you said, "I will let you know when
24        it is done", and she said, "okay", and that was it.
25        Right?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 214 of 501   Document 80-5          213

```
1    A    Right.

2    Q    If I were to represent to you that your mother's phone

3         records which have been produced reflect this phone call

4         occurring at 2:11 a.m. and it lasted for two minutes,

5         isn't that a bit longer than what you were testifying

6         the nature and content of that conversation is?

7    A    That is the initial contact.

8    Q    There was a phone call from you at 2:11 a.m. and the

9         next one is after the accident has occurred, according

10        to other records.  This is the only phone call.  The

11        only one prior from you is about 10:00 time.  So at

12        2:11, you have a phone call.  According to the records,

13        it is two minutes.  So how do you account for the fact

14        that the records say it was a two-minute conversation

15        and you are saying it was a 15-second conversation?

16                    MR. MC GAVER:      I will object.  That

17        is not his testimony.  He didn't say, at least from my

18        recollection, he didn't say the conversation lasted 15

19        seconds.

20                    MR. KONRAD:        First of all, do I

21        have a stipulation that the phone record indicates a

22        phone call at 2:11 that lasted two minutes?

23                    MR. MC GAVER:      Sure.

24                    MR. KONRAD:        Do you want to

25        rephrase it?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 215 of 501   Document 80-5   214

```
 1        BY MR. PEDERSON:

 2    Q   I am submitting to you, Mr. Lewandowski, that that is

 3        not a two-minute conversation that you testified to,

 4        so is there any way you can account for a longer conver-

 5        sation, if this record is accurate?

 6    A   I cannot account for it.

 7                    MR. PEDERSON:        Thank you.  That is

 8        all I have.

 9                    MR. MC GAVER:       Nothing further.

10                    MR. KONRAD:         The witness is

11        excused.

12        (Witness excused)

13                    MR. MC GAVER:       I call Officer Debora

14        Stacey.

15                    DEBORA STACEY, having been first duly

16        sworn on oath to tell the truth, the whole truth, and

17        nothing but the truth testified as follows:

18        DIRECT EXAMINATION BY MR. MC GAVER:

19    Q   How are you employed?

20    A   Milwaukee Police Department.

21    Q   Were you employed at the Milwaukee Police Department on

22        January 19, 2015?

23    A   Yes.

24    Q   What was your rank?

25    A   Police officer.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                         sueT@wi.rr.com
                                                             215
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 216 of 501   Document 80-5

```
1   Q    Where were you stationed?

2   A    District 3.

3   Q    What shift?

4   A    Late power shift.

5   Q    Did you happen to report to an accident at approximately

6        2:17 a.m. on January 19, 2015?

7   A    Yes.

8   Q    How did you find out about the accident?

9   A    We heard it broadcast over the radio.

10  Q    How did you decide to report -- why did you decide to

11       report?

12  A    When the accident came over and said there was possibly

13       two officers that were dead.

14  Q    Were you working with anyone on that night?

15  A    Yes.

16  Q    Who?

17  A    William Krumnow.

18  Q    Was Officer Krumnow with you in the squad responding to

19       the accident?

20  A    Yes.

21  Q    Do you know when you arrived on scene?

22  A    I don't recall.

23  Q    Do you know whether there were any emergency responders

24       who beat you to the scene?

25  A    Yes, there were a handful of other people that were
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              216
Case 2:16-cv-01089-WED    Filed 04/22/19    Page 217 of 501    Document 80-5

```
 1        there.

 2   Q    Who else was there before you, if you remember?

 3   A    It was pretty chaotic.  I remember running to her and

 4        her partner.

 5   Q    Who is "her"?

 6   A    Shannon Lewandowski and Juanita Carr.  And I remember

 7        MFP was there --

 8                    MS. MC KENZIE:      The fire depart-

 9        ment -- Milwaukee Fire Department.  Sorry.

10   A    I don't remember which squads were there.

11   Q    When you reported to the scene, do you remember whether

12        or not the emergency lights on the squad car involved in

13        the accident were activated?

14   A    On ours or hers?

15   Q    On Shannon Lewandowski's?

16   A    I don't remember.

17   Q    Do you remember whether the squad car siren that Shannon

18        Lewandowski was driving was activated?

19   A    I don't remember that, either.

20   Q    At some point in time, did you have contact with Shannon

21        Lewandowski?

22   A    Yes.

23   Q    How did she strike you?

24   A    She made absolutely no sense.

25   Q    What do you mean by that?
```

SUSAN K. TAYLOR          262-553-1058       COURT REPORTER
                        sueT@wi.rr.com
                                                          217
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 218 of 501   Document 80-5

| | | |
|---|---|---|
| 1 | A | Everything she was saying she was like she had a head |
| 2 | | injury.  It was very apparent that she was slurring her |
| 3 | | words and yelling and was very upset and hurt. |
| 4 | Q | Had you ever met Shannon Lewandowski prior to this |
| 5 | | encounter? |
| 6 | A | Yes. |
| 7 | Q | How would you characterize your relationship with |
| 8 | | Shannon Lewandowski? |
| 9 | A | We are friends. |
| 10 | Q | Do you know her son? |
| 11 | A | I don't know him well, but I have met him. |
| 12 | Q | Would you know by sight? |
| 13 | A | Yes, through pictures. |
| 14 | Q | When you were interacting with Lewandowski in the early |
| 15 | | morning hours of January 19, did she mention her son? |
| 16 | A | Yes. |
| 17 | Q | What did she say about him? |
| 18 | A | She kept yelling at me to go get her son. |
| 19 | Q | What did that cause you to do? |
| 20 | A | I wanted to get her son because I would do that for |
| 21 | | anybody that was in an accident on the job. |
| 22 | Q | How did you come to go get her son?  First of all, how |
| 23 | | did you know where he was? |
| 24 | A | I didn't.  I can't remember how I got to finally figure |
| 25 | | out where he was, but I knew the general area.  Somehow, |

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              218
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 219 of 501   Document 80-5

```
 1           somebody told us he was over by UWM.
 2   Q    Did you notice Lewandowski speaking to any other
 3        officers on scene?
 4   A    I believe she was speaking with Officer Joseph Goggins
 5        and is the only officer that I remember.  We were only
 6        on scene for a real short period of time.
 7   Q    And then you and your partner went to look for Jordan
 8        Lewandowski?
 9   A    Yes.
10   Q    How long did it take before you tracked him down?
11   A    It seemed like it took forever at the time, but it was
12        probably ten, 15 minutes maybe.  I am not really sure of
13        the time frame.
14   Q    Did you ever utilize Shannon's phone while you were on
15        the scene?
16   A    Not that I recall.
17   Q    Do you know who did?
18   A    No.
19   Q    If anyone?
20   A    No.
21   Q    Where did you ultimately track Jordan Lewandowski down?
22   A    A couple blocks away.  I couldn't remember the address.
23        Somewhere in the vicinity of, like, the college, but it
24        wasn't on the college campus.  It was at a house, like,
25        a couple blocks away.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 220 of 501   Document 80-5   219

```
 1   Q    Do you remember what municipality it was in?

 2   A    Maybe Shorewood.  I am not sure.  I don't know my way

 3        around that side of town at all.

 4   Q    When you encountered Jordan Lewandowski, was he with

 5        anyone?

 6   A    No, he was by himself.

 7   Q    No officers from other departments on the scene?

 8   A    No.

 9   Q    What did you say to Jordan when you first encountered

10        him?

11   A    I told him that we were taking him to the hospital

12        because his mom was in an accident.

13   Q    What did he say in response?

14   A    That he was worried about her and scared and upset and

15        he wanted to know what her injuries were and at the

16        time, we didn't know.

17   Q    Approximately how long did it take to arrive at the

18        hospital?

19   A    From there, to Froedtert, maybe 15, 20 minutes.

20   Q    When the squad car --  Who was driving?

21   A    My partner, Officer Krumnow was driving.

22   Q    When the squad driven by Officer Krumnow arrived at

23        Froedtert and he got into the hospital, did you

24        personally see Detective Lewandowski?

25   A    I saw her and her partner.
```

```
 1   Q    Did you talk to her?

 2   A    Yes.

 3   Q    What did you say to her?

 4   A    I was asking if she was okay, what her injuries are.

 5        That is about it.

 6   Q    How did she respond?

 7   A    She wasn't making sense.

 8   Q    How so?

 9   A    Slurring words and she wasn't her normal self.

10   Q    Do you know who Lieutenant Sean Hanley is?

11   A    Yes.

12   Q    Did you see him at the hospital?

13   A    I don't remember seeing him.  He may have been there.

14        I don't remember.

15   Q    Did you see Lieutenant Hanley interact with Shannon

16        Lewandowski at the hospital?

17   A    Not that I remember.

18                    MR. MC GAVER:      Nothing further.

19        Thank you.

20                    MR. KONRAD:        Commissioners, any

21        questions?

22                    MS. WILSON:        Yes, I have.

23                    Where was Jordan when you were --

24        Was he in the house?  Outdoors?  On the corner?

25                    THE WITNESS:       He was standing in
```

SUSAN K. TAYLOR        262-553-1058       COURT REPORTER
                       sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 222 of 501   Document 80-5   221

1      front of a house on the sidewalk.

2                     MS. WILSON:       On the sidewalk.

3                     THE WITNESS:      Yes.

4                     MS. WILSON:       Somebody else might

5      have said it, but I know you had said there was --

6      and you might not have used these word quite clearly,

7      but she had "a head injury".  Are you familiar with

8      panic attacks?

9                     THE WITNESS:      Yes.

10                    MS. WILSON:       I have them and I

11     start mumbling.  Everybody, kind of, throws the phrase

12     "head injuries" around.  Did she tell you she was

13     diagnosed with a head injury?

14                    THE WITNESS:      At the scene, the

15     fire department was yelling at me to get her son.  I

16     think somebody at the scene said she was knocked out

17     unconscious, so that is where I got that information

18     from.  I guess I put that together as to why she wasn't

19     making sense.

20                    MR. KONRAD:       Did you ever get

21     Jordan Lewandowski's phone number?

22                    THE WITNESS:      No.  I tried to

23     contact him on Facebook because I looked for him under

24     his name.  I don't remember speaking with him until we

25     got on scene, but it's been such a long period of time.

SUSAN K. TAYLOR          262-553-1058        COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 223 of 501  Document 80-5   222

```
 1                    MR. KONRAD:       I am curious how you
 2         found each other.
 3                    THE WITNESS:      I was talking to
 4         officers at the scene.  I believe that is how we found
 5         him.  Like, somebody initially gave us the area that he
 6         was in and we were, kind of, driving around from block
 7         to block because the hall that somebody said he was at,
 8         he wasn't at.  I think somebody at the scene may have
 9         given me his location.  I honestly don't remember.  I
10         also was in a squad accident and had a head injury, so
11         my memory is not the best.
12         CROSS-EXAMINATION BY MR. PEDERSON:
13    Q    You indicated you are friends with Shannon Lewandowski?
14    A    Yes.
15    Q    Would you characterize yourself as close friends?
16    A    Yes, I would say so.
17    Q    In fact, you went and visited Shannon Lewandowski the
18         next day after this occurred, didn't you?
19    A    Yes.
20    Q    That was a personal visit?
21    A    Yes.
22                    MR. PEDERSON:     Nothing further.
23                    MR. KONRAD:       Commissioners?
24                    MS. MC KENZIE:    When you saw her in
25         the hospital and you were talking with her and said that
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 224 of 501   Document 80-5        223

```
1    she wasn't herself, did she mention anything about,

2    "where is my son" or anything like that?

3                    THE WITNESS:        That is when we met

4    up.  We were all together.  I walked her son Jordan in.

5                    MS. MC KENZIE:      Thank you.

6                    MR. KONRAD:         You are excused.

7    (Witness excused)

8                    MR. MC GAVER:       Call Officer Jesse

9    Vollrath.

10                   JESSE VOLLRATH, having been first duly

11   sworn on oath to tell the truth, the whole truth, and

12   nothing but the truth testified as follows:

13                   MR. KONRAD:         The witness is sworn.

14   DIRECT EXAMINATION BY MR. MC GAVER:

15   Q   Officer Vollrath, how were you employed on January 19,

16       2015?

17   A   Milwaukee Police Department.

18   Q   Are you still City of Milwaukee police officer?

19   A   Yes.

20   Q   How long have you been so employed?

21   A   December of 2006 was my appointment date.

22   Q   A little less than ten years?

23   A   Yes.

24   Q   Where were you assigned on January 19 of 15?

25   A   District 3, late shift.
```

```
1   Q    What hours would those be?

2   A    Midnight to 8:00 in the morning.

3   Q    Did you have a partner?

4   A    I believe so.  I have to look at my assignment to see

5        who my partner was.

6   Q    What station were you at?   You said but I missed it.

7   A    District 3.

8   Q    Thank you.  Did you have occasion to respond to an

9        accident at approximately 2:17 on January 19 of 2015?

10  A    I believe so, yes.

11  Q    How did you learn about the accident?

12  A    Through dispatch.

13  Q    How is it that you came together to the accident scene?

14  A    How I arrived?

15  Q    How did you decide to go there?

16  A    Red lights and siren.

17  Q    On your own or did somebody order you there?

18  A    I went on my own.

19  Q    What did you see when you got there?

20  A    A Detective Carr was smashed and there was another

21       occupied vehicle at the corner of 35th and North Avenue.

22  Q    When you arrived, were there other emergency responders

23       there?

24  A    Yes.

25  Q    Do you remember who?  Did you see anyone that you knew?
```

SUSAN K. TAYLOR          262-553-1058        COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 226 of 501   Document 80-5    225

```
 1   A    Shannon Lewandowski, her partner, Juanita Carr was

 2        still inside the squad car.  MFD personnel was there.

 3   Q    What was Shannon doing?

 4   A    She was sitting on the curb.

 5   Q    Did you have occasion to speak with Shannon Lewandowski?

 6   A    I did.

 7   Q    What did she say to you?

 8   A    She was screaming hysterically.  She was worried about

 9        her kids.  What I had to do, I tried to calm her down

10        the best I could.  It was January.  But I still put my

11        coat over her shoulders to keep her warm until we were

12        able to go in the MFD med unit.

13   Q    Did you notice anything unusual about Detective

14        Lewandowski's behavior?

15   A    Like I said, she was hysterical, as anybody would be

16        with almost, like, a head-on collision.

17   Q    Did you have occasion to speak to detective Carr?

18   A    No.

19   Q    Were you instructed to stay with Detective Lewandowski?

20   A    I was.

21   Q    Who instructed you to do so?

22   A    I believe Sergeant Wade Grubich was on scene.

23   Q    Did you follow those instructions?

24   A    I did.

25   Q    Shannon Lewandowski eventually left the scene.  How did
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                                  226
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 227 of 501   Document 80-5

```
 1        she leave?

 2   A    I rode with her in the med unit to Froedtert.

 3   Q    And you rode with her?

 4   A    Yes.

 5   Q    From the time that you arrived on scene and interacted

 6        with Shannon Lewandowski, did she mention her son?

 7   A    Yes.  She was worried about both of her kids knowing

 8        that -- she wanted other officers to contact her kids to

 9        make sure that they weren't going crazy trying to kill

10        themselves to get to the hospital for her well-being.

11   Q    Did you hear any rumblings or any officers on scene say

12        anything about UWM or going to UWM?

13   A    I don't remember that at all.

14   Q    You didn't hear Shannon say that.  Correct?

15   A    No.

16   Q    Once you got to the hospital, where did they take

17        Shannon?

18   A    That is over a year and a half ago.  I believe they took

19        her right into an ER room.

20   Q    Where were you when they took Shannon into the ER room?

21   A    I was by her side.

22   Q    In the room?

23   A    Correct.

24   Q    At any point in time, did any family members enter

25        Shannon's emergency room?
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                      sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 228 of 501   Document 80-5    227

```
 1   A   I don't know what the time frame would be, but other
 2       officers, like Officer Stacey, she brought her son.
 3   Q   Any other family member show up?
 4   A   I am not sure if her other son showed up or not.  I
 5       can't recall that.
 6   Q   Do you remember if any other officer besides Debora
 7       Stacey and you walked into that emergency room group?
 8   A   If I had to guess, probably three or four other ones
 9       that were concerned about her well-being.
10   Q   Do you remember any names?
11   A   No.
12   Q   Do you know who Lieutenant Sean Hanley is?
13   A   Yes.
14   Q   Was he at the hospital?
15   A   I don't remember seeing him.  I recall seeing a
16       different lieutenant there.
17   Q   What lieutenant do you recall seeing?
18   A   Lieutenant Kelly.
19   Q   While you were with Shannon Lewandowski at the hospital,
20       did Lieutenant Hanley ever -- did you see Lieutenant
21       Hanley ever stop and talk to Shannon Lewandowski?
22   A   The only time I saw Lieutenant Hanley, I believe he was
23       at the scene of the accident, but I don't recall at the
24       hospital.
25   Q   From the point in time where you and Shannon Lewandowski
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 229 of 501   Document 80-5    228

```
 1        arrived at the hospital to the point in time where she

 2        was discharged and left, did you ever leave her side?

 3    A   Yes.

 4    Q   How long were you away from her?

 5    A   They ran several tests on her, like, I believe, a CT

 6        scan on her head, you know, her ankle.  I know one of

 7        her ankels was either broke or very swollen.  When she

 8        was getting tests done, I went over by detective Carr's

 9        room to see how she was doing.

10    Q   How long do you think in total you were away from

11        Shannon Lewandowski in minutes?

12    A   I don't know.

13                MR. MC GAVER:      Nothing further.

14        Thank you.

15                MR. KONRAD:        Commissioners?

16                MS. MC KENZIE:     Do you and Detective

17        Lewandowski have a friendship?

18                THE WITNESS:       I have known Shannon

19        from work.  She came to a lot of our scenes -- crime

20        scenes.  I know her as a great detective.  She does a

21        very good job, always gets the job done well.

22                MS. MC KENZIE:     Would you

23        characterize her as a friend?

24                THE WITNESS:       An occasional friend

25        at work.
```

SUSAN K. TAYLOR        262-553-1058       COURT REPORTER
                       sueT@wi.rr.com
                                                            229
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 230 of 501   Document 80-5

```
 1                    MS. MC KENZIE:      In any way, do you do
 2        anything outside of work together?
 3                    THE WITNESS:      No.
 4                    MS. MC KENZIE:      When you spent that
 5        time with her in the hospital, it was because you were
 6        told to watch over her or you were just being, like, a
 7        work friend?
 8                    THE WITNESS:       I would do that for
 9        my member of the police department that got in a severe
10        accident.
11                    MR. KONRAD:       Mr. Pederson?
12                    MR. PEDERSON:      Thank you, Mr.
13        Konrad.
14        CROSS-EXAMINATION BY MR. PEDERSON:
15    Q   Officer Vollrath, you provided some testimony about
16        UWM and whether you heard anything.  Do you recall that
17        testimony?
18    A   No.
19    Q   I will ask it again.  Do you recall any discussion of
20        Detective Lewandowski's son possibly being at UWM and
21        that is where she was headed?
22    A   I don't remember that at all.
23    Q   If I were to indicate to you that --  Strike that.  Do
24        you recall having an interview with Sergeant Adam
25        Zieger?
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 231 of 501   Document 80-5   230

```
 1   A     I do.  I believe that was on my birthday last year.

 2   Q     Do you recall stating that you acknowledge that there

 3         was discussion that he -- that you heard among the

 4         officers relating the her going to meet her son, but you

 5         didn't personally hear any of those statements from

 6         Detective Lewandowski herself?

 7   A     I think what I was indicating at that interview is

 8         that I heard that her son was over by the UWM campus

 9         and Shannon probably asked for someone to go get her son

10         because that is where he was.

11               MR. PEDERSON:       That is all I have.

12               MR. KONRAD:       Just to clarify.  You

13         didn't hear any of these comments yourself.

14               THE WITNESS:       Which comments?

15               MR. KONRAD:       You said you had

16         heard -- other people had heard that Shannon Lewandowski

17         was concerned about or had some discussion of

18         retrieveing her son or, as you put it, simply to get

19         her son after the accident.  What comments did you,

20         yourself, hear her make at all concerning her son?

21               THE WITNESS:       She was concerned

22         about one of us finding her son so he doesn't rush to

23         the hospital and try to get in an accident himself.

24               MR. PEDERSON:       I am sorry to

25         interject, Mr. Konrad, but my question was much more
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                                    231
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 232 of 501   Document 80-5

```
 1    pointed than that.  The summary report --

 2                    MR. KONRAD:        There is a

 3    contradiction.  Go ahead.

 4                    MR. PEDERSON:      As long as the

 5    contradiction is clear.  Very good. That is all I have.

 6                    MR. KONRAD:        Anything further?

 7                    MR. MC GAVER:      No.

 8                    MR. KONRAD:        Thank you.  You are

 9    excused.

10    (Witness excused)

11                    MR. MC GAVER:      Call Denise Brown.

12                    DENISE BROWN-ROGERS, having been first

13    duly sworn on oath to tell the truth, the whole truth,

14    and nothing but the truth testified as follows:

15                    MR. KONRAD:        The witness is sworn.

16                    Your name is Denise Brown-Rogers.

17                    THE WITNESS:       Yes.

18    DIRECT EXAMINATION BY MR. MC GAVER:

19    Q    Ms. Brown-Rogers, are you acquainted with Shannon

20         Lewandowski?

21    A    Yes.

22    Q    What is your relationship?

23    A    She is my daughter.

24    Q    Biological daughter?

25    A    We don't use that word in our family.  She is just my
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                     sueT@wi.rr.com
                                                      232
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 233 of 501   Document 80-5

```
 1      daughter.

 2  Q   How long has she --

 3  A   She is my baby.

 4  Q   You raised her?

 5  A   Yes, from the time she was 12 years old.

 6  Q   Do you recall reporting to the hospital on January 19

 7      of 2015?

 8  A   Yes, I do.

 9  Q   Approximately what time --  How did it come to be that

10      you reported to the hospital on that date, at that time?

11  A   My grandson called me.  They called me "Big Mama".  He

12      said, "Big Mama, Mama has been in an accident."  I said,

13      "where is she?"  He said, "at Froedtert."  So I hollered

14      upstairs for my youngest daughter to come and take me

15      out to Froedtert, because I was hysterical.

16  Q   Which grandson called you?

17  A   Jordan.

18  Q   Do you remember approximately what time he called you?

19  A   No, I don't.

20  Q   Do you remember what time you got to the hospital?

21  A   No, I don't.

22  Q   Do you remember what hospital it was?

23  A   Froedtert.

24  Q   When you walked into --  Did you encounter Shannon

25      Lewandowski when you got to Froedtert?
```

```
1    A    The first officer that I saw --  I saw two officers
2         standing on the side.  One of the officers was --
3         I just know her name as Debby.  She testified just a few
4         minutes ago.  And the other officer, I don't know who he
5         was, but she walked me in and showed me where Shannon
6         was and I was --
7    Q    What did you see when you first encountered Shannon?
8    A    She was, kind of, sitting up on the gurney a little bit
9         and she said something real crazy to me.  She said, "hi
10        Mama.  You look pretty."  I though, oh, my God and I
11        said, "are you okay, baby?"  She said, "I am fine."
12        Then she started talking about, "I gotta go do my
13        dishes.  I left my dishes in the sink."  I am a nurse,
14        so that was an indication to me that she had some type
15        of head injury.  I didn't even know beyond that, I
16        didn't notice her ankle.  I was too busy focusing on her
17        face and her upper body.
18   Q    Once you arrived at the hospital and got to the room and
19        saw Shannon, did you ever leave her side?
20   A    No.  I took her to the bathroom, went in the bathroom
21        with her.
22   Q    Do you remember any lieutenants coming into the hospital
23        room to talk to Shannon?
24   A    No, I don't.
25   Q    Would you know a lieutenant if you saw one?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 235 of 501   Document 80-5    234

```
1    A    Yes.  My ex-husband was a sergeant on the police
2         department, so I am quite familiar with officers.
3    Q    Did you see any other police officers coming through to
4         talk to Shannon?
5    A    No, not that I can recall.
6    Q    How long were you at the hospital?
7    A    Till she was discharged.  We took her home.
8    Q    Do you remember how long that was?
9    A    I really couldn't tell you.
10   Q    Did you go right home from the hospital?
11   A    We stopped to get her car, her personal vehicle, and my
12        daughter drove her personal vehicle and I drove my
13        daughter's car because my daughter drove me out to the
14        hospital, and, then, we went home with her.
15   Q    Where did you stop to get Shannon's personal vehicle?
16   A    It was at District 3.
17   Q    Did you go into District 3?
18   A    No.
19   Q    Did Shannon?
20   A    I don't remember her going in.
21   Q    There's been some testimony about a telephone conversa-
22        tion that Shannon was a participant in that took place
23        between 6:00 and 6:40 a.m.  Do you remember hearing any
24        phone call that Shannon would have made?
25   A    I don't remember.  Is this after the hospital?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    235
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 236 of 501   Document 80-5

```
 1   Q     Yes.

 2   A     I don't recall her being on the phone.

 3                   MR. MC GAVER:       Nothing further.

 4                   MS. MC KENZIE:      You indicated that at

 5         the time you stopped by your daughter's bedside, you do

 6         recall seeing lieutenants.  Correct?

 7                   THE WITNESS:        I don't recall seeing

 8         any officers to come into the pod that she was in.  It

 9         was me and my grandson and my daughter and hospital

10         personnel.

11                   MS. MC KENZIE:      I believe we had a

12         Jesse Vollrath testify that he was also sitting by your

13         daughter's side.  Do you remember seeing him?

14                   THE WITNESS:        He might have been

15         there before I got there, but I didn't -- there was

16         nobody in the room with her other than my daughter --

17         my youngest daughter my grandson and myself.

18                   MS. MC KENZIE:      Thank you.

19                   MS. WILSON:         Was she released from

20         the emergency or did she have to stay in the hospital?

21                   THE WITNESS:        I didn't hear the

22         first part.

23                   MS. WILSON:         Let me ask her once

24         she gets up there.  Thank you.

25                   MR. KONRAD:         Anything further?
```

```
 1          CROSS-EXAMINATION BY MR. PEDERSON:

 2     Q    You said you were by her side the entire time.  Right?

 3     A    From the time I got to the hospital, yes.

 4     Q    Is it possible that she had a seven-minute phone call

 5          at approximately 6:30 without you being aware of it?

 6     A    Possible.

 7     Q    You indicated that you were a nurse.

 8     A    Yes, retired.

 9     Q    You were concerned your daughter was exhibiting some

10          signs of a head injury, I believe, you testified to.

11          Is that right?

12     A    Yes.

13     Q    But despite whatever background you might have, it is

14          fair to say that you weren't at that hospital taking

15          care of her in a medical sense.   Right?

16     A    No.

17     Q    You didn't diagnose her or anything like that.

18     A    No.

19     Q    That just is a concern you had based on your

20          observations and experience?

21     A    Yes.

22                    MR. PEDERSON:      That is all I have.

23          Thank you.

24                    MR. MC GAVER:      Just one follow-up

25          question.
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
                                                          237
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 238 of 501   Document 80-5

```
 1          REDIRECT EXAMINATION BY MR. MC GAVER:

 2     Q    Were there officers outside the curtain -- the partition

 3          in the emergency room?

 4     A    Yes, there was.  There was a female officer.  Her

 5          pod -- Shannon's pod was on the end.  There were female

 6          officer about two pods down.  She insisted upon seeing

 7          Juanita, so we walked around, and there were some

 8          officers in the room with Ms. Juanita.  She only saw her

 9          for about 30 seconds, a minute.  She had to go to the

10          bathroom again, so I took her to the bathroom.  I saw

11          officers outside the hospital entrance and a few inside

12          also.

13                    MR. MC GAVER:        Nothing further.

14          Thank you.

15                    MR. KONRAD:          Anything from the

16          commissioners?

17                    Thank you.  You are excused.

18          (Witness excused)

19                    MR. MC GAVER:        I call Shannon

20          Lewandowski.

21                    SHANNON LEWANDOWSKI, having been first

22          duly sworn on oath to tell the truth, the whole truth,

23          and nothing but the truth testified as follows:

24                    MR. KONRAD:          The witness is sworn.

25          Go ahead.
```

        SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                              sueT@wi.rr.com
                                                              238
        Case 2:16-cv-01089-WED   Filed 04/22/19   Page 239 of 501   Document 80-5

```
 1        DIRECT EXAMINATION BY MR. MC GAVER:

 2   Q    Ms. Lewandowski, what year did you start with the

 3        Milwaukee police at the time?

 4   A    1999.

 5   Q    You were, at some point, promoted to detective.

 6        Correct?

 7   A    2005.

 8   Q    You remain so employed until you were discharged from

 9        the department.  True?

10   A    Correct.

11   Q    I draw your attention to January 19 of 2015.  Where were

12        you assigned?

13   A    Central Division, CIB.

14   Q    What station did you work at?

15   A    Three and five.

16   Q    What hours did you work?

17   A    8:00 at night till 4:00 in the morning.

18   Q    Who was your immediate supervisor?

19   A    I had a couple of them.  Lieutenant Sean Hanley and

20        Lieutenant Paul Lough.

21   Q    Did you work with a partner?

22   A    Not assigned to my car, but periodically, we will work

23        with other detectives.

24   Q    At some point during your shift, did you have a conver-

25        sation with then-officer, now-detective Melanie Beasley?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              239
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 240 of 501   Document 80-5

```
1   A    Yes.

2   Q    Where did that conversation take place?

3   A    District 5.

4   Q    Approximately when did it take place?

5   A    Beginning of -- I don't remember exactly what time.

6        It was somewhere before midnight at District 5.

7   Q    So before the car accident that we are talking about.

8   A    Yes.

9   Q    What did you talk with then-Officer Beasley about?

10  A    Melanie Beasley suffered some trauma from another

11       officer and on -- I already had knowledge of what had

12       happened because she went to get a restraining order

13       and so there was a temporary restraining order at

14       District 5 supposed to keep that officer away from her

15       district and that was not happening, so she wanted to

16       talk to me about who else to go to, so she and I had a

17       conversation that began sometime on the 18th and I heard

18       Juanita Carr get sent to a shooting.  Whenever someone

19       gets sent to a shooting, if I am available, I always

20       respond with them.

21  Q    Where did Officer Beasley live at that time?

22  A    On South 84th Street.

23  Q    Did she spend anytime at your house?

24  A    Yes.  She had been spending -- like, living at my house,

25       afraid to go home, so after work, she would come to my
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                          240
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 241 of 501   Document 80-5

1       house and stay.

2    Q  You said you heard about a shooting.  What did you do

3       after you heard about the shooting?

4    A  I told Melanie that I would return before her shift

5       ended.  Her shift ended at 3:00 and mine at ended at

6       4:00.  I called Juanita and asked her to give the exact

7       address of where she was dispatched to and I said I was

8       on my way.

9    Q  Was that conversation with detective Carr took place on

10      the telephone?

11   A  Yes.

12                  MS. MC KENZIE:     I am sorry.  You had

13      a conversation with Juanita.  Where were you?

14                  THE WITNESS:      In District 5 talking

15      to Melanie in the garage.

16                  MS. MC KENZIE:     Why did you contact

17      her?

18                  THE WITNESS:      When I heard her get

19      dispatched to a shooting, I just went and responded.  I

20      always do.  I always volunteer to go to the assignment.

21                  MS. MC KENZIE:     How do you know it was

22      detective Carr that was --

23                  THE WITNESS:       Because she had

24      her --  We are each assigned a number and it was her

25      number and she said, "10-4."  So I told Melanie, "hey,

SUSAN K. TAYLOR          262-553-1058        COURT REPORTER
                         sueT@wi.rr.com
                                                                   241
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 242 of 501   Document 80-5

```
1        just hold up, like, are you leaving right now the
2        district?"  And she said, "yes."  I said, "I will come
3        back here at the end of your shift and we will resume
4        the conversation."
5        BY MR. MC GAVER:
6    Q   What happened next?  After you spoke with detective Carr
7        on the telephone, what happened?
8    A   I was en route to St. Joe's Hospital with her.  She
9        called me back and said she could handle it.  They don't
10       even have a scene.  So I just continued.  I don't
11       remember what I did, if I did follow-up or a report or
12       what.
13   Q   Did you have occasion to have additional contact with
14       detective Carr?
15   A   Yes.
16   Q   How did that happen?
17   A   I went back to District 3, about two hours before the
18       end of my shift.  I saw Juanita doing reports.  I sat
19       next to her where I normally do and said, "what happened
20       with the shooting?"  She gave me a brief description and
21       at that time, a black patrol sergeant, a black male -- I
22       don't remember his name -- walked by and stopped Juanita
23       and said, "did you recover the gun?"  She said, "no."
24       He walked off.  So I said to her, "did you go to recover
25       it yet?" She said, "yes."  I said, "do you want to go
```

SUSAN K. TAYLOR          262-553-1058        COURT REPORTER
                         sueT@wi.rr.com
                                                              242
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 243 of 501   Document 80-5

1    again before the end of your shift?" She said, "yes."
2    So I said, "I have to run to District 5 to handle
3    something.  Since you just went, we will just go to five
4    together, take your car and we will come back around
5    three, do a search and if do we get the gun, I will
6    inventory it for you", because she wanted to be off on
7    time.
8  Q   Did you have any experience working with detective Carr
9      before that day?
10 A   Lots of experience, because we were promoted in the same
11     year.
12 Q   Did you believe there was any sense of urgency about
13     attempting to retrieve the gun and detective Carr's
14     actions surrounding that?
15 A   I knew there was not because she said that she already
16     went and she was actually putting that assignment into
17     the follow-up so the next shift could go and try and
18     recover it.  I said to her, "if we get it, I will --
19     and there is overtime, I will stay on overtime and you
20     can go and I will inventory it."  That is why we decided
21     to go together.  Additionally, she said there were no
22     cars in service at that time, it was still pretty busy
23     and I said, "then, you will have to pull another car out
24     of service.  I'll just go with you."
25 Q   "Pulling cars out of service", what does that mean?

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                      243
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 244 of 501   Document 80-5

```
1    A    It means if Juanita got to the house and was able to get
2         in, she would need help.  You can't search a house by
3         yourself.
4    Q    So what squad car she would have?
5    A    She wouldn't have to call for a squad car.
6                   MS. WILSON:          She was what?  I
7         didn't hear what you said.  You said she was something
8         with a squad.
9                   MR. MC GAVER:        Wouldn't have to call
10        for a squad.
11                  MS. WILSON:          Thank you.
12   BY MR. MC GAVER:
13   Q    You said you decided to take the squad car assigned to
14        detective Carr.  Correct?
15   A    That is correct.
16   Q    Why did you decide on taking that car?
17   A    Because I already turned my car keys in.  She still had
18        her car key sitting on the table.
19   Q    Can you reiterate what the plan was when you left?
20   A    I told her I had to go to District 5 because Melanie was
21        having a problem.  She knows who Melanie is and she is
22        well aware of the problem, to my knowledge, because I
23        told her already.
24   Q    So what were you planning on doing once you got to
25        District 5?
```

```
 1   A      Melanie said that she had -- she had been off of work
 2          a lot taking days off because of the threats and the
 3          trauma to her that she had reported to IAD and was not
 4          getting the sufficient help that she needed.  She was
 5          told by a supervisor, Sean Hanley, to get a restraining
 6          order.  In the process of all of this, I was saying,
 7          "I will come with you through your process and if you
 8          need a place to stay, whatever you need, I got it."
 9          So I work in District 5.  I didn't know Melanie as a
10          friend at all at that point.  She was just another
11          female co-worker.  Melanie had revealed to me things
12          that were happening to her, so I told her she could stay
13          by my house.  She was afraid to go home.  Now, she was
14          at the district that day and doing a search on a female
15          when other TAC officers were coming into the district
16          and I don't know if she felt threatened or was
17          threatened.  I wasn't quite sure at that point.  I told
18          her she had to go to the supervisor, that I had to go
19          and I was rushing out saying, "I have to go.  Juanita
20          just got sent to a shooting."  I never let -- I
21          always -- you can ask any of my supervisors.  I always
22          respond to every shooting if I am available.  I make
23          myself available to them.  If they don't need me, then,
24          I go.
25   Q      Are there any other matters that you're planning on
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                245
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 246 of 501   Document 80-5

1       assisting then-Officer Beasley with?

2    A   Yes.  Melanie had filed an ESUDW, Endangering Safety By

3        Use of Dangerous Weapon.  It is an acronym.  It means

4        endangering safety by use of a dangerous weapon.  It is

5        basically taking a handgun or any type of firearm and

6        shooting into an occupied or unoccupied home.

7               MS. MC KENZIE:      Hold on.  Go ahead.

8    A   She was having a conflict with a supervisor on whether

9        it was an endangering safety by use of a dangerous

10       weapon or a recklessly endangering safety.  The

11       difference would have been taking it to the district

12       attorney's office or not taking it to the district

13       attorney's office via, like, a liaison.  So that was an

14       issue that I originally was there for earlier in the

15       shift, but when I got to District 5 -- I normally work

16       at Central -- or a bunch of other officers there and

17       they just started talking to me about an incident that

18       happened prior where we had a huge fight on Sixth and

19       Hadley and a woman and her two daughters picked me up by

20       my jacket and were beating me, and they were asking how

21       I was and how everything was happening with that,

22       because it was like a melee.  So Melanie takes me into

23       the garage.  She's, like, "what am I supposed to do?

24       None of the supervisors here at District 5 are not only

25       not listening to me, but there is a valid temporary

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                      sueT@wi.rr.com
                                                          246
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 247 of 501   Document 80-5

```
 1        restraining order, which holds the same type of
 2        authority as a regular restraining order, and these
 3        TAC officers keep coming in here."  So I was trying
 4        to find her a supervisor that she could talk to.
 5   Q    Let's get back on track here.  Before you left with
 6        Juanita Carr, did you receive any phone calls from
 7        family members?
 8   A    Yes.
 9   Q    Who called you?
10   A    My son, Jordan.
11   Q    What time did he call you?
12   A    Maybe, like, a little bit after 2:00.
13   Q    What did he tell you when he called you?
14   A    He said, "Mom, I got pulled over."  I said, "where are
15        you?" He said, "I don't know."  I said, "what are you
16        pulled over for?"  He said, "I don't know."  I hear some
17        talking back and I said, "listen.  Are you on the east
18        side?"  He said, "yes."  I said, "when you find out
19        where you are and what is going on, just call me back."
20        He said, "all right."  I hung up.
21   Q    Why would Jordan call you to tell you about this, if you
22        know?
23   A    I instructed both of my children to always call me and
24        let me know where they are.  My family consists of me
25        and my two children.  That is it.  There is nobody else.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                      247
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 248 of 501   Document 80-5

```
  1            Jordan is my -- I am missing words -- my emergency
  2            contact.  My other son is 26.  At the time, he was 24,
  3            he lived in California.  I have Denise Rogers who lives
  4            in a completely different neighborhood and I usually
  5            don't worry her about anything.  Outside of that, that
  6            is the rule in my house.  I need to know where you are,
  7            especially since he had just transferred schools from
  8            Minnesota to UWM.  He doesn't know the area.  So I worry
  9            about my son's safety with all the robberies, not only
 10            on the east side, but all over.  The rule is --  There
 11            is many rules that I have, but one of them is if you get
 12            stop by police, that you always call and tell me where
 13            you are.
 14     Q      Did you give Jordan one of your business cards?
 15     A      Yes.
 16     Q      Why?
 17     A      Both of my children have my business cards as well as my
 18            other family members.  I explained to my son that
 19            traffic stops are the most unpredictable and dangerous
 20            things that occur within patrol, and my son has been
 21            stopped more than four times.  I don't know why he said
 22            that.  I want the officer to know that that is my son.
 23            I have a good reputation at work.  I have a -- I am a
 24            strong disciplinarian for my children and officers know
 25            they know my children.  So I want whoever has contact
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                            248
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 249 of 501   Document 80-5

```
 1        with them to know that not that he knows his rights, but
 2        that he respects the law and he respects them and he
 3        doesn't anticipate being pulled out of his car and
 4        searched for no reason, and, so, that has happened to
 5        him in the past.
 6   Q    I think it goes without saying that you have received
 7        these types of calls from Jordan in the past.
 8   A    Yes, and from my other son, Kasey.
 9   Q    Have you ever gone to a scene where Jordan was pulled
10        over by an officer in the past?
11   A    Absolutely not.
12   Q    Have you ever intervened or spoken with officers who
13        pulled Jordan over in the past?
14   A    Absolutely not, no.
15   Q    Did Jordan tell you --  What did Jordan tell you about
16        his location when he was pulled over on January 19,
17        2015?
18   A    He said he didn't know where he was.
19   Q    Did you have plans to go to him?
20   A    Absolutely not.
21   Q    Did you plan on intervening in that traffic stop?
22   A    No.
23   Q    Did the phone call that you received from Jordan change
24        any of the plans that you had made with detective Carr?
25   A    The only thing that would have changed would be if he
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                        sueT@wi.rr.com
                                                              249
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 250 of 501   Document 80-5

```
 1          got a citation, which I didn't know he was drinking, but
 2          if he would have got a citation, I would have taken the
 3          car from him.  That is about it.  So nothing changed.
 4          He gets pulled over, I know where he is.  He works
 5          downtown on Third Street.  He goes to work, he leaves
 6          work, he calls me.  I stay on the phone with him until
 7          he is inside.  It is just -- this is way I operate with
 8          my children.  He is out late at night, 4:00, 5:00 in the
 9          morning, because he works at a bar downtown.  That is
10          the same rule.  You must call me.  I need to know where
11          you are.
12     Q    What do you typically do with your phone when you are
13          driving with someone else in the car?
14     A    When I'm driving someone else's car?
15     Q    With someone else in the car.
16     A    I don't answer my phone driving.  If my phone is
17          ringing, I will pull over and answer it.  But on this
18          day, I tossed the phone to Juanita before we left the
19          garage at District 3 after Jordan called and I tossed it
20          to her and I said, "when Jordan calls, just answer it
21          for me and ask him where he is at."
22     Q    Have you ever driven that particular squad car prior to
23          January 19 of 2015?
24     A    I can't remember.  We interchange cars all the time.
25     Q    Just so we are crystal clear, where was your destina-
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                            250
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 251 of 501   Document 80-5

```
 1      tion?

 2   A   District 5.

 3   Q   As you approached the intersection of 36th Street and

 4       North Avenue, what did you see?

 5   A   I Wisch there was a map because it is one block between

 6       35th and 36th, but it is not a huge, long block.  It is

 7       a short block.  As I was passing -- or coming to 36th

 8       Street, I could see a car in the road.  That inter-

 9       section --   There you go.  Thank you.

10               MR. MC GAVER:      Hold on.  I will pull

11       a map out for you.

12   Q   I am handing you what's been identified as Exhibit 12.

13       Can you tell me what that is?

14   A   This is an overhead view  of --

15   Q   What am I looking at?  What are we looking at?

16   A   I believe that the right side of this map is west and

17       the street going straight down the middle is 35th.  It

18       is hard for me to tell.  Is that correct?

19   Q   You tell me.

20   A   It is hard for me to tell from this overview because it

21       looks like it is missing --  This is old.  It looks like

22       it is missing a building on the corner.

23               MR. MC GAVER:      It appears that the

24       orientation of the map is up being north, so I don't

25       know if that helps.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              251
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 252 of 501  Document 80-5

```
 1              MR. PEDERSON:      I object to that.

 2       Leading.  It doesn't say that.

 3   A   It is hard for me to tell.

 4   Q   Then, just walk me through it.  What direction were you

 5       driving on North Avenue?

 6   A   I am driving eastbound and --

 7   Q   As you approach 36th Street, what did you see?

 8   A   As I approached 36th Street, there is a new -- new paint

 9       on the road and they made a bike lane there.  There used

10       to be, like, a passing or parking lane.  There really

11       isn't anymore.  There is a car somewhere between 35th

12       and 36th that had pulled over what I assumed to be

13       picking up a call girl, prostitute.  The car is white or

14       light color.  It is pulled over and as I am approaching

15       it, I see the brake lights go on, I see them go off.

16       I see a girl by the car door on the passenger's side.

17       I make a comment to Juanita about needing a vice divi-

18       sion for exact this reason.  She laughs.

19   Q   What do you mean by that, that you "need a vice division

20       for this exact reason"?

21   A   We don't have a vice division like we used to have that

22       attacks drugs and prostitution like we used to.

23   Q   So what did you do in reaction to seeing this?

24   A   So I said to her something regarding, "that is why we

25       need a vice."  I used the toggle switch which is on the
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                            252
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 253 of 501   Document 80-5

```
 1        console between my seat and hers.  When you first make

 2        the first move of it and it clicks, one movement to the

 3        right, the interior lights go on and it is, like, click,

 4        click, click, click, like that.  I think the outside

 5        lights by the the headlights go on and, then, the next

 6        switch is the sound of the siren.  So I always say

 7        "blurp".  That is what police will say.  You "blurp" it.

 8   Q    Can you repeat that?

 9   A    It is, like, moving it to the right real fast and it

10        sounds like this; "blurp", and it is how we use a horn.

11        We don't use the horn per se.  We've never, ever been

12        trained to just use the horn.  This is just allowing him

13        to know that I am coming down the street and don't pull

14        out and hit me.  It's just so we didn't get hit.

15   Q    Are you familiar with the SOPs regarding use of

16        emergency lights?

17   A    Yes.  This operation is used all the time.  I could sit

18        on 35th Street and you can see every single day, some-

19        body probably using that, because that is a horrible

20        intersection.  Police use it all the time.

21   Q    Did you leave the squad lights on after you activated

22        them?

23   A    I went around the car and as I went around the car --

24        The intersection at 35th and North Avenue has a cell

25        phone store on the southwest corner and it has huge
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    253
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 254 of 501   Document 80-5

```
 1        large windows and I could see the car coming from the
 2        south going north on 35th and I looked up to see if I
 3        had the green light wondering if the car was going to
 4        stop and I slammed on the brakes.  I reached out to
 5        Juanita and, like, she said, I am sure I -- I don't
 6        recall but I am sure I swore and to let her know --
 7        it is just a reaction that when you have children, you
 8        want to hold them back, and that is what I did to her.
 9        I impacted that car.
10   Q    How fast were you going when you went through the
11        intersection of 35th and North?
12   A    I was going the speed limit, if not slower, because
13        when I went around this car, I was already slowing down.
14        I wasn't pulling this car over, I had no intent on
15        pulling this car over.  I went around it notifying it
16        so it doesn't come out into traffic and I was braking
17        because I see the car coming and I still collide with
18        him.
19   Q    Were your squad lights on as you traveled through the
20        intersection?
21   A    Yes, I never got a chance, I believe, to turn them off.
22        There was no distance.  I went around the car and before
23        I got straight in the lane, I could see the lights
24        coming.  I hit the brake -- I am not worried about the
25        lights -- and I am through.
```

```
 1   Q   Were the sirens on traveling through the intersection?

 2   A   I don't know.

 3   Q   Where was the squad impacted?

 4   A   I believe it was just the front end.  My front end hit

 5       her driver's side and passenger's side -- driver side

 6       back part of her car.

 7   Q   What did the impact do to your position in the car?

 8   A   I was flipped over the console.  My right foot was still

 9       stuck under the pedal of the car and I was on top of --

10       part of me was on top of Juanita.

11   Q   Do you know whether you lost consciousness?

12   A   I was told that I did.  I don't know if you really know

13       that you lose consciousness.

14   Q   Do you remember who told you that you went unconscious?

15   A   Juanita, because she was screaming in my ear that I was

16       dead.

17   Q   How did you get removed from the squad?

18   A   Some citizens came to the car and were asking -- they

19       were talking on how to get me out of the car.  I noticed

20       two of them.  I recognized two of them.  They said,

21       "oh, it is Blonde, it's Blonde," and they are trying

22       to pull me out of the window, but my foot is stuck

23       underneath the pedal and then I don't remember how I got

24       out, if I got out through the window or --  I remember

25       they were trying to squeeze me out of the door, but the
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                     255
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 256 of 501   Document 80-5

```
 1        door didn't really open.  I am not quite sure.
 2   Q    Did you call 911?
 3   A    I was told that I did and I don't remember me calling
 4        911 or even where I got the phone from, because Juanita
 5        had it.
 6   Q    Do you remember who the first emergency responder to the
 7        scene was?
 8   A    No.  The only person that I remember that was taking
 9        care of me was Jesse Vollrath.
10   Q    Do you remember anything that you said to any of the
11        first responders or officers immediately following the
12        accident?
13   A    Yes.  I remember telling somebody -- Officer Joe Goggins
14        asked me, you know, who should he call for me and I
15        said, "call my son."  I don't remember that he said --
16        the report that I was given said that I was giving him
17        the wrong number.  He was very frustrated with me and I
18        was getting even more frustrated because I knew my son
19        was at a traffic stop and when I have been injured
20        before on duty when I have been at the hospital, my
21        youngest son, Jordan, just freaks out, like, I am his
22        only family member, I am his only parent.  I didn't want
23        him driving.  So I said, "somebody, get ahold of my son.
24        He is on a traffic stop."  I don't remember who it was.
25        It was an officer.  He probably was new.  He was bent
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                            256
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 257 of 501   Document 80-5

```
 1          down and he said, "where", and I said, "on the east
 2          side.  He goes to UWM."  He came back telling me that he
 3          called the District 5 console and there was nobody on
 4          any traffic stops.  So I said, "call UWM police and see
 5          if they have one."  They called UWM police.  He came
 6          back and said, "they are not on any traffic stops."
 7          So I was like, "well, I don't know.  I don't know where
 8          he is.  Just somebody go find him", and that is it.
 9          When I saw Deb Stacey --  She knows me.  What we have in
10          comment common is being single parents of young, black
11          men, so we have that connection with each other and we
12          support each other and that's why she knows my son and I
13          told her, "can you just go find Jordan for me", and she
14          said "yes, I got it.  I got it."  That is it.
15     Q    How long after the accident until you were loaded into
16          an ambulance?
17     A    I don't know.
18     Q    Did any officers ride with you in the ambulance?
19     A    Jesse Vollrath.
20     Q    Any discussion with Officer Vollrath in the ambulance?
21     A    Not that I recall.  Just that I was convinced that
22          Juanita died.  I don't know if I heard it on the scene
23          or whatever, but that is what I kept talking to him
24          about.
25     Q    Did you see Lieutenant Hanley at the scene of the
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              257
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 258 of 501   Document 80-5

```
 1        accident?

 2   A    No.

 3   Q    Do you remember having a conversation with him at that

 4        time?

 5   A    I didn't see him and I didn't talk to him.

 6   Q    Where did the ambulance take you?

 7   A    Froedtert.

 8   Q    Did any of your family members report to the hospital?

 9   A    Yes.  Denise Rogers, who I call "Big Mama."

10   Q    Who was the first one to arrive?

11   A    Big Mama, my sister Jondalyn, and Deb Stacey.

12   Q    What about Jordan?

13   A    Then Deb Stacey brought in Jordan.

14   Q    Once you arrived at Froedtert, where did they take you?

15   A    I went right to a room, and the medical staff knows me

16        there from all the shootings.  I remember them joking

17        around with me in and out and said they are going to

18        get me to x-ray and I will be on my way.

19   Q    Did any officers speak with you while you were at the

20        hospital?

21   A    Jesse Vollrath and Deb Stacey and William Krumnow.

22   Q    Did you see Lieutenant Hanley at the hospital?

23   A    No.

24   Q    Did Lieutenant Hanley speak with you while you were at

25        the hospital?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                    sueT@wi.rr.com
                                                           258
Case 2:16-cv-01089-WED    Filed 04/22/19    Page 259 of 501    Document 80-5

```
 1   A    No.

 2   Q    Did Lieutenant Hanley spend 20 minutes with you while

 3        you were at the hospital?

 4   A    Lieutenant Hanley never spoke to me at the hospital.

 5        That is why when I got discharged around 5:30, I called

 6        him -- or later, called him at 6:38.

 7   Q    What time were you discharged?

 8   A    It was after 5:30.

 9   Q    Who left with you?

10   A    My sister and my mom and Jordan.

11   Q    Who drove?

12   A    My sister.

13   Q    Whose car?

14   A    My sister's.

15   Q    Where did you go?

16   A    To District 3.

17   Q    Where did you go there?

18   A    Because I didn't want go to home without talking to a

19        supervisor.

20   Q    Did you encounter a supervisor at District 3?

21   A    No.

22   Q    What did you do next?

23   A    Someone drove my car home, either my son or -- or

24        Jondalyn drove back to my house.  My house is, like,

25        four blocks from the district.  Once I got home, I
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                      sueT@wi.rr.com
                                                          259
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 260 of 501   Document 80-5

```
1        wanted to know if somebody was going to come talk to
2        me, so I called Hanley -- Lieutenant Hanley.
3   Q    You called him on his cell phone?
4   A    Yes.
5   Q    How long did you speak with him?
6   A    Ten, 15 minutes.
7   Q    What did you say to him?
8   A    I want to know if he was going to come over and talk to
9        me and he said, "no."  I said, "do you want to know,
10       like, what happened?"  He said, "yes, go ahead.  Tell
11       me."  So I told him and then he said, "all right.  Bye."
12  Q    Did you ever tell him that at the time you got into the
13       accident, that you were en route to pick up Jordan in
14       the area of UWM?
15  A    Absolutely not.
16                  MS. MC KENZIE:     Let me interrupt and
17       ask a question.
18                  MR. MC GAVER:     Please.
19                  MS. MC KENZIE:     There isn't some
20       standard or procedure for once you are in an accident,
21       as an officer, how that is reported and when you speak
22       to a superior, but what was your urgency in wanting to
23       speak to him?
24                  THE WITNESS:     We never go home from
25       a shift period, much less an accident, without notifying
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 261 of 501   Document 80-5        260

```
1        your supervisor that you are secured or going home.  So
2        I am at the hospital, he doesn't talk to me there.  I
3        snet my son to look for him within the hospital because
4        he knows who he is.  He's not there.  I asked Juanita if
5        she talked to him.  She said, "briefly, but he's gone."
6        So, now, I am leaving.  I don't know where my gun is, I
7        don't know where my gun belt on.  I don't know who has
8        it.  It is something that I am responsible for, and I
9        remember questioning to find out if somebody had taken
10       my gun belt off of me while they are trying to remove me
11       from the car.  Me getting ahold of my supervisor, that
12       is mandatory and I am, like, "don't you want to know
13       what happened?"
14                    MS. MC KENZIE:     Why Hanley?
15                    THE WITNESS:       He was working that
16       day.  He is my supervisor that day.
17                    MS. MC KENZIE:     Wasn't there another
18       supervisor that was working that day?
19                    THE WITNESS:       I don't believe so.
20       That is who I reported to that and that is the super-
21       visor I have.
22       BY MR. MC GAVER:
23  Q    Is there any reason that you would have told Lieutenant
24       Hanley that you were on your way to get Jordon at UMM
25       when you got into the crash?
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
                                                        261
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 262 of 501   Document 80-5

```
 1  A    It is not what happened.  I didn't speak to him at all.
 2  Q    Did you tell Hanley that you were traveling 45 miles an
 3       hour at the time of the crash?
 4  A    On the phone?
 5  Q    Yes.
 6  A    No.  I am going to tell my supervisor that I am speeding
 7       and that I am going to go do something, like, go impede
 8       on a traffic stop?  It doesn't make sense.  Like, I am
 9       going to tell my supervisor something that I did that
10       was illegal and wrong?  Even if I did do it, but I
11       didn't.  So I am not going to go and tell him any such
12       thing.  I told him exactly what the problem was, that
13       there were TAC officers at the scene, and those are the
14       people that told him that I was going to UWM.  These
15       are --  The overheard people are from TAC.  TAC is the
16       group of guys that have the officer who has assaulted
17       Melanie Beasley.   They are on the scene telling a
18       sergeant that I am saying these things, but there is no
19       reports by them, there is nothing in their memo book.
20       I didn't say any of those things.  All I wanted was
21       just, like Juanita Carr got her boyfriend to come to
22       her scene, her family members to come to the hospital.
23       I wanted my family members to come to the hospital,
24       especially because my family member was on a traffic
25       stop and I knew where he was and he is waiting to talk
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                        sueT@wi.rr.com
                                                              262
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 263 of 501   Document 80-5

```
 1        to me.

 2   Q    Back to the conversation on the phone the morning of the

 3        19th th -- January 19, 2015.  Did you tell Hanley that

 4        you had sirens on at the time of the accident?

 5   A    No.  I don't know if they were on.

 6   Q    Did you tell him that you had your squad car emergency

 7        lights on at the time of the accident?

 8   A    Yes.

 9   Q    When you were speaking with Hanley on the phone that

10        morning, did anyone overhear the conversation?

11   A    I guess not.  My son was at home.  Melanie showed up at

12        my house because she had been calling me and asking me

13        where I was because I didn't show up at the district.

14        I told her I was involved in a car accident and I was at

15        the house, so she came to the house.

16   Q    Melanie came to the house later that morning?

17   A    Yes.

18   Q    What did you do immediately after you hung up with

19        Hanley?

20   A    I am just sitting on the couch with a lot of family

21        members or friends and some officers coming to see how I

22        am.  I just remember sitting there and it just being,

23        kind of, chaotic.

24   Q    Did Hanley ever come to your house to visit you after

25        the accident?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                        sueT@wi.rr.com
                                                                263
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 264 of 501   Document 80-5

| | | |
|---|---|---|
| 1 | A | He never came to my house, period, after the accident. |
| 2 | Q | This phone conversation, is that the last time you spoke |
| 3 | | with Lieutenant Hanley? |
| 4 | A | Yes.  It is the first and only time I spoke with |
| 5 | | Lieutenant Hanley from the night of the 18th to the |
| 6 | | 19th. |
| 7 | Q | Did you receive any treatment for medical issues you |
| 8 | | suffered in the accident? |
| 9 | A | Yes. |
| 10 | Q | What issues --  What were you diagnosed with? |
| 11 | A | A concussion with brain bleed on the top of my head.  I |
| 12 | | believe that I hit the gun rack.  My chest was black and |
| 13 | | blue from one end to the other because of the air bags |
| 14 | | blew.  I had two black eyes.  My right foot was swollen |
| 15 | | and I reinjured my left knee.  I am not quite sure how. |
| 16 | | But I had surgery on it.  And I had not finished therapy |
| 17 | | for my short-term memory and my speech therapy because I |
| 18 | | was fired. |
| 19 | Q | How many doctors did you see in the months following the |
| 20 | | accident? |
| 21 | A | Five or six. |
| 22 | | (A document was marked as Exhibit 13) |
| 23 | Q | I show you a document marked as Exhibit 13.  What is |
| 24 | | that? |
| 25 | A | Progress notes from one of the doctors that I saw after |

```
 1      the accident.
 2  Q   Can you flip through the whole packet and get me a sense
 3      of what is there?
 4  A   Just evaluations and medical imaging reports and diag-
 5      nosis of the problems that I had after the accident
 6      along with physician reports, duty-related issues that
 7      I had my medical doctors fill out.
 8  Q   Do you believe the doctors are a fair and accurate
 9      representation of the medical issues you have dealt
10      with since the accident?
11  A   They are.
12  Q   Including neck, head, ankle, knee.  Am I missing any
13      injuries?
14  A   Head, neck, knee, foot.  That is it.
15                  MR. MC GAVER:      I will offer Exhibit
16      13.
17                  MR. PEDERSON:      No objection.
18                  MR. KONRAD:        Received.
19      BY MR. MC GAVER:
20  Q   Where did you receive treatment?
21  A   Several places.  Wheaton Franciscan out in Mequon and in
22      Franklin.
23  Q   Let me ask a different question.  Do you have any
24      lingering medical issues to this day?
25  A   Yes.  I still deal with short-term memory issues, having
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                        sueT@wi.rr.com
                                                          265
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 266 of 501   Document 80-5

```
 1          to write everything down on a piece of paper and a lot
 2          of persistent issues involving my head.
 3    Q     You were interviewed by Sergeant Zieger in the course of
 4          the investigation.  Correct?
 5    A     I was.
 6    Q     Did you tell Sergeant Zieger the same story you told
 7          here today?
 8    A     Yes.
 9    Q     Is there anything else you want to make sure that the
10          Commission knows about this situation?
11    A     Yes.  I believe that as Sergeant Zieger said, I called
12          a lieutenant a liar in my memo and I did, and I mean it,
13          because the things that he said happened, they did not
14          happen, and the treatment that I got was directly
15          related to some of these memos that I submitted because
16          the bottom line is the fair treatment of women in this
17          department, specifically Melanie Beasley at that
18          district, which I have -- I have more than these memos
19          here that I have handed in.  This investigation is a
20          direct result of that.  I believe it is complete
21          retaliation for me trying to help another female out at
22          a district who was sexually assaulted by another member
23          and the only people on this scene of mine where I was
24          hurt and injured and in a close-to-fatal accident TAC
25          members who made these statements saying that I was
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                    sueT@wi.rr.com
                                                    266
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 267 of 501   Document 80-5

```
 1          saying that, but none of those TAC members have ever
 2          written a report.  Sergeant Riley isn't even here today
 3          and if he is a supervisor on scene saying these people
 4          said that, then, where is that sergeant holding those
 5          people accountable for those things -- for them to be
 6          interviewed by detectives so that they could come to the
 7          truth?  A simple investigation like this?  The first
 8          people that I would have you can talked to -- which I
 9          have been a detective since 2005 -- would have been to
10          talk to Melanie Beasley.
11                      MR. PEDERSON:      I object at this
12          point.  I think this is running far afield and is
13          a narrative --
14                      THE WITNESS:      It is not.  This is
15          exactly what it is about.
16                      MR. KONRAD:        If you could sum up,
17          I would appreciate it.
18      A   If I was going to investiate the scene, it would have
19          been Melanie Beasley and my son and Juanita Carr.
20          They would have been separated from each other and
21          immediately talked to and you would have had the answers
22          to what happened.  There would be no hearsay.
23                      MR. KONRAD:        Let me ask you this.
24          I read the lieutenant's report several times and it
25          appears to me he didn't come to the conclusion that you
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
                                                          267
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 268 of 501   Document 80-5

```
1    were proceeding to pick up your son based on those
2    ambiguous after-accident statements.  He based that
3    conclusion on what you told him, it appeared to me.  So
4    you are saying that you never said that to him at all.
5                 THE WITNESS:        Not only did I not
6    say that to him, but I never had a conversation for 20
7    or 30 minutes at the hospital.  I even asked for the
8    video of the hospital room to be pulled to if he was
9    even in there.
10                MR. KONRAD:        Let's turn back to
11   the phone call.
12                THE WITNESS:        The phone call, I
13   called him and I told him exactly what happened, and I
14   already had heard the rumors in my house saying that the
15   TAC officers were telling him that and I even told him
16   at that point "that didn't even get -- that is not what
17   happened.  That is not where I was going."
18                MR. KONRAD:        You are saying he
19   made up this conversation?
20                THE WITNESS:       Yes.
21                MR. MC GAVER:      Nothing further.
22                MS. MC KENZIE:      Counsel, would you
23   happen to have --  You provided medical records.  Do
24   you have the initial emergency room medical records?
25                MR. MC GAVER:      I don't know if that
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                     sueT@wi.rr.com
                                                        268
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 269 of 501   Document 80-5

```
1        is part of that packet or not.  Is there something
2        specific you are looking for?
3                    MS. MC KENZIE:     I want to see the
4        information regarding when she was brought into the
5        emergency room.
6                    MR. MC GAVER:     I don't think it is
7        in there.
8                    MS. MC KENZIE:      If you don't have
9        it, you don't have it.  I was just wondering --
10       Maybe you could look for that as we move forward?
11                   MR. MC GAVER:     Sure.
12                   MR. PEDERSON:     I was going to
13       request a five-minute recess, if that is possible.
14                   MS. MC KENZIE:     It is up to the
15       hearing examiner.
16                   MR. KONRAD:       Mr. Mc Gaver, when
17       you filed your motion earlier in the case, didn't you
18       attach a complete set of medical records?  The emergency
19       record should be in there.
20                   MR. MC GAVER:     They should.  They
21       are somewhere in there.  I just don't have the where-
22       withal to find them right now.
23                   MR. KONRAD:       Let's take a few
24       minutes.
25                   MR. MC GAVER:      I will see if I can
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                  269
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 270 of 501   Document 80-5

```
1      track them down.
2                MR. KONRAD:        We will take a five-
3      minute break.
4      (Discussion off the record)
5                MR. KONRAD:        Do the commissioners
6      have any additional questions?
7                MS. WILSON:        I have a host of
8      them, so you might as well go first.
9
10               MS. HEIN:                I have two.  I
11     had a couple things I confused about.  The timeline.
12     You said that you and detective Carr left five -- I
13     mean, three and were going to five when the accident
14     happened.  Where were you when that whole process when
15     you got a call from your son?  Were you, like, still at
16     three or were you in the car or --
17               THE WITNESS:        We were sitting in
18     the assembly next to each other on a table similar to
19     this.
20
21               MS. HEIN:                "Assembly"
22     meaning what.
23               THE WITNESS:        Where the officers
24     have roll call in District 3.   After that, the sergeant
25     walks by, which is around probably five minutes to 2:00
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              270
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 271 of 501   Document 80-5

```
 1    or something and he said, "did you recover the gun?"
 2    She said, "no."  He was, like, "oh", and he keeps going.
 3    I say to her, "did you go?"  She said, "yes, I was just
 4    there."  I said, "if you want to go again, I will go
 5    with you."  The reason I offer it because that is what
 6    I do, but I have a reputation of being able to -- I will
 7    bang on the door until I -- you know, till somebody
 8    comes instead of just a short term.  So she said, "sure
 9    let's go."  I said, "I have to stop at District 5 first
10    to talk to Melanie.  Her shift is over at 3:00, so we
11    will go five, we will come back around to see if the gun
12    is there.  If you get it, I'll inventory it and we'll be
13    back at three -- District 3.  So as I am -- we decide
14    that, we were walking out o the back of District 3 to
15    where the patrol cars are and that is when I receive the
16    phone call from my son.  So I am talking to him from the
17    back door to the car.  In the car, I turn it on I talk
18    to him.  "Where are you?"   "I don't know." "What did
19    you get stopped for?"  "I don't know."  I said, "well,
20    call me back when you know where you are at."  He said,
21    "all right."
22
23              MS. HEIN:              Then you get in
24    the car and you proceed to go to District 5.
25                     THE WITNESS:       Yes.
```

```
 1
 2                    MS. HEIN:                About how long
 3      --
 4      I guess I was confused.
 5                    THE WITNESS:        A minute.  However
 6      long it took to hang up the phone and drive get out to
 7      North Avenue, which is right there, and from 49th get
 8      down to 35th before the accident.
 9
10                    MS. HEIN:                Your son
11      didn't tell you where he -- he said, "I don't know where
12      I am."
13                    THE WITNESS:        That's correct.
14
15                    MS. HEIN:                But did he
16      say he was on the east side or any kind of
17      clarification.
18                    THE WITNESS:        Yes.  I believe he
19      said he was on the east side, and that is why I knew to
20      call District 5, because District 5 is the east side.
21      Plus, he works downtown.  He works at the Pub Club.
22      So the same thing.  When you get done with work, you
23      call me so I know when you are going home.
24
25                    MS. HEIN:                And when
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                    272
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 273 of 501   Document 80-5

```
 1        did you call district -- you said you just called five
 2        to know --
 3                    THE WITNESS:        The officers on
 4        scene, I remember asking somebody, because apparently,
 5        I was giving the wrong phone number to my son.  He's had
 6        the same phone number since he had a cell phone, which
 7        has been years.  Apparently, I was giving Officer
 8        Goggins the wrong phone number, so he was getting really
 9        frustrated with me and I remember him standing over me
10        going, "how do you not know what his phone number is?
11        So I turned to somebody else and said -- I was sitting
12        on the pavement -- "I said just call District 5, the
13        console and see."
14
15                    MS. HEIN:               You said that
16        because he had said he was on the east side.
17                    THE WITNESS:        Yes.
18
19                    MS. HEIN:               Then, you also
20        made the claim that the TAC officers who were on the
21        scene were indicating that you were going to UWM.  First
22        of all, is a TAC officer different than a regular police
23        officer?
24                    THE WITNESS:        TAC officers do,
25        like, search warrants and more of the violent takedown
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                           273
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 274 of 501   Document 80-5

```
 1      processes.  They don't take normal assignments, they
 2      don't investigate.  We investigate.  We say --  For
 3      example, there might be a guy armed and he is not going
 4      to come out easily.  They will come.
 5

 6                  MS. HEIN:                Would it be
 7      usual for them to be at a car accident with a police
 8      officer involved?
 9                  THE WITNESS:         There really isn't a
10      usual or not usual.  It is depends on the staffing.  But
11      when you hear that two officers -- I mean, two
12      detectives have died, everybody comes.  So they were all
13      on the scene.
14

15                  MS. HEIN:                How would they
16      know -- how would they be able to spread the rumor that
17      you were going to UWM or up there if you didn't even
18      know?
19                  THE WITNESS:         Because I was saying
20      that -- they were taking bits and pieces, I imagine,
21      because I was saying, "my son lives by UWM" or, "he goes
22      to UWM.  Call UWM police and see if he stopped there."
23

24                  MS. HEIN:                So you are
25      claiming there was a statement from one of the
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                         274
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 275 of 501   Document 80-5

```
 1    witnesses, Mr. Hernandez, who also indicated that you
 2    are claiming that the TAC officers were -- that he heard
 3    it from the TAC officers?
 4                THE WITNESS:        If I am saying it --
 5    if I'm making the statement -- I say the statement is,
 6    "my son goes to UWM or he is near UWM.  Call UWM police"
 7    after I ask to have them call District 5, and they came
 8    back saying there was nobody on any traffic stops at
 9    that time.  So I said the next best thing will be UWM
10    police, because he lives, like, five houses from the
11    campus.  He lives right on Murray or Maryland.  I am
12    saying that.  The difference is if I am actually saying
13    I was going to go get my son on a traffic stop at UWM
14    police, first of all, he wasn't with UWM police.  He was
15    with the Shorewood police.  I didn't know where he was.
16    That is where the frustration came in with Goggins.  I
17    just wanted somebody to get my son for me to let him
18    know where I was and that I was injured.  It just got so
19    blown.  When I wrote the rebuttal, I am asking all the
20    TAC officers that are there who are hearing this, which
21    is all written as I heard it from somebody, but I don't
22    know who, I am asking somebody, "listen.  I will sit
23    down with you and and go over all of this and tell me
24    exactly what was being said", and I couldn't get any
25    compliance with internal investigation, like, I am
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              275
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 276 of 501   Document 80-5

saying, "that is not what I was doing."  I would have

never jeopardize, you know, anything with Juanita and

her status on things that she has to do.  I am not going

to take her to impede on a traffic stop that I don't

even know where it is.  So all I am saying is if you

are going to do an investigation -- I offered my son to

Lieutenant Hanley.  "You want to come over and talk to

him?  He is at the house right now.  Melanie is here,

too.  You want to talk to them?"  No one wanted to come

and talk to them.  If you already are telling me that

I am -- "TAC officers are saying that you were going to

go to UWM", these are the people that know where I was

really going.  I know where I was going, Juanita knows,

Melanie knows and Jordan knows.

          MS. WILSON:          You have to help me

with some of this.  I can't write as fast as she can.

I am trying to figure out how this phone call, this

hook-up you had with Juanita.  Did you talk to her on

the phone, because you said something about you heard

her badge number.  Do you remember that?

          THE WITNESS:          No.  We all have

squad numbers, not badge numbers; squad numbers.  I

believe mine was, at the time, 9282.  I am not sure.

Probably 9281or something.  So I am at District 5

talking to Melanie and I hear the dispatcher say, what-

 1    ever Juanita's squad was, respond to the hospital for a
 2    shooting.  So I tell Melanie, "hey, are you leaving the
 3    district?"  She is, like, "yes."  I am, like, "we will
 4    talk later."  She's, like, "you gotta come back, you
 5    gotta come back."  I'm, like, "no, we will talk later.
 6    She is, like, "what about this report, what about this
 7    report?"  I said, "I will be back later.  Your shift
 8    ends at 3:00, mine ends at 4:00.  I will come back
 9    before your shift has ended and if not, if I can't make
10    it back here because of an assignment, we will talk on
11    the phone on how to deal with it."  So she is, like,
12    "all right."  I said, "just wait for me at the district.
13    I will come back."  So that is when I got in my car and
14    proceeded to go to St. Joseph's Hospital, talked to
15    Juanita on the phone halfway there and she said, "this
16    is nothing.  I got it."  I said, "okay.  Call me if you
17    need me."

18              MS. WILSON:       Who took who --
19    Now, Juanita didn't seem to know whose car it was.  It
20    was a car that you all -- you said was called up or
21    something that he explained.  You just got a car?
22              THE WITNESS:       There is a process of
23    getting cars, but because the process of CIB, Criminal
24    Investigation Bureau, being dismantled into the
25    districts, instead of all at once place, there is not

        SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                            sueT@wi.rr.com
                                                              277
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 278 of 501   Document 80-5

1    enough cars half the time for us, so sometimes, we

2    share.  I have been dropped off at crime scenes before.

3    At this time, this was the car that she had keys sitting

4    on the table.  So I took them and I said, "I am

5    driving."

6                    MS. WILSON:        Because I know she

7    said --

8                    THE WITNESS:        She doesn't know how

9    I got to drive.

10                   MS. WILSON:        Let me ask you this.

11   When your son called you, he said he had been stopped by

12   the police department.  He didn't say, "and by the way,

13   Mom, I had a drink."  My granddaughter had better told

14   me because I will beat her to death because that moves

15   everything to a different level.  My other question

16   is --

17                   THE WITNESS:        Of course, he didn't

18   tell me that.

19                   MS. WILSON:        My other question is,

20   how did Officer Stacey -- if Jordan didn't know where he

21   was, you didn't know where he was, fifth district didn't

22   know where he was, nobody knew where he was, how did she

23   find him?  She just drove up and down the street?

24                   THE WITNESS:        Internal investigation

25   hadn't even found out how she found out where he was.

SUSAN K. TAYLOR         262-553-1058         COURT REPORTER
                        sueT@wi.rr.com
                                                              278
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 279 of 501   Document 80-5

```
1        She told me later on that she tried to get ahold of him
2        by calling his phone, but there was no answer.  I
3        imagine that is when he was probably doing sobriety
4        tests or something, and Mr. Cody Smith had his phone.
5        I am just speculating.  Don't know.  Or maybe everybody
6        is calling the wrong number that I am giving.  I am not
7        quite sure.  So she Facebooked a "In" box.  So if he had
8        his phone, it would -- it would come up as the Facebook
9        page or something.  That didn't happen.  I don't know.
10       I don't know how somebody found out or -- or Jordan --
11       when he was looking for me, called the districts and
12       told them, "hey, I am looking for my mom", because they
13       left him just standing there when he called the
14       districts and asked or 911 and asked, "where is my mom?"
15       If they gave him -- and, then, he gave that address to
16       them and, then, they gave it to her?  I don't know.
17                     MS. WILSON:        Your friend, I lost
18       her name.
19                     THE WITNESS:       Deb Stacey?
20                     MS. WILSON:        No.  The one you
21       went to --
22                     THE WITNESS:       Melanie Beasley?
23                     MS. WILSON:        Melanie.  You said
24       you went -- I think you said earlier, you went to talk
25       to her so you could help her find somebody who would
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                        279
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 280 of 501   Document 80-5

```
 1          listen to her.

 2                    THE WITNESS:          No.  She already had

 3          been telling me and Sojourner Truth House and Lieutenant

 4          Hanley.  On October 5, she told him, she also told

 5          Lieutenant Lipski sitting at the table here about her

 6          sexual assault.  She also told Adam Zieger and Sergeant

 7          Chris Schroeder (phonetic) from IAD, because I was with

 8          her all of those times that she told them what has been

 9          happening to her and nobody was listening to her and

10          they were giving her advice, like, "go get a restraining

11          order.  Then we will do something."  I was not friends

12          with Melanie at the time.  She was a female that was

13          working the late shift, like I was, that I had been

14          responding to more District 5 incidents than I had been

15          District 3 incidents and I would see her and then I

16          would see her break down.  We have an early interven-

17          tion program.  We are trained through the academy that

18          you see anybody in distress, your co-workers, you help

19          them and when you get that information, you give it to a

20          supervisor to handle, and that is exactly what I did.

21                    MS. WILSON:          I have one more

22          question.  The Shorewood officer -- officers I think

23          somebody said -- they stopped your son.

24                    THE WITNESS:          Yes.

25                    MS. WILSON:          They said he -- he
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              280
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 281 of 501   Document 80-5

1    passed the test.  Right?

2                    THE WITNESS:        I got two different

3    answers.  The one that he gave today was that he failed

4    it, saying he got a .09.  I was told he got a .08.

5    Regardless, he should not have been drinking at all.  So

6    whatever penalty he was going to get, he would have to

7    deal with.  I would never interfere with that.  I have

8    other brothers that have been in trouble with the law,

9    and I've never interfered.  They come --  Even the

10   detectives and the officers will call me and ask me,

11   "hey, your brother, John, he just did this, this and

12   this", and I will say, "he did it, he did it.  Then you

13   arrest him."  I never intervene and unfortunately, it

14   has happened several times with one of my brothers.  I

15   have never intervene.  I never ask them to give them

16   leniency.  The only time I told both of my sons is to

17   hand that card over to give it to them to let that

18   officer know that you are not going get searched and

19   that you know the law and you respect the law, because

20   my mother raised me and she is a detective.  So you

21   don't have to pull me out of my car.  It just happened

22   with this.  First of all, not to get into the traffic

23   stop, but why is he even stopped?  The call was to a

24   house.  It didn't mention anything about a blue car.

25   You don't get to pull over a car because it is leaving

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                          281
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 282 of 501   Document 80-5

```
 1        the area.  That is still a moot point just like the moot
 2        point that my son was drinking.  And yes, he would have
 3        had to pay those penalties.  I am not going to interfere
 4        in what he did.  He is a 19-year-old.  He just left
 5        Minnesota on a scholarship to come here and take the
 6        studies at UWM because he wanted to change his major.
 7        He makes those decisions, not me.  I just pay the bill.
 8                        MS. WILSON:        Thank you.
 9                        MS. MC KENZIE:     I have a few
10        questions.  I am going to straight to the Complaint
11        because this is really the basis for pretty much the
12        charges.
13                        MS. WILSON:        Where are you?
14                        MS. MC KENZIE:     The Complaint we
15        received.  I am looking at Page 3 of the Complaint.
16        It says --
17                        MR. PEDERSON:      It should be here
18        somewhere.  Document 5.  Page through it and find
19        Document 5.  It looks like this.
20                        MS. MC KENZIE:     I'm looking at
21        Page 3.  One of the charges against you is that --
22        basically, it states,
23                "Detective Lewandowski indicated that there
24        was no urgency to complete the follow-up and that she
25        intended to meet the other officer instead of conducting
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                        sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 283 of 501   Document 80-5
                                                                    282

1    the follow-up first because 'she had called me and asked
2    me to.'  Detective Lewandowski described that her
3    response to District 5 took precedence over the gun
4    retrieval because that was where she was 'going to go in
5    the first place.'  Detective Lewandowski added that the
6    firearm retrieval was not her assignment."
7                    THE WITNESS:      Yes.
8                    MS. MC KENZIE:      Looking at that and
9    seeing that the charge of "failed to use her time to
10   accomplish the mission of the department", are you
11   disagreeing with the fact that the mission of the
12   department was not to go to Ms. Beasley, but instead, to
13   do the job of gun retrieval?  Are you disputing that?
14                   THE WITNESS:      I am saying this.
15                   MS. MC KENZIE:      So let me backtrack.
16   What was, at that time, the mission of the department?
17                   THE WITNESS:      The mission for
18   Juanita Carr was to retrieve the gun.  I had nothing to
19   do with her assignment.  I didn't know there was
20   exigency in it.  She told me he shot himself and he was
21   a CCCW holder, meaning he was a permit holder.  So she
22   explained it to me, in brief, that he pulled the gun out
23   of his pocket and probably shot himself in the leg.
24   That is all she knew.  That isn't a crime to shoot
25   yourself with your own gun.  It happens all the time.

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              283
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 284 of 501   Document 80-5

1        We don't take people's guns from them for that.  She
                2        explained there was no exigency in it.  I didn't respond
                3        to the hospital, I didn't know that it was more than
                4        that.  I only knew that is what she had told me.  She
                5        wasn't even going go to get the gun a second time.  What
                6        she was going to do was put it into the follow-up, which
                7        day shift would have got it.  I said to her, "hey, I
                8        will go with you.  Let's go and take care of it.  I am
                9        going to go to District 5 first and talk to Melanie
               10        about her report and since you were just there, let's
               11        make some time go by and let people get home if they are
               12        going to get home.  I will go there.  It is only going
               13        to be a brief conversation with her, go over her report
               14        to tell her what I would file and, then, come back to
               15        District 3."
               16                        MS. MC KENZIE:      So you are saying
               17        that was not your assignment.
               18                        THE WITNESS:       That is correct.
               19                        MS. MC KENZIE:     The second part says
               20        here on Page --  Well, you were the driver of the car.
               21        Correct?
               22                        THE WITNESS:      Yes.
               23                        MS. MC KENZIE:     The second part, on
               24        Page 5, it says,
               25                        "The department vehicle was determined to be

        SUSAN K. TAYLOR         262-553-1058        COURT REPORTER
                                sueT@wi.rr.com
        Case 2:16-cv-01089-WED   Filed 04/22/19   Page 285 of 501   Document 80-5      284

```
 1        'totaled' with a value of $4,525.  Detective

 2        Lewandowski, a second detective, and a citizen were all

 3        transported to the hospital for injuries.  Both

 4        Detective Lewandowski and the other detective were

 5        unable to return to work for a significant period of

 6        time.

 7              detective Shannon Lewandowski failed to

 8        operate the vehicle in a safe and courteous manner

 9        while complying with all traffic laws."

10        So in your assessment, you are saying you did not

11        violate this particular charge.

12                    THE WITNESS:      I didn't violate one

13        charge.

14                    MS. MC KENZIE:     I am asking you about

15        this one.

16                    THE WITNESS:      About that one.

17                    MS. MC KENZIE:    Did you operate the

18        vehicle in a safe manner?

19                    THE WITNESS:       I operated the

20        vehicle not only in a safe manner.  Juanita Carr even

21        said if I was speeding, she would have told me so.  I

22        was operating at more of a safe manner because if I

23        wouldn't have had my lights on, the cars that were

24        coming from east to west that had pulled over when they

25        saw my lights would have also been in that intersection.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
                                                        285
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 286 of 501   Document 80-5

```
 1                    MS. MC KENZIE:      So again, let me ask
 2       you, based on police procedure, were you operating your
 3       car in a safe manner?
 4                    THE WITNESS:      Yes.
 5                    MS. MC KENZIE:      Not in your assess-
 6       ment.  I understand your assessment and Juanita's
 7       assessment, but as an employee of the police department,
 8       were you operating your car in a safe manner?
 9                    THE WITNESS:      Yes.
10                    MS. WILSON:        Now, I have a follow-
11       up question to hers.  If individuals shooting themselves
12       is not a crime, then, why would either one of you go to
13       see about the gun, because one of the duties of police
14       officers is to address crimes.  So it looks like neither
15       one of you should have been going.  You should have been
16       doing police work.
17                    THE WITNESS:      First of all, when
18       there is a shooting and people are -- I don't know the
19       whole case because since then, I never -- I only knew
20       that little caption of offering my assistance to
21       Juanita.  I don't know all the semantics of the case.
22       I don't know what happened afterwards.  I don't know
23       that they were lying to her or not.  I wasn't part of
24       her case.  I know about as much as her as all I know
25       about all the other detectives' work out there.  It is
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                            286
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 287 of 501  Document 80-5

```
 1      not my responsibility.  Those are your cases.  I have my
 2      cases, but if you need help, I am the first one who is
 3      going to offer the help.  I am the first one at your
 4      scene.  I am the last one usually at work.
 5                      MS. WILSON:         You are the one who
 6      said that shooting yourself is not a crime.
 7                      THE WITNESS:        She said, "he shot
 8      himself", so it is not a big deal and he is a permit
 9      holder.  It would be a crime if he was a felon and he
10      had possession of a firearm, but this is what I was told
11      from her.  He is a carry concealed weapon, he shot
12      himself in the leg with his own gun and he doesn't want
13      us to have the gun, because that is what I asked when
14      the patrol sergeant walked by.  He said, "did you
15      recover the gun?"  She said she went by herself and I am
16      thinking, "why would you go by yourself?  That is
17      dangerous."  She is, like, because he is just a CCW
18      carrier and he shot himself.  So it is not a big deal."
19      So I just took her word for it.
20                      MS. WILSON:         I apologize.  I
21      thought you said it.  I am sorry.
22                      THE WITNESS:        No.
23                      MS. WILSON:         I have no more
24      questions.
25                      MR. KONRAD:         You said the
```

SUSAN K. TAYLOR          262-553-1058        COURT REPORTER
                          sueT@wi.rr.com
                                                              287
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 288 of 501   Document 80-5

1      detectives are assigned to districts?

2                    THE WITNESS:        Yes.

3                    MR. KONRAD:         What district are you

4      assigned to?

5                    THE WITNESS:        Three and five.

6      Central Division covers three and five.

7                    MR. KONRAD:         That explains why you

8      were going back and forth.

9                    THE WITNESS:        I had a desk at both.

10                   MR. KONRAD:         Just so we are clear

11     on this shooting, the person who was injured reported

12     that they had shot themselves.  Correct?

13                   THE WITNESS:        I don't know what

14     they reported, what they --  Obviously, they lied

15     because they couldn't find the scene for a while.  I

16     don't know.  All I know is that day when I went to

17     District 3 to ask Juanita if she needed any help, she

18     said, "it is not a big deal.  He shot himself and he is

19     a CCW carrier."  I left it at that.

20                   MR. KONRAD:         So you didn't know

21     whether or not her statement was based upon just the

22     report that a person was shot or was it based on a more

23     fuller investigation?

24                   THE WITNESS:        My decision to offer

25     my help just stands.  Her decision in the exigency or

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                    sueT@wi.rr.com
                                                         288
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 289 of 501   Document 80-5

```
 1        the urgency to get it is based on her being a detective
 2        for as long as I have been a detective.  I cannot make
 3        those decisions for her.  That is her case.  Now, if a
 4        lieutenant would have said, "I want you to help her with
 5        that case", I would have said, "give me all the facts.
 6        What do we have going here?"  But I didn't.  I just
 7        offered my help.
 8                        MR. KONRAD:        Thank you.  I think
 9        we will --
10                        I understand you may have follow-up,
11        but you will have a chance for redirect after the cross.
12                        MR. MC GAVER:       Fine.
13                        MR. KONRAD:        So we will adjourn
14        and reconvene tomorrow at 8:30 in Room 301-B.
15        (WHEREUPON, THE DEPOSITION WAS CONDUCTED AT 4:57 P.M.)
16
17
18
19
20
21
22
23
24
25
```

```
1      STATE OF WISCONSIN )
                          )
2      COUNTY OF MILWAUKEE)

3

4                    I, SUSAN K. TAYLOR, do hereby certify

5      that I am a stenographic reporter; that I was present at

6      the hearing in the above entitled action, and that I

7      recorded the same in shorthand; that the above and

8      foregoing is a true, correct and exact copy, in

9      longhand, of my shorthand notes taken at said hearing.

10

11                   Dated this      day of        2016

12

13

14

15

16

17                              SUSAN K. TAYLOR

18                              Court Reporter

19

20

21

22

23

24

25
```

```
 1
                    E X A M I N A T I O N   I N D E X
 2

 3   WITNESS                                      PAGE NO.

 4   SHANNON LEWANDOWSKI

 5   Cross-Exam by Mr. Pederson                   292
     Redirect Exam by Mr. McGaver                 356
 6

 7   SEAN HANLEY

 8   Direct Exam by Mr. Pederson                  363
     Cross-Exam by Mr. McGaver                    381
 9   Redirect Exam by Mr. Pederson                386
     Recross-Exam by Mr. McGaver                  388
10

11   STEVEN KELLY

12   Direct Exam by Mr. Pederson                  390
     Cross-Exam by Mr. McGaver                    396
13

14   ADAM ZIEGER

15   Direct Exam by Mr. Pederson                  400
     Cross-Exam by Mr. McGaver                    409
16

17
                           PHASE II
18
     CARIANNE YERKES
19
     Direct Exam by Mr. Pederson                  440
20   Cross-Exam by Mr. McGaver                    459

21
     CHAD BOYACK
22
     Direct Exam by Mr. McGaver                   464
23

24   SHANNON LEWANDOWSKI

25   Direct Exam by Mr. McGaver                   467
     Cross-Exam by Mr. Pederson                   471
```

```
 1                    MR. KONRAD:      Good morning.  It is
 2      Thursday, August 11, 2016, approximately 8:30 a.m.  This
 3      is a continuation of the hearing in the matter of the
 4      Disciplinary Appeal of Detective Shannon Lewandowski.
 5      My name is Rudolph Konrad.  I am the hearing examiner
 6      presiding over this matter.  The Fire and Police
 7      Commission commissioners here serving on the panel are
 8      Commissioners Kathy Hein, Ann Wilson, and Angela
 9      McKenzie.
10                    We are still in Phase I of the
11      proceeding.  We will begin with the cross-examination
12      of Ms. Lewandowski.
13                    Take the stand.  You are still under
14      oath.
15      CROSS-EXAMINATION BY MR. PEDERSON:
16      Q    I would like to begin with you and Juanita Carr at
17           District 3.  Okay?
18      A    Okay.
19      Q    I would like to get a better understanding of how it was
20           determined that you would go to the house with her to
21           perform the search.  So my first question is, at the
22           time that you did that, did you already know that you
23           were going to go to District 5 first?
24      A    At the time that I volunteered?
25      Q    Yes.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              292
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 293 of 501   Document 80-5

```
1    A    Yes.

2    Q    Did you communicate that to Detective Carr?

3    A    Yes.

4    Q    What did you tell her?

5    A    I said, "do you want to go and try to get the gun

6         again?"  And she said, "yes."  I said, "I will go with

7         you if you want", and she said, "fine."  I said, "but I

8         have to go to District 5 first and handle some business.

9         It shouldn't take that long and, then, we can come back

10        around and do that," and she said, "yes, that is good,

11        because I was just at the house."

12   Q    What was your expectation about when you were going to

13        get back to the house to actually attempt to search?

14                    MR. MC GAVER:      I will object.

15        The question is vague.  Are you asking about the time?

16                    MR. PEDERSON:      I am.

17                    MR. KONRAD:        What was the

18        question?

19   Q    Your plan was to go to District 5 first and, then, go to

20        the house and see if you could perform a search.  Right?

21   A    Yes.

22   Q    Did you have an expectation at the time you left

23        District 5 about when you were going to get to District

24        5, how long it was going to take you and when you were

25        eventually going to get to the house?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
                                                          293
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 294 of 501   Document 80-5

```
 1   A    No.

 2   Q    Do you have any ability to estimate, like, an hour, two

 3        hours?  Anything like that?

 4   A    Maybe half hour, 45 minutes.  I -- if I thought about

 5        it right now, that is probably what it would have taken.

 6        I don't know how long the conversation would have

 7        lasted.

 8   Q    If you got into the house and you found the gun, there

 9        would be some paperwork going.  Right?

10   A    Yes.

11   Q    Would that require some overtime?

12   A    I can't speculate because I could have went to District

13        5 and handled my business within ten minutes or it could

14        have been an hour.  I can't speculate on it.  I offered

15        my assistance to a co-worker.  She accepted it and she

16        agreed to handle it the way we did.

17   Q    You'd agree with me that at the time you left the

18        district, though, you had -- both you and Detective Carr

19        only had two hours left on your shifts.  Right?

20   A    That's correct.

21   Q    As a detective, you are expected to, the extent you are

22        able, to manage your workload so as to minimize, not

23        maximize overtime.  You'd agree with me?

24   A    That is correct.

25   Q    Let's take a step back.  You had previously indicated
```

```
 1      that there was I believe your testimony was a black male
 2      sergeant who had asked Juanita Carr about if she found
 3      the gun.  Was that your testimony?
 4   A  Yes.
 5   Q  Do you know the name of this sergeant?
 6   A  I don't.
 7   Q  But you worked in the district.  Right?
 8   A  Yes.
 9   Q  How long did you work in the district?
10   A  I guess all of my career.
11   Q  Is it unusual that you wouldn't know who the sergeant
12      was that works on the very same shift that you work?
13   A  He doesn't work on my shift.  I think he either works
14      day shift or maybe a power shift.  I have only seen him
15      in passing as a patrol sergeant.  He has nothing to do
16      with anything that I do.
17   Q  Do you know a sergeant by the name of Allen Perry?
18   A  I would have to see his face.  I don't recognize the
19      name.
20   Q  Can you name any black sergeants -- black male sergeants
21      that you are familiar with at District 3?
22   A  Harmon (phonetic).  I don't know.
23   Q  Okay.  So you just said that you don't know the
24      sergeants because they don't have anything to do with
25      what you do.  Right?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                        sueT@wi.rr.com
                                                              295
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 296 of 501   Document 80-5

```
 1   A    Correct.

 2   Q    If that is the case, why is one of those sergeants

 3        getting involved in a detective's investigation and --

 4   A    You would have to ask him about that.

 5   Q    To your knowledge, is there a legitimate and bona fide

 6        reason why a patrol sergeant would regularly ask

 7        detectives about their investigations and ask them about

 8        their follow-up and ask them what they are doing

 9        regarding their investigation?

10   A    I don't know anything about regularly, like, no patrol

11        officer or sergeant, whatever, asked anything regularly.

12   Q    How often do patrol sergeants personally ask you about

13        your investigations and ask you if you performed follow-

14        up?

15   A    Not many, if any.

16   Q    Regarding Lieutenant Hanley at District 3, is it your

17        testimony that he was there, you just didn't speak to

18        him, or that he was not there?

19   A    What are you talking about?

20   Q    I can back up.  You indicated it was not Lieutenant

21        Hanley that spoke to Juanita Carr.  Right?

22                   MR. MC GAVER:        Objection.  Vague

23        as to time.

24   Q    I am still at the station.  I think that is clear.

25                   MR. KONRAD:     You are at the district
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                     sueT@wi.rr.com
                                                    296
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 297 of 501  Document 80-5

```
 1          before -- before Shannon Lewandowski teamed up with

 2          Juanita Carr?

 3                         MR. PEDERSON:        I am still

 4          referencing the occasion where Shannon Lewandowski

 5          served this unknown -- observed this unknown sergeant

 6          speak to Juanita Carr.

 7     A    Did I see the conversation with --

 8     Q    I am saying at or around that time, to your knowledge,

 9          was Lieutenant Hanley at the district station at all?

10     A    I have no idea.  I never saw him.

11     Q    When you left District 5, I believe you indicated before

12          you had a -- when you left District 3 on your way to

13          District 5, I believe yesterday's testimony, you said

14          you had a couple of reasons.  One, to assist Melanie

15          Beasley in a review of filing a felony and this personal

16          or this other business concerning her personal safety

17          concerns.  Right?  You had two functions?

18     A    Yes.

19     Q    My question for you now is, to your knowledge, regarding

20          the filing of the felony, when did that felony occur?

21     A    I don't recall because I didn't make it to her to talk

22          to her about it.

23     Q    The information that you were going to provide her, is

24          there a reason why it had to come from you and couldn't

25          come from a supervisor or another person at District 5?
```

SUSAN K. TAYLOR          262-553-1058        COURT REPORTER
                        sueT@wi.rr.com
                                                              297
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 298 of 501   Document 80-5

```
 1  A    You'd have to ask Melanie that.  I don't know.  She
 2       asked for my help.  Detectives assist officers all the
 3       time and I was going there to do that.  It was in my
 4       district anyway.
 5  Q    You'd agree with me that one of the functions of
 6       supervisors at districts is to assist their officers in
 7       the very thing that you are saying you were going there
 8       to assist her with.  Right?
 9  A    I am a detective, not supervisor.  That is their
10       responsibility.  If an officer asks me for help at a
11       crime scene, especially a felony, I will offer that
12       help.  I am going to give it to them.
13  Q    I appreciate that, but that wasn't responsive to my
14       question.  Based on your knowledge and experience,
15       isn't the type of issue that you were going there to
16       assist her on was the filing of a "felony matter" is the
17       exact type of thing that supervisors are supposed to
18       assist their officers with in the district and that is
19       one of their basic functions, in fact?
20  A    My experience isn't as a supervisor or a lieutenant or a
21       sergeant.  I have never worked in that capacity.  I have
22       never been trained in that capacity.  However, felony
23       investigations are part of detectives' work, so they are
24       part of my job assignment and so if somebody needs help
25       with them, that is what I am there for.
```

```
 1   Q   Do you regularly cross from one district to another to
 2       assist officers in basic functions of their job?
 3   A   In my division, yes.  In Central, I work in Three and
 4       Five.  The majority of my assignments are in District 5.
 5   Q   You were a very busy person.  Right?  At that time.
 6       In terms of your workload and your caseload.  Right?
 7   A   I am sure I was.
 8   Q   Sure.  You knew the search needed to be done for the
 9       gun.  Right?
10   A   I guess so.
11   Q   Is it a true and accurate statement to say that you
12       decided on your own to prioritize the assistance and
13       going to see Melanie over the search for the gun?
14   A   No.
15   Q   How is that wrong?
16   A   I didn't make that decision.  Juanita did.  I offered
17       my assistance and she accepted it.  I told her I had
18       to stop at District 5 and she agreed.  It was her
19       assignment.  I didn't know the exigency of it, the
20       urgency.  I didn't know a supervisor instructed her.
21       All I knew is that she already went and I agreed to go
22       with her a second time.
23   Q   Well, if you are going to volunteer yourself, would you
24       agree with me that you bear some responsibility in
25       confirming what needs to be done, why and what the time
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                         299
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 300 of 501   Document 80-5

1            frame is?

 2    A    No.  If she tells me -- if another coworker tells me

 3            they need assistance, "hey, we are going to go do a

 4            search warrant, we are going to go do a knock-and-talk,

 5            can you come along with us?"  I don't ask any questions

 6            at that point unless they are offering me the informa-

 7            tion.

 8    Q    I am going to refer to Document No. 9.  Please retrieve

 9            that.  Go to the third page.  I would direct your atten-

10            tion to the third line where it says, "there was no

11            exigency."  Do you see it?

12    A    That is correct.

13    Q    I will read it.  Please follow along.

14                "There was no exigency in retrieving the gun,

15            since the victim of the shooting shot himself with his

16            own gun.  The victim is not a felon and legally owned

17            his gun when he accidentally discharged it, striking

18            himself.  There was no reason to retrieve the gun that

19            the Sergeant from District 3 requested Detective Carr

20            do.  I did not know this information at the time, only

21            that Detective Carr wanted to return to his home a

22            second time."

23            Did I read that correctly?

24    A    Yes.

25    Q    All right.  So when did you become aware of that infor-

SUSAN K. TAYLOR            262-553-1058         COURT REPORTER
                          sueT@wi.rr.com
                                                           300
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 301 of 501   Document 80-5

```
 1       mation if you didn't know it then?

 2   A   It is misconstrued that I didn't know this information

 3       at the time.  I meant the information that it was more

 4       than what Juanita said it was; a CCW holder accidentally

 5       shooting himself, that it was actually something along

 6       the lines of a domestic dispute and there was some

 7       exigency in getting it, but I didn't know any of that

 8       information.  I didn't know anything about that at the

 9       time.  Other than what that says right there, that he

10       shot himself with his own gun and he didn't want to give

11       the gun back.

12   Q   If I understand your testimony, everything that you

13       listed here, you actually did know at the time.

14   A   Yes.

15   Q   So you did have some knowledge of underlying facts

16       related to the matter.  Right?

17   A   I testified to that yesterday that I knew that.

18   Q   And so therefore, do you ask or wonder to yourself that

19       is it possible that perhaps this victim isn't a victim

20       at all and in fact, is covering up, lying, about having

21       been shot and therefore, should be important to get the

22       gun for another reason?

23   A   You are suggesting that I know everybody's -- other

24       detectives' business.  You reiterated that I had my own

25       caseload, which I did.  I am not interested in those
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                   301
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 302 of 501   Document 80-5

1    details unless they ask me to be involved in their case.
2    So you are assuming that I should know everybody's
3    business and everybody's assignments.  If you ask me to
4    do some follow-up, I will help you with it.  If I am
5    assigned follow-up from a supervisor, then, I am going
6    to reach in differently, I am going to read all the
7    reports, I am going to question a detective who is
8    handling it so that I know how to treat the situation.
9    When I am going with a detective who is assigned to it,
10   that is all I need to do.
11 Q   But you would agree with me that these facts that you
12   have here, there is plenty of reasons why that may not
13   be known to you at the time, why it may be actually
14   exigent and more to the story.  You are acknowledging
15   that is true.  Right?
16 A   You are asking me to speculate about something --
17                MS. MC KENZIE:      Can you just answer
18   the question to the best of your knowledge?  Do not
19   argue with the attorney, please.
20 A   I do not -- I don't know how to answer what you are
21   saying.  You are asking me to speculate.  I don't know.
22 Q   At some point, you had an interview with Sergeant
23   Zieger.  Right?
24 A   Yes.
25 Q   Why didn't you tell him at the time that you had this

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
                                                          302
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 303 of 501   Document 80-5

```
1        dual purpose and only told him at your interview about
2        the single purpose of going to assist her regarding her
3        personal issues?
4    A   I don't remember if I omitted that.  I would have to
5        listen to that tape over again.
6    Q   I am presenting to you, and you should know for yourself
7        that Sergeant Zieger testified to that, so I am asking
8        you, you don't have the benefit of reviewing it.  I am
9        asking you now, can you account for why you didn't,
10       according to the testimony of Sergeant Zieger?
11   A   I believe that I did say that to him.  I believe it
12       was in April, I told him the dual reason is why.  I
13       addressed both of those.  So if he is stating that I
14       didn't say it, I am not saying I agree with it.  I
15       would have to listen to it because I believe at that
16       time, which I have not even returned to work at that
17       time, I was still under treatment, I don't recall what
18       I said that day.
19   Q   Did you include in any of your written statements the
20       fact that you were aware that Juanita Carr had already
21       searched it just immediately prior to you leaving
22       District 5?
23   A   No.
24   Q   Why not?
25   A   I didn't feel there was a need to.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                303
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 304 of 501   Document 80-5

```
1   Q   Wouldn't you agree with me that that is an important
2       fact which justifies why you could go ahead and put off
3       another search, because you were already there?
4   A   If someone would have asked me, I would have told them
5       that, but I never was asked.
6   Q   You had been writing reports for a very long time.
7       Right?
8   A   Yes.
9   Q   It is important to include all salient facts.  Would you
10      agree with me?
11  A   Yes.
12  Q   And it is important to be detail oriented?
13  A   Yes.
14  Q   So my question for you is, don't you agree with me that
15      it is an important fact that Juanita Carr had just
16      searched the house a short time before you had left
17      District 5 as it relates to why you are not going there
18      right away?
19  A   I didn't know I had to be accountable for that purpose.
20      That should have been in Juanita Carr's report.
21  Q   Is there a reason why you didn't say that in the
22      interviews -- or your interview with Adam Zieger?
23  A   I did say that.
24  Q   You are indicating that you told Adam Zieger in your
25      interview that Juanita Carr informed you that she had
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                        sueT@wi.rr.com
                                                              304
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 305 of 501   Document 80-5

```
 1       already searched the house once before she --
 2    A  No, that she was responsible for her assignment.
 3    Q  So, then, you would agree with me that the first time
 4       we have ever heard that Juanita Carr searched the house
 5       just before or shortly before you --  Let me back up.
 6       Would you agree with me that it was at this hearing the
 7       first time it was revealed that Juanita Carr attempted
 8       to search the house at issue shortly before the time
 9       that you met up with her and left District 5?
10    A  I don't know what Juanita Carr said in her hearing with
11       Zieger.
12    Q  I am asking, coming from you, is that the first time we
13       heard it?
14    A  From me personally, yes.
15                    MR. KONRAD:        I am confused with
16       the question and answer.
17                    MR. PEDERSON:      Do you want me to
18       restate it?
19                    MR. KONRAD:        Exhibit 9 is October
20       of 2015, her statement.  She says that, "I didn't know
21       the situation at the time."  Then, she says only that
22       Detective Carr wanted to return to the home a second
23       time.
24                    My question is, could you tell me again
25       what you meant by that sentence?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                         305
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 306 of 501   Document 80-5

```
 1                    THE WITNESS:      He just asked me about
 2      "we."  This is the first time we heard it and I already
 3      knew at the district, that Juanita had been to the
 4      house.  So I volunteered to go a second time and he
 5      asked me if we -- if this is the first time we heard it,
 6      all of us, and I said, "yes, I guess so."
 7                    MR. KONRAD:       So your answer is the
 8      first time that all of us heard it, not the first time
 9      you heard it.
10                    THE WITNESS:      The first time I
11      heard it was at the district on the 19th from Juanita
12      herself.
13                    MR. KONRAD:       You said this was
14      not in any of her written statements.  Counsel, which
15      written statements are you referring to?  Her PI-21 or
16      the --
17                    MR. PEDERSON:      The exhibits that
18      have been submitted, the three separate exhibits that
19      have been submitted, including Exhibit 9.
20                    MR. KONRAD:       Thank you.
21      BY MR. PEDERSON:
22   Q  I would like to move forward in time to the -- when you
23      are driving in the car and on east North -- west North
24      Avenue approaching North 35th Street.  Okay?
25   A  Yes.
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                    sueT@wi.rr.com
                                                    306
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 307 of 501   Document 80-5

```
 1   Q   You have indicated that you turned on the emergency
 2       lights between 36th and 35th.  Is that right?
 3   A   Yes.
 4   Q   If I recall your testimony correctly yesterday, it is
 5       not that there was a car coming out in front of you for
 6       sure, but you just thought it was possible and so it was
 7       just a cautionary measure.  Is that right?
 8   A   No.  I said the car was impeding traffic in the bicycle
 9       lane and half of my lane and its brake lights came on
10       and off and so as I was approaching it, I let them know
11       on a short notice that I was coming around them.
12   Q   I guess my question, then, is that this wasn't a close
13       call or anything.  This was more of a cautionary
14       measure of, "he might pull out in a second.  I am going
15       to go ahead and do this blurp -- I think you called
16       it -- and notify him so -- just to be extra safe so he
17       doesn't pull out while I am going around him."
18   A   I felt he might be pulling out because his brake lights
19       came on and off.
20   Q   This was not a quick action by you, like, a sudden,
21       unexpected thing.  You saw this as you are coming up
22       that "he is blocking traffic, I am going to need to go
23       around him" and you took this measure just as part of a
24       calculated measure as you were approaching.  Right?
25   A   Yes.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              307
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 308 of 501   Document 80-5

```
1   Q    If you are in a personal vehicle without the benefit of
2        emergency lights, would you agree with me that someone
3        would simply slow down, make sure there is no oncoming
4        traffic and go around the vehicle?
5   A    That is what I did in this vehicle, also except I
6        illuminated the lights.
7   Q    Why did you feel that was necessary?
8   A    I just felt it was necessary.
9   Q    Is there a reason why simply slowing down and going
10       around the vehicle was not going to be adequately safe?
11  A    It was just a little bit more safe with the lights.
12  Q    Are you trained to use your lights in this matter?
13  A    If someone is impeding traffic, we can use the lights
14       to go around them.  It is part of the horn.  The horn is
15       past the lights.  In order for me to get to the horn, I
16       have to go on the toggle switch past the lights to the
17       horn.
18  Q    Would you agree with me that you are trained to be
19       cautious in how you use emergency lights and sirens?
20  A    Yes.
21  Q    Why is that?
22  A    They are used for emergencies.
23  Q    Would you agree with me that it is possible --  Strike
24       that.  Would you agree with me that one of the reasons
25       why you are trained to be cautious is because turning on
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                   308
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 309 of 501   Document 80-5

```
 1          lights and sirens suddenly in the midst of traffic can
 2          be distracting and you can actually create a more
 3          hazardous situation with people responding to it?
 4     A    I never experienced turning on emergency lights and
 5          people being distracted even more.  We use the lights
 6          to block off streets when we have crime scenes.  We have
 7          lights on at parades.  We use the lights for several
 8          different non-emergency reasons.  So this was a way for
 9          me, because I don't have a horn just to beep, to go
10          around the car in a safe manner and let him know not to
11          pull out.  It is just that simple.
12     Q    So if this is a calculated move on your part, you just
13          do a quick notice to him, like, a horn, why do you leave
14          it on?
15     A    I couldn't tell you.  I don't believe I did leave it on,
16          but I don't remember after I hit the car.
17     Q    It is your testimony that you were traveling approxi-
18          mately how fast at the time of the collision?
19     A    30 or less.
20     Q    Just to try to clarify something.  In your testimony,
21          you said you didn't have a horn in your vehicle.  Is
22          that right?
23     A    The horn doesn't work on there.  You use it on the
24          toggle switch.
25     Q    What function does the horn have?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                        sueT@wi.rr.com
                                                                    309
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 310 of 501   Document 80-5

```
 1   A    I guess none.

 2   Q    Isn't there one of those air horns on the side that is

 3        attached to the vehicle?

 4   A    I don't know what you are referring to.  Air horn?

 5   Q    Yes.  Is there another piece of equipment on the vehicle

 6        that allows you to employ it so it makes a horn noise, a

 7        regular loud horn noise?

 8   A    Yes.  On the toggle switch past the lights.

 9   Q    Is it accurate --  Do you recall stating in your PI-21

10        that you purposely left the emergency lights on?

11   A    I don't recall.

12   Q    Were you wearing your seat belt at the time of the

13        accident?

14   A    I believe so.

15   Q    Yesterday, you testified about how TAC officers

16        responded to the scene.  Do you recall that testimony?

17   A    Yes.

18   Q    If I understand your testimony correctly, you were

19        indicating that that was somehow unusual that TAC

20        officers would respond to the scene of an accident.

21        Is that right?

22   A    I actually believe I testified that it would not be

23        unusual.

24   Q    Very good.  Then, you would agree with me that TAC

25        officers, while they do have special assignments as part
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              310
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 311 of 501   Document 80-5

```
 1           of TAC, they also do regular patrol as well during the
 2           course of their tour of duty.  Right?
 3     A     No, I don't believe they do patrol, but they might
 4           respond to two deceased detectives.
 5     Q     Let me ask the ultimate question so this will be easier.
 6           Would you agree with me that there is nothing unusual
 7           about the fact that there was a number of TAC officers
 8           that responded to the scene where you were in an auto
 9           accident?
10                     MS. WILSON:        I didn't hear you.
11                     MR. PEDERSON:        I tried to sum up in
12           a simple question if she would agree with me that there
13           would be nothing unusual about TAC officers responding
14           to the scene of an accident that she was involved in.
15     A     Just them responding?  Nothing unusual.
16     Q     Is there anything unusual about TAC officers being there
17           at the scene that you were involved with?
18     A     Yes.
19     Q     Can you please explain why?
20     A     Because they made statements apparently to Sergeant
21           Riley who said that I was making these statements and
22           they didn't remain on the scene.  They didn't write a
23           report.  They weren't interviewed.  If they are going to
24           take part of what I am babbling on the scene, then every
25           person who responds per SOP to a crime scene has to
```

1      write a report about what they heard or saw.

     2   Q  You indicated this was --  Strike that.  It is your

     3      testimony that every single officer at a crime scene has

     4      to file a report?

     5   A  Every officer who responds to a crime scene is supposed

     6      to write a report based on what they did or heard or saw

     7      before the end of their shift.

     8   Q  Would you agree with me that supervision has discretion

     9      on who should and should not write reports?

    10   A  Yes.

    11   Q  Would you agree with me that supervision has an interest

    12      in getting the reports from only key personnel, espe-

    13      cially when there are large numbers of officers who

    14      respond just due to efficiency?

    15   A  Yes.

    16   Q  So would you agree with me that it is not necessarily

    17      unusual that not every single officer filed a report

    18      that was at that scene?

    19   A  I find it highly unusual that a sergeant, specifically

    20      Adam Riley, stated that he heard statements from other

    21      officers on the scene.  He did not hold them, remain

    22      there to be interviewed by detectives.  He didn't ask

    23      them to write a report about what they heard me say,

    24      so everything was, "I heard something to the effect of

    25      I heard she was going to do this or that," but there is

     SUSAN K. TAYLOR          262-553-1058      COURT REPORTER
                          sueT@wi.rr.com
                                                         312
     Case 2:16-cv-01089-WED   Filed 04/22/19   Page 313 of 501   Document 80-5

```
 1        absolutely -- Sergeant Riley isn't here, Sergeant Zieger
 2        didn't seek those people out to find out who were those
 3        people on the scene who heard me say those statements?
 4        So yes, I find it troubling that I am responsible for
 5        somebody else's assignment according to how your ques-
 6        tioning goes, but here, the most important thing is
 7        something that I am saying and being held accountable
 8        to have someone get my son and those officers didn't
 9        write a report and we don't even know who they are.
10   Q    What else is unusual about the fact that the TAC
11        officers were there and what they did to you?
12   A    I don't think there is much else that I remember.
13   Q    Didn't you testify yesterday that you believe that they
14        were making up the story regarding your statements about
15        wanting to go to your son at UWM as part of a retalia-
16        tion toward you?  Wasn't that your testimony?
17   A    My testimony wasn't that they made it up.  My testimony
18        is that they said it and there was no reports done, no
19        questioning of them and the TAC officers that did show
20        up, I recognized them from TAC.  I don't know their
21        names.  There is no report done and at the same time, I
22        am responding to Melanie Beasley at District 5 for the
23        exact same problem of a TAC officer who had sexually
24        assaulted her, with a valid temporary restraining order
25        filed at her district, yet she was getting no help from
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              313
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 314 of 501   Document 80-5

```
 1        supervision there and it is kind of ironic that I am
 2        being disciplined for hearsay when I am asking those TAC
 3        officers who were at the scene to write that report and
 4        be interviewed, like, I want them to tell exactly what I
 5        said and tell the truth.  It is not available.  So I am
 6        going to go see Melanie and for some reason, there is no
 7        exigency of going to help a female officer who had been
 8        sexually assaulted at the district.  Apparently, that is
 9        not important to this department.
10   Q    When did this alleged sexual assault occur?
11   A    You would have to ask Melanie Beasley on that.  However,
12        I do know that October 5, 2014, I told Lieutenant Hanley
13        and, then, Lieutenant Hanley looked his picture up on
14        the computer to see who I was talking about.  Then, I
15        gave the IP address of that computer to Sergeant Zieger
16        so he could see that he did look it up and that somehow
17        got lost.  Then, Melanie Beasley told Lieutenant Timothy
18        Leitzke for an hour on November 11 and told -- for an
19        hour and ten minutes about how she was sexually
20        assaulted, harassed and threatened by a TAC member of
21        the department, and he has not done anything about it.
22        Then she went to --
23   Q    Let me stop you there.
24             MR. KONRAD:        This line of
25        questioning, you may continue it, but the whole premise
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
                                                            314
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 315 of 501   Document 80-5

```
 1          seems to be based upon the idea that there were some

 2          very exact statements made to -- of that incident.  The

 3          way I read the report, these statements were pretty

 4          ambiguous.  For example, just something about her son.

 5          She had to get her son.  I don't recall exact words.

 6          Something to the effect.  You may continue, but --

 7                    MR. PEDERSON:      I don't think the

 8          context --

 9                    MR. KONRAD:      I don't see a clear

10          accusation, nor do I see conspiracy.  You can go ahead,

11          but you should -- we should recognize the nature of

12          these statements on both sides.

13                    MR. PEDERSON:      I do have a purpose

14          that is unrelated to what the issue is that you are

15          raising right now.

16          BY MR. PEDERSON:

17     Q    I want to be clear.  The sexual assault did occur

18          months prior to when the accident occurred.  Right?

19     A    I am not sure of the date.

20     Q    But it was months.  You are indicating that she was

21          complaining about it in November of 2014.  Right?

22     A    Are you saying from the accident date?

23     Q    Yes.

24     A    Yes.

25     Q    You would agree with me that the district attorney
```

```
  1        reviewed the case where Melanie Beasley made that

  2        allegation.  Correct?

  3   A    Yes.

  4   Q    And you are aware that the DA decided not to process

  5        and issue charges in that case.  Correct?

  6   A    Yes.

  7   Q    I want to get some clarification.  Why was it so urgent

  8        at that moment, because the way you are testifying, it

  9        sounds like this just happened and you said it happened

 10        at the district.  I want you to clarify those points.

 11        Why was there such an urgency for you to do it at that

 12        time?

 13                   MR. MC GAVER:     I'll object.  It is

 14        vague.  What is she supposed to have been doing at that

 15        time?

 16                   MR. PEDERSON:     I don't understand

 17        the objection.

 18                   MR. MC GAVER:     You asked what was

 19        she doing at the time?

 20                   MR. PEDERSON:     Yes.  I will try to

 21        re-ask it.

 22                   MR. MC GAVER:     The question is

 23        vague.

 24                   MR. KONRAD:       I assume the question

 25        is, "why were you going to Five instead of checking on
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              316
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 317 of 501   Document 80-5

```
1          the gun?"

2                         MR. PEDERSON:        No.  That is not the

3          question.  I will re-ask it.

4          BY MR. PEDERSON:

5     Q    You just testified that you're on your way to District 3

6          and District 5 and it is this urgent thing, or at least

7          that is the impression I get, because she is suffering,

8          she just -- of the sexual assault and it is a big deal.

9          That is the impression I am getting from your testimony

10         and I want to understand why, then, at that moment is it

11         such a big deal -- the sexual assault, while terrible,

12         if it occurred, occurred months ago and there is no

13         urgency or immediacy for you personally to be going

14         doing this.  So please explain to me.

15                         MR. MC GAVER:        I am going to

16         interject another objection.  I think the question is

17         still ambiguous.  I think it is irrelevant at this

18         point.  I have let it go on for a while.  We seem to be

19         going nowhere and spinning our wheels.  My objection is

20         the question is vague, ambiguous, irrelevant.

21                         MR. KONRAD:         The question has been

22         asked and answered.  In previous testimony, she had

23         explained that she didn't because there had been a

24         previous search of the house.  There was no urgency to

25         go back immediately.  I will sustain the objection.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
                                                              317
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 318 of 501   Document 80-5

```
 1       BY MR. PEDERSON:

 2    Q  So is it your testimony today that the TAC officers were

 3       involved in a conspiracy and retaliation against you due

 4       to the whole situation with Melanie Beasley's accusa-

 5       tions and that whole thing?  Is that your testimony?

 6       I can't be any more plain than that.

 7                   MR. MC GAVER:       Same objections.  I

 8       will reiterate my relevance objection.  It is the same

 9       question asked in a different manner.

10                   MR. PEDERSON:       It goes to her

11       credibility.  She's provided this testimony.  I should

12       be able to examine her on her credibility.

13                   MR. KONRAD:         I think it would

14       expose any bias she might have that might affect her

15       testimony, so go ahead.

16       BY MR. PEDERSON:

17    Q  Is that your testimony?

18    A  Can you rephrase or say this again?

19                   MR. MC GAVER:       It might be good to

20       have the court reporter read it back.

21                   MR. PEDERSON:       Sure.

22       (Question read)

23    A  No.  I said it appears that way.  Here I am, asking

24       Internal Investigations to contact those TAC officers

25       who are on the scene that overheard me say that I was
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                            318
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 319 of 501   Document 80-5

```
 1          going to UWM or to get my son, but all there is in the
 2          report is hearsay and rumors at the district and I
 3          wanted them to nail those people down and say, "hey,
 4          what exactly did you hear?  What exactly did you see her
 5          -- her actions?"  None of that was done.  So yes, it
 6          just seems quite funny.  I am trying to get a fair
 7          judgment here and I can't even get Internal to do
 8          something fair for me.
 9                    MS. MC KENZIE:     So, then, your issue
10          is with the process and not necessarily the information
11          at this time.
12                    THE WITNESS:      That is correct.
13          BY MR. PEDERSON:
14      Q   Yesterday, you testified that you knew where your son
15          was.  Right?
16      A   That is not true.
17      Q   What did you say, then?
18      A   Depends when you are talking.  When he called me first
19          or when he told me at the hospital?
20      Q   Your testimony yesterday, my recollection, is at the
21          accident scene, you were trying to figure out where he
22          was and have somebody contact him and you were offering
23          these suggestions of different agencies where the police
24          might -- the officers around you might try to figure out
25          where he is.  Do you recall that testimony?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
319
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 320 of 501   Document 80-5

```
1   A    Yes.

2   Q    At that time, you said you got very frustrated because

3        you knew where he was.  Why don't you just go get him?

4   A    I said that?  I never said that.

5   Q    That is my recollection.

6   A    Your recollection isn't correct.

7   Q    What did you know, then?

8                    MR. MC GAVER:       The question is

9        ambiguous.  I will object.

10                   MR. KONRAD:        Could we focus on

11       what time we are talking about?  Immediately after the

12       accident?

13                   MR. PEDERSON:       I am at the accident

14       scene.

15  Q    What did you know about the location of your son?

16  A    Absolutely nothing.  Excuse me.  Other than he was on

17       the east side.

18  Q    Your testimony is therefore, from knowing he is on the

19       east side, this is what led you to just, sort of, deduce

20       that maybe he is at UWM and to contact them.  Is that

21       right?

22  A    That is not the correct order.  The first thing that was

23       asked of me was from Officer Joe Goggins who asked me

24       what the phone number was of my son.  When I couldn't

25       give him the correct phone number for whatever reason,
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              320
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 321 of 501   Document 80-5

```
 1          I recall asking them to call District 5 console to see
 2          if a District 5 officer was on a traffic stop, because
 3          District 5 is the east side.
 4    Q     You had the phone, didn't you?
 5    A     Juanita did, yes.
 6    Q     You didn't have your phone in your hand personally
 7          yourself?
 8    A     When are you talking about?
 9    Q     At the accident scene after the accident occurred.
10    A     I don't recall.  All I know is I had the phone because
11          I called 911 in the car, but I don't recall what
12          happened to my phone after.  I think Deb Stacey may have
13          had my phone.
14                    MR. PEDERSON:      I have a document
15          that I would like to introduce, but I only have one
16          copy.
17                    MR. MC GAVER:      If I can take a look
18          at it beforehand.
19                    MR. KONRAD:        Is this phone
20          records?
21                    MR. PEDERSON:      Yes.
22    Q     Can I ask you what your son's phone number is?
23    A     414-405-5138.
24    Q     What is your phone number?
25    A     414-405-4617.
```

```
 1                    MR. PEDERSON:       Thank you.

 2                    MS. MC KENZIE:      What is your son's

 3      number again?

 4                    THE WITNESS:        414-405-5138.

 5                    MR. PEDERSON:       This will be

 6      Exhibit 14.

 7                    MR. KONRAD:         You are stipulating

 8      to its admission?

 9                    MR. MC GAVER:       I would like to have

10      him introduce it first.

11      (A document was marked as Exhibit No. 14)

12      BY MR. PEDERSON:

13   Q   I am presenting you a document marked for identification

14       as number 14.

15   A   Yes.

16   Q   Do you see it?

17   A   Yes.

18   Q   What is it?

19   A   My phone bill.

20   Q   Is it correct to say on this phone bill, this is a bill

21       for two phone numbers?

22   A   Yes.

23   Q   These two phone numbers are the phone numbers which you

24       just provided, that is your cell number and your son

25       Jordan's cell number?
```

```
 1   A    Yes.

 2   Q    I direct your attention to Page 19 of 20.  Do you see

 3        it?

 4                  MR. MC GAVER:       Does anyone mind if I

 5        look on with the witness?

 6                  MR. PEDERSON:       I have no objection.

 7   A    Yes.

 8   Q    Is it correct to say that these are the phone call logs

 9        of the phone number for your son including the date of

10        January 19 --

11   A    Yes.

12   Q    -- of 2015?

13   A    Yes.

14   Q    I would direct your attention somewhere around the

15        middle where it indicates on January 19 at 2:11 a.m.

16        Do you see it?

17   A    Yes.

18   Q    Am I correct in stating that this phone record indicates

19        that your son placed a phone call to your phone number

20        at 2:11 a.m. and it lasted for two minutes?

21   A    Yes.

22   Q    Would it be correct to say this occurred approximately

23        five, six minutes or so before your accident?

24   A    Yes.

25   Q    Is this phone call where he informed you that he was
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                   323
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 324 of 501   Document 80-5

```
 1        stopped by the police?

 2   A    Yes.

 3   Q    Can you put in your own words what was indicated in that

 4        statement?  How did that conversation go?

 5   A    He said, "Mother, I am pulled over."  I said, "where you

 6        at?"  He said, "I don't know."  I said, "what are you

 7        pulled over for?"  He said, "I don't know."  I said,

 8        "when you find out, just call me back."  He is, like,

 9        "okay."  I heard some conversation on the phone and

10        eventually, he just hung up.  I tossed my phone to

11        Juanita and said, "when my son calls, just answer it.

12        Jordan got stopped."

13   Q    He said he doesn't know and that doesn't cause you

14        concern.  Is that right?

15   A    I don't understand what would be concerning about why he

16        doesn't know.

17   Q    You previously testified that you have great concerns

18        over the safety of your son when he has contact with

19        police and you are very protective of him and very

20        concerned about his safety, et cetera, so I am just

21        curious in itself that under this circumstance, he

22        notifies you he's been stopped, he can't give you any

23        details, and this doesn't concern you.

24   A    Because he doesn't know.

25   Q    I now direct your attention to Page 12 of 20.  Is it
```

```
 1        correct to say this page contains the phone record logs

 2        for your phone calls for the time period at issue?

 3   A    Yes.

 4   Q    Again, I direct your attention to about the middle of

 5        the page, just to correspond, 2:11 a.m., it states it

 6        is from "unavailable" and it lasted two minutes.  Right?

 7   A    Incoming call at 2:11.  Yes.

 8   Q    But we know just now, having looked at your son's

 9        records, that that was his phone call to you, even

10        though it states "unavailable."  Right?

11   A    Right.

12   Q    I direct you two entries down, 2:17 a.m.  Do you see it?

13   A    Yes.

14   Q    Am I correct to say that that was a phone call to your

15        son's phone?

16   A    Yes.

17   Q    I direct your attention one entry down, three minutes

18        later, 2:20 a.m.  Do you see it?

19   A    Yes.

20   Q    That was another call to your son's phone.

21   A    That is correct.

22   Q    Two entries down, 2:25 a.m., it indicates a phone call

23        from "unavailable."  Is that right?

24   A    Yes.

25   Q    Then another one from "unavailable" at 2:31?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 326 of 501   Document 80-5
325

```
 1    A    Yes.

 2    Q    And, then, another call at 2:45 to your son.  Right?

 3    A    Yes.

 4    Q    Please go back to Page 19.  Are you there?

 5    A    Yes.

 6    Q    I direct your attention to the middle of the page,

 7         2:25 a.m.  The second entry for 2:25 a.m.  Do you see

 8         that?

 9    A    Yes.

10    Q    This is from the records of your son's phone.  Is that

11         right?

12    A    Yes.

13    Q    It indicates that at 2:25 a.m., he made a phone call to

14         your phone and that call lasted three minutes.  Right?

15    A    Yes.

16              MS. WILSON:        Excuse me.  Are you

17         saying -- since I don't have the piece of paper, are you

18         saying there was two calls made at 2:25 a.m.?

19              MR. PEDERSON:      Yes.  I will clarify

20         it with the witness.

21    Q    Looking at the records, Ms. Lewandowski, is it correct

22         that there are two entries of outgoing calls from your

23         son's phone at 2:25 a.m.?

24    A    Yes, there are.

25    Q    One is for one minute and the other is for three
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 327 of 501   Document 80-5    326

| 1 | | minutes? |
|---|---|---|

1     minutes?

2  A  Yes.

3  Q  Have you had a chance to look and at and review this
4     document?

5  A  With you just now.

6  Q  Do you believe this to be a true and accurate copy of
7     your phone bill and an accurate representation of the
8     logs?

9  A  Sure.

10           MR. PEDERSON:     I would like to move
11    it into evidence.

12           MR. MC GAVER:     No objection.

13           MR. KONRAD:       Exhibit 14 is
14    received.

15 Q  My question to you is that you have just seen that there
16    was a number of calls between your phone and his phone
17    immediately following the time of the accident.  Would
18    you agree with me on that?

19 A  Yes.

20 Q  Did you place any of those calls?

21 A  No.

22 Q  Do you have any idea who did?

23 A  Idea?  Either probably Joe Goggins or Deb Stacey or
24    William Krumnow.  I don't know.  I don't know who had my
25    phone.

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                        327
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 328 of 501   Document 80-5

```
 1   Q    Would you agree with me, based on your own son's
 2        testimony, that if there was a three-minute call at
 3        2:25 a.m., that that is likely when, according to his
 4        testimony, Sergeant Smith answered the phone and spoke
 5        to someone who advised him that you had been in an
 6        accident.  Right?
 7   A    I can't speculate because I don't have any idea how long
 8        he was on that traffic stop, when he got picked up.
 9        That could have been Jordan calling for me on my phone.
10        It could have -- I have no idea.  I don't know if it
11        logs in one minute or two minutes.
12                  MR. KONRAD:         I think you answered
13        the question.  You can't speculate.
14   Q    I am not asking you to speculate.  I am just asking you,
15        is that consistent with the testimony that's been
16        provided, to your knowledge?
17                  MR. MC GAVER:        I will object.  I
18        think she answered the question, that she didn't know.
19                  MR. PEDERSON:        All right.  I will
20        move on.
21        BY MR. PEDERSON:
22   Q    You were transported to the hospital, Froedtert, from
23        the scene.  Is that right?
24   A    Yes.
25   Q    Do you now know an approximate time you arrived at the
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                               328
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 329 of 501   Document 80-5

```
 1        hospital?

 2   A    No.

 3   Q    When you were at the hospital --  Strike that.  I want

 4        to ask you about the nature of your injuries.  I believe

 5        yesterday, you testified that you had two black eyes.

 6        Is that right?

 7   A    Yes.

 8   Q    When did those develop?

 9   A    About three days after.

10   Q    On the day of the incident, I am wondering, can you tell

11        me what your appearance was at the time?  If someone

12        were to look at you when you were at the hospital, what

13        would they see in terms of injuries?

14               MR. MC GAVER:      I will object.  I

15        don't think this witness is qualified to identify the

16        nature of how her injuries appeared.

17               MR. KONRAD:        She can describe her

18        injuries, but I don't think she can describe how they

19        appeared to others.

20               MR. PEDERSON:      My question to her --

21        My question to her is a simple thing based on her

22        knowledge of herself.  Did she have any obvious injuries

23        to her body or anywhere.  That is my question.  I think

24        she is competent to answer that.

25               MR. MC GAVER:      I will renew my
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    329
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 330 of 501   Document 80-5

```
 1      objection.

 2                      MR. KONRAD:        What injuries did you

 3      have?

 4                      THE WITNESS:       That were visible?

 5                      MR. KONRAD:        When you were in the

 6      hospital, how do you believe you were injured?

 7                      THE WITNESS:       I had bruising and

 8      swelling on my entire chest because of the air bag blew

 9      and hit me and on my neck and I had the start of

10      swelling on my nose which ended up giving me black eyes.

11      My right foot was double or triple the size.  They took

12      photos of the foot.  I have pictures that I have taken.

13      I can get those.  I looked like I was disheveled in the

14      car accident.

15  Q   I would like to talk again.  Still at the hospital,

16      this time regarding Lieutenant Hanley.  I want to

17      clarify your testimony regarding that.  You already

18      testified you never spoke to him.  Correct?

19  A   Correct.

20  Q   Did you see him at all?

21  A   At the hospital?

22  Q   Yes.

23  A   No.

24  Q   Are you aware that he was actually at the hospital?

25  A   He said he was.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                        330
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 331 of 501   Document 80-5

```
 1   Q     I am asking you.  Did you have personal knowledge at
 2         any time that he was actually at the hospital?
 3   A     No.
 4   Q     Could you please locate Document No. 10 in front of you?
 5         Do you have it in front of you?
 6   A     Yes.
 7   Q     Go to the last page.  Is it correct to say this is one
 8         of your written statements?
 9   A     This is my written statement.
10   Q     I would direct your attention to the top line, last word
11         where it says "lieutenant."  Do you see it?
12   A     Yes.
13   Q     I will read it.
14                   "Lieutenant Hanley was at the hospital
15         and never asked me how I was, nor asked me what
16         happened."
17         Did I read that correctly?
18   A     Yes.
19                   MS. MC KENZIE:      What page is that?
20                   THE WITNESS:       The last page.
21                   MR. PEDERSON:      The last page.  Would
22         you like me to reread it?  I'll indicate for the record
23         that she shook her head "no."
24   Q     Can you explain that discrepancy?
25   A     Yes.  I was at the hospital January 19, 2015.  I went to
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                             331
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 332 of 501   Document 80-5

```
 1          IAD in April before I was even healed.  I read a report
 2          with my union representative that said that Lieutenant
 3          Sean Hanley was at the hospital and I wrote this subse-
 4          quently after November 12, 2015, several months after
 5          finding out that he was at the hospital and he never
 6          came and talked to me and he never came and talked to me
 7          at my house and has never called me on the phone to see
 8          how I was.  That is why in this report on November 12,
 9          2015 --
10     Q    I want to follow up with that and try to clarify your
11          testimony.  Is it your testimony, then, that as you sit
12          here today, you dispute or believe that he was not
13          actually there?
14     A    I am not saying he was or wasn't there.  I am saying
15          that he didn't talk to me.
16     Q    So if Lieutenant Hanley indicates that he was, in fact,
17          there, you wouldn't dispute that and say that he is
18          wrong about that or lying.
19     A    No.  If he says he was there, he was there.  He just
20          didn't talk to me.
21     Q    Very good.  Thank you.  I will now direct your attention
22          to the phone call that you placed to Lieutenant Hanley.
23          Do you know what I am referencing?
24     A    Yes.  6:38.
25     Q    Since we have the records, please get your phone
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              332
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 333 of 501   Document 80-5

```
 1        records.  Go to Page 12.  Approximately five entries

 2        from the bottom, it indicates "January 19, 5:24 a.m."

 3        Do you see that?

 4   A    Yes.

 5   Q    It lists there a phone number ending "1573."  Is that

 6        right?

 7   A    Yes.

 8   Q    That is Lieutenant Hanley's personal cell phone number.

 9        Is that right?

10   A    If you say it is -- I have him in my cell phone as

11        Lieutenant Sean Hanley.  I don't memorize the numbers.

12   Q    I can follow up on that with Lieutenant Hanley, but for

13        now, I'd like you to assume that the phone number ending

14        in "1573" is Lieutenant Hanley's phone number and if it

15        is, you'd agree with me that you placed the phone call

16        to him that lasted one minute.  Is that right?

17   A    Yes.

18   Q    Then, I'd ask you to go to the next page.  And the

19        second entry --

20                    MR. KONRAD:        What was the date of

21        that phone call?

22                    MR. PEDERSON:      January 19, 5:24 a.m.

23                    MS. WILSON:        That was '14?  I

24        don't know what year.

25                    MR. PEDERSON:      2015.
```

SUSAN K. TAYLOR          262-553-1058        COURT REPORTER
                         sueT@wi.rr.com
                                                              333
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 334 of 501   Document 80-5

```
 1                    MS. WILSON:          5:20.

 2                    MR. PEDERSON:        No.  5:24 a.m.

 3       BY MR. PEDERSON:

 4   Q   Are you aware how calls that are placed out, but not

 5       answered are recorded on this log here?

 6   A   They get a minute.

 7   Q   So you would agree with me that if it says "one minute"

 8       on this phone call, it doesn't necessarily mean that you

 9       spoke to him for one minute.  It could mean that you

10       called him and he didn't answer?

11   A   That is correct.

12   Q   Then on Page 13, second entry, that entry indicates that

13       there was a phone call placed on January 19, 6:38 a.m.

14       to Lieutenant Hanley's personal cell phone from your

15       phone and this log indicates that phone call lasted

16       seven minutes.  Do I have all of that correct?

17   A   Yes.

18   Q   With those facts established, can you indicate to me,

19       why did you call Lieutenant Hanley at 5:24 a.m.?

20   A   Probably to see if he was going to come talk to me at

21       the hospital, because I was being discharged.

22   Q   What did you want to talk to him about?

23   A   The accident.

24   Q   At that time, you believed you were in a proper state

25       to have that discussion.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                        sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 335 of 501   Document 80-5   334

```
1    A    I cannot say I was in a proper state, but like I
2         explained yesterday, you just don't go home.  You have
3         to talk to somebody and let them -- I am thinking he is
4         going to come and see how I am at a minimum.
5    Q    You heard Lieutenant Hanley indicate that it is depart-
6         ment policy that they have three days to conduct the
7         interview with you after an accident?
8    A    I wasn't referring to the interview.  I was just
9         referring to he is being my lieutenant, wanting to care
10        about me being in an accident.
11   Q    That was the purpose of the 5:24 call?  It was just an
12        informal conversation you wanted to have with him, more
13        of a friendly conversation?
14   A    No, not informal or friendly.  I was just involved in
15        an accident.  I wanted him to -- if he was going to come
16        and interview, talk to me, see if I was okay, let him
17        know that now I am leaving the hospital and where my gun
18        is and where my belt is.  I had a series of questions
19        for him and to let him know that now, I am leaving.
20        Does he want me to wait or does he want me to go home
21        with my family?
22   Q    You are indicating you left the hospital at around
23        5:24 a.m.?
24   A    I don't remember when I left.
25   Q    At 6:38 a.m., you placed another call to him.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                        sueT@wi.rr.com
                                                                335
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 336 of 501   Document 80-5

1    A    Yes, and I was home at that time.

2    Q    How far did you live at that time?

3    A    Not far.  The border of Wauwatosa.

4    Q    Can you estimate how many minutes it might take --

5    A    I live off of 53rd and Washington Boulevard -- or I

6         used to -- and it would take five, six minutes to

7         probably get to Froedtert and, mind you, I did go to

8         District 3 from the hospital first.  Then, I went home,

9         which from District 3, my house is, like, five, six

10        blocks.

11   Q    With all of that said, are you able to provide me any

12        estimate of how long that might have taken you?

13   A    When I got released, approximately between 5:24 and 6:38

14        a.m.

15   Q    At 6:38 a.m., you got ahold of Lieutenant Hanley and

16        actually spoke to him then.  Is that right?

17   A    Yes.

18   Q    You have indicated that his report is inaccurate.  That

19        is right?

20   A    Yes.

21   Q    I don't believe in your testimony yesterday, you

22        specified exactly what you told him at that time, so I

23        would like to get that in the record.  What did you tell

24        him at that time?

25   A    When I reached him on the phone call at 6:38 a.m., I

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              336
Case 2:16-cv-01089-WED    Filed 04/22/19    Page 337 of 501    Document 80-5

```
 1          asked him if he was going to come and talk to me at my
 2          house.  I wanted to take some pain medication and I
 3          wanted to go to sleep at that point.  So I didn't want
 4          to take it until I knew.  He said he wasn't and I said,
 5          "do you want to know what happened?"  He said, "yes, go
 6          ahead.  Tell me."  I said, "I was driving with Juanita."
 7          I just probably did a synopsis of it.  I don't know
 8          exactly what I said, but that I was in the accident
 9          going to District 5 and officers are already calling and
10          telling me that Sergeant Riley is stating that I was
11          going to intervene in a traffic stop with my son and I
12          said, "none of that is true, that Melanie is on her way
13          over to my house so if someone wants to talk to her and
14          my son is here.  You can talk to them."
15     Q    Did you take notes of your phone call with him?
16     A    No.
17     Q    So if I understand you correctly, what you are saying --
18          what your testimony is today is that you provided
19          essentially the same information that you provided in
20          your written memorandums that followed.  Right?
21     A    What memorandums are you talking about?
22     Q    Your Response to Charges, your interview, all of your
23          follow-up statements that you have made since you had
24          that phone call with Lieutenant Hanley.
25     A    I am not sure what you are saying, "all my follow-up
```

    SUSAN K. TAYLOR         262-553-1058         COURT REPORTER
                            sueT@wi.rr.com
                                                              337
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 338 of 501   Document 80-5

```
 1              statements."  I just made this statement about the phone
 2              call, which is a lot more elaborate than what is in that
 3              synopsis on the memo.  What specifically are you talking
 4              about?
 5    Q    You recall giving a statement to Adam Zieger.  Right?
 6    A    Yes.
 7    Q    And in that statement, which is contained in his summary
 8         which is an exhibit, certain statements of you are
 9         recorded regarding what you were doing at the time of
10         the accident.  Right?
11    A    Yes.
12    Q    I don't know if I have to rehash everything you said,
13         but what I am addressing is the fact that you were with
14         Juanita Carr, that you were going to go to District 5
15         first, et cetera, et cetera.  Right?
16    A    Yes, those two things.
17    Q    Do you understand your statements that I am referencing
18         now?
19    A    Do you want to go to the report so you can show me which
20         one specifically you are talking about?
21    Q    No, I don't.  I am asking you in total, the statements
22         that you made to Adam Zieger referencing what you were
23         doing that night and the facts and circumstances
24         surrounding it.  Do you recall your statements, in
25         general?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              338
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 339 of 501   Document 80-5

```
1   A    Like I said, that was in April and I don't recall all
2        the statements as I sit here today of what I said, but
3        if you want go to the document, that is fine.  I don't
4        remember even how long it lasted.  I know that my union
5        representative, Shawn Lauda, was there, and I was there
6        and Zieger and somebody else and asked me questions and
7        I answered them.  I will be more than happy if you want
8        to look at what statements you are referring to.  I made
9        statements.  I don't remember all of them.
10  Q    Did you tell Lieutenant Hanley that you were traveling
11       at approximately 45 miles an hour?
12  A    Absolutely not.
13  Q    What did you tell him regarding your speed?
14  A    I am not quite sure I even told him how fast I was
15       going.  I don't think he even asked.
16  Q    Would you agree with me that your recollection of the
17       events were better closer in time to when they occurred
18       than it is today?
19  A    It is hard to say because I don't remember exactly what
20       I said in April.  That is why it is recorded, because I
21       explained to him during that interview that I had a hard
22       time expressing myself.  It said on there that I was
23       stuttering and that I was trying to make things clear to
24       him, but because of my head injury, just to bear with
25       me.  So I can't sit here and talk vaguely about a
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
                                                        339
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 340 of 501   Document 80-5

```
 1          conversation that probably took a half hour or took an
 2          hour with a head injury back in April.
 3     Q    That is fine.  I have asked you if you stated you were
 4          going 45 miles an hour.  You said no.  And that you
 5          don't recall if you said anything about how fast you
 6          were going.  Is that your testimony?
 7     A    To Sean Hanley.
 8     Q    During this phone call on the morning of January 19,
 9          yes.
10     A    I don't recall saying if I was going any speed, much
11          less 45.
12     Q    Detective Hanley indicates in his report that you told
13          him that while driving to District 5 to see Melanie
14          Beasley, you got a phone call from your son indicating
15          where he had been stopped by UWM police, so you were
16          driving to the area of UWM first to find your son and he
17          was going to call you when he found out exactly where he
18          was.  Did you make that statement?
19     A    Absolutely not.
20     Q    What statement did you make to him in regard to your son
21          and what you were doing?
22     A    When I was explaining to him that officers were telling
23          me that I was on my way to UWM, I told him that I was
24          not.  I was going to District 5 and I was going to deal
25          with Melanie and I was not -- contrary to what rumors
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              340
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 341 of 501   Document 80-5

```
 1     were being said, I was not going to UWM police.  First
 2     of all, that doesn't even make sense because when I made
 3     that phone call at 6:38 a.m. on the 19th, I already knew
 4     where my son was.
 5                    MR. PEDERSON:      Ms. Lewandowski, I'll
 6     stop you.  Restrict to yourself answering my question.
 7  A  I'm sorry.  That was answering that question.  My son
 8     wasn't stopped by UWM police and I already know that he
 9     wasn't.  So why would I lie?  I'm, like, no.
10                    MR. PEDERSON:      Ma'am, please.  The
11     question to you is not whether the question makes sense.
12     The question to you was, what did you say regarding?
13     That is it.  So restrain yourself to the question.
14                    MR. KONRAD:        If you would repeat
15     what --
16                    MR. PEDERSON:      I am ready to move on
17     to the next question.  That answer can stand.  I just
18     was -- she was no longer responsive, so I am moving to
19     the next question.
20     BY MR. PEDERSON:
21  Q  Lieutenant Hanley reports that you indicated that your
22     emergency lights were on, but that you were not
23     operating as an emergency vehicle.  You just had them on
24     to make cars pull over and get out of your way.  Did you
25     make that statement to him?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                    sueT@wi.rr.com
                                                          341
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 342 of 501   Document 80-5

```
 1   A   Absolutely not.

 2   Q   What did you say to him regarding why your emergency

 3       lights were on?

 4   A   That there was a car impeding traffic.  I thought it

 5       was going to pull out because its brake lights went on.

 6       I slowed down, went around it and just wanted to alert

 7       with a horn, but in order to alert with a horn, I have

 8       to go past the lights, like, all one motion.  The lights

 9       first, then, the siren.  I didn't leave the siren on.

10       It was a blurp.  So I moved it to the right and I went

11       around the car.

12   Q   Detective Hanley, then, reports that you stated that

13       there was probably video on North Avenue that would show

14       the accident.  Did you make that statement to him?

15   A   Yes.

16   Q   What were you referring to when you made that statement?

17   A   I was referring to three spots that I know there is

18       video.  I took a shooting there probably a month or two

19       before and I knew exactly where there would be video at

20       three different locations that would probably catch the

21       entire accident and what happened prior.  I gave him a

22       list of the three spots.

23   Q   Did it turn out that there was any video?

24   A   He said there wasn't any located at Subway.  I don't

25       know if he checked the cameras on 35th and Garfield
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 343 of 501   Document 80-5          342

```
 1        which see the traffic coming north from south where
 2        Ms. Johnson was traveling and, then, there was another
 3        camera, I told him, on a church that would see me
 4        coming, traveling east.  I don't know if that was ever
 5        recovered.
 6   Q    Is it a correct statement to say that at the time that
 7        you were talking to Lieutenant Hanley, it was your
 8        belief that there was a high likelihood that there was
 9        going to be some video depicting this accident
10        occurring?
11   A    Yes.
12   Q    Would you agree with me that there are very stark
13        contrasts between what Lieutenant Hanley reported you
14        told him versus what you are testifying to that you told
15        him?
16   A    Most definitely.
17   Q    Would you agree with me that these are not the sort of
18        inconsistencies that could be explained away by a mis-
19        understanding, a simple misstatement, something like
20        that?
21   A    That is why I asked to see his memo book.
22                  MR. PEDERSON:      That doesn't answer
23        my question.
24                  THE WITNESS:      Can you repeat it?
25   Q    Sure.  My question to you was, would you agree with me
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
                                                          343
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 344 of 501   Document 80-5

1          that the contrasts, the discrepancies between those two

2          versions are so stark, that this can't be a simple

3          matter of a misunderstanding.  These are two completely

4          different versions of events.

5     A    Yes.

6     Q    When Lieutenant Hanley created this report, it is fair

7          to say that he either is lying or misrepresenting the

8          truth purposefully, or you are.  Isn't that right?

9     A    You would have to ask him that, but I am not.

10    Q    I am not asking you to speculate, but do you possess any

11         facts or knowledge as to why Lieutenant Hanley would

12         purposefully misrepresent the facts?

13    A    I went into that yesterday with the fact that I was

14         responding to District 5 with a matter that he and

15         District 5 lieutenants were already aware of and that

16         is exactly how we are trained through the early

17         intervention program; to help officers.  When they are

18         in trouble, to help each other.  That is exactly what I

19         was doing, because she was not getting that help through

20         supervision.  I felt it was very jaded.

21    Q    If you answered my question, I didn't understand it and

22         I apologize.  Do you have any facts or knowledge as to

23         what would motivate Lieutenant Hanley to misrepresent

24         the facts of your statement?

25    A    You would have to ask him that.

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 345 of 501   Document 80-5   344

```
1   Q    Again, that is not -- is the answer to the question --

2   A    You are asking me to surmise and speculate again.  That

3        is what that question is asking me; what is in his mind.

4        You have to ask him that.

5                    MR. KONRAD:        I think the answer is

6        "no."

7                    MR. PEDERSON:      Thank you.

8        BY MR. PEDERSON:

9   Q    You would agree with me that Lieutenant Hanley's version

10       of the statement would expose you to discipline.  Right?

11  A    That is correct.

12                   MR. MC GAVER:      Objection.  It calls

13       for speculation.

14                   MR. PEDERSON:      She has a knowledge

15       of the SOPs and the consequences and experience

16       regarding this.

17                   MR. KONRAD:        She had no problem

18       answering it, so I will overrule the objection.  I am

19       going to go back and I am going to sustain the objec-

20       tion.  I am going to strike the answer.  What bothers

21       me about the question is, at what time period?  Are you

22       referring to when she gave the answers or when she saw

23       the report later?  At what point do you think she would

24       be --  You are asking her about whether she believed she

25       would be subject to discipline.  When she gave the
```

SUSAN K. TAYLOR          262-553-1058       COURT REPORTER
                        sueT@wi.rr.com
                                                       345
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 346 of 501   Document 80-5

1   answers or when she saw the report?

2                   MR. PEDERSON:      I suppose we can go

3       with both.

4                   MR. KONRAD:      She called him.

5                   MR. PEDERSON:      Yes.

6                   MR. MC GAVER:      Then, I will object

7       on relevance grounds.  What she believed would subject

8       her to discipline doesn't matter to whether she was

9       actually subject to discipline, which is why we are

10      here.

11                  MR. PEDERSON:      Well, it goes to

12      credibility and motive to change her story.

13                  MR. KONRAD:      I think it goes to

14      the care with which a person would answer questions.  It

15      is one thing to an accident investigation calling up

16      saying, "here is what happened."  It is another thing to

17      get served with a PI-21 and you are questioned.  I think

18      one would naturally be more careful perhaps in one

19      situation than the other.  Let's go to that issue.

20                  MR. PEDERSON:      I can restate the

21      question, if I may.

22      BY MR. PEDERSON:

23  Q   Would you agree with me that if you had actually made

24      the statements that are attributed to you by Lieutenant

25      Hanley during the phone call that occurred on January

SUSAN K. TAYLOR          262-553-1058      COURT REPORTER
                         sueT@wi.rr.com
                                                        346
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 347 of 501   Document 80-5

1    19, that that could potentially subject you to

2    discipline and you would have known that at the time?

3  A  Yes.

4  Q  As a matter of follow-up, isn't it also true that

5    whenever you reviewed this report as it was written by

6    Lieutenant Hanley, at that time, you became aware that

7    his version of what you said at that time could subject

8    you to discipline?

9  A  I was just more shocked.  I was more shocked than

10    anything and that's expressed on tape when I read it in

11    April and, then, I subsequently had a PI-21, saw it the

12    same day that I was questioned.

13            MR. KONRAD:    A matter of clarifi-

14    cation.  The first time you saw Lieutenant Hanley's

15    statement was after you were served PI-21?  When is the

16    first time you saw it?

17            THE WITNESS:    The first time I saw

18    it was the day that I was standing in the hallway going

19    to talk to Sergeant Zieger with my union representative.

20    When I read it, I cried and I was distraught and I was

21    very upset with my union representative, Shawn Lauda,

22    standing there, because I couldn't believe what he had

23    written.

24            MR. KONRAD:    But that is the first

25    time you saw it.

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
                                                    347
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 348 of 501   Document 80-5

```
 1                    THE WITNESS:       The first time.

 2                    MS. HEIN:          How long was that

 3        between the accident?  I means, are we talking days or

 4        months?

 5                    THE WITNESS:       January to April.

 6        I had not returned to work until August.

 7        BY MR. PEDERSON:

 8    Q   At the time you had the phone call conversation with

 9        Lieutenant Hanley on January 19, what was your expecta-

10        tion of what he was going to do with the information you

11        were providing him?

12                    MR. MC GAVER:      That calls for

13        speculation.

14                    MR. PEDERSON:      I am asking her what

15        was her expectation.  She knows what is in her own mind.

16                    MR. MC GAVER:      That is my objection.

17                    MR. KONRAD:        It is overruled.

18                    Go ahead.

19    A   The question, again, was, what was I expecting to

20        happen?

21    Q   Yes.

22    A   I was expecting that my supervisor would come to my home

23        or arrange to come to the hospital while I was there to

24        ask me what happened or to see if I was okay.

25    Q   Let me stop you again.  That is not responsive.  My
```

        SUSAN K. TAYLOR         262-553-1058      COURT REPORTER
                            sueT@wi.rr.com
        Case 2:16-cv-01089-WED   Filed 04/22/19   Page 349 of 501   Document 80-5    348

```
 1        question was, what was your expectation regarding the

 2        phone statements that you were giving Lieutenant Hanley

 3        at that time?  What was he going to do with that infor-

 4        mation that you provided him?

 5                        MR. MC GAVER:       That calls for

 6        speculation.  She is being asked to speculate as to what

 7        Lieutenant Hanley would have done with a statement that

 8        she may or may not have made.

 9                        MR. KONRAD:         At the time you spoke

10        to the lieutenant, did you have any idea of what he

11        planned to do with the information?

12                        THE WITNESS:        No.  I called him

13        so he knew where I was.  I was leaving the hospital,

14        waiting for him to come and now going home wanting to

15        know if I can take medication or I can go to sleep or --

16        or find my gun.  I had a series of questions.  There is

17        also reports that need to be written that he has to do

18        so he can know what was going on and for the medical

19        section so I can get treatment.

20        BY MR. PEDERSON:

21   Q    You already testified that you asked him if he wanted to

22        know what happened.  Right?

23   A    Yes.

24   Q    You went into, not excruciating detail, but you gave

25        him a full summary of what happened.  Right?
```

SUSAN K. TAYLOR         262-553-1058      COURT REPORTER
                        sueT@wi.rr.com
                                                      349
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 350 of 501   Document 80-5

```
 1   A    I gave him a summary, yes.

 2   Q    The facts and circumstances that led to you being with

 3        Juanita Carr in that vehicle, where you were going, what

 4        your intent was, what were the other attending facts and

 5        circumstances surrounding it.  Right?

 6   A    No.

 7   Q    You were aware, as you just testified, that Lieutenant

 8        Hanley was responsible for creating an accident report.

 9        Right?

10   A    Or some form of report.  I am not sure if he is respon-

11        sible for an accident report.

12   Q    You were aware that Lieutenant Hanley would have to file

13        a report concerning information he gathers in statements

14        made from people who were involved in the accident.

15        Right?

16   A    I imagine so.

17             MR. PEDERSON:        Sorry for no segue

18        here.  I have, sort of, a few clean-up questions here.

19   Q    Do you recall indicating on your written responses to

20        charges that Ms. Johnson was under the influence of

21        THC at the time?

22   A    Yes, I received that information from the court liaison

23        that they were sending -- because I was asking why there

24        wasn't any charges for causing injury.  He said they

25        were sending her bloodwork back out because it was
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
                                                           350
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 351 of 501   Document 80-5

```
1         either positive for THC or some other unknown drug.
2         When I wrote that, that is the information that I
3         received from the court administration liaison that was
4         handling my case.
5    Q    You'd agree that you never actually reviewed the
6         toxicology report?
7    A    No.
8    Q    So you have no factual knowledge of what it says or does
9         not say?
10   A    No.
11   Q    And if I were to indicate to you that there is no
12        indication that that was even tested for, you wouldn't
13        be able to dispute that, based on your personal know-
14        ledge?
15   A    I have no idea.
16   Q    Yesterday, you testified that your son lives on Mary-
17        land?
18   A    Yes.
19   Q    In fact, he was the -- the location where he was, was on
20        Maryland.  Right?
21   A    Yesterday, I said I don't know if he was on Murray or
22        Maryland.  I don't know what -- I think it is Maryland
23        or Murray.  They are right by each other.
24   Q    So he lives in the exact area where he was stopped.
25   A    No.  That is in Shorewood.  He lives in Milwaukee.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                351
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 352 of 501   Document 80-5

```
 1    Q    How far is that?

 2    A    At least six blocks, because he lives on the -- his

 3         address is 3040 -- either Maryland or Murray, and the

 4         incident traffic stop in Shorewood is the 3600 block,

 5         so that is six blocks into a different jurisdiction.

 6    Q    You'd agree with me he was approximately six blocks

 7         from his personal residence when he was stopped by the

 8         Shorewood Police Department.

 9    A    Yes.

10                   MR. PEDERSON:      That is all I have

11         for cross.

12                   MR. MC GAVER:      I have some questions

13         for redirect, but can we take a short break?

14                   MR. KONRAD:        Sure.  Until 20

15         after.

16         (Discussion off the record)

17                   MR. KONRAD:        We are ready to

18         proceed.  Before you do your redirect, I will have the

19         commissioners ask any questions if they have any.

20                   MS. MC KENZIE:      I have a question.

21         At the time when you spoke to Lieutenant Hanley at that

22         6:38 a.m. telephone conference call that you had with

23         him, did you talk at all about your son being pulled

24         over?  Did you express that to him at all?

25                   THE WITNESS:      Yes.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                                352
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 353 of 501   Document 80-5

```
 1                    MS. MC KENZIE:      You did.  Okay.

 2                    MS. WILSON:          That car that you

 3       were involved in the accident with was going north or

 4       south and you were going east.  Was the car headed north

 5       or south?

 6                    THE WITNESS:        Her car was headed

 7       north and mine was east.

 8                    MS. WILSON:          I thought yesterday,

 9       that I heard something about a prostitute or something

10       about turning on the lights.  Was this the same car you

11       thought was going to pull out?

12                    THE WITNESS:       Yes.

13                    MS. WILSON:          Is the process or

14       procedure, do most detectives make their own decisions

15       about where they are going and when they are going and

16       if they are going?

17                    THE WITNESS:        If they are not on

18       assignment, yes.  Sometimes on an assignment also, if it

19       leads you to another house, you decide that is where you

20       have to continue to do the investigation and you, your-

21       self, make that decision.  Sometimes, a lieutenant is on

22       the scene.  Most of the time.  Sometimes, there is not.

23                    MS. WILSON:          So you didn't have to

24       get permission to go with Detective Carr.

25                    THE WITNESS:        No.
```

SUSAN K. TAYLOR        262-553-1058       COURT REPORTER
                       sueT@wi.rr.com
                                                              353
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 354 of 501  Document 80-5

```
 1                    MS. WILSON:         You didn't have to
 2    get permission to go to the fifth district.  You can
 3    just go.
 4                    THE WITNESS:        Yes.  I can just go.
 5                    MS. WILSON:         So you never told
 6    Lieutenant Hanley that you were going to the fifth
 7    district or anybody other than Detective Carr.
 8                    THE WITNESS:        Right.
 9                    MS. WILSON:         So you regularly just
10    volunteer to go wherever with somebody if -- I don't
11    want to say you do it for everybody, but if you don't
12    have as much to do, you just volunteer, "I will go with
13    you."  Right?
14                    THE WITNESS:        It is about how you
15    handle your time.  If it is 1:00 in the morning, I am
16    not going to go to somebody's house to interview them on
17    a Monday or a Sunday and wake them up to talk to them
18    about something that I can talk to them preferably in
19    the morning or have day shift do that follow-up.  It
20    just depends.  I usually keep myself available before I
21    get an assignment to help whoever is on the assignment,
22    because we are very short-handed.  I just volunteer.
23                    MS. WILSON:         In this document,
24    nine, where it says that you didn't know the information
25    at the time, only that Detective Carr wanted to go a
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                      sueT@wi.rr.com
                                                           354
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 355 of 501   Document 80-5

```
 1      second time, I am confused.  Could you clarify when you
 2      and Detective Carr left, what exactly did you know about
 3      where she was going?
 4                      THE WITNESS:        I knew that the two
 5      of us were going to go to District 5 and then come back
 6      and do a second check for the gun.  She said she had
 7      already been there, but I didn't know that -- I didn't
 8      know that getting the gun was exigent or not exigent.
 9      It was her just telling me, you know, "can you come with
10      me and get the gun?  I have already been there.  Do you
11      want to go right back?"  I have to go to District 5.
12      "No, we can just go to District 5 together and come back
13      around and get it done."   I didn't know any facts of
14      the case other than she said, "a dude shot himself and
15      he is a CCW carrier.  I don't even understand why they
16      want us to get the gun."  That was the conversation we
17      had.
18                      MS. WILSON:        Did I hear you say
19      that Detective Carr had searched the house when she went
20      there the first time?
21                      MR. PEDERSON:        No, ma'am.  I might
22      have, you know, used some shorthand language.
23                      MS. WILSON:        Okay.  The other
24      question -- and he may have answered it -- how long
25      have you lived in this area?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                                    355
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 356 of 501   Document 80-5

```
 1                    THE WITNESS:        My whole life.

 2                    MS. WILSON:         And how long has your

 3      son lived in this area?

 4                    THE WITNESS:        Almost his whole life

 5      except a year, he went to school in Minnesota; college.

 6                    MS. WILSON:         Okay.  Thank you.

 7                    MR. KONRAD:         Okay.  There being no

 8      more questions, we will now proceed with redirect.

 9                    MR. MC GAVER:       Thank you.

10      REDIRECT EXAMINATION BY MR. MC GAVER:

11   Q  You were asked some questions about the shooting that

12      occurred -- on cross-examination, the shooting that

13      occurred on January 18 or 19, somewhere in there.  It

14      later came out, through some investigation, that the

15      shooting may have been a part of a domestic violence-

16      related incident.  When, if ever, did you find out about

17      that aspect of the investigation?

18   A  Like, months and months later when some detectives

19      called me up.  I wasn't returned to work yet.  They said

20      they had to do the follow-up to go get the gun and they

21      were complaining about it.

22   Q  Fair to say that when you rode with Detective Carr on

23      the 19th, that you weren't privy to that piece of the

24      information?

25   A  No.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                         356
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 357 of 501   Document 80-5

```
 1                    MR. MC GAVER:      There's been testi-
 2          mony -- in fact, you were asked questions on cross-
 3          examination about your response to certain of these
 4          charges, labeled Exhibit 9.  Can you pull that out for
 5          me?  Tell me when you have it.
 6                    THE WITNESS:        Okay.
 7      Q   I want you to turn to the last page.  Mr. Pederson asked
 8          you some questions about the last sentence in the first
 9          paragraph.
10                    "I did not know this information at the
11          time, only that Detective Carr wanted to return to his
12          home a second time."
13          Now, the question I have is, you were asked on cross-
14          examination -- and I just want to make it very clear
15          that -- I will ask you whether the first time that you
16          presented the information about Detective Carr going to
17          this house, not one time, but two times, was at this
18          hearing or was it previous?
19      A   Can you say it again?  Sorry.
20      Q   It was probably a poorly phrased question.  This report
21          was dated October 11, 2015.  Correct?
22      A   Correct.
23      Q   And that report contains a reference to there being two
24          attempts by Detective Carr to retrieve the gun at the
25          home.  Correct?
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
                                                          357
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 358 of 501   Document 80-5

```
1    A    Yes.

2    Q    You wrote that report.  Correct?

3    A    Yes.

4    Q    So you disclosed that to the department at least on

5         October 11, 2015.  Right?

6    A    Yes.

7    Q    So they are not hearing about that.  No one in the room

8         who has been privy to this report should be hearing

9         about that for the first time.  Is that correct?

10   A    Yes.  This is at a minimum, the first time, much less

11        when she told them.

12   Q    You were also asked some questions about what you would

13        have done approaching the intersection of 35th Street

14        and North -- 36th Street and North before you got to

15        that intersection if you were driving a civilian

16        vehicle.  And what I mean by a "civilian vehicle," I

17        mean one that is not equipped with lights and siren.

18        Are you with me so far?

19   A    Yes.

20   Q    Would you have operated your horn when you saw that car

21        come out in the manner that it did, tapping its brake

22        lights as you described it?

23   A    Yes.

24   Q    Is it fair that you might have flashed your bright

25        lights if you saw the car operating in that manner
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    358
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 359 of 501   Document 80-5

| 1 | | driving a civilian car? |
| 2 | A | I could have, yes. I am sure I would have beeped my |
| 3 | | horn more and still traveled the same way. |
| 4 | Q | You testified that you turned your lights on in order |
| 5 | | to chirp the siren or blurp the siren. Correct? |
| 6 | A | Yes. |
| 7 | Q | Did you intend to leave your emergency lights on as you |
| 8 | | traveled through the intersection of 35th and North? |
| 9 | A | No. |
| 10 | Q | Just a matter of happenstance that it happened? |
| 11 | A | It is just a matter of once I got around the car, I |
| 12 | | could see through the cell phone store window the car |
| 13 | | coming down 35th Street. I could see the lights going |
| 14 | | around in the glass and I knew. That is when I looked |
| 15 | | up at the green light. I wasn't concerned about turning |
| 16 | | those lights off at that time. |
| 17 | Q | What is the distance you traveled from the moment in |
| 18 | | time that you turned your emergency lights on to the |
| 19 | | moment of impact? |
| 20 | A | Less than a block, three-quarters of a block. |
| 21 | Q | How long would that have taken, if you remember? |
| 22 | A | I have no idea. |
| 23 | Q | You were asked about your phone records and spent a lot |
| 24 | | of time on cross-examination talking about the phone |
| 25 | | records that were generated on January 19, 2015. Let |

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              359
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 360 of 501   Document 80-5

```
 1         me ask you.  From the two-minute phone call that you
 2         admitted and testified that you had with your son while
 3         he was in the process of being stopped by a Shorewood
 4         police officer to the point in time where your son was
 5         brought to the hospital, did you have any contact
 6         whatsoever with Jordan Lewandowski?
 7    A    None.
 8    Q    No telephone contact?
 9    A    No.
10    Q    No face-to-face contact?
11    A    No.
12    Q    No text messages?
13    A    No.
14    Q    Thank you.  The three-minute phone call that was
15         referenced in those phone records, one where, I think,
16         the testimony came out that Sergeant Smith answered the
17         phone, were you a party to that telephone conversation?
18    A    No.
19    Q    You didn't make that phone call?
20    A    No.
21    Q    The first phone call referenced in the records, the
22         5:24 a.m. phone call on January 19, 2015, do you recall
23         whether -- I think it was generated by you.  Do you
24         remember whether Lieutenant Hanley picked up the phone?
25    A    I don't recall.  I don't think so.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              360
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 361 of 501   Document 80-5

```
 1   Q    Then, as a result of the seven-minute phone call that
 2        you had with Lieutenant Hanley at 6:38 a.m., did
 3        Lieutenant Hanley ever follow up from that phone call
 4        that was generated and occurred on the same morning that
 5        the accident occurred?  Did he ever follow up?
 6   A    Like, with me or with the assignment?
 7   Q    With you.
 8   A    No, not at all.
 9   Q    Did he ever ask you anything more about that accident
10        after you hung up the phone?
11   A    No.
12   Q    Just so we are clear, the first time you heard about the
13        apparent discrepancies between your conversation with
14        Lieutenant Hanley on the phone and the AIMS report that
15        was generated by Lieutenant Hanley, when did that occur?
16   A    When I was -- had my conference with IAD and my union
17        representative minutes before I was questioned with the
18        PI-21.
19   Q    When did that take place?
20   A    In April.
21                 MR. MC GAVER:       Thank you.  Nothing
22        further.
23                 MR. KONRAD:         April, 2015?
24                 MR. MC GAVER:       Correct.
25                 MS. WILSON:         Could I ask a
```

SUSAN K. TAYLOR       262-553-1058       COURT REPORTER
                      sueT@wi.rr.com
                                                    361
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 362 of 501   Document 80-5

1        question?

2                    MR. KONRAD:          Go ahead.

3                    MS. WILSON:          There was some

4        testimony that at some point, you might have passed out

5        and that you were incoherent at a point.  You stated

6        that there was some officers or TAC people or something

7        saying stuff.  Were you passed out or were you

8        incoherent or do you remember what they were saying?

9        I am trying to figure out to what coherency you were

10       that you can remember what people said.

11                   THE WITNESS:         I don't remember them

12       being on the scene at all.  I don't even remember any-

13       body really except Officer Jesse Vollrath, Officer

14       Goggins yelling at me because I was giving the wrong

15       phone number to my son, Deb Stacey and two people that

16       I know from the street that pulled me out of the car.

17       I don't remember anything else.

18                   MR. KONRAD:          Anything further?

19                   MR. MC GAVER:        No.

20                   MR. PEDERSON:        Nothing.

21       (Witness excused)

22                   MR. KONRAD:          Both sides have

23       rested this phase?

24                   MR. MC GAVER:        Yes.

25                   MR. PEDERSON:        We will --

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                            362
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 363 of 501   Document 80-5

```
 1                    MR. MC GAVER:        The Petitioner rests.
 2                    MR. PEDERSON:        I would like to call
 3      a number of witnesses in rebuttal.
 4                    MR. KONRAD:          Go ahead.
 5                    MR. PEDERSON:         Thank you.  I would
 6      first call Lieutenant Hanley.  Should we reswear or
 7      continue?
 8                    MR. KONRAD:          Just to be safe, I
 9      will swear you in again.
10                    SEAN HANLEY, having been first duly sworn
11      on oath to tell the truth, the whole truth, and nothing
12      but the truth testified as follows:
13                    MR. KONRAD:          He's sworn.
14      DIRECT EXAMINATION BY MR. PEDERSON:
15   Q  Lieutenant Hanley, you have testified yesterday in this
16      case.  Is that right?
17   A  Yes.
18   Q  I would like to direct your attention to the shooting
19      investigation that is concerned in this matter that's
20      been discussed.  Are you familiar with what I am
21      speaking of?
22   A  Yes.
23   Q  What was your part or what was your piece in relation to
24      that?
25   A  We didn't have a scene initially.  We believed the
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                            363
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 364 of 501   Document 80-5

```
 1        person that was shot was lying, that went to the
 2        hospital with a detective who was also sent to the
 3        hospital.
 4    Q   What did you think he was lying about, specifically?
 5    A   Everything he said didn't really make sense.  He was
 6        acting as if he was trying to protect the woman that was
 7        being chased by a man and the man was wearing a face
 8        mask and the woman ran in front of his van and he
 9        stopped and got out and opened the door and the guy
10        tries to pull her out.  That would be kind of unusual.
11    Q   Is it fair to say, then, that you had inconsistent
12        statements and evidence that you couldn't put together
13        to make sense?  Is that fair?
14    A   I don't know that his statements became inconsistent.
15        He didn't really make sense.  He had a shooting wound,
16        a gunshot wound to his right hand.
17    Q   Does the Milwaukee Police Department place a high level
18        of priority in investigating shooting incidents?
19    A   Yes.
20    Q   Why is that?
21    A   It is the position of the department to investigate
22        thoroughly every shooting even if the victims or
23        witnesses are uncooperative, we try so that we can
24        identify the people using guns, because many times, they
25        are repeat offenders.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              364
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 365 of 501   Document 80-5

```
 1   Q   Can you tell me specifically at the beginning, how did
 2       you get involved?  What was your component in this?
 3   A   He showed up at St. Joseph's Hospital, which is in
 4       Central at the time.  It is in Seven, which was not in
 5       Central, but he says saying the shooting happened at
 6       17th and North, which is in Central.
 7   Q   Where is St. Joseph's Hospital?
 8   A   5000 West Chambers.
 9   Q   Again, what did you do?  Where were you, that kind of
10       thing?  Can you indicate that to us?
11   A   I responded to the hospital to find out what his story
12       was and to oversee the investigation.
13   Q   What did you observe while you were there?
14   A   Detective Troy Johnson responded to the scene.  He gave
15       me a preliminary story.  He was the only detective at
16       the hospital.
17   Q   Is there any reason why that sort of call would have
18       more than one detective?
19   A   No.
20   Q   When you were there, did you see any other detectives?
21   A   No.
22   Q   Specifically, did you ever see Juanita Carr while you
23       were there?
24   A   No.
25       (A document was marked as Exhibit No. 15)
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                          365
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 366 of 501   Document 80-5

```
1   Q   Lieutenant, I have handed you a document marked for
2       identification as number 15.  Ae you able to tell me
3       what that document is?
4   A   It is the CAD printout of the shooting that we were just
5       discussing.
6   Q   Does this document reflect who was at the scene of the
7       hospital in terms of detectives?
8   A   Yes.
9   Q   Can you please indicate to me where that is?
10  A   Page 2 of 3, at 22:57, 10:57 p.m., Squad 9271 responded
11      to the hospital.
12  Q   Who is -- does 9271 relate to a specific person?
13  A   Yes.  Detective Troy Johnson.
14  Q   Do you know what Juanita Carr's squad number was that
15      evening?
16  A   9288.
17  Q   Does her squad number appear anywhere on this CAD?
18  A   No.
19  Q   Do you recall the testimony --  Strike that.  Were you
20      present for the testimony of Juanita Carr yesterday?
21  A   Yes.
22  Q   And were you also present for the testimony of Ms.
23      Lewandowski?
24  A   Yes.
25  Q   Would you agree with me that Ms. Lewandowski testified
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                             366
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 367 of 501   Document 80-5

```
 1       that she heard over the radio that Juanita Carr called
 2       herself to the dispatcher indicating she was going to go
 3       to the hospital?
 4    A  Yes.
 5    Q  If that were true, would you expect an entry related to
 6       that to appear in this CAD?
 7    A  Yes.
 8    Q  Can you explain why it is not here if that were true?
 9    A  No.
10    Q  Just for the sake of clarity here, do you have a squad
11       number?
12    A  Yes.
13    Q  Does your squad number appear anywhere in here?
14    A  No.
15    Q  Can you explain why that is?
16    A  A lot of times, there is confusion with dispatch because
17       we are on a different channel.  We are not as driven by
18       the radio.  We usually dispatch by phone.
19              MS. MC KENZIE:    When you say "we," do
20       you mean --
21              THE WITNESS:     As in the detective
22       bureau at the time.  Sorry.
23       BY MR. PEDERSON:
24    Q  Did you call yourself in to dispatch to put yourself at
25       this place?
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
                                                         367
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 368 of 501   Document 80-5

```
 1   A    Probably not.

 2   Q    If you did, would you expect that it -- your squad

 3        number would be here and there would be an entry

 4        correlating to that?

 5   A    Yes.

 6   Q    Did you hear Juanita Carr's testimony that she talked to

 7        you at the hospital and that you told her at that time

 8        to go search the house?

 9   A    Yes.

10   Q    Is that accurate?

11   A    No.

12   Q    Is there any doubt in your mind?

13   A    No.

14   Q    You had previously indicated that you had that conver-

15        sation with her, but it was at District 3.  Right?

16   A    Correct.

17   Q    How were you so confident that that is the case?

18   A    Because Troy Johnson was the only detective at the

19        hospital on the scene and I deliberately went to

20        District 3 to see if there was a detective not doing

21        follow-up, not involved in a case so that they could go

22        do this to try to get a consent search immediately.

23                    MS. MC KENZIE:     Why not send

24        Detective Troy?

25                    THE WITNESS:     Because he was at the
```

```
 1    hospital.  He was interviewing the shooting victim.  He
 2    also got a consent search for the van.  He recovered a
 3    holster and a couple gun magazines, but no gun, which is
 4    another reason we wanted to recover this gun.  So he had
 5    a full plate.
 6    (A document was marked as Exhibit No. 16)
 7    BY MR. PEDERSON:
 8  Q  Lieutenant, I have presented you a document marked for
 9    identification as Document 16.  Do you have that in
10    front of you?
11  A  Yes.
12  Q  Are you familiar with that document?
13  A  Yes.
14  Q  What is it?
15  A  It is a lineup for District 3 Late Shift, District 3
16    Power Shift and District 3 Early Shift.
17  Q  Does this relate to a specific date?
18  A  Late Shift is January 19.  Power Shift is January 18,
19    which would run 8:00 p.m. on the 18th to 4:00 a.m. on
20    the 19th.  And Early Shift, which is 4:00 p.m. to
21    midnight on the 18th.
22  Q  If I were to restate what you just said, is it correct
23    to say these documents here are reflecting the shift
24    assignments for District 3 going from January 18 into
25    January 19, 2015?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                369
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 370 of 501   Document 80-5

```
 1   A    Yes.
 2                    MS. WILSON:        Late Shift is --
 3                    THE WITNESS:       Late Shift is
 4        midnight to 8:00 a.m.  To be perfectly clear, some
 5        districts might start at 11:00 p.m. and go to 7:00 a.m.
 6        Those are the standards shifts.  I don't know what
 7        District 3 does.
 8                    MS. WILSON:        It is in that range,
 9        given or take an hour.
10                    THE WITNESS:       Yes.
11                    MS. WILSON:        So the Power Shift
12        is --
13                    THE WITNESS:       8:00 p.m. to 4:00
14        a.m.  Some Power Shifts start at 7:00 p.m. and work to
15        3:00 a.m.  I don't know what District 3 does.
16                    MS. WILSON:        Early Shift, that is
17        4:00 p.m. to 12:00?
18                    THE WITNESS:       4:00 p.m. to 12:00
19        or 3:00 p.m. to 11:00.
20                    MS. WILSON:        Okay.  Carry on.
21        BY MR. PEDERSON:
22   Q    Have you reviewed these documents?
23   A    Yes.
24   Q    Are they true and accurate, to the best of your know-
25        ledge?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                      sueT@wi.rr.com
                                                          370
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 371 of 501  Document 80-5

```
1    A    To my knowledge, yes.

2    Q    In review of this document -- Strike that.  Are you

3         familiar with the personnel that are listed here on

4         these documents?

5    A    I am familiar with a lot of people here.  I see one

6         mistake.

7    Q    What do you see?

8    A    In the CAD, Sergeant Allen Perry started out as 3214.

9    Q    Are you referring to Document 15?

10   A    Yes.

11              MS. MC KENZIE:      Perry started off as

12        what?

13              THE WITNESS:      3214.

14              MS. WILSON:       Allen Perry.

15              THE WITNESS:      Started out as 3214.

16              MR. PEDERSON:      Take the time you

17        need to make sense of it, but let me know when you are

18        ready to communicate whatever error you think you have

19        observed.

20              THE WITNESS:      Okay.

21   BY MR. PEDERSON:

22   Q    What do you have to testify to?

23   A    I thought I saw him change his squad number in here, but

24        I don't see it now.

25              MR. PEDERSON:      The last question I
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
                                                                    371
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 372 of 501   Document 80-5

```
 1        was asking you is if you are familiar with personnel.

 2        I will withdraw that question and ask it differently.

 3   Q    Are you familiar with the supervisory personnel that are

 4        listed in the document on Exhibit 16?

 5   A    Yes.

 6   Q    Are you familiar with their sex and race?

 7   A    Yes.

 8   Q    In review of these documents in relation to who was

 9        assigned to work at District 3 on the evening of

10        January 18 into the morning hours of January 19, 2015,

11        were there any black male sergeants working?

12   A    Sergeant Allen Perry.

13   Q    Where is he indicated on Document 16?

14   A    He was Squad 3214.

15   Q    Am I correct that you are looking at the third page of

16        the document?

17   A    Yes.

18   Q    Roughly in the top middle where it says "Patrol

19        Sergeant"?

20   A    Yes.

21   Q    According to this document and your understanding and

22        training and experience, what was his work hours that

23        day?

24   A    He would be working -- he was a roll call sergeant, so

25        either 2:00 p.m. to 10:00 p.m. or 3:00 p.m. to 11:00
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                      372
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 373 of 501   Document 80-5

```
 1          p.m.

 2     Q    Is it accurate to say that he would not have been at

 3          District 3, at least in terms of working, between the

 4          hours of midnight and 2:00 a.m.?

 5     A    I believe he was at the hospital on the shooting.  He

 6          secured at District 3 at 1:44 a.m.  Actually, 1:55 a.m.,

 7          he showed up at District 3.

 8     Q    At what time?

 9     A    The way it is written, he was contacted at 1:44 a.m. by

10          dispatch, which is common.  Let me see if it shows when

11          he left the hospital.

12                    MR. KONRAD:        For the record, this

13          is referring to Exhibit 15?

14                    MR. PEDERSON:      Yes.

15     A    He was contacted by the dispatcher at 1:44 a.m., still

16          being at the hospital and he cleared from that at 2:07

17          a.m.

18     Q    You are referring to Document 15?

19     A    Yes.

20     Q    Can you tell me what page that appears on?

21     A    Appears on Page 3 of 3.

22     Q    Based on that information, is it possible that he could

23          have been at District 3 prior to 2:00 a.m. to talk to

24          Juanita Carr?

25     A    Yes.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                 373
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 374 of 501   Document 80-5

```
 1   Q    Do you recall seeing Sergeant Perry at the hospital?

 2   A    I don't remember.

 3   Q    Do you recall seeing Sergeant Perry at District 3?

 4   A    No.

 5   Q    Once again, is there a reason why you don't appear on

 6        this CAD in relation to this incident being at District

 7        3?

 8   A    It didn't go out to dispatch most likely.

 9   Q    Did you have any contact with Sergeant Perry at all in

10        relation to this?

11   A    I assume I did at the hospital.  I don't remember the

12        exact shooting for that detail, because there are a lot

13        of shootings in District 3.

14   Q    What would be your function as a lieutenant speaking

15        to a sergeant under these circumstances?

16   A    Under the circumstances, I was a bureau lieutenant, so

17        if the detective didn't have it, he would be giving us

18        the initial information of the person's name, his

19        initial story and, then, after that, I am responsible

20        for overseeing the investigative part of the scene.  He

21        is responsible for overseeing the police personnel --

22        I should say patrol personnel at the scene.

23   Q    With that given, is there anything necessarily wrong if

24        you were to approach a detective and require him to do a

25        follow-up in a matter that he had been involved in on --
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                          sueT@wi.rr.com
                                                              374
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 375 of 501   Document 80-5

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Again, relating to the testimony yesterday, you heard |
| 3 | | testimony from Ms. Lewandowski indicating that she had |
| 4 | | been part of meetings with you and Melanie Beasley where |
| 5 | | she made reports to you regarding the alleged sexual |
| 6 | | assault.  Did you hear that testimony? |
| 7 | A | Yes. |
| 8 | Q | Did that ever happen? |
| 9 | A | No. |
| 10 | Q | Did Melanie Beasley ever make a report to you? |
| 11 | A | No. |
| 12 | Q | Did Shannon Lewandowski ever advise you on Melanie |
| 13 | | Beasley's behalf regarding that? |
| 14 | A | No. |
| 15 | Q | When was the first time you ever heard that -- anything |
| 16 | | in relation to this? |
| 17 | A | Detective Lewandowski said October of 2014.  I don't |
| 18 | | know if that is accurate.  She told me Melanie was |
| 19 | | seeing somebody in TAC.  I pulled up his photo.  I don't |
| 20 | | know the guy.  Everything was fine.  Then Melanie |
| 21 | | approached me -- I don't know -- shortly after that and |
| 22 | | said, "Shannon told me she told you," and everything was |
| 23 | | fine.  I had no idea everything was not fine until I was |
| 24 | | called to Internal Affairs by Detective Chris Zimmerman. |
| 25 | Q | What were you called to Internal Affairs about? |

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                        375
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 376 of 501   Document 80-5

| | | |
|---|---|---|
| 1 | A | An allegation of a sexual assault. |
| 2 | Q | On these two occasions where you said you had these |
| 3 | | conversations with Lewandowski and Beasley, is it fair |
| 4 | | to characterize those as unofficial business and more of |
| 5 | | just friendly conversation, or no? |
| 6 | A | Yes. |
| 7 | Q | One matter of clarification.  Is it your testimony that |
| 8 | | you don't recall whether you asked Sergeant Perry |
| 9 | | specifically to find someone, or how does that relate |
| 10 | | to you to, yourself, going to District 3 also? |
| 11 | A | I wouldn't have asked Sergeant Perry to do that.  He was |
| 12 | | on the scene at the hospital.  This was an experimental |
| 13 | | phase for our department to split up the investigative |
| 14 | | bureau and it was very hard, as a supervisor, because my |
| 15 | | desk was at District 5, but half of my people were at |
| 16 | | District 3, so it was hard to know what everybody was |
| 17 | | doing at any given time if they were not on assignment |
| 18 | | and they are supposed to be there.  So I went to |
| 19 | | District 3 to see who was not on an assignment so that |
| 20 | | I could give them this assignment so they could go do it |
| 21 | | immediately. |
| 22 | | MR. PEDERSON:      That is all I have. |
| 23 | | MR. KONRAD:      Commissioners? |
| 24 | | MS. MC KENZIE:      I have a question. |
| 25 | | The issue that I am having now is the autonomy that |

```
 1    detectives have.  So from the testimony that Detective
 2    Lewandowski gave, it may seem as if she or any other
 3    detective would have the autonomy to decide what is
 4    important and what is not important.  Is that
 5    necessarily the case with detectives?
 6                 THE WITNESS:        Yes and no.  If you
 7    are investigating an active shooting, typically, the
 8    most important thing for an investigation of similar
 9    importance, then, that is what you do.  But yes; if you
10    are not on an assignment, then detectives have freedom
11    to do their caseload.
12                 MS. MC KENZIE:      Detective Lewandowski
13    indicated that that was not her assignment, that was
14    Detective Carr's assignment.  So in her assessment, what
15    I got from her testimony, she could do what she wanted
16    and Carr had to follow through.  It wasn't up to her to
17    follow through because that was not her assignment.  Was
18    that your understanding?
19                 THE WITNESS:        No.  But like I said,
20    I didn't know Detective Lewandowski went with Carr on
21    this assignment.  It was incumbent, probably most likely
22    on Carr, to contact me if she was going to do anything
23    else instead because I gave her the assignment.  I
24    didn't see Detective Lewandowski at District 3.
25                 MS. MC KENZIE:      Where are you
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                      sueT@wi.rr.com
                                                           377
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 378 of 501   Document 80-5

```
1          stationed?  Are you stationed at Five even though half
2          of your people are at Three?
3                          THE WITNESS:        Yes, at the time.
4                          MS. MC KENZIE:        You did not --
5          you did not know -- at the time that you were at the
6          hospital initially with the gunshot victim, you didn't
7          know that Detective Carr had gone to the house to
8          retrieve the gun.
9                          THE WITNESS:        Detective Carr had
10         nothing to do with this investigation at this point.
11         I don't believe she went to the house or would even know
12         that somebody needed to go to the house.  That was the
13         purpose of me going to District 3; to find a detective
14         that was available to give this assignment to.  On that
15         note, when I gave this assignment to Detective Carr and
16         briefed her on the assignment and told her, you know,
17         everything.  "If you can't get consent, it is not a case
18         at this point that we are going to seek a warrant.  We
19         are looking for consent before he is discharged from the
20         hospital."
21                         MS. MC KENZIE:        When you had the
22         telephone conversation with Detective Lewandowski, the
23         one at 6:38 a.m. after the accident, did you indicate to
24         her that you would be drafting a report based on that
25         interview?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              378
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 379 of 501   Document 80-5

```
 1                    THE WITNESS:        I seriously doubt it.
 2      When I was at the hospital, I told both her and Detec-
 3      tive Carr that I needed to talk to them about the
 4      accident and it is kind of assumed, everybody in our
 5      department knows when they are in a vehicle accident, a
 6      supervisor has to do a report, but when she called, no.
 7      I would be shocked if I would have said that.
 8                    MS. MC KENZIE:        Normally, when you
 9      are doing that type of reporting where you are gathering
10      information and you are putting together a report, do
11      you normally have telephone conversations or do you have
12      the detective come in and sit down as you draft that
13      report?  In other words, is it normal to just have a
14      telephone conversation?
15                    THE WITNESS:        Since I had already
16      seen her on the scene and already talked to her at the
17      hospital about her welfare and not the particulars of
18      the accident, that wouldn't be unusual.  Juanita, since
19      I didn't talk to her on the phone, she didn't call me,
20      I was going to go to both of their houses, but Detective
21      Lewandowski called me, so that is why I went to
22      Juanita's house later on.
23                    MS. WILSON:        Whose supervisor
24      are you, because I got lost in the shuffle.  Are you
25      Detective Lewandowski's?  Are you her supervisor?
```

     SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                            sueT@wi.rr.com
                                                              379
          Case 2:16-cv-01089-WED   Filed 04/22/19   Page 380 of 501   Document 80-5

```
 1                    THE WITNESS:        At the time, I was.

 2                    MS. WILSON:        So there are times

 3      you may be different detectives' supervisor.

 4                    THE WITNESS:        I was Detective

 5      Lewandowski's supervisor, Detective Juanita Carr's,

 6      Detective Troy Johnson's.  Every detective involved in

 7      here.

 8                    MS. WILSON:        Who is -- is she

 9      Officer Beasley or is she Detective Beasley?

10                    THE WITNESS:        At that time, she was

11      a police officer.  Currently, she is a detective.

12                    MS. WILSON:        Who was her super-

13      visor at that time?

14                    THE WITNESS:        She worked out of

15      District 5, so she had patrol supervisors.  I never

16      supervised Officer Beasley.

17                    MS. WILSON:        If on that night she

18      was having a concern, was there anybody in the Fifth

19      District that could help her, because I am not sure --

20      I am not clear on what she needed help with, but it is

21      clear she needed help.

22                    THE WITNESS:        Yes.  Because even if

23      all the sergeants are on the street, the person sitting

24      in the district lieutenant's office, whether it be a

25      sergeant as the acting lieutenant or the lieutenant, is
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              380
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 381 of 501   Document 80-5

```
 1      always on the premises and that would be her immediate
 2      chain of command.
 3                      MR. PEDERSON:        Nothing further.
 4                      MR. KONRAD:          Further questions?
 5      CROSS-EXAMINATION BY MR. MC GAVER:
 6   Q  Lieutenant, you indicated multiple times, I believe,
 7      that you responded to Saint Joseph's Hospital in
 8      response to the shooting.  Right?
 9   A  Yes.
10   Q  If I am not mistaken, your testimony was that at the
11      hospital, you reported there because there was no scene.
12      Correct?
13   A  Correct.
14   Q  Or at least --
15   A  Not known.
16   Q  You didn't know what the scene of the crime was.  True?
17   A  Yes.
18   Q  Is it fair that at the hospital, you were in charge of
19      that investigation --
20   A  Yes.
21   Q  -- at that point.  What squad number were you assigned
22      to on the 18th and the 19th during that shift?
23   A  9205.
24                      MS. MC KENZIE:       Squad?
25                      MR. MC GAVER:        Squad number.  I'm
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
                                                         381
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 382 of 501   Document 80-5

```
 1        sorry.  I'm going a little fast and I'm not using the
 2        microphone, and I should be.
 3        BY MR. MC GAVER:
 4   Q    9205 you said?
 5   A    Yes.
 6   Q    Can you show me on Exhibit 15 where 9205 shows up?
 7   A    No.
 8   Q    Why not?
 9   A    Because I didn't go out with dispatch.
10   Q    Is it possible that Juanita Carr was at the hospital
11        and her squad number doesn't show up on this CAD report?
12   A    If she stopped by, I didn't see her and she is not in
13        any of the reports.
14   Q    Is it possible she was there?
15   A    It is possible.
16   Q    Do you know whether Shannon Lewandowski was a parti-
17        cipant in this investigation before she went out with
18        Detective Carr in that squad car?
19   A    Yes, I know.  She was not.
20   Q    She was not.  Thank you.  Do you know whether
21        Lewandowski would have been briefed about the particu-
22        lars of this particular investigation before she went
23        out with Detective Carr?
24   A    I didn't brief her.
25   Q    Do you know whether anyone else did?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              382
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 383 of 501   Document 80-5

```
 1    A    No.  I briefed Detective Carr.

 2    Q    Is the shooting that is reflected in this Exhibit 15,

 3         is that still being investigated today?

 4    A    I don't believe so.

 5    Q    Is it a closed case?

 6    A    The district attorney refused to issue charges.

 7    Q    So there was no process by the DA's office.

 8    A    No process due to lack of cooperation from the victim.

 9    Q    Is it true that squad numbers change from time to time?

10    A    Yes.

11    Q    When reviewing the CAD report, you seem to at first

12         notice an issue with Sergeant Perry, that his squad

13         number might have changed in the content of the same

14         report.  Is that true?

15    A    Yes, that can be.  If he is under fill-in on Late Shift

16         or something, it would have changed his squad number,

17         so it does happen.  Some of these CAD reports are --

18         they can become quite confusing.

19    Q    It was a little unclear when you were testifying about

20         Sergeant Allen Perry.  Is it possible that he could have

21         been at District 3 after the shooting took place at the

22         same time that Detective Carr was at District 3?

23    A    The times here show him at the hospital at 1:44 and,

24         then, still on scene at 1:55 at the hospital and, then,

25         clearing at 2:07 a.m.  So actually by this, he'd be
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    383
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 384 of 501   Document 80-5

| | | |
|---|---|---|
| 1 | | clearing the hospital at 2:07 a.m. |
| 2 | Q | Does that mean he could be arriving at his new desti- |
| 3 | | nation as 2:07? |
| 4 | A | This has him clearing from the hospital at 2:07. |
| 5 | Q | What does that mean? |
| 6 | A | He is leaving the hospital and he's done with this |
| 7 | | assignment.  He has himself clearing this assignment. |
| 8 | | I don't know if it is his practice to clear right when |
| 9 | | he walks out the door or --  This wouldn't be unusual |
| 10 | | for him to drive into the boundaries of District 3 and |
| 11 | | clear because the hospital is actually in District 7, |
| 12 | | but when the shooting occurs in District 3 and it is |
| 13 | | determined that it occurred in District 3, District 3 |
| 14 | | responds and takes over. |
| 15 | Q | Thank you.  You said you became aware that Melanie |
| 16 | | Beasley was seeing someone in the Tactical Enforcement |
| 17 | | Unit around October of 2014? |
| 18 | A | That is when Detective Lewandowski said she told me. |
| 19 | Q | You looked up that picture on the PeopleSoft program at |
| 20 | | that time? |
| 21 | A | Yes.  Called "roster." |
| 22 | Q | Is there a particular issue why Detective Lewandowski -- |
| 23 | | any particular reason that you can remember as to why |
| 24 | | Detective Lewandowski would have told you about a then- |
| 25 | | police officer, who worked at a different district, |

| | | |
|---|---|---|
| 1 | | dating someone in the Tactical Enforcement Unit in |
| 2 | | October of 2014? |
| 3 | A | She was just, kind of, happy that Melanie seemed happy, |
| 4 | | but I wasn't a good friend with Melanie.  I really |
| 5 | | didn't care who she was dating, to be quite honest. |
| 6 | Q | If you didn't care, why did you pull up the picture? |
| 7 | A | She asked me to.  Detective Lewandowski asked me to. |
| 8 | Q | Do you know whether this gentleman was married at the |
| 9 | | time he was seeing Detective Beasley? |
| 10 | A | I don't know anything about this man.  I never met him. |
| 11 | | MR. MC GAVER:    Nothing further. |
| 12 | | MS. WILSON:    I have a question. |
| 13 | | I guess my confusion is this almost seems to be a trial |
| 14 | | by Melanie Beasley, so I don't quite understand what we |
| 15 | | are --  When I go to deliberation, I want to be clear on |
| 16 | | the role of Melanie Beasley.  I don't think I am quite |
| 17 | | clear on that yet.  Is it that we are trying to decide |
| 18 | | why she was going there?  Should she have been going |
| 19 | | there?  Is Melanie -- I am about to get confused because |
| 20 | | we keep on talking about her.  What is it you want us to |
| 21 | | think about? |
| 22 | | MR. PEDERSON:    I don't know -- |
| 23 | | MR. KONRAD:    Maybe you can save |
| 24 | | that for a closing argument. |
| 25 | | MS. WILSON:    As long as I know |

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
385
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 386 of 501   Document 80-5

```
1       before deliberation.

2                   MR. PEDERSON:      I will address all of

3       that in my closing argument.

4                   MR. KONRAD:        Anything further?

5                   MR. PEDERSON:      Yes.

6       REDIRECT EXAMINATION BY MR. PEDERSON:

7    Q  You testified it is possible that Detective Carr could

8       have physically been at the hospital.  Right?

9    A  It is possible, but I didn't see her and she had nothing

10      to do with this investigation.

11   Q  Is it possible that she could have called over the radio

12      indicating that she was en route in response to this

13      matter and have her number not appear and have no entry

14      relating to her on this CAD?

15   A  That would be an extremely rare oversight by dispatch.

16   Q  You indicated that sometimes, squad numbers change.

17      Right?

18   A  Yes.

19   Q  Do they spontaneously change?

20   A  Not typically in the bureau.  I mean, in patrol, they

21      do.

22   Q  Let's limit it to Detective Carr.  Is there any reason

23      why in the middle of her assigned shift, her squad

24      number would just suddenly change in the CAD?

25   A  No.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                           386
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 387 of 501   Document 80-5

```
 1   Q   Is there any reason why her assigned squad number was
 2       suddenly changed in the middle of her assigned shift?
 3   A   No.  In your bureau, your squad number is your squad
 4       number.  The reason it changes in patrol is the first
 5       digits of your squad number is your district.  The
 6       second digit of your squad number is your shift.  In
 7       the bureau, we don't designate by shift, so our squad
 8       numbers don't change like that in the bureau.
 9               MS. MC KENZIE:     You said "in the
10       bureau"?
11               THE WITNESS:       The investigation
12       bureau where all the detectives work out of.
13       BY MR. PEDERSON:
14   Q   When you gave the assignment to see if she could search
15       the house when you were in District 3, did Juanita Carr
16       tell you, "I just tried that"?
17   A   No.
18   Q   From your knowledge, is there any reason why she would
19       even have information that she should go --
20   A   No.  I had to brief her on the case.
21   Q   If a department member came to you and reported that
22       they had been sexually assaulted by another department
23       member off duty, what would you do?
24   A   Call Internal Affairs.
25   Q   Would you report it as a crime?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              387
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 388 of 501   Document 80-5

```
1   A    Yes.

2   Q    Something that should be investigated?

3   A    Yes.

4   Q    Is there any record of you having done that?

5   A    No.

6   Q    Why didn't you do that?

7   A    Because it never happened.  I don't know if it happened.

8        I know very little about this case.  Nothing was ever

9        reported to me.

10  Q    Thank you.  Would you have any reason to not report it

11       if an officer came and reported to you a sexual assault?

12  A    I know not only of no reason to not report it.  I have

13       big reason to report it.

14  Q    To clarify, you never made such a report.

15  A    Correct.

16                  MR. PEDERSON:        That is all I have.

17                  MR. MC GAVER:        Just a few follow-up

18       questions.

19       RECROSS-EXAMINATION BY MR. MC GAVER:

20  Q    At the time of this shooting investigation, Troy Johnson

21       was a new detective.  Correct?

22  A    Yes.

23  Q    He was still on probation at the time.  Correct?

24  A    I don't know.

25  Q    He was new, at the very least.
```

SUSAN K. TAYLOR        262-553-1058       COURT REPORTER
                       sueT@wi.rr.com
                                                          388
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 389 of 501   Document 80-5

```
 1    A    Yes.

 2    Q    If he was on probation, is it common practice to send

 3         another detective to assist him in an investigation?

 4    A    Depends on the investigation and how busy we are.  That

 5         is 90 percent of what we investigate; shootings, so to

 6         us, investigating a shooting is just another day.  It

 7         would be quite common for him to be there alone.

 8    Q    Is it possible that Juanita Carr could have volunteered

 9         to assist him in that investigation at some point with-

10         out you knowing it?

11    A    No.

12    Q    Why not?

13    A    How is it possible?

14    Q    Is it possible that conversation between Detective

15         Johnson and Detective Carr took place outside the

16         hospital and you just didn't know about it?

17    A    What conversation?

18    Q    The conversation that would have resulted in Juanita

19         Carr getting involved in that investigation.

20    A    It is a possibility.

21              MR. MC GAVER:      Nothing further.

22              MR. PEDERSON:      Nothing.

23              MR. KONRAD:        All right.  No

24         further witnesses.

25              MR. PEDERSON:      I have further
```

SUSAN K. TAYLOR        262-553-1058       COURT REPORTER
sueT@wi.rr.com
389
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 390 of 501   Document 80-5

```
 1     witnesses.
 2     (Witness excused)
 3               MR. PEDERSON:      I would call
 4     Lieutenant Kelly.
 5               STEVEN KELLY, having been first duly
 6     sworn on oath to tell the truth, the whole truth, and
 7     nothing but the truth testified as follows:
 8               MR. KONRAD:        The witness is sworn.
 9     DIRECT EXAMINATION BY MR. PEDERSON:
10  Q  Please state your name and spell your name for the
11     record.
12  A  Steven Kelly.  S-t-e-v-e-n   K-e-l-l-y.
13  Q  How are you employed?
14  A  I am a lieutenant with the Milwaukee Police Department.
15  Q  How long have you been with the police department?
16  A  21 years.
17  Q  How long have you been a lieutenant?
18  A  Three years.
19  Q  Do you recall working the evening of January 18 into
20     the early morning hours of January 19, 2015?
21  A  Yes.
22  Q  What were you assigned to at that time?
23  A  I was the supervisor with the Forensic Investigations
24     Unit.
25  Q  Do you recall a call of an accident occurring possibly
```

SUSAN K. TAYLOR          262-553-1058       COURT REPORTER
                    sueT@wi.rr.com
                                                          390
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 391 of 501   Document 80-5

involving Milwaukee Police Department personnel around

2    2:00 a.m.?

3  A  Yes.

4  Q  What did you do in response to becoming aware of that

5     information?

6  A  I rode along with one of my forensic investigators to

7     the scene and went to the scene to help out.

8  Q  What scene was that?

9  A  It was an accident scene, a squad accident.

10  Q  Who were the officers involved?

11  A  The members involved were Detective Shannon Lewandowski

12     and Detective Juanita Carr.

13  Q  What did you do when you arrived at the scene?

14  A  First, I approached Lieutenant Hanley, asked if he

15     needed any help.  He asked if I could go to the hospital

16     with the members.  They were in separate medical med

17     rigs.  It would be the ambulances.  I checked with

18     Lieutenant Hanley and, then, I rode along out to the

19     hospital.

20  Q  You just said you "rode along to the hospital."  Where

21     were you?  How did that take place?

22  A  I left the forensic investigator at the scene because

23     they documented the scene with photographs and I rode

24     along in the front of one of the cabs.  I rode along in

25     the one that Detective Lewandowski was in.

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
391
Case 2:16-cv-01089-WED    Filed 04/22/19    Page 392 of 501    Document 80-5

```
 1   Q   So you are actually in the ambulance itself.

 2   A   Yes.

 3   Q   And you traveled with Lewandowski from the scene to the

 4       hospital.

 5   A   I was in the front, she was in the back.  We were in

 6       the same vehicle.

 7   Q   What happened when you got to the hospital?

 8   A   I followed the gurneys of the two med rigs.  They put

 9       Detective Lewandowski in one room and Detective Carr in

10       another room.

11   Q   How close in proximity to each other?

12   A   I couldn't give you that answer.  They were separated.

13       They weren't, like, right in a line.  One med rig

14       arrived prior to the other, so they unloaded first.

15   Q   What happened after that?

16   A   Then, I checked in with both detectives, let them know

17       that I was there, if they needed anything.  I got the

18       information that was needed for any reports that I could

19       convey to Lieutenant Hanley at a later time and, then, I

20       stayed with both of them back and forth.  I think I

21       wasn't with Detective Lewandowski when she went to get

22       x-rays.  Then she came back.  I was between both rooms

23       throughout the night until I was relieved.

24   Q   How far apart were the two rooms?

25   A   They were both corner rooms on a common corridor, so I
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              392
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 393 of 501   Document 80-5

```
 1        could leave one room and go around the corner to the
 2        other.  They abutted to each other at the back of the
 3        rooms.  They didn't have access to each other, but the
 4        fronts were maybe 20, 30 feet.
 5   Q    Was there a time that you observed Lieutenant Hanley to
 6        arrive at that scene?
 7   A    There was.  I can't recall the exact time, but I know
 8        that I stayed at the scene until he got there and I
 9        briefed him with all the information I had.
10   Q    I want to be careful.  I just said "scene."  What I mean
11        is the hospital.  Was there a time when you were at the
12        hospital with the detectives and Lieutenant Hanley
13        arrived at the hospital with you there?
14   A    Yes.
15   Q    About how long were you there until he arrived?
16   A    Quite a while.
17   Q    When Lieutenant Hanley arrived, did you have any
18        communication with him?
19   A    Yes, I did.
20   Q    What did you guys talk about?
21   A    I briefed him with the room numbers that both detectives
22        were in, the current state of the injuries that the
23        doctors said they had, different type of personal
24        information that is needed for forms, medical informa-
25        tion and, then, I walked him over and showed him each
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                393
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 394 of 501   Document 80-5

```
1        room.

2    Q   Did you make any personal observations of what Lieuten-

3        ant Hanley did next?

4    A   As I was waiting for my forensic investigator, because

5        that was my ride home.  They came to take pictures of

6        both detectives.  As I was waiting, Lieutenant Hanley

7        at that time walked into Detective Lewandowski's room.

8    Q   How big is this room?

9    A   I am going to say it is probably about ten feet wide,

10       15 feet long.

11   Q   Did you see who else was in the room other than Lieuten-

12       ant Hanley and Shannon Lewandowski?

13   A   I believe she had two relatives in the room.  I think

14       one of them was her son, but he was in and out of the

15       room back and forth to use his cell phone, I think.  He

16       was at the hospital.  I remember that.

17   Q   Were you in uniform?

18   A   Full uniform.

19   Q   Same uniform you have on today?

20   A   Probably the same shirt.

21   Q   Was Lieutenant Hanley in uniform?

22   A   I don't believe he was in uniform.  I think he wears

23       a suit when he was in the detective bureau.

24   Q   If someone was casually looking at him and didn't know

25       him, they might not know that he is a police officer.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 395 of 501   Document 80-5          394

```
 1        Is that right?
 2   A    Someone from the hospital wouldn't know he was a police
 3        officer other than his identification that he would have
 4        had on.  He would have had a lanyard around his neck,
 5        probably with his ID.  No, a casual person wouldn't
 6        know.
 7   Q    Again, I want to go to your observations when Lieutenant
 8        Hanley enters the room.  Is this a situation where he is
 9        going in there to engage the people in there, or what
10        did you observe specifically?
11   A    The door is set up with privacy.  It has three sliding
12        glass doors, so it is wide open that if the nurses
13        enter, they can leave a curtain open, that they can see
14        in to view their patients, but still leave them to have
15        privacy by closing the doors.  Then, there is a set of
16        curtains.  I had the doors and the curtains closed for
17        their privacy in the room, and he opened one of the
18        sliding doors.  As he was entering, he pushed the
19        curtain aside, walked in and, then, he closed the
20        sliding glass door behind him, and I was out.
21   Q    Were you able to hear anything?  Were you in a position
22        to be able to do that?
23   A    No, I didn't hear anything.
24   Q    From your perspective, is there any possibility that the
25        people that were in that room could have not noticed
```

SUSAN K. TAYLOR         262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
                                                          395
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 396 of 501  Document 80-5

```
 1        that he was there?

 2   A    If they had their eyes closed.

 3                   MR. PEDERSON:        That is all I have.

 4                   MR. KONRAD:          Any cross?

 5                   MR. MC GAVER:        Do you want the

 6        commissioners to go first?

 7                   MR. KONRAD:          Any questions?

 8                   Go ahead.

 9        CROSS-EXAMINATION BY MR. MC GAVER:

10   Q    Were you interviewed by Detective Zieger in connection

11        with the investigation into Detective Lewandowski's

12        conduct?

13   A    No.

14   Q    Were you interviewed by anyone else in Internal Affairs

15        in connection with this case?

16   A    No.

17   Q    Did you review any reports generated by Internal Affairs

18        before testifying here today?

19   A    No.

20   Q    You supervised -- at the time of this investigation --

21        at the time of the accident, you supervised Officer

22        Vollrath.  Correct?

23   A    No.

24   Q    Did you have any personal contact -- what I mean by that

25        is conversation -- with Shannon Lewandowski at the scene
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                        sueT@wi.rr.com
                                                          396
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 397 of 501   Document 80-5

1      of the accident?

    2    A   At the accident?

    3    Q   Yes.

    4    A   No.

    5    Q   What about in the hospital?  Did you talk to her at all?

    6    A   Yes.

    7    Q   What did you say to her?

    8    A   Well, I told her who I was and why I was there to make

    9        sure she understood there was someone from the depart-

   10        ment, a supervisor there for her.  I explained to her

   11        that I needed to get some personal information for a

   12        report, which I think she understood.  General casual

   13        things like that.  I didn't talk to her about the acci-

   14        dent.  I just told her what I was there for.

   15    Q   You testified that you got some information from some

   16        of the physicians or nurses or hospital staff about

   17        some of Shannon Lewandowski's injuries.  Is that fair?

   18    A   I asked if they had anything for me.

   19    Q   Did they?

   20    A   They just said she has a bruised ankle and she was

   21        getting x-rays.  That is all I had.

   22    Q   That seems pretty vague.  Did you follow it up?

   23    A   I did not.

   24    Q   Do you know if anyone else did?

   25    A   I don't know.

SUSAN K. TAYLOR          262-553-1058         COURT REPORTER
                         sueT@wi.rr.com
                                                               397
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 398 of 501   Document 80-5

```
 1   Q    You said there were two relatives in Lewandowski's room?

 2   A    There was two people.  I thought they were relatives.

 3        I remember one was her son and I don't remember who the

 4        woman was.  She introduced them.

 5   Q    Do you know whether Hanley was wearing a badge on the

 6        exterior of his clothing at the time he was at the

 7        hospital?

 8   A    I didn't look for it, so I can't recall.  I can't

 9        testify to that.

10   Q    Same question about the ID on the lanyard.

11   A    Again, I wouldn't be able to know if it was inside or

12        outside his jacket.  I couldn't testify to viewing it.

13   Q    Did you take any photos about what you observed in the

14        hospital?

15   A    I am sure I did.

16   Q    Did you file a report?

17   A    No.

18   Q    What would have been done with the notes?

19   A    I would have briefed Lieutenant Hanley about anything

20        that I had received from the hospital so that he could

21        put it in his report.

22   Q    Did you retain the notes?

23   A    I am sure they are somewhere.

24   Q    You don't know where they are, though?

25   A    That is three locations ago.  I can look for them if
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    398
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 399 of 501   Document 80-5

```
  1          you want me to, but it will take a while.

  2                    MR. MC GAVER:       I don't have anything

  3          further.  Thank you.

  4                    MR. PEDERSON:       Nothing.

  5                    MS. WILSON:         I have one question.

  6          This was on January 19, 2015.  To your recollection,

  7          was it snowing?  Was it cold?  Was it a nice January

  8          day?

  9                    THE WITNESS:        My recollection,

 10          there was no snow.  It was just a normal January day.

 11                    MS. WILSON:         Whoever went to the

 12          hospital would have had on a jacket.  I am not talking

 13          about a suit jacket.  I am talking about a Wisconsin

 14          jacket, like, it was cold.

 15                    THE WITNESS:        Who are you referring

 16          to, ma'am?

 17                    MS. WILSON:         Actually, you said

 18          that Lieutenant Hanley may not have had on a uniform,

 19          but he would have had on some kind of jacket.  Right?

 20                    THE WITNESS:        Like a suit coat.

 21          The lieutenants who work at the detective bureau, most

 22          of them wear suits.  And patrol, we wear uniforms.  So

 23          he would have had a suit coat on and I didn't -- in

 24          prior assignments, I have seen him in suit coats, so

 25          that is what I am assuming he was wearing that night,
```

SUSAN K. TAYLOR          262-553-1058        COURT REPORTER
                         sueT@wi.rr.com
                                                              399
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 400 of 501   Document 80-5

```
 1        but I can't tell you what color it was.

 2                         MR. PEDERSON:        Nothing further.

 3                         MR. KONRAD:          The witness is

 4        excused.

 5        (Witness excused)

 6                          ADAM ZIEGER, having been first duly

 7        sworn on oath to tell the truth, the whole truth, and

 8        nothing but the truth testified as follows:

 9                         MR. KONRAD:        The witness is sworn.

10        DIRECT EXAMINATION BY MR. PEDERSON:

11    Q   Sergeant, again, you testified yesterday.  Is that

12        right?

13    A   Yes.

14    Q   You were the primary investigator in the Internal

15        Affairs investigation.  Is that right?

16    A   Yes.

17    Q   You were responsible for conducting the investigation

18        insofar as contacting department members that were at

19        the department's scene.  Is that right?

20    A   Yes.

21    Q   Did you do that?

22    A   Yes.

23    Q   Specifically, what did you do?

24    A   I contacted supervisors and officers.  Do you want me to

25        name them?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              400
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 401 of 501   Document 80-5

```
 1   Q   You don't have to, but did you contact all that you were
 2       aware that were there?
 3   A   I don't believe I contacted every single officer that
 4       responded, no.
 5   Q   Then why not?
 6   A   We briefed about the case quite a bit and a decision was
 7       made that there was no need to keep continuing to call
 8       people up.
 9   Q   Why?
10   A   We interviewed numerous people.  I located the TAC squad
11       officers that responded to the scene and acknowledged
12       that they reported the information to Lieutenant Hanley.
13       We located several officers that responded and picked up
14       her son and as I started -- I was directed to interview
15       Sergeant Riley.  After interviewing Sergeant Riley,
16       then, follow it with mentioning Tactical Squad officers,
17       that he got information from a TAC squad officer,
18       located that officer.  Kept following that officer, made
19       mention that these officers may have picked up the son,
20       which one rode to the hospital, things of that nature.
21   Q   You were specifically investigating, as part of this,
22       the allegations about potential statements that
23       Lewandowski made regarding she was on her way to pick
24       up her son, her son was at UWM.  Correct?
25   A   Part of it.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                401
Case 2:16-cv-01089-WED    Filed 04/22/19    Page 402 of 501    Document 80-5

```
 1   Q    Was part of your job trying to determine where that
 2        information came from?
 3   A    I was directed to interview certain sergeants and
 4        because of that interview, I, then, went beyond that and
 5        started interviewing additional personnel, and that was
 6        part of the questioning.
 7   Q    Did you ever locate a specific person, a department
 8        member, who indicated that, "yes, I personally heard
 9        it myself from Shannon Lewandowski some statements
10        regarding her son and UWM"?
11   A    Yes.
12   Q    Who was that department member?
13   A    Officer William Krumnow.
14   Q    What did Officer Krumnow say?
15   A    He indicated when he arrived at the scene, Detective
16        Lewandowski handed him her cell phone and said, "go get
17        my son.  He is with a friend at UWM."
18   Q    Can you spell Krumnow?
19   A    K-r-u-m-n-o-w.
20             MS. WILSON:        You said he was with
21        what?  You said, "go get my son because he was" --
22             THE WITNESS:        He was with a friend
23        at UWM.
24        BY MR. PEDERSON:
25   Q    Did you document this in your summary?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                          402
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 403 of 501   Document 80-5

```
 1   A   Yes.

 2                   MR. PEDERSON:      Did you locate your

 3       summary in front of you?  I believe it is Document 8.

 4       I direct your attention to Page 14.

 5                   THE WITNESS:        I am there.

 6   Q   Can you, please, review that and indicate where in your

 7       report what you just testified to?

 8   A   It is the third paragraph down.

 9   Q   It is about the middle of the page in the paragraph

10       starting, "during a non-PI-21 interview.  Is that right?

11   A   Yes.

12   Q   The second sentence beginning, "Officer Krumnow

13       described."  Is that correct?

14   A   Correct.

15   Q   I will read that.

16                   "Officer Krumnow described Detective

17       Lewandowski gave him her telephone and directed to

18       locate her son, and added he was with a friend at UWM."

19       Did I read that correctly?

20   A   Yes.

21   Q   What did Officer Krumnow tell you that he did in

22       response to this?

23   A   That he went to try to pick him up.

24   Q   What did he do?

25   A   He went to the UWM police station.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                                403
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 404 of 501   Document 80-5

```
1    Q    Did he find him there?

2    A    No.

3         (A document was marked as Exhibit 17)

4    Q    I have presented you a document marked for identifica-

5         tion as number 17.  Do you see it?

6    A    Yes.

7    Q    Are you familiar with this document?

8    A    Yes.

9    Q    What is it?

10   A    This is an entry where a dispatcher received a message

11        from a squad and attaches it to the computer-aided

12        dispatch, CAD report.

13   Q    Did you generate this document yourself?

14   A    The one I am looking at right now?

15   Q    Yes.

16   A    I generated the copy of it.

17   Q    What specifically does this relate to?

18   A    This relates to an officer sending an electronic

19        message from their in-squad computer to a dispatcher

20        indicating that they are changing locations to 3611

21        North Maryland Avenue regarding this assignment that

22        they were assigned to.

23   Q    How did this relate to the scene of the accident at

24        issue here?

25   A    This is a message from the squad computer of Officer
```

```
 1        Stacey and Officer Krumnow indicating that they --

 2        they sent a message at 2:30 a.m. saying they were going

 3        to 3611 North Maryland Avenue.

 4    Q   You heard the testimony of Debra Stacey yesterday?

 5    A   Yes.

 6    Q   Does this document contradict the testimony you heard in

 7        any way?

 8    A   Yes.

 9    Q   How does it contradict it?

10    A   It indicates that they were going to a specific location

11        and they knew where that location was.

12    Q   So specifically that it was --  Am I correct in saying

13        that Officer Stacey's testimony yesterday was she just

14        headed to the UWM area, had no idea where Jordan

15        Lewandowski was and she was just driving around and all

16        those sorts of things.  Right?

17    A   I believe it turned out they stumbled across -- they

18        came across him.

19    Q   So this indicates that at 2:30 a.m. -- am I correct in

20        saying that this document indicates that she left the

21        scene of the accident at 2:30 a.m. and was en route

22        directly to the exact spot where she eventually located

23        him?

24    A   It indicates at 2:30 and one second, that they indicated

25        that they were now en route to 3611 North Maryland
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              405
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 406 of 501   Document 80-5

```
 1        Avenue.

 2   Q    And does that correspond with the location where Jordan

 3        was eventually found?

 4   A    I don't know if that is the exact address, but it might

 5        be within the same block.  It might -- I am not sure

 6        what the exact address is.  It might have been 3616.

 7        A difference between a house or two.

 8   Q    Did you address this document in your summary?

 9   A    Yes.

10   Q    I will direct your attention to Page 3, the second full

11        paragraph beginning with, "the CAD documented."  Do you

12        see that?

13   A    Yes.

14   Q    It states,

15              "The CAD documented Squad 3482, Officer Stacey

16        and Officer Krumnow responded to the accident at 2:20

17        a.m.  At 2:30, Squad 3482 changed locations to 3611

18        North Maryland Avenue.  Message number -- and there is a

19        large number -- was entered stating 'Show us enroute to

20        3611 North Maryland AVE regarding.'"

21        Did I read that correctly?

22   A    Yes.

23   Q    Does that relate to this document?

24   A    Yes.

25                        MR. PEDERSON:     That is all I have.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                            406
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 407 of 501   Document 80-5

```
 1                    MR. KONRAD:        Commissioners?

 2                    MS. MC KENZIE:     Just for clarity, why

 3       does this CAD document, which was submitted as 15, look

 4       like this, then, and this one --  This is a CAD

 5       document, too, is it not?

 6                    THE WITNESS:        If you find in the

 7       CAD -- and I think you have it in front of you -- the

 8       actual report of this is not visual.  That message

 9       number that is in my summary is the message number in

10       the CAD, which I can look through it and I will find

11       and, then, it corresponds -- when you click on that, it

12       is a hyperlink.  It links this entry from this squad

13       directly to that assignment.  It is noted in the CAD

14       with a hyperlink that takes you to the documentation

15       for the message to and from the dispatcher.

16                    MS. MC KENZIE:     This is the message?

17       The hyperlink brought you to this.

18                    THE WITNESS:        Correct.

19                    MS. HEIN:          Is there any way to

20       determine if it says, "en route to this address on

21       Maryland" at 2:30, but could it have been at the scene

22       of the accident that they said that, or is there any way

23       to determine it was then or that they were already

24       there?

25                    THE WITNESS:        It is my under-
```

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
                                                            407
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 408 of 501   Document 80-5

1      standing they reported it at the accident scene.  It is
2      my understanding of the documentation of any messages
3      that are sent, when the dispatcher types it into the
4      CAD, that the 2:30 time is the time that the actual
5      message was transmitted or sent electronically from the
6      squad computer to the communications center and the time
7      above that, that 20, which would be 2:30 a.m. and 51
8      seconds, that would be the time the dispatcher was doing
9      something with it connecting it to the CAD.  The time.
10     2:30 and one second would be the time that they
11     transmitted that.
12                    MS. HEIN:          But there is no way
13     to determine where they physically were when they trans-
14     mitted this.  You are indicating that you think it is
15     when they were leaving the accident scene, but in the
16     document -- or the CAD report, there is no actual GPS to
17     say they are at the accident scene or they are halfway
18     to Maryland Avenue or --
19                    THE WITNESS:       There is not a way to
20     determine the location that it was sent from, from that
21     report, no.
22                    MS. WILSON:        Could I follow up on
23     her question?  When any officer says, "I am around,"
24     wherever, is there is some kind of a policy that you say
25     it when you are getting ready to leave, you say it when

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                            408
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 409 of 501   Document 80-5

```
 1      you get there or you say it two minutes before?  Is it
 2      based on case-by-case emergencies?
 3                      THE WITNESS:      When you are leaving
 4      from a scene or leaving a location and you are done, you
 5      are supposed to notify the dispatcher at that time that
 6      you are leaving the scene and done, because they need to
 7      be able to have the opportunity to send you to -- they
 8      need to have the control to be able to dispatch you to
 9      what they need to dispatch you to, so they need to know
10      your status.
11                      MR. KONRAD:       Any questions?
12                      MR. MC GAVER:      I do.  Thank you.
13      CROSS-EXAMINATION BY MR. MC GAVER:
14   Q  Did you interview Lieutenant Kelly in connection with
15      this internal investigation?
16   A  No.
17   Q  Before you filed your report dated September 9, 2015,
18      did you know he was at the hospital?
19   A  No.
20   Q  Did you know, before you filed your report, that he had
21      direct conversations with Shannon Lewandowski at the
22      hospital?
23   A  No.
24   Q  Knowing that now, would you have wanted to interview
25      him?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                        sueT@wi.rr.com
                                                            409
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 410 of 501   Document 80-5

```
 1   A    I don't think so, no.

 2   Q    You testified a little bit about Officer Krumnow and

 3        Officer Krumnow's statements in your report.

 4   A    Yes.

 5   Q    Your report says -- attributes a statement from Officer

 6        Krumnow who is attributing a statement from then-

 7        Detective Lewandowski.  The quote is, "go get my son.

 8        He is with a friend at UWM."  Is that accurately

 9        reflected from your report?

10   A    Yes.

11   Q    Is there any mention of police in that statement from

12        Officer Krumnow?

13   A    I believe he, then, mentions that he was told to go

14        there and that was -- because he was asked why he was

15        told to go there and he said because that is where he

16        was told he would be.

17   Q    You said "go there."  Where was "there"?

18   A    I believe it was the UWM Police Department.

19   Q    Do you know the address of the UWM Police Department?

20   A    No.

21   Q    Do you know Jordan Lewandowski's address?

22   A    No.

23   Q    If I told you that Jordan Lewandowski lived less than

24        six blocks from the UWM Police Department, would you

25        quarrel with me?
```

| | | |
|---|---|---|
| 1 | A | No idea. |
| 2 | Q | You testified a little bit about officers clearing |
| 3 | | scenes and having that show up on a dispatch.  In |
| 4 | | practice, do officers forget to clear scenes until they |
| 5 | | arrive at another location? |
| 6 | A | I don't think it is a practice, but I believe that you |
| 7 | | are probably asking if it happens. |
| 8 | Q | Does it happen? |
| 9 | A | Yes. |
| 10 | Q | Do officers occasionally forget to report their location |
| 11 | | to CAD until several minutes into their arrival -- after |
| 12 | | their arrival?  Does that happen? |
| 13 | A | I wouldn't think under those circumstances, that would |
| 14 | | be -- |
| 15 | Q | Does it ever happen? |
| 16 | A | -- it would happen, but officers often -- not often, but |
| 17 | | they have a choice of either notifying if they are not |
| 18 | | assigned to something, notifying the dispatcher when |
| 19 | | they are en route to something or they could tell them |
| 20 | | when they get there. |
| 21 | | MR. MC GAVER:     Thank you.  Nothing |
| 22 | | further. |
| 23 | | MS. WILSON:     To me, "en route" |
| 24 | | means I am going somewhere.  What do you use when you |
| 25 | | get there?  Do you use the same thing? |

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
411
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 412 of 501   Document 80-5

THE WITNESS:      Most common would be

2       "on scene."  En route, absolutely.  I am on my way.  "On

3       scene" is a term that is always used for "I am here" or

4       simply "I'm here" or "I have arrived."  But en route is

5       us traveling to a location.

6                   MS. WILSON:        And, then, you say

7       something when you leave.

8                   THE WITNESS:        Correct.

9                   MS. WILSON:        So there is, I am

10      going, I am here, and I am gone.

11                  THE WITNESS:        En route, I haven't

12      gone there yet.  I'm still going.  I still am on the

13      way.

14                  MS. WILSON:        But when you get

15      there, you don't have to say anything?

16                  THE WITNESS:        You are supposed to

17      say that -- you either provide a --  We have a "10" code

18      for it.

19                  MS. WILSON:        Yes, 10-17, 10-24.

20                  THE WITNESS:        10-23.  10-23 would

21      be the code that an officer should give when they arrive

22      at a location that is indicated that they are traveling

23      to, to notify communications that they are on scene.

24      They'd give a 10-23.  They say "10-23" on the radio and

25      give them the squad number.  They also have the option,

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 413 of 501   Document 80-5        412

```
 1        when they are responding, to mark --  On the computer,
 2        there is a big -- several buttons.  One of them is "on
 3        scene" and it says -- that is to notify them electron-
 4        ically that I have arrived.
 5                          MS. HEIN:          Is 3611 North
 6        Maryland the address of where the complaint -- the
 7        initial complaint to the Shorewood Police Department?
 8        Is that the same address?
 9                          THE WITNESS:          I don't think 3611
10        is the exact address, but I believe it is within a few
11        numbers.  I believe the complaint is, like, 3614 North
12        Maryland as opposed to 3611.  It might have been 3611.
13        I am going off my memory and I am not exactly sure what
14        the complaint address is.  I could probably find that in
15        my report.  We should be talking about a difference of
16        either across the street or a house over.
17                          MR. KONRAD:          Anything further?
18                          MR. PEDERSON:        No.
19                          MR. MC GAVER:        Nothing.
20                          MR. KONRAD:          You both rest?
21                          MR. PEDERSON:        Yes.
22                          MR. MC GAVER:        Yes.
23                          MR. KONRAD:          The witness is
24        excused.
25        (Witness excused)
```

1                    MR. KONRAD:        We will give you both
          2    an opportunity to present a closing statement.
          3                    Mr. Pederson, would you like to give your
          4    closing?
          5                    MR. PEDERSON:       I would.
          6    Commissioners, thank you for your time and attention the
          7    last day and a half.  I will do my best to sum up this
          8    hearing and the chief's position.  At beginning, I told
          9    you I expected the evidence to be somewhat simple from
         10    our side, and I still maintain that is true.  The
         11    chief's belief, understanding and version of events that
         12    he came to believe were true and based his discipline
         13    decisions on are relatively straightforward and that is
         14    that Ms. Lewandowski did violate the three rules that
         15    are contained in the charge and specs and in the Com-
         16    plaint.
         17                    We believe the true facts here are that
         18    Juanita Carr was never at the hospital, that that was a
         19    collusory statement made after the fact, that that is a
         20    fabrication that Lieutenant Hanley was at the hospital,
         21    had reason to assign a detective to follow up to go to
         22    this house and see if there could be a consent search
         23    done.  He went to District 3 to find a detective.  The
         24    detective he located was Juanita Carr.  He gave that
         25    assignment to her expecting her to do it immediately,

         SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                                 sueT@wi.rr.com
              Case 2:16-cv-01089-WED   Filed 04/22/19   Page 415 of 501   Document 80-5    414

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | because this was a time-sensitive issue.  We needed to        |
| 2   | get it done before he was -- the shooting victim was          |
| 3   | released from the hospital.  Unbeknownst to him, there        |
| 4   | was this interaction between Detective Lewandowski and        |
| 5   | Detective Carr, not that there is anything wrong with         |
| 6   | that.  It is perfectly fine had they actually followed        |
| 7   | through in the way that they had indicated.  If               |
| 8   | Lewandowski had said, "okay, because you are going to         |
| 9   | need some help, you know, not one officer can go in           |
| 10  | there, I will just go with you and we will do it              |
| 11  | together and that way, you don't have to call a car out       |
| 12  | of service that could otherwise be answering calls.  So       |
| 13  | let's do that."  Had they done that, drove the block or       |
| 14  | two, or whatever it was, to the house, they could have        |
| 15  | done it immediately and maybe they would have knocked on      |
| 16  | the door and there would have been no answer.  Who            |
| 17  | knows?  We don't know.  All we know is it wasn't done         |
| 18  | and they didn't follow the commands of their supervisor       |
| 19  | and they didn't effectively and efficiently carry out         |
| 20  | their duties.  Now, Juanita Carr isn't part of this, we       |
| 21  | are not discussing her, but they were together.  That is      |
| 22  | why I say "we."  Instead, this is the chief's under-          |
| 23  | standing of the facts.  Shannon Lewandowski decides she       |
| 24  | is going to go to District 5 to attend to a personal          |
| 25  | matter.  That is, to offer support/comfort to her             |

1    friend, Melanie Beasley.  Now, there is nothing wrong
2    with that per se, but there is something wrong when you
3    are traveling in the middle of a shift when you have
4    other actual police missions, police objectives, to
5    meet, to attend to this personal matter.  So that
6    presents an issue.  And that is what she was doing.
7                    The phone records support that at that
8    exact time or, you know, the line of time, she received
9    a call from her son and we have to assume, based on the
10   testimony, and she admits that is when she was advised
11   that her son was stopped.  She says that she wasn't
12   going to do anything at that time, but it is the chief's
13   belief she made the decision at that time to not go to
14   the house.  She's already diverted and going to District
15   5 to now, not go to District 5 and go directly to assist
16   her son.  This is based on credible evidence.  It is
17   based on, one, the supporting circumstantial evidence
18   of Sergeant Cody himself.  I will admit, it is somewhat
19   unusual that -- how Sergeant Cody handled that scene.
20   I'm not sure the Milwaukee Police Department would have
21   handled that scene the way that he did in that, you
22   know, he conducted field sobriety tests and got him to
23   blow a .09, according to him, which would be a viola-
24   tion -- he's 19 -- and, then, we are not sure even
25   if he stayed at the scene until Milwaukee police showed

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                416
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 417 of 501   Document 80-5

1          up or not, I can see that is a little unusual and he

2          couldn't recall exactly why he did what he did.  I don't

3          know.  But one thing is absolutely certain that he was

4          crystal clear on was that Jordan Lewandowski told them

5          "my mom is on the way."  He didn't equivocate on that

6          and he has no motive to lie or misrepresent.  If he did,

7          I, frankly, believe he would have said, "I stuck around

8          and I waited until they were there."  He has no upside,

9          no benefit to him to make a misrepresentation on his

10          understanding and he testified, without any equivoca-

11          tion, "I was told Shannon Lewandowski is on her way."

12          Now, does it prove it in and of itself?  No, it doesn't,

13          because maybe Jordan is lying.  Right?  Maybe he just

14          says that to every police officer he gets pulled over

15          by to -- you know, for whatever reason; if he thinks

16          they might be more lenient.  I don't know.  That doesn't

17          prove Shannon Lewandowski's state of mind, but it is an

18          important piece of circumstantial evidence, taken in

19          conjunction with everything else, that lends some

20          credence to the notion that she was on her way there,

21          in fact.  The most critical piece?  Her own statement.

22                    It is the chief's -- I will take the step

23          back.  It is the chief's position that she was on her

24          way to District 5.  That is clearly a violation of

25          performing duties outside of what she is required to do

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    417
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 418 of 501   Document 80-5

1     and not affecting the mission of the department.

2                    The chief's position regarding the

3     emergency lights is, again, consistent with her own

4     statement, that she was doing that to facilitate her

5     quick trip to see her son.  Why did she want to get

6     there quickly?  Because he is pulled over.  She wants

7     to get there as soon as possible so she can have maximum

8     effect of whatever she is going to do.  Now, I can't

9     tell you what her plan was.  I don't know her state of

10    mind, but it is our position that she was on her way

11    there and it was going to benefit her son that she got

12    there as quick as possible.  So that is why she is

13    operating her lights, and that is what she told

14    Lieutenant Hanley, according to Lieutenant Hanley.

15                   So again, if that is the case, if you

16    agree with that finding, then, clearly, she is operating

17    her vehicle in an unsafe manner inconsistent with the

18    law and is unsafe because we had some testimony, I

19    believe, from Shannon Lewandowski that she thought it

20    enhanced safety.  "I have my lights on.  People know I

21    am there.  I mean, that enhances safety."  But the

22    reality is, common sense tells you and the way they are

23    trained is that is not true, that that is an element of

24    chaos in a situation out on the streets.  If you are

25    driving along and all of a sudden, lights and siren go

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    418
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 419 of 501   Document 80-5

1      on behind you, does that enhance safety?  No.  That
2      creates a situation where everyone jumps, looks, pauses.
3      That can actually cause accidents and distractions.  So
4      for her to say this is enhancing safety is a misrepre-
5      sentation and that is why it is not safe.  And even if
6      you do believe it somehow enhances safety, it is
7      contrary to law.  So it is still a violation of the SOP
8      and the rule that she is charged with here, the guiding
9      principle, just by the mere fact of operating an
10     emergency vehicle contrary to law.  That is a violation.
11             The next set of facts we have to deal
12     with and the last charge is the integrity charge.  Where
13     does that come into play?  That comes into play when she
14     changes her story because up to the point -- up to that
15     point, the only two violations she's committed is the
16     operating her vehicle in an unsafe manner and not --
17     the idling, loafing charge, not carrying out the mission
18     of the department.  When she had the conversation with
19     Lieutenant Hanley, she provides one set of facts that we
20     believe are the true set of facts that we submit was, in
21     fact, what Detective Lewandowski told Lieutenant Hanley
22     and that he accurately reported in his report.  If
23     Detective Lewandowski had maintained that, she wouldn't
24     be facing an integrity charge.  That only came into play
25     when later on, she completely -- she filed responses to

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                           419
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 420 of 501   Document 80-5

1    the charges completly changing the story.  Of course, it
2    is her side that is consistent, but that is a point that
3    we differ on.  And goes so far as to accuse Lieutenant
4    Hanley of lying.  The chief police there is sufficient
5    evidence deduced here to believe that she did change her
6    story, that Lieutenant Hanley was telling the truth and
7    that she did, in fact, say all of those things to him
8    and that therefore, her changes in story was to say the
9    lieutenant was a liar and all of that constitutes the
10   integrity charge.

11               I told you at the very beginning in the
12   opening statement that I believe that in the end,
13   largely, your findings here are going to be a credi-
14   bility determination, and I still believe that to be
15   true.  Your decision here is going to hinge on whether
16   or not you believe Shannon Lewandowski actually reported
17   things -- said the statements that are attributed to her
18   by Lieutenant Hanley or if you believe Lieutenant Hanley
19   is lying.  That is going to be the biggest decision to
20   make here, and that is a credibility determination,
21   because all you have is two different people that were
22   the only people part of the conversation getting their
23   side of the story.

24               Here are the things I want you to take
25   into consideration on whether to terminate that

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                             420
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 421 of 501   Document 80-5

1        credibility decision.  It is Shannon Lewandowski that
         2        has the true motivation to lie, not Lieutenant Hanley.
         3        Why does she have a motivation to lie?  Because she
         4        wants to keep her job.  She doesn't want to be
         5        disciplined.  She knows full well if you believe that
         6        all of those statements that are attributed to her, that
         7        she was on her way to pick up her son, that she was
         8        operating with her lights on, not to be an emergency
         9        vehicle, but just so cars would get out of her way,
        10        that she was going 45 miles an hour, et cetera, that
        11        she clearly is going to be disciplined.  As they say
        12        oftentimes in these situations, the cover-up is worse
        13        than the crime, I think that is the instance here.
        14        She determined she was going to be exposed to discipline
        15        for having done that, so she engages in the cover-up,
        16        changes the story, tries to contort the whole thing and
        17        say now, her position is that is not true.  Lieutenant
        18        Hanley lied.

        19                      So there is a couple of questions.  Why
        20        would she lie from the very beginning?  Well, because
        21        she hasn't had an opportunity to collude yet with any
        22        other person; namely, Juanita Carr.  She doesn't know
        23        all the facts.  She doesn't know what other people know.
        24        Plus, she believes that there is a video out there.
        25        Right?  That is going to show that she was in the

         SUSAN K. TAYLOR          262-553-1058       COURT REPORTER
                                  sueT@wi.rr.com
                                                                    421
         Case 2:16-cv-01089-WED   Filed 04/22/19   Page 422 of 501   Document 80-5

accident, that her lights were on, her rate of speed, a
lot of these other sorts of things.  So that is one of
her big motivations to lie -- I mean, to tell the truth,
because she just can't lie, because she can't customize
the fabrications to the facts, because she doesn't know
what we know.  After she finds out what the department
knows, that is when she starts to change the story.  So
again, she has all the reasons to do that and Lieutenant
Hanley has no reason.  I asked her point blank, "are you
aware of any reason why he would be motivated to do
that," and she said, "no."  Now I can't expect that she
knows the mind of Lieutenant Hanley and should be able
to read his mind and all of that, but the point remains
that she has a motive, he does not.  In fact, he has
every motive in the world not to lie.  Why would he
subject himself to discipline himself, to take a state-
ment from an officer and completely make something out
of whole cloth and, then, attribute it to that so they
can get in trouble?  Would Lieutenant Hanley seriously
risk his career over that, because that is a career --
that is something that could you could sacrifice your
career on if you were caught.  It doesn't make any sense
why he would do that.

Furthermore, you would also have to
believe that if Shannon Lewandowski's version is true,

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 423 of 501   Document 80-5      422

```
 1        it wasn't only Lieutenant Hanley that was out to get
 2        her.  It was Lieutenant Hanley in conjunction with a
 3        number of other people.  I mean, she said that she
 4        accused Lieutenant Hanley of not reporting a sexual
 5        assault that was reported to him.  She also said that
 6        Lieutenant Leitzke did the same thing.  She said
 7        Sergeant Zieger did the same thing.  She called into
 8        question the motivations of the TAC officers who
 9        responded there.  These are mass conspiracies and, you
10        know, I can't prove that mass conspiracies are not true,
11        but when you make an extraordinary claim like that, it
12        requires extraordinary evidence.  I am presenting to you
13        there was no extraordinary evidence presented here on
14        why she would be the victim of this mass conspiracy.
15        So common sense has to lead you to the conclusion that
16        these simple -- the simple answer here, no Occam's
17        razor, the idea if there is a simple explanation, that
18        it is usually the best and the correct explanation.
19                    So are we to believe that she was on her
20        way to her son and got into an accident and, then, lied
21        to cover herself up?  A simple story?  Or are we to
22        believe that there is a mass conspiracy that's in effect
23        that requires the inclusion of multiple department
24        members that we are not even sure are connected to one
25        another.
```

SUSAN K. TAYLOR          262-553-1058        COURT REPORTER
                        sueT@wi.rr.com
                                                              423
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 424 of 501   Document 80-5

1              And there are other pieces that call her
        2       credibility into question.  Commissioner Wilson asked
        3       about the Melanie Beasley matter and how this connected
        4       in and we went into some of those facts.  Here is why I
        5       think we had to go into that, not because I think it is
        6       relevant or important, but because I knew this was going
        7       to be a defense tactic, if you will.  This really gets
        8       complicated when the defense gets involved.  So the
        9       chief's version of events is pretty straightforward.
       10       What the defense here wants to paint as part of this
       11       mass conspiracy, that this is all connected with Melanie
       12       Beasley and discrimination and retaliation, and so that
       13       is why I had to go into those questions regarding
       14       Melanie Beasley on "if someone reported sexual assault
       15       to you, what would you do?"  "I would do my job.  I
       16       would follow through on that."  They are police
       17       officers.  That is what they do.  What possible motiva-
       18       tion would Lieutenants Hanley, Leitzke or Zieger have to
       19       just blow off a report of a sexual assault?  It makes no
       20       sense.
       21              Furthermore, we had to get into it because
       22       Shannon Lewandowski, in her testimony and in her written
       23       statements, sort of, appointed herself the personal
       24       bodyguard and representative of Melanie Beasley.  That
       25       is not to say that in theory, that that is a bad thing.

     SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                              sueT@wi.rr.com
     Case 2:16-cv-01089-WED   Filed 04/22/19   Page 425 of 501   Document 80-5          424

1          You know, department members supporting each other and
         2          being friends.  Being a police officer, just like in the
         3          military, there are very strong bonds made between
         4          department members.  I am not suggesting there is any-
         5          thing wrong that she would support her friend and help
         6          her if she thought she was getting a raw deal from
         7          administration.  That is fine.  Where it becomes a
         8          problem is when she suggests -- not just suggests, but
         9          actually states there is a conspiracy to cover up the
        10          Beasley investigation, to cover up her own investi-
        11          gation, to turn everything around on them for the sole
        12          purpose of discriminating against them because they are
        13          females.  Those are extraordinary claims.  Again, those
        14          are extraordinary claims.  We need extraordinary
        15          evidence, and there is none other than her own personal
        16          perceptions and observations and feelings, many of which
        17          are not substantiated by the record or contradicted.

        18                  For example, she maintains Lieutenant Hanley
        19          was never at the hospital.  Well, let me retract that.
        20          She acknowledged it was possible that he could have been
        21          at the hospital, but she maintained that he did not
        22          speak to her, did not look in on her.  Well, we had
        23          Lieutenant Kelly come in to rebut that.  As far as I am
        24          aware, there isn't any particular accusations made
        25          against Lieutenant Kelly and his motivations.  Maybe he

         SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                                  sueT@wi.rr.com
                                                                    425
              Case 2:16-cv-01089-WED   Filed 04/22/19   Page 426 of 501   Document 80-5

1     is going to be part of the conspiracy now that he's

          2     testified, but as far as we know right now, he is just

          3     a neutral party that came in and completely contradicts

          4     what Shannon Lewandowski says.  And that is consistent

          5     throughout the entire record, that her version of the

          6     events, while -- if that was her first story -- might

          7     make sense, was not consistent, is not supported by the

          8     evidence that we do have.

          9                 Now, we have a lot of questions of things

         10     that we would like answered that we just can't answer

         11     due to the nature of it, but we have to look at the

         12     evidence that we do have and the evidence that we do

         13     have, when looked at fairly, I respectfully submit,

         14     indicates, quite clearly, that Lieutenant Hanley

         15     accurately reported what the detective told him on the

         16     early morning hours of January 19 and, then, in and of

         17     itself, just that statement, even if you had no other

         18     facts, in and of itself, justifies a finding of all of

         19     those rule violations having occurred.

         20                 It is also possible that you could decide

         21     that parts of it were true and other parts of it were

         22     not true.  I've talked long enough, so I won't go into

         23     all the possible ways that you could find some viola-

         24     tions and not others.  One, because of the time con-

         25     sideration, but also, two, because again, I respectfully

        SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                                  sueT@wi.rr.com
                                                                    426
        Case 2:16-cv-01089-WED   Filed 04/22/19   Page 427 of 501   Document 80-5

```
1        submit I don't think that is a reasonable conclusion.
2        Either you believe the whole package or you don't
3        because she's offered -- the detective has offered a
4        version of the events that if you believe would be
5        consistent with her not violating any rules depending on
6        how you analyzed it.  So I won't go down that path and
7        just urge that you believe Lieutenant Hanley and the
8        circumstantial evidence that also supports a finding
9        that she violated all of those rules on the bases that
10       are set forth in his report.  Thank you.
11              MR. KONRAD:        Mr. McGaver?
12              MR. MC GAVER:        Thank you.  Thank
13       you for your time and attention to this obviously very
14       important matter.  Just know it doesn't go unnoticed.
15       Nobody, nobody can credibly accuse Shannon Lewandowski
16       of being an idle cop.  She tried to stay busy.  There
17       was ample testimony she helps out with investigations
18       that are not even her own.  She helps out her fellow
19       police officers.  She involves herself in any way that
20       she can be helpful.  That is her practice.  That is her
21       policy.  That is what she does as a cop.
22              Now, on January 19, 2015, she reported
23       for duty.  She later met with then-Police Officer
24       Melanie Beasley and discovered that Officer Beasley had
25       a couple of concerns.  Now, the city has posited that
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                        427
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 428 of 501   Document 80-5

1    they were personal concerns.  I dispute that.  I think
2    the stipulation of Melanie Beasley and the testimony of
3    Shannon Lewandowski lends credibility to the fact that
4    Shannon Lewandowski offered to assist and Beasley
5    requested needing Shannon Lewandowski's assistance with
6    some police reports.  Shannon Lewandowski helped out.
7    She also helped out and provided counsel in what I would
8    call a personnel matter, but not a personal matter.  It
9    is no secret that Melanie Beasley was going through a
10   rough time.  Whether you believe a sexual assault
11   occurred or harassment or none of it, at least in
12   Melanie Beasley's mind, she was going through a rough
13   time and needed some help.  Shannon Lewandowski was
14   there to help her.
15                Again, I disagree with the city's
16   position that it is a personal matter.  It is a profes-
17   sional matter.  It is a police matter.  Officers should
18   look out for one another.  And more than that, there was
19   actual police work involved.  There's assistance with
20   these reports.
21                In any event, later on, Shannon
22   Lewandowski is pulled away from the conversation with
23   Officer Beasley because she hears something over the
24   radio.  It is something that she hears over the radio
25   that a shooting occurred and Juanita Carr was in some

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                          428
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 429 of 501   Document 80-5

1     way involved in the shooting.  You heard Juanita Carr's
        2     testimony.  She said she reported to the hospital.  What
        3     does Shannon do?  Shannon leaves Melanie Beasley and
        4     makes her way to the hospital.  She gets on the phone
        5     with Detective Carr and Detective Carr tells her that
        6     it is a self-inflicted gun wound from a concealed carry
        7     permit holder, so it is not a huge deal, that she's got
        8     this wrapped up.  Lewandowski goes off and does more
        9     police work, works on reports, does whatever, follows
       10     up with other investigations that were pending, does
       11     whatever she had to do.

       12                Now, later on in the same shift,
       13     Lewandowski meets up with Detective Carr and it somehow
       14     comes to light that Detective Carr needs to report back
       15     to, for the second time, this residence and conduct a
       16     knock-and-announce search in an attempt to find the gun
       17     that was used in the shooting.  It went to Detective
       18     Carr, not Lewandowski, but Lewandowski volunteered to
       19     assist with the caveat that, "since you were just at
       20     that house, Detective Carr, let's do a quick detour so
       21     I can handle my business, continue the conversation with
       22     Melanie Beasley.  We are going to go to District 5 for a
       23     second."  Detective Carr agreed.

       24                On the way to the squad car, Shannon
       25     Lewandowski gets a phone call from her son and it is a

        SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                              sueT@wi.rr.com
                                                                    429
        Case 2:16-cv-01089-WED   Filed 04/22/19   Page 430 of 501   Document 80-5

```
 1        phone call that I am sure every parent dreads getting

 2        and unfortunately, for both Jordan Lewandowski and

 3        Shannon, it is a phone call that happens many times in

 4        that household.  Jordan Lewandowski was stopped by the

 5        police.  "Where are you?"  "I am not sure."  "What did

 6        they stop you for?"  "I am not sure."  Then you heard

 7        Shannon say that there was some conversations in the

 8        background, which, I think, justifies -- at least

 9        explains why that phone call was two minutes long.

10        It ended with Shannon saying, "let me know what happens.

11        Call me back as soon as you realize what is going on."

12        The phone call ended.  Shannon Lewandowski got in her

13        squad car with Juanita Carr and they proceeded to make

14        their way to District 5.  They never got there.  They

15        never got there because just before the intersection of

16        35th and North, Shannon Lewandowski sees a car pulling

17        out in front of her and puts on her squad car lights,

18        operates her siren, uses it as a horn and lets the car

19        know that the squad was behind her and they avoid an

20        accident there, only to enter the intersection and get

21        slammed into by a drunk driver; a drunk driver with a

22        suspended license, a drunk driver with no insurance on

23        the car, a drunk driver with faulty brakes on the car.

24        The accident wasn't Shannon Lewandowski's fault.  Nobody

25        here said it was Shannon Lewandowski's fault.  Shannon
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                    430
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 431 of 501   Document 80-5

```
 1          Lewandowski had the green light.  There's been no testi-
 2          mony to the contrary of that.  I posit that had that
 3          squad car cleared the intersection without getting into
 4          that accident, the squad lights would have gone off and
 5          they would have proceeded right to District 5.
 6                    Well, what happens in the accident?
 7          Shannon Lewandowski is tossed over the center console
 8          some, ends up in Juanita Carr's lap, passes out. Juanita
 9          Carr is panicking, citizens are coming to aid the two
10          detectives, pulls them out of the car.  It is chaos.
11          But Jordan Lewandowski, in dealing with his situation in
12          Shorewood, he is dealing with a little chaos of his own.
13          He's pulled out of the car, performed some field
14          sobriety tests, blows into the Breathalyzer.  He is
15          underage.  He realizes that he's got some problems.
16          Where that situation ends is after Sergeant Smith
17          searches Jordan Lewandowski and has ahold of his phone,
18          the phone rings, so Sergeant Smith answers the phone and
19          it is an unidentified police officer from the Milwaukee
20          Police Department who tells the sergeant that Shannon
21          Lewandowski had been in a car accident, that she is
22          hurt.  What does Officer Smith do?  Tosses the phone and
23          the wallet back to Jordan Lewandowski, says, "your mom
24          is in a neck brace."  He clears the scene.  He doesn't
25          wait around, he doesn't order another officer to wait
```

        SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                          sueT@wi.rr.com
                                                              431
        Case 2:16-cv-01089-WED  Filed 04/22/19  Page 432 of 501  Document 80-5

```
 1    around.  Just vanishes.  So there is panic and chaos
 2    going on at the scene of 35th and North and there is
 3    panic and chaos going on on Maryland Street.  And that
 4    chaos is from Jordan Lewandowski, who doesn't know
 5    whether his mother is living or dead, doesn't know what
 6    happened.  He repeatedly calls his mother's cell phone.
 7    No answer.  Finally, through, it sounds from the testi-
 8    mony in this hearing, some small miracle, somebody gets
 9    ahold of Jordan Lewandowski and Officers Krumnow and
10    Stacey go to pick him up.  He ends up at the hospital,
11    reports to the room.  His mother is in a neck brace, at
12    least initially.  I think she was out of the neck brace
13    by then.  And the family is pretty much reunited, which
14    is good.
15            Now, there is a couple concerns that were
16    raised by the city in their case and in their presenta-
17    tion.  Number one is the business card that Jordan
18    Lewandowski presented to Officer Cody Smith, as if there
19    was something wrong with a black gentleman presenting a
20    business card to show that his mother is a Milwaukee
21    police detective.  You heard Shannon say, you heard
22    Jordan say that they weren't expecting any preferential
23    treatment because of that.  The business card was
24    presented to make sure that a traffic stop, which is
25    generally a very dangerous situation, didn't go poorly.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              432
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 433 of 501   Document 80-5

1      That is all there was to it.  You heard Jordan say, you
        2      heard Shannon say, you heard Juanita say, all live
        3      testimony from these witnesses that there was no
        4      intention by anyone to interfere with that investigation
        5      into the UWM Police Department -- into the Shorewood
        6      Police stop of Jordan Lewandowski.
        7                  Now, Lieutenant Hanley reported to the
        8      scene of the accident, did what he needed to do there
        9      and at some point, he reports to the hospital.  I think
       10      there is enough evidence to demonstrate that he did
       11      report to the hospital at some point.  But you heard
       12      from Jordan Lewandowski, you have heard from Denise
       13      Brown, you heard from Officer Vollrath, you heard from
       14      Shannon Lewandowski.  None of these people say they ever
       15      witnessed Lieutenant Sean Hanley have a conversation
       16      with Shannon Lewandowski, not a 20-or-30-minute conver-
       17      sation at that hospital.  So now, Shannon is getting
       18      ready to get discharged from the hospital.  She realizes
       19      that she had not had a conversation with her supervisor
       20      yet.  What does she do?  She goes to her district to
       21      pick up her personal car and then to try to have an
       22      interaction of some sort with Lieutenant Hanley, letting
       23      him know she's okay, letting him know she's going home.
       24      Hanley is not at the district, so what does she do?  She
       25      waits until she gets home and makes one phone call to

        SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                                 sueT@wi.rr.com
                                                                    433
        Case 2:16-cv-01089-WED   Filed 04/22/19   Page 434 of 501   Document 80-5

him it.  Appears from the phone records, that they never
2 connected.  She makes a second phone call.  A phone call
3 occurred at 6:38.  It was a seven-minute phone call --
4 Shannon Lewandowski's accident occurred at 2:18 -- only
5 a few hours after this accident.  Her testimony --
6 a lot of testimony was that Shannon Lewandowski was
7 unconscious for a period of time, suffered from a severe
8 concussion, had other injuries.  This is only a few
9 hours after this accident.  You heard testimony about
10 officers on the scene that had conversations with
11 Shannon Lewandowski.  They were getting frustrated with
12 her because she was making no sense.  She was talking
13 nonsense.  She was giving the wrong cell phone number
14 for her son.  I think it is pretty clear that she didn't
15 quite know what was going on at that time.

16                    I think something else is quite clear.
17 I think the statement that Sean Hanley attributes to
18 Shannon Lewandowski at 6:38 in the morning, that doesn't
19 make any sense, either.  I am not sure if the statement
20 doesn't make any sense because Shannon Lewandowski was
21 just involved in a severe car accident suffering from
22 concussion symptoms and didn't know what was going on
23 and couldn't form her thoughts to follow along with the
24 conversation or what.  I am not a medical professional,
25 I don't know if that is the case, or because Lieutenant

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
sueT@wi.rr.com
                                                              434
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 435 of 501   Document 80-5

```
 1          Hanley's recollection of the events isn't accurate.
 2          I don't know.  But a lot of the things that Shannon
 3          Lewandowski said in that conversation don't make sense.
 4          Why would she admit to going 45 in a 30 and speeding and
 5          violating department protocol through that intersection
 6          to her supervisor?  That doesn't make sense.  Why would
 7          she admit to going to UWM to intervene in a traffic
 8          stop, which is clearly inappropriate and clearly against
 9          department protocol?  It never happened.
10              The lights and sirens?  Well, you have
11          heard ample testimony about why, at least in Shannon's
12          mind, the lights were activated.  I would posit that
13          there was a traffic construction in front of her.  The
14          light went on.  Had she cleared the intersection, the
15          lights would have gone off.  And when the lights went on
16          from the point of impact, it is one block, and it's a
17          short block.  This was not a long period of time.  This
18          car wasn't sitting there for minutes and minutes and
19          minutes with its lights on.
20              You heard the city say that when you
21          see police lights in front of you, it causes chaos.  I
22          disagree.  I think when you see police lights before you
23          in a roadway, it causes you to be more careful.  When
24          you see police lights in front of you, you are not going
25          to panic and all of a sudden, run into a pole.  That
```

1    doesn't make any sense.  It doesn't create any chaos;
         2    it causes drivers to be careful.  That is why officers
         3    use those lights, so other drivers can use caution.
         4          What does all of it mean?  It doesn't make
         5    sense that Shannon Lewandowski would have given untruth-
         6    ful statements in the seven-minute conversation she had
         7    with her supervisor just a few hours after the accident.
         8    At least not intentionally.  Several months after the
         9    investigation, we see Adam Zieger's report which is not
        10    made available until September 9.  That report is
        11    riddled with rumors about officers hearing from other
        12    unidentified officers about Shannon Lewandowski going to
        13    UWM to intervene in some sort of a traffic stop.  None
        14    of it is substantiated.  It is all from unidentified
        15    police officers.
        16          After the report was filed, after the
        17    investigation is concluded, she is charged with rule
        18    violations and she submitted some written responses to
        19    those rule violations.  You have copies of those.
        20    Shannon Lewandowski was frustrated and she is angry that
        21    these accusations were made against her.  I will admit
        22    at best, the written responses are -- they are harsh.
        23    That is only because she is frustrated and angry at how
        24    she believes she was treated by the department.  As a
        25    result of this accident, which was not her fault, she's

      SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                          sueT@wi.rr.com
                                                              436
      Case 2:16-cv-01089-WED   Filed 04/22/19   Page 437 of 501   Document 80-5

1       had to deal with lingering injuries, including -- I

2       don't think it's ever been disputed -- some injuries to

3       her head.

4                    It is not fair to her how this investi-

5       gation has been treated because instead of giving an

6       officer, especially only a few hours after the injury

7       (sic) took place with a severe head injury, the benefit

8       of the doubt, sending Hanley back to come interview her

9       again, sending another officer to interview her again,

10      because some of the statements she made didn't make

11      sense.  She is charged with rule violations and she

12      is fired.  It all happened because of an accident that

13      wasn't her fault.  It is not fair, it is not right and

14      the charges should not be sustained.  Thank you.

15                   MR. KONRAD:        We will now proceed

16      into --

17                   MR. PEDERSON:      I am sorry.  There

18      are a number of documents that I have not moved into

19      evidence at least and I think that is at least 15, 16,

20      and 17, maybe 14.  I would move those into evidence.

21                   MR. MC GAVER:      I have no objection.

22                   MR. KONRAD:        Those documents will

23      be received.

24                   You have one document; 12.  I assume

25      that's been withdrawn?

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              437
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 438 of 501  Document 80-5

```
 1                    MR. MC GAVER:      I think -- I am not
 2           offering it as an exhibit.  To the extent that it is
 3           mentioned in the record, I don't know how you want to
 4           treat it, but it has been moved into evidence, and it
 5           will not be.
 6                    MR. KONRAD:        We will leave it in
 7           the record as not offered.  12 is not offered.  It is
 8           marked, but not offered.
 9                    MR. MC GAVER:      Thank you.
10                    MR. KONRAD:        Anything further?
11                    MR. PEDERSON:      I don't think so, no.
12                    MR. MC GAVER:      No.
13                    MR. KONRAD:        We will now proceed
14           into closed session with deliberations.  The first five
15           "just cause" standards.  Are counsel familiar with those
16           standards?
17                    MR. MC GAVER:      Yes.
18                    MR. PEDERSON:      Yes.
19                    MR. KONRAD:        Then I will forego
20           reading them into the record.
21                    In order for us to be in closed session,
22           we have to take a vote, or at least we have to record
23           any objections to closed session, so do any of the
24           commissioners have objections to going into closed
25           session?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                            438
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 439 of 501   Document 80-5

```
 1                    MS. WILSON:        Move to go into

 2        closed session.

 3                    MR. KONRAD:        Any objection?

 4                    MS. MC KENZIE:     I don't have any.

 5        I second.

 6                    MS. HEIN:          No objection.

 7                    MR. KONRAD:        No objection, then,

 8        we will now go into closed session for purposes of

 9        deliberations.  It is now 12:30.  We will convene at

10        1:25, or would you like to reconvene later?

11        (Discussion off the record)

12                    MR. KONRAD:        I will tell the other

13        participants to be here by 1:25, one hour from now.

14        (Closed session deliberations)

15                    MR. KONRAD:        We are back in

16        session.  After deliberation for Phase I of the

17        proceedings, we thank counsel for their hard work in

18        presenting the evidence to us.  After deliberation, the

19        members of the Commission have voted to sustain, by a

20        preponderance of the evidence, all three charges against

21        Detective Shannon Lewandowski.

22                    I have also found, by a preponderance of

23        the evidence, that the first five "just cause" standards

24        are satisfied.  Therefore, it is appropriate now to move

25        to Phase II of the proceedings.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              439
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 440 of 501   Document 80-5

```
 1                    MR. PEDERSON:       The chief would call
 2        Assistant Chief Yerkes.
 3                    CARIANNE YERKES, having been first duly
 4        sworn on oath to tell the truth, the whole truth, and
 5        nothing but the truth testified as follows:
 6                    MR. KONRAD        The witness is sworn.
 7                    THE WITNESS:       I am sitting in for
 8        the chief.  Unfortunately, his mother-in-law passed away
 9        within the last two days and he has to travel to Texas
10        in order to attend her funeral.  Just so you are aware.
11                    MR. KONRAD:        Thank you.
12        DIRECT EXAMINATION BY MR. PEDERSON:
13   Q    Please state your name for the record and spell it.
14   A    Carianne Yerkes.  C-a-r-i-a-n-n-e.  Y-e-r-k-e-s.
15   Q    What is your position?
16   A    Assistant Chief of Police.
17   Q    That is with the Milwaukee Police Department?
18   A    Yes.
19   Q    Is it correct to say you are here today as the chief's
20        representative in terms of Phase II?
21   A    Yes.
22        (A document was marked as Exhibit No. 18)
23   Q    I have presented you a document marked for identifica-
24        tion as Exhibit 18.
25                    MR. MC GAVER:      What is the date on
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                    sueT@wi.rr.com
                                                        440
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 441 of 501   Document 80-5

```
 1      that?

 2                    MR. PEDERSON:      Here is one for you.

 3   Q   Let's start over.  Assistant Chief, I have presented you

 4       a document marked for identification, marked as Exhibit

 5       No. 18.  Do you have that in front of you?

 6   A   Yes.

 7   Q   Are you familiar with this document?

 8   A   Yes.  It is the Discipline Review Summary.

 9   Q   Can you explain to me what that is?

10   A   This is a report that is filed after the discipline

11       review outlines what was discussed regarding the review

12       at the chief's level.

13   Q   Does this particular document relate to the case at

14       issue?

15   A   Yes, it does.

16   Q   How do you know that?

17   A   It is based off the file number and the charged member.

18   Q   Near the top, it indicates "Members Present."  Do you

19       see that box?

20   A   Yes.

21   Q   In there, it indicates a number of personnel, including

22       yourself, as well as Chief Flynn.  Is that an accurate

23       statement?

24   A   Yes.

25   Q   Can you, please, indicate what that "Members Present"
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                      sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 442 of 501   Document 80-5      441

1    box indicates?

2  A    It indicates the executives that were present during the

3       discipline summary that was Chief Flynn, Assistant

4       Chiefs Harpole and Leibold, myself -- I was an inspector

5       at the time -- Captain Shepherd, Lieutenant Leitzke and

6       Nicole Fleck, who was our interim HR administrator at

7       that time.

8  Q    What is discussed at that meeting?

9  A    The merits of the case and the discipline to be imposed.

10 Q    And what was your role?

11 A    My role is to offer my opinion and my expertise to the

12      chief prior to making discipline decisions.

13 Q    Were you present for the entire meeting where this was

14      discussed?

15 A    Yes.

16 Q    "Reviewed/Discussed."  Do you see that portion?

17 A    Yes.

18 Q    What does this portion relate to?

19 A    This goes over the documents that are provided during

20      the discipline hearing which are the charge specifica-

21      tions, the employee's hardcard, the case file history,

22      any comparables for other individuals that received

23      discipline of the same nature, the lieutenant's cover

24      which summarizes the case, the member's Response to

25      Charges and any other applicable documents.

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                      sueT@wi.rr.com
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 443 of 501  Document 80-5    442

```
 1   Q   You should have in front of you a pile of documents.
 2       Exhibits?
 3   A   Yes.
 4   Q   If you go through there and find Document No. 5 and
 5       Document No. 6.  Actually, all you need is number six.
 6   A   I have Document 6.
 7   Q   This has already been entered into evidence as the
 8       Charges and Specs.  Does that relate to any of the
 9       documents that are indicated that were reviewed?
10   A   Yes.  This would be what is considered the charge
11       specification which is one of the first documents
12       reviewed.
13       (A document was marked as Exhibit No. 19)
14   Q   Chief, I have handed you another document marked for
15       identification as number 19.  Do you have that in front
16       of you?
17   A   Yes.
18   Q   Are you familiar with this document?
19   A   Yes.  This is what we call the "hardcard" or the PM-5.
20   Q   Specifically on the Discipline Review Summary on the
21       charge specifications, it indicates PM-5 there.  Is that
22       what you are indicating?
23   A   Yes.
24   Q   This is a document that is reviewed in relation to that?
25   A   Yes.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 444 of 501   Document 80-5      443

```
 1   Q   Were both of those documents, in fact, reviewed?

 2   A   Yes.

 3   Q   The next category, according to this document, is the

 4       "Case File History."  Can you indicate to me what that

 5       document is?

 6   A   The case file history is a document that is an elec-

 7       tronic document that is produced by Internal Affairs,

 8       that outlines all the complaints sustained or not

 9       sustained against the member.

10       (A document was marked as Exhibit No. 20)

11   Q   I am handing you a document marked for identification as

12       Exhibit 20.  Are you familiar with this document?

13   A   Yes.

14   Q   What is this document?

15   A   This is the employee's case file history.

16   Q   All right.  Is that the same document that was reviewed

17       as part of the summary?

18   A   Yes.

19   Q   I think the next entry on the summary form is

20       "Comparables."  Do you see that?

21   A   Yes.

22   Q   What is that indicating?

23   A   The comparables are a list that is produced by Internal

24       Affairs of other Code of Conduct or rule violations that

25       are similar in nature and the discipline that was
```

1      imposed on the member at the time.

2      (A document was marked as Exhibit No. 21)

3  Q   I am presenting you a document marked for identification

4      as Exhibit 21.  Are you familiar with that document?

5  A   Yes.  This document is the comparables regarding this

6      case.

7  Q   The next entry indicates "IAS Lieutenant's Cover."

8      Is that correct?

9  A   Yes.

10 Q   What is that?

11 A   That is the memorandum that is filed by lieutenants

12     that summarizes the sergeant's investigation and makes a

13     recommendation.

14 Q   All right.  Finally, the last entry is "Member's

15     Response to Charges."  Did I read that correctly?

16 A   Yes.

17 Q   What is that?

18 A   That is a memorandum that is filed by the member and

19     gives them the opportunity to respond to the charges.

20 Q   Were all of those documents reviewed?

21 A   Yes.

22 Q   Does it indicate that they are reviewed on this docu-

23     ment?

24 A   Yes.

25 Q   How did you do that?

SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                       sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 446 of 501   Document 80-5      445

```
 1   A    By circling the word "yes."

 2   Q    I note that there is one final category called "Other."

 3        Do you see that?

 4   A    Yes.

 5   Q    Is there any indication whether there was anything

 6        reviewed or not?

 7   A    There is no indication that there was any other docu-

 8        ments reviewed.

 9   Q    Okay.  So does that represent concerns of the reporting

10        on this document, any error?  In other words --  Let

11        retract that question.  Were there any other materials

12        reviewed or considered at the meeting?

13   A    Not that I am aware of that I recall.

14   Q    So it appears that had this document been completed, it

15        should have probably been circled "no."  Is that right?

16        For that question?

17   A    Yes, it should have probably been circled "no."

18   Q    Do you know who prepares this document?

19   A    I believe the lieutenant prepares the document.

20   Q    Again, on your memory, there was no other materials

21        considered.

22   A    Correct.

23   Q    Next, the document goes into breaking out some cate-

24        gories.  We will go first.  "Employee Motivation."

25        Is that right?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                     sueT@wi.rr.com
                                                              446
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 447 of 501   Document 80-5

```
 1    A    Yes.

 2    Q    Next, it says, "A-Self-Interest."  What does that mean?

 3    A    One of the just causes that is considered for discipline

 4         is employee's motivation.  Is it aggravating or is it

 5         mitigating?  This document suggestions that the employee

 6         motivation was "aggravating" and that it was based off

 7         of self-interest.

 8    Q    The next in that same box, it says "M-N/A."  What does

 9         that mean?

10    A    Mitigating -- "M-N/A" means not applicable.

11    Q    Would it be correct to say, then, at least according to

12         this document, there was no mitigating factors taken

13         into consideration there?

14    A    Yes.

15    Q    Is that consistent with your recollection of what

16         happened at the meeting?

17    A    Yes.

18    Q    When it comes to "Degree of Harm," was that considered

19         an aggravating or mitigating set of circumstances?

20    A    Aggravating.

21    Q    How so?

22    A    Based on the injuries that occurred and the amount of

23         damage to the squad car from the accident, they were

24         both aggravating circumstances.  There were serious

25         injuries and the squad car was totaled.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              447
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 448 of 501   Document 80-5

```
 1   Q    Were there any other aggravating circumstances in
 2        relation to this?
 3   A    There are when you go into "Intentional/Unintentional"
 4        and "Employee Experience," but as relates to the "Degree
 5        of Harm," the things that were specifically taken into
 6        consideration were the injuries and the amount of
 7        damage.
 8   Q    Okay.  What about lost work time?
 9   A    That would be an aggravating degree of harm because both
10        individuals lost work time.  One of the individuals is
11        still, as far as I am aware, not back to full duty.
12   Q    Was Detective Lewandowski's experience an aggravating or
13        mitigating factor?
14   A    Aggravating, based on her amount of time in service.
15   Q    Could you go into that deeper?  Why is that aggravating?
16   A    Because we give some leeway to newer officers that make
17        mistakes because they are new to the department.
18        Officers that have a significant amount of time on
19        usually should know better and know what the rules are
20        and what we expect of them.
21   Q    It says "Intentional/Unintentional."  What is that
22        category aiming toward?
23   A    The "intentional" or "unintentional" speaks to the act
24        itself, whether or not the employee made a mistake and
25        was their mistake an unintended consequence of something
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 449 of 501   Document 80-5    448

```
 1      else that they were doing or was the mistake they made
 2      something that was an intentional act to go against a
 3      rule or a regulation?
 4   Q  Was that considered aggravated or mitigated?
 5   A  Aggravated.
 6   Q  How so?
 7   A  Because it was intentionally operating a squad as an
 8      emergency vehicle without cause, responding to a
 9      location for reasons other than department business and,
10      then, was intentionally untruthful as to her true des-
11      tination at the time of the squad accident.
12   Q  Do any one of those considerations have greater weight
13      than the other?
14   A  Yes.  The consideration as it relates specifically to
15      the untruthfulness has a greater weight.
16   Q  Why is that?
17   A  Because untruthfulness is one of the -- is an aggravat-
18      ing factor that usually results in discharge from the
19      department.
20   Q  All right.  In terms of her past record, was that con-
21      sidered aggravating or mitigating?
22   A  Aggravating.
23   Q  How so?
24   A  In 2015, behavior that could discredit the department,
25      received a district level reprimand and in 2014, has a
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                  449
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 450 of 501   Document 80-5

```
 1        violation of failure to treat department supervisor with
 2        respect.
 3   Q    Are you able to point to any of the documents that
 4        indicate a correlating documentation of what is being
 5        referred to there?
 6   A    I will look at the employee's case file history.  On the
 7        first page of Exhibit 20, there is a closed file from
 8        1-23-15 that was an integrity violation.  That was
 9        sustained.  It has an official reprimand.
10                        Then, on the second page is the 2014 file
11        that has a policy review as it relates to failing the
12        treat a supervisor with courtesy and professionalism.
13   Q    Is it significant that there is a specific integrity
14        violation as well?
15   A    Yes.  Integrity violations are taken very seriously.
16   Q    Finally, there is a "Notes" section on the document.
17        Do you see that?
18   A    Yes.
19   Q    It doesn't appear --  Is there anything important there
20        in terms of how this was considered or discussed among
21        the members other than the outcome?
22   A    No.  This just has the outcome of this review.
23   Q    I would like to talk about comparables for a second.
24        Those were considered during the meeting.  Is that
25        correct?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                    sueT@wi.rr.com
                                                              450
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 451 of 501   Document 80-5

1    A    Yes.

2    Q    All right.  As you are aware, let's talk first about the

3         charge relating to the -- it might be the last charge in

4         Exhibit 6, Competence.

5              "All department members shall render service

6         to the community promptly and efficiently.  When not

7         answering a call for service, member shall use their

8         time to accomplish the mission of the department."

9         Do you see that?

10   A    Yes.

11   Q    Do you know what the chief's decision was regarding

12        discipline on that charge?

13   A    A five-day suspension.

14   Q    Specifically as it relates to that charge, how was that

15        deemed an appropriate amount?

16   A    Based off of comparables in which -- I will have to look

17        through them.  There is probably another individual that

18        didn't go to an assignment or had some sort of similar

19        circumstances that received comparable discipline.

20   Q    I would direct your attention to the comparables

21        document.  I don't know the number.

22   A    21?

23   Q    I direct your attention to that.  In that packet in the

24        fourth page relating to Guiding Principle 1.03, I will

25        direct your attention to Dwight Copeland, if you can

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                451
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 452 of 501   Document 80-5

1    find that.

2  A   Yes.

3  Q   Could you please --

4              THE WITNESS:        Are we talking about

5       Page 2?  I want to make sure.

6              MR. PEDERSON:       Unfortunately, mine

7       are loose, so I cannot give you the --

8              MS. HEIN:        Page 2.

9              THE WITNESS:        Thank you.

10             MR. PEDERSON:       It indicates he

11      received five days.  That is the entry I am looking for.

12             THE WITNESS:        Then, I have a

13      different entry.

14             MS. HEIN:        On the bottom, what

15      does it say?  MPD -- what is the number?

16             MS. MC KENZIE:     Do you have a little

17      number on the bottom?

18             MR. PEDERSON:       I am referencing

19      Guiding Principle 1.03.  It is probably at the rear of

20      the packet.

21             MR. MC GAVER:      I have Bates 0016,

22      if that helps.

23             MS. WILSON:        What is the name?

24             THE WITNESS:        I found it.

25  A   0016, the third entry down is,

SUSAN K. TAYLOR         262-553-1058      COURT REPORTER
                        sueT@wi.rr.com
                                                              452
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 453 of 501   Document 80-5

1          "Police Officer Dwight Copeland failed to
2          answer the radio while arguing with an ex-girlfriend
3          while on duty."
4          He received a five-day suspension.
5     Q    I don't know if that was a specific one that was
6          considered, but would you consider that a comparable?
7     A    Yes.
8     Q    How so?
9     A    He wasn't where he was supposed to be or doing what he
10         was supposed to be doing.
11    Q    I don't know.  You tell me.  We have limited information
12         here, but what is more aggravated?  The Detective
13         Lewandowski situation or that of Officer Copeland?
14    A    I would say Detective Lewandowski's because of the
15         accident that was involved and not being where you are
16         supposed to be, doing what you are supposed to be doing.
17         That degree of harm is more aggravating than whatever
18         radio call this individual didn't respond to, which I
19         don't remember it being a significant call in which
20         somebody else was injured.
21    Q    Now, I would like to address the squad accident charge
22         which would be referencing Guiding Principle 1.05 and I
23         believe it is the first charge in the Complaint.  This
24         relates to the requirement, and I will read it.
25              "Operators of Department vehicles shall, in

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              453
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 454 of 501   Document 80-5

```
 1        all instances, operate the vehicle in a safe and courte-
 2        ous manner, comply with all traffic laws and ordinances,
 3        and wear seat belts at all times, except when doing so
 4        would endanger the safety of the operator or another, or
 5        when he/she has provided medical certification that
 6        he/she is unable to do so."
 7        Did I read that correctly?
 8    A   Yes.
 9    Q   What was the determination of the chief as to the amount
10        of discipline that was appropriate for that charge?
11    A   The chief went with significant discipline on that
12        charge, specifically because of the injuries that were
13        incurred not just by the detectives, but there were also
14        citizens that were injured, the amount of damage that
15        was done to the squad car, and the circumstances in
16        which Detective Lewandowski was operating, which was
17        with red lights on, which was not necessary for the
18        call.
19    Q   I don't think we have it quite in the record yet.  What
20        was his specific determination?
21    A   30 days.
22    Q   You have listed some reasons why that was aggravated.
23        I would direct your attention to the comparables in
24        number 21 and give you an opportunity to look at that.
25        Is it fair to say that that 30 days in comparison to
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                          454
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 455 of 501  Document 80-5

```
 1        what we have available in the comps is greatly higher

 2        than what we have here?

 3   A    Yes.

 4   Q    Given that context, if someone --  Let's talk about the

 5        first one.  The entry for PO Lucas McAleer.  Do you see

 6        it?

 7   A    Yes.

 8   Q    I will give you a quick moment to look at it.  Is it

 9        an accurate statement to say that Officer McAleer was

10        in the legitimate pursuit of his duties and got into an

11        accident and received two days?

12   A    Yes.

13   Q    So if someone is going to receive two days while in the

14        legitimate exercise of their duties, is that a factor in

15        the disparity between 30 days and two days in terms of

16        that decision?

17   A    Yes.  The difference is for Officer McAleer, the

18        employee motivation was mitigating which was he was in

19        the line of duty acting in a manner in which he was

20        authorized to act and unfortunately, he had a squad

21        accident.  Now, there was an aggravating factor with a

22        degree of harm in which speed was a factor and we lost

23        another squad car.  However, he was doing what he was

24        supposed to be doing.  The difference between this squad

25        accident and that squad accident was that the detective
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
sueT@wi.rr.com
                                                        455
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 456 of 501   Document 80-5

```
 1            wasn't where she said she was going to be and operating
 2            as an emergency vehicle, which it was not necessary to
 3            do, and the amount of injuries to herself and to her
 4            partners and to the civilians was significant.
 5    Q      Isn't it true, to the best of your knowledge, you
 6            actually lost two detectives as a result of that, that
 7            had yet to return to work.  Right?
 8    A      Correct.
 9    Q      At least full-time.
10    A      Full duty, correct.
11    Q      Is it a correct statement that they were both out on
12            medical leave doing nothing at all for about eight or
13            nine months?  Is that right?
14    A      I believe so.  I would have to actually look at the
15            record, but I know both of them lost significant amounts
16            of time from work.
17    Q      So we have a combined approximately 16 months of lost
18            time in that regard as well.  Right?
19    A      Yes.
20    Q      Finally, I would direct your attention to the
21            "Integrity" charge where it indicates,
22                    "All department, members shall be forthright
23            and candid, orally or in writing, in connection with any
24            administrative injury or report."
25            Did I read that correctly?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                                    456
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 457 of 501   Document 80-5

```
 1   A    Yes.

 2   Q    What was the chief's decision of the appropriate disci-

 3        pline for those charges?

 4   A    Dismissal from the department.

 5   Q    Why was that?

 6   A    Because it is an untruthfulness charge and it is an

 7        integrity violation and the integrity violation that is

 8        taken most seriously when an individual is untruthful

 9        and it was found, based on the case file, that Detective

10        Lewandowski was untruthful in her statements and was

11        discharged from the department.

12   Q    Why is it important for officers to be truthful and to

13        not have their truthfulness called into question?

14   A    Because we are keepers of the public trust.  As a member

15        of this department, you are given a lot of latitude in

16        your ability to make decisions as it relates to indi-

17        viduals' rights as it relates to investigations.  If a

18        member is going to be untruthful, how do we know that

19        member is not going to be untruthful to a citizen,

20        untruthful to an investigation, untruthful during any

21        other aspect of their job, which can have serious

22        consequences, not just for us as an employer, but for

23        the citizens as well.

24   Q    As an assistant chief, do you believe you would have

25        confidence in a department member returning to duty who
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                            457
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 458 of 501   Document 80-5

```
 1        had been caught in the type of lie that is at issue
 2        here?
 3   A    No, I don't.
 4   Q    Do you have any additional comments as it relates to
 5        the --  Strike that.  I would like to go through the
 6        comparables that relate to integrity.  Is there support
 7        in the comparables for a discharge on the issue of
 8        integrity?
 9   A    Yes, there is.
10   Q    What support is that?
11   A    There is several different ones.  The first one is
12        Officer Vidmar, who was discharged from the department
13        for an integrity violation as it relates to the posses-
14        sion of an inventoried bicycle.  Officer Copeland filed
15        a false official report, was discharged from the depart-
16        ment.  And Detective Gomez was discharged from the
17        department as well for an integrity violation.
18   Q    So would you say it is a fair characterization that
19        this administration has an established track record of
20        treating integrity violations most seriously and perhaps
21        even considers it one of the most dischargeable offenses
22        there are?
23   A    Yes.
24   Q    Are there any other observations that you made during
25        the meeting where this was discussed that I have not
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                458
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 459 of 501   Document 80-5

1       covered with you?

        2   A   The only other observation that I would say is when the

        3       chief determines discipline, one of the things he takes

        4       into account is whether or not an employee holds them-

        5       selves accountable for their actions and in this case,

        6       based on Response to Charges and throughout the whole

        7       investigation, this employee did not hold herself

        8       accountable for her actions, but instead, placed blame

        9       on many other individuals in this case, and that is also

       10       a factor that is considered, which is, have you held

       11       yourself accountable?  Are you willing to take the

       12       consequences for your actions?  If you don't, it also

       13       shows somewhat of your character and leans toward the

       14       integrity issue.

       15                       MR. PEDERSON:       That is all I have.

       16                       MR. KONRAD:         Mr. Mc Gaver, do you

       17       have any cross?

       18                       MR. MC GAVER:       I do.

       19       CROSS-EXAMINATION BY MR. MC GAVER:

       20   Q   Assistant Chief, how long was this meeting?

       21   A   I don't recall.

       22   Q   I will direct your attention to Exhibit 18.  Are you

       23       there?

       24   A   Yes.

       25   Q   The time is 2:23 to 2:32.

        SUSAN K. TAYLOR          262-553-1058         COURT REPORTER
                                 sueT@wi.rr.com
                                                                    459
        Case 2:16-cv-01089-WED   Filed 04/22/19   Page 460 of 501   Document 80-5

| 1 | A | Yes. |
|---|---|---|

1   A   Yes.

2   Q   Do you have a better recollection of how long the

3       meeting lasted now?

4   A   I don't, because it depends on whether or not this case

5       was heard by itself or if there were other cases at this

6       meeting.

7   Q   So there might have been more than just this case

8       discussed in that brief, less-than-ten-minute window?

9       Is that a possibility?

10  A   No, it is not possible this case and another case would

11      have been discussed in less than a ten-minute window.

12      I am not sure if there is an error.  That might be

13      something to take a look at, but this was a significant

14      case and it would have taken much longer than nine

15      minutes to determine it.

16  Q   Who is ultimately responsible at the department level

17      for making the ultimate disciplinary decision?

18  A   The chief.

19  Q   Who led the discussion at this meeting?

20  A   The discussion is led by the IA Division, either by the

21      captain or the lieutenant, who presents the case to the

22      chief and to the executive staff.

23  Q   From your recollection, do you remember whether or not

24      it was determined at this meeting whether Shannon

25      Lewandowski was at fault for the accident involved in

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                          sueT@wi.rr.com
                                                              460
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 461 of 501   Document 80-5

```
 1        this case?

 2   A    I don't recall whether that was determined, whether

 3        it was discussed if she was at fault.  There was dis-

 4        cussion about the fact that the other driver that was

 5        involved in the accident had been drinking and also had

 6        a mechanical issue with the vehicle.

 7   Q    Do you know whether Shannon Lewandowski has ever been

 8        suspended from the department before?

 9   A    Yes.

10   Q    Has she?

11   A    As far as I know, yes, according to the hardcard.

12   Q    How long?  How long was the suspension?

13   A    According to the hardcard, there was a suspension for

14        two days in 2002 and an additional suspension for one

15        day in 2002, and that is all that is on this hardcard.

16   Q    Was that suspension ultimately reversed by, I believe,

17        the chief?

18   A    Not by this chief.  There was a one-day suspension that

19        was rescinded.

20   Q    What year was that suspension?

21   A    2002.

22   Q    Has she been suspended since?

23                  THE WITNESS:        Can I look at the

24        case file?

25                  MR. MC GAVER:       Sure.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                         461
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 462 of 501   Document 80-5

```
 1   A   Not that I am aware of.  According to this, the last
 2       suspension was 2002 prior to this one.
 3   Q   With regard to the first charge, what I have been
 4       calling the "detour charge."  In the comparables, in
 5       your review of the comparables, were you able to
 6       discover any harsher penalty than a five-day suspension
 7       associated with a violation of that rule?
 8   A   By "charge" --
 9   Q   Talking about the first one that Mr. Pederson led you
10       through.  I believe it is toward the back of the packet.
11       A specific example was 0016.  The rule is Core Value
12       1.00 - Competence.  The guiding principle is 1.03.  It
13       starts with MPD Bates No. 0013.  Does that help direct
14       you?
15   A   Yes.
16   Q   My question was, is there anything harsher that you have
17       seen in the comps than a five-day suspension?
18   A   For failing to render services promptly and efficiently,
19       yes.  There is a discharge from the department, there is
20       a demotion.  And the five-day is the most comparable.
21   Q   I am going to fast-forward to the integrity charge.
22       Sometimes in these cases, it's been my experience that
23       the department will receive a letter from the district
24       attorney's office, the city attorney's office or the
25       United States Attorney's Office.  Do you know whether
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              462
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 463 of 501   Document 80-5

```
 1      any of those types of letters that would question
 2      Shannon Lewandowski's integrity were received by the
 3      department from any of those three entities?
 4   A  I don't know.
 5   Q  If I told you that none of those letters existed, would
 6      you quarrel with me?
 7   A  No.  I am unsure whether we asked for that letter or
 8      not.  That is why I am unsure.  As far as I know, we
 9      don't have one, but I don't know if we asked for one.
10   Q  When a member has been found to be untruthful, are there
11      any examples in the comparables where that member has
12      not been discharged from the department?
13                  THE WITNESS:        You would have to
14      give me a minute.
15                  MR. MC GAVER:       Take as much time as
16      you need.
17   A  Under the untruthfulness section, Section 1.05, there
18      are individuals that received less discipline than
19      discharge.
20                  MR. MC GAVER:       Nothing further.
21                  MR. PEDERSON:       I have no redirect.
22                  MR. KONRAD:         Commissioners with
23      any questions?  The witness is excused.
24      (Witness excused)
25                  MR. PEDERSON:       The chief rests for
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                      sueT@wi.rr.com
                                                      463
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 464 of 501   Document 80-5

1    Phase II.

2                    MR. MC GAVER:        Shannon Lewandowski

3    calls Officer Chad Boyack.

4                    CHAD BOYACK, having been first duly sworn

5    on oath to tell the truth, the whole truth, and nothing

6    but the truth testified as follows:

7                    MR. KONRAD:        The witness has been

8    sworn.

9    DIRECT EXAMINATION BY MR. MC GAVER:

10   Q    Please state and spell your first and last name for the

11        record.

12   A    First name is Chad.  C-h-a-d.  Last name, Boyack.

13        B-o-y-a-c-k.

14   Q    How are you employed?

15   A    I am a police officer for the City of Milwaukee.

16   Q    How long have you been so employed?

17   A    As a police officer, 19 years.

18   Q    Are you acquainted with Shannon Lewandowski?

19   A    Yes.

20   Q    How long have you known Shannon Lewandowski?

21   A    I knew her before when she was a cop in the late 90's/

22        early 2000's and I came to know her in person.  After

23        she became a detective, she came to a lot of our scenes

24        after, I think it was, '05, '06.

25   Q    I understand that you have been under subpoena for a

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                    sueT@wi.rr.com
                                                            464
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 465 of 501  Document 80-5

```
 1         while.  Have you seen any of the proceedings?

 2    A    Yes, I have.

 3    Q    Do you have an understanding that Shannon Lewandowski

 4         is now -- the alleged rule violations against Shannon

 5         Lewandowski have now been sustained by this Commission.

 6         Do you understand that?

 7    A    Yes, I do.

 8    Q    Knowing that, do you have an opinion as to whether

 9         Shannon Lewandowski can continue to serve on the

10         Milwaukee Police Department?  Or should be able to serve

11         on the Milwaukee Police Department?

12    A    I believe she should be able to.

13    Q    Why do you think that?

14    A    At all the crime scenes that I was involved with her at

15         shootings and robberies, she was always forthright with

16         me with information.  She was always candid about the

17         investigations we were involved in.  She always gave me,

18         to my knowledge, the best information regarding each

19         case and accurate and concise information regarding each

20         case.  I was always happy to see her, along with my

21         partners, happy to see her at the scene because I knew

22         that something was going to get done and the case was

23         going to be either solved and if not solved, to find out

24         what happened in the incident.

25    Q    Do you think she is a good cop?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                465
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 466 of 501   Document 80-5

| 1 | A | Yes. |
| 2 | Q | Why? |

3    A    Based off what I just previously stated.  With those

4         factors that -- not to put it in quotes, but we always

5         "got our man" and Shannon always got her man regarding

6         shootings and robberies and she would contact me or my

7         partners, via cell phone or text message, trying to get

8         a suspect that she was looking for, for a shooting and

9         not to get too far off track, she was looking for a

10        subject we were looking for -- or she was looking for,

11        Thomas Nelson, a very bad person.  The night she called

12        Officer Malone (phonetic) and I, and we ended up getting

13        the subject an hour after she asked us, that she was

14        going to be doing a search warrant with the TAC unit and

15        the subject shot up three different houses and he had a

16        gun on him and he fled from my partner and I.

17   Q    You said you have known her for a while.  You understand

18        what is going on here today.  Do you have anything else

19        to add?

20   A    I feel sad for her.  I don't know the -- everything

21        involved in this case, but I feel bad for her because

22        I know she's been through a lot and it is just -- I

23        could put myself in her shoes and I could be the one

24        sitting there if something happened to me and I just --

25        I try and make it -- equate the circumstances and I just

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                466
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 467 of 501   Document 80-5

```
1          feel -- I feel really bad for her.
2                    MR. MC GAVER:       Thank you.  Nothing
3          further.
4                    MR. PEDERSON:       I have no cross.
5                    MR. MC GAVER:       Any questions from
6          the commissioners?  I don't mean to take your job,
7          Mr. Konrad.
8          (Witness excused)
9                    MR. KONRAD:         Thank you.  It's
10         getting late.  The board will now deliberate in closed
11         session.
12                   MR. MC GAVER:       I didn't quite rest.
13         I would like to call Shannon Lewandowski.
14                   MR. KONRAD:         Go ahead.
15                   MR. MC GAVER:       I would like to call
16         Shannon Lewandowski.
17                   MR. KONRAD:         You are still under
18         oath.
19                   MR. MC GAVER:       Thank you.
20         DIRECT EXAMINATION BY MR. MC GAVER:
21    Q    Ms. Lewandowski, you were here.  You have an under-
22         standing of what happened and that the three charges
23         against you have been sustained.  Correct?
24    A    Yes.
25    Q    Do you believe you can still be a productive member of
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                467
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 468 of 501   Document 80-5

```
1          the Milwaukee Police Department?

2    A     Yes.

3    Q     Why?

4    A     Although I don't agree with your decision, I respect it.

5          I have 17 years of very dedicated service.  I love my

6          job.  I am very well known in this community, very

7          participatory in this community.  I have lived here all

8          my life.  I resonate with a lot of the victims.  I stand

9          by everything that I said here in the last two days and

10         everything that I have said and done in the last 17

11         years.  I apologize on behalf of my son for making a bad

12         decision that day.  He is human, like anybody else.

13         Like I said, I don't agree with your decision at all,

14         but I so respect it.

15   Q     Do you have anything else to add?

16   A     That is all I have to say.

17                    MR. MC GAVER:       Nothing further.

18                    MR. PEDERSON:       I have no cross.

19                    MS. MC KENZIE:      During this whole

20         proceeding, I found it interesting how driven you were

21         when you testified to be there in your testimony for

22         that person.  I guess what I would say to you is, what

23         I need to hear is with the understanding that this is a

24         police force, you are given directives.  You are under

25         authority of another following the chain of command.
```

```
 1          Is that -- I want to be convinced, knowing if you were
 2          to be put back on the force, that this proceeding wasn't
 3          in vain, that there would be some kind of acceptance,
 4          acknowledgement on your part that, when given things to
 5          do, the priority is not what you want, but what the
 6          department wants; the people.  Can you speak to that?
 7                    THE WITNESS:        I guess in hind-
 8          sight, given all this forum, should I question another
 9          detective, who is actually senior than me, about what we
10          are doing?  Yes, I guess after this forum, but I trust
11          in Juanita's work.  I trust who she is as a detective
12          and I am always going to volunteer myself.  I have
13          volunteered myself -- I was volunteered by Melanie who
14          suffered a sexual assault on the job and it hasn't been
15          handled at that point and as part of our training, if I
16          am being told by a citizen on the street that they have
17          been sexually assaulted, I am not just going to continue
18          to go.  She counts, even though she is a police officer,
19          just as much as a citizen does.  That is where the
20          problem came.  If Juanita would have explained to me
21          this is something very exigent, I would hope she would
22          have went on her own and got somebody to help her.  I
23          wanted to help her and if I knew that that was so
24          exigent, I would have gone.  That is how I handled my
25          cases, but I went on information that I had and I was
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              469
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 470 of 501   Document 80-5

```
 1          going to District 5 and I said, "since I am going out
 2          anyway, we can go together," because my other concern
 3          was Juanita's safety.  Streets are not safe.  And as you
 4          heard her say, she went to the door and knocked on it
 5          herself.  You just don't do that.  You don't go to a
 6          house by yourself and knock on the door.  So it is hard
 7          for me to sit here and convince you that I did something
 8          wrong because I will take culpability for my son because
 9          I raised him not to do anything like that, but I don't
10          know how to take culpability for what happened to
11          Melanie or what Juanita told me.  I want to.  Like, if
12          I knew it was exigent, I would have said, "let's go,"
13          because I didn't have to go to Five.  I could have saw
14          her after.  She would eventually be by my house anyway.
15          She ended up living with my two sons and I because she
16          was too afraid to go home.  And additionally, like Chad
17          said, my job important to me.  I don't play games at
18          work.  I am all about work.  I am all about this
19          community getting better.  I am all about leadership,
20          and leadership doesn't come in easy times.  Leadership
21          comes from a hard time.  These were hard times at
22          District 3 and 5, and they still are.  I will not walk
23          away from another female employee who is suffering.  I
24          was reaching out to everybody.  It is just like I was
25          reaching out for Juanita's well-being.  I wanted her not
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                              470
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 471 of 501   Document 80-5

```
 1              to go to a home by herself.  Nobody asked me to do it.

 2              I just said, "hey, do you want to go?  Let's get it.

 3              if we have overtime, if you can't do it, I will do it.

 4              It is okay to me."

 5                        MS. MC KENZIE:       Thank you.

 6                        MR. MC GAVER:       Just a follow-up to

 7              the commissioner's question.

 8              REDIRECT EXAMINATION BY MR. MC GAVER:

 9    Q    Very briefly, you understand there is a chain of command

10         in the Milwaukee Police Department.  Correct?

11    A    Yes.

12    Q    You understand you are a link in that chain.  Are you

13         with me?

14    A    Yes.

15    Q    If you are directed by a superior to do something in the

16         future in the event that this commission gives you your

17         job back, would there be problems doing that?

18    A    Not at all.

19                        MR. MC GAVER:       Thank you.  Nothing

20              further.

21                        MR. PEDERSON:       Just a matter of

22              housekeeping.  I will move the exhibits into evidence.

23              I believe it is 18 through 21.

24                        MR. KONRAD:       That is right.

25                        MR. MC GAVER:       No objection to any
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                                471
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 472 of 501   Document 80-5

1       of those.

2                       MR. KONRAD:          Those will be

3       admitted.

4                       Anything further?

5                       MR. MC GAVER:        No.  We rest.

6                       MR. PEDERSON:        No.

7                       MR. KONRAD:          All right.  Thank

8       you.  We will now deliberate in closed session in order

9       to determine whether the good of the service requires

10      the appellant be discharged or otherwise disciplined.

11                      Do we have a motion to go into closed

12      session?

13                      MS. HEIN:            So move.

14                      MS. MC KENZIE:       Second.

15                      MR. KONRAD:          We have a motion and

16      second.  Any objections?  No objections heard, closed

17      session.

18      (Closed session deliberations)

19                      MR. KONRAD:          We are now back in

20      open session.  The panel has concluded its deliberations

21      for Phase II.  The members of the panel have decided

22      unanimously that the discipline of Detective Shannon

23      Lewandowski should be sustained in accordance chief's

24      order of discipline.  To wit, the five-day suspension

25      for failure to use time to accomplish the mission.

1      30-day suspension for failure to driving a department
2      vehicle in a safe manner and discharge for failure to
3      be forthright and candid in an administrative inquiry
4      report.
5                  Please note the ten-day rule referenced
6      in Fire and Police Commission Rule 16(10)(f) is being
7      waived and a written decision will be provided as soon
8      as practicable.
9                  We stand adjourned at 3:05 p.m.  Thank
10     you.
11     (WHEREUPON, THE PROCEEDINGS WERE ADJOURNED AT 3:05 P.M.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SUSAN K. TAYLOR         262-553-1058        COURT REPORTER
                        sueT@wi.rr.com
                                                                473
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 474 of 501   Document 80-5

```
1     STATE OF WISCONSIN )
                         )
2     COUNTY OF MILWAUKEE)

3

4                 I, SUSAN K. TAYLOR, do hereby certify

5     that I am a stenographic reporter; that I was present at

6     the hearing in the above entitled action, and that I

7     recorded the same in shorthand; that the above and

8     foregoing is a true, correct and exact copy, in

9     longhand, of my shorthand notes taken at said hearing.

10

11                Dated this     day of      2016

12

13

14

15

16

17                              SUSAN K. TAYLOR

18                              Court Reporter

19

20

21

22

23

24

25
```

'

'05 [1] - 464:24
'06 [1] - 464:24
'14 [1] - 333:23
'Show [1] - 406:19

## 0

0013 [1] - 462:13
0016 [3] - 452:21, 452:25, 462:11
09 [1] - 416:23

## 1

1-23-15 [1] - 450:8
1.00 [1] - 462:12
1.03 [3] - 451:24, 452:19, 462:12
1.05 [2] - 453:22, 463:17
10 [2] - 331:4, 412:17
10-17 [1] - 412:19
10-23 [4] - 412:20, 412:24
10-24 [1] - 412:19
10:00 [1] - 372:25
10:57 [1] - 366:10
11 [4] - 292:2, 314:18, 357:21, 358:5
11:00 [3] - 370:5, 370:19, 372:25
12 [6] - 324:25, 332:4, 332:8, 333:1, 437:24, 438:7
12:00 [2] - 370:17, 370:18
12:30 [1] - 439:9
13 [1] - 334:12
14 [6] - 322:6, 322:11, 322:14, 327:13, 403:4, 437:20
15 [10] - 365:25, 366:2, 371:9, 373:13, 373:18, 382:6, 383:2, 394:10, 407:3, 437:19
1573 [2] - 333:5, 333:14
16 [6] - 369:6, 369:9, 372:4, 372:13, 437:19, 456:17
16(1)(f [1] - 473:6
17 [5] - 404:3, 404:5, 437:20, 468:5, 468:10
17th [1] - 365:6
18 [10] - 356:13,

369:18, 369:24, 372:10, 390:19, 440:22, 440:24, 441:5, 459:22, 471:23
18th [3] - 369:19, 369:21, 381:22
19 [25] - 323:2, 323:10, 323:15, 326:4, 331:25, 333:2, 333:22, 334:13, 340:8, 347:1, 348:9, 356:13, 359:25, 360:22, 369:18, 369:25, 372:10, 390:20, 399:6, 416:24, 426:16, 427:22, 443:13, 443:15, 464:17
19th [5] - 306:11, 341:3, 356:23, 369:20, 381:22
1:00 [1] - 354:15
1:25 [2] - 439:10, 439:13
1:44 [4] - 373:6, 373:9, 373:15, 383:23
1:55 [2] - 373:6, 383:24

## 2

2 [3] - 366:10, 452:5, 452:8
20 [8] - 323:2, 324:25, 352:14, 393:4, 408:7, 444:10, 444:12, 450:7
20-or-30-minute [1] - 433:16
2000's [1] - 464:22
2002 [4] - 461:14, 461:15, 461:21, 462:2
2014 [7] - 314:12, 315:21, 375:17, 384:17, 385:2, 449:25, 450:10
2015 [18] - 305:20, 323:12, 331:25, 332:4, 332:9, 333:25, 357:21, 358:5, 359:25, 360:22, 361:23, 369:25, 372:10, 390:20, 399:6, 409:17, 427:22, 449:24
2016 [2] - 292:2,

474:11
21 [6] - 390:16, 445:2, 445:4, 451:22, 454:24, 471:23
22:57 [1] - 366:10
2:00 [4] - 372:25, 373:4, 373:23, 391:2
2:07 [5] - 373:16, 383:25, 384:1, 384:3, 384:4
2:11 [4] - 323:15, 323:20, 325:5, 325:7
2:17 [1] - 325:12
2:18 [1] - 434:4
2:20 [2] - 325:18, 406:16
2:23 [1] - 459:25
2:25 [7] - 325:22, 326:7, 326:13, 326:18, 326:23, 328:3
2:30 [9] - 405:2, 405:19, 405:21, 405:24, 406:17, 407:21, 408:4, 408:7, 408:10
2:31 [1] - 325:25
2:32 [1] - 459:25
2:45 [1] - 326:2

## 3

3 [42] - 292:17, 295:21, 296:16, 297:12, 300:19, 317:5, 336:8, 336:9, 366:10, 368:15, 368:20, 369:15, 369:16, 369:24, 370:7, 370:15, 372:9, 373:3, 373:6, 373:7, 373:21, 373:23, 374:3, 374:7, 374:13, 376:10, 376:16, 376:19, 377:24, 378:13, 383:21, 383:22, 384:10, 384:12, 384:13, 387:15, 406:10, 414:23, 470:22
30 [6] - 309:19, 393:4, 435:4, 454:21, 454:25, 455:15
30-day [1] - 473:1
3040 [1] - 352:3
3214 [4] - 371:8, 371:13, 371:15, 372:14
3482 [2] - 406:15,

406:17
35th [8] - 306:24, 307:2, 342:25, 358:13, 359:8, 359:13, 430:16, 432:2
3600 [1] - 352:4
3611 [9] - 404:20, 405:3, 405:25, 406:17, 406:20, 413:5, 413:9, 413:12
3614 [1] - 413:11
3616 [1] - 404:20
36th [2] - 307:2, 358:14
3:00 [3] - 370:15, 370:19, 372:25
3:05 [2] - 473:9, 473:11

## 4

414-405-4617 [1] - 321:25
414-405-5138 [2] - 321:23, 322:4
45 [6] - 294:4, 339:11, 340:4, 340:11, 421:10, 435:4
4:00 [5] - 369:19, 369:20, 370:13, 370:17, 370:18

## 5

5 [41] - 292:23, 293:8, 293:19, 293:23, 293:24, 294:13, 297:11, 297:13, 297:25, 299:4, 299:18, 303:22, 304:17, 305:9, 313:22, 314:12, 317:6, 321:1, 321:2, 321:3, 337:9, 338:14, 340:13, 340:24, 344:14, 344:15, 355:5, 355:11, 355:12, 376:15, 380:15, 415:24, 416:15, 417:24, 429:22, 430:14, 431:5, 443:4, 470:1, 470:22
5000 [1] - 365:8
51 [1] - 408:7
53rd [1] - 336:5
5:20 [1] - 334:1
5:24 [8] - 333:2, 333:22, 334:2,

334:19, 335:11, 335:23, 336:13, 360:22

## 6

6 [3] - 443:5, 443:6, 451:4
6:38 [12] - 332:24, 334:13, 335:25, 336:13, 336:15, 336:25, 341:3, 352:22, 361:2, 378:23, 434:3, 434:18

## 7

7 [1] - 384:11
7:00 [2] - 370:5, 370:14

## 8

8 [1] - 403:3
8:00 [3] - 369:19, 370:4, 370:13
8:30 [1] - 292:2

## 9

9 [6] - 300:8, 305:19, 306:19, 357:4, 409:17, 436:10
90 [1] - 389:5
90's [1] - 464:21
911 [1] - 321:11
9205 [3] - 381:23, 382:4, 382:6
9271 [2] - 366:10, 366:12
9288 [1] - 366:16

## A

A-Self-Interest [1] - 447:2
a.m [48] - 292:2, 323:15, 323:20, 325:5, 325:12, 325:18, 325:22, 326:7, 326:13, 326:18, 326:23, 328:3, 333:2, 333:22, 334:2, 334:13, 334:19, 335:23, 335:25, 336:14, 336:15, 336:25, 341:3, 352:22, 360:22, 361:2, 369:19,

370:4, 370:5,
370:14, 370:15,
373:4, 373:6, 373:9,
373:15, 373:17,
373:23, 378:23,
383:25, 384:1,
391:2, 405:2,
405:19, 405:21,
406:17, 408:7
**ability** [2] - 294:2,
457:16
**able** [15] - 294:22,
318:12, 336:11,
351:13, 366:2,
395:21, 395:22,
398:11, 409:7,
409:8, 422:12,
450:3, 462:5,
465:10, 465:12
**absolutely** [7] - 313:1,
320:16, 339:12,
340:19, 342:1,
412:2, 417:3
**abutted** [1] - 393:2
**acceptance** [1] -
469:3
**accepted** [2] - 294:15,
299:17
**access** [1] - 393:3
**acci** [1] - 397:13
**accident** [74] - 310:13,
310:20, 311:9,
311:14, 315:18,
315:22, 319:21,
320:12, 320:13,
321:9, 323:23,
327:17, 328:6,
330:14, 334:23,
335:7, 335:10,
335:15, 337:8,
338:10, 342:14,
342:21, 343:9,
346:15, 348:3,
350:8, 350:11,
350:14, 353:3,
361:5, 361:9,
378:23, 379:4,
379:5, 379:18,
390:25, 391:9,
396:21, 397:1,
397:2, 404:23,
405:21, 406:16,
407:22, 408:1,
408:15, 408:17,
422:1, 423:20,
430:20, 430:24,
431:4, 431:6,
431:21, 433:8,
434:4, 434:5, 434:9,
434:21, 436:7,

436:25, 437:12,
447:23, 449:11,
453:15, 453:21,
455:11, 455:21,
455:25, 460:25,
461:5
**accidentally** [2] -
300:17, 301:4
**accidents** [1] - 419:3
**accomplish** [2] -
451:8, 472:25
**accordance** [1] -
472:23
**according** [11] -
303:10, 313:5,
328:3, 372:21,
416:23, 418:14,
444:3, 447:11,
461:11, 461:13,
462:1
**account** [2] - 303:9,
459:4
**accountable** [5] -
304:19, 313:7,
459:5, 459:8, 459:11
**accurate** [12] - 299:11,
310:9, 327:6, 327:7,
368:10, 370:24,
373:2, 375:18,
435:1, 441:22,
455:9, 465:19
**accurately** [3] - 410:8,
419:22, 426:10
**accusa** [1] - 318:4
**accusation** [1] -
315:10
**accusations** [2] -
425:24, 436:21
**accuse** [2] - 420:3,
427:15
**accused** [1] - 423:4
**acknowledged** [2] -
401:11, 425:20
**acknowledgement** [1]
- 469:4
**acknowledging** [1] -
302:14
**acquainted** [1] -
464:18
**act** [3] - 448:23, 449:2,
455:20
**acting** [3] - 364:6,
380:25, 455:19
**action** [2] - 307:20,
474:6
**actions** [4] - 319:5,
459:5, 459:8, 459:12
**activated** [1] - 435:12
**active** [1] - 377:7
**actual** [5] - 407:8,

408:4, 408:16,
416:4, 428:19
**Adam** [6] - 304:22,
304:24, 312:20,
338:5, 338:22, 436:9
**ADAM** [1] - 400:6
**add** [2] - 466:19,
468:15
**added** [1] - 403:18
**additional** [3] - 402:5,
458:4, 461:14
**additionally** [1] -
470:16
**address** [14] - 314:15,
352:3, 386:2, 406:4,
406:6, 406:8,
407:20, 410:19,
410:21, 413:6,
413:8, 413:10,
413:14, 453:21
**addressed** [1] -
303:13
**addressing** [1] -
338:13
**adequately** [1] -
308:10
**adjourned** [1] - 473:9
**ADJOURNED** [1] -
473:11
**administration** [3] -
351:3, 425:7, 458:19
**administrative** [2] -
456:24, 473:3
**administrator** [1] -
442:6
**admission** [1] - 322:8
**admit** [4] - 416:18,
435:4, 435:7, 436:21
**admits** [1] - 416:10
**admitted** [2] - 360:2,
472:3
**advise** [1] - 375:12
**advised** [2] - 328:5,
416:10
**ae** [1] - 366:2
**Affairs** [8] - 375:24,
375:25, 387:24,
396:14, 396:17,
400:15, 444:7,
444:24
**affect** [1] - 318:14
**affecting** [1] - 418:1
**afraid** [1] - 470:16
**agencies** [1] - 319:23
**aggravat** [1] - 449:17
**aggravated** [4] -
449:4, 449:5,
453:12, 454:22
**aggravating** [14] -
447:4, 447:6,

447:19, 447:20,
447:24, 448:1,
448:9, 448:12,
448:14, 448:15,
449:21, 449:22,
453:17, 455:21
**ago** [2] - 317:12,
398:25
**agree** [38] - 294:17,
294:23, 298:5,
299:24, 302:11,
303:14, 304:1,
304:10, 304:14,
305:3, 305:6, 308:2,
308:18, 308:23,
308:24, 310:24,
311:6, 311:12,
312:8, 312:11,
312:16, 315:25,
327:18, 328:1,
333:15, 334:7,
339:16, 343:12,
343:17, 343:25,
345:9, 346:23,
351:5, 352:6,
366:25, 418:16,
468:4, 468:13
**agreed** [4] - 294:16,
299:18, 299:21,
429:23
**ahead** [10] - 304:2,
307:15, 315:10,
318:15, 337:6,
348:18, 362:2,
363:4, 396:8, 467:14
**ahold** [3] - 336:15,
431:17, 432:9
**aid** [1] - 431:9
**aided** [1] - 404:11
**aiming** [1] - 448:22
**AIMS** [1] - 361:14
**air** [3] - 310:2, 310:4,
330:8
**alert** [2] - 342:6, 342:7
**allegation** [2] - 316:2,
376:1
**allegations** [1] -
401:22
**alleged** [3] - 314:10,
375:5, 465:4
**Allen** [5] - 295:17,
371:8, 371:14,
372:12, 383:20
**allows** [1] - 310:6
**almost** [2] - 356:4,
385:13
**alone** [1] - 389:7
**ambiguous** [4] -
315:4, 317:17,
317:20, 320:9

**ambulance** [1] - 392:1
**ambulances** [1] -
391:17
**amount** [8] - 447:22,
448:6, 448:14,
448:18, 451:15,
454:9, 454:14, 456:3
**amounts** [1] - 456:15
**ample** [2] - 427:17,
435:11
**analyzed** [1] - 427:6
**Angela** [1] - 292:8
**angry** [2] - 436:20,
436:23
**ankle** [1] - 397:20
**Ann** [1] - 292:8
**announce** [1] - 429:16
**answer** [19] - 302:17,
302:20, 305:16,
306:7, 324:11,
329:24, 334:10,
341:17, 343:22,
345:1, 345:5,
345:20, 346:14,
392:12, 415:16,
423:16, 426:10,
432:7, 453:2
**answered** [10] -
317:22, 328:4,
328:12, 328:18,
334:5, 339:7,
344:21, 355:24,
360:16, 426:10
**answering** [5] - 341:6,
341:7, 345:18,
415:12, 451:7
**answers** [3] - 345:22,
346:1, 431:18
**ant** [2] - 394:3, 394:12
**anyway** [3] - 298:4,
470:2, 470:14
**apart** [1] - 392:24
**apologize** [2] -
344:22, 468:11
**apparent** [1] - 361:13
**Appeal** [1] - 292:4
**appear** [6] - 366:17,
367:6, 367:13,
374:5, 386:13,
450:19
**appearance** [1] -
329:11
**appeared** [2] - 329:16,
329:19
**appellant** [1] - 472:10
**applicable** [2] -
442:25, 447:10
**appointed** [1] - 424:23
**appreciate** [1] -
298:13

approach [1] - 374:24
approached [2] - 375:21, 391:14
approaching [4] - 306:24, 307:10, 307:24, 358:13
appropriate [4] - 439:24, 451:15, 454:10, 457:2
approxi [1] - 309:17
approximate [1] - 328:25
April [9] - 303:12, 332:1, 339:1, 339:20, 340:2, 347:11, 348:5, 361:20, 361:23
area [5] - 340:16, 351:24, 355:25, 356:3, 405:14
argue [1] - 302:19
arguing [1] - 453:2
argument [2] - 385:24, 386:3
arrange [1] - 348:23
arrival [2] - 411:11, 411:12
arrive [3] - 393:6, 411:5, 412:21
arrived [9] - 328:25, 391:13, 392:14, 393:13, 393:15, 393:17, 402:15, 412:4, 413:4
arriving [1] - 384:2
aside [1] - 395:19
aspect [2] - 356:17, 457:21
assault [12] - 314:10, 315:17, 317:8, 317:11, 375:6, 376:1, 388:11, 423:5, 424:14, 424:19, 428:10, 469:14
assaulted [5] - 313:24, 314:8, 314:20, 387:22, 469:17
assessment [1] - 377:14
assign [1] - 414:21
assigned [10] - 302:5, 302:9, 372:9, 381:21, 386:23, 387:1, 387:2, 390:22, 404:22, 411:18
assignment [28] - 298:24, 299:19,

305:2, 313:5, 353:18, 354:21, 361:6, 376:17, 376:19, 376:20, 377:10, 377:13, 377:14, 377:17, 377:21, 377:23, 378:14, 378:15, 378:16, 384:7, 387:14, 404:21, 407:13, 414:25, 451:18
assignments [5] - 299:4, 302:3, 310:25, 369:24, 399:24
assist [13] - 297:14, 298:2, 298:6, 298:8, 298:16, 298:18, 299:2, 303:2, 389:3, 389:9, 416:15, 428:4, 429:19
assistance [6] - 294:15, 299:12, 299:17, 300:3, 428:5, 428:19
Assistant [3] - 440:2, 441:3, 442:3
assistant [3] - 440:16, 457:24, 459:20
associated [1] - 462:7
assume [5] - 316:24, 333:13, 374:11, 416:9, 437:24
assumed [1] - 379:4
assuming [2] - 302:2, 399:25
AT [1] - 473:11
attached [1] - 310:3
attaches [1] - 404:11
attempt [2] - 293:13, 429:16
attempted [1] - 305:7
attempts [1] - 357:24
atten [1] - 300:9
attend [3] - 415:24, 416:5, 440:10
attending [1] - 350:4
attention [19] - 323:2, 323:14, 324:25, 325:4, 325:17, 326:6, 331:10, 332:21, 363:18, 403:4, 406:10, 414:6, 427:13, 451:20, 451:23, 451:25, 454:23, 456:20, 459:22
attorney [3] - 302:19, 315:25, 383:6

attorney's [2] - 462:24
Attorney's [1] - 462:25
attribute [1] - 422:18
attributed [2] - 346:24, 420:17, 421:6
attributes [2] - 410:5, 434:17
attributing [1] - 410:6
August [2] - 292:2, 348:6
authority [1] - 468:25
authorized [1] - 455:20
auto [1] - 311:8
autonomy [2] - 376:25, 377:3
available [5] - 314:5, 354:20, 378:14, 436:10, 455:1
AVE [1] - 406:20
Avenue [7] - 306:24, 342:13, 404:21, 405:3, 406:1, 406:18, 408:18
avoid [1] - 430:19
aware [19] - 300:25, 303:20, 316:4, 330:24, 334:4, 344:15, 347:6, 350:7, 350:12, 384:15, 391:4, 401:2, 422:10, 425:24, 440:10, 446:13, 448:11, 451:2, 462:1

**B**

B-o-y-a-c-k [1] - 464:13
babbling [1] - 311:24
background [1] - 430:8
bad [5] - 424:25, 466:11, 466:21, 467:1, 468:11
badge [1] - 398:5
bag [1] - 330:8
based [21] - 298:14, 312:6, 315:1, 328:1, 329:21, 351:13, 373:22, 378:24, 409:2, 414:12, 416:9, 416:16, 416:17, 441:17, 447:6, 447:22, 448:14, 451:16, 457:9, 459:6, 466:3
bases [1] - 427:9

basic [2] - 298:19, 299:2
Bates [2] - 452:21, 462:13
bear [2] - 299:24, 339:24
Beasley [30] - 297:15, 313:22, 314:11, 314:17, 316:1, 340:14, 375:4, 375:10, 376:3, 380:9, 380:16, 384:16, 385:9, 385:14, 385:16, 416:1, 424:3, 424:12, 424:14, 424:24, 425:10, 427:24, 428:2, 428:4, 428:9, 428:23, 429:3, 429:22
Beasley's [3] - 318:4, 375:13, 428:12
became [4] - 347:6, 364:14, 384:15, 464:23
become [2] - 300:25, 383:18
becomes [1] - 425:7
becoming [1] - 391:4
beep [1] - 309:9
beeped [1] - 359:2
beforehand [1] - 321:18
begin [2] - 292:11, 292:16
beginning [6] - 365:1, 403:12, 406:11, 414:8, 420:11, 421:20
behalf [2] - 375:13, 468:11
behavior [1] - 449:24
behind [3] - 395:20, 419:1, 430:19
belief [3] - 343:8, 414:11, 416:13
believes [2] - 421:24, 436:24
belt [2] - 310:12, 335:18
belts [1] - 454:3
benefit [5] - 303:8, 308:1, 417:9, 418:11, 437:7
best [7] - 302:18, 370:24, 414:7, 423:18, 436:22, 456:5, 465:18
better [5] - 292:19,

339:17, 448:19, 460:2, 470:19
between [15] - 307:2, 327:16, 336:13, 343:13, 344:1, 348:3, 361:13, 373:3, 389:14, 392:22, 406:7, 415:4, 425:3, 455:15, 455:24
beyond [1] - 402:4
bias [1] - 318:14
bicycle [2] - 307:8, 458:14
big [6] - 317:8, 317:11, 388:13, 394:8, 413:2, 422:3
biggest [1] - 420:19
bility [1] - 420:14
bill [4] - 322:19, 322:20, 327:7
bit [4] - 308:11, 401:6, 410:2, 411:2
black [7] - 295:1, 295:20, 329:5, 330:10, 372:11, 432:19
blame [1] - 459:8
blank [1] - 422:9
blew [1] - 330:8
block [8] - 309:6, 352:4, 359:20, 406:5, 415:13, 435:16, 435:17
blocking [1] - 307:22
blocks [5] - 336:10, 352:2, 352:5, 352:6, 410:24
bloodwork [1] - 350:25
blow [2] - 416:23, 424:19
blows [1] - 431:14
blurp [3] - 307:15, 342:10, 359:5
board [1] - 467:10
body [2] - 329:23, 362:13
bodyguard [1] - 424:24
bona [1] - 296:5
bonds [1] - 425:3
book [1] - 343:21
border [1] - 336:3
bothers [1] - 345:20
bottom [3] - 333:2, 452:14, 452:17
Boulevard [1] - 336:5
boundaries [1] - 384:10

**box** [3] - 441:19, 442:1, 447:8
**Boyack** [2] - 464:3, 464:12
**BOYACK** [1] - 464:4
**brace** [1] - 431:24, 432:11, 432:12
**brake** [4] - 307:9, 307:18, 342:5, 358:21
**brakes** [1] - 430:23
**break** [1] - 352:13
**breaking** [1] - 446:23
**Breathalyzer** [1] - 431:14
**brief** [3] - 382:24, 387:20, 460:8
**briefed** [7] - 378:16, 382:21, 383:1, 393:9, 393:21, 398:19, 401:6
**briefly** [1] - 471:9
**bright** [1] - 358:24
**brought** [2] - 360:5, 407:17
**Brown** [1] - 433:13
**bruised** [1] - 397:20
**bruising** [1] - 330:7
**bureau** [11] - 367:22, 374:16, 376:14, 386:20, 387:3, 387:7, 387:8, 387:10, 387:12, 394:23, 399:21
**business** [11] - 293:8, 294:13, 297:16, 301:24, 302:3, 376:4, 429:21, 432:17, 432:20, 432:23, 449:9
**busy** [3] - 299:5, 389:4, 427:16
**buttons** [1] - 413:2
**BY** [36] - 292:15, 306:21, 315:16, 317:4, 318:1, 318:16, 319:13, 322:12, 328:21, 334:3, 341:20, 345:8, 346:22, 348:7, 349:20, 356:10, 363:14, 367:23, 369:7, 370:21, 371:21, 381:5, 382:3, 386:6, 387:13, 388:19, 390:9, 396:9, 400:10, 402:24, 409:13, 440:12, 459:19, 464:9,

467:20, 471:8

# C

**C-a-r-i-a-n-n-e** [1] - 440:14
**C-h-a-d** [1] - 464:12
**cabs** [1] - 391:24
**CAD** [22] - 366:4, 366:17, 367:6, 371:8, 374:6, 382:11, 383:11, 383:17, 386:14, 386:24, 404:12, 406:11, 406:15, 407:3, 407:4, 407:7, 407:10, 407:13, 408:4, 408:9, 408:16, 411:11
**calculated** [2] - 307:24, 309:12
**camera** [1] - 343:3
**cameras** [1] - 342:25
**candid** [3] - 456:23, 465:16, 473:3
**cannot** [2] - 335:1, 452:7
**capacity** [2] - 298:21, 298:22
**Captain** [1] - 442:5
**captain** [1] - 460:21
**car** [39] - 306:23, 307:5, 307:8, 309:10, 309:16, 321:11, 330:14, 342:4, 342:11, 353:2, 353:4, 353:6, 353:10, 358:20, 358:25, 359:1, 359:11, 359:12, 362:16, 382:18, 415:11, 429:24, 430:13, 430:16, 430:17, 430:18, 430:23, 431:3, 431:10, 431:13, 431:21, 433:21, 434:21, 435:18, 447:23, 447:25, 454:15, 455:23
**card** [3] - 432:17, 432:20, 432:23
**care** [4] - 335:9, 346:14, 385:5, 385:6
**career** [4] - 295:10, 422:20, 422:22
**careful** [4] - 346:18, 393:10, 435:23, 436:2
**CARIANNE** [1] - 440:3

**carianne** [1] - 440:14
**Carr** [66] - 292:16, 293:2, 294:18, 295:2, 296:21, 297:2, 297:6, 300:19, 300:21, 303:20, 304:15, 304:25, 305:4, 305:7, 305:10, 305:22, 338:14, 350:3, 353:24, 354:7, 354:25, 355:2, 355:19, 356:22, 357:11, 357:16, 357:24, 365:22, 366:20, 367:1, 373:24, 377:16, 377:20, 377:22, 378:7, 378:9, 378:15, 379:3, 382:10, 382:18, 382:23, 383:1, 383:22, 386:7, 386:22, 387:15, 389:8, 389:15, 389:19, 391:12, 392:9, 414:18, 414:24, 415:5, 415:20, 421:22, 428:25, 429:5, 429:13, 429:14, 429:18, 429:20, 429:23, 430:13, 431:9
**Carr's** [7] - 304:20, 366:14, 368:6, 377:14, 380:5, 429:1, 431:8
**carrier** [1] - 355:15
**carry** [3] - 370:20, 415:19, 429:6
**carrying** [1] - 419:17
**cars** [2] - 341:24, 421:9
**Case** [1] - 444:4
**case** [44] - 296:2, 302:1, 316:1, 316:5, 351:4, 355:14, 363:16, 368:17, 368:21, 377:5, 378:17, 383:5, 387:20, 388:8, 396:15, 401:6, 409:2, 418:15, 432:16, 434:25, 441:13, 442:9, 442:21, 442:24, 444:6, 444:15, 445:6, 450:6, 457:9, 459:5, 459:9, 460:4,

460:7, 460:10, 460:14, 460:21, 461:1, 461:24, 465:19, 465:20, 465:22, 466:21
**case-by-case** [1] - 409:2
**caseload** [3] - 299:6, 301:25, 377:11
**cases** [3] - 460:5, 462:22, 469:25
**casual** [2] - 395:5, 397:12
**casually** [1] - 394:24
**catch** [1] - 342:20
**cate** [1] - 446:23
**category** [3] - 444:3, 446:2, 448:22
**cation** [1] - 347:14
**caught** [2] - 422:22, 458:1
**causes** [4] - 435:21, 435:23, 436:2, 447:3
**causing** [1] - 350:24
**caution** [1] - 436:3
**cautionary** [2] - 307:7, 307:13
**cautious** [2] - 308:19, 308:25
**caveat** [1] - 429:19
**CCW** [2] - 301:4, 355:15
**cell** [11] - 322:24, 322:25, 333:8, 333:10, 334:14, 359:12, 394:15, 402:16, 432:6, 434:13, 466:7
**center** [2] - 408:6, 431:7
**Central** [4] - 299:3, 365:4, 365:5, 365:6
**certain** [4] - 338:8, 357:3, 402:3, 417:3
**certification** [1] - 454:5
**certify** [1] - 474:4
**cetera** [1] - 324:20, 338:15, 421:10
**Chad** [3] - 464:3, 464:12, 470:16
**CHAD** [1] - 464:4
**chain** [4] - 381:2, 468:25, 471:9, 471:12
**Chambers** [1] - 365:8
**chance** [1] - 327:3
**change** [9] - 346:12, 371:23, 383:9, 386:16, 386:19,

386:24, 387:8, 420:5, 422:7
**changed** [4] - 383:13, 383:16, 387:2, 406:17
**changes** [4] - 387:4, 419:14, 420:8, 421:16
**changing** [2] - 404:20, 420:1
**channel** [1] - 367:17
**chaos** [8] - 418:24, 431:10, 431:12, 432:1, 432:3, 432:4, 435:21, 436:1
**character** [1] - 459:13
**characterization** [1] - 458:18
**characterize** [1] - 376:4
**charge** [24] - 381:18, 414:15, 419:12, 419:17, 419:24, 420:10, 442:20, 443:10, 443:21, 451:3, 451:12, 451:14, 453:21, 453:23, 454:10, 454:12, 456:21, 457:6, 462:3, 462:4, 462:8, 462:21
**charged** [4] - 419:8, 436:17, 437:11, 441:17
**Charges** [5] - 337:22, 442:25, 443:8, 445:15, 459:6
**charges** [11] - 316:5, 350:20, 350:24, 357:4, 383:6, 420:1, 437:14, 439:20, 445:19, 457:3, 467:22
**chased** [1] - 364:7
**check** [1] - 355:6
**checked** [3] - 342:25, 391:17, 392:16
**checking** [1] - 316:25
**chest** [1] - 330:8
**chief** [14] - 420:4, 440:1, 440:8, 442:12, 443:14, 454:9, 454:11, 457:24, 459:3, 460:18, 460:22, 461:17, 461:18, 463:25
**Chief** [6] - 440:2, 440:16, 441:3, 441:22, 442:3,

459:20
**chief's** [13] - 414:8, 414:11, 415:22, 416:12, 417:22, 417:23, 418:2, 424:9, 440:19, 441:12, 451:11, 457:2, 472:23
**Chiefs** [1] - 442:4
**chirp** [1] - 359:5
**choice** [1] - 411:17
**Chris** [1] - 375:24
**church** [1] - 343:3
**cially** [1] - 312:13
**cipant** [1] - 382:17
**circled** [2] - 446:15, 446:17
**circling** [1] - 446:1
**circumstance** [1] - 324:21
**circumstances** [12] - 338:23, 350:2, 350:5, 374:15, 374:16, 411:13, 447:19, 447:24, 448:1, 451:19, 454:15, 466:25
**circumstantial** [3] - 416:17, 417:18, 427:8
**citizen** [3] - 457:19, 469:16, 469:19
**citizens** [3] - 431:9, 454:14, 457:23
**City** [1] - 464:15
**city** [4] - 427:25, 432:16, 435:20, 462:24
**city's** [1] - 428:15
**civilian** [3] - 358:15, 358:16, 359:1
**civilians** [1] - 456:4
**claim** [1] - 423:11
**claims** [2] - 425:13, 425:14
**clarifi** [1] - 347:13
**clarification** [2] - 316:7, 316:7
**clarify** [7] - 309:20, 316:10, 326:19, 330:17, 332:10, 355:1, 388:14
**clarity** [2] - 367:10, 407:2
**clean** [1] - 350:18
**clean-up** [1] - 350:18
**clear** [17] - 296:24, 315:9, 315:17, 339:23, 357:14, 361:12, 370:4,

380:20, 380:21, 384:8, 384:11, 385:15, 385:17, 411:4, 417:4, 434:14, 434:16
**cleared** [3] - 373:16, 431:3, 435:14
**clearing** [5] - 383:25, 384:1, 384:4, 384:7, 411:2
**clearly** [6] - 417:24, 418:16, 421:11, 426:14, 435:8
**clears** [1] - 431:24
**click** [1] - 407:11
**close** [2] - 307:12, 392:11
**Closed** [2] - 439:14, 472:18
**closed** [15] - 383:5, 395:16, 395:19, 396:2, 438:14, 438:21, 438:23, 438:24, 439:2, 439:8, 450:7, 467:10, 472:8, 472:11, 472:16
**closer** [1] - 339:17
**closing** [5] - 385:24, 386:3, 395:15, 414:2, 414:4
**cloth** [1] - 422:18
**clothing** [1] - 398:6
**co** [1] - 294:15
**co-worker** [1] - 294:15
**coat** [2] - 399:20, 399:23
**coats** [1] - 399:24
**Code** [1] - 444:24
**code** [2] - 412:17, 412:21
**Cody** [3] - 416:18, 416:19, 432:18
**coherency** [1] - 362:9
**cold** [2] - 399:7, 399:14
**college** [1] - 356:5
**collision** [1] - 309:18
**collude** [1] - 421:21
**collusory** [1] - 414:19
**color** [1] - 400:1
**Com** [1] - 414:15
**combined** [1] - 456:17
**coming** [8] - 305:12, 307:5, 307:11, 307:21, 343:1, 343:4, 359:13, 431:9
**command** [3] - 381:2, 468:25, 471:9
**commands** [1] -

415:18
**comments** [1] - 458:4
**commission** [1] - 471:16
**Commission** [4] - 292:7, 439:19, 465:5, 473:6
**commissioner** [1] - 424:2
**commissioner's** [1] - 471:7
**commissioners** [9] - 292:7, 352:19, 376:23, 396:6, 407:1, 414:6, 438:24, 463:22, 467:6
**Commissioners** [1] - 292:8
**committed** [1] - 419:15
**common** [7] - 373:10, 389:2, 389:7, 392:25, 412:1, 418:22, 423:15
**communicate** [2] - 293:2, 371:18
**communication** [1] - 393:18
**communications** [2] - 408:6, 412:23
**community** [4] - 451:6, 468:6, 468:7, 470:19
**comparable** [3] - 451:19, 453:6, 462:20
**comparables** [12] - 442:22, 444:23, 445:5, 450:23, 451:16, 451:20, 454:23, 458:6, 458:7, 462:4, 462:5, 463:11
**Comparables** [1] - 444:20
**comparison** [1] - 454:25
**Competence** [2] - 451:4, 462:12
**competent** [1] - 329:24
**complaining** [2] - 315:21, 356:21
**Complaint** [1] - 453:23
**complaint** [4] - 413:6, 413:7, 413:11, 413:14
**complaints** [1] - 444:8

**completed** [1] - 446:14
**completely** [4] - 344:3, 419:25, 422:17, 426:3
**completly** [1] - 420:1
**complicated** [1] - 424:8
**comply** [1] - 454:2
**component** [1] - 365:2
**comps** [2] - 455:1, 462:17
**computer** [7] - 314:14, 314:15, 404:11, 404:19, 404:25, 408:6, 413:1
**computer-aided** [1] - 404:11
**con** [2] - 426:24, 449:20
**concealed** [1] - 429:6
**concern** [4] - 324:14, 324:23, 380:18, 470:2
**concerned** [3] - 324:20, 359:15, 363:19
**concerning** [3] - 297:16, 324:15, 350:13
**concerns** [6] - 297:17, 324:17, 427:25, 428:1, 432:15, 446:19
**concise** [1] - 465:19
**concluded** [2] - 436:17, 472:20
**conclusion** [2] - 423:15, 427:1
**concussion** [2] - 434:8, 434:22
**Conduct** [1] - 444:24
**conduct** [3] - 335:6, 396:12, 429:15
**conducted** [1] - 416:22
**conducting** [1] - 400:17
**conference** [2] - 352:22, 361:16
**confidence** [1] - 457:25
**confident** [1] - 368:17
**confirming** [1] - 299:25
**confused** [3] - 305:15, 355:1, 385:19
**confusing** [1] - 383:18
**confusion** [2] - 367:16, 385:13
**conjunction** [2] -

417:19, 423:2
**connected** [4] - 423:24, 424:3, 424:11, 434:2
**connecting** [1] - 408:9
**connection** [4] - 396:10, 396:15, 409:14, 456:23
**consent** [5] - 368:22, 369:2, 378:17, 378:19, 414:22
**consequence** [1] - 448:25
**consequences** [3] - 345:15, 457:22, 459:12
**consider** [1] - 453:6
**consideration** [4] - 420:25, 447:13, 448:6, 449:14
**considerations** [1] - 449:12
**considered** [10] - 443:10, 446:12, 446:21, 447:3, 447:18, 449:4, 450:20, 450:24, 453:6, 459:10
**considers** [1] - 458:21
**consistent** [7] - 328:15, 418:3, 420:2, 426:4, 426:7, 427:5, 447:15
**console** [2] - 321:1, 431:7
**conspiracies** [2] - 423:9, 423:10
**conspiracy** [7] - 315:10, 318:3, 423:14, 423:22, 424:11, 425:9, 426:1
**constitutes** [1] - 420:9
**construction** [1] - 435:13
**contact** [12] - 318:24, 319:22, 320:20, 324:18, 360:5, 360:8, 360:10, 374:9, 377:22, 396:24, 401:1, 466:6
**contacted** [4] - 373:9, 373:15, 400:24, 401:3
**contacting** [1] - 400:18
**contained** [2] - 338:7, 414:15
**contains** [2] - 325:1, 357:23
**content** [1] - 383:13

context [2] - 315:8, 455:4
continuation [1] - 292:3
continue [7] - 314:25, 315:6, 353:20, 363:7, 429:21, 465:9, 469:17
continuing [1] - 401:7
contort [1] - 421:16
contradict [2] - 405:6, 405:9
contradicted [1] - 425:17
contradicts [1] - 426:3
contrary [4] - 340:25, 419:7, 419:10, 431:2
contrasts [2] - 343:13, 344:1
control [1] - 409:8
convene [1] - 439:9
conver [2] - 368:14, 433:16
conversation [27] - 294:6, 297:7, 324:4, 324:9, 335:12, 335:13, 340:1, 348:8, 355:16, 360:17, 361:13, 376:5, 378:22, 379:14, 389:14, 389:17, 389:18, 396:25, 419:18, 420:22, 428:22, 429:21, 433:15, 433:19, 434:24, 435:3, 436:6
conversations [5] - 376:3, 379:11, 409:21, 430:7, 434:10
convey [1] - 392:19
convince [1] - 470:7
convinced [1] - 469:1
cooperation [1] - 383:8
cop [4] - 427:16, 427:21, 464:21, 465:25
Copeland [4] - 451:25, 453:1, 453:13, 458:14
copies [1] - 436:19
copy [4] - 321:16, 327:6, 404:16, 474:8
Core [1] - 462:11
corner [2] - 392:25, 393:1
correct [60] - 294:20, 294:24, 296:1,

300:12, 316:2, 316:5, 319:12, 320:6, 320:22, 320:25, 322:20, 323:8, 323:18, 323:22, 325:1, 325:14, 325:21, 326:21, 330:18, 330:19, 331:7, 334:11, 334:16, 343:6, 345:11, 357:21, 357:22, 357:25, 358:2, 358:9, 359:5, 361:24, 368:16, 369:22, 372:15, 381:12, 381:13, 388:15, 388:21, 388:23, 396:22, 401:24, 403:13, 403:14, 405:12, 405:19, 407:18, 412:8, 423:18, 440:19, 445:8, 446:22, 447:11, 450:25, 456:8, 456:10, 456:11, 467:23, 471:10, 474:8
correctly [10] - 300:23, 307:4, 310:18, 331:17, 337:17, 403:19, 406:21, 445:15, 454:7, 456:25
correlating [2] - 368:4, 450:4
correspond [2] - 325:5, 406:2
corresponds [1] - 407:11
corridor [1] - 392:25
counsel [4] - 306:14, 428:7, 438:15, 439:17
counts [1] - 469:18
COUNTY [1] - 474:2
couple [5] - 297:14, 369:3, 421:19, 427:25, 432:15
course [2] - 311:2, 420:1
court [3] - 318:20, 350:22, 351:3
Court [1] - 474:18
courte [1] - 454:1
courtesy [1] - 450:12
cover [6] - 421:12, 421:15, 423:21, 425:9, 425:10,

442:23
Cover [1] - 445:7
cover-up [2] - 421:12, 421:15
covered [1] - 459:1
covering [1] - 301:20
coworker [1] - 300:2
create [2] - 309:2, 436:1
created [1] - 344:6
creates [1] - 419:2
creating [1] - 350:8
credence [1] - 417:20
credi [1] - 420:13
credibility [7] - 318:11, 318:12, 346:12, 420:20, 421:1, 424:2, 428:3
credible [1] - 416:16
credibly [1] - 427:15
cried [1] - 347:20
crime [9] - 298:11, 309:6, 311:25, 312:3, 312:5, 381:16, 387:25, 421:13, 465:14
critical [1] - 417:21
cross [11] - 292:11, 299:1, 352:11, 356:12, 357:2, 357:13, 359:24, 396:4, 459:17, 467:4, 468:18
CROSS [5] - 292:15, 381:5, 396:9, 409:13, 459:19
cross-examination [3] - 292:11, 356:12, 359:24
CROSS-EXAMINATION [5] - 292:15, 381:5, 396:9, 409:13, 459:19
crystal [1] - 417:4
culpability [2] - 470:8, 470:10
curious [1] - 324:21
current [1] - 393:22
curtain [2] - 395:13, 395:19
curtains [1] - 395:16
cussion [1] - 461:4
customize [1] - 422:4

# D

DA [1] - 316:4
DA's [1] - 383:7
damage [3] - 447:23,

448:7, 454:14
dangerous [1] - 432:25
date [6] - 315:19, 315:22, 323:9, 333:20, 369:17, 440:25
dated [2] - 357:21, 409:17
Dated [1] - 474:11
dating [2] - 385:1, 385:5
days [13] - 329:9, 335:6, 348:3, 440:9, 452:11, 454:21, 454:25, 455:11, 455:13, 455:15, 461:14, 468:9
dead [1] - 432:5
deal [7] - 317:8, 317:11, 340:24, 419:11, 425:6, 429:7, 437:1
dealing [2] - 431:11, 431:12
Deb [3] - 321:12, 327:23, 362:15
Debra [1] - 405:4
deceased [1] - 311:4
decide [4] - 353:19, 377:3, 385:17, 426:20
decided [2] - 299:12, 316:4, 472:21
decides [1] - 415:23
decision [15] - 299:16, 353:21, 401:6, 416:13, 420:15, 420:19, 421:1, 451:11, 455:16, 457:2, 460:17, 468:4, 468:12, 468:13, 473:7
decisions [4] - 353:14, 414:13, 442:12, 457:16
dedicated [1] - 468:5
deduce [1] - 320:19
deduced [1] - 420:5
deemed [1] - 451:15
deeper [1] - 448:15
defense [3] - 424:7, 424:8, 424:10
definitely [1] - 343:16
Degree [2] - 447:18, 448:4
degree [3] - 448:9, 453:17, 455:22
deliberate [2] - 467:10, 472:8

deliberately [1] - 368:19
deliberation [4] - 385:15, 386:1, 439:16, 439:18
deliberations [5] - 438:14, 439:9, 439:14, 472:18, 472:20
demonstrate [1] - 433:10
demotion [1] - 462:20
Denise [1] - 433:12
dent [1] - 397:14
depart [3] - 335:5, 397:9, 458:15
department [43] - 314:9, 314:21, 358:4, 364:21, 376:13, 379:5, 387:21, 387:22, 390:15, 400:18, 402:7, 402:12, 418:1, 419:18, 422:6, 423:23, 425:1, 425:4, 435:5, 435:9, 436:24, 448:17, 449:9, 449:19, 449:24, 450:1, 451:5, 451:8, 456:22, 457:4, 457:11, 457:15, 457:25, 458:12, 458:17, 460:16, 461:8, 462:19, 462:23, 463:3, 463:12, 469:6, 473:1
Department [17] - 352:8, 364:17, 390:14, 391:1, 410:18, 410:19, 410:24, 413:7, 416:20, 431:20, 433:5, 440:17, 453:25, 465:10, 465:11, 468:1, 471:10
department's [1] - 400:19
depicting [1] - 343:9
des [1] - 449:10
describe [2] - 329:17, 329:18
described [3] - 358:22, 403:13, 403:16
designate [1] - 387:7
desk [1] - 376:15
desti [1] - 384:2
detail [3] - 304:12,

349:24, 374:12
**details** [2] - 302:1, 324:23
**Detec** [1] - 379:2
**detective** [35] - 294:21, 298:9, 302:7, 302:9, 340:12, 342:12, 364:2, 365:14, 365:15, 365:18, 366:13, 367:21, 368:18, 368:20, 374:17, 374:24, 377:3, 378:13, 379:12, 380:6, 380:11, 388:21, 389:3, 394:23, 399:21, 414:21, 414:23, 414:24, 426:15, 427:3, 432:21, 455:25, 464:23, 469:9, 469:11
**Detective** [77] - 292:4, 293:2, 294:18, 300:19, 300:21, 305:22, 353:24, 354:7, 354:25, 355:2, 355:19, 356:22, 357:11, 357:16, 357:24, 368:24, 375:17, 375:24, 377:1, 377:12, 377:14, 377:20, 377:24, 378:7, 378:9, 378:15, 378:22, 379:20, 379:25, 380:4, 380:5, 380:6, 380:9, 382:18, 382:23, 383:1, 383:22, 384:18, 384:22, 384:24, 385:7, 385:9, 386:7, 386:22, 389:14, 389:15, 391:11, 391:12, 391:25, 392:9, 392:21, 394:7, 396:10, 396:11, 402:15, 403:16, 410:7, 415:4, 415:5, 419:21, 419:23, 429:5, 429:13, 429:14, 429:17, 429:20, 429:23, 439:21, 448:12, 453:12, 453:14, 454:16, 457:9, 458:16, 472:22

**detective's** [1] - 296:3
**detectives** [19] - 296:7, 298:2, 311:4, 312:22, 353:14, 356:18, 365:20, 366:7, 377:1, 377:5, 377:10, 387:12, 392:16, 393:12, 393:21, 394:6, 431:10, 454:13, 456:6
**detectives'** [3] - 298:23, 301:24, 380:3
**determination** [4] - 420:14, 420:20, 454:9, 454:20
**determine** [7] - 402:1, 407:20, 407:23, 408:13, 408:20, 460:15, 472:9
**determined** [5] - 292:20, 384:13, 421:14, 460:24, 461:2
**determines** [1] - 459:3
**detour** [2] - 429:20, 462:4
**develop** [1] - 329:8
**differ** [1] - 420:3
**difference** [4] - 406:7, 413:15, 455:17, 455:24
**different** [14] - 309:8, 318:9, 319:23, 342:20, 344:4, 352:5, 367:17, 380:3, 384:25, 393:23, 420:21, 452:13, 458:11, 466:15
**differently** [2] - 302:6, 372:2
**digit** [1] - 387:6
**digits** [1] - 387:5
**DIRECT** [6] - 363:14, 390:9, 400:10, 440:12, 464:9, 467:20
**direct** [21] - 300:9, 323:2, 323:14, 324:25, 325:4, 325:12, 325:17, 326:6, 331:10, 332:21, 363:18, 403:4, 406:10, 409:21, 451:20, 451:23, 451:25, 454:23, 456:20, 459:22, 462:13

**directed** [4] - 401:14, 402:3, 403:17, 471:15
**directives** [1] - 468:24
**directly** [3] - 405:22, 407:13, 416:15
**dis** [1] - 461:3
**disagree** [2] - 428:15, 435:22
**discharge** [5] - 449:18, 458:7, 462:19, 463:19, 473:2
**dischargeable** [1] - 458:21
**discharged** [10] - 300:17, 334:21, 378:19, 433:18, 457:11, 458:12, 458:15, 458:16, 463:12, 472:10
**disci** [1] - 457:2
**Disciplinary** [1] - 292:4
**disciplinary** [1] - 460:17
**discipline** [25] - 345:10, 345:25, 346:8, 346:9, 347:2, 347:8, 414:12, 421:14, 422:16, 441:10, 442:3, 442:9, 442:12, 442:20, 442:23, 444:25, 447:3, 451:12, 451:19, 454:10, 454:11, 459:3, 463:18, 472:22, 472:24
**Discipline** [2] - 441:8, 443:20
**disciplined** [4] - 314:2, 421:5, 421:11, 472:10
**disclosed** [1] - 358:4
**discover** [1] - 462:6
**discovered** [1] - 427:24
**discredit** [1] - 449:24
**discrepancies** [2] - 344:1, 361:13
**discrepancy** [1] - 331:24
**discretion** [1] - 312:8
**discriminating** [1] - 425:12
**discrimination** [1] - 424:12
**discussed** [9] - 363:20, 441:11,

442:8, 442:14, 450:20, 458:25, 460:8, 460:11, 461:3
**discussing** [2] - 366:5, 415:21
**Discussion** [2] - 352:16, 439:11
**discussion** [3] - 334:25, 460:19, 460:20
**disheveled** [1] - 330:13
**dismissal** [1] - 457:4
**disparity** [1] - 455:15
**dispatch** [11] - 367:16, 367:18, 367:24, 373:10, 374:8, 382:9, 386:15, 404:12, 409:8, 409:9, 411:3
**dispatcher** [9] - 367:2, 373:15, 404:10, 404:19, 407:15, 408:3, 408:8, 409:5, 411:18
**dispute** [5] - 301:6, 332:12, 332:17, 351:13, 428:1
**disputed** [1] - 437:2
**distance** [1] - 359:17
**distracted** [1] - 309:5
**distracting** [1] - 309:2
**distractions** [1] - 419:3
**distraught** [1] - 347:20
**district** [25] - 294:18, 295:7, 295:9, 296:25, 297:9, 298:4, 298:18, 299:1, 306:3, 306:11, 313:25, 314:8, 315:25, 316:10, 319:2, 354:2, 354:7, 380:24, 383:6, 384:25, 387:5, 433:20, 433:24, 449:25, 462:23
**District** [78] - 292:17, 292:23, 293:8, 293:19, 293:23, 294:12, 295:21, 296:16, 297:11, 297:12, 297:13, 297:25, 299:4, 299:18, 300:19, 303:22, 304:17, 305:9, 313:22, 317:5, 317:6, 321:1,

321:2, 321:3, 336:8, 336:9, 337:9, 338:14, 340:13, 340:24, 344:14, 344:15, 355:5, 355:11, 355:12, 368:15, 368:20, 369:15, 369:16, 369:24, 370:7, 370:15, 372:9, 373:3, 373:6, 373:7, 373:23, 374:3, 374:6, 374:13, 376:10, 376:15, 376:16, 376:19, 377:24, 378:13, 380:15, 380:19, 383:21, 383:22, 384:10, 384:11, 384:12, 384:13, 387:15, 414:23, 415:24, 416:14, 416:15, 417:24, 429:22, 430:14, 431:5, 470:1, 470:22
**districts** [2] - 298:6, 370:5
**diverted** [1] - 416:14
**Division** [1] - 460:20
**division** [1] - 299:3
**doctors** [1] - 393:23
**docu** [2] - 445:22, 446:7
**document** [61] - 321:14, 322:11, 322:13, 327:4, 339:3, 354:23, 365:25, 366:1, 366:3, 366:6, 369:6, 369:8, 369:12, 371:2, 372:4, 372:16, 372:21, 402:25, 404:3, 404:4, 404:7, 404:13, 405:6, 405:20, 406:8, 406:23, 407:3, 407:5, 408:16, 437:24, 440:22, 440:23, 441:4, 441:7, 441:13, 443:13, 443:14, 443:18, 443:24, 444:3, 444:5, 444:6, 444:7, 444:10, 444:11, 444:12, 444:14, 444:16, 445:2, 445:3, 445:4, 445:5, 446:10, 446:14, 446:18,

446:19, 446:23,
447:5, 447:12,
450:16, 451:21
**Document** [10] -
300:8, 331:4, 369:9,
371:9, 372:13,
373:18, 403:3,
443:4, 443:5, 444:6
**documentation** [3] -
407:14, 408:2, 450:4
**documented** [3] -
391:23, 406:11,
406:15
**documents** [14] -
369:23, 370:22,
371:4, 372:8,
437:18, 437:22,
442:19, 442:25,
443:1, 443:9,
443:11, 444:1,
445:20, 450:3
**domestic** [2] - 301:6,
356:15
**done** [23] - 299:8,
299:25, 313:18,
313:21, 314:21,
319:5, 349:7,
355:13, 358:13,
384:6, 388:4,
398:18, 409:4,
409:6, 414:23,
415:2, 415:13,
415:15, 415:17,
421:15, 454:15,
465:22, 468:10
**door** [7] - 364:9,
384:9, 395:11,
395:20, 415:16,
470:4, 470:6
**doors** [4] - 395:12,
395:15, 395:16,
395:18
**double** [1] - 330:11
**doubt** [3] - 368:12,
379:1, 437:8
**down** [12] - 308:3,
308:9, 319:3,
325:12, 325:17,
325:22, 342:6,
359:13, 379:12,
403:8, 427:6, 452:25
**draft** [1] - 379:12
**drafting** [1] - 378:24
**dreads** [1] - 430:1
**drinking** [1] - 461:5
**drive** [1] - 384:10
**driven** [2] - 367:17,
468:20
**driver** [5] - 430:21,
430:22, 430:23,

461:4
**drivers** [2] - 436:2,
436:3
**driving** [9] - 306:23,
337:6, 340:13,
340:16, 358:15,
359:1, 405:15,
418:25, 473:1
**drove** [1] - 415:13
**drug** [1] - 351:1
**drunk** [4] - 430:21,
430:22, 430:23
**dual** [2] - 303:1,
303:12
**dude** [1] - 355:14
**due** [4] - 312:14,
318:3, 383:8, 426:11
**duly** [5] - 363:10,
390:5, 400:6, 440:3,
464:4
**during** [12] - 311:1,
339:21, 340:8,
346:25, 381:22,
403:10, 442:2,
442:19, 450:24,
457:20, 458:24,
468:19
**duties** [4] - 415:20,
417:25, 455:10,
455:14
**duty** [8] - 311:2,
387:23, 427:23,
448:11, 453:3,
455:19, 456:10,
457:25
**Dwight** [2] - 451:25,
453:1

---

## E

**early** [5] - 344:16,
370:16, 390:20,
426:16, 464:22
**Early** [2] - 369:16,
369:20
**easier** [1] - 311:5
**east** [7] - 306:23,
320:17, 320:19,
321:3, 343:4, 353:4,
353:7
**easy** [1] - 470:20
**effect** [4] - 312:24,
315:6, 418:8, 423:22
**effectively** [1] - 415:19
**efficiency** [1] - 312:14
**efficiently** [3] -
415:19, 451:6,
462:18
**eight** [1] - 456:12
**either** [13] - 295:13,

327:23, 344:7,
351:1, 352:3,
372:25, 411:17,
412:17, 413:16,
427:2, 434:19,
460:20, 465:23
**elaborate** [1] - 338:2
**elec** [1] - 444:6
**electron** [1] - 413:3
**electronic** [1] - 404:18
**electronically** [1] -
408:5
**element** [1] - 418:23
**emergencies** [1] -
308:22, 409:2
**emergency** [16] -
307:1, 308:2,
308:19, 309:4,
309:8, 310:10,
341:22, 341:23,
342:2, 359:7,
359:18, 418:3,
419:10, 421:8,
449:8, 456:2
**employ** [1] - 310:6
**employed** [3] -
390:13, 464:14,
464:16
**Employee** [1] - 448:4
**employee** [7] -
446:24, 447:5,
448:24, 455:18,
459:4, 459:7, 470:23
**employee's** [4] -
442:21, 444:15,
447:4, 450:6
**employer** [1] - 457:22
**en** [1] - 386:12,
405:21, 405:25,
407:20, 411:19,
411:23, 412:2,
412:4, 412:11
**end** [2] - 312:7, 420:12
**endanger** [1] - 454:4
**ended** [5] - 330:10,
430:10, 430:12,
466:12, 470:15
**ending** [2] - 333:5,
333:13
**ends** [3] - 431:8,
431:16, 432:10
**Enforcement** [2] -
384:16, 385:1
**engage** [1] - 395:9
**engages** [1] - 421:15
**enhance** [1] - 419:1
**enhanced** [1] - 418:20
**enhances** [2] -
418:21, 419:6
**enhancing** [1] - 419:4

**enroute** [1] - 406:19
**enter** [2] - 395:13,
430:20
**entered** [2] - 406:19,
443:7
**entering** [1] - 395:18
**enters** [1] - 395:8
**entire** [4] - 330:8,
342:21, 426:5,
442:13
**entities** [1] - 463:3
**entitled** [1] - 474:6
**entries** [4] - 325:12,
325:22, 326:22,
333:1
**entry** [17] - 325:17,
326:7, 333:19,
334:12, 367:5,
368:3, 386:13,
404:10, 407:12,
444:19, 445:7,
445:14, 452:11,
452:13, 452:25,
455:5
**equate** [1] - 466:25
**equipment** [1] - 310:5
**equipped** [1] - 358:17
**equivoca** [1] - 417:10
**equivocate** [1] - 417:5
**error** [3] - 371:18,
446:10, 460:12
**espe** [1] - 312:12
**especially** [2] -
298:11, 437:6
**essentially** [1] -
337:19
**established** [2] -
334:18, 458:19
**estimate** [3] - 294:2,
336:4, 336:12
**et** [4] - 324:20, 338:15,
421:10
**evening** [3] - 366:15,
372:9, 390:19
**event** [2] - 428:21,
471:16
**events** [7] - 339:17,
344:4, 414:11,
424:9, 426:6, 427:4,
435:1
**eventually** [5] -
293:25, 324:10,
405:22, 406:3,
470:14
**evidence** [23] -
327:11, 364:12,
414:9, 416:16,
416:17, 417:18,
420:5, 423:12,
423:13, 425:15,

426:8, 426:12,
427:8, 433:10,
437:19, 437:20,
438:4, 439:18,
439:20, 439:23,
443:7, 471:22
**ex** [1] - 453:2
**ex-girlfriend** [1] -
453:2
**exact** [13] - 298:17,
313:23, 315:2,
315:5, 351:24,
374:12, 393:7,
405:22, 406:4,
406:6, 413:10,
416:8, 474:8
**exactly** [13] - 314:4,
319:4, 336:22,
337:8, 339:19,
340:17, 342:19,
344:16, 344:18,
355:2, 413:13, 417:2
**examination** [5] -
292:11, 356:12,
357:3, 357:14,
359:24
**EXAMINATION** [15] -
292:15, 356:10,
363:14, 381:5,
386:6, 388:19,
390:9, 396:9,
400:10, 409:13,
440:12, 459:19,
464:9, 467:20, 471:8
**examine** [1] - 318:12
**examiner** [1] - 292:5
**example** [3] - 315:4,
425:18, 462:11
**examples** [1] - 463:11
**except** [4] - 308:5,
356:5, 362:13, 454:3
**excruciating** [1] -
349:24
**excuse** [2] - 320:16,
326:16
**excused** [9] - 362:21,
390:2, 400:4, 400:5,
413:24, 413:25,
463:23, 463:24,
467:8
**executive** [1] - 460:22
**executives** [1] - 442:2
**exercise** [1] - 455:14
**Exhibit** [24] - 305:19,
306:19, 322:6,
322:11, 327:13,
357:4, 365:25,
369:6, 372:4,
373:13, 382:6,
383:2, 404:3,

SUSAN K. TAYLOR
262-553-1058
sueT@wi.rr.com
COURT REPORTER
8
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 483 of 501   Document 80-5

440:22, 440:24,
441:4, 443:13,
444:10, 444:12,
445:2, 445:4, 450:7,
451:4, 459:22
**exhibit** [2] - 338:8,
438:2
**exhibits** [4] - 306:17,
306:18, 443:2,
471:22
**exigency** [5] - 299:19,
300:11, 300:14,
301:7, 314:7
**exigent** [6] - 302:14,
355:8, 469:21,
469:24, 470:12
**existed** [1] - 463:5
**expect** [4] - 367:5,
368:2, 422:11,
448:20
**expecta** [1] - 348:9
**expectation** [4] -
293:12, 293:22,
348:15, 349:1
**expected** [2] - 294:21,
414:9
**expecting** [4] -
348:19, 348:22,
414:25, 432:22
**Experience** [1] - 448:4
**experience** [6] -
298:14, 298:20,
345:15, 372:22,
448:12, 462:22
**experienced** [1] -
309:4
**experimental** [1] -
376:12
**expertise** [1] - 442:11
**explain** [6] - 311:19,
317:14, 331:24,
367:8, 367:15, 441:9
**explained** [6] -
317:23, 335:2,
339:21, 343:18,
397:10, 469:20
**explaining** [1] -
340:22
**explains** [1] - 430:9
**explanation** [2] -
423:17, 423:18
**expose** [2] - 318:14,
345:10
**exposed** [1] - 421:14
**express** [1] - 352:24
**expressed** [1] -
347:10
**expressing** [1] -
339:22
**extent** [2] - 294:21,

438:2
**exterior** [1] - 398:6
**extra** [1] - 307:16
**extraordinary** [6] -
423:11, 423:12,
423:13, 425:13,
425:14
**extremely** [1] - 386:15
**eyes** [3] - 329:5,
330:10, 396:2

---

## F

**fabrication** [1] -
414:20
**fabrications** [1] -
422:5
**face** [4] - 295:18,
360:10, 364:7
**face-to-face** [1] -
360:10
**facilitate** [1] - 418:4
**facing** [1] - 419:24
**fact** [21] - 298:19,
301:20, 303:20,
304:2, 304:15,
311:7, 313:10,
332:16, 338:13,
344:13, 351:19,
357:2, 414:19,
417:21, 419:9,
419:21, 420:7,
422:14, 428:3,
444:1, 461:4
**factor** [6] - 448:13,
449:18, 455:14,
455:21, 455:22,
459:10
**factors** [2] - 447:12,
464:4
**facts** [21] - 301:15,
302:11, 304:9,
334:18, 338:23,
344:11, 344:12,
344:22, 344:24,
350:2, 350:4,
355:13, 414:17,
415:23, 419:11,
419:19, 419:20,
421:23, 422:5,
424:4, 426:18
**factual** [1] - 351:8
**failed** [1] - 453:1
**failing** [2] - 450:11,
462:18
**failure** [4] - 450:1,
472:25, 473:1, 473:2
**fair** [14] - 319:6, 319:8,
344:6, 356:22,
358:24, 364:11,

364:13, 376:3,
381:18, 397:17,
437:4, 437:13,
454:25, 458:18
**fairly** [1] - 426:13
**false** [1] - 458:15
**familiar** [14] - 295:21,
363:20, 369:12,
371:3, 371:5, 372:1,
372:3, 372:6, 404:7,
438:15, 441:7,
443:18, 444:12,
445:4
**family** [2] - 335:21,
432:13
**far** [12] - 336:2, 336:3,
352:1, 358:18,
392:24, 420:3,
425:23, 426:2,
448:11, 461:11,
463:8, 466:9
**fast** [5] - 309:18,
339:14, 340:5,
382:1, 462:21
**fast-forward** [1] -
462:21
**fault** [6] - 430:24,
430:25, 436:25,
437:13, 460:25,
461:3
**faulty** [1] - 430:23
**feelings** [1] - 425:16
**feet** [3] - 393:4, 394:9,
394:10
**fellow** [1] - 427:18
**felon** [1] - 300:16
**felony** [6] - 297:15,
297:20, 298:11,
298:16, 298:22
**felt** [3] - 307:18, 308:8,
344:20
**female** [2] - 314:7,
470:23
**females** [1] - 425:13
**few** [7] - 350:18,
388:17, 413:10,
434:5, 434:8, 436:7,
437:6
**fide** [1] - 296:5
**field** [2] - 416:22,
431:13
**fifth** [2] - 354:2, 354:6
**Fifth** [1] - 380:18
**figure** [3] - 319:21,
319:24, 362:9
**file** [12] - 312:4,
350:12, 398:16,
441:17, 442:21,
444:6, 444:15,
450:6, 450:7,

450:10, 457:9,
461:24
**File** [1] - 444:4
**filed** [10] - 312:17,
313:25, 409:17,
409:20, 419:25,
436:16, 441:10,
445:11, 445:18,
458:14
**filing** [3] - 297:15,
297:20, 298:16
**fill** [1] - 383:15
**fill-in** [1] - 383:15
**final** [1] - 446:2
**finally** [4] - 432:7,
445:14, 450:16,
456:20
**findings** [1] - 420:13
**fine** [8] - 293:7, 339:3,
340:3, 375:20,
375:23, 415:6, 425:7
**Fire** [2] - 292:6, 473:6
**fired** [1] - 437:12
**first** [58] - 292:21,
292:23, 293:8,
293:19, 305:3,
305:7, 305:12,
306:2, 306:5, 306:8,
306:10, 319:18,
320:22, 322:10,
336:8, 338:15,
340:16, 341:1,
342:9, 347:14,
347:16, 347:17,
347:24, 348:1,
355:20, 357:8,
357:15, 358:9,
358:10, 360:21,
361:12, 363:6,
363:10, 375:15,
383:11, 387:4,
390:5, 391:14,
392:14, 396:6,
400:6, 426:6,
438:14, 439:23,
440:3, 443:11,
446:24, 450:7,
451:2, 453:23,
455:5, 458:11,
462:3, 462:9, 464:4,
464:10, 464:12
**five** [13] - 323:23,
333:1, 336:6, 336:9,
438:14, 439:23,
451:13, 452:11,
453:4, 462:6,
462:17, 462:20,
472:24
**Five** [4] - 299:4,
316:25, 378:1,

470:13
**five-day** [6] - 451:13,
453:4, 462:6,
462:17, 462:20,
472:24
**flashed** [1] - 358:24
**Fleck** [1] - 442:6
**fled** [1] - 466:16
**Flynn** [2] - 441:22,
442:3
**focus** [1] - 320:10
**follow** [27] - 296:8,
296:13, 300:13,
302:4, 302:5,
332:10, 333:12,
337:23, 337:25,
347:4, 354:19,
356:20, 361:3,
361:5, 368:21,
374:25, 377:16,
377:17, 388:17,
397:22, 401:16,
408:22, 414:21,
415:18, 424:16,
434:23, 471:6
**follow-up** [12] - 296:8,
302:4, 302:5,
337:23, 337:25,
347:4, 354:19,
356:20, 368:21,
374:25, 388:17,
471:6
**followed** [1] - 337:20,
392:8, 415:6
**following** [3] - 327:17,
401:18, 468:25
**follows** [6] - 363:12,
390:7, 400:8, 429:9,
440:5, 464:6
**foot** [2] - 330:11,
330:12
**force** [2] - 468:24,
469:2
**forego** [1] - 438:19
**foregoing** [1] - 474:8
**Forensic** [1] - 390:23
**forensic** [3] - 391:6,
391:22, 394:4
**forget** [2] - 411:4,
411:10
**form** [3] - 350:10,
434:23, 444:19
**forms** [1] - 393:24
**forth** [3] - 392:20,
394:15, 427:10
**forthright** [3] - 456:22,
465:15, 473:3
**forum** [2] - 469:8,
469:10
**forward** [2] - 306:22,

462:21
**fourth** [1] - 451:24
**frame** [1] - 300:1
**frankly** [1] - 417:7
**freedom** [1] - 377:10
**friend** [7] - 385:4, 402:17, 402:22, 403:18, 410:8, 416:1, 425:5
**friendly** [3] - 335:13, 335:14, 376:5
**friends** [1] - 425:2
**Froedtert** [2] - 328:22, 336:7
**front** [16] - 307:5, 331:4, 331:5, 364:8, 369:10, 391:24, 392:5, 403:3, 407:7, 430:17, 435:13, 435:21, 435:24, 441:5, 443:1, 443:15
**fronts** [1] - 393:4
**frustrated** [4] - 320:2, 434:11, 436:20, 436:23
**ful** [1] - 436:6
**full** [8] - 349:25, 369:5, 394:18, 406:10, 421:5, 448:11, 456:9, 456:10
**full-time** [1] - 456:9
**function** [2] - 309:25, 374:14
**functions** [4] - 297:17, 298:5, 298:19, 299:2
**funeral** [1] - 440:10
**funny** [1] - 319:6
**Furthermore** [2] - 422:24, 424:21
**future** [1] - 471:16

## G

**games** [1] - 470:17
**Garfield** [1] - 342:25
**gathering** [1] - 379:9
**gathers** [1] - 350:13
**gation** [2] - 425:11, 437:5
**Gaver** [1] - 459:16
**GAVER** [72] - 293:14, 296:22, 316:13, 316:18, 316:22, 317:15, 318:7, 318:19, 320:8, 321:17, 322:9, 323:4, 327:12, 328:17, 329:14, 329:25, 345:12, 346:6, 348:12,

348:16, 349:5, 352:12, 356:9, 356:10, 357:1, 361:21, 361:24, 362:19, 362:24, 363:1, 381:5, 381:25, 382:3, 385:11, 388:17, 388:19, 389:21, 396:5, 396:9, 399:2, 409:12, 409:13, 411:21, 413:19, 413:22, 427:12, 437:21, 438:1, 438:9, 438:12, 438:17, 440:25, 452:21, 459:18, 459:19, 461:25, 463:15, 463:20, 464:2, 464:9, 467:2, 467:5, 467:12, 467:15, 467:19, 467:20, 468:17, 471:6, 471:8, 471:19, 471:25, 472:5
**general** [2] - 338:25, 397:12
**generally** [1] - 432:25
**generate** [1] - 404:13
**generated** [6] - 359:25, 360:23, 361:4, 361:15, 396:17, 404:16
**gentleman** [2] - 385:8, 432:19
**girlfriend** [1] - 453:2
**given** [9] - 370:9, 374:23, 376:17, 436:5, 455:4, 457:15, 468:24, 469:4, 469:8
**glass** [3] - 359:14, 395:12, 395:20
**Goggins** [3] - 320:23, 327:23, 362:14
**Gomez** [1] - 458:16
**gories** [1] - 446:24
**GPS** [1] - 408:16
**great** [1] - 324:17
**greater** [2] - 449:12, 449:15
**greatly** [1] - 455:1
**green** [2] - 359:15, 431:1
**grounds** [1] - 346:7
**guess** [9] - 295:10, 299:10, 306:6, 307:12, 310:1, 385:13, 468:22,

469:7, 469:10
**Guiding** [3] - 451:24, 452:19, 453:22
**guiding** [2] - 419:8, 462:12
**gun** [28] - 293:5, 294:8, 295:3, 299:9, 299:13, 300:14, 300:16, 300:17, 300:18, 301:10, 301:11, 301:22, 317:1, 335:17, 349:16, 355:6, 355:8, 355:10, 355:16, 356:20, 357:24, 369:3, 369:4, 378:8, 429:6, 429:16, 466:16
**guns** [1] - 364:24
**gunshot** [2] - 364:16, 378:6
**gurneys** [1] - 392:8
**guy** [2] - 364:9, 375:20
**guys** [1] - 393:20

## H

**half** [6] - 294:4, 307:9, 340:1, 376:15, 378:1, 414:7
**halfway** [1] - 408:17
**hallway** [1] - 347:18
**hand** [2] - 321:6, 364:16
**handed** [4] - 354:22, 366:1, 402:16, 443:14
**handing** [1] - 444:11
**handle** [4] - 293:8, 294:16, 354:15, 429:21
**handled** [5] - 294:13, 416:19, 416:21, 469:15, 469:24
**handling** [2] - 302:8, 351:4
**Hanley** [84] - 296:16, 296:21, 297:9, 314:12, 314:13, 330:16, 331:14, 332:3, 332:16, 332:22, 333:11, 333:12, 334:19, 335:5, 336:15, 337:24, 339:10, 340:7, 340:12, 341:21, 342:12, 343:7, 343:13, 344:6, 344:11, 344:23, 346:25,

347:6, 348:9, 349:2, 349:7, 350:8, 350:12, 352:21, 354:6, 360:24, 361:2, 361:3, 361:14, 361:15, 363:6, 363:15, 391:14, 391:18, 392:19, 393:5, 393:12, 393:17, 394:3, 394:6, 394:12, 394:21, 395:8, 398:5, 398:19, 399:18, 401:12, 414:20, 418:14, 419:19, 419:21, 420:4, 420:6, 420:18, 421:2, 421:18, 422:9, 422:12, 422:19, 423:1, 423:2, 423:4, 424:18, 425:18, 426:14, 427:7, 433:7, 433:15, 433:22, 433:24, 434:17, 437:8
**HANLEY** [1] - 363:10
**Hanley's** [6] - 333:8, 333:14, 334:14, 345:9, 347:14, 435:1
**happenstance** [1] - 359:10
**happy** [5] - 339:7, 385:3, 465:20, 465:21
**harassed** [1] - 314:20
**harassment** [1] - 428:11
**hard** [8] - 339:19, 339:21, 376:14, 376:16, 439:17, 470:6, 470:21
**hardcard** [5] - 442:21, 443:19, 461:11, 461:13, 461:15
**Harm** [2] - 447:18, 448:5
**harm** [3] - 448:9, 453:17, 455:22
**Harmon** [1] - 295:22
**Harpole** [1] - 442:4
**harsh** [1] - 436:22
**harsher** [2] - 462:6, 462:16
**hazardous** [1] - 309:3
**he/she** [2] - 454:5, 454:6
**head** [5] - 331:23, 339:24, 340:2,

437:3, 437:7
**headed** [3] - 353:4, 353:6, 405:14
**healed** [1] - 332:1
**hear** [8] - 311:10, 319:4, 355:18, 368:6, 375:6, 395:21, 395:23, 468:23
**heard** [41] - 305:4, 305:13, 306:2, 306:5, 306:8, 306:9, 306:11, 312:1, 312:6, 312:20, 312:23, 312:24, 312:25, 313:3, 324:9, 335:5, 353:9, 361:12, 367:1, 375:2, 375:15, 402:8, 405:4, 405:6, 429:1, 430:6, 432:21, 433:1, 433:2, 433:11, 433:12, 433:13, 434:9, 435:11, 435:20, 460:5, 470:4, 472:16
**hearing** [13] - 292:3, 292:5, 305:6, 305:10, 357:18, 358:7, 358:8, 414:8, 432:8, 436:11, 442:20, 474:6, 474:9
**hears** [2] - 428:23, 428:24
**hearsay** [2] - 314:2, 319:2
**Hein** [1] - 292:8
**HEIN** [8] - 348:2, 407:19, 408:12, 413:5, 439:6, 452:8, 452:14, 472:13
**held** [2] - 313:7, 459:10
**help** [23] - 298:2, 298:10, 298:12, 298:24, 302:4, 313:25, 314:7, 344:17, 344:18, 344:19, 354:21, 380:19, 380:20, 380:21, 391:7, 391:15, 415:9, 425:5, 428:13, 428:14, 462:13, 469:22, 469:23
**helped** [2] - 428:6, 428:7
**helpful** [1] - 427:20
**helps** [3] - 427:17,

SUSAN K. TAYLOR    262-553-1058    COURT REPORTER
sueT@wi.rr.com
10
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 485 of 501   Document 80-5

427:18, 452:22
**hereby** [1] - 474:4
**herself** [10] - 306:12, 329:22, 367:2, 423:21, 424:23, 427:19, 456:3, 459:7, 470:5, 471:1
**high** [2] - 343:8, 364:17
**higher** [1] - 455:1
**highly** [1] - 312:19
**himself** [9] - 300:15, 300:18, 301:5, 301:10, 355:14, 384:7, 416:18, 422:16
**hind** [1] - 469:7
**hinge** [1] - 420:15
**history** [4] - 442:21, 444:6, 444:15, 450:6
**History** [1] - 444:4
**hit** [2] - 309:16, 330:9
**hold** [2] - 312:21, 459:7
**holder** [2] - 301:4, 429:7
**holds** [1] - 459:4
**holster** [1] - 369:3
**home** [15] - 300:21, 305:22, 335:2, 335:20, 336:1, 336:8, 348:22, 349:14, 357:12, 357:25, 394:5, 433:23, 433:25, 470:16, 471:1
**honest** [1] - 385:5
**hope** [1] - 469:21
**horn** [17] - 308:14, 308:15, 308:17, 309:9, 309:13, 309:21, 309:23, 309:25, 310:4, 310:6, 310:7, 342:7, 358:20, 359:3, 430:18
**horns** [1] - 310:2
**Hospital** [3] - 365:3, 365:7, 381:7
**hospital** [83] - 319:19, 328:22, 329:1, 329:3, 329:12, 330:6, 330:15, 330:21, 330:24, 331:2, 331:14, 331:25, 332:3, 332:5, 334:21, 335:17, 335:22, 336:8, 348:23, 349:13, 360:5,

364:2, 364:3, 365:11, 365:16, 366:7, 366:11, 367:3, 368:7, 368:19, 369:1, 373:5, 373:11, 373:16, 374:1, 374:11, 376:12, 378:6, 378:20, 379:2, 379:17, 381:11, 381:18, 382:10, 383:23, 383:24, 384:1, 384:4, 384:6, 384:11, 386:8, 389:16, 391:15, 391:19, 391:20, 392:4, 392:7, 393:11, 393:12, 393:13, 394:16, 395:2, 397:5, 397:16, 398:7, 398:14, 398:20, 399:12, 401:20, 409:18, 409:22, 414:18, 414:20, 415:3, 425:19, 425:21, 429:2, 429:4, 432:10, 433:9, 433:11, 433:17, 433:18
**hour** [13] - 294:2, 294:4, 294:14, 314:18, 314:19, 339:11, 340:1, 340:2, 340:4, 370:9, 421:10, 439:13, 466:13
**hours** [11] - 294:3, 294:19, 372:10, 372:22, 373:4, 390:20, 426:16, 434:5, 434:9, 436:7, 437:6
**house** [34] - 292:20, 293:11, 293:13, 293:20, 293:25, 294:8, 304:16, 305:1, 305:4, 305:8, 306:4, 317:24, 332:7, 336:9, 337:2, 337:13, 353:19, 354:16, 355:19, 357:17, 368:8, 378:7, 378:11, 378:12, 379:22, 387:15, 406:7, 413:16, 414:22, 415:14, 416:14, 429:20, 470:6, 470:14

**household** [1] - 430:4
**housekeeping** [1] - 471:22
**houses** [2] - 379:20, 466:15
**HR** [1] - 442:6
**huge** [1] - 429:7
**human** [1] - 468:12
**hung** [2] - 324:10, 361:10
**hurt** [1] - 431:22
**hyperlink** [3] - 407:12, 407:14, 407:17

---

## I

**IA** [1] - 460:20
**IAD** [2] - 332:1, 361:16
**IAS** [1] - 445:7
**ically** [1] - 413:4
**ID** [2] - 395:5, 398:10
**idea** [13] - 297:10, 315:1, 327:22, 327:23, 328:7, 328:10, 349:10, 351:15, 359:22, 375:23, 405:14, 411:1, 423:17
**identifica** [2] - 404:4, 440:23
**identification** [8] - 322:13, 366:2, 369:9, 395:3, 441:4, 443:15, 444:11, 445:3
**identify** [2] - 329:15, 364:24
**idle** [1] - 427:16
**idling** [1] - 419:17
**II** [4] - 439:25, 440:20, 464:1, 472:21
**illuminated** [1] - 308:6
**imagine** [1] - 350:16
**immediacy** [1] - 317:13
**immediate** [1] - 381:1
**immediately** [8] - 303:21, 317:25, 320:11, 327:17, 368:22, 376:21, 414:25, 415:15
**impact** [2] - 359:19, 435:16
**impeding** [3] - 307:8, 308:13, 342:4
**importance** [1] - 377:9
**important** [16] - 301:21, 304:1, 304:9, 304:12, 304:15, 313:6,

314:9, 377:4, 377:8, 417:18, 424:6, 427:14, 450:19, 457:12, 470:17
**imposed** [2] - 442:9, 445:1
**impression** [2] - 317:7, 317:9
**in-squad** [1] - 404:19
**inaccurate** [1] - 336:18
**inappropriate** [1] - 435:8
**incident** [6] - 315:2, 329:10, 352:4, 356:16, 374:6, 465:24
**incidents** [1] - 364:18
**include** [2] - 303:19, 304:9
**including** [4] - 306:19, 323:9, 437:1, 441:21
**inclusion** [1] - 423:23
**incoherent** [2] - 362:5, 362:8
**incoming** [1] - 325:7
**inconsistencies** [1] - 343:18
**inconsistent** [3] - 364:11, 364:14, 418:17
**incumbent** [1] - 377:21
**incurred** [1] - 454:13
**indi** [1] - 457:16
**indicate** [12] - 331:22, 334:18, 335:5, 351:11, 365:10, 366:9, 378:23, 403:6, 441:25, 444:4, 445:22, 450:4
**indicated** [19] - 294:25, 296:20, 297:11, 307:1, 312:2, 324:3, 336:18, 341:21, 368:14, 372:13, 377:13, 381:6, 386:16, 402:8, 402:15, 405:24, 412:22, 415:7, 443:9
**indicates** [22] - 323:15, 323:18, 325:22, 326:13, 332:16, 333:2, 334:12, 334:15, 340:12, 405:10, 405:19, 405:20, 405:24, 426:14, 441:18, 441:21,

442:1, 442:2, 443:21, 445:7, 452:10, 456:21
**indicating** [14] - 304:24, 310:19, 315:20, 335:22, 340:14, 350:19, 367:2, 375:3, 386:12, 404:20, 405:1, 408:14, 443:22, 444:22
**indication** [3] - 351:12, 446:5, 446:7
**individual** [3] - 451:17, 453:18, 457:8
**individuals** [5] - 442:22, 448:10, 459:9, 463:18
**inflicted** [1] - 429:6
**influence** [1] - 350:20
**infor** [2] - 300:25, 349:3
**informa** [2] - 300:6, 393:24
**informal** [2] - 335:12, 335:14
**information** [34] - 297:23, 300:20, 301:2, 301:3, 301:8, 319:10, 337:19, 348:10, 349:11, 350:13, 350:22, 351:2, 354:24, 356:24, 357:10, 357:16, 373:22, 374:18, 379:10, 387:19, 391:5, 392:18, 393:9, 393:24, 397:11, 397:15, 401:12, 401:17, 402:2, 453:11, 465:16, 465:18, 465:19, 469:25
**informed** [2] - 304:25, 323:25
**ing** [1] - 449:18
**initial** [3] - 374:18, 374:19, 413:7
**injured** [3] - 330:6, 453:20, 454:14
**injuries** [16] - 329:4, 329:13, 329:16, 329:18, 329:22, 330:2, 393:22, 397:17, 434:8, 437:1, 437:2, 447:22, 447:25, 448:6, 454:12, 456:3

**injury** [6] - 339:24, 340:2, 350:24, 437:6, 437:7, 456:24
**inquiry** [1] - 473:3
**inside** [1] - 398:11
**insofar** [1] - 400:18
**inspector** [1] - 442:4
**instance** [1] - 421:13
**instances** [1] - 454:1
**instead** [5] - 316:25, 377:23, 415:22, 437:5, 459:8
**instructed** [1] - 299:20
**insurance** [1] - 430:22
**integrity** [16] - 419:12, 419:24, 420:10, 450:8, 450:13, 450:15, 457:7, 458:6, 458:8, 458:13, 458:17, 458:20, 459:14, 462:21, 463:2
**Integrity** [1] - 456:21
**intend** [1] - 359:7
**intent** [1] - 350:4
**intention** [1] - 433:4
**intentional** [2] - 448:23, 449:2
**Intentional/ Unintentional** [2] - 448:3, 448:21
**intentionally** [3] - 436:8, 449:7, 449:10
**interaction** [2] - 415:4, 433:22
**interest** [2] - 312:11, 447:7
**Interest** [1] - 447:2
**interested** [1] - 301:25
**interesting** [1] - 468:20
**interfere** [1] - 433:4
**interim** [1] - 442:6
**interject** [1] - 317:16
**internal** [1] - 409:15
**Internal** [10] - 318:24, 319:7, 375:24, 375:25, 387:24, 396:14, 396:17, 400:14, 444:7, 444:23
**intersection** [8] - 358:13, 358:15, 359:8, 430:15, 430:20, 431:3, 435:5, 435:14
**intervene** [3] - 337:11, 435:7, 436:13
**intervention** [1] - 344:17

**interview** [19] - 302:22, 303:1, 304:22, 304:25, 335:7, 335:8, 335:16, 337:22, 339:21, 354:16, 378:25, 401:14, 402:3, 402:4, 403:10, 409:14, 409:24, 437:8, 437:9
**interviewed** [6] - 311:23, 312:22, 314:4, 396:10, 396:14, 401:10
**interviewing** [3] - 369:1, 401:15, 402:5
**interviews** [1] - 304:22
**introduce** [2] - 321:15, 322:10
**introduced** [1] - 398:4
**inventoried** [1] - 458:14
**investi** [2] - 425:10, 437:4
**investigate** [2] - 364:21, 389:5
**investigated** [2] - 383:3, 388:2
**investigating** [4] - 364:18, 377:7, 389:6, 401:21
**investigation** [32] - 296:3, 296:9, 346:15, 353:20, 356:14, 356:17, 363:19, 365:12, 377:8, 378:10, 381:19, 382:17, 382:22, 386:10, 387:11, 388:20, 389:3, 389:4, 389:9, 389:19, 396:11, 396:20, 400:15, 400:17, 409:15, 425:10, 433:4, 436:9, 436:17, 445:12, 457:20, 459:7
**Investigations** [2] - 318:24, 390:23
**investigations** [7] - 296:7, 296:13, 298:23, 427:17, 429:10, 457:17, 465:17
**investigative** [2] - 374:20, 376:13
**investigator** [3] - 391:22, 394:4,

400:14
**investigators** [1] - 391:6
**involved** [25] - 296:3, 302:1, 311:14, 311:17, 318:3, 335:14, 350:14, 353:3, 365:2, 368:21, 374:25, 380:6, 389:19, 391:10, 391:11, 424:8, 428:19, 429:1, 434:21, 453:15, 460:25, 461:5, 465:14, 465:17, 466:21
**involves** [1] - 427:19
**involving** [1] - 391:1
**IP** [1] - 314:15
**ironic** [1] - 314:1
**irrelevant** [2] - 317:17, 317:20
**issue** [19] - 298:15, 305:8, 315:14, 316:5, 319:9, 325:2, 346:19, 376:25, 383:6, 383:12, 384:22, 404:24, 415:1, 416:6, 441:14, 458:1, 458:7, 459:14, 461:6
**issues** [1] - 303:3
**itself** [7] - 324:21, 392:1, 417:12, 426:17, 426:18, 448:24, 460:5

## J

**jacket** [5] - 398:12, 399:12, 399:13, 399:14, 399:19
**jaded** [1] - 344:20
**January** [26] - 323:10, 323:15, 331:25, 333:2, 333:22, 334:13, 340:8, 346:25, 348:5, 348:9, 356:13, 359:25, 360:22, 369:18, 369:24, 369:25, 372:10, 390:19, 390:20, 399:6, 399:7, 399:10, 426:16, 427:22
**Jesse** [1] - 362:13
**job** [11] - 298:24, 299:2, 402:1, 421:4, 424:15, 457:21,

467:6, 468:6, 469:14, 470:17, 471:17
**Joe** [2] - 320:23, 327:23
**Johnson** [7] - 343:2, 350:20, 365:14, 366:13, 368:18, 388:20, 389:15
**Johnson's** [1] - 380:6
**Jordan** [21] - 324:12, 328:9, 360:6, 405:14, 406:2, 410:21, 410:23, 417:4, 417:13, 430:2, 430:4, 431:11, 431:17, 431:23, 432:4, 432:9, 432:17, 432:22, 433:1, 433:6, 433:12
**Jordan's** [1] - 322:25
**Joseph's** [3] - 365:3, 365:7, 381:7
**Juanita** [46] - 292:16, 295:2, 296:21, 297:2, 297:6, 299:16, 301:4, 303:20, 304:15, 304:20, 304:25, 305:4, 305:7, 305:10, 306:3, 306:11, 321:5, 324:11, 337:6, 338:14, 350:3, 365:22, 366:14, 366:20, 367:1, 368:6, 373:24, 379:18, 380:5, 382:10, 387:15, 389:8, 389:18, 391:12, 414:18, 414:24, 415:20, 421:22, 428:25, 429:1, 430:13, 431:8, 433:2, 469:20, 470:11
**Juanita's** [4] - 379:22, 469:11, 470:3, 470:25
**judgment** [1] - 319:7
**jumps** [1] - 419:2
**jurisdiction** [1] - 352:5
**justifies** [3] - 304:2, 426:18, 430:8

## K

**K-e-l-l-y** [1] - 390:12
**k-r-u-m-n-o-w** [1] -

402:19
**Kathy** [1] - 292:8
**keep** [4] - 354:20, 385:20, 401:7, 421:4
**keepers** [1] - 457:14
**Kelly** [5] - 390:4, 390:12, 409:14, 425:23, 425:25
**KELLY** [1] - 390:5
**KENZIE** [24] - 302:17, 319:9, 322:2, 331:19, 352:20, 353:1, 367:19, 368:23, 371:11, 376:24, 377:12, 377:25, 378:4, 378:21, 379:8, 381:24, 387:9, 407:2, 407:16, 439:4, 452:16, 468:19, 471:5, 472:14
**kept** [1] - 401:18
**key** [1] - 312:12
**kind** [8] - 314:1, 364:10, 365:9, 379:4, 385:3, 399:19, 408:24, 469:3
**knock** [3] - 300:4, 429:16, 470:6
**knock-and-announce** [1] - 429:16
**knock-and-talk** [1] - 300:4
**knocked** [2] - 415:15, 470:4
**knowing** [5] - 320:18, 389:10, 409:24, 465:8, 469:1
**knowledge** [17] - 296:5, 297:8, 297:19, 298:14, 301:15, 302:18, 328:16, 329:22, 331:1, 344:11, 344:22, 345:14, 351:8, 371:1, 387:18, 456:5, 465:18
**known** [6] - 302:13, 347:2, 381:15, 464:20, 466:17, 468:6
**knows** [6] - 348:15, 379:5, 415:17, 421:5, 422:7, 422:12
**KONRAD** [82] - 292:1, 293:17, 296:25,

305:15, 305:19, 306:7, 306:13, 306:20, 314:24, 315:9, 316:24, 317:21, 318:13, 320:10, 321:19, 322:7, 327:13, 328:12, 329:17, 330:2, 330:5, 333:20, 341:14, 345:5, 345:17, 346:4, 346:13, 347:13, 347:24, 348:17, 349:9, 352:14, 352:17, 356:7, 361:23, 362:2, 362:18, 362:22, 363:4, 363:8, 363:13, 373:12, 376:23, 381:4, 385:23, 386:4, 389:23, 390:8, 396:4, 396:7, 400:3, 400:9, 407:1, 409:11, 413:17, 413:20, 413:23, 414:1, 427:11, 437:15, 437:22, 438:6, 438:10, 438:13, 438:19, 439:3, 439:7, 439:12, 439:15, 440:6, 440:11, 459:16, 463:22, 464:7, 467:9, 467:14, 467:17, 471:24, 472:2, 472:7, 472:15, 472:19

**Konrad** [2] - 292:5, 467:7

**Krumnow** [13] - 327:24, 402:13, 402:14, 402:18, 403:12, 403:16, 403:21, 405:1, 406:16, 410:2, 410:6, 410:12, 432:9

**Krumnow's** [1] - 410:3

# L

**labeled** [1] - 357:4
**lack** [1] - 383:8
**land** [1] - 351:17
**lane** [2] - 307:9
**language** [1] - 355:22
**lanyard** [2] - 395:4, 398:10

**lap** [1] - 431:8
**large** [2] - 312:13, 406:19
**largely** [1] - 420:13
**lars** [1] - 382:22
**last** [1] - 331:7, 331:10, 331:20, 331:21, 357:7, 357:8, 371:25, 414:7, 419:12, 440:9, 445:14, 451:3, 462:1, 464:10, 464:12, 468:9, 468:10
**lasted** [8] - 294:7, 323:20, 325:6, 326:14, 333:16, 334:15, 339:4, 460:3
**Late** [2] - 369:15, 383:15
**late** [5] - 369:18, 370:2, 370:3, 464:21, 467:10
**latitude** [1] - 457:15
**Lauda** [2] - 339:5, 347:21
**law** [4] - 418:18, 419:7, 419:10, 440:8
**laws** [1] - 454:2
**lead** [1] - 423:15
**leadership** [3] - 470:19, 470:20
**leads** [1] - 353:19
**leans** [1] - 459:13
**least** [16] - 317:6, 352:2, 358:4, 373:3, 381:14, 388:25, 428:11, 430:8, 432:12, 435:11, 436:8, 437:19, 438:22, 447:11, 456:9
**leave** [11] - 309:13, 309:15, 342:9, 359:7, 393:1, 395:13, 395:14, 408:25, 412:7, 438:6, 456:12
**leaves** [1] - 429:3
**leaving** [9] - 303:21, 335:17, 335:19, 349:13, 384:6, 408:15, 409:3, 409:4, 409:6
**led** [5] - 320:19, 350:2, 460:19, 460:20, 462:9
**ledge** [2] - 351:14, 370:25
**leeway** [1] - 448:16

**left** [14] - 293:22, 294:17, 294:19, 297:11, 297:12, 304:16, 305:9, 310:10, 335:22, 335:24, 355:2, 373:11, 391:22, 405:20
**legally** [1] - 300:16
**legitimate** [3] - 296:5, 455:10, 455:14
**Leibold** [1] - 442:4
**Leitzke** [4] - 314:18, 423:6, 424:18, 442:5
**lends** [2] - 417:19, 428:3
**lenient** [1] - 417:16
**less** [8] - 309:19, 340:11, 358:10, 359:20, 410:23, 460:8, 460:11, 463:18
**less-than-ten-minute** [1] - 460:8
**letter** [2] - 462:23, 463:7
**letters** [2] - 463:1, 463:5
**letting** [2] - 433:22, 433:23
**level** [4] - 364:17, 441:12, 449:25, 460:16
**lewandowski** [1] - 341:5
**Lewandowski** [104] - 292:4, 292:12, 297:1, 297:4, 326:21, 360:6, 366:23, 366:25, 375:3, 375:12, 375:17, 376:3, 377:2, 377:12, 377:20, 377:24, 378:22, 379:21, 382:16, 382:21, 384:18, 384:22, 384:24, 385:7, 391:11, 391:25, 392:3, 392:9, 392:21, 394:12, 396:25, 401:23, 402:9, 402:16, 403:17, 405:15, 409:21, 410:7, 410:23, 414:14, 415:4, 415:8, 415:23, 417:4, 417:11, 418:19, 419:21, 419:23,

420:16, 421:1, 424:22, 426:4, 427:15, 428:3, 428:4, 428:6, 428:13, 428:22, 429:8, 429:13, 429:18, 429:25, 430:2, 430:4, 430:12, 430:16, 431:1, 431:7, 431:11, 431:17, 431:21, 431:23, 432:4, 432:9, 432:18, 433:6, 433:12, 433:14, 433:16, 434:6, 434:11, 434:18, 434:20, 435:3, 436:5, 436:12, 436:20, 439:21, 453:13, 454:16, 457:10, 460:25, 461:7, 464:2, 464:18, 464:20, 465:3, 465:5, 465:9, 467:13, 467:16, 467:21, 472:23
**Lewandowski's** [16] - 379:25, 380:5, 394:7, 396:11, 397:17, 398:1, 410:21, 417:17, 422:25, 428:5, 430:24, 430:25, 434:4, 448:12, 453:14, 463:2
**liaison** [2] - 350:22, 351:3
**liar** [1] - 420:9
**license** [1] - 430:22
**lie** [9] - 341:9, 417:6, 421:2, 421:3, 421:20, 422:3, 422:4, 422:15, 458:1
**lied** [2] - 421:18, 423:20
**Lieuten** [2] - 394:2, 394:11
**lieutenant** [17] - 298:20, 331:11, 335:9, 349:10, 353:21, 366:1, 369:8, 374:14, 374:16, 380:25, 381:6, 390:14, 390:17, 420:9, 446:19, 460:21
**Lieutenant** [87] - 296:16, 296:20, 297:9, 314:12,

314:13, 314:17, 330:16, 331:14, 332:2, 332:16, 332:22, 333:8, 333:11, 333:12, 333:14, 334:14, 334:19, 335:5, 336:15, 337:24, 339:10, 341:21, 343:7, 343:13, 344:6, 344:11, 344:23, 345:9, 346:24, 347:6, 347:14, 348:9, 349:2, 349:7, 350:7, 350:12, 352:21, 354:6, 360:24, 361:2, 361:3, 361:14, 361:15, 363:6, 363:15, 390:4, 391:14, 391:18, 392:19, 393:5, 393:12, 393:17, 394:6, 394:21, 395:7, 398:19, 399:18, 401:12, 409:14, 414:20, 418:14, 419:19, 419:21, 420:3, 420:6, 420:18, 421:2, 421:17, 422:8, 422:12, 422:19, 423:1, 423:2, 423:4, 423:6, 425:18, 425:23, 425:25, 426:14, 427:7, 433:7, 433:15, 433:22, 434:25, 442:5
**Lieutenant's** [1] - 445:7
**lieutenant's** [2] - 380:24, 442:23
**Lieutenants** [1] - 424:18
**lieutenants** [3] - 344:15, 399:21, 445:11
**life** [3] - 356:1, 356:4, 468:8
**light** [4] - 359:15, 429:14, 431:1, 435:14
**lights** [50] - 307:2, 307:9, 307:18, 308:2, 308:6, 308:11, 308:12, 308:13, 308:15, 308:16, 308:19,

309:1, 309:4, 309:5,
309:7, 310:8,
310:10, 341:22,
342:3, 342:5, 342:8,
353:10, 358:17,
358:22, 358:25,
359:4, 359:7,
359:13, 359:16,
359:18, 418:3,
418:13, 418:20,
418:25, 421:8,
422:1, 430:17,
431:4, 435:10,
435:12, 435:15,
435:19, 435:21,
435:22, 435:24,
436:3, 454:17
**likelihood** [1] - 343:8
**likely** [3] - 328:3,
374:8, 377:21
**limit** [1] - 386:22
**limited** [1] - 453:11
**line** [6] - 300:10,
314:24, 331:10,
392:13, 416:8,
455:19
**lines** [1] - 301:6
**lineup** [1] - 369:15
**lingering** [1] - 437:1
**link** [1] - 471:12
**links** [1] - 407:12
**list** [2] - 342:22,
444:23
**listed** [4] - 301:13,
371:3, 372:4, 454:22
**listen** [2] - 303:5,
303:15
**lists** [1] - 333:5
**live** [3] - 336:2, 336:5,
433:2
**lived** [4] - 355:25,
356:3, 410:23, 468:7
**lives** [4] - 351:16,
351:24, 351:25,
352:2
**living** [2] - 432:5,
470:15
**loafing** [1] - 419:17
**locate** [4] - 331:4,
402:7, 403:2, 403:18
**located** [6] - 342:24,
401:10, 401:13,
401:18, 405:22,
414:24
**location** [12] - 320:15,
351:19, 405:10,
405:11, 406:2,
408:20, 409:4,
411:5, 411:10,
412:5, 412:22, 449:9

**locations** [4] - 342:20,
398:25, 404:20,
406:17
**log** [2] - 334:5, 334:15
**logs** [4] - 323:8, 325:1,
327:8, 328:11
**longhand** [1] - 474:9
**look** [20] - 314:16,
321:17, 323:5,
327:3, 329:12,
339:8, 398:8,
398:25, 407:3,
407:10, 425:22,
426:11, 428:18,
450:6, 451:16,
454:24, 455:8,
456:14, 460:13,
461:23
**looked** [6] - 314:13,
325:8, 330:13,
359:14, 384:19,
426:13
**looking** [10] - 326:21,
372:15, 378:19,
394:24, 404:14,
452:11, 466:8,
466:9, 466:10
**looks** [1] - 419:2
**loose** [1] - 452:7
**lost** [8] - 314:17,
379:24, 448:8,
448:10, 455:22,
456:6, 456:15,
456:17
**loud** [1] - 310:7
**love** [1] - 468:5
**Lucas** [1] - 455:5
**lying** [8] - 301:20,
332:18, 344:7,
364:1, 364:4,
417:13, 420:4,
420:19

## M

**M-N/A** [2] - 447:8,
447:10
**ma'am** [3] - 341:10,
355:21, 399:16
**magazines** [1] - 369:3
**maintain** [1] - 414:10
**maintained** [2] -
419:23, 425:21
**maintains** [1] - 425:18
**majority** [1] - 299:4
**male** [3] - 295:1,
295:20, 372:11
**Malone** [1] - 466:12
**man** [5] - 364:7,
385:10, 466:5

**manage** [1] - 294:22
**manner** [9] - 309:10,
318:9, 358:21,
358:25, 418:17,
419:16, 454:2,
455:19, 473:2
**mark** [1] - 413:1
**marked** [19] - 322:11,
322:13, 365:25,
366:1, 369:6, 369:8,
404:3, 404:4, 438:8,
440:22, 440:23,
441:4, 443:13,
443:14, 444:10,
444:11, 445:2, 445:3
**married** [1] - 385:8
**Mary** [1] - 351:16
**Maryland** [14] -
351:20, 351:22,
352:3, 404:21,
405:3, 405:25,
406:18, 406:20,
407:21, 408:18,
413:6, 413:12, 432:3
**mask** [1] - 364:8
**mass** [5] - 423:9,
423:10, 423:14,
423:22, 424:11
**mately** [1] - 309:18
**materials** [2] - 446:11,
446:20
**mation** [2] - 301:1,
349:4
**matter** [26] - 292:3,
292:6, 298:16,
301:16, 308:12,
344:3, 344:14,
346:8, 347:4,
347:13, 359:10,
359:11, 363:19,
374:25, 376:7,
386:13, 415:25,
416:5, 424:3,
427:14, 428:8,
428:16, 428:17,
471:21
**maximize** [1] - 294:23
**maximum** [1] - 418:7
**MC** [96] - 293:14,
296:22, 302:17,
316:13, 316:18,
316:22, 317:15,
318:7, 318:19,
319:9, 320:8,
321:17, 322:2,
322:9, 323:4,
327:12, 328:17,
329:14, 329:25,
331:19, 345:12,
346:6, 348:12,

348:16, 349:5,
352:12, 352:20,
353:1, 356:9,
356:10, 357:1,
361:21, 361:24,
362:19, 362:24,
363:1, 367:19,
368:23, 371:11,
376:24, 377:12,
377:25, 378:4,
378:21, 379:8,
381:5, 381:24,
381:25, 382:3,
385:11, 387:9,
388:17, 388:19,
389:21, 396:5,
396:9, 399:2, 407:2,
407:16, 409:12,
409:13, 411:21,
413:19, 413:22,
427:12, 437:21,
438:1, 438:9,
438:12, 438:17,
439:4, 440:25,
452:16, 452:21,
459:18, 459:19,
461:25, 463:15,
463:20, 464:2,
464:9, 467:2, 467:5,
467:12, 467:15,
467:19, 467:20,
468:17, 468:19,
471:5, 471:6, 471:8,
471:19, 471:25,
472:5, 472:14
**Mc** [1] - 459:16
**McAleer** [3] - 455:5,
455:9, 455:17
**McGaver** [1] - 427:11
**McKenzie** [1] - 292:9
**mean** [17] - 334:8,
334:9, 358:16,
358:17, 367:20,
384:2, 384:5,
386:20, 393:10,
396:24, 418:21,
422:3, 423:3, 436:4,
447:2, 447:9, 467:6
**means** [3] - 348:3,
411:24, 447:10
**meant** [2] - 301:3,
305:25
**measure** [4] - 307:7,
307:14, 307:23,
307:24
**mechanical** [1] -
461:6
**med** [3] - 391:16,
392:8, 392:13
**medical** [6] - 349:18,

391:16, 393:24,
434:24, 454:5,
456:12
**medication** [2] -
337:2, 349:15
**meet** [1] - 416:5
**meeting** [11] - 442:8,
442:13, 446:12,
447:16, 450:24,
458:25, 459:20,
460:3, 460:6,
460:19, 460:24
**meetings** [1] - 375:4
**meets** [1] - 429:13
**Melanie** [36] - 297:14,
298:1, 299:13,
313:22, 314:6,
314:11, 314:17,
316:1, 318:4,
337:12, 340:13,
340:25, 375:4,
375:10, 375:12,
375:18, 375:20,
384:15, 385:3,
385:4, 385:14,
385:16, 385:19,
416:1, 424:3,
424:11, 424:14,
424:24, 427:24,
428:2, 428:9,
428:12, 429:3,
429:22, 469:13,
470:11
**member** [17] - 314:20,
387:21, 387:23,
402:8, 402:12,
441:17, 444:9,
445:1, 445:18,
451:7, 457:14,
457:18, 457:19,
457:25, 463:10,
463:11, 467:25
**member's** [1] - 442:24
**Member's** [1] - 445:14
**Members** [2] - 441:18,
441:25
**members** [11] -
391:11, 391:16,
400:18, 423:24,
425:1, 425:4,
439:19, 450:21,
451:5, 456:22,
472:21
**memo** [2] - 338:3,
343:21
**memorandum** [2] -
445:11, 445:18
**memorandums** [2] -
337:20, 337:21
**memorize** [1] - 333:11

**memory** [2] - 413:13, 446:20
**ment** [5] - 335:6, 397:10, 422:17, 445:23, 458:16
**mention** [2] - 401:19, 410:11
**mentioned** [1] - 438:3
**mentioning** [1] - 401:16
**mentions** [1] - 410:13
**ments** [1] - 446:8
**mere** [1] - 419:9
**merits** [1] - 442:9
**message** [11] - 404:10, 404:19, 404:25, 405:2, 406:18, 407:8, 407:9, 407:15, 407:16, 408:5, 466:7
**messages** [2] - 360:12, 408:2
**met** [3] - 305:9, 385:10, 427:23
**microphone** [1] - 382:2
**middle** [8] - 323:15, 325:4, 326:6, 372:18, 386:23, 387:2, 403:9, 416:3
**midnight** [3] - 369:21, 370:4, 373:4
**midst** [1] - 309:1
**might** [25] - 307:14, 307:18, 311:3, 318:14, 318:19, 319:24, 336:4, 336:12, 355:21, 358:24, 362:4, 370:5, 383:13, 394:25, 406:4, 406:5, 406:6, 413:12, 417:16, 426:6, 451:3, 460:7, 460:12
**miles** [3] - 339:11, 340:4, 421:10
**military** [1] - 425:3
**Milwaukee** [14] - 351:25, 364:17, 390:14, 391:1, 416:20, 416:25, 431:19, 432:20, 440:17, 464:15, 465:10, 465:11, 468:1, 471:10
**MILWAUKEE** [1] - 474:2
**mind** [11] - 323:4, 336:7, 345:3,

348:15, 368:12, 417:17, 418:10, 422:12, 422:13, 428:12, 435:12
**mine** [2] - 353:7, 452:6
**minimize** [1] - 294:22
**minimum** [2] - 335:4, 358:10
**Minnesota** [1] - 356:5
**minute** [15] - 326:25, 328:2, 328:11, 333:16, 334:6, 334:7, 334:9, 360:1, 360:14, 361:1, 434:3, 436:6, 460:8, 460:11, 463:14
**minutes** [21] - 294:4, 294:13, 314:19, 323:20, 323:23, 325:6, 325:17, 326:14, 327:1, 328:11, 334:16, 336:4, 336:6, 361:17, 409:1, 411:11, 430:9, 435:18, 435:19, 460:15
**miracle** [1] - 432:8
**mis** [1] - 343:18
**misconstrued** [1] - 301:2
**misrepre** [1] - 419:4
**misrepresent** [3] - 344:12, 344:23, 417:6
**misrepresentation** [1] - 417:9
**misrepresenting** [1] - 344:7
**mission** [4] - 418:1, 419:17, 451:8, 472:25
**missions** [1] - 416:4
**misstatement** [1] - 343:19
**mistake** [4] - 371:6, 448:24, 448:25, 449:1
**mistaken** [1] - 381:10
**mistakes** [1] - 448:17
**misunderstanding** [1] - 344:3
**mitigated** [1] - 449:4
**mitigating** [7] - 447:5, 447:10, 447:12, 447:19, 448:13, 449:21, 455:18
**mitted** [1] - 408:14
**mom** [2] - 417:5, 431:23

**moment** [5] - 316:8, 317:10, 359:17, 359:19, 455:8
**Monday** [1] - 354:17
**month** [1] - 342:18
**months** [10] - 315:18, 315:20, 317:12, 332:4, 348:4, 356:18, 436:8, 456:13, 456:17
**mony** [3] - 357:2, 431:2, 432:8
**morning** [9] - 292:1, 340:8, 354:15, 354:19, 361:4, 372:10, 390:20, 426:16, 434:18
**most** [14] - 313:6, 343:16, 353:14, 353:22, 374:8, 377:8, 377:21, 399:21, 412:1, 417:21, 457:8, 458:20, 458:21, 462:20
**mother** [4] - 432:5, 432:11, 432:20, 440:8
**Mother** [1] - 324:5
**mother's** [1] - 432:6
**mother-in-law** [1] - 440:8
**motion** [3] - 342:8, 472:11, 472:15
**motiva** [1] - 424:17
**motivate** [1] - 344:23
**motivated** [1] - 422:10
**Motivation** [1] - 446:24
**motivation** [5] - 421:2, 421:3, 447:4, 447:6, 455:18
**motivations** [3] - 422:3, 423:8, 425:25
**motive** [4] - 346:12, 417:6, 422:14, 422:15
**move** [10] - 306:22, 309:12, 327:10, 328:20, 341:16, 437:20, 439:1, 439:24, 471:22, 472:13
**moved** [3] - 342:10, 437:18, 438:4
**moving** [1] - 341:18
**MPD** [2] - 452:15, 462:13
**MR** [258] - 292:1, 292:15, 293:14,

293:16, 293:17, 296:22, 296:25, 297:3, 305:15, 305:17, 305:19, 306:7, 306:13, 306:17, 306:20, 306:21, 311:11, 314:24, 315:7, 315:9, 315:13, 315:16, 316:13, 316:16, 316:18, 316:20, 316:22, 316:24, 317:2, 317:4, 317:15, 317:21, 318:1, 318:7, 318:10, 318:13, 318:16, 318:19, 318:21, 319:13, 320:8, 320:10, 320:13, 321:14, 321:17, 321:19, 321:21, 322:1, 322:5, 322:7, 322:9, 322:12, 323:4, 323:6, 326:19, 327:10, 327:12, 327:13, 328:12, 328:17, 328:19, 328:21, 329:14, 329:17, 329:20, 329:25, 330:2, 330:5, 331:21, 333:20, 333:22, 333:25, 334:2, 334:3, 341:5, 341:10, 341:14, 341:16, 341:20, 343:22, 345:5, 345:7, 345:8, 345:12, 345:14, 345:17, 346:2, 346:4, 346:5, 346:6, 346:11, 346:13, 346:20, 346:22, 347:13, 347:24, 348:7, 348:12, 348:14, 348:16, 348:17, 349:5, 349:9, 349:20, 350:17, 352:10, 352:12, 352:14, 352:17, 355:21, 356:7, 356:9, 356:10, 357:1, 361:21, 361:23, 361:24, 362:2, 362:18, 362:19, 362:20, 362:22, 362:24, 362:25, 363:1, 363:2, 363:4, 363:5, 363:8,

363:13, 363:14, 367:23, 369:7, 370:21, 371:16, 371:21, 373:12, 373:14, 376:22, 376:23, 381:3, 381:4, 381:5, 381:25, 382:3, 385:11, 385:22, 385:23, 386:2, 386:4, 386:5, 386:6, 387:13, 388:16, 388:17, 388:19, 389:21, 389:22, 389:23, 389:25, 390:3, 390:8, 390:9, 396:3, 396:4, 396:5, 396:7, 396:9, 399:2, 399:4, 400:2, 400:3, 400:9, 400:10, 402:24, 403:2, 406:25, 407:1, 409:11, 409:12, 409:13, 411:21, 413:17, 413:18, 413:19, 413:20, 413:21, 413:22, 413:23, 414:1, 414:5, 427:11, 427:12, 437:15, 437:17, 437:21, 437:22, 438:1, 438:6, 438:9, 438:10, 438:11, 438:12, 438:13, 438:17, 438:18, 438:19, 439:3, 439:7, 439:12, 439:15, 440:1, 440:6, 440:11, 440:12, 440:25, 441:2, 452:6, 452:10, 452:18, 452:21, 459:15, 459:16, 459:18, 459:19, 461:25, 463:15, 463:20, 463:21, 463:22, 463:25, 464:2, 464:7, 464:9, 467:2, 467:4, 467:5, 467:9, 467:12, 467:14, 467:15, 467:17, 467:19, 467:20, 468:17, 468:18, 471:6, 471:8, 471:19, 471:21, 471:24, 471:25, 472:2, 472:5, 472:6, 472:7, 472:15, 472:19

**MS** [75] - 302:17, 311:10, 319:9, 322:2, 326:16, 331:19, 333:23, 334:1, 348:2, 352:20, 353:1, 353:2, 353:8, 353:13, 353:23, 354:1, 354:5, 354:9, 354:23, 355:18, 355:23, 356:2, 356:6, 361:25, 362:3, 367:19, 368:23, 370:2, 370:8, 370:11, 370:16, 370:20, 371:11, 371:14, 376:24, 377:12, 377:25, 378:4, 378:21, 379:8, 379:23, 380:2, 380:8, 380:12, 380:17, 381:24, 385:12, 385:25, 387:9, 399:5, 399:11, 399:17, 402:20, 407:2, 407:16, 407:19, 408:12, 408:22, 411:23, 412:6, 412:9, 412:14, 412:19, 413:5, 439:1, 439:4, 439:6, 452:8, 452:14, 452:16, 452:23, 468:19, 471:5, 472:13, 472:14
**multiple** [2] - 381:6, 423:23
**Murray** [3] - 351:21, 351:23, 352:3

# N

**N/A** [2] - 447:8, 447:10
**nail** [1] - 319:3
**name** [14] - 292:5, 295:5, 295:17, 295:19, 295:20, 374:18, 390:10, 400:25, 440:13, 452:23, 464:10, 464:12
**namely** [1] - 421:22
**names** [1] - 313:21
**nation** [1] - 384:3
**naturally** [1] - 346:18
**nature** [7] - 315:11, 329:4, 329:16, 401:20, 426:11,

442:23, 444:25
**near** [1] - 441:18
**necessarily** [5] - 312:16, 319:10, 334:8, 374:23, 377:5
**necessary** [4] - 308:7, 308:8, 454:17, 456:2
**neck** [5] - 330:9, 395:4, 431:24, 432:11, 432:12
**need** [16] - 300:3, 302:10, 303:25, 307:22, 349:17, 371:17, 401:7, 409:6, 409:8, 409:9, 415:9, 425:14, 443:5, 463:16, 468:23
**needed** [13] - 299:8, 378:12, 379:3, 380:20, 380:21, 391:15, 392:17, 392:18, 393:24, 397:11, 415:1, 428:13, 433:8
**needing** [1] - 428:5
**needs** [3] - 298:24, 299:25, 429:14
**Nelson** [1] - 466:11
**neutral** [1] - 426:3
**never** [23] - 297:10, 298:21, 298:22, 304:5, 309:4, 320:4, 330:18, 331:15, 332:5, 332:6, 332:7, 351:5, 354:5, 380:15, 385:10, 388:7, 388:14, 414:18, 425:19, 430:14, 430:15, 434:1, 435:9
**new** [4] - 384:2, 388:21, 388:25, 448:17
**newer** [1] - 448:16
**next** [11] - 333:18, 341:17, 341:19, 394:3, 419:11, 444:3, 444:19, 445:7, 446:23, 447:2, 447:8
**nice** [1] - 399:7
**Nicole** [1] - 442:6
**night** [5] - 338:23, 380:17, 392:23, 399:25, 466:11
**nine** [3] - 354:24, 456:13, 460:14
**nobody** [4] - 427:15, 430:24, 471:1

**noise** [2] - 310:6, 310:7
**non** [1] - 309:8
**non-emergency** [1] - 309:8
**non-PI-21** [1] - 403:10
**none** [9] - 310:1, 319:5, 337:12, 360:7, 425:15, 428:11, 433:14, 436:13, 463:5
**nonsense** [1] - 434:13
**normal** [2] - 379:13, 399:10
**normally** [2] - 379:8, 379:11
**North** [17] - 306:23, 306:24, 342:13, 358:14, 359:8, 365:6, 404:21, 405:3, 405:25, 406:18, 406:20, 413:5, 413:11, 430:16, 432:2
**north** [4] - 343:1, 353:3, 353:4, 353:7
**nose** [1] - 330:10
**note** [3] - 378:15, 446:2, 473:5
**noted** [1] - 407:13
**notes** [4] - 337:15, 398:18, 398:22, 474:9
**Notes** [1] - 450:16
**nothing** [29] - 295:15, 311:6, 311:13, 311:15, 320:16, 361:21, 362:20, 363:11, 378:10, 381:3, 385:11, 386:9, 388:8, 389:21, 389:22, 390:7, 399:4, 400:2, 400:8, 411:21, 413:19, 416:1, 440:5, 456:12, 463:20, 464:5, 467:2, 468:17, 471:19
**notice** [3] - 307:11, 309:13, 383:12
**noticed** [1] - 395:25
**notifies** [1] - 324:22
**notify** [4] - 307:16, 409:5, 412:23, 413:3
**notifying** [2] - 411:17, 411:18
**notion** [1] - 417:20
**November** [4] - 314:18, 315:21,

332:4, 332:8
**nowhere** [1] - 317:19
**number** [55] - 311:7, 320:24, 320:25, 321:22, 321:24, 322:3, 322:14, 322:24, 322:25, 323:9, 323:19, 327:16, 333:5, 333:8, 333:13, 333:14, 362:15, 363:3, 366:2, 366:14, 366:17, 367:11, 367:13, 368:3, 371:23, 381:21, 381:25, 382:11, 383:13, 383:16, 386:13, 386:24, 387:1, 387:3, 387:4, 387:5, 387:6, 404:5, 406:18, 406:19, 407:9, 412:25, 423:3, 432:17, 434:13, 437:18, 441:17, 441:21, 443:5, 443:15, 451:21, 452:15, 452:17, 454:24
**numbers** [10] - 312:13, 322:21, 322:23, 333:11, 383:9, 386:16, 387:8, 393:21, 413:11
**numerous** [1] - 401:10
**nurses** [2] - 395:12, 397:16

# O

**oath** [7] - 292:14, 363:11, 390:6, 400:7, 440:4, 464:5, 467:18
**objec** [1] - 345:19
**object** [6] - 293:14, 316:13, 320:9, 328:17, 329:14, 346:6
**objection** [17] - 296:22, 316:17, 317:16, 317:19, 317:25, 318:8, 323:6, 327:12, 330:1, 345:12, 345:18, 348:16, 437:21, 439:3, 439:6, 439:7, 471:25
**objections** [5] - 318:7,

438:23, 438:24, 472:16
**objectives** [1] - 416:4
**observation** [1] - 459:2
**observations** [4] - 394:2, 395:7, 425:16, 458:24
**observe** [2] - 365:13, 395:10
**observed** [4] - 297:5, 371:19, 393:5, 398:13
**obvious** [1] - 329:22
**obviously** [1] - 427:13
**Occam's** [1] - 425:13
**occasion** [1] - 297:4
**occasionally** [1] - 411:10
**occasions** [1] - 376:2
**occur** [4] - 297:20, 314:10, 315:17, 361:15
**occurred** [18] - 315:18, 317:12, 321:9, 323:22, 339:17, 346:25, 356:12, 356:13, 361:4, 361:5, 384:13, 426:19, 428:11, 428:25, 434:3, 434:4, 447:22
**occurring** [2] - 343:10, 390:25
**occurs** [1] - 384:12
**October** [7] - 305:19, 314:12, 357:21, 358:5, 375:17, 384:17, 385:2
**OF** [2] - 474:1, 474:2
**offenders** [1] - 364:25
**offenses** [1] - 458:21
**offer** [3] - 298:11, 415:25, 442:11
**offered** [8] - 294:14, 299:16, 427:3, 428:4, 438:7, 438:8
**offering** [3] - 300:6, 319:22, 438:2
**office** [4] - 380:24, 383:7, 462:24
**Office** [1] - 462:25
**Officer** [2] - 320:23, 362:13, 380:9, 380:16, 396:21, 402:14, 403:12, 403:16, 403:21, 404:25, 405:1, 405:13, 406:15, 406:16, 410:2,

410:3, 410:5,
410:12, 427:23,
427:24, 428:23,
431:22, 432:18,
433:13, 453:1,
453:13, 455:9,
455:17, 458:12,
464:3, 466:12
**officer** [34] - 296:11,
298:10, 312:3,
312:5, 312:17,
313:23, 314:7,
321:2, 360:4,
380:11, 384:25,
388:11, 394:25,
395:3, 401:3,
401:17, 401:18,
402:13, 404:18,
408:23, 412:21,
415:9, 417:14,
422:17, 425:2,
431:19, 431:25,
437:6, 437:9,
458:14, 464:15,
464:17, 469:18
**Officers** [1] - 432:9
**officers** [45] - 298:2,
298:6, 298:18,
299:2, 310:15,
310:20, 310:25,
311:7, 311:13,
311:16, 312:13,
312:21, 313:8,
313:11, 313:19,
314:3, 318:2,
318:24, 319:24,
337:9, 340:22,
344:17, 362:6,
391:10, 400:24,
401:11, 401:13,
401:16, 401:19,
411:2, 411:4,
411:10, 411:16,
423:8, 424:17,
427:19, 428:17,
434:10, 436:2,
436:11, 436:12,
436:15, 448:16,
448:18, 457:12
**official** [2] - 450:9,
458:15
**often** [3] - 296:12,
411:16
**oftentimes** [1] -
421:12
**omitted** [1] - 303:4
**once** [3] - 305:1,
359:11, 374:5
**oncoming** [1] - 308:3
**one** [78] - 296:2,

297:14, 298:5,
298:19, 299:1,
308:24, 310:2,
321:15, 325:17,
325:25, 326:25,
328:11, 331:7,
333:16, 334:7,
334:9, 338:20,
342:8, 346:15,
346:18, 357:17,
358:7, 358:17,
360:15, 365:18,
371:5, 376:7,
378:23, 391:6,
391:24, 391:25,
392:9, 392:13,
393:1, 394:14,
395:17, 398:3,
399:5, 401:20,
404:14, 405:24,
407:4, 408:10,
413:2, 415:9,
416:17, 417:3,
419:19, 422:2,
423:24, 426:24,
428:18, 432:17,
433:25, 435:16,
437:24, 439:13,
441:2, 443:11,
446:2, 447:3,
448:10, 449:12,
449:17, 453:5,
455:5, 458:11,
458:21, 459:3,
461:14, 461:18,
462:2, 462:9, 463:9,
466:23
**one-day** [1] - 461:18
**ones** [1] - 458:11
**open** [3] - 395:12,
395:13, 472:20
**opened** [2] - 364:9,
395:17
**opening** [1] - 420:12
**operate** [1] - 454:1
**operated** [1] - 358:20
**operates** [1] - 430:18
**operating** [10] -
341:23, 358:25,
418:13, 418:16,
419:9, 419:16,
421:8, 449:7,
454:16, 456:1
**operator** [1] - 454:4
**operators** [1] - 453:25
**opinion** [2] - 442:11,
465:8
**opportunity** [5] -
409:7, 414:2,
421:21, 445:19,

454:24
**opposed** [1] - 413:12
**option** [1] - 412:25
**orally** [1] - 456:23
**order** [10] - 308:15,
313:24, 320:22,
342:7, 359:4,
431:25, 438:21,
440:10, 472:8,
472:24
**ordinances** [1] - 454:2
**oriented** [1] - 304:12
**otherwise** [2] -
415:12, 472:10
**ous** [1] - 454:2
**outcome** [2] - 450:21,
450:22
**outgoing** [1] - 326:22
**outlines** [2] - 441:11,
444:8
**outside** [3] - 389:15,
398:12, 417:25
**overheard** [1] - 318:25
**overrule** [1] - 345:18
**overruled** [1] - 348:17
**oversee** [1] - 365:17
**overseeing** [2] -
374:20, 374:21
**oversight** [1] - 386:15
**overtime** [3] - 294:11,
294:23, 471:3
**own** [15] - 299:12,
300:16, 301:10,
301:24, 324:3,
328:1, 348:15,
353:14, 417:21,
418:3, 425:10,
425:15, 427:18,
431:12, 469:22
**owned** [1] - 300:16

## P

**p.m** [14] - 366:10,
369:19, 369:20,
370:5, 370:13,
370:14, 370:17,
370:18, 370:19,
372:25, 373:1, 473:9
**P.M** [1] - 473:11
**package** [1] - 427:2
**packet** [3] - 451:23,
452:20, 462:10
**page** [16] - 300:9,
325:1, 325:5, 326:6,
331:7, 331:19,
331:20, 331:21,
333:18, 357:7,
372:15, 373:20,
403:9, 450:7,

450:10, 451:24
**Page** [11] - 323:2,
324:25, 326:4,
333:1, 334:12,
366:10, 373:21,
403:4, 406:10,
452:5, 452:8
**pain** [1] - 337:2
**paint** [1] - 424:10
**panel** [3] - 292:7,
472:20, 472:21
**panic** [3] - 432:1,
432:3, 435:25
**panicking** [1] - 431:9
**paper** [1] - 326:17
**paperwork** [1] - 294:9
**parades** [1] - 309:7
**paragraph** [4] - 357:9,
403:8, 403:9, 406:11
**parent** [1] - 430:1
**part** [23] - 298:23,
298:24, 307:23,
308:14, 309:12,
310:25, 311:24,
313:15, 356:15,
363:23, 374:20,
375:4, 401:21,
401:25, 402:1,
402:6, 415:20,
420:22, 424:10,
426:1, 444:17,
469:4, 469:15
**parti** [2] - 382:16
**participants** [1] -
439:13
**participatory** [1] -
468:7
**particu** [1] - 382:21
**particular** [5] - 382:22,
384:22, 384:23,
425:24, 441:13
**particulars** [1] -
379:17
**partner** [1] - 466:16
**partners** [3] - 456:4,
465:21, 466:7
**parts** [2] - 426:21
**party** [2] - 360:17,
426:3
**passed** [3] - 362:4,
362:7, 440:8
**passes** [1] - 431:8
**passing** [1] - 295:15
**past** [5] - 308:15,
308:16, 310:8,
342:8, 449:20
**path** [1] - 427:6
**patients** [1] - 395:14
**patrol** [11] - 295:15,
296:6, 296:10,

296:12, 311:1,
311:3, 374:22,
380:15, 386:20,
387:4, 399:22
**Patrol** [1] - 372:18
**pauses** [1] - 419:2
**Pederson** [3] - 357:7,
414:3, 462:9
**PEDERSON** [105] -
292:15, 293:16,
297:3, 305:17,
306:17, 306:21,
311:7, 315:7,
315:13, 315:16,
316:16, 316:20,
317:2, 317:4, 318:1,
318:10, 318:16,
318:21, 319:13,
320:13, 321:14,
321:21, 322:1,
322:5, 322:12,
323:6, 326:19,
327:10, 328:19,
328:21, 329:20,
331:21, 333:22,
333:25, 334:2,
334:3, 341:5,
341:10, 341:16,
341:20, 343:22,
345:7, 345:8,
345:14, 346:2,
346:5, 346:11,
346:20, 346:22,
348:7, 348:14,
349:20, 350:17,
352:10, 355:21,
362:20, 362:25,
363:2, 363:5,
363:14, 367:23,
369:7, 370:21,
371:16, 371:21,
371:25, 373:14,
376:22, 381:3,
385:22, 386:2,
386:5, 386:6,
387:13, 388:16,
389:22, 389:25,
390:3, 390:9, 396:3,
399:4, 400:2,
400:10, 402:24,
403:2, 406:25,
413:18, 413:21,
414:5, 437:17,
438:11, 438:18,
440:1, 440:12,
441:2, 452:6,
452:10, 452:18,
459:15, 463:21,
463:25, 467:4,
468:18, 471:21,
472:6

**penalty** [1] - 462:6
**pending** [1] - 429:10
**people** [25] - 309:3, 309:5, 313:2, 313:3, 319:3, 350:14, 362:6, 362:10, 362:15, 364:24, 371:5, 376:15, 378:2, 395:9, 395:25, 398:2, 401:8, 401:10, 418:20, 420:21, 420:22, 421:23, 423:3, 433:14, 469:6
**PeopleSoft** [1] - 384:19
**per** [2] - 311:25, 416:2
**percent** [1] - 389:5
**perceptions** [1] - 425:16
**perfectly** [2] - 370:4, 415:6
**perform** [2] - 292:21, 293:20
**performed** [2] - 296:13, 431:13
**performing** [1] - 417:25
**perhaps** [3] - 301:19, 346:18, 458:20
**period** [4] - 325:2, 345:21, 434:7, 435:17
**permission** [2] - 353:24, 354:2
**permit** [1] - 429:7
**perry** [1] - 371:11
**Perry** [11] - 295:17, 371:8, 371:14, 372:12, 374:1, 374:3, 374:9, 376:8, 376:11, 383:12, 383:20
**person** [13] - 297:25, 299:5, 311:25, 346:14, 364:1, 366:12, 380:23, 395:5, 402:7, 421:22, 464:22, 466:11, 468:22
**person's** [1] - 374:18
**personal** [21] - 297:15, 297:16, 303:3, 308:1, 331:1, 333:8, 334:14, 351:13, 352:7, 393:23, 394:2, 396:24, 397:11, 415:24, 416:5, 424:23, 425:15, 428:1,

428:8, 428:16, 433:21
**personally** [5] - 296:12, 305:14, 317:13, 321:6, 402:8
**personnel** [10] - 312:12, 371:3, 372:1, 372:3, 374:21, 374:22, 391:1, 402:5, 428:8, 441:21
**perspective** [1] - 395:24
**Petitioner** [1] - 363:1
**Phase** [6] - 292:10, 439:16, 439:25, 440:20, 464:1, 472:21
**phase** [2] - 362:23, 376:13
**phone** [104] - 320:24, 320:25, 321:4, 321:6, 321:10, 321:12, 321:13, 321:19, 321:22, 321:24, 322:19, 322:20, 322:21, 322:23, 323:8, 323:9, 323:18, 323:19, 323:25, 324:9, 324:10, 325:1, 325:2, 325:9, 325:14, 325:15, 325:20, 325:22, 326:10, 326:13, 326:14, 326:23, 327:7, 327:16, 327:25, 328:4, 328:9, 332:7, 332:22, 332:25, 333:5, 333:8, 333:10, 333:13, 333:14, 333:15, 333:21, 334:8, 334:13, 334:14, 334:15, 336:25, 337:15, 337:24, 338:1, 340:8, 340:14, 341:3, 346:25, 348:8, 349:2, 359:12, 359:23, 359:24, 360:1, 360:14, 360:15, 360:17, 360:19, 360:21, 360:22, 360:24, 361:1, 361:3, 361:10, 361:14, 362:15, 367:18, 379:19, 394:15,

402:16, 416:7, 429:4, 429:25, 430:1, 430:3, 430:9, 430:12, 431:17, 431:18, 431:22, 432:6, 433:25, 434:1, 434:2, 434:3, 434:13, 466:7
**phonetic** [1] - 466:12
**phonetic** [1] - 295:22
**photo** [1] - 375:19
**photographs** [1] - 391:23
**photos** [2] - 330:12, 398:13
**phrased** [1] - 357:20
**physically** [2] - 386:8, 408:13
**physicians** [1] - 397:16
**PI-21** [6] - 306:15, 310:9, 346:17, 347:11, 347:15, 361:18
**pick** [5] - 401:23, 403:23, 421:7, 432:10, 433:21
**picked** [4] - 328:8, 360:24, 401:13, 401:19
**picture** [3] - 314:13, 384:19, 385:6
**pictures** [2] - 330:12, 394:5
**piece** [6] - 310:5, 326:17, 356:23, 363:23, 417:18, 417:21
**pieces** [1] - 424:1
**pile** [1] - 443:1
**place** [8] - 327:20, 361:19, 364:17, 367:25, 383:21, 389:15, 391:21, 437:7
**placed** [7] - 323:19, 332:22, 333:15, 334:4, 334:13, 335:25, 459:8
**plain** [1] - 318:6
**plaint** [1] - 414:16
**plan** [2] - 293:19, 418:9
**planned** [1] - 349:11
**plate** [1] - 369:5
**play** [4] - 419:13, 419:24, 470:17
**plenty** [1] - 302:12
**pline** [1] - 457:3
**plus** [1] - 421:24

**PM-5** [2] - 443:19, 443:21
**PO** [1] - 455:5
**point** [22] - 300:6, 302:22, 317:18, 337:3, 345:23, 360:4, 362:4, 362:5, 378:10, 378:18, 381:21, 389:9, 419:14, 419:15, 420:2, 422:9, 422:13, 433:9, 433:11, 435:16, 450:3, 469:15
**points** [1] - 316:10
**pole** [1] - 435:25
**police** [38] - 319:23, 324:1, 324:19, 340:15, 341:1, 341:8, 360:4, 374:21, 380:11, 384:25, 390:15, 394:25, 395:2, 403:25, 410:11, 416:4, 416:25, 417:14, 420:4, 424:16, 425:2, 427:19, 428:6, 428:17, 428:19, 429:9, 430:5, 431:19, 432:21, 435:21, 435:22, 435:24, 436:15, 464:15, 464:17, 468:24, 469:18
**Police** [22] - 292:6, 352:8, 364:17, 390:14, 391:1, 410:18, 410:19, 410:24, 413:7, 416:20, 427:23, 431:20, 433:5, 433:6, 440:16, 440:17, 453:1, 465:10, 465:11, 468:1, 471:10, 473:6
**policy** [4] - 335:6, 408:24, 427:21, 450:11
**poorly** [1] - 357:20, 432:25
**portion** [2] - 442:16, 442:18
**posit** [2] - 431:2, 435:12
**posited** [1] - 427:25
**position** [9] - 364:21, 395:21, 414:8, 417:23, 418:2, 418:10, 421:17,

428:16, 440:15
**positive** [1] - 351:1
**posses** [1] - 458:13
**possess** [1] - 344:10
**possibility** [3] - 389:20, 395:24, 460:9
**possible** [21] - 301:19, 307:6, 308:23, 373:22, 382:10, 382:14, 382:15, 383:20, 386:7, 386:9, 386:11, 389:8, 389:13, 389:14, 418:7, 418:12, 424:17, 425:20, 426:20, 426:23, 460:10
**possibly** [1] - 390:25
**potential** [1] - 401:22
**potentially** [1] - 347:1
**power** [2] - 295:14, 369:18
**Power** [3] - 369:16, 370:11, 370:14
**practicable** [1] - 473:8
**practice** [5] - 384:8, 389:2, 411:4, 411:6, 427:20
**preferably** [1] - 354:18
**preferential** [1] - 432:22
**preliminary** [1] - 365:15
**premise** [1] - 314:25
**premises** [1] - 381:1
**prepares** [2] - 446:18, 446:19
**preponderance** [2] - 439:20, 439:22
**present** [6] - 366:20, 366:22, 414:2, 442:2, 442:13, 474:5
**Present** [2] - 441:18, 441:25
**presenta** [1] - 432:16
**presented** [8] - 357:16, 369:8, 404:4, 423:13, 432:18, 432:24, 440:23, 441:3
**presenting** [6] - 303:6, 322:13, 423:12, 432:19, 439:18, 445:3
**presents** [2] - 416:6, 460:21
**presiding** [1] - 292:6
**pretty** [5] - 315:3, 397:22, 424:9,

432:13, 434:14
**previous** [3] - 317:22,
317:24, 357:18
**previously** [4] -
294:25, 324:17,
368:14, 466:3
**primary** [1] - 400:14
**Principle** [1] - 451:24,
452:19, 453:22
**principle** [2] - 419:9,
462:12
**printout** [1] - 366:4
**prioritize** [1] - 299:12
**priority** [2] - 364:18,
469:5
**privacy** [3] - 395:11,
395:15, 395:17
**privy** [2] - 356:23,
358:8
**probation** [2] -
388:23, 389:2
**problem** [4] - 313:23,
345:17, 425:8,
469:20
**problems** [2] - 431:15,
471:17
**procedure** [1] -
353:14
**proceed** [4] - 352:18,
356:8, 437:15,
438:13
**proceeded** [2] -
430:13, 431:5
**proceeding** [3] -
292:11, 468:20,
469:2
**proceedings** [3] -
439:17, 439:25,
465:1
**PROCEEDINGS** [1] -
473:11
**process** [6] - 316:4,
319:10, 353:13,
360:3, 383:7, 383:8
**produced** [2] - 444:7,
444:23
**productive** [1] -
467:25
**profes** [1] - 428:16
**professional** [1] -
434:24
**professionalism** [1] -
450:12
**program** [2] - 344:17,
384:19
**promptly** [2] - 451:6,
462:18
**proper** [2] - 334:24,
335:1
**prostitute** [1] - 353:9

**protect** [1] - 364:6
**protective** [1] - 324:19
**protocol** [2] - 435:5,
435:9
**prove** [3] - 417:12,
417:17, 423:10
**provide** [3] - 297:23,
336:11, 412:17
**provided** [10] -
318:11, 322:24,
328:16, 337:18,
337:19, 349:4,
428:7, 442:19,
454:5, 473:7
**provides** [1] - 419:19
**providing** [1] - 348:11
**proximity** [1] - 392:11
**public** [1] - 457:14
**pull** [9] - 307:14,
307:17, 309:11,
341:24, 342:5,
353:11, 357:4,
364:10, 385:6
**pulled** [9] - 324:5,
324:7, 352:23,
362:16, 375:19,
417:14, 418:6,
428:22, 431:13
**pulling** [2] - 307:18,
430:16
**pulls** [1] - 431:10
**purpose** [7] - 303:1,
303:2, 304:19,
315:13, 335:11,
378:13, 425:12
**purposefully** [2] -
344:8, 344:12
**purposely** [1] - 310:10
**purposes** [1] - 439:8
**pursuit** [1] - 455:10
**pushed** [1] - 395:18
**put** [9] - 304:2, 324:3,
364:12, 367:24,
392:8, 398:21,
466:4, 466:23, 469:2
**puts** [1] - 430:17
**putting** [1] - 379:10

# Q

**qualified** [1] - 329:15
**quarrel** [2] - 410:25,
463:6
**quarters** [1] - 359:20
**quently** [1] - 332:4
**ques** [1] - 313:5
**questioned** [3] -
346:17, 347:12,
361:17
**questioning** [3] -

313:19, 314:25,
402:6
**questions** [22] - 300:5,
335:18, 339:6,
346:14, 349:16,
350:18, 352:12,
352:19, 356:8,
356:11, 357:2,
357:8, 358:12,
381:4, 388:18,
396:7, 409:11,
421:19, 424:13,
426:9, 463:23, 467:5
**quick** [6] - 307:20,
309:13, 418:5,
418:12, 429:20,
455:8
**quickly** [1] - 418:6
**quite** [14] - 319:6,
339:14, 383:18,
385:5, 385:14,
385:16, 389:7,
393:16, 401:6,
426:14, 434:15,
434:16, 454:19,
467:12
**quote** [1] - 410:7
**quotes** [1] - 466:4

# R

**race** [1] - 372:6
**radio** [8] - 367:1,
367:18, 386:11,
412:24, 428:24,
453:2, 453:18
**raised** [2] - 432:16,
470:9
**raising** [1] - 315:15
**ran** [1] - 364:8
**range** [1] - 370:8
**rare** [1] - 386:15
**rate** [1] - 422:1
**raw** [1] - 425:6
**rays** [2] - 392:22,
397:21
**razor** [1] - 423:17
**re** [2] - 316:21, 317:3
**re-ask** [2] - 316:21,
317:3
**reach** [1] - 302:6
**reached** [1] - 336:25
**reaching** [2] - 470:24,
470:25
**read** [19] - 300:13,
300:23, 302:6,
315:3, 318:20,
318:22, 331:13,
331:17, 332:1,
347:10, 347:20,

403:15, 403:19,
406:21, 422:13,
445:15, 453:24,
454:7, 456:25
**reading** [1] - 438:20
**ready** [5] - 341:16,
352:17, 371:18,
408:25, 433:18
**reality** [1] - 418:22
**realize** [1] - 430:11
**realizes** [2] - 431:15,
433:18
**really** [6] - 362:13,
364:5, 364:15,
385:4, 424:7, 467:1
**rear** [1] - 452:19
**reason** [24] - 296:6,
297:24, 300:18,
301:22, 303:12,
304:21, 308:9,
314:6, 320:25,
365:17, 369:4,
374:5, 384:23,
386:22, 387:1,
387:4, 387:18,
388:10, 388:12,
388:13, 414:21,
417:15, 422:9,
422:10
**reasonable** [1] - 427:1
**reasons** [7] - 297:14,
302:12, 308:24,
309:8, 422:8, 449:9,
454:22
**rebut** [1] - 425:23
**rebuttal** [1] - 363:3
**receive** [2] - 455:13,
462:23
**received** [15] - 327:14,
350:22, 351:3,
398:20, 404:10,
416:8, 437:23,
442:22, 449:25,
451:19, 452:11,
453:4, 455:11,
463:2, 463:18
**recognize** [2] -
295:18, 315:11
**recognized** [1] -
313:20
**recollection** [10] -
319:20, 320:5,
320:6, 339:16,
399:6, 399:9, 435:1,
447:15, 460:2,
460:23
**recommendation** [1] -
445:13
**reconvene** [1] -
439:10

**record** [21] - 323:18,
325:1, 331:22,
336:23, 352:16,
373:12, 388:4,
390:11, 425:17,
426:5, 438:3, 438:7,
438:20, 438:22,
439:11, 440:13,
449:20, 454:19,
456:15, 458:19,
464:11
**recorded** [4] - 334:5,
338:9, 339:20, 474:7
**records** [12] - 321:20,
325:9, 326:10,
326:21, 332:25,
333:1, 359:23,
359:25, 360:15,
360:21, 416:7, 434:1
**recover** [1] - 369:4
**recovered** [2] - 343:5,
369:2
**RECROSS** [1] -
388:19
**RECROSS-**
**EXAMINATION** [1] -
388:19
**red** [1] - 454:17
**redirect** [4] - 352:13,
352:18, 356:8,
463:21
**REDIRECT** [3] -
356:10, 386:6, 471:8
**refer** [1] - 300:8
**reference** [1] - 357:23
**referenced** [3] -
360:15, 360:21,
473:5
**referencing** [6] -
297:4, 332:23,
338:17, 338:22,
452:18, 453:22
**referred** [1] - 450:5
**referring** [12] - 306:15,
310:4, 335:8, 335:9,
339:8, 342:16,
342:17, 345:22,
371:9, 373:13,
373:18, 399:15
**reflect** [1] - 366:6
**reflected** [2] - 383:2,
410:9
**reflecting** [1] - 369:23
**refused** [1] - 383:6
**regard** [2] - 340:20,
456:18, 462:3
**regarding** [27] - 296:9,
296:16, 297:19,
303:2, 313:14,
330:16, 330:17,

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 494 of 501   Document 80-5

338:9, 339:13, 341:12, 342:2, 345:16, 349:1, 375:5, 375:13, 401:23, 402:10, 404:21, 406:20, 418:2, 424:13, 441:11, 445:5, 451:11, 465:18, 465:19, 466:5

**regular** [2] - 310:7, 311:1

**regularly** [5] - 296:6, 296:10, 296:11, 299:1, 354:9

**regulation** [1] - 449:3

**rehash** [1] - 338:12

**reiterate** [1] - 318:8

**reiterated** [1] - 301:24

**relate** [10] - 366:12, 369:17, 376:9, 404:17, 404:23, 406:23, 441:13, 442:18, 443:8, 458:6

**related** [3] - 301:16, 356:16, 367:5

**relates** [11] - 304:17, 404:18, 448:4, 449:14, 450:11, 451:14, 453:24, 457:16, 457:17, 458:4, 458:13

**relating** [4] - 375:2, 386:14, 451:3, 451:24

**relation** [7] - 363:23, 372:8, 374:6, 374:10, 375:16, 443:24, 448:2

**relatively** [1] - 414:13

**relatives** [3] - 394:13, 398:1, 398:2

**released** [2] - 336:13, 415:3

**relevance** [2] - 318:8, 346:7

**relevant** [1] - 424:6

**relieved** [1] - 392:23

**remain** [2] - 311:22, 312:21

**remains** [1] - 422:13

**remember** [22] - 303:4, 309:16, 313:12, 335:24, 339:4, 339:9, 339:19, 359:21, 360:24, 362:8, 362:10, 362:11, 362:12, 362:17, 374:2, 374:11,

384:23, 394:16, 398:3, 453:19, 460:23

**render** [2] - 451:5, 462:18

**renew** [1] - 329:25

**repeat** [3] - 341:14, 343:24, 364:25

**repeatedly** [1] - 432:6

**rephrase** [1] - 318:18

**report** [71] - 304:20, 311:23, 312:1, 312:4, 312:6, 312:17, 312:23, 313:9, 313:21, 314:3, 315:3, 319:2, 332:1, 332:8, 336:18, 338:19, 340:12, 344:6, 345:23, 346:1, 347:5, 350:8, 350:10, 350:11, 350:13, 351:6, 357:20, 357:23, 358:2, 358:8, 361:14, 375:10, 378:24, 379:6, 379:10, 379:13, 382:11, 383:11, 383:14, 387:25, 388:10, 388:12, 388:13, 388:14, 397:12, 398:16, 398:21, 403:7, 404:12, 407:8, 408:16, 408:21, 409:17, 409:20, 410:3, 410:5, 410:9, 411:10, 413:15, 419:22, 424:19, 427:10, 429:14, 433:11, 436:9, 436:10, 436:16, 441:10, 456:24, 458:15, 473:4

**reported** [15] - 343:13, 381:11, 387:21, 388:9, 388:11, 401:12, 408:1, 419:22, 420:16, 423:5, 424:14, 426:15, 427:22, 429:2, 433:7

**Reporter** [1] - 474:18

**reporter** [2] - 318:20, 474:5

**reporting** [1] - 379:9, 423:4, 446:9

**reports** [18] - 302:7, 304:6, 312:9,

312:12, 313:18, 341:21, 342:12, 349:17, 375:5, 382:13, 383:17, 392:18, 396:17, 428:6, 428:20, 429:9, 432:11, 433:9

**represent** [1] - 446:9

**representation** [1] - 327:7

**representative** [7] - 332:2, 339:5, 347:19, 347:21, 361:17, 424:24, 440:20

**reprimand** [2] - 449:25, 450:9

**requested** [2] - 300:19, 428:5

**require** [2] - 294:11, 374:24

**required** [1] - 417:25

**requirement** [1] - 453:24

**requires** [3] - 423:12, 423:23, 472:9

**reread** [1] - 331:22

**rescinded** [1] - 461:19

**residence** [2] - 352:7, 429:15

**resonate** [1] - 468:8

**respect** [3] - 450:2, 468:4, 468:14

**respectfully** [2] - 426:13, 426:25

**respon** [1] - 350:10

**respond** [5] - 310:20, 311:4, 312:14, 445:19, 453:18

**responded** [11] - 310:16, 311:8, 365:11, 365:14, 366:10, 381:7, 401:4, 401:11, 401:13, 406:16, 423:9

**responding** [7] - 309:3, 311:13, 311:15, 313:22, 344:14, 413:1, 449:8

**responds** [2] - 311:25, 312:5, 384:14

**response** [5] - 357:3, 381:8, 386:12, 391:4, 403:22

**Response** [4] - 337:22, 442:24, 445:15, 459:6

**responses** [4] - 350:19, 419:25,

436:18, 436:22

**responsibility** [2] - 298:10, 299:24

**responsible** [7] - 305:2, 313:4, 350:8, 374:19, 374:21, 400:17, 460:16

**responsive** [3] - 298:13, 341:18, 348:25

**rest** [3] - 413:20, 467:12, 472:5

**restate** [3] - 305:18, 346:20, 369:22

**rested** [1] - 362:23

**restrain** [1] - 341:13

**restraining** [1] - 313:24

**restrict** [1] - 341:6

**rests** [2] - 363:1, 463:25

**result** [3] - 361:1, 436:25, 456:6

**resulted** [1] - 389:18

**results** [1] - 449:18

**reswear** [1] - 363:6

**retain** [1] - 398:22

**retalia** [1] - 313:15

**retaliation** [2] - 318:3, 424:12

**retract** [2] - 425:19, 446:11

**retrieve** [4] - 300:8, 300:18, 357:24, 378:8

**retrieving** [1] - 300:14

**return** [4] - 300:21, 305:22, 357:11, 456:7

**returned** [3] - 303:16, 348:6, 356:19

**returning** [1] - 457:25

**reunited** [1] - 432:13

**revealed** [1] - 305:7

**reversed** [1] - 461:16

**Review** [2] - 441:8, 443:20

**review** [11] - 297:15, 327:3, 371:2, 372:8, 396:17, 403:6, 441:11, 450:11, 450:22, 462:5

**reviewed** [14] - 316:1, 347:5, 351:5, 370:22, 443:9, 443:12, 443:24, 444:1, 444:16, 445:20, 445:22, 446:6, 446:8, 446:12

**Reviewed/**

**Discussed** [1] - 442:16

**reviewing** [2] - 303:8, 383:11

**riddled** [1] - 436:11

**ride** [1] - 394:5

**rig** [1] - 392:13

**rights** [1] - 457:17

**rigs** [2] - 391:17, 392:8

**Riley** [6] - 311:21, 312:20, 313:1, 337:10, 401:15

**rings** [1] - 431:18

**risk** [1] - 422:20

**roadway** [1] - 435:23

**robberies** [2] - 465:15, 466:6

**rode** [7] - 356:22, 391:6, 391:18, 391:20, 391:23, 391:24, 401:20

**role** [3] - 385:16, 442:10, 442:11

**roll** [1] - 372:24

**room** [16] - 358:7, 392:9, 392:10, 393:1, 393:21, 394:1, 394:7, 394:8, 394:11, 394:13, 394:15, 395:8, 395:17, 395:25, 398:1, 432:11

**rooms** [4] - 392:22, 392:24, 392:25, 393:3

**roster** [1] - 384:21

**rough** [2] - 428:10, 428:12

**roughly** [1] - 372:18

**route** [9] - 386:12, 405:21, 405:25, 407:20, 411:19, 411:23, 412:2, 412:4, 412:11

**Rudolph** [1] - 292:5

**rule** [11] - 419:8, 426:19, 436:17, 436:19, 437:11, 444:24, 449:3, 462:7, 462:11, 465:4, 473:5

**Rule** [1] - 473:6

**rules** [4] - 414:14, 427:5, 427:9, 448:19

**rumors** [3] - 319:2, 340:25, 436:11

**run** [2] - 369:19, 435:25

# S

**sacrifice** [1] - 422:21
**sad** [1] - 466:20
**safe** [9] - 307:16, 308:10, 308:11, 309:10, 363:8, 419:5, 454:1, 470:3, 473:2
**safety** [10] - 297:16, 324:18, 324:20, 418:20, 418:21, 419:1, 419:4, 419:6, 454:4, 470:3
**Saint** [1] - 381:7
**sake** [1] - 367:10
**salient** [1] - 304:9
**sation** [2] - 368:15, 433:17
**satisfied** [1] - 439:24
**save** [1] - 385:23
**saw** [15] - 297:10, 307:21, 312:1, 312:6, 345:22, 346:1, 347:11, 347:14, 347:16, 347:17, 347:25, 358:20, 358:25, 371:23, 470:13
**scene** [68] - 298:11, 310:16, 310:20, 311:8, 311:14, 311:17, 311:22, 311:24, 311:25, 312:3, 312:5, 312:18, 312:21, 313:3, 314:3, 318:25, 319:21, 320:14, 321:9, 328:23, 353:22, 362:12, 363:25, 365:14, 366:6, 368:19, 374:20, 374:22, 376:12, 379:16, 381:11, 381:16, 383:24, 391:7, 391:8, 391:9, 391:13, 391:22, 391:23, 392:3, 393:6, 393:8, 393:10, 396:25, 400:19, 401:11, 402:15, 404:23, 405:21, 407:21, 408:1, 408:15, 408:17, 409:4, 409:6, 412:2, 412:3, 412:23, 413:3, 416:19, 416:21, 416:25, 431:24,

432:2, 433:8, 434:10, 465:21
**scenes** [5] - 309:6, 411:3, 411:4, 464:23, 465:14
**school** [1] - 356:5
**se** [1] - 416:2
**Sean** [5] - 332:3, 333:11, 340:7, 433:15, 434:17
**SEAN** [1] - 363:10
**search** [16] - 292:21, 293:13, 293:20, 299:8, 299:13, 300:4, 304:3, 305:8, 317:24, 368:8, 368:22, 369:2, 387:14, 414:22, 429:16, 466:14
**searched** [5] - 303:21, 304:16, 305:1, 305:4, 355:19
**searches** [1] - 431:17
**seat** [2] - 310:12, 454:3
**second** [24] - 299:22, 300:22, 305:22, 306:4, 307:14, 326:7, 333:19, 334:12, 355:1, 355:6, 357:12, 387:6, 403:12, 405:24, 406:10, 408:10, 429:15, 429:23, 434:2, 439:5, 450:10, 450:23, 472:14, 472:16
**seconds** [1] - 408:8
**secret** [1] - 428:9
**Section** [1] - 463:17
**section** [3] - 349:19, 450:16, 463:17
**secured** [1] - 373:6
**see** [65] - 293:20, 295:18, 297:7, 299:13, 300:11, 314:6, 314:14, 314:16, 315:9, 315:10, 319:4, 321:1, 322:16, 323:2, 323:16, 325:12, 325:18, 326:7, 329:13, 330:20, 331:11, 332:7, 333:3, 334:20, 335:4, 335:16, 340:13, 343:1, 343:3, 343:21, 348:24,

359:12, 359:13, 365:20, 365:22, 368:20, 371:5, 371:7, 371:24, 373:10, 376:19, 377:24, 382:12, 386:9, 387:14, 394:11, 395:13, 404:5, 406:12, 414:22, 417:1, 418:5, 435:21, 435:22, 435:24, 436:9, 441:19, 442:16, 444:20, 446:3, 450:17, 451:9, 455:5, 465:20, 465:21
**seeing** [5] - 374:1, 374:3, 375:19, 384:16, 385:9
**seek** [2] - 313:2, 378:18
**seem** [3] - 317:18, 377:2, 383:11
**sees** [1] - 430:16
**segue** [1] - 350:17
**self** [3] - 353:21, 429:6, 447:7
**Self** [1] - 447:2
**self-inflicted** [1] - 429:6
**self-interest** [1] - 447:7
**selves** [1] - 459:5
**send** [3] - 368:23, 389:2, 409:7
**sending** [5] - 350:23, 350:25, 404:18, 437:8, 437:9
**senior** [1] - 469:9
**sense** [19] - 341:2, 341:11, 364:5, 364:13, 364:15, 371:17, 418:22, 422:22, 423:15, 424:20, 426:7, 434:12, 434:19, 434:20, 435:3, 435:6, 436:1, 436:5, 437:11
**sensitive** [1] - 415:1
**sent** [5] - 364:2, 405:2, 408:3, 408:5, 408:20
**sentation** [1] - 419:5
**sentence** [3] - 305:25, 357:8, 403:12
**separate** [2] - 306:18, 391:16
**separated** [1] - 392:12
**September** [2] -

409:17, 436:10
**sergeant** [16] - 295:2, 295:5, 295:11, 295:15, 295:17, 296:6, 296:11, 297:5, 298:21, 312:19, 372:12, 372:24, 374:15, 380:25, 400:11, 431:20
**Sergeant** [28] - 300:19, 302:22, 303:7, 303:10, 311:20, 313:1, 314:15, 328:4, 337:10, 347:19, 360:16, 371:8, 372:19, 374:1, 374:3, 374:9, 376:8, 376:11, 383:12, 383:20, 401:15, 416:18, 416:19, 423:7, 431:16, 431:18
**sergeant's** [1] - 445:12
**sergeants** [8] - 295:20, 295:24, 296:2, 296:12, 372:11, 380:23, 402:3
**series** [2] - 335:18, 349:16
**serious** [2] - 447:24, 457:21
**seriously** [5] - 379:1, 422:19, 450:15, 457:8, 458:20
**serve** [2] - 465:9, 465:10
**served** [3] - 297:5, 346:17, 347:15
**service** [6] - 415:12, 448:14, 451:5, 451:7, 468:5, 472:9
**services** [1] - 462:18
**serving** [1] - 292:7
**session** [14] - 438:14, 438:21, 438:23, 438:25, 439:2, 439:8, 439:14, 439:16, 467:11, 472:8, 472:12, 472:17, 472:18, 472:20
**set** [7] - 395:11, 395:15, 419:11, 419:19, 419:20, 427:10, 447:19
**seven** [4] - 334:16,

361:1, 434:3, 436:6
**Seven** [1] - 365:4
**seven-minute** [3] - 361:1, 434:3, 436:6
**several** [7] - 309:7, 332:4, 401:13, 411:11, 413:2, 436:8, 458:11
**severe** [3] - 434:7, 434:21, 437:7
**sex** [1] - 372:6
**sexual** [12] - 314:10, 315:17, 317:8, 317:11, 375:5, 376:1, 388:11, 423:4, 424:14, 424:19, 428:10, 469:14
**sexually** [5] - 313:23, 314:8, 314:19, 387:22, 469:17
**shall** [4] - 451:5, 451:7, 453:25, 456:22
**Shannon** [69] - 292:4, 297:1, 297:4, 375:12, 375:22, 382:16, 391:11, 394:12, 396:25, 397:17, 402:9, 409:21, 415:23, 417:11, 417:17, 418:19, 420:16, 421:1, 422:25, 424:22, 426:4, 427:15, 428:3, 428:4, 428:5, 428:6, 428:13, 428:21, 429:3, 429:24, 430:3, 430:7, 430:10, 430:12, 430:16, 430:24, 430:25, 431:7, 431:20, 432:21, 433:2, 433:14, 433:16, 433:17, 434:4, 434:6, 434:11, 434:18, 434:20, 435:2, 436:5, 436:12, 436:20, 439:21, 460:24, 461:7, 463:2, 464:2, 464:18, 464:20, 465:3, 465:4, 465:9, 466:5, 467:13, 467:16, 472:22
**Shannon's** [1] - 435:11
**Shawn** [2] - 339:5,

347:21
**Shepherd** [1] - 442:5
**Shift** [11] - 369:15, 369:16, 369:18, 369:20, 370:2, 370:3, 370:11, 370:16, 383:15
**shift** [14] - 295:12, 295:13, 295:14, 312:7, 354:19, 369:23, 381:22, 386:23, 387:2, 387:6, 387:7, 416:3, 429:12
**Shifts** [1] - 370:14
**shifts** [2] - 294:19, 370:6
**shirt** [1] - 394:20
**shocked** [3] - 347:9, 379:7
**shoes** [1] - 466:23
**shook** [1] - 331:23
**shooting** [27] - 300:15, 301:5, 342:18, 356:11, 356:12, 356:15, 363:18, 364:15, 364:18, 364:22, 365:5, 366:4, 369:1, 373:5, 374:12, 377:7, 381:8, 383:2, 383:21, 384:12, 388:20, 389:6, 415:2, 428:25, 429:1, 429:17, 466:8
**shootings** [4] - 374:13, 389:5, 465:15, 466:6
**Shorewood** [7] - 351:25, 352:4, 352:8, 360:3, 413:7, 431:12, 433:5
**short** [5] - 304:16, 307:11, 352:13, 354:22, 435:17
**short-handed** [1] - 354:22
**shorthand** [3] - 355:22, 474:7, 474:9
**shortly** [3] - 305:5, 305:8, 375:21
**shot** [6] - 300:15, 301:10, 301:21, 355:14, 364:1, 466:15
**show** [9] - 313:19, 338:19, 342:13, 382:6, 382:11, 383:23, 411:3, 421:25, 432:20

**showed** [4] - 365:3, 373:7, 393:25, 416:25
**shows** [3] - 373:10, 382:6, 459:13
**shuffle** [1] - 379:24
**sible** [1] - 350:11
**sic** [1] - 437:7
**side** [7] - 310:2, 320:17, 320:19, 321:3, 414:10, 420:2, 420:23
**sideration** [1] - 426:25
**sidered** [1] - 449:21
**sides** [2] - 315:12, 362:22
**sight** [1] - 469:8
**significant** [7] - 448:18, 450:13, 453:19, 454:11, 456:4, 456:15, 460:13
**similar** [3] - 377:8, 444:25, 451:18
**simple** [10] - 309:11, 311:12, 329:21, 343:19, 344:2, 414:9, 423:16, 423:17, 423:21
**simply** [3] - 308:3, 308:9, 412:4
**single** [4] - 303:2, 312:3, 312:17, 401:3
**sion** [1] - 458:14
**sional** [1] - 428:17
**siren** [7] - 342:9, 358:17, 359:5, 418:25, 430:18
**sirens** [3] - 308:19, 309:1, 435:10
**sit** [5] - 332:11, 339:2, 339:25, 379:12, 470:7
**sitting** [4] - 380:23, 435:18, 440:7, 466:24
**situation** [12] - 302:8, 305:21, 309:3, 318:4, 346:19, 395:8, 418:24, 419:2, 431:11, 431:16, 432:25, 453:13
**situations** [1] - 421:12
**six** [8] - 323:23, 336:6, 336:9, 352:2, 352:5, 352:6, 410:24, 443:5
**size** [1] - 330:11
**slammed** [1] - 430:21
**sleep** [2] - 337:3,

349:15
**sliding** [3] - 395:11, 395:18, 395:20
**slow** [1] - 308:3
**slowed** [1] - 342:6
**slowing** [1] - 308:9
**small** [1] - 432:8
**Smith** [6] - 328:4, 360:16, 431:16, 431:18, 431:22, 432:18
**snow** [1] - 399:10
**snowing** [1] - 399:7
**sobriety** [2] - 416:22, 431:14
**sole** [1] - 425:11
**solved** [2] - 465:23
**someone** [16] - 304:4, 308:2, 308:13, 313:8, 328:5, 329:11, 337:13, 376:9, 384:16, 385:1, 394:24, 395:2, 397:9, 424:14, 455:4, 455:13
**sometimes** [5] - 353:18, 353:21, 353:22, 386:16, 462:22
**somewhat** [3] - 414:9, 416:18, 459:13
**somewhere** [4] - 323:14, 356:13, 398:23, 411:24
**son** [49] - 313:8, 313:15, 315:4, 315:5, 319:1, 319:14, 320:15, 320:24, 322:24, 323:9, 323:19, 324:11, 324:18, 326:2, 337:11, 337:14, 340:14, 340:16, 340:20, 341:4, 341:7, 351:16, 352:23, 356:3, 360:2, 360:4, 362:15, 394:14, 398:3, 401:14, 401:19, 401:24, 402:10, 402:17, 402:21, 403:18, 410:7, 416:9, 416:11, 416:16, 418:5, 418:11, 421:7, 423:20, 429:25, 434:14, 468:11, 470:8
**son's** [8] - 321:22,

322:2, 325:8, 325:15, 325:20, 326:10, 326:23, 328:1
**sons** [1] - 470:15
**soon** [3] - 418:7, 430:11, 473:7
**SOP** [2] - 311:25, 419:7
**SOPs** [1] - 345:15
**sorry** [6] - 341:7, 350:17, 357:19, 367:22, 382:1, 437:17
**sort** [8] - 320:19, 343:17, 350:18, 365:17, 424:23, 433:22, 436:13, 451:18
**sorts** [2] - 405:16, 422:2
**sounds** [2] - 316:9, 432:7
**south** [3] - 343:1, 353:4, 353:5
**speaking** [2] - 363:21, 374:14
**speaks** [1] - 448:23
**special** [1] - 310:25
**specific** [8] - 366:12, 369:17, 402:7, 405:10, 450:13, 453:5, 454:20, 462:11
**specifica** [1] - 442:20
**specifically** [17] - 312:19, 338:3, 338:20, 364:4, 365:1, 365:22, 376:9, 395:10, 400:23, 401:21, 404:17, 405:12, 443:20, 448:5, 449:14, 451:14, 454:12
**specification** [1] - 443:11
**specifications** [1] - 443:21
**specified** [1] - 336:22
**Specs** [1] - 443:8
**specs** [1] - 414:15
**speculate** [10] - 294:12, 294:14, 302:16, 302:21, 328:7, 328:13, 328:14, 344:10, 345:2, 349:6
**speculation** [3] - 345:13, 348:13,

349:6
**speed** [4] - 339:13, 340:10, 422:1, 455:22
**speeding** [1] - 435:4
**spell** [4] - 390:10, 402:18, 440:13, 464:10
**spent** [1] - 359:23
**spinning** [1] - 317:19
**split** [1] - 376:13
**spontaneously** [1] - 386:19
**spot** [1] - 405:22
**spots** [2] - 342:17, 342:22
**Squad** [5] - 366:10, 372:14, 401:16, 406:15, 406:17
**squad** [47] - 366:14, 366:17, 367:10, 367:13, 368:2, 371:23, 381:21, 381:24, 381:25, 382:11, 382:18, 383:9, 383:12, 383:16, 386:16, 386:23, 387:1, 387:3, 387:5, 387:6, 387:7, 391:9, 401:10, 401:17, 404:11, 404:19, 404:25, 407:12, 408:6, 412:25, 429:24, 430:13, 430:17, 430:19, 431:3, 431:4, 447:23, 447:25, 449:7, 449:11, 453:21, 454:15, 455:20, 455:23, 455:24, 455:25
**St** [2] - 365:3, 365:7
**Stacey** [1] - 321:12, 327:23, 362:15, 405:1, 405:4, 406:15, 432:10
**Stacey's** [1] - 405:13
**staff** [2] - 397:16, 460:22
**stand** [4] - 292:13, 341:17, 468:8, 473:9
**standards** [4] - 370:6, 438:15, 438:16, 439:23
**standing** [5] - 347:18, 347:22, 408:1, 415:23, 467:22
**stark** [2] - 343:12, 344:2

**start** [4] - 330:9, 370:5, 370:14, 441:3
**started** [5] - 371:8, 371:11, 371:15, 401:14, 402:5
**starting** [1] - 403:10
**starts** [2] - 422:7, 462:13
**STATE** [1] - 474:1
**state** [9] - 334:24, 335:1, 390:10, 393:22, 417:17, 418:9, 422:16, 440:13, 464:10
**statement** [31] - 299:11, 305:20, 324:4, 331:9, 338:1, 338:5, 338:7, 340:18, 340:20, 341:25, 342:14, 342:16, 343:6, 344:24, 345:10, 347:15, 349:7, 410:5, 410:6, 410:11, 414:2, 414:19, 417:21, 418:4, 420:12, 426:17, 434:17, 434:19, 441:23, 455:9, 456:11
**statements** [35] - 303:19, 306:14, 306:15, 311:20, 311:21, 312:20, 313:3, 313:14, 315:2, 315:3, 315:12, 331:8, 337:23, 338:1, 338:8, 338:17, 338:21, 338:24, 339:2, 339:8, 339:9, 346:24, 349:2, 350:13, 364:12, 364:14, 401:22, 402:9, 410:3, 420:17, 421:6, 424:23, 436:6, 437:10, 457:10
**states** [4] - 325:5, 325:10, 406:14, 425:9
**States** [1] - 462:25
**stating** [5] - 303:13, 310:9, 323:18, 337:10, 406:19
**station** [3] - 296:24, 297:9, 403:25
**stationed** [2] - 378:1
**status** [1] - 409:10
**stay** [1] - 427:16

**stayed** [3] - 392:20, 393:8, 416:25
**stenographic** [1] - 474:5
**step** [2] - 294:25, 417:22
**STEVEN** [2] - 390:5, 390:12
**Steven** [1] - 390:12
**still** [22] - 292:10, 292:13, 296:24, 297:3, 303:17, 317:17, 330:15, 359:3, 373:15, 383:3, 383:24, 388:23, 395:14, 412:12, 414:10, 419:7, 420:14, 448:11, 467:17, 467:25, 470:22
**stipulating** [1] - 322:7
**stipulation** [1] - 428:2
**stop** [13] - 299:18, 314:23, 321:2, 328:8, 337:11, 341:6, 348:25, 352:4, 430:6, 432:24, 433:6, 435:8, 436:13
**stopped** [12] - 324:1, 324:12, 324:22, 340:15, 341:8, 351:24, 352:7, 360:3, 364:9, 382:12, 416:11, 430:4
**store** [1] - 359:12
**story** [15] - 302:14, 313:14, 346:12, 365:11, 365:15, 374:19, 419:14, 420:1, 420:6, 420:8, 420:23, 421:16, 422:7, 423:21, 426:6
**straightforward** [2] - 414:13, 424:9
**Street** [5] - 306:24, 358:13, 358:14, 359:13, 432:3
**street** [4] - 362:16, 380:23, 413:16, 469:16
**streets** [3] - 309:6, 418:24, 470:3
**strike** [1] - 345:20
**Strike** [6] - 308:23, 312:2, 329:3, 366:19, 371:2, 458:5
**striking** [1] - 300:17
**strong** [1] - 425:3

**stuck** [1] - 417:7
**stuff** [1] - 362:7
**stumbled** [1] - 405:17
**stuttering** [1] - 339:23
**subject** [9] - 345:25, 346:7, 346:9, 347:1, 347:7, 422:16, 466:10, 466:13, 466:15
**submit** [3] - 419:20, 426:13, 427:1
**submitted** [4] - 306:18, 306:19, 407:3, 436:18
**subpoena** [1] - 464:25
**subse** [1] - 332:3
**subsequently** [1] - 347:11
**substantiated** [2] - 425:17, 436:14
**Subway** [1] - 342:24
**sudden** [3] - 307:20, 418:25, 435:25
**suddenly** [3] - 309:1, 386:24, 387:2
**suffered** [2] - 434:7, 469:14
**suffering** [3] - 317:7, 434:21, 470:23
**sufficient** [1] - 420:4
**suggesting** [2] - 301:23, 425:4
**suggestions** [2] - 319:23, 447:5
**suggests** [2] - 425:8
**suit** [5] - 394:23, 399:13, 399:20, 399:23, 399:24
**suits** [1] - 399:22
**sum** [2] - 311:11, 414:7
**summarizes** [2] - 442:24, 445:12
**Summary** [2] - 441:8, 443:20
**summary** [10] - 338:7, 349:25, 350:1, 402:25, 403:3, 406:8, 407:9, 442:3, 444:17, 444:19
**Sunday** [1] - 354:17
**super** [1] - 380:12
**superior** [1] - 471:15
**supervised** [3] - 380:16, 396:20, 396:21
**supervision** [4] - 312:8, 312:11, 314:1, 344:20
**supervisor** [20] -

297:25, 298:9, 298:20, 299:20, 302:5, 348:22, 376:14, 379:6, 379:23, 379:25, 380:3, 380:5, 390:23, 397:10, 415:18, 433:19, 435:6, 436:7, 450:1, 450:12
**supervisors** [4] - 298:6, 298:17, 380:15, 400:24
**supervisory** [1] - 372:3
**support** [4] - 416:7, 425:5, 458:6, 458:10
**support/comfort** [1] - 415:25
**supported** [1] - 426:7
**supporting** [2] - 416:17, 425:1
**supports** [1] - 427:8
**suppose** [1] - 346:2
**supposed** [11] - 298:17, 312:5, 316:14, 376:18, 409:5, 412:16, 453:9, 453:10, 453:16, 455:24
**surmise** [1] - 345:2
**surrounding** [2] - 338:24, 350:5
**SUSAN** [2] - 474:4, 474:17
**suspect** [1] - 466:8
**suspended** [3] - 430:22, 461:8, 461:22
**suspension** [13] - 451:13, 453:4, 461:12, 461:13, 461:14, 461:16, 461:18, 461:20, 462:2, 462:6, 462:17, 472:24, 473:1
**sustain** [3] - 317:25, 345:19, 439:19
**sustained** [7] - 437:14, 444:8, 444:9, 450:9, 465:5, 467:23, 472:23
**swear** [1] - 363:9
**swelling** [2] - 330:8, 330:10
**switch** [3] - 308:16, 309:24, 310:8
**sworn** [10] - 363:10, 363:13, 390:6,

390:8, 400:7, 400:9, 440:4, 440:6, 464:4, 464:8
**symptoms** [1] - 434:22
**synopsis** [2] - 337:7, 338:3

## T

**TAC** [21] - 310:15, 310:19, 310:24, 311:1, 311:7, 311:13, 311:16, 313:10, 313:19, 313:20, 313:23, 314:2, 314:20, 318:2, 318:24, 362:6, 375:19, 401:10, 401:17, 423:8, 466:14
**tactic** [1] - 424:7
**Tactical** [3] - 384:16, 385:1, 401:16
**tape** [2] - 303:5, 347:10
**tapping** [1] - 358:21
**TAYLOR** [2] - 474:4, 474:17
**teamed** [1] - 297:1
**telephone** [7] - 352:22, 360:8, 360:17, 378:22, 379:11, 379:14, 403:17
**temporary** [1] - 313:24
**ten** [6] - 294:13, 314:19, 394:9, 460:8, 460:11, 473:5
**ten-day** [1] - 473:5
**ten-minute** [1] - 460:11
**term** [1] - 412:3
**terminate** [1] - 420:25
**terms** [8] - 299:6, 329:13, 366:7, 373:3, 440:20, 449:20, 450:20, 455:15
**terrible** [1] - 317:11
**tested** [1] - 351:12
**testi** [1] - 357:1, 431:1, 432:7
**testified** [20] - 301:17, 303:7, 310:15, 310:22, 317:5, 319:14, 324:17, 329:5, 330:18, 349:21, 350:7,

351:16, 359:4, 360:2, 363:12, 363:15, 366:25, 386:7, 390:7, 397:15, 400:8, 400:11, 403:7, 410:2, 411:2, 417:10, 426:2, 440:5, 464:6, 468:21
**testify** [4] - 313:13, 371:22, 398:9, 398:12
**testifying** [4] - 316:8, 343:14, 383:19, 396:18
**testimony** [62] - 295:1, 295:3, 296:17, 297:13, 301:12, 303:10, 307:4, 309:17, 309:20, 310:16, 310:18, 312:3, 313:16, 313:17, 317:9, 317:22, 318:2, 318:5, 318:11, 318:15, 318:17, 319:20, 319:25, 320:18, 328:2, 328:4, 328:15, 330:17, 332:11, 336:21, 337:18, 340:6, 360:16, 362:4, 366:19, 366:20, 366:22, 368:6, 375:2, 375:3, 375:6, 376:7, 377:1, 377:15, 381:10, 405:4, 405:6, 405:13, 416:10, 418:18, 424:22, 427:17, 428:2, 429:2, 433:3, 434:5, 434:6, 434:9, 435:11, 468:21
**tests** [2] - 416:22, 431:14
**Texas** [1] - 440:9
**text** [2] - 360:12, 466:7
**THC** [2] - 350:21, 351:1
**THE** [71] - 306:1, 306:10, 319:12, 322:4, 330:4, 330:7, 331:20, 343:24, 347:17, 348:1, 348:5, 349:12, 352:25, 353:6, 353:12, 353:17, 353:25, 354:4, 354:8, 354:14,

355:4, 356:1, 356:4, 357:6, 362:11, 367:21, 368:25, 370:3, 370:10, 370:13, 370:18, 371:13, 371:15, 371:20, 377:6, 377:19, 378:3, 378:9, 379:1, 379:15, 380:1, 380:4, 380:10, 380:14, 380:22, 387:11, 399:9, 399:15, 399:20, 402:22, 403:5, 407:6, 407:18, 407:25, 408:19, 409:3, 412:1, 412:8, 412:11, 412:16, 412:20, 413:9, 440:7, 452:4, 452:9, 452:12, 452:24, 461:23, 463:13, 469:7, 473:11
**then-Police** [1] - 427:23
**theory** [1] - 424:25
**therefore** [5] - 301:18, 301:21, 320:18, 420:8, 439:24
**thinking** [1] - 335:3
**thinks** [1] - 417:15
**third** [5] - 300:9, 300:10, 372:15, 403:8, 452:25
**Thomas** [1] - 466:11
**thoroughly** [1] - 364:22
**thoughts** [1] - 434:23
**threatened** [1] - 314:20
**three** [20] - 306:18, 325:17, 326:14, 326:25, 328:2, 329:9, 335:6, 342:17, 342:20, 342:22, 359:20, 360:14, 390:18, 395:11, 398:25, 414:14, 439:20, 463:3, 466:15, 467:22
**Three** [2] - 299:3, 378:2
**three-minute** [2] - 328:2, 360:14
**three-quarters** [1] - 359:20
**throughout** [3] - 392:23, 426:5, 459:6

**Thursday** [1] - 292:2
**time-sensitive** [1] - 415:1
**Timothy** [1] - 314:17
**tination** [1] - 449:11
**tion** [12] - 300:7, 300:10, 313:16, 345:20, 348:10, 393:25, 404:5, 416:24, 417:11, 424:18, 432:17, 440:24
**tioning** [1] - 313:6
**tions** [3] - 318:5, 426:24, 442:21
**tive** [1] - 379:3
**today** [10] - 318:2, 332:12, 337:18, 339:2, 339:18, 383:3, 394:19, 396:18, 440:19, 466:18
**together** [6] - 355:12, 364:12, 379:10, 415:11, 415:21, 470:2
**toggle** [3] - 308:16, 309:24, 310:8
**took** [8] - 307:23, 330:11, 340:1, 342:18, 383:21, 389:15, 437:7
**top** [3] - 331:10, 372:18, 441:18
**tossed** [2] - 324:10, 431:7
**tosses** [1] - 431:22
**total** [1] - 338:21
**totaled** [1] - 447:25
**tour** [1] - 311:2
**toward** [4] - 313:16, 448:22, 459:13, 462:10
**toxicology** [1] - 351:6
**track** [2] - 458:19, 466:9
**traffic** [16] - 307:8, 307:22, 308:4, 308:13, 309:1, 321:2, 328:8, 337:11, 342:4, 343:1, 352:4, 432:24, 435:7, 435:13, 436:13, 454:2
**trained** [6] - 298:22, 308:12, 308:18, 308:25, 344:16, 418:23
**training** [2] - 372:22,

469:15
**trans** [1] - 408:13
**transmitted** [2] - 408:5, 408:11
**transported** [1] - 328:22
**travel** [1] - 440:9
**traveled** [4] - 359:3, 359:8, 359:17, 392:3
**traveling** [7] - 309:17, 339:10, 343:2, 343:4, 412:5, 412:22, 416:3
**treat** [4] - 302:8, 438:4, 450:1, 450:12
**treated** [2] - 436:24, 437:5
**treating** [1] - 458:20
**treatment** [3] - 303:17, 349:19, 432:23
**trial** [1] - 385:13
**tried** [3] - 311:11, 387:16, 427:16
**tries** [2] - 364:10, 421:16
**trip** [1] - 418:5
**triple** [1] - 330:11
**tronic** [1] - 444:7
**trouble** [2] - 344:18, 422:19
**troubling** [1] - 313:4
**Troy** [6] - 365:14, 366:13, 368:18, 368:24, 380:6, 388:20
**true** [27] - 299:11, 302:15, 319:16, 327:6, 337:12, 347:4, 367:5, 367:8, 370:24, 381:16, 383:9, 383:14, 414:10, 414:12, 414:17, 418:23, 419:20, 420:15, 421:2, 421:17, 422:25, 423:10, 426:21, 426:22, 449:10, 456:5, 474:8
**trust** [1] - 457:14, 469:10, 469:11
**truth** [19] - 314:5, 344:8, 363:11, 363:12, 390:6, 390:7, 400:7, 400:8, 420:6, 422:3, 440:4, 440:5, 464:5, 464:6
**truthful** [1] - 457:12
**truthfulness** [1] - 457:13
**try** [10] - 293:5,

309:20, 316:20, 319:24, 332:10, 364:23, 368:22, 403:23, 433:21, 466:25
**trying** [8] - 319:6, 319:21, 339:23, 362:9, 364:6, 385:17, 402:1, 466:7
**turn** [3] - 342:23, 357:7, 425:11
**turned** [4] - 307:1, 359:4, 359:18, 405:17
**turning** [4] - 308:25, 309:4, 353:10, 359:15
**two** [46] - 294:2, 294:19, 297:17, 311:4, 322:21, 322:23, 323:20, 325:6, 325:12, 325:22, 326:18, 326:22, 328:11, 329:5, 338:16, 342:18, 344:1, 344:3, 355:4, 357:17, 357:23, 360:1, 362:15, 376:2, 392:8, 392:24, 394:13, 398:1, 398:2, 406:7, 409:1, 415:14, 419:15, 420:21, 426:25, 430:9, 431:9, 440:9, 455:11, 455:13, 455:15, 456:6, 461:14, 468:9, 470:15
**two-minute** [1] - 360:1
**type** [5] - 298:15, 298:17, 379:9, 393:23, 458:1
**types** [2] - 408:3, 463:1
**typically** [2] - 377:7, 386:20

## U

**ultimate** [2] - 311:5, 460:17
**ultimately** [2] - 460:16, 461:16
**unable** [1] - 454:6
**unanimously** [1] - 472:22
**unavailable** [4] - 325:6, 325:10,

325:23, 325:25
**unbeknownst** [1] - 415:3
**unclear** [1] - 383:19
**unconscious** [1] - 434:7
**uncooperative** [1] - 364:23
**under** [15] - 292:13, 303:17, 324:21, 350:20, 374:15, 374:16, 383:15, 407:25, 411:13, 415:22, 463:17, 464:25, 467:17, 467:21, 468:24
**underage** [1] - 431:15
**underlying** [1] - 301:15
**understood** [2] - 397:9, 397:12
**unexpected** [1] - 307:21
**unfortunately** [4] - 430:2, 440:8, 452:6, 455:20
**unidentified** [3] - 431:19, 436:12, 436:14
**uniform** [6] - 394:17, 394:18, 394:19, 394:21, 394:22, 399:18
**uniforms** [1] - 399:22
**unintended** [1] - 448:25
**unintentional** [1] - 448:23
**union** [5] - 332:2, 339:4, 347:19, 347:21, 361:16
**unit** [1] - 466:14
**Unit** [3] - 384:17, 385:1, 390:24
**United** [1] - 462:25
**unknown** [3] - 297:5, 351:1
**unless** [2] - 300:6, 302:1
**unloaded** [1] - 392:14
**unnoticed** [1] - 427:14
**unofficial** [1] - 376:4
**unrelated** [1] - 315:14
**unsafe** [3] - 418:17, 418:18, 419:16
**unsure** [2] - 463:7, 463:8
**untruth** [1] - 436:5
**untruthful** [8] - 449:10, 457:8,

457:10, 457:18, 457:19, 457:20, 463:10
**untruthfulness** [4] - 449:15, 449:17, 457:6, 463:17
**unusual** [15] - 295:11, 310:19, 310:23, 311:6, 311:13, 311:15, 311:16, 312:17, 312:19, 313:10, 364:10, 379:18, 384:9, 416:19, 417:1
**up** [78] - 296:8, 296:14, 296:20, 297:1, 301:20, 302:4, 302:5, 305:5, 305:9, 307:21, 311:11, 313:14, 313:17, 313:20, 314:13, 314:16, 324:10, 328:8, 330:10, 332:10, 333:12, 337:23, 337:25, 346:15, 347:4, 350:18, 354:17, 354:19, 356:19, 356:20, 359:15, 360:24, 361:3, 361:5, 361:10, 365:3, 368:21, 373:7, 374:25, 375:19, 376:13, 377:16, 382:6, 382:11, 384:19, 385:6, 388:17, 395:11, 397:22, 401:8, 401:13, 401:19, 401:24, 403:23, 408:22, 411:3, 414:7, 414:21, 417:1, 419:14, 421:7, 421:12, 421:15, 423:21, 425:9, 425:10, 429:8, 429:10, 429:13, 431:8, 432:10, 433:21, 466:12, 466:15, 470:15, 471:6
**upset** [1] - 347:21
**upside** [1] - 417:8
**urge** [1] - 427:7
**urgency** [4] - 299:20, 316:11, 317:13, 317:24
**urgent** [2] - 316:7, 317:6

**uses** [1] - 430:18
**UWM** [22] - 313:15, 319:1, 320:20, 340:15, 340:16, 340:23, 341:1, 341:8, 401:24, 402:10, 402:17, 402:23, 403:18, 403:25, 405:14, 410:8, 410:18, 410:19, 410:24, 433:5, 435:7, 436:13

## V

**vague** [6] - 293:15, 296:22, 316:14, 316:23, 317:20, 397:22
**vaguely** [1] - 339:25
**vain** [1] - 469:3
**valid** [1] - 313:24
**Value** [1] - 462:11
**van** [2] - 364:8, 369:2
**vanishes** [1] - 432:1
**vehicle** [22] - 308:1, 308:4, 308:5, 308:10, 309:21, 310:3, 310:5, 341:23, 350:3, 358:16, 379:5, 392:6, 418:17, 419:10, 419:16, 421:9, 449:8, 454:1, 456:2, 461:6, 473:2
**vehicles** [1] - 453:25
**version** [7] - 345:9, 347:7, 414:11, 422:25, 424:9, 426:5, 427:4
**versions** [2] - 344:2, 344:4
**versus** [1] - 343:14
**via** [1] - 466:7
**victim** [9] - 300:15, 300:16, 301:19, 369:1, 378:6, 383:8, 415:2, 423:19
**victims** [2] - 364:22, 468:8
**video** [6] - 342:13, 342:18, 342:19, 342:23, 343:9, 421:24
**Vidmar** [1] - 458:12
**viduals'** [1] - 457:17
**view** [1] - 395:14
**viewing** [1] - 398:12
**viola** [2] - 416:23, 426:23

**violate** [1] - 414:14
**violated** [1] - 427:9
**violating** [2] - 427:5, 435:5
**violation** [11] - 417:24, 419:7, 419:10, 450:1, 450:8, 450:14, 457:7, 458:13, 458:17, 462:7
**violations** [9] - 419:15, 426:19, 436:18, 436:19, 437:11, 444:24, 450:15, 458:20, 465:4
**violence** [1] - 356:15
**visible** [1] - 330:4
**visor** [1] - 380:13
**visual** [1] - 407:8
**Vollrath** [3] - 362:13, 396:22, 433:13
**volunteer** [5] - 299:23, 354:10, 354:12, 354:22, 469:12
**volunteered** [6] - 292:24, 306:4, 389:8, 429:18, 469:13
**vote** [1] - 438:22
**voted** [1] - 439:19

## W

**wait** [3] - 335:20, 431:25
**waited** [1] - 417:8
**waiting** [3] - 349:14, 394:4, 394:6
**waits** [1] - 433:25
**waived** [1] - 473:7
**wake** [1] - 354:17
**walk** [1] - 470:22
**walked** [3] - 393:25, 394:7, 395:19
**walks** [1] - 384:9
**wallet** [1] - 431:23
**wants** [5] - 337:13, 418:6, 421:4, 424:10, 469:6
**warrant** [3] - 300:4, 378:18, 466:14
**Washington** [1] - 336:5
**Wauwatosa** [1] - 336:3
**ways** [1] - 426:23
**wear** [3] - 399:22, 454:3
**wearing** [4] - 310:12,

364:7, 398:5, 399:25
**wears** [1] - 394:22
**weight** [2] - 449:12, 449:15
**welfare** [1] - 379:17
**well-being** [1] - 470:25
**WERE** [1] - 473:11
**West** [1] - 365:8
**west** [1] - 306:23
**whatsoever** [1] - 360:6
**wheels** [1] - 317:19
**WHEREUPON** [1] - 473:11
**whole** [15] - 314:25, 318:4, 318:5, 356:1, 356:4, 363:11, 390:6, 400:7, 421:16, 422:18, 427:2, 440:4, 459:6, 464:5, 468:19
**wide** [2] - 394:9, 395:12
**William** [2] - 327:24, 402:13
**willing** [1] - 459:11
**Wilson** [2] - 292:8, 424:2
**WILSON** [43] - 311:10, 326:16, 333:23, 334:1, 353:2, 353:8, 353:13, 353:23, 354:1, 354:5, 354:9, 354:23, 355:18, 355:23, 356:2, 356:6, 361:25, 362:3, 370:2, 370:8, 370:11, 370:16, 370:20, 371:14, 379:23, 380:2, 380:8, 380:12, 380:17, 385:12, 385:25, 399:5, 399:11, 399:17, 402:20, 408:22, 411:23, 412:6, 412:9, 412:14, 412:19, 439:1, 452:23
**window** [3] - 359:12, 460:8, 460:11
**WISCONSIN** [1] - 474:1
**Wisconsin** [1] - 399:13
**wit** [1] - 472:24
**withdraw** [1] - 372:2
**withdrawn** [1] - 437:25

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 500 of 501   Document 80-5

**Witness** [6] - 362:21, 390:2, 400:5, 413:25, 463:24, 467:8

**witness** [10] - 323:5, 326:20, 329:15, 390:8, 400:3, 400:9, 413:23, 440:6, 463:23, 464:7

**WITNESS** [70] - 306:1, 306:10, 319:12, 322:4, 330:4, 330:7, 331:20, 343:24, 347:17, 348:1, 348:5, 349:12, 352:25, 353:6, 353:12, 353:17, 353:25, 354:4, 354:8, 354:14, 355:4, 356:1, 356:4, 357:6, 362:11, 367:21, 368:25, 370:3, 370:10, 370:13, 370:18, 371:13, 371:15, 371:20, 377:6, 377:19, 378:3, 378:9, 379:1, 379:15, 380:1, 380:4, 380:10, 380:14, 380:22, 387:11, 399:9, 399:15, 399:20, 402:22, 403:5, 407:6, 407:18, 407:25, 408:19, 409:3, 412:1, 412:8, 412:11, 412:16, 412:20, 413:9, 440:7, 452:4, 452:9, 452:12, 452:24, 461:23, 463:13, 469:7

**witnessed** [1] - 433:15

**witnesses** [5] - 363:3, 364:23, 389:24, 390:1, 433:3

**woman** [3] - 364:6, 364:8, 398:4

**wonder** [1] - 301:18

**wondering** [1] - 329:10

**word** [2] - 331:10, 446:1

**words** [4] - 315:5, 324:3, 379:13, 446:10

**worker** [1] - 294:15

**workload** [2] - 294:22, 299:6

**works** [3] - 295:12, 295:13, 429:9

**world** [1] - 422:15

**worse** [1] - 421:12

**wound** [3] - 364:15, 364:16, 429:6

**wrapped** [1] - 429:8

**write** [7] - 311:22, 312:1, 312:6, 312:9, 312:23, 313:9, 314:3

**writing** [2] - 304:6, 456:23

**written** [15] - 303:19, 306:14, 306:15, 331:8, 331:9, 337:20, 347:5, 347:23, 349:17, 350:19, 373:9, 424:22, 436:18, 436:22, 473:7

**wrote** [3] - 332:3, 351:2, 358:2

## X

**x-rays** [2] - 392:22, 397:21

## Y

**Y-e-r-k-e-s** [1] - 440:14

**year** [3] - 333:24, 356:5, 461:20

**years** [5] - 390:16, 390:18, 464:17, 468:5, 468:11

**yelling** [1] - 362:14

**Yerkes** [2] - 440:2, 440:14

**YERKES** [1] - 440:3

**yesterday** [19] - 301:17, 307:4, 310:15, 313:13, 319:14, 319:20, 329:5, 335:2, 336:21, 344:13, 351:16, 351:21, 353:8, 363:15, 366:20, 375:2, 400:11, 405:4, 405:13

**yesterday's** [1] - 297:13

**yourself** [13] - 299:23, 301:18, 303:6, 321:7, 341:6, 341:13, 367:24, 376:10, 404:13, 441:22, 459:11,

470:6

## Z

**ZIEGER** [1] - 400:6

**Zieger** [15] - 302:23, 303:7, 303:10, 304:22, 304:24, 305:11, 313:1, 314:15, 338:5, 338:22, 339:6, 347:19, 396:10, 423:7, 424:18

**Zieger's** [1] - 436:9

**Zimmerman** [1] - 375:24