STATE OF WISCONSIN        CIRCUIT COURT        MILWAUKEE COUNTY

---

SHANNON LEWANDOWSKI,

    Petitioner,

v.                                      Case No.  2016-CV-9243

BOARD of FIRE and POLICE COMMISSIONERS
of the CITY OF MILWAUKEE,

    Respondent.

---

## REPLY BRIEF OF PETITIONER SHANNON LEWANDOWSKI

---

Petitioner Shannon Lewandowski submits this reply brief in support of her petition.

### RESPONSE TO BACKGROUND

Respondent Board of Fire and Police Commissioners of the City of Milwaukee has filed a thirty-six page brief, including a lengthy recitation of the "Background" of this matter.  Although extremely detailed, the Board's recitation either omits certain facts and evidence, or suggests they are of no import.  Throughout the brief, the Board riddles its argument with commentary on Lewandowski's different "versions" of events, painting Lewandowski as a liar because she added details to her statements over time.  This commentary ignores much more likely reason for the evolution of her statements:  her memory of the car accident and its immediate aftermath was scrambled

by being knocked unconscious in a car accident and the details of what happened reemerged over time and after speaking with or reviewing the statements of others.

At the top of page 3 of its brief, the Board states unequivocally that Lt. Hanley ordered Detective Juanita Carr "to immediately proceed" to a crime victim's home to try to retrieve a firearm and told her time was of the essence. Nowhere in that narrative does the Board mention or acknowledge Carr's testimony that the conversation with Lt. Hanley had occurred earlier and that she already had gone to the victim's home before she ever saw Lt. Hanley. (R.74 at 160:13-162:9.) Further, although the narrative correctly states that Lewandowski was at District 3 that evening, any suggestion that she heard Lt. Hanley direct Detective Carr as asserted in the brief is wrong – Lt. Hanley and Lewandowski had no interaction at District 3. (R.74 at 162:23-163:20; 165:15-166:3.)

In the next paragraph, the Board describes an encounter between Lewandowski's son, Jordan Lewandowski, and Shorewood police, stating that when Jordan handed Shorewood Police Officer Cody Smith his driver's license and his mother's business card, he also said that his mother was on her way to meet them there. Lewandowski denied that she ever told Jordan she was coming to Shorewood to assist in dealing with his potential arrest. (R.56:10, 20-21; R.74:247:5-250:11.) Jordan Lewandowski denies telling Officer Smith his mother was coming to meet them. (R.74 at 197:24-198:11.) Detective Carr never stated that Lewandowski and she were on the way to intervene in Jordan Lewandowski's traffic stop. (*Id.* at 164:22-166:17.) Officer Smith, himself, is unsure whether Lewandowski was actually on the way to the scene of the traffic stop. (R.74 at 28:18-25.)

2

At the top of page 4 of its brief, the Board states: "Sgt. Riley told Lt. Hanley that others at the scene had reported to him that Lewandowski was on her way to UWM because her son had been pulled over." These "others" have never been identified and remain unknown to Lewandowski -- and apparently to the Board, the Chief and the entire MPD -- to this day. When questioned at the hearing, Lt. Hanley admitted that virtually all of the information he received when he arrived on the scene came from Sgts. Riley and Grubich (*Id.* at 36:16-36:25) who received their information from unidentified officers. Sgt. Riley was not called at the hearing.

The paragraph beginning at the bottom of page 4 and ending at page 5 contains the Board's synopsis of Lt. Hanley's visit to the hospital after the car accident. First, the statements attributed to Lt. Hanley in this paragraph are inconsistent with his own statements. At various times, Lt. Hanley has stated, "we spent 30 minutes with Lewandowski" (R.51); "I spent 20 minutes in the hospital speaking with Lewandowski." (R.74 at 42:16-43:16); and that when he arrived at the hospital, Lewandowski was "under medication" and "receiving treatment" Hanley said that he was "unable to receive a response from Lewandowski about what happened." (R.56 at 16.) More important, Lt. Hanley's conclusion that Lewandowski suffered only an ankle injury and otherwise was lucid and had no trouble communicating is in stark contrast to: his prior statements; to Lewandowski's own medical records, which state she suffered cervical musculoligamentous, a neck injury that causes delayed speech and memory loss; a concussion; whiplash; a sprained right ankle; a torn ankle ligament; bruising and swelling (R.60); to testimony of officers at the scene of the accident

indicating that she was hysterical, yelling and screaming (R.74:146,147,217-218,226); and to testimony of those who observed Lewandowski at the hospital that she was slurring her words and, in the words of those who observed her, was not making any sense. (R.74:146,211,217,218,233-235). Indeed, Lewandowski has no memory whatsoever of speaking with Lt. Hanley. (R.74 at 258:22-259; R.56 at 19-22). Her first memory of speaking with Lt. Hanley was the telephone call a few hours later. (R.74 at 259:23-260:15.)

