# MILWAUKEE POLICE DEPARTMENT
## INTERNAL INVESTIGATION

## DET. SHANNON LEWANDOWSKI
## SEX DISCRIMINATION COMPLAINT

March 1, 2016

Anna M. Pepelnjak
Weiss Berzowski LLP



RECEIVED
MAR 0 4 2016
FIRE AND POLICE COMMISSION

### I.   Overview:

On October 14, 2015, Milwaukee Police Department Detective Shannon Lewandowski submitted a citizen complaint to the Fire and Police Commission. Ex. 1, October 13, 2015 Complaint. FPC Executive Director MaryNell Regan assigned Anna M. Pepelnjak of Weiss Berzowski LLP to investigate the complaint.

The following persons were interviewed: Det. Shannon Lewandowski (three meetings), Sgt. Shannon Taylor, Sgt. Justin Sebestyen, Lt. Jeffrey Norman, Capt. Thomas Stigler, PO Clayton Amborn and Sgt. Roberta Klein. The investigator issued an FPC PI-21 to Det. Melanie Beasley, but Det. Beasley declined to participate in the interview because she is on an indefinite medical leave.

Det. Lewandowski's complaint has been divided into three component parts for purposes of this analysis: (I) Lawrence Poggenburg matter; (II) PO Melanie Beasley matter and (III) PO Clayton Amborn matter. Each subsection contains findings and conclusions, leading to the final conclusion.

### II.   Lawrence Poggenburg matter:

#### A.   Findings:

On November 28, 2011, Detective Shannon Lewandowski sent a memo by registered mail to Chief Edward A. Flynn. Ex. 2, 09/01/2011 Memo, Det. Lewandowski to Chief Flynn. In the memo, Det. Lewandowski complained about a number of events of allegedly harassing conduct by her neighbor, Lawrence Poggenburg, and about the Milwaukee Police Department's purported failure to address the problem. At interview, Det. Lewandowski stated that she never heard from Chief Flynn in response to this memo. Det. Lewandowski did not identify Chief Flynn as a target of her complaint either in writing or at interview.

Det. Lewandowski's 10/13/2015 complaint states that, on an unidentified date, she reported allegations about her neighbor to Lt. Jeffrey Norman. Det. Lewandowski's complaint asserts that "nothing occurred" as a result of this

1

conversation. At his PI-21 interview, Lt. Norman acknowledged that Det. Lewandowski raised some concerns about a neighbor, but stated that Det. Lewandowski's complaints constituted a peripheral issue in an investigation into a parking complaint involving a nearby school. Lt. Norman looked into Det. Lewandowski's allegations and found nothing he could pursue.

Det. Lewandowski's October 13, 2015 complaint further asserts that, at an undisclosed point in time, "in tears" she sought help regarding her neighbor's conduct from then-Acting Metro Division Capt. Thomas Stigler. At his PI-21 interview, Capt. Stigler acknowledged learning that Det. Lewandowski had problems with a neighbor from Dist. #3 supervisors. However, Capt. Stigler recalled only one direct conversation with Det. Lewandowski during which Det. Lewandowski spoke about difficulties with a neighbor.[1] Capt. Stigler testified that this conversation took place in a hallway and Det. Lewandowski was "emotional". He listened and advised Det. Lewandowski that her concerns amounted to a "civil matter", not a criminal case or a department rule violation that would warrant police intervention. Capt. Stigler counseled Det. Lewandowski to consider moving her residence. He promised to ask the Internal Affairs Division if there were any other options for assistance, and he did so, but they had nothing of assistance to offer.

On November 15, 2011, Det. Lewandowski applied for a restraining order against Poggenburg. Ex. 3, CCAP, Court Record Events; Milwaukee County Case No. 2011CV17284. The court granted a two-year injunction on December 7, 2011. Det. Lewandowski's 10/13/2015 complaint does not describe any problems with her neighbor or any failure to respond by the Milwaukee Police Department during the pendency of the injunction. More recently, on August 25, 2015, Lawrence E. Poggenburg was charged with misdemeanor Disorderly Conduct. Ex. 4, CCAP, Milwaukee County Case No. 2015 CM 2479. The record indicates that, on October 1, 2015, Poggenburg was ordered to have no contact with "Shannon L." and her residence. On January 11, 2016, on the State's motion, the charge was amended to a county ordinance violation. Poggenburg pled "no contest" and was levied a $25.00 forfeiture, including costs.

## B. Conclusions:

Nothing in Det. Lewandowski's October 13, 2015 complaint suggests that any member of the Milwaukee Police Department failed or declined to act due to Det. Lewandowski's sex. Rather, the concerns she raised were not actionable police matters. As proof, Det. Lewandowski's use of the civil justice system appears to have adequately addressed and resolved the problem.

---

[1] Det. Lewandowski's 10/13/2015 complaint states that adherence to the "chain of command" is what prompted her to approach Capt. Stigler. At interview, Capt. Stigler testified that, from approximately 2006 to 2011, he was the Acting Captain of the then-existing Metro Investigations Division but Det. Lewandowski did not report directly to him in that or any other capacity.

2

### III.  PO Melanie Beasley Matter:

#### A.  Findings:

Det. Lewandowski's 10/13/2015 memo next claims that, on or about January 21, 2015[2], she reached out to Capt. Stigler for help again.[3] According to the complaint, the matter about which Det. Lewandowski spoke with Capt. Stigler was a complaint that Det. Lewandowski made on behalf of then-PO Melanie Beasley, a female officer stationed at Dist. #5. Det. Lewandowski alleges she told Capt. Stigler that PO Beasley "feared for her life" due to a "valid restraining order" against "another member", a male police officer. Det. Lewandowski's memo claims that the male officer often worked the same hours and assignments as the female officer. Det. Lewandowski states that the female officer experienced "great mental trauma" and called Det. Lewandowski to assist her "while on duty". Det. Lewandowski asserts that she knew that PO Beasley emailed Capt. Stigler to say that she was afraid to come to work because the male officer said he could "take her out at 1000 yards". Det. Lewandowski asserts that Capt. Stigler never contacted the female officer.

This investigator attempted to interview now-Det. Melanie Beasley by issuing an FPC PI-21, pursuant to SOP 450.60(B). On Tuesday, February 16, 2016, Det. Beasley made contact with this investigator and reported that she was unable to participate in an interview for an indefinite period of time due to health problems. Ex. 5, 02/16/2016 Email, Beasley to Pepelnjak; Ex. 6, 02/16/2016 Report, Rogers Memorial Hospital. Consequently, this report has been prepared without Det. Beasley's input. Specifically, this investigator makes no finding as to Det. Lewandowski's assertion that Det. Beasley "feared for her life" or experienced "great mental trauma", since that information is uniquely within Det. Beasley's control.

At Capt. Thomas Stigler's PI-21 interview, he stated that he became aware at some point that PO Beasley and PO Robert Wilkinson were involved in a consensual relationship. He later learned that the relationship broke off, after which animosity developed between the two officers. PO Beasley spoke with Capt. Stigler about her concerns regarding PO Wilkinson. Capt. Stigler advised her that there was little he

---

[2]    On January 19, 2015, Det. Lewandowski was involved in a squad accident that totaled the squad and caused personal injury to Det. Lewandowski and to her passenger, Det. Juanita Carr. Det. Lewandowski's injuries required transport to the hospital by ambulance. After the accident, Det. Lewandowski reported that she was injured in number of bodily areas, had trouble with her short-term memory, and had difficulty "articulating herself". Evidently, Det. Lewandowski was in a position to pursue a complaint on behalf of PO Melanie Beasley just two days later.

[3]    Det. Lewandowski's memo asserts that she approached Capt. Stigler because he had recently become the captain of Police Dist. #5. While at Dist. #5, Capt. Stigler had no supervisory authority over Det. Lewandowski. Any inference that Det. Lewandowski contacted Capt. Stigler in adherence to the chain of command is unfounded.

3

could do to address their interpersonal difficulties. He recommended that they attempt to work the matter out between them. At her PI-21 interview, Sgt. Roberta Klein testified that she participated in serving PO Beasley with a mutual, internal no contact order as to PO Wilkinson. The identity of the person who arranged for the issuance of this order is unknown to this investigator.

It should be noted that the assertion in Det. Lewandowski's 10/13/2014 memo that PO Beasley had a "valid restraining order" against PO Wilkinson is false. On January 15, 2015, PO Beasley filed for a judicial restraining order (using Det. Lewandowski as her witness) but the court denied PO Beasley's request for injunction. On March 23, 2015, the case was dismissed. Ex. 7, CCAP, Milwaukee County Case No. 2015 CV 488. CCAP does not disclose any other attempts by PO Beasley to obtain a judicial restraining order against PO Wilkinson.

### B. Conclusions:

Det. Lewandowski does not aid her gender-based discrimination claim by alleging mistreatment of Det. Beasley. Det. Beasley's situation stemmed from a romantic relationship that went sour. These situations cannot be properly or successfully addressed by the police or by the employer. In addition, the fact that Det. Beasley was unable to obtain a judicial restraining order suggests that her allegations do not rise to the level of harassment or abuse required by statute.

### IV. PO Clayton Amborn matter:

#### A. Findings:

The bulk of Det. Lewandowski's 10/13/2015 complaint involves allegations of favorable treatment accorded PO Clayton Amborn. Det. Lewandowski alleges that Fifth District Capt. Thomas Stigler failed to follow MPD rules, "used his rank and status" to contact Internal Affairs regarding PO Amborn's status and instructed the investigating officers, including IAD investigator Sgt. Roberta Klein, to "disregard the fact" that PO Amborn was on probation at the time of a serious rule violation committed by PO Amborn. Det. Lewandowski states that Capt. Stigler gave PO Amborn his personal cell phone number, which PO Amborn used to contact Capt. Stigler regarding his probationary status.

Det. Lewandowski also alleges that Sgt. Roberta Klein deviated from procedure with regard to PO Amborn. Det. Lewandowski claims that Sgt. Klein "prepared" PO Amborn for "every question" she would ask him during his PI-21 interview and "what to say in response". Det. Lewandowski asserts that Sgt. Klein permitted PO Amborn to augment the statements made in his recorded interview by adding them to her report. Presumably, Det. Lewandowski offers this evidence in support of her sex discrimination claim, as a similarly situated male comparator who received more favorable treatment than she (a female) received.

4

PO Clayton Amborn joined the Milwaukee Police Department as a probationary employee on August 5, 2013. Ex. 8, 07/02/2013 Appointment Letter, Flynn to FPC. At the time, new officers served a 16-month probationary period. PO Amborn's probationary class became regular employees on January 24, 2015. During probation, PO Amborn was off work for 55 days, from October 26, 2014 to January 4, 2015, due to illness. His immediate supervisor was Sgt. Shannon Taylor, who conducted and signed most of PO Amborn's probationary and regular evaluations. Ex. 9, Probationary and MPD Evaluations, PO Clayton Amborn.[4]

PO Amborn's February 8, 2015 evaluation (identified as a "probationary evaluation") shows his off-probation date as March 18, 2015. The same is true for his March 7, 2015 evaluation. Sgt. Taylor initiated both of these evaluations. At his PI-21 interview, Sgt. Taylor acknowledged that he knew PO Amborn missed over 50 days of work during probation. Sgt. Taylor denied that it was his responsibility as Amborn's first line supervisor to start or monitor the process of extending probation. Sgt. Taylor testified that one of the lieutenants may have filled out a document lengthening PO Amborn's probation, but Sgt. Taylor claimed he never saw the paperwork. Lt. Jeffrey Norman denied that it was his responsibility to extend PO Amborn's probation. Capt. Thomas Stigler testified that he thought the payroll department had the duty to start the process of extending probation. All witnesses testified that extending an officer's probation is a rare occurrence. Evidently, in order to formally extend an officer's probation, FPC approval is required.

On March 8, 2015, PO Amborn was involved in an off-duty property damage automobile accident while driving intoxicated. He was charged with first offense Operating While Intoxicated and Blood Alcohol Content .08%+ [§346.63(1)(a) and §346.63(1)(b) WI Stats]. PO Amborn was initially stripped of his badge and gun, but eventually returned to work on limited duty status. On March 10, 2015, Sgt. Roberta Klein opened an IAD investigation into the offenses.

At his PI-21 interview, Capt. Thomas Stigler he was aware that PO Amborn was on medical leave in late 2014. Capt. Stigler stated that it is standard practice for department and union representatives to periodically check on officers who are out on medical leave. Capt. Stigler explained that officers on leave can become suicide risks, especially if the officer has a limited personal support system. Capt. Stigler said that, while on leave, PO Amborn reported that he was "doing fine" and would return to work eventually.

---

[4]     PO Amborn's probationary evaluations do not appear to have been performed on a regular basis. PO Amborn's absence accounts for the lack of evaluations from October 26, 2014 to January 4, 2015, but the gaps exceed that time period. It is beyond the scope of this investigation to determine whether this practice is typical.

5

When PO Amborn was charged with OWI, Capt. Stigler became concerned. He held a discussion with PO Amborn about the event, during which he stressed the severity of the offense, asked for a plan for response from PO Amborn and sent him to the department's EAP referral source. (PO Amborn described the conversation this way: "He really laid into me; he snapped on me like he was my father"). Capt. Stigler gave PO Amborn his personal cell phone number so the PO Amborn could keep Capt. Stigler informed of his progress with EAP. Capt. Stigler said this is not unusual – he recently gave another officer his personal cell phone number under similar circumstances. As to PO Amborn's status as on/off probation, Capt. Stigler could not recall how it came to his attention that probation had not been officially extended, but the fact remained that the extension process was not completed.

On April 9, 2015, Sgt. Klein issued a PI-21 "Informing the Member" form to PO Amborn. At her PI-21 interview, Sgt. Klein testified that her practice for issuing the PI-21 form is to prepare the form, contact the officer and ask him/her to report to IAD to accept service of the form. When the officer appears, Sgt. Klein takes him/her into an interview room with an IAD colleague (the subject officer is not represented), explains the interview procedure, goes over the items listed on the form (including the charges under investigation) and obtains the officer's signature on the PI-21 form. Sgt. Klein does not record this conversation and she does not ask substantive questions of the officer during this approximately 10-15 minute conference. Sgt. Klein testified that this procedure is consistent with her training at IAD and currently in use by other IAD investigators. Sgt. Klein confirmed that she followed this procedure with PO Amborn.

Sgt. Klein did state that the issue of PO Amborn's probationary status came up during their April 9, 2015 conversation. Sgt. Klein testified that she told PO Amborn that IAD was trying to find out whether he was on probation at the time of his offense. At that time, Sgt. Klein was unaware of the formal procedure for extending probation. She "may have" shown PO Amborn a performance evaluation marked "probationary" (confirmed as true by PO Amborn).[5]

Between the issuance of the PI-21 and the actual interview, Sgt. Klein investigated the question of PO Amborn's probationary status. She contacted Sgt. Shannon Taylor and asked him for documents but he failed to provide them. Later, Sgt. Klein received word from Lt. Heather Wurth and Sgt. Adam Zeiger at Dist. #5 that PO Amborn was not on probation because the FPC had not officially acted to extend his probation. In response to Det. Lewandowski's allegation that Capt. Thomas Stigler "reamed" her out, Sgt. Klein testified that she has never spoken with Capt. Stigler about PO Amborn.

---

[5]     Sgt. Klein maintained that determining PO Amborn's status as on probation or off probation was a legitimate inquiry because the subjects of PI-21 interviews often ask about possible discipline options. Sgt. Klein expressed her personal belief that termination was more likely to occur if PO Amborn were still on probation, since he could not grieve the Chief's decision.

6

Although it was originally scheduled for April 23, 2015, PO Amborn's recorded PI-21 interview actually took place on May 4, 2015. PO Amborn appeared with his MPA representative. Because the question of PO Amborn's probation status had been answered to Sgt. Klein's satisfaction by then, it was not brought up during the PI-21 interview. Sgt. Klein asked questions regarding the March 8, 2015 OWI offense and the property damage accident. PO Amborn admitted fault and took full responsibility for his actions. (In the October 13, 2015 complaint, Det. Lewandowski accuses Sgt. Klein of preparing PO Amborn as to "every question and what to say in response". Sgt. Klein denied doing so, stating that PO Amborn "answered the questions on his own"). After the recorded interview was over, PO Amborn stated that he wanted to add something to his remarks. He told Sgt. Klein that he wanted her report to indicate that he was sorry for his behavior. Sgt. Klein checked with three other IAD officers to determine if adding information not on the recording was proper. When they advised her that it was, Sgt. Klein added that information to her report.

On May 21, 2015, PO Amborn pled guilty to Operating While Intoxicated and sentenced to a forfeiture of $861.00, AODA program attendance, revocation of his driver's license for 180 days and required use of an ignition interlock device for 365 days. Ex. 10, Municipal Court Query System, Case. No 15011551.

PO Amborn was served with paperwork relative to Core Value violation, charge and investigative summary pursuant to SOP 870.20(C) on June 2, 2015. He submitted a response to the charge to IAD on June 8, 2015 [SOP 870.20(D)]. On June 23, 2015, Chief Flynn conducted a disciplinary review of the record and imposed a 30-day unpaid suspension, under SOP 870.20(E). The Personnel Order imposing the discipline was signed by the Chief on June 24, 2015 and served on PO Amborn on June 25, 2015. At his PI-21 interview, PO Amborn testified that he served his 30-day unpaid suspension and did not file a grievance.

### B. Conclusions:

Det. Lewandowski offers the above evidence to support her sex discrimination claim. Sex discrimination claimants can prove their claims using the direct evidence or the burden-shifting (indirect) method. This record is devoid of direct evidence of sex discrimination, such as sexist statements, documents or overt sexist behavior. Accordingly, Det. Lewandowski must prove sex discrimination using the indirect or burden-shifting method under which the claimant must first establish a *prima facie* case. The *prima facie* requires a complainant to show that (1) she is a member of a protected class, (2) she experienced an adverse employment action, (3) she performed her job to the satisfaction of her employer, and (4) a similarly situated individual, not in the protected class, was treated more favorably. *Puetz Motor Sales v. LIRC*, 126 Wis.2d, 168, 173, 376 N.W.2d, 372, 374-75 (Ct. App. 1985); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253-254 (1981).

The evidence Det. Lewandowski offers fails more than one of the required elements, but the fourth prong is the most decisive. Det. Lewandowski is not similarly situated to PO Amborn in any sense. As a legal matter, to be "similarly situated" requires a showing that two employees are directly comparable in "all material respects". *Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002). Typically, that means that they had the same supervisor, were subject to the same standards, and engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Gates v. Caterpillar*, 513 F.3d 680, 690 (7th Cir. 2008), citing *Snipes v. Illinois Dept. of Corr.*, 291 F.3d 460, 463 (7th Cir. 2002) and *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). The "similarly situated" analysis asks this question: Are there enough shared features between the individuals to permit a meaningful comparison? While the test is both flexible and contextual, there still must be enough commonalities to allow a comparison that, taken together with the other *prima facie* evidence, authorizes a jury to reach an inference of discrimination. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), aff'd, 553 U.S. 442, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008).