The Board next discusses the 6:38 a.m. telephone call from Lewandowski to Lt. Hanley. Despite knowing that Lewandowski had been involved in a serious car accident just over four hours earlier, that she was rendered unconscious at the scene and that she had been awake for hours, Lt. Hanley questioned Lewandowski about the car accident. (R.56 at 16-17; R.74 at 44:16-51.) Lewandowski again adamantly denies Lt. Hanley's version of what Lewandowski allegedly told him during that telephone call – that she was on her way to UWM and was speeding with her emergency lights activated to get there quickly. (R.74:262, 267-68, 281;R.75:340.)

The Board also emphasizes that during this 6:38 a.m. telephone call, Lewandowski did not provide another reason for activating her emergency lights – *i.e.*, that she did so to warn another driver pulling into traffic to prevent an accident, suggesting subsequent fabrication to cover the alleged trip to UWM. Yet, Lt. Hanley's version of events not only is inconsistent with every statement Lewandowski made but also is inconsistent with Detective Carr's testimony that they were on their way to District 5 to meet Officer Beasley, not to go to UWM (R.74:165:2-14; R.49 at 6; R.56 at 17-

4

19), and with Officer Beasley's stipulated statement. (R.55.)  Detective Carr, who was in the vehicle with Lewandowski, stated that Lewandowski said nothing about going to UWM or intervening in Jordan Lewandowski's traffic stop in anyway. (R.74 at 164:12-165;R.49 at 6; R.56 at 17-19.)  Officer Beasley's statement also corroborates that at the time of the car accident, Lewandowski and Detective Carr were on their way to District 5 to meet with Beasley.  These accounts of Detective Carr and Officer Beasley were not rebutted.

Lt. Hanley interviewed Detective Carr just two days later. Lt. Hanley testified Detective Carr told him they were going to District 5 to help a friend (Officer Beasley) before going to back to the victim's house to search for the weapon (R.49 at 6;R.56 at 17) and that Lewandowski activated the emergency lights to scare off prostitutes. (*Id.*)  As Detective Carr later clarified in her interview with Sgt. Ziegler, Lewandowski activated the lights to prompt a vehicle to move over and said something about prostitutes. (R.56 at 17-19.)  This is consistent with Lewandowski's statement that the vehicle was in the bike lane and she was concerned that the driver, whom she believed was speaking with some prostitutes, would pull into traffic, prompting her to sound her siren and "blurp" her lights. (R.56 at 19;R.74 at 252-253.)  Detective Carr said nothing to Lt. Hanley about being enroute to UWM or leaving the lights activated to get to UWM quickly.  (R.49 at 6; R.56 at 17-19.)

Beginning at page 9 of its brief, the Board discusses Lewandowski's responses to the charges against her, noting that her October 11, 2015 response was the first time she mentioned going to District 5 to help Officer Beasley with filing a felony case, in

addition to assisting her with a personal matter. If, by this comment, the Board intends to suggest recent fabrication, again, that suggestion is rebutted by Officer Beasley, whose statement unequivocally states that Lewandowski was on her way to District 5. (R.55.)

Later on pages 9-10 of its brief, the Board takes exception to the notion of Lewandowski's argument that MPD members were targeting her because she dared to help Officer Beasley, who had told Lewandowski she had been sexually assaulted by another officer. Did Lewandowski challenge what she believed was the "old boys' club" mentality of the MPD? Absolutely. In its brief, the Board characterizes that challenge "vitriolic" and "brazen," and used terms such as "carp" and "sniping." Whether these comments cross the line into an ad hominem attack is for the Court to decide, but they certainly are not necessary for the Board to make its point that it disagrees with Lewandowski's statement.

At page 13 of its brief, the Board discusses two motions Lewandowski filed prior to the hearing, including a motion for a bill of particulars and a motion to suppress the statements Lewandowski made in a 6:38 a.m. telephone call that occurred just a few hours after Lewandowski was rendered unconscious in the accident. The issue of whether Lt. Hanley was conducting an accident investigation, as opposed to interrogating Lewandowski for her actions that morning, are addressed later in this brief.

## STANDARD OF REVIEW

Lewandowski recognizes she is not entitled to a *de novo* review and never has claimed that such a review is proper. Yet, the Board's recitation of the standard of review suggests that, because the only issue before the Court in this "just cause" review is sufficiency of the evidence to support the Board's conclusion, and because this Court must give deference to facts as found by the Board, then the Court must affirm the Board's decision. That is not the case, as this Court still must determine whether that evidence is sufficient to sustain the charges and affirm the ordered discipline.