Based on these legal principles, it cannot be found that Det. Lewandowski and PO Amborn are similarly situated. First, PO Amborn was assigned to Dist. #5 and his first line supervisor was Sgt. Shannon Taylor. Sgt. Taylor reported to one or more lieutenants, including Lt. Jeffrey Norman. Lt. Norman reported to Capt. Thomas Stigler. Therefore, PO Amborn was a direct line subordinate of Capt. Thomas Stigler. Det. Lewandowski was assigned to the Investigations Division, which is has no direct or dotted line relationship with Dist. #5. Ex. 11, MPD Organizational Chart, 2015. She has no reporting relationship with any sergeant, lieutenant or captain in any of the seven police districts. She does not report to Capt. Stigler. Second, PO Amborn was a patrol officer; Det. Lewandowski was a detective. Their job duties, compensation and qualifications are considerably different. Ex. 12, Job description, Patrol Officer; Ex. 13, Job Description, Detective. Third, PO Amborn was a rookie, not a seasoned officer. His hire date is August 5, 2013, compared with Det. Lewandowski's hire date of June 7, 1999. Det. Lewandowski had considerably more experience in the Milwaukee Police Department, a distinction that should have enhanced her understanding of the range (and the limits) of the department's authority. Fourth, Det. Lewandowski approached Capt. Stigler with a problem that was not a police problem at all, but resolvable as a civil matter; PO Amborn's OWI clearly represented a personnel issue requiring department attention.

Det. Lewandowski's use of evidence associated with PO Amborn as a male comparator to support her sex discrimination claim lacks factual and legal merit. Det. Lewandowski complaint is groundless and therefore, the complaint must be dismissed.

8

Dated this 3rd day of March, 2016.

WEISS BERZOWSKI LLP

By _____
Anna M. Pepelnjak
WI State Bar No. 1018391

P.O. ADDRESS:
700 North Water St., Suite 1400
Milwaukee, WI 53202
Phone:       414/276-5800
Fax:          414/276-0458
amp@wbb-law.com

**ADDENDUM**

A number of Det. Lewandowski's accusations are based on two recorded interviews of PO Amborn conducted by then-PO Melanie Beasley on April 24, 2015 and June 2, 2015. According to Det. Lewandowski, PO Beasley recorded these conversations using her cell phone, without disclosing the act of recording to PO Amborn. On April 24, 2015, PO Beasley questioned PO Amborn (in an undisclosed setting in which background noise makes hearing the conversation difficult) and on June 2, 2015, PO Beasley interrogated PO Amborn when they were assigned to a patrol squad. On January 29, 2016, Det. Lewandowski provided the recordings to this investigator. Ex. 14, CD, Recordings. She had previously provided a "transcript" of the recordings. This "transcript", when compared to the audio, turns out to be incomplete and inaccurate. Ex. 15, "Recording of PO Amborn and PO Beasley in squad together".

Moreover, some of Det. Lewandowski's 10/13/2015 accusations misrepresent the recorded conversations. As an example, compare one of Det. Lewandowski's allegations to the words of the recording:

Lewandowski complaint: "Officer Clayton Amborn has been bragging to other officers that "Tommy Boy" (Thomas Stigler) is giving him special treatment and does not know why but believes that Captain Thomas Stigler had a prior OWI and understands his issues.

Recording:

9

PO Amborn: I think Capt. may have had a similar experience happen to him.

PO Beasley: Oh, I never heard of anything like that.

PO Amborn: Maybe it was before he got on the job or he knows people on the job. Because he really laid into me; he snapped on me like he was my father. And he's been very helpful ever since.

\* \* \* \* \*

PO Amborn: Everyone keeps saying to me "Wow, you're best buddies with Tommy Boy". Even like (officer's name) said, "WTF, I haven't talked to the Capt. one f'g time; he never called me."

PO Beasley: That's his name?

PO Amborn: Yeah…But he reached out to me.

\* \* \* \* \*

PO Amborn did not "brag" about receiving special treatment from Capt. Stigler, nor did he call Capt. Stigler "Tommy Boy". To the contrary, what PO Amborn did is speculate on Capt. Stigler's motive (without expressing certainty or source) and report statements made by others. Capt. Stigler offered a reasonable explanation for his conduct, namely, concern for the wellbeing of a subordinate who was in a tough situation. Det. Lewandowski draws a conclusion that is contrary to the facts.

These recordings raise issues as to Det. Lewandowski's credibility and trustworthiness.[6] First, because PO Amborn was unaware that his discussions with PO Beasley were actually interrogations, his words were not well chosen, his thoughts were poorly organized, and his language was occasionally crude. After all, PO Amborn thought he was talking to a friend, not an adversary who would seek to use his statements against him. Second, PO Beasley asked leading and suggestive questions, to which PO Amborn often responded with a casual "yeah". For all PO Amborn knew, these talks were off-the-record, as conversations are, among friends or coworkers. So, PO Amborn's perfunctory responses to PO Beasley's improper questions fail to constitute knowledgeable acceptance of the questions' foundation. Third, the incomplete and inaccurate "transcript" Det. Lewandowski provided to this

---

[6]     PO Beasley's use of her cell phone to record conversations may or may not amount to a violation of policy. That question is beyond the scope of this investigation. Under SOP 750.20(A)(5), using the department's digital audio-visual recording system to eavesdrop or to record the conversations of members without the consent of all parties is prohibited. At the time of these recordings, there were no SOPs prohibiting use of personal recording devices to record conversations with coworkers or superiors.

investigator calls her fact-finding capabilities into question. Attention to detail, adherence to facts and getting the whole story are hallmarks of good police work. None of those attributes describes this transcript. Finally, as shown above, Det. Lewandowski's 10/13/2015 complaint mischaracterizes PO Amborn's statements to Det. Lewandowski's advantage. Det. Lewandowski's credibility suffers for the effort.

# EXHIBIT #1

# MILWAUKEE POLICE DEPARTMENT
## MEMORANDUM



RECEIVED
OCT 14 2015
FIRE AND POLICE COMMISSION

**Date: 10/13/2015**

**TO:** The Fire and Police Commission

**FR:** Detective Shannon Lewandowski

**RE:** Discrimination, Misconduct in Office

---

This report is written by Detective Shannon Lewandowski, assigned to Fusion, late shift.

This is the second attempt via memo to report the intentional disparate treatment in direct action due to gender; I and others have been discriminated within this department because we are women. While the laws and Codes of this Department are excellent in theory, they are inadequate in addressing the cover- ups, directly related to females on this police department. There is collusion in the ranks of the male Milwaukee Police Department. The selective enforcement of the law is very corrupt, illegal, and grounds for suspension or immediate dismissal of several officers of rank according to the Code of Conduct and Standard Operating Procedures.

Specifically, on or about September 1, 2011, I addressed a situation that I was having with my neighbor, Lawrence Poggenburg to my Captain. I plead for help. At the time, Lieutenant of Police, Thomas STIGLER was the Acting Captain of the Metro Division, and that is where I was assigned. In tears, I plead for help, explained the fear that I had living next to this person. I went to Lt. Stigler for help as my leader, since I had addressed my concerns and need for help to Lieutenant of Police Jeffery NORMAN first, and nothing occurred. I asked for help, however he refused to intervene, nor did he direct me to whom I could get advice, and demonstrated lack of courage, and failed leadership. I looked to Lieutenant of Police Thomas STIGLER for impartial and effective advice or service in dealing with a neighbor, following the chain of command, as we are directed. The same chain of command that I went to on December 6, 2015 and was reprimanded. I questioned Lt STIGLER days after, then a week after, and he told me he would get back to me. That never happened.

On or about January 21, 2015, I once again reached to Captain Thomas STIGLER, not because I wanted to, but because he was promoted to Captain of District 5. I informed Captain of Police Thomas Stigler that a female at his District on the late shift had a valid restraining order with another member, and that she feared for her life. This member often worked on the same shift, the same hours, and same assignments as the female he assaulted. Additionally, I informed him that the officer was experiencing great mental trauma from her experience, as I was being called to assist her while on duty, and she would like to talk to him. I am also aware that the Officer in distraught, emailed Captain Thomas STIGLER regarding her fear while coming to work, that regarding the other member told the female officer multiple times that he could "Take her out at 1000 yards, and she would not see it coming in the dark." Captain STIGLER never contacted her.

On or about March 2015, I had contact with an officer of District 5 who explained that he was on probation and had been invc' 'ed in an OWI incident, when he was in' 'icated and he struck two cars. Not only did Captain τ.iomas Stigler fail to follow the rules of τ.ie Milwaukee Police Department, but he used his rank and status to call Internal Affairs Division and order Sergeant Roberta Klein and Sergeant Adam Zieger of IAD to disregard the fact that Officer Clayton Amborn was on probation during the time of his OWI.

The first meeting with IAD and Officer Clayton Amborn was with Sergeant Roberta Klein, who was advising Officer Clayton Amborn how to answer the questions. Officer Clayton Amborn answered the questions and said aloud that he was "thrown for a loop" when he observed that Sergeant Roberta Klein had documents that he was still on probation. Officer Clayton Amborn acknowledged that he was on probation and stated that "I thought that they were proceeding as if I was not on probation?" Sergeant Roberta Klein gave him a copy of proof that he was on probation during the time of the accident. Officer Clayton Amborn then called Captain Thomas Stigler on his personal cell phone because Captain Thomas Stigler told him to call if he needed any help with this investigation. Officer Clayton Amborn spoke with Captain Thomas Stigler and Captain Thomas Stigler became irate telling Officer Clayton Amborn that he would make some phone calls and told him not to worry. Soon after Captain Thomas Stigler told Officer Clayton Amborn that he reamed out Sergeant Roberta Klein and Sergeant Adam Zieger to say that Officer Amborn will be carried as if he is not on probation.

Officer Clayton Amborn returned to IAD and Sergeant Roberta Klein prepared Officer Clayton Amborn for every question and what to say in response, and proceeded as if he was not on probation, and the probation paperwork was never discussed. Officer Clayton Amborn then stated the week following Sergeant Roberta Klein called him to see how he was doing and if he was ok, once again receiving special treatment.

During the interview the second time with Sergeant Roberta Klein, Officer Clayton Amborn stated that he forgot to mention a few things that the "Chief likes to hear when deciding the persons fate. Sergeant Roberta Klein stated that she would just put it in the report albeit she did not make those statements himself. Officer Clayton Amborn has been bragging to other officers that "Tommy Boy" (Thomas STIGLER) is giving him special treatment and does not know why, but believes that Captain Thomas Stigler had a prior OWI and understands his issues. Additionally, Officer Clayton Amborn bragged about being on probation January 24, 2015 along with his class, but if this got out, he would claim it was a clerical error.

Officer Amborn was out sick off of the payroll to answer the questions/preparing him in a portion of his field training, thus his probation was extended 55 days. At the time of his OWI, Officer Clayton Amborn had 8 days left on his probation.

Captain Thomas Stigler not only gave Officer Clayton Amborn his personal cell phone number to call if he needed any help, he talked to him in the office, fixed or discarded the paperwork of his probation, directed Sergeant Roberta Klein at IAD to disregard the probation when he received a PI-21. Officer Clayton Amborn did respond to IAD for the violation, and when he was on the third floor of the Academy talking on recording explaining the accident to Sergeant Roberta Klein, he explained that his Captain, Captain Thomas Stigler, fixed this paperwork and he was "no longer on probation." Additionally Officer Amborn bragged about the fact that he was in an OWI, that he was drunk, and that he caused additional damage to two other vehicles. Officer Clayton Amborn then bragged and laughed about the fact that he has drank and drove drunk from a young age, and now had to "purchase Captain Stigler a bottle of booze or Scotch and write a damn letter to "Kiss the Chiefs' Ass."

Officer Clayton Amborn was off the payroll while on probation, IAD went to his house and removed is gun and badge f n him. When he returned to work after ing off approximately 55 days, he returned to District . without his gun/badge and then those it..ns were returned to him within one day. Officer Amborn knew that he was on extended probation, and during an official evaluation that Officer Amborn signed. This evaluation was explained and signed in the presence of Sergeant Shannon Taylor.

Furthermore, after Officer Clayton Amborn was in a OWI accident, Sergeant Justin Sebestyen informed roll-call at District 5 on March 8, 2015, "We are going to be down another officer because one of your fellow officers got arrested while on probation; and he doesn't have a leg to stand on, and he cannot appeal, and he is going to lose his job." Sergeant Justin Sebestyen also made it very clear that we are not to drink and drive and can call for a ride via the Department.

Likewise, I was involved in an on-duty accident, that of which I was not supported in any way, the Department has failed to pay my medical bills and leave, causing me additional stress and additional medical problems, delaying my healing process. I was also reprimanded for having a cell phone at a public hearing and disciplined on June 3, 2015. Although, I have returned to work, I still am without my police powers, and have not been given my gun/badge back with no explanation. This is also part of the retaliation that I continue to receive, and is obviously discriminatory as male officers like Clayton Amborn are treated with special and different treatment. The treatment that the female officer at his District received while having a valid restraining order is reprehensible, shameful much less his actions dishonorable.

I work in an oppressive environment with a different set of rules for men and women. The actions of Captain Thomas Stigler, breach the Code of Conduct, exercising his powers to defraud the Department while in public office, as he used his status to intervene personally with Officer Amborn. Moreover, Captain Stigler has discriminated against more than one female under his supervision, with different standards for men and women. Officer Amborn lied to IAD, and Captain Thomas Stigler covered up for him. Officer Amborn is serving the public when he should be terminated, much less exercising police powers on the public. Captain Thomas Stigler provided his "personal" cell phone number stating to Officer Amborn, "Call or text me for whatever you need" thus providing assistance for a male officer who did something criminal, as opposed to females who actually needed him to be a leader and provide a safe work environment or at least equal treatment.

Furthermore, Officer Robert Wilkinson was never placed on desk duty/suspended/admin. suspension, while the restaining order was valid much less during the investigation and Sergeant Klein used her powers to dismiss and mislead the investigation, willfully and knowingly.

I would like this complaint investigated by an outside agency, as these actions have impacted not only my work, but created great concern due to the continued abuse of power of this Police Department, Internal Affairs Division, making the work environment, a untrustworthy and hostile work place, everyday.

Respectfully submitted,

Detective Shannon Lewandowski
012860

# EXHIBIT #2



11/28/2014

Shannon Lewandowski

Edward A. Flynn

Chief of Police

**Dear Chief Flynn,**

My name is Shannon Lewandowski, and I am a Detective in the Metro Division at your Police Department. I am writing to you as a citizen, not as your employee. I feel the need to address you by letter because I have been very upset with the direction and way that I have been treated by the members of the Milwaukee Police Department. The same Department that I represent and am honored to be a part. I love my job, consider myself an asset to the city of Milwaukee, and have never tarnished its reputation.

However, for years I have become appalled, mortified, and mostly embarrassed to say that I am a Detective on the Milwaukee Police Department when I personally have called for help. This is not during the course of my duties, but rather as a citizen. I would personally have never handled the following situations as my fellow officers have.

At my appointment time, I lived in Wauwatosa WI., I looked for an apartment in 1999, and located one that was 4 blocks to the north of my home which was in Milwaukee. After filling out the application, the landlord wanted me to rent from him. I soon declined after obsessive calls, personal questions that were out of order, and when he physically appeared at my home, I eventually changed my phone number and looked for a home to purchase. That weekend in 1999, I walked to the front door of where I currently live and asked the family that had a Shorewest Realtor sign in the yard, if I could look at the home without an appointment. That day, I purchased the home.

Five years later, my neighbors at 5231 W. Washington Blvd. moved in, this is a property right next to mine, to the north. This man was the landlord from 1999. His name is Lawrence Poggenburg. When he moved in, I did not welcome him to the neighborhood, since I recognized him immediately. I was not sure if he had remembered since he had gotten married and five years had passed. I was wrong.



Lawrence Poggenburg did remember, and he has made the only place of serenity and comfort I have in the world, a distrustful place of defensiveness. Five years ago, anytime I went into the back yard or to the front of my house to leave, he would approach me and do the same with the incessant barrage of unwanted questions, and repeated intrusions that eventually included deep anger, hostility, and compulsive obsessive acts toward me. The behaviors have escalated over the years, after the first six months of quietly dealing with it, I soon, for lack of better words, "told him off" to set boundaries. I informed him not to come on my property, and I followed the advice of EVERY Sergeant that came to my calls for help, or his obsessive calls about me. This is the short list of officers that have come to my home:


PO Timothy Koestering.

PO Paul Riehle

PO Jeff Hoffman

PO Tom Lieske

PO Ashley Gryzkewicz

PO Edwin Reyes

Sgt Louis Staton

PO Steven Olmstead

PO Steven Strasser

PO Scott IVERSON

PO Gary Post

Lt. Tom Sigler

Det. Moises Gomez

PO Peter Panasiuk

PO Greg Heaney

Sgt Charles Brown

PO Charlotte Brown

Sgt Sobek

Captain Terrance Gordon

Alderman Michael J Murphy

... many more that I cannot recall, and a CAD system that must either erase or file other calls in such a way that I cannot retrieve.

2

I have made every effort to alleviate this problem on my own and with the advice provided to me through my Supervisor. When CIB would finally go to arrest him, L. Poggenburg would lock himself in his home, pull the curtains and refuse to answer the door. Captain T. Gordon handled an incident in 2008 or 2009 when L. Poggenburg exited his garage, pointed to me (I was not in ear shot of what was said but my neighbor was and made a statement) and stated to my then 14 year old son, "That is why you will always be poor and fatherless." My oldest son also heard this and called me as I drove to a basketball game in Waukesha. I pleaded with my eldest to not go outside and let the police handle the situation. Lt Gordon responded with officers. L. Poggenburg refused to exit his home, pulled the drapes and did not come out to the calls and knocks of the police. No follow-up was ever done, no citations, no arrests, no advisement for him to stay away.

The racial epithets from L. Poggenburg, include calling my sons and their Grandmother "Niggers, monkeys, 'go back to Africa,' 'go to your own neighborhood.'"

I on the other hand am called "bitch, cunt," and yells across my yard that "People like me do not belong on the police department."

I have heard L. Poggenburg make remarks about the gay lifestyle of one of our neighbors who resides at 5211 W. Washington Bl.

Assistant Chief Harpole who was at the time the District Three Captain, had arrived at my home, but only due to my constant request. That day I left my bedroom window open a short time, returned home and found that L. Poggenburg had aimed/situated his rotor sprinkler grass watering device directly into my home, as it stayed at one constant stream into my window, saturating my mattress. This mattress had to be disposed. I was told that "although it appears intentional, it cannot be proved." Only the siding of my home where my bedroom was located was wet, none of his lawn. I tried to re-iterate "totality of circumstances" but no one was interested.

Other traditionally non-police calls from L. Poggenburg resulted in Sergeants coming to my home to ask if I had "thrown trash in the street" (CAD call 07 175 1952). Not only did I not throw trash in the street, this is another form of his harassment knowing that I had come home to sleep during the day, only to have more Supervisors knocking at my door as I slept.

CAD 11 103 1161, a call for "parking too close to his car." L. Poggenburg lives on the corner of 53rd/Washington Blvd. He has two corners to park on, a three car garage, three slabs to park. I do not have a garage, I do not have an alley, I do not have a parking slab. I have street parking only. I parked in the front of my home when returning from work, and he then parked his car up against mine and called the police. This is not a reason to call for police service, however Sgt. Larson responded from district three and woke me, and asked me to move my car, which I did. This was another attempt of many by L.Poggenburg for this intent only; harassment.