Lewandowski asks this Court to remain mindful of the Wisconsin Supreme Court's admonitions. First, "[t]he question to be determined by the court shall be: Upon the evidence was the order of the board reasonable?" *Larson v. City of Tomah,* 193 Wis. 2d 225, 232, 532 N.W.2d 726 (1995) (quoting *State ex rel. Enk v. Mentkowski,* 76 Wis. 2d 565, 571–72, 252 N.W.2d 28, 31 (1977)). Second, the purpose and intent of statutory review of a board or agency's application of the just cause standards is to ensure "that police officers and firefighters are not 'wrongfully disciplined and provides them with a sufficient remedial process in the event that they are wrongfully disciplined.'" *City of Madison v. State Dep't of Workforce Dev., Equal Rights Div.,* 2003 WI 76, ¶32, 262 Wis. 2d 652, 669, 664 N.W.2d 584.

In other words, this Court should be not be a rubber stamp of the Board's ruling. The Court must review all of the facts and evidence and then determine whether those facts can sustain both the charges and the discipline imposed. In other words, was it reasonable to discipline Lewandowski and terminate her employment for her actions?

## REPLY ARGUMENT

I.   **The Board's Findings Of Just Cause To Support The Three Charges Against Lewandowski Are Not Reasonably Supported By The Facts.**

The Board begins its argument by asserting that Lewandowski has not made a cognizable claim under section 62.50 because she has not challenged the "evidentiary sufficiency" of the Board's findings. This statement ignores Lewandowski's extensive recitation of facts in her initial brief in which she challenged the evidence, including the testimony of Lt. Hanley that was relied on extensively by the Board. She challenged the notion that she was completely coherent and capable of being questioned by her superior officer only hours after being rendered unconscious in a car accident that left her hysterical, slurring her words and not making sense. She challenged the Chief's position that providing additional information in her PS-21s after her initial interrogation by Lt. Hanley, whether that information arose in her own memory or as a result of her memory being refreshed by statements of others, was evidence that she lied. She challenged the anonymous "others" who said she was going to UWM, as well as Lt. Hanley's version of the early morning interrogation, as being refuted by not only her own testimony, but also that of Jordan Lewandowski and Detective Carr and the statement of Officer Beasley. Contrary to the Board's claim, Lewandowski *does not* concede that the factual record is sufficient for the Board to have reasonably concluded that the just cause standards were met.

At page 19 of its brief, the Board argues that Lewandowski's argument that statements attributed to her at the scene should not be considered is irrelevant because

8

the Board did not consider those statements. The flaw in this reasoning is that it ignores the fact that it was that very reporting that led Lt. Hanley to call detectives to investigate the scene -- not only because of injuries to detectives, but also due to "*the need for detailed interviews due to the possibility of violations of Rules and Regulations and SOP.*" (R.50 at Bates #184) (emphasis added). Lt. Hanley's report itself confirms that he relied on the hearsay presented to him at the scene to open his investigation into whether Lewandowski had violated any Department rules almost immediately after reporting to the scene of the accident. Lt. Hanley was armed with that information when he interrogated Lewandowski and, most likely, used it to his advantage during the interrogation. Thus, contrary to the Board's written finding, by relying on Lt. Hanley's testimony, it did rely on a significant amount of hearsay testimony that was presented to Lt. Hanley at the scene of the accident.

Next, it is simply not reasonable for the Board or anyone to give credence to Lt. Hanley's version of events considering the proximity of Lewandowski's accident and injury, and that her "recollection" of events that morning was inconsistent with the testimony of Jordan Lewandowski, Detective Carr and Officer Beasley, all of whom stated that Lewandowski was *not* going to UWM. If Lewandowski "changed her story" during the disciplinary investigation as the Board claims, then why is it that Jordan Lewandowski has consistently maintained he never asked his mother to come to UWM – indeed never told his mother he was at UWM – and that she never told him she was going to meet him?

9

The Board argues at page 20 of its brief that it relied on the testimony of Police Officer Smith that Jordan told him his mother was coming to meet them at the traffic stop. While the Board gives significant weight to this testimony, even a cursory review of Officer Smith's testimony acknowledges that his memory of events is far from crystal clear and he took no notes nor authored any report related to his interaction with Jordan Lewandowski. (R.74 at 28-29:1.)