This summer L. Poggenburgs antics escalated with throwing garbage (bags) in between my home and his fence, spray painting a frame as it rested on a tree in the front of my home close to my parked car. This aerosol type canister propelled the paint mixture on the rear of my car. The neighbor Jeanett Soleski observed this and called my son who was in the yard. My son Kasey ran to the car and asked him to spray paint in the front of his own home. We were able to remove the paint that landed on the bumper of my Honda civic. Police were called, and of course, it could not be proven as intentional.

In 2007 I filed a harassment order after police responded to my home. When I arrived at the courthouse to file, I was informed that L. Poggenburg filed the same. Officers who were at Poggenburg's home the day prior had informed him that I would be filing a harassment order. That day, I was at the District Attorney's office prior to my

appointment with a case to present. I became ill and fainted at the District Attorney's office, and missed the hearing. My illness, I believe, was the stress that I have to go through regarding this neighbor. I reopened the case and six members from my neighborhood arrived at court to testify on my behalf. These members are the witnesses to the behaviors of L. Poggenburg. A supervisor from the Department who has witnessed his antics also testified. The police had to be called again when L. Poggenburg stated that he was going to get my gun taken from me, and get me fired from the police department. The filing of such an order was dismissed after several residents on my block came to court on my behalf and testified.

In 2008 my son Kasey graduated from High school. L Poggenburg placed his lawn hose the same way in which he did in my bedroom window, destroying my food and getting my guest wet. When police were called, he locked himself in the home and refused to come out. I was told that there was no way to prove that it was intentional. I explained totality of the circumstances once more; however this has fallen to deaf ears, and told to get a restraining order once more.

In 2008, L. Poggenburg built a play structure right next to my home, The photos are included. He sits in the playhouse and observed by not only myself, but guests of my home, and he looks into my home. I have placed curtains on the entire north side of my home to avoid looking at him in any capacity, as well as to keep him from looking into my home. My neighbors John and Sandra Folaron of 5211 W Washington Bl Apt #4, asked me why I approved the building of the play house so close to my house. I stated that I had not. John Folaron stated that he called the City Inspector on him and also called about his fence. John Folaron stated that to his knowledge the fence was on my property since it was so close to my home. After that conversation, I then was contacted by the city Inspector. I informed John Folaron that I did not want any more problems, and John explained that he has had confrontations with L. Poggenburg regarding calling the police on him about loud parties.

L. Poggenburg called the city inspector on my property for a plastic shed that can hold 3-4 shovels and a lawn mower. This shed came with the home which I had already been in for 12 years. L. Poggenburg informed the city inspector that it was "new construction". The Alderman, Michael Murphy had to resolve the matter. I subsequently took the shed down to avoid any other problems.

I placed video surveillance cameras on my home after the Burglary in 2008, and for protection/evidence from L. Poggenburg. I have kindly and angrily told L. Poggenburg to stay away from the front of my residence and my children. Both of my boys were frightened of him when they were younger. L. Poggenburg would walk to my home; confront my kids when I left for work or to the store. One time after having an argument regarding him talking to my children, I left for work. L. Poggenburg walked to my home and asked both of my sons if they wanted to walk to get "ice cream" with him. Both of my children have been approached by him several other times. This summer, L. Poggenburg charged at me when I ignored him, and he then called me a "fucking bitch." My son observed and heard what was said and felt the need to defend me, knocking L. Poggenburg back off of our property in the front of our home onto the ground. This is the only time he did NOT call the police.

L. Poggenburg was caught peering in my bedroom window this summer in August 2011, and provided the explanation that he cut between my home and his fence to enter my yard to retrieve a "Wiffle ball" a 5cent plastic ball (which was actually mine). As he cut through the yard, he put his hands on my window (the writers prints were visible), and looked in my bedroom. I was on my computer and it was 7am on a Sunday, as I was preparing to attend church. My car was not parked in the front of my home and was getting repaired. This was his indication that I was not home. Sgt Charlie Brown responded, gave his opinion about L Poggenburgs obsession with me and provided the advice to put up another camera, and no-trespassing signs. I did.

On November 1, 2011, a realtor came to my home to provide an estimate on selling my home. She informed my sister that the signs on the outside of my home home (no trespassing etc) should be removed because I appears that the area is problematic. L. Poggenburg called the police because he placed a sign in my yard, and claimed that it was his. When PO Edwin Reyes and Sgt Sobek of District Three arrived to talk to me about the sign, I did not know about the sign removal. Later that day, L.Poggenburg threw a sign over my fence that read "u cunt." I asked Sgt Sobek to go to his home as I observed him throw it over the fence. To my knowledge, nothing was done.

On November 12, 2011 my children's Grandmother stayed the night at my home. Her name is Denise Rogers. She stayed the night for the safety of my son, taking him to school on Friday the 11th and taking care of the dog. At 4:24am on November 12, 2011, L. Poggenburg used a long pruning scissors to cut the surveillance wires on the north east side of my home. As the wires were cut, interference was sounded on the alarm system, waking Denise. Denise, well aware of the problems, which she has witnessed herself, looked out the window where she slept and observed L. Poggenburg attempting to cut another wire. After she opened the window, L. Poggenburg ran from the side of the fence in his own yard and into the side door of his home. Denise called me; I was in Fond du Lac WI. I was in Fond du Lac completing work on my Masters. I provided the phone numbers to Metro. Denise could get no answer, so she called District 3. Denise was at my residence until 9am. No squad to our knowledge ever came.

I filed a harassment order on November 15, 2011. After filing it, I called Sgt Sobek of District three who provided me his cell number and stated that when I saw him, to call, that he would personally go to his home to serve it.

This summer to the best of my knowledge, L. Poggenburg was fired from the City of Milwaukee where he worked as an electrician. Since his dismissal with the city, he was hired (according to facebook) at Potomac Electric Power Company which is either located according to Google in either Maryland, Washington D.C. or Boston. Happy as I am, L. Poggenburg is gone a week or two at a time. However, this has not deterred him either because since then, as he has in the past, blew all of his leaves in the front of my home, cut my surveillance wires, and threw notes over my fence. Due to the fact that he is out of town during the week, it has become difficult to serve him the harassment court order, him especially without him finding out that we were trying to serve him. If he had that knowledge, he would make it even more difficult to be served if not impossible. Given my late shift schedule, court schedule, I only rest between noon and 4pm and am then with my children getting them from school etc. My schedule does not permit such surveillance of his whereabouts.

I have surrendered and decided to sell my home. I have lived her 13 years. I do not want to sell my house. However, my ability to rest is limited having such a vile and vindictive, obsessive neighbor, and no piece of property is worth all of this. I cannot sell my home with a realtor without an order since he will be sending people to my home or even come himself when I am not here for the open houses. I cannot have that occur. As it stands, I tried to post a sale sign on my lawn, and he has called my home over two dozen times and I believe have had his friends call. I can see the numbers on the caller ID, and when I research those numbers, they come to friends of his that are on his facebook page. (He has no knowledge that I access the page).

At this home, on this street, MY STREET, I solved the mayor's sons robbery, who I informed officers of the stop I had made the night before which were occupants of the home across from my home (1613 N 53rd). I issued citations to the two robbery suspects the night before the robbery. Citations that I initially took heat from CIB about because "Detective don't issue municipal citations." Luckily I had. This was after a short foot chase in the middle of the night from Vliet Street to Washington blvd where I observed two of them run in the home. This is the same home that burglarized my home and removed my service weapon. A case that I had to solve myself. This is the same drug house across the street where one of its occupants stole a lawyers car and crashed into mine, placing me injured and on foot chase in flip flops catching all three until I could only hold down one. There was also shooting across the

street. I observed the shooting, identified myself as I pointed my weapon at him. This suspect ran south right into NTF. This case has been charged RES and is already sentenced. I also opened my door to every officer on the block, fed them and let them use my facilities. When a canvass was done, Poggenburg refused to talk to the police. Later, L. Poggenburg made statements that the "niggers across the street are same as the niggers next to me." Well, the ones next to him are my sons. A junior in College, attending Chicago State on a Division One baseball scholarship, and another a junior in high School; honor roll and all city first pick wide receiver and tight end, all city first string baseball offensive and all State defensive player as a Sophomore. Fine young men I might add.

The list of problems with my neighbor is endless. However to top off the lack of regard for me not only as an employee, but as a female, parent, but a citizen. I filed the appropriate paperwork, at the cost of $168. For a harassment order. The hearing was November 28, 2011. I observed L Poggenburg home at this residence on November 26, 2011. I went to District three where I filed the order, talked to Lt Obergon to ask someone to go to 5231 W Washington bld and serve the order since I observed him at home. Poggenburg has twelve windows in the rear of his home that do not have curtains. District three Captain Michael Brunson REFUSED to allow any officer's at the district to serve the harassment order, stating "We don't want any part of it." I was told this quote by sergeants at District 3. Further that Metro had to serve the order. Outside of the fact that I am coming for help once more, I presented and filed a legal document that I paid for, received and filed on my own time in hopes to finally get the help that the police of the district that I reside and pay taxes in. The same officers and supervisors that stated that they needed this document to arrest my neighbor if needed, to set the boundaries that he could not set for himself.

Eventually Lt of Police Jim Timm and Lt of Police Paul Kavanaugh served the order, but to L. Poggenburg's wife. Colleen Poggenburg told the Lieutenant of Police Jim Timm that her husband was at Menard's and would be returning but only to leave out of town for two weeks. Instead of waiting until he returned from Menards, they served his wife. Subsequently I took off another day of work, as did two of my neighbors, a friend who witnessed his actions, Grandmother to my children, and my eldest son who took off of school. Court Commissioner Nancy Sturm refused to move forward since the wife was served, even though L. Poggenburg's lawyer Brent Linster was representing him. Additionally the Lieutenants of Metro and CIB did not file the appropriate paperwork, leaving me lectured by the commissioner that "I should know better that Lawrence needed to be served and not his wife." I wanted to reply, but did not, that if I could have done it, and done it right myself, I would have. The lawyer Linster stated that Lawrence Poggenburg would be out of town for next two weeks and the Commissioner left me with eight days to serve a document that I cannot since he is supposedly out of town. When he is not out of town, he hides from our department. I requested that out of "Good Faith" that Linster service his client. He refused, stating, "I find it ironic that someone that harasses her so much cannot be found by her."

Additionally, I had addressed this entire situation with Lt Thomas Stigler of Metro Division that perhaps someone with more experience and the fact that he was Acting Captain at the time could help after both Lawrence and Colleen Poggenburg tried to get all of my personnel records from MPD. On 08-31-2011 both Colleen and Lawrence Poggenburg requested All calls for service to my home. I was informed by PSSI Frank Heinrich that he would make appropriate redactions to the reports. Asking myself why anyone would want these reports, still evades me, other than to get personal information about me in the burglary reports. After I pleaded for help, Acting Captain Lt Stigler never talked to me about what he could or could not do, nor has he ever addressed me regarding my conversation with him; as if how I feel is ok or that I do not matter.

Colleen Poggenburg, the wife of Lawrence Poggenburg has never uttered a word to me, however has stood and watched majority of these incidents, and lied to police when they have come for her husband. She has watched her husband berate me, watched him shovel snow and blow leaves onto my stairs in the front of my home, and watched

6

him cut my trees and bushes. One winter when L Poggenburg was swearing at me and throwing snow on my cars with his snow blower, his father or father-in-law walked to my home and apologized (witnessed by another neighbor) and cleared all of the snow from my cars. L. Poggenburg has told me numerous times how he hates MPD since his wife was married to a detective who beat her. I have no knowledge of this (Det Larry Schimke) nor any validity in his statement. However this may be part of his issue with me at hand.

I realize that by the time that anyone would even consider what or how to help me, December 7, 2011 at 10:15am will have passed and L. Poggenburg will not have been served, I will have fallen victim to more. Additionally, I will have had to pay another $168 dollars that I do not have, my neighbors who are struggling in this economy cannot continue to take off of work, nor can my son be asked to leave college to attend another hearing.

I would like to ask you, the head of my Department, what am I to do? How am I supposed to live? Where am I supposed to turn for help? WILL SOMEONE PLEASE HELP ME?

Respectfully submitted,



Shannon Lewandowski

Citizen

1632 N 53rd St

Milwaukee, WI 53208

(414) 405-4617c(414) 455-3773h

COPY

7

# EXHIBIT #3

# Wisconsin Circuit Court Access (WCCA)

## Shannon Lewandowski vs. Lawrence Poggenburg

## Milwaukee County Case Number 2011CV017284

## Court Record Events

| | Date | Event | Court Official | Court Reporter |
|---|---|---|---|---|
| 1 | 03-05-2012 | Injunction hearing | Amato, Dominic S. | |

**Additional Text:**

Petitioner appears in court. Respondent appears in court. De Nov Hearing for Injunction proceeded. For reasons stated on the record, Court affirms commissioner decision and Injunction remains in full force and effect. jci

| | Date | Event | | |
|---|---|---|---|---|
| 2 | 02-28-2012 | Amended | | |

**Additional Text:**

Notice of Hearing and Motion on Respondent's Motion to Review Decision / Ruling of Family Court Commissioner, filed. jci

| | | | | |
|---|---|---|---|---|
| 3 | 02-22-2012 | Notice | | |

**Additional Text:**

to reschedule 3-2-12 Injunction hearing mailed to parties. filed. jci

| | | | | |
|---|---|---|---|---|
| 4 | 01-26-2012 | Letters/correspondence | | |

**Additional Text:**

from Attorney Brent Nistler, filed. jci

| | | | | |
|---|---|---|---|---|
| 5 | 01-20-2012 | Transcript | | |

**Additional Text:**

of 12-7-11 hearing, filed. jci

| | | | | |
|---|---|---|---|---|
| 6 | 12-19-2011 | Amended | | |

**Additional Text:**

Notice of Hearing and Motion on Respondent's Motion to Review Decision / Ruling of Family Court Commissioner, filed. jci

| | | | | |
|---|---|---|---|---|
| 7 | 12-16-2011 | Notice of hearing | | |

**Additional Text:**

and Motion on Respondent's Motion to Review Decision / Ruling of Family Court Commissioner, filed. jci

| | | | | |
|---|---|---|---|---|
| | 12-07-2011 | Injunction w/out firearm restriction | Honrath, William | |

**Event Party**

Poggenburg, Lawrence

Case 2:16-cv-01089-WED    Filed 04/22/19    Page 25 of 88    Document 80-17

| 9 | 12-07-2011 | Injunction grar ~~~ 1 | | Amato, Do ~~~ nic S. | |
|---|---|---|---|---|---|

| 10 | 12-07-2011 | Injunction hearing | | Honrath, William | Digital Recording |
|---|---|---|---|---|---|

**Additional Text:**

Petitioner appears in court. Respondent does NOT appear in court EXCEPT by attorney Michael Tuchalski. Respondent is reserving any jurisdictional defects, also indicated off the record that there's a challenge to the service. Petitioner does not agree to respondent's request to adjourn. Hearing for Injunction will proceed. Service is on file with the court. Sworn and examined: Petitioner. Sworn for petitioner: Denise Rogers. Petitioner's Motion for Injunction Granted and is effective until DECEMBER 07, 2013 (2 years). 4. Other: Respondent is not to subject the Petitioner to violent abusive or otherwise disorderly conduct under circumstances tending to provoke a disturbance. Filed, signed Injunction (Harassment).

| 11 | 12-06-2011 | Proof of service | | TRO Court | |
|---|---|---|---|---|---|

**Additional Text:**

filed.

| 12 | 11-28-2011 | Injunction hearing | | Sturm, Nancy L. | Digital Recording |
|---|---|---|---|---|---|

**Additional Text:**

Petitioner appears. Respondent does NOT appear, Attorney Brett Nistler appears on behalf of Respondent, stating Respondent has not been served, ask court to dismiss matter. Respondent has NOT been served with a copy of the Temporary Restraining Order, Notice of Hearing, and Fact Sheet. The time for hearing on an Injunction is adjourned to DECEMBER 7, 2011 at 10:15AM ROOM 712, COURTHOUSE. If a temporary restraining order has been issued, it remains in effect until the injunction hearing is held. Petitioner given copies of Order. Filed, signed Order Extending Time for Hearing.

| 13 | 11-15-2011 | Petition for TRO/injunction | | | |
|---|---|---|---|---|---|

| 14 | 11-15-2011 | Temporary restraining order | | Amato, Dominic S. | |
|---|---|---|---|---|---|

| 15 | 11-15-2011 | Filing fee paid | | | |
|---|---|---|---|---|---|

**Amount**

$ 168.00

**Additional Text:**

11RV042493

# EXHIBIT #4

# State of Wisconsin vs. Lawrence E Poggenburg

Printable Version (PDF)

## Milwaukee County Case Number 2015CM002479

### Court Record Events

What Is RSS?

| | Date | Event | Court Official | Court Reporter |
|---|------|-------|----------------|----------------|
| 1 | 08-25-2015 | Summons and complaint | | |

**Additional Text:**
SUMMONS MAILED. DEFENDANT ORDERED INTO ROOM 221 SAFETY BUILDING ON 10/1/15 @ 1:30 pm

| | | | | |
|---|------|-------|----------------|----------------|
| 2 | 10-01-2015 | Request for substitution | Sweet, David | Digital Recording |

**Additional Text:**
Defendant Lawrence E Poggenburg in court with attorney Brent Daniel Nistler. Patrick J Anderson appeared for the State of Wisconsin. Request for Substitution of Judge received and filed. Court consented to substitution against Judge Siefert. Parties are advised the Clerk of Circuit Court reassigned case pursuant to current court rules to Judge Dee, Br. 37. Pre-trial conference scheduled for October 19, 2015 at 01:30 pm.

| | | | | |
|---|------|-------|----------------|----------------|
| 3 | 10-01-2015 | Initial appearance | Sweet, David | Digital Recording |

**Additional Text:**
Defendant is advised this case is assigned to Judge Dee, Branch 37. Court reviewed the complaint and found probable cause. Defendant advised of right to counsel and complaint given to Defendant's attorney. Defendant plead not guilty. Case is adjourned for a Pretrial Conference in Branch 37.

| | | | | |
|---|------|-------|----------------|----------------|
| 4 | 10-01-2015 | No Contact Provision Ordered | Sweet, David | Digital Recording |

**Additional Text:**
Signed and filed, No Contact Order. Defendant to have no contact with Shannon L. and her residence. Court advised defendant that failure to comply with conditions of bail may result in an additional charge of bail jumping.

| | | Event Party | Amount | | |
|---|------|-------------|--------|----------------|----------------|
| 5 | 10-01-2015 | Signature bond set | | Sweet, David | Digital Recording |
| | | Poggenburg, Lawrence E | $ 1000.00 | | |

**Additional Text:**
DEFENDANT WAS ORDERED BY THE COURT TO REPORT TO THE MILWAUKEE COUNTY JAIL (CJF) TO BE BOOKED AND RELEASED BY 3:00 P.M. ON (10-2-2015). IF THEY FAIL TO APPEAR A BENCH WARRANT WILL BE ISSUED FOR THEIR ARREST.

| | | | | |
|---|------|-------|----------------|----------------|
| 6 | 10-01-2015 | Judicial transfer | Dee-37, T. Christopher | |
| 7 | 10-19-2015 | Pre-trial conference | Dee-37, T. Christopher | Off the Record |