The Board criticizes Detective Carr for changing her story. The change, however, related to who told her to go to the crime victim's house and when. It was that testimony that "strained credulity." Detective Carr's testimony that Lewandowski and she were going from District 3 to District 5 remained unchanged from the time she first spoke with Lt. Hanley, only two days after the accident, to the point of her testimony before the Board. Also, interestingly, the Board believed that Detective Carr suffered memory loss as a result of the accident, apparently because she mentioned it, but did not believe that Lewandowski suffered similar memory loss or confusion, despite her medical records. Ignoring medical records in favor of Lt. Hanley's testimony (which Lewandowski adamantly and, yes, combatively challenged) simply is not reasonable under all the facts and circumstances of this case.

As for Officer Beasley's statement, the Board argues that it considered it, but did not "blindly" accept it, citing Lewandowski's "inconsistency" in explaining why she was going to District 5. This argument misses the point. Regardless of why she was going to District 5 -- be it a personal matter or to help file a felony matter or both -- Lewandowski, Detective Carr and Officer Beasley all consistently stated that

Lewandowski and Detective Carr were enroute to District 5 at the time of the accident. Contrary to the Board's conclusion on page 21, no reasonable view of the evidence would lead to the conclusion that all three women were lying about that fact.

II. **Lewandowski's January 19, 2015 Statements Were Taken In Violation Of Her Rights; Therefore, The Board's Reliance On Those Statements To Impose Discipline Violated The Just Cause Standards And The Board's Order Should Be Reversed.**

A. **It was not reasonable for the Board to rely upon Lt. Hanley's version of statements allegedly made to him by Lewandowski during the telephone call immediately following the accident.**

The Board does not challenge Lewandowski's recitation of the law governing the taking of statements under WIS. STAT. §164.02. Instead, the Board argues that Lewandowski defines the term "interrogation" too broadly. As the Board concedes at page 24 of its brief, no Wisconsin case defines "interrogation" in the context of this statute. The Board devotes several pages of its brief to attempt to distinguish the cases Lewandowski cited in her brief, citing yet another case as establishing a "roadmap" for this Court's consideration of whether Lt. Hanley conducted an interrogation during the early morning telephone call and then arguing that there was no interrogation.

At page 23 of its brief, the Board engages in a lengthy attempt to distinguish the United States Supreme Court's holding in *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 267 (1975), holding that an employee has a "right of union representation at investigatory interview which the employee reasonably believes may result in disciplinary action against him." A closer look at Lewandowski's brief confirms that she cited *Weingarten* only in the context of pointing out that the provisions of the *Weingarten* holding are

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 11 of 26   Document 80-10

codified with respect to law enforcement officers at WIS. STAT. §164.02. Although no caselaw expressly states that the statute was a "wholesale adoption" of *Weingarten*, the Board also has presented no authority indicating that the statute's enactment, which occurred after *Weingarten*, was not in recognition of, or in response to, the Supreme Court's decision. The Board attempts to limit *Weingarten* on grounds that the NLRB statutes do not apply to the states; however, that argument ignores the Court's recognition of "well-established abitral authority" that employees are entitled to union representation "at investigatory interviews which the employee reasonably believes may result in disciplinary action against him." *Weingarten*, 420 U.S. at 267.

In other words, if an employer conducts any type of investigatory interview, the employee is entitled to the benefit of certain union rules, including having a union representative present during the investigatory interview. That is exactly the purpose of WIS. STAT. §164.02, which provides that law enforcement officers under investigation for internal department rule violations are entitled to the following: (1) to be informed of the nature of the investigation prior to interrogation, (2) to be provided a representative should the officer request one, and (3) that "[e]vidence obtained during the course of any interrogation not conducted in accordance with sub. (1) may not be utilized in any subsequent disciplinary proceeding against the law enforcement officer." WIS. STAT. §164.02(1)(a-b) and (2).

Despite this, Board argues, without any support, that the "investigatory interview" of an employee substantively differs from an "interrogation" of an employee by her employer. The Board attempts to distinguish *Slawinski v. Milwaukee City Fire and*

*Police Com'n*, where the Court of Appeals affirmed the circuit court's application of the statute in ruling a petitioner-officer's statements made without being informed of his rights violated the statute. 212 Wis. 2d 777, 794-95, 569 N.W.2d 740 (Ct. App. 1997). The Board argues that the decision in *Slawinski* is unavailing because in that case the chief of police ordered an employee to his office to confront the employee. That factual distinction does not change the analysis. As much as Lt. Hanley and the Board want to deny it, Lt. Hanley's own report states that he saw a "need for detailed interviews ***due to the possibility of violations of Rules and Regulations and SOP.***" (R.50 at Bates #184.) (emphasis added). Lt. Hanley's knowledge that the incident involved potential violations should have triggered an immediate presentation of the matter to Internal Affairs, ensuring that Lewandowski was afforded her rights under the statute.