**Additional Text:**
Defendant Lawrence E Poggenburg in court with attorney Brent Daniel Nistler. Kelly O'Neill appeared for the State of Wisconsin. Deputy Court Clerk: TC. Defense counsel has received discovery and offer. Assistant District Attorney's office requests additional time. Court ordered case adjourned for a projected guilty plea and sentencing / possible disposition in Branch 37. Agreed Upon Request for a

New Court Date is sign' j nd filed. Plea/sentencing hearing schedule  r November 6, 2015 at 08:30 am.

| 8 | 11-06-2015 | Scheduling conference | Dee-37, T. Christopher | Digital Recording |

**Additional Text:**

Defendant Lawrence E Poggenburg in court with attorney Brent Daniel Nistler. Brittany Skye Kachingwe appeared for the State of Wisconsin. Deputy Court Clerk: TC. Case calendared for projected guilty plea and sentencing. For reasons stated on the record, Court ordered case adjourned for status conference in Branch 31. Defense counsel requests jury trial date. Any and all motions are to be filed with the court by the final pretrial date. Case is adjourned for Final Pretrial Conference and Jury Trial, Branch 31. All parties are notified that effective 11-19-15 this case will be assigned to Reserved Branch, Branch 31, in Room 615 of the Courthouse. Status conference scheduled for November 24, 2015 at 08:30 am. Final pre-trial scheduled for January 11, 2016 at 08:30 am. Jury trial scheduled for February 15, 2016 at 09:00 am.

| 9 | 11-24-2015 | Substitution of attorney | Flynn, Dennis | Off the Record |

**Additional Text:**

-Stipulation received from Attorney Craig A. Mastantuono on behalf of his client; received and filed. Deputy Court Clerk: TC.

| 10 | 11-24-2015 | Status conference | Flynn, Dennis | Off the Record |

**Additional Text:**

Attorney Leah Thomas on behalf of attorney Craig Mastantuono in court. Kelly O'Neill appeared for the State of Wisconsin. Deputy Court Clerk: TC. Defendant's appearance waived for today's proceedings. Defense counsel would like final pre-trial on January 11, 2016 at 1:30 p.m. not 8:30 a.m.

| 11 | 12-01-2015 | Judicial transfer | Rifelj, Paul J. | |

| 12 | 01-11-2016 | Amended | Rifelj, Paul J. | Digital Recording |

**Additional Text:**

Defendant Lawrence E Poggenburg in court with attorney Craig Mastantuono. Jennifer L Pickett appeared for the State of Wisconsin. eputy Court Clerk: TC. Case calendared for final pre-trial. AS TO COUNT 1: On motion of the State, Court ordered charge amended to Disorderly Conduct, contrary to County ordinance section(s) 63.01, a Class forfeiture. Defendant enters a plea of no contest. Court found the Defendant guilty. Court orders Defendant to pay a forfeiture of $25.00 including costs to be paid by 02-10-16 or Civil Judgment. Court ordered February 15, 2016 at 9:00 a.m. jury trial vacated.

| 13 | 01-11-2016 | Charge amended | | |

| 14 | 01-11-2016 | Dispositional order/judgment | Rifelj, Paul J. | |

Printable Version (PDF)

Return to Case 2015CM002479

file:///C:/Users/Public/Documents/microsoft/Work%20docs/City%20of%20...  1/15/2016

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 29 of 88   Document 80-17

*EXHIBIT #5*

**Anna M. Pepelnjak**

| | |
|---|---|
| **From:** | Melanie <melaniecopper836@yahoo.com> |
| **Sent:** | Tuesday, February 16, 2016 3:26 PM |
| **To:** | Anna M. Pepelnjak |
| **Subject:** | Re: From Det Melanie Beasley |

Thank you. Have a nice day
Detective Melanie Beasley

Sent from my iPhone

> On Feb 16, 2016, at 3:09 PM, Anna M. Pepelnjak <amp@wbb-law.com> wrote:
>
> Dear Det. Beasley,
> I have received your two voice mail messages, this email message and a fax regarding your inability to attend the PI-21 interview on Friday, February 19, 2016. I wish you a speedy and full recovery.
>
> Because your health condition is indefinite in duration, I will prepare my investigative report without your input.
>
> Thank you,
> Anna Pepelnjak
>
> Sent from my iPhone
>
>> On Feb 16, 2016, at 6:27 AM, Melanie <melaniecopper836@yahoo.com> wrote:
>>
>> Attorney Anna,
>> You advised me I am supposed to provide testimony this Friday morning regarding a memo Shannon Lewandowski submitted to the Fire and Police Commission. I am on FMLA sick time and not able to attend to meeting. I will be in the hospital all day on Friday.
>> Please send me a response back to this email So I am aware you have received and I'm accepted to not attend.
>> The Union President Mike Crivello has also been notified of the fact I'm not at work at this time due to being fully incapacitated in treatment diagnosed by a psychiatrist.
>> Mike, I respectfully request you also call the fire and police
>> commission on my behalf and notify them as well that I am not able to testify at this time. I do not want there to be any miscommunication in any way that I have ignored a PI-21 or be punished for not attending for medical reasons which were approved by the department. The attorneys number is 414-270-2518 Please both of you respond.
>> Sincerely,
>> Detective Melanie Beasley
>> 414-491-0792
>>
>> Sent from my iPhone

1

*EXHIBIT #6*



34700 Valley Road, Oconomowoc, WI 53066-4500   P. 262-646-4411   F. 262-646-3150
Admissions or Information  000-767-4411    rogershospital.org

February 16ᵗʰ, 2016

To whom it may concern,

    Detective Beasley is currently on FMLA for medical reasons and is unable to attend scheduled PI-21 meeting on Friday February 19ᵗʰ, 2016.  Please confirm receipt of this documentation with Detective Beasley at melaniecopper836@yahoo.com or 414-491-0792. Please feel free to contact me with any further questions.

Sincerely,

**Dr. Hemalatha Rajanna, M.D.**

PTSD Psychiatrist

Rogers Memorial Hospital

PTSD Partial Hospitalization Program

414-539-3000

11101 West Lincoln Avenue, Milwaukee, WI 53227  P. 414-327-3000 F. 414-327-6045
406 Science Drive, Madison, WI 53711-1098 P. 608-238-4411 F. 608-238-4412
4600 West Schroeder Drive, Brown Deer, WI 53223 P. 414-355-9000 F. 414-355-9665
9916 75th Street, Kenosha, WI 53142 P. 262-942-4000 F. 262-942-7740

*EXHIBIT #7*

## Melanie M Beasley vs. Robert S Wilkinson

# Milwaukee County Case Number 2015CV000488

| **Filing Date** | **Case Type** | **Case Status** |
|---|---|---|
| 01-15-2015 | Civil | Closed |
| **Class Code Description** | **Responsible Official** | |
| Harassment Restraining Order | Conen-30, Jeffrey A. | |
| **Branch Id** | | |
| 30 | | |

## Parties

| **Party Type** | **Party Name** | **Party Status** |
|---|---|---|
| Petitioner | Beasley, Melanie M | |
| Respondent | Wilkinson, Robert S | |

## Party Details

**Beasley, Melanie M - Petitioner**

| **Date of Birth** | **Sex** | **Race**[1] |
|---|---|---|
| 11-1974 | | |
| **Address** | **Address Updated On** | |

**Party Attorney(s)**

| **Attorney Name** | **GAL** | **Entered** |
|---|---|---|
| Smith, Richard Joseph | No | 03-23-2015 |

**Wilkinson, Robert S - Respondent**

| **Date of Birth** | **Sex** | **Race**[1] |
|---|---|---|
| 08-1969 | Male | Caucasian |
| **Address** | | **Address Updated On** |
| Party Address Sealed by Judge Conen-30 | | 01-15-2015 |

---

1 The designation listed in the Race field is subjective. It is provided to the court by the agency that filed the case.

2 Non-Court activities do not require personal court appearances. For questions regarding which court type

Case 2:16-cv-01089-WED    Filed 04/22/19    Page 35 of 88    Document 80-17

activities require court appearances, please contact the Clerk of Circuit Court in the county where the case originated.

## Melanie M Beasley vs. Robert S Wilkinson

## Milwaukee County Case Number 2015CV000488

### Court Record Events

| | Date | Event | Court Official | Court Reporter |
|---|---|---|---|---|
| 1 | 01-15-2015 | Temporary restraining order | Conen-30, Jeffrey A. | |

| | | | | |
|---|---|---|---|---|
| 2 | 01-15-2015 | Petition for TRO/injunction | | |

| | | | | |
|---|---|---|---|---|
| 3 | 01-26-2015 | Petitioners statement of resp possession firearms | TRO Court | |

**Additional Text:**

filed. Yes, I believe the respondent currently, or within the past six months, owned or possessed firearm. .40 caliber smith and wesson (1); ruger lcp .380 (1); rifles, shotgun

| | | | | |
|---|---|---|---|---|
| 4 | 01-26-2015 | Injunction hearing | Rustad, Janice M. | Digital Recording |

**Additional Text:**

Petitioner appears in court with attorney Jamie Lavora. Respondent appears in court with attorney Dan Sanders. Hearing for Injunction proceeded. Swom: Petitioner and Respondent. Examined and cross-examined: Petitioner 10:58 Break 11:12 Recall Case Same Appearances Continued cross-examination of petitioner. Redirect. Recross. Exhibits moved into evidence. 11:53 case adjourned to 1:15pm. 1:25 Recall Case Same Appearances. Redirect/Recross of petitioner. Exhibits moved into evidence. Sworn for petitioner: Shannon Lewandowski 2:35 take a break. 3:11 Recall Case Same Appearances. Petitioner rest. Sworn for respondent: Christine Wilkinson. Exhibit moved into evidence. Respondent examinded. The time for hearing on an Injunction is extended and rescheduled for MARCH 23, 2015 at 2:15PM, ROOM 712, COURTHOUSE. If a temporary restraining order has been issued, it remains in effect until the injunction hearing is held. Parties given copies of Order. Filed, signed Order Extending Time for Hearing. 4:18 pm hearing concluded.

| | | | | |
|---|---|---|---|---|
| 5 | 03-09-2015 | Transcript | | |

**Additional Text:**

from Injunction Hearing on 1/26/15 (173 pages), filed.

| | | | | |
|---|---|---|---|---|
| 6 | 03-23-2015 | Stipulation and Order | Conen-30, Jeffrey A. | |

**Additional Text:**

for Substitution of Counsel, signed and filed.

| | | | | |
|---|---|---|---|---|
| 7 | 03-23-2015 | Injunction hearing | Rustad, Janice M. | Digital Recording |

**Additional Text:**

Petitioner appears in court with attorney Richard J. Smith. Respondent appears in court with attorney Dan Sanders. Hearing for injunction proceeded. Sworn and examined: Respondent Petitioner through counsel introduce photograph. Sworn for rebuttal: Petitioner Closing

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 37 of 88   Document 80-17

argument. The petitioner failed to meet the burden of proof. Harassment: 813.125 and 48.25(6), Wis. Stats. Domestic ___ use: 813.12, Wis. Stats. Filed, signed ᶜ ___ 'er Dismissing/Denying Petition for Injunction.

---

8   03-23-2015   Injunction denied                                Rustad, Janice M.

**Event Party**

Wilkinson, Robert S

---

9   03-23-2015   Dismissed                                        Conen-30, Jeffrey A.

---

10  04-13-2015   Transcript

**Additional Text:**

of Injunction Hearing on March 23, 2015 (84 pages), filed.

---

11  05-13-2015   Petition

**Additional Text:**

Affidavit and Proposed Order Concerning Removal of Address Information from Online Records, received. Forwarded to the Court for review/signature

---

12  06-09-2015   Order                                            Conen-30, Jeffrey A.

**Additional Text:**

Petition, Affidavit and Order Concerning Removal of Address Information from Online Records, signed and filed.

---

13  06-09-2015   Order to seal party address                      Conen-30, Jeffrey A.

**Event Party**

Wilkinson, Robert S

---

*EXHIBIT #8*

 **BE A FORCE**

Milwaukee Police Department
Police Administration Building
749 West State Street
Milwaukee, Wisconsin 53233
http://www.milwaukee.gov/police

Edward A. Flynn
Chief of Police

(414) 935-7200

July 2, 2013

The Board of the
Fire & Police Commissioners
200 E. Wells Street - Room 706
Milwaukee, WI 53202

Dear Commissioners:

      I hereby nominate and appoint, subject to your approval, the following Police Aides:

                Dorian L. Andress
                Michael R. Braunreiter
                Jeremy A. Carter
                Alberto Figueroa
                Andrew T. Fuerte
                Robert J. Gregory
                Dominique L. Heaggan
                Jordan T. Herrmann
                Ryan A. Lafond
                Paul A. Miner
                Maxwell T. Ours
                Kira L. Williams

to the rank of POLICE OFFICER in this Department to fill existing vacancies, effective SUNDAY, AUGUST 4, 2013. These appointments are contingent upon successful completion of a medical examination, drug screening, psychological evaluation, and background update.

                Respectfully Submitted,

                EDWARD A. FLYNN
                CHIEF OF POLICE

EAF:ac
cc: Payroll Supervisor Cindy Ratliff
F&P: 6/5/13

**RECEIVED**
JUL 3 2013
FIRE AND POLICE COMMISSION

Approved by the Board of Fire and Police Commissioners:

_____
Chairman

_____

_____

_____

_____          Date: _____

_____          _____
                                         Executive Director

 **BE A FORCE**

Milwaukee Police Department
Police Administration Building
749 West State Street
Milwaukee, Wisconsin 53233
http://www.milwaukee.gov/police

Edward A. Flynn
Chief of Police

(414) 935-7200

July 2, 2013

The Board of the
Fire & Police Commissioners
200 E. Wells, Room 706
Milwaukee, WI 53202

Dear Commissioners:

I hereby nominate and appoint, subject to your approval, the following named individuals to the rank of Police Officer, effective Monday, August 5, 2013:

POLICE OFFICER (Eligible List) – Adopted, July 12, 2012:

110. Anthony Walesby, II
138. Jeffrey Jopp
148. William Pamperin
149. Lee Xiong
151. Clayton Amborn
153. Luis Vargas
154. Michael Ritmanich
155. Juan Roman

The appointments will fill existing Police Officer vacancies in the Police Department. These names appear in the indicated order on the eligible lists for Police Officer adopted by your Honorable Board on July 12, 2012. The appointments are contingent upon successful completion of a medical examination, drug screen, psychological test, and background update.

These appointments total eight (8) individuals from the eligibility list and twelve (12) Police Aides being appointed to Police Officer. The Monday, August 5, 2013, class will consist of twenty (20) Probationary Police Officers.

Respectfully submitted,

EDWARD A. FLYNN
CHIEF OF POLICE

RECEIVED
JUL 3 2013
FIRE AND POLICE COMMISSION

Fire and Police Commission
July 2, 2013
Page 2


EAF:ac
F&P: 6/5/13
RECRUIT CLASS: 8/5/13

cc: Payroll Supervisor Ratliff

Approved by the BOARD OF FIRE & POLICE COMMISSIONERS:

Chairman
_____

_____

_____

_____

_____          Date: _____

_____          _____
                                          Executive Director

*EXHIBIT #9*

# MILWAUKEE POLICE DEPARTMENT

## EVALUATION REPORT

PERIOD ENDING     June 30, 2014

NAME    AMBORN, Clayton                          P.O.                    024062
                                                 RANK                    P.S. #     S.S. #

DISTRICT/BUREAU/DIVISION    District 5           SHIFT  Late Power    ASSIGNMENT  54

Instructions:  Rater to set forth in concise narrative manner specifically observed performance or behavior during rating period.  Area 3 should present a specific recommendation or course of action through which employee can improve performance as specified in Area 2 of report.

1.  **Identify area (s) where employee does well or excels:**  P.O. AMBORN is currently assigned to district five, late power shift.  He shows a positive attitude toward work and works well with others.  He is regularly punctual for duty and conforms to uniform and appearance standards.  He has shown a desire to engage in proactive policing and appears to be learning the intricacies of his job, as well as his role in achieving departmental goals.

2.  **Identify area (s) where improvement is recommended:**  P.O. AMBORN is still a relatively new officer, having five months left before he completes his probationary period.  As such, he still has much to learn and should strive to improve himself in all aspects of his job.  Being a newer employee, he lacks much of the advanced training that is available that will make him more of an asset to the department.  In the near future, P.O. AMBORN should focus on 1) increasing his self-initiated activity, and 2) explore some training opportunites once the busy summer months come to a close.

3.  **Recommended course of action through which employee can improve performance:**  P.O. AMBORN should engage in all aspects of proactive policing including traffic stops and field interviews, thereby increasing his activity and becoming more accustomed to the intricacies of the job.  He should also look to specific training such as Narco-Pouch operator, speed enforcement training, and CSO/CST training.  As P.O. AMBORN gains more experience, he should consider the Leadership in Police Organizations (LPO) training course.

How long has employee worked    rater: 4 months

**Other comments (continued from reverse, if necessary).**

Merits/Commendations: None during this period

Disciplinary Actions: None this period

Memo Book: Conforms to departmental standards

**Progress Evaluation:** Satisfactory

Rater's Signature: _____     07-11-14
                                   Rank/Title                Date

Shift Commander Signature: _____     7-11-14
                                   Rank/Title                Date

I have read this report and it has been reviewed with a Supervisory Officer.

Employee Signature: P.O. _____ AMBORN     7-11-14
                              Rank/Title                Date

District/Bureau/Division
Commander's Signature: _____ Acting Captain    7-14-14
                                   Rank/Title                Date

# Milwaukee Police Department
## Probationary Performance Report

### Check one:    Police Sergeant __
### Police Officer **X**

[X] Satisfactory        [ ] Needs Improvement        [ ] Not Responding to Training (Unsatisfactory)

**(Note: Refer to Block IV for special circumstances)**

Number of previous rating periods with a rating of (if none in a category, indicate 0): Needs Improvement **0** or Unsatisfactory **0**

| Name  PO Clayton AMBORN | Rank Police Officer | PS # 024062 | Date of Report 07-04-14 |
|---|---|---|---|
| District<br>District 5 | Shift<br>Late Power | | Date Probation Ends 12-6-2013 |

**INSTRUCTIONS:** Complete either block I or II, and all blocks thereafter (except block IV; if not applicable). Staple field training module evaluations and reworked reports to this form.

**I.  [] Field Training (12th module ending date: __)**

| Module # | Assigned FTS/FTO Name |
|---|---|
| Module # | Assigned FTS/FTO Name |
| Module # | Assigned FTS/FTO Name |

**II.  [X] Probationary Period Evaluation (for the month of: _June_)**

| Regular Duty Assignment: |
|---|
| Activity Days: |
| Non-Activity Days: |
| Sick/Injured Days: |
| Other Absence Days: |

| PROBATIONARY POLICE OFFICER ONLY | |
|---|---|
| **ACTIVITY** | **QUANTITY** |
| - Traffic (moving)Citations Issued | |
| - Traffic (equipment) Citations Issued | |
| - Traffic (parking) Citations Issued | |
| - Other Municipal Cases Processed | |
| - State Non-Traffic Cases Processed | |
| - Traffic Warnings Issued | |
| - Field Interviews Written | |
| - Inter Agency Referrals Made | |

**III. REMARKS:** Give any spec... instances to support your evaluation, such as, outsta... g accomplishments, improper actions, complaints or commendations. If probationary sergeant/officer was rated, A Needs Improvement≅ list specific areas for improveme... for a rating of A Unsatisfactory.≅ list reasons.