The Board next criticizes Lewandowski's citation of *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980), in which the court defined an interrogation as "express questioning or its functional equivalent" – *i.e.*, "any words or actions" by the investigator that the investigator "should know are reasonably likely to elicit an incriminating response" by the suspect constitutes an interrogation. *Id.* The Board attempts to distinguish *Innis* because it was a criminal case considering whether the defendant was subjected to "interrogation" for *Miranda* purposes. Although it is true that *Innis* did arise from an arrest, nothing in the decision supports the Board's conclusion that the Court's definition does not apply here. The concern that applying that definition would mean that virtually every discussion between a supervisor and an employee would be deemed an interrogation is mere hyperbole and should be ignored.

13

This brings us to *Oddsen v. Bd. Of Fire and Police Commissioners for City of Milwaukee*, 108 Wis. 2d 143, 321 N.W.2d (1982). The Board contends that *Oddsen* supports its conclusion that an investigation differs from an interrogation for purposes of the statute, citing the court's reference to investigatory vs. accusatory interrogation. But let us be clear, in *Oddsen*, as in this case, the MPD argued that the questioning of its police officers was merely investigatory, a claim the court rejected. The issue, as the Board promulgates it, is whether a supervisor's questioning of a police officer, where the supervisor believes the officer violated Rules and Regulations and SOP, is investigatory and not accusatory. *Oddsen* does not answer that question. *Weingarten* and *Slawinski* do. Lewandowski was entitled to the benefits of WIS. STAT. §164.02.

Beginning at page 26 of its brief, the Board purports to apply *Oddsen* to convince this Court that Lt. Hanley's early morning telephone call with Lewandowski was merely an investigation, not an interrogation. This entire argument misses a salient point, which the Board cannot deny. In addition to WIS. STAT. §164.02, Lewandowski has the rights afforded to her by the Department's Rules and Regulations; specifically, Milwaukee Police Department Standard Operating Procedure, General Order 2009-33, p. 6, states:

> If a Department member is under investigation for an alleged violation of Department Rules, Procedures, or Position Responsibilities *and is subject to an interview for any reason*, which *could* lead to disciplinary action, demotion or discharge from the Milwaukee Police Department, such interview *shall* comply with the following requirements . . . .

The order's use of the term "interview" – as opposed to the statute's use of the term "interrogation" could mean one of two things: either the drafters of the order believed

"interrogation" as used in the statute should be construed as meaning any interview that might lead to disciplinary action, OR the drafters intended its departmental order to provide even greater protection to officers. Under either scenario, as long as the questioning "could" lead to discipline, the Department had the burden of providing the benefits set forth in the rule.

The Board complains at the bottom of page 26 of its brief that any questioning, including why a report is late, would be considered an interrogation because it "could" raise questions as to a rule violation. Although the Board's example likely was intended to show that Lewandowski's interpretation could lead to an absurd result, asking a subordinate why he or she failed to file a report, certainly could be "accusatory" as opposed to investigative. Moreover, contrary to the Board's claim, Lewandowski is not asking the Court to imply suspicion of wrongdoing into virtually every conversation, only into those conversations where a superior officer is already on record as believing an officer's actions involved rule violations before speaking with the officer.

Moreover, the Board's argument ignores its own order. Given the clear language of General Order 2009-33 -- any "interview" that "could" lead to discipline -- it seems that even a minor infraction does require the invocation of the rule's procedures, including issuance of a PS-21. If the Department does not like this interpretation, its remedy is to amend its general order, not to disparage Lewandowski for arguing a position consistent with that order.

15

It is undisputed that Lewandowski called Lt. Hanley only a few hours after being rendered unconscious in the accident and being diagnosed with a condition that affected her memory. The Board does not deny that the burden is on the Department, not Lewandowski, to ensure that she was properly informed of her rights before discussing with her supervisor a situation that may have led to discipline. Despite the fact that he already had concerns as to whether any departmental rules or regulations had been violated in relation to the accident, Lt. Hanley did not caution Lewandowski that their discussion may raise questions about her actions that could subject her to discipline. He did not suggest that the interview could take place at a later time when she was feeling better. Certainly there was no urgency mandating immediate questioning as Detective Carr was not interviewed until two days later.

At page 27 of its brief, the Board argues that "despite the language" in his report, Lt. Hanley was conducting an "accident investigation." In other words, the Board is asking this Court to do what the Board did – ignore clear, documentary evidence of Lt. Hanley's intent in favor of believing his self-serving testimony. Further, although the Board argues that Lt. Hanley was not authorized to initiate an investigation, nothing in Wis. Stat. §164.02 or the General Order -- or in *Oddsen* for that matter -- requires that the interrogation or interview must be conducted by someone authorized to initiate disciplinary investigations. Finally, regardless of Lt. Hanley's intent, it cannot be disputed that the primary basis for discipline in this matter was information Lt. Hanley gained during the early morning telephone call with Lewandowski.