PO AMBORN has shown a positive attitude towards his work and an eagerness to learn. PO AMBORN works well with his co-workers. PO AMBORN is punctual for duty and maintains a professional appearance. PO AMBORN has shown that he stays current with crime trends in the district. PO AMBORN'S activity during the month of June was 12 arrest, 23 incident reports, 12 traffic stops and 5 subject stops.

In an effort to improve areas of performance the following corrective measures have been (or will be) implemented:
On occasion PO AMBORN will be assigned to a proactive squad assigned with a veteran officer help him improve on initiating self-generated activity.

Remedial training was (or will be) provided that consisted of the following:
N/A

Indicate how long F.T. Lieutenant/F.T. Sergeant has observed employee's performance:
F.T. Lieutenant's/F.T. Sergeant's Signature _Sgt. Shawn Taylor_____ Date _07-04-14_

Shift Commander's Signature _____ Date _7-4-14_

**IV. NON-PATROL DUTY OR UNAVAILABLE FOR DUTY CIRCUMSTANCES**
SHIFT COMMANDER TO CHECK AND COMPLETE IF APPLICABLE FOR THIS RATING PERIOD

Γ⊠ This probationary sergeant/officer has been temporarily reassigned to non-patrol duty because (briefly describe reason for temporary reassignment) Limited duty due to an old duty injury and therefore, the rating indicated is limited to these duties. Probationary sergeant/officer was not rated for performance of duties in patrol setting, which comprises the probationary sergeant's/officer's essential duties and responsibilities.

Γ Not rated for this monthly rating period because probationary sergeant/officer was unavailable for duty during rating period for ____ days, because of
_____ (Specify number of days and reasons for off-duty status)

**V. EMPLOYEE**

I have read this report and it has been reviewed with a supervisory officer.

Employee's Signature: PO Clayton AMBORN _P.O. _____ Date _7/4/14_

**VI. COMMANDING OFFICER** (CO to interview and comment, for other than A satisfactory progress≅ rating)

Signature _____ Date _7.7.14_

Comments:

**DISTRIBUTION:**
Original to Training Bureau

# Milwaukee Police Department
## Probationary Performance Report

Check one:     Police Sergeant __
                Police Officer **X**

[X] Satisfactory      [ ] Needs Improvement      [ ] Not Responding to Training (Unsatisfactory)

(Note: Refer to Block IV for special circumstances)

Number of previous rating periods with a rating of (if none in a category, indicate 0): Needs Improvement   0   or Unsatisfactory   0

| Name  PO Clayton AMBORN | Rank Police Officer | PS # 024062 | Date of Report 07-04-14 |
|---|---|---|---|
| District District 5 | Shift Late Power | | Date Probation Ends 12-6-2013 |

INSTRUCTIONS: Complete either block I or II, and all blocks thereafter (except block IV; if not applicable). Staple field training module evaluations and reworked reports to this form.

**I.   [] Field Training (12th module ending date: __)**

| Module # | Assigned FTS/FTO Name |
|---|---|
| Module # | Assigned FTS/FTO Name |
| Module # | Assigned FTS/FTO Name |

**II.   [X] Probationary Period Evaluation (for the month of: June )**

| Regular Duty Assignment: |
|---|
| Activity Days: |
| Non-Activity Days: |
| Sick/Injured Days: |
| Other Absence Days: |

| PROBATIONARY POLICE OFFICER ONLY | |
|---|---|
| ACTIVITY | QUANTITY |
| - Traffic (moving)Citations Issued | |
| - Traffic (equipment) Citations Issued | |
| - Traffic (parking) Citations Issued | |
| - Other Municipal Cases Processed | |
| - State Non-Traffic Cases Processed | |
| - Traffic Warnings Issued | |
| - Field Interviews Written | |
| - Inter Agency Referrals Made | |

## III. REMARKS:

Give any specific instances to support your evaluation, such as, outstanding accomplishments, improper actions, complaints or commendations. If probationary sergeant/officer was rated, A Needs Improvement ≅ list specific areas for improvemen for a rating of A Unsatisfactory ≅ list reasons.

PO AMBORN has shown a positive attitude towards his work and an eagerness to learn. PO AMBORN works well with his co-workers. PO AMBORN is punctual for duty and maintains a professional appearance. PO AMBORN has shown that he stays current with crime trends in the district. PO AMBORN'S activity during the month of June was 12 arrest, 23 incident reports, 12 traffic stops and 5 subject stops.

In an effort to improve areas of performance the following corrective measures have been (or will be) implemented:
On occasion PO AMBORN will be assigned to a proactive squad assigned with a veteran officer help him improve on initiating self-generated activity.

Remedial training was (or will be) provided that consisted of the following:
N/A

Indicate how long F.T. Lieutenant/F.T. Sergeant has observed employee's performance:
F.T. Lieutenant's/F.T. Sergeant's Signature _Sgt. Shawn Taylor_ Date 07-04-14

Shift Commander's Signature _LT ____ Date 7-4-14

## IV. NON-PATROL DUTY OR UNAVAILABLE FOR DUTY CIRCUMSTANCES
SHIFT COMMANDER TO CHECK AND COMPLETE IF APPLICABLE FOR THIS RATING PERIOD

☒ This probationary sergeant/officer has been temporarily reassigned to non-patrol duty because (briefly describe reason for temporary reassignment) Limited duty due to an old duty injury and therefore, the rating indicated is limited to these duties. Probationary sergeant/officer was not rated for performance of duties in patrol setting, which comprises the probationary sergeant's/officer's essential duties and responsibilities.

☐ Not rated for this monthly rating period because probationary sergeant/officer was unavailable for duty during rating period for ___ days, because of
_____ (Specify number of days and reasons for off-duty status)

## V. EMPLOYEE

I have read this report and it has been reviewed with a supervisory officer.

Employee's Signature: PO Clayton AMBORN  _P.O. Clayton_   Date 7/4/14

## VI. COMMANDING OFFICER (CO to interview and comment, for other than A satisfactory progress≅ rating)

Signature _____ Date 7-7-14

Comments:

# Milwaukee Police Department
## Probationary Performance Report

**Check one:**    Police Sergeant __
Police Officer **X**

[X] Satisfactory         [ ] Needs Improvement         [ ] Not Responding to Training (Unsatisfactory)

(Note: Refer to Block IV for special circumstances)

Number of previous rating periods with a rating of (if none in a category, indicate 0): Needs Improvement   0   or Unsatisfactory   0

| Name PO Clayton AMBORN | Rank Police Officer | PS # 024062 | Date of Report 09-05-14 |
|---|---|---|---|
| District<br>District 5 | Shift<br>Late Power | | Date Probation Ends<br>12-05-2014 |

**INSTRUCTIONS:** Complete either block I or II, and all blocks thereafter (except block IV; if not applicable). Staple field training module evaluations and reworked reports to this form.

I.    [] Field Training (12th module ending date: __)

| Module # | Assigned FTS/FTO Name |
|---|---|
| Module # | Assigned FTS/FTO Name |
| Module # | Assigned FTS/FTO Name |

II.    [X] Probationary Period Evaluation (for the month of: September)

| Regular Duty Assignment: Squad Patrol |
|---|
| Activity Days: 13 |
| Non-Activity Days: 0 |
| Sick/Injured Days: 0 |
| Other Absence Days: 0 |

| PROBATIONARY POLICE OFFICER ONLY | |
|---|---|
| ACTIVITY | QUANTITY |
| - Traffic (moving) Citations Issued | |
| - Traffic (equipment) Citations Issued | |
| - Traffic (parking) Citations Issued | |
| - Other Municipal Cases Processed | |
| - State Non-Traffic Cases Processed | |
| - Traffic Warnings Issued | |
| - Field Interviews Written | |
| - Inter Agency Referrals Made | |

**III. REMARKS:** Give any specific instances to support your evaluation, such as, outstanding accomplishments, improper actions, complaints or commendations. If probationary sergeant/officer was rated, A Needs Improvement ≅ list specific areas for improvement for a rating of A Unsatisfactory ≅ list reasons.

PO AMBORN has shown a positive attitude towards his work and an eagerness to learn. PO AMBORN works well with his co-workers. PO AMBORN is punctual for duty and maintains a professional appearance. PO AMBORN has shown that he stays current with crime trends in the district. PO AMBORN has shown that he has the ability to work as a one-man squad. A review of PO AMBORN'S activity during the month of September shows the following: 0 arrest, 21 incident reports, 35 traffic stops and 1 subject stop. PO AMBORN incident reports and traffic stops are above average, but arrest and subject stops compared to his peers during the same time period are below average.

In an effort to improve areas of performance the following corrective measures have been (or will be) implemented:
On occasion PO AMBORN will he assigned to a proactive squad assigned with a veteran officer help him improve on initiating self-generated activity. A supervisor will meet with PO AMBORN regularly during the rating period to review his activity, to ensure that he his performing at a level comparable with his peers. A sergeant will meet with PO AMBORN regularly to review his activity to ensure that he is performing at or above a level comparable with his peers.

Remedial training was (or will be) provided that consisted of the following:
N/A

Indicate how long F.T. Lieutenant/F.T. Sergeant has observed employee's performance:
F.T. Lieutenant's/F.T. Sergeant's Signature _Sgt. Shramek Tyler_ Date 10-04-2014

Shift Commander's Signature _Hrbacic Turcinovic TURCINOVIC_ Date 10/05/14

**IV. NON-PATROL DUTY OR UNAVAILABLE FOR DUTY CIRCUMSTANCES**
SHIFT COMMANDER TO CHECK AND COMPLETE IF APPLICABLE FOR THIS RATING PERIOD

☒ This probationary sergeant/officer has been temporarily reassigned to non-patrol duty because (briefly describe reason for temporary reassignment), Limited duty due to an old duty injury and therefore, the rating indicated is limited to these duties. Probationary sergeant/officer was not rated for performance of duties in patrol setting, which comprises the probationary sergeant's/officer's essential duties and responsibilities.

☐ Not rated for this monthly rating period because probationary sergeant/officer was unavailable for duty during rating period for ___ days, because of
_____ (Specify number of days and reasons for off-duty status)

**V. EMPLOYEE**

I have read this report and it has been reviewed with a supervisory officer.

Employee's Signature: PO Clayton AMBORN _Clayton AMBORN_ Date 09-05-2014

**VI. COMMANDING OFFICER** (C/O to interview and comment, for other than A satisfactory progress ≅ rating)

Signature _Capt. Thomas H. Stigler (A)_ Date 10/05/14

Comments:

# Milwaukee Police Department
## obationary Performance Report

Check one:     Police Sergeant __
Police Officer **X**

[X] Satisfactory     [ ] Needs Improvement     [ ] Not Responding to Training (Unsatisfactory)

(Note: Refer to Block IV for special circumstances)

Number of previous rating periods with a rating of (if none in a category, indicate 0):  Needs Improvement  0  or Unsatisfactory  0

| Name  PO Clayton AMBORN | Rank Police Officer | PS # 024062 | Date of Report 09-05-14 |
|---|---|---|---|
| District<br>District 5 | Shift<br>Late Power | | Date Probation Ends<br>12-05-2014 |

**INSTRUCTIONS:**  Complete either block I or II, and all blocks thereafter (except block IV; if not applicable).  Staple field training module evaluations and reworked reports to this form.

I.    [] Field Training (12th module ending date:  _)

| Module # | Assigned FTS/FTO Name |
|---|---|
| Module # | Assigned FTS/FTO Name |
| Module # | Assigned FTS/FTO Name |

II.    [X] Probationary Period Evaluation (for the month of: <u>August</u>)

| Regular Duty Assignment: Squad Patrol |
|---|
| Activity Days: 16 |
| Non-Activity Days:  0 |
| Sick/Injured Days:  0 |
| Other Absence Days: 0 |

| PROBATIONARY POLICE OFFICER ONLY | |
|---|---|
| ACTIVITY | QUANTITY |
| - Traffic (moving)Citations Issued | |
| - Traffic (equipment) Citations Issued | |
| - Traffic (parking) Citations Issued | |
| - Other Municipal Cases Processed | |
| - State Non-Traffic Cases Processed | |
| - Traffic Warnings Issued | |
| - Field Interviews Written | |
| - Inter Agency Referrals Made | |

**III. REMARKS:** Give any specific instances to support your evaluation, such as, outstanding accomplishments, improper actions, complaints or commendations. If probationary sergeant/officer was rated, A Needs Improvement≡ list specific areas for improvement for a rating of A Unsatisfactory,≡ list reasons.

PO AMBORN has shown a positive attitude towards his work and an eagerness to learn. PO AMBORN works well with his co-workers. PO AMBORN is punctual for duty and maintains a professional appearance. PO AMBORN has shown that he stays current with crime trends in the district. PO AMBORN has shown that he has the ability to work as a one-man squad. A review of PO AMBORN'S activity thus far during this current Compstat rating period (July 20- September 5) shows the following: 8 arrest, 40 incident reports, 29 traffic stops and 2 subject stops. PO AMBORN incident reports are above average, but arrest, traffic stops and subject stops during this rating period compared to his peers are below average.

In an effort to improve areas of performance the following corrective measures have been (or will be) implemented:
On occasion PO AMBORN will be assigned to a proactive squad assigned with a veteran officer help him improve on initiating self-generated activity. A supervisor will meet with PO AMBORN regularly during the rating period to review his activity, to ensure that he his performing at a level comparable with his peers. A sergeant will meet with PO AMBORN regularly to review his activity to ensure that he is performing at or above a level comparable with his peers.

Remedial training was (or will be) provided that consisted of the following:
N/A

Indicate how long F.T. Lieutenant/F.T. Sergeant has observed employee's performance:
F.T. Lieutenant's/F.T. Sergeant's Signature _____ Date 09-05-2014

Shift Commander's Signature _____ Date 9-5-14

**IV. NON-PATROL DUTY OR UNAVAILABLE FOR DUTY CIRCUMSTANCES**
SHIFT COMMANDER TO CHECK AND COMPLETE IF APPLICABLE FOR THIS RATING PERIOD

⊠ This probationary sergeant/officer has been temporarily reassigned to non-patrol duty because (briefly describe reason for temporary reassignment) Limited duty due to an old duty injury and therefore, the rating indicated is limited to these duties. Probationary sergeant/officer was not rated for performance of duties in patrol setting, which comprises the probationary sergeant's/officer's essential duties and responsibilities.

☐ Not rated for this monthly rating period because probationary sergeant/officer was unavailable for duty during rating period for ___ days, because of
_____ (Specify number of days and reasons for off-duty status)

**V. EMPLOYEE**

I have read this report and it has been reviewed with a supervisory officer.

Employee's Signature: PO Clayton AMBORN _____ Date 09-05-2014

**VI. COMMANDING OFFICER** (CO to interview and comment, for other than A satisfactory progress≡ rating)

Signature _____ Date 9·9·14

Comments:

# MILWAUKEE POLICE DEPARTMENT

## EVALUATION REPORT

PERIOD ENDING    12-31-2014

NAME   Clayton AMBORN                         Police Officer              024062     N/A
                                              RANK                        P.S. #     S.S. #

DISTRICT/BUREAU/DIVISION    District 5              SHIFT  Late Power    ASSIGNMENT  54

Instructions:  Rater to set forth in concise narrative manner specifically observed performance or behavior during rating period.  Area 3 should present a specific recommendation or course of action through which employee can improve performance as specified in Area 2 of report.

1.  **Identify area (s) where employee does well or excels:**  PO AMBORN, when at work, is prepared for duty and has a neat and clean uniform appearance.  PO AMBORN gets along well with his peers and does not receive citizen complaints.  PO AMBORN is a good team worker. PO AMBORN works effectively with co- workers and is respectful towards supervision. PO AMBORN accepts assigments willingly and without complaint. PO AMBORN keeps informed of the latest trends and developments that occur in the district.

**Identify area (s) where improvement is recommended:**  During comp stat rating period, June 1, 2014 through July 19, 2014, the power shift means were as follows: 69 traffic stops, 16 subject stops, 10 arrest and 34 incident reports.  PO AMBORN'S activity during this rating period compared to his peer during this rating period is as follows: 45 traffic stops, 6 subject stops, 12 arrest and 32 incident reports.  Traffic stops, subject stops and incident report are below an acceptable level compared to his peer during this rating period.  PO AMBORN'S arrest activity during this rating period was above average.

During comp stat rating period, July 27, 2014 through September 13, 2014, the power shift means were as follows: 56 traffic stops, 20 subject stops, 10 arrest and 38 incident reports.  PO AMBORN'S activity during this rating period compared to his peer during this rating period is as follows: 25 traffic stops, 2 subject stops, 6 arrest and 35 incident reports.  PO AMBORN'S traffic stops, subject stops, arrest and incident reports were all below an acceptable level compared to his peers.

PO AMBORN has a poor attendance record. PO AMBORN has been absent for a substantial portion of this evaluation period.

2. **Recommended course of action through which employee can improve performance:** PO AMBORN can improve is performance by improving his attendance. By improving his attendance his activity will improve. PO AMBORN will also improve his activity my focusing on patrolling in the district hot spots, and focusing on target vehicles, during his unobligated patrol time.

Short term goal: PO AMBORN should improve his attendance

Long term goals: PO AMBORN should continue to seek additional training to expand his knowledge base and to also improve his overall activity.

**How long has employee worked for rater:** 12 months

**Other comments (continued from reverse, if necessary).** On Sunday, June 8th, 2014, PO AMBORN and his partner responded to a Strong Armed Robbery. PO AMBORN and his partner arrested 5 subjects regarding the Strong Armed robbery. PO AMBORN also conducted custodial interrogations regarding.

PO Amborn has completed the credit requirement.

**Progress Evaluation:** PO AMBORN needs improvement.

Rater's Signature: _Sgt. Shaunnen Taylor_ TAYLOR     Rank/Title     04-09-15   Date

Shift Commander Signature: _____ Rank/Title     4-14-15   Date

I have read this report and it has been reviewed with a Supervisory Officer.

Employee Signature: _P.O._ _____ AMBORN     Rank/Title     04/14/15   Date

District/Bureau/Division
Commander's Signature: _____



# Milwaukee Police Department
## Probationary Performance Report

Check one:     Police Sergeant ___
               Police Officer  X

[X] Satisfactory        [ ] Needs Improvement        [ ] Not Responding to Training (Unsatisfactory)

(Note: Refer to Block IV for special circumstances)

Number of previous rating periods with a rating of (if none in a category, indicate 0): Needs Improvement  **0**  or Unsatisfactory  **0**

| Name   PO Clayton AMBORN | Rank Police Officer | PS # 024062 | Date of Report 02-08-2015 |
|---|---|---|---|
| District District 5 | Shift Late Power | | Date Probation Ends 03-18-2015 |

**INSTRUCTIONS:** Complete either block I or II, and all blocks thereafter (except block IV; if not applicable). Staple field training module evaluations and reworked reports to this form.