The Board seems to believe Lt. Hanley deserves kudos for not asking Lewandowski about the accident while she was at the hospital, yet justifies his participation in the telephone call only a few hours later. Yes, Lewandowski initiated the telephone call; however, when she asked Lt. Hanley if he wanted to know what happened, his response should have been to the effect of "yes, let's find a time to talk after you have had a chance to rest." There was no reason for him to obtain her version of events moments after she was released from the hospital – there were no exigent circumstances compelling any "investigation" at that time.

Finally, although the Board rejects the argument, it is true that the very fact of the accident could raise questions that could lead to discipline. Even absent any discussion of going to UWM, even if Lewandowski and Detective Carr were on their way to retrieve the gun from the shooting victim's home, information garnered during the alleged "accident investigation" as to speed and use of emergency lights still could have led to discipline. Thus, Lewandowski was entitled to the benefits afforded to her under both the statute and the Department order.

### B. Other evidence against Lewandowski was tainted by Lt. Hanley's version of the telephone call.

At pages 28 to 30 of its brief, the Board argues that there was sufficient evidence for just cause even if the statements made in the telephone call were suppressed. The Board ignores the reality that its findings were rooted in and tainted by Lt. Hanley's version of Lewandowski's statements during the telephone call.

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 17 of 26   Document 80-10

The Board argues that the first charge of inappropriate use of time is sustained by Officer Smith's testimony that Jordan Lewandowski said his mother was on the way to meet them. As discussed above, Officer Smith took no notes, authored no report and his memory was less than clear, and both Lewandowski and Jordan deny that Jordan ever made this statement. Further, it is quite a leap for the Board to conclude that Lewandowski asked Jordan for his location because she was going to rush over there, as opposed to asking as a concerned mother who wanted to reassure herself her child was in a safe place. Equally unpersuasive is Lt. Hanley's testimony that going to District 5 was not a legitimate law enforcement objective, and his testimony that she removed herself from an assignment is misleading, at best, despite the fact that Lewandowski and Beasley's statements indicate that Lewandowski was going to assist Beasley with some felony arrest reports. (R.55.) Is helping a fellow officer by providing counsel and perhaps even filing a report about a sexual assault by another officer truly an "inappropriate use of time" in the MPD? Lt. Hanley never gave Lewandowski the assignment and certainly did not tell her time was of the essence, such that she had any reason to know that going to District 5 first would constitute a rule violation.

As for the second charge, the Board tacitly admits that the only evidence of failure to operate a vehicle appropriately was that the emergency lights were activated. This evidence is also tainted by Lewandowski's alleged statement that she was speeding to go to UWM. Remove those statements and all that remains is testimony from Lewandowski that mid-block between 35th and 36th Streets on North Avenue, a vehicle was in the bike lane and she was concerned the driver, whom she believed was

speaking with some prostitutes, would pull into traffic, prompting her to sound her siren and "blurp" her lights. (R.56 at 19; R.74 at 254.) The Department never presented any evidence that this action violated any department rule. As for the testimony about "leaving the lights on," neither Lt. Hanley nor Sgt. Ziegler were present and neither knew exactly where the squad was when Lewandowski activated the lights. Lewandowski and Detective Carr have hazy memories of what happened. However, given the car speeding down 35th Street before entering the intersection, focusing on the approaching vehicle and attempting to avoid an accident was a more reasonable use of the squad than turning off the lights, especially when the lights could have, but unfortunately did not in this case, alert the speeding driver to her environs.

The Board belittles Lewandowski's position on the third charge, calling it "laughable" and "an unsympathetic gripe." The Board's attempt at literary flourish aside, Lewandowski certainly is not arguing that "she was left no recourse but to lie." Her statements are not irreconcilable and any inconsistencies are attributable to her memory being refreshed by the statements of others, not by fabrication at any stage of the investigation. Moreover, the Board's findings are rooted in its determination of Lewandowski's credibility, a determination that calls back to the statements allegedly made during the telephone call. But for Lt. Hanley's version of events, Lewandowski would have had no reason to vehemently challenge the accusation of her fellow officers that she was derelict in her duty and violated her duty by speeding off to help her son. As for stating that she never saw Lt. Hanley at the hospital, is it really so difficult to believe that after suffering a concussion and memory loss, that she simply did not

remember seeing him? It is not reasonable to conclude that Lewandowski's lack of recollection and memory loss justifies a lack of integrity charge. Similarly, Lewandowski's reaction to the allegations against her – based in part on hearsay comments by TAC officers with an ax to grind – was to challenge the accusations and question the integrity of those making the allegations and failing to investigate them. The determination that Lewandowski acted without integrity simply is not reasonable.