I.   [] Field Training (12th module ending date: __)

| Module # | Assigned FTS/FTO Name |
|---|---|
| Module # | Assigned FTS/FTO Name |
| Module # | Assigned FTS/FTO Name |

II.   [X] Probationary Period Evaluation (for the month of: **August**)

| Regular Duty Assignment: Squad Patrol |
|---|
| Activity Days: |
| Non-Activity Days: |
| Sick/Injured Days: |
| Other Absence Days: |

| PROBATIONARY POLICE OFFICER ONLY | |
|---|---|
| ACTIVITY | QUANTITY |
| - Traffic (moving) Citations Issued | |
| - Traffic (equipment) Citations Issued | |
| - Traffic (parking) Citations Issued | |
| - Other Municipal Cases Processed | |
| - State Non-Traffic Cases Processed | |
| - Traffic Warnings Issued | |
| - Field Interviews Written | |
| - Inter Agency Referrals Made | |

## III. REMARKS:

Give any specific instances to support your evaluation, such as, outstanding accomplishments, improper actions, compli___ or commendations. If probationary sergeant/officer was rated, A Needs Improvement≡ list specific areas for improve, for a rating of A Unsatisfactory.≡ list reasons.

PO AMBORN has shown a positive attitude towards his work and an eagerness to learn. PO AMBORN works well with his co-workers. PO AMBORN is punctual for duty and maintains a professional appearance. PO AMBORN has shown that he stays current with crime trends in the district. PO AMBORN has shown that he has the ability to work as a one-man squad. A review of PO AMBORN'S activity during the month of January shows the following: 0 arrest, 13 incident reports, 33 traffic stops and 4 subject stops.

In an effort to improve areas of performance the following corrective measures have been (or will be) implemented:
On occasion PO AMBORN will be assigned to a proactive squad assigned with a veteran officer help him improve on initiating self-generated activity. A supervisor will meet with PO AMBORN regularly during the rating period to review his activity, to ensure that he his performing at a level comparable with his peers. A sergeant will meet with PO AMBORN regularly to review his activity to ensure that he is performing at or above a level comparable with his peers.

Remedial training was (or will be) provided that consisted of the following:
N/A

Indicate how long F.T. Lieutenant/F.T. Sergeant has observed employee's performance:
F.T. Lieutenant's/F.T. Sergeant's Signature _Sgt. Maureen Taylor_ Date _02-17-15_

Shift Commander's Signature _HiBois Turcinovic TURCINOVIC_ Date _02/17/15_

## IV. NON-PATROL DUTY OR UNAVAILABLE FOR DUTY CIRCUMSTANCES
### SHIFT COMMANDER TO CHECK AND COMPLETE IF APPLICABLE FOR THIS RATING PERIOD

[☒] This probationary sergeant/officer has been temporarily reassigned to non-patrol duty because (briefly describe reason for temporary reassignment) Limited duty due to an old duty injury and therefore, the rating indicated is limited to these duties. Probationary sergeant/officer was not rated for performance of duties in patrol setting, which comprises the probationary sergeant's/officer's essential duties and responsibilities.

[ ] Not rated for this monthly rating period because probationary sergeant/officer was unavailable for duty during rating period for ___ days, because of

_____ (Specify number of days and reasons for off-duty status)

## V. EMPLOYEE

I have read this report and it has been reviewed with a supervisory officer.

Employee's Signature: PO Clayton AMBORN _(signature) AMBORN_ Date _2/17/15_

## VI. COMMANDING OFFICER (C/O to interview and comment, for other than A satisfactory progress≡ rating)

Signature _Capt. Thomas H. Stigler C/O_ Date _02/17/15_

Comments:

# Milwaukee Police Department
## Probationary Performance Report

Check one:  Police Sergeant __
Police Officer  X

[X] Satisfactory  [ ] Needs Improvement  [ ] Not Responding to Training (Unsatisfactory)

(Note: Refer to Block IV for special circumstances)

Number of previous rating periods with a rating of (if none in a category, indicate 0):  Needs Improvement  0  or Unsatisfactory  0

| Name  PO Clayton AMBORN | Rank Police Officer | PS # 024062 | Date of Report 03-07-2015 |
|---|---|---|---|
| District District 5 | Shift Late Power | | Date Probation Ends 03-18-2015 |

**INSTRUCTIONS:** Complete either block I or II, and all blocks thereafter (except block IV; if not applicable). Staple field training module evaluations and reworked reports to this form.

I.  [] Field Training (12th module ending date:  _)

| Module # | Assigned FTS/FTO Name |
|---|---|
| Module # | Assigned FTS/FTO Name |
| Module # | Assigned FTS/FTO Name |

II.  [X] Probationary Period Evaluation (for the month of: <u>February</u>)

| Regular Duty Assignment: Squad Patrol |
|---|
| Activity Days: |
| Non-Activity Days: |
| Sick/Injured Days: |
| Other Absence Days: |

| PROBATIONARY POLICE OFFICER ONLY | |
|---|---|
| <u>ACTIVITY</u> | <u>QUANTITY</u> |
| - Traffic (moving)Citations Issued | |
| --Traffic (equipment) Citations Issued | |
| - Traffic (parking) Citations Issued | |
| - Other Municipal Cases Processed | |
| - State Non-Traffic Cases Processed | |
| - Traffic Warnings Issued | |
| - Field Interviews Written | |
| - Inter Agency Referrals Made | |

III. **REMARKS:**    Give any specific instances to support your evaluation, such as, outstanding accomplishments, improper actions, complaints or commendations. If probationary sergeant/officer was rated, A Needs Improvement list specific areas for improvement; for a rating of A Unsatisfactory list reasons.

PO AMBORN has shown a positive attitude towards his work and an eagerness to learn. PO AMBORN works well with his co-workers. PO AMBORN is punctual for duty and maintains a professional appearance. PO AMBORN has shown that he stays current with crime trends in the district. PO AMBORN has shown that he has the ability to work as a one-man squad. A review of PO AMBORN'S activity during the month of February shows the following: 2 arrest, 10 incident reports, 56 traffic stops and 1 subject stops. PO AMBORN has improved his traffic activity this month.

In an effort to improve areas of performance the following corrective measures have been (or will be) implemented:
On occasion PO AMBORN will be assigned to a proactive squad assigned with a veteran officer help him improve on initiating self-generated activity. A supervisor will meet with PO AMBORN regularly during the rating period to review his activity, to ensure that he his performing at a level comparable with his peers. A sergeant will meet with PO AMBORN regularly to review his activity to ensure that he is performing at or above a level comparable with his peers.

Remedial training was (or will be) provided that consisted of the following:
N/A

Indicate how long F.T. Lieutenant/F.T. Sergeant has observed employee's performance:
F.T. Lieutenant's/F.T. Sergeant's Signature _____ Date 03-07-15

Shift Commander's Signature _____ TVRCINOVIC _____ Date 03/10/15

IV. **NON-PATROL DUTY OR UNAVAILABLE FOR DUTY CIRCUMSTANCES**
    SHIFT COMMANDER TO CHECK AND COMPLETE IF APPLICABLE FOR THIS RATING PERIOD

☐   This probationary sergeant/officer has been temporarily reassigned to non-patrol duty because (briefly describe reason for temporary reassignment) Limited duty due to an old duty injury and therefore, the rating indicated is limited to these duties. Probationary sergeant/officer was not rated for performance of duties in patrol setting, which comprises the probationary sergeant's/officer's essential duties and responsibilities.

☐   Not rated for this monthly rating period because probationary sergeant/officer was unavailable for duty during rating period for ___ days, because of

_____ (Specify number of days and reasons for off-duty status)

V. **EMPLOYEE**

I have read this report and it has been reviewed with a supervisory officer.

Employee's Signature: PO Clayton AMBORN _____ AMBORN    Date 3/07/15

VI. **COMMANDING OFFICER** (C/O to interview and comment, for other than A satisfactory progress rating)

Signature _____ Capt. Thomas H. Stigler (CV) _____ Date 03/10/15

Comments:

PE-27 5/87

# MILWAUKEE POLICE DEPARTMENT

## EVALUATION REPORT

PERIOD ENDING    05-31-2015

| NAME | PO Clayton AMBORN | Police Officer | 024062 | N/A |
|---|---|---|---|---|
| | | RANK | P.S. # | S.S. # |

DISTRICT/BUREAU/DIVISION    5        SHIFT   Power     ASSIGNMENT   Patrol

**Instructions:** Rater to set forth in concise narrative manner specifically observed performance or behavior during rating period. Area 3 should present a specific recommendation or course of action through which employee can improve performance as specified in Area 2 of report.

**Identify area (s) where employee does well or excels:** PO AMBORN, when at work, is prepared for duty and has a neat and clean uniform appearance. PO AMBORN gets along well with his peers and does not receive citizen complaints. PO AMBORN is a good team worker. PO AMBORN works effectively with co- workers and is respectful towards supervision. PO AMBORN accepts assigments willingly and without complaint. PO AMBORN keeps informed of the latest trends and developments that occur in the district.

**Identify area (s) where improvement is recommended:** PO AMBORN has shown that he is a capable officer when is working, but he has a poor attendance record and is on medical substantiation. PO AMBORN should strive to improve his attendance, which will improve his activity during the next evaluation period.

**3. Recommended course of action through which employee can improve performance:** PO AMBORN could improve his performance by requesting to attend specialty-training course order by the academy or other Law Enforcement entities.

How long has employee worked for ____ter: 18 months

Other comments (continued from reverse, if necessary). N/A

**Progress Evaluation:** PO AMBORN needs improvement.

NOTE: PO AMBORN needs improvement
in areas of decision making,
                report writing
                Attendance
        & knowledge of laws & procedures,
    Sgt. Grant has filed memos on
    these issues which have been forwarded
    to Academy for training. Capt. Vas

Rater's Signature: _____    08-12-15
                         Rank/Title          Date

Shift Commander Signature: _____    8-14-18
                                      Rank/Title      Date

I have read this report and it has been reviewed with a Supervisory Officer.

Employee Signature: P.O. _____    8/12/15
                               Rank/Title      Date

District/Bureau/Division
Commander's Signature: _Capt._____ STIGLER    8/28/15
                               Rank/Title      Date

*EXHIBIT #10*

# Municipal Court Query System

Court Reports and Statistics



**CITY OF MILWAUKEE**
# MUNICIPAL COURT
Case Information &
Online Payment System

New Search

🖶 Printing Tips

## Case Number: 15011552

### Defendant Information

| | |
|---|---|
| **Name:** | AMBORN, CLAYTON R |
| **Last Known Address:** | N/A |
| **Month of Birth:** | 09/1984 |
| **Sex:** | Male |
| **Race:** | White |

All Cases for Defendant | All Scheduled Appearances / Submit a Plea | Make a Payment

### Case Information

| | | | |
|---|---|---|---|
| **Case Type:** | Traffic citation | **Status:** | Closed |
| **Violation:** | Statute 346.63(1)(b), Operating While Intoxicated - BAC .08%+ | **Citation #:** | U8747874 |
| **Violation Date:** | 03/08/2015 01:15 AM | | |
| **Location:** | 1ST ST S / 800 BLK | **Deposit Amount:** | $811.00 |
| **Plea:** | No Contest | **In Collection?** | No |
| **Plea Entered By:** | Defendant | **Installment Plan?** | No |

### Judgment

| | | | |
|---|---|---|---|
| **Finding:** | Guilty - Suspended Sentence | **Date:** | 05/21/2015 |
| **Penalty:** | $0.00 | **Due On:** | 05/21/2015 |
| **Balance Due:** | $0.00 | **Branch:** | 1 |

New Search

Return To Municipal Court Home

• Mayor Tom Barrett    • Services & Programs    • Web & Email Policies
• Common Council        • Do Business           • Contact Us
• Departments           • Live & Work
• Calendar              • Play

City of Milwaukee

MILWAUKEE
Design by City of Milwaukee

# Municipal Court Query System

Court Reports and Statistics



# CITY OF MILWAUKEE
# MUNICIPAL COURT    Case Information & Online Payment System    [ New Search ]

🖨 Printing Tips

**Case Number: 15D11551**

## Defendant Information

| | |
|---|---|
| **Name:** | AMBORN, CLAYTON R |
| **Last Known Address:** | N/A |
| **Month of Birth:** | 09/1984 |
| **Sex:** | Male |
| **Race:** | White |

[ All Cases for Defendant ]    [ All Scheduled Appearances / Submit a Plea ]    [ Make a Payment ]

## Case Information

| | | | |
|---|---|---|---|
| **Case Type:** | Traffic citation | **Status:** | Closed |
| **Violation:** | Statute 346.63(1)(a), Operating While Intoxicated | **Citation #:** | U8747863 |
| **Violation Date:** | 03/08/2015 01:15 AM | | |
| **Location:** | 1ST ST S / 800 BLK | **Deposit Amount:** | $811.00 |
| **Plea:** | No Contest | **In Collection?** | No |
| **Plea Entered By:** | Defendant | **Installment Plan?** | No |

## Judgment

| | | | |
|---|---|---|---|
| **Finding:** | Guilty | **Date:** | 05/21/2015 |
| **Penalty:** | $861.00 | **Due On:** | 07/20/2015 |
| **Balance Due:** | $0.00 | **Branch:** | 1 |

| Additional Penalty | Amount | Enforced On |
|---|---|---|
| AODA Assessment | 1 Program attendance | |
| DL Revocation - Concurrent | 180 Days | 05/22/2015 |
| Ignition Interlock Device | 365 Days | 05/22/2015 |

| Alternative to Non-Payment by Due Date | Amount | Enforced On |
|---|---|---|
| Commitment - Consecutive | 17 Days | |

New Search

Return To Municipal Court Home



City of

• Mayor Tom Barrett    • Services & Programs    • Web & Email Policies
• Common Council    • Do Business    • Contact Us
• Departments    • Live & Work

MILWAUKEE
Design by City of Milwaukee

# EXHIBIT #11



**FIRE & POLICE COMMISSION**

Milwaukee Police Department
Operational Organizational Chart
Effective May 24, 2015

**OFFICE OF THE CHIEF**

- OFFICE OF MANAGEMENT ANALYSIS AND PLANNING
- PUBLIC RELATIONS
- BUDGET & FINANCE
- EXECUTIVE PROTECTION

## NORTH COMMAND BUREAU
- FOURTH DISTRICT
- FIFTH DISTRICT
- SEVENTH DISTRICT
- TACTICAL PLANNING & LOGISTICS
- POLICY, RESEARCH & DEVELOPMENT
- GRANT & COMMUNITY DEVELOPMENT COORDINATION
- STRATEGIC & ADMINISTRATIVE ANALYSIS
- PERFORMANCE MEASURES / COMPSTAT
- LICENSING UNIT

## CENTRAL COMMAND BUREAU
- FIRST DISTRICT
  - MARINE OPERATIONS UNIT
  - MOUNTED PATROL UNIT
- THIRD DISTRICT
- NEIGHBORHOOD TASK FORCE
- CANINE UNIT
- CRASH RECONSTRUCTION UNIT
- FUGITIVE APPREHENSION UNIT
- MOTORCYCLE UNIT
- STREET CRIMES UNIT
- TACTICAL ENFORCEMENT UNIT

## SOUTH COMMAND BUREAU
- SECOND DISTRICT
- SIXTH DISTRICT
- OFFICE OF COMMUNITY OUTREACH AND EDUCATION
- T.A.R.S UNIT

POLICE ACADEMY
- SAFETY UNIT
- FIREARMS UNIT
- IN SERVICE UNIT
- RECRUIT UNIT
- RECREATION ASSOCIATION OF THE MILWAUKEE POLICE DEPARTMENT

## RISK MANAGEMENT BUREAU
- INTERNAL AFFAIRS DIVISION
  - CIVIL INVESTIGATIONS SECTION
  - INTERNAL INVESTIGATIONS SECTION
  - SPECIAL INVESTIGATIONS SECTION
- INSPECTIONS DIVISION
  - FIELD INSPECTIONS SECTION
  - AUDITS SECTION
  - INSPECTIONS SECTION
  - ACCREDITATIONS SECTION
- HUMAN RESOURCES DIVISION
  - BACKGROUND INVESTIGATIONS UNIT
  - MEDICAL SECTION
  - PAYROLL SECTION
  - RECRUITING UNIT
- EARLY INTERVENTION PROGRAM

## INVESTIGATIONS AND INTELLIGENCE BUREAU
- CENTRAL INVESTIGATIONS DIVISION
- NORTH INVESTIGATIONS DIVISION
- SOUTH INVESTIGATIONS DIVISION
  - FINANCIAL CRIMES UNIT
- METROPOLITAN INVESTIGATIONS DIVISION
- SENSITIVE CRIMES DIVISION
- NARCOTICS DIVISION
- INVESTIGATIVE MANAGEMENT DIVISION
  - FORENSICS SECTION
  - EXTRADITION UNIT
- INTELLIGENCE FUSION CENTER
  - STAC
  - DIGNITARY PROTECTION UNIT
  - REAL-TIME EVENTS CENTER
  - PREDICTIVE INTELLIGENCE CENTER
  - HIGH TECHNOLOGY UNIT
  - FIREARMS INTELLIGENCE UNIT

## STRATEGIC MANAGEMENT BUREAU
- CENTRAL BOOKING SECTION
- COURT ADMINISTRATION SECTION
- PROPERTY CONTROL SECTION
- TECHNICAL COMMUNICATIONS DIVISION
- FACILITIES SERVICES DIVISION
  - FLEET SERVICES SECTION
  - PRINTING & STORES SECTION
- INFORMATION SYSTEMS DIVISION
  - TECHNOLOGY UNIT
  - RADIO COMMUNICATIONS SECTION
- RECORDS MANAGEMENT DIVISION
  - OPEN RECORDS



MILWAUKEE POLICE DEPARTMENT
OPERATIONAL ORGANIZATIONAL CHART
EFFECTIVE AUGUST 2, 2015

# EXHIBIT #12

City of Milwaukee
CS-25, Rev. 12/09

# JOB DESCRIPTION

FOR DER USE ONLY

Vacancy No.
City Service                    Finance
Commission:                     Committee:
Fire & Police                   Common
Commission:                     Council:

**Instructions:** Complete all sections. Refer to the *Guidelines for Preparing Job Descriptions* for instructions on completing specific items.

| 1. Date Prepared/ Revised: 4/15/15 | 2. Present Incumbent: Various | Is incumbent underfilling position? |
|---|---|---|
| 3. Date Filled: | 4. Previous Incumbent: Various | YES ☐  NO ☒ *If YES, indicate Underfill Title in box 10.* |

| 5. Department: Police Department | Bureau: Varied | Unit: |
|---|---|---|
| | Division: | Section: |

| 6. Work Location: Varied | Telephone: Email: | Work Schedule: Hours: : 8 hr shifts; various start times / Days: |
|---|---|---|

| 7. Represented by a Union? ☒ Yes ☐ No | 8. Bargaining Unit: Local 21, Milw Police Assn If in District Council 48, which local? | 9. FLSA Status *(check one):* ☐ Exempt  ☒ Non-Exempt |
|---|---|---|

| 10. | Official Title: Police Officer | | Pay Range | Job Code | EEO Code |
|---|---|---|---|---|---|
| | | | 4B | 2342 | |
| | Underfill Title *(if applicable):* | | | | |
| | Requested Title *(if applicable):* | | | | |

| Recommended Title (DER Use Only): | Approved by: *A/C* |
|---|---|
| | Date: 5/8/2015 |

## 11. BASIC FUNCTION OF POSITION:

The preservation of public peace, protection of life and property, prevention of crime, enforcement of ordinances of the City of Milwaukee and the laws of the State of Wisconsin, and the arrest of violators thereof in accordance with the Code of Conduct and mission of the Milwaukee Police Department.