### III. Lewandowski Was Entitled To Know The Nature Of The Charges Against Her.

The Board characterizes the Chief's failure to advise her of the details and particulars of the charges against her as a purely legal claim. It may have been a legal matter prior to the hearing, but at and after the hearing, the underlying issue of the lack of particulars goes to the overall fairness of the proceeding. Again, the statutory purpose of the just cause standards is to ensure that officers like Lewandowski "are not 'wrongfully disciplined and provides them with a sufficient remedial process in the event that they are wrongfully disciplined.'" *City of Madison v. State Dep't of Workforce Dev., Equal Rights Div.*, at ¶32; *Larson*, 193 Wis. 2d at 232. If the overriding standard in a just cause hearing is that the findings as to the charges and discipline imposed must be reasonable, how can they be reasonable when the officer is not afforded information necessary to address the charges at the hearing? Like the admission of Lewandowski's statements, proceeding without providing her with the particulars of the charges tainted the entire proceeding, raising serious questions as to the reasonableness of the Board's findings and decision.

At page 31 of its brief, the Board criticizes Lewandowski for not setting forth caselaw cited in the Board opinion as to the requirements of the notice of charges. There is nothing "telling" about the decision not to restate caselaw that is not in dispute. Yes, the charges need not be drawn with the precision of an indictment and, yes, the key is that the notice must provide information sufficient to allow the officer to provide a defense. Where the Board and Lewandowski disagree is the application of these standards. It is her position that the charges against her were ambiguous and failed to specify which act or acts allegedly violated the Code of Conduct.

As for the first charge, the Board takes a conclusory sentence out of context and suggests it was the only argument Lewandowski made. To the contrary, Lewandowski did not merely assert that the Department failed to allege a single law that was violated. The allegation as to the first charge stated that she was operating a squad with emergency lights activated, cited her explanation of why the lights were activated, and then asserts that she failed to operate a vehicle in a safe and courteous manner while complying with all traffic laws. The Department may not have to cite chapter and verse as to what traffic law was violated, but certainly it must provide more than the vague and ambiguous allegation, quoted at page 32 of the Board's brief, that fails to identify how her driving was unsafe or uncourteous and/or how she violated any traffic laws. In addition, the allegation that the vehicle was totaled does not provide a sufficient factual basis for Lewandowski to defend a claim that she totaled the car. The allegation is akin to a tort claim that asserts damages but fails to assert any facts establishing cause.

21

The Board's focus in the second charge, failure to properly use her time to accomplish the mission of the Department, is the allegation that Lewandowski did not respond to assist with a firearm recovery and instead went to District 5 for a "personal issue." This allegation does not provide sufficient facts for Lewandowski to defend the allegation as it is vague and ambiguous as to how and why she failed to accomplish the mission of the Department. Had the accident not occurred, Lewandowski would have accomplished two tasks that morning – assisting a fellow officer with filing a felony complaint against another officer who assaulted her, and retrieving, or at least attempting to retrieve, a firearm. Although Lt. Hanley testified that his direct order to Detective Carr should take precedence, that information was not set forth in the allegation. Given the consensus that detectives are generally free to use their discretion to determine what to do during their shifts, absent an assertion that Lewandowski disobeyed an order, the allegation is insufficient for her to know what she did wrong.

As for the third charge, Lewandowski was charged with failing to be forthright and candid in connection with an administrative inquiry. As noted in Lewandowski's initial brief, the charge sets forth a series of alleged facts and a bare conclusion, failing to assert what Lewandowski allegedly lied about, when she lied, what evidence proves the lie, and other relevant facts necessary to defend against the charge.

The need for detailed information to defend the third charge is even greater in this case given what happened. As a result of the accident, Lewandowski was badly injured and suffered memory loss. Did she say Lt. Hanley did not come to see her in the hospital? Yes. Did that statement indicate a lack of candor? Not if she had no

recollection of seeing him there due to her memory loss. Similarly, any discrepancy between her statements in the early morning telephone call with Lt. Hanley and her PI-21 are readily explainable as a natural consequence of memory loss followed by refreshed recollection. Knowing that Lewandowski suffered memory loss, a fact clearly established by her medical records, submitting a bare bones allegation was simply insufficient for her to defend herself.