## 12. DESCRIPTION OF JOB (Check if description applies to Official Title ☒ or Underfill Title ☐):

**A. ESSENTIAL FUNCTIONS/Duties and Responsibilities:** *(Refer to the "Guidelines for Preparing Job Descriptions" for instructions on determining Essential Functions.)*

| % of Time | ESSENTIAL FUNCTIONS |
|---|---|
| 100 | • Carries and maintains firearms and other defensive weapons in accordance with official training. <br> • Executes powers of arrest and control, including full search of arrestee. <br> • Serves as a credible witness in court and administrative proceedings. |
| | • Has working knowledge of the Wisconsin criminal and traffic laws and City of Milwaukee ordinances. |
| | • Enforces criminal laws, identifies, detains, and processes wanted individuals, all in accordance with the Constitution of the United States, State of Wisconsin and ordinances of the City of Milwaukee. <br> • Responds to calls for service or traffic related assignments in order of priority and handles such calls efficiently and responsibly, consistent with training, Department directives, Code of Conduct, and Standard Operating Procedures. <br> • Conducts crime scene investigations, properly documenting all pertinent information to such investigation including evidence recovery and preservation, witness and suspect statements, and provides such information to the commanding officers. <br> • Physically control suspects who are actively resisting arrest ensuring the humane treatment and care of prisoners detained. |
| | • Prepares and testifies in court as to the facts surrounding any criminal, departmental, or civil action. |
| | • Properly and thoroughly documents all pertinent information needed to prepare for and present a case in the District Attorney's Office for charging. Ensures accurate entry of all information into the Records Management System. |

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

*Page 1 of 5, CS-25, Job Description*

| % of Time | ESSENTIAL FUNCTIONS |
|---|---|
| | • Using the data available, familiarizes him/herself with the daily crime trends, suspect and/or vehicle descriptions, and when directed, deploys to those areas to abate crime and to apprehend those individuals responsible.<br>• Identifies and develops strategies to solve problems, utilizing data and the analysis of data to manage those issues. |
| | • Develops and maintains functional knowledge of the technology available to properly elicit information relative to offenses, and to properly report those incidents of which an officer takes cognizance. |
| | • Maintains a professional demeanor and displays a proper attitude in all dealings with citizens, supervisors and other departmental personnel.<br>• Acts in a manner consistent with the Code of Conduct, Policies and Procedures and Standard Operating Procedures as set forth by the Chief of Police. |
| | • Participates in and successfully completes all required training (e.g., recruit, field, probationary, CPR, firearm, DAAT, EVOC, etc). |
| | • Reports to duty fully equipped, prepared, and fit for the full duration of his/her scheduled shift. |

**B.  PERIPHERAL DUTIES:**

| % of Time | PERIPHERAL DUTY |
|---|---|
| | • Other duties as assigned. |
| | • |
| | • |
| | • |
| | • |
| | • |
| | • |
| | • |
| | • |
| | • |

**C.  NAME AND TITLE OF IMMEDIATE SUPERVISOR:**

Normally a Police Sergeant, but could be a Lieutenant of Police, Captain of Police, or Civilian Manager.

**D.  SUPERVISION RECEIVED:**  (Describe the extent to which work assignments and methods are outlined, reviewed, and approved by this position's supervisor.)

A police officer is supervised by a member of a higher rank who makes assignments of work and discusses methods to be employed in the performance of such duties, reviews and approves work performed, and instructs the police officer in the proper method of performing all the duties of an officer.

**E.  SUPERVISION EXERCISED:**
Total number of employees for whom responsible, either directly or indirectly = **None**.

**Direct Supervision:** List the number and titles of personnel directly supervised. Specify the kind and extent of supervision exercised by indicating one or more of the following:

| | | | |
|---|---|---|---|
| a. | Assign duties | e. | Sign or approve work |
| b. | Outline methods | f. | Make hiring recommendations |
| c. | Direct work in progress | g. | Prepare performance appraisals |
| d. | Check or inspect completed work | h. | Take disciplinary action or effectively recommend such |

| Number Supervised | Job Title | Extent of Supervision Exercised (Select those that apply from list above, a - h) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

| a. | Assign duties | e. | Sign or approve work |
| b. | Outline methods | f. | Make hiring recommendations |
| c. | Direct work in progress | g. | Prepare performance appraisals |
| d. | Check or inspect completed work | h. | Take disciplinary action or effectively recommend such |

| Number Supervised | Job Title | Extent of Supervision Exercised *(Select those that apply from list above, a - h)* |
|---|---|---|
| | | |
| | | |

F. **MINIMIMUM QUALIFICATIONS REQUIRED:** (Indicate the MINIMUM qualifications required to <u>enter</u> the job as a recruit/probationary officer.)

    i. <u>Education and Experience</u>:
    Minimum age 21. United States Citizenship. High School Diploma or Wisconsin GED, or other GED with minimum total score of 230, or Certified High School Equivalency Diploma, and 60 college credits within five years of hire.

    ii. <u>Knowledge, Skills and Abilities</u>:
    Successful completion of all portions of the examination process established by the Fire and Police Commission (written, oral, medical, background and/or psychological).
    Ability to read, understand, and explain Wisconsin State Statutes and City of Milwaukee ordinances
    Ability to communicate effectively with a diverse population, in-person, via telephone, and in writing
    Ability to use language in writing to communicate information or ideas including organizing information and expressing it in a clear and logical manner using proper sentence structure, grammar and appropriate vocabulary
    Ability to recognize or identify the existence of a problem or issue that needs to be addressed, critically evaluate the problem or issue, evaluate alternative solutions and arrive at a sound decision
    Ability to memorize and retain new information including the memory of names, faces, vehicles, geographic locations, maps and patrol patterns
    Ability to maintain self-control and take direction from supervisors
    Ability to perform physical activities necessary to protect oneself and others

    iii. <u>Certifications, Licenses, Registrations</u>:
    Valid Motor Vehicle Operator's License (Drivers License) at time of background investigation. Must maintain valid Driver's License.

    iv. <u>Other Requirements</u>:
    Participation in and successful completion of all phases of the required training (Phases I, II, III, IV, V, and VI - Recruit Officer, Officer in Training (OIT) and Probationary Officer);
    Attainment of LESB certification during recruit training. Maintenance of LESB certification thereafter.

## 13. <u>PHYSICAL AND ENVIRONMENTAL DEMANDS: TOOLS AND EQUIPMENT USED</u>

The Americans with Disabilities Act of 1993 requires job descriptions to provide detailed information regarding the physical demands required to perform the essential functions of a job; the conditions under which the job is performed; and the tools and equipment the employee will be required to use on the job. Reasonable accommodations may be made to enable qualified individuals to perform the essential duties and responsibilities of the job for each of the categories listed below.

G. **PHYSICAL ACTIVITY OF THE POSITION:** (List the physical activities that are representative of those that <u>must</u> be met to successfully perform the essential functions of the job).

    *CHECK ALL THAT APPLY:*

| ☒ | **Climbing:** Ascending or descending ladders, stairs, scaffolding, ramps, poles, and the like; using feet and legs and/or hands and arms. Body agility is emphasized. Check only if the amount and kind of climbing required exceeds that required for ordinary locomotion. |
|---|---|

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

| | |
|---|---|
| ☐ | **Balancing:** Maintaining body equilibrium to prevent falling when walking, standing or crouching on narrow, slippery or erratically moving surfaces. Check only if the amount and kind of balancing exceeds that needed for ordinary locomotion and maintenance of body equilibrium. |
| ☒ | **Stooping:** Bending body downward and forward by bending spine at the waist. Check only if it occurs to a considerable degree and requires full use of the lower extremities and back muscles. |
| ☒ | **Kneeling:** Bending legs at knee to come to a rest on knee or knees. |
| ☒ | **Crouching:** Bending the body downward and forward by bending leg and spine. |
| ☒ | **Crawling:** Moving about on hands and knees or hands and feet. |
| ☒ | **Reaching:** Extending Hand(s) and arm(s) in any direction. |
| ☒ | **Standing:** Particularly for sustained periods of time. |
| ☒ | **Walking:** Moving about on foot to accomplish tasks, particularly for long distances. |
| ☒ | **Pushing:** Using upper extremities to exert force in order to draw, press against something with steady force in order to thrust forward, downward or outward. |
| ☒ | **Pulling:** Using upper extremities to exert force in order to draw, drag, haul or tug objects in a sustained motion. |
| ☒ | **Lifting:** Raising objects from a lower to a higher position or moving objects horizontally from position-to-position. Check only if it occurs to a considerable degree and requires substantial use of the upper extremities and back muscles. |
| ☒ | **Fingering:** Picking, pinching, typing or otherwise working primarily with fingers rather than with the whole hand or arm, as in handling. |
| ☒ | **Grasping:** Applying pressure to an object with fingers and palm. |
| ☒ | **Feeling:** Perceiving attributes of objects such as size, shape, temperature or texture by touching with the skin, particularly that of the fingertips. |
| ☒ | **Talking:** Expressing or exchanging ideas by means of the spoken word. Those activities which demand detailed or important instructions spoken to other workers accurately, loudly or quickly. |
| ☒ | **Hearing:** Perceiving the nature of sounds with no less than a 40 db loss. Ability to receive oral communication and make fine discriminations in sound. |
| ☒ | **Repetitive Motions:** Substantial movements (motions) of the wrist, hands, and/or fingers. |
| ☒ | **Driving:** Minimum standards required by State Law (including license). |

H.  **PHYSICAL REQUIREMENTS OF THE POSITION:** (List the physical requirements that are essential functions of the job.)

*CHECK ONE:*

| | |
|---|---|
| ☐ | **Sedentary Work:** Exerting up to 10 pounds of force occasionally and/or negligible amount of force frequently or constantly to lift, carry, push, pull or otherwise move objects. Sedentary work involves sitting most of the time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met. |
| ☐ | **Light Work:** Exerting up to 10 pounds of force occasionally and/or negligible amount of force constantly to move objects. If the use of arm and/or leg controls requires exertion of forces greater than that for sedentary work and the worker sits most of the time, the job is rated for Light Work. |
| ☒ | **Medium Work:** Exerting up to 50 pounds of force occasionally and/or up to 20 pounds of force frequently, and/or up to 10 pounds of force constantly to move objects. |
| ☐ | **Heavy Work:** Exerting up to 100 pounds of force occasionally, and/or up to 50 pounds of force frequently, and/or up to 20 pounds of force constantly to move objects. |
| ☐ | **Very Heavy Work:** Exerting in excess of 100 pounds of force occasionally, and/or in excess of 50 pounds of force frequently, and/or in excess of 20 pounds of force constantly to move objects. |

I.  **VISUAL ACUITY REQUIREMENTS:** (List the visual acuity requirements that are essential functions of the job.)

*CHECK ONE:*

| | |
|---|---|
| ☒ | **Operators (Electronic Equipment), Inspection, Close Assembly, Clerical, Administrative:** This is a minimum standard for use with those whose job requires work done at close visual range (i.e. preparing and analyzing data and figures, accounting, transcription, computer terminal, extensive reading, visual inspection involving small parts, operation of machines, using measurement devises, assembly or fabrication of parts). |
| ☐ | **Machine Operators, Mechanics, Skilled Tradespeople:** This is a minimum standard for use with those whose work deals with machines where the seeing job is at or within arm's reach. This also includes mechanics and skilled tradespeople and those who do work of a non-repetitive nature such as carpenters, technicians, service people, plumbers, painters, mechanics, etc. (If the machine operator also inspects, check the "Operators" box.) |
| ☐ | **Mobile Equipment Operators:** This is a minimum standard for use with those who operate cars, trucks, forklifts, cranes, and high lift equipment. |

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

*Page 4 of 5, CS-25, Job Description*

| ☐ | Other: This is a minimum standard based on the criteria of accuracy and neatness of work for janitors, sweepers, etc. |
|---|---|

**J.** **THE CONDITIONS THE WORKER WILL BE SUBJECT TO IN THIS POSITION:**
List the environmental/working conditions to which the employee may be exposed while performing the essential functions of the job. Include scheduling considerations such as on-call for emergencies, rotating shift, etc. **Approximate Percentage of time performing field work: 95%**

*CHECK ALL THAT APPLY:*

| | |
|---|---|
| ☐ | **None:** The worker is not substantially exposed to adverse environmental conditions *(such as typical office or administrative work)*. |
| ☐ | **The worker is subject to inside environmental conditions:** Protection from weather conditions but not necessarily from temperature changes *(i.e. warehouses, covered loading docks, garages, etc.)* |
| ☒ | **The worker is subject to outside environmental conditions:** No effective protection from weather. |
| ☒ | **The worker is subject to extreme cold:** Temperatures below 32 degrees for period of more than one hour. |
| ☒ | **The worker is subject to extreme heat:** Temperatures above 100 degrees for periods of more than one hour. |
| ☒ | **The worker is subject to noise:** There is sufficient noise to cause the worker to shout in order to be heard above the surrounding noise level. |
| ☒ | **The worker is subject to vibration:** Exposure to oscillating movements of the extremities or whole body. |
| ☒ | **The worker is subject to hazards:** Includes a variety of physical conditions, such as proximity to moving mechanical parts, electrical current, working on scaffolding and high places or exposure to chemicals. |
| ☒ | **The worker is subject to atmospheric conditions:** One or more of the following conditions that affect the respiratory system or the skin: Fumes, odors, dust, mists, gases or poor ventilation. |
| ☐ | **The worker is subject to oil:** There is air and/or skin exposure to oils and other cutting fluids. |
| ☒ | **The worker is required to wear a respirator.** (In recruit training) |

**K.** **MACHINE, TOOLS, EQUIPMENT, ELECTRONIC DEVICES, SOFTWARE, ETC. USED BY POSITION:**
List equipment needed to successfully perform the essential functions of the job. Reasonable accommodations may be made to enable qualified individuals with disabilities to perform the essential functions.)

*CHECK ALL THAT APPLY:*

| | | | |
|---|---|---|---|
| ☒ Camera and photographic equipment | | ☒ Office Equipment (desk, chair, telephone, etc.) | |
| ☐ Cleaning supplies | | ☐ Office supplies (pens, staplers, pencils, etc.) | |
| ☒ Commercial vehicle | | ☒ Packing materials (boxes, shrink wrap, etc.) | |
| ☐ Data processing equipment | | ☒ PC equipment (monitor, keyboard, printer, etc.) | |
| ☐ Handcart | | ☐ PC software | |
| ☒ Hand tools *(please list)*: screwdrivers, hammer, knives | | | |
| ☒ Office Machines *(check all that apply)*: ☒ Copier ☒ Facsimile ☐ Calculator ☐ Cash register | | | |
| ☒ Other *(please list)*: Firearms (training, use and dismantle); riot gear (helmet, baton); ballistic vest and Sam Browne belt and equipment (handcuffs, baton, etc.). | | | |

**L.** **SUPPLEMENTARY INFORMATION:** (Indicate any other information which further explains the importance, difficulty, or uniqueness of the position, such as its scope of responsibility related to finances, equipment, people, information, etc. Also indicate success factors such a personal characteristics that contribute to an individual's ability to perform well in the job, and any other special considerations.)

Ability to communicate effectively with a variety of people, write accurate and complete reports, make quick and appropriate decisions under stressful situations, perform physical activities necessary to protect self and others, and work long hours for extended periods of time.

**M.** **I believe that the statements made above in describing this job are complete and accurate.**

_____ INSP William Jenny _____
*Signature of Department Head or Designated Representative*

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

*Page 5 of 5, CS-25, Job Description*

# EXHIBIT #13

City of Milwaukee
CS-25, Rev. *12/09*

# JOB DESCRIPTION

**FOR DER USE ONLY**

Vacancy No.:
City Service Commission:
Fire & Police Commission:
Finance Committee:
Common Council:

**Instructions:** Complete all sections. Refer to the *Guidelines for Preparing Job Descriptions* for instructions on completing specific items.

| | | | |
|---|---|---|---|
| **1. Date Prepared/ Revised:** 4/15/15 | **2. Present Incumbent:** Various | | **Is incumbent underfilling position?** |
| **3. Date Filled:** | **4. Previous Incumbent:** Various | | **YES** ☐  **NO** ☒<br>*If YES, indicate Underfill in box 10.* |
| **5. Department:** Police Department | **Bureau:** Varied<br>**Division:** | | **Unit:**<br>**Section:** |
| **6. Work Location:** Varied | **Telephone:**<br>**Email:** | | **Work Schedule:**<br>Hours: 8 hr shifts; various start times / Days: |
| **7. Represented by a Union?** ☒ *Yes*  ☐ *No* | **8. Bargaining Unit:** Local 21, Milw Police Assn<br>**If in District Council 48, which local?** | | **9. FLSA Status** *(check one):*<br>☐ Exempt  ☒ Non-Exempt |

| 10. | **Official Title:** Detective | | **Pay Range** | **Job Code** | **EEO Code** |
|---|---|---|---|---|---|
| | | | 4F | 2309 | |
| | **Underfill Title** *(if applicable):* | | | | |
| | **Requested Title** *(if applicable):* | | | | |

| **Recommended Title (DER Use Only):** | Approved by:<br>Date: | | | |
|---|---|---|---|---|

## 11. BASIC FUNCTION OF POSITION:

Investigation of major crimes and any other investigations deemed necessary by the Chief of Police and/or his designee. Recognize crime trends and patterns and identify solutions in combination with personnel from other bureaus and divisions.