Finally, the Board is correct that *State ex rel. Richey v. Neenah Police and Fire Comm.*, 48 Wis. 2d 575, 582, 180 N.W.2d 743 (1970), and *State ex rel. Meissner v. Milwaukee Cty. Civil Serv. Comm'n*, 56 Wis. 2d 438, 445, 202 N.W.2d 13 (1972), state as a general rule that "conduct unbecoming an officer" can be alleged generally. However, the Board's reliance on this "low bar" is misplaced. *Meissner* also states that the "degree of procedural rigor required" varies from case to case and "***depends upon the particular facts*** and upon the weight to be afforded to private interests as contrasted to governmental interests in the circumstances." *Meissner*, 56 Wis. 2d at 444 (emphasis added) (citing *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971); *Goldberg v. Kelly*, 397 U.S. 254, 263 (1970)). "These general observations are applicable to the notice requirements of due process ***which 'will vary with circumstances and conditions*.'** The notice requirement of due process cannot be defined with any 'rigid formula.'" *Id.* (emphasis added) (quoting *Walker v. Hutchinson City*, 352 U.S. 112, 115 (1956)). Meissner also noted that the United States Supreme Court has "stressed the reasonableness requirement of notice and stated . . . that the notice requirement is such that is 'reasonably calculated, ***under all the circumstances***, to apprise interested parties of the

23

pendency of the action and afford them an opportunity to present their objections.'" *Id.* (emphasis added) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)).

Here, the Board's finding that the allegations against Lewandowski were sufficient to allow her to defend herself paid no heed to the particular circumstances of this case. All of the charges, including the integrity/lack of candor charge, arise from or are related to events that occurred immediately before or a few hours after Lewandowski was injured in a car accident that rendered her unconscious and resulted in a concussion and memory loss. Certainly, these circumstances require greater procedural rigor in providing notice of allegations of a lack of candor and forthrightness than the general allegations set forth here. Forcing Lewandowski to defend any charge, let alone an integrity charge, under these circumstances without advising her of the specific factual basis for that charge, was neither fair nor proper, and certainly fails to meet the criteria for just cause set forth in §62.50(17)(b) and to ensure that she was not wrongly disciplined.

## IV. The Chief Failed To Establish Just Cause For The Discipline Imposed On Lewandowski And For Terminating Her Employment.

The Board's characterization of Lewandowski's final argument as a "throw-away" or "afterthought" or "a proverbial spaghetti throw at a wall" argument is both unnecessarily snarky and far from true. Of course she reiterated and summarized her earlier arguments. Those arguments go to the heart of whether Lewandowski's actions were an aberration resulting from the extreme circumstances surrounding the events

leading to the allegations, or whether she was a "bad cop" whose termination was necessary for "the good of the service."

The Board relies on its own findings to support its decision to terminate Lewandowski rather than suspend her. That conclusion simply is not reasonable. Lewandowski has never denied the importance of the chain of command and the Department never claimed, or established, that she violated a direct order. The Board concluded she lied based on her rejection of Lt. Hanley's statements as to what she allegedly told him and Officer Smith's statements. But put her reaction in context. At the accident scene, she was concussed and hysterical. At the hospital, she was diagnosed with memory loss. Rather than give credence to the notation in her medical records than she was suffering from memory loss, or simply recognizing that most people who go through a traumatic experience do not immediately recall all of the details of that experience, the Department painted her as a liar and a troublemaker. Did she challenge the credibility of her accusers? Yes, because her recollection of events was so different from theirs. The Board's final salvo, that Lewandowski did not immediately respond to a question about understanding the priority of assignments, with all due respect to the Board, was irrelevant to the rules that she was accused of violating. Lewandowski was a 17-year veteran of the Department. She was a decorated and experienced Detective. Of course she knew how the chain of command operated, and she spent the entirety of her career protecting and serving the citizens of Milwaukee. She deserves better than to be summarily fired from her vocation and livelihood because she was "dishonest" in her recollection of events following a serious

car accident where she lost consciousness and underwent several months of medical treatment and occupational therapy for memory loss and speech issues. (R.60.)

## CONCLUSION

For all of the foregoing reasons, petitioner Shannon Lewandowski respectfully urges this Court to reverse the Board's determination and order and that she be reinstated to her position of Detective in the City of Milwaukee Police Department.

Dated this _10th_ day of March, 2017.

GIMBEL, REILLY, GUERIN & BROWN LLP

By:

D. MICHAEL GUERIN
State Bar No. 1010343
dmguerin@grgblaw.com
STEVEN C. McGAVER
State Bar No. 1051898
smcgaver@grgblaw.com
Attorneys for Appellant
Shannon Lewandowski

POST OFFICE ADDRESS:

330 East Kilbourn Avenue, Suite 1170
Milwaukee, Wisconsin 53202
Teletelephone: 414/271-1440
*cit/Lewandowski,Shannon/a/replybrieftocircuitcourt2017-03-08*

26