## 12. DESCRIPTION OF JOB (Check if description applies to **Official Title** ☐ or **Underfill Title** ☐):

### A. ESSENTIAL FUNCTIONS/Duties and Responsibilities: *(Refer to the "Guidelines for Preparing Job Descriptions" for instructions on determining Essential Functions.)*

| % of Time | ESSENTIAL FUNCTIONS |
|---|---|
| 100 | • Carries and maintains firearms and other defensive weapons in accordance with official training.<br>• Executes powers of arrest and control, including full search of arrested persons.<br>• Investigation of criminal offenses that usually fall into the area of major felonies.<br>• Protection of life and property.<br>• Serves as a credible witness in court and administrative proceedings. |
| | • Has complete knowledge of Wisconsin State Statutes and City of Milwaukee Ordinances.<br>• Assists in developing and administrating crime prevention programs to eliminate causes of crime.<br>• Detection and apprehension of criminal offenders. |
| | • Manages criminal investigations and properly documents and recovers evidence. Identifies, documents, preserves, processes and analyzes items of evidence obtained from crime scenes and suspects, placing them in proper containers, and properly maintaining the chain of custody. |
| | • Obtains and executes search and arrest warrants needed to collect additional evidence and to arrest suspects.<br>• Conducts proper interview/interrogation techniques that produce statements that stand the test of judicial proceedings.<br>• Responds to crime scenes and mentors/aids police officers in proper crime scene management.<br>• Conducts investigative evidence recovery, interviews of witnesses, and the apprehension of wanted persons at crime scenes. |

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 78 of 88   Document 80-17

| % of Time | ESSENTIAL FUNCTIONS |
|---|---|
| | • Conducts a review and analysis of completed police reports to determine what additional information and investigative work is needed and collaborates with other districts and bureaus to ensure the work is properly completed.<br>• Based on an analysis of crime trends, suspected offenders and/or problem locations, collaborates with other districts and bureaus to deploy police resources to mitigate crime and apprehend the offenders involved.<br>• Thoroughly and properly documents crime scenes, including but not limited to citizen/witness interviews, offender/suspect interviews, evidence location and recovery, scene diagrams, and all other aspects pertinent to the investigation. |
| | • Demonstrates a thorough knowledge of Wisconsin Criminal Code and case law that affect the detective's duties. |
| | • Participates in and successfully completes all required training (e.g., CPR, Firearms, DAAT, EVOC, etc.). |
| | • Reports to duty fully equipped, prepared, and fit for the full duration of his/her scheduled shift. |
| | • Acts in a manner consistent with the Department's Code of Conduct, policies and procedures, and Standard Operating Procedures as set forth by the Chief of Police. |
| | • When directed, enforces criminal laws, identifies, detains, and processes wanted individuals, all in accordance with the Constitution of the United States, State of Wisconsin and ordinances of the City of Milwaukee.<br>• When directed, responds to calls for service in order of priority and handles such calls efficiently and responsibly, consistent with training, Department directives, Code of Conduct, and Standard Operating Procedures.<br>• Manages major crime scenes until officially relieved by a higher ranking supervisor. Directs uniform personnel who are involved in the investigation. Processes and protects the crime scene for evidence, directing the recovery and packing of evidence, directing the arrest of wanted persons and preparing the case for proper presentation to the District Attorney's Office and court. |

**B. PERIPHERAL DUTIES:**

| % of Time | PERIPHERAL DUTY |
|---|---|
| | • Other duties as assigned. |
| | • |
| | • |
| | • |
| | • |
| | • |
| | • |
| | • |
| | • |
| | • |

**C. NAME AND TITLE OF <u>IMMEDIATE</u> SUPERVISOR:**

Police Lieutenant or Police Sergeant

**D. SUPERVISION RECEIVED:** (Describe the extent to which work assignments and methods are outlined, reviewed, and approved by this position's supervisor.)

Police Lieutenant monitors daily work assignments. A Detective follows procedures and policies set forth by the Division Commander (Captain of Police), Inspector, and Assistant Chief of the work location.

**E. SUPERVISION EXERCISED:**
Total number of employees for whom responsible, either directly or indirectly = <u>N/A</u>.

<u>Direct Supervision:</u> List the number and titles of personnel directly supervised. Specify the kind and extent of supervision exercised by indicating one or more of the following:

| | | | |
|---|---|---|---|
| a. | Assign duties | e. | Sign or approve work |
| b. | Outline methods | f. | Make hiring recommendations |
| c. | Direct work in progress | g. | Prepare performance appraisals |
| d. | Check or inspect completed work | h. | Take disciplinary action or effectively recommend such |

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

| Number Supervised | Job Title | Extent of Supervision Exercised *(Select those that apply from list above, a - h)* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

F. **MINIMIMUM QUALIFICATIONS REQUIRED:** (Indicate the MINIMUM qualifications required to <u>enter</u> the job.)

    i. <u>Education and Experience:</u>
    Minimum years of experience as specified by the Fire and Police Commission at time of promotional process.
    Familiarity with problem-oriented policing and ethical issues in policing.

    ii. <u>Knowledge, Skills and Abilities:</u>
    Ability to analyze and solve problems, make decisions, and exercise judgment effectively. Good oral and written communication skills. Ability to accurately recall details. Knowledge of the Milwaukee Police Department's Standard Operating Procedures, general rules and regulations, and Code of Conduct. Knowledge of laws, ordinances and the criminal law handbook. Strong planning and organization skills. Knowledge and experience with current technologies required within ranks. Ability to analyze information and develop action plans.

    iii. <u>Certifications, Licenses, Registrations:</u>
    Maintenance of a valid Driver's license.

    ~~iv.~~ <u>Other Requirements:</u>
    Maintenance of LESB certification.

## 13. <u>PHYSICAL AND ENVIRONMENTAL DEMANDS:  TOOLS AND EQUIPMENT USED</u>

The Americans with Disabilities Act of 1993 requires job descriptions to provide detailed information regarding the physical demands required to perform the essential functions of a job; the conditions under which the job is performed; and the tools and equipment the employee will be required to use on the job. Reasonable accommodations may be made to enable qualified individuals to perform the essential duties and responsibilities of the job for each of the categories listed below.

G. **PHYSICAL ACTIVITY OF THE POSITION:** (List the physical activities that are representative of those that <u>must</u> be met to successfully perform the essential functions of the job).

*CHECK ALL THAT APPLY:*

| | |
|---|---|
| ☒ | **Climbing:** Ascending or descending ladders, stairs, scaffolding, ramps, poles, and the like; using feet and legs and/or hands and arms. Body agility is emphasized. Check only if the amount and kind of climbing required exceeds that required for ordinary locomotion. |
| ☐ | **Balancing:** Maintaining body equilibrium to prevent failing when walking, standing or crouching on narrow, slippery or erratically moving surfaces. Check only if the amount and kind of balancing exceeds that needed for ordinary locomotion and maintenance of body equilibrium. |
| ☒ | **Stooping:** Bending body downward and forward by bending spine at the waist. Check only if it occurs to a considerable degree and requires full use of the lower extremities and back muscles. |
| ☒ | **Kneeling:** Bending legs at knee to come to a rest on knee or knees. |
| ☒ | **Crouching:** Bending the body downward and forward by bending leg and spine. |
| ☒ | **Crawling:** Moving about on hands and knees or hands and feet. |

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

| | |
|---|---|
| ☒ | **Reaching:** Extending Hand(s) and arm(s) in any direction. |
| ☒ | **Standing:** Particularly for sustained periods of time. |
| ☒ | **Walking:** Moving about on foot to accomplish tasks, particularly for long distances. |
| ☒ | **Pushing:** Using upper extremities to exert force in order to draw, press against something with steady force in order to thrust forward, downward or outward. |
| ☒ | **Pulling:** Using upper extremities to exert force in order to draw, drag, haul or tug objects in a sustained motion. |
| ☒ | **Lifting:** Raising objects from a lower to a higher position or moving objects horizontally from position-to-position. Check only if it occurs to a considerable degree and requires substantial use of the upper extremities and back muscles. |
| ☒ | **Fingering:** Picking, pinching, typing or otherwise working primarily with fingers rather than with the whole hand or arm, as in handling. |
| ☒ | **Grasping:** Applying pressure to an object with fingers and palm. |
| ☒ | **Feeling:** Perceiving attributes of objects such as size, shape, temperature or texture by touching with the skin, particularly that of the fingertips. |
| ☒ | **Talking:** Expressing or exchanging ideas by means of the spoken word. Those activities which demand detailed or important instructions spoken to other workers accurately, loudly or quickly. |
| ☒ | **Hearing:** Perceiving the nature of sounds with no less than a 40 db loss. Ability to receive oral communication and make fine discriminations in sound. |
| ☒ | **Repetitive Motions:** Substantial movements (motions) of the wrist, hands, and/or fingers. |
| ☒ | **Driving:** Minimum standards required by State Law (including license): |

H.  **PHYSICAL REQUIREMENTS OF THE POSITION:** (List the physical requirements that are essential functions of the job.)

   *CHECK ONE:*

| | |
|---|---|
| ☐ | **Sedentary Work:** Exerting up to 10 pounds of force occasionally and/or negligible amount of force frequently or constantly to lift, carry, push, pull or otherwise move objects. Sedentary work involves sitting most of the time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met. |
| ☐ | **Light Work:** Exerting up to 10 pounds of force occasionally and/or negligible amount of force constantly to move objects. If the use of arm and/or leg controls requires exertion of forces greater than that for sedentary work and the worker sits most of the time, the job is rated for Light Work. |
| ☒ | **Medium Work:** Exerting up to 50 pounds of force occasionally and/or up to 20 pounds of force frequently, and/or up to 10 pounds of force constantly to move objects. |
| ☐ | **Heavy Work:** Exerting up to 100 pounds of force occasionally, and/or up to 50 pounds of force frequently, and/or up to 20 pounds of force constantly to move objects. |
| ☐ | **Very Heavy Work:** Exerting in excess of 100 pounds of force occasionally, and/or in excess of 50 pounds of force frequently, and/or in excess of 20 pounds of force constantly to move objects. |

I.  **VISUAL ACUITY REQUIREMENTS:** (List the visual acuity requirements that are essential functions of the job.)

   *CHECK ONE:*

| | |
|---|---|
| ☒ | **Operators (Electronic Equipment), Inspection, Close Assembly, Clerical, Administrative:** This is a minimum standard for use with those whose job requires work done at close visual range (i.e. preparing and analyzing data and figures, accounting, transcription, computer terminal, extensive reading, visual inspection involving small parts, operation of machines, using measurement devises, assembly or fabrication of parts). |
| ☐ | **Machine Operators, Mechanics, Skilled Tradespeople:** This is a minimum standard for use with those whose work deals with machines where the seeing job is at or within arm's reach. This also includes mechanics and skilled tradespeople and those who do work of a non-repetitive nature such as carpenters, technicians, service people, plumbers, painters, mechanics, etc. (If the machine operator also inspects, check the "Operators" box.) |
| ☐ | **Mobile Equipment Operators:** This is a minimum standard for use with those who operate cars, trucks, forklifts, cranes, and high lift equipment. |
| ☐ | **Other:** This is a minimum standard based on the criteria of accuracy and neatness of work for janitors, sweepers, etc. |

J.  **THE CONDITIONS THE WORKER WILL BE SUBJECT TO IN THIS POSITION:**
    List the environmental/working conditions to which the employee may be exposed while performing the essential functions of the job. Include scheduling considerations such as on-call for emergencies, rotating shift, etc. **Approximate Percentage of time performing field work: 50%**

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

CHECK ALL THAT APPLY:

| | |
|---|---|
| ☐ | **None:** The worker is not substantially exposed to adverse environmental conditions *(such as typical office or administrative work).* |
| ☒ | **The worker is subject to inside environmental conditions:** Protection from weather conditions but not necessarily from temperature changes *(i.e. warehouses, covered loading docks, garages, etc.)* |
| ☒ | **The worker is subject to outside environmental conditions:** No effective protection from weather. |
| ☒ | **The worker is subject to extreme cold:** Temperatures below 32 degrees for period of more than one hour. |
| ☒ | **The worker is subject to extreme heat:** Temperatures above 100 degrees for periods of more than one hour. |
| ☒ | **The worker is subject to noise:** There is sufficient noise to cause the worker to shout in order to be heard above the surrounding noise level. |
| ☒ | **The worker is subject to vibration:** Exposure to oscillating movements of the extremities or whole body. |
| ☒ | **The worker is subject to hazards:** Includes a variety of physical conditions, such as proximity to moving mechanical parts, electrical current, working on scaffolding and high places or exposure to chemicals. |
| ☒ | **The worker is subject to atmospheric conditions:** One or more of the following conditions that affect the respiratory system or the skin: Fumes, odors, dust, mists, gases or poor ventilation. |
| ☐ | **The worker is subject to oil:** There is air and/or skin exposure to oils and other cutting fluids. |
| ☐ | **The worker is required to wear a respirator.** |

K. **MACHINE, TOOLS, EQUIPMENT, ELECTRONIC DEVICES, SOFTWARE, ETC. USED BY POSITION:** List equipment needed to successfully perform the essential functions of the job. Reasonable accommodations may be made to enable qualified individuals with disabilities to perform the essential functions.)

CHECK ALL THAT APPLY:

| | |
|---|---|
| ☒ Camera and photographic equipment | ☒ Office Equipment (desk, chair, telephone, etc.) |
| ☐ Cleaning supplies | ☒ Office supplies (pens, staplers, pencils, etc.) |
| ☒ Commercial vehicle | ☐ Packing materials (boxes, shrink wrap, etc.) |
| ☐ Data processing equipment | ☒ PC equipment (monitor, keyboard, printer, etc.) |
| ☐ Handcart | ☐ PC software |

☒ Hand tools *(please list):*
☒ Office Machines *(check all that apply):* ☒ Copier  ☒ Facsimile  ☐ Calculator  ☐ Cash register
☒ Other *(please list):* Firearms (training, use and dismantle); riot gear (helmet, baton); ballistic vest and Sam Browne belt and equipment (handcuffs, baton, etc.).

L. **SUPPLEMENTARY INFORMATION:** (Indicate any other information which further explains the importance, difficulty, or uniqueness of the position, such as its scope of responsibility related to finances, equipment, people, information, etc. Also indicate success factors such a personal characteristics that contribute to an individual's ability to perform well in the job, and any other special considerations.)

M. **I believe that the statements made above in describing this job are complete and accurate.**

_____ INSP William Jessup _____
*Signature of Department Head or Designated Representative*

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 82 of 88   Document 80-17

*EXHIBIT #14*



Beasley / Amborn
04-34-15 // 06-03-15

*EXHIBIT #15*

P.O. Amborn and P.O. Beasley in squad together.

1. Z0000031 start @2:25

2. June 2, 2015...8:30pm

3. ..So your hours. What are you supposed to do about that?    *Melanie Beasley*

4. He wants me to change them then I have to change them to accommodate late shift, late power now..    *Amborn*

5. Oh ok    *Melanie*

6. So I'll probably make it like so I can drive five hours before work and like three hours after..in case I get

7. stuck on overtime..    *Amborn*

8. Oh yeah the    *Melanie*

9. He only thing that matters is that don't get pulled over by some asshole cop that runs my license.    *Amborn*

10. Just call the captain since he gave you his number...    *Melanie*

11. I got pulled over by Greenfield I live on the border of Greenfield and Milwaukee and I got pulled over by

12. a Greenfield officer for going too fast off of a red light. I wasn't squealing my tires or anything, he

13. walked up and I was wearing my uniform, and he was like Oh! Oh have a good night! So whenever I

14. drive ill just put on one of my workshirts!    *Amborn*

15. Did they tell you have thirty days like everyone else    *Melanie*

16. I'm most likely ..I should be getting my manila envelope soon from Sgt Klien    *Amborn*

17. Yeah..    *Melanie*

18. If I don't get it today I have to write the damn letter to the chief. Kissing his ass (4:07)    *Amborn*

19. About what?    *Melanie*

20. You know that they want you within seven days of getting you're ah  charges you have to write  from A

21. they ask that you write a letter to the chief how you were wrong and accepted responsibility for it..    *Amborn*

22. Ar you going to say that you are on probation?    *Melanie*

23. Nope, I'm not even going to mention it since we proceeded as if I wasn't. I lucked out with that shit...    *Amborn*

24. Yeah    *Melanie*

25. So like when you got called back in there and she had that piece of paper what happened?    *Melanie*

26. When I got called back in, it is probably because I talked to Captain Stigler... (squad ) sent to assignment..    *Amborn*

27. I know when I have pulled over people before and they have a device I thought it was a lot of money to

28. have one    *Amborn*

29. Yeah, like it depends what company you go through. There are different costs I found a cheap one..    *Amborn*

30. So that is good that it is not that much and get to keep your job    *Melanie*

31 Yeah but it sucks when I have to take that suspension I have a car payment, the device, I have to pay one *Amborn*
32 of the tickets by July 860$ so I should do a couple DPM or something otherwise it will suck
  *Melanie*

33 Do you have to blow into it to drive...yes you have to blow into it to start the car um shot u even got to
34 do it to park the car and then it can go off randomly anywhere from 5-40 minutes for a year.. *Amborn*

35 I have a bicycle..i wonder what they would do if that was my primary vehicle? It is still technically a moto
36 of transportation *Amborn*

37 You can use your bicycle itt would be funny no you can *Melanie*

38 Everyone..call in ah.brain fart...Schanke to pick me up in his Uber that is what he does when he leaves
39 work..does he ever go home — *Amborn*

40 Maybe you will find out this week when you go on your vacation but it will probably be thirty days you *Melanie*
41 know that it is going to be 30 days..rumor is that you at least will be off every other week unpaid tho

42 I know that you cannot work on a suspension day but if it is off day you can work for someone and make
43 up for it...

44 I also wanted to talk to the union to see if I could get unemployment during the suspension. I don't
45 know ask him that is what they are there for *Amborn*

46 You will find out this week..they used to let you pick when you wanted to take it now they tell u and u
47 can use vacation maybe holidays maybe comp...10:21 *Melanie*

48 Yeah at least thy don't make me take it all one month not sure how it works ask another officer that has
49 been through it *Amborn*

50 Your probably shiting your pants when it happened.. *Melanie*

51 When did it happen? *Melanie*

52 March 8, my mother's birthday..oh r you serious? Iwas off the night for her birthday and I was out with
53 some district two coppers we were all..I wasn't as bad as I blew. Obviously I blew high I remember
54 everything. Probably because my tolerance is really high..haha *Amborn*

55 That was not a real good happy birthday phone call to my mom *Amborn*

56 So when did the captain call you then ( 11:40) *Melanie*

57 He called me two days later asking me how I thought I was still on probation.. I told him that um sgt
58 Taylor had my last probationary review and said that it was extended or having the probationary date
59 ending date of March 18th and that is why I assumed I was on probation. I should have been..but
60 someone, specifically sergeant Taylor never submitted the proper paperwork to the Captain and the
61 Captain had to review it and sign off on it and send it to the fire and police commission and they sign off
62 on it and file the extension and that was never done. That kind of saved my ass *Amborn*

63 Ha *Melanie*

64 Otherwise I most likely would have been fired *Amborn*

65    Why was he called to ask you? *Melanie*

66    Yeah he called and asked me why I thought I was on probation. He said "well so you know I was never
67    aware of you being extended on probation and I would be the one to sign that paper..so as far as I'm
68    concerned your probation ended  um January 24  *Amborn*

69    Oh that is good  *Melanie*  *—Melanie*

70    Is he saying that to tell you not to worry about it kind of thing? He really looked out for me..he gave me
71    his cell number and told me to text him if I need a status or what's going on..he could have been like hey
72    not on file but it is on file now and could have been what stopped him from submitting it late I'm still on
73    probation. Clerical error..  *Amborn*

74    That is what it sounds like he did..  *Melanie*

75    He could have been like always talking to me ask me how im doing gave me his phone number..  *Amborn*

76    13:33

77    And when you thought you were ok and ~~and~~ they gave you the questions and asked you what to say?  *Melanie*
78    Sgt Klein tried to proceeded as if I was on probation I told Captain Stigler and he called and snapped on
79    them and had her and Zieger and the next meeting they said we are not going to proceed with you being
80    on probation, your probation ended January 24th then we went over the whole thing and she pretty
81    much prepped me for every answer actually pretty simple and the chief was to liten to the recording at
82    the end where I accept what I did..it was my know it was ..disgrace to the department and peers
83    especially the chief take this as a lesson learned participating in employee assistance program 14:39 kiss
84    the chiefs ass as much as possible..I have to put that on my paper my memo Lees said he would help me
85    with it.  *Amborn*

86    They just told you not to mention the probation thing then?  *Melanie*

87    The recording? No they said don't mention that it was recorded. Klein was like..  *Amborn*

88    They never brought it up so I never brought it up...  *Amborn*

89    They just asked me where I was what I was doing  *Amborn*

90

91

92

93

94

95

96

97