UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SHANNON LEWANDOWSKI,

        Plaintiff,

      v.                                    Case No. 16C1089

CITY OF MILWAUKEE,

        Defendant.

## DEFENDANT'S INITIAL DISCLOSURES

Defendant City of Milwaukee, by its attorneys, Grant F. Langley, City Attorney, by

Robin Pederson, Assistant City Attorney, submits the following initial disclosures pursuant to

Fed. R. Civ. P. 26(a)(1).

**(i): The name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless solely for impeachment:**

RESPONSE: The following persons may provide testimony regarding their knowledge of

the facts and circumstances surrounding the claims of Plaintiff and may be reached through

defense counsel.

1. Police Officer Melanie Beasley – This witness may testify to her personal knowledge related to various events described throughout the Amended Complaint, including the events of and leading up to the plaintiff's traffic accident.

2. Deputy Inspector Michael Brunson – This witness was the Deputy Inspector in charge of Internal Affairs during the time at issue and may testify to his role and knowledge regarding the internal investigation against plaintiff.

3. Detective Juanita Carr – This witness was riding along with plaintiff when the traffic accident occurred and may testify to her knowledge of events that led up to that and after.

4. Police Chief Edward Flynn – This witness was the decision maker regarding plaintiff's discharge and may testify to his knowledge regarding the same.

5. Lt. Sean Hanley – This witness may testify in relation to the allegations concerning him contained in the Amended Complaint, including his supervision and contacts with plaintiff, and any complaints she may have lodged with him, and his communications with plaintiff regarding the traffic accident.

6. Captain Timothy Heier – This witness was a captain assigned to Internal Affairs during the time at issue and may testify to his role and knowledge regarding the internal investigation against plaintiff.

7. Sergeant Steven Kelly – This witness was present at the scene of the traffic accident and hospital and may testify to his observations and knowledge of the same.

8. Shorewood PD Michael Kerr – This witness may testify in relation to his contact with Jordan Lewandowski on the night of the traffic accident.

9. Police Officer Steven Kuspa – This witness responded to the scene of the traffic accident and may testify to his observations and knowledge related to that event.

10. Police Officer William Krumnow – This witness responded to the scene of the traffic accident and may testify to his observations and knowledge related to that event.

11. Lt. Timothy Leitzke – This witness was a lieutenant assigned to Internal Affairs during the time at issue and may testify to his role and knowledge regarding the internal investigation against plaintiff.

12. Detective. Shannon Lewandowski – This witness is the plaintiff and may be called to testify to her personal knowledge related to her claims.

13. Jordan Lewandowski – This witness may testify to his observations and knowledge related to his communications with plaintiff on the night of the traffic accident and the following day at the hospital.

14. Anna Pepelnjak – This witness is an attorney who conducted an investigation into the discrimination complaints lodged by plaintiff, and may testify to her knowledge of the same.

15. Police Officer Brian Pinter – This witness interviewed the plaintiff regarding her injuries suffered during the traffic accident and may testify to his observations and knowledge regarding the same.

16. Sergeant Adam Riley – This witness responded to the scene of the traffic accident and may testify to his observations and knowledge related to that event.

17. Sergeant Christopher Schroeder – This witness was a sergeant assigned to Internal Affairs during the time at issue and may testify to his role and knowledge regarding the internal investigation against plaintiff.

18. Captain James Shepard – This witness was a captain assigned to Internal Affairs during the time at issue and may testify to his role and knowledge regarding the internal investigation against plaintiff.

19. Shorewood PD Cody Smith – This witness may testify in relation to his contact with Jordan Lewandowski on the night of the traffic accident.

20. Police Officer Debora Stacey – This witness responded to the scene of the traffic accident and may testify to her observations and knowledge related to that event.

3

21. Police Officer Jesse Vollrath – This witness responded to the scene of the traffic accident and may testify to his observations and knowledge related to that event.

22. Captain Heather Wurth – This witness was a lieutenant assigned to Internal Affairs during the time at issue and may testify to her role and knowledge regarding the internal investigation against plaintiff.

23. Assistant Chief Carianne Yerkes – This witness was an inspector under Chief Flynn and was present at the time the discharge decision was made, and testified as the Chief's designee at plaintiff's FPC appeal, and may testify to her knowledge of the same.

24. Sergeant Adam Zieger – This witness was a sergeant assigned to Internal Affairs during the time at issue and may testify to his role and knowledge regarding the internal investigation against plaintiff as the primary investigator.

**FRCP 26(a)(1)(A)(ii): A copy—or a description by category and location--of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody or control and may use to support its claims or defenses, unless solely for impeachment:**

RESPONSE: Please see attached documents Bates stamped 16CV1089 0001-800.

**(iii): A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.**

RESPONSE: Not applicable.

**(iv): For inspection and copying as under Rule 34, the insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

RESPONSE:   Not applicable

Dated and signed at Milwaukee, Wisconsin 25 day of April, 2018.

GRANT F. LANGLEY

4

City Attorney

Robin A. Pederson
Assistant City Attorney
State Bar No. 01045759
Attorneys for Defendant

<u>P.O. ADDRESS</u>:

800 City Hall
200 East Wells Street
Milwaukee, WI 53202
(414) 286-2601

1032-2016-1768:248779

5

 **BE A FORCE**

**Milwaukee Police Department**
Police Administration Building
749 West State Street
Milwaukee, Wisconsin 53233
http://www.milwaukee.gov/police

**Edward A. Flynn**
Chief of Police

(414) 933-4444

# PERSONNEL ORDER 2015 – 150

December 16, 2015

RE:    DISCIPLINARY ACTION

DETECTIVE SHANNON LEWANDOWSKI, (012860), Intelligence Fusion Center, charged with violation of department Code of Conduct as follows:

Core Value 1.00 - Competence, referencing Guiding Principle 1.03: Failure to use time to accomplish the mission of the department.

Core Value 1.00 – Competence, referencing Guiding Principle 1.05, referencing Standard Operating Procedures relating to Department Owned Vehicles and Property, Section 640.15(A)(2): Failure to operate a department vehicle in a safe manner.

Core Value 3.00 - Integrity, referencing Guiding Principle 3.10:  Failure to be forthright and candid in connection with any administrative inquiry or report.

The charges having been substantiated, she is found guilty as charged and the penalty adjudged appropriate by the Chief of Police is as follows:

| | |
|---|---|
| Failure to use time to accomplish the mission of the department. | Five (5) day suspension without pay. |

IN SOME JOBS, SUCCESS IS MEASURED BY WHAT DOESN'T HAPPEN.

| | |
|---|---|
| Failure to operate a department vehicle in a safe manner. | Thirty (30) day suspension without pay. |
| Failure to be forthright and candid in connection with any administrative inquiry or report. | Discharged from the department. |

It is hereby ordered that DETECTIVE SHANNON LEWANDOWSKI be discharged from the department and removed from the payroll effective immediately pursuant to Wisconsin Statute § 62.50(18).


EDWARD A. FLYNN
CHIEF OF POLICE

EAF:rls
(15-0032)

 

# DISCIPLINE REVIEW SUMMARY

Review Date: <u>12-15-15</u> Time: <u>2:23pm-2:32pm</u> Location: <u>Chief's Conference Room</u>

File #: <u>15-0032</u>   Charged Member: <u>Det. Shannon Lewandowski</u>

Members Present: Chief Flynn, AC's Harpole and Leibold, Insp. Yerkes, Captain Shepard, Lt. Leitzke, Nicole Fleck

Reviewed/Discussed:
| | | |
|---|---|---|
| (Yes)/ No | Charge Specification(s) | |
| (Yes)/ No | PM-5 | |
| (Yes)/ No | Case File History | |
| (Yes)/ No | Comparables | |
| (Yes)/ No | IAS Lieutenant's Cover | |
| (Yes)/ No | Member's "Response to Charges" | |
| Yes / No | Other (if YES, explain) | |

_____

Employee Motivation (A / M) A- Self Interest; M-N/A

Degree of Harm (A / M) A- Severe injury to Det. Lewandowski, Det. Carr, and operator of the second vehicle; Destruction of squad; M-N/A

Employee Experience (A / M) A- 16 years of service; M- N/A

Intentional / Unintentional (A / M) A- Intentionally operated squad as an emergency vehicle w/out cause and was responding to a location for reasons other than Department business, Member was intentionally untruthful as to her true destination at the time of the squad accident ; M-N/A

Employee Past Record (A / M) A- 2015 Behavior that could discredit the Department received District Level Reprimand; 2014 F/T treat Department supervisor w/ respect received Policy Review; M- N/A

Notes / Comments: Member received 5-day suspension, 30-day suspension, Member discharged from the Department.

## CORE VALUE 3.10 – INTEGRITY
### REFERENCING GUIDING PRINCIPLE 3.10

## FAILURE TO BE FORTHRIGHT OR CANDID, ORALLY OR IN WRITING, IN CONNECTION WITH ANY INQUIRY OR REPORT/UNTRUTHFULNESS

*Pull Section 105.00 or 105.05

| REVIEW BY CHIEF FLYNN AS OF: | FILE & NAME | DISCIPLINE IMPOSED | Aggravating (A) or Mitigating (M) Factors |
|---|---|---|---|
| 01-07-14 | 12-0655 PO Daniel VIDMAR (Signed a property release form with a unknowing citizen's name in order to take possession of an inventoried bicycle) | Discharged from department<br><br>(Also discharged for CV 3.05 for theft and CV 1.02 for negatively impacting his credibility in court) | **A:** Employee Motivation (Personal gain); Employee Experience; Intentional<br><br>**M:** Employee Past Record (Commendations)<br><br>**Notes:** Notified Chief re: Vidmar's decision not to resign<br><br>**REDUCED TO A 60-DAY SUSPENSION BY THE FPC AT APPEAL; MEMBER STILL DISCHARGED UNDER CV 1.02** |
| 09-10-13 | 13-0252 PO Joseph SERIO (left inservice to attend former PO Vagnini's sentencing hearing & failed to accurately reflect the hours he was gone on his time card) | 1 day<br><br>(Also received 1 day for CV 1.05 ref SOP 010.110(4) being AWOL from inservice) | A: Employee Motivation: Said it was a conscious decision to attend the hearing; Employee Experience; Intentional: Attended sentencing hearing due to his feelings of family toward his colleague<br><br>M: Employee Past Record: Evaluations are positive, state he is a leader among his peers<br><br>Notes: Member attended PO Vagnini's sentencing hearing while on-duty, photographed by JS Online |

| | | | |
|---|---|---|---|
| 03-12-13 | 12-0307 PO Dwight COPELAND (submitted a Worker's Comp report directly to the City's Employee's Benefits office; claimed he told the Medical Section about his injury and that a Disability Specialist told him to file the report, contrary to witness statements) | Discharged from the department | **A:** Employee Motivation (sought to gain financially); Employee Experience (has demonstrated prior understanding of dept procedures); Intentional (his account is contrary to witness statements); Past Record (seven sustained allegations since 2011); Lengthy discussion about his career, disciplinary cases and attendance, supervisory evaluations, reliability |
| 09-11-12 | 12-0420 Det. Rodolfo GOMEZ Jr. (Asked another member to unlock his wife's iPhone because she forgot the password & needed it for work; he was actually checking for evidence of an affair) | 2 days (Also received 1 day for CV 1.05 ref SOP 680.05(A) for causing Dept equipment to be used for non-Dept reasons) | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# UNTRUTHFULNESS

## SECTION
## 105.00

| REVIEW BY CHIEF FLYNN AS OF: | FILE & NAME | DISCIPLINE IMPOSED |
|---|---|---|
| 09-01-11 | 10-0688 PO Cory HARRIS (CV 3.11) (denied all allegations of fight w gf – her blood was found on his shirt; DA's office has indicated they won't call him as a testifying witness in the future) | Discharged from Department (Discharge upheld by the FPC under appeal) |
| 05-23-11 | 11-0051 PO James MORSOVILLO (CV 3.10) (Untruthful statements during PI-21 re: staying at the scene of an accident he was involved in) | Discharged from Department (Charge Dismissed through an agreement to drop his FPC appeal in exchange for having the untruthfulness charge dismissed & being discharged under 250.30(5) FT report an off-duty incident instead) |
| 05-12-11 | 11-0012 PO Joel MOELLER (CV 3.11) (inaccurate statements regarding a pursuit during PI-21) | 5 days (Charge dismissed by FPC during appeal) |
| 04-11-11 | 10-0264 PA Twyla SHEFFA (false statements during her PI-21) | Terminated from the Dept. |
| 12-02-10 | 10-0391 PO Ladmarald CATES (2 counts during non-custodial interview re: sexual contact while on duty) | Discharged from Dept. (both counts) |
| 10-12-10 | 10-0353 PO Tamecka CARR-WINDING | Discharged from Dept. |
| 06-29-10 | 10-0016 OAI Monique ALSTON (stated she left a msg on Capt. Zibolski's voicemail – he doesn't have VM) | 2 days |

| | | |
|---|---|---|
| 2-15-10 | 09-0595 Sgt. Roosevelt Jenkins (made untruthful statements during a PI-21 interview) | Discharged from the Department |
| 12-22-09 | 09-0467 Det. Andre MATTHEWS (orally in connection with an interview) | 1 day |
| 9-30-09 | 09-0121 Sgt Pamela Holmes (stated she was not given an order until later in the morning, contrary to statement of others) | 2 days |
| 8-25-09 | 08-0648 PO Sean LESNJAK (3 counts of 2/105.00)

08-0648 PO F. Salinsky (stated he filed a sick/injured report when he hadn't) | Chrg Dismissed (all three counts were dismissed)

2 days |
| 7-1-09 | 08-0485 PO James Nisiewicz (was untruthful about his knowledge of fraudulently released Dept. property & his activities on the incident date)

08-0656 PO Jason Dewitt (Stated he did not see a use of force, contrary to his proximity to the incident)

08-0647 PO Elgerrith Tucker (was untruthful in reporting where his car was parked when it was broken into) | 5 days

30 days

3 days |
| 5-13-08 | 07-0933 CWII Vanleer (called in sick when he was actually out of the country and delayed in his return) | 4 days |
| 4-23-08 | 07-0740 PO ELM (denied being armed & pulling a gun, contrary to the statements of 4 witnesses & 1 victim) | DISCHARGED FROM DEPT |
| | | |
| | | |

# SQUAD ACCIDENT

## SECTION
## 640.15(A)(2)

| REVIEW BY CHIEF FLYNN AS OF: | FILE & NAME | DISCIPLINE IMPOSED | Aggravating (A) or Mitigating (M) Factors |
|---|---|---|---|
| 05-19-15 | 15-0091 PO Lucas MCALEER (Responded and acted as a secondary in a pursuit; believed an intersection to be clear & struck a civilian vehicle upon proceeding through) | 2 days + EVOC re-training | **A:** Employee Motivation (Speed as a factor immediately prior to accident); Degree of Harm (Squad car totaled - $19,000 damage; minor injuries to civilians); Employee Experience (12+ years' experience)<br><br>**M:** Employee Motivation (Member was attempting to respond to and assist another member with a vehicle pursuit for a violent felony); Employee Experience (Above average ratings & evals from all supervisors at work location); Employee Past Record (Above average ratings & minimal disciplinary history)<br><br>**Notes:** Video of pursuit & accident was shown & speed/weather as a factor in the accident was discussed. Also discussed was the fault of the civilian party involved. Member signed a stipulation agreement & indicated he was using means to drive with more caution. |
| 03-03-15 | 14-0379 PO Robert WENGER (Driving reverse, hit a legally parked vehicle) | OR | **M:** Degree of Harm (Minimal damage to squad (not repaired) and minimal damage to other vehicle and no injuries); Employee Motivation (Discussed member's response in the efforts he is taking to mitigate further risk of accidents)<br><br>Employee Past Record: Discussed prior accidents, all of which were minimal damage and no injuries & progressive damage; personnel evals were all above average) |

| | | | |
|---|---|---|---|
| 2-11-15 | · 14-0376 PO Rolando HERNANDEZ (Struck bus while responding to foot pursuit, pulled over, but continued, not immediately reporting it to a supervisor.) | Official Reprimand (Also received one (1) day for 650.40(A)(1) for failing to report the crash to a supervisor.) | **A:** Degree of Harm (Minimal Squad damage) Employee Experience (Little history discussed; deferred to senior partner) Employee Past Record (Little history discussed/average evaluations) **M:** Unintentional – responding to foot pursuit; signed stip & accepted responsibility **Notes:** AC Leibold questioned why 25 squads responded to foot pursuit |
| 01-20-15 | 14-0389 PO Michael LEES (No lights or siren, traveling at 65mph, struck by a drunk driver) | 3 days | **A:** Degree of Harm (Squad damage & injury to all involved); Employee Experience (Speed as factor, 14 year history & # of accidents)' Employee Past Record (# of squad accidents & at fault history) **M:** Unintentional (OWI of other driver) **Notes:** Chief considered penalty of not driving for a period of time and/or assignment to DPR (to be tco by Leibold) |
| 11-25-14 | 14-0386 PO Nicholas DANKERT (Made a U-turn in the intersection, failing to yield the right of way, causing an accident resulting in injury to himself and severe damage to both vehicles) | 1 day | **A:** Degree of Harm (Extensive squad damage, total loss); Employee Experience (1 prior squad accident – 2012); Employee Past Record (1 prior crash) **M:** Employee Motivation (Attention diverted to possible shoplifters); Employee Experience (Good reviews) **Notes:** Photos of squad accident |

| | | | |
|---|---|---|---|
| 05-21-14 | 14-0009 PO Melissa TAKACS (PI accident, slipped on black ice into a tree, was traveling 43mph with the pedal to the floor prior to impact, both she and her partner suffered significant injuries & the vehicle sustained significant damage - $46,218.89 to repair) | 2 days + EVO re-training | **A:** Degree of Harm (Injuries); Employee Experience<br><br>**M:** Employee Motivation (Responding to a foot pursuit); Unintentional; Employee Past Record (No prior accidents)<br><br>**Notes:** No seat belts on either member |
| 05-21-14 | 14-0147 PO Michael LEES (Non-injury accident, failed to yield the right of way when making a left turn) | OR | **A:** Employee Past Record (3 prior accidents)<br><br>**M:** Degree of Harm (No injuries to member or citizen); Unintentional<br><br>**Notes:** Now assigned to bicycle patrol. Photographs – squad repaired by vehicle services personnel |
| 04-08-14 | 14-0100 PO Joshua ALBERT (Non-injury accident; 2 priors) | DLWR | **A:** Employee Experience; Employee Past Record (Prior training – vehicle operations)<br><br>**M:** Degree of Harm (No injuries – minor damage); Unintentional |
| 03-12-14 | 13-0506 PO Michael LEES (Struck a concrete guard pole when exiting a parking structure) | OR | **M:** Degree of Harm (No damage – no injury or cost to repair); Unintentional |
| 03-13-12 | 11-0523 PO Maurice WOULFE (Backed up to read a plate & bumped another auto that was also backing; minor damage) | Charge Dismissed | |
| 02-07-12 | 11-0356 PO Maurice WOULFE (parked his squad in front of a stolen auto, whose driver then fled & the vehicle rolled into the squad) | EVOC training | |
| 12-01-11 | 11-0297 PO Edgardo BAUZO-SANTIAGO (bumped the squad in front of his at a stoplight) | Charge Dismissed | |

| | | | |
|---|---|---|---|
| 08-03-11 | 11-0095 PO Cheuyeml YANG (hit a patch of black ice) | O.R. + Policy Training | |
| | 11-0104 PO Justin JOLLIFF (lights & sirens, went thru a red light & t-boned another squad) | 1 day + EVOC | |
| 04-05-11 | 10-0599 PO Ross KUESEL (no lights sirens, traveling 53-60 mph, struck a vehicle in an intersection) | 2 days + EVOC re-training | |
| 03-14-11 | 10-0580 PO Richard TICCIONI (Driving too fast for conditions, slid on wet pavement into a tree) | OR | |
| 03-08-11 | 10-0581 PO William KINGSTON (CV 1.00 GP 1.10) (FT yield, didn't activate lights/siren far enough in advance) | DLWR | |
| | 10-0597 PO Chauncey HARRIS (CV 1.00 GP 1.10) (drove through a controlled intersection) | 1 day + EVOC re-training | |
| | 10-0598 PO Cindy CARLSON (CV 1.00 GP 1.10) (clipped a median w a tire while maneuvering through barricades) | Charge Dismissed | |
| 02-24-11 | 10-0506 Help Desk Specialist I Loretta HOLLOWAY (CV 1.00 GP 1.10) (struck a fence while looking at her cell phone) | DLWR | |
| 12-16-10 | 10-0430 PO Kurt MEYLE (struck utility pole in an effort to move out of the way of an ambulance) | Charge Dismissed | |
| 12-09-10 | 10-0067 PO Edward MATECKI (pulled out from a parked position to catch a speeder & lost control) | Charge Dismissed | |

| | | | |
|---|---|---|---|
| 10-04-10 | 10-0321 PO Michael GASSER (driving in reverse during pursuit, struck a tree) | DLWR | |
| 08-19-10 | 10-0234 PO Jerry WHITELEY | Charge Dismissed | |
| 08-05-10 | 10-0255 PO Joseph ESQUEDA | O.R. | |
| 06-15-10 | 10-0160 PO Natalie OLSZEWSKI<br><br>09-0322 PO Richard VILLANUEVA | OR + Policy training<br><br>OR + Policy training | |
| 05-11-10 | 09-0688 PO James SOMMER | O.R. and EVOC re-training | |
| 05-05-10 | 09-0703 PO Laurel OSIEWALSKI | Charge Dismissed | |
| 3-15-10 | 09-0634 PO Robert Wagner | 1 day and EVOC re-training relative to approaching vehicles when they don't pull over | |
| 10-27-09 | 09-0380 PO Jorge Suarez | DLWR | |
| 9-14-09 | 09-0187 PO Laura CAPTAIN | O.R. | |
| 8-25-09 | 09-0090 PO Wayne YOUNG | O.R. | |
| 8-13-09 | 09-0185 PO Nicole Miller | DLWR | |
| 7-1-09 | 09-0096 PO Andrew TISCHER | DLWR | |
| 5-29-09 | 09-0136 PO Shawn Humitz | 3 days | |

# CORE VALUE 1.00 – COMPETENCE
## REFERENCING GUIDING PRINCIPLE 1.03

### FT RENDER SERVICE PROMPTLY AND EFFICIENTLY

*Also pull 380.00

| REVIEW BY CHIEF FLYNN AS OF: | FILE & NAME | DISCIPLINE IMPOSED | Aggravating (A) or Mitigating (M) Factors |
|---|---|---|---|
| 09-29-15 | 15-0174 PO Mathew JACKSON (Posted on Facebook during his shift that he was sitting next to a shooting victim who he wanted to "poke his bullet hole to cause him a little more pain." | 1 day<br><br>(Charge of CV 3.01 for behavior creating the appearance of impropriety & corruptive behavior was dismissed.) | **A:** Degree of Harm (Member's post went "viral" & created outrage amongst community groups)<br><br>**M:** Degree of Harm (Only created outrage because it was discovered); Employee Experience (Member is relatively new officer); Unintentional (Member believed his settings on Facebook were set to private & he deleted his account after post was discovered); Employee Past Record (Member has not discipline history)<br><br>**Notes:** Response to charges – Member admitted fault & apologized for offending people. |
| 06-30-15 | 14-0260 Sgt. Gregory SOUSEK (Did not respond to a battery-cutting promptly when no squads were available) | Charge dismissed | **A:** Degree of Harm (Death of Victim)<br><br>**M:** Employee Motivation (Member was making multiple attempts to find squads for assignments); Degree of Harm (Unknown if delay in police response contributed to death); Employee Experience (Member was a relatively new sergeant & had little experience as an acting shift commander, especially on a night as busy as the date of the incident); Employee Past Record (No related discipline history and average/above average ratings)<br><br>**Notes:** Discussed that the member's actions to find squads was appropriate given his assignment & experience and that the member received no guidance or assistance from his lieutenant, who was working on the night of the incident and assigned "special" |

| | | | |
|---|---|---|---|
| 06-30-15 | 14-0260 Sgt. Rochelle GAWIN (Did not respond to a battery-cutting promptly when no squads were available) | Charge dismissed | **A:** Degree of Harm (Death of victim)<br><br>**M:** Employee Motivation (Member was reported as responding to other assignments with an apparent threat level higher than the stabbing assignment); Degree of Harm (Unknown if delay in police response contributed to death); Employee Past Record (No related discipline history & average/above average ratings)<br><br>**Notes:** Discussed that the member's action or lack thereof could not be proven or disproven, and that member has taken action to ensure this would not occur again. |
| 06-30-15 | 14-0260 Lt. Timothy LEITZKE (Failed to ensure an efficient response by members under his command; squads did not respond to a battery-cutting promptly; the victim was DOA) | 1 day | **A:** Employee Motivation (Member was out of his district & not attentive to radio/needs of shift commander); Degree of Harm (Death of victim)<br><br>**M:** Employee Motivation (Member attending to other admin duties); Degree of Harm (Unknown if delay in police response caused death); Employee Past Record (No discipline history & above average ratings)<br><br>**Notes:** Discussed that member needs to be more familiar with police response/calls for service & that member has taken steps to correct this issue within his assignment. |
| 05-05-14 | 14-0417 PT Claire ZELLNER (Received a 911 hangup with noises but no verbal response, entered & closed out the call, went to lunch, came back & re-entered the call as a "call for police" assignment, police arrived to find a DOE) | Charge dismissed; policy training | **M:** Employee Motivation (Wanted to do the right thing); Employee Experience (Hired in 2013); Unintentional (No willful misconduct); Employee Past Record (No discipline history) |

| | | | |
|---|---|---|---|
| 08-05-14 ✗ | 13-0338 PO Cheuyeml YANG (Went to the City of Oak Creek to resolve an accident involving a family member) | 2 days (Also received 3 days for CV 3.06 for unnecessarily interfering with the personal affairs of another) | **A:** Employee Motivation (Personal gain – misled his shift commander); Degree of Harm (Negative impact); Intentional **Notes:** Voice recordings left on citizen's cellphone mailbox |
| 02-11-14 ✗ | 13-0266 PO Josephine JONES (went to her residence outside of her district on duty in a marked squad and became involved in a child custody dispute involving her grandchildren) | 1 day (Also received 2 days for CV 3.06 for interfering officiously in the private business of others and a DLWR from IAD for SOP section 250.25 for leaving her district) | **A:** Employee Motivation (intent to interfere on behalf of family); Employee Experience; Intentional **M:** Degree of Harm; Employee Past Record |
| 10-01-13 | 13-0287 PO Thomas MARCUS (was photographed asleep at the front desk of the Avenues West substation, photo was posted to Twitter) | 1 day | **A:** Degree of Harm (observed by a citizen, posted on Twitter); Employee Experience; Employee Past Record (two prior reprimands) **M:** Unintentional (worked 4 hours prior to shift, normally sleeps at home) Notes: Employee evals were positive; Response – admitted he fell asleep |
| 04-09-13 | 12-0663 PO Steven DUCKHORN (authored a Facebook post, while on-duty, stating he was questioned about not paying for food bc he is Hispanic) | DLWR (Also received 1 day for CV 1.05 ref SOP 685.15(A)(6) for posting defamatory allegations re the dept to a social networking site) | **A:** Knowingly published untruth |
| 01-16-13 | 12-0510 PO Thomas ZIESEMER (left IAD but did not go back in service for 40 minutes, while dispatch called for him 11 times) | OR | **A:** Employee Experience (experienced employee) |

| | | | |
|---|---|---|---|
| 12-06-12 | 12-0568 Cust. Worker II Ronald ARMSTRONG (passed out drunk in a hallway during his shift -- Had a Last Chance Agreement that was drafted by the City Attorney & signed 01-21-11 regarding his 2nd offense OWI) | Discharged from Dept.<br><br>(Also discharged on CV 1.08 for reporting to work intoxicated and CV 1.05 ref SOP 010.70(B) FT report a medical condition which affected his ability to work) | |
| 09-04-12 | 11-0465 Sgt. Charles CROSS (Left work early 63 times between 12-26-10 and 12-24-11, for a total of 1,004 minutes) | Demoted to P.O.<br><br>(Also demoted for CV 1.06, late for duty, and discharged from the Dept for two counts of 3.11 for filing inaccurate reports) | |
| 06-05-12 | 11-0350 PO Dwight COPELAND (Failed to answer the radio while arguing with an ex-girlfriend while on duty) | 5 days<br><br>(Also received 5 days for CV 3.05 – DC not DV related)<br><br>(Entire 10 day suspension upheld at the FPC appeal hearing) | |
| 05-22-12 | **COURT ADMIN CASES:**<br><br>12-0010 PO Robert MOORE (Extended lunch – 39) (Leaving early – 8)<br><br>12-0011 PO James HUMPHREYS (Extended lunch – 5) (Leaving early – 5) | DLWR 3 days<br><br>Charge Dismissed 1 day | |

| 05-15-12 | COURT ADMIN CASES: | | |
|---|---|---|---|
| | 12-0007 PO Kelly BROWN (Extended lunch –10) (Leaving early – 1) | DLWR 1 day | |
| | 12-0008 PO Scott DAVIS (Leaving early – 54) | 4 days | |
| | 12-0009 PO Devlin BURRIS (Extended lunch – 33) (Leaving early – 74) | DLWR 8 days | |
| | 12-0013 PO Reginald HAMPTON (Leaving early – 34) | 3 days | |
| | 12-0014 PO Jennifer HYCZEWSKI (Extended lunch – 1) (Leaving early – 17) | Charge Dismissed 1 day | |
| | 12-0015 PO Gerardo OCHOA (Leaving early – 11) | 1 day | |
| | 12-0016 PO Ray HARRIS (Extended lunch – 10) (Leaving early – 55) | DLWR 4 days | |
| | 12-0017 PO Derrick VANCE (Extended lunch – 10) (Leaving early – 14) | DLWR 2 days | |
| | 12-0018 PO Patricia SCHNELL (Extended lunch – 2) (Leaving early – 13) | Charge Dismissed 1 day | |

| | | | |
|---|---|---|---|
| | 12-0019 PO Pamela LOONEY (Extended lunch – 1) (Leaving early – 68) | Charge Dismissed 4 days | |
| | 12-0020 PO Geoffrey LASSA (Leaving early – 56) | 2 days | |
| | 12-0021 PO Judy HARGROVE (Extended lunch – 8) (Leaving early – 23) | DLWR 3 days | |
| | 12-0012 CLO Joanne SUNN (Extended lunch – 9) (Leaving early – 34) | DLWR Demoted to PO | |
| 12-21-11 | 11-0229 PO Robert PALUSO (Count One – Extended lunch breaks on 41 occasions) | O.R. | |
| | 11-0229 PO Robert PALUSO (Count Two – Left work early on 25 occasions) | 5 days (Total for case was 2 O.R.'s and 10 total days) | |

# IDLING/LOAFING

## SECTION
## 380.00

| REVIEW BY CHIEF FLYNN AS OF: | FILE & NAME | DISCIPLINE IMPOSED |
|---|---|---|
| 12-16-10 | 10-0439 PO Steven MAHNKE (social visits at the residence of a female acquaintance on his lunch) | 5 days |
| 12-02-10 | 10-0391 PO Ladmarald CATES (sexual contact while on-duty) | Discharged from Dept. |
| 06-15-10 | 09-0690 Sgt Thomas RUEGE (Four counts) | Demoted to P.O. |
| 05-05-10 | 09-0628 Sgt. Leon DAVIS<br><br>09-0628 Sgt. Carlos HARMON | 3 days<br><br>3 days |
| 11-10-09 | 09-0478 PO Martin Gonzalez | 1 day |
| 7-1-09 | 08-0485 PO James Nisiewicz | O.R. |
| 5-21-09 | 08-0485 PO Karen REGNER (went to bank and to eat)<br><br>09-0041 Det CD CHILDS (Attended civil court w/son while on duty) | DLWR<br><br>Chrge Dismissed |
| 1-15-09 | 08-0499 PA Jesse Colas | O.R. |
| 07-11-08 | 08-0181 Det Kenyatte Wooden | 5 day |
| 5-1-08 | 07-0841 PO Bridges | DLWR |
| 2-28-08 | 07-0883 PO Wilson 2 counts | DLWR<br>DLWR |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| | |
|---|---|
| NAME LEWANDOWSKI, SHANNON | DATE APPOINTED JUNE 7, 1999 |
| DATE OF BIRTH ▮▮▮▮▮ | PLACE MILWAUKEE, WI |
| ADDRESS 1121 N. Waverly Pl. #307 (02) | TEL # 405-4617   BADGE # |
| PREVIOUS OCCUPATION HARLEY DAVIDSON (Machinist) | |
| PREVIOUS NAME(S) | |

POSITION : POLICE OFFICER
PROMOTED TO: DETECTIVE

S.S.# ▮▮▮▮▮
PAYROLL# 67352
DATE 2-13-05

SINGLE ☒     DIVORCED ☐  DATE_____
MARRIED ☐  DATE_____     WIDOWER ☐  DATE_____

| DATE | ASSIGNMENTS AND TRANSFERS | DATE | ASSIGNMENTS AND TRANSFERS |
|---|---|---|---|
| 06/07/99 | TRAINING BUREAU/RECRUIT COURSE OF INSTRUCTION | 2/1/04 | DISTRICT 7, NIGHTS |
| 11/14/99 | TRAINING PHASE II, #3, #33 12-26-99 | 2-13-05 | PROMOTED TO DETECTIVE, ASSIGNED TO CRIMINAL INVESTIGATION BUREAU, NIGHTS, #93 9-16-07 |
| 01/05/01 | loc. 38 | | 93 3-26-08 |
| 3/3/02 | SPECIAL OPERATIONS BUREAU, ( CRIMINAL INTELLIGENGE DIVISION), NIGHTS. | 5/3/09 | VIOLENT CRIMES DIVISION, NIGHTS |
| 4/14/02 | NO. 3, NIGHTS, (Avenues West) | 8/22/10 | CIB, (METROPOLITAN INVESTIGATIONS DIV),NIGHTS, LATE |
| 6/9/02 | NO. 1, NIGHTS (P.P.S.). | 3/4/12 | CENTRAL INVESTIGATIONS DIVISION, NIGHTS, LATE, 4/14/15 Early |
| 07/21/02 | NO. 7, NIGHTS | 6/7/2015 | INTELLIGENCE FUSION CENTER, NIGHTS |
| 02/02/03 | DISTRICT ONE, NIGHTS (P.P.S.) | | |



| DESCRIPTION | |
|---|---|
| HEIGHT | |
| WEIGHT | |
| BUILD | |
| HAIR | |
| COMPLEXION | |
| EYES | |
| REMARKS: | F/W   PS #012860 |

FINGERPRINT
RIGHT INDEX FINGER

EXAMINATIONS

(SIGNATURE)

16CV1089 - 0020

| DATE | MERITORIOUS MENTION |
|------|---------------------|
| 04/28/04 | M/A BURGLARY |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| DATE | DEMERITS |
|------|----------|
| 05/14/2002 | VIOLATION OR RULES AND PROCEDURES: FAILING TO USE THE UTMOST PRECAUTION TO PREVENT THE ESCAPE OF A PRISONER, SUSPENDED WITHOUT PAY FOR TWO (2) CONSECTIVE WORKING DAYS. ORDER# 2002-191 CHARGE# 5914 |
| 05/14/02 | VIOLATION OF DEPARTMENT RULES AND PROCEDURES: FAILING TO PROMPTLY COMMUNICATE TO HER COMMANDING OFFICER INFORMATION OF WHICH THE DEPARTMENT TAKES COGNIZANCE, SUSPENDED WITHOUT PAY FOR ONE (1) WORKING DAY. ORDER# 2002-192 CHARGE# 5919 |
| 08/23/02 | Pursuant to Personnel Order 2002-192, promulgated on 5/14/02, the Chief has decided to reduce the one 91) day suspesion w/o pay shell be rescinded in its entirety. ORDER# 2002-329 |
| 5/21/15 | Violation of Department Rules & Procedures: Core Value 3.00 - Integrity, referencing Guiding Principle 3:01: Behaving in such a way that created the appearance of impropriety. Official Reprimand. Personnel Order No. 2015-5 |

16CV1089 - 0021

# Milwaukee Police Department

## Investigation Employee Case File History

**Personnel Profile**

| | | | |
|---|---|---|---|
| Employee Name: | LEWANDOWSKI, SHANNON | Rank: | DETECTIVE |
| Employ | 012860 | Bureau: | 331 58 |
| Sex: | F | Sworn: | |
| Race: | White | Assignment: | INTEL ERLY |
| DOB: | ■■■■■ | Hire Date: | 06/07/1999 |
| Height: | 510 | Agency: | Milwaukee Police Department |
| Weight: | 145 | Position: | 2309 |
| Hair Color: | BLONDE | Status: | A |
| Eye Color: | GREEN | | |



| Case No | Status | Incident Date | Allegation | Violation | Finding | Action Type | Action | Suspension Days | Linked Complainant |
|---|---|---|---|---|---|---|---|---|---|
| IAS-2015-0026 | Closed | 01/23/2015 | Integrity, 3.01 - Behavior that could discredit the Dept. | Integrity, 3.01 - Behavior that could bring discredit to Dept | SUSTAINED | Initial | REPRIMAND - OFFICIAL | | SGRIGNUOLI, JOHNNY C |
| IAS-2015-0032 | Open | 01/19/2015 | Competence, 1.03 - Idling & loafing | | | | | | BRUNSON, MICHAEL J |
| | | | Integrity, 3.06 - Interfering in business of another | | | | | | BRUNSON, MICHAEL J |
| | | | Competence, 1.05 - SOP Squad Accident | 640.15(A)(2) | | | | | BRUNSON, MICHAEL J |
| IAS-2014-0435 | Open | 12/28/2014 | Competence, 1.05 - F/T Know Dept Policy/Procedure | | | | | | SMITH, Joyce S |

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 27 of 805   Document 80-21

16CV1089 - 0022

## Personnel Profile

| | | | |
|---|---|---|---|
| **Employee Name:** | LEWANDOWSKI, SHANNON | **Rank:** | DETECTIVE |
| **Employ** | 012860 | **Bureau:** | 331 58 |
| **Sex:** | F | **Sworn:** | |
| **Race:** | White | **Assignment:** | INTEL ERLY |
| **DOB:** | ▮▮▮▮ | **Hire Date:** | 06/07/1999 |
| **Height:** | 510 | **Agency:** | Milwaukee Police Department |
| **Weight:** | 145 | **Position:** | 2309 |
| **Hair Color:** | BLONDE | **Status:** | A |
| **Eye Color:** | GREEN | | |



| Case No | Status | Incident Date | Allegation | Violation | Finding | Action Type Action | Suspension Days | Linked Complainant |
|---|---|---|---|---|---|---|---|---|
| IAS-2014-0094 | Closed | 02/23/2014 | Respect, 5.01 - FT treat a supervisor with courtesy & professionalism | | POLICY REVIEW | | | TURCINOVIC, BORIS |
| PPD-2012-0249 | Closed | 05/18/2012 | Integrity, 3.03 - Improper Search & Seizure | | UNFOUNDED | | | MCDANIELS, ERICA L |
| SIS-2011-0006 | Closed | 01/04/2011 | 947.01 - Disorderly Conduct | | BASELESS | | | Collins, Julie C |
| PPD-2009-0524 | Closed | 05/26/2009 | PROCEDURES/INTERNAL-F/T BE CIVIL TWDS ASSOC | | NOT SUSTAINED | | | BJORKQUIST, PAUL J |
| PPD-2009-0344 | Closed | 04/12/2009 | SERVICE RELATED-F/T FULLY INVESTIGATE | | NOT SUSTAINED | | | WEBER, TODD D |
| | | | SERVICE RELATED-F/T BE CIVIL/COURTEOUS | | NOT SUSTAINED | | | WEBER, TODD D |
| PPD-2008-0315 | Closed | 05/15/2008 | ETHICS-OTHER/ | | NOT SUSTAINED | | | BEECHER, VICTOR E |

16CV1089 - 0023

## Personnel Profile

| | | | |
|---|---|---|---|
| Employee Name: | LEWANDOWSKI, SHANNON | Rank: | DETECTIVE |
| Employ | 012860 | Bureau: | 331 58 |
| Sex: | F | Sworn: | |
| Race: | White | Assignment: | INTEL ERLY |
| DOB: | ████ | Hire Date: | 06/07/1999 |
| Height: | 510 | Agency: | Milwaukee Police Department |
| Weight: | 145 | Position: | 2309 |
| Hair Color: | BLONDE | Status: | A |
| Eye Color: | GREEN | | |



| Case No | Status | Incident Date | Allegation | Violation | Finding | Action Type Action | Suspension Days | Linked Complainant |
|---|---|---|---|---|---|---|---|---|
| | | | PROCEDURES/INTERNAL-FILING FALSE OFF RPT | | NOT SUSTAINED | | | BEECHER, VICTOR E |
| | | | INSUBORDINATION-F/T OBEY ORDER | 2/030.00 - WRITTEN DIRECTIVE | NOT SUSTAINED | | | BEECHER, VICTOR E |
| | | | SERVICE RELATED-F/T FULLY INVESTIGATE | | NOT SUSTAINED | | | BEECHER, VICTOR E |
| PPD-2008-0679 | Closed | 11/28/2007 | PROCEDURES/INTERNAL-FILING FALSE OFF RPT | | FILED - PENDING ADDITIONAL INFORMATION | | | Flynn, Robert |
| PPD-2007-0758 | Closed | 09/26/2007 | SOP, F/T KNOW-SECT. # | 4/080.00(19) | POLICY TRAINING | | | RAMIREZ, ALEXANDER |
| PPD-2007-0723 | Closed | 09/17/2007 | SERVICE RELATED-OTHER/ | | MEMBER COUNSELED | | | Shank, Cynthia M |
| PPD-2007-0716 | Closed | 08/15/2007 | F/T CONFORM/STATE-STATUTE # | | NOT SUSTAINED | | | |

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 29 of 805   Document 80-21

16CV1089 - 0024

## Personnel Profile

| | | | |
|---|---|---|---|
| **Employee Name:** | LEWANDOWSKI, SHANNON | **Rank:** | DETECTIVE |
| **Employ** | 012860 | **Bureau:** | 331 58 |
| **Sex:** | F | **Sworn:** | |
| **Race:** | White | **Assignment:** | INTEL ERLY |
| **DOB:** | ■■■■ | **Hire Date:** | 06/07/1999 |
| **Height:** | 510 | **Agency:** | Milwaukee Police Department |
| **Weight:** | 145 | **Position:** | 2309 |
| **Hair Color:** | BLONDE | **Status:** | A |
| **Eye Color:** | GREEN | | |



| Case No | Status | Incident Date | Allegation | Violation | Finding | Action Type | Action | Suspension Days | Linked Complainant |
|---|---|---|---|---|---|---|---|---|---|
| | | | SERVICE RELATED-F/T BE CIVIL/COURTEOUS | | NOT SUSTAINED | | | | Flynn, Maribeth A |
| CIS-2007-0173 | Closed | 08/15/2007 | 943.20 - Theft | | SUPENDED PENDING ADDED INFO | | | | Flynn, Maribeth A |
| CL-C-2007-0021 | Closed | 01/30/2007 | | | | | | | |
| PI20060683 | Closed | 08/11/2006 | SERVICE RELATED-F/T BE CIVIL/COURTEOUS | | NOT SUSTAINED | | | | LEMMERHIRT, LISA |
| X PI20060503 | Closed | 06/20/2006 | OTHER/-OFFICIOUS CONDUCT | 2/065.00 | SUSTAINED | Initial | REPRIMAN D - DISTRICT LEVEL | | GUERRO, DENISE |
| | | | X SOP, F/T KNOW-SECT. # | 3/250.35 - 3/250.35 (A) (5) | SUSTAINED | Initial | REPRIMAN D - DISTRICT LEVEL | | GUERRO, DENISE |
| PI20060113 | Closed | 02/12/2006 | PROCEDURES/INTERNAL-F/T BE CIVIL TWDS ASSOC | | NOT SUSTAINED | | | | HAYNES, LINDA |

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 30 of 805   Document 80-21

16CV1089 - 0025

## Personnel Profile

| | | | |
|---|---|---|---|
| **Employee Name:** | LEWANDOWSKI, SHANNON | **Rank:** | DETECTIVE |
| **Employ** | 012860 | **Bureau:** | 331 58 |
| **Sex:** | F | **Sworn:** | |
| **Race:** | White | **Assignment:** | INTEL ERLY |
| **DOB:** | ▉▉▉ | **Hire Date:** | 06/07/1999 |
| **Height:** | 510 | **Agency:** | Milwaukee Police Department |
| **Weight:** | 145 | **Position:** | 2309 |
| **Hair Color:** | BLONDE | **Status:** | A |
| **Eye Color:** | GREEN | | |



| Case No | Status | Incident Date | Allegation | Violation | Finding | Action Type Action | Suspension Days | Linked Complainant |
|---|---|---|---|---|---|---|---|---|
| | | | PROCEDURES/INTERNAL-F/T BE CIVIL TWDS ASSOC | | NOT SUSTAINED | | | FLOWERS, KERRY L |
| PI20050769 | Closed | 08/23/2005 | SERVICE RELATED-F/T BE CIVIL/COURTEOUS | | NOT SUSTAINED | | | CRAWFORD, JOETTA |
| CIS-2005-0106 | Closed | 06/17/2005 | | | | | | |
| PI20040819 | Closed | 09/26/2004 | SERVICE RELATED-F/T BE CIVIL/COURTEOUS | | NOT SUSTAINED | | | BLAN, ARKESHIA |
| PI20040530 | Closed | 07/02/2004 | F/T CONFORM/STATE-STATUTE # | | UNFOUNDED | | | BILLINGS, MICKY |
| CIS-2004-0150 | Closed | 07/02/2004 | 940.19(1) - Battery | | BASELESS | | | BILLINGS, MICKY |
| PI20040197 | Closed | 01/09/2004 | OTHER/-OTHER/ | | OTHER | | | MARTIN, UNIQUEKA J. |

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 31 of 805   Document 80-21

16CV1089 - 0026

## Personnel Profile

| | | | |
|---|---|---|---|
| **Employee Name:** | LEWANDOWSKI, SHANNON | **Rank:** | DETECTIVE |
| **Employ** | 012860 | **Bureau:** | 331 58 |
| **Sex:** | F | **Sworn:** | |
| **Race:** | White | **Assignment:** | INTEL ERLY |
| **DOB:** | ■■■■■ | **Hire Date:** | 06/07/1999 |
| **Height:** | 510 | **Agency:** | Milwaukee Police Department |
| **Weight:** | 145 | **Position:** | 2309 |
| **Hair Color:** | BLONDE | **Status:** | A |
| **Eye Color:** | GREEN | | |



| Case No | Status | Incident Date | Allegation | Violation | Finding | Action Type Action | Suspension Days | Linked Complainant |
|---|---|---|---|---|---|---|---|---|
| CIS-2004-0017 | Closed | 10/30/2003 | FORCE/USE OF IMPROP. -OTHER/ | | BASELESS | | | MARTIN, UNIQUEKA J. |
| PI20030170 | Closed | 01/18/2003 | SERVICE RELATED-F/T FILE REPORTS | | NOT SUSTAINED | | | HUNT, JEANETTE |
| | | | SERVICE RELATED-F/T BE CIVIL/COURTEOUS | | NOT SUSTAINED | | | HUNT, JEANETTE |
| PI20021131 | Closed | 09/27/2002 | SERVICE RELATED-F/T BE CIVIL/COURTEOUS | | NOT SUSTAINED | | | OMEREONYE, GOLD |
| PI20020447 | Closed | 04/24/2002 | SERVICE RELATED-F/T BE CIVIL/COURTEOUS | | RESOLVED AT DISTRICT LEVEL | | | JONES, JOSEPH |
| PI20020124 | Closed | 02/01/2002 | FORCE/USE OF IMPROP. -BODILY FORCE | | NOT SUSTAINED | | | Lewis, Delisa H |
| | | | SERVICE RELATED-FALSE ARREST | | NOT SUSTAINED | | | Lewis, Delisa H |

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 32 of 805   Document 80-21

16CV1089 - 0027

## Personnel Profile

| | | | |
|---|---|---|---|
| **Employee Name:** | LEWANDOWSKI, SHANNON | **Rank:** | DETECTIVE |
| **Employ** | 012860 | **Bureau:** | 331 58 |
| **Sex:** | F | **Sworn:** | |
| **Race:** | White | **Assignment:** | INTEL ERLY |
| **DOB:** | ▮▮▮▮ | **Hire Date:** | 06/07/1999 |
| **Height:** | 510 | **Agency:** | Milwaukee Police Department |
| **Weight:** | 145 | **Position:** | 2309 |
| **Hair Color:** | BLONDE | **Status:** | A |
| **Eye Color:** | GREEN | | |



| Case No | Status | Incident Date | Allegation | Violation | Finding | Action Type | Action | Suspension Days | Linked Complainant |
|---|---|---|---|---|---|---|---|---|---|
| PI20011169 | Closed | 09/17/2001 | SERVICE RELATED-OTHER/ | | NOT SUSTAINED | | | | HOPKINS, BEVERLY |
| PI20010328 | Closed | 02/26/2001 | COURT-F/T APPEAR | 2/225.00 - 2/225.00 | SUSTAINED | Initial | REPRIMAND - DISTRICT LEVEL | | DREES, CINDY L |
| PI20010243 | Closed | 02/21/2001 | EQUIPMENT/DEPT-NEGLIGENT CARE | | UNFOUNDED | | | | LUCAS, EARNEL |
| PI20010198 | Closed | 02/18/2001 | FORCE/USE OF IMPROP. -BODILY FORCE | | NOT SUSTAINED | | | | HARRIS, TYRONE |
| PI20001489 | Closed | 11/01/2000 | RULES/REG, F/T KNOW-RULE # | 2/110.00 - 2/110.00 | SUSTAINED | Initial | SUSPENSION | 1 | LUCAS, EARNEL |
| | | | RULES/REG, F/T KNOW-RULE # | 3/250.35(A)(4) - 2/010.00 | SUSTAINED | Initial | SUSPENSION | 0 | LUCAS, EARNEL |
| PI20001082 | Closed | 08/09/2000 | F/T CONFORM/STATE-STATUTE # | | UNFOUNDED | | | | CARTER, ANDRE |

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 33 of 805   Document 80-21

16CV1089 - 0028

## Personnel Profile

| | | | |
|---|---|---|---|
| **Employee Name:** | LEWANDOWSKI, SHANNON | **Rank:** | DETECTIVE |
| **Employ** | 012860 | **Bureau:** | 331 58 |
| **Sex:** | F | **Sworn:** | |
| **Race:** | White | **Assignment:** | INTEL ERLY |
| **DOB:** | ██████ | **Hire Date:** | 06/07/1999 |
| **Height:** | 510 | **Agency:** | Milwaukee Police Department |
| **Weight:** | 145 | **Position:** | 2309 |
| **Hair Color:** | BLONDE | **Status:** | A |
| **Eye Color:** | GREEN | | |



| Case No | Status | Incident Date | Allegation | Violation | Finding | Action Type | Action | Suspension Days | Linked Complainant |
|---|---|---|---|---|---|---|---|---|---|
| PI20001048 | Closed | 08/09/2000 | SOP, F/T KNOW-SECT. # | 3/250.35 - 3/250.35 - NOTIFY DISP BE CHANGE IN | SUSTAINED | Initial | INSTRUCTION | | ETTIENNE, LISA D |
| | | | SERVICE RELATED-F/T FULLY INVESTIGATE | | NOT SUSTAINED | | | | ETTIENNE, LISA D |
| CIS-2000-0229 | Closed | 08/09/2000 | 940.19(1) - Battery | | WARRANT REFUSED | | | | CARTER, ANDRE |
| PI20000062 | Closed | 01/25/2000 | FORCE/USE OF IMPROP. -BATON | | EXONERATED | | | | ROSE, VICTOR M |
| CIS-2000-0019 | Closed | 01/25/2000 | 940.19(1) - Battery | | BASELESS | | | | ROSE, VICTOR |
| PI20011287 | Closed | | SERVICE RELATED-F/T BE CIVIL/COURTEOUS | | NOT SUSTAINED | | | | BLACK, LISA |
| PI20010883 | Closed | | PRISONER-ESCAPE/CUSTODY | 2/460.00 | SUSTAINED | Initial | SUSPENSION | 2 | LUCAS, EARNEL |

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 34 of 805   Document 80-21

16CV1089 - 0029

## Personnel Profile

| | | | |
|---|---|---|---|
| Employee Name: | LEWANDOWSKI, SHANNON | Rank: | DETECTIVE |
| Employee: | 012860 | Bureau: | 331 58 |
| Sex: | F | Sworn: | |
| Race: | White | Assignment: | INTEL ERLY |
| DOB: | ▇▇▇▇ | Hire Date: | 06/07/1999 |
| Height: | 510 | Agency: | Milwaukee Police Department |
| Weight: | 145 | Position: | 2309 |
| Hair Color: | BLONDE | Status: | A |
| Eye Color: | GREEN | | |



| Case No | Status | Incident Date | Allegation | Violation | Finding | Action Type Action | Suspension Days | Linked Complainant |
|---|---|---|---|---|---|---|---|---|
| PI20011269 | Closed | | SERVICE RELATED-F/T BE CIVIL/COURTEOUS | | NOT SUSTAINED | | | BANKS, JOHNNY |
| PI20051228 | Closed | | PROCEDURES/INTERNAL-F/T KEEP INFO CONFIDENTIAL | | FILED - INFORMATION ONLY | | | HOERIG, MARY K |
| | | | PROCEDURES/INTERNAL-F/T KEEP INFO CONFIDENTIAL | | FILED - INFORMATION ONLY | | | COUNCIL, NS CITIZEN |

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 35 of 805   Document 80-21

16CV1089 - 0030

View Records Where:

(Employee Name In ('LEWANDOWSKI, SHANNON '))

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 36 of 805   Document 80-21

16CV1089 - 0031

# MILWAUKEE POLICE DEPARTMENT

# CHARGES

*October 7, 2015*

*AGAINST* .............................................................. *SHANNON LEWANDOWSKI* ....................................................

*RANK —* $\}$  *POLICE OFFICER* ......................................................
*POSITION*

*P.S.  012860, I.A.S.  #15-0032* ..............................................

**(PAGE 1 OF 2)**

*Violation of Department Code of Conduct as follows:*

## CHARGE

### CORE VALUE 1.00 – COMPETENCE:

*We are prudent stewards of the public's grant of authority and resources. We are accountable for the quality of our performance and the standards of our conduct.  We are exemplary leaders and exemplary followers.*

### REFERENCING GUIDING PRINCIPLE 1.05:

*All department members shall be familiar with department policy, procedures and training and shall conduct themselves accordingly.*

### REFERENCING STANDARD OPERATING PROCEDURES RELATING TO: DEPARTMENT OWNED VEHICLES - - SECTION 640.15(A)(2):

*640.15*    *VEHICLE OPERATIONS - GENERAL*

**A.  OPERATING REQUIREMENTS**

2.  *Operators of Department vehicles shall, in all instances, operate the vehicle in a safe and courteous manner, comply with all traffic laws and ordinances, and wear seat belts at all times, except when doing so would endanger the safety of the operator or another, or when he/she has provided medical certification that he/she is unable to do so.*

### SPECIFICATION

### CORE VALUE 1.00 – COMPETENCE/REFERENCING GUIDING PRINCIPLE 1.05 REFERENCING S.O.P. SECTION 640.15(A)(2):

*On January 19, 2015, at 2:17 a.m., Detective Shannon LEWANDOWSKI, while on-duty, was involved in a squad accident that occurred at North 35th Street and West North Avenue.  Detective LEWANDOWSKI was operating a department vehicle eastbound on West North Avenue with the emergency lights activated.  The department vehicle crashed into a vehicle that had attempted to travel northbound through the intersection with a red or yellow traffic light on North 35th Street.*

*Prior to the squad accident, the passenger in the department vehicle, also a detective, had been assigned and intended to recover a firearm used in a shooting incident.  Detective LEWANDOWSKI volunteered to assist the other detective, both of whom were in the same vehicle for that assignment.  Instead of responding to the location to attempt the firearm recovery, Detective LEWANDOWSKI was responding to a location for reasons not related to aid in the recovery of the firearm.*

*Respectfully submitted,*

_____  _____ Commanding Officer, Internal Affairs Division

*James C. SHEPARD, Captain of Police*

# MILWAUKEE POLICE DEPARTMENT

# CHARGES

*October 7, 2015*

*AGAINST* ............................................................. *SHANNON LEWANDOWSKI* ............................................................

*RANK —*  
*POSITION* } *POLICE OFFICER* ..........................................................

*P.S.  012860, I.A.S. #15-0032* ........................................

*Violation of Department Code of Conduct as follows:*

### SPECIFICATION (continued)

### CORE VALUE 1.00 – COMPETENCE/REFERENCING GUIDING PRINCIPLE 1.05 REFERENCING S.O.P. SECTION 640.15(A)(2):

During a PI-21 interview, Detective LEWANDOWSKI stated she had previously activated the emergency lights and siren to prevent a vehicle from pulling out and striking her vehicle. Detective LEWANDOWSKI stated she turned off the siren, but thought she left the emergency lights on. Detective LEWANDOWSKI indicated there was no other reason for the emergency lights to be activated. Detective LEWANDOWSKI admitted she was not responding to recover the firearm at the time of the accident, but going to District Five to help an officer with a personal issue. Detective LEWANDOWSKI indicated she had been at District Five for the same issue earlier.

The department vehicle was determined to be "totaled" with a value of $4,525. Detective LEWANDOWSKI, a second detective, and a citizen were all transported to the hospital for injuries. Both Detective LEWANDOWSKI and the other detective were unable to return to work for a significant period of time.

Detective Shannon LEWANDOWSKI failed to operate the vehicle in a safe and courteous manner while complying with all traffic laws.

*Respectfully submitted,*

_____  _____ Commanding Officer, Internal Affairs Division

*James C. SHEPARD, Captain of Police*

## WITNESSES

SERGEANT ADAM ZIEGER

---

## JUDGMENT—ORDER

153

**DATE:** 8 DEC 2015

### I HAVE REVIEWED THE CHARGE CONTAINED HEREIN AND ORDER

30 DAYS SUSPENSION FROM PAY AND DUTY,

**Dated** 12/08/15

_Edward_ _____
Chief of Police

# MILWAUKEE POLICE DEPARTMENT

# CHARGES

*November 20, 2015*

*AGAINST* ............................................ *SHANNON LEWANDOWSKI* ........................................

RANK —
POSITION }

*DETECTIVE*

*P.S. #012860, I.A.S. #15-0032*

**(PAGE 1 OF 2)**

*Violation of Department Code of Conduct as follows:*

## CHARGE

### CORE VALUE 3.00 – INTEGRITY

*We recognize the complexity of police work and exercise discretion in ways that are beyond reproach and worthy of public trust. Honesty and truthfulness are fundamental elements of integrity. It is our duty to earn public trust through consistent words and actions. We are honest in word and deed.*

### REFERENCING: GUIDING PRINCIPLE 3.10

*All department members shall be forthright and candid, orally or in writing, in connection with any administrative inquiry or report.*

## SPECIFICATION

### CORE VALUE 3.00 – INTEGRITY
### REFERENCING GUIDING PRINCIPLE 3.10:

*On January 19, 2015, at 2:17 a.m., Detective Shannon LEWANDOWSKI, while on-duty, was involved in a squad accident that occurred at North 35th Street and West North Avenue. Detective LEWANDOWSKI was operating a department vehicle eastbound on West North Avenue with the emergency lights and siren activated. The department vehicle crashed into a vehicle that had attempted to travel northbound through the intersection with a red or yellow traffic light on North 35th Street.*

*Prior to the squad accident, the passenger in the department vehicle, also a detective, had been assigned and intended to recover a firearm used in a shooting incident. Detective LEWANDOWSKI volunteered to assist the other detective, and both were in the same vehicle for that assignment. Instead of responding to the location to attempt the firearm recovery, Detective LEWANDOWSKI was responding to a location for reasons not related to aid in the recovery of the firearm.*

*At approximately 2:04 a.m., Shorewood Police Department Sergeant Cody SMITH had contact with Detective LEWANDOWSKI'S son, Mr. Jordan LEWANDOWSKI, near 3616 North Maryland Avenue. Sergeant SMITH indicated during an interview, Mr. LEWANDOWSKI informed him his mother was a Milwaukee Police Detective by handing him a business card, and stated she was on her way to the location.*

*Respectfully submitted,*

*D.I. Michael J. Brunson* _____ Commanding Officer, Internal Affairs Division

*Michael J. BRUNSON, Deputy Inspector of Police*

# MILWAUKEE POLICE DEPARTMENT

# CHARGES

*November 20, 2015*

AGAINST ......................................................... SHANNON LEWANDOWSKI ..................................

RANK —
POSITION }

*DETECTIVE*

*P.S. #012860, I.A.S. #15-0032*

**(PAGE 2 OF 2)**

---

*Violation of Department Code of Conduct as follows:*

### SPECIFICATION (continued)

**CORE VALUE 3.00 – INTEGRITY**
**REFERENCING GUIDING PRINCIPLE 3.10:**

Police Lieutenant Sean HANLEY documented Detective LEWANDOWSKI contacted him by telephone at about 6:38 a.m. Detective LEWANDOWSKI informed Lieutenant HANLEY she received a phone call from her son, while driving to District Five, informing her he had been stopped by the UWM (University of Wisconsin - Milwaukee) Police Department. Additionally, Detective LEWANDOWSKI informed Lieutenant HANLEY she was driving to the area of UWM first to find her son. Lieutenant HANLEY documented Detective LEWANDOWSKI stated her emergency lights were activated to make cars pull over and get out of her way, but not to operate as an emergency vehicle.

Witnesses at the scene of Detective LEWANDOWSKI'S accident reported hearing her state that she needed to get her son. Police Sergeant Adam RILEY informed Lieutenant HANLEY that Detective LEWANDOWSKI told officers on the scene she was responding to the area of UWM, because her son had been stopped by the UWM Police Department. Sergeant RILEY later informed Lieutenant HANLEY that witnesses were also making these statements. A witness, Jasmin HERNANDEZ, observed the white female detective use a phone and stated something regarding that she needed to get her son from the UWM Police Department. Police Officer Joseph BOEHLKE indicated the only thing he heard from Detective LEWANDOWSKI was "just something about her son, that she had to get to her son." Officer BOEHLKE did not recall the exact words of Detective LEWANDOWSKI stating, "I don't recall the exact words, but it seemed something to the effect of I need something about my son, or I need to get to my son."

During a PI-21 interview, Detective LEWANDOWSKI stated she had previously activated the emergency lights and siren to prevent a vehicle from pulling out and striking her vehicle. Detective LEWANDOWSKI stated she turned off the siren, but thought she left the emergency lights on. Detective LEWANDOWSKI indicated there was no other reason for the emergency lights to be activated. Detective LEWANDOWSKI admitted she was not responding to recover the firearm at the time of the accident, but going to District Five to help an officer with a personal issue. Detective LEWANDOWSKI indicated she had been at District Five for the same issue earlier.

Detective LEWANDOWSKI acknowledged she received a telephone call from her son informing he had been stopped by a Police Officer. Detective LEWANDOWSKI stated she was not meeting her son, and indicated Lieutenant HANLEY'S report was not accurate.

Detective Shannon LEWANDOWSKI failed to be forthright and candid, orally or in writing, in connection with any administrative inquiry or report.

*Respectfully submitted,*

_____ Commanding Officer, Internal Affairs Divisio

*Michael J. BRUNSON, Deputy Inspector of Police*

## WITNESSES
### SERGEANT ADAM ZIEGER

## JUDGMENT—ORDER

DATE: *15 Dec 2015*

**I HAVE REVIEWED THE CHARGE CONTAINED HEREIN AND ORDER**

*DISCHARGE FROM MPD.*

Dated *12/15/15*

_____
Chief of Police

# MILWAUKEE POLICE DEPARTMENT

# CHARGES

*October 7, 2015*

*AGAINST* ..................................................... *SHANNON LEWANDOWSKI* ..................................................

$RANK -$ } *POLICE OFFICER*

$POSITION$ *P.S. #012860, I.A.S. #15-0032*

*Violation of Department Code of Conduct as follows:*

## CHARGE

### CORE VALUE 1.00 – COMPETENCE

*We are prudent stewards of the public's grant of authority and resources. We are accountable for the quality of our performance and the standards of our conduct. We are exemplary leaders and exemplary followers.*

### REFERENCING: GUIDING PRINCIPLE 1.03

*All department members shall render service to the community promptly and efficiently. When not answering a call for service, members shall use their time to accomplish the mission of the department.*

## SPECIFICATION

### CORE VALUE 1.00 – COMPETENCE
### REFERENCING GUIDING PRINCIPLE 1.03:

*On January 19, 2015, at 2:17 a.m., Detective Shannon LEWANDOWSKI, while on-duty, was involved in a squad accident that occurred at North 35th Street and West North Avenue. Detective LEWANDOWSKI was operating a department vehicle eastbound on West North Avenue with the emergency lights activated. The department vehicle crashed into a vehicle that had attempted to travel northbound through the intersection with a red or yellow traffic light on North 35th Street.*

*Prior to the squad accident, the passenger in the department vehicle, also a detective, had been assigned and intended to recover a firearm used in a shooting incident. Detective LEWANDOWSKI volunteered to assist the other detective, both of whom were in the same vehicle for that assignment. Instead of responding to the location to attempt the firearm recovery, Detective LEWANDOWSKI was responding to a location for reasons not related to aid in the recovery of the firearm.*

*During a PI-21 interview, Detective LEWANDOWSKI stated she had previously activated the emergency lights and siren to prevent a vehicle from pulling out and striking her vehicle. Detective LEWANDOWSKI stated she turned off the siren, but thought she left the emergency lights on. Detective LEWANDOWSKI indicated there was no other reason for the emergency lights to be activated. Detective LEWANDOWSKI admitted she was not*

*Respectfully submitted,*

*James C. Shepard*

Commanding Officer, Internal Affairs Divisio

*James C. SHEPARD, Captain of Police*

# MILWAUKEE POLICE DEPARTMENT

# CHARGES

*October 7, 2015*

*AGAINST* ............................................................ *SHANNON LEWANDOWSKI* ................................................................

*RANK —* **}** *POLICE OFFICER*
*POSITION*
*P.S. #012860, I.A.S. #15-0032*

*(PAGE 2 OF 2)*

---

*Violation of Department Code of Conduct as follows:*

### *SPECIFICATION (continued)*

*CORE VALUE 1.00 – COMPETENCE*
*REFERENCING GUIDING PRINCIPLE 1.03:*

*responding to recover the firearm at the time of the accident, but going to District Five to help an officer with a personal issue. Detective LEWANDOWSKI indicated she had been at District Five for the same issue earlier.*

*Detective LEWANDOWSKI indicated that there was no urgency to complete the follow-up and that she intended to meet the other officer instead of conducting the follow-up first because "she had called me and asked me to." Detective LEWANDOWSKI described that her response to District Five took precedence over the gun retrieval because that was where she was "going to go in the first place." Detective LEWANDOWSKI added that the firearm retrieval was not her assignment.*

*Detective Shannon LEWANDOWSKI failed to render service to the community promptly and efficiently. Detective LEWANDOWSKI failed to use her time to accomplish the mission of the department.*

*Respectfully submitted,*

*James C. Shepard* _____ Commanding Officer, Internal Affairs Division

*James C. SHEPARD, Captain of Police*

## WITNESSES

### SERGEANT ADAM ZIEGER

## JUDGMENT—ORDER

DATE: 8 DEC. 2015

**I HAVE REVIEWED THE CHARGE CONTAINED HEREIN AND ORDER**

5 DAYS SUSPENSION FROM PAY AND DUTY

Dated 12/08/15

_Edward A. Lyon_
Chief of Police

CCSO982 10040

# Incident Report
# MILWAUKEE POLICE DEPT

**150180140**

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
01/18/2015
Nature of Call
RECKLESSUSE
Officer
JOHNSON,TROY P

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 150180140 | ORIG | 01/18/2015 | 22:37 | 150182839 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | RECKLESS USE/SHOOTING/ENDANGERING SAFETY |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 1700 W NORTH AV | MILWAUKEE | 53210 | 3515 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 3 | 340 | 01/18/2015 | 22:37 | 017794/JOHNSON,TROY P |

| Assignment | Entered by | Assignment |
|---|---|---|
| CENTRAL INVESTIGATIONS DIVISION | 017794 | CENTRAL INVESTIGATIONS DIVISION |

| RMS Transfer | Prop Trans Stat | Property? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|---|
| Successful | Pending | Yes | 019162 | 02/13/2015 | 08:12:00 |

| CASE STATUS |
|---|
| PENDING |

| ARREST PACKAGE | CAD PRINTOUT | CRIME VICT RS FM PV-17 | DA CRIM CASE SCHD CAL | DA COMPLAINT WRKSHT |
|---|---|---|---|---|
| Yes | Yes | Yes | Yes | Yes |

| DA WITN SUB DATA FRM | PHOTOGRAPHS |
|---|---|
| Yes | Yes |

| # Offenses | Offense | | | | Description | Complaint Type | AC | Use | Bias | Loc |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 941.20(1)(c) | | | | ESBUDW:Intentionally | D | C | N | 88 | 13 |

| #Pr | MOE | Act | Weapon/Force | IBRS | No |
|---|---|---|---|---|---|
| | | N | 12 | 13A | 1 |

| Link | Involvement | Invl No | Name | Race | Sex | |
|---|---|---|---|---|---|---|
| SUS | OIS | 1 | MEEKS,DEMETRIUS SR | B | M | |
| VIC | VIC | 1 | SELLERS,TIMOTHY A | B | M | |
| OTH | ACQ | 1 | AUTMAN,MARION A | B | F | |
| OTH | ORO | 1 | JOHNSON,TROY | B | M | |
| OTH | VAB | 1 | MILW PD | Race | Sex | DOB |

| # Offenses | Offense | | | | Description | Complaint Type | AC | Use | Bias | Loc |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 946.41(1) | | | | Resist Police - MISD | D | C | N | 88 | 13 |

| #Pr | MOE | Act | Weapon/Force | IBRS | No |
|---|---|---|---|---|---|
| | | | | 90Z | 2 |

| Link | Involvement | Invl No | Name | Race | Sex | |
|---|---|---|---|---|---|---|
| SUS | OIS | 1 | MEEKS,DEMETRIUS SR | B | M | |
| OTH | VIC | 1 | SELLERS,TIMOTHY A | B | M | |
| OTH | ACQ | 1 | AUTMAN,MARION A | B | F | |
| RPR | ORO | 1 | JOHNSON,TROY | B | M | |
| VIC | VAB | 1 | MILW PD | Race | Sex | DOB |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | |
|---|---|---|---|---|---|---|---|
| ACQ | 1 | I | AUTMAN,MARION A | 2755973 | B | F | |
| OIS | 1 | I | MEEKS,DEMETRIUS SR | 138686 | B | M | |
| ORO | 1 | P | JOHNSON,TROY | 3022485 | B | M | |
| VAB | 1 | S | MILW PD | 1777777 | Race | Sex | |

| Report Officer | Printed At | |
|---|---|---|
| 017794/JOHNSON,TROY P | 10/14/2015 04:57 | Page 1 of 8 |

## Person Summary

| Invl | Invl No | Type | Name | | MNI | Race | Sex | |
|------|---------|------|------|--|-----|------|-----|--|
| VIC | 1 | I | SELLERS,TIMOTHY A | | 2680209 | B | M | |

## Vehicle Summary

| Invl | Type | Plate No | State | Lic Year | Year | Make | Model | Style | Color |
|------|------|----------|-------|----------|------|------|-------|-------|-------|
| CRM | 2 | 237VPH | WI | | 2002 | | | 4D | GRY |

## Property Summary

| Involvement | Description |
|-------------|-------------|
| EVD | ARTICLE: OTHER WRAPPE     Used red condom wrapper |
| EVD | ARTICLE: FIREARM ACCESSORIES MAGAZI S&W   Silver and black 9mm Mags |
| EVD | ARTICLE: FIREARM ACCESSORIES HOLSTE    Black Gun Holster |
| EVD | ARTICLE: RECORDINGS - AUDIO/VISUAL VIDEO     St Joseph's video footage |
| EVD | ARTICLE: RECORDINGS - AUDIO/VISUAL CD    containing QP of MEEKS |
| EVD | ARTICLE: EXPLOSIVES BULLET    Silver 9mm S7W RC Bullets |
| EVD | ARTICLE: DOCUMENTS FORM     Consent Search form |

## Narrative

Actor intentionally pointed a firearm at the victim without consent, causing victim to fear for his safety. Actor then obstructed the investigation by refusing to tell where the fire arm was.

| Report Officer | Printed At | |
|----------------|-----------|--|
| 017794/JOHNSON,TROY P | 10/14/2015 04:57 | Page 2 of 8 |

# Incident Report
# MILWAUKEE POLICE DEPT

## ACQUAINTANCE 1: AUTMAN,MARION A

| Involvement | Invl No | Type | Name | | MNI |
|---|---|---|---|---|---|
| ACQUAINTANCE | 1 | INDIVIDUAL | AUTMAN,MARION A | | 2755973 |

| Race | Sex | | Age | Ethnicity | Juvenile? |
|---|---|---|---|---|---|
| BLACK/AFRICAN AMERICAN | FEMALE | ███ | 53 | NOT HISPANIC/LATINO | No |

| Height | Weight | Hair Color | Eye Color | Res Status |
|---|---|---|---|---|
| 5'03" | 137# | BLACK | BROWN | RESIDENT |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 2765 N 52ND ST | | MILWAUKEE | WISCONSIN |

| ZIP Code |
|---|
| 53210 |

| Phone Type | Phone No |
|---|---|
| CELL | (414)639-9535 |

## ORDER IN (SUSPECT) 1: MEEKS,DEMETRIUS SR

| Involvement | Invl No | Type | Name | MNI |
|---|---|---|---|---|
| ORDER IN (SUSPECT) | 1 | INDIVIDUAL | MEEKS,DEMETRIUS SR | 138686 |

| Race | Sex | | Age | Ethnicity | Juvenile? | Height |
|---|---|---|---|---|---|---|
| BLACK/AFRICAN AMERICAN | MALE | ███ | 46 | NOT HISPANIC/LATINO | No | 6'00" |

| Weight | Hair Color | Eye Color | Res Status | OF |
|---|---|---|---|---|
| 240# | BLACK | BROWN | RESIDENT | 1 |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 2765 N 52ND ST | | MILWAUKEE | WISCONSIN |

| ZIP Code |
|---|
| 53210 |

| Type | | OLS |
|---|---|---|
| DRIVERS LICENSE NUMBER | ████ | WISCONSIN |

| Type |
|---|
| STATE IDENTIFICATION NUMBER |

| Type |
|---|
| SOCIAL SECURITY NUMBER |

| Phone Type | Phone No |
|---|---|
| CELL | (414)380-9390 |

| Alias Name | Race | Sex | |
|---|---|---|---|
| MEEKS,DEMETRIUS | BLACK/AFRICAN AMERICAN | MALE | ████ |

| Relationship | Name | Sex |
|---|---|---|
| EMERGENCY CONTACT | AUTMAN,MARION | FEMALE |

| Race | Address |
|---|---|
| BLACK/AFRICAN AMERICAN | 2765 N 52ND ST |

| City | State | ZIP Code |
|---|---|---|
| MILWAUKEE | WISCONSIN | 53218 |

| Employer/School | Position/Grade |
|---|---|
| RITEWAY | DRIVER |

| Location | City | State |
|---|---|---|
| 6242 N 64TH ST | MILWAUKEE | WISCONSIN |

| ZIP Code | Phone Type | Phone No |
|---|---|---|
| 53218 | BUSINESS | (414)226-5481 |

## REPORTING OFFICER 1: JOHNSON,TROY

| Involvement | Invl No | Type | Name |
|---|---|---|---|
| REPORTING OFFICER | 1 | POLICE OFFICER | JOHNSON,TROY |

| MNI | Race | Sex |
|---|---|---|
| 3022485 | BLACK/AFRICAN AMERICAN | MALE |

| Type | Address | City |
|---|---|---|
| WORK/BUSINESS | 749 W STATE ST | MILWAUKEE |

| State | ZIP Code |
|---|---|
| WISCONSIN | 53233 |

## VICTIM (BUSINESS) 1: MILW PD

| Involvement | Invl No | Type | Name |
|---|---|---|---|
| VICTIM (BUSINESS) | 1 | SOCIETY/PUBLIC | MILW PD |

| MNI |
|---|
| 1777777 |

| Type | Address | City |
|---|---|---|
| WORK/BUSINESS | 749 W STATE ST | MILWAUKEE |

| State | ZIP Code |
|---|---|
| WISCONSIN | 53233 |

| Report Officer | Printed At | |
|---|---|---|
| 017794/JOHNSON,TROY P | 10/14/2015 04:57 | Page 3 of 8 |

# Incident Report
# MILWAUKEE POLICE DEPT

**150180140**

Supplement No
ORIG

| WILL VICTIM PROSECUTE | VICTIM GAVE CONSENT | | | | | |
|---|---|---|---|---|---|---|
| YES | NO | | | | | |

## IBRS Info

| Victim Invl No | Offense Codes | | | | | |
|---|---|---|---|---|---|---|
| 1 | 90Z | | | | | |

| Rel | Involvement | Invl No | Name | Race | Sex | |
|---|---|---|---|---|---|---|
| ST | OIS | 1 | MEEKS,DEMETRIUS SR | B | M | |

## VICTIM (PERSON) 1: SELLERS,TIMOTHY A

| Involvement | | Invl No | Type | Name | | MNI |
|---|---|---|---|---|---|---|
| VICTIM (PERSON) | | 1 | INDIVIDUAL | SELLERS,TIMOTHY A | | 2680209 |

| Race | Sex | | Age | Ethnicity | Juvenile? | Height |
|---|---|---|---|---|---|---|
| BLACK/AFRICAN AMERICAN | MALE | | 26 | NOT HISPANIC/LATINO | No | 5'07" |

| Weight | Hair Color | Eye Color | Means of Attack | Extent of Injury | D.V. | Res Status |
|---|---|---|---|---|---|---|
| 145# | BROWN | BROWN | FIREARM | NONE | NO | RESIDENT |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 4265 N 84TH ST | | MILWAUKEE | WISCONSIN |

| ZIP Code | | | | |
|---|---|---|---|---|
| 53218 | | | | |

| Phone Type | Phone No | | | |
|---|---|---|---|---|
| CELL | (414)418-9130 | | | |

| CONVEYED TO | CONVEYED BY | VICTIM ORDERED IN TO DA | ORDER IN TO VIEW PHOTOS | WILL VICTIM PROSECUTE |
|---|---|---|---|---|
| NONE | NONE | YES 01/20/15 | NO | YES |

| VICTIM GAVE CONSENT | VIC INFORMED CRM PRV SRV | VIC REQ ADDL CRM PRV SRV | | |
|---|---|---|---|---|
| NO | YES | NO | | |

## IBRS Info

| Victim Invl No | Offense Codes | Agg Homicide |
|---|---|---|
| 1 | 13A | OTHER CIRCUMSTANCES |

| Injury | | |
|---|---|---|
| NONE | | |

| Rel | Involvement | Invl No | Name | Race | Sex | |
|---|---|---|---|---|---|---|
| ST | OIS | 1 | MEEKS,DEMETRIUS SR | B | M | |

## Vehicle: 237VPH

| Involvement | Type | Plate No | State | Lic Type | Year | Style |
|---|---|---|---|---|---|---|
| OBJECT OF A CRIME | TRUCK/VAN | 237VPH | WISCONSIN | PASSENGER CAR | 2002 | 4 DOOR |

| Color | VIN | Damage | | | | |
|---|---|---|---|---|---|---|
| GRAY | 2C4GP44332R657115 | RIGHT | | | | |

| Link | Involvement | Invl No | Name | Race | Sex | |
|---|---|---|---|---|---|---|
| SUS | OIS | 1 | MEEKS,DEMETRIUS SR | B | M | |
| VIC | VIC | 1 | SELLERS,TIMOTHY A | B | M | |
| OTH | ACQ | 1 | AUTMAN,MARION A | B | F | |
| OTH | ORO | 1 | JOHNSON,TROY | B | M | |
| OTH | VAB | 1 | MILW PD | | | DOB |

## Property

| Item | Involvement | Invl Date | In Custody? |
|---|---|---|---|
| 1 | EVIDENCE | 01/18/2015 | Yes |

| Description | | | | |
|---|---|---|---|---|
| Used red condom wrapper | | | | |

| Typ | Cat | Article | UCR Type | # Pieces |
|---|---|---|---|---|
| A | OTHER | WRAPPE | OTHER | 1 |

| Link | Involvement | Invl No | Name | Race | Sex | |
|---|---|---|---|---|---|---|
| SUS | OIS | 1 | MEEKS,DEMETRIUS SR | B | M | |
| OTH | VIC | 1 | SELLERS,TIMOTHY A | B | M | |
| OTH | ACQ | 1 | AUTMAN,MARION A | B | F | |
| OTH | ORO | 1 | JOHNSON,TROY | B | M | DOB |
| OTH | VAB | 1 | MILW PD | | | DOB |

| Report Officer | Printed At | |
|---|---|---|
| 017794/JOHNSON,TROY P | 10/14/2015 04:57 | Page 4 of 8 |

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 49 of 805   Document 80-21

MPD0010044

| Item | Involvement | Invl Date | In Custody? |
|---|---|---|---|
| 2 | EVIDENCE | 01/18/2015 | Yes |

**Description**
Silver and black 9mm Mags

| Typ | Cat | Article | Brand | UCR Type | # Pieces |
|---|---|---|---|---|---|
| A | FIREARM ACCESSORIES | MAGAZI | S&W | FIREARM ACCESSORIES | 2 |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| SUS | OIS | 1 | MEEKS,DEMETRIUS SR | B | M | |
| OTH | VIC | 1 | SELLERS,TIMOTHY A | B | M | |
| OTH | ACQ | 1 | AUTMAN,MARION A | B | F | |
| OTH | ORO | 1 | JOHNSON,TROY | B | M | |
| OTH | VAB | 1 | MILW PD | | | |

| Item | Involvement | Invl Date | In Custody? |
|---|---|---|---|
| 3 | EVIDENCE | 01/18/2015 | Yes |

**Description**
Black Gun Holster

| Typ | Cat | Article | UCR Type | # Pieces |
|---|---|---|---|---|
| A | FIREARM ACCESSORIES | HOLSTE | FIREARM ACCESSORIES | 1 |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| SUS | OIS | 1 | MEEKS,DEMETRIUS SR | B | M | |
| OTH | VIC | 1 | SELLERS,TIMOTHY A | B | M | |
| OTH | ACQ | 1 | AUTMAN,MARION A | B | F | |
| OTH | ORO | 1 | JOHNSON,TROY | B | M | |
| OTH | VAB | 1 | MILW PD | | | |

| Item | Involvement | Invl Date | In Custody? |
|---|---|---|---|
| 4 | EVIDENCE | 01/18/2015 | Yes |

**Description**
St Joseph's video footage

| Typ | Cat | Article | UCR Type | # Pieces |
|---|---|---|---|---|
| A | RECORDINGS - AUDIO/VISUAL | VIDEO | RECORDINGS - AUDIO, VISUAL | 1 |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| SUS | OIS | 1 | MEEKS,DEMETRIUS SR | B | M | |
| OTH | VIC | 1 | SELLERS,TIMOTHY A | B | M | |
| OTH | ACQ | 1 | AUTMAN,MARION A | B | F | |
| OTH | ORO | 1 | JOHNSON,TROY | B | M | |
| OTH | VAB | 1 | MILW PD | | | |

| Item | Involvement | Invl Date | In Custody? |
|---|---|---|---|
| 5 | EVIDENCE | 01/18/2015 | Yes |

**Description**
containing QP of MEEKS

| Typ | Cat | Article | UCR Type |
|---|---|---|---|
| A | RECORDINGS - AUDIO/VISUAL | CD | RECORDINGS - AUDIO, VISUAL |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| SUS | OIS | 1 | MEEKS,DEMETRIUS SR | B | M | |
| OTH | VIC | 1 | SELLERS,TIMOTHY A | B | M | |
| OTH | ACQ | 1 | AUTMAN,MARION A | B | F | |
| OTH | ORO | 1 | JOHNSON,TROY | B | M | |
| OTH | VAB | 1 | MILW PD | | | |

| Report Officer | Printed At | |
|---|---|---|
| 017794/JOHNSON,TROY P | 10/14/2015 04:57 | Page 5 of 8 |

| Item | Involvement | | InvI Date | In Custody? | | | | |
|---|---|---|---|---|---|---|---|---|
| 6 | EVIDENCE | | 01/18/2015 | Yes | | | | |

**Description**
Silver 9mm S7W RC Bullets

| Typ | Cat | | Article | UCR Type | | # Pieces | | |
|---|---|---|---|---|---|---|---|---|
| A | EXPLOSIVES | | BULLET | EXPLOSIVES | | 17 | | |

| Link | Involvement | InvI No | Name | | | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|---|
| SUS | OIS | 1 | MEEKS,DEMETRIUS SR | | | B | M | ■■■■ |
| OTH | VIC | 1 | SELLERS,TIMOTHY A | | | B | M | ■■■■ |
| OTH | ACQ | 1 | AUTMAN,MARION A | | | B | F | ■■■■ |
| OTH | ORO | 1 | JOHNSON,TROY | | | B | M | ■■■■ |
| OTH | VAB | 1 | MILW PD | | | | | DOB |

| Item | Involvement | | InvI Date | In Custody? | | | | |
|---|---|---|---|---|---|---|---|---|
| 7 | EVIDENCE | | 01/18/2015 | Yes | | | | |

**Description**
Consent Search form

| Typ | Cat | | Article | UCR Type | | | # Pieces | |
|---|---|---|---|---|---|---|---|---|
| A | DOCUMENTS | | FORM | DOCUMENTS, PERSONAL OR BUSINESS | | | 1 | |

| Link | Involvement | InvI No | Name | | | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|---|
| SUS | OIS | 1 | MEEKS,DEMETRIUS SR | | | B | M | ■■■■ |
| OTH | VIC | 1 | SELLERS,TIMOTHY A | | | B | M | ■■■■ |
| OTH | ACQ | 1 | AUTMAN,MARION A | | | B | F | ■■■■ |
| OTH | ORO | 1 | JOHNSON,TROY | | | B | M | ■■■■ |
| OTH | VAB | 1 | MILW PD | | | | | DOB |

## Modus Operandi

| Gang Act? | Gang Name | Person/Prop Attacked | Physical Evidence | Weapon Used |
|---|---|---|---|---|
| No | NONE | PERSON | BLOOD/PHOTOS | HANDGUN |

| Premise Type | Victim's Action |
|---|---|
| STREET, HIGHWAY, ALLEY | PROSTITUTE |

**Suspect Action**
SUSPECT ARMED/ACTED ALONE

**Crime Code(s)**
ASSAULTS

## Supplement

This report was written by Detective Troy JOHNSON assigned to the Central Investigations Division, late power shift, squad # 9271.

On Thursday January 14, 2014, at 22:50 P.M. I was instructed by Lt. Michael SCHMIDTZ instructed me to respond to 5000 W chambers (St. Joseph's Hospital) regarding shooting complaint. It was later determined by officers that MEEKS intentionally pointed a firearm at the victim, Timothy A. SELLERS (B/M ■■■■■■) because he wouldn't accept a ride with him. This incident occurred in the area of 18th an W North Ave. MEEKS then obstructed the investigation by refusing to tell where the fire arm was.

My dispatch time was 22:57 and my arrival time was 23:08. The call Cad Referenced the victim Demetrius MEEKS B/M, ■■■■■ was at St. Joseph's hospital with a gunshot wound (GSW) to the arm. Upon arrival, I interviewed the following individual at which time he stated:

### INTERVIEW OF DEMETRIUS MEEKS B/M,

This report is a synopsis of an electronically recorded interview. Information included is a summation of what was said. For a complete record of this interview, one must listen to the entire digital recording. I conducted a Mirandized interview with Demetrius MEEKS B/M, ■■■■■■ This interview was conducted at St. Joseph's Hospital in ER room #23. The interview was recorded using an Olympus Digital voice recorder due to the fact that MEEKS is a diabetic and sustained a gunshot wound to his right palm. MEEKS is scheduled to have surgery in the morning on 01/29/15 and was ordered into the Dist. Atty.'s office January 20, 2015 at 8:30 AM. I provided

| Report Officer | Printed At | |
|---|---|---|
| 017794/JOHNSON,TROY P | 10/14/2015 04:57 | Page 6 of 8 |

## Supplement

MEEKS with a copy of the state of Wisconsin Department of Justice constitutional rights form. I read this form to MEEKS as he read along with me. Afterwards MEEKS acknowledged that he was sober, could read write and understand English, and agreed to make statements regarding the incident.

MEEKS stated he was coming from his family owned bar, which is called "Still on 12th #2, located at 1887 N.12th St. MEEKS stated he got in his vehicle and drove westbound on W. North Ave. MEEKS stated he continued to travel past N. 16th St. which is a flashing light and continued westbound until he got to N. 17Th St., which is also a flashing yellow light. MEEKS stated when he got midblock between N.17th and N.18th St. an unknown black female ran out in the middle of the street, at which time he had to slam on the brakes to prevent from hitting her. MEEKS provided the following description of the unknown female:

### DESCRIPTION OF UNKNOWN B/F
B/F, medium complexion, 506 - 508, long black hair weave, and black stretch pants/leggings.

MEEKS continued to state, when he stopped the unknown B/F, she approached the front passenger side of his vehicle and yelled to him, "This guy has harassing me!" MEEKS stated he immediately turned northbound on N. 18th St. and parked his vehicle on the corner just North of W. North Ave. MEEKS continued to state, he exited his vehicle and walked around to the front passenger side of his vehicle and opened the door for the unknown female so that she could enter into his vehicle. Meeks stated the unknown B/F stated she needed a ride to North 27th and Center St. MEEKS went on to state he then walked back around to the front driver side of his vehicle and entered into the vehicle.

MEEKS stated he is a CCW holder (valid #234029 and expires 2017) and he always keeps his silver and black 9mm under his front driver seat. MEEKS continued to state once he was inside of his vehicle sitting in the front driver seat, he observed a B/M, dark complexion, 6 feet to 602, black hooded sweatshirt, and black skullcap approach the front passenger side of his vehicle. MEEKS stated the same unknown suspect opened up his front passenger door, grabbed the unknown female by the arm and attempted to pull her out of the vehicle while he stated, "Get out of the van bitch!"

MEEKS stated he is left-handed, so he grabbed his firearm from under his seat with his left hand, and grabbed a female by the arm and attempted to keep her inside of the van, with his right hand. MEEKS further stated while attempting to hold female in the van, the firearm accidentally discharged firing one round. MEEKS stated he did not know whether the unknown B/M suspect pulled the unknown B/F out of the van or if the unknown B/F exited the van on her own. MEEKS continued to state after the gun went off he drove away traveling westbound W. North Ave. MEEKS continued to state he did not know he was shot at the time, but he observed that his front passenger side door was still open. MEEKS continued to state he attempted to reach over and close the front passenger side door and at that time he noticed that he sustained a gunshot wound to his right hand.

During the interview I asked MEEKS what happened to the firearm at which time MEEKS stated he did not know. MEEKS did sign a consent to search authorization form for me to search his vehicle. Upon searching the van, I recovered one silver Smith & Wesson magazine clip with 15 9mm Luger RP bullets fromn the left side of the front driver seat. Also recovered one used red condom package near the front passenger seat. While speaking with MEEKS in ER room #23 I noticed that MEEKS did have a black gun holster with a second silver Smith & Wesson magazine containing two silver 9 mm RP bullets.

Forensics investigator Michael WINKER squad #1922 responded to the scene and took 20 photos at 12:10 A.M. please see his supplemental report regarding.

It should be noted that video footage was obtained from St. Joseph's Hospital and was placed on inventory. The recovered items were all placed on the below listed inventory.

### RECOVERED ITEMS ON INVENTORY #15001954

Item# 1 - 17 Silver 9mm Luger RP bullets.
Item# 2 - Two silver Smith & Wesson magazines and black gun holster
Item# 3 - Mirandized interview of MEEKS and St. Joseph's video footage.
Item# 4 - Mirandized interview of MEEKS and St. Joseph's video footage.
Item #5 - St Joseph's video footage.

| Report Officer | Printed At | |
|---|---|---|
| 017794/JOHNSON,TROY P | 10/14/2015 04:57 | Page 7 of 8 |

# Incident Report
# MILWAUKEE POLICE DEPT

## Supplement

Item# 6 - Photos of Holster, magazines and two Silver bullets.
Item# 7 - Consent to search authorization for and used condom wrapper.

MEEKS stated after he realized he had sustained a GSW to the right-hand, he immediately drove the gray 2002 Chrysler Town & Country van bearing Wisconsin auto plate of 237-VPH, vehicle registration number 2C4GP44332R657115 to St. Joseph's Hospital. MEEKS stated the vehicle belongs to his girlfriend Marion A AUTMAN, B/F, ███. MEEKS continued to state he believes that this incident was an attempt robbery.

It should be noted that on Sunday, January 18, 2015, Squad #3221, P.O. William SCHMITZ and P.O. Mark FLESSERT were dispatched to 1700 W North Ave for a Reckless Endangering Safety complaint. Upon our arrival, we spoke with the caller/victim who identified himself as Anana SCOTT. Anana SCOTT was an alias that the victim was using while dressed as a female. The victim's real name was Timothy A. SELLERS (b/m, , which was on his Wisconsin Identification card. Please see P.O. FLESSERT'S supplemental report regarding.

MEEKS was ordered into the Dist. Atty.'s office for Tuesday, January 20, 2015 at 8:30 A.M. And SELLERS was ordered to the district attorneys office for Tuesday January 20th 2015 at 1:30 P.M.

This case is pending and will be submitted to the Dist. Atty.'s office for further review.

| Report Officer | Printed At | |
|---|---|---|
| 017794/JOHNSON,TROY P | 10/14/2015 04:57 | Page 8 of 8 |

# Incident Report
# MILWAUKEE POLICE DEPT

**150180140**

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
01/19/2015
Nature of Call
RECKLESSUSE
Officer
FLESSERT JR, MARK A

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 150180140 | 0001 | 01/19/2015 | | 03:02 | 150182839 |

| Status | | Nature of Call | | | | | |
|---|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | | RECKLESS USE/SHOOTING/ENDANGERING SAFETY | | | | | |

| Location | | | | City | | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|---|
| 1700 W NORTH AV | | | | MILWAUKEE | | 53210 | 3515 |

| District | Squad | From Date | From Time | Officer | | | |
|---|---|---|---|---|---|---|---|
| 3 | 340 | 01/18/2015 | 22:37 | 024601/FLESSERT, MARK A | | | |

| Assignment | | 2nd Officer | | Assignment | | | Entered by |
|---|---|---|---|---|---|---|---|
| THIRD DISTRICT - EARLY | | SCHMITZ,WILLIAM P | | THIRD DISTRICT - EARLY | | | 024601 |

| Assignment | | RMS Transfer | | | | Property? | |
|---|---|---|---|---|---|---|---|
| THIRD DISTRICT - EARLY | | Supplement Transfer Complete | | | | None | |

| Approving Officer | | Approval Date | | Approval Time | | | |
|---|---|---|---|---|---|---|---|
| 019162 | | 01/26/2015 | | 12:49:22 | | | |

## INTERVIEW 1: SELLERS,TIMOTHY A JR

| Involvement | Invl No | Type | Name | | MNI |
|---|---|---|---|---|---|
| INTERVIEW | 1 | INDIVIDUAL | SELLERS,TIMOTHY A JR | | 2680209 |

| Race | Sex | | Age | Ethnicity | Juvenile? | Height |
|---|---|---|---|---|---|---|
| BLACK/AFRICAN AMERICAN | MALE | ▮▮▮▮ | 26 | NOT HISPANIC/LATINO | No | 5'07" |

| Weight | Hair Color | Eye Color | Skin | Res Status | | |
|---|---|---|---|---|---|---|
| 145# | BROWN | BROWN | BLACK | RESIDENT | Successful | |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 4265 N 84TH ST | | MILWAUKEE | WISCONSIN |

| ZIP Code | | |
|---|---|---|
| 53224 | | |

| Phone Type | Phone No | |
|---|---|---|
| CELL | (414)418-9130 | |

## Supplement

This report was written by P.O. Mark FLESSERT (ps # 024601), assigned to District 3, Early Shift.

On Sunday, January 18, 2015, my partner William SCHMITZ (ps # 018355) and myself were dispatched to 1700 W North Ave for a Reckless Endangering Safety complaint. Upon our arrival, we spoke with the caller/victim who identified himself as Anana SCOTT. Anana SCOTT was an alias that the victim was using while dressed as a female. The victim's real name was Timothy A. SELLERS(b/m, ▮▮▮▮▮▮), which was on his Wisconsin Identification card.

SELLERS stated that he was walking westbound on W North Ave between 16th and 18th Street, when he was approached by a Silver Mini Van with WI Plate: 237-VPH. SELLERS stated that the driver of the mini van was a black male with a medium complexion, a baseball cap, and glasses that looked like reading glasses. SELLERS stated that the driver's age appeared to be in his late 40's or early 50's. The driver told SELLERS that his name was "Johnny".

According to SELLERS, they engaged in a conversation about SELLERS' age, and if he was in a relationship. The driver eventually offered SELLERS a ride. SELLERS stated that after speaking with the driver, he elected to refuse the ride.

SELLERS added that after he refused the ride in the van, the driver, pointed a silver semi-automatic handgun with a black grip at him and ordered SELLERS to get into the vehicle. SELLERS stated that he ran away when he saw the gun pointed at him.

After running away, SELLERS called the police and returned to the scene to wait for our arrival. SELLERS was evasive when asked about any possible illegal activity (such as soliciting), however was generally cooperative

| Report Officer | Printed At | |
|---|---|---|
| 024601/FLESSERT JR, MARK A | 10/14/2015 04:58 | Page 1 of 2 |

when describing the scene to us.  SELLERS even answered our phone calls to his cell phone requesting additional information.

It should also be noted that there were numerous Neighborhood Task Force (NTF) squads in the immediate area conducting traffic stops.  None of the squads observed any unusual behavior or heard any gunshots while patrolling this area.

I spoke with P.O. Hue KONG (ps # 017582) and P.O. Sisto PLACENCIA (ps # 018131).  KONG and PLACENCIA were working at the intersection of 16th and North Ave.  They arrived on our scene and stated that they didn't hear any gunshots.

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 55 of 805   Document 80-21   MPD1989 0050

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**150180140**

Reported Date
01/19/2015
Nature of Call
RECKLESSUSE
Officer
FISCHER,TODD J

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 150180140 | 0002 | 01/19/2015 | 13:06 | 150182839 |

| Status | Nature of Call | | | | | |
|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | RECKLESS USE/SHOOTING/ENDANGERING SAFETY | | | | | |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 1700 W NORTH AV | MILWAUKEE | 53210 | 3515 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 3 | 340 | 01/18/2015 | 22:37 | 007100/FISCHER,TODD J |

| Assignment | Entered by | Assignment |
|---|---|---|
| CENTRAL INVESTIGATIONS DIVISION | 007100 | CENTRAL INVESTIGATIONS DIVISION |

| RMS Transfer | Property? | Approving Officer | Approval Date |
|---|---|---|---|
| Supplement Transfer Complete | Yes | 019162 | 02/06/2015 |

| Approval Time | | | |
|---|---|---|---|
| 08:48:54 | | | |

| CRIME VICT RS FM PV-17 | | | |
|---|---|---|---|
| Yes | | | |

| # Offenses | Offense | Description | Complaint Type | AC | Use | Bias | Loc |
|---|---|---|---|---|---|---|---|
| 1 | 943.20(3)(D)5 | Theft - Firearm | O | C | N | 88 | 13 |

| #Pr | MOE | Act | Weapon/Force | IBRS | No |
|---|---|---|---|---|---|
| | | 1 | | 23H | 1 |

| Link | Involvement | Invl No | Name | Race | Sex | |
|---|---|---|---|---|---|---|
| OTH | INT | 1 | AUTMAN,MARION ANNETTE | B | F | |
| VIC | VIC | 1 | MEEKS,DEMETRIUS | B | M | |
| SUS | SUS | | UNKNOWN | U | U | |

## INTERVIEW 1: AUTMAN,MARION ANNETTE

| Involvement | Invl No | Type | Name | MNI |
|---|---|---|---|---|
| INTERVIEW | 1 | INDIVIDUAL | AUTMAN,MARION ANNETTE | 2755973 |

| Race | Sex | | Age | Ethnicity | Juvenile? |
|---|---|---|---|---|---|
| BLACK/AFRICAN AMERICAN | FEMALE | | 53 | NOT HISPANIC/LATINO | No |

| Height | Weight | Hair Color | Eye Color | Res Status | RMS Transfer |
|---|---|---|---|---|---|
| 5'03" | 137# | BLACK | BROWN | RESIDENT | Successful |

| Type | Address | City | State |
|---|---|---|---|
| HOME | 2765 N 52ND ST | MILWAUKEE | WISCONSIN |

| ZIP Code | | | |
|---|---|---|---|
| 53210 | | | |

| Phone Type | Phone No | | |
|---|---|---|---|
| CELL | (414)639-9535 | | |

## SUSPECT 1: UNKNOWN

| Involvement | Invl No | Type | Name | Race | Sex | Age |
|---|---|---|---|---|---|---|
| SUSPECT | 1 | INDIVIDUAL | UNKNOWN | UNKNOWN | UNKNOWN | 00 |

| Juvenile? | OFN_INVL | RMS Transfer | |
|---|---|---|---|
| Yes | 1 | Successful | |

## VICTIM (PERSON) 1: MEEKS,DEMETRIUS

| Involvement | Invl No | Type | Name | MNI |
|---|---|---|---|---|
| VICTIM (PERSON) | 1 | INDIVIDUAL | MEEKS,DEMETRIUS | 2497130 |

| Race | Sex | | Age | Ethnicity | Juvenile? | Height |
|---|---|---|---|---|---|---|
| BLACK/AFRICAN AMERICAN | MALE | | 46 | NOT HISPANIC/LATINO | No | 6'00" |

| Weight | Hair Color | Eye Color | Skin | Res Status | RMS Transfer |
|---|---|---|---|---|---|
| 240# | BLACK | BROWN | DARK | RESIDENT | Successful |

| Type | Address | City | State |
|---|---|---|---|
| HOME | 2765 N 52ND ST | MILWAUKEE | WISCONSIN |

| ZIP Code | | | |
|---|---|---|---|
| 53210 | | | |

| Report Officer | Printed At | |
|---|---|---|
| 007100/FISCHER,TODD J | 10/14/2015 04:58 | Page 1 of 3 |

| Phone Type | Phone No |
|---|---|
| CELL | (414)639-9635 |

## IBRS Info

| Victim Invl No | Offense Codes | | | | | |
|---|---|---|---|---|---|---|
| 1 | 23H | | | | | |

| Rel | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| RU | SUS | 1 | UNKNOWN | U | U | |

## Property

| Item | Involvement | Invl Date | In Custody? | Serial No | Value | |
|---|---|---|---|---|---|---|
| 1 | STOLEN | 01/19/2015 | No | HEA910Z | $1,000.00 | |

Description
Black and Silver, Smith and Wesson, model SD9VE, semi automatic handgun.

| Typ | Make | Model | Type/Cat | UCR Type | RMS Transfer |
|---|---|---|---|---|---|
| F | SMITH & WESSON | SD9VE | PISTOL, SEMIAUTOMATIC | FIREARMS | Successful |

| Link | Involvement | Invl No | Name | Race | Sex | |
|---|---|---|---|---|---|---|
| OTH | INT | 1 | AUTMAN,MARION ANNETTE | B | F | |
| OWN | VIC | 1 | MEEKS,DEMETRIUS | B | M | |
| SUS | SUS | 1 | UNKNOWN | U | U | |

## Modus Operandi

| Gang Act? | Gang Name | Person/Prop Attacked | Crime Code(s) |
|---|---|---|---|
| No | NONE | FIREARMS | ASSAULTS |

## Supplement

**Detective Todd J. Fischer** of the Milwaukee Police Department, Command Investigation Bureau, Central Geographic Division, Day Shift squad # 9235 while temporarily assigned to the Third District submit this report concerning my involvement in this investigation.

On Monday January 19th 2015 **Lieutenant Charles Berard** directed me to complete follow up concerning the Endangering Safety incident, which occurred at 1700 West North Avenue incident # 15-180-0140.

I was briefed by **Detective Troy Johnson** one of the initial responding detectives. Detective Johnson explained that the gun used in this shooting was unaccounted for and Detective Johnson requested that I make contact with the resident at 2765 North 52nd Street which is three blocks away form Saint Josephs Regional Medical Center located at 5000 West Chambers. Detective Johnson believed that Demetrius Meeks may have dropped off the gun on his way to driving himself to the St Josephs hospital.

### INTERVIEW OF MARION ANNETTE AUTMAN / HOWARD

On Monday January 19th 2015 I interviewed Ms. Marion Annette Autman a black female with the date of birth of 12-05-1961. Ms. Autman resides at 2765 North 52nd Street with a contact phone number of (414) 639-9535. Mr. Interview with Ms. Autman was conducted in the living room of her residence. Upon opening the door Ms. Autman stated that she was wanting the police to come to her door and allowed me entry. Ms. Autman states that she her son and Demetrius all live at the 2765 North 52nd Street address.
Concerning Demetrius being shot. Ms. Autman states that she was aware that Demetrius was trained and possessed a CCW concealed carry permit. Ms. Autman states that Demetrius usually has the gun in the nightstand / dresser drawer. Ms. Autman states that she takes medication for her sleep disorder and was home last night. Ms. Autman states that the medication causes her to sleep pretty heavy but she believes she would have known if Demetrius had come home last night. Ms Autman states that she drove the van to the family bar last night. That Demetrius and she were involved in a verbal argument at the bar and she left on her own to go home in order to cool off. Ms. Autman states that the first she knew of Demetrius being shot was when he arrived home this morning and needed to a shower and to be taken back to the hospital at 07:30 this morning.
Concerning a search of her premises Ms. Autman gave me her consent allowing and assisted me in searching her home in my attempt to locate Demetriuses handgun. We could not find the missing handgun

### INTERVIEW OF DEMETRIUS MEEKS

On Monday January 19th 2015 I interviewed Demetrius Meeks a black male with the date of birth of 09-09-1968. Mr. Meeks states that he lives at the 2765 North 52nd Street residence. My interview with Mr. Meeks was

| Report Officer | Printed At | |
|---|---|---|
| 007100/FISCHER,TODD J | 10/14/2015 04:58 | Page 2 of 3 |

## Supplement

conducted in the living room of his home at 2765 North 52nd Street. Mr. Meeks continued to state that he didn't remember discharging the handgun. Mr. Meeks states that as the man was pulling the women out of the passenger seat of his van he remembers bringing the handgun out from under the seat. Mr. Meeks states that he didn't remember discharging his handgun. Mr. Meeks states that he doesn't remember what happened to the gun after he was shot. Mr. Meeks states that he is sure the gun is not in his home or in the van. Mr. Meeks states he didn't know which person the women or man took his gun but he now wants to report his gun stolen from his possession. Mr. Meeks states that the condom found in the van was from sexual intercourse he had with Ms. Autman not the women he picked up. Mr. Meeks states that he believed that he would be able to identify the women and man if he was to see them again.

Mr. Meeks provided me with the ATF Alcohol Tobacco and Firearms Form # 4472 and # 4473 listing himself Demetrius Meeks as the purchaser of a Smith and Wesson brand, Model SD9VE, 9mm caliber, semiautomatic handgun, with the serial number of # HEA910Z. The gun was purchased at Gander Mountain W190 N10768 Commerce Circle Germantown, Wisconsin, 53027 (262) 250-0600 on August 22nd 2012.

Concerning the search of his premises Mr. Meeks consented to the search of his home and even had his son in law help by lifting up the bed mattress / box spring.

I teletyped that Mr. Meeks handgun was missing / stolen on teletype # MWP3-0276 at 12:00 on 01-19-2015.

DETECTIVE TODD J. FISCHER 59399, Squad # 9235, P.S. # 007100, LOC # 0092.

| Report Officer | Printed At | |
|---|---|---|
| 007100/FISCHER,TODD J | 10/14/2015 04:58 | Page 3 of 3 |

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**150180140**

Reported Date
01/20/2015
Nature of Call
RECKLESUSE
Officer
JOHNSON,TROY P

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 150180140 | 0003 | 01/20/2015 | 21:33 | 150182839 |

| Status | Nature of Call | | | |
|---|---|---|---|---|
| REPORT TO FOLLOW | RECKLESS USE/SHOOTING/ENDANGERING SAFETY | | | |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 1700 W NORTH AV | MILWAUKEE | 53205 | 3515 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 3 | 340 | 01/18/2015 | 22:37 | 017794/JOHNSON,TROY P |

| Assignment | Entered by | Assignment |
|---|---|---|
| CENTRAL INVESTIGATIONS DIVISION | 017794 | CENTRAL INVESTIGATIONS DIVISION |

| RMS Transfer | Property? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|
| Successful | None | 010991 | 01/27/2015 | 15:00:43 |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | ASSAULTS |

## Supplement

This report was written by Detective Troy JOHNSON assigned to the Central Investigations Division, late power shift, squad # 9271.

On Tuesday January 20, 2015, at 9:00 A.M.I took this case into the DA's office at which time DA Nicole SHELDON reviewed and pended the case until she speaks with the victim.

| Report Officer | Printed At | |
|---|---|---|
| 017794/JOHNSON,TROY P | 10/14/2015 04:58 | Page 1 of 1 |

MPD002210054

# Incident Report
# MILWAUKEE POLICE DEPT

**150180140**  Supplement No 0004

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
01/21/2015
Nature of Call
RECKLESUSE
Officer
FLESSERT JR, MARK A

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 150180140 | 0004 | 01/21/2015 | 14:29 | 150182839 |

| Status | Nature of Call | | | | | |
|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | RECKLESS USE/SHOOTING/ENDANGERING SAFETY | | | | | |

| Location | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|
| 1700 W NORTH AV | | MILWAUKEE | 53210 | 3515 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 3 | 340 | 01/18/2015 | 22:37 | 024601/FLESSERT JR, MARK A |

| Assignment | Entered by | Assignment | RMS Transfer | Property? |
|---|---|---|---|---|
| THIRD DISTRICT - EARLY | 024601 | THIRD DISTRICT - EARLY | Successful | None |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 019162 | 01/30/2015 | 11:25:30 |

## Modus Operandi

| Crime Code(s) |
|---|
| ASSAULTS |

## Supplement

This report was written by P.O. Mark FLESSERT (ps # 024601) assigned to District 3, Early Shift.

On Wednesday, January 21, 2015, I, along with my partner William SCHMITZ came to the Milwaukee County DA's office to present the ESBUODW case to ADA Nicole SHELDON.

This case was pended, needing the cooperation of Timothy SELLERS.

| Report Officer | Printed At | |
|---|---|---|
| 024601/FLESSERT JR, MARK A | 10/14/2015 04:58 | Page 1 of 1 |

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

**150180140**

Supplement No
0005

Reported Date
01/24/2015
Nature of Call
RECKLESUSE
Officer
JOHNSON,TROY P

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 150180140 | 0005 | 01/24/2015 | 02:09 | 150182839 |

| Status | Nature of Call | | | | |
|---|---|---|---|---|---|
| REPORT TO FOLLOW | RECKLESS USE/SHOOTING/ENDANGERING SAFETY | | | | |

| Location | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|
| 1700 W NORTH AV | | MILWAUKEE | 53205 | 3515 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 3 | 340 | 01/18/2015 | 22:37 | 017794/JOHNSON,TROY P |

| Assignment | Entered by | Assignment |
|---|---|---|
| CENTRAL INVESTIGATIONS DIVISION | 017794 | CENTRAL INVESTIGATIONS DIVISION |

| RMS Transfer | Property? | Approving Officer | Approval Date |
|---|---|---|---|
| Supplement Transfer Complete | None | 010991 | 01/27/2015 |

| Approval Time |
|---|
| 15:02:08 |

## INTERVIEW 1: SELLERS,TIMOTHY A

| Involvement | Invl No | Type | Name | | MNI |
|---|---|---|---|---|---|
| INTERVIEW | 1 | INDIVIDUAL | SELLERS,TIMOTHY A | | 2680209 |

| Race | Sex | | Age | Ethnicity | Juvenile? | Height |
|---|---|---|---|---|---|---|
| BLACK/AFRICAN AMERICAN | MALE | | 26 | NOT HISPANIC/LATINO | No | 5'07" |

| Weight | Hair Color | Eye Color | Res Status | RMS Transfer |
|---|---|---|---|---|
| 145# | BROWN | BROWN | RESIDENT | Successful |

| Type | Address | City | State |
|---|---|---|---|
| HOME | 4265 N 84TH ST | MILWAUKEE | WISCONSIN |

| ZIP Code |
|---|
| 53216 |

| Phone Type | Phone No |
|---|---|
| CELL | (414)418-9130 |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | ASSAULTS |

## Supplement

This report was written by Detective Troy JOHNSON assigned to the Central Investigations Division, late power shift, squad # 9271.

On Saturday January 23, 2015, at 1:10 A.M. I spoke with SELLERS over the telephone regarding his not showing up at the DA's office at his appointed time. SELLERS stated he emailed the DA and will try to make it to see her some time next week. SELLERS stated he was sleeping and did not want to talk about the incident.

| Report Officer | Printed At | |
|---|---|---|
| 017794/JOHNSON,TROY P | 10/14/2015 04:58 | Page 1 of 1 |

Case 2:16-cv-01089-WED    Filed 04/22/19    Page 61 of 805    Document 80-21    MPD1089 10056

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

150180140

Reported Date
02/04/2015
Nature of Call
RECKLESUSE
Officer
JOHNSON,TROY P

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 150180140 | 0006 | 02/04/2015 | 19:53 | 150182839 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | RECKLESS USE/SHOOTING/ENDANGERING SAFETY |

| Location | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|
| 1700 W NORTH AV | | MILWAUKEE | 53210 | 3515 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 3 | 340 | 01/18/2015 | 22:37 | 017794/JOHNSON,TROY P |

| Assignment | Entered by | Assignment |
|---|---|---|
| CENTRAL INVESTIGATIONS DIVISION | 017794 | CENTRAL INVESTIGATIONS DIVISION |

| RMS Transfer | Property? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|
| Successful | None | 019162 | 02/10/2015 | 09:31:10 |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | ASSAULTS |

## Supplement

This report was written by Detective Troy JOHNSON assigned to the Central Investigations Division, late power shift, squad # 9271.

On Wednesday February 3, 2015, at 12:42 P.M. I received an email from DA Nicole SHELDON stating SELLERS was a no show at the DA'S office. SHELDON stated Officers arrived and waited, but SELLERS did not show. DA SHELDON is not able to move forward with the case at this time.

| Report Officer | Printed At | |
|---|---|---|
| 017794/JOHNSON,TROY P | 10/14/2015 04:58 | Page 1 of 1 |

Form PM-9E
11/09

# MILWAUKEE POLICE DEPARTMENT
## MEMORANDUM



**Date:** OCTOBER 13, 2015

**TO:** MICHAEL BRUNSON
DEPUTY INSPECTOR of POLICE

**FR:** ADAM ZIEGER
POLICE SERGEANT

**RE:** DETECTIVE SHANNON LEWANDOWSKI PS #012860
IA FILE #2015-0032/ RESPONSE TO CHARGES

---

Sir,

I, Police Sergeant Adam ZIEGER, reviewed a Response to Charges Memorandum submitted by Detective Shannon LEWANDOWSKI dated October 11, 2015.

Detective LEWANDOWSKI provided reasons why she was driving to District Five with Detective Juanita CARR. Detective LEWANDOWSKI explained an "officer requested my help with filing of a felony case, additionally, and most importantly, to help her with the fear and stress she was experiencing while working, due to an assault by a co-worker." Detective LEWANDOWSKI met with the officer earlier, but left to assist with a shooting investigation agreeing to meet again.

Detective LEWANDOWSKI indicated the activation of the emergency lights prevented a possible accident. Detective LEWANDOWSKI reported she used, "Due Care," and the emergency light activation also prevented other vehicles that were entering the intersection from being involved in the accident. Detective LEWANDOWSKI indicated the driver of the other vehicle involved in the accident not only tested positive for a blood alcohol level of .06, but THC as well.

Detective LEWANDOWSKI cited Standard Operating Procedures 520-Equal Employment Opportunity Policy, specifically 520.25, 520.35, and 112.10-Sexual Assault Investigation Procedure as reasons for responding to meet the officer at District Five. Detective LEWANDOWSKI indicated that supervisors of the officer violated those sections of SOP. Detective LEWANDOWSKI reported, "As a team, we are to be of service to the Department and its members. I was doing exactly that."

Detective LEWANDOWSKI indicated the firearm recovery that Detective CARR was pursuing involved no exigency. Detective LEWANDOWSKI reasoned, "The victim is not a felon and legally owned his gun when he accidentally discharged it, striking himself. There was no reason to retrieve the gun that the Sergeant from District 3 requested Detective Carr do. It is not a crime to have shot oneself." Detective LEWANDOWSKI

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 63 of 805   Document 80-21   MCB1982 0058

admitted in her response that she was not aware of that information at the time of the accident. Detective LEWANDOWSKI reported the follow up was completed by a different Detective and the firearm was not taken. Detective LEWANDOWSKI believed the community was served just as efficiently and more effectively for that reason.

I located Records Management System (RMS) report number 150180140 for a shooting investigation that occurred on January 18, 2015. The subject who received the gunshot wound reported he had accidentally shot himself while trying to protect a female from another subject. A review of the reports revealed a citizen had filed a complaint that contradicted the circumstances reported by the shooting victim.

The reporting victim indicated a subject (shooting victim) had pointed the firearm at them, and ordered him into the vehicle. A detective attempted to recover the firearm from the residence on January 19, 2015. The firearm was not located, and the subject then reported his firearm missing or stolen. The incident was reviewed multiple times at the Milwaukee County District Attorney's Office and not processed after the victim did not appear.

Respectfully submitted,

Adam ZIEGER-016283
Police Sergeant
Internal Affairs Division

Internal Affairs Division
Received: 10-16-15
Referred:
By:

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 64 of 805   Document 80-21

# MILWAUKEE POLICE DEPARTMENT
## MEMORANDUM

**Date: 10/11/2015**

**TO:   Edward A. Flynn, Chief of Police**

**FR:   Detective Shannon Lewandowski**

RE: *IAS # 15-0032*



---

This report is written by Detective Shannon Lewandowski, assigned to Fusion, Late shift.

On January 15th 2015, I was traveling to District 5 in an unmarked squad with Detective Juanita CARR in the front passenger seat. The two of us left District 3 together to take care of her follow-up regarding her assignment. Additionally, I had to return to Distinct 5 to meet with a female officer on duty that was feeling distraught.

The female officer had asked me to meet her at the District earlier, so I responded to talk to her, but left to assist in a shooting. This officer requested my help with the filing of a felony case, additionally, and most importantly, to help her with the fear and stress she was experiencing while working, due to an assault by a co-worker. I explained that I would return before her shift ended at approximately 2:00a.m., to which she agreed.

As Detective CARR and I traveled east on W. North Ave, a car picking up a female was impeding traffic, and about to go forward. I activated my red lights to warn the auto from pulling out eastbound. The auto stopped, and I was able to prevent from getting into a possible accident. Upon passing that auto, I continued toward N 35th St., traveling east, and was struck by an auto that ran a red light as it traveled north. The driver had a blood alcohol level of .06 and tested positive for THC. The driver confessed that she drank alcohol, her brakes were faulty, and she had prior knowledge of that fact her brakes were faulty as she ran the red light.

I sustained great injury as a result of this accident, and then accused of untruthfulness and now charges of Violations of Department code of Conduct, Core Value 1.00-Competence.

Specifically that I failed to operate the vehicle in a safe and courteous manner while complying with all traffic laws. Approaching 36th St on W North Ave., I used my red lights and siren to avoid from being struck, and then entering the intersection a short distance (35th St) from that circumstance, I was struck. Even complying with a particular statute provides evidence that I used "Due Care." I was not only safe but coincidently had the special circumstances to have additional precaution measures since my emergency lights were still on and provided even additional regard and safety to the woman that struck us. The fact that I did have the lights on for that short distance most likely did prevent the death of Detective Juanita CARR and myself. The issue of using both my lights and siren or having one of them on prior to being hit is mute, since having the lights on stopped the other vehicles from becoming involved that were also entering the intersection.

Due to the fact that I had my red lights on as I made it to the intersection probably prevented great bodily harm to Detective Carr and I, as well as the other cars entering the intersection traveling westbound.

In supplemental 1 of IR# 15 019 017, the interview of witness Jasmin HERNANDEZ W/F 7-08-1989, stated that she observed an unmarked police squad car traveling eastbound on W. North Ave from 3600 block approaching N 35th St in the opposite direction as they were going. HERNANDEZ stated that she was confident the light was green for east and west traffic HERNANDEZ also stated that she knew that the car traveling eastbound was a police car because she could see the flashing red lights as the vehicle approached them in their direction. HERNANDEZ'S boyfriend pulled over to the curb, and the white car collided with the unmarked squad. HERNANDEZ also stated that the unmarked squad was traveling 30-35mph, the white car 40-45mph.

The second charge of Core Value 1.00-Competence states that I failed to render service to the community promptly and efficiently, and failed to use her time to accomplish the mission of the department.

The mission of the department is "In partnership with the community, we will create and maintain neighborhoods capable of sustaining civic life. We commit to reducing the levels of crime, fear, and disorder through community-based, problem-oriented, and data-driven policing." Milwaukee Police Department is proud of the established Code of Conduct and the Vision and Mission Statement. In the spirit of partnering with the community, The Milwaukee Police Department is supposed to strive to make our department accessible as possible to the people we serve. With that in mind, the Standard Operating Procedures provide direction to the members in a wide variety of situations that occur as they carry out the mission.

Part of that Standard Operating Procedure is section 520-Equal Employment Opportunity Policy. "It is the policy of the Milwaukee Police Department to provide a work environment that is safe and free from employment discrimination, harassment, improper treatment or inappropriate conduct…to achieve this; deparmtment members shall uphold the highest standard of professionalism, respect and civility toward their associates and the community."

Additionally, section 520.25 states that it is the Supervisors' responsibility to act promptly and affirmatively when they observe behavior that violates inappropriate conduct, properly document and forward to the IAD and reported incident or complaint of Sexual harassment or inappropriate conduct. Section 520.35 states that Supervisors receiving the complaint must prepare a final report which will be forwarded to the respective bureau. This incident was reported to two Lieutenants and one Captain of district 5 and was never handled, much less properly.

Section 112.10 Sexual Assault Investigation Procedure states that the Milwaukee police Department is to thoroughly investigate all allegations of sexual assault while remaining sensitive to the needs and requests of the victims throughout the investigative process. I was going to the District to meet those needs.

The sections listed above were violated by the supervisors of this officer at District 5, as she continually had to endure many wrong-doings that attributed to her stress and anxiety based upon the traumatic events that she reported to her supervisors and to IAD. As a team, we are to be of service to the Department and its members. I was doing exactly that.

The gun that Detective Juanita CARR was recovering was her shooting incident/assignment, one that I had no knowledge or participation of, but asked her if she needed assistance going to a

home in the midle of the night alone. Detective Carr agreed that follow-up would be to possibly retrieve the gun. Instead of placing that in SharePoint, I suggested going back a second time. There was no exigency in retrieving that gun, since the victim of the shooting shot himself with his own gun. The victim is not a felon and legally owned his gun when he accidently discharged it, striking himself. There was no reason to retrieve the gun that the Sergeant from District 3 requested Detective Carr do. I did not know this information at the time, only that Detective CARR wanted to return to his home a second time.

Actually, it is well known that 80% of police officers, who are shot, shoot themselves. This is not referring to suicide, but rather to negligent shootings where the officer injured himself or herself. It is not a crime to have shot oneself.

The follow up was done by another Detective due to the accident, and the community was served, just as efficiently and more effectively since the gun should not have been taken from the victim, and in the end it was not.

*Respectfully submitted,*

*Det Ruwandr*

*01286*

MILWAUKEE POLICE

15 OCT 12 PM 7:52

RECEIVED

Form PM-9E
11/09

# MILWAUKEE POLICE DEPARTMENT
## MEMORANDUM

RECEIVED
15 NOV 30 PH 3: 58



Date: November 12, 2015

TO:   Fire and Police Commission

FR:   Detective Shannon Lewandowski

RE:   Misconduct in Office

---

I am once again reporting the misconduct in office of two members of the Milwaukee Police Department; Lieutenant of Police Sean Hanley and Sergeant Adam Riley. This complaint is a formal allegation of misconduct which began with the inaccurate and false statements made by Sergeant Adam Riley of District Three on January 19, 2015. These statements were made during an accident that I was involved in, IR#15 019 0017, MPD Accident # QQD1J1J. Sergeant Riley took part of a statement made at a crime scene, one that I did not make, and knowingly passed on an untruth with the intent to deceive and give a false impression. To imply a falsity as this one is slanderous at a minimum.

According to the investigation done by the Internal Affairs Division regarding the accident, claims were made that I informed officers on the scene that I was responding to the area of UWM because my son had been stopped by Police. This is false. Although I was knocked unconscious, when I became of mind, I merely asked for anyone to bring my son to the hospital. My 21 year -old- son is the only family I have in the city of Milwaukee, and just as other officers assisted the other victims in calling their loved ones, I supposedly was not allowed.

These statements made were not only insensible and impervious, but below and contrary to the standards expected in a Sergeants profession and status. They were not only thoughtless and carelessly made, but they have had an adverse impact on my recovery, my reputation, and on the integrity of Lieutenant Sean Hanley, and members of the Internal Investigations' a whole.

The verbal statements used against me were "overheard" and received from other unknown officers. These statements cannot adequately be used as "fact" in an investigation. As of today's date, November 12, 2015, (297) days have passed, (9 months, 24 days) and there is still no written report of Sergeant Adam Riley's observations, and no report written about what he was told and by whom. On page 11 of 22 of IAD report submitted by Sergeant Adam ZIEGER, Sergeant Riley described how he "heard" that I was going to UWM to "intervene," but has no idea who had said that.

This scene was treated as a crime scene, as Lieutenant of Police Sean Hanley ordered Detectives to conduct interviews, and informed those arriving that I had traveled in the squad, on- duty, not in the mission or duty as a detective of police. I know this due to the fact that I was informed by Detective Troy JOHNSON of Central Division on the same day, as well as Lieutenant of Police Kevin Armbruster on January 21, 2015. Detective Troy JOHNSON stated to me, "I can't talk to

you because you are "hot" I was told that it is in my best interest not to communicate with you since I am on probation, and I don't want to lose my rank."

According to the Milwaukee Police Department Standard Operating Procedures, 725 Crime Scene Investigation effective August 21, 2014, specifically order #725.15(10)(a). "The success of our investigations is dependent upon the support, trust, and cooperation of our witnesses. While it is critical to gather information in a timely manner, the circumstances of an investigation and the emotional state of a witness should be considered and may occasionally necessitate that an interview be delayed."

Also, Order 725.15(15) states, "All officers, having performed any tasks at a crime scene, shall file a written report detailing their activities prior to securing for duty. From time to time it may be necessary to file reports at a later date; however, this shall only be done with the approval of a supervisor in charge of the investigation."

According to the patrol sergeant's responsibilities, he/she is to communicate the "facts" of the case to his/her shift commander. Facts are indisputable. They are not part of hearsay, or rumors. Determining what is the truth is difficult when Sergeant Adam Riley never interviewed me, and with his subjective opinion, along with that of Lieutenant Sean Hanley's opinion, the facts ended up buried deep within, and I have been treated dishonestly, underhandedly and improperly.

This abuse of process, abuse of authority, lack of courtesy and professionalism went even further when Lieutenant of Police Sean Hanley, as well as Acting Captain of Police Johnny Sgrignuolli, attended multiple roll calls with Detectives in the Central Division as well as roll call amongst Patrol Officers, and defamed my character by making these false statements based on Sergeant Adam Riley's hearsay, and without finding out the truth.

The investigation IAD File #IAS-2015-0032 is a reflection of Lieutenant Hanley's continued lies as he wrote in the memo he submitted in December 2014, when he called me into the office demanding that I apologize for writing a memo that included the Chief of Police.

Lieutenant Sean Hanley also lied about the phone call contents that I made to him on the night of the accident.

These statements were published as well as spoken and done so freely, and were injurious, as they informed members and peers at daily roll calls starting on January 20, 2015 at District three and District five. Officers were told that I was going to be fired. These statements made were during the 8 month long investigation, and were not only false, but malicious and recklessly made. The accusations were not only made to my peers, some who were quick to show their support and others who voiced their opinions at roll calls, and at crime scenes.

Sergeant Adam Zieger of IAD also demonstrates this in the interview with Sergeant Adam Riley. What were even more damaging were the concerns of the investigation being voiced at roll call, to the District Attorney's Office and to Probation and Parole Agents who called me and told me.

There has not been even one day that I have been at work since my return from the accident when I have not been approached by other members of MPD, Lawyers from the District Attorney's Office, that of which I had a good standing relationship with, and even in court when I was on the stand.

The following are the only witnesses interviewed on the scene:

1. Jasmin HERNANDEZ W/F          pulled over to the side and did not go through the intersection because they saw the red lights, and heard no siren, Detective Stated something that she needed to get her son from UWM Police Department.

2. Javier GARIVAY W/M          saw unmarked squad thought it was going to do a u-turn based on how it was positioned in traffic and he helped the Black Detective.

3. Juan PEREZ W/M          observed unmarked detective car did not hear siren pulled over to get out of intersection, Driver was yelling my leg is hurt, driver fell to0 the ground.

4. Ricardo PEREZ W/M          saw the detective car spin around and fluids coming from car and he stayed with the driver.

5. Officer Kupsa is mentioned in the report by IAD, but I have no idea who this is since his last name must be spelled wrong and there is no first name.

No reports were generated for the incident from the following officers that were on the scene:

No report by Joseph Boehlke
No report by Joseph Goggins
No report By Sergeant Adam Riley
No report by Debora Stacey
No report by William Krummnow
No report by Jesse Vollrath
No report by Alexander Nuter
No report by Joseph GOGGINS 372
No report by Michael Destefanis
No report by David Wilhelm
No report by Robert Smith
No report by Anthony Knox
No report by Brian Flannery
No report by Larry Leibsle
No report by Ryan Fekete
No report by Michael Winker


If I were to conduct an investigation as this one was handled, I would be reprimanded. The truth cannot be figured out when so many of IAD members are invested in the rumors and not in the truth. Circling the drain with biased speculations instead of conducting a proper investigation is what was done here. I own recorded proof that members of IAD who investigated my case are unethical, and completed this investigation differently due to gender.

I was not interviewed at the hospital. I was kept separate from Detective Juanita CARR, but she was not interviewed until days later. My son was not interviewed at the hospital even though he made himself available. In fact, he was not interviewed until June 2015 via a phone conversation. This was five months after the fact.

I was not interviewed by anyone until I was summoned to IAD, however Lieutenant of Police Sean Hanley conducted an illegal interrogation of me since he already viewed me as a suspect, and then asked me questions on the phone. I was the target of the investigation by Lt Hanley, yet he never read me my rights. Lt Hanley's conduct allowed the creating of false evidence and is just as unethical as perjury. Furthermore, the statements that Sean Hanley wrote on the memo are false.

The only people that can attest to where I was going at the time of the accident is myself, Detective Juanita Carr, Jordan Lewandowski, and Detective Melanie Beasley. Beasley was not

interviewed for months, just as my son wasn't. They were available that night. Lieutenant Hanley was at the hospital and never asked me how I was, nor asked me what happened. The ethics and duty of the Milwaukee Police Department have an obligation to make this scene just as important as those we make with the outside community.

The consequences for the inept, faulty investigative thinking has a high cost, which means that my bills are not being paid by Workman's Compensation, damage to my reputation, and considerable conflict at work. I request an outside investigation to look into and properly investigate this incident, as well as the Core Values of Competence and Guiding Principles 1.03, 1.04, 1.05, of IAD members that conducted the investigation, specifically Sergeant Adam Zieger.

I am not assured that the Milwaukee Police Department members mentioned above have maintained integrity throughout any investigation involving me, and once again the disparate treatment of other females in similar circumstances is obvious.

This accident has yet to be charged at the District Attorney's office, with no explanation.

I can be contacted at 1121 N Waverly Pl. #307, Milwaukee, WI 53202., (414) 405-4617.

Respectfully submitted,

Detective S. Lewandowski

# MILWAUKEE POLICE DEPARTMENT
## MEMORANDUM



**Date:** DECEMBER 4, 2015

**TO:** MICHAEL BRUNSON
DEPUTY INSPECTOR of POLICE

**FR:** ADAM ZIEGER
POLICE SERGEANT

**RE:** DETECTIVE SHANNON LEWANDOWSKI PS #012860
IA FILE #2015-0032/ RESPONSE TO CHARGES

---

Sir,

I, Police Sergeant Adam ZIEGER, reviewed a Response to Charges Memorandum submitted by Detective Shannon LEWANDOWSKI dated November 27, 2015. The memorandum was time stamped as received November 30, 2015, at 3:58 p.m.

Detective LEWANDOWSKI indicated the memorandum was a response for the new charge of Integrity she received November 20, 2015. Detective LEWANDOWSKI detailed she had not subsequently been able to obtain answers to questions she had regarding the new charge.

Detective LEWANDOWSKI cited and listed a portion of Wisconsin State Statute 164, Law Enforcement Officers' Bill of Rights. Detective LEWANDOWSKI indicated at the time of her PI-21 interview she had not yet returned to duty from the accident. Detective LEWANDOWSKI documented she was "Sick-Injured Off-Duty, due to the fact that the Milwaukee Police Department's medical section refused to treat my on-duty accident, as Injured on Duty." Detective LEWANDOWSKI continued, "This was done out of retaliation, and began with rumors overheard by officers." Detective LEWANDOWSKI indicated she was questioned and treated at the scene as if she had done something wrong. Detective LEWANDOWSKI documented, "Additionally, I was transferred during this process in violation of 164.03."

Detective LEWANDOWSKI indicated the only true statement, regarding Police Lieutenant Sean HANLEY'S recorded interview, was she contacted him after the accident by cellular telephone. Detective LEWANDOWSKI indicated she did not report to Lieutenant HANLEY that Police Officer Melanie BEASLEY, "was afraid of "ALL" TEU, nor that they would band together and do something to her." Detective LEWANDOWSKI indicated she never stated she drove 45 miles per hour or that her son was stopped by UWM police. Detective LEWANDOWSKI indicated she had no knowledge of any arrests made by the Tactical Enforcement Unit at District Five.

Detective LEWANDOWSKI indicated she reported Officer BEASLEY was concerned for her safety, in emotional tears, "needed to talk to me," and needed assistance with a report. Detective LEWANDOWSKI documented, "Officer Melanie BEASLEY needed my assistance on reports regarding a RES on the day of the accident." Detective LEWANDOWSKI indicated she stated this in her PI-21 interview, but it had not been investigated.

Detective LEWANDOWSKI was not satisfied with the quality of the investigation conducted immediately following the incident and the subsequent internal investigation. Detective LEWANDOWSKI asserted interviews and inquiries were not done on a timely basis.

Detective LEWANDOWSKI detailed concerns she had with the following Milwaukee Police Department Personnel: Lieutenant HANLEY, Captain of Police James SHEPARD, Police LIEUTENANT Justin CARLONI, Police Lieutenant Timothy LEITZKE, Sergeant ZIEGER, and Police Sergeant Roberta KLEIN.

Detective LEWANDOWSKI indicated she sustained a severe head injury and had been honest about what occurred. Detective LEWANDOWSKI indicated she obtained her "file" and it did not include several memorandums including one Police Sergeant Steven HERRMANN obtained from her house 1-2 days after the accident. Detective LEWANDOWSKI requested an outside agency conduct an investigation of the allegations, but did not specify what agency.

On December 3, 2015, I obtained and reviewed a memorandum dated January 22, 2015, submitted by Detective LEWANDOWSKI. The memorandum documented she was involved in a squad accident on January 19, 2015, at about 2:30 a.m. Detective LEWANDOWSKI requested, "to be carried as being injured on-duty."

Detective LEWANDOWSKI referenced and submitted a memorandum dated November 12, 2015, addressed to the Fire and Police Commission, with her response to charges on November 30, 2015. In the memorandum, Detective LEWANDOWSKI alleged Police Sergeant Adam RILEY made "inaccurate and false statements" at the scene of the accident. Detective LEWANDOWSKI indicated she regained consciousness after the accident, requested her son be brought to the hospital, and did not state she was responding to UWM because her son had been stopped by police. Detective LEWANDOWSKI indicated the statements "used against me were "overheard" and received from other unknown officers."

Detective LEWANDOWSKI cited Standard Operating Procedure 725 and referenced the patrol sergeant's responsibilities. Detective LEWANDOWSKI indicated a sergeant is to communicate the facts of a case, which are indisputable, not part of hearsay or rumors, to the shift commander.

A review of SOP 725.15(B) Patrol Sergeants Responsibilities revealed it states, "If not already completed, the patrol sergeant shall communicate the preliminary facts of the case to his/her shift commander, in order to facilitate the dispatch of appropriate investigative resources to the scene.

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 73 of 805   Document 80-21

Detective LEWANDOWSKI indicated the scene was treated as a crime scene, and Lieutenant HANLEY ordered detectives to conduct interviews. Detective LEWANDOWSKI indicated Lieutenant HANLEY informed personnel that arrived she operated the squad "not in the mission or duty as a detective of police." Detective LEWANDOWSKI documented Detective Troy JOHNSON and Police Lieutenant Kevin ARMBRUSTER informed her of those details. Detective LEWANDOWSKI listed several officers that were on the scene of the accident, and did not file a report.

Detective LEWANDOWSKI indicated Lieutenant HANLEY was not truthful about the contents of the phone call she made to him the night of the accident, and referenced a memorandum Lieutenant HANLEY submitted December 2014. Detective LEWANDOWSKI indicated Captain of Police Johnny SGRIGNUOLI and Lieutenant HANLEY made false statements based on Sergeant RILEY'S "hearsay" at roll calls about her and informed officers she was going to be fired.

Detective LEWANDOWSKI indicated a proper investigation was not completed, and she has "recorded proof" Internal Affairs members, who investigated her case, are unethical and conducted a biased investigation based on gender.

Detective LEWANDOWSKI indicated neither she, her son, nor Detective CARR was interviewed at the hospital. Detective LEWANDOWSKI documented the first time she was interviewed was at Internal Affairs. Detective LEWANDOWSKI indicated Lieutenant HANLEY viewed her as a "suspect," asked questions during their phone conversation, and that was an illegal interrogation.

Lieutenant HANLEY documented in his Administrative Investigations Management (AIM) Squad Accident report he instructed detectives to conduct interviews of the witnesses. Lieutenant HANLEY indicated this was done because serious injuries were possible and "the need for detailed interviews due to the possibility of violations of Rules and Regulations and SOP." Lieutenant HANLEY decided to interview Detective LEWANDOWSKI and Detective CARR later, because while at the hospital they were receiving medical attention and were accompanied by family or friends. Lieutenant HANLEY documented, when he was contacted by Detective LEWANDOWSKI she asked if he wanted to know what happened, and he responded he did.

Detective LEWANDOWSKI desired the Internal Affairs members, who conducted the investigation, be investigated for competence. Detective LEWANDOWSKI documented there has not been an explanation why the accident had not been charged at the Office of the District Attorney.

Respectfully submitted,

Adam ZIEGER 016283
Police Sergeant
Internal Affairs Division

Form PM-9E
11/09

# MILWAUKEE POLICE DEPARTMENT
## MEMORANDUM



Date: November 27, 2015

TO: Edward Flynn, Chief of Police

FR: Shannon Lewandowski

RE: Rebuttle for IAS 2015-0032

---

This report is written by Detective Shannon Lewandowski, assigned to Fusion, Early shift. On November 20, 2015, I was once again summoned to IAD regarding the on-duty accident that I was injured during (January 19, 2015), at the intersection of 35th and W. North Ave when I was hit by a female that had been consuming alcohol and disregarded a red light. This is the second attempt during an approximate nine month investigation for alleged violations of department Code of Conduct Core Values. The first core values that I was initially targeted, was that of Competence; and now this memo is a written response for the new allegations of Integrity, guiding principles 3.10.

Sergeant Christopher Schroeder of IAD presented the manila folder with documentation for the second set of charges for the same accident, with another member of the Milwaukee Police Department who did not reveal his name or rank.

I had several questions regarding the charges, none of which Sergeant Christopher Schroeder could answer. I was then instructed to call Sergeant Adam Zieger the following day. I called IAD on November 21-25th with no return call. I had asked for Sergeant Christopher Schroeder to contact Lieutenant of Police Heather Wurth since she "signed off" on the charges according to Sergeant Christopher Schroeder. Sergeant Christopher Schroeder stated that no one was available. I then questioned the reason that I would receive such vague charges, with no supervisors available, and the reply was again that Sergeant Christopher Schroeder did not know.

I asked why these charges were given to me November 20, 2015, and why were they not given to me October 7, 2015 with the first charges. Sergeant Christopher Schroeder replied that new information may have been revealed. I asked what the new information would have been since the Memorandum dated September 9, 2015, file #IAS 2015-0032, included with the new charges, and includes the same amount of pages (22 pages) as the investigation did on October 7, 2015. Sergeant Christopher Schroeder stated that he did not know. I asked why the exigency of these charges now, since it is a holiday week, with no supervision to explain, the answer is unknown also. The ability to present a proper rebuttal is significantly limited when the Sergeant presenting them has zero knowledge about the investigation.

Regarding Chapter 164 of the Law Enforcement Officers' Bill of Right, specifically 164.02:
1. If a law enforcement officer is under investigation and is subjected to interrogation for any reason which could lead to disciplinary action, demotion, dismissal or criminal charges, the interrogation shall comply with the following requirements:

(a)     The law enforcement officer under investigation shall be informed of the nature of the investigation prior to any interrogation.
(b)     At the request of the law enforcement officer under interrogation, she may be represented by a representative of her choice, at the discretion of the officer, may be present at all times during the interrogation.
2.     Evidence obtained during the course of an interrogation not conducted in accordance with sub (1) may not be utilized in any subsequent disciplinary proceedings against the law enforcement officer.

164.03, No law enforcement officer may be discharged, disciplined, demoted or denied promotion, transfer or reassignment, or otherwise discriminated against in regard to employment, or threatened with any such treatment by reason of the exercise of the rights under this chapter. I was subjected to an interrogation (with Union representation, Police Officer Shawn Lauda), after the accident on January 19, 2015, at IAD. I was questioned by Sergeant Adam Zieger. At that time I had not returned to duty and was carried as Sick-Injured Off- Duty, due to the fact that the Milwaukee Police Department's medical section refused to treat my on-duty accident, as Injured on Duty. This was done out of retaliation, and began with rumors overheard by officers (See memo attached November 12, 2015). The Milwaukee Police Department supervisors at my scene treated me as if I had done something wrong, and questioned me as such. Additionally, I was transferred during this process in violation of 164.03.

This investigation by members of IAD on September 9, 2015, has discouraging frequencies. To conduct charges and specifications, alleging employee misconduct, in regards to me, has no credibility. Specifically, those investigated by Sergeant Adam Zieger.

Sergeant Adam Zieger conduct a PI-21 at IAD, unknown date (not listed in the summary report on page 20) with questions regarding the familiarity of Core Values 1.0- Competence, and Guiding Principal 1.03, as well as guiding Principal 1.05, SOP 640.15(a)(2) Vehicle Operations, and Guiding Principles 1.10. On October 11, 2015, which I responded in a Memorandum regarding those charges.

During the PI-21 interview of Lieutenant of Police Sean Hanley during Sergeant Adam Zieger's investigation of the accident, Lieutenant Sean Hanley indicated that I contacted him after the accident by cellular telephone call. That is the only statement in the report regarding Lieutenant Hanley's PI-21 that is true.

I reported that Officer Melanie Beasley was concerned for her safety, in emotional tears, and needed to talk to me, as well as get assistance on a felony report. Lieutenant Sean Hanley and Lieutenant Timothy Leitzke at that time were aware that Officer Melanie Beasley alleged the sexual assault by TEU Police Officer Robert Wilkinson. Officer Beasley often cried at work, suffered panic attacks, and had been reaching out for help. After Officer Beasley reached to both Lieutenant Sean Hanley and Lieutenant Timothy Leitzke; both failed her. Additionally, Officer Melanie Beasley needed my assistance on reports regarding a RES on the day of the accident as I stated in my PI-21, but that too was never investigated.

Not at any time, did I say that Officer Melanie Beasley was afraid of "ALL" TEU officers, nor that they would ban together and do something to her as reported by Sergeant Adam Zieger regarding the PI-21 of Lieutenant Sean Hanley. I never stated that I was traveling 45mph. I never stated that my son was stopped by UWM police. (Additionally he was not).
The fact that Lieutenant Sean Hanley failed to report the sexual assault allegations made by Officer Melanie Beasley in October 2014, as well as those she reported in December 2014 to

Lieutenant Timothy LEITZKE, is one of the reasons for the statements made about this incident, in retaliation and fear of their misconduct.

During the PI-21 of Lieutenant Sean Hanley, Lieutenant Sean Hanley stated that he could not remember statements made by me in regards to specifics; however, he was selectively able to recall circumstances of TEU officers bringing in arrest and direct quotes that I made. I had no knowledge of any arrests made by TEU at District Five, and Officer Beasley was not afraid of TEU personnel in general, rather for one officer in particular that she named. (TEU Officer Robert Wilkinson). Additionally, Lieutenant Hanley failed to explain that he agreed that Officer Beasley should take it serious about being threatened, and suggested that she call Police Officer Robert Wilkinson's' wife, and obtain a restraining order.

Sergeant Adam Zieger conducted a 22 page investigation that took over nine months to prepare and articulate, which was done with no formal training as an investigator, and vital interviews and inquiries were not completed on a timely basis. I provided the computer IP# by which Lieutenant Sean Hanley pulled up the photo on October 5, 2014 to view the photo of Wilkinson, proving that I made a report of Melanie Beasley's welfare. That was never completed, or omitted from the investigation. I paid for my file and memorandums are missing, not only from this investigation, but many others.

These facts and allegations are pertinent to my investigation:

1.      Sergeant Adam Zieger was the Sergeant of Probationary employee Clayton Amborn at District Five.
2.      Sergeant Adam Zieger had direct and personal knowledge that Police Officer Clayton Amborn was out ill and off the payroll during his probationary period for 55 days.
3.      Sergeant Zeiger was a subordinate of Captain Thomas Stigler at District Five before being transferred to IAD in November 2014.
4.      Sergeant Adam Zeiger handled portions of the PI-21 along with Sergeant Roberta Klien, both of which influenced the conduct of the officer in relation to the OWI that was pending, inducing the officer to omit the acts of violations of the officer's lawful conduct and obtaining personal advantages Officer Amborn was not authorized to receive.
5.      Sergeant Zieger as well as Captain of Police Thomas Stigler assisted in the influence of Officer Clayton Amborn and his standing, with intent to assist the officer in his omission, in the violations he obtained while on probation, having received an OWI.
6.      Sergeant Adam Zieger had direct knowledge that documentation for that extension of probation, due to Amborns' Sick time extension, which was completed by Sergeant Shannon Taylor of District Five, yet disregarded that document.
7.      Officer Amborn stated that although his Sergeant and Captain had knowledge of the OWI while he was on probation, it was known to IAD, and they purposefully ignored that fact and carried on as if he was not.
8.      Due to items 1-7, the most recent allegations of Core Value 1.00 alleging my wrongdoing were signed by Captain James Shepard Commanding Officer of IAD. Captain Shepard's actions are subjected to integrity issues from Sensitive Crimes investigations involving him and Lieutenant of Police Justin Carloni as well.

It should also be noted that the acts of Sergeant Adam Zeiger, Sergeant Roberta Klien constitute misconduct in public office and guilty of a class I and H felony.

I believe that it is inappropriate for Sergeant Adam Zieger to conduct an investigation of me or anyone else. Originally I was told that my investigation was completed in June 2015. I questioned how that could be when so many people were not interviewed. I informed Sergeant

Adam Zieger of additional interviews that needed to be completed for a fair investigation. Sergeant Adam Zieger then informed me that he was given follow-up by Deputy Inspector Michael Brunson, which included interviewing my son. This interview should have been one of the first interviews conducted, and not only was it not, but it was completed over the phone.

I was never interviewed until I was summoned to IAD while I still had not returned to work, due to a severe head injury. If I were to conduct any investigation as inept as this one, I can ensure that there would be repercussions.

My son was at the hospital on the day of the accident and Lieutenant of Police Sean Hanley never himself nor gave instruction for anyone else to interview him. My son made himself available that night, later that night, and when Sergeant Steve Hermann visited at my home. Officer Melanie Beasley also made herself available to be immediately interviewed. Neither of then were interview until more than five months after the fact.

Furthermore, I paid for my file and the memo that Sergeant Steve Hermann picked up at my house 1-2 days after the accident in January, were not in my file, as well as many others.

It is still unclear what exactly I am being charged for, however I have been available to answer all and every question, even with a severe head injury. I have been honest and straightforward, open and frank about not only what occurred, but assisted in the investigation. Outside of scene preservation, one of the most important evidence gathering and fact findings occur through interviews of those directly involved, yet here those directly involved were last. The weakness of this investigation is many. We are to collect evidence and interview those immediately and use it to make up our minds, but in fact what was done is that the supervision on the scene and throughout IAD made up their minds, then collected evidence to support that belief out of retaliation.

It is important to practice moral principles by being honest. Integrity is not just about cohesion, unity and being undivided. It is that, but just as well, it is the encouragement of responsibility through our laws. However, when hard working women such as I, have to be suspicious of those that want to have power over another instead, and are not bound by stringent rules, all we have is intentional wrongdoing and improper behavior as this.

I would like an outside agency to investigate these allegations since it is improper to have internal affairs members who are in alleged violation of misconduct themselves, while not in a detective command, and investigate any internal matter. This is supposed to be a policing function rather it has turned into an enforcement function that basis of grudge holding, and motivated by premeditated obstinate indifference. I will again be glad to cooperate in the investigation to my fullest.

Respectfully submitted,

Detective S. Lewandowski

# MILWAUKEE POLICE DEPARTMENT
## EVALUATION INFORMATION REGARDING INTERNAL MATTERS

NAME: <u>SHANNON LEWANDOWSKI</u>          PEOPLESOFT # <u>012860</u>

1. DATE OF APPOINTMENT                          <u>06-07-1999</u>

2. DATE OF ASSIGNMENT TO PRESENT LOCATION   08-30-2015

|  | <u>2013</u> | <u>2014</u> | <u>2015</u> |
|---|---|---|---|
| 3. SICK DAYS | <u>4</u> | <u>3</u> | <u>53</u> |

4. SUPERVISORS EVALUATIONS

   A.  REPUTATION (Above Average – Average – Below Average)

      SUPERVISOR: <u>LT ARMBRUSTER</u>     SINCE: <u>2014</u>     RATING: Below Average
      SUPERVISOR: <u>LT LOUGH</u>     SINCE: <u>2013</u>     RATING: Below Average
      SUPERVISOR: _____     SINCE: _____     RATING: ~~Above Average~~

   B.  ADHERENCE TO CORE VALUES AND POLICIES

      SUPERVISOR: <u>LT ARMBRUSTER</u>     SINCE: <u>2014</u>     RATING: Average
      SUPERVISOR: <u>LT LOUGH</u>     SINCE: <u>2013</u>     RATING: Below Average
      SUPERVISOR: _____     SINCE: _____     RATING: ~~Above Average~~

   C.  INTEREST IN WORK

      SUPERVISOR: <u>LT ARMBRUSTER</u>     SINCE: <u>2014</u>     RATING: Above Average
      SUPERVISOR: <u>LT LOUGH</u>     SINCE: <u>2013</u>     RATING: Above Average
      SUPERVISOR: _____     SINCE: _____     RATING: ~~Above Average~~

<u>SGT ADAM GROCHOWSKI</u>                    Respectfully submitted,
Prepared By

<u>10-16-2015</u>
Date                                            Commanding Officer

NOTE: Attach the members' latest rating report (Form PE-27) to this report. Commanding officers shall file this report and attach it to each investigative package forwarded to the Internal Affairs Division.

# MILWAUKEE POLICE DEPARTMENT

## EVALUATION REPORT

PERIOD ENDING   12/31/2014

NAME   Lewandowski, Shannon                    Detective                         012860
                                               RANK                              P.S. #

DISTRICT/DIVISION   CID                               SHIFT  8p-4a        ASSIGNMENT  0092

Instructions:  Rater to set forth in concise narrative manner specifically observed performance or behavior during rating period.  Area 3 should present a specific recommendation or course of action through which employee can improve performance as specified in Area 2 of report.

1.  **Identify area (s) where employee does well or excels:**  Detective Lewandowski is assigned to the late power shift in the Central Investigations Division, and she reports directly to  District #3.  Detective Lewandowski is very passionate bout her work and genuinely cares about the victims. She takes ownership of all of her cases, and completes the required follow up in order to obtain criminal charges AND a conviction. Detective Lewandowski is skilled at using social media to identify suspects and gather evidence against them. During this rating period, she chaired a trial in which the defendant was a high value target. At the conclusion of the trial, the defendant was found guilty of Attempt-1st Degree Intentional Homicide, and he was sentenced to 37years in prison.

2.  **Identify area (s) where improvement is recommended:**  Detective Lewandowski should seek training on RMS (ORIG) reporting in order to minimize errors. Furthermore, she needs to focus on one task until it's completed, rather than jumping from one thing to the next. During this rating period, she was counseled by Lt. Sean Hanley about the proper way to follow the chain of command. This stemmed from an email that she sent to the Chief and other members of the command staff.

3.  **Recommended course of action through which employee can improve performance:**  Keep up with training and technology which can assist investigations.

**How long has employee worked for rater:** Since March 1st of 2013.

**Other comments (continued from reverse, if necessary).** Detective Lewandowski is punctual and neat in appearance.

**Progress Evaluation:** Progress is good

Detective Lewandowski is undoubtedly one of the most dedicated detectives on the department — Her ability to follow through with her investigations from start to finish is impressive. I am concerned with her ability to remain professional and focused on her duties and strongly urge her to dedicate attention to her assigned tasks. *LJS*

Rater's Signature: _____ Lucy PAUL D LT. 02/22/2015
　　　　　　　　　　　　　　　Rank/Title　　　　　　　　Date

Shift Commander Signature: _____ Lucy PAUL D LT. 02/22/2015
　　　　　　　　　　　　　　　　　Rank/Title　　　　　　　Date

I have read this report and it has been reviewed with a Supervisory Officer.

Employee Signature: X _Refused Signature_
　　　　　　　　　　　　　Rank/Title　　　　　　　　Date

District/Division
Commander's Signature: _____ Acting Captain 1-25-2015
　　　　　　　　　　　　　　　Rank/Title　　　　　　　Date

# MILWAUKEE POLICE DEPARTMENT

## EVALUATION REPORT



PERIOD ENDING  12/31/2011

NAME  Shannon Lewandowski          Detective          012860

RANK                P.S. #    S.S. #

DISTRICT/BUREAU/DIVISION  Metropolitan          SHIFT  Late          ASSIGNMENT  V.C.

Instructions:  Rater to set forth in concise narrative manner specifically observed performance or behavior during rating period.  Area 3 should present a specific recommendation or course of action through which employee can improve performance as specified in Area 2 of report.

**1.  Identify area (s) where employee does well or excels:**  Detective Lewandowski shows exceptional skill in her thoroughness to investigate a felonious crime.  Detective Lewandowski exhibits tenacity and is relentless when conducting follow-up to track down known and unknown criminals for any type of crime. Detective Lewandowski shows independence in her investigations and willingly accepts any assignment given to her without complaint.  Detective Lewandowski is a reliable and dependable investigator.  Additionally, Detective Lewandowki has shown considerable improvement in her overall report writing skills.

**2.  Identify area (s) where improvement is recommended:**  Detective Lewandowski needs to continue to work on being consistent with her reports.  Detective Lewandowski can be overly detailed in her reports where at times she needs to decide what is relevant and what is not, thus, keeping her reports more concise and to the point.

**3.  Recommended course of action through which employee can improve performance:**  Even though Detective Lewandowski has shown improvement she should continue to use her supervisor for feedback on her reports and if she or her supervisor identifies any training and/or coursework that will assist her in gaining more skills in her report writing, she should proactively take advantage of the opportunity. Additionally, Detective Lewandowski needs to respond in a positive manner when she receives recommendation, counsel and/or advice on how to be effective and efficient on how she completes her reports.  At times Detective Lewandowski can respond in a negative manner when she receives professional criticism which detracts from the message that this supervisor is attempting to convey to her about completing her reports in an effective and efficient manner.

How long has employee worked for rater: 12 months

Other comments (continued from reverse, if necessary). Demonstrates a critical skill set by maintaining a "Division Median" with interrogatories that result in clearances. Additionally, demonstrates through performance, adherence to the Department's Code of Conduct.

Progress Evaluation: Progess is satisfactory.

Rater's Signature: _____  4-25-12

                                                Rank/Title                             Date

Shift Commander Signature: _____  4-30-12

                                                  Rank/Title                           Date

I have read this report and it has been reviewed with a Supervisory Officer.

Employee Signature: _____  4-27-12

                                              Rank/Title                           Date

District/Bureau/Division Commander's Signature: Capt Michael DuBose  5-7-12

                                              Rank/Title                           Date

COB 0089 0078

**Summary of Arrest Activity for PSN 012860, LEWANDOWSKI,SHANNON From October 07, 2014 To October 07, 2015**
**1 Persons Arrested on 2 Total Charges**

October 16, 2015 13:38

| Booking #: | 1420629 | ROBINSON,DEVON B | M/B | DOB: | MPD ID#: 000349937 |
|---|---|---|---|---|---|
| Arrest data: | | Location: 821 W STATE ST | | Date-Time:10/08/2014 1120 | |
| | 940.43(3) | Intim Wit/Threat For | | | 14281006 3 |
| | 946.49(1)(a) | Bail Jump-Misdemeano | | | 14281006 3 |

Page 1 of

## Tiburon Incidents

| | |
|---|---|
| **Originals** | **8** |
| **Supps** | **38** |
| **Total Reports** | **46** |

PSN Listed in Officer, Officer2,
or Author

## CMS Arrests

| | |
|---|---|
| **Felony** | 1 Arrests With 1 Charges |
| **Misdemeanor** | 1 Arrests With 1 Charges |
| **Total Charges** | 2 |
| **Total Arrests** | 1 |

## Tracs Activity

| Document Type | Document Status |
|---|---|

## FI Activity

## Inventories

| | Inv Type | 49 Case No |
|---|---|---|
| Evidence | EVID | 38 |
| Major Crime | MAJC | 8 |
| Safekeeping | SAFE | 3 |

Data Type: **Municipal**

*Issue dates of* **01/01/2012** *through* **10/08/2015**

District:     **All**

| | |
|---|---|
| Officer Name: **LEWANDOWSKI SHANNON** | |
| Payroll Number: **012860** | |

% of All Valids:      100.00%
% of All Voids:          0.00%
% of All Fines:      100.00%

| Ordinance: | Ordinance Description: | Fine Amount | Late Fee Amount | Valid Count | % of Officer Valids: | Officer Fines: | % of Officer Fines: | Void Count: | % of Officer Voids: |
|---|---|---|---|---|---|---|---|---|---|
| 106-1-1 | DISORDERLY CONDUCT | $185.00 | $0.00 | 1 | 100.00% | $185.00 | 100.00% | 0 | 0.00% |
| **Officer Totals:** | | | | | | $185.00 | | 0 | |
| **Report Totals:** | | | | | | $185.00 | | 0 | |

*No Information for Traffic Citations*

**TABLE OF CONTENTS**

**DETECTIVE SHANNON LEWANDOWSKI**
**PS #012860**

**I.A.D. FILE #15-0032**

1.    Milwaukee Police Department Memorandum (PM-9E), dated 09-11-15, by Police Lieutenant Heather WURTH, Internal Affairs Division (IAD) – Her cover; sustained by Deputy Inspector of Police Michael BRUNSON, IAD, on 09-27-15

2.    PM-9E, dated 03-07-15, by Police Sergeant Adam ZIEGER, IAD – His initiation

3.    PM-9E, dated 09-09-15, by Police Sergeant Adam ZIEGER, IAD – His summary

4.    Milwaukee Police Department Internal Investigation Informing the Member (PI-21), issued to Det. Juanita CARR on 03-27-15

5.    PI-21, issued to Det. LEWANDOWSKI on 04-08-15

6.    PI-21, issued to PO Andrew GROSS on 07-15-15

7.    PM-9E, dated 09-08-15, by Police Sergeant Adam ZIEGER, IAD, re: participation in interviews

8.    Supplemental documents related to the squad accident, including but not limited to MPD Incident Report #150190017, CAD call #150190259, Milwaukee Municipal Court case #15002151, MPD Incident Report #PA-2015-0011, and the restitution worksheet for squad damage

9.    Shorewood Police Department CAD Activity for call #15-000490

10.   CAD call #150190097

11.   Copy of Letter, dated 10-07-15, from Deputy Inspector of Police Michael J. BRUNSON to DET LEWANDOWSKI - - Advising her of Core Value violation; attached is copy of Charges and investigative summary

12.   Department Memo (PM-9E), dated 10-07-15, by Sergeant Adam ZIEGER and Lieutenant Heather WURTH, IAD/IAS -- Hand delivery of letter advising of Core Value violation to DET LEWANDOWSKI; attached also was copy of Charges and investigative summary

13.   Department Memo (PM-9E), dated 10-08-15, by OAII Tyronda WILLIAMS, IAD/IAS -- Certified mailing of letter advising of Core Value violation by DET LEWANDOWSKI and copy of Charges and investigative summary to the Milwaukee Police Association

14.   Copy of Letter, dated 11-20-15, from Deputy Inspector of Police Michael J. BRUNSON to DET LEWANDOWSKI - - Advising her of Core Value violation; attached is copy of Charges and investigative summary

15.    Department Memo (PM-9E), dated 11-20-15, by Sergeant Matthew PALMER and Sergeant William WALSH, IAD/IAS -- Hand delivery of letter advising of Core Value violation to DET LEWANDOWSKI; attached also was copy of Charges and investigative summary

16.    Department Memo (PM-9E), dated 11-23-15, by OAIV Rebecca SMITH, IAD/IAS -- Certified mailing of letter advising of Core Value violation by DET LEWANDOWSKI and copy of Charges and investigative summary to the Milwaukee Police Association

15-0032  table/rls

Form PM-9E
11/09

# MILWAUKEE POLICE DEPARTMENT
## MEMORANDUM

**Date:** September 11, 2015

**TO:** Michael J. BRUNSON
Deputy Inspector of Police

**CC:** James SHEPARD
Captain of Police

**FR:** Heather WURTH
Police Lieutenant

**RE:** Allegations of Misconduct on the part of Detective Shannon LEWANDOWSKI
IAS FILE #2015-0032

Sir,

I have reviewed the investigation regarding the allegations of misconduct on the part of Detective Shannon LEWANDOWSKI and have found it to be thorough and complete. The investigation, which was assigned to Sergeant Adam ZIEGER, is summarized below.

On January 19, 2015, at about 2:17 a.m., while on duty, Detective LEWANDOWSKI operated a squad with the emergency lights activated and collided with a vehicle at North 35th Street and West North Avenue. Both Detective LEWANDOWSKI and passenger Detective Juanita CARR sustained injuries that prevented their return to duty. The squad damage was determined to be "totaled," with a value of $4525.00.

The other vehicle's driver, Ms. Debrielle JOHNSON, admitted to drinking prior to the crash. Ms. JOHNSON was transported to a hospital and treated for a vertebrae fracture. An evidentiary blood sample from Ms. JOHNSON tested positive for ethanol at .064 g/100mL. Ms. JOHNSON reported she tried to stop for the yellow light, but could not due to brake problems of which she was previously aware. Ms. JOHNSON was issued five citations including Wisconsin State Statue violations for Cause Injury/Operating While Intoxicated (OWI), Failure to Obey Sign or Signal, and four other ordinance level violations. Ms. JOHNSON pleaded "no contest" and was found guilty of the ordinance violations in Milwaukee Municipal Court. There is no record of disposition for the Operating While Intoxicated.



Witnesses reported the squad, with flashing red and blue lights, collided with a speeding vehicle attempting to make it through an intersection with a red or yellow light. A witness heard the driver of the detective's vehicle scream to call her son, who was at the University of Wisconsin Milwaukee (UWM) police station, and she needed to get him. A second witness described the detective that had been driving called her son to verify he was "okay."

Police Lieutenant Sean HANLEY responded to the scene and reported his findings in the Administrative Investigations Management System (AIM). Lieutenant HANLEY documented being informed by Police Sergeant Adam RILEY that the squad's emergency lights had been activated at the time of the crash, and there were no assignments that required such a response. Further, Sergeant RILEY reported officers and witnesses stated Detective LEWANDOWSKI was responding to her son who had been stopped by the UWM Police Department.

Lieutenant HANLEY documented he had assigned Detective CARR to go to 2765 North 52nd Street to recover a firearm involved in a shooting investigation. Lieutenant HANLEY documented Detective CARR wanted to conduct the search as instructed, and Detective LEWANDOWSKI wanted to go to District Five first. Lieutenant HANLEY documented neither detective informed him they were responding elsewhere. Detective CARR reported to Lieutenant HANLEY that the emergency lights were activated to scare prostitutes.

Lieutenant HANLEY also documented a telephone call he received from Detective LEWANDOWSKI the morning after the accident. According to Lieutenant HANLEY'S report, Detective LEWANDOWSKI intended to assist with follow-up assigned to Detective CARR, but received a call from Police Officer Melanie BEASLEY who had asked her for assistance dealing with a personal matter. According to Detective LEWANDOWSKI, Officer BEASLEY reported to her that she was "afraid" and had asked her to come to District Five. Detective LEWANDOWSKI also reported that she was first responding to find her son, who had been stopped by a UWM Police Officer. Lieutenant HANLEY reported Detective LEWANDOWSKI acknowledged driving about 45 miles per hour, and the emergency lights were activated to make cars pull over.

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 90 of 805   Document 80-21

Detective LEWANDOWSKI'S son, Jordan LEWANDOWSKI, was interviewed and acknowledged he called to inform his mother he had been stopped by a police officer, though he denied that his mother was meeting him.

Shorewood Police Sergeant Cody SMITH confirmed stopping Mr. LEWANDOWSKI on January 19, 2015. Sergeant SMITH reported that at the time of the stop, Mr. LEWANDOWSKI handed him a business card with his mother's name on it. Mr. LEWANDOWSKI informed Sergeant SMITH that his mother was a detective and on her way to the stop. Sergeant SMITH indicated that under different circumstances, he probably would have arrested Mr. LEWANDOWSKI for OWI.

Detective LEWANDOWSKI reported she had sustained injuries including: Cervical Musculoligamentous – causing delayed speech and memory loss, a concussion, whiplash, a sprained right ankle with a ligament tear, as well as bruising and swelling to her right leg and ankle.

During a PI-21 interview, Detective CARR confirmed Detective LEWANDOWSKI was driving and she (Detective LEWANDOWSKI) activated the emergency lights somewhere between North Sherman Boulevard and North 35th Street to ensure a vehicle near prostitutes moved over. Detective CARR acknowledged there was no other reason for the emergency light activation.

Detective CARR was not sure if the follow-up had been assigned by Lieutenant HANLEY, but felt she initiated the follow-up. Detective CARR described there was not any urgency to complete the follow-up, acknowledged it was closer to District Three, but indicated the intention was to complete it on the way back to the District. Detective CARR described Detective LEWANDOWSKI was going to District Five first before conducting the follow-up related to the firearm.

Detective CARR was conveyed by ambulance to the hospital after the accident, and has not returned to duty since. Detective CARR reported that she has received treatment for a concussion, has had a headache since the accident, was diagnosed with Carpal Tunnel Syndrome in her wrists, and has three degenerative bulging discs in her neck with one bulging disc in her lower back.

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 91 of 805   Document 80-21   MPD1989 0086

During a PI-21 interview, Detective LEWANDOWSKI acknowledged she was driving and on-duty during the accident. Detective LEWANDOWSKI observed a vehicle in the bicycle lane that appeared it was going to pull into traffic, and activated the emergency siren to prevent the vehicle from striking the squad. Detective LEWANDOWSKI immediately turned off the siren, but thought she left the emergency lights on. Detective LEWANDOWSKI indicated there was not another reason for the emergency lights to be activated.

Detective LEWANDOWSKI acknowledged she was familiar with Core Value 1.00 – Competence, and Guiding Principal 1.03. Detective LEWANDOWSKI described she was not assigned, but was going to help Detective CARR with the follow-up. Detective LEWANDOWSKI described she was going to District Five to help Officer BEASLEY, and there was not an urgency to complete the follow-up. Detective LEWANDOWKI added it was the third time going to District Five that shift, and she had met Officer BEASLEY regarding the same issue earlier in the night. Detective LEWANDOWSKI reported she was not going to meet her son, and did not tell that to Lieutenant HANLEY.

Detective LEWANDOWSKI acknowledged that she was familiar with Guiding Principal 1.05 and Standard Operating Procedure (SOP) 640.15(a)(2) Vehicle Operations. Detective LEWANDOWSKI reasoned the emergency lights were used to prevent a vehicle from hitting her. Detective LEWANDOWSKI stated she did not respond to District Five as an emergency vehicle, and followed the rules of the road.

Detective LEWANDOWSKI described that after the accident she lost consciousness, and was brought to the hospital in an ambulance. Detective LEWANDOWSKI indicated she sustained a concussion that has caused memory problems, continued eye swelling, and pain to both the neck and back. Detective LEWANDOWSKI has returned to duty.

After reviewing the attached investigative reports, there is evidence present to support the allegation that Detective Shannon LEWANDOWKI failed to render service to the community promptly and efficiently and failed to operate a department vehicle in a safe and courteous manner while complying with all traffic laws and violated Department Code of Conduct as follows. Therefore, I recommend that the allegations against the aforementioned member be SUSTAINED.

Case 2:16-cv-01089-WED    Filed 04/22/19    Page 92 of 805    Document 80-21

Core Value 1.00 – Competence, Referencing Guiding Principle 1.03, which states; All department members shall render service to the community promptly and efficiently. When not answering a call for service, members shall use their time to accomplish the mission of the department.

Core Value 1.00 – Competence, Referencing Guiding Principle 1.05, which states; All department members shall be familiar with department policy, procedures and training and shall conduct themselves accordingly.

Referencing Standard Operating Procedure 640.15(A)(2), which states; Operators of department vehicles shall, in all instances, operate the vehicle in a safe and courteous manner, comply with all traffic laws and ordinances, and wear seat belts at all times, except when doing so would endanger the safety of the operator or another, or when he/she has provided medical certification that he/she is unable to do so.

Respectfully submitted,

Heather WURTH
Police Lieutenant
Internal Affairs Division

DATE: SEP 18 2015

REVIEWED BY: _Capt. James C. Shepard_

DISPOSITION: _Sustained - Charges_

VIOLATION: _C.V. 1.00 ref 1.03;_
_C.V. 1.00 ref 1.05 per S.O.P. 640.15(A)(2)_

Reviewed by: _Dir. of Michael J. Brown_

SEP 21 2015

Disposition: _SUSTAINED_

Violations: _G.P. 1.03 & G.P. 1.05 REF SOP 640.15(A)(2)_

Lieutenant Cover
IA File# 2015-0032
Page 5 of 5

Form PM-9E
11/09

# MILWAUKEE POLICE DEPARTMENT
## MEMORANDUM



**Date:** March 7, 2015

**TO:** **Heather WURTH**
**Police Lieutenant**

**FR:** **Adam ZIEGER**
**Police Sergeant**

**RE:** **Detective Shannon LEWANDOWSKI, Peoplesoft # 012860**
**File # IAS-2015-0032**

---

Ma'am,

On January 29, 2015 Captain of Police Timothy HEIER instructed members of the Internal Affairs Division to initiate an investigation into an allegation of misconduct on the part of Police Detective Shannon LEWANDOWSKI.

On January 19, 2015, at approximately 2:17 a.m., Detective LEWANDOWSKI operated a Department vehicle, with emergency lights activated, and collided with another vehicle near 3500 West North Avenue. Detective LEWANDOWSKI was not responding to official Department business at the time of the accident.

If this allegation is sustained it could constitute a violation of the Department's Code of Conduct as follows:

**Core Value 1.00: Competence,** which states, *"We are prudent stewards of the public's grant of authority and resources. We are accountable for the quality of our performance and the standards of our conduct. We are exemplary leaders and exemplary followers."*

**Referencing Guiding Principle 1.03,** which states, *"All department members shall render service to the community promptly and efficiently. When not answering a call for service, members shall use their time to accomplish the mission of the department."*

**Referencing Guiding Principle 1.05,** which states, *"All department members shall be familiar with department policy, procedures and training, and shall conduct themselves accordingly."*

**Referencing Standard Operating Procedure 640.15(A)(2) Vehicle Operations – General:**

   *A. Operating Requirements*

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 94 of 805   Document 80-21

2. Operators of Department vehicles shall, in all instances, operate the vehicle in a safe and courteous manner, comply with all traffic laws and ordinances.

Respectfully submitted,

Adam ZIEGER
Police Sergeant
Internal Affairs Division

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 95 of 805   Document 80-21

# MILWAUKEE POLICE DEPARTMENT
## MEMORANDUM

**Date:** September 9, 2015

**TO:** Michael BRUNSON
Deputy Inspector of Police

**FR:** Adam ZIEGER
Police Sergeant

**RE:** Police Detective Shannon LEWANDOWSKI, Peoplesoft # 012860
FILE # IAS-2015-0032



On January 29, 2015, Captain of Police Timothy HEIER instructed members of the Internal Affairs Division to initiate an investigation into an allegation of misconduct on the part of Police Detective Shannon LEWANDOWSKI.

## ALLEGATION

On January 19, 2015, at approximately 2:17 a.m., Detective LEWANDOWSKI operated a Department vehicle with emergency lights activated and collided with another vehicle near 3500 West North Avenue. Detective LEWANDOWSKI was not responding to official Department business at the time of the accident.

## INVESTIGATION

I, Police Sergeant Adam ZIEGER reviewed the Central Investigations daily lineup for January 18, 2015. The lineup reflected Detective LEWANDOWSKI was assigned as Squad 9291, and Detective Juanita CARR was assigned as Squad 9288.

A review of Squad 9291's unit history for both January 18, 2015, and January 19, 2015, revealed the operator was Detective LEWANDOWSKI, and there were no Computer Aided Dispatch (CAD) entries listed.

Squad 9288's unit history for both January 18, 2015, and January 19, 2015, revealed the operator was Detective CARR, and there were no CAD entries listed.

I reviewed the January 18, 2015, daily lineup for District Five Power Shift, which reflected Police Officer Melanie BEASLEY and Police Officer Andrew GROSS were assigned as Squad 5428.

A review of Squad 5428's unit history beginning January 18, 2015, revealed Officer BEASLEY and Officer GROSS were recorded as at the location of 4257 North Teutonia Avenue at 1:18 a.m. on January 19, 2015, CAD number 150190097. Squad 5428 was recorded as clear from the assignment at 2:21 a.m.



I reviewed CAD number 150190259, created January 19, 2015, at 2:17 a.m. for a personal injury accident at North 35th Street and West North Avenue. Squad 3330 (Police Officer Sean AINES and Police Officer Scott WIETING), Squad 3341 (Police Officer Jesse VOLLRATH and Police Officer Alexander NUTER), and Squad 3410 (Police Sergeant Wade GRUBICH) were dispatched to the accident. The CAD recorded Squad 3430 (Police Officer Joseph GOGGINS and Police Officer Michael DESTEFANIS), Squad 3482 (Police Officer Debora STACEY and Police Officer William KRUMNOW), Squad 766 (Police Officer Joseph BOEHLKE and Police Officer Steven KUSPA), and Squad 3210 (Police Sergeant Adam RILEY) responded. There were several other squads documented as having responded. Incident report number 150190017 was added to the assignment.

The first call listed in the CAD was recorded as from telephone number 911/559-1577. I reviewed a recording of the conversation between the telecommunicator and the caller. The caller, who identified himself as Christopher THURMAN, indicated he was not at the location, but looking out a window. Mr. THURMAN stated he did not witness the accident. On April 29, 2015, I attempted to call 559-1577, and later spoke to a subject who identified herself as Shannon SCHULTE. Ms. SCHULTE stated she did not call the police that evening and was not in Milwaukee County.

The second call was from telephone number (414) 722-4618. I reviewed a recording between the telecommunicator and the caller. The caller stated a police just hit a car on North 35th Street and West North Avenue. The caller noted the subjects involved were injured and one was unconscious. During a callback from the telecommunicator, the caller identified himself as "Malik," and stated he did not witness the accident.

I interviewed a subject who identified himself as Malik L. TOWNSEND (███████) via telephone. Mr. TOWNSEND stated he had been outside with a friend who owns the barber shop in the 3400 block of West North Avenue, and heard the accident. Mr. TOWNSEND described he did not see the accident, but assisted the injured detectives. Mr. TOWNSEND did not hear any sirens before the accident, and stated he would have heard them. Mr. TOWNSEND stated the detectives were distraught and did not state where they were responding. Mr. TOWNSEND identified his friend as Bihia KADIMA and provided a contact telephone number of (414) 426-6563.

The third call listed in the CAD was from (414) 405-4617, which was Detective LEWANDOWSKI. I reviewed recordings of two conversations between Detective LEWANDOWSKI and the telecommunicator. Detective LEWANDOWSKI identified herself as a detective, requested an ambulance to the location, but did not provide her name. During a callback by the telecommunicator, Detective LEWANDOWSKI stated she was in an accident with her partner and again requested an ambulance.

The fourth call listed in the CAD was from telephone number (414) 759-8229. The recording identified the caller as Darryl OWENS. Mr. OWENS indicated he thought someone was deceased, and a police officer's vehicle had been hit at North 35th Street and West North Avenue. During the call, Mr. OWENS indicated he did not know what happened; he heard a loud crash and was looking out his window.

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 97 of 805   Document 80-21

The fifth call listed in the CAD was from (414) 628-4354 with name "Ivette." I reviewed a recording between a telecommunicator and a subject who identified herself as "Ivette." During this call, "Ivette" stated she did not witness the accident.

I called (414) 628-4354, and the subject who answered identified herself as Evette SPENCER. Ms. SPENCER stated Evette was her middle name and would not provide her first name. Ms. SPENCER was unwilling to provide any more personal information, or fully cooperate. Ms. SPENCER reported her two children, fourteen and twenty years old, were also inside of her vehicle. Ms. SPENCER described the accident happened while she was driving a vehicle and approaching the area. Ms. SPENCER stated, "We couldn't see it...all we saw was two cars hit." Ms. SPENCER stated, "The car that was going through the red light was the officer." Ms. SPENCER was not sure if the siren was activated. Ms. SPENCER stated she observed one person, a female, from the non-police squad, and identified that subject as the driver. Ms. SPENCER then stated she did not want to provide a statement.

The CAD documented Squad 3482, Officer STACEY and Officer KRUMNOW responded to the accident at 2:20 a.m. At 2:30 a.m., Squad 3482 changed locations to 3611 North Maryland Avenue. Message number 011501190830022373 was entered stating, "Show us enroute to 3611 N Maryland AVE regarding." Unit 3482 sent the message and "Debora STACEY" was the listed operator.

CAD number 150190264 was linked to the assignment. The CAD was created at 2:17 a.m. for a personal injury accident at North 35th Street and West North Avenue. The CAD included, "Per pole cam, unable to see accident, 35[th] / Garfield cam is not operational." The caller was identified as a male with phone number (414) 426-6562. I reviewed a recording between the telecommunicator and the caller. The caller stated there were two officers involved in an accident, and an ambulance was needed at North 35th Street and West North Avenue.

The telephone number (414) 426-6563 for Mr. KADIMA, provided by Mr. TOWNSEND, was the incorrect number. Through department records, I was able to identify Mr. KADIMA as Biaya P. KADIMA (B/M,        with phone number (414) 426-6562. I conducted a phone interview with Mr. KADIMA who indicated he did not witness the accident occur. Mr. KADIMA exited from 3421 West North Avenue and went outside after he heard the accident. Mr. KADIMA did not assist the injured detectives, or hear any discussion about what happened. Mr. KADIMA described the female driver of the other vehicle, which was not the squad, was intoxicated. Mr. KADIMA described the female was asking strange questions like, "Was I driving?" Mr. KADIMA stated the female was "hanging" outside of the driver's window of the vehicle.

I reviewed Records Management System (RMS) report number 150190017. The original report was recorded as filed by Officer AINES. However, the supplement portion of the original report indicated it was written by Officer WIETING. A single subject was arrested during the incident and identified in the report as Debrille D. JOHNSON (B/F       ).

Officer WIETING indicated, at about 2:18 a.m. he was dispatched to investigate a "crash" involving a Milwaukee Police Department squad. Upon arrival, Officer WIETING

observed Ms. JOHNSON outside of the vehicle with, "a bump in the center of her forehead, which had a small laceration on it." Officer WIETING observed Ms. JOHNSON'S eyes were glassy and bloodshot, and was slurring her speech. Ms. JOHNSON admitted to Officer WIETING she had been drinking, and indicated she was the only person that was in the vehicle. Ms. JOHNSON was treated by the Milwaukee Fire Department (MFD) and transported to Froedtert Hospital.

Ms. JOHNSON was given intravenous fluids prior to an evidentiary blood sample being obtained at 3:54 a.m. Ms. JOHNSON denied being the driver of the vehicle. Officer WEITING described his observations of Ms. JOHNSON'S vehicle. The vehicle was a 2002 Mitsubishi Galant, and had crashed into a cement pillar of the business located on the northeast corner of North 35th Street and West North Avenue.

I reviewed supplement 0001 of RMS report number 150190017, filed by Detective Kenyatte WOODEN. Detective WOODEN was assigned by Police Lieutenant Sean HANLEY to assist in the investigation of a personal injury accident that occurred at 3500 West North Avenue, involving two on-duty police detectives. Detective WOODEN summarized an interview with Jasmin HERNANDEZ (H/F, ████████.

Ms. HERNANDEZ was a front seat passenger in a vehicle westbound on West North Avenue from North 34th Street, driven by a subject identified as Juan PEREZ. Ms. HERNANDEZ observed a squad with flashing red and blue lights traveling eastbound on West North Avenue approaching North 35th Street. Ms. HERNANDEZ stated she was listening to music, and thought that may be why she did not hear an audible siren. Ms. HERNANDEZ described the squad was traveling about 30 to 35 miles per hour as it approached the intersection and collided with the vehicle traveling north on North 35th Street at approximately 40 to 45 miles per hour. Ms. HERNANDEZ indicated the accident was caused by the white colored vehicle failing to stop for the red light.

Ms. HERNANDEZ approached the scene to assist a detective, described as a black female, while Mr. PEREZ assisted the detective who was the driver get out of the vehicle. Ms. HERNANDEZ observed the white female detective use a phone and stated something regarding that she needed to get her son from the UWM Police Department. Ms. HERNANDEZ observed Javier M. GARIVAY (H/M, ████████) who followed them also help the passenger from the squad.

Detective WOODEN also summarized an interview with Mr. GARIVAY. Mr. GARIVAY indicated he left the same party as Ms. HERNANDEZ and Mr. PEREZ a few minutes later. Mr. GARIVAY stated he arrived after the accident occurred and assisted the black female detective get out of the vehicle.

I reviewed supplement number 0002 of RMS report number 150190017, filed by Detective Troy JOHNSON. Detective JOHNSON summarized an interview with Mr. Juan R. PEREZ (H/M,████████ Mr. PEREZ was driving westbound on West North Avenue approaching North 35th Street, and Ms. HERNANDEZ was the passenger in the vehicle. Mr. PEREZ observed a vehicle eastbound with flashing red and blue lights. Mr. PEREZ reported he did not hear a siren, because his music was loud. Mr. PEREZ stated he pulled over to allow the squad to have the right-of-way. Mr. PEREZ observed the squad had a green light, and the other vehicle appeared to be speeding to try to

make it through the intersection, which appeared to have a red light. Mr. PEREZ observed the collision and assisted the detectives.

Mr. PEREZ reported the driver (of the squad) was yelling her leg was hurt. Mr. PEREZ helped pick up the driver and escorted her to the sidewalk. Mr. PEREZ stated the driver asked him to call her son and verify he was ok, at which time he did.

Detective JOHNSON also summarized an interview with Ricardo H. PEREZ (H/M, ████████. Detective JOHNSON reported that Mr. R. PEREZ was a passenger in the vehicle driven by Mr. GARIVAY, and assisted the driver of the detective's vehicle.

I reviewed supplement number 0003 of RMS report number 150190017, filed by Detective Michael WILKERSON summarizing an interview of Ms. JOHNSON conducted on Monday, January 19, 2015. Ms. JOHNSON admitted she had been drinking and was the driver of the vehicle during the accident. Ms. JOHNSON informed Detective WILKERSON that there was a passenger named "Kevin" inside her vehicle at the time of the accident. Ms. JOHNSON described the traffic light turned yellow, and she tried to stop. Ms. JOHNSON believed the light was still yellow as her vehicle failed to stop and entered the intersection. Ms. JOHNSON indicated she did not observe the squad or emergency lights. Ms. JOHNSON believed "Kevin" caused the accident because he shifted the vehicle into neutral to help the vehicle try to stop. Ms. JOHNSON stated she should not have been driving her 2002 Mitsubishi Galant, which was having brake problems, and she had been adding brake fluid.

I reviewed a Wisconsin Department of Transportation Informing the Accused report which indicated Ms. JOHNSON was arrested for Operating While Intoxicated, issued citation number S467931-2, and consented to an evidentiary chemical test of her blood.

I reviewed a Milwaukee Police Department Operating While Intoxicated memorandum submitted by Officer WIETING. Officer WIETING described the same details regarding the accident scene that were included in his RMS report narrative. Additionally, Officer WIETING reported the blood evidence was obtained by Registered Nurse (R.N.) Andrea HOPPE at 3:54 a.m. at Froedtert Hospital.

Officer WIETING documented Ms. JOHNSON'S responses to questions asked by Officer AINES. Ms. JOHNSON indicated she consumed wine and whiskey between 11:30 p.m. and 1:19 a.m. Ms. JOHNSON responded she was under the influence of alcohol at the time she was being asked the questions by Officer AINES. Ms. JOHNSON acknowledged she operated a motor vehicle and was involved in a crash.

Officer WIETING reported Officer DESTEFANIS interviewed Mr. Juan PEREZ at the accident scene. The information provided to Officer DESTEFANIS included that Mr. J. PEREZ was driving westbound on West North Avenue, with Ms. HERNANDEZ as the passenger. Mr. J. PEREZ observed the eastbound squad with lights and a siren activated. Mr. PEREZ saw a vehicle northbound on North 35th Street which disregarded the red light at West North Avenue and struck the squad.

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 100 of 805   Document 80-21

Officer WIETING reported Police Officer Ryan FEKETE spoke to Darryl OWENS (B/M, ████████) and Felicia L. OWENS ████████). Both Mr. and Ms. OWENS reported they did not witness the accident.

Officer WIETING described Ms. JOHNSON acknowledged she was driving the vehicle, but later stated she was not driving at the time of the accident. Officer WIETING documented Ms. JOHNSON acknowledged to Detective WILKERSON, during her interview, that she lied and was the driver of the vehicle.

I reviewed Wisconsin Motor Vehicle Accident Report number QQD1J1J filed by Officer AINES, for a three person injury accident on North 35th Street at West North Avenue, at 2:15 a.m., on January 19, 2015. Ms. JOHNSON was listed as operator one and issued five citations. Vehicle one was a 2002 Mitsubishi white four door, with Wisconsin registration 357WVX, and vehicle identification number (VIN) 4A3AA46G52E032572. Operator two was listed as Detective LEWANDOWSKI. Vehicle two was described as a 2007 Ford Crown Victoria black four door with Wisconsin registration 280LPY and VIN 2FAFP71W67X11023. The only occupant listed was Detective CARR.

Officer AINES reported vehicle one, operated by Ms. JOHNSON, disregarded a northbound stop light, caused an accident in the intersection, and then struck the concrete pillar. Officer AINES reported Detective LEWANDOWSKI operated vehicle number two with the squad's emergency lights activated. Detective LEWANDOWSKI and Detective CARR were transported to Froedtert Hospital and treated for complaints of soreness, swelling, and bruises. Ms. JOHNSON was transported to Froedtert Hospital and was treated for a fracture to her vertebrae. Officer AINES listed the witnesses to the accident as Mr. Juan PEREZ, Ms. HERNANDEZ, and Mr. OWENS.

I reviewed the five citations issued to Ms. JOHNSON. The first was for Cause Injury/Operating While Intoxicated, a violation of state statue 346.63(2)(a), and numbered S467931-2. The second was for Operating after Suspension, a violation of ordinance 101-1-2, and numbered I100954-0. The third was for Operate Motor Vehicle without Insurance, a violation of ordinance 101-1, and numbered I100955-1. The fourth was for Operate after Revocation/suspension of Registration, a violation of ordinance 101-1-2, and numbered I100956-2. The fifth was for Failure to obey sign or signal, the ordinance number was missing, had state statue 346.37(1)(c)3, and numbered I100957-3. All citations included a court date of January 20, 2015.

The Milwaukee Police Department Arrest-Detention Report of Ms. JOHNSON for January 19, 2015, at 3500 West North Avenue documented the same citations as previously reported. The report, signed by Officer WIETING, included an observation that Ms. JOHNSON was intoxicated. The report documented Ms. JOHNSON was conveyed to a hospital by MFD Medical Unit Seven.

I reviewed form CR-215, Probable Cause Statement and Judicial Determination, filed by Officer WIETING for the arrest of Ms. JOHNSON. Officer WIETING reported, "Our investigation revealed JOHNSON was operating a motor vehicle in the 2300 block of N 35th St...after consuming alcoholic beverages, which resulted in a traffic crash." The report documented the crash caused injuries to the occupants of a Milwaukee Police Department unmarked vehicle traveling with the emergency lights and sirens operating.

Officer WIETING described witnesses reported Ms. JOHNSON failed to stop for an official red traffic signal.

I reviewed the Administrative Investigations Management (AIM) Squad Accident report number PA-2015-0011 filed by Lieutenant HANLEY. Lieutenant HANLEY responded to the scene of a squad accident on January 19, 2015, at approximately 2:17 a.m., at the intersection of North 35th Street and West North Avenue. Sergeant GRUBICH informed Lieutenant HANLEY that Detective LEWANDOWSKI was driving east on West North Avenue, and the collision was caused by the white Mitsubishi Galant, which failed to stop for a red light while traveling north on North 35th Street. Lieutenant HANLEY was also informed by Sergeant GRUBICH that Detective CARR was the front seat passenger of the vehicle. Lieutenant HANLEY indicated Detective LEWANDOWSKI and Detective CARR were receiving medical treatment and were not able to provide much detail. Ms. JOHNSON had already been transported for medical treatment.

Sergeant RILEY reported to Lieutenant HANLEY the squad car involved in the accident had been traveling with the emergency lights activated. Sergeant RILEY was not aware of any assignment that required emergency light activation. Sergeant RILEY then informed Lieutenant HANLEY that Detective LEWANDOWSKI told officers on the scene she was responding to the area of UWM, because her son had been stopped by the UWM Police Department. Sergeant RILEY later informed Lieutenant HANLEY that witnesses were also making these statements.

Lieutenant HANLEY reported he received a phone call from Detective LEWANDOWSKI at about 6:38 a.m. to discuss the accident. Detective LEWANDOWSKI informed Lieutenant HANLEY that she and Detective CARR were going to attempt to try and complete a consent search that was assigned to Detective CARR. Lieutenant HANLEY added he had assigned Detective CARR to go to the address of 2765 North 52nd Street to attempt to recover a firearm related to an ongoing shooting investigation.

Detective LEWANDOWSKI explained she was contacted by Officer BEASLEY, who had a restraining order against a Police Officer assigned to the Tactical Enforcement Unit (TEU). A different officer from the TEU was at District Five, and Officer BEASLEY was afraid something might happen. Lieutenant HANLEY reported while Detective LEWANDOWSKI was driving to District Five, "to protect PO BEASLEY," she received a phone call from her son informing her he had been stopped by the UWM Police Department. Detective LEWANDOWSKI was driving to the area of UWM first to find her son. Lieutenant HANLEY documented, "...she did not have her sirens on but she did have her red lights on... was driving about 45mph. She said she did not have her red lights on to drive like an emergency vehicle, she just had them on to make cars pull over and get out of her way." Detective LEWANDOWSKI further reported to Lieutenant HANLEY that the traffic light was green for the squad. Detective LEWANDOWSKI explained Detective CARR was trying to find something in her (Detective LEWANDOWSKI'S) phone and probably did not see anything.

Lieutenant HANLEY and Police Lieutenant Paul LOUGH went to speak to Detective CARR on January 21, 2015, about the incident. Detective CARR reported she wanted to respond to the residence to conduct the search as instructed, and Detective

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 102 of 805   Document 80-21

LEWANDOWSKI went with her. While in the squad, Detective LEWANDOWSKI wanted to go to District Five first to help a friend, and then do the search.

Detective CARR reported while east on West North Avenue near North Sherman Boulevard, Detective LEWANDOWSKI activated the emergency lights to scare prostitutes that they had seen. Detective CARR thought the lights were left on, but was not sure. Detective CARR was attempting to locate "Melanie" in Detective LEWANDOWSKI'S phone at the time of the accident. Detective CARR believed the sirens were not activated, and added her memory was suffering since the accident.

Lieutenant HANLEY reported there were no working cameras in the area, including the pole camera located at North 35th Street and West Garfield Avenue. Lieutenant HANLEY was not notified by either detective they were responding to District Five or to the area of UWM. The report indicated Detective LEWANDOWSKI was driving department unmarked vehicle number 764, which was not equipped with a camera.

A query of the DP3 In Car Video Portal record revealed there were no recorded events in the last year for vehicle number 764. I also did not locate any video capturing any statements made by Detective LEWANDOWSKI or Detective CARR.

I reviewed an electronic copy of 186 photographs taken at the scene and hospital on January 19, 2015. The photographs depicted the squad had Wisconsin registration 280-LPY displayed on the rear of the vehicle. There were flashing red and blue emergency lights activated and visible in the rear and front windshields. There was a blue flashing light inside the rear passenger side window and a red flashing light in the driver side rear window. There was severe damage to the front of the vehicle.

Overall photographs taken of the intersection showed there were stop lights controlling traffic in all four directions. There was a white Mitsubishi Galant with rear Wisconsin registration 357-WVX with a pillar directly in front of the vehicle. There was severe damage to the front, driver side, and rear of the vehicle.

The photographs depicted visible injuries sustained by Detective LEWANDOWSKI, Detective CARR, and Ms. JOHNSON. Detective LEWANDOWSKI had a large red mark on what appeared to be her right forearm, a large contusion to the left forearm, a small abrasion on an unknown ankle, and a laceration or abrasion to the right shin area.

Detective CARR appeared to have an abrasion on her lip and a bruise to the left forearm near the elbow. Ms. JOHNSON had a brace around her neck, a laceration or abrasion to the center of the forehead, an abrasion on the forehead above the right eye, a contusion to an unknown area of the body, an abrasion or laceration to what appeared to be the right knee, and a large abrasion to the upper left thigh area.

I reviewed a Milwaukee Police Department Accident Supplement report filed by Court Administration Section Police Officer Brian PINTER. On February 6, 2015, Detective LEWANDOWSKI reported to Officer PINTER, she sustained the following injuries: Cervical Musculoligamentous causing delayed speech and memory loss, a concussion, whiplash, sprained right ankle, a torn ligament to her right ankle, as well as bruising and swelling to her right leg and ankle. Detective CARR informed her that she (Detective

LEWANDOWSKI) had lost consciousness for three to four minutes. Detective LEWANDOWSKI reported she was treated by Doctor Jamie EDWARDS.

I reviewed an accident supplement report filed by Court Administration Section Police Officer Maurice WOULFE. On April 20, 2015, Detective CARR reported to Officer WOULFE that she had suffered a concussion, neck pain from three bulging discs in her neck, upper and lower back pain, had one bulging disc in her lower back, and Carpal Tunnel Syndrome in both wrists. Detective CARR listed numerous physicians and physical therapists from which she had been receiving treatment.

I viewed a record of the municipal citations, issued to Ms. JOHNSON, in the Milwaukee Municipal Court query system. Citation number I100954-0 for Operating after Suspension had a finding of guilty with a three day commitment entered for Ms. JOHNSON. Citations I100955-1 for Operate Motor Vehicle without Insurance, I100956-2 for Operating vehicle after suspension of Registration, and I100957-3 for illegal right turn on red had a finding of guilty with a two year driver license suspension.

I reviewed Wisconsin Department of Justice Confidential Report of Laboratory Findings report submitted for Ms. JOHNSON. Blood reportedly recovered from Ms. JOHNSON tested positive for ethanol with a result of .064 g/100mL.

I reviewed a restitution worksheet filed by Police Service Specialist Investigator Mark WAGNER, of Facilities Services, dated May 26, 2015. The squad was "totaled," with a value listed for the vehicle of $4525.00. There was an additional $359.22 listed for a "Damage Appraisal," and towing of the vehicle.

On March 09, 2015, I conducted a telephone interview of Ms. HERNANDEZ who stated she was the front passenger in a vehicle driven by Juan PEREZ. Ms. HERNANDEZ described Mr. PEREZ was driving on West North Avenue and they were traveling towards the detective vehicle. The vehicle that was traveling north, that struck the detective, ran the red light. Ms. HERNANDEZ continued to explain that the light might have been yellow and the vehicle might have tried to make the light before it turned red. The light was already green for the detective's vehicle, and it struck the other vehicle. The vehicle that was struck by the detective's vehicle then struck the brick post. Ms. HERNANDEZ stated the driver of the non-detective vehicle was "driving pretty fast."

Ms. HERNANDEZ approached the detective's vehicle and observed the driver had an injured leg. Ms. HERNANEZ described the driver of the detective vehicle was a white female with blonde hair. Ms. HERNANDEZ did not hear any discussion about what the detectives were responding to. Ms. HERNANDEZ indicated she heard the driver of the detective's vehicle screaming out to everyone to call her son, because her son was at the UWM police station, and she needed to get to him. Ms. HERNANDEZ stated she did not know if the squad's lights or siren were on before the accident occurred. Ms. HERNANDEZ stated the music was not too loud in her vehicle, and she just did not remember if the siren was on. Ms. HERNANDEZ had consumed alcohol from two bottles of wine, which was shared between five people, prior to witnessing the accident.

I attempted to contact Mr. Juan Perez three or more times, and Mr. PEREZ did not answer the telephone or return any messages. Attempted phone contact with Mr.

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 104 of 805   Document 80-21

Javier GARIVAY revealed the phone number was no longer in service. I attempted to contact Mr. Ricardo PEREZ two or more times. Mr. R. PEREZ returned one phone call, but did not return any other messages that were left.

I conducted a telephone interview with Mr. Jordan LEWANDOWSKI on June 11, 2015. Mr. LEWANDOWSKI acknowledged he had contact with an unknown law enforcement agency at about 1:00 a.m. or 1:30 a.m. the night of the accident. Mr. LEWANDOWSKI was able to only provide that he was stopped a few blocks away from Sandburg Hall.

Mr. LEWANDOWSKI stated he tells his mother when he gets "pulled over." Mr. LEWANDOWSKI described he called his mother, informed her he was "pulled over," and he would call her (Detective LEWANDOWSKI) when he was done. Detective LEWANDOWSKI responded, "Alright, bye." Mr. LEWANDOWSKI stated that was the extent of the phone conversation. Mr. LEWANDOWSKI denied that his mother requested him (Mr. LEWANDOWSKI) to call her back when he determined where he was. Mr. LEWANDOWSKI responded that his mother did not state she wanted to meet him or tell him where she was going. Mr. LEWANDOWSKI stated, "I would never put my mom in that position to come like get me." Mr. LEWANDOWSKI stated he did not inform his mother that he was by UWM.

Mr. LEWANDOWSKI stated his phone was answered by the officer who conducted the stop. The officer informed Mr. LEWANDOWSKI of his mother's accident and then left. Mr. LEWANDOWSKI obtained an exact address from his friend's residence, which was the same location where he had contact with the police. Then, two unknown officers picked him up and brought him to the hospital. Mr. LEWANDOWSKI stated the license plate on his vehicle was 179-WVF.

A CAD comment search for January 19, 2015, and January 20, 2015, of "LEWANDOWSKI" and license plate "179-WVF" returned no matching results.

I spoke with UWM Police Sergeant Joseph SUTHER who was unable to locate any record of contact with Mr. LEWANDOWSKI.

Shorewood Police Department Public Safety Clerk Jackie BEARD located a contact related to license plate 179-WVF, which occurred at 2:02 a.m. on January 19, 2015. Clerk BEARD provided the contact's call number was 15-000490, for a field interview conducted by Sergeant Cody SMITH, but did not have a name of an included subject.

I reviewed Shorewood Police Department CAD Activity Report 15-000490 for a disturbance complaint at 3616 North Maryland Avenue on January 19, 2015. The notes indicated the complaint was reported at 2:02:01, and the responding squads (Cody SMITH and Michael KERR) were recorded as arrived at 2:05:03. There was comment, "Subject turned over to MPD."

I conducted a telephone interview of Shorewood Police Sergeant SMITH on June 12, 2015. Sergeant SMITH recalled he worked on January 19, 2015, and had contact with Mr. LEWANDOWSKI. Sergeant SMITH described he conducted a traffic stop of a vehicle Mr. LEWANDOWSKI was driving near the 3600 block of North Maryland Avenue. When Sergeant SMITH initially approached the vehicle, Mr. LEWANDOWSKI

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 105 of 805   Document 80-21

handed him a business card with his mother's name on it. Mr. LEWANDOWSKI informed Sergeant SMITH his mother was a detective and on her way to the stop. Sergeant SMITH stated, had it been a different circumstance he probably would have taken Mr. LEWANDOWSKI into custody for "OWI" or absolute sobriety. Sergeant SMITH spoke to someone who said he was on the way to pick up Mr. LEWANDOWSKI because Mr. LEWANDOWSKI'S mother had been in a car accident. Sergeant SMITH believed Jordan had told him the same thing. Sergeant SMITH did not remember if he just released Jordan, or an officer waited with Mr. LEWANDOWSKI. Sergeant SMITH thought Shorewood Police Officer Michael KERR might have been present at the stop. Sergeant SMITH did not talk directly to Detective LEWANDOWSKI. Sergeant SMITH checked for squad video of the incident and informed me there was none available.

During a subsequent telephone interview on August 7, 2015, Sergeant SMITH confirmed after initial contact with Mr. LEWANDOWSKI, he conducted an investigation related to the initial noise complaint. Sergeant SMITH was informed Detective LEWANDOWSKI was involved in an accident "on the way there, and that somebody from Milwaukee was coming." Sergeant SMITH confirmed after doing his investigation, he did not wait for Detective LEWANDOWSKI to arrive at any time.

During a non PI-21 interview, Sergeant GRUBICH recalled working on January 19, 2015, as Squad 3410. Sergeant GRUBICH confirmed he responded to North 35th Street and West North Avenue and located an accident at the location involving an unmarked squad which was severely damaged. Sergeant GRUBICH stated Detective LEWANDOWSKI sustained facial abrasions and was lying on the concrete. Detective CARR had a cervical collar on and was "moaning obviously like she was in pain." Sergeant GRUBICH stated both detectives were transported by separate medical units.

Sergeant GRUBICH approached the detectives to ascertain their injuries, and then attended to the scene. Sergeant GRUBICH stated the detectives did not tell him what happened. Sergeant GRUBICH stated that the citizen witnesses on scene, that were right behind the accident, told him that the squad had their emergency lights activated. Sergeant GRUBICH stated he did not hear where or to what the squad was responding. After the incident, Sergeant GRUBICH stated he heard a rumor that Detective LEWANDOWSKI was going to the UWM area because her son had been stopped by a UWM Police Officer. Sergeant GRUBICH stated he did not recall who said this, but described he heard it when several officers were talking loud in preparation for roll call.

During a non PI-21 interview, Sergeant RILEY indicated he responded to the scene of the accident. Sergeant RILEY was informed Detective LEWANDOWSKI operated an unmarked vehicle east on West North Avenue, with the emergency lights activated, and was responding to a matter with her son. Additionally, Detective LEWANDOWSKI was responding to intervene possibly at a contact with the UWM Police Department. Sergeant RILEY acknowledged he did not receive this information from Detective LEWANDOWSKI and described he had heard it amongst discussions.

Sergeant RILEY did not know who provided the information to him, and stated there were District Three officers from different shifts and TEU officers on scene. Sergeant RILEY added there were conflicting reports whether or not the squad's emergency siren

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 106 of 805   Document 80-21

Was briefly activated. Sergeant RILEY reported citizens observed the emergency lights were activated. Sergeant RILEY forwarded the information to Lieutenant HANLEY.

During a non PI-21 interview, Officer BOEHLKE confirmed he was assigned to TEU and responded to the accident scene with his partner Officer KUSPA. Upon arrival, Officer BOEHLKE observed an accident occurred involving a department vehicle, and then primarily conducted "scene security." As to the location the squad was responding to Officer BOEHLKE stated, "I thought I heard something down on the Eastside like Milwaukee, UWM Milwaukee Police, or something to that effect." Officer BOEHLKE did not recall the source of that information.

Officer BOEHLKE did not speak directly with any witnesses or either member involved in the accident. Officer BOEHLKE thought he heard a statement made by Detective LEWANDOWSKI and noted, "...I was a little further down on the scene." Officer BOEHLKE responded the only thing he heard from Detective LEWANDOWSKI was "just something about her son, that she had to get to her son." Officer BOEHLKE did not recall the exact words of Detective LEWANDOWSKI stating, "I don't recall the exact words, but it seemed something to the effect of I need something about my son, or I need to get to my son." Officer BOEHLKE described he observed from a distance, Detective LEWANDOWSKI was distraught, very "worry-some," and slightly agitated.

Officer BOEHLKE described he overheard a witness speaking to an officer. Officer BOEHLKE stated, "I believe they indicated that the department vehicle was operating lights and siren, had a green traffic signal, and I believe the other motorist in question, the alleged drunk driver, violated a red traffic signal which resulted in the collision." Officer BOEHLKE was unable to recall who the witness or officer was.

Officer BOEHLKE described a discussion he had with Officer KUSPA after they had left the scene. Officer BOEHLKE stated, "I basically remember the extent of the conversation being something to the effect that she was at the District Three Police Station. She received a telephone call from a different agency that being I believe it was University of Wisconsin Milwaukee Police. That there was some sort of investigation going on with her son, and that she was responding to that location." Officer BOEHLKE was not on-scene with Officer KUSPA, and was not aware where that information would have been obtained.

During a non PI-21 interview, Officer KUSPA confirmed he responded to the accident scene with his partner Officer BOEHLKE. Officer KUSPA described several Officers were also arriving simultaneously. Officer KUSPA acknowledged it appeared an accident involving detectives with a department vehicle occurred. Officer KUSPA described the detective had an apparent leg injury, was very incoherent, and kept saying, "Go get my son." Officer KUSPA thought she may have hit her head, and would not answer his questions about her injuries, and just kept responding regarding her son. Officer KUSPA described the detective was aggressively yelling to get her son, that he was stopped by the UWM Police. Officer KUSPA stated the detective did not provide any information as to what caused the accident. Officer KUSPA did not initially recall the name of the detective, but later confirmed it was Detective LEWANDOWSKI.

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 107 of 805   Document 80-21

Officer KUSPA stated witnesses on the scene observed the squad travel at a high rate of speed eastbound, approaching the intersection of North 35th Street and West North Avenue. Officer KUSPA recalled, "The light had just changed as the squad was going through traveling red lights and siren, and a vehicle that was traveling northbound on North 35th Street ran through the intersection just as the light changed, and then the squad t-boned that car." Officer KUSPA detailed the light changed green for the squad and red for the other vehicle simultaneously as they entered the intersection. Officer KUSPA indicated this information was obtained from witnesses when he asked if anybody saw what happened. Officer KUSPA did not obtain their names, requested the witnesses to wait to speak to an officer, and they were subsequently interviewed.

Officer KUSPA stated neither detective informed him where they were responding. After receiving information from witnesses that the squad was responding to something, the direction the vehicle was traveling, and Detective LEWANDOWSKI instructing to get her son, Officer KUSPA'S belief was the detectives were going together to go meet her son, but not what the detectives reported to him. Officer KUSPA then reported the witness statements, and Detective LEWANDOWSKI'S statements, "about her wanting me or any other officers to go meet her son at the UWM area because her son was stopped by the police" to Sergeant GRUBICH.

During a PI-21 interview, Officer GROSS acknowledged he was assigned as Squad 5428 with Officer BEASLEY on January 18, 2015, and the shift ended On January 19, 2015. In reference to CAD complaint number 150190097, for an assignment at 4257 North Teutonia Avenue, Officer GROSS could not recall if they were at the location until the assignment reflected it was cleared at 2:21 a.m. After that assignment, Officer GROSS believed they went to District Five so Officer BEASLEY could talk to a detective. Officer GROSS stated he did not discuss any personal matters with Officer BEASLEY, did not observe any signs of distress or danger, and was not aware of a department member was involved in an accident.

Personnel Order 2015-66, dated June 19, 2015, promoted Officer BEASLEY to the rank of Detective. Henceforth, Officer BEASLEY will be referred to as Detective BEASLEY.

During a non PI-21 interview, Detective BEASLEY acknowledged she intended to meet Detective LEWANDOWSKI at District Five at about the time the accident had occurred. Detective BEASLEY tried to talk to Detective LEWANDOWSKI earlier, in person, while at District Five. Detective LEWANDOWSKI did not have time, and they agreed to meet again at District Five around "two to three." Detective BEASLEY included there were "a lot of things" she wanted to talk to Detective LEWANDOWSKI about, including a report. Detective BEASLEY described after Detective LEWANDOWSKI did not arrive, she attempted to call Detective LEWANDOWSKI at about 3:00 a.m., and there was no answer. Detective BEASLEY stated she later learned from a phone call from Detective LEWANDOWSKI that she did not make it back to the district because she was involved in a vehicular accident. Detective BEASLEY stated Detective LEWANDOWSKI never told her of an intention to meet her son before the accident.

During a non PI-21 interview, Officer WIETING acknowledged he and Officer AINES responded to the accident scene. Officer WIETING confirmed he located an accident at the location. Officer WIETING stated he spoke to Detective LEWANDOWSKI briefly

Case 2:16-cv-01089-WED    Filed 04/22/19    Page 108 of 805    Document 80-21 0103

who only directed him to check on the welfare of the occupant of the other vehicle. Officer WEITING did not hear any other communication from Detective LEWANDOWSKI during the investigation. Officer WEITING described he accompanied Ms. JOHNSON to Froedtert Hospital, who he had observed had swelling to her forehead and a laceration. Officer WEITING acknowledged he was assigned to investigate the accident, and subsequently the related "OWI." Officer WEITING recalled Detective LEWANDOWSKI and a Detective with first name "Juanita" were involved in the accident. Officer WEITING indicated Ms. JOHNSON admitted to "drinking", and her eyes appeared to be bloodshot. Officer WEITING stated he did not obtain any information relative to what or where the detectives were responding to. Officer WEITING did not recall what information he obtained that caused him to document, in form CR-215, a determination the squad was operating with emergency lights and siren activated at the time of the accident.

Officer AINES separated from the department prior to the completion of the investigation.

During a non PI-21 interview, Officer KRUMNOW confirmed he responded to the accident scene with his partner Officer STACEY. Officer KRUMNOW described Detective LEWANDOWSKI gave him her telephone and directed to locate her son, and added he was with a friend at UWM. Officer KRUMNOW initially went and parked near the UWM Police Station because that was where Detective LEWANDOWSKI told them to go. Officer KRUMNOW described Detective LEWANDOWSKI was "not all there." Officer KRUMNOW confirmed he went to the area of 3611 North Maryland Avenue to pick up Detective LEWANDOWSKI'S son and brought him to the hospital. Officer KRUMNOW did not speak to any law enforcement officers from another jurisdiction, and there were no officers present when they located Mr. LEWANDOWSKI.

Officer KRUMNOW reported he did speak to Detective LEWANDOWSKI after Mr. LEWANDOWSKI was brought to the hospital. Officer KRUMNOW only remembered checking on Detective LEWANDOWSKI and seeing she had bruises. Officer KRUMNOW responded that Detective LEWANDOWSKI never informed him of where she was going before she got involved in the accident. Officer KRUMNOW did not remember what if anything Mr. LEWANDOWSKI had said to him. Officer KRUMNOW stated neither Detective CARR, or Detective LEWANDOWSKI informed him why the emergency lights were on.

During a non PI-21 interview, Officer STACEY acknowledged she responded to an accident at North 35th Street and West North Avenue involving Detective LEWANDOWSKI and Detective CARR. Officer STACEY stated she spoke briefly with Detective LEWANDOWSKI. Detective LEWANDOWSKI "wasn't making any sense and told us to go get her son." Officer STACEY recalled Detective LEWANDOWSKI stated something indicating that her son might be with District Five, and he was "stopped."

Officer STACEY went to the area of 3611 North Maryland Avenue with her partner Officer KRUMNOW and located Mr. LEWANDOWSKI. Officer STACEY stated the address may have been provided to her by Officer GOGGINS. Officer STACEY stated Mr. LEWANDOWSKI was alone and she did not speak to another member of another police department.

Officer STACEY did not remember if Detective LEWANDOWSKI informed her, at the scene, of an intention to meet Mr. LEWANDOWSKI prior to the accident, but stated she may have. Officer STACEY described Mr. LEWANDOWSKI informed her that he received a call and his mother wanted him to go to the hospital. Officer STACEY responded that Mr. LEWANDOWSKI did inform her he had contact with another police department, but did not provide related details. Officer STACEY did not think Mr. LEWANDOWSKI stated his mother was coming to meet him before the accident.

Officer STACEY stated she did go to Detective LEWANDOWSKI'S residence during the next shift. Officer STACEY stated she did not witness Detective LEWANDOWSKI talk to anyone on the phone at that time. Officer STACEY reported Officer VOLLRATH may have accompanied Detective LEWANDOWSKI to the hospital.

During a non PI-21 interview, Officer GOGGINS confirmed he responded to the accident scene with Officer DESTEFANIS. Officer GOGGINS spoke to Detective LEWANDOWSKI and Detective CARR. Officer GOGGINS recalled Detective LEWANDOWSKI was disorientated and requested him to contact her son. Officer GOGGINS indicated he contacted Detective CARR'S "significant other," from the scene. Officer GOGGINS did not successfully contact Mr. LEWANDOWSKI, nor did he believe he had spoken to another law enforcement official from another jurisdiction.

Officer GOGGINS indicated while at the scene there was discussion that the detectives were responding to check on one of Detective LEWANDOWSKI'S son, but did not remember who, and did not recall if he had spoken to Detective LEWANDOWSKI or Detective CARR regarding that information. Officer GOGGINS responded Detective LEWANDOWSKI did not inform him why she wanted him to locate her son. Officer GOGGINS explained he assumed the intention was to notify her son that Detective LEWANDOWSKI was involved in an accident. Officer GOGGINS indicated someone at the scene said Detective LEWANDOWSKI'S son was stopped by UWM Police or Shorewood, but never heard that from either detective.

Officer GOGGINS added, upon arrival, he observed the department vehicle involved in the accident had both emergency lights and the siren activated. Officer GOGGINS described the siren was "annoying" and turned off only the siren.

During a non PI-21 interview, Officer VOLLRATH confirmed he responded to the scene, and observed an accident had occurred. Officer VOLLRATH identified Detective LEWANDOWSKI and Detective CARR were involved in the accident. Officer VOLLRATH was instructed to and remained with Detective LEWANDOWSKI on scene, while in the ambulance, and at the hospital. Officer VOLLRATH did not speak to Detective CARR.

Detective LEWANDOWSKI informed Officer VOLLRATH that while traveling on West North Avenue a vehicle struck them. Detective LEWANDOWSKI did not inform Officer VOLLRATH where she was going, and reported he did not witness any statements made relative to that. Officer VOLLRATH described Detective LEWANDOWSKI might have told another officer to get in contact with her son, and one of her son's arrived at the hospital later. Officer VOLLRATH acknowledged there was discussion that he

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 110 of 805   Document 80-21

heard amongst officers related to going to meet her son, but none of the statements were from Detective LEWANDOWSKI.

During a non PI-21 interview, Lieutenant HANLEY indicated he was on duty and responded to the accident scene after he had heard radio transmissions for a possible fatal accident involving a detective. Upon arrival at North 35th Street and West North Avenue, Lieutenant HANLEY observed an accident had occurred. Lieutenant HANLEY'S investigation revealed Detective LEWANDOWSKI was the operator, and Detective CARR was the passenger of the vehicle involved. Lieutenant HANLEY confirmed he authored the squad accident report and it was accurate.

Lieutenant HANLEY described the preliminary investigation revealed the department vehicle was eastbound on West North Avenue and collided with the citizen's vehicle traveling northbound on North 35th Street. Sergeant RILEY informed Lieutenant HANLEY witnesses to the accident reported the squad with emergency lights activated traveled through the intersection with a green traffic light, when the citizen vehicle disregarded the red traffic light and collided into the department vehicle.

Lieutenant HANLEY reported he briefly spoke to Detective LEWANDOWSKI and Detective CARR at the scene. Both detectives were receiving medical attention and did not provide any details regarding the accident to Lieutenant HANLEY at that time. Lieutenant HANLEY stated he was informed by Sergeant RILEY that Detective LEWANDOWSKI was heard stating she was reporting to the area of UWM because her son was at a traffic stop with the police. Lieutenant HANLEY confirmed that neither detective provided any information to him personally relative to that, and it was information reported to Sergeant RILEY by TEU officers. Lieutenant HANLEY had not spoken to any officers that reported hearing related statements.

Lieutenant HANLEY indicated he responded to the hospital and spoke to both Detective LEWANDOWSKI and Detective CARR. Detective CARR was "under medication," and did not make any statements about what happened. Detective LEWANDOSWKI was also receiving treatment and "under medication." Lieutenant HANLEY was unable to obtain a response about what happened from Detective LEWANDOWSKI.

Lieutenant HANLEY added he personally ordered Detective CARR at District Three to conduct a "knock and talk" related to a shooting that had happened that evening. The purpose was to conduct a search of 2765 North 52nd Street to recover the firearm involved in the incident. At the time of the instruction to Detective CARR, Lieutenant HANLEY reported Detective LEWANDOWSKI was not present. Lieutenant HANLEY indicated he expected that the order to conduct the follow up would have been conducted immediately, and he ordered it to be completed right away. Lieutenant HANLEY described the residence was in close proximity to St. Joseph's hospital, and wanted the follow up completed before the victim was released.

Lieutenant HANLEY indicated Detective LEWANDOWSKI contacted him, after the accident, later that morning on his cellular telephone. Lieutenant HANLEY provided additional details regarding what was reported to him related to Detective LEWANDOWSKI meeting Officer BEASLEY. Lieutenant HANLEY stated Detective LEWANDOWSKI told him, after entering the vehicle to conduct the consent search she

received a phone call from her friend Officer BEASLEY. Lieutenant HANLEY added the TEU Officer had entered District Five with an arrest, and Officer BEASLEY was concerned for her safety because she was afraid all TEU Officers "would all band together and do something to her."

Detective LEWANDOWSKI stated to Lieutenant HANLEY, while traveling to District Five she received a telephone call from her son who had been stopped by UWM police. Detective LEWANDOWSKI indicated she was responding to that area first to find her son. Detective LEWANDOWSKI reported operating about 45 mph with the department vehicle's emergency lights activated, but not the siren when the accident occurred. Lieutenant HANLEY did not remember any specific statements made by Detective LEWANDOWSKI as to when the emergency lights were activated.

Lieutenant HANLEY described the January 21, 2015, meeting he had with Detective CARR at her residence. Lieutenant HANLEY indicated he did not ask, and Detective CARR did not indicate she was aware of the situation regarding Detective LEWANDOWSKI'S son. Detective CARR informed Lieutenant HANLEY she did not think the siren was on because she recalled hearing Detective LEWANDOWSKI scream at the time of the accident. Lieutenant HANLEY indicated, prior to the accident, he was not informed by anyone that Detective CARR was responding elsewhere before the accident, and not to the previously assigned follow-up.

During a PI-21 interview, Detective CARR acknowledged, while on duty, she was assigned as Squad 9288 on January 19, 2015, and at about 2:17 a.m., was the passenger in the vehicle driven by Detective LEWANDOWSKI. While traveling east on West North Avenue and at North 35th Street, their vehicle was involved in an accident. Detective CARR reported she "has" a concussion and is receiving treatment.

Detective CARR stated she did not see the accident occur, and had been looking through Detective LEWANDOWSKI'S cell phone at the time. Detective CARR was not sure if the squad's emergency lights were activated at the time of the collision, and did not see what the color of the traffic light was prior to the accident.

Detective CARR estimated the squad's emergency lights had been activated somewhere between North Sherman Boulevard and North 35th Street. Detective CARR continued, "There was a car that was in the road, you know with the prostitutes hanging out over there." Detective CARR did not see the actual prostitutes, but recalled either she (Detective CARR) or Detective LEWANDOWSKI mentioned something about prostitutes. Detective LEWANDOWSKI "flipped the lights on" to make sure that the car moved over. Detective CARR described she did not know if the lights were then turned off. Detective CARR stated besides addressing the vehicle or prostitutes, there was no other reason for the emergency lights to have been activated.

Detective CARR stated she looked through Detective LEWANDOWSKI'S cell phone looking for a phone number of Detective LEWANDOWSKI'S son. Detective CARR was not told why, but to answer if "Jordan" called. Detective CARR did not think Detective LEWANDOWSKI was speeding. After the lights were activated, Detective CARR did not observe any traffic violations committed. Detective CARR continued that she was

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 112 of 805   Document 80-21

not paying attention because Detective LEWANDOWSKI was driving "normally." If the squad was being driven "erratically," she would have paid attention.

Detective CARR viewed four photographs taken of the squad at the scene, which included the license plate 280-LPY. Detective CARR confirmed that was the squad she was in the night of the accident. Detective CARR acknowledged she remembered the inside of that squad that night and described that the emergency lights were positioned up by the dashboard.

Detective CARR explained she had investigated a shooting in which the suspect lived on North 52nd Street, and was going to check for the firearm used in the offense. Detective LEWANDOWSKI was going to meet an officer at District Five and then go with Detective CARR to the residence so they did not have to call for another squad to meet them. Detective LEWANDOWSKI informed Detective CARR she was meeting "Melanie," but did not state why. Detective CARR stated they both left in the same vehicle from District Three. Detective CARR did not know if Lieutenant HANLEY had assigned the follow up or asked if she was going to check for the firearm, or if she had spoken to Lieutenant HANLEY before leaving District Three.

Detective CARR stated she was conveyed to the hospital by ambulance and had not returned to duty since the accident. Detective CARR reported, in addition to the concussion, she has had a headache that has not stopped, was diagnosed with Carpal Tunnel Syndrome in her wrists, three degenerative bulging discs in her neck, and one in her back. Detective CARR viewed photographs and indicated they were of a lip injury plus bruising and pain to her left arm.

Detective CARR acknowledged she was familiar with Core Value 1.00 - Competence. Detective CARR stated she was never told by Detective LEWANDOWSKI she was trying to meet her son. Detective CARR stated if she would have observed Detective LEWANDOWSKI utilize the emergency lights without accomplishing a mission of the police department, she would have either turned them off or told Detective LEWANDOWSKI to turn them off.

Detective CARR acknowledged she was familiar with Guiding Principal 1.03, and felt that she did not violate the Guiding Principal. Detective CARR stated she did not know exactly what Detective LEWANDOWSKI was going to handle at District Five, but she was then going to respond with Detective CARR, which would have saved time by "not pulling other officers into their assignment." Detective CARR stated if she knew Detective LEWANDOWSKI was going to District Five to do something not work related she would not have went, adding she was trying to "get off work."

Detective CARR acknowledged she was familiar with Core Value 2.00 - Courage, including Guiding Principals 2.02 and 2.03. Detective CARR also acknowledged she was familiar with Core Value 5.00 - Respect and Guiding Principal 5.03. Detective CARR stated the follow-up she intended to complete was close to District Three, and felt she initiated the follow-up. Detective CARR stated if she would have been ordered by Lieutenant Hanley to conduct the follow-up, she would have still gone to District Five first. Detective CARR continued she assumed Detective LEWANDOWSKI was

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 113 of 805   Document 80-21

handling business that was work-related; the goal was not to have another vehicle go out of service just to search a house when they could be taking other assignments.

Detective CARR responded there was not any urgency to complete the follow-up, but if she would have been told to do it immediately she would have taken care of it right away. Detective CARR stated she did not hear Detective LEWANDOWSKI have any conversations with her son, or tell Detective CARR that she needed to meet her son, or that something happened at UWM. Detective CARR described that Detective LEWANDOWSKI'S son came to the hospital, and Detective LEWANDOWSKI told her that her son had been stopped by the police. Detective CARR recalled that Detective LEWANDOWSKI told her that "Melanie" had been involved in some dispute but she did not go into detail. After the accident, Detective LEWANDOWSKI never told Detective CARR that she needed to go meet her son that night.

Detective CARR acknowledged the follow-up she needed to complete was closer. Detective CARR indicated since she got into the car with Detective LEWANDOWSKI, she rode with her to take care of her business, and intended to take care of the follow-up on the way back. Detective CARR stated she would have taken over driving if she felt Detective LEWANDOWSKI had any "major issues" on her mind while she was driving. Detective CARR stated, "She didn't tell me that she was, had another alternate agenda or anything." Detective CARR added, "Detective LEWANDOWSKI was driving normal, and she didn't seem like she was responding to anything urgent."

During a PI-21 interview, Detective LEWANDOWSKI stated while on duty January 19, 2015, and assigned as Squad 9282 she was involved in an accident at West North Avenue and North 35th Street at approximately 2:17 a.m. Detective LEWANDOWSKI described she was driving east on West North Avenue to go to District Five, and Detective CARR was the passenger. While at approximately North 36th Street, she observed a car in the bicycle lane either picking up or dropping off "some girls." The vehicle's brake lights were on, and it appeared it was going to pull into traffic. To warn the driver and prevent the vehicle from striking the squad, Detective LEWANDOWSKI activated the emergency siren. Detective LEWANDOWSKI'S description of how long the siren was activated was equal to about one second. Detective LEWANDOWSKI passed the vehicle with just the emergency lights on. Detective LEWANDOWSKI added Detective CARR also noticed the vehicle because they made comments to each other that the subject was picking up prostitutes.

Detective LEWANDOWSKI continued driving east, observed a car not stopping, and they collided. Detective LEWANDOWSKI observed the traffic light was green for east and west traffic prior to the collision. Detective LEWANDOWSKI stated she applied the brakes, but could not avoid striking the vehicle. Detective LEWANDOWSKI did not think she turned off the emergency lights prior to the collision. Detective LEWANDOWSKI stated the lights were only activated so the car she observed did not pull out and strike the squad.

Detective LEWANDOWSKI viewed a photograph of the squad at the scene of the accident, including a photograph with the license plate 280-LPY, and identified it was the vehicle she operated the night of the accident.

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 114 of 805   Document 80-21

Detective LEWANDOWSKI described she lost consciousness after the accident and was conveyed to a hospital by ambulance. Detective LEWANDOWSKI described she sustained a concussion causing "short term memory issues." Detective LEWANDOWSKI viewed photographs taken at the hospital. Detective LEWANDOWSKI confirmed one was of left arm bruising from the accident, and one was of an injury to her right arm. Detective LEWANDOWSKI stated she received a "cut" on her lower leg as well as swelling and bruising to her knee. Detective LEWANDOWSKI continued her eye was still swollen; she received "two black eyes," and had pain to her neck and back. Detective LEWANDOWSKI added she has had trouble with short term memory, "articulating herself," and had not returned to work since the accident.

Detective LEWANDOWSKI summarized the events that transpired before Detective CARR entered the department vehicle with her. Detective CARR was sent to a "shooting" earlier. Detective LEWANDOWSKI was at District Five at about 12:00 a.m. or 12:30 a.m. with Officer BEASLEY, who had to conduct a search of a female subject. Detective LEWANDOWSKI continued Officer BEASLEY did not want to be there, because somebody against whom she had a complaint was there, or had his "buddies" there. Detective LEWANDOWSKI stated Officer BEASLEY had lived with her about five days a week for the last five or six months and asked her to come to the district.

Detective LEWANDOWSKI intended to help retrieve a firearm for Detective CARR'S shooting assignment. Detective LEWANDOWSKI stated a sergeant asked Detective CARR if she had recovered the firearm. Once the sergeant left, Detective LEWANDOWSKI asked Detective CARR if she wanted help to retrieve the firearm. Detective LEWANDOWSKI informed Detective CARR that she had something to do at District Five "quick and then we'll do it, and we left together in one car."

Detective LEWANDOWSKI acknowledged, when the accident occurred, she was going to meet Officer BEASLEY at District Five. Detective LEWANDOWSKI stated she intended to meet Officer BEASLEY instead of conducting the follow-up first because "she had called me and asked me to." Detective LEWANDOWSKI added it would have been her second time at District Five that night. Detective LEWANDOWSKI described she had been there for the same issue about two hours earlier.

Detective LEWANDOWSKI did not feel a need to and did not respond to District Five as an emergency. Detective LEWANDOWSKI reported she left from District Three, followed the rules of the road, and was not speeding. Detective LEWANDOWSKI stated she did not activate the lights or siren to respond to District Five.

Detective LEWANDOWSKI acknowledged she was familiar with Core Value 1.00 - Competence, and Guiding Principal 1.03. Detective LEWANDOWSKI did not believe she violated the Guiding Principal, and accomplished the mission of the Department. Detective LEWANDOWSKI explained she was going to District Five to aid a fellow officer and then go retrieve the firearm Detective CARR did not retrieve on her own.

Detective LEWANDOWSKI described why she went to meet Officer BEASLEY instead of aiding in the retrieval of the firearm. Detective LEWANDOWSKI stated, "A, that wasn't my assignment to do with the gun that was just something I was going to help her with. It took precedence because that was where I was going to go in the first

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 115 of 805   Document 80-22

place." Detective LEWANDOWSKI described the police purpose that she was serving, by going to District Five, was to help a coworker. Detective LEWANDOWSKI stated, "My co-worker called me and asked me to come there; I'm gonna come there."

Detective LEWANDOWSKI stated she had not been assigned or told to do the follow-up and there was not any urgency to complete it. Detective LEWANDOWSKI did not know exactly what was going on, but stated it would have been her third time back to the district that day. Detective LEWANDOWSKI stated, "I was just returning back because Melanie asked me are you coming, and I said yes." Officer BEASLEY informed Detective LEWANDOWSKI she was "sitting in the parking lot," and needed her (Detective LEWANDOWSKI) to come. Detective LEWANDOWSKI stated she was on her way to District Five traveling east on West North Avenue to see what Officer BEASLEY needed. Detective LEWANDOWSKI stated she goes to District Five on a daily basis and described it as her "base for Central."

Detective LEWANDOWSKI acknowledged she was familiar with Guiding Principal 1.05, Standard Operating Procedure (SOP) 640.15(a)(2) Vehicle Operations, and Guiding Principal 1.10. Detective LEWANDOWSKI responded she had not violated the SOP or Guiding Principles, because she used the emergency lights to prevent a vehicle from hitting her.

Detective LEWANDOWSKI stated she last spoke to her son about when the sergeant asked Detective CARR if the firearm was recovered. Detective LEWANDOWSKI described, as she entered the vehicle to leave, her son called and informed her he got pulled over. Jordan did not know where he was, and Detective LEWANDOWSKI told Jordan to call her when he knew something. Detective LEWANDOWSKI provided Detective CARR with her phone to answer if either Melanie or her son called, so she would not drive and talk on the phone.

After the accident, Detective LEWANDOWSKI asked "Deb Stace" (Officer STACEY) and Officer KRUMNOW to pick up her son. Detective LEWANDOWSKI communicated with other officers who responded to the accident to locate her son, so they could tell him that she was hurt and where she was.

Detective LEWANDOWSKI stated Lieutenant HANLEY was her supervisor, but was not anymore. Detective LEWANDOWSKI stated she spoke to Lieutenant HANLEY later and not at the scene of the accident. Detective LEWANDOWSKI stated her son Jordan LEWANDOWSKI had contact with a police agency other than UWM. Detective LEWANDOWSKI indicated she never had responded to anything when her son has been pulled over. Detective LEWANDOWSKI described her concerns when her son has had police contact and instructed, "tell them that I'm gonna be calling my mother she's a Milwaukee Police Detective." Detective LEWANDOWSKI indicated she never intended to meet her son prior to the accident.

Detective LEWANDOWSKI indicated she did not inform Lieutenant HANLEY of many of the details he reported in the squad accident report, and those details were not true. Detective LEWANDOWSKI noted she had contacted Lieutenant HANLEY at a District Five telephone extension, and if the phones are recorded it would reflect that

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 116 of 805   Document 80-21

information was not provided.  Detective LEWANDOWSKI requested the recording of the phone conversation with Lieutenant HANLEY be obtained if it existed.

Detective LEWANDOWSKI stated she had informed Lieutenant HANLEY she was going to District Five, and Detective CARR was with her because they were going to conduct follow-up.  Detective LEWANDOWSKI informed Lieutenant HANLEY she activated the emergency lights to move a car over that was in traffic.  Detective LEWANDOWSKI stated, "I thought he was gonna, he had brake lights on, like come out, so I switched it on to let him know."  She stated that she told the citizens and officers who were helping her to locate her phone and call her son, who goes to UWM, and tell him about the accident.  Detective LEWANDOWSKI stated she did not tell Lieutenant HANLEY she was going to meet her son prior to the accident.  Detective LEWANDOWSKI indicated she told Lieutenant HANLEY she instructed other officers to pick up her son to take him to the hospital.

Detective LEWANDOWSKI requested that her son be interviewed.  Detective LEWANDOWSKI stated she had a subsequent conversation with Lieutenant HANLEY and addressed the specific "rumors" that she was going to meet her son, and he informed her that the information was coming from Sergeant GRUBICH.  Detective LEWANDOWSKI stated this conversation occurred a different day after the accident.

Respectfully submitted,

Adam Zieger PS# 016283
Police Sergeant
Internal Affairs Division

Internal Affairs Division

Received: 12-11-15
Referred By:

# MILWAUKEE POLICE DEPARTMENT

## INTERNAL INVESTIGATION
## INFORMING THE MEMBER

1.) The Milwaukee Police Department is presently investigating you concerning an allegation- on January 19, 2015 you were a passenger in a department vehicle, operated with emergency lights activated, while not accomplishing the mission of the department near North 35th Street and West North Avenue. The department vehicle was subsequently involved in a personal injury accident. IAD file # 2015-0032.

2.) This is a confidential investigation and shall not be discussed or disclosed – with the exception of the member's chosen representative pursuant to Wis. Stat. 164.02 – without the authority of the Chief of Police.

3.) Disciplinary action may result.

4.) Refusal to respond during this investigation, or any response, which is untruthful, may result in discipline up to and including discharge from the Milwaukee Police Department.

5.) This is an internal investigation, and the answers you give, or the fruits thereof, cannot be used against you in a criminal proceeding.

6.) Pursuant to Wis. Stat. 164.02 and / 111.70 (2), you may be represented by a representative of your choice, who, at your discretion, may be present for consultation at all times during the interrogation.

7.) You will be required to provide verbal responses and/or a Memorandum(s). You may consult with your representative prior to responding.

Your responses will be obtained at: 6680 N. Teutonia Ave Room 321A    4 /14/15    6:15 pm
                                     Location                          Date        Time

I hereby acknowledge that I have read this form and I have received a copy of the same.

_____
Department Member's Signature

Date    3/27/15

Time    1:07 pm

_____
Supervisor's Signature

_____
Supervisor's Signature

**Original:** With Investigative Package
**Copy:** To Member

PI-21 Rev. 04/07

# MILWAUKEE POLICE DEPARTMENT

## INTERNAL INVESTIGATION
## INFORMING THE MEMBER

1.) The Milwaukee Police Department is presently investigating you concerning an allegation- <u>on January 19, 2015 you were operating a department vehicle, with emergency lights activated, while not accomplishing the mission of the department near North 35th Street and West North Avenue.  The department vehicle was subsequently involved in a personal injury accident.  IAD file # 2015-0032.</u>

2.)  This is a confidential investigation and shall not be discussed or disclosed – with the exception of the member's chosen representative pursuant to Wis. Stat. 164.02 – without the authority of the Chief of Police.

3.)  Disciplinary action may result.

4.)  Refusal to respond during this investigation, or any response, which is untruthful, may result in discipline up to and including discharge from the Milwaukee Police Department.

5.)  This is an internal investigation, and the answers you give, or the fruits thereof, cannot be used against you in a criminal proceeding.

6.)  Pursuant to Wis. Stat. 164.02 and / 111.70 (2), you may be represented by a representative of your choice, who, at your discretion, may be present for consultation at all times during the interrogation.

7.) You will be required to provide verbal responses and/or a Memorandum(s).  You may consult with your representative prior to responding.

Your responses will be obtained at:   <u>6680 N. Teutonia Ave Room 321A</u>   <u>4-14-15</u>   <u>7:00 pm</u>
                                                                      Location                                          Date                    Time

I hereby acknowledge that I have read this form and I have received a copy of the same.

_X_ _Brewando_____
Department Member's Signature

Date   _4-8-15_

Time   _10:02 pm_

_Numan Amed_____
**Supervisor's Signature**

_Sgt._ _____ KLEIN
**Supervisor's Signature**

**Original:**  With Investigative Package
**Copy:**      To Member

PI-21 Rev. 04/07

# MILWAUKEE POLICE DEPARTMENT

## INTERNAL INVESTIGATION
## INFORMING THE MEMBER

1.) The Milwaukee Police Department is presently investigating you concerning an allegation- <u>regarding your actions and whereabouts while not on scene at your recorded assignments during your shift beginning January 18, 2015 and ending January 19, 2015.</u>
<u>Member to supply his memorandum book for January 18, 2015 and January 19, 2015.</u>

2.) This is a confidential investigation and shall not be discussed or disclosed – with the exception of the member's chosen representative pursuant to Wis. Stat. 164.02 – without the authority of the Chief of Police.

3.) Disciplinary action may result.

4.) Refusal to respond during this investigation, or any response, which is untruthful, may result in discipline up to and including discharge from the Milwaukee Police Department.

5.) This is an internal investigation, and the answers you give, or the fruits thereof, cannot be used against you in a criminal proceeding.

6.) Pursuant to Wis. Stat. 164.02 and / 111.70 (2), you may be represented by a representative of your choice, who, at your discretion, may be present for consultation at all times during the interrogation.

7.) You will be required to provide verbal responses and / or "In The Matter Of" Reports(s). You may consult with your representative prior to responding.

Your responses will be obtained at:   6680 N. Teutonia Ave Room 321A      7-28-15      7:45p
                                                    Location                                    Date             Time

I hereby acknowledge that I have read this form and I have received a copy of the same.

_____
Department Member's Signature

Date   7-15-15

Time   11:07 PM

_____
Supervisor's Signature

_____
Supervisor's Signature

**Original:**  With Investigative Package
**Copy:**      To Member

Form PM-9E
11/09

# MILWAUKEE POLICE DEPARTMENT
## MEMORANDUM

**Date:** September 8, 2015

**TO:** Heather WURTH
Police Lieutenant

**FR:** Adam ZIEGER
Police Sergeant

**RE:** Police Detective Shannon LEWANDOWSKI, Peoplesoft #012860
FILE# IAS-2015-0032

---

Ma'am,

On April 14, 2015, both Detective Shannon LEWANDOWSKI and Detective JUANITA CARR were interviewed persuant to issued PI-21's. Both Detective LEWANDOWSKI and Detective CARR were represented by Police Liaison Officer Shawn LAUDA of the Milwaukee Police Association (MPA). MPA representative LAUDA expressed to me, Police Sergeant Adam ZIEGER, a concern whether Detective LEWANDOWSKI and Detective CARR would be able to participate in the interview do to their injuries sustained from the accident. The concern was stated while the interview was not in progress, and therefore specifically not recorded. Both Detective LEWANDOWSKI and Detective CARR particpated and completed the interviews.

Respectfully Submitted,

Adam ZIEGER
Police Sergeant
Internal Affairs Division

ORIGINAL

PA-45 MILWAUKEE POLICE DEPARTMENT ARREST-DETENTION REPORT

MPD ID # 000518532
MPD Arrest/Booking Number # 1501097    C/CJIS AR/BK #

Page 1 of 3

Master C/CJIS ID

N Juvenile

## Arrestee (Bar Code Label)

| Last,First Middle Suffix | | | | Sex F | Race B | H/N/U N | | Age 21 |
|---|---|---|---|---|---|---|---|---|
| JOHNSON, DEBRIELLE D | | | | | | | | |

Home Address: **3112 N 38TH ST**  Apt. **2**  City **MILWAUKEE**  State **WI**  Zip **53216**

| Height 5'06" | Weight 150 | Build MED | Eyes BRO | Hair BLK | Glasses/Contacts N | Teeth | Complexion MBR | Mustache/Beard NONE |
|---|---|---|---|---|---|---|---|---|

| Chin | Hand R | Marital Status S | Occupation NURSE | Employer UNKNOWN | | School |
|---|---|---|---|---|---|---|

Military Branch **NONE**  Place of Birth (City and State) **MILWAUKEE, WI**  US Citizen **YES**  Country Citizenship **USA**

Social Security #   Home Telephone # **(414)313-3360 - C**  Work Telephone #

Scars/Marks/Tattoos:

Alias/Maiden Name:

## Arrest

| Date 01/19/2015 | Time 02:30 | Agency ID MPD  D3 | Arrest Address 3500 W NORTH AV | | District/Bureau |
|---|---|---|---|---|---|

| Agency ID MPD | Arresting Officer PS # 019453 | Arresting Officer Name WIETING, SCOTT R JR | District/Bureau 033 |
|---|---|---|---|
| Agency ID MPD | Arresting Officer PS # 021475 | Assisting Officer Name AINES, SEAN M | District/Bureau 033 |
| Agency ID | Arresting Officer PS # | Assisting Officer Name | District/Bureau |

## Conveyance

Conveyed To: CJF / District Station / Hospital / Other   Date 01/19/2015   Time 0247   By: Squad / Ambulance / Med Unit

Agency ID MPD *Milw. Fire*  PeopleSoft #   Name   District/Bureau   Squad # *Med 7*

Conveyed To: CJF / District Station / Hospital / Other   Date   Time   By: Squad / Ambulance / Med Unit

Agency ID *MPD*  PeopleSoft # *018121*  Name *PO JOHNSON*  District/Bureau *5*  Squad # *3390*

Released By Doctor   Date Returned to CJF   Time Returned to CJF

Arrestee demeanor: Cooperative / Argumentative/combative   Physical Observation: *Intoxicated*

| NURSE | Employee ID | Signature | Remarks |
|---|---|---|---|

Officer Processing Case: Liaison / Arresting Officer   Employee Name *PO Scott WIETING*   Agency ID *Milw PD*

---

### 1

| Cit # / Warrant # / Commit # **Cit#: S467931-2** | Court Case # / Summary | Statute / Ordinance # **346.63(2)(A)1** | F I M I O I T M | State / Muni S | Bail |
|---|---|---|---|---|---|

Charge Description **Cause Inj by Intoxic**   1 Cnts   Offense Date 01/19/2015   Issuing Agency   Drug/Weapon/Gambling Type   Amount (Drug/Theft)

If Dispo:   Deft. to Appear at:   Date:   Time:   Sig:

Remarks:

---

### 2

| Cit # / Warrant # / Commit # **Cit#: I100954-0** | Court Case # / Summary | Statute / Ordinance # **101-1-2** | F I M I O I T O | State / Muni M | Bail |
|---|---|---|---|---|---|

Charge Description **OPERATE AFTER SUSPEN**   1 Cnts   Offense Date 01/19/2015   Issuing Agency   Drug/Weapon/Gambling Type   Amount (Drug/Theft)

If Dispo:   Deft. to Appear at:   Date:   Time:   Sig:

Remarks:

---

### 3

| Cit # / Warrant # / Commit # **Cit#: I100955-1** | Court Case # / Summary | Statute / Ordinance # **101-1-2** | F I M I O I T O | State / Muni M | Bail |
|---|---|---|---|---|---|

Charge Description **OPER W/O INSURANCE**   1 Cnts   Offense Date 01/19/2015   Issuing Agency   Drug/Weapon/Gambling Type   Amount (Drug/Theft)

If Dispo:   Deft. to Appear at:   Date:   Time:   Sig:

Remarks:

---

### 4

| Cit # / Warrant # / Commit # **Cit#: I100956-2** | Court Case # / Summary | Statute / Ordinance # **101-1-2** | F I M I O I T O | State / Muni M | Bail |
|---|---|---|---|---|---|

Charge Description **VEHICLE REGISTRATION**   1 Cnts   Offense Date 01/18/2015   Issuing Agency   Drug/Weapon/Gambling Type   Amount (Drug/Theft)

If Dispo:   Deft. to Appear at:   Date:   Time:   Sig:

Remarks:

| Last,First Middle Suffix | | | Sex | Race |
|---|---|---|---|---|
| **JOHNSON, DEBRIELLE D** | | | **F** | **B** |

| | Cit # / Warrant # / Commit # | Court Case # / Summary | Statute / Ordinance # | F\|M\|O\|T | State / Muni | Bail |
|---|---|---|---|---|---|---|
| | **Cit#: I100957-3** | | **101-1-2** | **O** | **M** | |
| **5** | Charge Description | | Offense Date | Issuing Agency | Drug/Weapon/Gambling Type | Amount (Drug/Theft) |
| | **DISREGARD OFF SIGNAL**     1 Cnts | | **01/19/2015** | | | |
| | If Dispo: | Deft. to Appear at: | | Date: | Time: | Sig: |
| | Remarks: | | | | | |

| | Cit # / Warrant # / Commit # | Court Case # / Summary | Statute / Ordinance # | F\|M\|O\|T | State / Muni | Bail |
|---|---|---|---|---|---|---|
| | **War#: 09130499** | | **106-1** | **O** | **M** | |
| **6** | Charge Description | | Offense Date | Issuing Agency | Drug/Weapon/Gambling Type | Amount (Drug/Theft) |
| | **Disorderly Conduct**     1 Cnts | | **11/03/2009** | **WIMPD0000** | | |
| | If Dispo: | Deft. to Appear at: | | Date: | Time: | Sig: |
| | Remarks: | | | | | |

| | Cit # / Warrant # / Commit # | Court Case # / Summary | Statute / Ordinance # | F\|M\|O\|T | State / Muni | Bail |
|---|---|---|---|---|---|---|
| | **War#: 13080893** | | **105-138** | **O** | **M** | |
| **7** | Charge Description | | Offense Date | Issuing Agency | Drug/Weapon/Gambling Type | Amount (Drug/Theft) |
| | **Resist/Obstruct Poli**     1 Cnts | | **10/01/2013** | **WIMPD0000** | | |
| | If Dispo: | Deft. to Appear at: | | Date: | Time: | Sig: |
| | Remarks: | | | | | |

**Prop./Accomp. Wanted Check**

| Arrestee Property Inventory # | Money Amount | Agency Inventory Location | | |
|---|---|---|---|---|
| **Y315931** | | | | |
| Probation / Parole | | Agency Arrest # | | |
| Wanted Check Date | Time | Agency ID | PeopleSoft # | Employee Name | District / Bureau |
| Accomplice Last Name | | First | Middle Name | Sex | Race | DOB | Ref to DA? |
| Family ID # | | Family Case # | Juvenile # | Active Case # |

**Juvenile Case Information**

| Name of Person Notified | Date | Time | By Whom | PeopleSoft # |
|---|---|---|---|---|
| Parent/Guardian Mother Last Name | | First | MI | Home Telephone # |
| Home Address | Apt | City | State | Zip | Work Telephone # |
| Parent/Guardian Father Last Name | | First | MI | Home Telephone # |
| Home Address | Apt | City | State | Zip | Work Telephone # |

**Weapon / Vehicle Evidence**

| Weapon Inventory # | Type | Color | Serial # | Manufacturer |
|---|---|---|---|---|
| Vehicle Inventory # | Year | Make | Model | Body Style | Color |
| License # | State | Plate Type | Exp. Year/Month | Vin # |
| Evidence Inventory # | | Agency Inventory Location | |
| Property Damage? | Estimated Amount | Property Loss? | Estimated Amount | List Attached? |

**Victim Complainant**

| Agency ID | Victim / Complainant Employee ID | Employee Name | District / Bureau |
|---|---|---|---|
| **MWPD** | **019453** | **WIETING, SCOTT R JR** | **033** |
| Victim / Complainant Civilian Name | | Sex | Race | H/N/U | DOB |
| Home Address | Apt. | City | State | Zip | Home / Work Telephone # |
| Injury to Victim? | Medical Treatment? | Injury Description: | | |

# MILWAUKEE POLICE DEPARTMENT ARREST-DETENTION REPORT

| Last,First Middle Suffix | Sex | Race | |
|---|---|---|---|
| **JOHNSON, DEBRIELLE D** | F | B | Right Index Fingerprint |

**Details of Arrest**
(Elements of Crime, Probable Cause Statement)

See Form CR-215.

Special Bail Factors:

| Report By: (Signature) PO Scott Wietin WIETING | PeopleSoft # 019453 | Supervisor Approval: (Signature, Rank) | PeopleSoft # 007548 | Date 1-19-15 |
|---|---|---|---|---|

## State of Wisconsin, Milwaukee County | Probable Cause Determination

Seal here

Subscribed and sworn before me this

_____ day of _____

Notary Public (Signature)

Commission Expires: _____

I find probable cause to believe that a crime was committed and that the defendant committed the crime and direct that the defendant be held in custody pending further proceedings in this matter.

Bail Amount:

Signature:                                      Date:                          Time:

I find no probable cause for continued detention and direct that the defendant be released.

Signature:                                      Date:                          Time:

Record entered M.P.D. System by: _____ (PeopleSoft #)

| ADMIT Y / N | Date | Time | Bkng Cntrl Dep. | Signature | AFIS Y / N | AFIS Dep Emp ID |
|---|---|---|---|---|---|---|

**STATE OF WISCONSIN, CIRCUIT COURT, <u>MILWAUKEE</u>_____ COUNTY**

For Official Use

<u>Johnson, Debrielle D</u>_____
Name of Arrested Person

**Probable Cause
Statement and
Judicial Determination**

<u>07/07/1993</u>_____
Date of Birth

Case No. _____

1. I state as follows:
   ☒ a. I am the arresting officer in this case.
   ☐ b. I am a law enforcement officer and make this statement on information and belief.

2. The above-named person was arrested without a warrant on <u>01/09/15</u> at <u>2:45</u>_____ ☒ a.m. ☐ p.m.
   How identified: ☒ verbally ☐ WI D.L. ☐ Other (specify): _____
   Agency case no. _____ Arresting Officer: <u>019453</u>_____ Department: <u>Milwaukee Police</u>
   <u>Department</u>_____

3. I have probable cause to believe that the arrested person committed the following offense(s):

   | **Offense(s)** | **Statute Number(s)** |
   |---|---|
   | Cause Injury by Intoxicated use of Motor Vehicle | 346.63(2)(A)1 |
   | Operate after Suspension | 343.44(1)(a) |
   | Operate without Insurance | 344.62(1) |
   | Operate after suspension of Registration | 341.03(1) |
   | Failure to Obey signal | 346.37(1)(c)3 |
   | Disorderly Conduct | 947.01 |
   | Resist/Obstruct a Police Officer | 946.41 |

4. Information for following summary provided by: ☐ Alleged Victim: _____ ☒ Other: <u>Juan R PEREZ</u>
   <u>(W/M</u>_____ <u>of 2919 N 32nd St #5 Milwaukee, WI, 53210, ph#326-8116, and Darryl OWENS (B/M</u>____) <u>of</u>
   <u>3511 W North Av #202, Milwaukee, WI, 53208, ph# 759-8229, and Felicia L OWENS</u>_____), <u>3511 W North Av</u>
   <u>#202, Milwaukee, WI, 53208, ph 350-1790, and P.O. Scott WIETING (2333 N 49th St, Milwaukee, WI, 53210,</u>
   <u>ph# 935-7234).</u>____

5. I believe the arrested person committed this offense(s) because: *Summarize below and/or* ☐
   documentation attached.

   The alleged victim(s) ☐ did ☒ did not consent to the above listed offense(s):

   This report was submitted by P.O. Scott WIETING, assigned to District 3, late shift.

   On Monday, January 19, 2015, I was assigned to Squad 3330 (along with P.O. Sean AINES). At approximately 2:18 A.M., we were dispatched to the intersection of N 35th St and W North Av, in the City and County of Milwaukee, regarding a traffic crash. Upon our arrival, I spoke with the driver of one of the vehicles involved. She identified herself as Debrielle D JOHNSON (B/F_____ Our investigation revealed, JOHNSON was operating a motor vehicle in the 2300 block of N 35th St, inside the City and County of Milwaukee, Wisconsin, after consuming alcoholic beverages, which resulted in a traffic crash. The crash caused injuries to the occupants in the other vehicle involved (an Milwaukee Police unmarked vehicle, that was traveling with the emergency lights and sirens operating). A check of JOHNSON's DOT status revealed that her Wisconsin Driver's License was suspended. JOHNSON stated she did not have auto insurance on her vehicle. A DOT check also showed her vehicle's registration (Wisconsin Plate of 357WVX) was suspended. According to witnesses JOHNSON disregarded an official red traffic signal. A wanted check revealed that JOHNSON had two outstanding warrants (one for disorderly conduct and one for resisting/obstructing a police officer). JOHNSON was conveyed to Froedtert Hospital for medical treatment. After she was discharged, JOHNSON was conveyed to District 3 for booking and processing

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 125 of 805   Document 80-21

Subscribed and sworn to before me
on

_____
Signature of Officer

Wieting, Scott R. Jr.
Name Printed or Typed

<u>Monday, January 19, 2015, 9:30</u>   ☒ am ☐ pm
Date                Time

_1-19-2015_

_18-_

Notary Public, State of Wisconsin
My commission expires: _Oct. 21, 2016_

## Probable Cause Determination

I have reviewed the probable cause statement from the arresting officer. Based on this statement:

☐ 1.  I find probable cause to believe that the arrested person committed the offense(s) ☐ as listed above **OR**
☐ as follows:_____

☐ Bail is set as follows: _____

☐ 2.  I do not find sufficient probable cause to have been presented and direct that the arrested person be released from this custody.  Reason(s) probable cause not found (optional): _____

☐ **Telephone Conference Call Determining Probable Cause**
The initial probable cause was determined by a telephone conference call. The judge/commissioner instructed me to affix the decision, his/her signature, and date and time in the appropriate location, to be countersigned later by the judge/commissioner.

Officer's Signature _____

**BY THE COURT:**

_____
Circuit Court Judge/Court Commissioner

_____
Name Printed or Typed

_____   ☐ am ☐ pm
Date                Time

Distribution:1. Court–Original; 2. Sheriff; 3. Facility; 4. D.A.; 5. Arrested Person/Counsel

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 126 of 805   Document 80-21

 **COPY**

# INFORMING THE ACCUSED
SP4197  4/2010-2  s.343.305(4) Wis. Stats.

Wisconsin Department of Transportation

Police Number

S467931-2

Under Wisconsin's Implied Consent Law, I am required to read this notice to you:

You have either been arrested for an offense that involves driving or operating a motor vehicle while under the influence of alcohol or drugs, or both, or you are the operator of a vehicle that was involved in an accident that caused the death of, great bodily harm to, or substantial bodily harm to a person, or you are suspected of driving or being on duty time with respect to a commercial motor vehicle after consuming an intoxicating beverage.

This law enforcement agency now wants to test one or more samples of your breath, blood or urine to determine the concentration of alcohol or drugs in your system. If any test shows more alcohol in your system than the law permits while driving, your operating privilege will be suspended. If you refuse to take any test that this agency requests, your operating privilege will be revoked and you will be subject to other penalties. The test results or the fact that you refused testing can be used against you in court.

If you take all the requested tests, you may choose to take further tests. You may take the alternative test that this law enforcement agency provides free of charge. You also may have a test conducted by a qualified person of your choice at your expense. You, however, will have to make your own arrangements for that test.

If you have a commercial driver license or were operating a commercial motor vehicle, other consequences may result from positive test results or from refusing testing, such as being placed out of service or disqualified.

In addition, your operating privileges will also be suspended if a detectable amount of a restricted controlled substance is in your blood.

Will you submit to an evidentiary chemical test of your ___blood___? ☑ Yes ☐ No
(breath, blood, urine)

I certify that I have read the above information to ___Debrielle  D  JOHNSON___,

who has been arrested for a violation of ___OWI___, and have

provided him/her a copy of this form. He/She was identified by ___Verbal  statements___.

___S467931-2___
(Citation Number)

___January  19, 2015___  ___3:45___
(Date and Time Signed)  (a.m./p.m.)

___Milwaukee  PD___
(Agency)

X ___PO Scott Wintz WIETING___
(Law Enforcement Officer)

Distribution:  1 - Agency Requesting Test;  2 - Review Examiner;  3 - Person Requested to Submit to Test

# NOTICE OF INTENT TO SUSPEND OPERATING PRIVILEGE

Wisconsin Department of Transportation
MV3519     3/2011

**IN THE MATTER OF THE SUSPENSION OF:**

| NOTICE DATE |
|---|
| January 19, 2015 |

| Driver Name - Last, First, Middle Initial | Driver License No. | State of Issuance |
|---|---|---|
| JOHNSON, Debrielle D | ████████ | WI |

| Address | Birth Date | Sex |
|---|---|---|
| 3112 N 38th St #2 Milwaukee, WI | ████████ | F |

| City | State | ZIP Code |
|---|---|---|
| Milwaukee | WI | 53216 |

| CITATION NUMBER | STATUTE NUMBER | DATE OF VIOLATION | TIME OF VIOLATION | Police Number: 15-019-0259 (CAD) |
|---|---|---|---|---|
| | s. 346.63(1)(a) | 1-19-2015 | 2:15 AM | |
| | s. 346.63(1)(b) | County Where Violation Occurred: Milwaukee | | |
| | s. 346.63(1)(am) | Operating Commercial Motor Vehicle at Time of Violation ☐ Yes ☒ No | Transporting Hazardous Materials ☐ Yes ☒ No | |
| S467931-2 | s. 346.63(2)(a)1 | This Notice (MV3519) Issued ☐ In person ☐ Mailed | MV3530 Issued ☐ Yes ☐ No | |
| | s. 346.63(2)(a)2 | Check if Criminal Complaint Issued: ☐ | | |
| | s. 346.63(2)(a)3 | | | |
| | s. 940.09(1)(a) | Milwaukee Police Department | | |
| | s. 940.09(1)(b) | (Arresting Agency) | (Agency Code) | |
| | s. 940.25(1)(a) | PO Scott WIETING | 3144 | |
| | s. 940.25(1)(b) | (Officer) | (Badge Number) | |

On the above date you submitted to chemical testing administered in accordance with s.343.305 Wis. Stats. The test result indicated a prohibited alcohol concentration or a detectable amount of restricted controlled substance. Your operating privilege will be administratively suspended for six months. You have a right to obtain administrative and judicial review of the suspension under the provisions of s.343.305(8) Wis. Stats.

Thirty (30) days from the Notice Date listed in the box above your operating privilege will be suspended and a formal Order of Suspension will be mailed to you by the Department of Transportation.

Within 10 days after this notification or within 13 days if this notice was mailed to you, you may request, in writing, that the suspension be reviewed. If such a request is made a review shall be held within 30 days of this notice. You may present evidence and you may be represented by counsel at the review.

Arresting Agency submit white ply to:
**DMV Driver Services**
**Wisconsin Dept. of Transportation**
**PO Box 7930**
**Madison, WI  53707-7930**

Date DOT Received

Distribution: Yellow - Driver; Pink - Driver; White - Review Examiner; Green - Law Enforcement

1

NAME JOHNSON, Debrielle D

## MILWAUKEE POLICE DEPARTMENT
## OPERATING WHILE INTOXICATED MEMORANDUM:

This report is written by: P.O. Scott WIETING, assigned to District 3, Late shift.

On Monday, January 19, 2015, at 2:18 AM, Squad 3330, Officer(s) P.O. AINES and I, responded to an accident   and did investigate an incident involving the operation of a motor vehicle where a subject was believed to be under the influence of an intoxicant.  The defendant did operate/drive a motor vehicle, a 2002 Mitsubishi Galant on 01/19/15, at approximately 2:17 AM, in the City of Milwaukee.  The said operating was observed by Debrielle D JOHNSON (B/F ████ who stated that;

### PHASE ONE – VEHICLE IN MOTION     (Observations of the driving & observations of the stop)

Upon my arrival, I observed JOHNSON's vehicle facing Northbound just east of the intersection at N 35th St and W North Av. The vehicle had substantial damage to the entire body, and had come to rest after striking a concrete pillar infront of the business located on the Northeast corner of N 35th St and W North Av.

### PHASE TWO – PERSONAL CONTACT     (Observations of the driver & observations of the exit)

The arresting police officer made the following observation of the defendant at the scene. I observed a female, later identified as JOHNSON, sitting in the 3400 block of W North Av, in the Eastbound lane. I ran over and asked her if she was ok. JOHNSON stated she was; however, she had a bump in the center of her forehead, which had a small laceration on it. JOHNSON was slurring her speech and stated that she had been drinking prior to the accident. JOHNSON's eye appeared to be glassy and bloodshot. Originally JOHNSON stated that she had been the only person in the car. I observed JOHNSON was wearing shorts, a short sleeved shirt, and had one shoe on. JOHNSON stated that she was cold, so I put her inside of our Squad car, uncuffed, where it was warm. I then observed JOHNSON's missing shoe on the floor of her vehicle in front of the driver's seat. JOHNSON was then evaluated by Milwaukee Fire Department members. JOHNSON began to complain of pain and began to cry. Due to JOHNSON's complaints, as well as, the severity of the damage on her vehicle, JOHNSON was taken to the Froedtert Hospital by Milwaukee Fire Department, Med Unit 7, Red shift, L.T. MILLER.

### PHASE THREE – PRE-ARREST SCREENING     (Observations of field sobriety tests)

Based upon said observations, the defendant was requested to perform field sobriety tests.  The result of said tests are as follows: Due to the transport of JOHNSON to the hospital and physcial inability for JOHNSON to complete the SFST's, I did not conduct them.

The tests were not conducted on scene, but at          for the following reason (s):
If no field sobriety tests were given due to level of intoxication, recent injury, or a refusal to perform tests, explain in the space above.

Based upon the above, the defendant was placed under arrest for OWI and later conveyed to Milwaukee Police District number 3 for processing.

Were any intoxicants, drugs or paraphernalia found on the scene?  No  If yes, describe the type, location item(s) were observed, and condition of the items:

Was a DRE officer on the scene?  No  Did the DRE perform an evaluation? No  If yes, see DRE Report.

**COMPLETE THE APPROPRIATE SECTION (S):**

The defendant was requested to take a blood test, which she consented to do. If test was refused, explain circumstances, Once we arrived at Froedtert Hospital (9200 W Wisconsin Av, ph# 805-6717), JOHNSON was taken to the Trauma Bay to be treated. JOHNSON was admitted by Dr. Carrie PACE at 2:58 A.M. JOHNSON was given an IV for her medical care. After the medical personnel concluded their intial treatment and questions, I read JOHNSON the "Informing the Accused" form. JOHNSON stated that she would consent to a blood draw for testing. R.N. Andrea HOPPE conducted the blood draw at 3:54 A.M.

On          , at          select, a chemical test of the defendant's **breath** was administered by          , District          ,          shift, off group          , PS#          . The subject was observed for the twenty- minute period prior to the administration of that test by          , beginning at          select. During that period of observation the subject did not eat or drink anything, chew gum or tobacco, smoke, regurgitate or vomit. The test results indicated an alcohol concentration of          . The defendant was then issued a citation for Operating Motor Vehicle with Prohibited Alcohol Concentration.

A chemical test of the defendant's **blood** was drawn at Froedtert, witnessed by Officer Scott WIETING and placed on evidentiary inventory at District 3.
On 01/19/2015, at 5:15 AM, Officer Sean AINES read the defendant their Constitutional Rights per Miranda. After reading the defendant his/her constitutional rights, he/she wished to make a statement.

Were you operating a motor vehicle? Yes
What street or highway were you on? 3rd and Mitchell
Where were you going? Home
Where were you coming from? 3rd and Mitchell
What is today's date? 1/19/2015
What time is it? 4 or 5 A.M.
When did you last sleep? Night of 1/17/15
How much sleep did you have? 4 to 6 hours
Is that your normal amount? No
Are you under a doctor's care? No    (For what?)
Have you taken any prescription medication/drugs in the last 24 hours? No
What type?          Time of last use?          select
Have you been to a dentist in the past 24 hours? No (What time?)          select
What kind of dental care did you receive?
Do you have epilepsy? No, Diabetes? No, Are you taking insulin? No, Last dose?
Were you injured recently? No          Please describe:
Do you have any physical defects? No          Please describe:
Have you been drinking? Yes          How much? 1 glass of wine and sips of whiskey   Time started?
11:30 PM    Time stopped? 1:19 AM
What have you been drinking? (Check all that apply) ☐ Beer ☒ Wine ☐ Whiskey ☐ Brandy ☒ Other,
Specify: Red Wine, Hennessey Cognac
Where were you drinking? Jynx Night Club
With whom were you drinking? Joevenna PORTER
Have you been using drugs? No (What type?)
Are you under the influence of alcohol or drugs at this time? Yes
Were you involved in a crash today? Yes

Have you been drinking or using drugs since then? No (What and how much?)

Additional officer comments or notes: Other officers on-scene spoke with multiple witness. Officer Michael DESTEFANIS spoke with Juan R PEREZ (W/M ████ of 2919 N 32nd St #5 Milwaukee, WI, 53210, ph#326-8116. PEREZ was driving his vehicle Westbound on W North Av, also inside of the vehicle was Jasmin HERNANDEZ (W/M ████ of 211 Fairview Av, South Milwaukee, WI 53172, ph# 531-1674. PEREZ stated he observed a Milwaukee Police Squad driving Eastbound on W North Av, with the lights and siren operating. PEREZ then saw a vehicle traveling Northbound on N 35th St, disregard the red light at N 35th st and W North Av. strike the Squad. The Squad car spun around, while continuing to travel Eastbound. The vehicle that disregarded the red traffic light, hit a concrete pillar on the Northeast side of the street.

P.O. Ryan FEKETE spoke with Darryl OWENS (B/M ████ ) of 3511 W North Av #202, Milwaukee, WI, 53208, ph# 759-8229. OWENS stated he heard a crash from his apartment, which is located on the Southwest corner of the intersection of N 35th St and W North Av. OWENS looked out window and saw JOHNSON slumped over the front driver's side window of the vehicle that struck the concrete pillar. Felicia L OWENS ████ ), 3511 W North Av #202, Milwaukee, WI, 53208, ph #350-1790, reported making similar observations.

JOHNSON's shoe was returned to her, at the hospital.

JOHNSON's license and vehicle registration was suspended. JOHNSON did not have any insurance on her vehicle.

Additional statements or comments made by defendant: JOHNSON intially stated she had been the driver of the vehicle and the only occupant of the vehicle at the time of the crash. As the night progressed JOHNSON would change her story and stated she was in the rear seat on the passenger side, and then the front passenger seat. JOHNSON admitted to Officer AINES that she was driving her vehicle, at the time of his questioning.

In a statement JOHNSON made to Detective Michael WILKERSON, after she was read her Miranda rights, JOHNSON eventually admitted to being the driver of the vehicle. JOHNSON stated that she was approaching the intersection as the light was yellow. JOHNSON stated she has had trouble with her brakes in the past, and needs to put brake fluid in the vehicle in order for the brakes to work. JOHNSON stated "Kevin" (who she knew from school, graduate of 2011) was a passenger inside of her vehicle and put the vehicle into neutral in an attempt to slow the vehicle down. JOHNSON stated she did not see any lights or hear any sirens from a Squad car prior to the crash. The next event JOHNSON remembers is having her clothes cut off at the hospital. JOHNSON stated she was sorry for lying about being the passenger inside of the vehicle earlier.

Arresting Officer _PO Scott (White) WIETING_____ (Signature)

Arresting Officer P.O. Scott WIETING (Typed Name)
District 3, Shift Late, Hours 12AM-8AM, Off Group 15-06, PS# 019453, Vacation(s) Month of March/Pending

Obtain a right index fingerprint from the defendant and place it at the end of this report.

## GENERAL INFORMATION

| ☒ Reportable Accident | ☒ On Emergency | ☐ Amended | DOT Document Number QQD1J1J | Document Override Number |
|---|---|---|---|---|

| Agency Accident Number | Police Number |
|---|---|

| 4 - Accident Date 01/19/2015 | 5 - Time of Accident (Military Time) 0215 | 6 - Total Units 02 | 7 - Total Injured 03 | 8 - Total Killed 00 |
|---|---|---|---|---|

| 2 - County 40 | 3 - Municipality 4057 | | 11 - Accident Location 1 |
|---|---|---|---|

| 14 - On Hwy No. | 14 - On Street Name 35TH ST N | 14 - Bus/Frnt/Rmp | 15 - Est. Dist Ft/Mi | 15 - Hwy. Dir |
|---|---|---|---|---|

| 16 - Fr/At Hwy No. | 16 - From/At Street Name NORTH AVE W | 16 - Business/Frontage/Ramp |
|---|---|---|

| 17 - Structure Type | 17 - Structure Number | 12 - Latitude | 13 - Longitude - |
|---|---|---|---|

| 80 - First Harmful Event 01 | 93 - Manner of Collision 05 |
|---|---|

| 112 - Access Control 01 | 113 - Road Curvature 01 | 113 - Road Terrain 03 | Surface Type 3 |
|---|---|---|---|

| 115 - Traffic Way 01 |
|---|

| 117 - Relation To Roadway 01 |
|---|

| 114 - Light Condition 03 | 116 - Road Surface Condition 01 | 118 - Weather 01 |
|---|---|---|

| 9 ☐ Hit and Run | 9 ☐ Government Property | 9 ☐ Fire | 9 ☒ Photos Taken | 9 ☐ Trailer or Towed |
|---|---|---|---|---|
| 9 ☐ Truck, Bus, or Hazardous Materials | | 9 ☐ Load Spillage | 9 ☐ Construction Zone | 9 ☐ Names Exchanged |
| 101 ☐ Supplemental Reports | 102 ☒ Witness Statements | | 103 ☐ Measurements Taken | 79 - E M S Number |

## Operator/Pedestrian

| Unit Status | 81 - Most Harmful Event: Collision With 01 | 23 - Dir Of Travel N | 24 - Speed Limit 30 |
|---|---|---|---|

| 36 - Operating as Classified D | 37 - Endorsements | 35 ☐ Operating Commercial Motor Vehicle |
|---|---|---|

| 30 - Driver's License Number | 30 - State WI | 31 - Expiration Year 2020 | 34 - On Duty Accident |
|---|---|---|---|

| 25 - Operator/Pedestrian Last Name JOHNSON | 25 - First Name DEBRIELLE | 25 - Middle Initial D | 25 - Suffix |
|---|---|---|---|

| 32 - Date Of Birth | 33 - Sex F |
|---|---|

| 26 - Address  Street & Number 3112 N 38TH ST # 2 | 26 - PO Box |
|---|---|

| 27 - City MILWAUKEE | 27 - State WI | 27 - Zip Code 53216 | 28 - Telephone Number (414) 487-5500 EXT. |
|---|---|---|---|

| 39 - Seat Position 01 | 40 - Safety Equipment 00 |
|---|---|

| 38 - Injury Severity A | 41 - Airbag 01 | 42 - Ejected 04 | 44 ☒ Medical Transport |
|---|---|---|---|

| 43 - Trapped/Extricated 02 | 92 - Pedestrian Location | 92 - Pedestrian Action |
|---|---|---|

| 119 - What Driver Was Doing 01 | 120 - Traffic Control 02 | 62 - No. of Citations Issued 5 |
|---|---|---|

| 64 - 1st Statute No. 346.63(2)(A)1 | 64 - 2nd Statute No. 343.44(1)(A) | 64 - 3rd Statute No. 341.03(1) | 64 - 4th Statute No. 344.62(1) | 64 - 5th Statute No. 346.37(1)(C)3 |
|---|---|---|---|---|

| 122 - Driver Factors 04 |
|---|

| 88 - Driver or Pedestrian Cond 02 | 89 - Substance Presence 09 |
|---|---|

| 90 - Alcohol Test 12 | 90 - Alcohol Content | 91 - Drug Test 14 |
|---|---|---|

| 91 - Drugs Reported |
| --- |

| 124 - Highway Factors |
| --- |
| 77 |

## Vehicle

**VEHICLE 01**

| 21 - Unit Type | | Vehicle Type | 22 - Total Occupants |
| --- | --- | --- | --- |
| 1 | | 01 | 1 |

| 56 - License Plate Number | 57 - Plate Type | 58 - State | 59 - Exp Year | 55 - Vehicle Identification Number |
| --- | --- | --- | --- | --- |
| 357WVX | AUT | WI | 2015 | 4A3AA46G52E032572 |

| 50 - Year | 51 - Make | 52 - Model | 53 - Body Style | 54 - Color | 100 - Skidmarks to Impact (Ft) |
| --- | --- | --- | --- | --- | --- |
| 2002 | MITS | | 4D | WHI | |

| 94 - Vehicle Damage |
| --- |
| 01,02,05,06,07,08 |

| 95 - Extent Of Damage | 96 ☒ Vehicle Towed Due To Damage | 97 - Vehicle Removed By |
| --- | --- | --- |
| 4 | | |

| 123 - Vehicle Factors |
| --- |
| 77 |

## Vehicle Owner

**VEH OWNER 01**

45 ☒ Vehicle Owner Same As Operator

| 46 - Vehicle Owner Last Name | 46 - First Name | 46 - Middle Initial | 46 - Suffix | Date Of Birth |
| --- | --- | --- | --- | --- |
| JOHNSON | DEBRIELLE | D | | ▮▮▮▮ |

| 46 - Company Name |
| --- |

| 47 - Address Street & Number | 47 - PO Box |
| --- | --- |
| 3112 N 38TH ST # 2 | |

| 48 - City | 48 - State | 48 - Zip Code | 49 - Telephone Number |
| --- | --- | --- | --- |
| MILWAUKEE | WI | 53216 | (414) 487-5500 EXT. |

## Insurance

**INS 01**

| 63 - Liability Insurance Company | 60 ☐ Policy Holder Same As Owner |
| --- | --- |
| NONE | |

| 61 - Policy Holder Last Name | 61 - Policy Holder First Name |
| --- | --- |
| | |

| 61 - Policy Holder Company |
| --- |

## School Bus

**BUS 01**

| Bus Travelling to/from ◯ To ◯ From | School Name | Body Make | Seating Capacity |
| --- | --- | --- | --- |
| School District Contracted With | | | |

## Operator/Pedestrian

| Unit Status | 81 - Most Harmful Event: Collision With | 23 - Dir Of Travel | 24 - Speed Limit |
| --- | --- | --- | --- |
| E | 01 | E | 30 |

| 36 - Operating as Classified | 37 - Endorsements | 35 ☐ Operating Commercial Motor Vehicle |
| --- | --- | --- |
| D | | |

| ▮▮▮ Driver License Number | 30 - State | 31 - Expiration Year | 34 - On Duty Accident |
| --- | --- | --- | --- |
| ▮▮▮▮▮▮ | WI | 2017 | P |

| 25 - Operator/Pedestrian Last Name | 25 - First Name | 25 - Middle Initial | 25 - Suffix |
| --- | --- | --- | --- |
| LEWANDOWSKI | SHANNON | | |

| 32 - Date Of Birth | 33 - Sex |
| --- | --- |
| ▮▮▮▮▮ | F |

## OPERATOR/PEDESTRIAN — 02

| 26 - Address Street & Number | | 26 - PO Box |
|---|---|---|
| 749 W STATE ST | | |

| 27 - City | 27 - State | 27 - Zip Code | 28 - Telephone Number |
|---|---|---|---|
| MILWAUKEE | WI | 53233 | (414) 935-7360 EXT. |

| 39 - Seat Position | 40 - Safety Equipment |
|---|---|
| 01 | 01 |

| 38 - Injury Severity | 41 - Airbag | 42 - Ejected | 44 |
|---|---|---|---|
| B | 01 | 02 | ☒ Medical Transport |

| 43 - Trapped/Extricated | 92 - Pedestrian Location | 92 - Pedestrian Action |
|---|---|---|
| 02 | | |

| 119 - What Driver Was Doing | 120 - Traffic Control | 62 - No. of Citations Issued |
|---|---|---|
| 01 | 02 | |

| 64 - 1st Statute No. | 64 - 2nd Statute No. | 64 - 3rd Statute No. | 64 - 4th Statute No. | 64 - 5th Statute No. |
|---|---|---|---|---|
| | | | | |

| 122 - Driver Factors |
|---|
| 77 |

| 88 - Driver or Pedestrian Cond | 89 - Substance Presence |
|---|---|
| 01 | 05 |

| 90 - Alcohol Test | 90 - Alcohol Content | 91 - Drug Test |
|---|---|---|
| 10 | | 14 |

| 91 - Drugs Reported |
|---|
| |

| 124 - Highway Factors |
|---|
| 77 |

## Vehicle

### VEHICLE 02

| 21 - Unit Type | Vehicle Type | 22 - Total Occupants |
|---|---|---|
| 1 | 02 | 2 |

| 56 - License Plate Number | 57 - Plate Type | 58 - State | 59 - Exp Year | 55 - Vehicle Identification Number |
|---|---|---|---|---|
| 280LPY | AUT | WI | 2020 | 2FAFP71W67X110523 |

| 50 - Year | 51 - Make | 52 - Model | 53 - Body Style | 54 - Color | 100 - Skidmarks to Impact (Ft) |
|---|---|---|---|---|---|
| 2007 | FORD | CROWN VIC | 4D | BLK | |

| 94 - Vehicle Damage |
|---|
| 01,02,08 |

| 95 - Extent Of Damage | 96 | 97 - Vehicle Removed By |
|---|---|---|
| 4 | ☒ Vehicle Towed Due To Damage | OWNER |

| 123 - Vehicle Factors |
|---|
| 77 |

## Vehicle Owner

### VEH OWNER 02

| 45 |
|---|
| ☐ Vehicle Owner Same As Operator |

| 46 - Vehicle Owner Last Name | 46 - First Name | 46 - Middle Initial | 46 - Suffix | Date Of Birth |
|---|---|---|---|---|
| | | | | |

| 46 - Company Name |
|---|
| CITY OF MILWAUKEE |

| 47- Address Street & Number | 47 - PO Box |
|---|---|
| 749 W STATE ST | |

| 48 - City | 48 - State | 48 - Zip Code | 49 - Telephone Number |
|---|---|---|---|
| MILWAUKEE | WI | 53202 | (414) 935-7233 EXT. |

## Insurance

| INS 02 | 63 - Liability Insurance Company<br>GOVERNMENT | | 60<br>☐ Policy Holder Same As Owner |
|---|---|---|---|
| | 61 - Policy Holder Last Name | 61 - Policy Holder First Name | |
| | 61 - Policy Holder Company | | |

### School Bus

| BUS 02 | Bus Travelling to/from<br>○ To ○ From | School Name | Body Make | Seating Capacity |
|---|---|---|---|---|
| | School District Contracted With | | | |

### Occupant

| | ☐ **Address Same As Operator** | | | |
|---|---|---|---|---|
| OCCUPANT 01 | 65 - Unit No<br>02 | 66 - Occupant Last Name<br>CARR | 66 - First Name<br>JUANITA | 66 - Middle Initial   66 - Suffix |
| | 68 - Address Street & Number<br>749 W STATE ST | | 68 - PO Box | |
| | 68 - City<br>MILWAUKEE | | 68 - State<br>WI | 68 - Zip Code<br>53233 |
| | 67 - Date of Birth<br>████████ | | 69 - Sex<br>F | |
| | 71 - Seat Position<br>03 | | | 72 - Safety Equipment<br>01 |
| | 70 - Injury Severity<br>B | 73 - Airbag<br>01 | 75 - Ejected<br>02 | 77<br>☒ Medical Transport |
| | 76 - Trapped/Extricated<br>02 | 78 - Agency Space | | |

### Diagram and Narrative

| DIAGRAM AND NARRATIVE | 105 - PHOTOS BY<br>FORENSIC INVESTIGATOR JAMES PETERSON |
|---|---|
| |  |

THIS REPORT IS WRITTEN BY P.O. SEAN AINES ASSIGNED TO DISTRICT #3, LATE SHIFT, SQUAD #3330 ALONG WITH P.O. WIETING. ON MONDAY JANUARY 19, 2015 AT 2:18 AM, I RESPONDED TO A TWO VEHICLE ACCIDENT AT THE INTERSECTION OF N. 35TH ST. AND W. NORTH AVE. VEHICLE #1, BEING OPERATED BY JOHNSON, DEBRIELLE D. (B/F ████████), WAS TRAVELING NORTHBOUND ON N. 35TH ST. VEHICLE #2, AN UNMARKED POLICE SQUAD BEING OPERATED BY LEWANDOWSKI, SHANNON (W/F ████████), WAS TRAVELING EASTBOUND ON W. NORTH AVE. WITH IT'S EMERGENCY LIGHTS ACTIVATED. AS BOTH VEHICLES WERE APPROACHING THE

**Wisconsin Motor Vehicle**
**Accident Report**
PK2011
MV4000e 01/2005

QQD1J1J

Page    5

INTERSECTION OF N. 35TH ST. AND W. NORTH AVE., VEHICLE #1 DISREGARDED A NORTHBOUND STOP LIGHT, CAUSING AN
ACCIDENT IN THE INTERSECTION. VEHICLE #1, AFTER STRIKING THE FRONT END OF VEHICLE #2, CONTINUED NORTHBOUND
STRIKING A CONCRETE PILLAR OF A BUSINESS ON THE NORTHEAST CORNER OF N. 35TH ST. AND W NORTH AVE WHERE IT CAME
TO A REST. VEHICLE #2, AFTER COLLIDING WITH VEHICLE #1, CONTINUED EASTBOUND AFTER SPINNING AROUND, COMING TO A
REST IN THE 3400 BLOCK OF W. NORTH AVE. LEWANDOWSKI AND FRONT PASSENGER OF VEHICLE #2, CARR, JUANITA          ),
BOTH WERE TRANSPORTED TO FROEDTERT HOSPITAL WITH COMPLAINTS OF SORENESS, SWELLING, AND BRUISES TO THEIR
BODIES. JOHNSON WAS TRANSPORTED TO FROEDTERT HOSPITAL AND TREATED FOR A FRACTURE TO HER VERTEBRAE.

## Witness

| | 107 - Witness Last Name PEREZ | 107 - First Name JUAN | 107 - Middle Initial R | |
|---|---|---|---|---|
| WITNESS 01 | 108 - Address Streeet & Number 2419 N 32ND ST #5 | | 108 - PO Box | 109 - Date of Birth ▮▮▮ |
| | 110 - City MILWAUKEE | State WI | 110 - Zip Code 53210 | 111 - Telephone Number (414) 326-8116 EXT. |

## Witness

| | 107 - Witness Last Name HERNANDEZ | 107 - First Name JASMIN | 107 - Middle Initial | |
|---|---|---|---|---|
| WITNESS 02 | 108 - Address Streeet & Number 211 FAIRVIEW AVE | | 108 - PO Box | 109 - Date of Birth ▮▮▮ |
| | 110 - City SOUTH MILWAUKEE | State WI | 110 - Zip Code 53172 | 111 - Telephone Number (414) 531-1674 EXT. |

## Witness

| | 107 - Witness Last Name OWENS | 107 - First Name DARRYL | 107 - Middle Initial | |
|---|---|---|---|---|
| WITNESS 03 | 108 - Address Streeet & Number 3511 W NORTH AVE | | 108 - PO Box | 109 - Date of Birth ▮▮▮ |
| | 110 - City MILWAUKEE | State WI | 110 - Zip Code 53208 | 111 - Telephone Number (414) 759-8229 EXT. |

## Officer Information

| | 125 - Officer Last Name AINES | 125 - First Name SEAN | 125 - Middle Initial | 131 - Officer ID 21475 |
|---|---|---|---|---|
| OFFICER INFORMATION | 129 - Law Enforcement Agency No. 33 | 130 - Law Enforcement Agency Name MILWAUKEE POLICE DEPARTMENT | | |
| | 126 - Law Enforcement Agency Address Street & Number 749 WEST STATE STREET | | | |
| | 127 - City MILWAUKEE | 127 - State WI | 127 - Zip Code 53233 | 128 - Telephone Number (414) 933-4444 EXT. |
| | 132 - Date Notified 01/19/2015 | 133 - Time Notified (Military Time) 0217 | 134 - Time Arrived (Military Time) 0219 | 135 - Date Of Report 01/19/2015 |
| | Agency Accident Number | Police Number | 19 - Special Study | |
| | 18 - AGENCY SPACE | | | |

Message From Terminal/Unit:  TIME     Operator:  TIME
Date/Time Sent:  19-JAN-2015 07:27:50
/0781 B758 CADTERM:H054   019453      WIMPD0000 DOT      119241      6 01/19/15 07:27 01 OF 01 Request: 2015-01-1
-07.27.50.000018 Type=CFL First=DEBRIELLE Middle=D
   Last=JOHNSON Sex=F DOB=█████████
DID/
NAM/JOHNSON, DEBRIELLE DOMINICK
STR/3112 N 38TH ST # 2
CITY/MILWAUKEE        ST/WI ZIP/53216 CT/MILWAUKEE
SEX/F RAC/BLACK      ████████ HGT/506 WGT/150 HAI/BRWN EYE/BRWN DONR/ N
AT= NON                    ISS=  EXP=  AT=
-------------------------------------------------------------------
:======>>> CONDENSED FORMAT / QUICK VIEW <<<======

No License Issued Status=SUS
Confidential ID Card Confidential Status=VAL Expires=07/07/2019
     Name on Card=JOHNSON DEBRIELLE DOMINICK

ADDRESS UPDATED=01/06/2015
FORMER: First=DEBRIELLE Middle=DOMINICK Last=JOHNSON Sex=F
     DOB=█████████  Notified=08/31/2010 DID█████████
FORMER: First=DEBRIELLE Middle=D Last=JOHNSON Sex=F  ███████████
     Notified=01/06/2015 DID=J5251649374701

01/27/2013 03/06/2013 GUILTY OWL
11/18/2013 01/15/2014 GUILTY FFS
03/18/2014           SUSPENDED 2 YEAR FPF
-------------------------------------------------------------------
:======>>> EXPANDED FORMAT / DETAILED VIEW <<<======

  PAGE   1 - MORE ...

Message From Terminal/Unit: TIME      Operator: TIME
Date/Time Sent: 19-JAN-2015 07:27:50
/0781 B758 CADTERM:H054   019453      WIMPD0000 DOT      119241      7 01/19/15 07:27 01 OF 01 ===>> JOHNSON, DEB
RIELLE DOMINICK Sex=F DOB=█████
ADDRESS UPDATED=01/06/2015
FORMER: First=DEBRIELLE Middle=DOMINICK Last=JOHNSON Sex=F
               █████Notified=08/31/2010 DII█████████
FORMER: First=DEBRIELLE Middle=D Last=JOHNSON Sex=F DOB=█████
       Notified=01/06/2015 DID=J5251649374701

No License Issued Status=SUS Primary=Y

** Confidential Product AND Confidential Status Next **
ID Card Status=VAL Issued=01/06/2015 Expires=07/07/2019 RealId=N
     Original=08/31/2010 Application Type=DUPLICATE Name on Card=JOHNSON
     DEBRIELLE DOMINICK

01/27/2013 03/06/2013 GUILTY OWL (OPERATING WITHOUT DRIVER LICENSE)
OWL                    343.05(3)(a) Points=03 Court=WAUKESHA CITY
                       MUNICIPAL COURT County=WAUKESHA Class=D
                       Citation #=S044613-2
11/18/2013 01/15/2014 GUILTY FFS (FAILURE TO FASTEN SEAT BELT)
FFS                    347.48(2m)(d) Points=00 Court=MENOMONEE FALLS
                       VILLAGE MUNICIPAL COURT County=WAUKESHA Non
                       Driving Citation #=S137914-0 See File #=S130943
03/18/2014            SUSPENDED 2 YEAR FPF (FAILURE TO PAY FORFEITURE)
FPF                    Case #=S130943 Court=MENOMONEE FALLS VILLAGE
                       MUNICIPAL COURT County=WAUKESHA Eligible For
                       Reinstatement=03/17/2016 Mailed=03/19/2014

End of Record  ( PAGE   2 - END)

Message From Terminal/Unit:   TIME      Operator:   TIME
Date/Time Sent:  19-JAN-2015 06:05:16
/0159 B758 CADTERM:H054   019453      WIMPD0000 DOT      100150      3 01/19/15 06:05 01 OF 01 INP   Input Request

INP1    Plate: 357WVX Type: AUT   01/19/2015 06.05 AM CT
INP2    Response 1 of 1

PLT   Plate Information:
PLT1    NBR: 357WVX / Type: AUT - AUTOMOBILE

REG   Registration Information:
REG1    Type: AUTO / Last Updated: 10/01/2014 at 11:14 AM
REG2    Status: SUSPENDED
REG3    Period: ANNUAL / Expires: 09/28/2015

INC   Incidents:
INC1    EMISSION SUSPENSION: SUSPEND

OWN   Owner Detail:
OWN1    1st: JOHNSON DEBRIELLE DOMINICK
OWN2    DOB: 0█████████ / DID: ████████████
OWN3a    3112 N 38TH ST # 2
OWN3d    MILWAUKEE WI 53216-3661

VEH   Vehicle Information:
VEH2    4A3AA46G52E032572 / AUTOMOBILE
VEH3    Year: 2002 / Make: MITSUBISHI
VEH4    Model: GALANT ES/LS / Style: 4DR SEDAN
VEH5    Color: WHITE / WHITE

TL   Title Information:
TL1    Title Number: S4343A3860013

LIN   Lien Detail:
LIN1    Secured party: 00040358
LIN2    WISCONSIN AUTO TITLE LOANS
LIN3a    1403 C MILLER PARK WAY
LIN3d    MILWAUKEE WI 53214-3649



### STATE OF WISCONSIN
### BLOOD / URINE ANALYSIS
### ALCOHOL / OTHER DRUGS
### WISCONSIN STATUTE 343.305(3)

**A. AGENCY INFORMATION**

Officer: P.O. Scott WIETING / PO Sean AINES
Agency: Milwaukee PD
Address: 2333 N 49th St
Milwaukee, WI, 53210

Agency Telephone: (414)935-7234

**B. SUBJECT INFORMATION**

Name: JOHNSON, Debrielle D
(Last, First, MI)
Address: 3112 N 38th St #2
Milwaukee WI, 53216

Date of Birth: ▮▮ ▮ Sex: ☐ M ☑ F

**C. OFFENSE INFORMATION**

Drivers License ▮▮▮▮ DL Issuing State: WI Citation No: S 4 6 7 9 3 1 - 2

Violation Date: 1-19-2015 Violation Time: 2:15 (A.M.) P.M.

Comments: Accident

Traffic Statute 346.63 (specify): (1)(a) ☐ (1)(b) ☐ (1)(am) ☐ (2)(a) ☒ (2m) ☐ Other Statute (specify): _____

**D. SPECIMEN COLLECTION**

Specimen Type: ☒ Blood ☐ Urine Collection Date: 1-19-15 Collection Time: 1351 (A.M.) P.M.

Specimen Collected by: ☐ Med. Tech. ☒ R.N. ☐ P.A. ☐ Physician ☐ Person acting under the direction of a Physician ☐ Officer

Name: (Print): Andrea Hoppe Signature: _____

**E. ANALYSIS REQUESTED FOR**

☒ Alcohol Only
☐ Alcohol & THC Only
☐ Alcohol & Cocaine Only
☐ Alcohol and Drug Panel

☐ Cancel Drug Testing
If BAC is over:
_____

Suspected Drugs: _____
_____
_____

**F. LABORATORY INFORMATION**

Specimen Received By: _____ Date: _____

Specimen Condition / Seal / Label / Comments: _____ Time: _____

**G. RESULT**

Date of Analysis: _____ Date Reported: _____ Analyst Cert. No. _____

Results of Analysis:

**Analysis Number**

Analyst Signature: _____

Reviewed by: _____
(Name and Title)

IC-1  04-05

34130

| Milwaukee Police Department | IN# 0000000000 | AC# 15001956 | *15u01956 |
|---|---|---|---|
| PROPERTY CONTROL SECTION **OFFICER DROP RECEIPT** | INV | Lab # | |
| | | | Drop Off Time 01/19/2015 09:02:05 AM |

| RESPONSIBLE WORK [33] - Dist #3Late | Other# | PAGE 1 |
|---|---|---|

| RESPONSIBLE OFFICER [021475] - PO Sean AINES | TYPE EVID |
|---|---|

**SUBMITTING OFFICER**
[021475] - PO Sean AINES

**CIRCUMSTANCES**

01/09/2014
OWI Accident
N. 35th St. and W. North Ave.
JOHNSON, Debrielle D. (b/f ███)

**PEOPLE**

| 1 | name Johnson, Debrielle D. | address 3112 N. 38th St. #2 Milwaukee, WI 53210 | Relationship(s): Prisoner Charge(s): Operating While Intoxicat |
|---|---|---|---|
| | phone (414) 487-5500 | date of birth ███ | |

**ITEMS**

| itm no | qty | ACE generated description | d r | i d | flags | user description |
|---|---|---|---|---|---|---|
| 1 | 1 | Y - Blood sample taken from OWI suspect *15001956___1 | | | | Blood sample taken from OWI suspect JOHNSON, Debrielle D. (b/f ███) |

| Approval Copy | | TOTAL ITEMS 1 |
|---|---|---|

DROP APPROVAL REQUIRES SIGNATURE OF DIST #3 DAYS WORK LOCATION SUPERVISING OFFICER

| Supervisor sign here: _____ Print name here    SGT Winfrid T FINKLEY | PS# MP59651 | Wrk Loc 31 | ☐ Approved |
|---|---|---|---|

| You Are Notified to Appear | | Date | Time | | Form No. and Version | | CITATION NO. |
|---|---|---|---|---|---|---|---|
| Appearance Required: | YES | JAN-20-2015 | 01:30 PM | | NV4017 0901 | | S467931 - 2 |

MILWAUKEE COUNTY CIRCUIT COURT
821 W STATE STREET  RM 221
MILWAUKEE, WI 53233

| Estimated Points | DEPOSIT | Cash - Card |
|---|---|---|
| 6 | $500.00 | N    N |

Court Use

**Defendant** (Last Name, First, Middle), Street Address, P.O. Box, City, State, Zip

| | Birth Date | Sex | Race |
|---|---|---|---|
| JOHNSON, DEBRIELLE D | ████ | F | B |

3112 N 38TH ST # 2
MILWAUKEE, WI 53216

| Telephone Number | HT | WT | Hair | Eyes |
|---|---|---|---|---|
| (414) 487-5500 EXT. | 506 | 150 lbs | BLK | BRO |

| Driver License/Identification Card Number | State | Exp. Yr. | OPERATING AS: |
|---|---|---|---|
| ████████ | WI | 2020 | DRIVER |

| License Plate Number | Plate Type | State | Exp. Yr. | Vehicle Class | Vehicle Endorsements |
|---|---|---|---|---|---|
| 357NVX | AUT | WI | 2015 | D | |

| Vehicle Identification Number | US DOT No. | Hazmat No. | Holds CDL | CDL Waiver |
|---|---|---|---|---|
| 4A3AA46G52E032572 | | | N | |

| Vehicle Year | Make | Type | Color |
|---|---|---|---|
| 2002 | MITS | 4D | WHI |

**Plaintiff**
CITY OF MILWAUKEE

| Ordinance Violated | | Adopting State Statute |
|---|---|---|
| CIRCUIT | | 346.63(2)(a)1 |

Violation Description
CAUSE INJURY/OPERATING WHILE INTOX.    BAC    Overweight

Agency Space

OFF GROUP 6, SHIFT HOURS 12AM-8AM,
ACCIDENT #QQD1J1J

| Week Day | Date | Time | Actual Speed | Legal | Over |
|---|---|---|---|---|---|
| MONDAY | JAN-19-2015 | 02:15 AM | | | |

| County | City/Village/Town |
|---|---|
| MILWAUKEE - 40 | MILWAUKEE - 57, CITY |

ON Hwy No. and/or Street Name
35TH ST N

Estimate Distance

From/AT Hwy No. and/or Street Name
NORTH AVE W

GPS Coordinates

Minor Passenger
N

| Officer Name | Zone: RR - Utility - School - Const | Accident Severity |
|---|---|---|
| OFCR SEAN AINES | N      N      N      N | INJURY |

| Officer ID | Department | Date Citation Served, | Method |
|---|---|---|---|
| 21475 | MILWAUKEE POLICE DEPARTMENT | JAN-19-2015 | IN PERSON |

**REPORT OF COURT DISPOSITION**

| Adjudicating Court | Adjudicating Court Code | Adjudication Date |
|---|---|---|

Judge Code

Amended Charge and Description

Speed amended to:

Adjudication:

Plea

Describe other Disposition/Comments

Vacate refusal

T331 9/2001 WDOT
s345.11 Wis. Stats

replicated copy of issued
**WISCONSIN UNIFORM CITATION**

If you have a disability and need help in court, please contact the above Clerk of Court's office.

| You Are Notified to Appear | Date | Time | | Form No. and Version | CITATION NO. |
|---|---|---|---|---|---|
| Appearance Required: **NO** | JAN-20-2015 | 01:30 PM | | MV4017   0901 | I100954 | 0 |

MILWAUKEE CITY MUNICIPAL COURT
951 N JAMES LOVELL ST
MILWAUKEE, WI 53233

Estimated Points | DEPOSIT | Cash - Card
3 | $114.00 | N   N

Court Use

**Defendant** (Last Name, First, Middle), Street Address, P.O. Box, City, State, Zip

JOHNSON, DEBRIELLE D

| Birth Date | Sex | Race |
|---|---|---|
| | F | B |

3112 N 38TH ST # 2
MILWAUKEE, WI 53216

| Telephone Number | HT | WT | Hair | Eyes |
|---|---|---|---|---|
| (414) 487-5500 EXT. | 506 | 150 lbs | BLK | BRO |

| Driver License/Identification Card Number | State | Exp. Yr. | OPERATING AS: |
|---|---|---|---|
| | WI | 2020 | DRIVER |

| License Plate Number | Plate Type | State | Exp. Yr. | Vehicle Class | Vehicle Endorsements |
|---|---|---|---|---|---|
| 357WVX | AUT | WI | 2015 | | |

| Vehicle Identification Number | US DOT No. | Hazmat No. | Holds CDL | CDL Waiver |
|---|---|---|---|---|
| 4A3AA46G52E032572 | | | N | |

| Vehicle Year | Make | Type | Color |
|---|---|---|---|
| 2002 | MITS | 4D | WHI |

**Plaintiff**
CITY OF MILWAUKEE

| Ordinance Violated | | Adopting State Statute |
|---|---|---|
| 101-1-2 | | 343.44(1)(a) |

Violation Description
OPERATING AFTER SUSPENSION | BAC | Overweight

Agency Space

| Week Day | Date | Time | Actual Speed | Legal | Over |
|---|---|---|---|---|---|
| MONDAY | JAN-19-2015 | 02:15 AM | | | |

| County | City/Village/Town |
|---|---|
| MILWAUKEE - 40 | MILWAUKEE - 57, CITY |

ON Hwy No. and/or Street Name | Estimate Distance
35TH ST N

From/AT Hwy No. and/or Street Name | GPS Coordinates
NORTH AVE W | Minor Passenger
N

| Officer Name | Zone: | RR - Utility - School - Const | Accident Severity |
|---|---|---|---|
| OFCR SEAN AINES | | N   N   N   N | INJURY |

| Officer ID | Department | Date Citation Served, | Method |
|---|---|---|---|
| 21475 | MILWAUKEE POLICE DEPARTMENT | JAN-19-2015 | IN PERSON |

## REPORT OF COURT DISPOSITION

| Adjudicating Court | Adjudicating Court Code | Adjudication Date |
|---|---|---|
| | | |

Judge Code

Amended Charge and Description | Speed amended to:

Adjudication: | Plea

Describe other Disposition/Comments | Vacate refusal



T331  9/2001  WDOT
s345.11  Wis. Stats

replicated copy of issued
WISCONSIN UNIFORM CITATION

If you have a disability and need help in court,
please contact the above Clerk of Court's office.

| You Are Notified to Appear | Date | Time | | Form No. and Version | | CITATION NO. | |
|---|---|---|---|---|---|---|---|
| Appearance Required: NO | JAN-20-2015 | 01:30 PM | | MV4017 0901 | | I100955 | 1 |

| | Estimated Points | DEPOSIT | Cash - Card |
|---|---|---|---|
| MILWAUKEE CITY MUNICIPAL COURT | 0 | $114.00 | N    N |
| 951 N JAMES LOVELL ST | | | |
| MILWAUKEE, WI 53233 | Court Use | | |

**Defendant** (Last Name, First, Middle), Street Address, P.O. Box, City, State, Zip

| | Birth Date | Sex | Race |
|---|---|---|---|
| JOHNSON, DEBRIELLE D | ▆▆▆▆ | F | B |

| 3112 N 38TH ST # 2 | Telephone Number | HT | WT | Hair | Eyes |
|---|---|---|---|---|---|
| MILWAUKEE, WI 53216 | (414) 487-5500 EXT. | 506 | 150 lbs | BLK | BRO |

| Driver License/Identification Card Number | State | Exp. Yr. | OPERATING AS: |
|---|---|---|---|
| ▆▆▆▆▆▆▆ | WI | 2020 | DRIVER |

| License Plate Number | Plate Type | State | Exp. Yr. | Vehicle Class | Vehicle Endorsements |
|---|---|---|---|---|---|
| 357WVX | AUT | WI | 2015 | D | |

| Vehicle Identification Number | US DOT No. | Hazmat No. | Holds CDL | CDL Waiver |
|---|---|---|---|---|
| 4A3AA46G52E032572 | | | N | |

| Vehicle Year | Make | Type | Color |
|---|---|---|---|
| 2002 | MITS | 4D | WHI |

| **Plaintiff** | Ordinance Violated | | Adopting State Statute |
|---|---|---|---|
| CITY OF MILWAUKEE | 101-1 | | 344.62(1) |

| Violation Description | | BAC | Overweight | Agency Space |
|---|---|---|---|---|
| OPERATE MOTOR VEHICLE W/O INSURANCE | | | | |

| Week Day | Date | Time | Actual Speed | Legal | Over | |
|---|---|---|---|---|---|---|
| MONDAY | JAN-19-2015 | 08:06 AM | | | | |

| County | City/Village/Town | |
|---|---|---|
| MILWAUKEE - 40 | MILWAUKEE - 57, CITY | |

| ON Hwy No. and/or Street Name | | Estimate Distance |
|---|---|---|
| 35TH ST N | | |

| From/AT Hwy No. and/or Street Name | | GPS Coordinates | Minor Passenger |
|---|---|---|---|
| NORTH AVE W | | - | N |

| Officer Name | Zone: RR - Utility - School - Const | Accident Severity |
|---|---|---|
| OFCR SEAN AINES | N    N    N    N    N | INJURY |

| Officer ID | Department | Date Citation Served, | Method |
|---|---|---|---|
| 21475 | MILWAUKEE POLICE DEPARTMENT | JAN-19-2015 | |

**REPORT OF COURT DISPOSITION**

| Adjudicating Court | Adjudicating Court Code | Adjudication Date |
|---|---|---|
| | | |
| | | Judge Code |

| Amended Charge and Description | Speed amended to: |
|---|---|

| Adjudication: | Plea |
|---|---|

| Describe other Disposition/Comments | Vacate refusal |
|---|---|



T331  9/2001  WDOT
s345.11 Wis. Stats

replicated copy of issued
**WISCONSIN UNIFORM CITATION**

If you have a disability and need help in court,
please contact the above Clerk of Court's office.

| You Are Notified to Appear | Date | Time | | Form No. and Version | | CITATION NO. | |
|---|---|---|---|---|---|---|---|
| Appearance Required: NO | JAN-20-2015 | 01:30 PM | | MV4017 0901 | | I100956 | 2 |

MILWAUKEE CITY MUNICIPAL COURT

951 N JAMES LOVELL ST
MILWAUKEE, WI 53233

| Estimated Points | DEPOSIT | Cash - Card |
|---|---|---|
| 0 | $88.80 | N    N |

Court Use

---

**Defendant** (Last Name, First, Middle), Street Address, P.O. Box, City, State, Zip

JOHNSON, DEBRIELLE D

| | | Birth Date | Sex | Race |
|---|---|---|---|---|
| | | ▉ | F | B |

3112 N 38TH ST # 2
MILWAUKEE, WI 53216

| | Telephone Number | HT | WT | Hair | Eyes |
|---|---|---|---|---|---|
| | (414) 487-5500 EXT. | 506 | 150 lbs | BLK | BRO |

| Driver License/Identification Card Number | State | Exp. Yr. | OPERATING AS: |
|---|---|---|---|
| ▉ | WI | 2020 | |

| License Plate Number | Plate Type | State | Exp. Yr. | Vehicle Class | Vehicle Endorsements |
|---|---|---|---|---|---|
| 357WVX | AUT | WI | 2015 | | |

| Vehicle Identification Number | US DOT No. | Hazmat No. | Holds CDL | CDL Waiver |
|---|---|---|---|---|
| 4A3AA46G52E032572 | | | | |

| Vehicle Year | Make | Type | Color |
|---|---|---|---|
| 2002 | MITS | 4D | WHI |

---

**Plaintiff**
CITY OF MILWAUKEE

| Ordinance Violated | Adopting State Statute |
|---|---|
| 101-1-2 | 341.03(1) |

**Violation Description**
OPERATE AFTER REV/SUSP OF REGISTRATION

| | BAC | Overweight | Agency Space |
|---|---|---|---|

| Week Day | Date | Time | Actual Speed | Legal | Over |
|---|---|---|---|---|---|
| MONDAY | JAN-19-2015 | 08:06 AM | | | |

| County | City/Village/Town |
|---|---|
| MILWAUKEE - 40 | MILWAUKEE - 57, CITY |

| ON Hwy No. and/or Street Name | | Estimate Distance |
|---|---|---|
| 35TH ST N | | |

| From/AT Hwy No. and/or Street Name | GPS Coordinates | |
|---|---|---|
| NORTH AVE W | | Minor Passenger |
| | | N |

| Officer Name | Zone: | RR - Utility - School - Const | Accident Severity |
|---|---|---|---|
| OFCR SEAN AINES | | N    N    N    N | INJURY |

| Officer ID | Department | Date Citation Served, | Method |
|---|---|---|---|
| 21475 | MILWAUKEE POLICE DEPARTMENT | JAN-19-2015 | |

---

**REPORT OF COURT DISPOSITION**

| Adjudicating Court | Adjudicating Court Code | Adjudication Date |
|---|---|---|
| | | |
| | | Judge Code |

Amended Charge and Description

Speed amended to:

Adjudication:

Plea

Describe other Disposition/Comments

Vacate refusal



T331  9/2001  WDOT
s345.11  Wis. Stats

replicated copy of issued
WISCONSIN UNIFORM CITATION

If you have a disability and need help in court, please contact the above Clerk of Court's office.

| You Are Notified to Appear | Date | Time | | Form No. and Version | CITATION NO. |
|---|---|---|---|---|---|
| Appearance Required: NO | JAN-20-2015 | 01:33 PM | | MV4017 0901 | I100957 - 3 |

MILWAUKEE CITY MUNICIPAL COURT
951 N JAMES LOVELL ST
MILWAUKEE, WI 53233

| | Estimated Points | DEPOSIT | Cash - Card |
|---|---|---|---|
| | 3 | $88.80 | N N |
| Court Use | | | |

**Defendant** (Last Name, First, Middle), Street Address, P.O. Box, City, State, Zip

| | Birth Date | Sex | Race |
|---|---|---|---|
| JOHNSON, DEBRIELLE D | ▇▇▇▇ | F | B |

3112 N 38TH ST # 2
MILWAUKEE, WI 53216

| Telephone Number | HT | WT | Hair | Eyes |
|---|---|---|---|---|
| (414) 487-5500 EXT. | 506 | 150 lbs | BLK | BRO |

| Driver License/Identification Card Number | State | Exp. Yr. | OPERATING AS: |
|---|---|---|---|
| ▇▇▇▇▇▇ | WI | 2020 | DRIVER |

| License Plate Number | Plate Type | State | Exp. Yr. | Vehicle Class | Vehicle Endorsements |
|---|---|---|---|---|---|
| 357WVX | AUT | WI | 2015 | D | |

| Vehicle Identification Number | US DOT No. | Hazmat No. | Holds CDL | CDL Waiver |
|---|---|---|---|---|
| 4A3AA46G52E032572 | | | N | |

| Vehicle Year | Make | Type | Color |
|---|---|---|---|
| 2002 | MITS | 4D | WHI |

**Plaintiff**
CITY OF MILWAUKEE

| Ordinance Violated | | Adopting State Statute |
|---|---|---|
| | | 346.37(1)(c)3 |

Violation Description
FAILURE TO OBEY SIGN OR SIGNAL

| | BAC | Overweight | Agency Space |
|---|---|---|---|

| Week Day | Date | Time | Actual Speed | Legal | Over |
|---|---|---|---|---|---|
| MONDAY | JAN-19-2015 | 08:07 AM | | | |

| County | City/Village/Town |
|---|---|
| MILWAUKEE - 40 | MILWAUKEE - 57, CITY |

ON Hwy No. and/or Street Name          Estimate Distance
35TH ST N

From/AT Hwy No. and/or Street Name     GPS Coordinates
NORTH AVE W                            -                      Minor Passenger
                                                              N

| Officer Name | Zone: RR - Utility - School - Const | Accident Severity |
|---|---|---|
| OFCR SEAN AINES | N N N N | INJURY |

| Officer ID | Department | Date Citation Served, | Method |
|---|---|---|---|
| 21475 | MILWAUKEE POLICE DEPARTMENT | JAN-19-2015 | IN PERSON |

**REPORT OF COURT DISPOSITION**

| Adjudicating Court | Adjudicating Court Code | Adjudication Date |
|---|---|---|
| | | |
| | | Judge Code |

Amended Charge and Description          Speed amended to:

Adjudication:                           Plea

Describe other Disposition/Comments     Vacate refusal



T331 9/2001 WDOT
s345.11 Wis. Stats

replicated copy of issued
WISCONSIN UNIFORM CITATION

If you have a disability and need help in court,
please contact the above Clerk of Court's office.

# MUNICIPAL COURT
# CITY OF MILWAUKEE

## COMPLAINT

| | |
|---|---|
| Case No.: 09130499 | Date of Birth: ▮ |
| Name: JOHNSON, DEBRIELLE DOMINIC | Sex: F   Race: B   Eyes: BRO |
| Address: 7123 W SILVER SPRING DR #3 | Hair: BRO   Ht: 5'05"   Wt: 150 |
| MILWAUKEE, WI 53218 | DL #: ▮ |
| Date of Violation: 09/15/09 | Telephone: 414-303-9363 |
| Court Date: 11/03/09 | Vehicle Plate: |
| Citation #: 65563680 | Vehicle Type: |
| Complainant: GUZMAN, ERICK M | Ordinance #: 106-1-1 |
| | Statute #: |

Violation: Disorderly Conduct

On behalf of the City of Milwaukee the complaint states that on the basis of personal knowledge or upon information and belief, the defendant violated the ordinance (resolution) in the City of Milwaukee, Milwaukee County.

## WARRANT

**THE STATE OF WISCONSIN, TO ANY LAW ENFORCEMENT OFFICER:**

The above complaint, the original of which is on file in the Office of the Clerk of the Clerk of the Municipal Court, is the basis for accusing the defendant of committing the described offense contrary to the Wisconsin State Statutes/ordinances of the City of Milwaukee.

On the basis of this complaint, I find probable cause that the defendant committed the offense. You are commanded to arrest the defendant and bring him/her before the Municipal Court.

01/19/2015
Date

Municipal Judge
City of Milwaukee

Bail Amount:   73.00
Bail Conditions:   None

I hereby certify that I have arrested the above-name defendant on

1- 19- 2015
Date

PO Scott Winty WIETING
Police Officer

RPT006 Rev: 05/13

www.municourt.milwaukee.gov

Ref: 09130499-04328722

# CERTIFICATION OF DELIVERY OF PRISONER

Defendant Name: JOHNSON, DEBRIELLE DOMINIC    DOB: ███████    MUNICIPAL CASE #: 09130499

TO: The Sheriff of Milwaukee County, or the Superintendent of the House of Correction

I hereby certify that I am:    ☒ A Peace Officer of the City of Milwaukee, District Stations # _3___

         ☐ A Deputy Sheriff of Milwaukee County

and that I took the defendant into custody on this commitment on the _19_ day of _January_, 20_15_, for delivery to you in accordance with the terms thereof.

Dated: _1-19-15_    Signature: _PO Scott Witz WIETING_    Title: _PO_    PeopleSoft #: _019453_

## SHERIFF/JAILOR CERTIFICATION ON COMMITMENT RETURN

TO: Chief Court Administrator of the Municipal Court of the City of Milwaukee

I hereby certify that I am the Sheriff or one of his deputies or jailors and that I did on the ___ day of _____, 20___, take the defendant into custody on this commitment and that the defendant was given credit for time served from the date of his/her arrest, whereupon he/she was then:

☐ Held at the Milwaukee County Jail Facility to satisfy the terms of this commitment.

☐ Transferred to the Milwaukee County House of Correction to satisfy the terms of this commitment;

Dated: _____    Signature: _____    Title: _____

## SHERIFF/JAILOR/SUPERINTENDENT CERTIFICATION ON COMMITMENT RETURN

TO: Chief Court Administrator of the Municipal Court of the City of Milwaukee

I hereby certify that I am:

☐ The Sheriff of Milwaukee County or one of his deputies or jailors

☐ The Superintendent of the House of Correction in and for Milwaukee County

and that I took the defendant into custody on this commitment on the ___ day of _____, 20___, and that the defendant was given credit for time served from the date of his/her arrest, whereupon he/she was then discharged by me for reason of his/her:

☐ Having paid to me the amount of the judgment herein, together with all costs and fees.

☐ Having been discharged by Order of the Municipal Court

☐ Having served his/her sentence herein in full from _____ to _____

Dated: _____    Signature: _____    Title: _____

## SHERIFF/JAILOR/SUPERINTENDENT CERTIFICATION ON WARRANT/RETURN OTHER THAN COMMITMENT

TO: Chief Court Administrator of the Municipal Court of the City of Milwaukee

I hereby certify that I am:

☐ The Sheriff of Milwaukee County or one of his deputies or jailors

☐ The Superintendent of the House of Correction in and for Milwaukee County

and that I took the defendant into custody on this commitment on the ___ day of _____, 20___, whereupon he/she was then discharged by me for reason of his/her:

☐ Having paid to me the amount of the judgment herein, together with all costs and fees.

☐ Having been discharged by Order of the Municipal Court

Dated: _____    Signature: _____    Title: _____

*Please retain one copy for your records and return a copy to the Municipal Court of the City of Milwaukee upon discharging the defendant in accordance with the terms of the Warrant or Commitment.*

STATE OF WISCONSIN           MUNICIPAL COURT           MILWAUKEE COUNTY
                             CITY OF MILWAUKEE

| COMPLAINT | |
|---|---|
| Case No.: 13080893 | Date of Birth: ▮ |
| Name: JOHNSON, DEBRIELLE DOMINIC | Sex: F    Race: B    Eyes: BRO |
| Address: 7123 W SILVER SPRING DR #3 | Hair: BRO    Ht: 5'05"    Wt: 150 |
| MILWAUKEE, WI 53218 | DL #: ▮ |
| Date of Violation: 08/12/13 | Telephone: 414-303-9363 |
| Court Date: 10/01/13 | Vehicle Plate: |
| Citation #: 48968011122 | Vehicle Type: |
| Complainant: BAAKE, LISA M | Ordinance #: 105-138-2 |
| | Statute #: |

Violation: Resisting / Obstructing Police Officer

On behalf of the City of Milwaukee the complaint states that on the basis of personal knowledge or upon information and belief, the defendant violated the ordinance (resolution) in the City of Milwaukee, Milwaukee County.

| WARRANT |
|---|

**THE STATE OF WISCONSIN, TO ANY LAW ENFORCEMENT OFFICER:**

The above complaint, the original of which is on file in the Office of the Clerk of the Clerk of the Municipal Court, is the basis for accusing the defendant of committing the described offense contrary to the Wisconsin State Statutes/ordinances of the City of Milwaukee.

On the basis of this complaint, I find probable cause that the defendant committed the offense. You are commanded to arrest the defendant and bring him/her before the Municipal Court.

01/19/2015
Date

Municipal Judge
City of Milwaukee

Bail Amount:      186.00
Bail Conditions:  None

I hereby certify that I have arrested the above-name defendant on

1 - 19 - 2015
Date

PO Scott White WIETING
Police Officer

Case 2:16-cv-01089-WED    Filed 04/22/19    Page 149 of 805    Document 80-21

# CERTIFICATION OF DELIVERY OF PRISONER

Defendant Name: JOHNSON, DEBRIELLE DOMINIC      DOB: ███      MUNICIPAL CASE #: 13080893

TO: The Sheriff of Milwaukee County, or the Superintendent of the House of Correction

I hereby certify that I am: ☒ A Peace Officer of the City of Milwaukee, District Stations # _3_

☐ A Deputy Sheriff of Milwaukee County

and that I took the defendant into custody on this commitment on the _19_ day of _January_ , 20 _15_ , for delivery to you in accordance with the terms thereof.

Dated: _1-19-15_      Signature: _PO Scott Witz WIETING_      Title: _PO_      PeopleSoft #: _019 452_

## SHERIFF/JAILOR CERTIFICATION ON COMMITMENT RETURN

TO: Chief Court Administrator of the Municipal Court of the City of Milwaukee

I hereby certify that I am the Sheriff or one of his deputies or jailors and that I did on the ___ day of _____, 20___; take the defendant into custody on this commitment and that the defendant was given credit for time served from the date of his/her arrest, whereupon he/she was then:

☐ Held at the Milwaukee County Jail Facility to satisfy the terms of this commitment.

☐ Transferred to the Milwaukee County House of Correction to satisfy the terms of this commitment;

Dated: _____      Signature: _____      Title: _____

## SHERIFF/JAILOR/SUPERINTENDENT CERTIFICATION ON COMMITMENT RETURN

TO: Chief Court Administrator of the Municipal Court of the City of Milwaukee

I hereby certify that I am:

☐ The Sheriff of Milwaukee County or one of his deputies or jailors

☐ The Superintendent of the House of Correction in and for Milwaukee County

and that I took the defendant into custody on this commitment on the ____ day of _____, 20___, and that the defendant was given credit for time served from the date of his/her arrest, whereupon he/she was then discharged by me for reason of his/her:

☐ Having paid to me the amount of the judgment herein, together with all costs and fees.

☐ Having been discharged by Order of the Municipal Court

☐ Having served his/her sentence herein in full from _____ to _____

Dated: _____      Signature: _____      Title: _____

## SHERIFF/JAILOR/SUPERINTENDENT CERTIFICATION ON WARRANT/RETURN OTHER THAN COMMITMENT

TO: Chief Court Administrator of the Municipal Court of the City of Milwaukee

I hereby certify that I am:

☐ The Sheriff of Milwaukee County or one of his deputies or jailors

☐ The Superintendent of the House of Correction in and for Milwaukee County

and that I took the defendant into custody on this commitment on the ____ day of _____, 20___, whereupon he/she was then discharged by me for reason of his/her:

☐ Having paid to me the amount of the judgment herein, together with all costs and fees.

☐ Having been discharged by Order of the Municipal Court

Dated: _____      Signature: _____      Title: _____

*Please retain one copy for your records and return a copy to the Municipal Court of the City of Milwaukee upon discharging the defendant in accordance with the terms of the Warrant or Commitment.*

# Incident Report
# MILWAUKEE POLICE DEPT

**150190017**

Supplement No
ORIG

2333 N. 49TH ST

Milwaukee,WI 53210

Reported Date
01/19/2015
Nature of Call
FLEE/TRAFF
Officer
AINES, SEAN M

(414)935-7502

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 150190017 | ORIG | 01/19/2015 | 02:17 | 150190259 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | FLEEING/TRAFFIC OFFENSES |

| Location | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|
| N 35TH ST/W NORTH AV | | MILWAUKEE | 53208 | 3642 |

| District | Squad | From Date | From Time | Officer | | |
|---|---|---|---|---|---|---|
| 3 | 330 | 01/19/2015 | 02:15 | 021475/AINES, SEAN M | | |

| Assignment | 2nd Officer | Assignment | Entered by |
|---|---|---|---|
| THIRD DISTRICT - LATE | WIETING, SCOTT R JR | THIRD DISTRICT - LATE | 021475 |

| Assignment | RMS Transfer | Property? | Approving Officer | Approval Date |
|---|---|---|---|---|
| THIRD DISTRICT - LATE | Successful | None | 010991 | 02/25/2015 |

| Approval Time |
|---|
| 14:31:56 |

| CASE STATUS |
|---|
| CLEARED |

| ARREST REPORT PA-45 | CRIME VICT RS FM PV-17 | INFORM ACCUSE SP 4197 |
|---|---|---|
| Yes | Yes | Yes |

| # Offenses | Offense | Description | Complaint Type | AC | Use | Bias | Loc |
|---|---|---|---|---|---|---|---|
| 1 | 346.63(2)(A)1 | Cause Inj by Intoxic | D | C N | | 88 | 13 |

| #Pr | MOE | Act | Weapon/Force | IBRS | No |
|---|---|---|---|---|---|
| | | | | 90D | 1 |

| Link | Involvement | Invl No | Name | Race | Sex |
|---|---|---|---|---|---|
| ARR | ARR | 1 | JOHNSON,DEBRILLE D | B | F |
| VIC | VIC | 1 | CARR,JUANITA | B | F |
| VIC | VIC | 2 | LEWANDOWSKI, SHANNON | W | F |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex |
|---|---|---|---|---|---|---|
| ARR | 1 | I | JOHNSON,DEBRILLE D | 3330268 | B | F |
| VIC | 1 | I | CARR,JUANITA | 2003532 | B | F |
| VIC | 2 | I | LEWANDOWSKI, SHANNON | 1781351 | W | F |

## Vehicle Summary

| Invl | Type | Plate No | State | Lic Year | Year | Make | Model | Style | Color |
|---|---|---|---|---|---|---|---|---|---|
| ACC | 1 | 280LPY | WI | 2007 | FORD | CVC | 4D | BRO |
| DUI | 1 | 357WVX | WI | 2015 | 2002 | MITS | GAL | 4D | WHI |

## Narrative

Known actor intentionally, and without consent, operated a motor vehicle (veh #1) while under the influence of alcohol. Known actor then disobeyed a traffic signal causing a two vehicle accident (MPD Accident #QQD1J1J) in which the passenger's of the other vehicle (veh #2) sustained injuries.

| Report Officer | Printed At | |
|---|---|---|
| 021475/AINES, SEAN M | 03/04/2015 19:24 | Page 1 of 4 |

## ARRESTEE 1: JOHNSON,DEBRILLE D

| Involvement | Invl No | Type | Name | | MNI |
|---|---|---|---|---|---|
| ARRESTEE | 1 | INDIVIDUAL | JOHNSON,DEBRILLE D | | 3330268 |

| Race | Sex | | Age | Ethnicity | Juvenile? |
|---|---|---|---|---|---|
| BLACK/AFRICAN AMERICAN | FEMALE | | 21 | NOT HISPANIC/LATINO | No |

| Height | Weight | Hair Color | Eye Color | Res Status | OFN_INVL | |
|---|---|---|---|---|---|---|
| 5'06" | 150# | BLACK | BROWN | RESIDENT | 1 | |

| Type | Address | City | State |
|---|---|---|---|
| HOME | 3112 N 38TH ST #2 | MILWAUKEE | WISCONSIN |

| ZIP Code |
|---|
| 53216 |

| Type | | OLS |
|---|---|---|
| DRIVERS LICENSE NUMBER | | WISCONSIN |

| Type | ID No |
|---|---|
| MPD ID# | 000518532 |

| Type | ID No |
|---|---|
| SOCIAL SECURITY NUMBER | |

| Phone Type | Phone No |
|---|---|
| CELL | (414)313-3360 |

| Alias Name | Race | Sex |
|---|---|---|
| JOHNSON,DEBRIELLE D | BLACK/AFRICAN AMERICAN | FEMALE |

| Employer/School | Position/Grade |
|---|---|
| NURSE | NURSE |

| Involvement | Arrest Type | Arrest Date | Arrest Time | Booking No | Book Date | Book Time |
|---|---|---|---|---|---|---|
| ARRESTED | ON-VIEW ARREST | 01/19/2015 | 02:30:00 | 1501097 | 01/19/2015 | 07:50:00 |

| Status | Arrest Location | City | Place of Birth |
|---|---|---|---|
| BOOKED | 3500 W NORTH AV | MILWAUKEE | WISCONSIN |

| City of Birth | Armed | Multi-Clear |
|---|---|---|
| MILWAUKEE | UNARMED | NOT APPLICABLE |

| Charge | Level | Charge Literal |
|---|---|---|
| 346.63(2)(A)1[5404MU] | M | Cause Inj by Intoxic |
| 101-1-2 | N | OPERATE AFTER SUSPEN |
| 101-1-2 | N | OPER W/O INSURANCE |
| 101-1-2 | N | VEHICLE REGISTRATION |
| 101-1-2 | N | DISREGARD OFF SIGNAL |
| 106-1 | N | Disorderly Conduct |

| Warrant No | Warrant ORI |
|---|---|
| 09130499 | WIMPD0000 |

| Charge | Level | Charge Literal |
|---|---|---|
| 105-138 | N | Resist/Obstruct Poli |

| Warrant No | Warrant ORI |
|---|---|
| 13080893 | WIMPD0000 |

This report was submitted by P.O. Scott WIETING, assigned to District 3, late shift.On Monday, January 19, 2015, I was assigned to Squad 3330 (along with P.O. Sean AINES). At approximately 2:18 A.M., we were dispatched to the intersection of N 35th St and W North Av, in the City and County of Milwaukee, regarding a traffic crash. Upon our arrival, I spoke with the driver of one of the vehicles involved. She identified herself as Debrielle D JOHNSON (B/F ███████). Our investigation revealed, JOHNSON was operating a motor vehicle in the 2300 block of N 35th St, inside the City and County of Milwaukee, Wisconsin, after consuming alcoholic beverages, which resulted in a traffic crash. The crash caused injuries to the occupants in the other vehicle involved (an Milwaukee Police unmarked vehicle, that was traveling with the emergency lights and sirens operating). A check of JOHNSON's DOT status revealed that her Wisconsin Driver's License was suspended. JOHNSON stated she did not have auto insurance on her vehicle. A DOT check also showed her vehicle's registration (Wisconsin Plate of 357WVX) was suspended. According to witnesses JOHNSON disregarded an official red traffic signal. A wanted check revealed that JOHNSON had two outstanding warrants (one for disorderly conduct and one for resisting/obstructing a police officer). JOHNSON was conveyed to Froedtert Hospital for medical treatment. After she was discharged, JOHNSON was conveyed to District 3 for booking and processing.

| Report Officer | Printed At | |
|---|---|---|
| 021475/AINES, SEAN M | 03/04/2015 19:24 | Page 2 of 4 |

# Incident Report
# MILWAUKEE POLICE DEPT

## VICTIM (PERSON) 1: CARR,JUANITA

| Involvement | Invl No | Type | Name | | MNI |
|---|---|---|---|---|---|
| VICTIM (PERSON) | 1 | INDIVIDUAL | CARR,JUANITA | | 2003532 |

| Race | Sex | | Age | Ethnicity | | Juvenile? |
|---|---|---|---|---|---|---|
| BLACK/AFRICAN AMERICAN | FEMALE | | 48 | NOT HISPANIC/LATINO | | No |

| Hair Color | Eye Color | Res Status |
|---|---|---|
| UNKNOWN OR COMPLETELY BALD | UNKNOWN | RESIDENT |

| Type | Address | | City |
|---|---|---|---|
| WORK/BUSINESS | 749 W STATE ST | | MILWAUKEE |

| State | ZIP Code |
|---|---|
| WISCONSIN | 53233 |

| Phone Type | Phone No |
|---|---|
| CELL | (414)935-7360 |

| VICTIM ORDERED IN TO DA | ORDER IN TO VIEW PHOTOS | WILL VICTIM PROSECUTE | VICTIM GAVE CONSENT | VIC INFORMED CRM PRV SRV |
|---|---|---|---|---|
| N | N | Y | N | Y |

| VIC REQ ADDL CRM PRV SRV |
|---|
| N |

### IBRS Info

| Victim Invl No | Offense Codes |
|---|---|
| 1 | 90D |

| Rel | Involvement | Invl No | Name | Race | Sex | |
|---|---|---|---|---|---|---|
| ST | ARR | 1 | JOHNSON,DEBRILLE D | B | F | |

## VICTIM (PERSON) 2: LEWANDOWSKI,SHANNON

| Involvement | Invl No | Type | Name | | MNI |
|---|---|---|---|---|---|
| VICTIM (PERSON) | 2 | INDIVIDUAL | LEWANDOWSKI,SHANNON | | 1781351 |

| Race | Sex | | Age | Ethnicity | Juvenile? |
|---|---|---|---|---|---|
| WHITE | FEMALE | | 48 | NOT HISPANIC/LATINO | No |

| Hair Color | Eye Color | Res Status |
|---|---|---|
| UNKNOWN OR COMPLETELY BALD | UNKNOWN | RESIDENT |

| Type | Address | City |
|---|---|---|
| WORK/BUSINESS | 749 W STATE ST | MILWAUKEE |

| State | ZIP Code |
|---|---|
| WISCONSIN | 53233 |

| Phone Type | Phone No |
|---|---|
| CELL | (414)935-7360 |

| VICTIM ORDERED IN TO DA | ORDER IN TO VIEW PHOTOS | WILL VICTIM PROSECUTE | VICTIM GAVE CONSENT | VIC INFORMED CRM PRV SRV |
|---|---|---|---|---|
| N | N | Y | N | Y |

| VIC REQ ADDL CRM PRV SRV |
|---|
| N |

### IBRS Info

| Victim Invl No | Offense Codes |
|---|---|
| 2 | 90D |

| Rel | Involvement | Invl No | Name | Race | Sex | |
|---|---|---|---|---|---|---|
| ST | ARR | 1 | JOHNSON,DEBRILLE D | B | F | |

## Vehicle: 280LPY

| Involvement | Type | Plate No | State | Lic Type | Year | Make | Model |
|---|---|---|---|---|---|---|---|
| TRAFFIC ACCIDENT | AUTO | 280LPY | WISCONSIN | PASSENGER CAR | 2007 | Ford | CVC |

| Style | Color | VIN |
|---|---|---|
| 4 DOOR | BROWN | 2FAFP71W67Z110523 |

| Link | Involvement | Invl No | Name | Race | Sex |
|---|---|---|---|---|---|
| OTH | ARR | 1 | JOHNSON,DEBRILLE D | B | F |
| DRV | VIC | 1 | CARR,JUANITA | B | F |
| PAS | VIC | 2 | LEWANDOWSKI,SHANNON | W | F |

## Vehicle: 357WVX

| Involvement | Type | Plate No | State | Lic Year | Lic Type | Year |
|---|---|---|---|---|---|---|
| VEHICLE INVOLVED IN DUI | AUTO | 357WVX | WISCONSIN | 2015 | PASSENGER CAR | 2002 |

| Make | Model | Style | Color | VIN | Storage |
|---|---|---|---|---|---|
| Mitsubishi | GAL | 4 DOOR | WHITE | 4A3AA46G52E032572 | CITY TOW LOT |

| Link | Involvement | Invl No | Name | Race | Sex |
|---|---|---|---|---|---|
| DRV | ARR | 1 | JOHNSON,DEBRILLE D | B | F |
| OTH | VIC | 1 | CARR,JUANITA | B | F |

| Report Officer | Printed At | |
|---|---|---|
| 021475/AINES, SEAN M | 03/04/2015 19:24 | Page 3 of 4 |

# Incident Report
# MILWAUKEE POLICE DEPT

**150190017**

## Vehicle: 357WVX

| Link | Involvement | Invl No | Name | | Race | Sex | |
|------|-------------|---------|------|--|------|-----|--|
| OTH | VIC | 2 | LEWANDOWSKI, SHANNON | | W | F | |

## Modus Operandi

| Gang Act? | Gang Name | Person/Prop Attacked | Physical Evidence |
|-----------|-----------|----------------------|-------------------|
| No | NONE | OTHER | BLOOD/GLASS FRAGMENTS/PHOTOS |

| Weapon Used |
|-------------|
| NONE |

| Suspect Action |
|----------------|
| HAD BEEN DRINKING |

| Crime Code(s) |
|---------------|
| ALL OTHERS |

## Supplement

This report was submitted by P.O. Scott WIETING, assigned to District 3, late shift.

On Monday, January 19, 2015, I was assigned to Squad 3330 (along with P.O. Sean AINES). At approximately 2:18 A.M., we were dispatched to investigate a crash. One of the vehicles involved was an unmarked Milwaukee Police Department Squad.

Upon arrival I observed a female, later identified as JOHNSON, sitting in the 3400 block of W North Av, in the Eastbound lane. I ran over and asked her if she was ok. JOHNSON stated she was; however, she had a bump in the center of her forehead, which had a small laceration on it. JOHNSON was slurring her speech and stated that she had been drinking prior to the accident.

JOHNSON's eye appeared to be glassy and bloodshot. Originally JOHNSON stated that she had been the only person in the other vehicle involved in the accident. I observed JOHNSON was wearing shorts, a short sleeved shirt, and had only one shoe on. JOHNSON stated that she was cold, so I put her inside of our Squad car, uncuffed, where it was warm.

I observed JOHNSON's vehicle (2002 Mitsubishi Galant) facing Northbound in the 3400 block of W North Av. The vehicle had crashed into a cement pillar of the business located on the Northeast corner of the intersection at N 35th St and W North Av. I then observed JOHNSON's missing shoe on the floor of her vehicle in front of the driver's seat.

JOHNSON was evaluated by Milwaukee Fire Department members. JOHNSON began to complain of pain and began to cry. Due to JOHNSON's complaints, as well as, the severity of the damage on her vehicle, JOHNSON was taken to the Froedtert Hospital by Milwaukee Fire Department, Med Unit 7, Red shift, L.T. MILLER.

Due to the transport of JOHNSON to the hospital and physcial inability for JOHNSON to complete the SFST's, I did not conduct them.

Once we arrived at Froedtert Hospital (9200 W Wisconsin Av, ph# 805-6717), JOHNSON was taken to the Trauma Bay to be treated. JOHNSON was admitted by Dr. Carrie PACE at 2:58 A.M. JOHNSON was given an IV for her medical care. After the medical personnel concluded their initial treatment and questions, I read JOHNSON the "Informing the Accused" form. JOHNSON stated that she would consent to a blood draw for testing. R.N. Andrea HOPPE conducted the blood draw at 3:54 A.M.

JOHNSON initially stated she had been the driver of the vehicle and the only occupant of the vehicle at the time of the crash. As the night progressed JOHNSON would change her story and stated she was in the rear seat on the passenger side, and then the front passenger seat.

P.O. Brandy JOHNSON relieved me at Froedtert, in order for P.O. AINES and I to return to District 3 to finish the paperwork regarding this incident.

The crash was filed under QQD1J1J.

This case was cleared by arrest and is to be reviewed by the District Attorney on 01/20/2015 at 8:30 AM.

| Report Officer | Printed At | |
|----------------|------------|--|
| 021475/AINES, SEAN M | 03/04/2015 19:24 | Page 4 of 4 |

# Incident Report
# MILWAUKEE POLICE DEPT

**150190017** Supplement No 0001

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
01/19/2015
Nature of Call
FLEE/TRAFF
Officer
WOODEN,KENYATTE R

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 150190017 | 0001 | 01/19/2015 | 02:17 | 150190259 |

| Status | Nature of Call | | | | | |
|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | FLEEING/TRAFFIC OFFENSES | | | | | |

| Location | | | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|
| 3500 W NORTH AV | | | | MILWAUKEE | 53208 | 3541 |

| District | Squad | From Date | From Time | Officer | | |
|---|---|---|---|---|---|---|
| 3 | 330 | 01/19/2015 | 02:15 | 011351/WOODEN,KENYATTE R | | |

| Assignment | | | Entered by | Assignment | |
|---|---|---|---|---|---|
| CENTRAL INVESTIGATIONS DIVISION | | | 011351 | CENTRAL INVESTIGATIONS DIVISION | |

| RMS Transfer | Property? | Approving Officer | Approval Date |
|---|---|---|---|
| Supplement Transfer Complete | None | 019162 | 01/28/2015 |

| Approval Time | | | |
|---|---|---|---|
| 08:33:00 | | | |

## WITNESS (WITH INFORMATION) 1: HERNANDEZ,JASMIN

| Involvement | | Invl No | Type | Name | |
|---|---|---|---|---|---|
| WITNESS (WITH INFORMATION) | | 1 | INDIVIDUAL | HERNANDEZ,JASMIN | |

| MNI | Race | Sex | | Age | Ethnicity | Juvenile? | Res Status |
|---|---|---|---|---|---|---|---|
| 2911045 | WHITE | FEMALE | | 25 | HISPANIC/LATINO | No | NON RESIDENT |

| RMS Transfer | | | | | | | |
|---|---|---|---|---|---|---|---|
| Successful | | | | | | | |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 520 W RIVERWOOD DR | | OAK CREEK | WISCONSIN |

| ZIP Code | | | | |
|---|---|---|---|---|
| 53154 | | | | |

| Phone Type | Phone No | | | |
|---|---|---|---|---|
| CELL | (414)531-1674 | | | |

## WITNESS (WITH INFORMATION) 2: GARIVAY,JAVIER M

| Involvement | | Invl No | Type | Name | |
|---|---|---|---|---|---|
| WITNESS (WITH INFORMATION) | | 2 | INDIVIDUAL | GARIVAY,JAVIER M | |

| MNI | Race | Sex | | Age | Ethnicity | Juvenile? | Res Status | RMS Transfer |
|---|---|---|---|---|---|---|---|---|
| 3487278 | WHITE | MALE | | 43 | HISPANIC/LATINO | No | RESIDENT | Successful |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 2419 N 52ND ST | | MILWAUKEE | WISCONSIN |

| ZIP Code | | | | |
|---|---|---|---|---|
| 53210 | | | | |

| Phone Type | Phone No | | | |
|---|---|---|---|---|
| CELL | (414)336-0947 | | | |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) | |
|---|---|---|---|
| No | NONE | ALL OTHERS | |

## Supplement

This report is being written by Detective Kenyatte WOODEN, assigned to the CIB, Central Investigations Division.

On Monday, January 18, 2015, I was assigned by Lt. Sean HANLEY, to assist with an PI accident which occurred at 3500 W. North Ave. regarding an unmarked squad which was struck by another vehicle. The occupants of the unmarked squad were two on-duty Police Detectives. I was assigned to speak to citizen witnesses regarding this accident.

### INTERVIEW of Jasmin HERNANDEZ

I spoke with Jasmine HERNANDEZ, H/F ____ 520 W. Riverwood Dr., Oak Creek, WI, 53154

| Report Officer | Printed At | |
|---|---|---|
| 011351/WOODEN,KENYATTE R | 03/04/2015 19:24 | Page 1 of 3 |

## Supplement

(531-1674). HERNANDEZ stated that she was the front passenger of her vehicle which was being driven by her boyfriend, Juan PEREZ.

HERNANDEZ stated that they were traveling westbound on W. North Ave. from the 3400 block. HERNANDEZ stated that they had a green light as they were traveling westbound. HERNANDEZ stated that she had observed an unmarked police squad car traveling eastbound on W. North Ave. from the 3600 block approaching N. 35th St., in the opposite direction as they were going.

HERNANDEZ stated that she knew that the car traveling eastbound was a police car because she could see the flashing red and blue lights as the vehicle was approaching them in their direction. HERNANDEZ stated that she did not hear the audible siren of the vehicle because she was listening to music inside of her vehicle. HERNANDEZ stated that her boyfriend PEREZ, had also observed the flashing red and blue lights and start the pullover to the curb, when the squad was approaching.

HERNANDEZ stated that she believes that the unmarked squad car was traveling approximately 30-35mph, as it was approaching the intersection. HERNANDEZ stated that as the unmarked squad approached the intersection a white vehicle collided with the unmarked squad car. HERNANDEZ stated that the white vehicle was traveling northbound on N. 35th St. HERNANDEZ stated that she believes the white vehicle was traveling approximately 40-45mph, when the vehicles collided.

HERNANDEZ stated that the squad car has spun around in the eastbound lane of W. North Ave., and then started to go back east. HERNANDEZ stated that the squad then started turning into their lane in a north direction almost striking her vehicle. HERNANDEZ stated that she had observed that the white vehicle had collided with a business on the North East corner of W. North Ave. and N. 35th St.

HERNANDEZ stated that she and her boyfriend PEREZ got out of her vehicle and went to assist the Detectives who were just involved in accident. HERNANDEZ stated that she went to the passenger side portion of the vehicle where she assisted a B/F, Detective to the north sidewalk a W. North Ave. HERNANDEZ stated that her boyfriend, PEREZ along with two unknown black male citizens went and helped remove the driver of the squad car to the south sidewalk of W. North Av.

HERNANDEZ stated that she had heard the W/F, Detective on her phone stating something that she needed to get her son from the UWM Police Department, when she was sitting on the sidewalk. HERNANDEZ stated that the whole incident occurred very quickly and did not observe where the two B/M citizens went to after they helped out.

HERNANDEZ stated that she remained with the B/F, Detective until the medical attention arrived on the scene. HERNANDEZ stated that there were some unknown citizens who assisted the driver of the white vehicle also. HERNANDEZ stated that she then observed her boyfriend's uncle, Javier M. GARIVAY, H/M ▮▮▮▮▮▮

HERNANDEZ stated that GARIVAY had followed them from a party they had just left. HERNANDEZ stated that GARIVAY had helped her remove the passenger of the unmarked squad to safety onto the North sidewalk, of W. North Ave.

HERNANDEZ stated that she was confident that the light was green for east and west traffic and that they had the right of way. She stated that the driver in the white vehicle went through the stop light, which caused the accident. HERNANDEZ could not provide no further information.

INTERVIEW of Javier GARIVAY

I spoke with Javier M. GARIVAY, H/M, ▮▮▮▮▮ of 2419 N. 52nd St. (336-0947). GARIVAY stated that he was following, his nephew, Juan PEREZ and his girlfriend, Jasmin HERNANDEZ. GARIVAY stated that they all were leaving a family member's house.

GARIVAY you stated that he left a few minutes later then HERNANDEZ and PEREZ. GARIVAY stated that he was traveling westbound on W. North Ave. towards N. 35th St. He stated that as he made it to the 3400 block, he saw an unmarked police squad which he thought was originally about to do a U-turn, based on how the vehicle was positioned in traffic.

| Report Officer | Printed At | |
|---|---|---|
| 011351/WOODEN,KENYATTE R | 03/04/2015 19:24 | Page 2 of 3 |

# Incident Report
# MILWAUKEE POLICE DEPT

**150190017**

## Supplement

GARIVAY stated that as he got closer to the vehicle he observed that the vehicle was smoking. GARIVAY stated that he then proceeded with his nephew's girlfriend, HERNANDEZ, to assist the Detectives by opening the passenger door of the vehicle, and helping the B/F, Detective out of the vehicle. GARIVAY stated that there were two unknown black males helping his nephew assist the Detective who was driving to safety.

GARIVAY stated that he did not know the black males who helped. He could only provide a very brief description of the subjects. He stated that one of the males was wearing a black jacket and that the second male was wearing a red jacket. GARIVAY could not provide any further descriptions of these subjects.

GARIVAY stated that he did not witness the accident because he was a few minutes behind, and when he arrived the vehicles had already collided with one another. GARIVAY could not provide any further information regarding this incident.

Detective Troy JOHNSON interviewed GARIVAY's nephew, Juan PEREZ and another citizen. Please see Detective JOHNSON's report regarding.

End of report.

| Report Officer | Printed At | |
|---|---|---|
| 011351/WOODEN,KENYATTE R | 03/04/2015 19:24 | Page 3 of 3 |

# Incident Report
# MILWAUKEE POLICE DEPT

**150190017**

Supplement No
0002

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
01/19/2015
Nature of Call
FLEE/TRAFF
Officer
JOHNSON,TROY P

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 150190017 | 0002 | 01/19/2015 | 06:25 | 150190259 |

| Status | Nature of Call | | | | | |
|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | FLEEING/TRAFFIC OFFENSES | | | | | |

| Location | | | City | Rep Dist | District | Squad |
|---|---|---|---|---|---|---|
| N 35TH ST/W NORTH AV | | | MILWAUKEE | 3642 | 3 | 330 |

| From Date | From Time | Officer | | | | |
|---|---|---|---|---|---|---|
| 01/19/2015 | 02:15 | 017794/JOHNSON,TROY P | | | | |

| Assignment | | Entered by | Assignment | | | |
|---|---|---|---|---|---|---|
| CENTRAL INVESTIGATIONS DIVISION | | 017794 | CENTRAL INVESTIGATIONS DIVISION | | | |

| RMS Transfer | Property? | Approving Officer | Approval Date |
|---|---|---|---|
| Supplement Transfer Complete | None | 010991 | 02/02/2015 |

| Approval Time | | | |
|---|---|---|---|
| 10:04:23 | | | |

## INTERVIEW 1: PEREZ,JUAN R

| Involvement | Invl No | Type | Name | | MNI | Race |
|---|---|---|---|---|---|---|
| INTERVIEW | 1 | INDIVIDUAL | PEREZ,JUAN R | | 2454075 | WHITE |

| Sex | | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color | Res Status |
|---|---|---|---|---|---|---|---|---|---|
| MALE | | 30 | HISPANIC/LATINO | No | 5'05" | 135# | BLACK | BROWN | RESIDENT |

| RMS Transf | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Successful | | | | | | | | | |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 2419 N 52ND ST | | MILWAUKEE | WISCONSIN |

| ZIP Code | | | | |
|---|---|---|---|---|
| 53210 | | | | |

| Phone Type | Phone No | | | |
|---|---|---|---|---|
| CELL | (414)326-8116 | | | |

## INTERVIEW 2: PEREZ,RICARDO

| Involvement | Invl No | Type | Name | | MNI | Race |
|---|---|---|---|---|---|---|
| INTERVIEW | 2 | INDIVIDUAL | PEREZ,RICARDO | | 3484463 | WHITE |

| Sex | | Age | Ethnicity | Juvenile? | Res Status | RMS Transfer |
|---|---|---|---|---|---|---|
| MALE | | 32 | HISPANIC/LATINO | No | RESIDENT | Successful |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 2419 N 52ND ST | | MILWAUKEE | WISCONSIN |

| ZIP Code | | | | |
|---|---|---|---|---|
| 53210 | | | | |

| Phone Type | Phone No | | | |
|---|---|---|---|---|
| CELL | (931)217-5301 | | | |

## Supplement

This report was written by Detective Troy JOHNSON assigned to the Central Investigations Division, late power shift, squad # 9271.

    On Thursday January 14, 2014, at 2:48A.M. I was instructed by Lt. Shawn HANLEY to respond to a PI accident (officer/Detective involved) at the intersection of N 35th And W North Ave. Upon arrival, I interviewed the following individuals /witness's

### INTERVIEW OF JUAN R PEREZ, H/M,

JUAN stated he was driving his girlfriend Jasmine FERNANDEZ car traveling westbound on W. North Ave. JUAN further stated, just as they were approaching the intersection of N. 35th St. and W. North Ave., they observed an unmarked detective car with the red and blue lights flashing traveling eastbound. JUAN stated he did not hear a siren because he had his music up loud. JUAN stated he immediately pulled his vehicle over to the right so that the detective's vehicle could have the right-of-way. He further stated that the detective's vehicle did have the

| Report Officer | Printed At | |
|---|---|---|
| 017794/JOHNSON,TROY P | 03/04/2015 19:24 | Page 1 of 2 |

**Supplement**

green light, when he also observed a white colored vehicle (possibly a Mitsubishi) speeding trying to make it through the intersection at which time it appeared they had the red light.

JUAN continued to state, all of a sudden he saw the two vehicles collide, and all he saw was the impact and debris flying everywhere. JUAN stated the detective's car spent around the circle then begin to roll backwards towards his vehicle, almost colliding into his vehicle, but then came to a rest about 20 feet away from his vehicle. JUAN stated he immediately exited his vehicle and ran over to the detective's car, approaching the passenger side.

JUAN continued to state he heard the driver of the vehicle yelling," My leg is hurt, my leg is hurt that I cant open my door!" JUAN stated he immediately ran around to the driver side of the vehicle and pulled on the driver side door, but the door was stuck shut. JUAN continued to state once he got driver-side door open, the driver attempted to exit the vehicle but then fell down to the ground. JUAN stated he annd a unknown person picked the driver of the vehicle up off the ground and took her over to the sidewalk located at the south east side of the street.

JUAN continued to state, as he was taking the driver over to the southeast side of the street, the driver of the vehicle was asking if the passengers of the other vehicle involved in the accident were okay and the driver of the vehicle asked asked if he could call to make sure her son was ok, at which time he did. JUAN stated after making sure the detective driver was okay, he walked towards the white Mitsubishi, at which time he observed unknown males carrying the driver of the Mitsubishi over to the southeast side of the sidewalk as well. JUAN stated he looked down on the ground just east of the white Mitsubishi vehicle, which was positioned near the light pole and fire hydrant on the North East side of the street near the corner.

JUAN stated while he was standing near the Mitsubishi looking down, he heard a cell phone ringing approximately 5 feet east of that same vehicle. JUAN stated he picked up the cell phone and walked back across the street. JUAN stated he asked the driver of the white Mitsubishi if the cell phone belonged her, at which time she stated yes. JUAN stated he handed the cell phone over to the driver of the white Mitsubishi. JUAN stated he does not know who called 911, but he wanted to make sure that all of the people were out of the vehicles because the detective's car was leaking fluids and was smoking.

I furthered my investigation by speaking with a second individual:

**INTERVIEW OF RICARDO H PEREZ, H/M,** ▮▮▮▮▮

RICARDO stated he was the front passenger in his uncle's vehicle and they were trailing his brother JUAN at the time of the collision. RICARDO stated he observed the detective squad car spin around into a circle and told his uncle Javier GARIVARY to stop the vehicle. RICARDO stated he jumped out of the green Volkswagen and observed fluids coming from the detective's car.

RICARDO stated he ran over to the detective's vehicle and helped get the driver out of the car and took her over to the southeast side of the street. RICARDO continued to state he stayed with the driver for while and made sure she was okay asking questions like, is there anything broken or do you need anything? RICARDO stated he stayed with the driver the entire time until MFD arrived on scene at which time he told MFD would heed saw and what aid he had rendered.

| Report Officer | Printed At | |
|---|---|---|
| 017794/JOHNSON,TROY P | 03/04/2015 19:24 | Page 2 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

**150190017**  
Supplement No 0003

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date  
01/19/2015  
Nature of Call  
FLEE/TRAFF  
Officer  
WILKERSON, MICHAEL W

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 150190017 | 0003 | 01/19/2015 | 14:28 | 150190259 |

| Status | | Nature of Call | | | | |
|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | | FLEEING/TRAFFIC OFFENSES | | | | |

| Location | | | City | | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|
| N 35TH ST/W NORTH AV | | | MILWAUKEE | | 53208 | 3642 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 3 | 330 | 01/19/2015 | 02:15 | 007042/WILKERSON, MICHAEL W |

| Assignment | 2nd Officer | Assignment |
|---|---|---|
| CENTRAL INVESTIGATIONS DIVISION | WIETING, SCOTT R JR | THIRD DISTRICT - LATE |

| Entered by | Assignment | RMS Transfer | Property? |
|---|---|---|---|
| 007042 | CENTRAL INVESTIGATIONS DIVISION | Supplement Transfer Complete | None |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 010991 | 02/02/2015 | 10:06:29 |

## WITNESS (WITH INFORMATION) 1: JOHNSON,DEBRIELLE D

| Involvement | | Invl No | Type | Name | | | |
|---|---|---|---|---|---|---|---|
| WITNESS (WITH INFORMATION) | | 1 | INDIVIDUAL | JOHNSON,DEBRIELLE D | | | |

| MNI | Race | Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color |
|---|---|---|---|---|---|---|---|---|
| 3330268 | BLACK/AFRICAN AMERICAN | FEMALE | | 21 | No | 5'05" | 150# | BROWN |

| Eye Color | RMS Transfer |
|---|---|
| BROWN | Successful |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | ALL OTHERS |

## Supplement

This report is written by Detective Michael WILKERSON, currently assigned to the Criminal Investigation Bureau dayshift.

On Monday 19, 2015 I, Det. WILKERSON was assigned followup regarding the above listed incident.The specific followup was to interview Debrielle D JOHNSON, B/F▮▮▮▮▮▮▮▮ who was in custody at Distrit# 3. I escorted JOHNSON from her cell to interview room. I advised JOHNSON of her Miranda Warnings from a State of Wisconsin Department of Justice Cnstitutional rights car. JOHNSON related to me she understood her rights and agreed to speak with me.

JOHNSON stated on Sunday, January 18, 2015, she had gone out with her friend, Joevena PORTER, black female 22-23, 5'4", 130 pounds, light complexion, and a ponytail.
JOHNSON indicated she has known Joevena for approximately 10 years. She related Joevena is a friend who lived in her neighborhood when they lived in the area of 36 and Villard. JOHNSON indicated she considers Joevena a close friend and a member of the family.

JOHNSON let Joevena drive her car, 2002 Mitsubishi Galant, to JYNX Club, in the area of fifth and national, (715 S. 5th street). JOHNSON indicated the car has been having brake problems and she has been adding a can of brake fluid to the car to get the brakes to work properly. JOHNSON indicated they got to the club at approximately 11 PM. JOHNSON indicated she had one glass of wine and two sips of a mixed alcohol drink belonging to Joevena.

JOHNSON related she and Joevena ran into Kevin and Marcus. Kevin was a friend she knew from high school. JOHNSON described Kevin as 21 to 22 years of age, 6 foot two, shorthair, slim build, 180 pounds, medium complexion, wearing a gray Nike jogging suit and a white Nike shoes.

Johnson related she and Kevin had a brief conversation in the club and that his friend Marcus was identified as a

| Report Officer | Printed At | |
|---|---|---|
| 007042/WILKERSON, MICHAEL W | 03/04/2015 19:24 | Page 1 of 2 |

CCV00000 2155

## Supplement

person Joevena was talking to. JOHNSON indicated she was not involved with Kevin but her friend Joevena and Marcus talked off and on. JOHNSON related later that night, Marcus drove with Kevin and followed them to Joevena's house. JOHNSON indicated Marcus was driving a black Nissan Altima with Kevin in the passenger seat and two other unknown males in the backseat.

JOHNSON related after they arrived at Joevena's house, she and Joevena got out of her car and they walked up to Marcus' car. JOHNSON indicated they talked with Marcus and Kevin for a while outside of Joevena's house. Johnson related she discussed the fact that she was having trouble with her car and Marcus indicated he would help her get the car to her house. JOHNSON stated she got into the drivers seat of he car and Kevin was in the passenger seat of her vehicle.

JOHNSON related she drove northbound on 35th St. and approached North Avenue. Johnson related she observed the light at 35th and North Avenue turn yellow and tried to stop. JOHNSON stated she believed the light was still yellow when her car entered the intersection at North Avenue.She indicated the car did not stop and Marcus moved the gearshift from drive into neutral, in an effort to help her get the car to stop. She indicated the car did not see a car, red or blue lights, or hear a siren as they drove into the intersection at 35th and North Avenue. JOHNSON indicated she didn't realize she had been involved in an accident until she was at the hospital and being treated.

JOHNSON related she remembered she was driving the vehicle at the time of the accident and Kevin was in the passenger seat but not much after that. She stated she believed Kevin caused the accident because Kevin shifted the car from drive to neutral. She indicated the car wasn't stopping prior to Kevin shifting the car into neutral even though she was depressing the brake pedal. She related she knew she shouldn't have been driving the car because she knew the cars brakes were faulty.

| Report Officer | Printed At | |
|---|---|---|
| 007042/WILKERSON, MICHAEL W | 03/04/2015 19:24 | Page 2 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

**150190017**

Supplement No
0004

2333 N. 49TH ST

Milwaukee,WI 53210

Reported Date
01/20/2015
Nature of Call
FLEE/TRAFF
Officer
WIETING, SCOTT R JR

(414)935-7502

## Administrative Information

| Agency | | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | | 150190017 | 0004 | 01/20/2015 | 09:40 | 150190259 |

| Status | Nature of Call | | | | | |
|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | FLEEING/TRAFFIC OFFENSES | | | | | |

| Location | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|
| N 35TH ST/W NORTH AV | | MILWAUKEE | 53208 | 3642 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 3 | 330 | 01/19/2015 | 02:15 | 019453/WIETING, SCOTT R JR |

| Assignment | Entered by | Assignment | RMS Transfer | Property? |
|---|---|---|---|---|
| THIRD DISTRICT - LATE | 019453 | THIRD DISTRICT - LATE | Successful | None |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 019162 | 01/21/2015 | 08:09:02 |

## Modus Operandi

| Crime Code(s) |
|---|
| ALL OTHERS |

## Supplement

This report was submitted by P.O. Scott WIETING, assigned to District 3, late shift.

On Tuesday, January 20, 2015, I presented this case to ADA MINEO, who pended the case for medical releases and findings to be discovered.

I will be returning Friday, January 23, 2015.

| Report Officer | Printed At | |
|---|---|---|
| 019453/WIETING, SCOTT R JR | 03/04/2015 19:24 | Page 1 of 1 |

Case 2:16-cv-01089-WED Filed 04/22/19 Page 162 of 805 Document 80-21

## Detailed History for Police Call #150190259 As of 4/29/2015 21:41:34

Output for:

Priority:2 Type:1301 - ACC PI
Location:N 35TH ST / W NORTH AV,MKE < 2200/ 3498>

| Created: | 01/19/2015 02:17:23 | PT12 | 016089 |
|---|---|---|---|
| Entered: | 01/19/2015 02:17:53 | PT12 | 016089 |
| Dispatch: | 01/19/2015 02:18:33 | PD09 | 009255 |
| Enroute: | 01/19/2015 02:18:33 | PD09 | 009255 |
| Onscene: | 01/19/2015 02:20:40 | M081 | 018121 |
| Transprt: | 01/19/2015 07:45:08 | RD04 | 013528 |
| Complete: | 01/19/2015 07:59:51 | RD04 | 013528 |
| Closed: | 01/19/2015 09:41:40 | RD04 | 013528 |

IC: PrimeUnit:3330 Dispo:C1 Type:1301 - ACC PI
Agency:MWPD DAREA:D3 Squad Area:330 RptDist:3641
Case #:IR150190017  ☑ Detail

| | | |
|---|---|---|
| 02:17:23 CREATE | 016089/PT12 | Location:N 35TH ST / W NORTH AV,MKE Type:1301 DAREA:D3 RptDist:3641 TypeDesc:ACC PI LocDesc: < 2200/ 3498> Priority:2 Response:1PO Agency:MWPD LocType:H |
| 02:17:23 ALI | | E911Phne:911/559-1577 E911Pilot:414/511-7304 E911Add:3022 W CENTER - SW SECTOR,MKE E911Subs:VERIZON WIRELESS E911Srce:WRLS AliLong:-87.952101 AliLatitude:43.068724 |
| 02:17:53 ENTRY | | |
| 02:17:53 -PREMIS | | Comment:PPR |
| 02:17:55 SELECT | 009255/PD09 | |
| 02:18:04 INFO | 024636/PT06 | Location:N 35TH ST / W NORTH AV,MKE LocDesc: < 2200/ 3498> Priority:2 Comment:MFD SENT//CLLR STS A POLICE OFFICER VEH JUST HIT A VEH AT LOC/// |
| 02:18:04 ALI | | E911Phne:414/722-4618 E911Pilot:414/511-7706 E911Add:3056 W MEINECKE AV - W,MKE E911Subs:SPRINT E911Srce:WPH2 AliLong:-87.956865 AliLatitude:43.060763 |
| 02:18:04 ALIGEO | | GeoLong:-87.956865 GeoLat:43.060763 ClosestAdd:3444 W NORTH AV AddDesc:39 ft N ClosestInt:W NORTH AV / N 34TH ST InterDesc:151 ft W |
| 02:18:06 INFO | 016089/PT12 | Priority:2 Comment:MFD RESPONDING CALLER REPORTING NOT INVOLVED IN ACCIDENT AT LOC |
| 02:18:19 INFO | 018366/PT10 | Location:N 35TH ST / W NORTH AV,MKE Name:FEMALE CLLR Phone: (414) 405-4617 LocDesc: < 2200/ 3498> Priority:2 Contact?:EITHER Call/InPerson Language?:English Comment:CLLR STATED SHE WAS A MILWAUKEE DETECTIVE AND NEEDED AMB AND DISCNNCTED. ON CLLBK, CLLR STATED IT WAS A TWO PERSON CAR ACCIDENT NEEDED AMB AND DISCNNCTED AGAIN. NFI |
| 02:18:19 ALI | | E911Phne:414/405-4617 E911Pilot:414/511-7285 E911Add:2323 N 49TH - SE SECTOR,MKE E911Subs:VERIZON WIRELESS E911Srce:WPH2 AliLong:-87.956886 AliLatitude:43.060516 |
| 02:18:19 ALIGEO | | GeoLong:-87.956886 GeoLat:43.060516 ClosestAdd:3447 W NORTH AV AddDesc:21 ft S ClosestInt:W NORTH AV / N 34TH ST InterDesc:151 ft W |
| 02:18:22 INFO | 024636/PT06 | Priority:2 Comment:2 OFFICERS INJ AT LOC//THE OTHER OFFICER IS ON THE GROUND |
| 02:18:33 DISPER | 009255/PD09 | 3330 Operator:021475 019453 OperNames:AINES, SEAN M WIETING JR, SCOTT R |
| 02:18:33 DISPER | | 3341 Operator:018140 024292 OperNames:VOLLRATH, JESSE J NUTER, ALEXANDER D |

Case 2:16-cv-01089-WED Filed 04/22/19 Page 163 of 805 Document 80-21 158

| Time | Type | Unit | Details |
|------|------|------|---------|
| 02:18:33 | DISPER | | **3410** Operator:008099 OperNames:GRUBICH, WADE W |
| 02:18:33 | -PRIU | | **3330** |
| 02:18:33 | -HOLD | | |
| 02:18:48 | INFO | 024640/PT01 | Location:N 35TH ST / W NORTH AV,MKE Phone:(414) 759-8229 LocDesc: < 2200/ 3498> Priority:2 Comment:CALLER STS THAT THERE IS A FEMALE IN A CAR, THINKS SHE MAY BE DECESASED. CALLER STS POLICE OFFICER AND FEMALE OFFICER ARE INJURED |
| 02:18:48 | ALI | | E911Phne:414/759-8229 E911Pilot:414/511-7707 E911Add:3056 W MEINECKE AV - W,MKE E911Subs:SPRINT E911Srce:WRLS AliLong:-87.960513 AliLatitude:43.061482 |
| 02:19:08 | INFO | | Name:DARREL OWENS Priority:2 Contact?:EITHER Call/InPerson Language?:English Comment:MFD RESPONDING |
| 02:19:17 | BACKER | 009255/PD09 | **3390** UnitID:3330 Location:N 35TH ST / W NORTH AV,MKE Operator:018121 OperNames:JOHNSON, BRANDY C |
| 02:19:28 | BACKER | | **3430** UnitID:3410 Location:N 35TH ST / W NORTH AV,MKE Operator:014748 014727 OperNames:GOGGINS, JOSEPH D DESTEFANIS, MICHAEL P |
| 02:19:30 | INFO | 022578/RC06 | Location:N 35TH ST / W NORTH AV,MKE Name:IVETTE Phone:(414) 628-4354 LocDesc: < 2200/ 3498> Priority:2 Contact?:EITHER Call/InPerson Language?:English Comment:CLLR REPORTING 2 VEH ACC. APPEARS TO BE A SQUAD CAR INVOLVED. CLLR WAS JUST DRIVING PAST. NFI |
| 02:19:30 | ALI | | E911Phne:414/628-4354 E911Pilot:414/511-7135 E911Add:3901 W NORTH - N AV,MKE E911Subs:T-Mobile USA, Inc. E911Srce:WRLS AliLong:-87.958903 AliLatitude:43.059068 |
| 02:19:31 | BACKER | 009255/PD09 | **3460** UnitID:3410 Location:N 35TH ST / W NORTH AV,MKE Operator:007525 017473 OperNames:WILHELM, DAVID P SMITH, ROBERT R |
| 02:19:44 | BACKER | | **3490** UnitID:3410 Location:N 35TH ST / W NORTH AV,MKE Operator:009066 016244 OperNames:KNOX, ANTHONY R FLANNERY, BRIAN E |
| 02:19:59 | INFO | 024640/PT01 | Priority:2 Comment:CALLER STS HE DOES NOT KNOW WHAT HAPPEND JUST KNOW THAT THEY ARE BOTH INJURED. CALLER HAD NFI |
| 02:20:03 | INFO | 024636/PT06 | Name:MALIK Phone:(414) 722-4618 Priority:2 Contact?:EITHER Call/InPerson Language?:English Comment:CLLR STS OFFICERS ARE ON SCENE AT LOC//NFI |
| 02:20:14 | MISC | 009255/PD09 | Comment:7472 SGT TW NOTIFIED |
| 02:20:34 | BACKER | | **3482** UnitID:3410 Location:N 35TH ST / W NORTH AV,MKE Operator:016077 015962 OperNames:KRUMNOW, WILLIAM R STACEY, DEBORA A |
| 02:20:37 | INFO | 016089/PT12 | Name:CHRISTOPHER THURMAN RPaddr:3421 W NORTH Phone:N/A Priority:2 Contact?:EITHER Call/InPerson Comment:3 CARS INVOLVED //CALLER DIFFICULT TO HEAR //THINKS A FEMALE IS INJ ///CALLER WATCHING |
| 02:20:38 | NOMORE | | |
| 02:20:40 | *ONSCN | 018121/M081 | **3390** |
| 02:20:59 | BACKER | 009255/PD09 | **3450** UnitID:3410 Location:N 35TH ST / W NORTH AV,MKE Operator:009073 019710 OperNames:LEIBSLE, LARRY L FEKETE, RYAN M |
| 02:21:02 | INFO | 024636/PT06 | Priority:2 Comment:CLLR STS DID NOT WITNESS ACC//JUST SAW AFTERMATH//NFI |
| 02:21:12 | MISC | 009255/PD09 | **3330** Comment:TRAFFIC OFFICERS |
| 02:21:37 | MISC | | **3390** Comment:BLOCKING TRAFFIC |
| 02:21:41 | XREF | 024638/PT09 | Service:P Call:#150190264 Type:1301 Agency:MWPD |
| 02:22:02 | CLOS | 009255/PD09 | **3390** Location:N 35TH ST / W GARFIELD AV,MKE Comment:N/B TRAFFIC |
| 02:22:21 | INFO | 024638/PT09 | Location:N 35TH ST / W NORTH AV,MKE LocDesc: < 2200/ 3498> Priority:2 Comment:MEANT TO DUP CALLS TOGETHER .0264 .0259 NFI |
| 02:23:13 | BACKOS | 009255/PD09 | **766** UnitID:3410 Location:N 35TH ST / W NORTH AV,MKE Operator:018526 016345 OperNames:BOEHLKE, JOSEPH M KUSPA, STEVEN J |

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 164 of 805   Document 80-21

| Time | Type | Unit | Detail |
|---|---|---|---|
| | | | Comment:S/B TRAFFIC |
| 02:23:22 | MISC | | 3410 Comment:REQ ID TECH |
| 02:23:34 | *ONSCN | 017473/M071 | 3460 |
| 02:23:44 | *ONSCN | 024292/M156 | 3341 |
| 02:24:01 | MISC | 009255/PD09 | 3430 Comment:SQDS.. 35TH/ GARFIED.. LOT AT PICK N SAVE.. 36TH.. NORTH/// 3 VEHICLS INVOLVED.. |
| 02:24:29 | CLOS | | 3460 Location:N 36TH ST / W NORTH AV,MKE |
| 02:24:38 | BACKOS | | 3431 UnitID:3430 Location:N 34TH ST / W NORTH AV,MKE Operator:019738 016877 OperNames:MICHALAK JR, RICHARD D CARLSON, JOSEPH R |
| 02:24:40 | ONSCN | | 3410 |
| 02:25:03 | MISC | | 3410 Comment:** CP ** 36TH/NORTH SAFE ENTRY WEST.. |
| 02:25:15 | CLOS | | 3341 Location:N 34TH ST / W NORTH AV,MKE |
| 02:25:34 | MISC | | 3430 Comment:NEED 1 MORE MED UNIT.. |
| 02:26:01 | MISC | | 3430 Comment:2 VEHICELS.. INVOLVED WHT MITS 4DR 357WVX 2ND IS THE DETECTIVE CAR.. |
| 02:26:09 | MISC | | 3430 Comment:BRN CROWN VIC 280LPY |
| 02:26:49 | MISC | | 3430 Comment:INJURED B/F 40YR WF 40YR.. |
| 02:26:57 | MISC | | 3430 Comment:SQD 9282 IS INVOLVED.. |
| 02:27:19 | *RFT | 017473/M071 | 3460 Comment:INQUIRY QVEH,,357WVX,PC,11,,, |
| 02:27:19 | *ONSCN | 016244/M092 | 3490 |
| 02:28:34 | *MISC | 016877/M463 | 3431 Comment:at 35th/north nothing southbound |
| 02:28:36 | BACKER | 005321/PD03 | 1922 UnitID:3410 Location:N 35TH ST / W NORTH AV,MKE Operator:016643 OperNames:WINKER, MICHAEL J |
| 02:28:36 | COMBIN | 009255/PD09 | Service:P Call:#150190264 Type:1301 Agency:MWPD |
| 02:28:44 | COMBIN | 005321/PD03 | Service:P Call:#150190275 Type:PH Agency:MWPD |
| 02:28:51 | MISC | 009255/PD09 | 3410 Comment:OFFICER TC COME TO THE SCENE.. OF ACCIDENT.. |
| 02:29:11 | SELECT | 008076/PD02 | |
| 02:29:22 | BACKOS | 009255/PD09 | 3210 UnitID:3410 Location:N 35TH ST / W NORTH AV,MKE Operator:015127 OperNames:RILEY, ADAM K |
| 02:29:22 | -HOLD | | |
| 02:30:45 | CHGLOC | | 3482 Location:3611 N MARYLAND AV Comment:RE: |
| 02:30:51 | LOGM | | 3482 Message:011501190830022373 MessageType:Text Received:01/19/2015 02:30:09 Comment:LOGM |
| 02:31:27 | BACKER | | 3205 UnitID:3410 Location:N 35TH ST / W NORTH AV,MKE |
| 02:31:52 | CLEAR | | 3205 |
| 02:31:56 | BACKER | | 9205 UnitID:3410 Location:N 35TH ST / W NORTH AV,MKE |
| 02:32:20 | CLOS | | 9205 Location:N 35TH ST / W NORTH AV,MKE |
| 02:32:29 | CLOS | | 3410 Location:N 36TH ST / W NORTH AV,MKE |
| 02:32:32 | *ONSCN | 019453/M451 | 3330 |
| 02:32:40 | CHGLOC | 009255/PD09 | 9205 Location:N 36TH ST / W NORTH AV,MKE |
| 02:33:08 | *RFT | 019453/M451 | 3330 Comment:INQUIRY QPER,JOHNSON,DEBRIBELLE,B,F,B,07071993,,,,, |
| 02:33:59 | *RFT | | 3330 Comment:INQUIRY QPER,,JOHNSON,DEBRIBELLE,B,F,B,07071993,,,,, |
| 02:34:47 | *RFT | 019710/M7769 | 3450 Comment:INQUIRY QVEH,,357WVX,PC,15,,, |
| 02:37:11 | *RFT | 019453/M451 | 3330 Comment:INQUIRY QPER,JOHNSON,DEBRIBELLE,D,F,B,07071993,,,,, |
| 02:38:13 | *RFT | 019710/M7769 | 3450 Comment:INQUIRY QVEH,,280LPY,PC,15,,, |
| 02:38:57 | *ONSCN | | 3450 |
| 02:39:53 | ONSCN | 009255/PD09 | 3430 |
| 02:42:15 | *ONSCN | 015962/M9986 | 3482 |
| 02:45:09 | XPRMPT | 008076/PD02 | 1922 Operator:016643 OperNames:WINKER, MICHAEL J |
| 02:45:09 | XDISP | | 1921 Operator:015497 OperNames:PETERSON, JAMES C |
| 02:45:12 | ONSCN | | 1921 |
| 02:47:37 | *RFT | 019453/M451 | 3330 Comment:INQUIRY QVEH,,357WVX,PC,00,,, |
| 02:47:41 | CHGLOC | 009255/PD09 | 3330 Location:FROEDTERT MEMORIAL LUTHERAN HOSPITAL,MKE Comment:MED 7/// REQ SOMEONE TO BRING AN OWI KIT /// PAPER |

Case 2:16-cv-01089-WED Filed 04/22/19 Page 165 of 805 Document 80-21

|  |  |  |  |
|---|---|---|---|
|  |  |  | **WORK** |
| 02:48:10 | BACKOS |  | 3330W UnitID:3410 Location:N 36TH ST / W NORTH AV,MKE |
| 02:48:20 | *ONSCN | 019453/M451 | 3330 |
| 02:48:34 | NOTIFY | 009255/PD09 | 3330 Notified:MCSO |
| 02:52:35 | BACKOS | 008076/PD02 | 3450W UnitID:3450 Location:N 35TH ST / W NORTH AV,MKE |
| 02:52:49 | CHGLOC |  | 3450 Location:FROEDTERT MEMORIAL LUTHERAN HOSPITAL,MKE Comment:DROPPING OFF OWI KIT & PAPERS, 1/2 REMAINING AT ACCIDENT SCENE |
| 02:53:02 | *RFT | 019453/M451 | 3330 Comment:INQUIRY QVEH,,,,,2FAFP71W67X110523,, |
| 02:53:41 | BACKOS | 008076/PD02 | 3341W UnitID:3341 Location:N 34TH ST / W NORTH AV,MKE |
| 02:54:10 | CHGLOC |  | 3341W Location:FROEDTERT MEMORIAL LUTHERAN HOSPITAL,MKE Comment:IN MED 14 WITH INJ OFFICER |
| 02:55:15 | NOTIFY |  | 3330 Notified:MCSO |
| 02:55:20 | NOTIFY |  | 3341W Notified:MCSO |
| 02:55:24 | NOTIFY |  | 3450 Notified:MCSO |
| 02:56:08 | ONSCN | 005321/PD03 | 9205 |
| 03:00:59 | CLOS | 008076/PD02 | 3450 Location:N 35TH ST / W NORTH AV,MKE |
| 03:01:02 | *CLEAR | 018526/M9868 | 766 Dispo:C18 DispoLevel:0 |
| 03:01:14 | CHGLOC | 008076/PD02 | 3450W Location:FROEDTERT MEMORIAL LUTHERAN HOSPITAL,MKE Comment:TO DROP OFF OWI KIT & PAPERS |
| 03:01:26 | MISC |  | 3450 Comment:MEDIA ARRIVED |
| 03:09:03 | *RFT | 014748/M143 | 3430 Comment:INQUIRY QVEH,,280LPY,PC,15,,, |
| 03:09:39 | *RFT |  | 3430 Comment:INQUIRY QVEH,,357WVX,PC,15,,, |
| 03:09:42 | CONTCT | 009255/PD09 | 3330 9205 1921 3210 3330W 3341 3341W 3390 3410 3430 ContactTime:120 |
| 03:09:42 | CONTCT |  | 3431 3450 3450W 3460 3482 3490 ContactTime:120 |
| 03:15:00 | *RFT | 019710/M7769 | 3450 Comment:INQUIRY QPER,JOHNSON,DEBRIELLE,D,F,B,07071993,,,,, |
| 03:15:53 | CLOS | 009255/PD09 | 3210 Location:D3,MKE Comment:DROPPING OFF PROPERTY |
| 03:20:41 | CHGLOC |  | 3330W Location:FROEDTERT MEMORIAL LUTHERAN HOSPITAL,MKE Comment:MEET W/ PARTNER |
| 03:22:29 | CASE |  | 3330 Incident#:IR150190017 Comment:019453 |
| 03:29:34 | CLEAR |  | 3210 Dispo:C18 DispoLevel:0 |
| 03:31:58 | *CHGLOC | 019710/M7769 | 3450 Location:3500 W NORTH |
| 03:32:55 | *MISC | 014748/M143 | 3430 Comment:CITY DPW TOWING 9282 SQUAD CAR, VEHICLE# 764 |
| 03:34:23 | *MISC |  | 3430 Comment:TOW# 1607314 FOR MITSUBISHI GALANT, PLATE#357-WVX |
| 03:35:01 | CHGLOC | 009255/PD09 | 3490 Location:FROEDTERT MEMORIAL LUTHERAN HOSPITAL,MKE Comment:MEET W/ PARTNER |
| 03:35:04 | NOTIFY |  | 3490 Notified:MCSO |
| 03:37:53 | *RFT | 024292/M156 | 3341 Comment:INQUIRY QVEH,,141CDE,PC,00,,, |
| 03:44:49 | *ONSCN | 016244/M092 | 3490 |
| 03:48:11 | CHGLOC | 009255/PD09 | 9205 Location:D5,MKE Comment:RE |
| 03:48:43 | *ONSCN | 019710/M7769 | 3450 |
| 03:50:41 | CLEAR | 009255/PD09 | 3450 3450W Dispo:C18 DispoLevel:0 |
| 03:53:15 | MISC |  | 3410 Comment:D3 P/U KEY CAR 764.. DAMAGED SQD.. |
| 03:53:22 | MISC |  | 3410 Comment:3430 HAS THE KEYS |
| 04:01:49 | MISC |  | 3430 Comment:MFD/ FLUSH OF VEHICLE FLUIDS.. TOWS ARE HERE |
| 04:02:16 | MISC |  | 3430 Comment:MFD/ NOTIFIED// ENROUTE |
| 04:07:47 | CONTCT |  | 3330 9205 1921 3330W 3341 3341W 3390 3410 3430 3431 ContactTime:120 |
| 04:07:47 | CONTCT |  | 3460 3482 3490 ContactTime:120 |
| 04:08:47 | CHGLOC | 005321/PD03 | 1921 Location:FROEDTERT MEMORIAL LUTHERAN HOSPITAL,MKE |
| 04:15:41 | *MISC | 014748/M143 | 3430 Comment:MFD ENGINE 32 ON SCENE |
| 04:17:46 | ONSCN | 005321/PD03 | 9205 |
| 04:20:49 | *MISC | 014748/M143 | 3430 Comment:ENGINE 32 HAS COMPLETED THE FLUID CLEAN UP |
| 04:21:28 | ONSCN | 005321/PD03 | 1921 |
| 04:23:36 | *CHGLOC | 014748/M143 | 3430 Location:D3 |

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 166 of 805   Document 80-21

| Time | Action | ID | Details |
|---|---|---|---|
| 04:27:21 | *ONSCN | | 3430 |
| 04:29:39 | CLEAR | 009255/PD09 | 3490 Dispo:C18 DispoLevel:0 |
| 04:30:13 | CHGLOC | | 3341W Location:D3,MKE Comment:DROPPED OF AT D3 // BY 3490 |
| 04:35:09 | CLEAR | | 3460 Dispo:C18 DispoLevel:0 |
| 04:35:22 | CLEAR | | 3431 Dispo:C18 DispoLevel:0 |
| 04:35:52 | CLEAR | | 3341 Dispo:C18 DispoLevel:0 |
| 04:36:00 | BACKER | | 3341 UnitID:3341W Location:D3,MKE Operator:018140 024292 OperNames:VOLLRATH, JESSE J NUTER, ALEXANDER D Comment:P/U PARTNER |
| 04:37:53 | CLEAR | | 3390 Dispo:C18 DispoLevel:0 |
| 04:39:00 | *ONSCN | 024292/M156 | 3341 |
| 04:40:58 | CLEAR | 009255/PD09 | 3430 Dispo:C8 DispoLevel:0 |
| 04:46:25 | BACKER | | 3390 UnitID:3330 Location:FROEDTERT MEMORIAL LUTHERAN HOSPITAL,MKE Operator:018121 OperNames:JOHNSON, BRANDY C Comment:ER RM 29.. TAKE OVER FOR 3330 |
| 04:51:39 | SELECT | | |
| 04:51:49 | CHGLOC | | 9205 Location:FROEDTERT MEMORIAL LUTHERAN HOSPITAL,MKE Comment:RE |
| 04:51:49 | -HOLD | | |
| 04:51:52 | NOTIFY | | 9205 Notified:MCSO |
| 05:02:06 | ONSCN | | 3330W 3341W |
| 05:02:35 | CONTCT | | 3390 |
| 05:05:23 | *ONSCN | 018121/M081 | 3390 |
| 05:20:47 | ONSCN | 005321/PD03 | 9205 |
| 05:23:00 | *CHGLOC | 019453/M451 | 3330 Location:D3 Comment:RE |
| 05:24:32 | *ONSCN | | 3330 |
| 05:25:52 | CLEAR | 008076/PD02 | 3341 3341W Dispo:C18 DispoLevel:0 |
| 05:29:45 | *CHGLOC | 015962/M9986 | 3482 Location:D3 Comment:SECURE |
| 05:31:36 | CLOS | 008076/PD02 | 3410 Location:D3,MKE |
| 05:31:44 | CHGLOC | | 3482 Location:D3,MKE |
| 05:31:50 | CLOS | | 3330 Location:D3,MKE |
| 05:36:42 | *ONSCN | 015962/M9986 | 3482 |
| 05:47:38 | CONTCT | 009255/PD09 | 3330 9205 1921 3330W 3390 3410 3482 ContactTime:90 |
| 06:11:35 | CLEAR | | 3482 Dispo:C18 DispoLevel:0 |
| 06:22:38 | CLEAR | | 9205 Dispo:C8 DispoLevel:0 |
| 06:22:55 | MISC | | Comment:C18 FOR 9205 |
| 06:27:38 | CLEAR | 008076/PD02 | 3410 Dispo:C8 DispoLevel:0 |
| 06:45:38 | CLEAR | 005321/PD03 | 1921 |
| 07:18:09 | CONTCT | 009255/PD09 | 3330 3330W 3390 |
| 07:45:08 | TRANSP | 013528/RD04 | 3390 Location:D3 #C1,MKE |
| 07:59:51 | CMPLT | | 3390 |
| 08:38:33 | CLEAR | | 3390 |
| 09:31:03 | MISC | | 3330 3330W Comment:N / R (SEVERAL TIMES) |
| 09:41:32 | SCDOFF | | 3330 |
| 09:41:36 | SCDOFF | | 3330W |
| 09:41:40 | CLEAR | | 3330 3330W Dispo:C1 DispoLevel:0 |
| 09:41:40 | -CLEAR | | |
| 09:41:40 | CLOSE | | |

CONTACT INFO:

| Name | Phone | RPaddr | Contact? | Language? | Resolved? | Satisfied? |
|---|---|---|---|---|---|---|
| FEMALE CLLR | (414) 405-4617 | | EITHER Call/InPerson | English | | |
| | (414) 759- | | | | | |

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 167 of 805   Document 80-21

| | 8229 | | | | | |
|---|---|---|---|---|---|---|
| DARREL OWENS | | | EITHER Call/InPerson | English | | |
| IVETTE | (414) 628-4354 | | EITHER Call/InPerson | English | | |
| MALIK | (414) 722-4618 | | EITHER Call/InPerson | English | | |
| CHRISTOPHER THURMAN | N/A | 3421 W NORTH | EITHER Call/InPerson | | | |

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 168 of 805   Document 80-21

8PD0900925519-JAN-2015 02:30:51☐Message From Terminal/Unit: 3482    Operato
Originally Sent To: -D3
Date/Time Sent:  19-JAN-2015 02:30:01
☐SHOW US ENROUTE TO 3611 N MARYLAND AVE REGARDING

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 169 of 805   Document 80-21

## Detailed History for Police Call #150190264 As of 4/29/2015 20:25:58

**Output for:**

Priority:2 Type:1301 - ACC PI
Location:N 35TH ST / W NORTH AV,MKE < 2200/ 3498>

| Created: | 01/19/2015 02:17:21 | PT09 | 024638 |
|---|---|---|---|
| Entered: | 01/19/2015 02:20:30 | PT09 | 024638 |
| Closed: | 01/19/2015 02:28:36 | PD09 | 009255 |

IC: PrimeUnit: Dispo: Type:1301 - ACC PI
Agency:MWPD DAREA:D3 Squad Area:330 RptDist:3641 ☐ Detail

| | | |
|---|---|---|
| 02:17:21 | CREATE | Location:N 35TH ST / W NORTH AV,MKE Type:1301 Name:MALE CLLR Phone:(414) 426-6562 DAREA:D3 RptDist:3641 TypeDesc:ACC PI LocDesc: < 2200/ 3498> Priority:2 Response:1PO Agency:MWPD LocType:H Contact?:EITHER Call/InPerson Language?:English |
| 02:17:21 | ALI | E911Phne:414/426-6562 E911Pilot:414/511-7387 E911Add:3100 W NORTH SW,XX E911Subs:AT & T MOBILITY E911Srce:WRLS AliLong:-87.953131 AliLatitude:43.061546 |
| 02:20:30 | ENTRY | Comment:AMB SENT. CLLR STS THERE ARE 2 POLICE OFFICERS IN AN ACC AT LOC. CLLR STS THIS JUST OCC. |
| 02:20:30 | VEH | V#:1 VehCol:TAN Misc:UNMARKED VEH |
| 02:20:30 | VEH | V#:2 VehCol:WHI |
| 02:20:30 | SUBJ | S#:1 |
| 02:20:30 | SUBJ | S#:2 |
| 02:20:30 | -PREMIS | Comment:PPR |
| 02:20:40 | SELECT | |
| 02:21:01 | HOLD | |
| 02:21:04 | INFO | Priority:2 Comment:CLLR WAS NOT INVOLVED IN THE ACC. NFI |
| 02:21:05 | NOMORE | |
| 02:21:41 | XREF | Service:P Call:#150190259 Type:1301 Agency:MWPD |
| 02:22:55 | SELECT | |
| 02:26:09 | MISC | Comment:PER POLE CAM, UNABLE TO SEE ACCIDENT, 35TH / GARFIELD CAM IS NOT OPERATIONAL |
| 02:28:31 | SELECT | |
| 02:28:36 | COMBIN | Service:P Call:#150190259 Type:1301 Agency:MWPD |
| 02:28:36 | -CLOSE | |

**CONTACT INFO:**

| Name | Phone | RPaddr | Contact? | Language? | Resolved? | Satisfied? |
|---|---|---|---|---|---|---|
| MALE CLLR | (414) 426-6562 | | EITHER Call/InPerson | English | | |

Case 2:16-cv-01089-WED Filed 04/22/19 Page 170 of 805 Document 80-21

## Detailed History for Police Call #150190275 As of 4/29/2015 20:50:58

**Output for:**

Priority:1 Type:PH - PHOTO ASSIGN
Location:N 35TH ST / W NORTH AV,MKE < 2200/ 3498>

| Created: | 01/19/2015 02:27:39 | PD09 | 009255 |
|----------|---------------------|------|--------|
| Entered: | 01/19/2015 02:27:39 | PD09 | 009255 |
| Closed:  | 01/19/2015 02:28:44 | PD03 | 005321 |

IC: PrimeUnit: Dispo: Type:PH - PHOTO ASSIGN
Agency:MWPD DAREA:FI(D3) Squad Area:330 RptDist:3641    ☐ Detail

---

| 02:27:39 | CREATE | Location:N 35TH ST / W NORTH AV,MKE Type:PH DAREA:D3 RptDist:3641 |
| | | TypeDesc:PHOTO ASSIGN LocDesc: < 2200/ 3498> Priority:2 Agency:MWPD SquadArea:330 |
| | | LocType:H |
| 02:27:39 | ENTRY | DAREA:D3-->FI Priority:2-->1 Comment:PER 3410 REQ ID TECH RE: ACC PI |
| 02:27:39 | -PREMIS | Comment:PPR |
| 02:28:18 | SELECT | |
| 02:28:44 | COMBIN | Service:P Call:#150190259 Type:1301 Agency:MWPD |
| 02:28:44 | -CLOSE | |

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 171 of 805   Document 80-21

**Output for:**

**Detailed History for Unit 9288 Between 01/18/2015 00:00 And 01/19/2015 23:59** ☐ Detail

**00:05:48  LOGOFF**
**15:59:35  LOGON**    Operator:010730 OperNames:CARR, JUANITA DAREA:CITY
**19:52:39  RELOG**    Operator:010730 OperNames:CARR, JUANITA DAREA:CITY
**23:54:53  LOGOFF**

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 172 of 805   Document 80-21

**Output for:**

**Detailed History for Unit 9291 Between 01/18/2015 00:00 And 01/19/2015 23:59**   ☐Detail

03:56:43  LOGOFF
15:59:19  LOGON    Operator:012860 OperNames:LEWANDOWSKI, SHANNON DAREA:CITY
[01/19/2015]
03:48:53  LOGOFF

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 173 of 805   Document 80-21

| INCIDENT<br>OWI Causing Injury Debrielle Johnson | | DATE OF INCIDENT/ACCIDENT<br>01/19/2015 | |
|---|---|---|---|
| VICTIM<br>Det S Lewandowski & Det J Carr | | LOCATION OF INCIDENT/ACCIDENT<br>N. 35th St. At W. North Ave | DIST. #<br>3 |
| JUVENILE LAST NAME          FIRST          MIDDLE | | DATE OF BIRTH | ☐ DETAINED<br>☐ ORDERED TO MCCC<br>☐ OTHER |

| QUANTITY | TYPE OF PROPERTY | DESCRIPTION | SERIAL # | CODE # | VALUE |
|---|---|---|---|---|---|

This report is typed by PO Maurice Woulfe, Assigned to Court Administration Section as the Traffic Liaison Officer.

On Monday, April 20, 2015 at 2:35 PM, I spoke with Detective Juanita Carr over the phone regarding the injuries that she suffered as a result of this crash. Det. Carr said that she suffered a concussion, Neck Pain from 3 bulging discs in her neck, upper and lower back pain and has one bulging disc in her lower back. Det Carr said that she was also diagnosed with Carpal Tunnel in both wrists as a result of this crash.

Det. Carr said that she received treatment from the Emergency Room at Froedtert Hospital the night of the crash. She has gotten treatment from her regular Doctor - Dr S. Gundamraj at her office at the Aurora Medical Center located at 3289 N. Mayfair Rd, Wauwatosa, WI 53226.

Det Carr said that she is being treated by Dr. Jamie Edwards, an orthopedics Doctor at his offices at 3111 W. Rawson Ave Suite 215, Franklin, WI.

Det Carr said that she is being treated by Dr. Erin O'Toole, a Concussion specialist, at his offices at 8825 S. Howell Ave, Oak Creek WI.

Det. Carr said that she is being treated by Dr. Steven Trinkl, a carpal tunnel specialist, at his offices at 2323 N. Mayfair Rd. Suite 310, Wauwatosa, WI 53226.

Det. Carr said that she is being treated by Dr. Jitendra Baruah, a nerve specialist, at his offices at 2505 N. Mayfair Rd. Suite 102, Wauwatosa, WI 53226. Dr. Baruah performed a Nerve study on her and determined that she suffered injuries that resulted in Carpal Tunnel syndrome in both wrists.

Det. Carr said that she is being treated by Nicole a Physical Therapist specializing in Concussions at her offices at Elm brook Medical Arts Center, 17000 W. North Ave, Suite 2 West.

Det. Carr said that she is being treated by Megan a physical Therapist specializing in Head, Neck and Back pain at her offices at the Orthopedic Institute of Wisconsin located at 2323 N. Mayfair Rd Suite 300, Wauwatosa, WI 53226.

Det. Carr said that she is supposed to start seeing a speech therapist and a psychologist, but has not been scheduled any appointments yet.

| REPORTING OFFICER<br><br>PO Maurice Woulfe | Payroll<br>09070 | Loc Code<br>16 | SUPERVISORS SIGNATURE |
|---|---|---|---|

| INCIDENT INFORMATION | INCIDENT Personal Injury Accident | | DATE OF INCIDENT/ACCIDENT 01/19/2015 | |
|---|---|---|---|---|
| | VICTIM Lewandowski, Shannon | | LOCATION OF INCIDENT/ACCIDENT 3500 W North Ave | DIST. # 3 |
| JUVENILE LAST NAME      FIRST      MIDDLE | | | DATE OF BIRTH | ☐ DETAINED ☐ ORDERED TO MCCC ☐ OTHER |

| QUANTITY | TYPE OF PROPERTY | DESCRIPTION | SERIAL # | CODE # | VALUE |
|---|---|---|---|---|---|
| | | | | | |

This report is written by P.O. Brian Pinter, assigned to CAS, day shift.

On Friday, February 6, 2015, I interviewed Detective Shannon Lewandowski regarding the injuries she suffered as the result of a squad accident on 1/19/2015. Det. Lewandowski suffered the following injuries:

- Cervical Musculoligamentous. This is a strained neck injury. It causes delayed speech and memory loss.
- A concussion. Det. Lewandowski suffered 3-4 minutes of loss of consciousness. Det. Lewandowski was told this by Det. Juanita Carr, who was also involved in the accident.
- Whiplash
- Sprained right ankle
- Torn ligament to right ankle
- Bruising and swelling to her right leg and ankle

These injuries all caused pain and discomfort. Det. Lewandowski is being treated by Dr. Jamie Edwards.

| REPORTING OFFICER *PINTER* PS: 008376  Loc: 16 | SUPERVISORS SIGNATURE |
|---|---|

CONFIDENTIAL REPORT OF LABORATORY FINDINGS
DJ-LE-103 (4/12)



Wisconsin Department of Justice
Division of Law Enforcement Services
State Crime Laboratory-Milwaukee
1578 South 11th Street
Milwaukee, WI 53204-2860
(414) 382-7500
FAX (414) 382-7507

Submitting Agency:

**Chief Edward A. Flynn**
**Attn: Traffic Division**
**Milwaukee Police Department**
**749 West State Street**
**P.O. Box 531**
**Milwaukee WI 53201**

Date: February 13, 2015

Case No: R15-287

Agency No: 15001956

Laboratory Analyst:

*Bernard Huettl*

Bernard Huettl
(Toxicology) 2/13/15

Case Name: Johnson, Debrielle (S)

I do hereby certify this document, consisting of 1 page(s), to be a true and correct report of the findings of the State Crime Laboratory on the items examined as shown by this report. This report contains the conclusions of the above signed analyst.

_____
Brad D. Schimel
ATTORNEY GENERAL

_____
DESIGNEE 2-19-2015

Item A1 (blood), reportedly recovered from Debrielle D. Johnson on January 19, 2015 at 0354 hours, was received at the State Crime Laboratory on January 22, 2015.

**Item A1 (blood)**

| Toxicologist | Drug | Result | Uncertainty (99.73% coverage probability) |
|---|---|---|---|
| *Volatiles Analysis by Headspace Gas Chromatography* | | | |
| Bernard Huettl | Ethanol | 0.064 g/100mL | ±0.003 g/100mL |

**Toxicology analysis of the above item(s) is complete. Upon the completion of all requested analyses, the item(s) will be returned to the submitting agency.**

COPYING AND DISTRIBUTION OF THIS REPORT IS THE RESPONSIBILITY OF THE SUBMITTING AGENCY
*The laboratory reserves the right to choose the items which will be tested and the methods which will be used to test them.*





*Official Website of the City of Milwaukee*

CALL for Action (414) 286-CITY | Click for Services

Directory     Residents     Business     Visitors

## Municipal Court Query System

Who We Are     Court Reports and Statistics     Questions & Answers     Forms     Useful Links     Your Feedback



**CITY OF MILWAUKEE**
**MUNICIPAL COURT**     Case Information &
Online Payment System     [ New Search ]

For best results when printing:

Set page size to 70%
No "shrink to fit"
Landscape Orientation

Close

**Case Number: 15002151**

**Defendant Information**

| | |
|---|---|
| Name: | JOHNSON, DEBRIELLE DOMINICK |
| Last Known Address: | N/A |
| Month of Birth: | ▆ |
| Sex: | Female |
| Race: | Black |

[ All Cases for Defendant ]     [ All Scheduled Appearances / Submit a Plea ]     [ Make a Payment ]

**Case Information**

| | | | |
|---|---|---|---|
| Case Type: | Traffic citation | Status: | Active |
| Violation: | Statute 341.03(1), Oper Veh After Sus/Rev or Can of Reg | Citation #: | I1009562 |
| Violation Date: | 01/19/2015 08:06 AM | | |
| Location: | 35TH ST N / NORTH AVE W | Deposit Amount: | $88.80 |
| Plea: | No Contest | In Collection? | No |
| Plea Entered By: | Court | Installment Plan? | No |

**Judgment**

| | | | |
|---|---|---|---|
| Finding: | Guilty | Date: | 03/13/2015 |
| Penalty: | $88.80 | Due On: | 05/12/2015 |
| Balance Due: | $88.80 | Branch: | 2 |

| Alternative to Non-Payment by Due Date | Amount | Enforced On |
|---|---|---|
| DL Suspension - Concurrent | 2 Years | |

New Search

Return To Municipal Court Home

| | | |
|---|---|---|
| Mayor Tom Barrett | Services & Programs | Web & Email Policies |
| Common Council | Do Business | Contact Us |
| Departments | Live & Work | |
| Calendar | Play | Design by City of Mil |



*Official Website of the City of Milwaukee*

CALL for Action (414) 286-CITY | Click for Services

Directory     Residents     Business     Visitors

## Municipal Court Query System

Who We Are     Court Reports and Statistics     Questions & Answers     Forms     Useful Links     Your Feedback



**CITY OF MILWAUKEE**
**MUNICIPAL COURT**     Case Information & Online Payment System     [New Search]

| For best results when printing: |
|---|
| Set page size to 70% |
| No "shrink to fit" |
| Landscape Orientation |
| Close |

**Case Number: 15002152**

**Defendant Information**

| | |
|---|---|
| Name: | JOHNSON, DEBRIELLE DOMINICK |
| Last Known Address: | N/A |
| Month of Birth: | ▮▮▮ |
| Sex: | Female |
| Race: | Black |

[All Cases for Defendant]   [All Scheduled Appearances / Submit a Plea]   [Make a Payment]

**Case Information**

| | | | |
|---|---|---|---|
| Case Type: | Traffic citation | Status: | Active |
| Violation: | Statute 346.37(1)(c)3, Illegal Right Turn on Red | Citation #: | I1009573 |
| Violation Date: | 01/19/2015 08:07 AM | | |
| Location: | 35TH ST N / NORTH AVE W | Deposit Amount: | $88.80 |
| Plea: | No Contest | In Collection? | No |
| Plea Entered By: | Court | Installment Plan? | No |

**Judgment**

| | | | |
|---|---|---|---|
| Finding: | Guilty | Date: | 03/13/2015 |
| Penalty: | $88.80 | Due On: | 05/12/2015 |
| Balance Due: | $88.80 | Branch: | 2 |

| Alternative to Non-Payment by Due Date | Amount | Enforced On |
|---|---|---|
| DL Suspension - Concurrent | 2 Years | |

New Search

Return To Municipal Court Home

| | | |
|---|---|---|
| Mayor Tom Barrett | Services & Programs | Web & Email Policies |
| Common Council | Do Business | Contact Us |
| Departments | Live & Work | |
| Calendar | Play | |

Design by City of Mil

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 178 of 805   Document 80-21



*Official Website of the City of Milwaukee*

CALL for Action (414) 286-CITY | Click for Services

Directory　　　Residents　　　Business　　　Visitors

## Municipal Court Query System

Who We Are　　　Court Reports and Statistics　　　Questions & Answers　　　Forms　　　Useful Links　　　Your Feedback



**CITY OF MILWAUKEE**
**MUNICIPAL COURT**　　Case Information & Online Payment System　　[New Search]

For best results when printing:
Set page size to 70%
No "shrink to fit"
Landscape Orientation
　　　　　　　　　　Close

**Case Number: 15002149**

### Defendant Information

| | |
|---|---|
| Name: | JOHNSON, DEBRIELLE DOMINICK |
| Last Known Address: | N/A |
| Month of Birth: | ▇ |
| Sex: | Female |
| Race: | Black |

[All Cases for Defendant]　[All Scheduled Appearances / Submit a Plea]　[Make a Payment]

### Case Information

| | | | |
|---|---|---|---|
| Case Type: | Traffic citation | Status: | Active |
| Violation: | Statute 343.44(1)(a), Operating After Suspension | Citation #: | I1009540 |
| Violation Date: | 01/19/2015 02:15 AM | | |
| Location: | 35TH ST N / NORTH AVE W | Deposit Amount: | $114.00 |
| Plea: | No Contest | In Collection? | No |
| Plea Entered By: | Court | Installment Plan? | No |

### Judgment

| | | | |
|---|---|---|---|
| Finding: | Guilty | Date: | 03/13/2015 |
| Penalty: | $114.00 | Due On: | 05/12/2015 |
| Balance Due: | $114.00 | Branch: | 2 |

| Alternative to Non-Payment by Due Date | Amount | Enforced On |
|---|---|---|
| Commitment - Consecutive | 3 Days | |

New Search

Return To Municipal Court Home

| | | |
|---|---|---|
| Mayor Tom Barrett | Services & Programs | Web & Email Policies |
| Common Council | Do Business | Contact Us |
| Departments | Live & Work | |
| Calendar | Play | |

Design by City of Mil



*Official Website of the City of Milwaukee*

CALL for Action (414) 286-CITY | Click for Services

Directory    Residents    Business    Visitors

## Municipal Court Query System

Who We Are    Court Reports and Statistics    Questions & Answers    Forms    Useful Links    Your Feedback



CITY OF MILWAUKEE
**MUNICIPAL COURT**    Case Information &
Online Payment System    [ New Search ]

> For best results when printing:
>
> Set page size to 70%
> No "shrink to fit"
> Landscape Orientation
>
> Close

**Case Number: 15002150**

### Defendant Information

| | |
|---|---|
| Name: | JOHNSON, DEBRIELLE DOMINICK |
| Last Known Address: | N/A |
| Month of Birth: | ▮▮▮▮ |
| Sex: | Female |
| Race: | Black |

[ All Cases for Defendant ]   [ All Scheduled Appearances / Submit a Plea ]   [ Make a Payment ]

### Case Information

| | | | |
|---|---|---|---|
| Case Type: | Traffic citation | Status: | Active |
| Violation: | Statute 344.62(1), Operate Motor Vehicle without Insurance | Citation #: | I1009551 |
| Violation Date: | 01/19/2015 08:06 AM | | |
| Location: | 35TH ST N / NORTH AVE W | Deposit Amount: | $114.00 |
| Plea: | No Contest | In Collection? | No |
| Plea Entered By: | Court | Installment Plan? | No |

### Judgment

| | | | |
|---|---|---|---|
| Finding: | Guilty | Date: | 03/13/2015 |
| Penalty: | $114.00 | Due On: | 05/12/2015 |
| Balance Due: | $114.00 | Branch: | 2 |

| Alternative to Non-Payment by Due Date | Amount | Enforced On |
|---|---|---|
| DL Suspension - Concurrent | 2 Years | |

New Search

Return To Municipal Court Home

| | | |
|---|---|---|
| Mayor Tom Barrett | Services & Programs | Web & Email Policies |
| Common Council | Do Business | Contact Us |
| Departments | Live & Work | Design by City of Mil |
| Calendar | Play | |



**SUPERVISORS**

| | LIEUTENANT | |
|---|---|---|
| **R** LT. ARMBRUSTER, Kevin (000970) | 9203 | |
| LT. HANLEY, Sean (007929) | X7858 | |
| **R** LT. LOUGH, Paul (013455) | 9305 LT. HANLEY, Sean (007929) | |
| **R** SGT. HERRMANN, Steven (010014) | | |

**DETECTIVES**

| | | | 9306 | |
|---|---|---|---|---|
| **R** DET ARDIS, Luke (009152) | D5 | | X7858 | |
| DET BURTCH, Kenton (018930) | D3 | | 9204 | |
| DET CARR, Juanita (010730) | D3 | | | |
| DET CARTER, Leo (008169) | D5 | | **CENTRAL DETECTIVES 11A-7P** | |
| **R** DET DORAVA, Jason (007010) | D3 | | 9220 | |
| DET FARINA, Andrew (018536) | D3 | | 9221 DET KOHNERT, Britt (007108) | |
| **R** DET HARMS, Mark (011320) | D5 | | 9291 DET LEWANDOWSKI, Shannon (012860) | |
| DET HENNER, James (011125) | D5 | | | |
| **R** DET JOHNSON, Steven (010978) | D3 | | | |
| DET JOHNSON, Troy (017794) | D5 | | | |
| **R** DET KNITTER, Daniel (013913) | D3 | | **DISTRICT 6 - FBI TASK FORCE** | |
| DET KOHNERT, Britt (007108) | D3 | | 9222 | |
| **R** DET LACKOVIC, Scott (015116) | D5 | | 9227 | |
| DET LEWANDOWSKI, Shannon (012860) | D3 | | 9232 | |
| **R** DET MALANCHE, Gena (011333) | D3 | | | |
| **R** DET PORTNOY, Anne (015126) | D3 | | **METRO TASK FORCE** | |
| **R** DET RUTHERFORD, Carlos (010270) | D5 | | 9267 | |
| **R** DET SHEEHAN, William (012432) | METRO | | | |
| **R** DET SIMS, Jerome (001547) | D3 | | | |
| DET SLOMCZEWSKI, Michael (015508) | D3 | | | |
| **R** DET TANEM, Michael (012879) | D3 | | | |
| **R** DET VARTANIAN, Chad (018031) | D5 | | | |
| **R** DET WARD, Mitchell (007360) | D5 | | | |
| DET WOODEN, Kenyatte (011351) | D5 | | | |

**REPLACEMENT**

**District 3 DETECTIVES**

**EARLY SHIFT**

9223 DET BURTCH, Kenton (018930)

9225

9228

9229

9230 DET FARINA, Andrew (018536)

**DISTRICT 3 -LATE POWER SHIFT**

9288 DET CARR, Juanita (010730)

9293

9294

9271 DET JOHNSON, Troy (017794)

**District 6 Detectives**

**EARLY SHIFT**

9224

9228 DET SLOMCZEWSKI, Michael (015508)

9270

**District 6 ARSON DETECTIVE -EARLY SHIFT**

11A-7P    9265 DET CARTER, Leo (008169)

**DISTRICT 6 -LATE POWER SHIFT**

9290

9292

9286 DET WOODEN, Kenyatte (011351)

**District 6 ARSON DETECTIVE - LATE POWER**

9266

9287

# DISTRICT THREE - LATE SHIFT

## MONDAY, JANUARY 19, 2015

| SUPERVISORS | | |
|---|---|---|
| V | 007345 | LT. FOSTER, M'Johno R. |
| | 018008 | D/SGT. LASSANSKE, Michael W. |
| FMLA % | 015481 | SGT. HEWITT, Raymond M. |
| ACAD | 013216 | SGT. LIESKE, Thomas M. |
| ACAD | 018141 | SGT. WEBER, Todd D. |

| CLERICAL | | |
|---|---|---|
| H | 002846 | PDOA BERENDT, Mary L. |
| H | 003577 | PDOA WALTERS-BOYD, Neaver C. |

| POLICE AIDE |
|---|

| OFFICERS | | |
|---|---|---|
| | 021475 | AINES, Sean M. |
| | 010723 | ANTONIAK, Donald S. |
| O/O | 018422 | CABRAL, Andres |
| O/O (RP) | 021478 | CHISUM, Corianna E. |
| | 016626 | CHOVANEC, Aileene I. |
| | 024276 | DOMBECK, Ryan S. |
| | 021480 | DREWEK, Daniel J. |
| R | 018631 | FARKAS, August J. |
| R | 024278 | FINKLEY, Melvin L. |
| H | 019712 | FITZPATRICK, Zachary T. |
| R | 024279 | GONZALEZ, Adam M. |
| FRL | 017786 | GOODWIN, Shannon Y. |
| | 015349 | HERNANDEZ, Roberto A. |
| | 018121 | JOHNSON, Brandy C. |
| R | 017457 | KIEFER, Margaret J. |
| | 016255 | KRAKER, Jerry J. |
| | 018124 | MA, Kenneth Y. |
| R | 014765 | MAGEE, Eric T. |
| O/O | 019200 | McKINLEY, Markel R. |
| | 024292 | NUTER, Alexander D. |
| | 024086 | SWEENEY, Eric M. |
| R | 018140 | VOLLRATH, Jesse J. |
| | 019453 | WIETING JR., Scott R. |
| | 016282 | WILKE, Kevin M. |
| | 015968 | WILSON, Anthony L. |

| OFFICERS IN TRAINING | | |
|---|---|---|
| R | 024608 | JUMES, Charles L. |
| | 024621 | SOWIN, Zachary L. |

| OFFICE PERSONNEL | | |
|---|---|---|
| CAPT: | | |
| LT: | 018008 | SGT LASSANSKE (CIT,I,L,R,T) |
| | | (ROLL CALL, 11P-7A) |
| A/D SGT: | 018124 | PO MA (B,C,I,L,NP,R,RF,T) |
| BOOKER: | 016282 | WILKE (B,C,CIT,FTO,I,L,NP,R,T) |
| CLK: | | |
| CLK: | | |
| CONSOLE: | 015349 | HERNANDEZ (B,C,CST,L,NP,R) |
| DESK PO: | 021478 | CHISUM (CIT,CST,F) |
| AVE WEST | | |
| CON/SS: | 024086 | SWEENEY (CST,NP,T) |

| PATROL SERGEANTS | | |
|---|---|---|
| 3410 | 008099 | GRUBICH (MIRT) (to cover) |
| 3311 | | NIS |
| 3312 | | NIS |
| 3313 | | NIS |

| SPECIAL ASSIGNMENTS | | |
|---|---|---|
| 3368 | | NIS |

| TRAINING |
|---|
| DAAT 720 UPDATE TRNG (8A-4P) |
| SGT LIESKE / SGT WEBER |

| SECTOR AREA 320 | | |
|---|---|---|
| 3320L | 016255 | KRAKER (B,I,L,NP,R) |
| 3321L | | NIS |

| SECTOR AREA 330 | | |
|---|---|---|
| 3330L | 021475 | AINES (CIT,CST,L) |
| | 019453 | WIETING (C) |
| 3331L | 015968 | WILSON (BIC,CIT,FTO,L,NP,T) |
| | 024621 | SOWIN (OIT) |

| SECTOR AREA 340 | | |
|---|---|---|
| 3340L | | NIS |
| 3341L | 018140 | VOLLRATH (B,CIT,L,NP,R) |
| | | (repl for Chovanec) |
| | 024292 | NUTER |

| SECTOR AREA 350 | | |
|---|---|---|
| 3350L | 024276 | DOMBECK |
| | 021480 | DREWEK |
| 3351L | | NIS |

| PATROL WAGON | | |
|---|---|---|
| 3390L | 018121 | JOHNSON (B,C,F,T) |

| EQUIPMENT ON STREET | |
|---|---|
| 1 | E.C.D.S |
| 0 | PATROL RIFLES |

| Total PO's | 25 |
|---|---|
| Working | 13 |
| R | 7 |
| H | 1 |
| O/O | 3 |
| V | 0 |
| Oth Sch | |
| S | 0 |

# DISTRICT THREE - POWER SHIFT

**FULL**   DATE: Sunday, January 18, 2015

## SUPERVISORS

| PS # | Name: Last, First |
|------|-------------------|
| | 008099 GRUBICH, Wade |
| o/o | 013212 HOFFMAN, Richard |

## OFFICERS

| | |
|------|-------------------|
| | 16877 CARLSON, Joseph |
| FUR | 017910 CLAUDIO, Matthew |
| | 008844 DAVIS, Leon |
| R | 019233 DELANEY, Thomas |
| | 014727 DESTEFANIS, Michael |
| R | 017996 FASULO, Michael |
| | 019710 FEKETE, Ryan |
| | 016244 FLANNERY, Brian |
| | 014748 GOGGINS, Joseph |
| R | 018117 GRETENHARDT, Michael |
| R | 008850 HOPGOOD, Troy |
| FUR | 017463 JELINEK, Kyle |
| O/O | 019729 KEMPEN, Andrew |
| | 009066 KNOX, Anthony |
| R | 018938 KOWALIK, Miles |
| | 016077 KRUMNOW, William |
| | 009073 LEIBSLE, Larry |
| | 019738 MICHALAK, Richard |
| R | 011680 NELSON, Nancy |
| R | 017923 NEMETH, Joshua |
| | 018013 ORLANDO, Procopio |
| R | 019741 RUBLEE, Michael |
| | 013918 SCHULZ, Jason |
| | 017473 SMITH, Robert |
| | 015962 STACEY, Debora |
| | 007525 WILHELM, David |
| R | 018035 YINKO, Frank R. |

| | |
|-----------------|----|
| Total PO's | 27 |
| Working | 15 |
| R | 9 |
| H | 0 |
| O/O | 1 |
| V | 0 |
| Oth Sch ( T ) | 0 |
| S | 0 |
| FURLOUGH | 2 |

## CENTRAL DETECTIVES

O1073O CARR, Juanita
O1O978 JOHNSON, Steve
17794 JOHNSON, Troy
O1286O LEWANDOWSKI, Shannon
O12879 TANEM, Michael

## PATROL SERGEANT

| SQD # | |
|-------|---|
| 3410 | 008099 GRUBICH, Wade SGT (MIRT) 7P-3A |
| 3411 | |
| 3418 | |

### LIMITED DUTY

### SPECIAL ASSIGNMENTS

| | |
|-------|---|
| 3480 | |
| 3481 | |

### STOLEN AUTO CAR

| | |
|-------|---|
| 3482 | 016077 KRUMNOW, William (NP,L) |
| | 015962 STACEY. Debora (T,F) |

### TRAINING

### TAVERN CAR

| | |
|-------|---|
| 3465 | |

### CONCORDIA BEAT

| | |
|-------|---|
| 3456 | 018013 ORLANDO, Procopio |
| | 013918 SCHULZ, Jason |
| | (Bicycle Patrol) |
| 3457 | |

### CENTRAL DETECTIVES

| | |
|-------|---|
| 9288 | 010730 CARR, Juanita |
| 9291 | |
| 9292 | 012860 LEWANDOWSKI, Shannon |
| 9293 | |
| 9294 | |

### ARSON DETECTIVES

| | |
|-------|---|
| 9271 | 017794 JOHNSON, Troy |

## SECTOR AREA 330

| SQD # | |
|-------|---|
| 3430 | 014748 GOGGINS, Joseph (CP,L,R,NP,FTO) |
| | 014727 DESTEFANIS, Michael |
| 3431 | 019738 MICHALAK, Richard |
| | 016877 CARLSON, Joseph |

### SECTOR AREA 340

| | |
|-------|---|
| 3440 | |
| 3441 | 008844 DAVIS, Leon (NP) |

### SECTOR AREA 350

| | |
|-------|---|
| 3450 | 009073 LEIBSLE, Larry (CST,I) |
| | 019710 FEKETE, Ryan |
| 3451 | |

### WAGON

| | |
|-------|---|
| 3490 | 009066 KNOX, Anthony (PR, T) |
| | 016244 FLANNERY, Brian (PR, NP, GS) |

### TRAFFIC CAR

| | |
|-------|---|
| 3460 | 007525 WILHELM, David (T,L,R) |
| | 017473 SMITH, Robert (L,R,NP,ET) |

### RELIEF

Patrol Rifles: 3
ECDs: 2

FULL      DISTRICT #5     POWER SHIFT

**DATE: SUNDAY, JANUARY 18, 2015**

## SUPERVISORS

|   |   |   |
|---|---|---|
|   | 012429 | SEBESTYEN, Justin |
| R | 014108 | TAYLOR, Shannon Sgt |

## OFFICERS

|   |   |   |
|---|---|---|
| R | 024062 | AMBORN, Clayton PO |
|   | 017774 | BEASLEY, Melanie PO |
|   | 018624 | BUSSHARDT, Jessie PO |
| R | 024277 | DONAHUE, Casey PO |
|   | 018114 | DRISCOLL, Michael PO |
| R | 014708 | GRABOWSKI, Blaine PO |
|   | 024280 | GROSS, Andrew |
|   | 016226 | HARRIS, Chauncey PO |
|   | 019772 | HINSENKAMP, Jared PO |
| R | 018432 | KELLER, Daniel PO |
| R | 022616 | KENNEDY, Jeffrey PO |
| F/% | 017798 | KRUEGER, Jeffrey PO |
| R | 022622 | KWIATKOWSKI, Zachary PO |
|   | 014106 | LEES, Michael PO |
|   | 024615 | PAVLIK, Douglas-OIT |
| R | 019446 | NEWPORT, Jonathon |
|   | 018946 | SHIPMAN, John PO |
|   | 022645 | SUTYAK, Daniel PO |
|   | 018677 | WATTS, Robert PO |
| R | 019787 | YANG, Joshua PO |

## PATROL SERGEANT

| 5410 |  | NIS |
|---|---|---|
| 5411 | 012429 | SEBESTYEN |
| 5412 |  | NIS |

## TRAINING/SPECIAL ASSIGNMENTS

Desk PO
LEES

FMLA
KRUEGER

## CAR #

| 5428 | 017774 | BEASLEY (F) |
|---|---|---|
|  | 024280 | GROSS |
|  |  | CAR #115 |

| 5438 |  | NIS |
|---|---|---|

| 5448 | 022645 | SUTYAK |
|---|---|---|
|  | 019772 | HINSENKAMP |
|  |  | CAR #283 |

## BICYCLE
| 5462 |  | NIS |
|---|---|---|

## BICYCLE
| 5464 | 016226 | HARRIS (BIRT,BIC) |
|---|---|---|
|  | 018946 | SHIPMAN (T,CIT,MIRT) |
|  |  | CAR #261 |

## RADAR / TRAFFIC
| 5468 | 018677 | WATTS |
|---|---|---|
|  |  | CAR #291 |

## TAVERN SSI
| 5469 |  | NIS |
|---|---|---|

## VIOLENT CRIMES SATURATION
| 5481 | 018624 | BUSSHARDT |
|---|---|---|
|  | 018114 | DRISCOLL (BIC, BIRT,POST) |
|  |  | CAR #181 |
| 5483 |  | NIS |

## RELIEF

NOTES:
RIFLES
TASERS
MORPHS

| Total PO's | 20 |
|---|---|
| Working | 10 |
| R | 9 |
| H | 0 |
| O/O | 0 |
| V | 0 |
| FMLA | 1 |
| S | 0 |
| OTHER | 0 |

# Milwaukee Police Department

| Incident Report |
|---|

**Incident Type:** Squad Accidents        **Incident #:** PA-2015-0011

**Call Type:**                        **Incident Date:** 01/19/2015 **Time:** 2:17

**Origin:**                           **Date Reported:** 01/19/2015 **Time:** 2:17

**Report #:** QQD1J1J    15-019-0017

**Location:**

**Address:** (Verified) 3500 W NORTH AV, , Milwaukee, WI 53208

**District:** 3      **Squad:** 330      **Census:** 9000      **Aldermanic:** 15

**Status:** Closed                        **Date Closed:** 02/04/2015

## Subject(s)

| | |
|---|---|
| **Subject:** | JOHNSON, DEBRIELLE C |
| **Address:** | 3112 N 38TH ST |

| | | | | | |
|---|---|---|---|---|---|
| **City:** | Milwaukee | **State:** | WI | **Zip:** | 53216 |

| | |
|---|---|
| **Accident Role:** | Driver |
| **Unit:** | Unit 2 |
| **Injury Type:** | Minor |
| **Driving Activity:** | Going Straight |
| **Subject Injured:** | Yes |
| **Subject Deceased:** | No |
| **Ejected From Vehicle:** | No |
| **Vehicle Type:** | 4DR |
| **Vehicle Year:** | 2002 |
| **Vehicle Make:** | MITSUBISHI |
| **Vehicle Model:** | GALANT |
| **Vehicle Color:** | WHITE |
| **License Plate #:** | 357WVX |
| **Type of Plate:** | PC |
| **State:** | WI |
| **Vin #:** | 4A3AA6G52E032572 |
| **Citation Issued:** | |
| **Citation Number:** | |
| **Notes:** | |

## Employee(s)

1

**Employee:** LEWANDOWSKI, SHANNON    **ID:** 012860    **Badge ID:**

**Supervisor:**    **ID:**

| | |
|---|---|
| **Accident Role:** | Driver |
| **Unit:** | Unit 1 |
| **Type of Activity:** | On Patrol; Responding as Emergency Vehicle |
| **Manner of Collision:** | Angle |
| **Driving Activity:** | Going Straight |
| **Member Injured:** | Yes |
| **Member Injury Type:** | Minor |
| **Member Deceased:** | No |
| **Squad Number:** | 9291 |
| **Car Number:** | 764 |
| **Type of Vehicle Involved:** | Unmarked Squad |
| **Member wearing seatbelt:** | Yes |
| **Member fit for duty:** | Yes |
| **Airbag Deployed:** | Yes |
| **Property Damage:** | Yes |
| **Other Injured:** | Yes |
| **Ejected From Vehicle:** | No |
| **Citation Issued:** | No |
| **Citation Number:** | |
| **Accident Result of Pursuit:** | No |

**Notes:**

## Action Taken

**Action Taken:** INTERNAL GENERATED

**Suspension**

**# Days    Start Date**

**Due Date:**    **Date Action Taken:** 01/29/2015

**Type:**    **Order Number:**

**Review/Hearing:    Date:**    **Time:**

**Notes:**

## Employee Link Details

**Employee Details**    LEWANDOWSKI, SHANNON

**Subject Details**    JOHNSON, DEBRIELLE C

**Employee:** PASSENGER, EMPLOYEE 1    **ID:** PASSENGER 1    **Badge ID:**

**Supervisor:**    **ID:**

2

| | |
|---|---|
| **Accident Role:** | Passenger |
| **Unit:** | Unit 1 |
| **Type of Activity:** | Responding as Emergency Vehicle |
| **Manner of Collision:** | Angle |
| **Driving Activity:** | Going Straight |
| **Member Injured:** | Yes |
| **Member Injury Type:** | Complaint of Pain |
| **Member Deceased:** | No |
| **Squad Number:** | 9288 |
| **Car Number:** | 764 |
| **Type of Vehicle Involved:** | Unmarked Squad |
| **Member wearing seatbelt:** | Yes |
| **Member fit for duty:** | Yes |
| **Airbag Deployed:** | No |
| **Property Damage:** | Yes |
| **Other Injured:** | Yes |
| **Ejected From Vehicle:** | No |
| **Citation Issued:** | |
| **Citation Number:** | |
| **Accident Result of Pursuit:** | No |

**Notes:**   Detectrive Juanita CARR 010730 Central Inv

## Action Taken

### Employee Link Details

| | |
|---|---|
| **Employee  Details** | PASSENGER, EMPLOYEE 1 |
| **Subject Details** | JOHNSON, DEBRIELLE C |

## Details

**District Review Finding:**

**IAS Review Finding:**

**District Discipline Recommended:**

**IAS Discipline Recommended:**

**Video Exists:**                      No

**Video Reviewed by::**

**Type of Accident:**                 Department Vehicle Involved; Personal Injury; Property Damage

3

| | |
|---|---|
| **Reportable (Over $1000 or PI or over $200 govt dmg):** | Yes |
| **Accident Location:** | Public Highway, Intersection/Related |
| **Investigation Officer:** | PO WIETING |
| **Photos Taken By:** | ID Division |
| **# of Photos Taken:** | Greater than 10 |
| **Traffic Investigation (ARU):** | No |
| **IAS Investigation (IAD USE ONLY):** | Yes |
| **IAS File # (IAD USE ONLY):** | IAS-2015-0032 |

## Assignments

| | | | |
|---|---|---|---|
| **Group:** | Central Investigations - Supervisors | **Assigned To:** | HANLEY, SEAN M |
| **Role:** | Supervisor | **Assigned By:** | HANLEY, SEAN M |
| **Assign Date:** | 1/19/2015 | **Due Date:** | |
| **Completion Date:** | 1/22/2015 | **Recommendation:** | |
| **Notes:** | | | |

| | | | |
|---|---|---|---|
| **Group:** | Central Investigations - Commander | **Assigned To:** | SGRIGNUOLI, JOHNNY C |
| **Role:** | Reviewer | **Assigned By:** | HANLEY, SEAN M |
| **Assign Date:** | 1/22/2015 | **Due Date:** | |
| **Completion Date:** | 1/26/2015 | **Recommendation:** | Further Investigation Warranted |
| **Notes:** | | | |

Updated 1/22/2015 2:15:15 AM by 007929:

Michelle,
I am concerned with the fact Det Lewandowski and Carr were not reponding to the shooting follow up assigned which was in the 2700 blk of N 52nd st. Rather, Det Lewandowski was operating her squad w emergency lights to repond on personal business. Either she was exceeding the postd speed limit to visit a police officer friend at D5, or her son who had been stopped by UWM police. Regardless, operating the department vehicle in such a manner is not authorized.

| | | | |
|---|---|---|---|
| **Group:** | IAD - Admin | **Assigned To:** | PAGAN, MICHELLE A |
| **Role:** | Reviewer | **Assigned By:** | SGRIGNUOLI, JOHNNY C |
| **Assign Date:** | 1/26/2015 | **Due Date:** | |
| **Completion Date:** | 1/29/2015 | **Recommendation:** | Concur with Bureau, Division, District Level Investigation |
| **Notes:** | | | |

4

| Group: | IAD - Admin | Assigned To: | WILLIAMS, TYRONDA L |
|---|---|---|---|
| Role: | Create File | Assigned By: | PAGAN, MICHELLE A |
| Assign Date: | 1/29/2015 | Due Date: | |
| Completion Date: | 1/29/2015 | Recommendation: | |
| Notes: | | | |

| Group: | Police Academy - Commander | Assigned To: | |
|---|---|---|---|
| Role: | Reviewer | Assigned By: | WILLIAMS, TYRONDA L |
| Assign Date: | 2/4/2015 | Due Date: | |
| Completion Date: | 2/4/2015 | Recommendation: | |
| Notes: | | | |

## Notifications

## Exhibits

## Related Incidents

| Incident/Case# | Date | Date Reported | Incident Type | Status | Report # |
|---|---|---|---|---|---|
| IAS-2015-0032 | 1/19/2015 | 1/29/2015 | Personnel | Open | |

**Incident Notes:**

This report is typed by Lt. Sean HANLEY, assigned to CID late power shift.

On Monday, January 19th, 2015 at approximately 2:17AM, there was a squad accident in the intersection on N. 35th St. and W. North Av. I, squad 9205, responded to the scene. Upon arriving I was informed by Sgt. Wade GRUBICH that Det. Shannon LEWANDOWSKI (Squad 9291) was driving the squad and Det. Juanita CARR (Squad 9288) was in the front passenger seat. He also told me there were witnesses that said Det. LEWANDOWSKI was traveling E/B on North Av. She was travelling through the intersection at N. 35th St., where she had a green light, and a white Mitsubishi Galant disregarded a red light while travelling N/B on N. 35th St. causing the collision in the intersection.

I went over to Det. LEWANDOWSKI and asked her it she was okay, she was on a stretcher and being treated by MFD personnel. She was not able to tell me much because the EMT's were working on her.

I went over to Det. CARR next, who was inside an MFD ambulance. She was also in pain and receiving medical attention.

The lady that was in the other vehicle, a 2002 Mitsubishi Galant, white 4dr, WI/357WVX, VIN#4A3AA6G52E032572, was already enroute to Froedtert Lutheran Memorial Hospital before I arrived on scene. This lady was identified as Debrielle D. JOHNSON (BF ▮▮▮▮▮▮▮▮).

While on the scene I was informed by Sgt. Adam RILEY that the squad car involved in the accident, a 2007 Ford Crown Vic. 4Dr. Brown, WI/280LPY, VIN#2FAFP71W67X110523, had been travelling with its emergency lights on. I asked him if he knew of any assignment that required an emergency lights response. He said he was not aware of any. I was then informed by Sgt. RILEY that Det. LEWANDOWSKI had told officers on the scene that she was responding to the area of the University of Wisconsin, Milwaukee, because her son had been stopped in a car by the UWM police. He also stated the witnesses were stating that Det. LEWANDOWSKI was saying she was responding to UWM because the UWM police had stopped her son. I asked Sgt. RILEY to confirm if this was true, he returned a short time later and told me the witnesses were making these statements.

At this point I contacted Detectives Kenyatte WOODEN and Troy JOHNSON and instructed them to come to the scene for witness interviews. I did this because the possibility of serious injuries to the

5

detectives involved in the accident and the need for detailed interviews due to the possibility of violations of Rules and Regulations and SOP.

I then responded to Froedtert Hospital to check on Detectives LEWANDOWSKI and CARR. They both had family or friends with them and were receiving medical attention while I was there. Under the circumstances I decided I would interview them at a later time.

At 6:38AM Det. LEWANDOWSKI called me and asked me if I would like her to tell me what had happened. I said "Yes, I would like to know what happened". She stated her and Juanita (Det. CARR) were going to try to do a consent-search that I had assigned to Juanita. (I had assigned Det. CARR to go to the address of 2765 N. 52nd St. and attempt to get consent to search the house for a gun relating to an on-going shooting investigation, IR#15-019-0017). Det. LEWANDOWSKI told me she was then contacted by P.O. Melanie BEASLEY (a friend of Det. LEWANDOWSKI that works at District 5, late power). Det. LEWANDOWSKI informed me that PO BEASLEY had a restraining order against a Police Officer assigned to the Tac. Squad (Tactical Enforcement Unit). There was a Tac. Officer at District 5, not the one that PO BEASLEY had a restraining order against, and PO BEASLEY was afraid something might happen, so Det. LEWANDOWSKI was driving to District 5 to protect PO BEASLEY. Det. LEWANDOWSKI then told me that while driving to District 5 she got a phone call from her son and he had been stopped in his car by UWM police, so she was driving to the area of UWM first to find her son, who was going to call her when he could figure out exactly where he was. I asked Det. LEWANDOWSKI if she was driving with her red lights and sirens on? She stated she did not have her sirens on but she did have her red lights on. She said she was driving about 45MPH EastBound on W. North Av. She said she did not have her red lights on to drive like an emergency vehicle, she just had them on to make cars pull over and get out of her way. She said she did not see the white vehicle until the last second. She had a green light and did not have time to react to the white vehicle that was travelling NorthBound on N. 35th St. and ran the red light. Det. LEWANDOWSKI then said Det. CARR probably did not see anything because she asked Juanita (Det. CARR) to find something in her (LEWANDOWSKI'S) phone because she doesn't mess with her phone while she's driving. Det. LEWANDOWSKI then stated there was probably video on North Av. that would show the accident.

On Wednesday, January 21, 2015 at approximately 8:30PM, Lt. Paul LOUGH and I responded to Det. Juanita CARR'S residence, at 4719 W. Nash St. to interview Det. CARR regarding this incident. She stated she wanted to respond to the house I had told her to go to for the consent search (2765 N. 52nd St.) She went with Det. LEWANDOWSKI to do this search. While in the car Det. LEWANDOWSKI wanted to go to District 5 to help a friend and then do the consent search. Det. CARR said that while they were driving EastBound on W. North Av. at about Sherman Blvd. there were prostitutes on the sidewalks and Det. LEWANDOWSKI turned on the red lights to scare them. Det. CARR said she doesn't know if Shannon ever turned the lights off, she thinks she might have left them on, she wasn't really paying attention because Shannon gave Det. CARR her cell phone and asked her to find "Melanie" in it. Det. CARR said Melanie is a friend of Shannon that was at District 5 and needed help from Shannon, so Det. CARR was looking down at the phone when the accident happened. She said she heard Shannon yell something, she doesn't remember what, and she saw a white blur from the corner of her eye and the collision occurred. Det. CARR doesn't believe the sirens were on because she heard Shannon yell. Det. CARR said her memory has suffered since the accident and she has to take notes or she'll forget things she easily remembered before the accident.

A check of the area revealed there were no working cameras on North Av. and the pole camera on 35th and Garfield also does not work.

The squad car is not equipped with a camera.

The accident was investigated by PO's Scott WIETING and Sean AINES on squad 3330. The accident is filed under Accident # QQD1J1J and IR#15-019-0017. The driver of the Mitsubishi, JOHNSON is being charged with Causing Injury by Intoxication, Operating After Suspension, Operating Without Insurance, and she had Municipal warrants for Disorderly Conduct and Resist/Obstruct Police.

Forensic Investigator James PETERSON responded to the scene and took 186 photos at 6:00AM.

I was not notified or made aware by either Detective that they were responding to District 5 or to the area of UWM.

The witness interviews by the detectives are detailed in IR#15-019-0017.

| Reviewing Supervisor (Print name) | Signature | Date |
|---|---|---|

| Reviewing Supervisor (Print name) | Signature | Date |
|---|---|---|

6

**THIS INFORMATION**
**IS NOT CONFIDENTIAL**     RESTITUTION WORKSHEET  4192 R5

Court Date: _____          Case Number: _____
Victim: CITY OF MILW POLICE DEPT     Defendant: JOHNSON DEBRISLLE D
Address: 951 N JAMES LOVELL ST       Charge: _____
Zip Code: MILW WIS 53233             Read-in Charge: _____
Phone: _____ Work: 935-7530      V/W Specialist: _____

| Property Loss* (items stolen) | Value |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |
| If these items are covered by any insurance, check (  )  TOTALS $ | |

| Damages* (broken window, auto repair cost, etc.) | Cost |
|---|---|
| 1. SQUAD DAMAGE (ACCIDENT) CAR TOTALLED | |
| 2. NADA BOOK VALUE | 4525.00 |
| 3. DAMAGE APPRASAL | 100.00 |
| 4. TOWING | 259.22 |
| 5. | |
| If these items are covered by any insurance, check (  )  TOTALS $ | 4884.22 |

| Miscellaneous Losses* (medical expenses, car rental costs, etc.) | |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |
| If these items are covered by any insurance, check (  )  TOTALS $ | |

*Please include **copies** of any receipts you may have.

If you checked that some or all of your losses were covered by auto, homeowners or renter's insurance, what was your **total**
deductible(s):
                                                           $ _____

Insurance Company Name(s)/Agents: SELF INSURED

Total amount of restitution owed to **you** (total of all items that were not covered by insurance **plus** any deductible(s):
                                                           $ _____

I believe this information to be true and correct.

Peg Miller  (MARK WAGNER)                    5-26-15
Signature of Victim                          Date

_____ This information was provided by phone to Victim/Witness Services          Date: _____

3936 North Murray Avenue
Shorewood, Wisconsin 53211
(414) 847 – 2610
(414) 847 – 2626 (Fax)



# **Shorewood Police Department**

# Fax

| To: | Sgt. Zieger | From: | Sgt. Simandl |
|-----|-------------|-------|--------------|
| Date: | 8/27/15 | Pages: | 3 (incl. cover) |
| Re: | Requested call printout | | |

**CONFIDENTIALITY NOTICE:** This communication with its contents, including attachments, may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not a named recipient, please contact the sender immediately and do not disclose the contents to another, use it for any purpose, store or copy the information in any medium. Please destroy all copies of the communication.



**Shorewood Police Department**
3930 N Murray Ave | Shorewood, WI 53211 | Phone: (414) 847-2610

**CAD Activity Report**

Friday, August 28, 2015
3:32:36 am
** For official use only **

## Reporting Period: 01/19/15 - 01/19/15

### Village of Shorewood

| 15-000490 | 3616 N Maryland Ave;SH | | Disturbance (DIST) |
|---|---|---|---|
| Reported | 01/19/2015 | 2:02:01 | Prime Unit | 976 |
| Priority | 2 | | Call Taker | Kochevar, Tammie M |
| Stacked | 2:02:50 | | Dispatcher | Salerno, Olga A |
| Dispatched | 2:03:53 | | | |
| Arrived | 2:05:03 | | | |
| Finished | 2:31:08 | | Disposition | Finish |

### Notes

01/19/15 02:02:01
    CAR IN FRONT OF THE HOUSE
    YELLING
    6 PEOPLE
01/19/15 02:02:58
    ANOTHER VEHICLE JUST PULLED UP
01/19/15 02:03:17
    CFS from -> DV          to DIST
    Pri from -> 1 to 2
01/19/15 02:03:18
    Update reviewed by dispatcher- Salerno, Olga A-238
01/19/15 02:03:53
    Dispatched: 976, 970
01/19/15 02:04:17
    COUPLE FEMALES/ 4 MALES
01/19/15 02:04:26
    NOTHING HAPPENING RIGHT NOW
01/19/15 02:04:38
    POSSIBLY INTOXICATED
01/19/15 02:05:06
    CALLER- JAMES EDGAR -414-630-0689
01/19/15 02:06:07
    Plates Added : 179WVF;
01/19/15 02:31:07
    FI'D

### Unit History

| Unit | CC | Date/Time | Officer | Operator | Disposition |
|---|---|---|---|---|---|
| 970 | DI | 01/19/15 02:03:53 | 9700 | | |
| 976 | DI | 01/19/15 02:03:53 | 9760 | | |
| 970 | EN | 01/19/15 02:04:02 | 9700 | | |
| 976 | EN | 01/19/15 02:04:02 | 9760 | | |
| 970 | OS | 01/19/15 02:05:03 | 9700 | | |
| 976 | OS | 01/19/15 02:05:03 | 9760 | | |

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 193 of 805   Document 80-21



### Shorewood Police Department
3936 N Murray Ave | Shorewood, WI 53211 | Phone: (414) 847-2610

### CAD Activity Report

Friday, August 28, 2015
3:32:36 pm

** For official use only **

| | | | | | |
|---|---|---|---|---|---|
| 970 | FI | 01/19/15 | 02:31:07 | 9700 | Finish |
| 976 | FI | 01/19/15 | 02:31:07 | 9760 | Finish |

**Summary**

Subject turned over to MPD.

**Monday, January 19, 2015**

**Kerr, Michael (9700)**

| 02:03:53 | DI | 970 | Dispatched: 976, 970 |
|---|---|---|---|
| 02:04:02 | EN | 970 | |
| 02:05:03 | OS | 970 | |
| 02:31:07 | FI | 970 | |

**Smith 536, Cody (9760)**

| 02:03:53 | DI | 976 | Prime Unit |
|---|---|---|---|
| | | | Dispatched: 976, 970 |
| 02:04:02 | EN | 976 | |
| 02:05:03 | OS | 976 | |
| 02:31:07 | FI | 976 | FI'D |

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 194 of 805   Document 80-21

**Detailed History for Police Call #150190097 As of 7/15/2015 21:28:52**

**Output for:**

Priority:3 Type:1636 - TRBL W/SUBJ
Location:4257 N TEUTONIA AV,MKE
LocCross:btwn W HOPE AV and W ROOSEVELT DR

| Created: | 01/19/2015 00:47:33 | PT09 | 024638 |
|---|---|---|---|
| Entered: | 01/19/2015 00:49:41 | PT09 | 024638 |
| Dispatch: | 01/19/2015 01:01:16 | PD10 | 006781 |
| Enroute: | 01/19/2015 01:01:16 | PD10 | 006781 |
| Onscene: | 01/19/2015 01:18:04 | M066 | 024280 |
| Closed: | 01/19/2015 02:21:00 | M066 | 024280 |

IC: PrimeUnit:5428 Dispo:C15 Type:1636 - TRBL W/SUBJ
Agency:MWPD DAREA:D5 Squad Area:520 RptDist:1583 ☐ Detail

---

| | | |
|---|---|---|
| 00:47:33 | CREATE | Location:4257 N TEUTONIA AV,MKE Type:1636 Name:FEMALE CLLR Phone:(414) 236-8782 DAREA:D5 RptDist:1583 TypeDesc:TRBL W/SUBJ LocCross:btwn W HOPE AV and W ROOSEVELT DR Priority:3 Response:1PO Agency:MWPD LocType:S Contact?:EITHER Call/InPerson Language?:English |
| 00:47:33 | ALI | E911Phne:414/236-8782 E911Pilot:414/511-7132 E911Add:3025 W ATKINSON - SE AV,MKE E911Subs:T-Mobile USA, Inc. E911Srce:WPH2 AliLong:-87.942295 AliLatitude:43.094012 |
| 00:47:33 | ALIGEO | GeoLong:-87.942295 GeoLat:43.094012 |
| 00:47:33 | ALIGEO | GeoLong:-87.942295 GeoLat:43.094012 ClosestAdd:2418 W ATKINSON AV AddDesc:13 ft S ClosestInt:W ATKINSON AV / N 24TH ST InterDesc:145 ft NW |
| 00:49:41 | ENTRY | Comment:CLLR STS THERE ARE SUBJS AT LOC THAT ARE REFUSING TO LEAVE. CLLR STS LOC IS A DUPLEX AND DISCONNECTED THE LINE. UNK IF CLLR IS IN UPR OR LWR. UPON 3 CB NA. NFI |
| 00:49:41 | -NPREMS | Comment:(none) |
| 00:49:43 | NOMORE | |
| 00:49:44 | SELECT | |
| 00:49:57 | HOLD | |
| 01:00:07 | SELECT | |
| 01:01:16 | DISPER | 5428 Operator:017774 024280 OperNames:BEASLEY, MELANIE M GROSS, ANDREW R |
| 01:01:16 | -PRIU | 5428 |
| 01:01:16 | -HOLD | 5428 |
| 01:18:04 | *ONSCN | 5428 |
| 01:22:59 | BACKER | 5468 UnitID:5428 Location:4257 N TEUTONIA AV,MKE Operator:018677 OperNames:WATTS, ROBERT I |
| 01:24:52 | *ONSCN | 5468 |
| 01:36:41 | *CLEAR | 5468 Dispo:C18 DispoLevel:0 |
| 02:21:00 | *CLEAR | 5428 Dispo:C15 DispoLevel:0 |
| 02:21:00 | -CLEAR | |
| 02:21:00 | *CLOSE | |

---

**CONTACT INFO:**

| Name | Phone | RPaddr | Contact? | Language? | Resolved? | Satisfied? |
|---|---|---|---|---|---|---|
| FEMALE CLLR | (414) 236-8782 | | EITHER Call/InPerson | English | | |



Case 2:16-cv-01089-WED   Filed 04/22/19   Page 195 of 805   Document 86-21

**Output for:**

**Detailed History for Unit 5428 Between 01/18/2015 18:00 And 01/19/2015 05:00**  ☐ **Detail**

---

| | |
|---|---|
| 18:57:16 LOGON | Operator:017774 024280 OperNames:BEASLEY, MELANIE M; GROSS, ANDREW R DAREA:D5 Radio:017774 |

---

| | |
|---|---|
| 19:09:46 DISPER | #150182185 Type:1358 CallLoc:3155 N 25TH ST,MKE |
| 19:09:46 -PRIU | |

---

| | |
|---|---|
| 19:27:58 *RELOG | Operator:017774 024280 Vehicle:115 Mileage:85618 OperNames:BEASLEY, MELANIE M GROSS, ANDREW R MobileId:M:M066 Radio:017774 CAR_115 |
| 19:27:58 *OPON | Operators:017774 024280 OperNames:BEASLEY, MELANIE M GROSS, ANDREW R |
| 19:27:59 -AVLCNT | |

---

| | |
|---|---|
| 19:37:21 *CLEAR | #150182185 Type:1358 Dispo:C15 DispoLevel:0 |

---

| | |
|---|---|
| 19:38:46 DISPER | #150182045 Type:1626 CallLoc:3520 N 25TH ST,MKE |
| 19:38:46 -PRIU | |
| 19:41:26 *ONSCN | |
| 20:18:50 *RFT | Comment:INQUIRY QPER,RAY,CLIFFORD,,M,B,08141936,,,,, |
| 20:19:55 *RFT | Comment:INQUIRY QPER,DUNEAWAY,QUAVARI,M,M,B,07302000,,,,, |
| 20:22:48 TRANSP | Location:DETOX #CITZ,MKE LocDesc:at 2835 N 32ND ST #CITZ,MKE LocCross:btwn W HADLEY ST and W LOCUST ST Comment:CITZ CONVEY |
| 20:25:04 CLEAR | Type:1626 Dispo:C15 DispoLevel:0 |

---

| | |
|---|---|
| 20:26:43 DISPER | #150182442 Type:1344 CallLoc:3538 N 13TH ST,MKE |
| 20:26:43 -PRIU | |
| 20:32:17 *ONSCN | |
| 20:52:33 CLEAR | Type:1344 Dispo:C9 DispoLevel:0 Comment:C10 |

---

| | |
|---|---|
| 20:52:40 DISPOS | #150182515 Type:1357 Location:N 15TH ST / W KEEFE AV,MKE |
| 20:52:40 -PRIU | |
| 20:59:39 *CLEAR | Type:1357 Dispo:C15 DispoLevel:0 |

---

| | |
|---|---|
| 21:00:32 BACKER | #150182451 UnitID:9271 Type:1304 CallLoc:3229 W BURLEIGH ST,MKE Location:N 30TH ST / W BURLEIGH ST,MKE |
| 21:21:15 *ONSCN | |
| 21:28:03 *RFT | Comment:INQUIRY QPER,CORPRUE,DESHAWN,J,M,B,03151985,,,,, |
| 21:42:42 CLEAR | Type:1304 Dispo:C18 DispoLevel:0 |

---

| | |
|---|---|
| 21:42:52 DISPOS | #150182671 Type:PW Location:2300 W BURLEIGH ST,MKE |
| 21:42:52 -PRIU | |
| 21:51:45 *CLEAR | Type:PW Dispo:C18 DispoLevel:0 |

---

| | |
|---|---|
| 21:54:08 DISPER | #150182646 Type:1626 CallLoc:2576 N HOLTON ST #UPR,MKE |
| 21:54:08 -PRIU | |
| 21:59:38 ONSCN | |
| 22:09:03 TRANSP | Location:MCMH,MKE LocDesc:at 8900 W WISCONSIN AV,MKE LocCross:btwn N 89TH ST and N 90TH ST |
| 22:09:24 NOTIFY | Notified:MCSO |
| 22:11:48 *RFT | Comment:INQUIRY QPER,SCHWADER,ANTHONY,D,M,W,06161976,,,,, |
| 22:24:03 CMPLT | |
| 23:09:03 *CLEAR | Type:1626 Dispo:C18 DispoLevel:0 Comment:VOLUNTARY C7 |

---

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 196 of 805   Document 80-21   COB 02191

23:10:29  DISPER    #150182594 Type:1851 CallLoc:3307 N 11TH ST,MKE
23:10:29  -PRIU
23:14:41  *ONSCN
23:22:35  *RFT       Comment:INQUIRY QPER,ROGERS,RONALD,,M,B,04301957,,,,,
23:22:48  CLEAR     Type:1851 Dispo:C10 DispoLevel:0

---

23:22:53  BACKER    #150182725 UnitID:5464 Type:1344 CallLoc:3462 N RICHARDS ST #A,MKE
                     Location:D5,MKE Comment:FEMALE SEARECH
23:26:38  *ONSCN
[01/19/2015]
00:06:25  *CLEAR    Type:1344 Dispo:C18 DispoLevel:0

---

00:12:30  *RFT       Comment:INQUIRY QVEH,,845VAD,PC,00,,,
00:18:51  *RFT       Comment:INQUIRY QVEH,,462XBA,PC,00,,,
00:32:51  *RFT       Comment:INQUIRY QVEH,,928VYP,PC,00,,,
00:33:46  *RFT       Comment:INQUIRY QVEH,,675SEM,PC,00,,,
00:36:38  *RFT       Comment:INQUIRY QVEH,,373TWF,PC,00,,,
00:55:52  *RFT       Comment:INQUIRY QVEH,,487RZA,PC,00,,,
00:58:44  *RFT       Comment:INQUIRY QVEH,,740VVF,PC,00,,,

---

01:01:16  DISPER    #150190097 Type:1636 CallLoc:4257 N TEUTONIA AV,MKE
01:01:16  -PRIU
01:18:04  *ONSCN
02:21:00  *CLEAR    Type:1636 Dispo:C15 DispoLevel:0

---

02:43:35  BACKER    #150190234 UnitID:5320 Type:TS CallLoc:2008 W CENTER ST,MKE Location:D5 #C1,MKE
02:43:49  MISC       Comment:FOR FEMALE SEARCH
02:44:03  *ONSCN
04:57:08  SCDOFF
04:57:12  CLEAR     Type:TS Dispo:C1 DispoLevel:0

---

04:57:12  LOGOFF

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 197 of 805   Document 80-21



BE A FORCE COPY

**Milwaukee Police Department**
Police Administration Building
749 West State Street
Milwaukee, Wisconsin 53233
http://www.milwaukee.gov/police

**Edward A. Flynn**
Chief of Police

(414) 935-7200

October 7, 2015

Shannon Lewandowski
Detective
P.S. #012860

Detective Lewandowski:

There is reason to believe that you have violated the department Code of Conduct, including but not limited to the following Core Value, which is detailed in the enclosed copy of Charges and Specifications:

Core Value 1.00 - Competence, referencing Guiding Principle 1.05,
Referencing Standard Operating Procedures Relating To: 640.15(A)(2)

Core Value 1.00 - Competence, referencing Guiding Principle 1.03

Included with this letter is a summary of the investigation. If you wish to do so, you are hereby afforded the opportunity to respond in writing to the information contained in the summary of the investigation. Your department Memo (PM-9E) may include the following:

a.) A written statement of your side of the story including the names, addresses and phone numbers of additional witnesses you wish the department investigators to interview, specifying the nature of the information possessed by the additional witnesses.

b.) Any mitigating factors or circumstances you may wish the Chief to consider in determining a possible penalty.

You have the right to consult with your union representative in the preparation of your written response. The Chief of Police will carefully consider the contents of your department Memo (PM-9E) before making any decision on your guilt or innocence. Similarly, he will weigh any mitigating circumstances against the nature and seriousness of the charges before deciding upon any possible penalty. If you choose not to take this opportunity, the Chief will be compelled to base his disciplinary decisions solely upon the information possessed by the department.

IN SOME JOBS, SUCCESS IS MEASURED BY WHAT DOESN'T HAPPEN.



Your department Memo (PM-9E) must be received in the Office of the Internal Affairs Division no later than 4:00 P.M. on or before the seventh (7th) day following the date you received this notice.  If the seventh (7th) day falls on a Saturday, a Sunday, or a holiday, your department Memo (PM-9E) may be received on the next regular business day.

If you have any questions regarding this matter, please contact the Internal Affairs Division at 935-7942.

Sincerely,

EDWARD A. FLYNN
CHIEF OF POLICE

James C. SHEPARD
Captain of Police
Internal Affairs Division

EAF:JCS:rls

Enclosures (2)

# MILWAUKEE POLICE DEPARTMENT

## CHARGES



October 7, 2015

AGAINST............................................................SHANNON LEWANDOWSKI..............................................................

RANK —  }  *POLICE OFFICER*
POSITION }

*P.S. 012860, I.A.S. #15-0032*

*Violation of Department Code of Conduct as follows:*

### CHARGE

#### CORE VALUE 1.00 – COMPETENCE:

*We are prudent stewards of the public's grant of authority and resources. We are accountable for the quality of our performance and the standards of our conduct. We are exemplary leaders and exemplary followers.*

#### REFERENCING GUIDING PRINCIPLE 1.05:

*All department members shall be familiar with department policy, procedures and training and shall conduct themselves accordingly.*

#### REFERENCING STANDARD OPERATING PROCEDURES RELATING TO: DEPARTMENT OWNED VEHICLES - - SECTION 640.15(A)(2):

*640.15      VEHICLE OPERATIONS - GENERAL*

  *A. OPERATING REQUIREMENTS*

    *2. Operators of Department vehicles shall, in all instances, operate the vehicle in a safe and courteous manner, comply with all traffic laws and ordinances, and wear seat belts at all times, except when doing so would endanger the safety of the operator or another, or when he/she has provided medical certification that he/she is unable to do so.*

### SPECIFICATION

#### CORE VALUE 1.00 – COMPETENCE/REFERENCING GUIDING PRINCIPLE 1.05 REFERENCING S.O.P. SECTION 640.15(A)(2):

*On January 19, 2015, at 2:17 a.m., Detective Shannon LEWANDOWSKI, while on-duty, was involved in a squad accident that occurred at North 35th Street and West North Avenue. Detective LEWANDOWSKI was operating a department vehicle eastbound on West North Avenue with the emergency lights activated. The department vehicle crashed into a vehicle that had attempted to travel northbound through the intersection with a red or yellow traffic light on North 35th Street.*

*Prior to the squad accident, the passenger in the department vehicle, also a detective, had been assigned and intended to recover a firearm used in a shooting incident. Detective LEWANDOWSKI volunteered to assist the other detective, both of whom were in the same vehicle for that assignment. Instead of responding to the location to attempt the firearm recovery, Detective LEWANDOWSKI was responding to a location for reasons not related to aid in the recovery of the firearm.*

*Respectfully submitted,*

_____                    Commanding Officer, Internal Affairs Division

*James C. SHEPARD, Captain of Police*

## WITNESSES

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

## JUDGMENT—ORDER

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Dated** _____          _____
                                              Chief of Police

# MILWAUKEE POLICE DEPARTMENT

## CHARGES

*October 7, 2015*

AGAINST ................................................................ *SHANNON LEWANDOWSKI* ....................................................

RANK — **}**  *POLICE OFFICER*
POSITION

*P.S.  012860, I.A.S. #15-0032*

**(PAGE 2 OF 2)**

*Violation of Department Code of Conduct as follows:*

### SPECIFICATION (continued)

**CORE VALUE 1.00 – COMPETENCE/REFERENCING GUIDING PRINCIPLE 1.05
REFERENCING S.O.P. SECTION 640.15(A)(2):**

During a PI-21 interview, Detective LEWANDOWSKI stated she had previously activated the emergency lights and siren to prevent a vehicle from pulling out and striking her vehicle. Detective LEWANDOWSKI stated she turned off the siren, but thought she left the emergency lights on. Detective LEWANDOWSKI indicated there was no other reason for the emergency lights to be activated. Detective LEWANDOWSKI admitted she was not responding to recover the firearm at the time of the accident, but going to District Five to help an officer with a personal issue. Detective LEWANDOWSKI indicated she had been at District Five for the same issue earlier.

The department vehicle was determined to be "totaled" with a value of $4,525. Detective LEWANDOWSKI, a second detective, and a citizen were all transported to the hospital for injuries. Both Detective LEWANDOWSKI and the other detective were unable to return to work for a significant period of time.

Detective Shannon LEWANDOWSKI failed to operate the vehicle in a safe and courteous manner while complying with all traffic laws.

*Respectfully submitted,*

_____                      _____ Commanding Officer, Internal Affairs Division

James C. SHEPARD, Captain of Police

## WITNESSES

### SERGEANT ADAM ZIEGER

## JUDGMENT—ORDER

**DATE:**

**I HAVE REVIEWED THE CHARGE CONTAINED HEREIN AND ORDER**

**Dated** _____

_____
Chief of Police

# MILWAUKEE POLICE DEPARTMENT

## CHARGES



*October 7, 2015*

AGAINST............................................................*SHANNON LEWANDOWSKI*............................................

RANK —
POSITION }    *POLICE OFFICER*

*P.S. #012860, I.A.S. #15-0032*

**(PAGE 1 OF 2)**

---

*Violation of Department Code of Conduct as follows:*

### CHARGE

#### CORE VALUE 1.00 – COMPETENCE

    *We are prudent stewards of the public's grant of authority and resources. We are accountable for the quality of our performance and the standards of our conduct. We are exemplary leaders and exemplary followers.*

#### REFERENCING: GUIDING PRINCIPLE 1.03

    *All department members shall render service to the community promptly and efficiently. When not answering a call for service, members shall use their time to accomplish the mission of the department.*

### SPECIFICATION

**CORE VALUE 1.00 – COMPETENCE**
**REFERENCING GUIDING PRINCIPLE 1.03:**

    *On January 19, 2015, at 2:17 a.m., Detective Shannon LEWANDOWSKI, while on-duty, was involved in a squad accident that occurred at North 35th Street and West North Avenue. Detective LEWANDOWSKI was operating a department vehicle eastbound on West North Avenue with the emergency lights activated. The department vehicle crashed into a vehicle that had attempted to travel northbound through the intersection with a red or yellow traffic light on North 35th Street.*

    *Prior to the squad accident, the passenger in the department vehicle, also a detective, had been assigned and intended to recover a firearm used in a shooting incident. Detective LEWANDOWSKI volunteered to assist the other detective, both of whom were in the same vehicle for that assignment. Instead of responding to the location to attempt the firearm recovery, Detective LEWANDOWSKI was responding to a location for reasons not related to aid in the recovery of the firearm.*

    *During a PI-21 interview, Detective LEWANDOWSKI stated she had previously activated the emergency lights and siren to prevent a vehicle from pulling out and striking her vehicle. Detective LEWANDOWSKI stated she turned off the siren, but thought she left the emergency lights on. Detective LEWANDOWSKI indicated there was no other reason for the emergency lights to be activated. Detective LEWANDOWSKI admitted she was not*

*Respectfully submitted,*

_____      Commanding Officer, Internal Affairs Division

*James C. SHEPARD, Captain of Police*

**WITNESSES**

**JUDGMENT—ORDER**

Dated _____                    _____
                                                    Chief of Police

# MILWAUKEE POLICE DEPARTMENT

## CHARGES

October 7, 2015

AGAINST ................................................ SHANNON LEWANDOWSKI ................................................

RANK —
POSITION }

POLICE OFFICER .....................................

P.S. #012860, I.A.S. #15-0032

---

*Violation of Department Code of Conduct as follows:*

### SPECIFICATION (continued)

#### CORE VALUE 1.00 – COMPETENCE
#### REFERENCING GUIDING PRINCIPLE 1.03:

responding to recover the firearm at the time of the accident, but going to District Five to help an officer with a personal issue. Detective LEWANDOWSKI indicated she had been at District Five for the same issue earlier.

Detective LEWANDOWSKI indicated that there was no urgency to complete the follow-up and that she intended to meet the other officer instead of conducting the follow-up first because "she had called me and asked me to." Detective LEWANDOWSKI described that her response to District Five took precedence over the gun retrieval because that was where she was "going to go in the first place." Detective LEWANDOWSKI added that the firearm retrieval was not her assignment.

Detective Shannon LEWANDOWSKI failed to render service to the community promptly and efficiently. Detective LEWANDOWSKI failed to use her time to accomplish the mission of the department.

Respectfully submitted,

*James C. Shepard*                                    Commanding Officer, Internal Affairs Division

James C. SHEPARD, Captain of Police

## WITNESSES

SERGEANT ADAM ZIEGER

## JUDGMENT—ORDER

**DATE:**

**I HAVE REVIEWED THE CHARGE CONTAINED HEREIN AND ORDER**

**Dated** _____          _____
                                                Chief of Police

Form PM-9E
11/09

# MILWAUKEE POLICE DEPARTMENT
## MEMORANDUM

**Date:**

**TO:** MICHAEL J. BRUNSON
Deputy Inspector of Police

**RE:** DETECTIVE SHANNON LEWANDOWSKI
I.A.D. FILE #15-0032

On _WEDNESDAY, OCTOBER 7, 2015_, at approximately _7:59_ A.M./P.M., Sergeant _ADAM ZIEGER + SHARONDA GRANT_ of the Internal Affairs Division hand delivered a sealed City of Milwaukee Police Department envelope to the above named at _TAD 321A_. The envelope contained notification of pending charges and instructions for further proceedings, as well as a copy of the **"Charges"** and **investigating supervisor's summary** of the investigation involving the above named.

On _10·0·15_, at approximately _12:58pm_ A.M./P.M., ~~Sergeant~~ _LT. HEATHER WURTH_ of the Internal Affairs Division personnel delivered a sealed envelope to _LT. V. ARMBRUSTER_ the Commanding Officer of _IFC_. This sealed envelope contained reports pertinent to the aforementioned pending **"Charges."**

Respectfully submitted,

_Sgt. [signature] ZIEGER_
Police Sergeant
Internal Affairs Division

[signature]
Police Sergeant
Internal Affairs Division

MEM.MO/rls

Form PM-9E
11/09

# MILWAUKEE POLICE DEPARTMENT
## MEMORANDUM

Date: **OCT 0 8 2015**



**TO:** MICHAEL J. BRUNSON
Deputy Inspector of Police

**RE:** DETECTIVE SHANNON LEWANDOWSKI
I.A.D. FILE #15-0032

---

On _____**OCT 0 8 2015**_____, at approximately **11:00**

A.M./P.M., I delivered a sealed envelope containing notification of pending charges and

instructions for further proceedings, as well as a copy of the **"Charges"** and

**investigating supervisor's summary** of the investigation regarding above, to

Department mail room personnel,

_M. P. Dorsey_____, with

instructions to send said envelope via certified mail to the addressee:

Milwaukee Police Association, Mr. Michael Crivello, President

6310 West Bluemound Road, Milwaukee, Wisconsin

Respectfully submitted,

MPA.MO/rls

 **BE A FORCE** 

Milwaukee Police Department
Police Administration Building
749 West State Street
Milwaukee, Wisconsin 53233
http://www.milwaukee.gov/police

Edward A. Flynn
Chief of Police

(414) 933-4444

November 20, 2015

Shannon Lewandowski
Detective
P.S. #012860

Detective Lewandowski:

There is reason to believe that you have violated the department Code of Conduct, including but not limited to the following Core Value, which is detailed in the enclosed copy of Charges and Specifications:

Core Value 3.00 - Integrity, referencing Guiding Principle 3.10

Included with this letter is a summary of the investigation. If you wish to do so, you are hereby afforded the opportunity to respond <u>in writing</u> to the information contained in the summary of the investigation. Your department Memo (PM-9E) may include the following:

a.)     A written statement of your side of the story including the names, addresses and phone numbers of additional witnesses you wish the department investigators to interview, specifying the nature of the information possessed by the additional witnesses.

b.)     Any mitigating factors or circumstances you may wish the Chief to consider in determining a possible penalty.

You have the right to consult with your union representative in the preparation of your written response. The Chief of Police will carefully consider the contents of your department Memo (PM-9E) <u>before</u> making any decision on your guilt or innocence. Similarly, he will weigh any mitigating circumstances against the nature and seriousness of the charges <u>before</u> deciding upon any possible penalty. If you choose not to take this opportunity, the Chief will be compelled to base his disciplinary decisions solely upon the information possessed by the department.

Your department Memo (PM-9E) must be received in the Office of the Internal Affairs Division no later than 4:00 P.M. on or before the seventh (7th) day following the date you received this notice. If the seventh (7th) day falls on a Saturday, a Sunday, or a



IN SOME JOBS, SUCCESS IS MEASURED BY WHAT DOESN'T HAPPEN.

holiday, your department Memo (PM-9E) may be received on the next regular business day.

If you have any questions regarding this matter, please contact the Internal Affairs Division at 935-7942.

Sincerely,

EDWARD A. FLYNN
CHIEF OF POLICE

Michael J. BRUNSON
Deputy Inspector of Police
Internal Affairs Division

EAF:MJB:rls

Enclosures (2)

# MILWAUKEE POLICE DEPARTMENT

# CHARGES

*November 20, 2015*

*AGAINST* .................................................. *SHANNON LEWANDOWSKI* ......................................

*RANK —* } *DETECTIVE*
*POSITION* } *P.S. #012860, I.A.S. #15-0032*

*(PAGE 1 OF 2)*

═══════════════════════════════════════════

*Violation of Department Code of Conduct as follows:*

### CHARGE

#### CORE VALUE 3.00 – INTEGRITY

We recognize the complexity of police work and exercise discretion in ways that are beyond reproach and worthy of public trust. Honesty and truthfulness are fundamental elements of integrity. It is our duty to earn public trust through consistent words and actions. We are honest in word and deed.

#### REFERENCING: GUIDING PRINCIPLE 3.10

All department members shall be forthright and candid, orally or in writing, in connection with any administrative inquiry or report.

### SPECIFICATION

#### CORE VALUE 3.00 – INTEGRITY
#### REFERENCING GUIDING PRINCIPLE 3.10:

On January 19, 2015, at 2:17 a.m., Detective Shannon LEWANDOWSKI, while on-duty, was involved in a squad accident that occurred at North 35th Street and West North Avenue. Detective LEWANDOWSKI was operating a department vehicle eastbound on West North Avenue with the emergency lights and siren activated. The department vehicle crashed into a vehicle that had attempted to travel northbound through the intersection with a red or yellow traffic light on North 35th Street.

Prior to the squad accident, the passenger in the department vehicle, also a detective, had been assigned and intended to recover a firearm used in a shooting incident. Detective LEWANDOWSKI volunteered to assist the other detective, and both were in the same vehicle for that assignment. Instead of responding to the location to attempt the firearm recovery, Detective LEWANDOWSKI was responding to a location for reasons not related to aid in the recovery of the firearm.

At approximately 2:04 a.m., Shorewood Police Department Sergeant Cody SMITH had contact with Detective LEWANDOWSKI'S son, Mr. Jordan LEWANDOWSKI, near 3616 North Maryland Avenue. Sergeant SMITH indicated during an interview, Mr. LEWANDOWSKI informed him his mother was a Milwaukee Police Detective by handing him a business card, and stated she was on her way to the location.

*Respectfully submitted,*

*D.I. Michael J. Brunson* _____ Commanding Officer, Internal Affairs Division

*Michael J. BRUNSON, Deputy Inspector of Police*

**WITNESSES**

---

**JUDGMENT—ORDER**

---

**Dated** _____

_____
Chief of Police

# MILWAUKEE POLICE DEPARTMENT 

# CHARGES

*November 20, 2015*

*AGAINST* ......................................... *SHANNON LEWANDOWSKI* ...........................................

RANK — POSITION } *DETECTIVE*

*P.S. #012860, I.A.S. #15-0032*

*(PAGE 2 OF 2)*

═══════════════════════════════════════════════

*Violation of Department Code of Conduct as follows:*

### *SPECIFICATION (continued)*

**CORE VALUE 3.00 – INTEGRITY**
**REFERENCING GUIDING PRINCIPLE 3.10:**

Police Lieutenant Sean HANLEY documented Detective LEWANDOWSKI contacted him by telephone at about 6:38 a.m. Detective LEWANDOWSKI informed Lieutenant HANLEY she received a phone call from her son, while driving to District Five, informing her he had been stopped by the UWM (University of Wisconsin - Milwaukee) Police Department. Additionally, Detective LEWANDOWSKI informed Lieutenant HANLEY she was driving to the area of UWM first to find her son. Lieutenant HANLEY documented Detective LEWANDOWSKI stated her emergency lights were activated to make cars pull over and get out of her way, but not to operate as an emergency vehicle.

Witnesses at the scene of Detective LEWANDOWSKI'S accident reported hearing her state that she needed to get her son. Police Sergeant Adam RILEY informed Lieutenant HANLEY that Detective LEWANDOWSKI told officers on the scene she was responding to the area of UWM, because her son had been stopped by the UWM Police Department. Sergeant RILEY later informed Lieutenant HANLEY that witnesses were also making these statements. A witness, Jasmin HERNANDEZ, observed the white female detective use a phone and stated something regarding that she needed to get her son from the UWM Police Department. Police Officer Joseph BOEHLKE indicated the only thing he heard from Detective LEWANDOWSKI was "just something about her son, that she had to get to her son." Officer BOEHLKE did not recall the exact words of Detective LEWANDOWSKI stating, "I don't recall the exact words, but it seemed something to the effect of I need something about my son, or I need to get to my son."

During a PI-21 interview, Detective LEWANDOWSKI stated she had previously activated the emergency lights and siren to prevent a vehicle from pulling out and striking her vehicle. Detective LEWANDOWSKI stated she turned off the siren, but thought she left the emergency lights on. Detective LEWANDOWSKI indicated there was no other reason for the emergency lights to be activated. Detective LEWANDOWSKI admitted she was not responding to recover the firearm at the time of the accident, but going to District Five to help an officer with a personal issue. Detective LEWANDOWSKI indicated she had been at District Five for the same issue earlier.

Detective LEWANDOWSKI acknowledged she received a telephone call from her son informing he had been stopped by a Police Officer. Detective LEWANDOWSKI stated she was not meeting her son, and indicated Lieutenant HANLEY'S report was not accurate.

Detective Shannon LEWANDOWSKI failed to be forthright and candid, orally or in writing, in connection with any administrative inquiry or report.

*Respectfully submitted,*

*D-l Michael J. Brunson* _____ Commanding Officer, Internal Affairs Division

*Michael J. BRUNSON, Deputy Inspector of Police*

**WITNESSES**

SERGEANT ADAM ZIEGER

**JUDGMENT—ORDER**

**DATE:**

**I HAVE REVIEWED THE CHARGE CONTAINED HEREIN AND ORDER**

**Dated** _____

_____
Chief of Police

Form PM-9E
11/09

# MILWAUKEE POLICE DEPARTMENT
## MEMORANDUM

**Date:**

**TO:**   MICHAEL J. BRUNSON
Deputy Inspector of Police

**RE:**   DETECTIVE SHANNON LEWANDOWSKI
I.A.D. FILE #15-0032

---

On _Friday, November 20_, at approximately _4:40_
A.M./P.M., Sergeant _Matthew PALMER_ of the
Internal Affairs Division hand delivered a sealed City of Milwaukee Police Department
envelope to the above named at _I.A.D_. The envelope contained notification of
pending charges and instructions for further proceedings, as well as a copy of the
**"Charges"** and **investigating supervisor's summary** of the investigation involving the
above named.

On _12/02/2015_, at approximately _9:15_
A.M./P.M., Sergeant _William C. WALSH_ of the
Internal Affairs Division personnel delivered a sealed envelope to
_Capt. David SALAZAR_, the Commanding Officer of _Intel. Fusion Center_.
This sealed envelope contained reports pertinent to the aforementioned pending
**"Charges."**

Respectfully submitted,

_St. Martin Palm_   PALMER
Police Sergeant
Internal Affairs Division

_____
Police Sergeant
Internal Affairs Division

MEM.MO/rls

Form PM-9E
11/09

# MILWAUKEE POLICE DEPARTMENT
## MEMORANDUM

Date:

**TO:** MICHAEL J. BRUNSON
Deputy Inspector of Police



**RE:** DETECTIVE SHANNON LEWANDOWSKI
I.A.D. FILE #15-0032

---

On _11-23-15_, at approximately _11:00 AM_
A.M./P.M., I delivered a sealed envelope containing notification of pending charges and
instructions for further proceedings, as well as a copy of the **"Charges"** and
**investigating supervisor's summary** of the investigation regarding above, to
Department mail room personnel,
_Mail Processor Shana Dorsey_, with
instructions to send said envelope via certified mail to the addressee:

<u>Milwaukee Police Association, Mr. Michael Crivello, President</u>

<u>6310 West Bluemound Road, Milwaukee, Wisconsin</u>

Respectfully submitted,

_Rebecca Smith_

SMITH

MPA.MO/rls



# MILWAUKEE POLICE DEPARTMENT
# INTERNAL INVESTIGATION

## DET. SHANNON LEWANDOWSKI
## SEX DISCRIMINATION COMPLAINT

March 1, 2016

Anna M. Pepelnjak
Weiss Berzowski LLP



RECEIVED
MAR 0 4 2016
FIRE AND POLICE COMMISSION

### I.     Overview:

On October 14, 2015, Milwaukee Police Department Detective Shannon Lewandowski submitted a citizen complaint to the Fire and Police Commission. Ex. 1, October 13, 2015 Complaint. FPC Executive Director MaryNell Regan assigned Anna M. Pepelnjak of Weiss Berzowski LLP to investigate the complaint.

The following persons were interviewed: Det. Shannon Lewandowski (three meetings), Sgt. Shannon Taylor, Sgt. Justin Sebestyen, Lt. Jeffrey Norman, Capt. Thomas Stigler, PO Clayton Amborn and Sgt. Roberta Klein. The investigator issued an FPC PI-21 to Det. Melanie Beasley, but Det. Beasley declined to participate in the interview because she is on an indefinite medical leave.

Det. Lewandowski's complaint has been divided into three component parts for purposes of this analysis: (I) Lawrence Poggenburg matter; (II) PO Melanie Beasley matter and (III) PO Clayton Amborn matter. Each subsection contains findings and conclusions, leading to the final conclusion.

### II.     Lawrence Poggenburg matter:

#### A. Findings:

On November 28, 2011, Detective Shannon Lewandowski sent a memo by registered mail to Chief Edward A. Flynn. Ex. 2, 09/01/2011 Memo, Det. Lewandowski to Chief Flynn. In the memo, Det. Lewandowski complained about a number of events of allegedly harassing conduct by her neighbor, Lawrence Poggenburg, and about the Milwaukee Police Department's purported failure to address the problem. At interview, Det. Lewandowski stated that she never heard from Chief Flynn in response to this memo. Det. Lewandowski did not identify Chief Flynn as a target of her complaint either in writing or at interview.

Det. Lewandowski's 10/13/2015 complaint states that, on an unidentified date, she reported allegations about her neighbor to Lt. Jeffrey Norman. Det. Lewandowski's complaint asserts that "nothing occurred" as a result of this

1

conversation. At his PI-21 interview, Lt. Norman acknowledged that Det. Lewandowski raised some concerns about a neighbor, but stated that Det. Lewandowski's complaints constituted a peripheral issue in an investigation into a parking complaint involving a nearby school. Lt. Norman looked into Det. Lewandowski's allegations and found nothing he could pursue.

Det. Lewandowski's October 13, 2015 complaint further asserts that, at an undisclosed point in time, "in tears" she sought help regarding her neighbor's conduct from then-Acting Metro Division Capt. Thomas Stigler. At his PI-21 interview, Capt. Stigler acknowledged learning that Det. Lewandowski had problems with a neighbor from Dist. #3 supervisors. However, Capt. Stigler recalled only one direct conversation with Det. Lewandowski during which Det. Lewandowski spoke about difficulties with a neighbor.[1] Capt. Stigler testified that this conversation took place in a hallway and Det. Lewandowski was "emotional". He listened and advised Det. Lewandowski that her concerns amounted to a "civil matter", not a criminal case or a department rule violation that would warrant police intervention. Capt. Stigler counseled Det. Lewandowski to consider moving her residence. He promised to ask the Internal Affairs Division if there were any other options for assistance, and he did so, but they had nothing of assistance to offer.

On November 15, 2011, Det. Lewandowski applied for a restraining order against Poggenburg. Ex. 3, CCAP, Court Record Events; Milwaukee County Case No. 2011CV17284. The court granted a two-year injunction on December 7, 2011. Det. Lewandowski's 10/13/2015 complaint does not describe any problems with her neighbor or any failure to respond by the Milwaukee Police Department during the pendency of the injunction. More recently, on August 25, 2015, Lawrence E. Poggenburg was charged with misdemeanor Disorderly Conduct. Ex. 4, CCAP, Milwaukee County Case No. 2015 CM 2479. The record indicates that, on October 1, 2015, Poggenburg was ordered to have no contact with "Shannon L." and her residence. On January 11, 2016, on the State's motion, the charge was amended to a county ordinance violation. Poggenburg pled "no contest" and was levied a $25.00 forfeiture, including costs.

### B. Conclusions:

Nothing in Det. Lewandowski's October 13, 2015 complaint suggests that any member of the Milwaukee Police Department failed or declined to act due to Det. Lewandowski's sex. Rather, the concerns she raised were not actionable police matters. As proof, Det. Lewandowski's use of the civil justice system appears to have adequately addressed and resolved the problem.

---

[1] Det. Lewandowski's 10/13/2015 complaint states that adherence to the "chain of command" is what prompted her to approach Capt. Stigler. At interview, Capt. Stigler testified that, from approximately 2006 to 2011, he was the Acting Captain of the then-existing Metro Investigations Division but Det. Lewandowski did not report directly to him in that or any other capacity.

2

### III.  PO Melanie Beasley Matter:

#### A.  Findings:

Det. Lewandowski's 10/13/2015 memo next claims that, on or about January 21, 2015[2], she reached out to Capt. Stigler for help again.[3]  According to the complaint, the matter about which Det. Lewandowski spoke with Capt. Stigler was a complaint that Det. Lewandowski made on behalf of then-PO Melanie Beasley, a female officer stationed at Dist. #5.  Det. Lewandowski alleges she told Capt. Stigler that PO Beasley "feared for her life" due to a "valid restraining order" against "another member", a male police officer.  Det. Lewandowski's memo claims that the male officer often worked the same hours and assignments as the female officer.  Det. Lewandowski states that the female officer experienced "great mental trauma" and called Det. Lewandowski to assist her "while on duty".  Det. Lewandowski asserts that she knew that PO Beasley emailed Capt. Stigler to say that she was afraid to come to work because the male officer said he could "take her out at 1000 yards".  Det. Lewandowski asserts that Capt. Stigler never contacted the female officer.

This investigator attempted to interview now-Det. Melanie Beasley by issuing an FPC PI-21, pursuant to SOP 450.60(B).  On Tuesday, February 16, 2016, Det. Beasley made contact with this investigator and reported that she was unable to participate in an interview for an indefinite period of time due to health problems. Ex. 5, 02/16/2016 Email, Beasley to Pepelnjak; Ex. 6, 02/16/2016 Report, Rogers Memorial Hospital.  Consequently, this report has been prepared without Det. Beasley's input.  Specifically, this investigator makes no finding as to Det. Lewandowski's assertion that Det. Beasley "feared for her life" or experienced "great mental trauma", since that information is uniquely within Det. Beasley's control.

At Capt. Thomas Stigler's PI-21 interview, he stated that he became aware at some point that PO Beasley and PO Robert Wilkinson were involved in a consensual relationship.  He later learned that the relationship broke off, after which animosity developed between the two officers. PO Beasley spoke with Capt. Stigler about her concerns regarding PO Wilkinson.  Capt. Stigler advised her that there was little he

---

[2]      On January 19, 2015, Det. Lewandowski was involved in a squad accident that totaled the squad and caused personal injury to Det. Lewandowski and to her passenger, Det. Juanita Carr.  Det. Lewandowski's injuries required transport to the hospital by ambulance.  After the accident, Det. Lewandowski reported that she was injured in number of bodily areas, had trouble with her short-term memory, and had difficulty "articulating herself".  Evidently, Det. Lewandowski was in a position to pursue a complaint on behalf of PO Melanie Beasley just two days later.

[3]      Det. Lewandowski's memo asserts that she approached Capt. Stigler because he had recently become the captain of Police Dist. #5.  While at Dist. #5, Capt. Stigler had no supervisory authority over Det. Lewandowski.  Any inference that Det. Lewandowski contacted Capt. Stigler in adherence to the chain of command is unfounded.

could do to address their interpersonal difficulties. He recommended that they attempt to work the matter out between them. At her PI-21 interview, Sgt. Roberta Klein testified that she participated in serving PO Beasley with a mutual, internal no contact order as to PO Wilkinson. The identity of the person who arranged for the issuance of this order is unknown to this investigator.

It should be noted that the assertion in Det. Lewandowski's 10/13/2014 memo that PO Beasley had a "valid restraining order" against PO Wilkinson is false. On January 15, 2015, PO Beasley filed for a judicial restraining order (using Det. Lewandowski as her witness) but the court denied PO Beasley's request for injunction. On March 23, 2015, the case was dismissed. Ex. 7, CCAP, Milwaukee County Case No. 2015 CV 488. CCAP does not disclose any other attempts by PO Beasley to obtain a judicial restraining order against PO Wilkinson.

### B. Conclusions:

Det. Lewandowski does not aid her gender-based discrimination claim by alleging mistreatment of Det. Beasley. Det. Beasley's situation stemmed from a romantic relationship that went sour. These situations cannot be properly or successfully addressed by the police or by the employer. In addition, the fact that Det. Beasley was unable to obtain a judicial restraining order suggests that her allegations do not rise to the level of harassment or abuse required by statute.

### IV. PO Clayton Amborn matter:

#### A. Findings:

The bulk of Det. Lewandowski's 10/13/2015 complaint involves allegations of favorable treatment accorded PO Clayton Amborn. Det. Lewandowski alleges that Fifth District Capt. Thomas Stigler failed to follow MPD rules, "used his rank and status" to contact Internal Affairs regarding PO Amborn's status and instructed the investigating officers, including IAD investigator Sgt. Roberta Klein, to "disregard the fact" that PO Amborn was on probation at the time of a serious rule violation committed by PO Amborn. Det. Lewandowski states that Capt. Stigler gave PO Amborn his personal cell phone number, which PO Amborn used to contact Capt. Stigler regarding his probationary status.

Det. Lewandowski also alleges that Sgt. Roberta Klein deviated from procedure with regard to PO Amborn. Det. Lewandowski claims that Sgt. Klein "prepared" PO Amborn for "every question" she would ask him during his PI-21 interview and "what to say in response". Det. Lewandowski asserts that Sgt. Klein permitted PO Amborn to augment the statements made in his recorded interview by adding them to her report. Presumably, Det. Lewandowski offers this evidence in support of her sex discrimination claim, as a similarly situated male comparator who received more favorable treatment than she (a female) received.

4

PO Clayton Amborn joined the Milwaukee Police Department as a probationary employee on August 5, 2013. Ex. 8, 07/02/2013 Appointment Letter, Flynn to FPC. At the time, new officers served a 16-month probationary period. PO Amborn's probationary class became regular employees on January 24, 2015. During probation, PO Amborn was off work for 55 days, from October 26, 2014 to January 4, 2015, due to illness. His immediate supervisor was Sgt. Shannon Taylor, who conducted and signed most of PO Amborn's probationary and regular evaluations. Ex. 9, Probationary and MPD Evaluations, PO Clayton Amborn.[4]

PO Amborn's February 8, 2015 evaluation (identified as a "probationary evaluation") shows his off-probation date as March 18, 2015. The same is true for his March 7, 2015 evaluation. Sgt. Taylor initiated both of these evaluations. At his PI-21 interview, Sgt. Taylor acknowledged that he knew PO Amborn missed over 50 days of work during probation. Sgt. Taylor denied that it was his responsibility as Amborn's first line supervisor to start or monitor the process of extending probation. Sgt. Taylor testified that one of the lieutenants may have filled out a document lengthening PO Amborn's probation, but Sgt. Taylor claimed he never saw the paperwork. Lt. Jeffrey Norman denied that it was his responsibility to extend PO Amborn's probation. Capt. Thomas Stigler testified that he thought the payroll department had the duty to start the process of extending probation. All witnesses testified that extending an officer's probation is a rare occurrence. Evidently, in order to formally extend an officer's probation, FPC approval is required.

On March 8, 2015, PO Amborn was involved in an off-duty property damage automobile accident while driving intoxicated. He was charged with first offense Operating While Intoxicated and Blood Alcohol Content .08%+ [§346.63(1)(a) and §346.63(1)(b) WI Stats]. PO Amborn was initially stripped of his badge and gun, but eventually returned to work on limited duty status. On March 10, 2015, Sgt. Roberta Klein opened an IAD investigation into the offenses.

At his PI-21 interview, Capt. Thomas Stigler he was aware that PO Amborn was on medical leave in late 2014. Capt. Stigler stated that it is standard practice for department and union representatives to periodically check on officers who are out on medical leave. Capt. Stigler explained that officers on leave can become suicide risks, especially if the officer has a limited personal support system. Capt. Stigler said that, while on leave, PO Amborn reported that he was "doing fine" and would return to work eventually.

---

[4] PO Amborn's probationary evaluations do not appear to have been performed on a regular basis. PO Amborn's absence accounts for the lack of evaluations from October 26, 2014 to January 4, 2015, but the gaps exceed that time period. It is beyond the scope of this investigation to determine whether this practice is typical.

5

When PO Amborn was charged with OWI, Capt. Stigler became concerned. He held a discussion with PO Amborn about the event, during which he stressed the severity of the offense, asked for a plan for response from PO Amborn and sent him to the department's EAP referral source. (PO Amborn described the conversation this way: "He really laid into me; he snapped on me like he was my father"). Capt. Stigler gave PO Amborn his personal cell phone number so the PO Amborn could keep Capt. Stigler informed of his progress with EAP. Capt. Stigler said this is not unusual – he recently gave another officer his personal cell phone number under similar circumstances. As to PO Amborn's status as on/off probation, Capt. Stigler could not recall how it came to his attention that probation had not been officially extended, but the fact remained that the extension process was not completed.

On April 9, 2015, Sgt. Klein issued a PI-21 "Informing the Member" form to PO Amborn. At her PI-21 interview, Sgt. Klein testified that her practice for issuing the PI-21 form is to prepare the form, contact the officer and ask him/her to report to IAD to accept service of the form. When the officer appears, Sgt. Klein takes him/her into an interview room with an IAD colleague (the subject officer is not represented), explains the interview procedure, goes over the items listed on the form (including the charges under investigation) and obtains the officer's signature on the PI-21 form. Sgt. Klein does not record this conversation and she does not ask substantive questions of the officer during this approximately 10-15 minute conference. Sgt. Klein testified that this procedure is consistent with her training at IAD and currently in use by other IAD investigators. Sgt. Klein confirmed that she followed this procedure with PO Amborn.

Sgt. Klein did state that the issue of PO Amborn's probationary status came up during their April 9, 2015 conversation. Sgt. Klein testified that she told PO Amborn that IAD was trying to find out whether he was on probation at the time of his offense. At that time, Sgt. Klein was unaware of the formal procedure for extending probation. She "may have" shown PO Amborn a performance evaluation marked "probationary" (confirmed as true by PO Amborn).[5]

Between the issuance of the PI-21 and the actual interview, Sgt. Klein investigated the question of PO Amborn's probationary status. She contacted Sgt. Shannon Taylor and asked him for documents but he failed to provide them. Later, Sgt. Klein received word from Lt. Heather Wurth and Sgt. Adam Zeiger at Dist. #5 that PO Amborn was not on probation because the FPC had not officially acted to extend his probation. In response to Det. Lewandowski's allegation that Capt. Thomas Stigler "reamed" her out, Sgt. Klein testified that she has never spoken with Capt. Stigler about PO Amborn.

---

[5] Sgt. Klein maintained that determining PO Amborn's status as on probation or off probation was a legitimate inquiry because the subjects of PI-21 interviews often ask about possible discipline options. Sgt. Klein expressed her personal belief that termination was more likely to occur if PO Amborn were still on probation, since he could not grieve the Chief's decision.

6

Although it was originally scheduled for April 23, 2015, PO Amborn's recorded PI-21 interview actually took place on May 4, 2015. PO Amborn appeared with his MPA representative. Because the question of PO Amborn's probation status had been answered to Sgt. Klein's satisfaction by then, it was not brought up during the PI-21 interview. Sgt. Klein asked questions regarding the March 8, 2015 OWI offense and the property damage accident. PO Amborn admitted fault and took full responsibility for his actions. (In the October 13, 2015 complaint, Det. Lewandowski accuses Sgt. Klein of preparing PO Amborn as to "every question and what to say in response". Sgt. Klein denied doing so, stating that PO Amborn "answered the questions on his own"). After the recorded interview was over, PO Amborn stated that he wanted to add something to his remarks. He told Sgt. Klein that he wanted her report to indicate that he was sorry for his behavior. Sgt. Klein checked with three other IAD officers to determine if adding information not on the recording was proper. When they advised her that it was, Sgt. Klein added that information to her report.

On May 21, 2015, PO Amborn pled guilty to Operating While Intoxicated and sentenced to a forfeiture of $861.00, AODA program attendance, revocation of his driver's license for 180 days and required use of an ignition interlock device for 365 days. Ex. 10, Municipal Court Query System, Case. No 15011551.

PO Amborn was served with paperwork relative to Core Value violation, charge and investigative summary pursuant to SOP 870.20(C) on June 2, 2015. He submitted a response to the charge to IAD on June 8, 2015 [SOP 870.20(D)]. On June 23, 2015, Chief Flynn conducted a disciplinary review of the record and imposed a 30-day unpaid suspension, under SOP 870.20(E). The Personnel Order imposing the discipline was signed by the Chief on June 24, 2015 and served on PO Amborn on June 25, 2015. At his PI-21 interview, PO Amborn testified that he served his 30-day unpaid suspension and did not file a grievance.

### B. Conclusions:

Det. Lewandowski offers the above evidence to support her sex discrimination claim. Sex discrimination claimants can prove their claims using the direct evidence or the burden-shifting (indirect) method. This record is devoid of direct evidence of sex discrimination, such as sexist statements, documents or overt sexist behavior. Accordingly, Det. Lewandowski must prove sex discrimination using the indirect or burden-shifting method under which the claimant must first establish a *prima facie* case. The *prima facie* requires a complainant to show that (1) she is a member of a protected class, (2) she experienced an adverse employment action, (3) she performed her job to the satisfaction of her employer, and (4) a similarly situated individual, not in the protected class, was treated more favorably. *Puetz Motor Sales v. LIRC*, 126 Wis.2d, 168, 173, 376 N.W.2d, 372, 374-75 (Ct. App. 1985); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253-254 (1981).

7

The evidence Det. Lewandowski offers fails more than one of the required elements, but the fourth prong is the most decisive. Det. Lewandowski is not similarly situated to PO Amborn in any sense. As a legal matter, to be "similarly situated" requires a showing that two employees are directly comparable in "all material respects". *Grayson v. O'Neill,* 308 F.3d 808, 819 (7th Cir. 2002). Typically, that means that they had the same supervisor, were subject to the same standards, and engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Gates v. Caterpillar,* 513 F.3d 680, 690 (7th Cir. 2008), citing *Snipes v. Illinois Dept. of Corr.,* 291 F.3d 460, 463 (7th Cir. 2002) and *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617-18 (7th Cir. 2000). The "similarly situated" analysis asks this question: Are there enough shared features between the individuals to permit a meaningful comparison? While the test is both flexible and contextual, there still must be enough commonalities to allow a comparison that, taken together with the other *prima facie* evidence, authorizes a jury to reach an inference of discrimination. *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 405 (7th Cir. 2007), aff'd, 553 U.S. 442, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008).

Based on these legal principles, it cannot be found that Det. Lewandowski and PO Amborn are similarly situated. First, PO Amborn was assigned to Dist. #5 and his first line supervisor was Sgt. Shannon Taylor. Sgt. Taylor reported to one or more lieutenants, including Lt. Jeffrey Norman. Lt. Norman reported to Capt. Thomas Stigler. Therefore, PO Amborn was a direct line subordinate of Capt. Thomas Stigler. Det. Lewandowski was assigned to the Investigations Division, which is has no direct or dotted line relationship with Dist. #5. Ex. 11, MPD Organizational Chart, 2015. She has no reporting relationship with any sergeant, lieutenant or captain in any of the seven police districts. She does not report to Capt. Stigler. Second, PO Amborn was a patrol officer; Det. Lewandowski was a detective. Their job duties, compensation and qualifications are considerably different. Ex. 12, Job description, Patrol Officer; Ex. 13, Job Description, Detective. Third, PO Amborn was a rookie, not a seasoned officer. His hire date is August 5, 2013, compared with Det. Lewandowski's hire date of June 7, 1999. Det. Lewandowski had considerably more experience in the Milwaukee Police Department, a distinction that should have enhanced her understanding of the range (and the limits) of the department's authority. Fourth, Det. Lewandowski approached Capt. Stigler with a problem that was not a police problem at all, but resolvable as a civil matter; PO Amborn's OWI clearly represented a personnel issue requiring department attention.

Det. Lewandowski's use of evidence associated with PO Amborn as a male comparator to support her sex discrimination claim lacks factual and legal merit. Det. Lewandowski complaint is groundless and therefore, the complaint must be dismissed.

8

Dated this 3rd day of March, 2016.

WEISS BERZOWSKI LLP

By _____
Anna M. Pepelnjak
WI State Bar No. 1018391

P.O. ADDRESS:
700 North Water St., Suite 1400
Milwaukee, WI 53202
Phone:        414/276-5800
Fax:          414/276-0458
amp@wbb-law.com

## ADDENDUM

A number of Det. Lewandowski's accusations are based on two recorded interviews of PO Amborn conducted by then-PO Melanie Beasley on April 24, 2015 and June 2, 2015. According to Det. Lewandowski, PO Beasley recorded these conversations using her cell phone, without disclosing the act of recording to PO Amborn. On April 24, 2015, PO Beasley questioned PO Amborn (in an undisclosed setting in which background noise makes hearing the conversation difficult) and on June 2, 2015, PO Beasley interrogated PO Amborn when they were assigned to a patrol squad. On January 29, 2016, Det. Lewandowski provided the recordings to this investigator. Ex. 14, CD, Recordings. She had previously provided a "transcript" of the recordings. This "transcript", when compared to the audio, turns out to be incomplete and inaccurate. Ex. 15, "Recording of PO Amborn and PO Beasley in squad together".

Moreover, some of Det. Lewandowski's 10/13/2015 accusations misrepresent the recorded conversations. As an example, compare one of Det. Lewandowski's allegations to the words of the recording:

Lewandowski complaint: "Officer Clayton Amborn has been bragging to other officers that "Tommy Boy" (Thomas Stigler) is giving him special treatment and does not know why but believes that Captain Thomas Stigler had a prior OWI and understands his issues.

Recording:

9

PO Amborn: I think Capt. may have had a similar experience happen to him.

PO Beasley: Oh, I never heard of anything like that.

PO Amborn: Maybe it was before he got on the job or he knows people on the job. Because he really laid into me; he snapped on me like he was my father. And he's been very helpful ever since.

\* \* \* \* \*

PO Amborn: Everyone keeps saying to me "Wow, you're best buddies with Tommy Boy". Even like (officer's name) said, "WTF, I haven't talked to the Capt. one f'g time; he never called me."

PO Beasley: That's his name?

PO Amborn: Yeah…But he reached out to me.

\* \* \* \* \*

PO Amborn did not "brag" about receiving special treatment from Capt. Stigler, nor did he call Capt. Stigler "Tommy Boy". To the contrary, what PO Amborn did is speculate on Capt. Stigler's motive (without expressing certainty or source) and report statements made by others. Capt. Stigler offered a reasonable explanation for his conduct, namely, concern for the wellbeing of a subordinate who was in a tough situation. Det. Lewandowski draws a conclusion that is contrary to the facts.

These recordings raise issues as to Det. Lewandowski's credibility and trustworthiness. [6] First, because PO Amborn was unaware that his discussions with PO Beasley were actually interrogations, his words were not well chosen, his thoughts were poorly organized, and his language was occasionally crude. After all, PO Amborn thought he was talking to a friend, not an adversary who would seek to use his statements against him. Second, PO Beasley asked leading and suggestive questions, to which PO Amborn often responded with a casual "yeah". For all PO Amborn knew, these talks were off-the-record, as conversations are, among friends or coworkers. So, PO Amborn's perfunctory responses to PO Beasley's improper questions fail to constitute knowledgeable acceptance of the questions' foundation. Third, the incomplete and inaccurate "transcript" Det. Lewandowski provided to this

---

[6]     PO Beasley's use of her cell phone to record conversations may or may not amount to a violation of policy. That question is beyond the scope of this investigation. Under SOP 750.20(A)(5), using the department's digital audio-visual recording system to eavesdrop or to record the conversations of members without the consent of all parties is prohibited. At the time of these recordings, there were no SOPs prohibiting use of personal recording devices to record conversations with coworkers or superiors.

10

investigator calls her fact-finding capabilities into question. Attention to detail, adherence to facts and getting the whole story are hallmarks of good police work. None of those attributes describes this transcript. Finally, as shown above, Det. Lewandowski's 10/13/2015 complaint mischaracterizes PO Amborn's statements to Det. Lewandowski's advantage. Det. Lewandowski's credibility suffers for the effort.

11

# *EXHIBIT #1*

# MILWAUKEE POLICE DEPARTMENT
## MEMORANDUM



RECEIVED

FIRE AND POLICE COMMISSION

OCT 1 4 2015

FIRE AND POLICE COMMISSION

**Date: 10/13/2015**

**TO:** The Fire and Police Commission

**FR:** Detective Shannon Lewandowski

**RE:** Discrimination, Misconduct in Office

This report is written by Detective Shannon Lewandowski, assigned to Fusion, late shift.

This is the second attempt via memo to report the intentional disparate treatment in direct action due to gender; I and others have been discriminated within this department because we are women. While the laws and Codes of this Department are excellent in theory, they are inadequate in addressing the cover- ups, directly related to females on this police department. There is collusion in the ranks of the male Milwaukee Police Department. The selective enforcement of the law is very corrupt, illegal, and grounds for suspension or immediate dismissal of several officers of rank according to the Code of Conduct and Standard Operating Procedures.

Specifically, on or about September 1, 2011, I addressed a situation that I was having with my neighbor, Lawrence Poggenburg to my Captain. I plead for help. At the time, Lieutenant of Police, Thomas STIGLER was the Acting Captain of the Metro Division, and that is where I was assigned. In tears, I plead for help, explained the fear that I had living next to this person. I went to Lt. Stigler for help as my leader, since I had addressed my concerns and need for help to Lieutenant of Police Jeffery NORMAN first, and nothing occurred. I asked for help, however he refused to intervene, nor did he direct me to whom I could get advice, and demonstrated lack of courage, and failed leadership. I looked to Lieutenant of Police Thomas STIGLER for impartial and effective advice or service in dealing with a neighbor, following the chain of command, as we are directed. The same chain of command that I went to on December 6, 2015 and was reprimanded. I questioned Lt STIGLER days after, then a week after, and he told me he would get back to me. That never happened.

On or about January 21, 2015, I once again reached to Captain Thomas STIGLER, not because I wanted to, but because he was promoted to Captain of District 5. I informed Captain of Police Thomas Stigler that a female at his District on the late shift had a valid restraining order with another member, and that she feared for her life. This member often worked on the same shift, the same hours, and same assignments as the female he assaulted. Additionally, I informed him that the officer was experiencing great mental trauma from her experience, as I was being called to assist her while on duty, and she would like to talk to him. I am also aware that the Officer in distraught, emailed Captain Thomas STIGLER regarding her fear while coming to work, that regarding the other member told the female officer multiple times that he could "Take her out at 1000 yards, and she would not see it coming in the dark." Captain STIGLER never contacted her.

On or about March 2015, I had contact with an officer of District 5 who explained that he was on probation and had been invc'"ed in an OWI incident, when he was in' icated and he struck two cars. Not only did Captain 1.omas Stigler fail to follow the rules of the Milwaukee Police Department, but he used his rank and status to call Internal Affairs Division and order Sergeant Roberta Klein and Sergeant Adam Zieger of IAD to disregard the fact that Officer Clayton Amborn was on probation during the time of his OWI.

The first meeting with IAD and Officer Clayton Amborn was with Sergeant Roberta Klein, who was advising Officer Clayton Amborn how to answer the questions. Officer Clayton Amborn answered the questions and said aloud that he was "thrown for a loop" when he observed that Sergeant Roberta Klein had documents that he was still on probation. Officer Clayton Amborn acknowledged that he was on probation and stated that "I thought that they were proceeding as if I was not on probation?" Sergeant Roberta Klein gave him a copy of proof that he was on probation during the time of the accident. Officer Clayton Amborn then called Captain Thomas Stigler on his personal cell phone because Captain Thomas Stigler told him to call if he needed any help with this investigation. Officer Clayton Amborn spoke with Captain Thomas Stigler and Captain Thomas Stigler became irate telling Officer Clayton Amborn that he would make some phone calls and told him not to worry. Soon after Captain Thomas Stigler told Officer Clayton Amborn that he reamed out Sergeant Roberta Klein and Sergeant Adam Zieger to say that Officer Amborn will be carried as if he is not on probation.

Officer Clayton Amborn returned to IAD and Sergeant Roberta Klein prepared Officer Clayton Amborn for every question and what to say in response, and proceeded as if he was not on probation, and the probation paperwork was never discussed. Officer Clayton Amborn then stated the week following Sergeant Roberta Klein called him to see how he was doing and if he was ok, once again receiving special treatment.

During the interview the second time with Sergeant Roberta Klein, Officer Clayton Amborn stated that he forgot to mention a few things that the "Chief likes to hear when deciding the persons fate. Sergeant Roberta Klein stated that she would just put it in the report albeit she did not make those statements himself. Officer Clayton Amborn has been bragging to other officers that "Tommy Boy" (Thomas STIGLER) is giving him special treatment and does not know why, but believes that Captain Thomas Stigler had a prior OWI and understands his issues. Additionally, Officer Clayton Amborn bragged about being on probation January 24, 2015 along with his class, but if this got out, he would claim it was a clerical error.

Officer Amborn was out sick off of the payroll to answer the questions/preparing him in a portion of his field training, thus his probation was extended 55 days. At the time of his OWI, Officer Clayton Amborn had 8 days left on his probation.

Captain Thomas Stigler not only gave Officer Clayton Amborn his personal cell phone number to call if he needed any help, he talked to him in the office, fixed or discarded the paperwork of his probation, directed Sergeant Roberta Klein at IAD to disregard the probation when he received a PI-21. Officer Clayton Amborn did respond to IAD for the violation, and when he was on the third floor of the Academy talking on recording explaining the accident to Sergeant Roberta Klein, he explained that his Captain, Captain Thomas Stigler, fixed this paperwork and he was "no longer on probation." Additionally Officer Amborn bragged about the fact that he was in an OWI, that he was drunk, and that he caused additional damage to two other vehicles. Officer Clayton Amborn then bragged and laughed about the fact that he has drank and drove drunk from a young age, and now had to "purchase Captain Stigler a bottle of booze or Scotch and write a damn letter to "Kiss the Chiefs' Ass."

Officer Clayton Amborn was off the payroll while on probation, IAD went to his house and removed is gun and badge f m him. When he returned to work after ing off approximately 55 days, he returned to District . without his gun/badge and then those items were returned to him within one day. Officer Amborn knew that he was on extended probation, and during an official evaluation that Officer Amborn signed. This evaluation was explained and signed in the presence of Sergeant Shannon Taylor.

Furthermore, after Officer Clayton Amborn was in a OWI accident, Sergeant Justin Sebestyen informed roll-call at District 5 on March 8, 2015, "We are going to be down another officer because one of your fellow officers got arrested while on probation; and he doesn't have a leg to stand on, and he cannot appeal, and he is going to lose his job." Sergeant Justin Sebestyen also made it very clear that we are not to drink and drive and can call for a ride via the Department.

Likewise, I was involved in an on-duty accident, that of which I was not supported in any way, the Department has failed to pay my medical bills and leave, causing me additional stress and additional medical problems, delaying my healing process. I was also reprimanded for having a cell phone at a public hearing and disciplined on June 3, 2015. Although, I have returned to work, I still am without my police powers, and have not been given my gun/badge back with no explanation. This is also part of the retaliation that I continue to receive, and is obviously discriminatory as male officers like Clayton Amborn are treated with special and different treatment. The treatment that the female officer at his District received while having a valid restraining order is reprehensible, shameful much less his actions dishonorable.

I work in an oppressive environment with a different set of rules for men and women. The actions of Captain Thomas Stigler, breach the Code of Conduct, exercising his powers to defraud the Department while in public office, as he used his status to intervene personally with Officer Amborn. Moreover, Captain Stigler has discriminated against more than one female under his supervision, with different standards for men and women. Officer Amborn lied to IAD, and Captain Thomas Stigler covered up for him. Officer Amborn is serving the public when he should be terminated, much less exercising police powers on the public. Captain Thomas Stigler provided his "personal" cell phone number stating to Officer Amborn, "Call or text me for whatever you need" thus providing assistance for a male officer who did something criminal, as opposed to females who actually needed him to be a leader and provide a safe work environment or at least equal treatment.

Furthermore, Officer Robert Wilkinson was never placed on desk duty/suspended/admin. suspension, while the restaining order was valid much less during the investigation and Sergeant Klein used her powers to dismiss and mislead the investigation, willfully and knowingly.

I would like this complaint investigated by an outside agency, as these actions have impacted not only my work, but created great concern due to the continued abuse of power of this Police Department, Internal Affairs Division, making the work environment, a untrustworthy and hostile work place, everyday.

Respectfully submitted,

Detective Shannon Lewandowski
012860

# EXHIBIT #2

16CV-089 - 0228



 11/28/2011

Shannon Lewandowski

Edward A. Flynn

Chief of Police

**Dear Chief Flynn,**

My name is Shannon Lewandowski, and I am a Detective in the Metro Division at your Police Department. I am writing to you as a citizen, not as your employee. I feel the need to address you by letter because I have been very upset with the direction and way that I have been treated by the members of the Milwaukee Police Department. The same Department that I represent and am honored to be a part. I love my job, consider myself an asset to the city of Milwaukee, and have never tarnished its reputation.

However, for years I have become appalled, mortified, and mostly embarrassed to say that I am a Detective on the Milwaukee Police Department when I personally have called for help. This is not during the course of my duties, but rather as a citizen. I would personally have never handled the following situations as my fellow officers have.

At my appointment time, I lived in Wauwatosa WI., I looked for an apartment in 1999, and located one that was 4 blocks to the north of my home which was in Milwaukee. After filling out the application, the landlord wanted me to rent from him. I soon declined after obsessive calls, personal questions that were out of order, and when he physically appeared at my home, I eventually changed my phone number and looked for a home to purchase. That weekend in 1999, I walked to the front door of where I currently live and asked the family that had a Shorewest Realtor sign in the yard, if I could look at the home without an appointment. That day, I purchased the home.

Five years later, my neighbors at 5231 W. Washington Blvd. moved in, this is a property right next to mine, to the north. This man was the landlord from 1999. His name is Lawrence Poggenburg. When he moved in, I did not welcome him to the neighborhood, since I recognized him immediately. I was not sure if he had remembered since he had gotten married and five years had passed. I was wrong.



Lawrence Poggenburg did remember, and he has made the only place of serenity and comfort I have in the world, a distrustful place of defensiveness. Five years ago, anytime I went into the back yard or to the front of my house to leave, he would approach me and do the same with the incessant barrage of unwanted questions, and repeated intrusions that eventually included deep anger, hostility, and compulsive obsessive acts toward me. The behaviors have escalated over the years, after the first six months of quietly dealing with it, I soon, for lack of better words, "told him off" to set boundaries. I informed him not to come on my property, and I followed the advice of EVERY Sergeant that came to my calls for help, or his obsessive calls about me. This is the short list of officers that have come to my home:

PO Timothy Koestering.

PO Paul Riehle

PO Jeff Hoffman

PO Tom Lieske

PO Ashley Gryzkewicz

PO Edwin Reyes

Sgt Louis Staton

PO Steven Olmstead

PO Steven Strasser

PO Scott IVERSON

PO Gary Post

Lt. Tom Sigler

Det. Moises Gomez

PO Peter Panasiuk

PO Greg Heaney

Sgt Charles Brown

PO Charlotte Brown

Sgt Sobek

Captain Terrance Gordon

Alderman Michael J Murphy

… many more that I cannot recall, and a CAD system that must either erase or file other calls in such a way that I cannot retrieve.

2

I have made every effort to alleviate this problem on my own and with the advice provided to me through my Supervisor. When CIB would finally go to arrest him, L. Poggenburg would lock himself in his home, pull the curtains and refuse to answer the door. Captain T. Gordon handled an incident in 2008 or 2009 when L. Poggenburg exited his garage, pointed to me (I was not in ear shot of what was said but my neighbor was and made a statement) and stated to my then 14 year old son, "That is why you will always be poor and fatherless." My oldest son also heard this and called me as I drove to a basketball game in Waukesha. I pleaded with my eldest to not go outside and let the police handle the situation. Lt Gordon responded with officers. L. Poggenburg refused to exit his home, pulled the drapes and did not come out to the calls and knocks of the police. No follow-up was ever done, no citations, no arrests, no advisement for him to stay away.

The racial epithets from L. Poggenburg, include calling my sons and their Grandmother "Niggers, monkeys, 'go back to Africa,' 'go to your own neighborhood.'"

I on the other hand am called "bitch, cunt," and yells across my yard that "People like me do not belong on the police department."

I have heard L. Poggenburg make remarks about the gay lifestyle of one of our neighbors who resides at 5211 W. Washington Bl.

Assistant Chief Harpole who was at the time the District Three Captain, had arrived at my home, but only due to my constant request. That day I left my bedroom window open a short time, returned home and found that L. Poggenburg had aimed/situated his rotor sprinkler grass watering device directly into my home, as it stayed at one constant stream into my window, saturating my mattress. This mattress had to be disposed. I was told that "although it appears intentional, it cannot be proved." Only the siding of my home where my bedroom was located was wet, none of his lawn. I tried to re-iterate "totality of circumstances" but no one was interested.

Other traditionally non-police calls from L. Poggenburg resulted in Sergeants coming to my home to ask if I had "thrown trash in the street" (CAD call 07 175 1952). Not only did I not throw trash in the street, this is another form of his harassment knowing that I had come home to sleep during the day, only to have more Supervisors knocking at my door as I slept.

CAD 11 103 1161, a call for "parking too close to his car." L. Poggenburg lives on the corner of 53rd/Washington Blvd. He has two corners to park on, a three car garage, three slabs to park. I do not have a garage, I do not have an alley, I do not have a parking slab. I have street parking only. I parked in the front of my home when returning from work, and he then parked his car up against mine and called the police. This is not a reason to call for police service, however Sgt. Larson responded from district three and woke me, and asked me to move my car, which I did. This was another attempt of many by L.Poggenburg for this intent only; harassment.

This summer L. Poggenburgs antics escalated with throwing garbage (bags) in between my home and his fence, spray painting a frame as it rested on a tree in the front of my home close to my parked car. This aerosol type canister propelled the paint mixture on the rear of my car. The neighbor Jeanett Soleski observed this and called my son who was in the yard. My son Kasey ran to the car and asked him to spray paint in the front of his own home. We were able to remove the paint that landed on the bumper of my Honda civic. Police were called, and of course, it could not be proven as intentional.

In 2007 I filed a harassment order after police responded to my home. When I arrived at the courthouse to file, I was informed that L. Poggenburg filed the same. Officers who were at Poggenburg's home the day prior had informed him that I would be filing a harassment order. That day, I was at the District Attorney's office prior to my

3

appointment with a case to present. I became ill and fainted at the District Attorney's office, and missed the hearing. My illness, I believe, was the stress that I have to go through regarding this neighbor. I reopened the case and six members from my neighborhood arrived at court to testify on my behalf. These members are the witnesses to the behaviors of L. Poggenburg. A supervisor from the Department who has witnessed his antics also testified. The police had to be called again when L. Poggenburg stated that he was going to get my gun taken from me, and get me fired from the police department. The filing of such an order was dismissed after several residents on my block came to court on my behalf and testified.

In 2008 my son Kasey graduated from High school. L Poggenburg placed his lawn hose the same way in which he did in my bedroom window, destroying my food and getting my guest wet. When police were called, he locked himself in the home and refused to come out. I was told that there was no way to prove that it was intentional. I explained totality of the circumstances once more; however this has fallen to deaf ears, and told to get a restraining order once more.

In 2008, L. Poggenburg built a play structure right next to my home, The photos are included. He sits in the playhouse and observed by not only myself, but guests of my home, and he looks into my home. I have placed curtains on the entire north side of my home to avoid looking at him in any capacity, as well as to keep him from looking into my home. My neighbors John and Sandra Folaron of 5211 W Washington Bl Apt #4, asked me why I approved the building of the play house so close to my house. I stated that I had not. John Folaron stated that he called the City Inspector on him and also called about his fence. John Folaron stated that to his knowledge the fence was on my property since it was so close to my home. After that conversation, I then was contacted by the city Inspector. I informed John Folaron that I did not want any more problems, and John explained that he has had confrontations with L. Poggenburg regarding calling the police on him about loud parties.

L. Poggenburg called the city inspector on my property for a plastic shed that can hold 3-4 shovels and a lawn mower. This shed came with the home which I had already been in for 12 years. L. Poggenburg informed the city inspector that it was "new construction". The Alderman, Michael Murphy had to resolve the matter. I subsequently took the shed down to avoid any other problems.

I placed video surveillance cameras on my home after the Burglary in 2008, and for protection/evidence from L. Poggenburg. I have kindly and angrily told L. Poggenburg to stay away from the front of my residence and my children. Both of my boys were frightened of him when they were younger. L. Poggenburg would walk to my home; confront my kids when I left for work or to the store. One time after having an argument regarding him talking to my children, I left for work. L. Poggenburg walked to my home and asked both of my sons if they wanted to walk to get "ice cream" with him. Both of my children have been approached by him several other times. This summer, L. Poggenburg charged at me when I ignored him, and he then called me a "fucking bitch." My son observed and heard what was said and felt the need to defend me, knocking L. Poggenburg back off of our property in the front of our home onto the ground. This is the only time he did NOT call the police.

L. Poggenburg was caught peering in my bedroom window this summer in August 2011, and provided the explanation that he cut between my home and his fence to enter my yard to retrieve a "Wiffle ball" a 5cent plastic ball (which was actually mine). As he cut through the yard, he put his hands on my window (the writers prints were visible), and looked in my bedroom. I was on my computer and it was 7am on a Sunday, as I was preparing to attend church. My car was not parked in the front of my home and was getting repaired. This was his indication that I was not home. Sgt Charlie Brown responded, gave his opinion about L Poggenburgs obsession with me and provided the advice to put up another camera, and no-trespassing signs. I did.

**4**

On November 1, 2011, a realtor came to my home to provide an estimate on selling my home. She informed my sister that the signs on the outside of my home home (no trespassing etc) should be removed because I appears that the area is problematic. L. Poggenburg called the police because he placed a sign in my yard, and claimed that it was his. When PO Edwin Reyes and Sgt Sobek of District Three arrived to talk to me about the sign, I did not know about the sign removal. Later that day, L.Poggenburg threw a sign over my fence that read "u cunt." I asked Sgt Sobek to go to his home as I observed him throw it over the fence. To my knowledge, nothing was done.

On November 12, 2011 my children's Grandmother stayed the night at my home. Her name is Denise Rogers. She stayed the night for the safety of my son, taking him to school on Friday the 11th and taking care of the dog. At 4:24am on November 12, 2011, L. Poggenburg used a long pruning scissors to cut the surveillance wires on the north east side of my home. As the wires were cut, interference was sounded on the alarm system, waking Denise. Denise, well aware of the problems, which she has witnessed herself, looked out the window where she slept and observed L. Poggenburg attempting to cut another wire. After she opened the window, L. Poggenburg ran from the side of the fence in his own yard and into the side door of his home. Denise called me; I was in Fond du Lac WI. I was in Fond du Lac completing work on my Masters. I provided the phone numbers to Metro. Denise could get no answer, so she called District 3. Denise was at my residence until 9am. No squad to our knowledge ever came.

I filed a harassment order on November 15, 2011. After filing it, I called Sgt Sobek of District three who provided me his cell number and stated that when I saw him, to call, that he would personally go to his home to serve it.

This summer to the best of my knowledge, L. Poggenburg was fired from the City of Milwaukee where he worked as an electrician. Since his dismissal with the city, he was hired (according to facebook) at Potomac Electric Power Company which is either located according to Google in either Maryland, Washington D.C. or Boston. Happy as I am, L. Poggenburg is gone a week or two at a time. However, this has not deterred him either because since then, as he has in the past, blew all of his leaves in the front of my home, cut my surveillance wires, and threw notes over my fence. Due to the fact that he is out of town during the week, it has become difficult to serve him the harassment court order, him especially without him finding out that we were trying to serve him. If he had that knowledge, he would make it even more difficult to be served if not impossible. Given my late shift schedule, court schedule, I only rest between noon and 4pm and am then with my children getting them from school etc. My schedule does not permit such surveillance of his whereabouts.

I have surrendered and decided to sell my home. I have lived her 13 years. I do not want to sell my house. However, my ability to rest is limited having such a vile and vindictive, obsessive neighbor, and no piece of property is worth all of this. I cannot sell my home with a realtor without an order since he will be sending people to my home or even come himself when I am not here for the open houses. I cannot have that occur. As it stands, I tried to post a sale sign on my lawn, and he has called my home over two dozen times and I believe have had his friends call. I can see the numbers on the caller ID, and when I research those numbers, they come to friends of his that are on his facebook page. (He has no knowledge that I access the page).

At this home, on this street, MY STREET, I solved the mayor's sons robbery, who I informed officers of the stop I had made the night before which were occupants of the home across from my home (1613 N 53rd). I issued citations to the two robbery suspects the night before the robbery. Citations that I initially took heat from CIB about because "Detective don't issue municipal citations." Luckily I had. This was after a short foot chase in the middle of the night from Vliet Street to Washington blvd where I observed two of them run in the home. This is the same home that burglarized my home and removed my service weapon. A case that I had to solve myself. This is the same drug house across the street where one of its occupants stole a lawyers car and crashed into mine, placing me injured and on foot chase in flip flops catching all three until I could only hold down one. There was also shooting across the

street. I observed the shooting, identified myself as I pointed my weapon at him. This suspect ran south right into NTF. This case has been charged RES and is already sentenced. I also opened my door to every officer on the block, fed them and let them use my facilities. When a canvass was done, Poggenburg refused to talk to the police. Later, L. Poggenburg made statements that the "niggers across the street are same as the niggers next to me." Well, the ones next to him are my sons. A junior in College, attending Chicago State on a Division One baseball scholarship, and another a junior in high School; honor roll and all city first pick wide receiver and tight end, all city first string baseball offensive and all State defensive player as a Sophomore. Fine young men I might add.

The list of problems with my neighbor is endless. However to top off the lack of regard for me not only as an employee, but as a female, parent, but a citizen. I filed the appropriate paperwork, at the cost of $168. For a harassment order. The hearing was November 28, 2011. I observed L Poggenburg home at this residence on November 26, 2011. I went to District three where I filed the order, talked to Lt Obergon to ask someone to go to 5231 W Washington bld and serve the order since I observed him at home. Poggenburg has twelve windows in the rear of his home that do not have curtains. District three Captain Michael Brunson REFUSED to allow any officer's at the district to serve the harassment order, stating "We don't want any part of it." I was told this quote by sergeants at District 3. Further that Metro had to serve the order. Outside of the fact that I am coming for help once more, I presented and filed a legal document that I paid for, received and filed on my own time in hopes to finally get the help that the police of the district that I reside and pay taxes in. The same officers and supervisors that stated that they needed this document to arrest my neighbor if needed, to set the boundaries that he could not set for himself.

Eventually Lt of Police Jim Timm and Lt of Police Paul Kavanaugh served the order, but to L. Poggenburg's wife. Colleen Poggenburg told the Lieutenant of Police Jim Timm that her husband was at Menard's and would be returning but only to leave out of town for two weeks. Instead of waiting until he returned from Menards, they served his wife. Subsequently I took off another day of work, as did two of my neighbors, a friend who witnessed his actions, Grandmother to my children, and my eldest son who took off of school. Court Commissioner Nancy Sturm refused to move forward since the wife was served, even though L. Poggenburg's lawyer Brent Linster was representing him. Additionally the Lieutenants of Metro and CIB did not file the appropriate paperwork, leaving me lectured by the commissioner that "I should know better that Lawrence needed to be served and not his wife." I wanted to reply, but did not, that if I could have done it, and done it right myself, I would have. The lawyer Linster stated that Lawrence Poggenburg would be out of town for next two weeks and the Commissioner left me with eight days to serve a document that I cannot since he is supposedly out of town. When he is not out of town, he hides from our department. I requested that out of "Good Faith" that Linster service his client. He refused, stating, "I find it ironic that someone that harasses her so much cannot be found by her."

Additionally, I had addressed this entire situation with Lt Thomas Stigler of Metro Division that perhaps someone with more experience and the fact that he was Acting Captain at the time could help after both Lawrence and Colleen Poggenburg tried to get all of my personnel records from MPD. On 08-31-2011 both Colleen and Lawrence Poggenburg requested All calls for service to my home. I was informed by PSSI Frank Heinrich that he would make appropriate redactions to the reports. Asking myself why anyone would want these reports, still evades me, other than to get personal information about me in the burglary reports. After I pleaded for help, Acting Captain Lt Stigler never talked to me about what he could or could not do, nor has he ever addressed me regarding my conversation with him; as if how I feel is ok or that I do not matter.

Colleen Poggenburg, the wife of Lawrence Poggenburg has never uttered a word to me, however has stood and watched majority of these incidents, and lied to police when they have come for her husband. She has watched her husband berate me, watched him shovel snow and blow leaves onto my stairs in the front of my home, and watched

6

him cut my trees and bushes. One winter when L Poggenburg was swearing at me and throwing snow on my cars with his snow blower, his father or father-in-law walked to my home and apologized (witnessed by another neighbor) and cleared all of the snow from my cars. L. Poggenburg has told me numerous times how he hates MPD since his wife was married to a detective who beat her. I have no knowledge of this (Det Larry Schimke) nor any validity in his statement. However this may be part of his issue with me at hand.

I realize that by the time that anyone would even consider what or how to help me, December 7, 2011 at 10:15am will have passed and L. Poggenburg will not have been served, I will have fallen victim to more. Additionally, I will have had to pay another $168 dollars that I do not have, my neighbors who are struggling in this economy cannot continue to take off of work, nor can my son be asked to leave college to attend another hearing.

I would like to ask you, the head of my Department, what am I to do? How am I supposed to live? Where am I supposed to turn for help? WILL SOMEONE PLEASE HELP ME?

Respectfully submitted,

Shannon Lewandowski

Citizen

1632 N 53rd St

Milwaukee, WI 53208

(414) 405-4617c(414) 455-3773h



COPY

**7**

# EXHIBIT #3

16CV.089 - 0236

## Court Record Events

| | Date | Event | Court Official | Court Reporter |
|---|---|---|---|---|
| 1 | 03-05-2012 | Injunction hearing | Amato, Dominic S. | |

**Additional Text:**

Petitioner appears in court. Respondent appears in court. De Nov Hearing for Injunction proceeded. For reasons stated on the record, Court affirms commissioner decision and Injunction remains in full force and effect. jci

---

| | | | | |
|---|---|---|---|---|
| 2 | 02-28-2012 | Amended | | |

**Additional Text:**

Notice of Hearing and Motion on Respondent's Motion to Review Decision / Ruling of Family Court Commissioner, filed. jci

---

| | | | | |
|---|---|---|---|---|
| 3 | 02-22-2012 | Notice | | |

**Additional Text:**

to reschedule 3-2-12 Injunction hearing mailed to parties. filed. jci

---

| | | | | |
|---|---|---|---|---|
| 4 | 01-26-2012 | Letters/correspondence | | |

**Additional Text:**

from Attorney Brent Nistler, filed. jci

---

| | | | | |
|---|---|---|---|---|
| 5 | 01-20-2012 | Transcript | | |

**Additional Text:**

of 12-7-11 hearing, filed. jci

---

| | | | | |
|---|---|---|---|---|
| 6 | 12-19-2011 | Amended | | |

**Additional Text:**

Notice of Hearing and Motion on Respondent's Motion to Review Decision / Ruling of Family Court Commissioner, filed. jci

---

| | | | | |
|---|---|---|---|---|
| 7 | 12-16-2011 | Notice of hearing | | |

**Additional Text:**

and Motion on Respondent's Motion to Review Decision / Ruling of Family Court Commissioner, filed. jci

---

| | | | | |
|---|---|---|---|---|
| | 12-07-2011 | Injunction w/out firearm restriction | Honrath, William | |

**Event Party**

Poggenburg, Lawrence

Case 2:16-cv-01089-WED    Filed 04/22/19    Page 242 of 805    Document 80-21

| 9 | 12-07-2011 | Injunction gran t | | Amato, Do nic S. | |

| 10 | 12-07-2011 | Injunction hearing | | Honrath, William | Digital Recording |

**Additional Text:**

Petitioner appears in court. Respondent does NOT appear in court EXCEPT by attorney Michael Tuchalski. Respondent is reserving any jurisdictional defects, also indicated off the record that there's a challenge to the service. Petitioner does not agree to respondent's request to adjourn. Hearing for Injunction will proceed. Service is on file with the court. Sworn and examined: Petitioner. Sworn for petitioner: Denise Rogers. Petitioner's Motion for Injunction Granted and is effective until DECEMBER 07, 2013 (2 years). 4. Other: Respondent is not to subject the Petitioner to violent abusive or otherwise disorderly conduct under circumstances tending to provoke a disturbance. Filed, signed Injunction (Harassment).

| 11 | 12-06-2011 | Proof of service | | TRO Court | |

**Additional Text:**

filed.

| 12 | 11-28-2011 | Injunction hearing | | Sturm, Nancy L. | Digital Recording |

**Additional Text:**

Petitioner appears. Respondent does NOT appear, Attorney Brett Nistler appears on behalf of Respondent, stating Respondent has not been served, ask court to dismiss matter. Respondent has NOT been served with a copy of the Temporary Restraining Order, Notice of Hearing, and Fact Sheet. The time for hearing on an Injunction is adjourned to DECEMBER 7, 2011 at 10:15AM ROOM 712, COURTHOUSE. If a temporary restraining order has been issued, it remains in effect until the injunction hearing is held. Petitioner given copies of Order. Filed, signed Order Extending Time for Hearing.

| 13 | 11-15-2011 | Petition for TRO/injunction | | | |

| 14 | 11-15-2011 | Temporary restraining order | | Amato, Dominic S. | |

| 15 | 11-15-2011 | Filing fee paid | | | |

**Amount**

$ 168.00

**Additional Text:**

11RV042493

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 243 of 805   Document 80-21

# EXHIBIT #4

# State of Wisconsin vs. Lawrence E Poggenburg

Printable Version (PDF)

## Milwaukee County Case Number 2015CM002479

### Court Record Events

What Is RSS? **RSS**

| | Date | Event | Court Official | Court Reporter |
|---|---|---|---|---|
| 1 | 08-25-2015 | Summons and complaint | | |

**Additional Text:**
SUMMONS MAILED. DEFENDANT ORDERED INTO ROOM 221 SAFETY BUILDING ON 10/1/15 @ 1:30 pm

| | Date | Event | Court Official | Court Reporter |
|---|---|---|---|---|
| 2 | 10-01-2015 | Request for substitution | Sweet, David | Digital Recording |

**Additional Text:**
Defendant Lawrence E Poggenburg in court with attorney Brent Daniel Nistler. Patrick J Anderson appeared for the State of Wisconsin. Request for Substitution of Judge received and filed. Court consented to substitution against Judge Siefert. Parties are advised the Clerk of Circuit Court reassigned case pursuant to current court rules to Judge Dee, Br. 37. Pre-trial conference scheduled for October 19, 2015 at 01:30 pm.

| | Date | Event | Court Official | Court Reporter |
|---|---|---|---|---|
| 3 | 10-01-2015 | Initial appearance | Sweet, David | Digital Recording |

**Additional Text:**
Defendant is advised this case is assigned to Judge Dee, Branch 37. Court reviewed the complaint and found probable cause. Defendant advised of right to counsel and complaint given to Defendant's attorney. Defendant plead not guilty. Case is adjourned for a Pretrial Conference in Branch 37.

| | Date | Event | Court Official | Court Reporter |
|---|---|---|---|---|
| 4 | 10-01-2015 | No Contact Provision Ordered | Sweet, David | Digital Recording |

**Additional Text:**
Signed and filed, No Contact Order. Defendant to have no contact with Shannon L. and her residence. Court advised defendant that failure to comply with conditions of bail may result in an additional charge of bail jumping.

| | Date | Event | Court Official | Court Reporter |
|---|---|---|---|---|
| 5 | 10-01-2015 | Signature bond set | Sweet, David | Digital Recording |

| Event Party | Amount |
|---|---|
| Poggenburg, Lawrence E | $ 1000.00 |

**Additional Text:**
DEFENDANT WAS ORDERED BY THE COURT TO REPORT TO THE MILWAUKEE COUNTY JAIL (CJF) TO BE BOOKED AND RELEASED BY 3:00 P.M. ON (10-2-2015). IF THEY FAIL TO APPEAR A BENCH WARRANT WILL BE ISSUED FOR THEIR ARREST.

| | Date | Event | Court Official | Court Reporter |
|---|---|---|---|---|
| 6 | 10-01-2015 | Judicial transfer | Dee-37, T. Christopher | |
| 7 | 10-19-2015 | Pre-trial conference | Dee-37, T. Christopher | Off the Record |

**Additional Text:**
Defendant Lawrence E Poggenburg in court with attorney Brent Daniel Nistler. Kelly O'Neill appeared for the State of Wisconsin. Deputy Court Clerk: TC. Defense counsel has received discovery and offer. Assistant District Attorney's office requests additional time. Court ordered case adjourned for a projected guilty plea and sentencing / possible disposition in Branch 37. Agreed Upon Request for a

New Court Date is sign[ed] [a]nd filed. Plea/sentencing hearing schedule[d fo]r November 6, 2015 at 08:30 am.

| 8 | 11-06-2015 | Scheduling conference | Dee-37, T. Christopher | Digital Recording |

**Additional Text:**
Defendant Lawrence E Poggenburg in court with attorney Brent Daniel Nistler. Brittany Skye Kachingwe appeared for the State of Wisconsin. Deputy Court Clerk: TC. Case calendared for projected guilty plea and sentencing. For reasons stated on the record, Court ordered case adjourned for status conference in Branch 31. Defense counsel requests jury trial date. Any and all motions are to be filed with the court by the final pretrial date. Case is adjourned for Final Pretrial Conference and Jury Trial, Branch 31. All parties are notified that effective 11-19-15 this case will be assigned to Reserved Branch, Branch 31, in Room 615 of the Courthouse. Status conference scheduled for November 24, 2015 at 08:30 am. Final pre-trial scheduled for January 11, 2016 at 08:30 am. Jury trial scheduled for February 15, 2016 at 09:00 am.

| 9 | 11-24-2015 | Substitution of attorney | Flynn, Dennis | Off the Record |

**Additional Text:**
-Stipulation received from Attorney Craig A. Mastantuono on behalf of his client; received and filed. Deputy Court Clerk: TC.

| 10 | 11-24-2015 | Status conference | Flynn, Dennis | Off the Record |

**Additional Text:**
Attorney Leah Thomas on behalf of attorney Craig Mastantuono in court. Kelly O'Neill appeared for the State of Wisconsin. Deputy Court Clerk: TC. Defendant's appearance waived for today's proceedings. Defense counsel would like final pre-trial on January 11, 2016 at 1:30 p.m. not 8:30 a.m.

| 11 | 12-01-2015 | Judicial transfer | Rifelj, Paul J. | |

| 12 | 01-11-2016 | Amended | Rifelj, Paul J. | Digital Recording |

**Additional Text:**
Defendant Lawrence E Poggenburg in court with attorney Craig Mastantuono. Jennifer L Pickett appeared for the State of Wisconsin. eputy Court Clerk: TC. Case calendared for final pre-trial. AS TO COUNT 1: On motion of the State, Court ordered charge amended to Disorderly Conduct, contrary to County ordinance section(s) 63.01, a Class forfeiture. Defendant enters a plea of no contest. Court found the Defendant guilty. Court orders Defendant to pay a forfeiture of $25.00 including costs to be paid by 02-10-16 or Civil Judgment. Court ordered February 15, 2016 at 9:00 a.m. jury trial vacated.

| 13 | 01-11-2016 | Charge amended | | |

| 14 | 01-11-2016 | Dispositional order/judgment | Rifelj, Paul J. | |

Printable Version (PDF)

Return to Case 2015CM002479

*EXHIBIT #5*

**Anna M. Pepelnjak**

| | |
|---|---|
| **From:** | Melanie <melaniecopper836@yahoo.com> |
| **Sent:** | Tuesday, February 16, 2016 3:26 PM |
| **To:** | Anna M. Pepelnjak |
| **Subject:** | Re: From Det Melanie Beasley |

Thank you. Have a nice day
Detective Melanie Beasley

Sent from my iPhone

> On Feb 16, 2016, at 3:09 PM, Anna M. Pepelnjak <amp@wbb-law.com> wrote:
>
> Dear Det. Beasley,
> I have received your two voice mail messages, this email message and a fax regarding your inability to attend the PI-21 interview on Friday, February 19, 2016. I wish you a speedy and full recovery.
>
> Because your health condition is indefinite in duration, I will prepare my investigative report without your input.
>
> Thank you,
> Anna Pepelnjak
>
> Sent from my iPhone
>
>> On Feb 16, 2016, at 6:27 AM, Melanie <melaniecopper836@yahoo.com> wrote:
>>
>> Attorney Anna,
>> You advised me I am supposed to provide testimony this Friday morning regarding a memo Shannon Lewandowski submitted to the Fire and Police Commission. I am on FMLA sick time and not able to attend to meeting. I will be in the hospital all day on Friday.
>> Please send me a response back to this email So I am aware you have received and I'm accepted to not attend.
>> The Union President Mike Crivello has also been notified of the fact I'm not at work at this time due to being fully incapacitated in treatment diagnosed by a psychiatrist.
>> Mike, I respectfully request you also call the fire and police
>> commission on my behalf and notify them as well that I am not able to testify at this time. I do not want there to be any miscommunication in any way that I have ignored a PI-21 or be punished for not attending for medical reasons which were approved by the department. The attorneys number is 414-270-2518 Please both of you respond.
>> Sincerely,
>> Detective Melanie Beasley
>> 414-491-0792
>>
>> Sent from my iPhone

1

# *EXHIBIT #6*

16CV-089 - 0244



34700 Valley Road, Oconomowoc, WI 53066-4500  P. 262-646-4411  F. 262-646-3150
Admissions or Information  000-767-4411  rogershospital.org

February 16th, 2016

To whom it may concern,

Detective Beasley is currently on FMLA for medical reasons and is unable to attend scheduled PI-21 meeting on Friday February 19th, 2016. Please confirm receipt of this documentation with Detective Beasley at melaniecopper836@yahoo.com or 414-491-0792. Please feel free to contact me with any further questions.

Sincerely,

Dr. Hemalatha Rajanna, M.D.

PTSD Psychiatrist

Rogers Memorial Hospital

PTSD Partial Hospitalization Program

414-539-3000

11101 West Lincoln Avenue, Milwaukee, WI 53227  P. 414-327-3000 F. 414-327-6045
406 Science Drive, Madison, WI 53711-1098 P. 608-238-4411 F. 608-238-4412
4600 West Schroeder Drive, Brown Deer, WI 53223 P. 414-355-9000 F. 414-355-9665
9916 75th Street, Kenosha, WI 53142 P. 262-942-4000 F. 262-942-7740

# EXHIBIT #7

# Melanie M Beasley vs. Robert S Wilkinson

# Milwaukee County Case Number 2015CV000488

| **Filing Date** | **Case Type** | **Case Status** |
|---|---|---|
| 01-15-2015 | Civil | Closed |
| **Class Code Description** | **Responsible Official** | |
| Harassment Restraining Order | Conen-30, Jeffrey A. | |
| **Branch Id** | | |
| 30 | | |

## Parties

| **Party Type** | **Party Name** | **Party Status** |
|---|---|---|
| Petitioner | Beasley, Melanie M | |
| Respondent | Wilkinson, Robert S | |

## Party Details

**Beasley, Melanie M - Petitioner**

| **Date of Birth** | **Sex** | **Race**[1] |
|---|---|---|
| 11-1974 | | |

| **Address** | **Address Updated On** |
|---|---|

**Party Attorney(s)**

| **Attorney Name** | **GAL** | **Entered** |
|---|---|---|
| Smith, Richard Joseph | No | 03-23-2015 |

**Wilkinson, Robert S - Respondent**

| **Date of Birth** | **Sex** | **Race**[1] |
|---|---|---|
| 08-1969 | Male | Caucasian |

| **Address** | **Address Updated On** |
|---|---|
| Party Address Sealed by Judge Conen-30 | 01-15-2015 |

---

1 The designation listed in the Race field is subjective. It is provided to the court by the agency that filed the case.

2 Non-Court activities do not require personal court appearances. For questions regarding which court type

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 252 of 805   Document 80-21   16CV089 - 0247

activities require court appearances, please contact the Clerk of Circuit Court in the county where the case originated.

## Melanie M Beasley vs. Robert S Wilkinson

## Milwaukee County Case Number 2015CV000488

### Court Record Events

|   | Date | Event | Court Official | Court Reporter |
|---|------|-------|----------------|----------------|
| 1 | 01-15-2015 | Temporary restraining order | Conen-30, Jeffrey A. | |
| 2 | 01-15-2015 | Petition for TRO/injunction | | |
| 3 | 01-26-2015 | Petitioners statement of resp possession firearms | TRO Court | |

**Additional Text:**

filed. Yes, I believe the respondent currently, or within the past six months, owned or possessed firearm. .40 caliber smith and wesson (1); ruger lcp .380 (1); rifles, shotgun

| 4 | 01-26-2015 | Injunction hearing | Rustad, Janice M. | Digital Recording |
|---|------|-------|----------------|----------------|

**Additional Text:**

Petitioner appears in court with attorney Jamie Lavora. Respondent appears in court with attorney Dan Sanders. Hearing for Injunction proceeded. Swom: Petitioner and Respondent. Examined and cross-examined: Petitioner 10:58 Break 11:12 Recall Case Same Appearances Continued cross-examination of petitioner. Redirect. Recross. Exhibits moved into evidence. 11:53 case adjourned to 1:15pm. 1:25 Recall Case Same Appearances. Redirect/Recross of petitioner. Exhibits moved into evidence. Sworn for petitioner: Shannon Lewandowski 2:35 take a break. 3:11 Recall Case Same Appearances. Petitioner rest. Sworn for respondent: Christine Wilkinson. Exhibit moved into evidence. Respondent examinded. The time for hearing on an Injunction is extended and rescheduled for MARCH 23, 2015 at 2:15PM, ROOM 712, COURTHOUSE. If a temporary restraining order has been issued, it remains in effect until the injunction hearing is held. Parties given copies of Order. Filed, signed Order Extending Time for Hearing. 4:18 pm hearing concluded.

| 5 | 03-09-2015 | Transcript | | |
|---|------|-------|----------------|----------------|

**Additional Text:**

from Injunction Hearing on 1/26/15 (173 pages), filed.

| 6 | 03-23-2015 | Stipulation and Order | Conen-30, Jeffrey A. | |
|---|------|-------|----------------|----------------|

**Additional Text:**

for Substitution of Counsel, signed and filed.

| 7 | 03-23-2015 | Injunction hearing | Rustad, Janice M. | Digital Recording |
|---|------|-------|----------------|----------------|

**Additional Text:**

Petitioner appears in court with attorney Richard J. Smith. Respondent appears in court with attorney Dan Sanders. Hearing for injunction proceeded. Sworn and examined: Respondent Petitioner through counsel introduce photograph. Sworn for rebuttal: Petitioner Closing

argument. The petitioner failed to meet the burden of proof. Harassment: 813.125 and 48.25(6), Wis. Stats. Domestic _ use: 813.12, Wis. Stats. Filed, signed ⌐ ᵗᵉʳ Dismissing/Denying Petition for Injunction.

---

8   03-23-2015   Injunction denied                          Rustad, Janice M.

**Event Party**

Wilkinson, Robert S

---

9   03-23-2015   Dismissed                                  Conen-30, Jeffrey A.

---

10  04-13-2015   Transcript

**Additional Text:**

of Injunction Hearing on March 23, 2015 (84 pages), filed.

---

11  05-13-2015   Petition

**Additional Text:**

Affidavit and Proposed Order Concerning Removal of Address Information from Online Records, received. Forwarded to the Court for review/signature

---

12  06-09-2015   Order                                      Conen-30, Jeffrey A.

**Additional Text:**

Petition, Affidavit and Order Concerning Removal of Address Information from Online Records, signed and filed.

---

13  06-09-2015   Order to seal party address                Conen-30, Jeffrey A.

**Event Party**

Wilkinson, Robert S

---

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 255 of 805   Document 80-21

# EXHIBIT #8

16CV-089 - 0251



BE A FORCE

Milwaukee Police Department
Police Administration Building
749 West State Street
Milwaukee, Wisconsin 53233
http://www.milwaukee.gov/police

Edward A. Flynn
Chief of Police

(414) 935-7200

July 2, 2013

The Board of the
Fire & Police Commissioners
200 E. Wells Street - Room 706
Milwaukee, WI 53202

Dear Commissioners:

I hereby nominate and appoint, subject to your approval, the following Police Aides:

> Dorian L. Andress
> Michael R. Braunreiter
> Jeremy A. Carter
> Alberto Figueroa
> Andrew T. Fuerte
> Robert J. Gregory
> Dominique L. Heaggan
> Jordan T. Herrmann
> Ryan A. Lafond
> Paul A. Miner
> Maxwell T. Ours
> Kira L. Williams

to the rank of POLICE OFFICER in this Department to fill existing vacancies, effective SUNDAY, AUGUST 4, 2013. These appointments are contingent upon successful completion of a medical examination, drug screening, psychological evaluation, and background update.

Respectfully Submitted,

EDWARD A. FLYNN
CHIEF OF POLICE

EAF:ac
cc: Payroll Supervisor Cindy Ratliff
F&P: 6/5/13



RECEIVED
JUL 3 2013
FIRE AND POLICE COMMISSION

Approved by the Board of Fire and Police Commissioners:

_____
Chairman

_____

_____

_____

_____                    Date: _____

_____                    _____
                                                     Executive Director

16CV089 - 0253



BE A FORCE

Milwaukee Police Department
Police Administration Building
749 West State Street
Milwaukee, Wisconsin 53233
http://www.milwaukee.gov/police

Edward A. Flynn
Chief of Police

(414) 935-7200

July 2, 2013

The Board of the
Fire & Police Commissioners
200 E. Wells, Room 706
Milwaukee, WI 53202

Dear Commissioners:

I hereby nominate and appoint, subject to your approval, the following named individuals to the rank of Police Officer, effective Monday, August 5, 2013:

POLICE OFFICER (Eligible List) – Adopted, July 12, 2012:

110. Anthony Walesby, II
138. Jeffrey Jopp
148. William Pamperin
149. Lee Xiong
151. Clayton Amborn
153. Luis Vargas
154. Michael Ritmanich
155. Juan Roman

The appointments will fill existing Police Officer vacancies in the Police Department. These names appear in the indicated order on the eligible lists for Police Officer adopted by your Honorable Board on July 12, 2012. The appointments are contingent upon successful completion of a medical examination, drug screen, psychological test, and background update.

These appointments total eight (8) individuals from the eligibility list and twelve (12) Police Aides being appointed to Police Officer. The Monday, August 5, 2013, class will consist of twenty (20) Probationary Police Officers.

Respectfully submitted,



EDWARD A. FLYNN
CHIEF OF POLICE

RECEIVED
JUL 3 2013
FIRE AND POLICE COMMISSION

EAF:ac
F&P: 6/5/13
RECRUIT CLASS: 8/5/13

cc: Payroll Supervisor Ratliff

Approved by the BOARD OF FIRE & POLICE COMMISSIONERS:

_____
Chairman
_____

_____

_____

_____        Date: _____

_____        _____
                                         Executive Director

# EXHIBIT #9

# MILWAUKEE POLICE DEPARTMENT

## EVALUATION REPORT

PERIOD ENDING   June 30, 2014

NAME   AMBORN, Clayton                    P.O.                024062
                                          RANK                P.S. #     S.S. #

DISTRICT/BUREAU/DIVISION   District 5                SHIFT  Late Power    ASSIGNMENT  54

Instructions: Rater to set forth in concise narrative manner specifically observed performance or behavior during rating period. Area 3 should present a specific recommendation or course of action through which employee can improve performance as specified in Area 2 of report.

1. **Identify area (s) where employee does well or excels:** P.O. AMBORN is currently assigned to district five, late power shift. He shows a positive attitude toward work and works well with others. He is regularly punctual for duty and conforms to uniform and appearance standards. He has shown a desire to engage in proactive policing and appears to be learning the intricacies of his job, as well as his role in achieving departmental goals.

2. **Identify area (s) where improvement is recommended:** P.O. AMBORN is still a relatively new officer, having five months left before he completes his probationary period. As such, he still has much to learn and should strive to improve himself in all aspects of his job. Being a newer employee, he lacks much of the advanced training that is available that will make him more of an asset to the department. In the near future, P.O. AMBORN should focus on 1) increasing his self-initiated activity, and 2) explore some training opportunites once the busy summer months come to a close.

3. **Recommended course of action through which employee can improve performance:** P.O. AMBORN should engage in all aspects of proactive policing including traffic stops and field interviews, thereby increasing his activity and becoming more accustomed to the intricacies of the job. He should also look to specific training such as Narco-Pouch operator, speed enforcement training, and CSO/CST training. As P.O. AMBORN gains more experience, he should consider the Leadership in Police Organizations (LPO) training course.

How long has employee worked     rater:  4 months

Other comments (continued from reverse, if necessary).

Merits/Commendations:  None during this period

Disciplinary Actions:  None this period

Memo Book:  Conforms to departmental standards

Progress Evaluation:  Satisfactory

Rater's Signature: _____     07-11-14
                                    Rank/Title                              Date

Shift Commander Signature: _____     7-11-14
                                         Rank/Title                         Date

I have read this report and it has been reviewed with a Supervisory Officer.

Employee Signature:  P.O. _____ AMBORN      7-11-14
                                      Rank/Title                         Date

District/Bureau/Division
Commander's Signature: _____ Acting Captain    7-14-14
                                         Rank/Title                         Date

# Milwaukee Police Department
## Probationary Performance Report

### Check one:  Police Sergeant __
### Police Officer __X__

[X] Satisfactory          [ ] Needs Improvement          [ ] Not Responding to Training (Unsatisfactory)

**(Note: Refer to Block IV for special circumstances)**

Number of previous rating periods with a rating of (if none in a category, indicate 0):  Needs Improvement  **0**  or Unsatisfactory  **0**

| Name   PO Clayton AMBORN | Rank Police Officer | PS # 024062 | Date of Report 07-04-14 |
|---|---|---|---|
| District<br>District 5 | Shift<br>Late Power | | Date Probation Ends 12-6-2013 |

**INSTRUCTIONS:** Complete either block I or II, and all blocks thereafter (except block IV; if not applicable). Staple field training module evaluations and reworked reports to this form.

**I.** [] Field Training (12th module ending date: __)

| Module # | Assigned FTS/FTO Name |
|---|---|
| Module # | Assigned FTS/FTO Name |
| Module # | Assigned FTS/FTO Name |

**II.** [X] Probationary Period Evaluation (for the month of: __June__)

| Regular Duty Assignment: |
|---|
| Activity Days: |
| Non-Activity Days: |
| Sick/Injured Days: |
| Other Absence Days: |

| PROBATIONARY POLICE OFFICER ONLY | |
|---|---|
| ACTIVITY | QUANTITY |
| - Traffic (moving)Citations Issued | |
| - Traffic (equipment) Citations Issued | |
| - Traffic (parking) Citations Issued | |
| - Other Municipal Cases Processed | |
| - State Non-Traffic Cases Processed | |
| - Traffic Warnings Issued | |
| - Field Interviews Written | |
| - Inter Agency Referrals Made | |

**III. REMARKS:** Give any spec... instances to support your evaluation, such as, outsta... ..g accomplishments, improper actions, complaints or commendations. If probationary sergeant/officer was rated, A Needs Improvement≅ list specific areas for improveme for a rating of A Unsatisfactory.≅ list reasons.

PO AMBORN has shown a positive attitude towards his work and an eagerness to learn. PO AMBORN works well with his co-workers. PO AMBORN is punctual for duty and maintains a professional appearance. PO AMBORN has shown that he stays current with crime trends in the district. PO AMBORN'S activity during the month of June was 12 arrest, 23 incident reports, 12 traffic stops and 5 subject stops.

In an effort to improve areas of performance the following corrective measures have been (or will be) implemented:
On occasion PO AMBORN will be assigned to a proactive squad assigned with a veteran officer help him improve on initiating self-generated activity.

Remedial training was (or will be) provided that consisted of the following:
N/A

Indicate how long F.T. Lieutenant/F.T. Sergeant has observed employee's performance:
F.T. Lieutenant's/F.T. Sergeant's Signature _Sgt. Shawn Taylor_____ Date _07-04-14_

Shift Commander's Signature _____ Date _7-4-14_

**IV. NON-PATROL DUTY OR UNAVAILABLE FOR DUTY CIRCUMSTANCES**
SHIFT COMMANDER TO CHECK AND COMPLETE IF APPLICABLE FOR THIS RATING PERIOD

☒ This probationary sergeant/officer has been temporarily reassigned to non-patrol duty because (briefly describe reason for temporary reassignment) Limited duty due to an old duty injury and therefore, the rating indicated is limited to these duties. Probationary sergeant/officer was not rated for performance of duties in patrol setting, which comprises the probationary sergeant's/officer's essential duties and responsibilities.

☐ Not rated for this monthly rating period because probationary sergeant/officer was unavailable for duty during rating period for ___ days, because of
_____ (Specify number of days and reasons for off-duty status)

**V. EMPLOYEE**

I have read this report and it has been reviewed with a supervisory officer.

Employee's Signature: PO Clayton AMBORN _P.O._____ Date _7/4/14_

**VI. COMMANDING OFFICER** (CO to interview and comment, for other than A satisfactory progress≅ rating)

Signature _____ Date _7.7.14_

Comments:

**DISTRIBUTION:**
Original to Training Bureau

# Milwaukee Police Department
## Probationary Performance Report

**Check one:**     Police Sergeant __
              Police Officer **X**

[X] Satisfactory     [ ] Needs Improvement     [ ] Not Responding to Training (Unsatisfactory)

(Note: Refer to Block IV for special circumstances)

Number of previous rating periods with a rating of (if none in a category, indicate 0): Needs Improvement   0   or Unsatisfactory   0

| Name PO Clayton AMBORN | Rank Police Officer | PS # 024062 | Date of Report 07-04-14 |
|---|---|---|---|
| District<br>District 5 | Shift<br>Late Power | | Date Probation Ends 12-6-2013 |

**INSTRUCTIONS:** Complete either block I or II, and all blocks thereafter (except block IV; if not applicable). Staple field training module evaluations and reworked reports to this form.

**I.**   [] Field Training (12th module ending date: _)

| Module # | Assigned FTS/FTO Name |
|---|---|
| Module # | Assigned FTS/FTO Name |
| Module # | Assigned FTS/FTO Name |

**II.**   [X] Probationary Period Evaluation (for the month of: **June** )

| Regular Duty Assignment: |
|---|
| Activity Days: |
| Non-Activity Days: |
| Sick/Injured Days: |
| Other Absence Days: |

| PROBATIONARY POLICE OFFICER ONLY | |
|---|---|
| ACTIVITY | QUANTITY |
| - Traffic (moving)Citations Issued | |
| - Traffic (equipment) Citations Issued | |
| - Traffic (parking) Citations Issued | |
| - Other Municipal Cases Processed | |
| - State Non-Traffic Cases Processed | |
| - Traffic Warnings Issued | |
| - Field Interviews Written | |
| - Inter Agency Referrals Made | |

## III. REMARKS:

Give any specific instances to support your evaluation, such as, outstanding accomplishments, improper actions, complaints or commendations. If probationary sergeant/officer was rated, A Needs Improvement ≤ list specific areas for improvem for a rating of A Unsatisfactory ≤ list reasons.

PO AMBORN has shown a positive attitude towards his work and an eagerness to learn. PO AMBORN works well with his co-workers. PO AMBORN is punctual for duty and maintains a professional appearance. PO AMBORN has shown that he stays current with crime trends in the district. PO AMBORN'S activity during the month of June was 12 arrest, 23 incident reports, 12 traffic stops and 5 subject stops.

In an effort to improve areas of performance the following corrective measures have been (or will be) implemented:
On occasion PO AMBORN will be assigned to a proactive squad assigned with a veteran officer help him improve on initiating self-generated activity.

Remedial training was (or will be) provided that consisted of the following:
N/A

Indicate how long F.T. Lieutenant/F.T. Sergeant has observed employee's performance:
F.T. Lieutenant's/F.T. Sergeant's Signature _Sgt. Shawn Taylor_ Date _07-04-14_

Shift Commander's Signature _LT ___ Date _7-4-14_

## IV. NON-PATROL DUTY OR UNAVAILABLE FOR DUTY CIRCUMSTANCES
SHIFT COMMANDER TO CHECK AND COMPLETE IF APPLICABLE FOR THIS RATING PERIOD

☒ This probationary sergeant/officer has been temporarily reassigned to non-patrol duty because (briefly describe reason for temporary reassignment) Limited duty due to an old duty injury and therefore, the rating indicated is limited to these duties. Probationary sergeant/officer was not rated for performance of duties in patrol setting, which comprises the probationary sergeant's/officer's essential duties and responsibilities.

☐ Not rated for this monthly rating period because probationary sergeant/officer was unavailable for duty during rating period for ___ days, because of
_____ (Specify number of days and reasons for off-duty status)

## V. EMPLOYEE

I have read this report and it has been reviewed with a supervisory officer.

Employee's Signature: PO Clayton AMBORN _P.O. Cl____ Date _7/4/14_

## VI. COMMANDING OFFICER (CTO to interview and comment, for other than A satisfactory progress ≤ rating)

Signature _____ Date _7.7.14_

Comments:

# Milwaukee Police Department
## Probationary Performance Report

**Check one:** Police Sergeant __
Police Officer **X**

[X] Satisfactory    [ ] Needs Improvement    [ ] Not Responding to Training (Unsatisfactory)

(Note: Refer to Block IV for special circumstances)

Number of previous rating periods with a rating of (if none in a category, indicate 0):  Needs Improvement  0  or Unsatisfactory  0

| Name  PO Clayton AMBORN | Rank Police Officer | PS # 024062 | Date of Report 09-05-14 |
|---|---|---|---|
| District  District 5 | Shift  Late Power | | Date Probation Ends 12-05-2014 |

**INSTRUCTIONS:** Complete either block I or II, and all blocks thereafter (except block IV; if not applicable). Staple field training module evaluations and reworked reports to this form.

**I.** [] Field Training (12th module ending date: __)

| Module # | Assigned FTS/FTO Name |
|---|---|
| Module # | Assigned FTS/FTO Name |
| Module # | Assigned FTS/FTO Name |

**II.** [X] Probationary Period Evaluation (for the month of: September)

| Regular Duty Assignment: Squad Patrol |
|---|
| Activity Days: 13 |
| Non-Activity Days: 0 |
| Sick/Injured Days: 0 |
| Other Absence Days: 0 |

| PROBATIONARY POLICE OFFICER ONLY | |
|---|---|
| **ACTIVITY** | **QUANTITY** |
| - Traffic (moving) Citations Issued | |
| - Traffic (equipment) Citations Issued | |
| - Traffic (parking) Citations Issued | |
| - Other Municipal Cases Processed | |
| - State Non-Traffic Cases Processed | |
| - Traffic Warnings Issued | |
| - Field Interviews Written | |
| - Inter Agency Referrals Made | |

**III. REMARKS:** Give any specific instances to support your evaluation, such as, outstanding accomplishments, improper actions, complaints or commendations. If probationary sergeant/officer was rated, A Needs Improvement≅ list specific areas for improvement, for a rating of A Unsatisfactory≅ list reasons.

PO AMBORN has shown a positive attitude towards his work and an eagerness to learn. PO AMBORN works well with his co-workers. PO AMBORN is punctual for duty and maintains a professional appearance. PO AMBORN has shown that he stays current with crime trends in the district. PO AMBORN has shown that he has the ability to work as a one-man squad. A review of PO AMBORN'S activity during the month of September shows the following: 0 arrest, 21 incident reports, 35 traffic stops and 1 subject stop. PO AMBORN incident reports and traffic stops are above average, but arrest and subject stops compared to his peers during the same time period are below average.

In an effort to improve areas of performance the following corrective measures have been (or will be) implemented:
On occasion PO AMBORN will he assigned to a proactive squad assigned with a veteran officer help him improve on initiating self-generated activity. A supervisor will meet with PO AMBORN regularly during the rating period to review his activity, to ensure that he his performing at a level comparable with his peers. A sergeant will meet with PO AMBORN regularly to review his activity to ensure that he is performing at or above a level comparable with his peers.

Remedial training was (or will be) provided that consisted of the following:
N/A

Indicate how long F.T. Lieutenant/F.T. Sergeant has observed employee's performance:
F.T. Lieutenant's/F.T. Sergeant's Signature _Sgt. Shawen Tazler_ Date 10-04-2014

Shift Commander's Signature _Hrboris Turcinovic TURCINOVIC_ Date 10/05/14

**IV. NON-PATROL DUTY OR UNAVAILABLE FOR DUTY CIRCUMSTANCES**
SHIFT COMMANDER TO CHECK AND COMPLETE IF APPLICABLE FOR THIS RATING PERIOD

☒ This probationary sergeant/officer has been temporarily reassigned to non-patrol duty because (briefly describe reason for temporary reassignment), Limited duty due to an old duty injury and therefore, the rating indicated is limited to these duties. Probationary sergeant/officer was not rated for performance of duties in patrol setting, which comprises the probationary sergeant's/officer's essential duties and responsibilities.

☐ Not rated for this monthly rating period because probationary sergeant/officer was unavailable for duty during rating period for ___ days, because of
_____ (Specify number of days and reasons for off-duty status)

**V. EMPLOYEE**

I have read this report and it has been reviewed with a supervisory officer.

Employee's Signature: PO Clayton AMBORN _Clayton AMBORN_ Date 09-05-2014

**VI. COMMANDING OFFICER** (C/O to interview and comment, for other than A satisfactory progress≅ rating)

Signature _Capt. Thomas H. Stigler (A)_ Date 10/05/14

Comments:

16CV089 - 0264

# Milwaukee Police Department
## Probationary Performance Report

Check one:  Police Sergeant __
Police Officer **X**

[X] Satisfactory  [ ] Needs Improvement  [ ] Not Responding to Training (Unsatisfactory)

(Note: Refer to Block IV for special circumstances)

Number of previous rating periods with a rating of (if none in a category, indicate 0): Needs Improvement  0  or Unsatisfactory  0

| Name  PO Clayton AMBORN | Rank Police Officer | PS # 024062 | Date of Report 09-05-14 |
|---|---|---|---|
| District District 5 | Shift Late Power | | Date Probation Ends 12-05-2014 |

**INSTRUCTIONS:** Complete either block I or II, and all blocks thereafter (except block IV; if not applicable). Staple field training module evaluations and reworked reports to this form.

I. [] Field Training (12th module ending date: __)

| Module # | Assigned FTS/FTO Name |
|---|---|
| Module # | Assigned FTS/FTO Name |
| Module # | Assigned FTS/FTO Name |

II. [X] Probationary Period Evaluation (for the month of: August)

| Regular Duty Assignment: Squad Patrol |
|---|
| Activity Days: 16 |
| Non-Activity Days: 0 |
| Sick/Injured Days: 0 |
| Other Absence Days: 0 |

| PROBATIONARY POLICE OFFICER ONLY | |
|---|---|
| ACTIVITY | QUANTITY |
| - Traffic (moving) Citations Issued | |
| - Traffic (equipment) Citations Issued | |
| - Traffic (parking) Citations Issued | |
| - Other Municipal Cases Processed | |
| - State Non-Traffic Cases Processed | |
| - Traffic Warnings Issued | |
| - Field Interviews Written | |
| - Inter Agency Referrals Made | |

## III. REMARKS:

Give any specific instances to support your evaluation, such as, outstanding accomplishments, improper actions, complaint or commendations. If probationary sergeant/officer was rated, A Needs Improvement≡ list specific areas for improvemen for a rating of A Unsatisfactory≡ list reasons.

PO AMBORN has shown a positive attitude towards his work and an eagerness to learn. PO AMBORN works well with his co-workers. PO AMBORN is punctual for duty and maintains a professional appearance. PO AMBORN has shown that he stays current with crime trends in the district. PO AMBORN has shown that he has the ability to work as a one-man squad. A review of PO AMBORN'S activity thus far during this current Compstat rating period (July 20- September 5) shows the following: 8 arrest, 40 incident reports, 29 traffic stops and 2 subject stops. PO AMBORN incident reports are above average, but arrest, traffic stops and subject stops during this rating period compared to his peers are below average.

In an effort to improve areas of performance the following corrective measures have been (or will be) implemented:
On occasion PO AMBORN will be assigned to a proactive squad assigned with a veteran officer help him improve on initiating self-generated activity. A supervisor will meet with PO AMBORN regularly during the rating period to review his activity, to ensure that he his performing at a level comparable with his peers. A sergeant will meet with PO AMBORN regularly to review his activity to ensure that he is performing at or above a level comparable with his peers.

Remedial training was (or will be) provided that consisted of the following:
N/A

Indicate how long F.T. Lieutenant/F.T. Sergeant has observed employee's performance:
F.T. Lieutenant's/F.T. Sergeant's Signature _____ Date 09-05-2014

Shift Commander's Signature _____ Date 9-5-14

## IV. NON-PATROL DUTY OR UNAVAILABLE FOR DUTY CIRCUMSTANCES
SHIFT COMMANDER TO CHECK AND COMPLETE IF APPLICABLE FOR THIS RATING PERIOD

☐ This probationary sergeant/officer has been temporarily reassigned to non-patrol duty because (briefly describe reason for temporary reassignment) Limited duty due to an old duty injury and therefore, the rating indicated is limited to these duties. Probationary sergeant/officer was not rated for performance of duties in patrol setting, which comprises the probationary sergeant's/officer's essential duties and responsibilities.

☐ Not rated for this monthly rating period because probationary sergeant/officer was unavailable for duty during rating period for ___ days, because of _____ (Specify number of days and reasons for off-duty status)

## V. EMPLOYEE

I have read this report and it has been reviewed with a supervisory officer.

Employee's Signature: PO Clayton AMBORN _____ Date 09-05-2014

## VI. COMMANDING OFFICER (CO to interview and comment, for other than A satisfactory progress≡ rating)

Signature _____ Date 9-9-14

Comments:

# MILWAUKEE POLICE DEPARTMENT

## EVALUATION REPORT

PERIOD ENDING     12-31-2014

NAME     Clayton AMBORN                    Police Officer          024062     N/A
                                          RANK                    P.S. #     S.S. #

DISTRICT/BUREAU/DIVISION     District 5          SHIFT  Late Power     ASSIGNMENT  54

Instructions:  Rater to set forth in concise narrative manner specifically observed performance or behavior during rating period.  Area 3 should present a specific recommendation or course of action through which employee can improve performance as specified in Area 2 of report.

1.  **Identify area (s) where employee does well or excels:**  PO AMBORN, when at work, is prepared for duty and has a neat and clean uniform appearance.  PO AMBORN gets along well with his peers and does not receive citizen complaints.  PO AMBORN is a good team worker. PO AMBORN works effectively with co- workers and is respectful towards supervision. PO AMBORN accepts assigments willingly and without complaint. PO AMBORN keeps informed of the latest trends and developments that occur in the district.

**Identify area (s) where improvement is recommended:**  During comp stat rating period, June 1, 2014 through July 19, 2014, the power shift means were as follows: 69 traffic stops, 16 subject stops, 10 arrest and 34 incident reports.  PO AMBORN'S activity during this rating period compared to his peer during this rating period is as follows: 45 traffic stops, 6 subject stops, 12 arrest and 32 incident reports.  Traffic stops, subject stops and incident report are below an acceptable level compared to his peer during this rating period.  PO AMBORN'S arrest activity during this rating period was above average.

During comp stat rating period, July 27, 2014 through September 13, 2014, the power shift means were as follows: 56 traffic stops, 20 subject stops, 10 arrest and 38 incident reports.  PO AMBORN'S activity during this rating period compared to his peer during this rating period is as follows: 25 traffic stops, 2 subject stops, 6 arrest and 35 incident reports.  PO AMBORN'S traffic stops, subject stops, arrest and incident reports were all below an acceptable level compared to his peers.

PO AMBORN has a poor attendance record. PO AMBORN has been absent for a substantial portion of this evaluation period.

2.  **Recommended course of action through which employee can improve performance:** PO AMBORN can improve is performance by improving his attendance. By improving his attendance his activity will improve. PO AMBORN will also improve his activity my focusing on patrolling in the district hot spots, and focusing on target vehicles, during his unobligated patrol time.

Short term goal: PO AMBORN should improve his attendance

Long term goals: PO AMBORN should continue to seek additional training to expand his knowledge base and to also improve his overall activity.

**How long has employee worked for rater:** 12 months

**Other comments (continued from reverse, if necessary).** On Sunday, June 8th, 2014, PO AMBORN and his partner responded to a Strong Armed Robbery. PO AMBORN and his partner arrested 5 subjects regarding the Strong Armed robbery. PO AMBORN also conducted custodial interrogations regarding.

PO Amborn has completed the credit requirement.

**Progress Evaluation:** PO AMBORN needs improvement.

Rater's Signature: _Sgt. Shannon Taylor TAYLOR_   Rank/Title   Date _04-09-15_

Shift Commander Signature: _____   Rank/Title   Date _4-14-15_

I have read this report and it has been reviewed with a Supervisory Officer.

Employee Signature: _P.O. Amborn_   Rank/Title   Date _04/14/15_

District/Bureau/Division
Commander's Signature: _____



# Milwaukee Police Department
## Probationary Performance Report

Check one:     Police Sergeant __
              Police Officer  X

[X] Satisfactory      [ ] Needs Improvement     [ ] Not Responding to Training (Unsatisfactory)

(Note: Refer to Block IV for special circumstances)

Number of previous rating periods with a rating of (if none in a category, indicate 0):  Needs Improvement  0  or Unsatisfactory  0

| Name  PO Clayton AMBORN | Rank Police Officer | PS # 024062 | Date of Report 02-08-2015 |
|---|---|---|---|
| District  District 5 | Shift  Late Power | | Date Probation Ends 03-18-2015 |

**INSTRUCTIONS:** Complete either block I or II, and all blocks thereafter (except block IV; if not applicable). Staple field training module evaluations and reworked reports to this form.

I.   [] Field Training (12th module ending date: __)

| Module # | Assigned FTS/FTO Name |
|---|---|
| Module # | Assigned FTS/FTO Name |
| Module # | Assigned FTS/FTO Name |

II.   [X] Probationary Period Evaluation (for the month of: _August_)

| Regular Duty Assignment: Squad Patrol |
|---|
| Activity Days: |
| Non-Activity Days: |
| Sick/Injured Days: |
| Other Absence Days: |

| PROBATIONARY POLICE OFFICER ONLY | |
|---|---|
| ACTIVITY | QUANTITY |
| - Traffic (moving)Citations Issued | |
| - Traffic (equipment) Citations Issued | |
| - Traffic (parking) Citations Issued | |
| - Other Municipal Cases Processed | |
| - State Non-Traffic Cases Processed | |
| - Traffic Warnings Issued | |
| - Field Interviews Written | |
| - Inter Agency Referrals Made | |

COPY 0269

## III. REMARKS:

Give any specific instances to support your evaluation, such as, outstanding accomplishments, improper actions, complaints or commendations. If probationary sergeant/officer was rated, A Needs Improvement list specific areas for improvement, for a rating of A Unsatisfactory list reasons.

PO AMBORN has shown a positive attitude towards his work and an eagerness to learn. PO AMBORN works well with his co-workers. PO AMBORN is punctual for duty and maintains a professional appearance. PO AMBORN has shown that he stays current with crime trends in the district. PO AMBORN has shown that he has the ability to work as a one-man squad. A review of PO AMBORN'S activity during the month of January shows the following: 0 arrest, 13 incident reports, 33 traffic stops and 4 subject stops.

In an effort to improve areas of performance the following corrective measures have been (or will be) implemented:
On occasion PO AMBORN will be assigned to a proactive squad assigned with a veteran officer help him improve on initiating self-generated activity. A supervisor will meet with PO AMBORN regularly during the rating period to review his activity, to ensure that he his performing at a level comparable with his peers. A sergeant will meet with PO AMBORN regularly to review his activity to ensure that he is performing at or above a level comparable with his peers.

Remedial training was (or will be) provided that consisted of the following:
N/A

Indicate how long F.T. Lieutenant/F.T. Sergeant has observed employee's performance:
F.T. Lieutenant's/F.T. Sergeant's Signature _Sgt. Maureen Vepsla_ Date _02-17-15_

Shift Commander's Signature _Tibor Turcinovic TURCINOVIC_ Date _02/17/15_

## IV. NON-PATROL DUTY OR UNAVAILABLE FOR DUTY CIRCUMSTANCES
SHIFT COMMANDER TO CHECK AND COMPLETE IF APPLICABLE FOR THIS RATING PERIOD

☒ This probationary sergeant/officer has been temporarily reassigned to non-patrol duty because (briefly describe reason for temporary reassignment) Limited duty due to an old duty injury and therefore, the rating indicated is limited to these duties  Probationary sergeant/officer was not rated for performance of duties in patrol setting, which comprises the probationary sergeant's/officer's essential duties and responsibilities.

☐ Not rated for this monthly rating period because probationary sergeant/officer was unavailable for duty during rating period for ___ days, because of
_____ (Specify number of days and reasons for off-duty status)

## V. EMPLOYEE

I have read this report and it has been reviewed with a supervisory officer.

Employee's Signature: PO Clayton AMBORN _AMBORN_ Date _2/17/15_

## VI. COMMANDING OFFICER (C/O to interview and comment, for other than A satisfactory progress rating)

Signature _Capt. Thomas H. Stigler C/O_ Date _02/17/15_

Comments:

# Milwaukee Police Department
## Probationary Performance Report

Check one:     Police Sergeant __

Police Officer **X**

[X] Satisfactory     [ ] Needs Improvement     [ ] Not Responding to Training (Unsatisfactory)

(Note: Refer to Block IV for special circumstances)

Number of previous rating periods with a rating of (if none in a category, indicate 0): Needs Improvement **0** or Unsatisfactory **0**

| Name PO Clayton AMBORN | Rank Police Officer | PS # 024062 | Date of Report 03-07-2015 |
|---|---|---|---|
| District<br>District 5 | Shift<br>Late Power | | Date Probation Ends<br>03-18-2015 |

**INSTRUCTIONS:** Complete either block I or II, and all blocks thereafter (except block IV; if not applicable). Staple field training module evaluations and reworked reports to this form.

I.    [] Field Training (12th module ending date: __)

| Module # | Assigned FTS/FTO Name |
|---|---|
| Module # | Assigned FTS/FTO Name |
| Module # | Assigned FTS/FTO Name |

II.    [X] Probationary Period Evaluation (for the month of: February)

| Regular Duty Assignment: Squad Patrol |
|---|
| Activity Days: |
| Non-Activity Days: |
| Sick/Injured Days: |
| Other Absence Days: |

| PROBATIONARY POLICE OFFICER ONLY | |
|---|---|
| ACTIVITY | QUANTITY |
| - Traffic (moving)Citations Issued | |
| – Traffic (equipment) Citations Issued | |
| - Traffic (parking) Citations Issued | |
| - Other Municipal Cases Processed | |
| - State Non-Traffic Cases Processed | |
| - Traffic Warnings Issued | |
| - Field Interviews Written | |
| - Inter Agency Referrals Made | |

**III. REMARKS:**    Give any specific ...stances to support your evaluation, such as, outstandin... accomplishments, improper actions, complaints or commendations. If probationary sergeant/officer was rated, A Needs Improvement≤ list specific areas for improvement; for a rating of A Unsatisfactory,≤ list reasons.

PO AMBORN has shown a positive attitude towards his work and an eagerness to learn. PO AMBORN works well with his co-workers. PO AMBORN is punctual for duty and maintains a professional appearance. PO AMBORN has shown that he stays current with crime trends in the district. PO AMBORN has shown that he has the ability to work as a one-man squad. A review of PO AMBORN'S activity during the month of February shows the following: 2 arrest, 10 incident reports, 56 traffic stops and 1 subject stops. PO AMBORN has improved his traffic activity this month.

In an effort to improve areas of performance the following corrective measures have been (or will be) implemented:
On occasion PO AMBORN will be assigned to a proactive squad assigned with a veteran officer help him improve on initiating self-generated activity. A supervisor will meet with PO AMBORN regularly during the rating period to review his activity, to ensure that he his performing at a level comparable with his peers. A sergeant will meet with PO AMBORN regularly to review his activity to ensure that he is performing at or above a level comparable with his peers.

Remedial training was (or will be) provided that consisted of the following:
N/A

Indicate how long F.T. Lieutenant/F.T. Sergeant has observed employee's performance:
F.T. Lieutenant's/F.T. Sergeant's Signature _~Sgt. Thomen ~Cagle_ Date 03-07-15

Shift Commander's Signature _H/Brus Tucinovic_ TVRCNOVIC Date 03/10/15

**IV. NON-PATROL DUTY OR UNAVAILABLE FOR DUTY CIRCUMSTANCES**
SHIFT COMMANDER TO CHECK AND COMPLETE IF APPLICABLE FOR THIS RATING PERIOD

☐ This probationary sergeant/officer has been temporarily reassigned to non-patrol duty because (briefly describe reason for temporary reassignment) Limited duty due to an old duty injury and therefore, the rating indicated is limited to these duties. Probationary sergeant/officer was not rated for performance of duties in patrol setting, which comprises the probationary sergeant's/officer's essential duties and responsibilities.

☐ Not rated for this monthly rating period because probationary sergeant/officer was unavailable for duty during rating period for ___ days, because of

_____ (Specify number of days and reasons for off-duty status)

**V. EMPLOYEE**

I have read this report and it has been reviewed with a supervisory officer.

Employee's Signature:  PO Clayton AMBORN _(signature) AMBORN_ Date 3/07/15

**VI. COMMANDING OFFICER** (C/O to interview and comment, for other than A satisfactory progress≤ rating)
Signature _Capt. Thomas H. Stigler (H)_ Date 03/10/15

Comments:

# MILWAUKEE POLICE DEPARTMENT

## EVALUATION REPORT

PERIOD ENDING    05-31-2015

NAME    PO Clayton AMBORN          Police Officer          024062    N/A
                                   RANK                    P.S. #    S.S. #

DISTRICT/BUREAU/DIVISION    5          SHIFT  Power    ASSIGNMENT  Patrol

Instructions:  Rater to set forth in concise narrative manner specifically observed performance or behavior during rating period.  Area 3 should present a specific recommendation or course of action through which employee can improve performance as specified in Area 2 of report.

**Identify area (s) where employee does well or excels:**  PO AMBORN, when at work, is prepared for duty and has a neat and clean uniform appearance.  PO AMBORN gets along well with his peers and does not receive citizen complaints.  PO AMBORN is a good team worker. PO AMBORN works effectively with co- workers and is respectful towards supervision. PO AMBORN accepts assigments willingly and without complaint. PO AMBORN keeps informed of the latest trends and developments that occur in the district.

**Identify area (s) where improvement is recommended:**  PO AMBORN has shown that he is a capable officer when is working, but he has a poor attendance record and is on medical substantiation. PO AMBORN should strive to improve his attendance, which will improve his activity during the next evaluation period.

**3. Recommended course of action through which employee can improve performance:**  PO AMBORN could improve his performance by requesting to attend specialty-training course order by the academy or other Law Enforcement entities.

How long has employee worked for ___ ter: 18 months

Other comments (continued from reverse, if necessary).  N/A

Progress Evaluation:  PO AMBORN needs improvement.

NOTE: PO AMBORN Needs improvement
in areas of decision making,
        report writing
        Attendance
  & knowledge of laws & procedures.
   Sgt. Grant has Filed memos on
these issues which have been forwarded
to Academy For training. Capt. Vas

Rater's Signature: _____     08-12-15
                        Rank/Title                      Date

Shift Commander Signature: _____     8-14-15
                              Rank/Title               Date

I have read this report and it has been reviewed with a Supervisory Officer.

Employee Signature: P.O. _____       8/12/15
                              Rank/Title               Date

District/Bureau/Division
Commander's Signature: _Capt._ _____STIGLER     8/28/15
                                  Rank/Title           Date

# EXHIBIT #10

16CV089 - 0277

Directory ⌄    Residents    Business    Visitors

# Municipal Court Query System

Court Reports and Statistics



**CITY OF MILWAUKEE**
## MUNICIPAL COURT
Case Information &
Online Payment System

New Search

🖶 Printing Tips

**Case Number: 15011552**

### Defendant Information

| | |
|---|---|
| **Name:** | AMBORN, CLAYTON R |
| **Last Known Address:** | N/A |
| **Month of Birth:** | ▉ |
| **Sex:** | Male |
| **Race:** | White |

All Cases for Defendant    All Scheduled Appearances / Submit a Plea    Make a Payment

### Case Information

| | | | |
|---|---|---|---|
| **Case Type:** | Traffic citation | **Status:** | Closed |
| **Violation:** | Statute 346.63(1)(b), Operating While Intoxicated - BAC .08%+ | **Citation #:** | U8747874 |
| **Violation Date:** | 03/08/2015 01:15 AM | | |
| **Location:** | 1ST ST S / 800 BLK | **Deposit Amount:** | $811.00 |
| **Plea:** | No Contest | **In Collection?** | No |
| **Plea Entered By:** | Defendant | **Installment Plan?** | No |

### Judgment

| | | | |
|---|---|---|---|
| **Finding:** | Guilty - Suspended Sentence | **Date:** | 05/21/2015 |
| **Penalty:** | $0.00 | **Due On:** | 05/21/2015 |
| **Balance Due:** | $0.00 | **Branch:** | 1 |

New Search

**Return To Municipal Court Home**

🏛 City of Milwaukee

• Mayor Tom Barrett
• Common Council
• Departments
• Calendar

• Services & Programs
• Do Business
• Live & Work
• Play

• Web & Email Policies
• Contact Us

MILWAUKEE
Design by City of Milwaukee

# Municipal Court Query System



## CITY OF MILWAUKEE MUNICIPAL COURT
Case Information & Online Payment System

New Search

🖶 Printing Tips

**Case Number: 15D11551**

### Defendant Information

| | |
|---|---|
| **Name:** | AMBORN, CLAYTON R |
| **Last Known Address:** | N/A |
| **Month of Birth:** | ■ |
| **Sex:** | Male |
| **Race:** | White |

All Cases for Defendant    All Scheduled Appearances / Submit a Plea    Make a Payment

### Case Information

| | | | |
|---|---|---|---|
| **Case Type:** | Traffic citation | **Status:** | Closed |
| **Violation:** | Statute 346.63(1)(a), Operating While Intoxicated | **Citation #:** | U8747863 |
| **Violation Date:** | 03/08/2015 01:15 AM | | |
| **Location:** | 1ST ST S / 800 BLK | **Deposit Amount:** | $811.00 |
| **Plea:** | No Contest | **In Collection?** | No |
| **Plea Entered By:** | Defendant | **Installment Plan?** | No |

### Judgment

| | | | |
|---|---|---|---|
| **Finding:** | Guilty | **Date:** | 05/21/2015 |
| **Penalty:** | $861.00 | **Due On:** | 07/20/2015 |
| **Balance Due:** | $0.00 | **Branch:** | 1 |

| Additional Penalty | Amount | Enforced On |
|---|---|---|
| AODA Assessment | 1 Program attendance | |
| DL Revocation - Concurrent | 180 Days | 05/22/2015 |
| Ignition Interlock Device | 365 Days | 05/22/2015 |

| Alternative to Non-Payment by Due Date | Amount | Enforced On |
|---|---|---|
| Commitment - Consecutive | 17 Days | |

New Search

Return To Municipal Court Home



City of

- Mayor Tom Barrett
- Common Council
- Departments

- Services & Programs
- Do Business
- Live & Work

- Web & Email Policies
- Contact Us

MILWAUKEE
Design by City of Milwaukee

*EXHIBIT #11*

16CV089 - 0280



**FIRE & POLICE COMMISSION**

MILWAUKEE POLICE DEPARTMENT
OPERATIONAL ORGANIZATIONAL CHART
EFFECTIVE MAY 24, 2015

**OFFICE OF THE CHIEF**

OFFICE OF MANAGEMENT ANALYSIS AND PLANNING

PUBLIC RELATIONS

BUDGET & FINANCE

EXECUTIVE PROTECTION

**NORTH COMMAND BUREAU**
- FOURTH DISTRICT
- FIFTH DISTRICT
- SEVENTH DISTRICT
- TACTICAL PLANNING & LOGISTICS
- POLICY, RESEARCH & DEVELOPMENT
- GRANT & COMMUNITY DEVELOPMENT COORDINATION
- STRATEGIC & ADMINISTRATIVE ANALYSIS
- PERFORMANCE MEASURES / COMPSTAT
- LICENSING UNIT

**CENTRAL COMMAND BUREAU**
- FIRST DISTRICT
  - MARINE OPERATIONS UNIT
  - MOUNTED PATROL UNIT
- THIRD DISTRICT
- NEIGHBORHOOD TASK FORCE
- CANINE UNIT
- CRASH RECONSTRUCTION UNIT
- FUGITIVE APPREHENSION UNIT
- MOTORCYCLE UNIT
- STREET CRIMES UNIT
- TACTICAL ENFORCEMENT UNIT

**SOUTH COMMAND BUREAU**
- SECOND DISTRICT
- SIXTH DISTRICT
- OFFICE OF COMMUNITY OUTREACH AND EDUCATION
  - T.A.R.S UNIT

POLICE ACADEMY
- SAFETY UNIT
- FIREARMS UNIT
- IN SERVICE UNIT
- RECRUIT UNIT
- RECREATION ASSOCIATION OF THE MILWAUKEE POLICE DEPARTMENT

**RISK MANAGEMENT BUREAU**
- INTERNAL AFFAIRS DIVISION
  - CIVIL INVESTIGATIONS SECTION
  - INTERNAL INVESTIGATIONS SECTION
  - SPECIAL INVESTIGATIONS SECTION
- INSPECTIONS DIVISION
  - FIELD INSPECTIONS SECTION
  - AUDITS SECTION
  - INSPECTIONS SECTION
  - ACCREDITATIONS SECTION
- HUMAN RESOURCES DIVISION
  - BACKGROUND INVESTIGATIONS UNIT
  - MEDICAL SECTION
  - PAYROLL SECTION
  - RECRUITING UNIT
- EARLY INTERVENTION PROGRAM

**INVESTIGATIONS AND INTELLIGENCE BUREAU**
- CENTRAL INVESTIGATIONS DIVISION
- NORTH INVESTIGATIONS DIVISION
- SOUTH INVESTIGATIONS DIVISION
  - FINANCIAL CRIMES UNIT
- METROPOLITAN INVESTIGATIONS DIVISION
- SENSITIVE CRIMES DIVISION
- NARCOTICS DIVISION
- INVESTIGATIVE MANAGEMENT DIVISION
  - FORENSICS SECTION
  - EXTRADITION UNIT
- INTELLIGENCE FUSION CENTER
  - STAC
  - DIGNITARY PROTECTION UNIT
- REAL-TIME EVENTS CENTER
- PREDICTIVE INTELLIGENCE CENTER
- HIGH TECHNOLOGY UNIT
- FIREARMS INTELLIGENCE UNIT

**STRATEGIC MANAGEMENT BUREAU**
- CENTRAL BOOKING SECTION
- COURT ADMINISTRATION SECTION
- PROPERTY CONTROL SECTION
- TECHNICAL COMMUNICATIONS DIVISION
- FACILITIES SERVICES DIVISION
  - FLEET SERVICES SECTION
  - PRINTING & STORES SECTION
- INFORMATION SYSTEMS DIVISION
  - TECHNOLOGY UNIT
  - RADIO COMMUNICATIONS SECTION
- RECORDS MANAGEMENT DIVISION
  - OPEN RECORDS



**MILWAUKEE POLICE DEPARTMENT**
OPERATIONAL ORGANIZATIONAL CHART
EFFECTIVE AUGUST 2, 2015

# EXHIBIT #12

16CV089 - 0283

City of Milwaukee
CS-25, Rev. 12/09

# JOB DESCRIPTION

FOR DER USE ONLY

Vacancy No.
City Service Commission:
Fire & Police Commission:
Finance Committee:
Common Council:

**Instructions:** Complete all sections. Refer to the *Guidelines for Preparing Job Descriptions* for instructions on completing specific items.

| 1. Date Prepared/ Revised: 4/15/15 | 2. Present Incumbent: Various | Is incumbent underfilling position? |
|---|---|---|
| 3. Date Filled: | 4. Previous Incumbent: Various | YES ☐   NO ☒ *If YES, indicate Underfill Title in box 10.* |
| 5. Department: Police Department | Bureau: Varied   Division: | Unit:   Section: |
| 6. Work Location: Varied | Telephone:   Email: | Work Schedule: Hours: : 8 hr shifts; various start times /  Days: |
| 7. Represented by a Union? ☒ Yes ☐ No | 8. Bargaining Unit: Local 21, Milw Police Assn   If in District Council 48, which local? | 9. FLSA Status *(check one)*: ☐ Exempt   ☒ Non-Exempt |

| 10. Official Title: Police Officer | | Pay Range | Job Code | EEO Code |
|---|---|---|---|---|
| | | 4B | 2342 | |
| Underfill Title *(if applicable):* | | | | |
| Requested Title *(if applicable):* | | | | |
| Recommended Title (DER Use Only): | Approved by: *[signature]* | | | |
| | Date: 5/8/2015 | | | |

## 11. BASIC FUNCTION OF POSITION:

The preservation of public peace, protection of life and property, prevention of crime, enforcement of ordinances of the City of Milwaukee and the laws of the State of Wisconsin, and the arrest of violators thereof in accordance with the Code of Conduct and mission of the Milwaukee Police Department.

## 12. DESCRIPTION OF JOB (Check if description applies to Official Title ☒ or Underfill Title ☐):

### A. ESSENTIAL FUNCTIONS/Duties and Responsibilities: *(Refer to the "Guidelines for Preparing Job Descriptions" for instructions on determining Essential Functions.)*

| % of Time | ESSENTIAL FUNCTIONS |
|---|---|
| 100 | • Carries and maintains firearms and other defensive weapons in accordance with official training. <br>• Executes powers of arrest and control, including full search of arrestee. <br>• Serves as a credible witness in court and administrative proceedings. <br>• Has working knowledge of the Wisconsin criminal and traffic laws and City of Milwaukee ordinances. |
| | • Enforces criminal laws, identifies, detains, and processes wanted individuals, all in accordance with the Constitution of the United States, State of Wisconsin and ordinances of the City of Milwaukee. <br>• Responds to calls for service or traffic related assignments in order of priority and handles such calls efficiently and responsibly, consistent with training, Department directives, Code of Conduct, and Standard Operating Procedures. <br>• Conducts crime scene investigations, properly documenting all pertinent information to such investigation including evidence recovery and preservation, witness and suspect statements, and provides such information to the commanding officers. <br>• Physically control suspects who are actively resisting arrest ensuring the humane treatment and care of prisoners detained. |
| | • Prepares and testifies in court as to the facts surrounding any criminal, departmental, or civil action. |
| | • Properly and thoroughly documents all pertinent information needed to prepare for and present a case in the District Attorney's Office for charging. Ensures accurate entry of all information into the Records Management System. |

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

*Page 1 of 5, CS-25, Job Description*

| % of Time | ESSENTIAL FUNCTIONS |
|---|---|
| | • Using the data available, familiarizes him/herself with the daily crime trends, suspect and/or vehicle descriptions, and when directed, deploys to those areas to abate crime and to apprehend those individuals responsible.<br>• Identifies and develops strategies to solve problems, utilizing data and the analysis of data to manage those issues. |
| | • Develops and maintains functional knowledge of the technology available to properly elicit information relative to offenses, and to properly report those incidents of which an officer takes cognizance. |
| | • Maintains a professional demeanor and displays a proper attitude in all dealings with citizens, supervisors and other departmental personnel.<br>• Acts in a manner consistent with the Code of Conduct, Policies and Procedures and Standard Operating Procedures as set forth by the Chief of Police. |
| | • Participates in and successfully completes all required training (e.g., recruit, field, probationary, CPR, firearm, DAAT, EVOC, etc). |
| | • Reports to duty fully equipped, prepared, and fit for the full duration of his/her scheduled shift. |

**B. PERIPHERAL DUTIES:**

| % of Time | PERIPHERAL DUTY |
|---|---|
| | • Other duties as assigned. |
| | • |
| | • |
| | • |
| | • |
| | • |
| | • |
| | • |
| | • |
| | • |

**C. NAME AND TITLE OF IMMEDIATE SUPERVISOR:**

Normally a Police Sergeant, but could be a Lieutenant of Police, Captain of Police, or Civilian Manager.

**D. SUPERVISION RECEIVED:** (Describe the extent to which work assignments and methods are outlined, reviewed, and approved by this position's supervisor.)

A police officer is supervised by a member of a higher rank who makes assignments of work and discusses methods to be employed in the performance of such duties, reviews and approves work performed, and instructs the police officer in the proper method of performing all the duties of an officer.

**E. SUPERVISION EXERCISED:**
Total number of employees for whom responsible, either directly or indirectly = **None**.

**Direct Supervision:** List the number and titles of personnel directly supervised. Specify the kind and extent of supervision exercised by indicating one or more of the following:

| | | | |
|---|---|---|---|
| a. | Assign duties | e. | Sign or approve work |
| b. | Outline methods | f. | Make hiring recommendations |
| c. | Direct work in progress | g. | Prepare performance appraisals |
| d. | Check or inspect completed work | h. | Take disciplinary action or effectively recommend such |

| Number Supervised | Job Title | Extent of Supervision Exercised (Select those that apply from list above, a - h) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

*Page 2 of 5, CS-25, Job Description*

| a. Assign duties | | e. Sign or approve work |
|---|---|---|
| b. Outline methods | | f. Make hiring recommendations |
| c. Direct work in progress | | g. Prepare performance appraisals |
| d. Check or inspect completed work | | h. Take disciplinary action or effectively recommend such |

| Number Supervised | Job Title | Extent of Supervision Exercised *(Select those that apply from list above, a - h)* |
|---|---|---|
| | | |
| | | |

F. **MINIMIMUM QUALIFICATIONS REQUIRED:** (Indicate the MINIMUM qualifications required to <u>enter</u> the job as a recruit/probationary officer.)

    i. <u>Education and Experience:</u>
Minimum age 21. United States Citizenship. High School Diploma or Wisconsin GED, or other GED with minimum total score of 230, or Certified High School Equivalency Diploma, and 60 college credits within five years of hire.

    ii. <u>Knowledge, Skills and Abilities:</u>
Successful completion of all portions of the examination process established by the Fire and Police Commission (written, oral, medical, background and/or psychological).
Ability to read, understand, and explain Wisconsin State Statutes and City of Milwaukee ordinances
Ability to communicate effectively with a diverse population, in-person, via telephone, and in writing
Ability to use language in writing to communicate information or ideas including organizing information and expressing it in a clear and logical manner using proper sentence structure, grammar and appropriate vocabulary
Ability to recognize or identify the existence of a problem or issue that needs to be addressed, critically evaluate the problem or issue, evaluate alternative solutions and arrive at a sound decision
Ability to memorize and retain new information including the memory of names, faces, vehicles, geographic locations, maps and patrol patterns
Ability to maintain self-control and take direction from supervisors
Ability to perform physical activities necessary to protect oneself and others

    iii. <u>Certifications, Licenses, Registrations:</u>
Valid Motor Vehicle Operator's License (Drivers License) at time of background investigation. Must maintain valid Driver's License.

    iv. <u>Other Requirements:</u>
Participation in and successful completion of all phases of the required training (Phases I, II, III, IV, V, and VI - Recruit Officer, Officer in Training (OIT) and Probationary Officer);
Attainment of LESB certification during recruit training. Maintenance of LESB certification thereafter.

## 13. PHYSICAL AND ENVIRONMENTAL DEMANDS: TOOLS AND EQUIPMENT USED

The Americans with Disabilities Act of 1993 requires job descriptions to provide detailed information regarding the physical demands required to perform the essential functions of a job; the conditions under which the job is performed; and the tools and equipment the employee will be required to use on the job. Reasonable accommodations may be made to enable qualified individuals to perform the essential duties and responsibilities of the job for each of the categories listed below.

G. **PHYSICAL ACTIVITY OF THE POSITION:** (List the physical activities that are representative of those that <u>must</u> be met to successfully perform the essential functions of the job).

**CHECK ALL THAT APPLY:**

| ☒ | **Climbing:** Ascending or descending ladders, stairs, scaffolding, ramps, poles, and the like; using feet and legs and/or hands and arms. Body agility is emphasized. Check only if the amount and kind of climbing required exceeds that required for ordinary locomotion. |
|---|---|

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

| | |
|---|---|
| ☐ | **Balancing:** Maintaining body equilibrium to prevent falling when walking, standing or crouching on narrow, slippery or erratically moving surfaces. Check only if the amount and kind of balancing exceeds that needed for ordinary locomotion and maintenance of body equilibrium. |
| ☒ | **Stooping:** Bending body downward and forward by bending spine at the waist. Check only if it occurs to a considerable degree and requires full use of the lower extremities and back muscles. |
| ☒ | **Kneeling:** Bending legs at knee to come to a rest on knee or knees. |
| ☒ | **Crouching:** Bending the body downward and forward by bending leg and spine. |
| ☒ | **Crawling:** Moving about on hands and knees or hands and feet. |
| ☒ | **Reaching:** Extending Hand(s) and arm(s) in any direction. |
| ☒ | **Standing:** Particularly for sustained periods of time. |
| ☒ | **Walking:** Moving about on foot to accomplish tasks, particularly for long distances. |
| ☒ | **Pushing:** Using upper extremities to exert force in order to draw, press against something with steady force in order to thrust forward, downward or outward. |
| ☒ | **Pulling:** Using upper extremities to exert force in order to draw, drag, haul or tug objects in a sustained motion. |
| ☒ | **Lifting:** Raising objects from a lower to a higher position or moving objects horizontally from position-to-position. Check only if it occurs to a considerable degree and requires substantial use of the upper extremities and back muscles. |
| ☒ | **Fingering:** Picking, pinching, typing or otherwise working primarily with fingers rather than with the whole hand or arm, as in handling. |
| ☒ | **Grasping:** Applying pressure to an object with fingers and palm. |
| ☒ | **Feeling:** Perceiving attributes of objects such as size, shape, temperature or texture by touching with the skin, particularly that of the fingertips. |
| ☒ | **Talking:** Expressing or exchanging ideas by means of the spoken word. Those activities which demand detailed or important instructions spoken to other workers accurately, loudly or quickly. |
| ☒ | **Hearing:** Perceiving the nature of sounds with no less than a 40 db loss. Ability to receive oral communication and make fine discriminations in sound. |
| ☒ | **Repetitive Motions:** Substantial movements (motions) of the wrist, hands, and/or fingers. |
| ☒ | **Driving:** Minimum standards required by State Law (including license). |

H.  **PHYSICAL REQUIREMENTS OF THE POSITION:** (List the physical requirements that are essential functions of the job.)

*CHECK ONE:*

| | |
|---|---|
| ☐ | **Sedentary Work:** Exerting up to 10 pounds of force occasionally and/or negligible amount of force frequently or constantly to lift, carry, push, pull or otherwise move objects. Sedentary work involves sitting most of the time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met. |
| ☐ | **Light Work:** Exerting up to 10 pounds of force occasionally and/or negligible amount of force constantly to move objects. If the use of arm and/or leg controls requires exertion of forces greater than that for sedentary work and the worker sits most of the time, the job is rated for Light Work. |
| ☒ | **Medium Work:** Exerting up to 50 pounds of force occasionally and/or up to 20 pounds of force frequently, and/or up to 10 pounds of force constantly to move objects. |
| ☐ | **Heavy Work:** Exerting up to 100 pounds of force occasionally, and/or up to 50 pounds of force frequently, and/or up to 20 pounds of force constantly to move objects. |
| ☐ | **Very Heavy Work:** Exerting in excess of 100 pounds of force occasionally, and/or in excess of 50 pounds of force frequently, and/or in excess of 20 pounds of force constantly to move objects. |

I.  **VISUAL ACUITY REQUIREMENTS:** (List the visual acuity requirements that are essential functions of the job.)

*CHECK ONE:*

| | |
|---|---|
| ☒ | **Operators (Electronic Equipment), Inspection, Close Assembly, Clerical, Administrative:** This is a minimum standard for use with those whose job requires work done at close visual range (i.e. preparing and analyzing data and figures, accounting, transcription, computer terminal, extensive reading, visual inspection involving small parts, operation of machines, using measurement devises, assembly or fabrication of parts). |
| ☐ | **Machine Operators, Mechanics, Skilled Tradespeople:** This is a minimum standard for use with those whose work deals with machines where the seeing job is at or within arm's reach. This also includes mechanics and skilled tradespeople and those who do work of a non-repetitive nature such as carpenters, technicians, service people, plumbers, painters, mechanics, etc. (If the machine operator also inspects, check the "Operators" box.) |
| ☐ | **Mobile Equipment Operators:** This is a minimum standard for use with those who operate cars, trucks, forklifts, cranes, and high lift equipment. |

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

*Page 4 of 5, CS-25, Job Description*

| ☐ | Other: This is a minimum standard based on the criteria of accuracy and neatness of work for janitors, sweepers, etc. |

**J.** **THE CONDITIONS THE WORKER WILL BE SUBJECT TO IN THIS POSITION:**
List the environmental/working conditions to which the employee may be exposed while performing the essential functions of the job. Include scheduling considerations such as on-call for emergencies, rotating shift, etc. **Approximate Percentage of time performing field work: 95%**

*CHECK ALL THAT APPLY:*

| | |
|---|---|
| ☐ | **None:** The worker is not substantially exposed to adverse environmental conditions *(such as typical office or administrative work).* |
| ☐ | **The worker is subject to inside environmental conditions:** Protection from weather conditions but not necessarily from temperature changes *(i.e. warehouses, covered loading docks, garages, etc.)* |
| ☒ | **The worker is subject to outside environmental conditions:** No effective protection from weather. |
| ☒ | **The worker is subject to extreme cold:** Temperatures below 32 degrees for period of more than one hour. |
| ☒ | **The worker is subject to extreme heat:** Temperatures above 100 degrees for periods of more than one hour. |
| ☒ | **The worker is subject to noise:** There is sufficient noise to cause the worker to shout in order to be heard above the surrounding noise level. |
| ☒ | **The worker is subject to vibration:** Exposure to oscillating movements of the extremities or whole body. |
| ☒ | **The worker is subject to hazards:** Includes a variety of physical conditions, such as proximity to moving mechanical parts, electrical current, working on scaffolding and high places or exposure to chemicals. |
| ☒ | **The worker is subject to atmospheric conditions:** One or more of the following conditions that affect the respiratory system or the skin: Fumes, odors, dust, mists, gases or poor ventilation. |
| ☐ | **The worker is subject to oil:** There is air and/or skin exposure to oils and other cutting fluids. |
| ☒ | **The worker is required to wear a respirator.** (In recruit training) |

**K.** **MACHINE, TOOLS, EQUIPMENT, ELECTRONIC DEVICES, SOFTWARE, ETC. USED BY POSITION:**
List equipment needed to successfully perform the essential functions of the job. Reasonable accommodations may be made to enable qualified individuals with disabilities to perform the essential functions.)

*CHECK ALL THAT APPLY:*

| | | | |
|---|---|---|---|
| ☒ Camera and photographic equipment | | ☒ Office Equipment (desk, chair, telephone, etc.) | |
| ☐ Cleaning supplies | | ☐ Office supplies (pens, staplers, pencils, etc.) | |
| ☒ Commercial vehicle | | ☒ Packing materials (boxes, shrink wrap, etc.) | |
| ☐ Data processing equipment | | ☒ PC equipment (monitor, keyboard, printer, etc.) | |
| ☐ Handcart | | ☐ PC software | |
| ☒ Hand tools *(please list):* screwdrivers, hammer, knives | | | |
| ☒ Office Machines *(check all that apply):* ☒ Copier ☒ Facsimile ☐ Calculator ☐ Cash register | | | |
| ☒ Other *(please list):* Firearms (training, use and dismantle); riot gear (helmet, baton); ballistic vest and Sam Browne belt and equipment (handcuffs, baton, etc.). | | | |

**L.** **SUPPLEMENTARY INFORMATION:** (Indicate any other information which further explains the importance, difficulty, or uniqueness of the position, such as its scope of responsibility related to finances, equipment, people, information, etc. Also indicate success factors such a personal characteristics that contribute to an individual's ability to perform well in the job, and any other special considerations.)

Ability to communicate effectively with a variety of people, write accurate and complete reports, make quick and appropriate decisions under stressful situations, perform physical activities necessary to protect self and others, and work long hours for extended periods of time.

**M.** **I believe that the statements made above in describing this job are complete and accurate.**

_____ INSP William Jenn _____
*Signature of Department Head or Designated Representative*

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

*Page 5 of 5, CS-25, Job Description*

# EXHIBIT #13

City of Milwaukee
CS-25, Rev. *12/09*

# JOB DESCRIPTION

**FOR DER USE ONLY**

Vacancy No.

City Service Commission:

Fire & Police Commission:

Finance Committee:

Common Council:

**Instructions:** Complete all sections. Refer to the *Guidelines for Preparing Job Descriptions* for instructions on completing specific items.

| | | |
|---|---|---|
| **1. Date Prepared/ Revised:** 4/15/15 | **2. Present Incumbent:** Various | **Is incumbent underfilling position?** |
| **3. Date Filled:** | **4. Previous Incumbent:** Various | **YES** ☐ **NO** ☒ <br> *If YES, indicate Underfill Title in box 10.* |

| | | |
|---|---|---|
| **5. Department:** Police Department | **Bureau:** Varied <br> **Division:** | **Unit:** <br> **Section:** |
| **6. Work Location:** Varied | **Telephone:** <br> **Email:** | **Work Schedule:** <br> Hours: 8 hr shifts; various start times / Days: |

| **7. Represented by a Union?** ☒ *Yes* ☐ *No* | **8. Bargaining Unit:** Local 21, Milw Police Assn <br> **If in District Council 48, which local?** | **9. FLSA Status** *(check one):* <br> ☐ Exempt ☒ Non-Exempt |
|---|---|---|

| 10. | **Official Title:** Detective | | **Pay Range** 4F | **Job Code** 2309 | **EEO Code** |
|---|---|---|---|---|---|
| | **Underfill Title** *(if applicable):* | | | | |
| | **Requested Title** *(if applicable):* | | | | |

| **Recommended Title (DER Use Only):** | Approved by: | | | |
|---|---|---|---|---|
| | Date: | | | |

## 11. BASIC FUNCTION OF POSITION:

Investigation of major crimes and any other investigations deemed necessary by the Chief of Police and/or his designee. Recognize crime trends and patterns and identify solutions in combination with personnel from other bureaus and divisions.

## 12. DESCRIPTION OF JOB (Check if description applies to **Official Title** ☐ or **Underfill Title** ☐):

### A. ESSENTIAL FUNCTIONS/Duties and Responsibilities: *(Refer to the "Guidelines for Preparing Job Descriptions" for instructions on determining Essential Functions.)*

| % of Time | ESSENTIAL FUNCTIONS |
|---|---|
| 100 | • Carries and maintains firearms and other defensive weapons in accordance with official training. <br> • Executes powers of arrest and control, including full search of arrested persons. <br> • Investigation of criminal offenses that usually fall into the area of major felonies. <br> • Protection of life and property. <br> • Serves as a credible witness in court and administrative proceedings. |
| | • Has complete knowledge of Wisconsin State Statutes and City of Milwaukee Ordinances. <br> • Assists in developing and administrating crime prevention programs to eliminate causes of crime. <br> • Detection and apprehension of criminal offenders. |
| | • Manages criminal investigations and properly documents and recovers evidence. Identifies, documents, preserves, processes and analyzes items of evidence obtained from crime scenes and suspects, placing them in proper containers, and properly maintaining the chain of custody. |
| | • Obtains and executes search and arrest warrants needed to collect additional evidence and to arrest suspects. <br> • Conducts proper interview/interrogation techniques that produce statements that stand the test of judicial proceedings. <br> • Responds to crime scenes and mentors/aids police officers in proper crime scene management. <br> • Conducts investigative evidence recovery, interviews of witnesses, and the apprehension of wanted persons at crime scenes. |

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 295 of 805   Document 80-21
16CV-009 - 0290

| % of Time | ESSENTIAL FUNCTIONS |
|---|---|
| | • Conducts a review and analysis of completed police reports to determine what additional information and investigative work is needed and collaborates with other districts and bureaus to ensure the work is properly completed.<br>• Based on an analysis of crime trends, suspected offenders and/or problem locations, collaborates with other districts and bureaus to deploy police resources to mitigate crime and apprehend the offenders involved.<br>• Thoroughly and properly documents crime scenes, including but not limited to citizen/witness interviews, offender/suspect interviews, evidence location and recovery, scene diagrams, and all other aspects pertinent to the investigation. |
| | • Demonstrates a thorough knowledge of Wisconsin Criminal Code and case law that affect the detective's duties. |
| | • Participates in and successfully completes all required training (e.g., CPR, Firearms, DAAT, EVOC, etc.). |
| | • Reports to duty fully equipped, prepared, and fit for the full duration of his/her scheduled shift. |
| | • Acts in a manner consistent with the Department's Code of Conduct, policies and procedures, and Standard Operating Procedures as set forth by the Chief of Police. |
| | • When directed, enforces criminal laws, identifies, detains, and processes wanted individuals, all in accordance with the Constitution of the United States, State of Wisconsin and ordinances of the City of Milwaukee.<br>• When directed, responds to calls for service in order of priority and handles such calls efficiently and responsibly, consistent with training, Department directives, Code of Conduct, and Standard Operating Procedures.<br>• Manages major crime scenes until officially relieved by a higher ranking supervisor. Directs uniform personnel who are involved in the investigation. Processes and protects the crime scene for evidence, directing the recovery and packing of evidence, directing the arrest of wanted persons and preparing the case for proper presentation to the District Attorney's Office and court. |

**B. PERIPHERAL DUTIES:**

| % of Time | PERIPHERAL DUTY |
|---|---|
| | • Other duties as assigned. |
| | • |
| | • |
| | • |
| | • |
| | • |
| | • |
| | • |
| | • |
| | • |

**C. NAME AND TITLE OF <u>IMMEDIATE</u> SUPERVISOR:**

Police Lieutenant or Police Sergeant

**D. SUPERVISION RECEIVED:** (Describe the extent to which work assignments and methods are outlined, reviewed, and approved by this position's supervisor.)

Police Lieutenant monitors daily work assignments. A Detective follows procedures and policies set forth by the Division Commander (Captain of Police), Inspector, and Assistant Chief of the work location.

**E. SUPERVISION EXERCISED:**
Total number of employees for whom responsible, either directly or indirectly = <u>**N/A**</u>.

<u>Direct Supervision:</u> List the number and titles of personnel directly supervised. Specify the kind and extent of supervision exercised by indicating one or more of the following:

| | | | |
|---|---|---|---|
| a. | Assign duties | e. | Sign or approve work |
| b. | Outline methods | f. | Make hiring recommendations |
| c. | Direct work in progress | g. | Prepare performance appraisals |
| d. | Check or inspect completed work | h. | Take disciplinary action or effectively recommend such |

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

*Page 2 of 5, CS-25, Job Description*

| Number Supervised | Job Title | Extent of Supervision Exercised *(Select those that apply from list above, a - h)* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

F. **MINIMIMUM QUALIFICATIONS REQUIRED:** (Indicate the MINIMUM qualifications required to <u>enter</u> the job.)

    i.  <u>Education and Experience:</u>
Minimum years of experience as specified by the Fire and Police Commission at time of promotional process.
Familiarity with problem-oriented policing and ethical issues in policing.

    ii.  <u>Knowledge, Skills and Abilities:</u>
Ability to analyze and solve problems, make decisions, and exercise judgment effectively. Good oral and written communication skills. Ability to accurately recall details. Knowledge of the Milwaukee Police Department's Standard Operating Procedures, general rules and regulations, and Code of Conduct. Knowledge of laws, ordinances and the criminal law handbook. Strong planning and organization skills. Knowledge and experience with current technologies required within ranks. Ability to analyze information and develop action plans.

    iii.  <u>Certifications, Licenses, Registrations:</u>
Maintenance of a valid Driver's license.

    ~~iv.~~  <u>Other Requirements:</u>
Maintenance of LESB certification.

## 13. <u>PHYSICAL AND ENVIRONMENTAL DEMANDS: TOOLS AND EQUIPMENT USED</u>

The Americans with Disabilities Act of 1993 requires job descriptions to provide detailed information regarding the physical demands required to perform the essential functions of a job; the conditions under which the job is performed; and the tools and equipment the employee will be required to use on the job. Reasonable accommodations may be made to enable qualified individuals to perform the essential duties and responsibilities of the job for each of the categories listed below.

G. **PHYSICAL ACTIVITY OF THE POSITION:** (List the physical activities that are representative of those that <u>must</u> be met to successfully perform the essential functions of the job).

*CHECK ALL THAT APPLY:*

| | |
|---|---|
| ☒ | **Climbing:** Ascending or descending ladders, stairs, scaffolding, ramps, poles, and the like; using feet and legs and/or hands and arms. Body agility is emphasized. Check only if the amount and kind of climbing required exceeds that required for ordinary locomotion. |
| ☐ | **Balancing:** Maintaining body equilibrium to prevent failing when walking, standing or crouching on narrow, slippery or erratically moving surfaces. Check only if the amount and kind of balancing exceeds that needed for ordinary locomotion and maintenance of body equilibrium. |
| ☒ | **Stooping:** Bending body downward and forward by bending spine at the waist. Check only if it occurs to a considerable degree and requires full use of the lower extremities and back muscles. |
| ☒ | **Kneeling:** Bending legs at knee to come to a rest on knee or knees. |
| ☒ | **Crouching:** Bending the body downward and forward by bending leg and spine. |
| ☒ | **Crawling:** Moving about on hands and knees or hands and feet. |

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 297 of 805   Document 80-21

| | |
|---|---|
| ☒ | **Reaching:** Extending Hand(s) and arm(s) in any direction. |
| ☒ | **Standing:** Particularly for sustained periods of time. |
| ☒ | **Walking:** Moving about on foot to accomplish tasks, particularly for long distances. |
| ☒ | **Pushing:** Using upper extremities to exert force in order to draw, press against something with steady force in order to thrust forward, downward or outward. |
| ☒ | **Pulling:** Using upper extremities to exert force in order to draw, drag, haul or tug objects in a sustained motion. |
| ☒ | **Lifting:** Raising objects from a lower to a higher position or moving objects horizontally from position-to-position. Check only if it occurs to a considerable degree and requires substantial use of the upper extremities and back muscles. |
| ☒ | **Fingering:** Picking, pinching, typing or otherwise working primarily with fingers rather than with the whole hand or arm, as in handling. |
| ☒ | **Grasping:** Applying pressure to an object with fingers and palm. |
| ☒ | **Feeling:** Perceiving attributes of objects such as size, shape, temperature or texture by touching with the skin, particularly that of the fingertips. |
| ☒ | **Talking:** Expressing or exchanging ideas by means of the spoken word. Those activities which demand detailed or important instructions spoken to other workers accurately, loudly or quickly. |
| ☒ | **Hearing:** Perceiving the nature of sounds with no less than a 40 db loss. Ability to receive oral communication and make fine discriminations in sound. |
| ☒ | **Repetitive Motions:** Substantial movements (motions) of the wrist, hands, and/or fingers. |
| ☒ | **Driving:** Minimum standards required by State Law (including license): |

**H.  PHYSICAL REQUIREMENTS OF THE POSITION:** (List the physical requirements that are essential functions of the job.)

*CHECK ONE:*

| | |
|---|---|
| ☐ | **Sedentary Work:** Exerting up to 10 pounds of force occasionally and/or negligible amount of force frequently or constantly to lift, carry, push, pull or otherwise move objects. Sedentary work involves sitting most of the time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met. |
| ☐ | **Light Work:** Exerting up to 10 pounds of force occasionally and/or negligible amount of force constantly to move objects. If the use of arm and/or leg controls requires exertion of forces greater than that for sedentary work and the worker sits most of the time, the job is rated for Light Work. |
| ☒ | **Medium Work:** Exerting up to 50 pounds of force occasionally and/or up to 20 pounds of force frequently, and/or up to 10 pounds of force constantly to move objects. |
| ☐ | **Heavy Work:** Exerting up to 100 pounds of force occasionally, and/or up to 50 pounds of force frequently, and/or up to 20 pounds of force constantly to move objects. |
| ☐ | **Very Heavy Work:** Exerting in excess of 100 pounds of force occasionally, and/or in excess of 50 pounds of force frequently, and/or in excess of 20 pounds of force constantly to move objects. |

**I.  VISUAL ACUITY REQUIREMENTS:** (List the visual acuity requirements that are essential functions of the job.)

*CHECK ONE:*

| | |
|---|---|
| ☒ | **Operators (Electronic Equipment), Inspection, Close Assembly, Clerical, Administrative:** This is a minimum standard for use with those whose job requires work done at close visual range (i.e. preparing and analyzing data and figures, accounting, transcription, computer terminal, extensive reading, visual inspection involving small parts, operation of machines, using measurement devises, assembly or fabrication of parts). |
| ☐ | **Machine Operators, Mechanics, Skilled Tradespeople:** This is a minimum standard for use with those whose work deals with machines where the seeing job is at or within arm's reach. This also includes mechanics and skilled tradespeople and those who do work of a non-repetitive nature such as carpenters, technicians, service people, plumbers, painters, mechanics, etc. (If the machine operator also inspects, check the "Operators" box.) |
| ☐ | **Mobile Equipment Operators:** This is a minimum standard for use with those who operate cars, trucks, forklifts, cranes, and high lift equipment. |
| ☐ | **Other:** This is a minimum standard based on the criteria of accuracy and neatness of work for janitors, sweepers, etc. |

**J.  THE CONDITIONS THE WORKER WILL BE SUBJECT TO IN THIS POSITION:**
List the environmental/working conditions to which the employee may be exposed while performing the essential functions of the job. Include scheduling considerations such as on-call for emergencies, rotating shift, etc. **Approximate Percentage of time performing field work: 50%**

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

*Page 4 of 5, CS-25, Job Description*

ISM-0029 - 0293

**CHECK ALL THAT APPLY:**

| | |
|---|---|
| ☐ | None: The worker is not substantially exposed to adverse environmental conditions *(such as typical office or administrative work).* |
| ☒ | The worker is subject to inside environmental conditions: Protection from weather conditions but not necessarily from temperature changes *(i.e. warehouses, covered loading docks, garages, etc.)* |
| ☒ | The worker is subject to outside environmental conditions: No effective protection from weather. |
| ☒ | The worker is subject to extreme cold: Temperatures below 32 degrees for period of more than one hour. |
| ☒ | The worker is subject to extreme heat: Temperatures above 100 degrees for periods of more than one hour. |
| ☒ | The worker is subject to noise: There is sufficient noise to cause the worker to shout in order to be heard above the surrounding noise level. |
| ☒ | The worker is subject to vibration: Exposure to oscillating movements of the extremities or whole body. |
| ☒ | The worker is subject to hazards: Includes a variety of physical conditions, such as proximity to moving mechanical parts, electrical current, working on scaffolding and high places or exposure to chemicals. |
| ☒ | The worker is subject to atmospheric conditions: One or more of the following conditions that affect the respiratory system or the skin: Fumes, odors, dust, mists, gases or poor ventilation. |
| ☐ | The worker is subject to oil: There is air and/or skin exposure to oils and other cutting fluids. |
| ☐ | The worker is required to wear a respirator. |

K. **MACHINE, TOOLS, EQUIPMENT, ELECTRONIC DEVICES, SOFTWARE, ETC. USED BY POSITION:** List equipment needed to successfully perform the essential functions of the job. Reasonable accommodations may be made to enable qualified individuals with disabilities to perform the essential functions.)

*CHECK ALL THAT APPLY:*

| | |
|---|---|
| ☒ Camera and photographic equipment | ☒ Office Equipment (desk, chair, telephone, etc.) |
| ☐ Cleaning supplies | ☒ Office supplies (pens, staplers, pencils, etc.) |
| ☒ Commercial vehicle | ☐ Packing materials (boxes, shrink wrap, etc.) |
| ☐ Data processing equipment | ☒ PC equipment (monitor, keyboard, printer, etc.) |
| ☐ Handcart | ☐ PC software |

☒ Hand tools *(please list):*
☒ Office Machines *(check all that apply):* ☒ Copier ☒ Facsimile ☐ Calculator ☐ Cash register
☒ Other *(please list):* Firearms (training, use and dismantle); riot gear (helmet, baton); ballistic vest and Sam Browne belt and equipment (handcuffs, baton, etc.).

L. **SUPPLEMENTARY INFORMATION:** (Indicate any other information which further explains the importance, difficulty, or uniqueness of the position, such as its scope of responsibility related to finances, equipment, people, information, etc. Also indicate success factors such a personal characteristics that contribute to an individual's ability to perform well in the job, and any other special considerations.)

M. **I believe that the statements made above in describing this job are complete and accurate.**

_____ INSP William Jessup _____
Signature of Department Head or Designated Representative

*The above statements are intended to summarize the nature and level of work and typical responsibilities and duties being performed by the incumbent(s) of this job. They are not intended to be an exhaustive list of all responsibilities, duties, and tasks required of the position.*

*Page 5 of 5, CS-25, Job Description*

*EXHIBIT #14*

16CV089 - 0295



# EXHIBIT #15

16CV-089 - 0297

P.O. Amborn and P.O. Beasley in squad together.



1    Z0000031 start @2:25

2    June 2, 2015...8:30pm

3    ..So your hours. What are you supposed to do about that?    *Melanie Beasley*

4    He wants me to change them then I have to change them to accommodate late shift, late power now..    *Amborn*

5    Oh ok    *Melanie*

6    So I'll probably make it like so I can drive five hours before work and like three hours after .in case I get
7    stuck on overtime..    *Amborn*

8    Oh yeah the    *Melanie*

9    He only thing that matters is that don't get pulled over by some ass hole cop that runs my license.    *Amborn*

10    Just call the captain since he gave you his number...    *Melanie*

11    I got pulled over by Greenfield I live on the border of Greenfield and Milwaukee and I got pulled over by
12    a Greenfield officer for going too fast off of a red light . I wasn't squealing my tires or anything, he
13    walked up and I was wearing my uniform, and he was like Oh! Oh have a good night!. So whenever I
14    drive ill just put on one of my workshirts!    *Amborn*

15    Did they tell you have thirty days like everyone else    *Melanie*

16    I'm most likely .I should be getting my manila envelope soon from Sgt Klien    *Amborn*

17    Yeah..    *Melanie*

18    If I don't get it today I have to write the damn letter to the chief. Kissing his ass (4:07)    *Amborn*

19    About what?    *Melanie*

20    You know that they want you within seven days of getting you're ah charges you have to write  from It
21    they ask that you write a letter to the chief how you were wrong and accepted responsibility for it.    *Amborn*

22    Ar you going to say that you are on probation?    *Melanie*

23    Nope, I'm not even going to mention it since we proceeded as if I wasn't . I lucked out with that shit..    *Amborn*

24    Yeah    *Melanie*

25    So like when you got called back in there and she had that piece of paper what happened?    *Melanie*

26    When I got called back in, it is probably because I talked to Captain Stigler... (squad ) sent to assignment..    *Amborn*

27    I know when I have pulled over people before and they have a device I thought it was a lot of money to
28    have one    *Amborn*

29    Yeah, like it depends what company you go through. There are different costs I found a cheap one..    *Amborn*

30    So that is good that it is not that much and get to keep your job    *Melanie*

31  Yeah but it sucks when I have to take that suspension I have a car payment, the device, I have to pay one    *Amborn*
32  of the tickets by July 860$ so I should do a couple DPM or something otherwise it will suck    *Melanie*

33  Do you have to blow into it to drive...yes you have to blow into it to start the car um shot u even got to
34  do it to park the car and then it can go off randomly anywhere from 5-40 minutes for a year..    *Amborn*

35  I have a bicycle..i wonder what they would do if that was my primary vehicle? It is still technically a moto
36  of transportation    *Amborn*

37  You can use your bicycle itt would be funny no you can    *Melanie*

38  Everyone..call in ah.brain fart...Schanke to pick me up in his Uber that is what he does when he leaves
39  work..does he ever go home    — *Amborn*

40  Maybe you will find out this week when you go on your vacation but it will probably be thirty days you
41  know that it is going to be 30 days..rumor is that you at least will be off every other week unpaid tho    *Melanie*

42  I know that you cannot work on a suspension day but if it is off day you can work for someone and make
43  up for it...

44  I also wanted to talk to the union to see if I could get unemployment during the suspension. I don't
45  know ask him that is what they are there for    *Amborn*

46  You will find out this week..they used to let you pick when you wanted to take it now they tell u and u
47  can use vacation maybe holidays maybe comp...10:21    *Melanie*

48  Yeah at least thy don't make me take it all one month not sure how it works ask another officer that has
49  been through it    *Amborn*

50  Your probably shiting your pants when it happened..    *Melanie*

51  When did it happen?    *Melanie*

52  March 8, my mother's birthday..oh r you serious? Iwas off the night for her birthday and I was out with
53  some district two coppers we were all..I wasn't as bad as I blew. Obviously I blew high I remember
54  everything. Probably because my tolerance is really high..haha    *Amborn*

55  That was not a real good happy birthday phone call to my mom    *Amborn*

56  So when did the captain call you then ( 11:40)    *Melanie*

57  He called me two days later asking me how I thought I was still on probation.. I told him that um sgt
58  Taylor had my last probationary review and said that it was extended or having the probationary date
59  ending date of March 18th and that is why I assumed I was on probation. I should have been..but
60  someone, specifically sergeant Taylor never submitted the proper paperwork to the Captain and the
61  Captain had to review it and sign off on it  and send it to the fire and police commission and they sign off
62  on it and file the extension and that was never done. That kind of saved my ass    *Amborn*

63  Ha    *Melanie*

64  Otherwise I most likely would have been fired    *Amborn*

65   Why was he called to ask you?   *Melanie*

66   Yeah he called and asked me why I thought I was on probation. He said "well so you know I was never
67   aware of you being extended on probation and I would be the one to sign that paper..so as far as I'm
68   concerned your probation ended  um January 24    *Amborn*

69   Oh that is good   *Melanie*

                                                          *~Melanie*

70   Is he saying that to tell you not to worry about it kind of thing? He really looked out for me..he gave me
71   his cell number and told me to text him if I need a status or what's going on..he could have been like hey
72   not on file but it is on file now and could have been what stopped him from submitting it late I'm still on
73   probation. Clerical error..   *Amborn*

74   That is what it sounds like he did..   *Melanie*

75   He could have been like always talking to me ask me how im doing gave me his phone number..   *Amborn*

76   13:33

77   And when you thought you were ok and pp... they gave you the questions and asked you what to say?   *Melanie*
78   Sgt Klein tried to proceeded as if I was on probation I told Captain Stigler and he called and snapped on
79   them and had her and Ziegler and the next meeting they said we are not going to proceed with you being
80   on probation, your probation ended January 24 then we went over the whole thing and she pretty
81   much prepped me for every answer actually pretty simple and the chief was to liten to the recording at
82   the end where I accept what I did..it was my know it was ..disgrace to the department and peers
83   especially the chief take this as a lesson learned participating in employee assistance program 14:39 kiss
84   the chiefs ass as much as possible..I have to put that on my paper my memo Lees said he would help me
85   with it   *Amborn*

86   They just told you not to mention the probation thing then?   *Melanie*

87   The recording? No they said don't mention that it was recorded. Klein was like..   *Amborn*

88   They never brought it up so I never brought it up...   *Amborn*

89   They just asked me where I was what I was doing   *Amborn*

90

91

92

93

94

95

96

97

1        BEFORE THE

2    MILWAUKEE FIRE AND POLICE COMMISSION

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - -

4    In Re the Appeal of:        MPD Personnel
                                 Order No. 2015-150
5    SHANNON LEWANDOWSKI

6    - - - - - - - - - - - - - - - - - - - - - - - - - - - -

7

8
          MILWAUKEE POLICE & FIRE COMMISSION
9
                    Ann Wilson
10                 Kathryn Hein
                  Angela McKenzie
11

12        Hearing Examiner:  Rudolph Konrad

13

14   HEARING HELD:              TRANSCRIPT PAGES

15                                 1 - 290
     200 E. Wells Street
16   Milwaukee, Wisconsin      EXHIBITS IDENTIFIED:

17                                 1 - 21
     Date: August 10, 2016
18
                              EXHIBITS ADMITTED:
19

20

21

22

23

24

25

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 306 of 805   Document 80-21

```
 1                    A P P E A R A N C E S:

 2


 3


 4       THE COMMISSION:

 5                         COMMISSIONER ANN WILSON
                           COMMISSIONER KATHRYN HEIN
 6                         COMMISSIONER ANGELA MC KENZIE

 7


 8       Hearing Examiner:  Rudolph Konrad

 9


10       For the Milwaukee Police Department:

11           MILWAUKEE DISTRICT ATTORNEY'S OFFICE
             By: ROBIN A. PEDERSON
12           200 E. Wells Street  #800
             Milwaukee, Wisconsin 53202
13
         The Appellant in Person and By:
14
             GIMBEL REILLY GUERIN BROWN, LLP.
15           By: STEVEN C. MC GAVER
             Two Plaza East
16           330 E. Kilbourn Avenue #1170
             Milwaukee, Wisconsin 53202
17

18

19

20

21

22

23

24

25
```

1

2              E X A M I N A T I O N   I N D E X

3

     WITNESS                                    PAGE NO.
4
     CODY SMITH
5
     Direct Exam by Mr. Pederson                    12
6    Cross-Exam by Mr. McGaver                      24

7
     SEAN HANLEY
8
     Direct Exam by Mr. Pederson                    29
9    Cross-Exam by Mr. Mc Gaver                     54
     Redirect Exam by Mr. Pederson                  78
10   Recross-Exam by Mr. McGaver                    84
     Re-Redirect Exam by Mr. Pederson               89
11

12   ADAM ZIEGER

13   Direct Exam by Mr. Pederson                    90
     Cross-Exam by Mr. McGaver                     140
14   Redirect Exam by Mr. Pederson                 155
     Recross-Exam by Mr. McGaver                   156
15   Re-Redirect Exam by Mr. Pederson              156

16

17   JUANITA CARR

18   Direct Exam by Mr. McGaver                    159
     Cross-Exam by Mr. Pederson                    175
19   Redirect Exam by Mr. McGaver                  193

20

21   JORDAN LEWANDOWSKI

22   Direct Exam by Mr. McGaver                    195
     Cross-Exam by Mr. Pederson                    206
23   Redirect Exam by Mr. McGaver                  212
     Recross-Exam by Mr. Pederson                  213
24

25

     SUSAN K. TAYLOR        262-553-1058       COURT REPORTER
                            sueT@wi.rr.com

1

DEBORA STACEY
2
Direct Exam by Mr. McGaver                      215
3       Cross-Exam by Mr. Pederson                      223
4

5       JESSE VOLLRATH

6       Direct Exam by Mr. McGaver                      224
        Cross-Exam by Mr. Pederson                      230
7
8       DENISE BROWN-ROGERS

9       Direct Exam by Mr. McGaver                      232
        Cross-Exam by Mr. Pederson                      237
10      Redirect Exam by Mr. McGaver                    238
11

12      SHANNON LEWANDOWSKI

13      Direct Exam by Mr. McGaver                      239
14

15

16

17

18

19

20

21

22

23

24

25

```
 1              MR. KONRAD:         Good morning.  This
 2   is Wednesday, August 10, 2016 at approximately 8:37 a.m.
 3   We are here in the matter of a disciplinary appeal of
 4   Police Detective Shannon Lewandowski from the Milwaukee
 5   Police Department Personnel Order No. 2015-150.  My name
 6   is Rudolph Konrad and I am the hearing examiner for this
 7   matter and will serve as the chair of the hearing today.
 8   I am joined by Fire and Police Commissioners Kathy Hein,
 9   Ann Wilson and Angela McKenzie.  This will be Phase I.
10   In the Phase I hearing, Detective Lewandowski disputes
11   the charges against her.
12              Could we have the appearances of counsel
13   for the record, please?  City first.
14              MR. PEDERSON:         Thank you.  Good
15   morning, Commissioners and Mr. Konrad.  I am Robin
16   Pederson, Assistant City Attorney.  I am representing
17   Chief Flynn today and today with me as my court officer
18   will be Lieutenant Lipski.
19              MR. MC GAVER:         Good morning.  My
20   name is Steven McGaver of the law firm of Gimbel Reilly
21   Guerin & Brown.  Shannon Lewandowski is present at the
22   hearing today as well as a law clerk of mine, Brianna
23   Meyer, although she is not formally appearing.
24              MR. KONRAD:         Thank you.  Are there
25   any matters we need to attend or address before the
```

```
1      opening statements?

2                   MR. PEDERSON:       I don't believe so.

3                   MR. KONRAD:         Counsel may make an

4      opening statement if they choose, starting with the

5      city.

6                   MR. PEDERSON:       Thank you, Mr.

7      Konrad.

8                   Commissioners, I expect the chief's case

9      to be relatively straightforward.  I expect to call

10     three witnesses.  That would be Sergeant Cody Smith of

11     the Shorewood Police Department, Lieutenant Hanley of

12     the Milwaukee Police Department and finally, Sergeant

13     Zieger who is the investigator in the Internal Affairs

14     matter.  Through those witnesses, I expect to establish

15     all the facts necessary for the chief's side of the

16     case.  We are scheduled for two days, so I guess things

17     might get a little more complicated as we go forward,

18     but when I say the chief's case is straightforward, I

19     mean it in that, you know, there are three charges here.

20     One of them relate to operating a vehicle in a manner

21     that was not consistent with the law as required by

22     SOPs and to that extent we are going to -- operating,

23     Detective Lewandowski was operating a squad car as an

24     emergency vehicle contrary to law.  It is as simple

25     as that.  There is a charge relating to effective and
```

```
 1     efficient time -- use of time in completing the mission
 2     of the department.  To that extent, we are going to put
 3     on evidence that shows that she was engaged in a
 4     personal -- personal concerns.  That is, she was en
 5     route to attend to matters that were not concerns of the
 6     department.  There is two possibilities here.  The facts
 7     are going to come out that she was either going to see
 8     her son, who had been pulled over by a police officer,
 9     or heading to District 5 for a to assist a fellow
10     officer for a matter that was, again, personal.

11               So to that extent, it doesn't matter what
12     the truth is.  The chief is going to maintain she was on
13     her way to the scene where her son had been stopped.  I
14     expect that they are going to maintain she was on her
15     way to District 5.  So the chief's position on that is
16     that it doesn't matter which one it is.  It was not
17     effectively and efficiently a matter or a concern of the
18     department.  So that is sustains -- that is the evidence
19     we will present to sustain that rule violation.

20               Finally, the most significant charge is
21     the integrity charge.  For that, I expect to put up
22     evidence which will demonstrate that the detective
23     changed her story substantively.  That is to say, that
24     when, on a night that the accident -- the squad accident
25     at issue here occurred, it was -- she was interviewed by
```

```
 1          Lieutenant Hanley regarding that to gather facts as part
 2          of the accident investigation and she gave one version
 3          of the events to Lieutenant Hanley.  On subsequent
 4          occasions, she completely recanted everything that she
 5          said and gave entirely different facts.  Not a matter
 6          if this is confusion or anything, but flatly said that
 7          Lieutenant Hanley was lying, that he misrepresented
 8          purposely.  Now, this is going to largely be a credi-
 9          bility concern because the only witness to that original
10          statement provided from Lewandowski to Lieutenant Hanley
11          are the two people involved; the detective and the
12          lieutenant.  So I don't know how you are going to make
13          your credibility determination, but I think there are
14          going to be enough supporting circumstantial facts to
15          support the chief's position that the detective did
16          fabricate, retract her story in a manner that was
17          inconsistent with integrity rules of the department.
18                    So that is the evidence I expect to
19          present and that is all.  Thank you.
20                    MR. MC GAVER:     This is a strange
21          case, although the city intends to present it in a
22          relatively straightforward matter.  I say it is strange
23          because it is involving a car accident and it is strange
24          in that Ms. Lewandowski, former Detective Lewandowski
25          didn't cause the car accident.  She was hit by a driver
```

```
 1    who ran a red light, who was drunk, impaired with both
 2    marijuana and alcohol, knew that the car she was driving
 3    had bad brakes and collided into the squad car that
 4    Lewandowski was driving.  Lewandowski entered the inter-
 5    section.  The evidence will show she had a green light
 6    and she didn't do anything wrong, what I mean by that is
 7    there is going to be evidence that the lights were on,
 8    the squad lights.  Ms. Lewandowski's position is that
 9    the squad lights were on because she was using them as
10    hazard lights to make sure there was not a collision
11    with a car pulling out in front of her before she
12    entered the intersection.  She entered the intersection
13    and she was slammed into by a different car that no one
14    saw coming.  The other allegation is that she was
15    engaging in what my office has come to call frolic and
16    detour, that she wasn't using her time for the purposes
17    of the department.  Well, that is nonsense.  It is
18    nonsense for -- in either scenario that the city
19    presents.  It is nonsense that she was not -- the city
20    might present some evidence showing that she was on her
21    way to intervene in a traffic stop where her son was
22    pulled over by Shorewood police, although there is a lot
23    of statements that apparently, it was UWM police who had
24    nothing to do with anything and that Lewandowski was
25    on her way to intervene.
```

```
 1              You are going to hear from Lewandowski
 2      herself, you are going to hear from her son Jordan as
 3      well as a couple other witnesses, including Juanita
 4      Carr, the detective in the car with Lewandowski, and no
 5      one will say that she was on her way to intervene in the
 6      traffic stop that her son was involved in.
 7              The other scenario is also nonsense, but
 8      for a different reason.  You will hear testimony and
 9      Lewandowski will say that she was on her way to District
10      5.  Through counsel, another officer by the name of
11      Melanie Beasley.  Now, you won't hear from Detective --
12      then-Officer Beasley, but we have some stipulated
13      testimony, so you will read about a statement that she
14      made.  Lewandowski was having some trouble completing
15      some police reports and she asked for -- I'm sorry.
16      Beasley was having some trouble completing some police
17      reports and she asked for Lewandowski's assistance,
18      which I think is a pretty fair use of police resources;
19      aiding another officer.  And she was having a personal
20      problem with another member of the police department
21      who, at best, was engaging in some harassing and
22      stalking behavior.  At worst, sexual assault.  And
23      Lewandowski's aim -- one of her aims was to counsel
24      that Officer, now Detective Beasley about what should
25      be done.  You will hear about how, as a result of the
```

1     accident, Ms. Lewandowski still has some lingering
2     health issues.  She was unconscious for a period of
3     time in the car.  She was pulled out of the car and any
4     statement that she made shortly thereafter, I think the
5     evidence will be pretty clear that she had no idea what
6     she was saying, at least then and there.
7              So at the end of all of this, the
8     investigation into Lewandowski's conduct commenced and
9     I will see that it was pretty sloppily done.  It was
10    sloppy for a couple reasons.  Number one, a number of
11    the key witnesses weren't interviewed until four, five,
12    six, sometimes seven months after this accident took
13    place.  That is a lot of time to pass.  People's
14    memories fade.  They don't recall exactly what happened,
15    so it is not the most reliable recollection of what
16    occurred.  There were only a handful of witnesses that
17    were interviewed at the scene of the accident.  None of
18    them by Internal Affairs.  If you are going to conduct
19    an Internal Affairs investigation which is ultimately
20    going to result in the loss of a detective's job, the
21    investigation must be better.
22             So at the end of this case, I am
23    confident that we will be able to show you that there
24    were no rule violations committed by Ms. Lewandowski and
25    that termination of her and other penalties associated

```
 1   with these alleged rule violations were in error.  Thank

 2   you.

 3                 MS. WILSON:        You said somebody

 4   knew they had bad brakes.  Was it --

 5                 MR. MC GAVER:      The driver of the --

 6   the drunk driver.

 7                 MS. WILSON:        Okay.

 8                 MR. KONRAD:        Mr. Pederson, you may

 9   call your first witness.

10                 MR. PEDERSON:      The chief would call

11   Sergeant Cody Smith.

12                 CODY SMITH, having been first duly sworn

13   on oath to tell the truth, the whole truth, and nothing

14   but the truth testified as follows:

15                 MR. KONRAD:        The witness is sworn.

16   DIRECT EXAMINATION BY MR. PEDERSON:

17   Q   Please state your name and spell your name for the

18       record.

19   A   Cody.  C-o-d-y.  Last name is Smith.  S-m-i-t-h.

20   Q   Mr. Smith, how are you employed?

21   A   I am a late shift sergeant with the Village of Shorewood

22       Police Department.

23   Q   How long have you had that position?

24   A   I have been a sergeant since March of 2015.

25   Q   Were you on duty January 1, 2015?
```

```
 1   A     I was.

 2   Q     What time did you start your shift that day?

 3   A     I believe it was 10:45 p.m.

 4   Q     That would have been the day before on the 18th, I

 5         assume?

 6   A     Yes.

 7   Q     Were you on duty at approximately 2:00 a.m.?

 8   A     I was.

 9   Q     Do you recall receiving a call for service at around

10         that time?

11   A     I do.

12   Q     Can you please indicate what that call was?

13   A     A disturbance in the 3500 block of North Maryland

14         Avenue.

15   Q     What did you do when you received that call?

16   A     I responded to the 3500 block of Maryland.

17   Q     What happened when you arrived there?

18   A     I observed a vehicle leaving the scene of a house

19         that I believe the disturbance was coming from.

20   Q     What did you do next upon making that observation?

21   A     Conducted a field interview on that vehicle.

22   Q     I presume that you first had to stop the vehicle.

23         Is that right?

24   A     Correct.

25   Q     Was there any issues with stopping the vehicle?
```

```
 1   A    No.

 2   Q    How far did the vehicle get from the point where you

 3        first saw it until you stopped it?

 4   A    I don't remember.

 5   Q    Was it very far at all?

 6   A    No.  It was still in the 3500 block of Maryland.

 7   Q    Thank you.  What happened after you actually conducted

 8        the stop?

 9   A    I made a driver's side approach on that vehicle.

10   Q    Did you identify the driver?

11   A    I did.

12   Q    Who was the driver?

13   A    Jordan Lewandowski.

14   Q    Was there anyone else in the car?

15   A    No.

16   Q    After you identified him, what happened next?

17   A    He had a business card that he made me aware of.

18   Q    How did he make you aware of it?

19   A    I don't remember if he showed it to me or if it was on

20        his lap, but I remember seeing specifically a gold

21        colored badge business card with a name on it for

22        "Detective".

23   Q    Did he give you that or just show it to you?

24   A    I don't remember if he handed it to me or showed it to

25        me.
```

```
 1    Q    Did you see the card?

 2    A    Yes.

 3    Q    Did you read the card?

 4    A    I did.

 5    Q    What did the card say?

 6    A    Detective Shannon Lewandowski, Milwaukee Police

 7         Department.

 8    Q    Did he say anything in connection with that card?

 9    A    That his mom was on the way.

10    Q    What did you understand that to mean?

11    A    That she was going to be arriving at our traffic stop.

12    Q    Did you ask him any questions as to why she was coming

13         or anything?

14    A    Not that I can recall.

15    Q    Is there a reason why you didn't ask him why his mom was

16         on the way?

17    A    I was going to grab his ID and continue on with my

18         business.

19    Q    What was your thought processes related to the

20         possibility of a Milwaukee police detective coming to

21         the scene?  How was that going to affect anything in

22         your mind?

23    A    That is the first time I had ever experienced anything

24         like that, so I was kind of working my way through it.

25         I went back to my squad car and ran the ID that was
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 320 of 805   Document 80-21

```
 1        provided to me.

 2   Q    When you had this contact with Jordan Lewandowski,

 3        did you make any observations that related to your

 4        investigation or created any other concerns?

 5   A    I did observe an odor of intoxicants coming from inside

 6        the vehicle.

 7   Q    Why was that an issue?

 8   A    For one, the vehicle was operated and two, Jordan

 9        Lewandowski was 19 years old.

10   Q    I believe you already testified that after you got his

11        information, you went back to your squad car.  Is that

12        right?

13   A    Yes.

14   Q    What happened then?

15   A    I am not sure when, but another officer arrived on the

16        scene, Officer Michael Kerr.

17   Q    Is this a Milwaukee officer or Shorewood?

18   A    Shorewood officer.

19   Q    I'd like to backtrack a little bit.  Upon your first

20        contact with him, was he ever on his phone or anything

21        like that?

22   A    Not that I can recall.

23   Q    Do you have an approximate time of the actual stop of

24        the vehicle contact?

25   A    No.
```

```
 1   Q   Are you able to give us some indication of how long it
 2       took from the 2:00 a.m. hour?  I believe we -- around
 3       2:00 a.m. that you received the call for service?
 4   A   Yes.
 5   Q   How long after that?  Are you able to approximate at
 6       all?
 7   A   I'd just be guessing.
 8   Q   How far did you have to travel from the point that you
 9       received the call till you got to the scene?
10   A   Shorewood is very small, so I would say less than five
11       minutes.
12   Q   Okay.  Let's go forward now to where the other officer
13       arrived at the scene.  What happens next?
14   A   I make a second approach on the vehicle that was
15       stopped.
16   Q   What is your intent at that point?
17   A   I established field sobriety tests on Jordan
18       Lewandowski.
19   Q   What happened next?
20   A   After the field sobriety tests, I had Jordan conduct
21       a preliminary breath test.
22   Q   What is a "preliminary breath test"?
23   A   It is a device that you use on the street to get
24       somebody's breath alcohol concentration.
25   Q   Did you actually have him perform that test?
```

```
 1   A    Yes.

 2   Q    What was the result of that test?

 3   A    0.09 BRAC.

 4   Q    What is "BRAC"?

 5   A    Breath alcohol concentration.

 6   Q    So what did that indicate to you?

 7   A    Exactly that.  A 19-year-old kid is a .09 and operating

 8        a motor vehicle.

 9   Q    What happened next?

10   A    I believe Jordan's phone rang.  He answered the phone

11        and stated that his mom had been in a car accident.

12   Q    After that?

13   A    It was brought to my attention that somebody from the

14        Milwaukee Police Department was going to be coming to

15        pick up Jordan.

16   Q    How did you become aware of that?

17   A    I don't remember if I talked to somebody on the phone or

18        if he had mentioned it to me.

19   Q    If you talked to somebody on the phone, would it have

20        been what phone?

21   A    His phone.

22   Q    Do you know who it was that that information came from?

23   A    I don't know.

24   Q    What was -- what was your understanding what was going

25        to happen when somebody picked him up?
```

```
 1    A    That they were going to take him to the hospital to see
 2         his mom.
 3    Q    Did you have an understanding of who was going to pick
 4         him up?
 5    A    I don't.
 6    Q    Did you have an understanding whether it was going to
 7         be Milwaukee Police Department officers or a private
 8         citizen?
 9    A    That was my understanding, that somebody from the
10         Milwaukee Police Department was coming.
11    Q    What did you do at that time?
12    A    I don't remember what happened next.  I don't remember.
13    Q    Going back to the point where he indicated that his mom
14         was on the way, is there any doubt in your mind, because
15         I understand you have had some trouble recalling, is
16         there any doubt in your mind at all that he indicated
17         that his mother was on the way to the scene?
18    A    No doubt.
19    Q    Is there any other source of that information than
20         Jordan Lewandowski?
21    A    No.
22    Q    You testified -- I believe you testified already that
23         you had decided that you were going to allow him to
24         leave the scene.  Is that right?
25    A    Correct.
```

```
 1   Q     What did you base that decision on?
 2   A     That his mother had just been involved in a serious
 3         car accident and was on her way to the hospital.
 4   Q     That was just a discretionary call on your part, fair to
 5         say?
 6   A     Yes.
 7               MR. PEDERSON:      That is all I have
 8         for this witness on direct.
 9               MR. KONRAD:      Commissioners with
10         any questions?
11               MS. WILSON:      What is the process
12         for any officer that gets hurt on duty to notify the
13         family?  Does another officer do it?  Take them to the
14         hospital?  What is the process?
15               MR. PEDERSON:      Who are you asking?
16               MS. WILSON:      What is the process?
17         I am sorry.  If an officer gets hurt on duty, what is
18         the process of notifying the family or getting the
19         family to where the officer is, or is there a process?
20               MR. KONRAD:      I think that is an
21         excellent question.  I don't think this witness can
22         testify as to what the Milwaukee police process is.
23         However, counsel perhaps can take note of that and
24         answer the question with the appropriate witness.
25               MR. PEDERSON:      At a future time?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                     sueT@wi.rr.com
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 325 of 805  Document 80-21    160V-089 - 0320

1              MR. KONRAD:          In the course of this

         2    hearing.

         3              MR. PEDERSON:        I will be happy to

         4    address that with an appropriate witness, Commissioner.

         5              MS. HEIN:            From the time you got

         6    your initial phone call for service till the time Jordan

         7    indicated that his -- he got the phone call indicating

         8    his mother was in an accident, can you give me an

         9    approximate amount of time that elapsed?

        10              THE WITNESS:         Any approximation

        11    would be simply a guess.

        12              MS. HEIN:            You said it took less

        13    than five minutes to get there.  So, I guess, I am

        14    looking for a --  Would it take a half hour from the

        15    time you got there till he got that phone call?

        16              THE WITNESS:         No.

        17              MS. HEIN:            A matter of, like,

        18    maybe five or ten minutes?  Even an approximate would

        19    be helpful.

        20              THE WITNESS:         Just based on

        21    standard field sobriety tests and how long those take

        22    and just a straightforward traffic stop where nothing

        23    else is going on, I would say the field sobriety tests

        24    take somewhere around seven to nine minutes.  For me to

        25    get to the location was five minutes.  I would say

       SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                            sueT@wi.rr.com
       Case 2:16-cv-01089-WED   Filed 04/22/19   Page 326 of 805   Document 80-21   ICOY 099 - 0321

```
 1      between 15 and 20 minutes would be the entirety of this
 2      whole thing.
 3                      MS. HEIN:           Thank you.
 4                      MS. MC KENZIE:      You stopped the car.
 5                      THE WITNESS:        Yes.
 6                      MS. MC KENZIE:      You approached the
 7      driver.
 8                      THE WITNESS:        Yes.
 9                      MS. MC KENZIE:      The driver was in the
10      car with the card either on his lap or in his hand to
11      show or give to you.
12                      THE WITNESS:        I don't know if his
13      intention was to give it to me or for me to see it.
14                      MS. MC KENZIE:      But you saw a card.
15                      THE WITNESS:        Yes.
16                      MS. MC KENZIE:      The driver said to
17      you, "my mom is coming."
18                      THE WITNESS:        Yes.
19                      MS. MC KENZIE:      So after that, you
20      still continued to do your job, which is the field
21      sobriety tests.  Is that correct?
22                      THE WITNESS:        Yes.
23                      MS. MC KENZIE:      At what point did the
24      phone interaction happen where you on the phone with
25      someone?  Before or after the sobriety test?
```

```
 1                    THE WITNESS:        It was after the PBT,
 2        the breath test.
 3                    MS. MC KENZIE:      After the breath
 4        test -- I'm sorry.  Do you also have a person come out
 5        of the car and walk and do those types of things?
 6                    THE WITNESS:       Yes.
 7                    MS. MC KENZIE:      You engage the driver
 8        that way.
 9                    THE WITNESS:       Yes.
10                    MS. MC KENZIE:      So after that is when
11        you received the call.
12                    THE WITNESS:       Yes.
13                    MS. MC KENZIE:      And, then, just so I
14        am clear, after you received the call, you let the
15        driver go.
16                    THE WITNESS:       Yes.
17                    MS. MC KENZIE:      In the car.  So he
18        drove away.
19                    THE WITNESS:       He didn't drive away.
20                    MS. MC KENZIE:      How did you let him
21        go?
22                    THE WITNESS:       I don't recall.  All I
23        know is I wasn't going to let a 19-year-old kid drive
24        a vehicle who is over the legal limit.
25                    MS. MC KENZIE:      Was there someone who
```

```
 1        came at the time to pick him up?  Do you recall that.
 2                    THE WITNESS:        I don't recall that.
 3                    MS. MC KENZIE:      Okay.
 4                    MR. KONRAD:         Cross?
 5        CROSS-EXAMINATION BY MR. MC GAVER:
 6   Q    Sergeant Smith, remind everybody here when you were
 7        promoted to sergeant.
 8   A    March of 2015.
 9   Q    So that was after this incident.  Correct?
10   A    Yes.
11   Q    You were a patrol officer at the time?
12   A    Yes.
13   Q    Have you ever met Shannon Lewandowski?
14   A    No.
15   Q    Have you ever spoken to Shannon Lewandowski either in
16        person or on the phone?
17   A    No.
18   Q    Isn't it true that you were called to this scene and
19        your interaction with Jordan Lewandowski was because of
20        a noise complaint?
21   A    Yes.
22   Q    Isn't it true that there was nothing in the initial CAD
23        report or any information that you initially received
24        involving a car that caused you to report to that scene.
25        Correct?
```

```
1    A    Not that I can remember.

2    Q    As far as you know, there was no car involved when --

3         Strike that.  Your understanding, approaching the scene

4         of Jordan Lewandowski, your understanding was that there

5         was no car involved.  Is that fair?

6    A    That is not fair.

7    Q    What is not fair about it?

8    A    The vehicle is leaving the area where a noise complaint

9         was called in.

10   Q    But that is not the reason you were initially dispatched

11        there.  Correct?

12   A    A noise complaint.  Correct.

13   Q    At some point, your testimony was a little unclear.

14        You got ahold of Jordan Lewandowski's phone.  Is that

15        true?

16   A    Not that I can recall.

17   Q    Whose phone did you speak to a representative of the

18        Milwaukee Police Department on?

19   A    I don't remember if I spoke to somebody on the phone or

20        Jordan told me his mom was in an accident.  I can't

21        remember.

22   Q    Jordan did tell you his mother was on the way.  Correct?

23   A    Correct.

24   Q    Do you remember the exact words he used?

25   A    I don't.
```

```
 1   Q   Is there a squad dash cam in the vehicle you were

 2       driving?

 3   A   There is.

 4   Q   Were you able to consult that footage?

 5   A   I was not.

 6   Q   Why not?

 7   A   We have had the squad video crash multiple times since

 8       then.

 9   Q   Even though footage may have been taken at the time, it

10       was not available?

11   A   It has never been available for me to view.

12   Q   When were you first interviewed about this incident?

13   A   I don't recall.

14   Q   If I told you it was -- we'll call it several months --

15       How about June 12, 2015?  Would you quarrel with me?

16   A   I don't remember what day it was.

17   Q   But you wouldn't dispute that.

18   A   I wouldn't dispute it.

19   Q   If Detective Lewandowski had shown up to the scene,

20       would it have impacted or changed anything that you

21       would have done with Jordan Lewandowski?

22   A   It never happened, so I can't answer that question.

23   Q   I think you might have testified to this, but I am not

24       sure.  Has another officer ever intervened in a traffic

25       stop that you were conducting?
```

```
1    A    No.

2    Q    At the end of all of this, did anybody remain on scene

3         with Jordan Lewandowski?

4    A    Not that I can recall.

5    Q    Is that because no representative of the Shorewood

6         Police Department was present with Jordan Lewandowski

7         when you left?

8    A    Not that I can remember.

9    Q    So your testimony today is that you took the word of a

10        19-year-old who was on the phone with somebody and told

11        you that his mother was in a car accident and that got

12        him off the hook for a potential OWI charge.  Is that

13        true?

14   A    That is not what I am testifying to.

15   Q    What is wrong with that statement?

16   A    You are accusing me of doing something when I am not the

17        one that is here on trial.

18   Q    I just asked you what you did.

19   A    I didn't have a chance to do what I was going to do

20        because that was obviously derailed by some other set of

21        circumstances.

22   Q    But the cause of that was a phone call that Jordan took

23        and you don't know whether you even spoke to the person

24        on the other end of the phone?

25   A    Correct.  I don't recall if I spoke to them or not.
```

```
1   Q    You don't know whether that person was a Milwaukee

2        police officer?

3   A    Correct.

4   Q    Did you generate a police report as a result of this

5        incident?

6   A    No.

7   Q    Did you write anything down in your memo book?

8   A    Not that I can remember.

9   Q    Did you bring your memo book here today?

10  A    No.

11  Q    Once Jordan Lewandowski left your custody, I will call

12       it "custody" because it is the easiest word to use,

13       although I don't think he was in formal custody.  True?

14  A    True.

15  Q    We'll change the word, then.  After Jordan Lewandowski

16       left your presence, you don't know what happened to him.

17  A    Correct.

18  Q    And you don't know whether anybody from Milwaukee police

19       came to pick him up.

20  A    Correct.

21  Q    You don't know whether his mother ever reported to the

22       scene.

23  A    Correct.

24  Q    Or if he got in the car and drove away.

25  A    I don't know.
```

```
 1                    MR. MC GAVER:      Nothing further.
 2    Thank you.
 3                    MR. PEDERSON:      I have no redirect.
 4                    MR. KONRAD:        Thank you.
 5    (Witness excused)
 6                    MR. PEDERSON:      The chief next calls
 7    Lieutenant Hanley.
 8                    SEAN HANLEY, having been first duly sworn
 9    on oath to tell the truth, the whole truth, and nothing
10    but the truth testified as follows:
11    DIRECT EXAMINATION BY MR. PEDERSON:
12    Q    Could you please state your name for the record and
13         spell your name?
14    A    Sean Hanley.  H-a-n-l-e-y.
15    Q    How are you employed?
16    A    Lieutenant with the Milwaukee Police Department.
17    Q    How long have you been with the police department?
18    A    20 years.
19    Q    How long have you been a lieutenant?
20    A    Since February of 2013.
21    Q    To your recollection, were you working on the evening
22         of January 18/morning of January 19, 2015?
23    A    Yes, I was.
24    Q    What were you doing that day?
25    A    I was a lieutenant in CIB for Central.
```

```
 1   Q    What was your job in that capacity?

 2   A    Central covers -- at that time, covered Districts 3 and

 3        5.  It was my job to supervise detectives and crime

 4        scenes that occurred in that area.

 5   Q    Was there a call that evening related to a person who

 6        was shot?

 7   A    Yes.

 8   Q    Could you please provide some facts related to that

 9        incident?

10   A    A person showed up at St. Joseph's Hospital shot through

11        the hand -- he had a holster, but didn't have a gun with

12        him -- stating that he accidentally had shot himself

13        while trying to help a female that was being chased on

14        17 and North.

15   Q    Was this incident responded to or addressed or

16        investigate in any way by Milwaukee police personnel?

17   A    Yes.

18   Q    Why?

19   A    We investigate all shootings in the city.

20   Q    Were you involved in that investigation in any capacity?

21   A    Yes.

22   Q    How so?

23   A    I responded to the hospital because at the time he

24        showed up at the hospital, we didn't have a scene, we

25        didn't know where the incident occurred.
```

| | | |
|---|---|---|
| 1 | Q | What happened next as a part of that investigation? |
| 2 | A | His statement of how he shot himself was very question- |
| 3 | | able and the fact that he no longer possesses his gun, |
| 4 | | which he has a holster for, two magazines for, is also |
| 5 | | very suspicious and we believe that the circumstances |
| 6 | | he is giving us are not truthful at that point. |
| 7 | Q | So what is the safety or police concern? |
| 8 | A | The police concern is one, he shot himself, so he had |
| 9 | | his gun in his hand brandishing it.  Two, if he is being |
| 10 | | untruthful, that is a crime.  It is a crime to shoot a |
| 11 | | gun in the city unless you fall under -- the district |
| 12 | | attorney rules it self-defense or something like that, |
| 13 | | but just on the outside, you can't shoot a gun in the |
| 14 | | city. |
| 15 | Q | All right.  Was there any other police concerns related |
| 16 | | to that? |
| 17 | A | We wanted to recover the gun.  He is a permit holder, |
| 18 | | the gun was just used in an incident, so we would like |
| 19 | | to recover the gun as evidence of that. |
| 20 | Q | Did you have any facts to know for certain that the |
| 21 | | story he was providing was the whole truth and there |
| 22 | | was nothing more to it? |
| 23 | A | He became --  He couldn't explain where his gun was. |
| 24 | | He had a holster, he had two magazines and he couldn't |
| 25 | | explain the whereabouts of his gun, although he said he |

1        drove straight from the shooting incident to the

         2        hospital.

         3   Q    So what did you decide needed to happen next in this

         4        investigation at that time?

         5   A    I directed Detective Juanita Carr to go to his house and

         6        do a "knock and talk" to try to get a consent search to

         7        try to locate his gun before he was released from the

         8        hospital.

         9   Q    I think you might have said -- Juanita Carr is a

        10        detective.  Is that right?

        11   A    Yes.

        12   Q    Where were you when you gave this directive to Detective

        13        Carr?

        14   A    District 3.

        15   Q    Where was Detective Carr?

        16   A    At District 3.

        17   Q    Face to face?

        18   A    Yes.

        19   Q    Do you have an approximate time that you gave her this

        20        task?

        21   A    Probably between 12:30 and 1:00 a.m.

        22   Q    Again, I believe it is in the record, but I want to make

        23        sure it is clear.  What was the assignment specifically

        24        given to her?

        25   A    To go directly to the house, which was close to St.

```
 1          Joe's -- it is 2765 North 52nd Street -- and to try to

 2          obtain consent from this person's girlfriend to search

 3          the house for the gun before he is discharged from the

 4          hospital.

 5     Q    So was this time-sensitive?

 6     A    Yes.

 7     Q    Why was it -- why in your mind was it a time-sensitive

 8          issue?

 9     A    Because this type of gunshot injury, many times, results

10          in a very quick release from the hospital and I wanted

11          to --  We might have a higher chance of compliance if he

12          is not -- has not returned home yet.

13     Q    I believe you gave the address, but I am not sure it was

14          clear to me.  Can you provide the address of the house

15          again?

16     A    2765 North 52nd.

17     Q    Are you familiar with District 3?

18     A    Yes.

19     Q    Are you familiar with how long it might take to drive

20          from District 3 to this address you just provided?

21     A    Yes.

22     Q    How long would it take, approximately?

23     A    Five minutes or less.

24     Q    When you gave Detective Carr this assignment, did you

25          let her know that you wanted it done quickly?
```

```
1    A    Yes.

2    Q    To your knowledge, what happened next?

3    A    What I discovered later or what I assumed?

4    Q    What is the next thing you know personally?

5    A    The next thing personally is I reported back to District

6         5.

7    Q    Was that immediately after giving Detective Carr the

8         instruction or sometime after that?

9    A    It was immediately after giving it to her.

10   Q    What happened after you arrived at District 5?

11   A    I become aware there was a traffic accident involving

12        two detectives on 35th and North.

13   Q    Do you have an approximate time for that?

14   A    The accident was initiated at 2:17 a.m.  I wasn't

15        notified immediately.  I was probably notified within

16        five minutes -- five to ten minutes.

17   Q    What did you do when you received that information?

18   A    I immediately went to my squad and started responding

19        to 35th and North.

20   Q    Why did you do that?

21   A    Well, one, it is in Central, but two, it is after mid-

22        night and in the geographic divisions we had at the

23        time, that would be -- I would be the only lieutenant

24        working in the regular section of the investigative

25        bureau after midnight.  It would be my responsibility
```

```
1          to respond to that, no matter where I am.

2     Q    What would be your function once you responded to the

3          scene?

4     A    To supervise a fair and impartial investigation of the

5          scene and to check on the welfare of the injured

6          parties.

7     Q    What type of investigation?

8     A    Traffic accident.

9     Q    You don't respond to every traffic accident.

10    A    No.

11    Q    So why was it required for a supervisor to be at this

12         traffic accident?

13    A    For standard SOPs, supervisors have to respond to every

14         traffic accident involving a duty member.

15    Q    Did you know who was involved in the accident?

16    A    No, I didn't.

17    Q    When did you discover that?

18    A    When I arrived on scene.

19    Q    When did you arrive on the scene?

20    A    2:32 a.m.

21    Q    What happened when you arrived on the scene?

22    A    I was approached by Sergeant Wade Grubich who told me

23         who was involved in the accident and witness statements

24         pertaining to the direction of travel of the vehicles.

25    Q    Who was involved in the accident?
```

```
 1   A     A citizen, Debrielle Johnson, and the two detectives,

 2         Shannon Lewandowski and Juanita Carr.

 3   Q     What information were you provided at that time and

 4         in conjunction with your observation did you come to

 5         understand what happened?

 6   A     Sergeant Grubich told me there were witnesses stating

 7         that the squad car was traveling eastbound on West North

 8         Avenue going through an intersection which had a green

 9         light and that a Mitsubishi was traveling northbound on

10         north 35th Street and disregarded a red light causing

11         the squad car to hit the Mitsubishi.

12   Q     So based on those preliminary facts, it is your under-

13         standing the squad car was not at fault and that the

14         citizen-driven vehicle was at fault?

15   A     Yes.

16   Q     Were you given any information or make any observations

17         consistent with whether the squad car was being operated

18         as an emergency vehicle at the time of the accident?

19   A     Yes.

20   Q     What did you see or observe or learn regarding that?

21   A     Sergeant Adam Riley told me that Detective Lewandowski

22         had been making a statement that she was going to UWM

23         because her son had been stopped in a traffic accident

24         and he told me that she was operating with her lights

25         on, activated.
```

```
1   Q   Was that of concern to you when you were provided that
2       information?
3   A   Originally, he said the lights on, yes.  That was a
4       concern because we are limited in the capacity that we
5       can use our emergency lights.  So I asked him if he knew
6       of any call that would require emergency lights.  He
7       said no.  Then reporting to the area of UW-Milwaukee,
8       her son was stopped by the police was a concern.
9   Q   You said you are limited in how you can use your
10      emergency lights.  Can you please expand on that?
11  A   State statute and SOP give very direct criteria for
12      us to use our emergency lights, being responding to
13      emergency situations, exigent circumstances or in
14      pursuit of a vehicle or making a traffic stop, you can
15      use your lights for an escort, but you can't use them to
16      report to a non-emergency situation.
17  Q   What about the distinction of having just lights and
18      no siren?  Does that make a difference?
19  A   Yes.  There is very few situations where you can use
20      just your emergency lights without your sirens acti-
21      vated.  That being, you can for an escort, like an over-
22      sized load or something.  You can on what is -- what we
23      call a "silent run".  It relates to getting to a scene
24      of a felony where the sound of the sirens may cause harm
25      to the victim, may cause evidence to be destroyed, may
```

```
 1         cause the perpetrator to flee.  In those cases, you can
 2         use your lights without your siren, but you can't dis-
 3         regard a red light.  Those are only felony cases.
 4    Q    So you said that was a concern you had related to the
 5         emergency lights.  What about the information you were
 6         provided regarding she may have been on her way to UWM
 7         or something -- something regarding her son?
 8    A    That is a concern.
 9    Q    Why was that?
10    A    We are not allowed by SOP to interfere with the investi-
11         gation of other departments.  Plus, they were on an
12         assignment.  I was not notified they were not responding
13         to the assignment, which is required.
14    Q    In your role as the supervisor at the scene, did you
15         make any decision at that time regarding how the acci-
16         dent investigation should proceed based on the informa-
17         tion you received?
18    A    Yes.
19    Q    What decision did you make?
20    A    I called two detectives to the scene to do detailed
21         citizen interviews.
22    Q    Anything else?
23    A    I notified acting Captain Johnny Sgrignuoli just due
24         to the injuries, which is standard.  The whole protocol
25         when a squad accident, you know, they are taken to the
```

```
 1        hospital, I am going to need to bring support to the
 2        hospital, do comp reports.  I mean, there is a whole
 3        process.
 4    Q   Is it your job to oversee to make sure that all of that
 5        takes place properly?
 6    A   Yes.  It is my job on the scene to make sure it is done
 7        properly and to ensure a fair and unbiased investigation
 8        to all parties involved.
 9    Q   Including officers?
10    A   Including officers.
11    Q   Speaking of officers, did you check in on the two
12        detectives?
13    A   Yes.
14    Q   What observations did you make about them?
15    A   Originally, I talked to both of them on the scene
16        briefly.  They were being treated medically.  Later,
17        I went to the hospital, to Froedtert.
18    Q   Is it your --  Do you have any specific task as it
19        relates to conducting interviews?
20    A   Yes.
21    Q   What is your role as the supervisor as it relates to
22        interviews?
23    A   My role as a supervisor is I am responsible for inter-
24        viewing the department members and I have three days
25        from the time of the incident to complete my accident
```

```
 1          report per SOP.  I have to start it the night of the
 2          accident and have it completed within three days.
 3     Q    You said you spoke to them on the scene.  What did you
 4          speak to them about?
 5     A    I asked them if they were all right, if they need any-
 6          thing.
 7     Q    Were you looking to conduct the interview that you
 8          needed to conduct at that time?
 9     A    No.  They were receiving medical treatment.
10     Q    I believe you already testified that they were trans-
11          ferred to a medical facility.  Is that correct?
12     A    To Froedtert.
13     Q    What happened after they were transported?
14     A    What do you mean?  I stayed on the scene for a while to
15          oversee the investigation, I had detectives respond to
16          there to do the citizen witnesses.  Some citizens were
17          Good Samaritans.  They helped pull the detectives out of
18          the car and get them to safety.  They thought the car
19          was going to go up in flames.  Then I reported to
20          District 5 to get some necessary paperwork because I
21          have to turn them over to the doctors.  It is preferable
22          we give them our department medical form so they can
23          fill them out and, then, report to Froedtert.
24     Q    How about the gun search assignment that you gave to
25          Detective Carr?  Did you get any information regarding
```

```
1        whether that was done at that time or not?
2                     MR. MC GAVER:      I will object.
3        The question is vague.  What time are we talking about?
4                     MR. PEDERSON:      I can limit it to the
5        time when he is at the scene.
6                     MR. MC GAVER:      Thank you.
7                     MR. KONRAD:        You may proceed.
8        Answer the question.
9    A   At the scene, I didn't know it had not been done, no.
10   Q   Was there a time that came that you discovered it had
11       not been done yet?
12   A   Yes.
13   Q   When did you first discover that?
14   A   At the hospital.  I don't remember if it was at the
15       hospital or when Detective Lewandowski called me when
16       I first realized it had not been done.
17   Q   Are you aware of when -- if the search was ever done?
18   A   I am not aware that it was ever done, no.
19   Q   Do you know definitively if it was done by Detective
20       Carr and Detective Lewandowski at any time?
21   A   It was not.
22   Q   So after you are at District 5, what happens next after
23       you left the scene?
24   A   I reported to District 5 to pick up the necessary paper-
25       work.  Then I reported to Froedtert Hospital.
```

```
 1   Q    Why did you do that?

 2   A    Because there is forms that we have to give the medical

 3        personnel that they fill out regarding when they come

 4        back to work, if they come back, are they going to be

 5        limited duty.  Department forms.

 6   Q    Do you know what time you arrived at the hospital?

 7   A    At, I believe, 5:21 p.m.  I went out -- I go in at 4:51.

 8        I ran into some construction and arrived on scene at

 9        5:20.

10   Q    What did you do when you arrived at the hospital?

11   A    I entered the hospital and located first Detective

12        Lewandowski.

13   Q    What happened when you located her?

14   A    I talked to her.

15   Q    What did you talk to her about?

16   A    I asked her if she was all right, explained to her the

17        process of "injured on duty."  I told her I will talk to

18        her at a later time regarding her accident.

19   Q    Did you make any observations regarding her physical

20        condition?

21   A    Her right foot, I believe, seemed hurt.  Other than

22        that, she seemed in fairly good spirits.  She was

23        walking on her foot that seemed hurt -- one of her feet.

24        I believe it was her right foot.

25   Q    How much time did you spend with her?
```

```
 1  A    I was at the hospital till 6:22.  That included time
 2       with Detective Lewandowski and time with Detective Carr
 3       and talking to medical staff.
 4  Q    Are you able to approximate how much of that approximate
 5       hour or so you spent with -- in the company of Detective
 6       Lewandowski?
 7  A    Probably 20 minutes.
 8  Q    During that time, was she speaking?  Was she awake?
 9  A    Yes.
10  Q    Did you make observations of her that indicated to
11       you that she might not be lucid or might have trouble
12       communicating, anything like that?
13  A    No.  She was talking fine, she was walking.
14  Q    Was there a point where you went and visited Detective
15       Carr?
16  A    Yes.
17  Q    What happened there?
18  A    Detective Lewandowski walked me to the room Detective
19       Carr was in and she had family or friends in her room.
20       I talked to her for a little while, explained again the
21       process, asked if she was all right.  I told her I would
22       talk to her at a later time regarding the accident.
23  Q    Did you make any observations of her?  Was she able to
24       communicate at the time or was there any difficulty
25       regarding that?
```

| | | |
|---|---|---|
| 1 | A | No difficulty.  She communicated fine. |
| 2 | Q | Did you consider the possibility of interviewing either |
| 3 | | or both of the detectives at that time? |
| 4 | A | Both had family or friends with them and they had |
| 5 | | medical staff coming in and going, so I decided at that |
| 6 | | time to not do it at that time. |
| 7 | Q | Does that correlate with the time you left? |
| 8 | A | Yes. |
| 9 | Q | I believe you already testified you left the hospital |
| 10 | | at approximately 6:22 a.m.? |
| 11 | A | Yes. |
| 12 | Q | So you were there approximately one hour.  Is that |
| 13 | | right? |
| 14 | A | Yes. |
| 15 | Q | All right.  What happened when you left the hospital? |
| 16 | A | I was driving back to District 5 to start the necessary |
| 17 | | reports and I received a phone call from Detective |
| 18 | | Lewandowski. |
| 19 | Q | Was this your personal cell phone you received a phone |
| 20 | | call on? |
| 21 | A | Yes. |
| 22 | Q | Did you know where the call came from? |
| 23 | A | No.  It showed up as "restricted". |
| 24 | Q | But you answered it and it was Detective Lewandowski. |
| 25 | | Is that right? |

1   A    Yes.

2   Q    Okay.  And what happened when you answered the phone and

3        spoke to her?

4   A    She asked me if I would like to know what happened and I

5        said yes.

6   Q    Do you have an approximate time that she called you?

7   A    6:38 a.m.

8   Q    Had you told her to give you a call right away or

9        anything like that?

10  A    No.

11  Q    Were you expecting her to call you?

12  A    No.

13  Q    Did you ask her when she called -- I want to be more

14       clear.  When you spoke to her, how did that conversation

15       go?  Did you ask her at that time, "hey, can I talk to

16       you", or did she offer?  How did that happen?

17                      MR. MC GAVER:        I will object.

18       Compound.

19                      MR. KONRAD:        Sustained.

20       BY MR. Pederson:

21  Q    When you received the call, can you clearly state what

22       Detective Lewandowski said to you?

23  A    She said, "would you like to know what happened", words

24       to that effect.

25  Q    Did you have an understanding of what she was referring

```
 1      to?

 2   A   She said the accident.

 3   Q   So what happened after that?

 4   A   I said yes, and I pulled over.

 5   Q   Did you take a statement from her at that time?

 6              MS. WILSON:        You said yes and then

 7      what?

 8              THE WITNESS:       I said, "yes, I would

 9      like to know what happened", and I pulled over.

10              MS. WILSON:        Pulled over.  Okay.

11      BY MR. Pederson:

12   Q   Did you take a statement from her at that time?

13   A   Yes, I did.

14      (A document was marked as Exhibit No. 1)

15   Q   Lieutenant, I have presented you a document marked for

16      identification as Exhibit 1.  Are you familiar with that

17      document?

18   A   Yes, I am.

19   Q   What is this document?

20   A   This is the AIMS report for the accident.

21              MR. KONRAD:        I don't have a copy

22      of number one.  It says two on it.

23      (Discussion off the record)

24      BY MR. PEDERSON:

25   Q   Does this document relate to the statement that you took
```

```
 1        from Detective Lewandowski?

 2    A   Yes, it does.

 3    Q   How so?

 4    A   This is my putting onto paper what was said.

 5    Q   I will direct your attention to Page 5 and Page 6 of the

 6        document.  Do you see that?

 7    A   Yes.

 8    Q   What is contained on those two pages?

 9    A   My narrative of the original investigation.

10    Q   What part of the investigation does this specifically

11        relate to?

12    A   The traffic accident.

13    Q   When did you write this narrative?

14    A   January 22.

15    Q   As I look right above it, it says "Date Reported:

16        1/29/2015".  Can you explain how that is?

17    A   On what page?

18    Q   I am on Page 5.

19    A   January 29 is when Michele Pagan assigned it to Tyronda

20        Williams.  This time, it is completely out of my hands.

21        I don't have any contact with this report anymore.

22    Q   Is there anything on this document that relates to

23        January 22 or indicates January 22?

24    A   On Page 4, kind of the middle of the page under

25        "Assignments", it is assigned to me by me.  "Assign
```

```
 1        Date, 1/19/2015", which is the date of the accident,

 2        the date we open the report and do what is considered

 3        a phase, put preliminary names and stuff in it.  I

 4        completed it on January 22, which I would have tracked

 5        it -- what we call "tracked it" to Johnny Sgrignuoli,

 6        who was a lieutenant, but he was the acting captain of

 7        Central at that point.

 8    Q   To someone who is not familiar with the AIMS reporting

 9        system that you are describing, this looks a little

10        confusing because you are saying that the January 22

11        date that is on Page 4, there is a lot of separation to

12        the narrative.  Why is that?

13    A   That is a confusing system.  There is a separate tab

14        for tracking, totally different than the narrative which

15        is on a tab called "Notes".  We do the narrative.  When

16        we are done with the reports, we go back to tracking,

17        put a completed date, saying, "I am done with this",

18        and I send it to the next person in the chain that needs

19        to see it.

20    Q   As you sit here today, when it comes to the narrative

21        to Pages 5 and 6, is there any doubt that you submitted

22        that on January 22?

23    A   No.

24    Q   Just another thing just to cover.  On Page 4, there is

25        another smaller narrative that starts with, "Michelle,
```

```
 1        I am concerned".  Do you see that?

 2   A    Yes.

 3   Q    Did you write that?

 4   A    No.

 5   Q    Is it correct to say that the narrative contained on

 6        Pages 5 and 6 relates specifically to the statement that

 7        you took from Detective Lewandowski when she called you

 8        at approximately 6:38 in the morning on January 19,

 9        2015?

10   A    Yes.

11   Q    All right.  Is the information that you convey in this

12        report true and accurate?

13   A    Yes.

14   Q    Did you truthfully record the statements as you under-

15        stood them as they were provided to you by Detective

16        Lewandowski?

17   A    Yes.

18   Q    In review of the document that you have in front of you,

19        does that appear to be a true and accurate copy of the

20        report that you generated back on January 22?

21   A    Yes.

22                   MR. PEDERSON:     I move this document

23        into evidence.

24                   MR. MC GAVER:     I'll object.  There

25        is multiple levels of hearsay within the document which
```

1    really calls question to the reliability therein.  For
2    that reason, I don't believe it should be offered for
3    the truth of the matter as asserted therein and I would
4    object.
5              MR. KONRAD:          Overruled.  The
6    document is admitted.
7    BY MR. PEDERSON:
8    Q   Please indicate what Detective Lewandowski advised you
9        during that phone call.
10   A   She advised me that she was teaming up with Juanita Carr
11       to go do -- to try to get the consent search and when I
12       instructed Detective Juanita Carr to get the consent
13       search, I also told her, "either have officers or
14       another detective go with you.  It is a two-person
15       assignment."  So she said that she was contacted by
16       Officer Melanie Beasley, who is a District 5 officer,
17       stating that she had a restraining order on a TAC
18       officer, a different TAC officer in District 5, and she
19       was concerned something might happen, so Shannon started
20       to go to District 5 to help Melanie and, then, got a
21       phone call from her son saying he was stopped in the
22       area of UWM by the police -- UWM police and she was
23       going to respond to that area first while trying to
24       figure out exactly where he was and, then, go to
25       District 5 and when all of that was done, do the consent

```
 1        search.  She also indicated she was going about 45 miles
 2        an hour eastbound and turned her lights on, but not her
 3        sirens and she was not using her vehicle as an emergency
 4        vehicle.  She just wanted the cars in front of her to
 5        get out of her way and that she had handed her phone to
 6        Detective Juanita Carr because she doesn't mess with her
 7        phone while she is driving and the accident, she didn't
 8        have time to respond.  The car ran a red light.
 9   Q    At that time, did she make any statements to you regard-
10        ing turning on the lights because she wanted to prevent
11        an accident with another vehicle that might pull out of
12        North Avenue or anything like that?
13   A    No.
14   Q    Again, to be clear, did she tell you why the emergency
15        lights were on?
16   A    To have cars move out of her way so she could get to the
17        area of UWM.
18   Q    As you sit here today, is there any doubt in your mind
19        whatsoever that she said she was going to the scene of
20        her son?
21   A    No doubt, no.
22   Q    Was there any confusion on that at all?
23   A    No.
24   Q    At the time that she said she was going to District 5
25        to assist Detective Melanie Beasley, did she indicate to
```

```
 1        you at that time any official police business that she

 2        would be doing in relation to that?

 3   A    No.

 4   Q    Was there any other purpose that she reported to you at

 5        that time of her going to District 5 other than this

 6        support function for Officer Beasley?

 7   A    No.

 8   Q    As it relates to the search that you were talking about,

 9        is that the time you found out that the search was not

10        done?  Am I correct?

11   A    Yes.

12   Q    Did you talk to her about that at all?

13   A    What do you mean?  She told me she had not done it

14        because they were going to do it and, then, the other

15        things occurred.

16   Q    When she was talking to you, did she seem to have any

17        trouble communicating?

18   A    No.

19   Q    Was she lucid?

20   A    Yes.

21   Q    Was she responsive to your questions?

22   A    Yes.

23   Q    Was she hesitant or express any concern or reservation

24        about speaking to you at the time?

25   A    No.
```

```
 1   Q    To any of your questions?

 2   A    No.

 3   Q    Did she make any statement at that time about the

 4        possibility of video capturing the accident?

 5   A    Yes.

 6   Q    What did she say?

 7   A    She said the Subway sub shop on 35th and North has video

 8        that probably captured the accident.

 9                  MR. PEDERSON:      That is all I have

10        for this witness.

11                  MR. MC GAVER:      Could we take a five-

12        minute break?

13                  MR. KONRAD:        Certainly.  We will

14        break for five minutes.

15        (Discussion off the record)

16                  MR. KONRAD:        We are back in ses-

17        sion.  Before you start your cross, there is a question

18        pending as to whether or not the police department has a

19        procedure for notifying family members when officers are

20        injured on duty and what that procedure is.

21                  So I will ask, Lieutenant, are you aware

22        of any -- do you have knowledge of any such procedure?

23                  THE WITNESS:       I don't know if there

24        is a standard operating procedure.  I assume there is.

25        Typically, when we do these, we make notification
```

```
 1      whenever possible in person and we offer family members

 2      rides to the hospital.

 3                       MR. KONRAD:          Thank you.

 4                       Mr. McGaver, you may proceed.

 5                       MR. MC GAVER:        I think with the

 6      first witness, we had commissioners ask questions before

 7      cross-examination.  Do you want to do that again or

 8      would you prefer --

 9                       MR. KONRAD:          Do you have any

10      questions for the lieutenant?

11                       MS. HEIN:            I do.  When you took

12      the report when you were in your car and you pulled

13      over, are those reports recorded or do you just take

14      notes and, then --

15                       THE WITNESS:         Take notes and, then,

16      this is the recorded report.  Do you mean audio

17      recorded?

18                       MS. HEIN:            Yes.

19                       THE WITNESS:         No.

20                       MR. KONRAD:          You may proceed.

21                       MR. MC GAVER:        Thank you.

22      CROSS-EXAMINATION BY MR. MC GAVER:

23   Q  Lieutenant, as of January 19, 2015, you were then-

24      Detective Lewandowski's immediate supervisor.  Correct?

25   A  Yes.
```

```
 1   Q    And you were also Detective Carr's immediate supervisor

 2        at that time.  Correct?

 3   A    Yes.

 4   Q    And in your capacity as Detective Carr's immediate

 5        supervisor, you personally ordered her to conduct --

 6        I will call it a "knock and talk".  Is that a fair term?

 7   A    Yes.

 8   Q    That was related to a shooting earlier that evening at

 9        2765 North 52nd?

10   A    Yes.

11   Q    That was to recover -- or attempt to recover the firearm

12        involved in that incident.  Correct?

13   A    Yes.

14   Q    Did you direct her to do so in person?

15   A    Yes.

16   Q    At District 3?

17   A    Yes.

18   Q    How long did that interaction last?

19   A    Probably ten minutes.

20   Q    Where within District 3 did the conversation take place?

21   A    I believe it was in --  Well, it was in the Captain's

22        office.

23   Q    Was Shannon Lewandowski present for that conversation?

24   A    No.

25   Q    Was she in the building, if you know?
```

```
 1   A    I don't know.

 2   Q    Did you ever directly order Shannon Lewandowski to

 3        participate in that investigation?

 4   A    No.  I told Detective Carr to take somebody with her,

 5        whether it was an officer or another detective.  I never

 6        told Detective Lewandowski --

 7   Q    So you never told Lewandowski in person to participate

 8        in the investigation.  Right?

 9   A    Yes.

10   Q    And you never told Detective Carr to relay to Detective

11        Lewandowski that she was to participate in that investi-

12        gation.  True?

13   A    No.  She was to relay the person going with her.

14        Detective Lewandowski's name never came up in that

15        conversation.

16   Q    You testified earlier that you reported to the hospital

17        to participate in the investigation of the shooting.

18        Is that true?

19   A    Yes.

20   Q    And why did you do that yourself instead of sending a

21        detective to do that?

22   A    A detective was there.  As an investigative lieutenant,

23        we have to respond to every shooting.  We don't always

24        respond to the hospital, but in this case, when he

25        showed up at the hospital, we didn't know where the
```

```
 1        scene was, so I responded to the hospital.

 2    Q   I am going to fast-forward to the accident.  We have

 3        been over that it occurred at roughly 2:17 in the

 4        morning on January 19.  Right?

 5    A   Yes.

 6    Q   When, approximately, did you respond?

 7    A   I arrived on the scene at 2:32.

 8    Q   And you testified that when you arrived on the scene,

 9        you spoke with Sergeant Wade Grubich?

10    A   Yes.

11    Q   Was he the first person you talked with?

12    A   Yes.

13    Q   Sergeant Grubich told you that Lewandowski was going

14        to the UWM area because her son had been stopped by UWM

15        police.  Is that what you heard from Grubich?

16    A   No.

17    Q   Did Grubich mention anything about Lewandowski heading

18        to the UWM area?

19    A   No.

20    Q   What about Sergeant Riley?  Did he say anything about

21        Lewandowski headed to the UWM area?

22    A   Yes.

23    Q   Did Riley tell you where he received this information?

24    A   Yes.

25    Q   And who told Sergeant Riley about Lewandowski going to
```

```
 1          UWM?
 2    A     He said officers on the scene told him that Detective
 3          Lewandowski told them and the witnesses, so he at that
 4          point -- that is what he -- he didn't specify which
 5          officers.
 6    Q     He didn't give you any names?
 7    A     No.
 8    Q     And he didn't say that that information came from
 9          Lewandowski to him.  True?
10    A     Correct.
11    Q     So at that point, you don't know who Lewandowski
12          supposedly told that she was going to the UWM area at
13          that time.  Right?
14    A     I don't know which officers.  He also said witnesses.
15    Q     Just because I missed something here, when you were at
16          District 5 before responding to the traffic accident,
17          was Melanie Beasley present at District 5?
18    A     I don't remember seeing her.
19    Q     Do you know Melanie Beasley?
20    A     Yes.
21    Q     Do you know whether she was working at all that day?
22    A     I don't know if she was or not.
23    Q     You testified you spoke with Lewandowski once you
24          arrived on scene.  What did she say to you?
25    A     I asked her if she was all right.  She said, "what does
```

```
 1        it look like?"  She was getting medical attention.  She
 2        was on a stretcher.  She was concerned that her bag may
 3        have been taken.
 4   Q    So how much time did you spend with Lewandowski on the
 5        scene?
 6   A    Probably four or five minutes, but there were a lot of
 7        medical personnel tending to her, so there wasn't a lot
 8        of conversation at that time.
 9   Q    I am sorry I interrupted you.  Did Lewandowski, in those
10        four or five minutes, tell you anything about what the
11        cause of the traffic accident was?
12   A    No.
13   Q    You spent some time with Detective Carr on scene, too.
14        Right?
15   A    Yes.
16   Q    How long did you spend with Detective Carr?
17   A    Maybe three minutes.
18   Q    Did Detective Carr tell you anything about how the --
19        what the cause of the accident was while you spent the
20        three or four minutes on scene with her?
21   A    No.
22   Q    Both Detective Carr and Detective Lewandowski were
23        conveyed to Froedtert in ambulances.  Right?
24   A    Yes.
25   Q    Separate ambulances?
```

```
 1   A      Yes.

 2   Q      Do you know who rode with Lewandowski, which members of

 3          the police department?

 4   A      No.

 5   Q      Do you know who rode with Carr?

 6   A      No.

 7   Q      You testified that you eventually made your way to

 8          Froedtert and you spoke to Detective Lewandowski.

 9          Correct?

10   A      Yes.

11   Q      We, kind of, have been over this, but I want to pin it

12          down.  How much time did you spend with Detective

13          Lewandowski at the hospital?

14   A      I would estimate 20 minutes.

15   Q      Where in the hospital did you spend this time with

16          Lewandowski?

17   A      In her room and then partly, because she walked me to

18          Detective Carr's room, so partly there.

19   Q      Who was in Lewandowski's hospital room with her?

20   A      I believe one of her sons.

21   Q      Anyone else?

22   A      Not that I recall.  Medical personnel was in and out.

23   Q      Was her mother there?

24   A      Maybe.

25   Q      Was her sister there?
```

```
 1   A    I don't know.

 2   Q    Were any officers in the room with her?

 3   A    Not that I recall.

 4   Q    Were any officers waiting outside the room?

 5   A    I don't recall.

 6   Q    So your testimony is, despite the fact that Detective

 7        Lewandowski had family and friends with her, she still

 8        walked you to Detective Carr's room?

 9   A    Yes.

10   Q    I would assume, but I will just ask, did her family and

11        friends or whoever was in the room with her accompany

12        her while escorting you to Detective Carr's room?

13   A    I don't believe so, no.  I wasn't paying a whole lot

14        of attention to that, so it is possible they did.

15   Q    You asked Lewandowski how she was doing?  She responded

16        that her foot was injured, but she was otherwise okay.

17        True?

18   A    I don't know that she said she was "otherwise okay."

19   Q    Did you know at that point in time, visiting Shannon

20        Lewandowski in the hospital, whether she had been

21        unconscious earlier that morning?

22   A    No.  I never heard that.

23   Q    You told Lewandowski that you eventually needed to speak

24        with her to complete your -- what we have referred to as

25        the AIMS report.  Correct?
```

```
 1  A    Yes.

 2  Q    And you added that you wouldn't do it there, but you'd

 3       follow up with her in a day or two.  Right?

 4  A    Yes.

 5  Q    And you did follow --  Actually, she followed up later

 6       that day -- later that morning with a phone call that

 7       occurred somewhere around 6:30, 6:38 I think?

 8  A    6:38, yes.

 9  Q    After that phone call, did you participate in any more

10       interviews or conduct any more interviews of Lewandowski

11       relative to this incident?

12  A    No.

13  Q    How long did that phone call last?

14  A    I would guess five to ten minutes.

15  Q    If I told you seven minutes, would you dispute that?

16  A    No.

17  Q    I am going to eventually hand you what's been marked as

18       Exhibit 2.  I will represent to you this is a report

19       prepared by Sergeant Adam Zieger.  It is 22 pages in

20       length.  It's dated September 9, 2015.  Is anything I've

21       started untrue so far?  It is an excerpt of the report.

22       Is that what it is?

23  A    Yes.

24  Q    On the bottom, it says "Page 16 of 22."  Let me know

25       when you are there.
```

```
 1   A    I am there.

 2   Q    It is the third paragraph from the bottom starting with,

 3        "Lieutenant Hanley indicated he responded."  Are you

 4        with me?

 5   A    Yes.

 6   Q    Okay.

 7             "Lieutenant Hanley indicated he responded to

 8        the hospital and spoke to both Detective Lewandowski and

 9        Detective Carr.  Detective Carr was 'under medication,'

10        and did not make any statements about what happened.

11        Detective Lewandowski was also receiving treatment and

12        'under medication.'  Lieutenant Hanley was unable to

13        obtain a response about what happened from Detective

14        Lewandowski."

15        Do you remember making those statements to Sergeant

16        Zieger when he interviewed you as a result of this

17        investigation?

18   A    Do I remember saying that?

19   Q    Yes.

20   A    No.

21   Q    Did I read it accurately?

22   A    I probably said it.  Do I remember saying it?  No.

23   Q    When the call came in about the accident initially, at

24        least some caller to the 911 system reported it as a

25        fatal accident.  Do you know anything about that?
```

1    A    I know that was --

2    Q    Is that true?

3    A    Yes.

4    Q    So when you reported to the scene, you were initially

5         under the impression that somebody had died.

6    A    I was under the impression there was a high likelihood

7         that somebody had died, but citizens often get those

8         wrong.

9    Q    Talk a little bit about the phone call that you received

10        from Shannon Lewandowski at 6:38 in the morning.  You

11        testified earlier that at 6:22 or thereabouts, you left

12        the hospital and, then, this phone call came in roughly

13        at 6:38.  Is my timing correct?

14   A    Yes.

15   Q    And do you remember Shannon Lewandowski telling you

16        about any phone calls that she received while she was

17        on her way to wherever she was going at District 5 or

18        the UWM area?

19   A    Yes.

20   Q    What did she tell you about the first phone call she

21        received in the squad car traveling to District 5?

22   A    To clarify, she said she was contacted by Melanie

23        Beasley and that is why she was going to District 5,

24        so I don't know whether that was a phone call or a text.

25        I don't know how she was contacted.  So as far as while

```
 1          driving, I am only aware of one phone call from her son.
 2    Q     Fair point.  But she did tell you that while she was in
 3          the squad car, Melanie Beasley had contacted her in some
 4          way.  Correct?
 5    A     Yes.
 6    Q     Have you ever ridden in a squad car while Shannon
 7          Lewandowski is driving?
 8    A     No.
 9    Q     So you don't know anything about Shannon's -- I'll call
10          it an "internal policy" about handing her phone off to
11          the passenger while she is driving?
12    A     No.
13    Q     Then you mentioned that you are aware of a second phone
14          call that she received from her son while she was in the
15          squad en route to District 5 or UWM.
16    A     Again, to clarify, I don't know if she received a phone
17          call from Melanie as far as --
18    Q     I am talking about her son.
19    A     I am only aware of one phone call.
20    Q     Let's talk about the Melanie situation a little bit.
21          Were you aware at that point at 6:30 or so in the
22          morning on the 19th, that Shannon had previously --
23          Detective Lewandowski had previously been at District 5
24          discussing matters with Melanie Beasley earlier in her
25          shift?  Did you know that?
```

| 1 | A | No. |
| 2 | Q | If Detective Lewandowski was discussing matters related |
| 3 | | to department business with then Officer, now Detective |
| 4 | | Beasley, would that be acceptable use of time as a |
| 5 | | police department member? |
| 6 | A | You mean after the assignment or before? I am not quite |
| 7 | | clear on what -- |
| 8 | Q | I mean before. Let's say -- |
| 9 | A | If she is not on an assignment, sure. |
| 10 | Q | What about counseling Beasley relative to a personal |
| 11 | | matter related to another member of the police depart- |
| 12 | | ment? Would that be acceptable use of company time? |
| 13 | A | Again, it depends if you are on assignment. Officers |
| 14 | | and detectives are not banned from talking to each |
| 15 | | other, but if it is pulling them away from an assign- |
| 16 | | ment, then, it is not appropriate. If they are not on |
| 17 | | an assignment, if they have downtime, then, of course, |
| 18 | | they can talk. |
| 19 | Q | You never placed Lewandowski on assignment at all that |
| 20 | | morning. Correct? |
| 21 | A | Correct. |
| 22 | Q | You don't know whether she was on an assignment or not. |
| 23 | | Strike that. I will withdraw that question. Did you |
| 24 | | know anything about a particular officer being served |
| 25 | | with a temporary restraining order against -- by Melanie |

```
 1        Beasley on the morning of January 19, 2015?
 2   A    Not till the phone call at 6:38.
 3   Q    Have you ever heard of temporary restraining orders or
 4        restraining orders being served on department members
 5        while they are at work?
 6   A    While they are at work?
 7   Q    Yes.
 8   A    Not that I have personally observed.
 9   Q    Do you know anything about a temporary restraining order
10        being served at District 5 on January 16, 2015?
11   A    No.
12   Q    Do you know anything -- did you that morning know
13        anything about Melanie Beasley's situation relative to
14        an unnamed TEU or Tactical Enforcement Unit officer?
15   A    I had been told she was seeing one.  That was it.
16   Q    Did you know anything about some abuse or harassment
17        that occurred in the relationship?
18   A    No.
19   Q    You were a supervisor at District 5?
20   A    No.
21   Q    I am sorry.  At CIB?
22   A    Yes.
23   Q    You are stationed out of District 5.  Correct?
24   A    Yes.
25   Q    Primarily, or you were at that time?
```

```
 1   A    At that time.

 2   Q    In your capacity as a supervisor, wouldn't you like to

 3        know that there was a restraining order served at

 4        District 5 against one of the members in the department?

 5   A    It sounds like maybe I should know, but really, I didn't

 6        supervise officers.  I supervised detectives.  So the

 7        supervisors at Five responsible for the personnel at

 8        Five, don't have any obligation to tell me there was a

 9        restraining order served.

10   Q    So you never instructed Melanie Beasley to get a

11        restraining order against this officer?

12   A    No.

13   Q    You testified some about the limits of what an officer,

14        driving a squad car, can use lights and sirens for.  Do

15        you recall that testimony?

16   A    Yes.

17   Q    And if there is a traffic hazard, a car pulling out into

18        traffic -- let's just call it a traffic hazard in front

19        of an officer's squad car, would that be an acceptable

20        use of squad lights?

21   A    Yes.

22   Q    Are you familiar with the particular squad car that

23        Shannon Lewandowski was driving on the morning of

24        January 19, 2015?

25   A    I am familiar with it.
```

```
 1   Q   Have you ever been in that car?

 2   A   No.

 3   Q   Are you familiar with vehicles equipped with the same

 4       features as that car?

 5   A   Yes.

 6   Q   Do you know how the lights and sirens operate on that

 7       particular car, or cars like it?

 8   A   We have, like, four different systems out there.

 9   Q   Do you know what system that car utilizes?

10   A   No, I don't.  As far as you mean where the buttons are?

11   Q   Yes.

12   A   No.

13   Q   What are the options for where buttons could be located?

14   A   Some of them are on the dash, some of them are on the

15       console.

16   Q   The ones on the center console, do they operate on what

17       I will call a toggle switch?

18   A   Yes.

19   Q   So, for instance, the squad car equipped with lights and

20       sirens operated from the center console, what would one

21       have to do to turn the lights on?

22   A   Hit the toggle switch, which is sometimes an old-

23       fashioned metal switch, sometimes it is an electric

24       two-stage button.

25   Q   What would an officer have to do to operate the sirens
```

```
 1       on a car like that?

 2   A   Usually, you hit the toggle switch to the next position.

 3   Q   If I wanted -- if I was an officer driving that car and

 4       wanted to change the sound of the siren that was being

 5       employed, how would I do that?

 6   A   Usually, you hit the horn.

 7   Q   Tap the steering wheel?

 8   A   Yes.

 9   Q   Are those squad cars equipped with horns, so to speak?

10   A   Well, they are equipped with regular horns.  They are

11       also equipped with air horns.  When the sirens are

12       running, if you hit the horns --

13   Q   You mean if the lights are running?

14   A   Sorry.  No, if the sirens are running, if you hit the

15       horn, it changes the tone of the horn.  I mean, if you

16       hit the horn, it changes the tone of the siren if the

17       siren is on, or the cadence of the siren.

18   Q   Are you now aware of what department was involved with

19       the traffic stop of Jordan Lewandowski?

20   A   Now, I am.

21   Q   You said you might have seen or you think Jordan

22       Lewandowski was with Shannon Lewandowski at the

23       hospital.  Correct?

24   A   It is possible one of her sons were there.  I don't

25       remember which one.
```

```
1    Q    Do you know Shannon Lewandowski's sons?

2    A    I have met them.

3    Q    Do you know what Jordan Lewandowski looks like?

4    A    Yes.

5    Q    So if he was at the hospital, you would know he was

6         there.  Right?

7    A    Yes.

8    Q    Was he at the hospital?

9    A    I don't remember.

10   Q    Shannon Lewandowski told you she was traveling at 45

11        miles an hour in her telephone conversation with you the

12        morning of the 19th.  Correct?

13   A    Yes.

14   Q    Do you know the speed limit going eastbound on North

15        Avenue on the corner of 35th and North Avenue?

16   A    30.

17   Q    So it is your testimony that she admitted to speeding

18        to you while she was on the phone on the morning of

19        January 19, 2015?

20   A    Yes.

21   Q    The seven-minute phone call on the 19th, that is the

22        last time you spoke with Shannon Lewandowski.  Correct?

23   A    Yes.

24   Q    You never visited her at home to check up on her to

25        see how she was recovering from her injuries?
```

```
 1   A    No.  I sent her a detective.

 2   Q    When did you send the detective?

 3   A    A few days after that.

 4   Q    So she made no other statements to you relative to this

 5        incident.  Correct?

 6   A    No.

 7   Q    When you received the phone call from Lewandowski in the

 8        early morning hours of the 19th, you said you pulled

 9        over.  Right?

10   A    Yes.

11   Q    Why did you pull over?

12   A    To talk on the phone and take notes.

13   Q    You took notes?

14   A    Yes.

15   Q    What happened to the notes?

16   A    I used them to compile my report.

17   Q    Do you have them with you?

18   A    No.

19   Q    What did you do after you compiled the report with the

20        notes?

21   A    Keep the steno pad until it was used up.

22   Q    Are the notes available?

23   A    No.

24   Q    Where are they right now?

25   A    We don't retain them.
```

```
 1   Q    Is that against department policy?

 2   A    No.

 3   Q    Was an accident reconstructionist used at the scene of

 4        the accident?

 5   A    No.

 6   Q    So no skid mark measurements were taken?

 7   A    I don't know if skid mark measurements were taken.

 8   Q    You don't know whether they were or not?

 9   A    I don't know if there were skid marks.

10   Q    Were any measurements taken on scene?

11   A    I don't know.  District squad handled the accident.

12        We handled the interviews.

13   Q    You interviewed Detective Carr a few days after the

14        accident.  Correct?

15   A    Yes.

16   Q    Where did that interview take place?

17   A    At her house.

18   Q    Did she say anything about Shannon Lewandowski going to

19        intervene at a traffic stop by UWM or any other police

20        department, in that interview with you?

21   A    No, she didn't.

22   Q    Did you ask her?

23   A    No.

24   Q    She didn't mention it at all?

25   A    No.
```

| | | |
|---|---|---|
| 1 | Q | Where did Detective Carr say that Shannon Lewandowski |
| 2 | | was going when she got into the accident? |
| 3 | A | To District 5. |
| 4 | Q | Did Detective Carr express a problem that she had with |
| 5 | | her going to District 5 instead of going to attempt to |
| 6 | | recover the gun that you ordered her to do? |
| 7 | A | Did she express a problem? |
| 8 | Q | Did she express a problem? |
| 9 | A | No. |
| 10 | Q | Was there any discipline to Detective Carr for failing |
| 11 | | to recover the gun? Did you take any action to disci- |
| 12 | | pline Detective Carr for failure to recover the gun? |
| 13 | A | No. |
| 14 | | MR. MC GAVER: Nothing further. |
| 15 | | MR. KONRAD: Commissioners, do you |
| 16 | | have any questions? |
| 17 | | MS. MC KENZIE: I have a couple |
| 18 | | questions. |
| 19 | | When you were supervising detectives and |
| 20 | | you told one detective to perform a certain assignment |
| 21 | | and also, to choose another detective to go with, does |
| 22 | | that other detective, then, fall within your juris- |
| 23 | | diction of the assignment? In other words, they should |
| 24 | | follow the assignment? |
| 25 | | THE WITNESS: Yes. |

```
 1              MS. MC KENZIE:    Do you normally, in
 2    any way, brief that second detective?
 3              THE WITNESS:     If they are not on
 4    the scene, they brief the first detective and she is
 5    expected to brief the second, at that point, depending
 6    on the availability, because it very well could have
 7    ended up an officer going with her.
 8              MS. MC KENZIE:    When you gave that
 9    assignment to Detective Carr, did you emphasize the
10    importance of the -- that it was time-sensitive?
11              THE WITNESS:     Yes.
12              MS. MC KENZIE:    In your experience,
13    are detectives allowed to prioritize assignments?  So
14    for example, you give a detective an assignment and they
15    say, "well, I understand I have to do this, but I am
16    going to do X before that."  Do they have that flexi-
17    bility?
18              THE WITNESS:      No.  They have to
19    discuss that with you because in the Bureau, we actually
20    take the function of dispatching them.  So we have to
21    know what they are doing when they are on an assignment.
22              MS. MC KENZIE:    And so is it your
23    experience -- I don't know you would know this.  Do
24    Detective Carr and Detective Lewandowski, do they
25    normally ride together?  For example, if you tell Carr,
```

1        "I need you to do this", do you often find that she
        2        chooses Lewandowski and vice-versa?
        3                    THE WITNESS:      No, not necessarily.
        4        This was weekend staffing because although it happened
        5        on a Monday morning, it falls under Sunday night's
        6        staffing because we start at Sunday night and at that
        7        time, weekend staffing was low.  You grab who you can.
        8                    MS. HEIN:         If a detective or
        9        officer were to receive word from a family member that
       10        there was an issue that they need -- that needed their
       11        attention, what would be the procedure to assist that
       12        relative?
       13                    THE WITNESS:      Either way, they would
       14        have to -- if they want to assist, they would have to
       15        ask their supervisor.
       16                    MS. HEIN:         If they wanted to
       17        leave.  What if Detective Lewandowski wanted to go to
       18        Shorewood to assist her son?  What would be the correct
       19        procedure?
       20                    THE WITNESS:      She would have had to
       21        ask me if it is all right.
       22                    MS. HEIN:         That is all?
       23                    THE WITNESS:      Well, there is an SOP
       24        prohibiting us from interfering officially in police
       25        matters of other jurisdictions.

        SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                               sueT@wi.rr.com

```
 1              MS. HEIN:        So if they needed to
 2    go home for some reason --
 3              THE WITNESS:     She has to clear it
 4    through a supervisor.
 5              MS. HEIN:        That would be you in
 6    this case.
 7              THE WITNESS:     In this case, yes.
 8              MR. KONRAD:      Did that happen in
 9    this case?
10              THE WITNESS:     No.
11              MS. WILSON:      If an officer is on
12    duty and a family member -- I am trying to figure out --
13    if a family member is stopped by another officer, be it
14    Milwaukee or Chicago, whatever, does, then, that family
15    member -- can that family member, then, get permission
16    to go and see about the other individual?
17              THE WITNESS:     You can ask per-
18    mission of the supervisor, but I never heard of it being
19    granted.
20              MS. WILSON:      That was going to be
21    my next question.  I have nothing else.
22              MS. MC KENZIE:   When you interviewed
23    Carr, you didn't ask her about whether or not Detective
24    Lewandowski was heading toward UWM.  Is that correct?
25              THE WITNESS:     Correct.  I asked her
```

```
 1      her recollection of what happened that night.

 2                      MS. MC KENZIE:      Let me ask you, why

 3      is it that you did not?  Did you not think it was

 4      important?

 5                      THE WITNESS:      No.  I wanted -- I

 6      didn't want to bias her memory.  She was saying she was

 7      having problems with her memory since the accident and

 8      writing a lot of notes.

 9                      MS. MC KENZIE:      There was a question

10      about whether or not Detective Carr was disciplined.

11      In your assessment, why didn't that occur?

12                      THE WITNESS:      I didn't recommend

13      discipline for anybody in this case.  Whether this

14      turned into an Internal against Detective Carr, I have

15      no idea.  Once it goes to Internal Affairs, the only

16      time we find out is if they call us out to interview us.

17                      MR. KONRAD:      Mr. Pederson?

18                      MR. PEDERSON:      Just a few points to

19      follow up on.

20      REDIRECT EXAMINATION BY MR. PEDERSON:

21  Q   I believe the first time you testified, I think --

22      you said you had given this assignment to Detective Carr

23      around 12:30 to 1:00.  Since then, we have kind of

24      nailed down the time of 2:00 a.m.  I am just wondering,

25      now that your memory is a little refreshed -- or my
```

```
 1      memory of your testimony is wrong, is there any

 2      correction or would you affirm the time that you gave?

 3   A  12:30 to 1:00.

 4   Q  So is there any concern about why she wasn't even going

 5      somewhere until 2:00 in the morning?

 6   A  Yes.  When the accident occurred, I had no idea who was

 7      in it and it never occurred to me that it was her.

 8   Q  Another question.  You were asked if Detective

 9      Lewandowski ever asked for permission to go to the

10      scene.  I am not asking you to speculate, but based on

11      your knowledge of SOPs, would you have granted such a

12      request?

13   A  No.

14   Q  Why not?

15   A  Because it would be interfering with a traffic stop from

16      another department.

17   Q  Were you familiar with Detective Lewandowski's caseload

18      at that time?

19   A  Yes.

20   Q  Was she a busy person?

21   A  Detective Lewandowski, if she was not on an active

22      shooting, she usually remained quite busy with other

23      investigations.

24   Q  Now, specifically around the early morning hours of

25      January 19, did she have work that she could be doing?
```

1    A    Yes.

2    Q    You previously testified that if a department member has

3         downtime and decides to spend a few minutes, whatever,

4         speak to another department member about personal

5         matters, whatever, that would be okay.  Do you recall

6         that testimony?

7    A    Yes.

8    Q    All right.  In your opinion, based on your knowledge of

9         that evening and Detective Lewandowski's caseload and

10        workload, did she have that kind of downtime to travel

11        from District 3 to District 5 to talk to --

12   A    Let me specify this to you.  We don't ban people from

13        talking when they run into each other and if she

14        responded to District 5, even though her office at that

15        time was in District 3 and mine was Five, we were all

16        still Central.  That was our geographic area.  It was

17        called "Central" at that time, which covered Three and

18        Five.  So Five is still in her area.

19   Q    Okay.  My question to you is, given whatever knowledge

20        you have of that evening and her workload, if she was

21        traveling specifically from District 5 to District 3 to

22        speak to Officer Beasley on a personal matter when she

23        had already decided to join up and conduct this search

24        for a gun as part of the assignment given to Detective

25        Carr, is that following procedure?   Is that a concern

in terms of being a supervisor?
A Going from Three to Five. Let me correct you on that. She wasn't going from Five to Three, but that is a concern.
Q If I said Five to Three, I was wrong. I am sorry. Was your opinion based on that?
A That is a concern.
Q Why is it a concern?
A Because I gave Detective Carr an assignment. So it is really incumbent on her to go to the assignment and if they agreed Detective Lewandowski would go to that assignment, she is basically putting herself on that assignment, also.
Q If she instead decided, "I am going to prioritize this trip to District 5 to talk to my -- Officer Beasley instead", would that be an effective and appropriate use of police time?
A No.
Q Specifically, were you aware when Detective Carr and Detective Lewandowski were supposed to end their tour of duty that day?
A 4:00 a.m.
Q All right. And did that play into your concerns also regarding what they were doing and how they were prioritizing?

```
 1    A    Yes.

 2    Q    How?

 3    A    We are monitored very closely on overtime.  So if I have

 4         an assignment at 1:30, even if it results in search and

 5         recovery of a weapon, you may still end up with some

 6         overtime with the inventory reports.  But now, if you go

 7         to two other locations before you go to that assignment,

 8         aside from the exigency of getting there before the

 9         person was released from the hospital, now, you are

10         basically pushing the assignment off and doing it on

11         overtime.  We are monitored in our department on over-

12         time very closely.

13    Q    Do you have any personal bias against Detective

14         Lewandowski?

15    A    No, not at all.

16    Q    Do you have any personal bias against Juanita Carr?

17    A    Not at all.

18    Q    Were you truthful in your report that was submitted as

19         Exhibit 1?

20    A    Yes.

21              MR. PEDERSON:      That is all I have.

22              MR. KONRAD:      I have a question.

23         If an officer is on an assignment and is contacted by

24         another officer who indicated there is some personal

25         crisis and ask that officer to intervene or assist, is
```

```
 1        it proper procedure to be for the first officer to call
 2        you for permission to be relieved of one assignment and
 3        pursue this other matter?
 4                    THE WITNESS:        Yes.  In a case of if
 5        they are in a district, the district has other officers
 6        and supervisors there, so it shouldn't require somebody
 7        coming from an outside location.
 8                    MR. KONRAD:        That didn't happen in
 9        this case, did it?
10                    THE WITNESS:        No.
11                    MR. KONRAD:        Had it happened, you
12        could have assigned someone to --  If you believed that
13        the crisis was of sufficient significance that it should
14        take precedence over recovery of the gun, then you could
15        have assigned someone else to recover the gun.
16                    THE WITNESS:        If that would have
17        happened and I would have decided it would have been
18        that important, then, I wouldn't have had them both go
19        to Five.  I would have had Juanita go with a different
20        detective or officer to conduct the search, but in this
21        case, I didn't see the reason to go there at all,
22        authorizing anybody to go do that.
23                    MR. KONRAD:        Any redirect (sic)?
24                    MR. MC GAVER:        Yes, a couple
25        questions.
```

```
 1        RECROSS-EXAMINATION BY MR. MC GAVER:

 2   Q    On January 19, 2015, do you know whether Detective Carr

 3        was at 2765 North 52nd Street prior to the accident that

 4        occurred at about 2:17 a.m.?

 5   A    Now, I do.

 6   Q    She was there before, wasn't she?

 7   A    No, she wasn't.

 8   Q    This was not a follow-up stop at that house?

 9   A    I am sorry?

10   Q    She was not at --  Let me rephrase.  Detective Carr, as

11        far as you know, never went to 2765 North 52nd Street.

12        True?

13   A    Correct.  Well, if she did as part of the initial

14        investigation, I don't remember.  I know she never went

15        there after I gave her the assignment that night.

16   Q    You are not aware of Detective Carr knocking on the

17        front door of 2765 North 52nd Street and nobody

18        answering the door.  Is that true?

19   A    That is true.

20              MR. PEDERSON:      I'm going to object

21        to the foundation of the question.  When are we talking

22        about?

23              MR. MC GAVER:      At any time.

24              MR. KONRAD:      Counsel, do you plan

25        on bringing evidence that Detective Carr went to that
```

```
 1       house?

 2                      MR. MC GAVER:     I do.  I anticipate

 3       calling Detective Carr as a witness and I believe she

 4       will testify that she was present at that house and

 5       knocked on that door?

 6                      MR. KONRAD:       Contingent on you

 7       connecting it up, you can answer the question.

 8   A   I am not aware.

 9       BY MR. MC GAVER:

10   Q   In connection with this case, you provided sworn

11       testimony in the form of an affidavit.  Correct?

12   A   An affidavit?

13   Q   Do you know what an affidavit is?

14   A   Yes.

15   Q   Yes, you did?

16   A   I don't recall.

17   Q   I am going to hand you a document marked as Exhibit 3.

18       Can you tell me what that is?

19   A   Yes.

20   Q   Is that your signature on the second page?

21   A   Yes.

22   Q   Before you signed it, did you swear that the contents of

23       the document was the truth, the whole truth and nothing

24       but the truth before a notary public?

25   A   Yes.
```

```
 1   Q    As far as you know, this is testimony given under oath.

 2        Correct?

 3   A    Correct.

 4   Q    The contents of the affidavit are still substantially

 5        true and correct today?

 6   A    Yes.

 7                  MR. MC GAVER:        I will offer Exhibit

 8        3.

 9                  MR. KONRAD:        Admitted.

10                  MR. MC GAVER:        Nothing further.

11                  MR. PEDERSON:        I object to the

12        admission of this.  What's the relevance?

13                  MR. MC GAVER:        Prior testimony that

14        he's given.  I think the Commission can make their own

15        conclusion as to whether it is similar or the same as

16        testimony he's given in connection with his interview

17        with Sergeant Zieger on the AIMS report and in this

18        hearing here today.

19                  MR. PEDERSON:        I maintain my objec-

20        tion.  If he thinks there is an inconsistency, he should

21        confront the witness with the inconsistency and give him

22        an opportunity to explain if there is an inconsistency

23        or --

24                  MR. MC GAVER:        I think we are

25        dealing with a sophisticated group of commissioners who
```

```
1        can draw that conclusion themselves.

2                          MR. KONRAD:          I assume you are

3        offering this as impeachment?

4                          MR. MC GAVER:      Yes, and as

5        substantive evidence of the actions that Lieutenant

6        Hanley took in the course of the investigation related

7        to the accident and the follow-up.

8                          MR. KONRAD:          Through a prior

9        statement of --

10                         MR. MC GAVER:      Correct.

11                         MR. KONRAD:          It will be admitted.

12                         MS. WILSON:          Usually, don't you

13       all need one a little bit different than the other one

14       or you put them all together?  Okay.

15                         MS. HEIN:            I have a question of

16       logistics.  You were -- Detective Lewandowski was going

17       from Three to Five.  Right?

18                         THE WITNESS:         Yes.

19                         MS. HEIN:            Three is at, like,

20       45th and Fond du Lac.  Correct?

21                         THE WITNESS:         No.  49th and Lisbon.

22                         MS. HEIN:            Okay.  And where is

23       Five?

24                         THE WITNESS:         It is on Fourth and

25       Locust.
```

```
 1                    MS. MC KENZIE:      When is it that you

 2       did this affidavit?  When was this affidavit done and

 3       what purpose was your understanding?

 4                    THE WITNESS:        It was done April 27.

 5                    MS. MC KENZIE:      Why is it that you

 6       did this affidavit as opposed to the fact that we have

 7       your investigative information in the report that you

 8       completed for the police department?  Why did you need

 9       to do an affidavit?

10                    THE WITNESS:      I don't know the

11       reason why I needed to do one.  We typically don't do

12       these in criminal cases like this when we have a report.

13                    MS. MC KENZIE:      Who told you to do an

14       affidavit?

15                    THE WITNESS:        City attorney.

16                    MR. KONRAD:        For the record, I

17       think the record is clear this affidavit was filed in

18       support of a brief that was filed in opposition to a

19       motion to exclude the Hanley statement.  Had Officer

20       Carr gone to that house, would there be any kind of

21       report required or would the CAD report indicate she had

22       been there or what evidence would there be other than

23       her statement?

24                    THE WITNESS:      She should be on the

25       CAD as going there.  Plus, she should have done a supp
```

    SUSAN K. TAYLOR        262-553-1058      COURT REPORTER
                         sueT@wi.rr.com
                                                                    88
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 393 of 805   Document 80-21

```
 1      in our report system stating she went there and knocked
 2      on the door and received no answer.
 3                  MR. PEDERSON:       I guess a follow-up.
 4      RE-REDIRECT EXAMINATION BY MR. PEDERSON:
 5   Q  To your knowledge, does a supp report exist?
 6   A  No.
 7                  MR. KONRAD:       Thank you.
 8      (Witness excused)
 9                  MR. KONRAD:       Mr. Pederson?
10                  MR. PEDERSON:       The chief will call
11      Sergeant Zieger.  I have one matter to attend to.  For
12      the record, I would move a number of documents in.  The
13      personnel order, the Complaint and the charging spec
14      into evidence.  As was indicated, the Commission likes
15      to have those documents as part of the record.  So if
16      there is no objection --
17                  MR. MC GAVER:       No.
18                  MR. PEDERSON:       -- I would like to
19      move them at this time.
20                  MR. KONRAD:       Do they have numbers?
21      Four, five, six?
22                  MR. PEDERSON:       Yes.  For the record,
23      three additional documents have been marked into
24      evidence.  Number four is Personnel Order 2015-150.
25      As number five, the Complaint in the matter of the
```

```
1    appeal of Shannon Lewandowski.  Number six, Charges and
2    Specifications, three rule violations -- as they relate
3    to the three rule violations in this matter marked as
4    number six.
5            Mr. Examiner, additionally, counsel has
6    raised my attention at this time, since we are handling
7    housekeeping matters, that we had agreed to a stipula-
8    tion in this matter regarding a statement of Melanie
9    Beasley.  I would enter that into evidence at this time
10   marked as number seven.
11           MR. MC GAVER:        No objection to
12   that.
13           MR. PEDERSON:        I think that
14   handles the housekeeping up to this point.
15           So I think we are ready to swear in the
16   witness and proceed.
17           ADAM ZIEGER, having been first duly sworn
18   on oath to tell the truth, the whole truth, and nothing
19   but the truth testified as follows:
20           MR. KONRAD:        The witness is sworn.
21   DIRECT EXAMINATION BY MR. PEDERSON:
22 Q  Would you please state your name and spell your last
23   name for the record?
24 A  Adam Zieger.  Last name is Z-i-e-g-e-r.
25 Q  How are you employed?
```

| | | |
|---|---|---|
| 1 | A | Milwaukee Police Department, police sergeant. |
| 2 | Q | How long have you been with the police department? |
| 3 | A | 2003. |
| 4 | Q | Where are you currently assigned? |
| 5 | A | Internal Affairs. |
| 6 | Q | How long have you been there? |
| 7 | A | Since a day in November -- I am not sure exactly what |
| 8 | | day of November -- of 2014. |
| 9 | Q | What do you do in the Internal Affairs Division? |
| 10 | A | I am assigned investigations and, then, I investigate |
| 11 | | them. |
| 12 | Q | Did you conduct an investigation in this matter? |
| 13 | A | Yes. |
| 14 | Q | What specifically did you do? |
| 15 | A | I interviewed witnesses, who witnessed the accident, I |
| 16 | | interviewed two detectives involved and subsequently |
| 17 | | after that, interviewed people that responded to the |
| 18 | | accident as well as the sergeant from Shorewood Police |
| 19 | | Department. |
| 20 | Q | Did you review any reports? |
| 21 | A | Yes. |
| 22 | Q | What reports did you review? |
| 23 | A | I reviewed reports from the RMS system -- it's either |
| 24 | | Records Management System or Reports Management |
| 25 | | System -- pertaining to this case.  CAD records, |

```
 1      Lieutenant Hanley's vehicle accident report.  An acci-

 2      dent report, a few supplementary reports from that

 3      accident report, citations, inventory, a report from

 4      submitting a sample of a test for alcohol to the

 5      Department of Justice, a subsequent report from the

 6      Department of Justice.

 7                   MR. PEDERSON:      I think that is a

 8      sufficient list for now.  Thank you, Sergeant.

 9  Q   Is it correct to say that you were the primary investi-

10      gator in this matter?

11  A   Yes.

12  Q   Did you conduct a full investigation?

13  A   Yes.

14  Q   When you completed your investigation, did you create a

15      summary report of your findings?

16  A   Yes.

17  Q   I direct your attention to a document that has been

18      placed in front of you marked for identification as

19      Exhibit 8.  Do you see it?

20  A   Yes.

21  Q   Are you familiar with that document?

22  A   Yes.

23  Q   What is that document?

24  A   It is a copy of a memorandum that I submitted, which is

25      my summary report of this investigation.
```

| 1 | Q | Is it true that this document is dated September 9, |
| 2 | | 2015? |
| 3 | A | Yes. |
| 4 | Q | It purports, on the first page, to have 22 pages? |
| 5 | A | Yes. |
| 6 | Q | Could you please just take a quick look through that |
| 7 | | document in front of you and ensure that that is a true |
| 8 | | and correct copy of the report that you submitted? |
| 9 | A | I believe it to be. |
| 10 | | MR. PEDERSON: I will admit it into |
| 11 | | evidence. |
| 12 | | MR. MC GAVER: I will object. I |
| 13 | | know hearsay is admissible, but there are several |
| 14 | | statements attributed to numerous witnesses where the |
| 15 | | actual source of the statement is completely undeter- |
| 16 | | mined and indeterminable, so for those reasons, I will |
| 17 | | object. |
| 18 | | MR. KONRAD: One of the elements |
| 19 | | of proof that the chief has to meet is that he conducted |
| 20 | | a thorough and complete investigation of the incident. |
| 21 | | So for that purpose, obviously, the report is admissible |
| 22 | | for that purpose. In addition, large parts of the |
| 23 | | report do contain statements that would be admissible |
| 24 | | under the "exception to hearsay" rule. For example, |
| 25 | | statements of Shannon Lewandowski herself. Other parts |

1     of hearsay that has been corroborated, in part, by the
     2     testimony of the lieutenant.  Of course, we have not
     3     looked at everything in the report.  If there is hearsay
     4     that is uncorroborated or in other ways, not reliable,
     5     the Commission will ignore that -- those entries in its
     6     decision and its decision, when it writes its Findings
     7     of Fact, will articulate the parts of the record that
     8     the Commission is relying on.  So with those
     9     limitations, the report is admitted.
    10     BY MR. PEDERSON:
    11  Q  Sergeant Zieger, did you review the CAD reports related
    12     to this matter?
    13  A  Yes.
    14  Q  What is a CAD report?
    15  A  I believe it stands for Computer Automated Dispatch
    16     Report.  It's an dispatch record of the activity
    17     involving the assignment.  It could be -- maybe a better
    18     word than "assignment" might be a complaint that comes
    19     through the communications division or radio trans-
    20     missions from personnel on patrol.
    21  Q  Did you check to see at the time or approximate time of
    22     the accident, if Detective Lewandowski or Detective Carr
    23     were on assignment according to CAD?
    24  A  I did.
    25  Q  What did you find?

```
 1   A     I did not find a record of a unit history.

 2   Q     Can you please indicate, what is the obligation of

 3         members of the department to call in what they are

 4         doing?

 5   A     When officers make contact with a citizen or someone

 6         makes contact with a citizen, they need to report it to

 7         a dispatcher.  Generally, as they make location changes

 8         throughout their day, you notify the dispatcher so the

 9         dispatcher knows where you are and they can allocate the

10         resources that are needed.

11   Q     If Detectives Carr and Lewandowski were on their way,

12         for example, to the house to conduct a search, would

13         they be generally ordinarily expected to call that in

14         and record that with CAD?

15   A     I don't think it would be uncommon for them to notify

16         the dispatcher when they got there.  I mean, it wouldn't

17         be uncommon to not notify them while en route.

18               MR. KONRAD:        What was the last --

19         Wouldn't be uncommon, what?

20               THE WITNESS:        I am not familiar

21         with every single -- what every detective, how they

22         handle it, but I don't think it is uncommon for a

23         detective not to notify them before they get there.

24               MR. KONRAD:        In other words, it is

25         common for them to notify --
```

```
 1                    THE WITNESS:        They might notify
 2        somebody, but they may not notify the dispatcher, "hey,
 3        I am going to a specific location", as they travel
 4        within --  Patrol officers travel within and look for
 5        things to do and things like that.
 6                    MR. KONRAD:        You said "it is not
 7        uncommon."  So it is common.
 8                    MR. PEDERSON:      I can clarify it.
 9        BY MR. PEDERSON:
10   Q    If I understand your testimony correctly --  And please
11        don't let me put words in your mouth.  It is my under-
12        standing you are saying -- your testimony is that it
13        is -- it would not be unusual for a detective not to
14        report to dispatch that they are on their way to conduct
15        a search and rather, wait until they got to the place
16        and, then, report it themselves.  Is that what your
17        testimony is?
18   A    Correct.
19                    MR. KONRAD:        Thank you.
20   Q    If the detectives were on their way to District 5 on
21        an official business matter, similarly, when would you
22        expect a report to CAD be made, if at all?
23   A    I don't think there would be --  Depending if they were
24        assigned to something, for instance, a homicide or a
25        shooting and they were part of that assignment, I think
```

```
 1        they would have an obligation to notify dispatch, but at
 2        that time, many of the detectives were operating out of
 3        districts and I don't know that they necessarily
 4        informed the dispatcher when they are in or out of the
 5        district.  I don't know.
 6    Q   Then again, just assuming, the last possibility here,
 7        I want you to assume that they were on their way -- in
 8        fact, Detective Lewandowski was on her way, at least,
 9        to Shorewood to assist her son.  Would there be any
10        obligation on the part of a department member to report
11        that?
12    A   Yes.
13    Q   What is your understanding of what the obligation would
14        be?
15    A   If they are responding to a particular matter within the
16        course of duty of that nature, they need to tell the
17        dispatcher that they were part of that, that they were
18        going to that.
19    Q   When you searched the CAD records, were you specifically
20        looking for those different possible entries to be made
21        in relation to them reporting their location?
22    A   I did.  I searched for their unit history and didn't
23        find anything.
24    Q   Did you search the CAD for reports of the traffic
25        accident that the detectives were involved in?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | What did you find? |
| 3 | A | I found more than one CAD assignment created or CAD |
| 4 | | complaint created; one initiating at 2:17, I believe it |
| 5 | | was, and there was maybe 23 seconds or 30-some seconds. |
| 6 | | I am not sure on the seconds, but I believe it is 2:17 |
| 7 | | a.m. for an accident. I don't remember what it was |
| 8 | | titled originally. |
| 9 | Q | So if I understand you correctly, you are indicating |
| 10 | | that two different dispatchers recorded the same event |
| 11 | | roughly around the same time? |
| 12 | A | Separate -- I don't know if they were dispatchers or |
| 13 | | telecommunicators, but persons within the communications |
| 14 | | TCD received calls related to the same incident. |
| 15 | Q | How can that happen? How could two different communi- |
| 16 | | cations personnel be recording information on the same |
| 17 | | matter? |
| 18 | A | There is multiple persons, particularly, that answer 911 |
| 19 | | calls. There is not just one person that answers 911 |
| 20 | | calls, there is several people working and there is |
| 21 | | ability for several calls to come in at one time. |
| 22 | Q | Was that the case in this matter? |
| 23 | A | I don't know if they were at the exact same time, but |
| 24 | | they were within close proximity. |
| 25 | Q | I believe you testified that those multiple entries from |

1          the different communications personnel were at 2:17.  Is

          2          that right?

          3    A     I believe, off the top of my head, that that was the

          4          created time for that complaint.

          5    Q     I direct your attention to the top of Page 2 of your

          6          report, if that refreshes your recollection.

          7    A     Yes.

          8    Q     Based upon the recording of 2:17, are you able to deduce

          9          from the facts of the investigation any other knowledge

         10          that you may have a rough estimate of when the accident

         11          must have occurred?

         12    A     It had to have occurred before 2:17 and the amount of

         13          seconds that were on the created time on the CAD.

         14    Q     Based on any other facts, are you able to, then, deduce

         15          how much earlier than 2:17 it may have happened or would

         16          you have expected to have happened?

         17    A     Based on the nature of the calls that were coming in

         18          and how the first entry on the CAD appeared that the

         19          dispatcher or telecommunicator entering preliminary

         20          information, basic information, about what location

         21          and what they possibly had immediately into the CAD.

         22    Q     Had you gained knowledge of what happened at the acci-

         23          dent?

         24    A     Yes.

         25    Q     How did you obtain this knowledge?

```
 1   A    Viewed the records management reports, RMS reports, I
 2        viewed the accident report itself and I interviewed a
 3        witness to the accident as well.
 4   Q    Based upon that knowledge, we will come back to some
 5        details, but just give me an overview, please, of your
 6        understanding of what happened in the accident.
 7   A    In the accident, my understanding is the department
 8        vehicle was traveling east on North Avenue and as it
 9        approached the 35th Street intersection, had its
10        emergency lights activated and collided with a citizen
11        vehicle, I believe, traveling south on 35th Street.
12   Q    Do you have knowledge of who was at fault in the
13        accident?
14   A    I didn't make a determination of who was at fault in the
15        accident.
16   Q    Do you have any information about who crossed against a
17        red light?
18   A    Yes.
19   Q    What information do you have?
20   A    I have information that the citizen vehicle was --
21        the witnesses either indicated that the citizen vehicle
22        either traveled into the intersection ignoring the red
23        light or was speeding trying to travel through the
24        intersection through a yellow light to try to make it
25        through the intersection before a red light.
```

```
 1   Q    Were there witnesses to this?

 2   A    Yes.

 3   Q    How many witnesses are you aware of?

 4   A    I am aware of, for sure, two that witnessed the accident

 5        and a third that may have witnessed the accident, but

 6        reported that she had and, then, at one time, indicated

 7        she hadn't.

 8   Q    Are you aware whether or not those witnesses called

 9        immediately after observing the accident?  Strike that

10        question.  Do you have knowledge whether or not those

11        witnesses called and reported to 911 having observed an

12        accident?

13   A    There was several people that called 911 to report the

14        accident.  I am not sure, from my memory, if it was the

15        people that actually saw the vehicles collide or if it

16        was people that were nearby and were obviously aware

17        that an accident just occurred and immediately called

18        the police through hearing the accident or whatever

19        happened.

20   Q    Are you aware whether or not those calls reporting the

21        accident were close in time to when the accident

22        occurred?

23   A    Yes.

24   Q    So based on that information and the fact that it was

25        entered at 2:17, are you able to give a very rough
```

```
 1        approximation of how much earlier than 2:17, based on

 2        the information you have, that you would expect that the

 3        accident occurred?

 4   A    Approximately one minute.

 5   Q    Are you aware of a witness having been traveling in the

 6        opposite direction of the detectives on North Avenue?

 7   A    Yes.

 8   Q    Are you aware of what their location was?

 9   A    I believe I obtained that.  I don't recall.  I don't

10        remember what it was, but I do believe I obtained that

11        information.

12   Q    Okay.  Do you have a recollection of whether they were

13        eastbound -- strike that -- whether they were east or

14        west of the intersection of 35th Street?

15   A    I believe they were east of 35th Street.

16                     MR. PEDERSON:       I would direct your

17        attention to the last paragraph of Page 4 of your

18        report.  If you would give that a quick review.  Let me

19        know when you are done.

20                     THE WITNESS:       I have read it.

21   Q    Does that paragraph relate to the questions I am asking

22        you right now?

23   A    Yes.

24   Q    All right.  Does this refresh your recollection?

25   A    Yes.
```

```
1   Q   Who was operating that vehicle?

2   A   Juan Perez.

3   Q   Was he east or west of 35th Street?

4   A   He reported that he was east of 35th Street.

5   Q   I suppose another way of saying that is, he was

6       approaching 35th Street westbound on North Avenue.

7       Is that right?

8   A   Yes.

9   Q   If I have the scene right, detectives would have been

10      traveling toward him.  Again, they also were approaching

11      35th Street on North Avenue.  Is that right?

12  A   Yes.

13  Q   In your review of the reports, did Mr. Perez make any

14      statements regarding observing emergency lights on the

15      detective's vehicle?

16  A   Yes.

17  Q   What did he say?

18  A   He reported that he observed flashing red and blue

19      lights.

20  Q   What did he do in response to that?

21  A   Started to pull over, or did pull over.

22  Q   Was it your testimony that he did or tried?

23  A   He was either starting to pull over, in the process of

24      pulling over or he had pulled all the way over.  I don't

25      remember which one of the two.
```

```
 1   Q    I direct your attention to the third line up in the last

 2        paragraph.  I will read into the record.

 3              "Mr. Perez stated he pulled over to allow the

 4        squad to have the right-of-way."

 5        Do you see that?

 6   A    You said the third sentence?

 7   Q    Third line up from the bottom.  Sorry if that wasn't

 8        clear.

 9   A    I see it.

10   Q    Did I read that correctly?

11   A    Can you read it again?

12   Q    "Mr. Perez stated he pulled over to allow the squad to

13        have the right-of-way."

14   A    Yes.

15   Q    Okay.  To be clear, this wasn't a statement that

16        Mr. Perez said to you.  Right?

17   A    Correct.

18   Q    This is a statement that you pulled from a report of

19        someone else who interviewed Mr. Perez.  Is that right?

20   A    Correct.

21   Q    Was there anyone that you personally interviewed that

22        was a witness?

23   A    Yes.

24   Q    Who was that?

25   A    Ms. Hernandez.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com

```
 1   Q    When were you able to interview her?

 2   A    I don't recall what the date was.

 3   Q    What did she advise you that she observed?

 4   A    She advised me that she observed the vehicle traveling

 5        with the emergency lights activated and that she

 6        observed the collision.  Then she observed either the

 7        citizen vehicle travel through the red -- I am going off

 8        of my recollection of her statement that's reported --

 9        that she traveled -- or that the citizen vehicle either

10        traveled through the red light or she was reporting that

11        it was speeding trying to make it through the inter-

12        section before the light turned red.

13   Q    Did she give you any indications of how the long

14        emergency lights had been on?

15   A    Not that I remember, no.

16   Q    But she did definitely tell you that they were on.

17   A    Yes.

18   Q    Did she make any other statements as regards to

19        statements of Shannon Lewandowski that she heard?

20   A    Yes.

21   Q    What did she say?

22   A    I reviewed a report of a statement that was obtained

23        from her and I also obtained a statement, so I'd have to

24        look to be sure which one is which for sure, but in both

25        scenarios, both times, she indicated that she heard
```

```
 1        something related to the detective's concern about her
 2        son -- getting to her son.  Those are not the exact
 3        words.  That is from my memory.
 4   Q    To your knowledge, were there any other individuals
 5        present at the scene that indicated that they
 6        specifically heard from Detective Lewandowski any
 7        statements related similarly about her son?
 8   A    Yes.
 9   Q    Who else?
10   A    There was officers that heard statements similar to that
11        nature.  There were citizen witnesses.  If I interviewed
12        some that heard, I don't recall another citizen witness
13        from my memory that said that.
14   Q    And again, is it accurate to say you can't tell
15        specifically what they heard or what they reported?
16        Right?
17   A    I can tell -- I can tell you what they said, but it
18        is fair that they didn't recall specifically the exact
19        words.
20   Q    Tell me what they said.
21   A    Subject Hernandez -- and again, I am not sure if it was
22        in the first interview with the detective or my inter-
23        view -- said that she observed the detective on the
24        phone and indicated something about her needing to get
25        to her son and I believe something mentioning UWM might
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 411 of 805   Document 80-21   106

```
 1        have been in that as well.

 2   Q    Is it accurate to say that there were multiple witnesses

 3        of unknown sources who indicated that there were some

 4        statements made by Detective Lewandowski regarding her

 5        son being stopped at UWM, etc.?

 6   A    Yes.  There was -- Mr. Perez, I believe also informed

 7        the detective that he heard a statement regarding that.

 8   Q    Did you have an opportunity to interview Lieutenant

 9        Hanley?

10   A    Yes.

11   Q    When you interviewed Lieutenant Hanley, were you aware

12        of his prior report that's been contained in Document

13        No. 1?

14                  THE WITNESS:       I'm pretty sure I

15        know what you are talking about, but I will look at it

16        to make sure.

17                  MR. PEDERSON:      Please do.

18   A    Yes.

19   Q    Did you review that prior to your interview with him?

20   A    Yes.

21   Q    Did you discuss the contents of that report with him?

22   A    Yes.

23   Q    What did he have to say regarding that?

24   A    He confirmed that the information in it was true and

25        that Detective Lewandowski called and reported that she
```

```
 1       was initially responding to District 5 prior to the
 2       accident and she had her lights activated, not to act
 3       as an emergency vehicle, but to move cars out of her
 4       way, and that at some point, she said was traveling to
 5       meet or to locate her son at UWM, or in that area of
 6       UWM.
 7                   MR. PEDERSON:      I want to take a step
 8       back.  I have some clean-up questions on a few things.
 9  Q    Are you aware of the other driver, the citizen driver,
10       the other person who was involved, the other vehicle
11       that was involved in the accident?
12  A    Yes.
13  Q    What was that person's name?
14  A    I would like to look to be sure, but I think it was
15       Debrielle Johnson.
16                   MR. PEDERSON:      You can confirm and
17       if you do refer to the document, just point to us what
18       you are looking at.
19  A    Sure.  Page 3 of the summary report, Exhibit 8.  And
20       yes, it's Debrielle Johnson.
21  Q    It is the second-to-the-last paragraph there?
22  A    Yes.
23  Q    Where you report that the driver is Debrielle Johnson.
24       Is that right?
25  A    Yes.
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 413 of 805   Document 80-21

```
 1   Q   Are you aware whether she was issued some citations on
 2       the scene?
 3   A   On the scene, I don't think she was issued any cita-
 4       tions, but probably at the hospital.
 5   Q   I direct your attention to Page 9 of your report, second
 6       full paragraph.  Are you reporting there in your report
 7       regarding citations issued to Ms. Johnson?
 8   A   Yes.
 9   Q   What are you reporting and what are you aware of?
10   A   That she was issued a citation for operating under
11       suspension and the fact that she had a finding of guilt
12       on that charge.  The charge may be an inappropriate term
13       on that citation.  And she was also issued for operating
14       a motor vehicle without insurance and for operating a
15       vehicle after suspension of registration and for illegal
16       right turn on red was also listed.  Those -- I don't
17       believe those are the total encompassing citations that
18       she was issued altogether.
19   Q   What else was she issued?
20   A   I believe she was also issued a citation for OWI.  I am
21       not for sure.
22   Q   Okay.  I would direct your attention to the next para-
23       graph there.  What are you reporting in the next para-
24       graph?  Strike that.  Are you aware whether a blood
25       sample was taken from Ms. Johnson on the evening in
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 414 of 805   Document 80-21   JOHNSON - 0409

```
 1        question?

 2   A    Yes.

 3   Q    Was it sent to the Department of Justice laboratory for

 4        BAC analysis?

 5   A    Yes.

 6   Q    Did the Department of Justice send a report back

 7        indicating that they had conducted an analysis and what

 8        the results were?

 9   A    Yes.

10   Q    What were the results of that analysis according to the

11        Department of Justice?

12   A    That it was ethanol at a level of .064.

13   Q    Is that a prohibited BAC level?

14   A    No.

15   Q    What is a prohibited BAC level?

16   A    I believe it starts at .08.

17              MS. WILSON:        I didn't hear what

18        you said.

19              THE WITNESS:       I believe it starts

20        at .08.

21   Q    Did you check records to indicate --  Strike that.  Did

22        you review any databases or records that are available

23        to you in relation to the OWI charge?

24   A    Yes.

25   Q    What did you find?
```

```
 1   A   I didn't find a criminal charge issued for it.  I found,
 2       I believe, a report indicating that a conference had
 3       been done and I believe I located the actual citation --
 4       or a copy of the citation.
 5   Q   So is it correct to say that Ms. Johnson was never
 6       actually charged with an OWI?
 7   A   I don't think so, no.
 8   Q   Certainly, are you able to testify today that Ms.
 9       Johnson was ever convicted of an OWI?
10   A   It's been some time since I checked that, but I don't
11       believe she has.
12   Q   Going back to your interview of Lieutenant Hanley, did
13       he say anything in his interview that was inconsistent
14       with his report?
15   A   Not that I am aware of.
16   Q   Did you become aware of any inconsistency that you
17       needed to investigate?
18   A   No.
19   Q   Was there a point in time that you interviewed Detective
20       Lewandowski?
21   A   Yes.
22   Q   Is that interview documented in the summary report?
23   A   Yes.
24   Q   I direct your attention to Page 19 of your summary
25       report.  I direct your attention to the third full
```

```
  1        paragraph.  Is it accurate to say that is a portion of
  2        the report here where you document -- you start to
  3        document the interview you had with her?
  4   A    Yes.
  5   Q    During that interview, did you discuss -- what did you
  6        discuss?
  7   A    We discussed what happened prior to the accident, what
  8        happened during the accident and we also discussed the
  9        phone call between Detective Lewandowski and Lieutenant
 10        Hanley.
 11   Q    Let's start at the beginning.  What did she tell you?
 12   A    She told me that relating to going to the accident, that
 13        she had mentioned that a sergeant told Detective Carr or
 14        discussed with Detective Carr about the gun not being
 15        recovered and that Detective Carr was going to go
 16        recover the firearm and she asked Detective Carr if she
 17        would like her to go with her and I don't know if she
 18        said yes, but they agreed they were going to go together
 19        and they discussed that she was going to attend to a
 20        matter at District 5 first and that they would go after
 21        that.
 22   Q    Based on her statements there, she was aware at the time
 23        what specifically the assignment was that Detective Carr
 24        was responsible for carrying out.  Is that right?
 25   A    Yes.
```

```
 1    Q    And by agreeing to assist her with it, she had assumed

 2         some professional responsibility to see that it was

 3         carried out.  Is that an accurate statement?

 4    A    I typically -- I don't know if I make that decision, but

 5         I feel, yes.

 6    Q    Based on your understanding of SOPs and work rules and

 7         your experience as a police officer, is that statement

 8         true?

 9    A    Correct.

10    Q    Did she tell you what this -- this side thing she wanted

11         to do at District 5 first, what it was?

12    A    We discussed that.

13    Q    What did she tell you?

14    A    She told me that she had previously in the evening

15         spoken with Detective Melanie Beasley and, I believe,

16         that Detective Lewandowski informed me that there was a

17         situation where Detective Beasley was at the district to

18         conduct a search of a female and that she didn't want to

19         be there and they finished that encounter and she was

20         going to talk to her again, because she had contacted

21         her and wanted her to come meet her there.

22    Q    Did she indicate whether or not she advised Detective

23         Carr of those details or facts?

24    A    It was clear that she advised Detective Carr that she

25         was meeting someone at District 5.  I don't believe she
```

```
 1          told me that she provided those details to her.

 2     Q    Did you ask her why she decided to go to District 5

 3          first, why that was a greater priority than to go find

 4          this gun?

 5     A    I asked her why she went to District 5 first.  That may

 6          not have been the exact question, but we did discuss why

 7          she went to District 5.

 8     Q    I now direct your attention to Page 20 of your report,

 9          the last paragraph.  Is this the paragraph where you

10          document asking that question to her?

11     A    Yes.

12     Q    Is it true that you wrote a quote attributed to her

13          which was her response?

14     A    Yes.

15     Q    What was her response?

16     A    "That wasn't my assignment to do with the gun.  That was

17          just something I was going to help her with.  It took

18          precedence because that was where I was going to go in

19          the first place", and then it continues on the next

20          page.

21                    THE WITNESS:       Would you like me to

22          read it in its entirety?

23                    MR. PEDERSON:      No, that was fine.

24     Q    Did you then ask her what police purpose she was serving

25          by going to District 5?
```

```
 1   A    Yes.

 2   Q    Did she respond?

 3   A    She responded,

 4            "my co-worker called me and asked me to come

 5        there; I'm gonna come there."

 6   Q    Is that a quote you also attribute to her in the body

 7        of your summary report?

 8   A    Yes.

 9   Q    Did she at that time indicate to you any other purpose

10        other than going to support then-Officer Beasley?

11   A    During that interview, I don't think so, no.

12   Q    Had she given you another reason why, would you have

13        documented it?

14   A    I think so.

15   Q    If she, for example, had told you at that time that in

16        addition to this support function, whatever it was, that

17        Officer -- with Officer Beasley, that she was also going

18        there on police business to assist with the filing of a

19        felony arrest, would you have documented that?

20   A    I don't recall her telling me that during that inter-

21        view.

22   Q    My question is, if she had, would you have documented

23        that she said that?

24   A    I think I would have, yes.

25   Q    Did Detective Lewandowski make any statements to you
```

```
 1      regarding why she had emergency lights on while she was
 2      on North Avenue?
 3   A  Yes.
 4   Q  What did she say?
 5   A  She described that while she was near 35th Street --
 6      I'm sorry, near 36th Street, she observed a vehicle on
 7      the side of the road, she described it in the bicycle
 8      lane, and that the vehicle had its brake lights on and
 9      she thought the vehicle might pull out and strike her
10      vehicle, so to prevent the vehicle from striking her,
11      she activated her emergency lights and she described
12      that the siren -- she activated the siren for a very
13      short period of time, a second or less than a second.
14   Q  I believe you indicated that she testified that she did
15      this near 36th Street?
16   A  It was during the interview testimony, but yes, near
17      36th Street.
18   Q  It is probably obvious, but that would be a full one
19      block before 35th Street where -- the intersection where
20      the accident occurred.  Is that right?
21   A  36th Street would be one full block away from 35th
22      Street.  During her interview, she stated she was near
23      36th Street.  I don't remember if I got clarification
24      whether that was west of 36th Street, east of 36th
25      Street.  I may have.  I just don't remember.
```

```
1    Q    Are you familiar with Milwaukee Police Department squad
2         cars?
3    A    Yes.
4    Q    You heard testimony earlier today about the type of
5         buttons and how to function and operate the lights in
6         that particular car at issue?
7    A    I heard some of that.
8    Q    Are you familiar with that type that was described?
9    A    I don't remember what specific type.  I don't remember
10        the exact testimony.  But I am familiar with the type of
11        vehicle that detectives drive and how their emergency
12        lights are operated.
13   Q    Have you, yourself, operated detective vehicles?
14   A    I have operated identical vehicles that weren't assigned
15        to detectives, but we have them in patrol as well, or we
16        used to.
17   Q    In operating these vehicles, have you had occasion to
18        turn on the lights and turn on the siren and do all of
19        those things?
20   A    Yes.
21   Q    Have you had an occasion to do a quick -- I'll call it
22        a burst of turning on a light for some reason to alert
23        someone or something like that?  Have you had occasion
24        to do that?
25   A    I am sure I have.
```

```
 1   Q   Based on your experience and your knowledge of what was
 2       provided to you today, is Shannon Lewandowski's expla-
 3       nation consistent with the evidence that we have here
 4       today?
 5               MR. MC GAVER:      I will object.  It
 6       goes to the ultimate question of the case.  I think
 7       there is a lack of foundation for this witness to answer
 8       that particular question.
 9               MR. KONRAD:       We will hear the
10       answer and decide what it is worth.
11   A   Can you repeat that?
12   Q   I will break it down and make it a little easier.  What
13       I am wondering is --  Let's start with you.  On those
14       occasions when you have had an opportunity to turn on
15       and off a light, are you able to do this in a quick
16       fashion?
17   A   Yes.
18   Q   How long would it take you?
19   A   Less than a second.
20   Q   We are assuming the purpose of doing that is to alert
21       someone who you fear might come out.  Would there be any
22       reason to turn it on and just leave it on?  The lights,
23       that is?
24   A   If you were going to make contact with a car or block
25       the car off, but I wouldn't see a reason to turn it on
```

```
1        and off as they passed a car.

2   Q    What I am wondering is if Lewandowski, if she was

3        turning on and off -- turning on the lights, at least --

4        that is what she told you -- to attempt to alert a

5        vehicle of her presence to avoid an accident.  Right?

6   A    Yes.

7   Q    Once she passed that vehicle, would there be any reason

8        to continue having the lights on?

9   A    No.

10  Q    When she got to the intersection of 35th Street and was

11       going through that intersection with the emergency

12       lights on, given the explanation she gave you as to why

13       she turned them on, in your knowledge of how it all

14       works, is there any reasonable reason why those

15       emergency lights should have still been on at that time?

16                MR. MC GAVER:        Same objection.

17                MR. PEDERSON:        I think I have laid

18       an adequate foundation.

19                MR. KONRAD:          Your line of ques-

20       tioning is a little more like a closing argument.  I

21       think the facts of what occurred are pretty well in the

22       record.  I think the Commission can judge the evidence

23       at this point.  You are certainly welcome to make --

24       you're piecing together arguments of the facts in your

25       closing argument.  So we can move on.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 424 of 805   Document 80-21   119

```
 1                    MR. PEDERSON:      If I may ask one
 2        summation question related to this and if you want
 3        to --
 4                    MR. KONRAD:        Go ahead.
 5        BY MR. PEDERSON:
 6    Q   Did Detective Lewandowski ever provide an explanation to
 7        you as to why she still had the emergency lights on when
 8        she was going through the intersection of 35th Street?
 9    A   I don't believe so, no.
10    Q   Did you ask her or confront her about the statements
11        attributed to her by Lieutenant Hanley?
12    A   Yes.
13    Q   What did she say?
14    A   She said that the majority of the statements, nearly all
15        of them were not true.
16    Q   Did you ask her if she was aware, at the time of the
17        accident, that her son had been stopped by some police
18        agency?
19    A   I don't know if that is an exact -- you know, if that is
20        an exact phrasing of the question, but she reported to
21        me that she did know that her son was stopped by a
22        police agency prior to the accident.
23    Q   Did she tell you when she became aware of that?
24    A   Well, she told me before she entered the squad car at
25        District 3, I believe, just prior to.
```

```
1   Q   Did she tell you how she became aware?

2   A   A telephone conversation from her son.

3   Q   Are you familiar with the District 3 area?

4   A   I am familiar with it.

5   Q   Are you familiar with the location of District 3

6       station?

7   A   Yes.

8   Q   Are you familiar with where the location of this

9       accident was?

10  A   Yes.

11  Q   Assuming that someone were to travel a direct route down

12      North Avenue, are you able to give an approximation of

13      how long, just roughly, it may take someone to drive

14      from the Third District station to 35th Street?

15  A   Obviously, it can be done based differently upon how

16      fast someone is going, but at a normal driving rate,

17      I'd say that could be accomplished certainly around five

18      minutes.

19  Q   Do you know how long it would take to drive to this

20      house where the search was supposed to take place?

21  A   I don't remember what the address was.

22  Q   It was previously indicated in the 2700 block of 52nd

23      Street.

24  A   Not much time at all.

25  Q   So a matter of about five minutes, something like that?
```

```
 1   A    Probably less.

 2   Q    Given the location of the vehicle, are you able to

 3        indicate whether or not they were headed in the direc-

 4        tion of the house?

 5   A    I don't think they were headed in the direction of the

 6        house.

 7                 MS. WILSON:        They were or they

 8        weren't?

 9                 THE WITNESS:       They were not.

10        Sorry.

11        BY MR. PEDERSON:

12   Q    In fact, they were already past the house and were

13        headed east on North Avenue.  Is that right?

14   A    Yes.

15   Q    Did you ask Detective Lewandowski if she was going to

16        the scene of where her son was?

17   A    I did.

18   Q    What did she say?

19   A    She said she was not, that she was going to District 5.

20   Q    Did she tell you when she last spoke to her son after

21        the initial time before she left the station?

22   A    After that?

23   Q    Yes.

24   A    I don't know that she said she spoke to him again.  She

25        may have, she may not have.
```

```
 1   Q   Did she tell you what she told her son when she spoke to
 2       him on the phone at the station before she left?
 3   A   I believe she did, but I don't remember what that was.
 4   Q   Did she indicate whether or not -- Strike that.  I want
 5       to direct your attention to Page 21 of your report.
 6   A   I am there.
 7   Q   Third full paragraph.  I'd ask you to read that and see
 8       if it refreshes your recollection.
 9   A   I read it.
10   Q   Does that refresh your recollection?
11   A   I believe I read the wrong paragraph.
12   Q   I am on Page 21, the third full paragraph.
13   A   I see which paragraph.  Yes.
14   Q   Does that refresh your recollection as to what she had
15       said to her son?
16   A   Yes.
17   Q   What did she say?
18   A   To call her when he knew something.
19   Q   Is it accurate to say at the time she was traveling in
20       her car, she was expecting another phone call from her
21       son.  Is that right?
22   A   She asked him to call her back.  I don't know what her
23       expectation was, if she expected she was going to get a
24       call when she was driving or not.  It seemed reasonable
25       that someone would know that something would happen when
```

```
1        she was still driving the car.
2   Q    Did the detective tell you anything about what she was
3        doing with her phone at or around the time that the
4        accident occurred?
5   A    Yes.
6   Q    What did she tell you?
7   A    She told me she didn't have her phone, that she had
8        given it to Detective Carr.
9   Q    Why did she do that?
10  A    She wanted Detective Carr to find, I believe, Melanie's
11       number in it -- in the phone.  But she wanted Detective
12       Carr to answer the phone, I believe, and, I believe, she
13       wanted her to look for a phone number.  I am not sure
14       from my memory if Detective Carr stated that she was
15       looking for a number in the phone or if that was
16       Detective Lewandowski.  But she had given the phone to
17       her and she was supposedly looking at the phone or
18       looking for a number.
19  Q    You have had a number of documents placed in front of
20       you for identification.  I direct your attention to the
21       first one marked for identification as number nine.  Can
22       you tell me what that document is?
23  A    It is a memorandum from Detective Lewandowski to Chief
24       of Police Edward Flynn dated October 11, 2015.
25  Q    Have you seen this document before?
```

```
1    A    Yes.

2    Q    Could you please give it a quick look-over and indicate

3         whether it is appears to be a true and correct copy of

4         the report it purports to be?

5    A    Yes, it appears to be.

6              MR. PEDERSON:       I move this into

7         evidence.

8              MR. MC GAVER:       No objection.

9              MR. KONRAD:         Admitted.  Exhibit 9

10        is admitted.

11   Q    What is your understanding of why this document was

12        filed?  What is the purpose of this document?

13   A    When a member is served, the proper term would be

14        "charges", they have an opportunity to submit a response

15        to those charges in writing.

16   Q    You are talking about the charge and specifications that

17        are provided to members after a determination has been

18        made that they may have committed a rule violation?

19   A    Yes.

20   Q    We have had those entered into evidence today, or at

21        least a portion of them.  I direct your attention to

22        Document --  You will have to tell me.  Oh, number six.

23        Do you have that in front of you?

24   A    Yes.

25   Q    Is that what you are talking about?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 430 of 805  Document 80-21    16CV001089 - 0425
125

```
 1   A    Yes.

 2   Q    Is it correct to say that all the charges that are

 3        contained here today were not in front of her at that

 4        time?  Is that right?

 5   A    Correct.

 6   Q    What was different?

 7   A    She was served with two or three charges that day.

 8   Q    Which one was she not charged with then that she is

 9        charged with here today in this packet?

10   A    It would be -- the common word we use of untruthfulness.

11        I don't know the exact wording of the charge.  Integrity

12        charge.

13   Q    I direct your attention to the fourth page of this

14        document where it indicates "integrity".

15                   MS. MC KENZIE:      Document 6?

16                   MR. PEDERSON:      Yes.

17   Q    Is it correct to say that that page -- the three pages

18        relating to that charge were not present at that time?

19   A    Yes.

20   Q    Why is that?

21   A    That was not part -- the integrity charge was not part

22        of the charges at that time.  It was determined later.

23   Q    That has nothing to do with you.  You don't decide what

24        charges are issues.

25   A    Right.
```

```
 1    Q    I suppose another point of clarification, as far as
 2         differences, the memo in number nine is dated
 3         October 11, 2015.  Is that right?
 4    A    Correct.
 5    Q    So for example, on Page 3 of Document 6 where it has
 6         the decision of Chief Flynn occurring December 15, 2015,
 7         those notations, obviously, wouldn't have been there.
 8         Is that a correct assumption?
 9    A    Correct.
10    Q    All right.  So this is what she is responding to in this
11         memo that is marked number nine.  Is that right?
12    A    Yes.
13    Q    Did you review this document?
14    A    Yes.
15    Q    Were her statements in this document consistent with the
16         interview that she gave you?
17    A    Some of them were.
18    Q    Are there any specific inconsistencies that you are
19         aware of?
20    A    I am not aware of a positive THC or marijuana test.
21         I was not --
22    Q    I want you to stop there and back up.  What are you
23         referring to?  What portion of this document?
24    A    I guess, that would be the -- I guess I would call it
25         the third full paragraph where it begins, "as Detective
```

```
 1        Carr."  In the paragraph, it says,

 2                "the driver had a blood level of .06 and

 3        tested positive for THC."  THC is the active ingredient,

 4        I believe, in marijuana.

 5   Q    What was the inconsistency there?

 6   A    I wasn't aware of a positive test for marijuana.

 7   Q    Any others?

 8                THE WITNESS:        Can I review it?

 9                MR. PEDERSON:       Yes, please.

10   A    In the second paragraph, it states,

11                "this officer requested my help with the

12        filing of a felony case.  Additionally, and most

13        importantly, to help her with the fear and stress she

14        was experiencing while working, due to an assault by a

15        co-worker."

16        I don't recall being informed during the interview that

17        she was helping with a filing of a felony case with her

18        and that she was responding at that time because she had

19        asked her to come.  She indicated earlier in the night,

20        that she did not want to be there regarding the matter.

21        It wasn't that --  It was for something that was on-

22        going, was my impression, not to deal with fear and

23        stress she was experiencing.

24   Q    Was this made part of her file as a formal response to

25        charges?
```

```
 1    A    Yes.

 2    Q    This was forwarded to the chief?

 3    A    I believe so, yes.

 4    Q    I now direct your attention to Document No. 10 marked

 5         for identification.  Are you familiar with this docu-

 6         ment?

 7    A    Yes.

 8    Q    What is this document?

 9    A    It is a memorandum that she filed dated November 12.

10         It is dated November 12.  I believe she attached it to

11         her second Response to Charges.  I am not fully certain

12         on that, but I think she attached it to her second

13         Response to Charges.

14    Q    Let's talk more about this document.  What is it, to

15         your knowledge?

16    A    She is providing more information regarding the state-

17         ments of Sergeant Riley and her perception of those

18         statements and she is also addressing claims of whether

19         she was meeting her son or not.

20    Q    In here, does she level allegations of misconduct toward

21         specific department members?

22    A    Yes.

23    Q    Who does she level those allegations towards?

24    A    There is quite a few.

25    Q    Please indicate to the extent you are able.
```

| | | |
|---|---|---|
| 1 | A | Lieutenant Hanley, Sergeant Riley, I believe -- I am not |
| 2 | | sure if it is acting Captain Sgrignuoli or Captain |
| 3 | | Sgrignuoli. |
| 4 | Q | I direct your attention to the second page from the |
| 5 | | bottom, fifth paragraph up.  Let me know when you are |
| 6 | | there.  It starts, "Lieutenant Sean Hanley." |
| 7 | A | Yes. |
| 8 | Q | I'll read that. |
| 9 | | "Lieutenant Sean Hanley also lied about the |
| 10 | | phone call contents that I made to him the night of the |
| 11 | | accident." |
| 12 | | Did I read that correctly? |
| 13 | A | Yes. |
| 14 | Q | Was this made part of the investigative file? |
| 15 | A | Yes. |
| 16 | | MR. PEDERSON:     I move that into |
| 17 | | evidence, please. |
| 18 | | MR. MC GAVER:     No objection. |
| 19 | | MR. KONRAD:       It is admitted. |
| 20 | | BY MR. Pederson: |
| 21 | Q | Finally, I direct your attention to Document No. 11 |
| 22 | | marked for identification.  Are you familiar with this |
| 23 | | document? |
| 24 | A | Yes. |
| 25 | Q | What is this? |

```
 1   A   I believe this is her second Response to Charges that
 2       she submitted.
 3   Q   Is this another response she was provided when she was
 4       provided the integrity charge?
 5   A   That is what my understanding of what it was for, yes.
 6   Q   Directing your attention to Document No. 6, before, I
 7       had indicated that starting with Page 3, for three
 8       pages, that was not present at that time.  She
 9       resubmitted this and, then, that charge was there?
10       Is that the difference for this one?
11   A   Can you re-ask that?
12   Q   You previously testified that with her prior -- her
13       first response, the integrity document, the documents
14       related to the integrity charges weren't there.  Right?
15   A   Yes.
16   Q   As they appear today in Document No. 6.  Right?
17   A   Yes.
18   Q   So this memo is a response to the portions that relate
19       to integrity.  Is that correct?
20               MS. WILSON:        Can you refer to the
21       number?  The number?  You are saying "this document".
22       I got all these documents.
23               MR. PEDERSON:        Sure.  I am
24       referring to Document No. 6, which is the charge and
25       specifications, and Pages 4, 5 and 6.
```

```
 1    Q    Is it accurate to say, Sergeant, that Pages 4, 5 and 6

 2         of Document 6 relate to the integrity charge?

 3    A    Yes.

 4    Q    And that these are the pages that were not present when

 5         she filed her first response memo?

 6    A    Yes.

 7    Q    And with the second response memo dated November 27,

 8         Document 11, this is the document when she was provided

 9         Pages 4, 5, and 6, Document 6.  Right?

10    A    Just to clarify, I wasn't present when she was provided

11         those charges.

12                    MR. PEDERSON:      Maybe that is only

13         clear to me.  I try to make it as clear as possible, but

14         let's proceed.

15    Q    Did you review this document?

16    A    Yes.

17    Q    All right.  In this document, does she raise any new

18         issues or anything that was concerning your investiga-

19         tion?

20                    THE WITNESS:      May I review it?

21                    MR. PEDERSON:      Yes, please.

22    A    Yes, there is a line.

23    Q    Go ahead.  What jumps out at you?

24    A    Page 2, second-to-the-last paragraph.

25                    "Additionally, Officer Melanie Beasley needed
```

```
 1        my assistance on reports regarding a RES on the date of

 2        the accident as I stated in my PI-21, but that too was

 3        never investigated."

 4   Q    What is concerning about that statement?

 5   A    I don't believe she indicated in her PI-21 that she was

 6        assisting Officer Beasley with an RES report.

 7   Q    Anything else?

 8   A    No.

 9   Q    I would direct your attention to the next page, the

10        second-to-the-last page of this document, Document 11,

11        where she makes some statements about you.  Do you see

12        that?

13   A    Yes.

14   Q    In here, she makes a number of statements regarding your

15        history of who you work for.  Do you see all of this?

16   A    Yes.

17   Q    I will direct your attention to the second-to-the-last

18        paragraph in here.  It starts, "it should also."

19        Do you see that?

20   A    Yes.

21   Q            "It should also be noted that the acts of

22        Sergeant Adam Zieger, Sergeant Roberta Klien constitute

23        misconduct in public office and guilty of a class I and

24        H felony."

25        Do you see that?
```

       SUSAN K. TAYLOR         262-553-1058        COURT REPORTER
                            sueT@wi.rr.com
   Case 2:16-cv-01089-WED   Filed 04/22/19   Page 438 of 805   Document 80-21    133

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Did I read that correctly? |
| 3 | A | Yes. |
| 4 | Q | Did that cause you to -- provoke you to have any sort of |
| 5 | | response to what she stated there? |
| 6 | A | As far as the investigation goes, no. |
| 7 | Q | Do you know what she is referring to there? |
| 8 | A | I am sorry? |
| 9 | Q | Do you know what she is referring to when she says you |
| 10 | | committed misconduct, what allegations she is making? |
| 11 | A | I assume the ones that she laid out beforehand. |
| 12 | Q | Can you summarize your understanding of what the allega- |
| 13 | | tions are there? |
| 14 | A | That during portions of the PI-21, I deduced an officer |
| 15 | | to admit the acts of violations of an officer's lawful |
| 16 | | conduct. |
| 17 | Q | Have you ever been investigated for any misconduct in |
| 18 | | relation to your investigation in this matter? |
| 19 | A | I don't know. |
| 20 | Q | Not to your knowledge, I guess.  Right? |
| 21 | A | No. |
| 22 | Q | Is there anywhere in this document where she denies |
| 23 | | having been on her way to her son? |
| 24 | A | It is a few pages in.  I am not sure.  I would have to |
| 25 | | review it. |

```
 1   Q   Is it fair to say that the majority of this document is

 2       criticizing the investigation that was conducted and

 3       calling its -- well, the integrity of the investigation

 4       itself into question?  Is that right?

 5   A   Yes.

 6   Q   When you received this, don't you have a responsibility

 7       to review it and determine if any follow-up investiga-

 8       tion is necessary due to issues that might be raised in

 9       it?  Is that part of your job?

10   A   That is typically what is done with a typical Response

11       to Charges.

12   Q   Was there anything specific in here that you needed to

13       do to continue the investigation?

14   A   I believe I obtained -- after this, I think I obtained

15       a memorandum from the medical section.

16   Q   Do you recall what the memo was regarding?

17   A   I believe it was just the initial memorandum that a

18       sergeant filed indicating that she was injured.

19   Q   Nothing else.  Am I right?

20                   THE WITNESS:        I need one more

21       second, please.

22                   MR. PEDERSON:       Maybe there is a

23       simple way I can ask this question.

24   Q   Is there anything contained, to your knowledge, in

25       Document No. 11 that fundamentally changed the nature of
```

```
 1          the investigation or required any sort of significant

 2          work on you to address new issues raised?

 3    A     I don't believe from that document, no.

 4                    MR. KONRAD:       Counsel, it is now

 5          l2:00, noon.

 6                    MR. PEDERSON:      I am actually going

 7          to be wrapping up very quickly.  I have one more area

 8          that I know off the top of my head.  It won't take long,

 9          so I would prefer to continue.

10                    MR. KONRAD:       What is "rather

11          quickly"?

12                    MR. PEDERSON:      Ten minutes.

13                    MR. KONRAD:       All right.

14          (Discussion off the record)

15          BY MR. PEDERSON:

16    Q     I just want to talk about Juanita Carr.  Did you inter-

17          view her?

18    A     Yes.

19    Q     What did you discuss with her?

20    A     I discussed what happened with the decision to go try

21          to make a gun recovery and where they were going before

22          they were involved in the accident and the accident

23          itself.

24    Q     What did she tell you regarding what started this whole

25          thing?
```

```
 1   A    She didn't recall whether she was instructed to do this,
 2        the follow-up, or she thought to do it on her own and
 3        that she decided to take -- or to be accompanied by
 4        Detective Lewandowski and Detective Lewandowski told her
 5        that she had a matter at District 5 she needed to take
 6        care of and they were going there first before going to
 7        do the follow-up.
 8   Q    What happened next?
 9   A    She said she wanted to do the follow-up.  She wanted to
10        leave and go home.  Those weren't her exact words, but
11        she said she wanted to leave on time or something to
12        that effect.  And that she -- they were traveling on
13        North Avenue.  At some point after Sherman Boulevard
14        before 35th Street, there was something going on on the
15        side of the road which may involve prostitution and that
16        the emergency lights were activated on the squad.
17   Q    Why was that?
18   A    I would have to look and see what her exact response to
19        that was, but it had to do with the vehicle on the side
20        of the road.
21   Q    Did she tell you what happened next?
22   A    That they continued and that she was not sure if the
23        emergency lights were still on and that they got into
24        the accident.
25   Q    Did she tell you what she, herself, was doing at the
```

```
 1      time the accident occurred?

 2   A  She did.  It had to do with Detective Lewandowski's

 3      operating her phone.  I don't remember if she was

 4      looking to get a number out of the phone or if she was

 5      trying to -- waiting for a call to answer.  From my

 6      memory, I believe, it was she was looking for a number

 7      in the phone.

 8                  MS. MC KENZIE:     On whose phone?

 9                  THE WITNESS:       Detective

10      Lewandowski's phone.

11      BY MR. Pederson:

12   Q  So you are not sure exactly whether she was looking for

13      a number or not, but you know for sure that she had

14      Detective Lewandowski's phone for some purpose.

15   A  Yes.

16                  MR. PEDERSON:      That is all I have on

17      direct.

18                  MR. KONRAD:        Do the commissioners

19      have any questions?

20                  MS. MC KENZIE:     No.

21                  MS. WILSON:        I may have missed

22      something.  When two people are riding in a squad car

23      and they are not assigned different assignments,

24      they go to one and go to another one, do they?

25                  THE WITNESS:       That could be a
```

1     complicated answer depending on the situation, but I
          2     don't think it would apply to this situation.
          3                    MS. WILSON:        The lights.  When you
          4     turn on the lights, my understanding is the light was
          5     turned on to keep another car from hitting the squad
          6     car.  Is that what we said?  How fast --  I guess in
          7     your estimation, could you get a light on to keep some-
          8     body from hitting you, because it seems to me if some-
          9     body is coming that way, them lights must move real fast
         10     and the person must respond real fast.
         11                    THE WITNESS:       Commissioner, if I
         12     felt the vehicle was going to probably hit me, I don't
         13     think I would react and turn the lights on.  I would
         14     probably hit my brakes.  But if you actually were
         15     reacting to turn the lights on, it is physical.  It's
         16     just reaching --  I believe the center console would be
         17     somewhere maybe a few inches away from the knee area.
         18     You could just reach down and you would just have to
         19     literally flip that toggle switch all the way over, if
         20     someone was choosing to do that.
         21                    MR. KONRAD:        All right.  That
         22     completes the morning session.  We will reconvene in
         23     Room 301B.
         24                    MS. WILSON:        "A".
         25                    MR. KONRAD:        "A".  Excuse me.

```
1       It's at the end of this hallway.  We will reconvene at

2       1:10.  Does that give you enough time?

3                       MR. PEDERSON:       I assume we will

4       reconvene with the witness back on the stand?

5                       MR. KONRAD:         Yes.

6       (Lunch break was taken)

7                       MR. KONRAD:         All right.  We are

8       ready to proceed with our afternoon session.

9                       Mr. Pederson, do you have any more

10      witnesses?

11                      MR. PEDERSON:       I do not.

12                      MR. MC GAVER:       I have not been able

13      to cross-examine this witness.

14                      MR. KONRAD:         Sorry.  You are still

15      under oath.

16      CROSS-EXAMINATION BY MR. MC GAVER:

17  Q   Sergeant, how many years of experience do you have

18      leading investigations?

19  A   I have been conducting investigations ever since I have

20      been trained as a police officer.

21  Q   How much training have you received in conducting

22      interviews?

23  A   I don't remember specifically.  I am sure there is

24      training at the academy.

25  Q   After the academy?
```

```
 1   A    I am sure there's been -- I'm sure there's been in-
 2        service training on it, but a specific recollection of
 3        what that was -- and for the academy, I had formal
 4        schooling which included an interview class for criminal
 5        investigation -- interrogation.
 6   Q    Have you ever held the rank of detective?
 7   A    No.
 8   Q    You testified a little bit about the CAD reports in
 9        this case.  Just a couple of questions about that.
10        Every time any officer leaves a police station, is
11        that supposed to be reported on a CAD entry somewhere?
12   A    No.
13   Q    Can you give me an example of a time where that wouldn't
14        be required to be reported?
15   A    As an example, for an officer on patrol looking for
16        maybe a contact, driving around looking for some --
17        trying to find, you know, an investigation or something
18        to do, it is not a designated assignment, it wouldn't
19        have a CAD generated for that.
20   Q    But if you are an officer going to a specific location
21        for a specific reason, you should probably have that
22        reported on a CAD entry.  Is that fair?
23   A    It could or could not.  An officer could be going to a
24        house for some sort of follow-up on what they were going
25        to do, but they are going to keep themselves available
```

```
 1        until they get there and they may not put themselves
 2        until they get there and they may not tell the dis-
 3        patcher where they are headed.  They might, say, remain
 4        available for in-service.
 5   Q    In the course of your investigation, are you aware of
 6        any Tactical Enforcement or TEU officers who were on the
 7        scene of the accident, even though there is no entry
 8        reported in CAD records?
 9   A    I am not sure one way or another.
10   Q    You came into this investigation a little bit after
11        it happened.  In fact, ten days -- is that roughly
12        correct -- after the accident occurred, you started your
13        investigation?
14   A    I believe it was one of the last days of January.
15        January 28 seems to stand out to me.
16   Q    So you didn't have the opportunity to interview any
17        witnesses on the scene.  Correct?
18   A    At the actual scene of the accident?
19   Q    Correct.
20   A    No.
21   Q    You interviewed one citizen witness, Jasmine Hernandez
22        after the fact.  Why only her?
23   A    That is not the only person I interviewed.
24   Q    Citizen witness.
25   A    That is not the only citizen I interviewed.
```

```
 1   Q   Who else did you interview?

 2   A   Should be --  There was another subject that partially

 3       identified themselves.  I believe, instead of providing

 4       her first name, she provided her middle name, Yvette.

 5       Then there were two male subjects.  I believe her first

 6       name or last name was Kadima.  Kadima with a "K".  And I

 7       don't remember the other subject's name.

 8   Q   You interviewed detective Carr as part of the investi-

 9       gation.  Correct?

10   A   Yes.

11   Q   And you didn't interview detective Carr until April 14,

12       2015.  Is that right?

13   A   I am not sure that is the exact date, but I wouldn't

14       dispute that that is the date.

15   Q   85 days after the accident?

16   A   Is that 85?

17   Q   Do you trust my math?

18   A   If that is 85 days.

19   Q   Same question with regard to Shannon Lewandowski.  I

20       believe -- correct me if I'm wrong -- that you inter-

21       viewed her on April 14 as well.

22   A   I wouldn't dispute that that is the correct date.

23   Q   Jordan Lewandowski, you interviewed him.  Correct?

24   A   Yes.

25   Q   That occurred on June 11, 2015?
```

```
 1   A   Correct.

 2   Q   143 days later?

 3   A   If your math is right.

 4   Q   I hope so.  Otherwise, I will look like a fool.

 5       June 12, Sergeant Smith, did you interview him?

 6   A   Yes.

 7   Q   On June 12?

 8   A   I don't remember -- the exact date, but June sounds

 9       appropriate.

10   Q   144 days after, if my math is correct?  Would you

11       dispute that?

12   A   No.

13   Q   Then you completed -- I will skip ahead a little bit.

14       You completed your memo -- or at least it is dated

15       September 9, 2015.  Is that right?

16   A   Yes.

17   Q   That is 233 days, if my math is right, after the acci-

18       dent.  Correct?

19   A   Sure.

20   Q   While you were conducting interviews with officers who

21       reported to the accident scene, did anyone give you any

22       observations about how Shannon Lewandowski was acting?

23   A   Yes.

24   Q   Do you remember what Officer Boehlke said about Shannon

25       Lewandowski?
```

```
 1   A    I don't remember what he specifically said --
 2                    MR. MC GAVER:      For the record, it's
 3        B-o-e-h-l-k-e.
 4   A    -- about her actions.  Correct.
 5   Q    Correct.  About how she was acting, what he observed
 6        about Shannon Lewandowski.  I will direct you to your
 7        report.  Do you still have it in front of you?
 8   A    Yes.
 9   Q    That is Exhibit No. 8.  I will direct you to Page 12 of
10        22, the second full paragraph.
11                    THE WITNESS:      Can you give me the
12        page number?
13                    MR. MC GAVER:      12 of 22.  Let me
14        know when you are there.
15                    THE WITNESS:      Okay.
16                    MR. MC GAVER:      Second full
17        paragraph, the last full sentence starts with "Officer
18        Boehlke described."  If you could read that sentence
19        and let me know when you are finished.
20                    THE WITNESS:      "Officer Boehlke --"
21        I will read it to myself.
22   Q    Does it refresh your memory as to what he said about
23        what he observed about Shannon Lewandowski?
24   A    I read the wrong paragraph.
25                    MR. MC GAVER:      Let me know when you
```

```
 1      are ready.
 2                      THE WITNESS:        Yes.
 3  Q    So Officer Boehlke describes Shannon Lewandowski as
 4       being what?
 5  A    "Distraught, very 'worri-some' and slightly agitated."
 6  Q    Do you have any recollection of Officer Kuspa making
 7       observations to you about Shannon's condition, what he
 8       observed about Shannon's condition?
 9  A    I don't have an independent memory of it.
10                      MR. MC GAVER:        I direct you to the
11       last paragraph, the sentence starting with "Officer
12       Kuspa described."  Let me know when you are there.  I
13       will read it for you.
14                      "Officer Kuspa described the detective had
15       an apparent leg injury, was very incoherent, and kept
16       saying, 'Go get my son.'"
17       Did I read it correctly?
18  A    Yes.
19  Q    Is that your recollection of what Kuspa told you?
20  A    I don't have an independent memory of it, but.
21  Q    Do you have any reason to dispute it?
22  A    No.
23  Q    Go ahead, if you would, to Page 14 of 22.  Did you
24       interview Officer Deb Stacey in connection with this
25       investigation?
```

```
 1   A    Yes.

 2   Q    Second-to-the-last paragraph on Page 14 of 22.  Do you

 3        see what I am looking at?

 4   A    Yes.

 5   Q    Second-to-the-last sentence there, it starts with

 6             "Detective Lewandowski 'wasn't making any

 7        sense' and told us to go get her son."

 8        Did I read that correctly?

 9   A    Yes.

10   Q    Any reason to dispute that is what Deb Stacey told you?

11   A    No.

12             MR. MC GAVER:       Page 15 of 22.  Let

13        me know when you are there.

14             THE WITNESS:        I am there.

15   Q    Last paragraph.  Start of a new sentence.

16             "Officer Vollrath acknowledged there was

17        discussion that he -- next page -- heard amongst

18        officers related to going to meet her son, but none

19        of the statements were from Detective Lewandowski."

20        Did you interview Vollrath in connection with the

21        investigation?

22   A    Yes.

23   Q    Do you have any quarrel with that being what he told

24        you?

25   A    No.
```

```
1   Q    Go to -- page over to 13 of 22.  I think you are going

2        backward now.  Did you interview then-Officer, now-

3        detective Melanie Beasley in connection with the

4        investigation?

5   A    Yes.

6   Q    Do you remember whether Melanie Beasley told you

7        anything about Shannon Lewandowski -- a conversation

8        that she wanted to have -- "she" being Melanie, wanted

9        to have with Shannon Lewandowski about finishing

10       reports?

11  A    Yes.

12  Q    What do you remember about that?

13  A    I remember that she stated that she wanted to talk to

14       Detective Lewandowski about several things and one of

15       them included a report that she was working on.

16  Q    Did she give any more details about what the report was

17       or what she wanted help with?

18  A    Not that I remember, no.

19  Q    Did you ask her?

20  A    I may have.  I don't know.

21  Q    Did you interview --  Obviously, you testified that you

22       interviewed Detective Lewandowski in connection with the

23       incident.  Correct?

24  A    Yes.

25  Q    What, if anything, did Detective Lewandowski explain to
```

```
1      you as to why Jordan would hand a business card to an
2      officer who is pulling him over?
3   A  That we didn't discuss that.
4   Q  What about phone calls she would -- what about phone
5      calls that she would -- would have instructed Jordan
6      Lewandowski to make to her in the event that he was
7      pulled over by a police officer?
8   A  Which statements --  Could you repeat the question?
9   Q  Did Shannon, in her interview with you, explain any
10     rationale or reasoning behind wanting her son to call
11     her if he was pulled over by police?
12  A  She said that -- I don't know if I remember it as a
13     "rationale."
14  Q  What did she say?
15  A  She said that he gets pulled over quite frequently and
16     she is worried about his safety.
17              MS. MC KENZIE:      That is what she
18     said to you in the interview?
19              THE WITNESS:      Yes.
20  BY MR. MC GAVER:
21  Q  In your interview with Detective Lewandowski, I am going
22     to ask you to assume her explanation of why she flipped
23     the toggle switch on her car and put her emergency
24     lights on as true.  Do you remember the explanation that
25     she gave you for that?
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 454 of 805   Document 80-21   149

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | If you assume that explanation were to be true, do you |
| 3 | | have an opinion as to whether that would violate an |
| 4 | | approved reason why emergency lights should be used? |
| 5 | A | An opinion? |
| 6 | Q | Yes.  What is your take on it? |
| 7 | A | My opinion is that the lights of an authorized emergency |
| 8 | | vehicle can be activated when responding to an emergency |
| 9 | | and there is a slew of things as far as delivering |
| 10 | | organs and assisting with that kind of thing as well |
| 11 | | as -- |
| 12 | Q | Observing a traffic hazard in the middle of the road? |
| 13 | A | I would agree if you were -- the lights would certainly |
| 14 | | be an appropriate use if you were blocking traffic for a |
| 15 | | traffic hazard. |
| 16 | Q | There's been testimony earlier today about the squad |
| 17 | | lights being activated around 36th Street.  Do you |
| 18 | | remember either hearing that or saying it? |
| 19 | A | I said near 36th Street. |
| 20 | Q | That is one block away from 35th Street, obviously. |
| 21 | | Correct? |
| 22 | A | 35th Street to 36th Street is certainly one block, yes. |
| 23 | | I don't remember if there was an elaboration as to what |
| 24 | | side of 36th Street, but 35th Street to 36th Street is |
| 25 | | about one block. |

```
 1   Q    There is no quarrel that the accident occurred at the
 2        intersection of 35th and North.  Right?
 3   A    No.
 4   Q    Okay.  Did you ever find out over the course of your
 5        investigation whether Shannon Lewandowski was uncon-
 6        scious at any time?
 7   A    It was reported to me that she was.
 8   Q    Do you remember who reported it?
 9   A    I believe she did.  I believe it may have been reported
10        to an officer of court administration who filed a
11        supplementary report and it may have been included in
12        there as well, but I am not for certain.  I believe
13        Detective Lewandowski said she was informed that she had
14        lost consciousness.
15   Q    Do you know who told Lewandowski that she went
16        unconscious?
17   A    I don't remember.
18   Q    What about detective Carr?  Do you know whether she
19        ever lost consciousness?
20   A    I don't remember her saying or ever reporting that she
21        lost consciousness.
22   Q    Did Detective Lewandowski ever report to you in the
23        process of you interviewing her that she had a hard
24        time articulating herself because of the nature of her
25        injury?
```

```
 1   A    Yes.

 2   Q    What about having issues with short-term memory?

 3   A    Yes.

 4   Q    Did you notice any slurred speech or -- slurred speech

 5        in your interview with Lewandowski?

 6   A    No.

 7   Q    Did she indicate that she was having problems with

 8        slurred speech?

 9   A    I don't remember if that was one of the things she said

10        or not.

11   Q    Earlier today, there was testimony about then-officer,

12        now-detective Melanie Beasley having an incident or a

13        problem with a Tactical Enforcement officer.  Do you

14        have any independent knowledge of that investigation,

15        if one existed?

16   A    I think so.

17   Q    What do you know about it?

18   A    I know that the Special Investigation Section had an

19        investigation for that.

20   Q    Were you involved in the investigation?

21   A    Yes.

22   Q    What was your role?

23   A    I was interviewed briefly once.

24   Q    What was the topic of the discussion in your interview?

25   A    If I received a phone call from a sergeant at a
```

```
 1        district.

 2   Q    Can you elaborate?  I don't understand.

 3   A    They wanted to confirm that I received a phone call from

 4        a sergeant at District 5, being Sergeant Gawin.

 5   Q    Regarding what?

 6   A    Well, there was -- it was regarding then-Officer Beasley

 7        coming and talking to her after at a hearing that day at

 8        court.

 9   Q    Do you have any knowledge what that hearing would have

10        been about?

11   A    I believe it was regarding a restraining order.

12   Q    Do you have any independent knowledge about a restrain-

13        ing order that affected Officer Beasley being served

14        upon the District 5 police station?

15   A    I have no idea what you are asking.

16   Q    Do you know whether a restraining order was ever served

17        on any officer at District 5 regarding the Melanie

18        Beasley situation?

19   A    I am aware that I believe someone was served with a

20        restraining order, but I wouldn't have received that

21        information.

22                MR. KONRAD:        Could we clarify?

23        Are we talking about some sort of confidential investi-

24        gation?  By your answers, I see you are hesitating.

25                THE WITNESS:       I believe it is --
```

```
 1          there is still a pending investigation.

 2                    MR. MC GAVER:      I have not asked for

 3          the officer's name and I won't ask for the officer's

 4          name involved in it.

 5                    THE WITNESS:      I don't believe there

 6          is a pending criminal investigation.

 7          BY MR. MC GAVER:

 8    Q     Do you know whether that investigation is closed?

 9    A     I believe what you are referring to is the Special

10          Investigation Section investigation is closed, yes.

11                    MR. KONRAD:      If this is an

12          internal investigation, I don't think it is appropriate

13          for discussion.

14                    MR. MC GAVER:      That is fine.  I have

15          nothing else.

16                    MR. PEDERSON:      Just a brief

17          redirect, if I may.

18                    MR. KONRAD:      Well, you have a

19          problem.

20                    MR. PEDERSON:      What's that?

21                    MR. KONRAD:      We don't want any

22          more discussion of that investigation.

23                    MR. PEDERSON:      I wasn't going to ask

24          about that.

25                    MR. KONRAD:      Then, you don't have
```

```
1        a problem.

2                     MR. PEDERSON:        Thank you,

3        Mr. Konrad.

4                     I just want to quickly ask you about

5        Jordan Lewandowski.

6        REDIRECT EXAMINATION BY MR. PEDERSON:

7    Q   This would be Detective Lewandowski's son.  Am I right?

8    A   Yes.

9    Q   You indicated you interviewed him?

10   A   Yes.

11   Q   I believe you were asked some questions and you said you

12       didn't talk about that.  What did you talk about with

13       Jordan?

14   A   Can you repeat that?

15   Q   What was the subject matter of your discussion with

16       Jordan Lewandowski?

17   A   The subject matter was the accident involving his mother

18       and his interaction with a police officer that night.

19   Q   Did you ask him whether or not he had a conversation

20       about his mom -- with his mom at that time?

21   A   Yes.

22   Q   What did he say?

23   A   He said he did have a short conversation with his mom.

24   Q   Did you ask him whether or not he had arranged with his

25       mother to have her come and pick him up -- or show up at
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                    sueT@wi.rr.com
155
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 460 of 805   Document 80-21

```
 1        the scene, I should say?

 2   A    That was part of the discussion, yes.

 3   Q    What did he say?

 4   A    He said no.

 5   Q    Did he say anything else more specifically in relation

 6        to that?

 7   A    He said that he wouldn't ever put her in that position.

 8   Q    What position is that?

 9   A    To ask her to come meet him at a traffic stop.

10                 MR. PEDERSON:      That is all I have.

11                 MR. MC GAVER:      One question.

12        RECROSS-EXAMINATION BY MR. MC GAVER:

13   Q    The interview you conducted with Jordan, how was that

14        conducted?

15   A    Over the telephone.

16                 MR. MC GAVER:      That's it.  Thank

17        you.

18                 MR. PEDERSON:      I am sorry.  Can I

19        have a little leeway?

20                 MR. KONRAD:        Go ahead.

21        RE-REDIRECT EXAMINATION BY MR. PEDERSON:

22   Q    I want to talk about the timeline here.  There were some

23        questions raised about how many days, how long it took.

24        Do you have an explanation as to why it took that long?

25   A    Yes.  The interview and investigation, Detective
```

```
 1          Lewandowski and detective Carr were -- had not returned
 2          to work.  They were not coming to work.  There was a
 3          little bit of difficulty -- I can't say for sure how
 4          long it was -- with me contacting one or both of them.
 5          And several of the interviews were interviews that were
 6          asked for me to complete after reviewing the status of
 7          the case with my current lieutenant.
 8     Q    How about the issue of the integrity charge coming later
 9          than the other two charges?  Did that have any effect on
10          the timing?
11     A    That submission of the charge itself?  It didn't affect
12          the timing of the investigation, the actual issuing of
13          the charge.
14     Q    Okay.  Any other factors that caused the interviews --
15          the investigation to be extended, to your knowledge?
16     A    There is -- it is common we don't just look at one case,
17          we have several cases that we are working on at one
18          time.  I work at night and I also respond to critical
19          incidents that occur in the city and I have additional
20          official responsibilities there on a daily basis.
21     Q    In terms of sequence, was it important to interview
22          anybody first or early on before you interviewed other
23          persons?
24     A    I tried to interview the witnesses that actually saw the
25          accident before the detectives.
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 462 of 805   Document 80-21

157

```
 1    Q    Is there anyone you were reserving until after you spoke
 2         to the detectives?
 3    A    No.
 4    Q    Would it be accurate to say you couldn't begin to
 5         investigate an integrity charge until she provided an
 6         inconsistent statement to you?  Is that right?
 7    A    Correct.
 8                    MR. PEDERSON:      That is all I have.
 9                    MR. MC GAVER:      Nothing further.
10                    MR. KONRAD:        Thank you.
11         (Witness excused)
12                    MR. PEDERSON:      The only housekeeping
13         matter is I need to move Exhibit 11 into evidence.
14                    MR. MC GAVER:      What is 11?
15                    MR. PEDERSON:      The third -- the
16         second Response to Charges.
17                    MR. MC GAVER:      No objection.
18                    MR. PEDERSON:      Other than that,
19         I think everything has been entered and with that,
20         the chief would rest his case.
21                    MR. KONRAD:        11 will be admitted.
22                    Mr. McGaver, do you have any witnesses?
23                    MR. MC GAVER:      I do.  I call
24         Detective Juanita Carr.
25                    JUANITA CARR, having been first duly
```

1    sworn on oath to tell the truth, the whole truth, and

2    nothing but the truth testified as follows:

3                    MR. KONRAD:         She is sworn.  You

4    may proceed.

5    DIRECT EXAMINATION BY MR. MC GAVER:

6    Q    State your name for the record.

7    A    My name is Juanita Carr.

8    Q    You are a Milwaukee Police detective.  Correct?

9    A    Yes.

10   Q    What year did you start working for the Milwaukee Police

11        Department?

12   A    1996.

13   Q    What year were you promoted to detective?

14   A    2005.

15   Q    Where were you assigned on January 19, 2015?

16   A    I was assigned to the Criminal Investigation Bureau

17        working out of District 3.

18   Q    What hours did you work?

19   A    8:00 p.m. to 4:00 a.m.

20   Q    Did you work on January 19?

21   A    Yes.

22   Q    Did you have any contact with Lieutenant Sean Hanley

23        during that shift?

24   A    Yes.

25   Q    Who is Hanley in relation -- in professional relation-

```
 1        ship to you, or who was he on January 19, 2015?
 2   A    One of the lieutenants out of the detective bureau.
 3   Q    Was he your supervisor?
 4   A    One of my supervisors.
 5   Q    Where did you have this first contact with Lieutenant
 6        Hanley?
 7   A    Where?
 8   Q    Where?  Where did you meet with him?
 9   A    I believe at the hospital.  Saint Joe's Hospital,
10        I believe.
11   Q    What did he tell you?
12   A    In regard to what?
13   Q    In that meeting.  You met with him at Saint Joe's
14        Hospital.  What were you talking about?
15   A    I don't recall exactly what our conversation was.
16        I was there investigating a shooting.
17   Q    Did he send you to a specific assignment at that time?
18   A    I am not understanding your question.
19   Q    What was the purpose of the conversation with Lieutenant
20        Hanley at St. Joseph's Hospital on January 19, 2015?
21        What did you guys talk about?
22   A    About the shooting and, then, recovering the weapon.
23   Q    What time did that conversation take place?
24   A    I don't recall the time.
25   Q    Can you tell me a little bit about the shooting you were
```

```
 1        investigating?

 2   A    I believe it was a shooting where a male had shot

 3        himself.

 4   Q    Do you know any of the circumstances under which the

 5        male shot himself?

 6   A    No, I don't.  I don't recall.

 7   Q    At any point in time, did you report to the 2700 block

 8        of 52nd Street?

 9   A    I don't know the exact time, but I know it would have

10        been right after leaving the hospital.  That is the

11        location I believe the victim -- the male person who

12        shot himself, that is where he resided.

13   Q    What was the purpose of visiting that address?

14   A    I went there to try and recover the weapon that he used.

15   Q    Did you come into contact with anyone at that address?

16   A    No.

17   Q    What happened?

18   A    I didn't get an answer.

19   Q    Did you knock on the door?

20   A    Yes.

21   Q    Did you announce yourself as a member of the Milwaukee

22        Police Department?

23   A    No.  No one answered, so I didn't respond to anything.

24   Q    Did Lieutenant Hanley at any point or anyone else for

25        that matter direct you to return to that address to
```

```
 1        follow up with that investigation?

 2   A    Yes.

 3   Q    Who told you?

 4   A    I don't recall.  It was one of the other supervisors out

 5        of the district.

 6   Q    It was not Lieutenant Hanley?

 7   A    No.  I don't recall.  I don't believe it was.  I

 8        remember another supervisor at District 3 asking if I

 9        recovered the weapon and I told him no.

10   Q    Did you notice or believe there was any sense of urgency

11        to retrieve the gun used -- allegedly used in the shoot-

12        ing?

13   A    The urgency that I had noticed was after leaving the

14        hospital and that is when I went to try and recover

15        the weapon.

16   Q    Why was there some urgency?

17   A    So that I could make it to the house before the person

18        was released from the hospital.  That would have been

19        the urgency.

20   Q    You were unsuccessful in locating the gun when you went

21        to the address.  Fair?

22   A    Correct.

23   Q    Did you have any contact with Detective Lewandowski

24        during that shift?

25   A    Yes.
```

| | | |
|---|---|---|
| 1 | Q | Where did you first have contact with her? |
| 2 | A | At District 3. |
| 3 | Q | Approximately what time was that contact? |
| 4 | A | I don't remember the time. |
| 5 | Q | You make any plans to go anywhere with Detective |
| 6 | | Lewandowski? |
| 7 | A | Yes. |
| 8 | Q | What were those plans? |
| 9 | A | I had plans to go back and check for the -- if I could |
| 10 | | get inside the house to check for the gun that was used |
| 11 | | in the incident and Detective Lewandowski said that she |
| 12 | | had to go to District 3 to meet with another officer or |
| 13 | | something, so we got in the car together so that we |
| 14 | | could both handle both incidents or both locations. |
| 15 | | She could go to District 5 and I could go to the |
| 16 | | victim's location and see if I could recover the gun. |
| 17 | Q | Just to be clear, this would be the second attempt you |
| 18 | | made to track down the gun at the location of the |
| 19 | | shooting.  Fair? |
| 20 | A | Yes. |
| 21 | Q | Did detective --  Did you notice Detective Lewandowski |
| 22 | | take any phone calls before she got in the car with you? |
| 23 | A | I don't remember. |
| 24 | Q | Who drove the car? |
| 25 | A | She did. |

```
 1   Q    Is there any reason why she was driving the car as

 2        opposed to you?

 3   A    No.

 4   Q    What, if anything, did Detective Lewandowski do with her

 5        phone when she got into the car?

 6   A    I don't know what she did with it immediately, but I

 7        know I did have her phone in my hand.

 8   Q    What was the purpose of you having Lewandowski's phone

 9        in your hand?

10   A    I was looking through her cell phone.  I remember

11        looking through it.

12   Q    Prior to your departure from the District 5 police

13        department with Detective Lewandowski, did she tell

14        you anything about an incident with her son?

15   A    We never left District 5.  We left out of District 3.

16                  MR. MC GAVER:      I apologize.  You are

17        correct.

18                  MR. KONRAD:        The same question

19        except District 3?

20                  MR. MC GAVER:      Right.

21   Q    Did she mention her son at all?

22   A    When she passed me her phone, I remember her asking me

23        to look for his number so she could get in contact with

24        him.

25   Q    Did she explain to you why?
```

```
 1   A   I don't believe so.

 2   Q   What was your understanding of where you were planning

 3       on going immediately?

 4   A   Immediately?

 5   Q   Immediately.  Where was the first stop?

 6   A   District 5.

 7   Q   And what was the purpose of you going to District 5?

 8   A   She was going to meet with another officer.

 9   Q   Who was the officer?

10   A   I didn't know at that time.  I believe the young lady's

11       name is Melanie.  I don't know her last name.

12   Q   Do you know anything about the purpose of Lewandowski's

13       planned meeting with Melanie?

14   A   No.

15   Q   To be clear, what was the plan after you departed from

16       District 5?

17   A   To go and pick up the gun, see if we could get inside

18       the house.

19   Q   How did Detective Lewandowski become involved in the

20       attempt to pick up the gun inside that house?

21   A   I told her that I was going to go and try and recover

22       the gun from that victim's residence, so she had to go

23       into District 5 and she was going to ride with me so we

24       could try and get inside the residence and recover the

25       gun.
```

```
 1   Q   As far as you know, did anyone order Detective

 2       Lewandowski to participate in that investigation?

 3   A   Not that I am aware of.

 4   Q   Prior to you approaching the intersection of 36th Street

 5       and North Avenue, did Detective Lewandowski receive any

 6       phone calls on her phone?

 7   A   No.  I had her cell phone in my hand.

 8   Q   And it didn't ring?

 9   A   I don't believe so.

10   Q   As you approached the intersection of 36th Street and

11       North Avenue, what did you see?

12   A   I didn't see anything.  I was looking down at her phone.

13       I just heard her say, "oh, N", some cuss word, but

14       before I could look as high up as the bottom of the

15       window on the passenger's side or the driver's side,

16       our car had been hit.  I didn't know which direction we

17       were hit from.

18   Q   Prior to the collision --

19               MS. MC KENZIE:     I'm sorry.

20               She said, "oh, N"?

21               THE WITNESS:     She said, "oh", just

22       "oh", and, then, she used a cuss word.  I don't recall

23       which cuss word she used.

24               MS. MC KENZIE:     Okay.  Go ahead.

25       BY MR. MC GAVER:
```

```
 1   Q    At any point prior to the collision, do you know whether
 2        Detective Lewandowski activated the squad lights?
 3   A    Yes.  I believe that the lights were on.
 4   Q    Can you explain the circumstances under which she
 5        activated those lights?
 6   A    I can't explain it.  I do know that there are -- during
 7        that time, there are a lot of prostitutes out in certain
 8        areas and a lot of times, people will activate the
 9        lights to let people know that, "hey; police are paying
10        attention to what you are doing, so you all stop doing
11        stuff like that," but I don't know why she specifically
12        may have activated the --
13   Q    Did Detective Lewandowski alter the manner in which she
14        was driving once the squad lights were activated?
15   A    No, I didn't notice anything different.
16   Q    Do you remember whether she activated the siren prior to
17        the collision?
18   A    I don't recall.
19   Q    Do you remember whether the siren was on at the time of
20        the collision?
21   A    No, I don't remember hearing the siren at all.
22   Q    Do you remember whether the lights were on -- the
23        emergency lights were on at the time of the collision?
24   A    I don't recall if they were on.
25   Q    Can you explain where the squad was impacted?
```

```
 1   A    We were struck from the front side of the vehicle on the
 2        passenger's side.
 3   Q    You were a passenger at that time?
 4   A    Yes.
 5   Q    What did the impact do, if anything, to Shannon
 6        Lewandowski's position in the car?
 7   A    She was actually on -- she was in the center of the
 8        driver and passenger's seat with her head laying back
 9        and her eyes were looking up toward the ceiling.
10   Q    Was she conscious?
11   A    She didn't look conscious, so I started screaming right
12        away.
13   Q    Did she respond to you?
14   A    Not initially.
15   Q    How long did it take for her to respond to you?
16   A    I don't recall.
17   Q    Do you know whether you lost consciousness at any point?
18   A    I don't think so.
19   Q    At any point, were you and/or -- were you removed from
20        the squad car?
21   A    Yes.
22   Q    How did that happen?
23   A    I believe there was a citizen that helped.
24   Q    At any point, did you witness whether Shannon
25        Lewandowski was removed from the squad car?
```

```
 1   A    I don't recall.

 2   Q    So you don't know --

 3   A    I believe she was, though.

 4   Q    Do you know how it happened?

 5   A    No, I can't recall.

 6   Q    Do you remember who the first responders -- the first

 7        emergency responder to the scene was?

 8   A    No.

 9   Q    Do you remember how long it took for emergency

10        responders to report to the scene?

11   A    No.

12   Q    Did you call 911?

13   A    No.

14   Q    Do you know who did?

15   A    No.

16   Q    Do you remember anything that you said to anyone

17        immediately following the collision?

18   A    No.  I don't remember saying anything.

19   Q    Do you remember any officers reporting to the scene

20        while you were still on the scene?

21   A    Yes.

22   Q    Can you tell me who was there?

23   A    No.

24   Q    Do you remember speaking to any of the officers on

25        scene?
```

```
 1    A    No.

 2    Q    Do you remember -- did you witness Shannon Lewandowski

 3         say anything to any of the officers on scene?

 4    A    No.  I was not near Shannon, so I don't know if she

 5         said anything or not.  I can't recall hearing anything.

 6    Q    Did you tell anyone to contact next of kin or relatives?

 7    A    Excuse me?

 8    Q    Did you tell anyone to contact your relatives after the

 9         collision?

10    A    Yes.  Someone did come to me and asked if there was

11         somebody that they could call.  I can't remember who

12         that was.

13    Q    Do you know whether they got ahold of your relative?

14    A    Yes.

15    Q    How long were you on the scene after the accident?

16    A    It couldn't have been long, because I was taken off to

17         the hospital.

18    Q    In an ambulance?

19    A    Yes.

20    Q    Who rode with you in the ambulance?  Did any members of

21         the police department ride with you in the ambulance?

22    A    I can't recall.  I am sorry.

23    Q    Do you remember seeing Lieutenant Hanley at the scene of

24         the accident?

25    A    No.
```

```
 1   Q    Once you reported to the hospital, do you remember any

 2        officers speaking with you?

 3   A    There were officers there, yes.

 4   Q    Do you remember who?

 5   A    No.

 6   Q    Do you remember seeing Hanley at the hospital?

 7   A    Yes.

 8   Q    Did Lieutenant Hanley come speak to you at the hospital?

 9   A    Yes.  I believe he came in the room and spoke.

10   Q    What did you say to Hanley at that time?

11   A    I don't know.

12   Q    Do you remember what he said to you?

13   A    No.

14   Q    Did you ever see Lieutenant Hanley speak with Detective

15        Lewandowski at the hospital?

16   A    No.

17   Q    Did Lieutenant Hanley enter your room at the hospital

18        with Shannon Lewandowski?

19   A    I don't remember.

20   Q    Did Shannon Lewandowski ever come into your room at the

21        hospital?

22   A    At the end of the night when she was leaving, I remember

23        her stopping by to check on me.

24   Q    Was Lieutenant Hanley with her?

25   A    I don't believe so.
```

1   Q   What time were you discharged from the hospital?

2   A   I don't remember.

3   Q   Do you know who left with you?

4   A   I had someone, one of my family members that was there.

5   Q   Do you know your diagnosis when you were discharged from

6       the hospital?

7   A   No.

8   Q   Did Lieutenant Hanley come to your house or visit you

9       after the accident?

10  A   Yes.

11  Q   Do you know approximately how many days after the

12      accident he visited you at your house?

13  A   I know it wasn't -- it wasn't immediately.  It was --

14      I don't remember how long it was, but I know it wasn't,

15      like, right away.

16  Q   What was the purpose of that visit?

17  A   I don't recall.  I know he came, him and Lieutenant

18      Paul Lough came and interviewed me at my house, but I

19      don't remember which day that was.

20  Q   Were you given what is called a PI-21 form prior to that

21      conversation with Lieutenant Hanley?

22  A   No, I don't believe so.

23  Q   Do you know what a PI-21 form is?

24              MR. PEDERSON:     I will object to this

25      line of questioning.

```
 1                 MR. KONRAD:          What is your
 2     objection?
 3                 MR. PEDERSON:        I am objecting to the
 4     line of questioning.  He is asking if she was provided a
 5     PI-21 before interviewed by Lieutenant Hanley.  I think
 6     that was -- you know, that issue was disposed of, I
 7     guess, obliquely by her own motion.  I don't see how
 8     that is relevant.
 9                 MR. MC GAVER:        The motion that
10     was filed earlier in the case had to do with Shannon
11     Lewandowki.  It had nothing to do with Juanita Carr.
12                 MR. KONRAD:          I think the testimony
13     is to elicit the nature of the visit, so go ahead.
14     BY MR. MC GAVER:
15     Q   Do you know what a PI-21 is?
16     A   Yes.
17     Q   What is it?
18     A   It is a form informing the member to contact PPD in
19         order to give a statement regarding a matter.
20     Q   PPD is now known as IAD?
21     A   Yes.
22     Q   Internal Affairs?
23     A   Yes.
24                 MS. WILSON:          Commissioner McKenzie
25     is new.  I am old.  You all are sliding acronyms around
```

```
 1        here like nobody's business.  You have to --

 2   Q    What does PPD stand for?

 3   A    I will call it IAD.

 4   Q    What does IAD stand for?

 5   A    Internal --

 6   Q    Affairs?

 7   A    Internal Affairs.

 8   Q    All right.  PPD is Professional Performance Division if

 9        I am not mistaken?

10   A    Yes.

11   Q    Is it fair that IAD is now -- or PPD is now IAD?

12   A    Yes.

13   Q    Thank you.  Did you ever return to work after the

14        accident?

15   A    Yes.

16   Q    How long were you off?

17   A    About eight, nine months.

18   Q    What kind of injuries did you suffer from the accident?

19   A    I had a concussion, a back -- back pain, neck pain,

20        wrist pain and headaches.

21   Q    Do you still have any of those issues?

22   A    Yes.

23   Q    Do you know who had the green light at the intersection

24        of 35th and North at the time just before the collision?

25   A    I believe Detective Lewandowski.
```

```
1   Q    How do you know that?

2   A    That is what I was told.  I didn't see, so I didn't

3        know.

4   Q    How fast --  Do you have any idea how fast the squad

5        that you were in was going at the time of the accident?

6   A    No.  We couldn't have been going fast because I was

7        looking down at the phone that I had in my hand.  It was

8        Detective Lewandowski's.  And if she would have been

9        going fast, I wouldn't paid attention to what she was

10       doing.  But I wasn't -- she was not doing anything that

11       startled me or that made me -- that I need to raise my

12       head up and look and see what she was doing.

13                    MR. MC GAVER:      Nothing further.

14                    MR. KONRAD:        Mr. Pederson?

15                    MR. PEDERSON:      Thank you,

16       Mr. Konrad.

17       CROSS-EXAMINATION BY MR. PEDERSON:

18  Q    I would like to start, detective, with your testimony

19       indicating that you had gone to the house to conduct

20       a search earlier in the evening.  Do you recall the

21       testimony that I am referring to?

22  A    Yes.

23  Q    When you did that, did you go alone or were you with

24       anyone?

25  A    I was probably alone.
```

```
 1   Q    Is that consistent with department policy?

 2   A    To check for a gun?

 3   Q    Yes.

 4   A    I believe so.

 5   Q    So if I were to indicate to you that those -- typically,

 6        those searches are supposed to be conducted with more

 7        than one department member at a time, you would say you

 8        are not aware of that fact?

 9   A    No, I wouldn't say that.  I am saying at that time, the

10        only person that was supposed to be at that residence

11        that I recall would have been his girlfriend or his wife

12        or a female that would have been there.

13   Q    How does that relate to whether or not you were going to

14        try to conduct the search alone or someone with you?

15        How did those two things connect?  I don't understand.

16   A    I am not understanding your question.

17   Q    Maybe we are both misunderstanding each other.  My

18        question to you was that you were at the house by

19        yourself.  There was no other department member with

20        you at that house.  Right?

21   A    Correct.

22   Q    And you knocked on the door and no one answered.  Right?

23   A    Right.

24   Q    And my question to you was, at that time, let's say

25        someone did answer.  Was it your intent to go into that
```

```
 1          house alone to conduct -- to request to do a consent

 2          search and to conduct a search of the home?

 3     A    No, I'm sorry.  No.  Had I gotten an answer at the door,

 4          I would have called for another squad to respond there,

 5          but seeing that I didn't get an answer, I didn't have to

 6          call for anyone to come out.  So the second time that --

 7          because Detective Lewandowski was going to ride with me,

 8          we would have been able to handle the search together.

 9     Q    So my follow-up question to you is, do you agree with me

10          that had you gone into the house alone and conducted the

11          search alone, that that would not have been consistent

12          with department policy?

13     A    I wouldn't have done that search alone.

14     Q    Very good.  Did you write a report that you did that?

15     A    That I did what?

16     Q    That you went to the house, that you knocked on the door

17          and attempted to conduct a consent search, but no one

18          answered?

19     A    I would have put that in my report.

20     Q    So you did report that?

21     A    No.  After the accident, I didn't file any report.

22     Q    So after you left the house, you went to District 3?

23     A    Correct.

24     Q    It is your testimony that while you were at District 3,

25          some supervisor instructed you to go back to the house
```

```
1        and try and conduct another search?
2   A    There was a supervisor at District 3 that I remember
3        asking if I had gotten the gun out of the house and I
4        said no, but, then, Detective Lewandowski and I were
5        going to go back -- we were going to back over to the
6        house so I could check for the gun.
7   Q    Did this supervisor you had the conversation with have
8        knowledge that you had already attempted to conduct a
9        consent search?
10                  MR. MC GAVER:        Objection.  Calls
11       for speculation.
12                  MR. PEDERSON:       I can rephrase.
13  Q    Did you advise the supervisor that you had the conver-
14       sation with that you had already attempted to search the
15       house?
16  A    I don't remember if I actually advised the person, but
17       I do believe that -- I remember -- I remember, kind of,
18       saying that I had gone to the house and didn't recover
19       the gun out of there.  They should have been aware.
20                  MS. MC KENZIE:      I am sorry.  One
21       quick question because I think --
22                  Who sent you to the house originally the
23       first time?
24                  THE WITNESS:        That would have been
25       Lieutenant Hanley.  But that is follow-up that we would
```

```
1        have done in the first place.  Even if he wouldn't have
2        said, "go to the house and check for the gun", it would
3        have been done naturally.
4        BY MR. PEDERSON:
5   Q    Lieutenant Hanley -- it is your testimony Lieutenant
6        Hanley gave you that directive while you were both at
7        the hospital, though.  Right?
8   A    Yes.  I think I remember him being at the hospital.
9   Q    So when you were at District 3, it sounds to me what
10       you are saying that you have a conversation with the
11       supervisor.  You don't recall who.  You didn't
12       necessarily get a directive from that supervisor to go
13       again, but you decided on your own to do that because
14       that is what you do as a detective.  Correct?  Is that
15       your testimony?
16  A    You are confusing me.
17  Q    Let's take it in smaller pieces.  You have testified
18       that you don't remember who the supervisor is that you
19       had a conversation with at District 3.  Right?
20  A    Correct.
21  Q    And you are not sure if it was Hanley or not.  Is that
22       true?
23  A    I don't believe it was Hanley.  I believe it was another
24       supervisor from District 3 that was asking -- I am not
25       sure which supervisor that was.  I don't believe it was
```

```
 1          Lieutenant Hanley.

 2     Q    How many supervisors do you have?

 3     A    There is a lot of lieutenants, but District 3, there

 4          was supervisors at District 3 in the detective bureau.

 5     Q    Let me limit it, then.  How many supervisors, to your

 6          knowledge, who had knowledge of the investigation that

 7          you were conducting were present and there and working

 8          that night?

 9     A    I don't know.

10     Q    Do you recall having any interaction with Lieutenant

11          Hanley at District 3 that night at all?

12     A    I don't remember.

13     Q    So when you have this conversation with the supervisor,

14          whoever it was, did that supervisor give you an assign-

15          ment to go back to the house and search it again, or try

16          to search it again?

17     A    Yes, I believe so.

18     Q    I think you have already testified, but do you know

19          approximately what time that was?

20     A    No.

21     Q    How did it come to pass that Detective Lewandowski was

22          aware of your assignment?

23     A    We were actually sitting right next to each other and we

24          always talk about the assignments that we have or were

25          actually sent to and I told her that that is what I was
```

```
 1        going to go and do.  I remember -- I think I remember
 2        discussing that the gun -- discussing the gun with her
 3        and rather than taking a squad out of service to go and
 4        do the search, Lewandowski was going to go with me.
 5   Q    So what happens next is you go outside and get ready to
 6        go, I assume.  Is that right?
 7   A    Yes.
 8   Q    Was there much length of time between the time that you
 9        talked to the supervisor that you get in the car?
10   A    I don't remember.
11   Q    At some point, you are in the car and you are driving
12        away from District 3.  Right?
13   A    Yes.
14   Q    At some point, you become aware that you are making this
15        quick run to whatever it is, to District 5 before you go
16        to the house.  Is that right?
17   A    Yes.
18   Q    So when do you become aware that you are going to
19        District 5?
20   A    I don't remember, but I do know that the plan was to go
21        to District 5 so she could handle whatever was going on
22        at District 5 and, then, I was going to come back to the
23        house where the gun probably was on the way back,
24        because that was, like, a block away from District 3.
25        So we were going to make a circle out of it, I guess you
```

1      could say.

2   Q  So this house was extremely close, the house that needed

3      to have the search performed on it, or at least try to

4      search.  It was very close.

5   A  Yes.

6   Q  It would be a true statement, then, that before you left

7      District 3, you knew you were going to District 5 first.

8   A  I am not sure.  I do know that we had -- that I had

9      already checked for the gun and to go right back there,

10     I was -- I wanted to put a little time in there.

11                   MR. PEDERSON:        That is not my

12     question.

13  A  I believe we were probably going straight to District 5.

14     I am not real sure.

15  Q  But you would agree with me if the house is a block or

16     two away as you indicated, if you are going to go there

17     first when you left the district, you would have got

18     there right away, but you didn't.

19  A  Right.

20  Q  You were heading eastbound on North Avenue, so the

21     deduction there, the reasonable conclusion is that when

22     you got in the car with the detective, you knew at that

23     time, you were going to District 5 first.  Right?

24  A  I knew once we were taking a left turn on North Avenue,

25     that we were going to District 5.

```
 1   Q    I think this is already in testimony.  I want to make
 2        sure.  The first time you went to the house, what was
 3        the police purpose?
 4   A    To the house where the gun was?
 5   Q    Yes.
 6   A    To recover the gun.
 7   Q    Okay.  To ask for a consent search and see if you could
 8        find it.  Is that right?
 9   A    Yes.
10   Q    Any other police purpose?
11   A    No.
12   Q    So when you are in the car, are you having any conver-
13        sation related to what she is going to District 5 for?
14   A    No.
15   Q    When you are in the car, it is about 2:00 a.m.  Right?
16   A    Yes.
17   Q    And you are getting off at 4:00.  Right?
18   A    Yes.
19   Q    If you get into the house and you find the gun, there is
20        going to be some work and some paperwork and it is going
21        to take some time.  Right?
22   A    Yes.
23   Q    So given that set of facts, did you have any concerns
24        about how long this detour to District 5 was going to
25        take?
```

```
 1   A    No, I didn't.  I didn't know, but I knew if there was
 2        work at my location, that I did have help.
 3   Q    So you didn't have any discussion with Detective
 4        Lewandowski about how long it might take or when you
 5        might expect to get back to the house or anything like
 6        that?
 7   A    No, I don't believe so.
 8   Q    Do you recall being interviewed by Sergeant Zieger in
 9        this matter?
10   A    Yes.
11   Q    Did you tell him about how you went to the house already
12        first?
13   A    I am sure I would have.
14   Q    When you have the phone in your hands, this is when you
15        have Detective Lewandowski's phone in your hands and you
16        are looking up the numbers, do you know why you are
17        doing that?
18   A    I was looking for her son's phone number.
19   Q    Did she tell you why, what she wanted to do?
20   A    I don't believe so.
21   Q    Was it the idea that you were going to call the number
22        for her?  Is that what was going to happen, from your
23        understanding?
24   A    I don't remember.
25   Q    When the accident occurred, you had the phone in your
```

```
 1        hands.  Right?

 2    A   Yes.

 3    Q   What happened to the phone?

 4    A   I have no idea.  That phone was the last thing on my

 5        mind at the time of the accident.

 6    Q   Sure.  That is entirely reasonable.  You didn't hang

 7        onto the phone to your knowledge, did you?

 8    A   I am sure I probably didn't.

 9    Q   But at that point, the phone is returned immediately to

10        Detective Lewandowski, isn't it?

11    A   I have no idea.

12    Q   You indicated that Lieutenant Hanley had come to your

13        house at some point to have a discussion with you.  Do

14        you recall that testimony?

15    A   Yes.

16    Q   If I were to indicate to you that Lieutenant Hanley

17        reported that he went to your house on Wednesday,

18        January 21, 2015 at approximately 8:30 p.m., with

19        Lieutenant Paul Lowe, would you have any reason to

20        dispute that?

21    A   I don't know.  If he would have come in, I am sure I

22        wouldn't have been interviewed at that time.  I was

23        still suffering from a very bad concussion.

24    Q   So I need to understand your testimony.  Are you saying

25        that that is not true, that can't be true?
```

| 1 | A | No, I am not saying that can't be true. I am saying |
| 2 | | that I don't know for sure. I don't remember if he |
| 3 | | did come a couple days -- I don't remember him coming |
| 4 | | a couple days after the accident. |
| 5 | Q | But you have no specific facts or knowledge that you can |
| 6 | | point to to indicate that must be wrong. Is that true? |
| 7 | A | Correct. |
| 8 | Q | And if he reported in the same report that at that time |
| 9 | | that he had a conversation with you regarding your |
| 10 | | recollection of the events that led up to the accident |
| 11 | | and surrounding it, would that -- would you have any |
| 12 | | reason to dispute that that was true or not true? |
| 13 | A | I don't remember discussing the accident with him at |
| 14 | | that time. I really don't remember discussing the |
| 15 | | accident with anyone for a few weeks of being home from |
| 16 | | the hospital. |
| 17 | | MR. PEDERSON: That is all I have. |
| 18 | | MR. KONRAD: Commissioners with |
| 19 | | any questions? |
| 20 | | MS. WILSON: When you asked the |
| 21 | | question about Lieutenant Hanley at the hospital, were |
| 22 | | you talking about at the hospital about the shooting or |
| 23 | | at the hospital that you were in the accident? |
| 24 | | MR. PEDERSON: I was talking about |
| 25 | | regarding the shooting. It is my understanding she |

```
 1        testified that she got that directive from Lieutenant

 2        Hanley while investigating the shooting investigation

 3        to go search the house.

 4                    MS. WILSON:        You may not know,

 5        but does anybody know how many lieutenants are on any

 6        given shift at any given time?  Or nobody knows, just as

 7        many as we need?

 8                    MR. PEDERSON:        I believe there had

 9        been prior testimony that there was one other lieutenant

10        that was on duty at that time.

11                    MS. MC KENZIE:        Do you recall whether

12        or not you were working on the weekend shift?

13                    THE WITNESS:        On the weekend?

14                    MS. MC KENZIE:        The weekend shift

15        that you were working on?

16                    THE WITNESS:        I believe so.  At

17        that time, we were working one weekend.  Every third

18        weekend, we were off.

19                    MS. MC KENZIE:        Do you normally work

20        with Detective Lewandowski?

21                    THE WITNESS:        No.  I normally work

22        by myself.

23                    MS. MC KENZIE:        So when you were given

24        the assignment by whoever your supervisor was at the

25        time to go retrieve the gun and you sat back down at
```

```
1        your desk, were you the person who initiates the

2        discussion of, "let's go do this together"?

3                        THE WITNESS:        I don't recall, but

4        I know between the two of us, we would sit there and

5        talk about our assignments and if there was something

6        that needed to be done, you know, we would make sure

7        that it got done.

8                        MS. MC KENZIE:        My question is, do

9        you work together often?

10                       THE WITNESS:        We don't ride in the

11       same car.  We may end up at the same assignment, but we

12       are not, like, partnered in the same vehicle.  But we --

13       Just as this young lady is sitting right next to me,

14       this is pretty much how Detective Lewandowski and I were

15       sitting in the assembly at District 3.

16                       MS. MC KENZIE:        I guess, outside of

17       this date, which is January 19, normally do you guys sit

18       together on weekends?

19                       THE WITNESS:        Yes.

20                       MS. MC KENZIE:        And so when you

21       initiated the discussion with Detective Lewandowski and

22       you said, "this is the assignment that I have," did you

23       say, "come with," or did she say to you, "I have some-

24       thing to do, I am going to go over" -- if you can.

25                       THE WITNESS:        I don't remember who
```

```
 1        initiated that, you know, "you go with me, I go with
 2        you", but I do know that we both came to the conclusion
 3        that she had something that she needed to do and I had
 4        something that I needed to do, so I was actually trying
 5        to not call and have a squad meet me there.  Since she
 6        was going to go out of the building, she could actually
 7        go and do the follow-up with me to see if we could both
 8        get inside of the house and once we got inside the
 9        house, we could both handle the follow-up, either --
10        you know.
11                   MS. MC KENZIE:     Was that her car that
12        you were in?
13                   THE WITNESS:     I don't believe that
14        car was assigned to anyone.  I don't know what car she
15        is assigned.
16                   MS. MC KENZIE:     That is fine.  I
17        guess my question was going to be, why is it that she
18        ended up driving and not you, if you can recall?
19                   THE WITNESS:     I don't know.  She
20        probably had the keys.  I don't know.
21                   MS. MC KENZIE:     Okay.  When you are
22        in the car driving with her, it is my understanding from
23        your testimony that a supervisor, whoever the supervisor
24        was, told you to go retrieve the gun.  Is that correct?
25                   THE WITNESS:     Yes.
```

```
 1              MS. MC KENZIE:     Were you under the
 2     impression that Detective Lewandowski had an assignment
 3     from a supervisor?
 4              THE WITNESS:     No.  I remember her
 5     saying that she was going to go to District 3 to meet
 6     with another officer.  I don't know -- I didn't know at
 7     that time if a supervisor had sent her to District 3 or
 8     what.  I just knew she was going to meet with another
 9     officer.
10              MS. MC KENZIE:     I guess my question
11     is, did you, in some sense, feel like your assignment
12     was more of a priority than what she was doing?
13              THE WITNESS:     No.  I believe all
14     police work is equal.
15              MS. WILSON:     And I want to follow
16     up on that.  Do you believe that all police work is
17     equal or are you talking about this specific case?
18              THE WITNESS:     No.  I'm saying that
19     the way I respond, I respond to all of my assignments
20     with care, so I usually take as much care as possible
21     from one assignment to the next.  I have to put myself
22     in the position.  I have four children.  Is this the way
23     I would want my children to be handled if a police
24     officer had to respond to one of their homes?  So I
25     always -- I have a large family and I want it to be
```

```
 1        taken care of -- I want people to be taken care of,

 2        so I do my job in the same way.

 3                   MS. WILSON:          "Care" is a wonderful

 4        word.  "Equal" is a little bit --  Homicide is not equal

 5        with a robbery.

 6                   THE WITNESS:         The crime is not

 7        equal, but police work is.

 8                   MS. WILSON:          I got you.

 9                   MS. MC KENZIE:       You earlier testified

10        not knowing what you were diagnosed with.  What were the

11        nature of your injuries?

12                   THE WITNESS:         I had been diagnosed

13        with a severe concussion.  Generally, concussions are

14        gone within ten days, but I was still -- I am still

15        suffering from a concussion today.  Part of the con-

16        cussion is the headaches that I still have.  I have a

17        lot of instability where a person who is not under the

18        influence of alcohol or drugs -- I am not an alcohol or

19        drug user, but a person who is not under the influence

20        or alcohol or drugs can maintain their stability, walk

21        a straight line, stand on one foot without wobbling,

22        you know, doing different things.  I couldn't do any of

23        that and it really makes you feel stupid when something

24        like that happens because you are supposed to be the

25        strong person.  I had traumatic carpal tunnel in my left
```

```
 1      wrist, low back pain, neck pain and upper back pain.

 2                   MS. MC KENZIE:      Are you currently

 3      working?

 4                   THE WITNESS:      I am working on

 5      limited duty status.

 6                   MS. MC KENZIE:      So you are still an

 7      employee of MPD?

 8                   THE WITNESS:      Yes.

 9                   MR. KONRAD:         When you responded to

10      2765 North 52nd Street, which was the location where the

11      gun was to be recovered, did you report your location to

12      the dispatch?

13                   THE WITNESS:      I don't recall.

14      Sometimes, detectives, and probably officers as well,

15      will leave the building, maybe knock on a door and if

16      you get a response or something, you may go over the air

17      at that point.  Sometimes we are in a hurry and I know

18      we probably shouldn't be, but I don't recall thinking

19      that maybe I probably didn't, but had I gotten inside

20      the house, I would definitely have notified the dis-

21      patcher that put me out with a follow-up at that point.

22                   MR. KONRAD:         If you don't notify

23      the dispatcher before you get out of your squad and go

24      to the house, something happens, they have no way of

25      knowing where you are.  Isn't that right?
```

```
 1                    THE WITNESS:      I would assume that
 2        they are able to pinpoint our location through the cars,
 3        but I know that is not what actually --  I am not sure.
 4        I don't know if I would have gone out at that time with
 5        my location.
 6                    MR. KONRAD:       Thank you.
 7                    THE WITNESS:      You are welcome.
 8                    MR. MC GAVER:     A few questions on
 9        redirect.
10                    MR. KONRAD:       Go ahead.
11                    MR. MC GAVER:     Thank you.
12        REDIRECT EXAMINATION BY MR. MC GAVER:
13   Q    Was Shannon Lewandowski present for the conversation
14        that you had, you think, with Lieutenant Hanley at Saint
15        Joseph's Hospital?
16   A    No, I don't believe so.
17   Q    Was she present for the conversation that you had at
18        District 3 with an unknown supervisor?
19   A    I believe she was sitting at her desk.  I am not sure.
20   Q    Did the supervisor order Lewandowski to participate in
21        the investigation?
22   A    No.  She volunteered.
23   Q    Did she do that from time to time?
24   A    All the time.
25   Q    Before or during your squad ride on January 19, 2015
```

1      with Shannon Lewandowski, was there any talk of going to

2      the UWM area?

3  A   No.

4                  MR. MC GAVER:       Thank you.  Nothing

5      further.

6                  MS. WILSON:        I have a question.

7      There was no conversation about UWM.  Was there a con-

8      versation about where you were going when you got in the

9      car and left?  Did she say, "let's go to a ball game"?

10     I mean, did you know where you were going?

11                 THE WITNESS:        I believe I knew that

12     we were probably going to go to District 5 first.  If I

13     didn't know that, I was hoping that because I had just

14     gone to knock on the door at the victim's residence and

15     didn't get an answer, so I was trying to let a little

16     time lapse.  I am sure that would have been the case.

17     But I don't remember if we had a conversation that we

18     were definitely going to District 5 first.

19                 MR. KONRAD:        No further questions

20     or examinations, thank you for testifying.

21                 MR. MC GAVER:      May the witness be

22     excused?

23                 MR. KONRAD:        Yes.

24     (Witness excused)

25                 MR. MC GAVER:      I call Jordan

```
 1      Lewandowski to the stand.
 2                      JORDAN LEWANDOWSKI, having been first
 3      duly sworn on oath to tell the truth, the whole truth,
 4      and nothing but the truth testified as follows:
 5                      MR. KONRAD:        You are now sworn.
 6      DIRECT EXAMINATION BY MR. MC GAVER:
 7   Q  State your name and spell your last name for the record.
 8   A  Jordan Lewandowski.  L-e-w-a-n-d-o-w-s-k-i.
 9   Q  Shannon Lewandowski is your mother.  Correct?
10   A  Yes.
11   Q  You also have another brother?
12   A  Yes.
13   Q  What is his name?
14   A  Kasey Lewandowski.
15   Q  Where does he live?
16   A  San Diego, California.
17   Q  Was he involved in any of -- anything surrounding the
18      accident occurring January 19, 2015?  Was he involved?
19   A  No.
20   Q  How old were you on January 19, 2015?
21   A  I was 19.
22   Q  How old are you now?
23   A  22.
24   Q  At any point, did you encounter a squad car?
25   A  Yes, I did.
```

```
 1   Q   Tell me how that happened.

 2   A   I was moving -- at the time, I was moving my car from

 3       the middle -- by a friend's driveway.

 4   Q   Why were you doing that?

 5   A   Because I would have got a parking ticket because my

 6       bumper was out on the sidewalk, so I was going to move

 7       it from one side of the street to the other.

 8   Q   Tell me about how it came to be that you encountered the

 9       squad car.

10   A   I was out with a few friends and I came back to the

11       house.  We were drinking water.  I told my friend

12       Michael that I was moving my car from one side of the

13       street to the other so I didn't get a ticket.  So I

14       proceeded to move my car out of the driveway and since

15       the street is narrow on Maryland, I put my emergencies

16       on because there were three cars coming from my direc-

17       tion, so I let the two cars -- one car passed, another

18       car passed and a third car was sitting behind me and I

19       was waiting for it to go and, then, that is when I found

20       out it was a squad car with lights on and I assumed that

21       I was going to be pulled over.

22   Q   Have you been pulled over in the past?

23   A   Yes.

24   Q   Approximately how many times?

25   A   Approximately four.
```

```
 1   Q   Do you have a policy or procedure that you follow when
 2       you are pulled over by a squad that might be different
 3       from someone else?
 4   A   One thing I always do is I follow their directions to
 5       comply.  I give them my ID and I give them my mother's
 6       business card.
 7   Q   Who told you to give the officer your mother's business
 8       card?
 9   A   My mother.
10   Q   Do you know why she wants you to give officers her
11       business card?
12   A   One thing that my mom told me when I first got my
13       driver's license was that when I am pulled over, being a
14       black male, that one of the most dangerous, one of the
15       most confusing or complicated issues with being pulled
16       over is that -- it is a complicated deal and the reason
17       why she told me to do that was to let the officers know
18       that I know my rights, and that is pretty much the
19       reason why.
20   Q   Do you have a practice of making any phone calls when
21       you are pulled over by the police?
22   A   I call my mom every time to tell her that I am getting
23       pulled over.
24   Q   Have you ever asked your mother to report to the scene
25       where you were pulled over by a police officer?
```

```
1   A   Never.

2   Q   Has she ever asked you to come to the scene where you

3       are being pulled over by a police officer?

4   A   Never.

5   Q   Has she ever shown up?

6   A   Never.

7   Q   Did she -- did you ask her to come to the scene of

8       3616 North Maryland on January 19, 2015?

9   A   No.

10  Q   Did she tell you she was coming there?

11  A   No.

12  Q   Did you ever tell --  Do you know who Sergeant Cody

13      Smith is?

14  A   I believe he was the man who pulled me over initially.

15  Q   Did you tell Sergeant Smith that your mom was on her way

16      there?

17  A   No.

18  Q   Walk me through what happened with Sergeant Smith.  He

19      approaches the car.  What did he say to you?

20  A   The first question was, "why are you making all this

21      noise outside?"  I say, "I don't know what you are

22      talking about."  He, then, proceeds to ask me if this is

23      my vehicle or not and what I was doing in that area and

24      I told him that I have no idea what he is talking about,

25      I just was just moving my car from one side of the
```

```
 1        street to the other and he then asked me for my driver's
 2        license and that is when I gave him my driver's license
 3        and my mom's business card and he went back to the car
 4        and he came back and asked me if I was able -- he asked
 5        me to step out of the car, so I turned my -- I don't
 6        remember if the car was on, but I got out of the car
 7        and, then, he asked me to step out of the car, so I
 8        stepped out of the car and he then asked me to do a
 9        series of sobriety tests, but before he did that, he
10        searched me and took my wallet and my phone away from me
11        as well as my keys.
12   Q    He ran you through some field sobriety tests.  Did he
13        conduct any other tests?
14   A    Not to my knowledge.
15   Q    Did he have you blow into a preliminary breath machine?
16   A    Yes, he did.
17   Q    Do you know what you blew?
18   A    I believe a .08.
19   Q    What were you doing at 3616 North Maryland to begin
20        with?
21   A    I was just with two of my friends -- four of my friends,
22        rather, and we were talking and there were two young
23        ladies who were leaving and so I walked them outside
24        and they got in their car and they left.
25   Q    So does somebody you know live at that address?
```

```
 1   A    Yes.

 2   Q    At what point during the interaction with the officer

 3        did you call your mother?

 4   A    Initially.  I called her once I saw that the lights were

 5        on.

 6   Q    Was this before the officer took your phone away?

 7   A    Yes.

 8   Q    What did you say to your mom?

 9   A    I told her, "hey, I am pulled over at a traffic stop.

10        I will call you when I am done."

11   Q    What did she say to you?

12   A    "Okay."

13   Q    Was there anything more to the conversation?

14   A    No.

15   Q    Did your mother ask you where you were?

16   A    No.

17   Q    Did you know where you were?

18   A    No.

19             MS. WILSON:         I didn't hear you.

20             THE WITNESS:        No.

21   Q    What do you mean, "no"?  Did you think you were in

22        Detroit or --

23   A    I knew I was in Milwaukee, Wisconsin.  I didn't know

24        what house I was at or my exact location.

25   Q    Because you probably had a couple of cocktails?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                        sueT@wi.rr.com

```
 1  A    Not just that.  It is just I didn't -- I am not aware

 2       of what house numbers, what -- where I was.

 3  Q    At any point in time, did a second officer arrive at the

 4       scene?

 5  A    I don't know if there was a -- I don't remember if there

 6       was a second squad or if there was a partner or not.

 7  Q    Did you have any interaction with the second officer?

 8  A    Not that I recall.

 9  Q    At any point in time when the officer who you were

10       speaking with had your phone, did it ring?

11  A    Yes.

12  Q    Tell me about what happened.

13  A    I don't remember exactly why he had my phone, but he

14       answered it and I got -- I didn't know who was on the

15       other line, but he said a series of yeses, okays, and,

16       then, immediately, he gave me my phone back, my wallet,

17       my keys and told me, "your mom is in a neck brace" or

18       something, and he left the scene.

19  Q    Did any Shorewood police officers remain on the scene?

20  A    No.

21  Q    What did you do after everybody left?

22  A    I panicked.  I went back inside and was trying to find

23       out who I could call to see what was going on, seeing

24       why my mother was in a neck brace.

25  Q    Did you try and call your mom's phone?
```

```
 1   A     Yes.

 2   Q     Multiple times?

 3   A     Yes.

 4   Q     Did you finally get ahold of someone?

 5   A     Yes.

 6   Q     Who?

 7   A     I believe Officer Deb Stacey.

 8   Q     You called her or she called you?

 9   A     I believe she called me.

10   Q     What did she say to you?

11   A     She asked me what my location was and I asked the house

12         owner where we were and, then, I repeated what he said

13         to me to Deb Stacey.

14   Q     Is Officer Stacey is a Milwaukee police officer?

15   A     Yes.

16   Q     What is the next thing you remember happening?

17   A     I remember panicking and asking -- very confused and I

18         remember going outside and not seeing a cop car pick me

19         up yet, or a police car, and I went back inside and I

20         went back outside again and at that time, Deb Stacey

21         arrived with another officer.  I don't remember his

22         name, but she took me -- they took me to where my mother

23         was and I remember asking if my mom was alive or not and

24         I remember seeing on the police screen that it said --

25         I believe it was a police screen that that Lewandowski
```

| | | |
|---|---|---|
| 1 | | was -- it said "deceased" on there and at that time, at |
| 2 | | that point, I began to panic even more. |
| 3 | Q | Had you met Officer Stacey prior to that interaction? |
| 4 | A | I believe an interaction where my mom and -- I run into |
| 5 | | police officers all the time, so she was a familiar |
| 6 | | person. |
| 7 | Q | Did Officer Stacey take you anywhere? |
| 8 | A | Other than to the hospital located around -- |
| 9 | Q | What hospital? |
| 10 | A | I believe it was Children's Hospital on Bluemound and |
| 11 | | Wauwatosa. |
| 12 | Q | Froedtert? |
| 13 | A | Froedtert, yes. |
| 14 | Q | Any other family members report to the hospital? |
| 15 | A | There was my -- Denise Rogers, who is part of our |
| 16 | | family, and Jondalyn Rogers, I believe, their last name |
| 17 | | is. |
| 18 | Q | What is the Rogers women's relationship to you? |
| 19 | A | My grandmother and my cousin. |
| 20 | Q | Once you arrived at the hospital, where did you go? |
| 21 | A | Immediately to my mother's room. |
| 22 | Q | Is there any point that you left the company of your |
| 23 | | mother once you got to the hospital that night -- I |
| 24 | | should say that morning? |
| 25 | A | I believe I left to go -- I knew my mother -- there was |

```
 1          a lieutenant or a sergeant in the hospital, so I went to
 2          go look for them.  I needed to find out more information
 3          from talking to my mother, too.
 4     Q    Do you know the person's name that you were looking for?
 5     A    At the time, I did, because somebody informed me who the
 6          sergeant was, or lieutenant, but at the time, I knew.
 7          Not right now, I don't.
 8     Q    Do you know who Lieutenant Sean Hanley is?
 9     A    Yes.
10     Q    Who is he?
11     A    He is a boss of my mother's, a lieutenant, someone my
12          mother reports to.
13     Q    Did you see Lieutenant Hanley at the hospital at all?
14     A    I don't remember.
15     Q    Did Lieutenant Hanley -- do you remember seeing
16          Lieutenant Hanley speak with your mother at the
17          hospital?
18     A    No.
19     Q    Is there any possibility that Lieutenant Hanley spent
20          20 or 30 minutes with your mother at the hospital?
21     A    There is a possibility.
22     Q    When could that have happened?
23     A    Either before I was in the room or -- I don't remember
24          the particulars about the hospital or where we were at,
25          but he could have been in the room.  I remember going
```

```
 1          to look for him, though, because I knew he would have

 2          known -- whoever her sergeant or lieutenant was, they

 3          would have known.

 4    Q     Did you see Lieutenant Hanley speak with your mother at

 5          the hospital?

 6    A     Yes.

 7    Q     You did.

 8    A     I believe so.  I think once we got up to leave out

 9          the -- my mother was being discharged, I saw him.

10    Q     What did he say?

11    A     I don't remember.

12    Q     Do you remember what your mom said to him?

13    A     No.

14                    MR. MC GAVER:      Nothing further.

15                    MR. KONRAD:        Commissioners, any

16          questions?  We will take a ten-minute break.

17          (Discussion off the record)

18                    MR. KONRAD:        Mr. McGaver, are

19          you --

20                    MR. MC GAVER:      I was finished.

21                    MR. KONRAD:        You were finished

22          with your direct.

23                    Do you have any cross?

24                    MR. PEDERSON:      Very briefly, just a

25          few points.
```

```
 1                    MR. KONRAD:          The witness remains
 2     under oath.  Conduct your cross.
 3                    MR. PEDERSON:        Thank you, Mr.
 4     Konrad.
 5     CROSS-EXAMINATION BY MR. PEDERSON:
 6     Q   Mr. Lewandowski, I have a few questions for you.
 7         On your testimony, if I recall correctly, you said that
 8         you had put your ID and your mom's business card to-
 9         gether and handed that to Sergeant Smith.  Is that
10         right?
11     A   Yes.
12     Q   That occurred on the first interaction with him.  Right?
13     A   Yes.
14     Q   Did you say anything to him in conjunction with that?
15     A   No.
16     Q   So you didn't mention to him that your mom is a detec-
17         tive for the police department, anything like that?
18     A   I don't recall.  I assume that the business card that
19         says Milwaukee Police Department would speak for itself.
20         I don't recall saying my mom is a police officer.  I
21         don't recall saying that.
22     Q   He took it from you.  Right?
23     A   Yes.
24     Q   Did he look at it right there?  Did you see him look at
25         it or anything like that?
```

```
 1   A    Not that I recall.

 2   Q    Did he ever ask you about the card, "why did you give me

 3        this card?"  "What does this card have to do anything?"

 4        Did he ever ask any questions like that?

 5   A    Not that I recall.

 6   Q    So you are saying that at no point, neither you nor

 7        Sergeant Smith had any discussion whatsoever about your

 8        mom and the business card and why you handed it to him.

 9   A    I don't remember specifically an interaction.

10   Q    What was the name on your driver's license?  How does

11        your name appear on your driver's license?

12   A    Jordan Lewandowski.

13   Q    How did your mom's name appear on her business card?

14   A    Shannon Lewandowski.

15   Q    Are you testifying today that it was your belief that

16        just based from that, the sergeant was supposed to

17        assume that Shannon Lewandowski was your mom and that

18        was --  Let's start there.  Was that your assumption?

19   A    Yes.

20   Q    What did you expect him to conclude based on that fact?

21   A    I wasn't assuming that he would conclude anything, but

22        again, what I said before was the reason why I do that;

23        because I want them to know that I know my rights as a

24        citizen and that I respect police.

25   Q    He returned to his vehicle and, then, he came back and
```

```
 1        asked you to step out.  Right?

 2    A   Yes.

 3    Q   How long was he gone?

 4    A   Approximately five minutes.

 5    Q   When did he get your phone?

 6    A   After he asked me to step out of the vehicle and he

 7        searched me.

 8    Q   You performed a number of field sobriety tests.  Right?

 9    A   Yes, but I also wasn't sure why.  I was never told why I

10        was being pulled over except for the interaction that --

11        What was said before me stepping out of the car was what

12        was the noise that I was making or why was I being so

13        loud, what was the noise, and I responded in saying,

14        "I have no idea what you are talking about."  So to this

15        day, I don't know why I was pulled over.  I read the

16        reports that supposedly, it was a nuisance and that I

17        got caught leaving from the scene, but at the same time,

18        there was also two cars behind me, so I don't know why I

19        was pinpointed out of the three cars on that street and

20        even the two cars that were in front of the police

21        officers that were behind me.

22    Q   My question for you was, did you perform field sobriety

23        tests?

24    A   Yes.

25    Q   Had you been drinking that evening?
```

```
1    A    Yes.

2    Q    And did you fail the field sobriety tests?

3    A    I passed them.

4    Q    How do you know that?

5    A    The other officer that was not Smith -- I forgot his

6         name -- he said that, "I think he passed them", and at

7         that point, that is where Officer Smith gave me the

8         Breathalyzer.

9    Q    Did he ask you to do that, consent to a Breathalyzer?

10   A    Yes, I believe so.

11   Q    It is an important point.  Did he tell you, "you are?

12        Taking this PBT", or did he tell you, "do you consent to

13        a breath test?"

14   A    From what I recall, he said, "are you familiar with what

15        this is.," and I said, "yes, it is a Breathalyzer", and

16        I don't recall if he said, "do you consent to taking

17        this or do you not", or not even saying it.  All I

18        remember is that I did take the test.

19   Q    Do you believe you were in good condition to drive that

20        evening?

21   A    Yes, but I wasn't planning on driving.

22   Q    You were going to move your car.  Right?

23   A    Yes.

24   Q    That is driving, isn't it?

25   A    Yes.
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 514 of 805   Document 80-21

| | | |
|---|---|---|
| 1 | Q | Okay. You said you blew a .08, from your recollection. |
| 2 | A | Yes. |
| 3 | Q | At some point, the phone rings and the sergeant hands |
| 4 | | you back your phone. I want to get a better under- |
| 5 | | standing. What does he tell you at that time? |
| 6 | A | The phone rings, he answers it and he says a series of |
| 7 | | yeses and okays and gives me back my phone and says, |
| 8 | | "your mother is in a neck brace", and I said -- I was |
| 9 | | confused -- "what do you mean?" He is, like, "I don't |
| 10 | | know, but your mother is in a neck brace," gave me my |
| 11 | | phone, my keys and wallet and left the scene. |
| 12 | Q | What did the other officer do? |
| 13 | A | Got in the car as well. |
| 14 | Q | His own car? |
| 15 | A | I don't remember if it was his own or if it was -- |
| 16 | | or if he was in the same car. |
| 17 | Q | Did the sergeant tell you that MPD is on their way or |
| 18 | | did you talk to someone on the phone yourself? |
| 19 | A | No. I was left unattended and with zero knowledge of |
| 20 | | anything else that happened. |
| 21 | Q | So are you saying that Sergeant Smith had somebody on |
| 22 | | the phone, he took all that information and, then, he |
| 23 | | hung up and gave you your phone back? |
| 24 | A | Yes. |
| 25 | Q | So you never had an opportunity to talk to anybody? |

```
 1   A    No.

 2   Q    At the time that the sergeant left, all you knew is

 3        something happened to your mom and that is it, period.

 4   A    Yes.

 5   Q    Did the sergeant tell you why he was leaving?

 6   A    No.

 7   Q    How long until a police officer showed up after the

 8        sergeant left?

 9   A    Approximately ten minutes, 15 minutes.

10   Q    And you testified that they took you to Froedtert.

11        Right?

12   A    Yes.

13   Q    There was some concern on your part, because you didn't

14        know what state your mother was in, but at some point,

15        you had contact with her.

16   A    Yes.

17   Q    You spoke with her?

18   A    Yes.

19   Q    How was she at that time?

20   A    She was not making sense, but the -- the first things we

21        were saying -- she was saying to me is, "I'm okay, I'm

22        okay."   She was -- her words weren't making sense.   She

23        was slurring.   I could tell she had a head injury from

24        the way she was speaking.

25   Q    Did you observe any injuries on her?
```

```
 1    A    I saw her ankle.  I forgot what ankle it was.  One of
 2         them was very bruised.
 3    Q    Any other injuries you observed on her?
 4    A    No, not that I recollect.
 5    Q    How about just looking at her?  You've indicated that
 6         she was talking in a way that made you concerned, but
 7         how about just looking at her?  Did she look like she
 8         was dazed and confused?  How was she composed in her
 9         appearance?
10    A    I would say she looked tired as if she just woke up or a
11         very confused manner.
12                   MR. PEDERSON:        That is all I
13         have.
14                   MR. MC GAVER:        Follow-up.
15         REDIRECT EXAMINATION BY MR. MC GAVER:
16    Q    By giving your mom's business card to then-Officer
17         Smith, were you expecting any special favors or con-
18         sideration from him?
19    A    No.
20    Q    With the benefit hindsight --
21                   MR. KONRAD:        Do commissioners have
22         any questions based on that examination?
23                   MS. MC KENZIE:     No.
24                   MR. KONRAD:        Go ahead.
25         BY MR. MC GAVER:
```

```
 1   Q    With the benefit of hindsight, you were 21 at the time.

 2        You know now you shouldn't have been driving.  Right?

 3   A    Absolutely.

 4   Q    In your interaction and conversation with your mother

 5        at the hospital, did you tell her where you were or what

 6        happened with the traffic stop?

 7   A    No.  I didn't, I don't believe so.  The first things

 8        that were said was -- was me asking if she was okay and

 9        just us having conversation saying, "everything is going

10        to be okay."

11   Q    Did you ever tell her where you were and what happened

12        with the traffic stop?

13   A    Not until -- I don't recall saying anything at the

14        hospital.  I don't recall.

15                    MR. MC GAVER:        Nothing further.

16                    MR. KONRAD:          Anything further?

17                    MR. PEDERSON:        I have one question.

18                    If you don't mind me using your phone

19        records.

20                    MR. MC GAVER:        Please.

21        RECROSS-EXAMINATION BY MR. PEDERSON:

22   Q    You previously testified that you called your mom just

23        to let her know and you said, "I will let you know when

24        it is done", and she said, "okay", and that was it.

25        Right?
```

```
 1   A      Right.

 2   Q      If I were to represent to you that your mother's phone

 3          records which have been produced reflect this phone call

 4          occurring at 2:11 a.m. and it lasted for two minutes,

 5          isn't that a bit longer than what you were testifying

 6          the nature and content of that conversation is?

 7   A      That is the initial contact.

 8   Q      There was a phone call from you at 2:11 a.m. and the

 9          next one is after the accident has occurred, according

10          to other records.  This is the only phone call.  The

11          only one prior from you is about 10:00 time.  So at

12          2:11, you have a phone call.  According to the records,

13          it is two minutes.  So how do you account for the fact

14          that the records say it was a two-minute conversation

15          and you are saying it was a 15-second conversation?

16                     MR. MC GAVER:      I will object.  That

17          is not his testimony.  He didn't say, at least from my

18          recollection, he didn't say the conversation lasted 15

19          seconds.

20                     MR. KONRAD:        First of all, do I

21          have a stipulation that the phone record indicates a

22          phone call at 2:11 that lasted two minutes?

23                     MR. MC GAVER:      Sure.

24                     MR. KONRAD:        Do you want to

25          rephrase it?
```

```
 1        BY MR. PEDERSON:

 2   Q    I am submitting to you, Mr. Lewandowski, that that is

 3        not a two-minute conversation that you testified to,

 4        so is there any way you can account for a longer conver-

 5        sation, if this record is accurate?

 6   A    I cannot account for it.

 7                  MR. PEDERSON:        Thank you.  That is

 8        all I have.

 9                  MR. MC GAVER:        Nothing further.

10                  MR. KONRAD:          The witness is

11        excused.

12        (Witness excused)

13                  MR. MC GAVER:        I call Officer Debora

14        Stacey.

15                  DEBORA STACEY, having been first duly

16        sworn on oath to tell the truth, the whole truth, and

17        nothing but the truth testified as follows:

18        DIRECT EXAMINATION BY MR. MC GAVER:

19   Q    How are you employed?

20   A    Milwaukee Police Department.

21   Q    Were you employed at the Milwaukee Police Department on

22        January 19, 2015?

23   A    Yes.

24   Q    What was your rank?

25   A    Police officer.
```

```
 1   Q    Where were you stationed?

 2   A    District 3.

 3   Q    What shift?

 4   A    Late power shift.

 5   Q    Did you happen to report to an accident at approximately

 6        2:17 a.m. on January 19, 2015?

 7   A    Yes.

 8   Q    How did you find out about the accident?

 9   A    We heard it broadcast over the radio.

10   Q    How did you decide to report -- why did you decide to

11        report?

12   A    When the accident came over and said there was possibly

13        two officers that were dead.

14   Q    Were you working with anyone on that night?

15   A    Yes.

16   Q    Who?

17   A    William Krumnow.

18   Q    Was Officer Krumnow with you in the squad responding to

19        the accident?

20   A    Yes.

21   Q    Do you know when you arrived on scene?

22   A    I don't recall.

23   Q    Do you know whether there were any emergency responders

24        who beat you to the scene?

25   A    Yes, there were a handful of other people that were
```

```
1          there.

2    Q     Who else was there before you, if you remember?

3    A     It was pretty chaotic.  I remember running to her and

4          her partner.

5    Q     Who is "her"?

6    A     Shannon Lewandowski and Juanita Carr.  And I remember

7          MFP was there --

8                    MS. MC KENZIE:     The fire depart-

9          ment -- Milwaukee Fire Department.  Sorry.

10   A     I don't remember which squads were there.

11   Q     When you reported to the scene, do you remember whether

12         or not the emergency lights on the squad car involved in

13         the accident were activated?

14   A     On ours or hers?

15   Q     On Shannon Lewandowski's?

16   A     I don't remember.

17   Q     Do you remember whether the squad car siren that Shannon

18         Lewandowski was driving was activated?

19   A     I don't remember that, either.

20   Q     At some point in time, did you have contact with Shannon

21         Lewandowski?

22   A     Yes.

23   Q     How did she strike you?

24   A     She made absolutely no sense.

25   Q     What do you mean by that?
```

| | | |
|---|---|---|
| 1 | A | Everything she was saying she was like she had a head |
| 2 | | injury. It was very apparent that she was slurring her |
| 3 | | words and yelling and was very upset and hurt. |
| 4 | Q | Had you ever met Shannon Lewandowski prior to this |
| 5 | | encounter? |
| 6 | A | Yes. |
| 7 | Q | How would you characterize your relationship with |
| 8 | | Shannon Lewandowski? |
| 9 | A | We are friends. |
| 10 | Q | Do you know her son? |
| 11 | A | I don't know him well, but I have met him. |
| 12 | Q | Would you know by sight? |
| 13 | A | Yes, through pictures. |
| 14 | Q | When you were interacting with Lewandowski in the early |
| 15 | | morning hours of January 19, did she mention her son? |
| 16 | A | Yes. |
| 17 | Q | What did she say about him? |
| 18 | A | She kept yelling at me to go get her son. |
| 19 | Q | What did that cause you to do? |
| 20 | A | I wanted to get her son because I would do that for |
| 21 | | anybody that was in an accident on the job. |
| 22 | Q | How did you come to go get her son? First of all, how |
| 23 | | did you know where he was? |
| 24 | A | I didn't. I can't remember how I got to finally figure |
| 25 | | out where he was, but I knew the general area. Somehow, |

```
 1        somebody told us he was over by UWM.
 2   Q    Did you notice Lewandowski speaking to any other
 3        officers on scene?
 4   A    I believe she was speaking with Officer Joseph Goggins
 5        and is the only officer that I remember.  We were only
 6        on scene for a real short period of time.
 7   Q    And then you and your partner went to look for Jordan
 8        Lewandowski?
 9   A    Yes.
10   Q    How long did it take before you tracked him down?
11   A    It seemed like it took forever at the time, but it was
12        probably ten, 15 minutes maybe.  I am not really sure of
13        the time frame.
14   Q    Did you ever utilize Shannon's phone while you were on
15        the scene?
16   A    Not that I recall.
17   Q    Do you know who did?
18   A    No.
19   Q    If anyone?
20   A    No.
21   Q    Where did you ultimately track Jordan Lewandowski down?
22   A    A couple blocks away.  I couldn't remember the address.
23        Somewhere in the vicinity of, like, the college, but it
24        wasn't on the college campus.  It was at a house, like,
25        a couple blocks away.
```

```
 1   Q   Do you remember what municipality it was in?

 2   A   Maybe Shorewood.  I am not sure.  I don't know my way

 3       around that side of town at all.

 4   Q   When you encountered Jordan Lewandowski, was he with

 5       anyone?

 6   A   No, he was by himself.

 7   Q   No officers from other departments on the scene?

 8   A   No.

 9   Q   What did you say to Jordan when you first encountered

10       him?

11   A   I told him that we were taking him to the hospital

12       because his mom was in an accident.

13   Q   What did he say in response?

14   A   That he was worried about her and scared and upset and

15       he wanted to know what her injuries were and at the

16       time, we didn't know.

17   Q   Approximately how long did it take to arrive at the

18       hospital?

19   A   From there, to Froedtert, maybe 15, 20 minutes.

20   Q   When the squad car --  Who was driving?

21   A   My partner, Officer Krumnow was driving.

22   Q   When the squad driven by Officer Krumnow arrived at

23       Froedtert and he got into the hospital, did you

24       personally see Detective Lewandowski?

25   A   I saw her and her partner.
```

```
1   Q    Did you talk to her?

2   A    Yes.

3   Q    What did you say to her?

4   A    I was asking if she was okay, what her injuries are.

5        That is about it.

6   Q    How did she respond?

7   A    She wasn't making sense.

8   Q    How so?

9   A    Slurring words and she wasn't her normal self.

10  Q    Do you know who Lieutenant Sean Hanley is?

11  A    Yes.

12  Q    Did you see him at the hospital?

13  A    I don't remember seeing him.  He may have been there.

14       I don't remember.

15  Q    Did you see Lieutenant Hanley interact with Shannon

16       Lewandowski at the hospital?

17  A    Not that I remember.

18                   MR. MC GAVER:      Nothing further.

19       Thank you.

20                   MR. KONRAD:      Commissioners, any

21       questions?

22                   MS. WILSON:      Yes, I have.

23                   Where was Jordan when you were --

24       Was he in the house?  Outdoors?  On the corner?

25                   THE WITNESS:      He was standing in
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 526 of 805   Document 80-21

```
 1        front of a house on the sidewalk.
 2                    MS. WILSON:        On the sidewalk.
 3                    THE WITNESS:       Yes.
 4                    MS. WILSON:        Somebody else might
 5        have said it, but I know you had said there was --
 6        and you might not have used these word quite clearly,
 7        but she had "a head injury".  Are you familiar with
 8        panic attacks?
 9                    THE WITNESS:       Yes.
10                    MS. WILSON:        I have them and I
11        start mumbling.  Everybody, kind of, throws the phrase
12        "head injuries" around.  Did she tell you she was
13        diagnosed with a head injury?
14                    THE WITNESS:       At the scene, the
15        fire department was yelling at me to get her son.  I
16        think somebody at the scene said she was knocked out
17        unconscious, so that is where I got that information
18        from.  I guess I put that together as to why she wasn't
19        making sense.
20                    MR. KONRAD:        Did you ever get
21        Jordan Lewandowski's phone number?
22                    THE WITNESS:       No.  I tried to
23        contact him on Facebook because I looked for him under
24        his name.  I don't remember speaking with him until we
25        got on scene, but it's been such a long period of time.
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                          222
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 527 of 805  Document 80-21

```
 1                    MR. KONRAD:        I am curious how you
 2        found each other.
 3                    THE WITNESS:       I was talking to
 4        officers at the scene.  I believe that is how we found
 5        him.  Like, somebody initially gave us the area that he
 6        was in and we were, kind of, driving around from block
 7        to block because the hall that somebody said he was at,
 8        he wasn't at.  I think somebody at the scene may have
 9        given me his location.  I honestly don't remember.  I
10        also was in a squad accident and had a head injury, so
11        my memory is not the best.
12        CROSS-EXAMINATION BY MR. PEDERSON:
13    Q   You indicated you are friends with Shannon Lewandowski?
14    A   Yes.
15    Q   Would you characterize yourself as close friends?
16    A   Yes, I would say so.
17    Q   In fact, you went and visited Shannon Lewandowski the
18        next day after this occurred, didn't you?
19    A   Yes.
20    Q   That was a personal visit?
21    A   Yes.
22                    MR. PEDERSON:      Nothing further.
23                    MR. KONRAD:        Commissioners?
24                    MS. MC KENZIE:     When you saw her in
25        the hospital and you were talking with her and said that
```

```
 1    she wasn't herself, did she mention anything about,

 2    "where is my son" or anything like that?

 3                    THE WITNESS:        That is when we met

 4    up.  We were all together.  I walked her son Jordan in.

 5                    MS. MC KENZIE:      Thank you.

 6                    MR. KONRAD:         You are excused.

 7    (Witness excused)

 8                    MR. MC GAVER:       Call Officer Jesse

 9    Vollrath.

10                    JESSE VOLLRATH, having been first duly

11    sworn on oath to tell the truth, the whole truth, and

12    nothing but the truth testified as follows:

13                    MR. KONRAD:         The witness is sworn.

14    DIRECT EXAMINATION BY MR. MC GAVER:

15    Q    Officer Vollrath, how were you employed on January 19,

16         2015?

17    A    Milwaukee Police Department.

18    Q    Are you still City of Milwaukee police officer?

19    A    Yes.

20    Q    How long have you been so employed?

21    A    December of 2006 was my appointment date.

22    Q    A little less than ten years?

23    A    Yes.

24    Q    Where were you assigned on January 19 of 15?

25    A    District 3, late shift.
```

```
 1   Q    What hours would those be?

 2   A    Midnight to 8:00 in the morning.

 3   Q    Did you have a partner?

 4   A    I believe so.  I have to look at my assignment to see

 5        who my partner was.

 6   Q    What station were you at?   You said but I missed it.

 7   A    District 3.

 8   Q    Thank you.  Did you have occasion to respond to an

 9        accident at approximately 2:17 on January 19 of 2015?

10   A    I believe so, yes.

11   Q    How did you learn about the accident?

12   A    Through dispatch.

13   Q    How is it that you came together to the accident scene?

14   A    How I arrived?

15   Q    How did you decide to go there?

16   A    Red lights and siren.

17   Q    On your own or did somebody order you there?

18   A    I went on my own.

19   Q    What did you see when you got there?

20   A    A Detective Carr was smashed and there was another

21        occupied vehicle at the corner of 35th and North Avenue.

22   Q    When you arrived, were there other emergency responders

23        there?

24   A    Yes.

25   Q    Do you remember who?  Did you see anyone that you knew?
```

```
 1    A    Shannon Lewandowski, her partner, Juanita Carr was

 2         still inside the squad car.  MFD personnel was there.

 3    Q    What was Shannon doing?

 4    A    She was sitting on the curb.

 5    Q    Did you have occasion to speak with Shannon Lewandowski?

 6    A    I did.

 7    Q    What did she say to you?

 8    A    She was screaming hysterically.  She was worried about

 9         her kids.  What I had to do, I tried to calm her down

10         the best I could.  It was January.  But I still put my

11         coat over her shoulders to keep her warm until we were

12         able to go in the MFD med unit.

13    Q    Did you notice anything unusual about Detective

14         Lewandowski's behavior?

15    A    Like I said, she was hysterical, as anybody would be

16         with almost, like, a head-on collision.

17    Q    Did you have occasion to speak to detective Carr?

18    A    No.

19    Q    Were you instructed to stay with Detective Lewandowski?

20    A    I was.

21    Q    Who instructed you to do so?

22    A    I believe Sergeant Wade Grubich was on scene.

23    Q    Did you follow those instructions?

24    A    I did.

25    Q    Shannon Lewandowski eventually left the scene.  How did
```

```
 1        she leave?

 2   A    I rode with her in the med unit to Froedtert.

 3   Q    And you rode with her?

 4   A    Yes.

 5   Q    From the time that you arrived on scene and interacted

 6        with Shannon Lewandowski, did she mention her son?

 7   A    Yes.  She was worried about both of her kids knowing

 8        that -- she wanted other officers to contact her kids to

 9        make sure that they weren't going crazy trying to kill

10        themselves to get to the hospital for her well-being.

11   Q    Did you hear any rumblings or any officers on scene say

12        anything about UWM or going to UWM?

13   A    I don't remember that at all.

14   Q    You didn't hear Shannon say that.  Correct?

15   A    No.

16   Q    Once you got to the hospital, where did they take

17        Shannon?

18   A    That is over a year and a half ago.  I believe they took

19        her right into an ER room.

20   Q    Where were you when they took Shannon into the ER room?

21   A    I was by her side.

22   Q    In the room?

23   A    Correct.

24   Q    At any point in time, did any family members enter

25        Shannon's emergency room?
```

```
1    A    I don't know what the time frame would be, but other

2         officers, like Officer Stacey, she brought her son.

3    Q    Any other family member show up?

4    A    I am not sure if her other son showed up or not.  I

5         can't recall that.

6    Q    Do you remember if any other officer besides Debora

7         Stacey and you walked into that emergency room group?

8    A    If I had to guess, probably three or four other ones

9         that were concerned about her well-being.

10   Q    Do you remember any names?

11   A    No.

12   Q    Do you know who Lieutenant Sean Hanley is?

13   A    Yes.

14   Q    Was he at the hospital?

15   A    I don't remember seeing him.  I recall seeing a

16        different lieutenant there.

17   Q    What lieutenant do you recall seeing?

18   A    Lieutenant Kelly.

19   Q    While you were with Shannon Lewandowski at the hospital,

20        did Lieutenant Hanley ever -- did you see Lieutenant

21        Hanley ever stop and talk to Shannon Lewandowski?

22   A    The only time I saw Lieutenant Hanley, I believe he was

23        at the scene of the accident, but I don't recall at the

24        hospital.

25   Q    From the point in time where you and Shannon Lewandowski
```

```
 1        arrived at the hospital to the point in time where she
 2        was discharged and left, did you ever leave her side?
 3   A    Yes.
 4   Q    How long were you away from her?
 5   A    They ran several tests on her, like, I believe, a CT
 6        scan on her head, you know, her ankle.  I know one of
 7        her ankels was either broke or very swollen.  When she
 8        was getting tests done, I went over by detective Carr's
 9        room to see how she was doing.
10   Q    How long do you think in total you were away from
11        Shannon Lewandowski in minutes?
12   A    I don't know.
13             MR. MC GAVER:       Nothing further.
14        Thank you.
15             MR. KONRAD:       Commissioners?
16             MS. MC KENZIE:      Do you and Detective
17        Lewandowski have a friendship?
18             THE WITNESS:       I have known Shannon
19        from work.  She came to a lot of our scenes -- crime
20        scenes.  I know her as a great detective.  She does a
21        very good job, always gets the job done well.
22             MS. MC KENZIE:      Would you
23        characterize her as a friend?
24             THE WITNESS:       An occasional friend
25        at work.
```

```
 1              MS. MC KENZIE:      In any way, do you do
 2      anything outside of work together?
 3              THE WITNESS:      No.
 4              MS. MC KENZIE:      When you spent that
 5      time with her in the hospital, it was because you were
 6      told to watch over her or you were just being, like, a
 7      work friend?
 8              THE WITNESS:      I would do that for
 9      my member of the police department that got in a severe
10      accident.
11              MR. KONRAD:      Mr. Pederson?
12              MR. PEDERSON:      Thank you, Mr.
13      Konrad.
14      CROSS-EXAMINATION BY MR. PEDERSON:
15  Q   Officer Vollrath, you provided some testimony about
16      UWM and whether you heard anything.  Do you recall that
17      testimony?
18  A   No.
19  Q   I will ask it again.  Do you recall any discussion of
20      Detective Lewandowski's son possibly being at UWM and
21      that is where she was headed?
22  A   I don't remember that at all.
23  Q   If I were to indicate to you that --  Strike that.  Do
24      you recall having an interview with Sergeant Adam
25      Zieger?
```

```
 1   A    I do.  I believe that was on my birthday last year.

 2   Q    Do you recall stating that you acknowledge that there

 3        was discussion that he -- that you heard among the

 4        officers relating the her going to meet her son, but you

 5        didn't personally hear any of those statements from

 6        Detective Lewandowski herself?

 7   A    I think what I was indicating at that interview is

 8        that I heard that her son was over by the UWM campus

 9        and Shannon probably asked for someone to go get her son

10        because that is where he was.

11                   MR. PEDERSON:      That is all I have.

12                   MR. KONRAD:        Just to clarify.  You

13        didn't hear any of these comments yourself.

14                   THE WITNESS:       Which comments?

15                   MR. KONRAD:        You said you had

16        heard -- other people had heard that Shannon Lewandowski

17        was concerned about or had some discussion of

18        retrieveing her son or, as you put it, simply to get

19        her son after the accident.  What comments did you,

20        yourself, hear her make at all concerning her son?

21                   THE WITNESS:       She was concerned

22        about one of us finding her son so he doesn't rush to

23        the hospital and try to get in an accident himself.

24                   MR. PEDERSON:      I am sorry to

25        interject, Mr. Konrad, but my question was much more
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 536 of 805   Document 80-21

```
1      pointed than that.  The summary report --

2                      MR. KONRAD:         There is a

3      contradiction.  Go ahead.

4                      MR. PEDERSON:       As long as the

5      contradiction is clear.  Very good. That is all I have.

6                      MR. KONRAD:         Anything further?

7                      MR. MC GAVER:       No.

8                      MR. KONRAD:         Thank you.  You are

9      excused.

10     (Witness excused)

11                     MR. MC GAVER:       Call Denise Brown.

12                     DENISE BROWN-ROGERS, having been first

13     duly sworn on oath to tell the truth, the whole truth,

14     and nothing but the truth testified as follows:

15                     MR. KONRAD:         The witness is sworn.

16                     Your name is Denise Brown-Rogers.

17                     THE WITNESS:        Yes.

18     DIRECT EXAMINATION BY MR. MC GAVER:

19     Q    Ms. Brown-Rogers, are you acquainted with Shannon

20          Lewandowski?

21     A    Yes.

22     Q    What is your relationship?

23     A    She is my daughter.

24     Q    Biological daughter?

25     A    We don't use that word in our family.  She is just my
```

```
  1       daughter.

  2   Q   How long has she --

  3   A   She is my baby.

  4   Q   You raised her?

  5   A   Yes, from the time she was 12 years old.

  6   Q   Do you recall reporting to the hospital on January 19

  7       of 2015?

  8   A   Yes, I do.

  9   Q   Approximately what time --  How did it come to be that

 10       you reported to the hospital on that date, at that time?

 11   A   My grandson called me.  They called me "Big Mama".  He

 12       said, "Big Mama, Mama has been in an accident."  I said,

 13       "where is she?"  He said, "at Froedtert."  So I hollered

 14       upstairs for my youngest daughter to come and take me

 15       out to Froedtert, because I was hysterical.

 16   Q   Which grandson called you?

 17   A   Jordan.

 18   Q   Do you remember approximately what time he called you?

 19   A   No, I don't.

 20   Q   Do you remember what time you got to the hospital?

 21   A   No, I don't.

 22   Q   Do you remember what hospital it was?

 23   A   Froedtert.

 24   Q   When you walked into --  Did you encounter Shannon

 25       Lewandowski when you got to Froedtert?
```

```
 1   A    The first officer that I saw --  I saw two officers
 2        standing on the side.  One of the officers was --
 3        I just know her name as Debby.  She testified just a few
 4        minutes ago.  And the other officer, I don't know who he
 5        was, but she walked me in and showed me where Shannon
 6        was and I was --
 7   Q    What did you see when you first encountered Shannon?
 8   A    She was, kind of, sitting up on the gurney a little bit
 9        and she said something real crazy to me.  She said, "hi
10        Mama.  You look pretty."  I though, oh, my God and I
11        said, "are you okay, baby?"  She said, "I am fine."
12        Then she started talking about, "I gotta go do my
13        dishes.  I left my dishes in the sink."  I am a nurse,
14        so that was an indication to me that she had some type
15        of head injury.  I didn't even know beyond that, I
16        didn't notice her ankle.  I was too busy focusing on her
17        face and her upper body.
18   Q    Once you arrived at the hospital and got to the room and
19        saw Shannon, did you ever leave her side?
20   A    No.  I took her to the bathroom, went in the bathroom
21        with her.
22   Q    Do you remember any lieutenants coming into the hospital
23        room to talk to Shannon?
24   A    No, I don't.
25   Q    Would you know a lieutenant if you saw one?
```

| | | |
|---|---|---|
| 1 | A | Yes.  My ex-husband was a sergeant on the police |
| 2 | | department, so I am quite familiar with officers. |
| 3 | Q | Did you see any other police officers coming through to |
| 4 | | talk to Shannon? |
| 5 | A | No, not that I can recall. |
| 6 | Q | How long were you at the hospital? |
| 7 | A | Till she was discharged.  We took her home. |
| 8 | Q | Do you remember how long that was? |
| 9 | A | I really couldn't tell you. |
| 10 | Q | Did you go right home from the hospital? |
| 11 | A | We stopped to get her car, her personal vehicle, and my |
| 12 | | daughter drove her personal vehicle and I drove my |
| 13 | | daughter's car because my daughter drove me out to the |
| 14 | | hospital, and, then, we went home with her. |
| 15 | Q | Where did you stop to get Shannon's personal vehicle? |
| 16 | A | It was at District 3. |
| 17 | Q | Did you go into District 3? |
| 18 | A | No. |
| 19 | Q | Did Shannon? |
| 20 | A | I don't remember her going in. |
| 21 | Q | There's been some testimony about a telephone conversa- |
| 22 | | tion that Shannon was a participant in that took place |
| 23 | | between 6:00 and 6:40 a.m.  Do you remember hearing any |
| 24 | | phone call that Shannon would have made? |
| 25 | A | I don't remember.  Is this after the hospital? |

```
 1   Q      Yes.

 2   A      I don't recall her being on the phone.

 3                       MR. MC GAVER:       Nothing further.

 4                       MS. MC KENZIE:      You indicated that at

 5          the time you stopped by your daughter's bedside, you do

 6          recall seeing lieutenants.  Correct?

 7                       THE WITNESS:        I don't recall seeing

 8          any officers to come into the pod that she was in.  It

 9          was me and my grandson and my daughter and hospital

10          personnel.

11                       MS. MC KENZIE:      I believe we had a

12          Jesse Vollrath testify that he was also sitting by your

13          daughter's side.  Do you remember seeing him?

14                       THE WITNESS:        He might have been

15          there before I got there, but I didn't -- there was

16          nobody in the room with her other than my daughter --

17          my youngest daughter my grandson and myself.

18                       MS. MC KENZIE:      Thank you.

19                       MS. WILSON:         Was she released from

20          the emergency or did she have to stay in the hospital?

21                       THE WITNESS:        I didn't hear the

22          first part.

23                       MS. WILSON:         Let me ask her once

24          she gets up there.  Thank you.

25                       MR. KONRAD:         Anything further?
```

```
 1            CROSS-EXAMINATION BY MR. PEDERSON:

 2      Q    You said you were by her side the entire time.  Right?

 3      A    From the time I got to the hospital, yes.

 4      Q    Is it possible that she had a seven-minute phone call

 5           at approximately 6:30 without you being aware of it?

 6      A    Possible.

 7      Q    You indicated that you were a nurse.

 8      A    Yes, retired.

 9      Q    You were concerned your daughter was exhibiting some

10           signs of a head injury, I believe, you testified to.

11           Is that right?

12      A    Yes.

13      Q    But despite whatever background you might have, it is

14           fair to say that you weren't at that hospital taking

15           care of her in a medical sense.   Right?

16      A    No.

17      Q    You didn't diagnose her or anything like that.

18      A    No.

19      Q    That just is a concern you had based on your

20           observations and experience?

21      A    Yes.

22                       MR. PEDERSON:      That is all I have.

23      Thank you.

24                       MR. MC GAVER:      Just one follow-up

25      question.
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 542 of 805   Document 80-21    237

```
 1            REDIRECT EXAMINATION BY MR. MC GAVER:

 2   Q    Were there officers outside the curtain -- the partition

 3        in the emergency room?

 4   A    Yes, there was.  There was a female officer.  Her

 5        pod -- Shannon's pod was on the end.  There were female

 6        officer about two pods down.  She insisted upon seeing

 7        Juanita, so we walked around, and there were some

 8        officers in the room with Ms. Juanita.  She only saw her

 9        for about 30 seconds, a minute.  She had to go to the

10        bathroom again, so I took her to the bathroom.  I saw

11        officers outside the hospital entrance and a few inside

12        also.

13                  MR. MC GAVER:      Nothing further.

14        Thank you.

15                  MR. KONRAD:        Anything from the

16        commissioners?

17                  Thank you.  You are excused.

18        (Witness excused)

19                  MR. MC GAVER:      I call Shannon

20        Lewandowski.

21                  SHANNON LEWANDOWSKI, having been first

22        duly sworn on oath to tell the truth, the whole truth,

23        and nothing but the truth testified as follows:

24                  MR. KONRAD:        The witness is sworn.

25        Go ahead.
```

```
 1        DIRECT EXAMINATION BY MR. MC GAVER:

 2   Q    Ms. Lewandowski, what year did you start with the

 3        Milwaukee police at the time?

 4   A    1999.

 5   Q    You were, at some point, promoted to detective.

 6        Correct?

 7   A    2005.

 8   Q    You remain so employed until you were discharged from

 9        the department.  True?

10   A    Correct.

11   Q    I draw your attention to January 19 of 2015.  Where were

12        you assigned?

13   A    Central Division, CIB.

14   Q    What station did you work at?

15   A    Three and five.

16   Q    What hours did you work?

17   A    8:00 at night till 4:00 in the morning.

18   Q    Who was your immediate supervisor?

19   A    I had a couple of them.  Lieutenant Sean Hanley and

20        Lieutenant Paul Lough.

21   Q    Did you work with a partner?

22   A    Not assigned to my car, but periodically, we will work

23        with other detectives.

24   Q    At some point during your shift, did you have a conver-

25        sation with then-officer, now-detective Melanie Beasley?
```

```
1    A    Yes.

2    Q    Where did that conversation take place?

3    A    District 5.

4    Q    Approximately when did it take place?

5    A    Beginning of -- I don't remember exactly what time.

6         It was somewhere before midnight at District 5.

7    Q    So before the car accident that we are talking about.

8    A    Yes.

9    Q    What did you talk with then-Officer Beasley about?

10   A    Melanie Beasley suffered some trauma from another

11        officer and on -- I already had knowledge of what had

12        happened because she went to get a restraining order

13        and so there was a temporary restraining order at

14        District 5 supposed to keep that officer away from her

15        district and that was not happening, so she wanted to

16        talk to me about who else to go to, so she and I had a

17        conversation that began sometime on the 18th and I heard

18        Juanita Carr get sent to a shooting.  Whenever someone

19        gets sent to a shooting, if I am available, I always

20        respond with them.

21   Q    Where did Officer Beasley live at that time?

22   A    On South 84th Street.

23   Q    Did she spend anytime at your house?

24   A    Yes.  She had been spending -- like, living at my house,

25        afraid to go home, so after work, she would come to my
```

```
 1        house and stay.

 2   Q    You said you heard about a shooting.  What did you do

 3        after you heard about the shooting?

 4   A    I told Melanie that I would return before her shift

 5        ended.  Her shift ended at 3:00 and mine at ended at

 6        4:00.  I called Juanita and asked her to give the exact

 7        address of where she was dispatched to and I said I was

 8        on my way.

 9   Q    Was that conversation with detective Carr took place on

10        the telephone?

11   A    Yes.

12                   MS. MC KENZIE:     I am sorry.  You had

13        a conversation with Juanita.  Where were you?

14                   THE WITNESS:      In District 5 talking

15        to Melanie in the garage.

16                   MS. MC KENZIE:    Why did you contact

17        her?

18                   THE WITNESS:      When I heard her get

19        dispatched to a shooting, I just went and responded.  I

20        always do.  I always volunteer to go to the assignment.

21                   MS. MC KENZIE:    How do you know it was

22        detective Carr that was --

23                   THE WITNESS:       Because she had

24        her --  We are each assigned a number and it was her

25        number and she said, "10-4."  So I told Melanie, "hey,
```

SUSAN K. TAYLOR        262-553-1058       COURT REPORTER
                        sueT@wi.rr.com
                                                                    241
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 546 of 805   Document 80-21

```
1        just hold up, like, are you leaving right now the
2        district?"  And she said, "yes."  I said, "I will come
3        back here at the end of your shift and we will resume
4        the conversation."
5        BY MR. MC GAVER:
6    Q   What happened next?  After you spoke with detective Carr
7        on the telephone, what happened?
8    A   I was en route to St. Joe's Hospital with her.  She
9        called me back and said she could handle it.  They don't
10       even have a scene.  So I just continued.  I don't
11       remember what I did, if I did follow-up or a report or
12       what.
13   Q   Did you have occasion to have additional contact with
14       detective Carr?
15   A   Yes.
16   Q   How did that happen?
17   A   I went back to District 3, about two hours before the
18       end of my shift.  I saw Juanita doing reports.  I sat
19       next to her where I normally do and said, "what happened
20       with the shooting?"  She gave me a brief description and
21       at that time, a black patrol sergeant, a black male -- I
22       don't remember his name -- walked by and stopped Juanita
23       and said, "did you recover the gun?"  She said, "no."
24       He walked off.  So I said to her, "did you go to recover
25       it yet?" She said, "yes."  I said, "do you want to go
```

```
 1    again before the end of your shift?" She said, "yes."
 2    So I said, "I have to run to District 5 to handle
 3    something.  Since you just went, we will just go to five
 4    together, take your car and we will come back around
 5    three, do a search and if do we get the gun, I will
 6    inventory it for you", because she wanted to be off on
 7    time.
 8  Q  Did you have any experience working with detective Carr
 9    before that day?
10  A  Lots of experience, because we were promoted in the same
11    year.
12  Q  Did you believe there was any sense of urgency about
13    attempting to retrieve the gun and detective Carr's
14    actions surrounding that?
15  A  I knew there was not because she said that she already
16    went and she was actually putting that assignment into
17    the follow-up so the next shift could go and try and
18    recover it.  I said to her, "if we get it, I will --
19    and there is overtime, I will stay on overtime and you
20    can go and I will inventory it."  That is why we decided
21    to go together.  Additionally, she said there were no
22    cars in service at that time, it was still pretty busy
23    and I said, "then, you will have to pull another car out
24    of service.  I'll just go with you."
25  Q  "Pulling cars out of service", what does that mean?
```

```
1    A    It means if Juanita got to the house and was able to get
2         in, she would need help.  You can't search a house by
3         yourself.
4    Q    So what squad car she would have?
5    A    She wouldn't have to call for a squad car.
6              MS. WILSON:          She was what?  I
7         didn't hear what you said.  You said she was something
8         with a squad.
9              MR. MC GAVER:        Wouldn't have to call
10        for a squad.
11             MS. WILSON:          Thank you.
12   BY MR. MC GAVER:
13   Q    You said you decided to take the squad car assigned to
14        detective Carr.  Correct?
15   A    That is correct.
16   Q    Why did you decide on taking that car?
17   A    Because I already turned my car keys in.  She still had
18        her car key sitting on the table.
19   Q    Can you reiterate what the plan was when you left?
20   A    I told her I had to go to District 5 because Melanie was
21        having a problem.  She knows who Melanie is and she is
22        well aware of the problem, to my knowledge, because I
23        told her already.
24   Q    So what were you planning on doing once you got to
25        District 5?
```

```
 1   A     Melanie said that she had -- she had been off of work
 2         a lot taking days off because of the threats and the
 3         trauma to her that she had reported to IAD and was not
 4         getting the sufficient help that she needed.  She was
 5         told by a supervisor, Sean Hanley, to get a restraining
 6         order.  In the process of all of this, I was saying,
 7         "I will come with you through your process and if you
 8         need a place to stay, whatever you need, I got it."
 9         So I work in District 5.  I didn't know Melanie as a
10         friend at all at that point.  She was just another
11         female co-worker.  Melanie had revealed to me things
12         that were happening to her, so I told her she could stay
13         by my house.  She was afraid to go home.  Now, she was
14         at the district that day and doing a search on a female
15         when other TAC officers were coming into the district
16         and I don't know if she felt threatened or was
17         threatened.  I wasn't quite sure at that point.  I told
18         her she had to go to the supervisor, that I had to go
19         and I was rushing out saying, "I have to go.  Juanita
20         just got sent to a shooting."  I never let -- I
21         always -- you can ask any of my supervisors.  I always
22         respond to every shooting if I am available.  I make
23         myself available to them.  If they don't need me, then,
24         I go.
25   Q     Are there any other matters that you're planning on
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 550 of 805   Document 80-21   245

```
 1       assisting then-Officer Beasley with?

 2   A   Yes.  Melanie had filed an ESUDW, Endangering Safety By

 3       Use of Dangerous Weapon.  It is an acronym.  It means

 4       endangering safety by use of a dangerous weapon.  It is

 5       basically taking a handgun or any type of firearm and

 6       shooting into an occupied or unoccupied home.

 7               MS. MC KENZIE:      Hold on.  Go ahead.

 8   A   She was having a conflict with a supervisor on whether

 9       it was an endangering safety by use of a dangerous

10       weapon or a recklessly endangering safety.  The

11       difference would have been taking it to the district

12       attorney's office or not taking it to the district

13       attorney's office via, like, a liaison.  So that was an

14       issue that I originally was there for earlier in the

15       shift, but when I got to District 5 -- I normally work

16       at Central -- or a bunch of other officers there and

17       they just started talking to me about an incident that

18       happened prior where we had a huge fight on Sixth and

19       Hadley and a woman and her two daughters picked me up by

20       my jacket and were beating me, and they were asking how

21       I was and how everything was happening with that,

22       because it was like a melee.  So Melanie takes me into

23       the garage.  She's, like, "what am I supposed to do?

24       None of the supervisors here at District 5 are not only

25       not listening to me, but there is a valid temporary
```

```
 1              restraining order, which holds the same type of
 2              authority as a regular restraining order, and these
 3              TAC officers keep coming in here."  So I was trying
 4              to find her a supervisor that she could talk to.
 5    Q    Let's get back on track here.  Before you left with
 6         Juanita Carr, did you receive any phone calls from
 7         family members?
 8    A    Yes.
 9    Q    Who called you?
10    A    My son, Jordan.
11    Q    What time did he call you?
12    A    Maybe, like, a little bit after 2:00.
13    Q    What did he tell you when he called you?
14    A    He said, "Mom, I got pulled over."  I said, "where are
15         you?" He said, "I don't know."  I said, "what are you
16         pulled over for?"  He said, "I don't know."  I hear some
17         talking back and I said, "listen.  Are you on the east
18         side?"  He said, "yes."  I said, "when you find out
19         where you are and what is going on, just call me back."
20         He said, "all right."  I hung up.
21    Q    Why would Jordan call you to tell you about this, if you
22         know?
23    A    I instructed both of my children to always call me and
24         let me know where they are.  My family consists of me
25         and my two children.  That is it.  There is nobody else.
```

```
 1          Jordan is my -- I am missing words -- my emergency
 2          contact.  My other son is 26.  At the time, he was 24,
 3          he lived in California.  I have Denise Rogers who lives
 4          in a completely different neighborhood and I usually
 5          don't worry her about anything.  Outside of that, that
 6          is the rule in my house.  I need to know where you are,
 7          especially since he had just transferred schools from
 8          Minnesota to UWM.  He doesn't know the area.  So I worry
 9          about my son's safety with all the robberies, not only
10          on the east side, but all over.  The rule is --  There
11          is many rules that I have, but one of them is if you get
12          stop by police, that you always call and tell me where
13          you are.
14     Q    Did you give Jordan one of your business cards?
15     A    Yes.
16     Q    Why?
17     A    Both of my children have my business cards as well as my
18          other family members.  I explained to my son that
19          traffic stops are the most unpredictable and dangerous
20          things that occur within patrol, and my son has been
21          stopped more than four times.  I don't know why he said
22          that.  I want the officer to know that that is my son.
23          I have a good reputation at work.  I have a -- I am a
24          strong disciplinarian for my children and officers know
25          they know my children.  So I want whoever has contact
```

```
 1        with them to know that not that he knows his rights, but
 2        that he respects the law and he respects them and he
 3        doesn't anticipate being pulled out of his car and
 4        searched for no reason, and, so, that has happened to
 5        him in the past.
 6   Q    I think it goes without saying that you have received
 7        these types of calls from Jordan in the past.
 8   A    Yes, and from my other son, Kasey.
 9   Q    Have you ever gone to a scene where Jordan was pulled
10        over by an officer in the past?
11   A    Absolutely not.
12   Q    Have you ever intervened or spoken with officers who
13        pulled Jordan over in the past?
14   A    Absolutely not, no.
15   Q    Did Jordan tell you --  What did Jordan tell you about
16        his location when he was pulled over on January 19,
17        2015?
18   A    He said he didn't know where he was.
19   Q    Did you have plans to go to him?
20   A    Absolutely not.
21   Q    Did you plan on intervening in that traffic stop?
22   A    No.
23   Q    Did the phone call that you received from Jordan change
24        any of the plans that you had made with detective Carr?
25   A    The only thing that would have changed would be if he
```

```
 1        got a citation, which I didn't know he was drinking, but
 2        if he would have got a citation, I would have taken the
 3        car from him.  That is about it.  So nothing changed.
 4        He gets pulled over, I know where he is.  He works
 5        downtown on Third Street.  He goes to work, he leaves
 6        work, he calls me.  I stay on the phone with him until
 7        he is inside.  It is just -- this is way I operate with
 8        my children.  He is out late at night, 4:00, 5:00 in the
 9        morning, because he works at a bar downtown.  That is
10        the same rule.  You must call me.  I need to know where
11        you are.
12   Q    What do you typically do with your phone when you are
13        driving with someone else in the car?
14   A    When I'm driving someone else's car?
15   Q    With someone else in the car.
16   A    I don't answer my phone driving.  If my phone is
17        ringing, I will pull over and answer it.  But on this
18        day, I tossed the phone to Juanita before we left the
19        garage at District 3 after Jordan called and I tossed it
20        to her and I said, "when Jordan calls, just answer it
21        for me and ask him where he is at."
22   Q    Have you ever driven that particular squad car prior to
23        January 19 of 2015?
24   A    I can't remember.  We interchange cars all the time.
25   Q    Just so we are crystal clear, where was your destina-
```

```
 1       tion?

 2   A    District 5.

 3   Q    As you approached the intersection of 36th Street and

 4        North Avenue, what did you see?

 5   A    I Wisch there was a map because it is one block between

 6        35th and 36th, but it is not a huge, long block.  It is

 7        a short block.  As I was passing -- or coming to 36th

 8        Street, I could see a car in the road.  That inter-

 9        section --   There you go.  Thank you.

10                    MR. MC GAVER:      Hold on.  I will pull

11        a map out for you.

12   Q    I am handing you what's been identified as Exhibit 12.

13        Can you tell me what that is?

14   A    This is an overhead view  of --

15   Q    What am I looking at?  What are we looking at?

16   A    I believe that the right side of this map is west and

17        the street going straight down the middle is 35th.  It

18        is hard for me to tell.  Is that correct?

19   Q    You tell me.

20   A    It is hard for me to tell from this overview because it

21        looks like it is missing --  This is old.  It looks like

22        it is missing a building on the corner.

23                    MR. MC GAVER:      It appears that the

24        orientation of the map is up being north, so I don't

25        know if that helps.
```

```
 1              MR. PEDERSON:      I object to that.

 2       Leading.  It doesn't say that.

 3  A    It is hard for me to tell.

 4  Q    Then, just walk me through it.  What direction were you

 5       driving on North Avenue?

 6  A    I am driving eastbound and --

 7  Q    As you approach 36th Street, what did you see?

 8  A    As I approached 36th Street, there is a new -- new paint

 9       on the road and they made a bike lane there.  There used

10       to be, like, a passing or parking lane.  There really

11       isn't anymore.  There is a car somewhere between 35th

12       and 36th that had pulled over what I assumed to be

13       picking up a call girl, prostitute.  The car is white or

14       light color.  It is pulled over and as I am approaching

15       it, I see the brake lights go on, I see them go off.

16       I see a girl by the car door on the passenger's side.

17       I make a comment to Juanita about needing a vice divi-

18       sion for exact this reason.  She laughs.

19  Q    What do you mean by that, that you "need a vice division

20       for this exact reason"?

21  A    We don't have a vice division like we used to have that

22       attacks drugs and prostitution like we used to.

23  Q    So what did you do in reaction to seeing this?

24  A    So I said to her something regarding, "that is why we

25       need a vice."  I used the toggle switch which is on the
```

```
 1        console between my seat and hers.  When you first make
 2        the first move of it and it clicks, one movement to the
 3        right, the interior lights go on and it is, like, click,
 4        click, click, click, like that.  I think the outside
 5        lights by the the headlights go on and, then, the next
 6        switch is the sound of the siren.  So I always say
 7        "blurp".  That is what police will say.  You "blurp" it.
 8   Q    Can you repeat that?
 9   A    It is, like, moving it to the right real fast and it
10        sounds like this; "blurp", and it is how we use a horn.
11        We don't use the horn per se.  We've never, ever been
12        trained to just use the horn.  This is just allowing him
13        to know that I am coming down the street and don't pull
14        out and hit me.  It's just so we didn't get hit.
15   Q    Are you familiar with the SOPs regarding use of
16        emergency lights?
17   A    Yes.  This operation is used all the time.  I could sit
18        on 35th Street and you can see every single day, some-
19        body probably using that, because that is a horrible
20        intersection.  Police use it all the time.
21   Q    Did you leave the squad lights on after you activated
22        them?
23   A    I went around the car and as I went around the car --
24        The intersection at 35th and North Avenue has a cell
25        phone store on the southwest corner and it has huge
```

1        large windows and I could see the car coming from the
        2        south going north on 35th and I looked up to see if I
        3        had the green light wondering if the car was going to
        4        stop and I slammed on the brakes.  I reached out to
        5        Juanita and, like, she said, I am sure I -- I don't
        6        recall but I am sure I swore and to let her know --
        7        it is just a reaction that when you have children, you
        8        want to hold them back, and that is what I did to her.
        9        I impacted that car.
       10   Q    How fast were you going when you went through the
       11        intersection of 35th and North?
       12   A    I was going the speed limit, if not slower, because
       13        when I went around this car, I was already slowing down.
       14        I wasn't pulling this car over, I had no intent on
       15        pulling this car over.  I went around it notifying it
       16        so it doesn't come out into traffic and I was braking
       17        because I see the car coming and I still collide with
       18        him.
       19   Q    Were your squad lights on as you traveled through the
       20        intersection?
       21   A    Yes, I never got a chance, I believe, to turn them off.
       22        There was no distance.  I went around the car and before
       23        I got straight in the lane, I could see the lights
       24        coming.  I hit the brake -- I am not worried about the
       25        lights -- and I am through.

          SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                                 sueT@wi.rr.com
                                                                    254
        Case 2:16-cv-01089-WED   Filed 04/22/19   Page 559 of 805   Document 80-21

```
 1    Q    Were the sirens on traveling through the intersection?

 2    A    I don't know.

 3    Q    Where was the squad impacted?

 4    A    I believe it was just the front end.  My front end hit

 5         her driver's side and passenger's side -- driver side

 6         back part of her car.

 7    Q    What did the impact do to your position in the car?

 8    A    I was flipped over the console.  My right foot was still

 9         stuck under the pedal of the car and I was on top of --

10         part of me was on top of Juanita.

11    Q    Do you know whether you lost consciousness?

12    A    I was told that I did.  I don't know if you really know

13         that you lose consciousness.

14    Q    Do you remember who told you that you went unconscious?

15    A    Juanita, because she was screaming in my ear that I was

16         dead.

17    Q    How did you get removed from the squad?

18    A    Some citizens came to the car and were asking -- they

19         were talking on how to get me out of the car.  I noticed

20         two of them.  I recognized two of them.  They said,

21         "oh, it is Blonde, it's Blonde," and they are trying

22         to pull me out of the window, but my foot is stuck

23         underneath the pedal and then I don't remember how I got

24         out, if I got out through the window or --  I remember

25         they were trying to squeeze me out of the door, but the
```

```
 1        door didn't really open.  I am not quite sure.
 2   Q    Did you call 911?
 3   A    I was told that I did and I don't remember me calling
 4        911 or even where I got the phone from, because Juanita
 5        had it.
 6   Q    Do you remember who the first emergency responder to the
 7        scene was?
 8   A    No.  The only person that I remember that was taking
 9        care of me was Jesse Vollrath.
10   Q    Do you remember anything that you said to any of the
11        first responders or officers immediately following the
12        accident?
13   A    Yes.  I remember telling somebody -- Officer Joe Goggins
14        asked me, you know, who should he call for me and I
15        said, "call my son."  I don't remember that he said --
16        the report that I was given said that I was giving him
17        the wrong number.  He was very frustrated with me and I
18        was getting even more frustrated because I knew my son
19        was at a traffic stop and when I have been injured
20        before on duty when I have been at the hospital, my
21        youngest son, Jordan, just freaks out, like, I am his
22        only family member, I am his only parent.  I didn't want
23        him driving.  So I said, "somebody, get ahold of my son.
24        He is on a traffic stop."  I don't remember who it was.
25        It was an officer.  He probably was new.  He was bent
```

```
 1          down and he said, "where", and I said, "on the east
 2          side.  He goes to UWM."  He came back telling me that he
 3          called the District 5 console and there was nobody on
 4          any traffic stops.  So I said, "call UWM police and see
 5          if they have one."  They called UWM police.  He came
 6          back and said, "they are not on any traffic stops."
 7          So I was like, "well, I don't know.  I don't know where
 8          he is.  Just somebody go find him", and that is it.
 9          When I saw Deb Stacey --  She knows me.  What we have in
10          comment common is being single parents of young, black
11          men, so we have that connection with each other and we
12          support each other and that's why she knows my son and I
13          told her, "can you just go find Jordan for me", and she
14          said "yes, I got it.  I got it."  That is it.
15      Q   How long after the accident until you were loaded into
16          an ambulance?
17      A   I don't know.
18      Q   Did any officers ride with you in the ambulance?
19      A   Jesse Vollrath.
20      Q   Any discussion with Officer Vollrath in the ambulance?
21      A   Not that I recall.  Just that I was convinced that
22          Juanita died.  I don't know if I heard it on the scene
23          or whatever, but that is what I kept talking to him
24          about.
25      Q   Did you see Lieutenant Hanley at the scene of the
```

```
 1      accident?

 2   A  No.

 3   Q  Do you remember having a conversation with him at that

 4      time?

 5   A  I didn't see him and I didn't talk to him.

 6   Q  Where did the ambulance take you?

 7   A  Froedtert.

 8   Q  Did any of your family members report to the hospital?

 9   A  Yes.  Denise Rogers, who I call "Big Mama."

10   Q  Who was the first one to arrive?

11   A  Big Mama, my sister Jondalyn, and Deb Stacey.

12   Q  What about Jordan?

13   A  Then Deb Stacey brought in Jordan.

14   Q  Once you arrived at Froedtert, where did they take you?

15   A  I went right to a room, and the medical staff knows me

16      there from all the shootings.  I remember them joking

17      around with me in and out and said they are going to

18      get me to x-ray and I will be on my way.

19   Q  Did any officers speak with you while you were at the

20      hospital?

21   A  Jesse Vollrath and Deb Stacey and William Krumnow.

22   Q  Did you see Lieutenant Hanley at the hospital?

23   A  No.

24   Q  Did Lieutenant Hanley speak with you while you were at

25      the hospital?
```

```
 1    A    No.

 2    Q    Did Lieutenant Hanley spend 20 minutes with you while

 3         you were at the hospital?

 4    A    Lieutenant Hanley never spoke to me at the hospital.

 5         That is why when I got discharged around 5:30, I called

 6         him -- or later, called him at 6:38.

 7    Q    What time were you discharged?

 8    A    It was after 5:30.

 9    Q    Who left with you?

10    A    My sister and my mom and Jordan.

11    Q    Who drove?

12    A    My sister.

13    Q    Whose car?

14    A    My sister's.

15    Q    Where did you go?

16    A    To District 3.

17    Q    Where did you go there?

18    A    Because I didn't want go to home without talking to a

19         supervisor.

20    Q    Did you encounter a supervisor at District 3?

21    A    No.

22    Q    What did you do next?

23    A    Someone drove my car home, either my son or -- or

24         Jondalyn drove back to my house.  My house is, like,

25         four blocks from the district.  Once I got home, I
```

```
 1          wanted to know if somebody was going to come talk to
 2          me, so I called Hanley -- Lieutenant Hanley.
 3     Q    You called him on his cell phone?
 4     A    Yes.
 5     Q    How long did you speak with him?
 6     A    Ten, 15 minutes.
 7     Q    What did you say to him?
 8     A    I want to know if he was going to come over and talk to
 9          me and he said, "no."  I said, "do you want to know,
10          like, what happened?"  He said, "yes, go ahead.  Tell
11          me."  So I told him and then he said, "all right.  Bye."
12     Q    Did you ever tell him that at the time you got into the
13          accident, that you were en route to pick up Jordan in
14          the area of UWM?
15     A    Absolutely not.
16                    MS. MC KENZIE:      Let me interrupt and
17          ask a question.
18                    MR. MC GAVER:       Please.
19                    MS. MC KENZIE:      There isn't some
20          standard or procedure for once you are in an accident,
21          as an officer, how that is reported and when you speak
22          to a superior, but what was your urgency in wanting to
23          speak to him?
24                    THE WITNESS:      We never go home from
25          a shift period, much less an accident, without notifying
```

```
 1          your supervisor that you are secured or going home.  So
 2          I am at the hospital, he doesn't talk to me there.  I
 3          snet my son to look for him within the hospital because
 4          he knows who he is.  He's not there.  I asked Juanita if
 5          she talked to him.  She said, "briefly, but he's gone."
 6          So, now, I am leaving.  I don't know where my gun is, I
 7          don't know where my gun belt on.  I don't know who has
 8          it.  It is something that I am responsible for, and I
 9          remember questioning to find out if somebody had taken
10          my gun belt off of me while they are trying to remove me
11          from the car.  Me getting ahold of my supervisor, that
12          is mandatory and I am, like, "don't you want to know
13          what happened?"
14                      MS. MC KENZIE:      Why Hanley?
15                      THE WITNESS:        He was working that
16          day.  He is my supervisor that day.
17                      MS. MC KENZIE:      Wasn't there another
18          supervisor that was working that day?
19                      THE WITNESS:        I don't believe so.
20          That is who I reported to that and that is the super-
21          visor I have.
22          BY MR. MC GAVER:
23      Q   Is there any reason that you would have told Lieutenant
24          Hanley that you were on your way to get Jordon at UMM
25          when you got into the crash?
```

```
 1   A    It is not what happened.  I didn't speak to him at all.
 2   Q    Did you tell Hanley that you were traveling 45 miles an
 3        hour at the time of the crash?
 4   A    On the phone?
 5   Q    Yes.
 6   A    No.  I am going to tell my supervisor that I am speeding
 7        and that I am going to go do something, like, go impede
 8        on a traffic stop?  It doesn't make sense.  Like, I am
 9        going to tell my supervisor something that I did that
10        was illegal and wrong?  Even if I did do it, but I
11        didn't.  So I am not going to go and tell him any such
12        thing.  I told him exactly what the problem was, that
13        there were TAC officers at the scene, and those are the
14        people that told him that I was going to UWM.  These
15        are --  The overheard people are from TAC.  TAC is the
16        group of guys that have the officer who has assaulted
17        Melanie Beasley.   They are on the scene telling a
18        sergeant that I am saying these things, but there is no
19        reports by them, there is nothing in their memo book.
20        I didn't say any of those things.  All I wanted was
21        just, like Juanita Carr got her boyfriend to come to
22        her scene, her family members to come to the hospital.
23        I wanted my family members to come to the hospital,
24        especially because my family member was on a traffic
25        stop and I knew where he was and he is waiting to talk
```

```
 1         to me.
 2     Q   Back to the conversation on the phone the morning of the
 3         19th th -- January 19, 2015.  Did you tell Hanley that
 4         you had sirens on at the time of the accident?
 5     A   No.  I don't know if they were on.
 6     Q   Did you tell him that you had your squad car emergency
 7         lights on at the time of the accident?
 8     A   Yes.
 9     Q   When you were speaking with Hanley on the phone that
10         morning, did anyone overhear the conversation?
11     A   I guess not.  My son was at home.  Melanie showed up at
12         my house because she had been calling me and asking me
13         where I was because I didn't show up at the district.
14         I told her I was involved in a car accident and I was at
15         the house, so she came to the house.
16     Q   Melanie came to the house later that morning?
17     A   Yes.
18     Q   What did you do immediately after you hung up with
19         Hanley?
20     A   I am just sitting on the couch with a lot of family
21         members or friends and some officers coming to see how I
22         am.  I just remember sitting there and it just being,
23         kind of, chaotic.
24     Q   Did Hanley ever come to your house to visit you after
25         the accident?
```

| | | |
|---|---|---|
| 1 | A | He never came to my house, period, after the accident. |
| 2 | Q | This phone conversation, is that the last time you spoke |
| 3 | | with Lieutenant Hanley? |
| 4 | A | Yes.  It is the first and only time I spoke with |
| 5 | | Lieutenant Hanley from the night of the 18th to the |
| 6 | | 19th. |
| 7 | Q | Did you receive any treatment for medical issues you |
| 8 | | suffered in the accident? |
| 9 | A | Yes. |
| 10 | Q | What issues --  What were you diagnosed with? |
| 11 | A | A concussion with brain bleed on the top of my head.  I |
| 12 | | believe that I hit the gun rack.  My chest was black and |
| 13 | | blue from one end to the other because of the air bags |
| 14 | | blew.  I had two black eyes.  My right foot was swollen |
| 15 | | and I reinjured my left knee.  I am not quite sure how. |
| 16 | | But I had surgery on it.  And I had not finished therapy |
| 17 | | for my short-term memory and my speech therapy because I |
| 18 | | was fired. |
| 19 | Q | How many doctors did you see in the months following the |
| 20 | | accident? |
| 21 | A | Five or six. |
| 22 | | (A document was marked as Exhibit 13) |
| 23 | Q | I show you a document marked as Exhibit 13.  What is |
| 24 | | that? |
| 25 | A | Progress notes from one of the doctors that I saw after |

```
 1        the accident.
 2    Q   Can you flip through the whole packet and get me a sense
 3        of what is there?
 4    A   Just evaluations and medical imaging reports and diag-
 5        nosis of the problems that I had after the accident
 6        along with physician reports, duty-related issues that
 7        I had my medical doctors fill out.
 8    Q   Do you believe the doctors are a fair and accurate
 9        representation of the medical issues you have dealt
10        with since the accident?
11    A   They are.
12    Q   Including neck, head, ankle, knee.  Am I missing any
13        injuries?
14    A   Head, neck, knee, foot.  That is it.
15                 MR. MC GAVER:       I will offer Exhibit
16        13.
17                 MR. PEDERSON:       No objection.
18                 MR. KONRAD:         Received.
19    BY MR. MC GAVER:
20    Q   Where did you receive treatment?
21    A   Several places.  Wheaton Franciscan out in Mequon and in
22        Franklin.
23    Q   Let me ask a different question.  Do you have any
24        lingering medical issues to this day?
25    A   Yes.  I still deal with short-term memory issues, having
```

```
 1        to write everything down on a piece of paper and a lot

 2        of persistent issues involving my head.

 3   Q    You were interviewed by Sergeant Zieger in the course of

 4        the investigation.  Correct?

 5   A    I was.

 6   Q    Did you tell Sergeant Zieger the same story you told

 7        here today?

 8   A    Yes.

 9   Q    Is there anything else you want to make sure that the

10        Commission knows about this situation?

11   A    Yes.  I believe that as Sergeant Zieger said, I called

12        a lieutenant a liar in my memo and I did, and I mean it,

13        because the things that he said happened, they did not

14        happen, and the treatment that I got was directly

15        related to some of these memos that I submitted because

16        the bottom line is the fair treatment of women in this

17        department, specifically Melanie Beasley at that

18        district, which I have -- I have more than these memos

19        here that I have handed in.  This investigation is a

20        direct result of that.  I believe it is complete

21        retaliation for me trying to help another female out at

22        a district who was sexually assaulted by another member

23        and the only people on this scene of mine where I was

24        hurt and injured and in a close-to-fatal accident TAC

25        members who made these statements saying that I was
```

```
 1          saying that, but none of those TAC members have ever
 2          written a report.  Sergeant Riley isn't even here today
 3          and if he is a supervisor on scene saying these people
 4          said that, then, where is that sergeant holding those
 5          people accountable for those things -- for them to be
 6          interviewed by detectives so that they could come to the
 7          truth?  A simple investigation like this?  The first
 8          people that I would have you can talked to -- which I
 9          have been a detective since 2005 -- would have been to
10          talk to Melanie Beasley.
11                    MR. PEDERSON:      I object at this
12          point.  I think this is running far afield and is
13          a narrative --
14                    THE WITNESS:      It is not.  This is
15          exactly what it is about.
16                    MR. KONRAD:      If you could sum up,
17          I would appreciate it.
18     A    If I was going to investiate the scene, it would have
19          been Melanie Beasley and my son and Juanita Carr.
20          They would have been separated from each other and
21          immediately talked to and you would have had the answers
22          to what happened.  There would be no hearsay.
23                    MR. KONRAD:      Let me ask you this.
24          I read the lieutenant's report several times and it
25          appears to me he didn't come to the conclusion that you
```

```
 1      were proceeding to pick up your son based on those
 2      ambiguous after-accident statements.  He based that
 3      conclusion on what you told him, it appeared to me.  So
 4      you are saying that you never said that to him at all.
 5                   THE WITNESS:       Not only did I not
 6      say that to him, but I never had a conversation for 20
 7      or 30 minutes at the hospital.  I even asked for the
 8      video of the hospital room to be pulled to if he was
 9      even in there.
10                   MR. KONRAD:        Let's turn back to
11      the phone call.
12                   THE WITNESS:       The phone call, I
13      called him and I told him exactly what happened, and I
14      already had heard the rumors in my house saying that the
15      TAC officers were telling him that and I even told him
16      at that point "that didn't even get -- that is not what
17      happened.  That is not where I was going."
18                   MR. KONRAD:        You are saying he
19      made up this conversation?
20                   THE WITNESS:       Yes.
21                   MR. MC GAVER:      Nothing further.
22                   MS. MC KENZIE:     Counsel, would you
23      happen to have --  You provided medical records.  Do
24      you have the initial emergency room medical records?
25                   MR. MC GAVER:      I don't know if that
```

```
 1        is part of that packet or not.  Is there something
 2        specific you are looking for?
 3                     MS. MC KENZIE:     I want to see the
 4        information regarding when she was brought into the
 5        emergency room.
 6                     MR. MC GAVER:     I don't think it is
 7        in there.
 8                     MS. MC KENZIE:      If you don't have
 9        it, you don't have it.  I was just wondering --
10        Maybe you could look for that as we move forward?
11                     MR. MC GAVER:     Sure.
12                     MR. PEDERSON:     I was going to
13        request a five-minute recess, if that is possible.
14                     MS. MC KENZIE:     It is up to the
15        hearing examiner.
16                     MR. KONRAD:        Mr. Mc Gaver, when
17        you filed your motion earlier in the case, didn't you
18        attach a complete set of medical records?  The emergency
19        record should be in there.
20                     MR. MC GAVER:     They should.  They
21        are somewhere in there.  I just don't have the where-
22        withal to find them right now.
23                     MR. KONRAD:        Let's take a few
24        minutes.
25                     MR. MC GAVER:     I will see if I can
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                              269
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 574 of 805   Document 80-21

1    track them down.

2                    MR. KONRAD:        We will take a five-

3    minute break.

4    (Discussion off the record)

5                    MR. KONRAD:        Do the commissioners

6    have any additional questions?

7                    MS. WILSON:        I have a host of

8    them, so you might as well go first.

9

10                    MS. HEIN:                I have two.  I

11   had a couple things I confused about.  The timeline.

12   You said that you and detective Carr left five -- I

13   mean, three and were going to five when the accident

14   happened.  Where were you when that whole process when

15   you got a call from your son?  Were you, like, still at

16   three or were you in the car or --

17                    THE WITNESS:        We were sitting in

18   the assembly next to each other on a table similar to

19   this.

20

21                    MS. HEIN:                "Assembly"

22   meaning what.

23                    THE WITNESS:        Where the officers

24   have roll call in District 3.  After that, the sergeant

25   walks by, which is around probably five minutes to 2:00

```
 1    or something and he said, "did you recover the gun?"
 2    She said, "no." He was, like, "oh", and he keeps going.
 3    I say to her, "did you go?" She said, "yes, I was just
 4    there." I said, "if you want to go again, I will go
 5    with you." The reason I offer it because that is what
 6    I do, but I have a reputation of being able to -- I will
 7    bang on the door until I -- you know, till somebody
 8    comes instead of just a short term. So she said, "sure
 9    let's go." I said, "I have to stop at District 5 first
10    to talk to Melanie. Her shift is over at 3:00, so we
11    will go five, we will come back around to see if the gun
12    is there. If you get it, I'll inventory it and we'll be
13    back at three -- District 3. So as I am -- we decide
14    that, we were walking out o the back of District 3 to
15    where the patrol cars are and that is when I receive the
16    phone call from my son. So I am talking to him from the
17    back door to the car. In the car, I turn it on I talk
18    to him. "Where are you?" "I don't know." "What did
19    you get stopped for?" "I don't know." I said, "well,
20    call me back when you know where you are at." He said,
21    "all right."
22
23            MS. HEIN:              Then you get in
24    the car and you proceed to go to District 5.
25                     THE WITNESS:       Yes.
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 576 of 805   Document 80-21

```
1
2                    MS. HEIN:                About how long
3      --
       I guess I was confused.
4
5                    THE WITNESS:       A minute.  However
6      long it took to hang up the phone and drive get out to
7      North Avenue, which is right there, and from 49th get
8      down to 35th before the accident.
9
10                   MS. HEIN:                Your son
11     didn't tell you where he -- he said, "I don't know where
12     I am."
13                   THE WITNESS:       That's correct.
14
15                   MS. HEIN:                But did he
16     say he was on the east side or any kind of
17     clarification.
18                   THE WITNESS:       Yes.  I believe he
19     said he was on the east side, and that is why I knew to
20     call District 5, because District 5 is the east side.
21     Plus, he works downtown.  He works at the Pub Club.
22     So the same thing.  When you get done with work, you
23     call me so I know when you are going home.
24
25                   MS. HEIN:                And when
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
                                                                272
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 577 of 805   Document 80-21   05722

```
 1      did you call district -- you said you just called five
 2      to know --
 3                    THE WITNESS:          The officers on
 4      scene, I remember asking somebody, because apparently,
 5      I was giving the wrong phone number to my son.  He's had
 6      the same phone number since he had a cell phone, which
 7      has been years.  Apparently, I was giving Officer
 8      Goggins the wrong phone number, so he was getting really
 9      frustrated with me and I remember him standing over me
10      going, "how do you not know what his phone number is?
11      So I turned to somebody else and said -- I was sitting
12      on the pavement -- "I said just call District 5, the
13      console and see."
14
15                    MS. HEIN:                You said that
16      because he had said he was on the east side.
17                    THE WITNESS:          Yes.
18
19                    MS. HEIN:                Then, you also
20      made the claim that the TAC officers who were on the
21      scene were indicating that you were going to UWM.  First
22      of all, is a TAC officer different than a regular police
23      officer?
24                    THE WITNESS:          TAC officers do,
25      like, search warrants and more of the violent takedown
```

```
 1      processes.  They don't take normal assignments, they
 2      don't investigate.  We investigate.  We say --  For
 3      example, there might be a guy armed and he is not going
 4      to come out easily.  They will come.
 5
 6                   MS. HEIN:                Would it be
 7      usual for them to be at a car accident with a police
 8      officer involved?
 9                   THE WITNESS:        There really isn't a
10      usual or not usual.  It is depends on the staffing.  But
11      when you hear that two officers -- I mean, two
12      detectives have died, everybody comes.  So they were all
13      on the scene.
14
15                   MS. HEIN:                How would they
16      know -- how would they be able to spread the rumor that
17      you were going to UWM or up there if you didn't even
18      know?
19                   THE WITNESS:        Because I was saying
20      that -- they were taking bits and pieces, I imagine,
21      because I was saying, "my son lives by UWM" or, "he goes
22      to UWM.  Call UWM police and see if he stopped there."
23
24                   MS. HEIN:                So you are
25      claiming there was a statement from one of the
```

```
 1    witnesses, Mr. Hernandez, who also indicated that you
 2    are claiming that the TAC officers were -- that he heard
 3    it from the TAC officers?
 4                  THE WITNESS:        If I am saying it --
 5    if I'm making the statement -- I say the statement is,
 6    "my son goes to UWM or he is near UWM.  Call UWM police"
 7    after I ask to have them call District 5, and they came
 8    back saying there was nobody on any traffic stops at
 9    that time.  So I said the next best thing will be UWM
10    police, because he lives, like, five houses from the
11    campus.  He lives right on Murray or Maryland.  I am
12    saying that.  The difference is if I am actually saying
13    I was going to go get my son on a traffic stop at UWM
14    police, first of all, he wasn't with UWM police.  He was
15    with the Shorewood police.  I didn't know where he was.
16    That is where the frustration came in with Goggins.  I
17    just wanted somebody to get my son for me to let him
18    know where I was and that I was injured.  It just got so
19    blown.  When I wrote the rebuttal, I am asking all the
20    TAC officers that are there who are hearing this, which
21    is all written as I heard it from somebody, but I don't
22    know who, I am asking somebody, "listen.  I will sit
23    down with you and and go over all of this and tell me
24    exactly what was being said", and I couldn't get any
25    compliance with internal investigation, like, I am
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 580 of 805   Document 80-21

1     saying, "that is not what I was doing."  I would have

          2     never jeopardize, you know, anything with Juanita and

          3     her status on things that she has to do.  I am not going

          4     to take her to impede on a traffic stop that I don't

          5     even know where it is.  So all I am saying is if you

          6     are going to do an investigation -- I offered my son to

          7     Lieutenant Hanley.  "You want to come over and talk to

          8     him?  He is at the house right now.  Melanie is here,

          9     too.  You want to talk to them?"  No one wanted to come

         10     and talk to them.  If you already are telling me that

         11     I am -- "TAC officers are saying that you were going to

         12     go to UWM", these are the people that know where I was

         13     really going.  I know where I was going, Juanita knows,

         14     Melanie knows and Jordan knows.

         15              MS. WILSON:          You have to help me

         16     with some of this.  I can't write as fast as she can.

         17     I am trying to figure out how this phone call, this

         18     hook-up you had with Juanita.  Did you talk to her on

         19     the phone, because you said something about you heard

         20     her badge number.  Do you remember that?

         21              THE WITNESS:          No.  We all have

         22     squad numbers, not badge numbers; squad numbers.  I

         23     believe mine was, at the time, 9282.  I am not sure.

         24     Probably 9281or something.  So I am at District 5

         25     talking to Melanie and I hear the dispatcher say, what-

1       ever Juanita's squad was, respond to the hospital for a
         2       shooting.  So I tell Melanie, "hey, are you leaving the
         3       district?"  She is, like, "yes."  I am, like, "we will
         4       talk later."  She's, like, "you gotta come back, you
         5       gotta come back."  I'm, like, "no, we will talk later.
         6       She is, like, "what about this report, what about this
         7       report?"  I said, "I will be back later.  Your shift
         8       ends at 3:00, mine ends at 4:00.  I will come back
         9       before your shift has ended and if not, if I can't make
        10       it back here because of an assignment, we will talk on
        11       the phone on how to deal with it."  So she is, like,
        12       "all right."  I said, "just wait for me at the district.
        13       I will come back."  So that is when I got in my car and
        14       proceeded to go to St. Joseph's Hospital, talked to
        15       Juanita on the phone halfway there and she said, "this
        16       is nothing.  I got it."  I said, "okay.  Call me if you
        17       need me."
        18                   MS. WILSON:        Who took who --
        19       Now, Juanita didn't seem to know whose car it was.  It
        20       was a car that you all -- you said was called up or
        21       something that he explained.  You just got a car?
        22                   THE WITNESS:        There is a process of
        23       getting cars, but because the process of CIB, Criminal
        24       Investigation Bureau, being dismantled into the
        25       districts, instead of all at once place, there is not

```
1       enough cars half the time for us, so sometimes, we
2       share.  I have been dropped off at crime scenes before.
3       At this time, this was the car that she had keys sitting
4       on the table.  So I took them and I said, "I am
5       driving."
6                   MS. WILSON:        Because I know she
7       said --
8                   THE WITNESS:       She doesn't know how
9       I got to drive.
10                  MS. WILSON:        Let me ask you this.
11      When your son called you, he said he had been stopped by
12      the police department.  He didn't say, "and by the way,
13      Mom, I had a drink."  My granddaughter had better told
14      me because I will beat her to death because that moves
15      everything to a different level.  My other question
16      is --
17                  THE WITNESS:       Of course, he didn't
18      tell me that.
19                  MS. WILSON:        My other question is,
20      how did Officer Stacey -- if Jordan didn't know where he
21      was, you didn't know where he was, fifth district didn't
22      know where he was, nobody knew where he was, how did she
23      find him?  She just drove up and down the street?
24                  THE WITNESS:       Internal investigation
25      hadn't even found out how she found out where he was.
```

```
 1      She told me later on that she tried to get ahold of him
 2      by calling his phone, but there was no answer.  I
 3      imagine that is when he was probably doing sobriety
 4      tests or something, and Mr. Cody Smith had his phone.
 5      I am just speculating.  Don't know.  Or maybe everybody
 6      is calling the wrong number that I am giving.  I am not
 7      quite sure.  So she Facebooked a "In" box.  So if he had
 8      his phone, it would -- it would come up as the Facebook
 9      page or something.  That didn't happen.  I don't know.
10      I don't know how somebody found out or -- or Jordan --
11      when he was looking for me, called the districts and
12      told them, "hey, I am looking for my mom", because they
13      left him just standing there when he called the
14      districts and asked or 911 and asked, "where is my mom?"
15      If they gave him -- and, then, he gave that address to
16      them and, then, they gave it to her?  I don't know.
17                      MS. WILSON:        Your friend, I lost
18      her name.
19                      THE WITNESS:       Deb Stacey?
20                      MS. WILSON:        No.  The one you
21      went to --
22                      THE WITNESS:       Melanie Beasley?
23                      MS. WILSON:        Melanie.  You said
24      you went -- I think you said earlier, you went to talk
25      to her so you could help her find somebody who would
```

```
1        listen to her.

2                    THE WITNESS:        No.  She already had

3        been telling me and Sojourner Truth House and Lieutenant

4        Hanley.  On October 5, she told him, she also told

5        Lieutenant Lipski sitting at the table here about her

6        sexual assault.  She also told Adam Zieger and Sergeant

7        Chris Schroeder (phonetic) from IAD, because I was with

8        her all of those times that she told them what has been

9        happening to her and nobody was listening to her and

10       they were giving her advice, like, "go get a restraining

11       order.  Then we will do something."  I was not friends

12       with Melanie at the time.  She was a female that was

13       working the late shift, like I was, that I had been

14       responding to more District 5 incidents than I had been

15       District 3 incidents and I would see her and then I

16       would see her break down.  We have an early interven-

17       tion program.  We are trained through the academy that

18       you see anybody in distress, your co-workers, you help

19       them and when you get that information, you give it to a

20       supervisor to handle, and that is exactly what I did.

21                    MS. WILSON:        I have one more

22       question.  The Shorewood officer -- officers I think

23       somebody said -- they stopped your son.

24                    THE WITNESS:        Yes.

25                    MS. WILSON:        They said he -- he
```

```
 1      passed the test.  Right?
 2                  THE WITNESS:        I got two different
 3      answers.  The one that he gave today was that he failed
 4      it, saying he got a .09.  I was told he got a .08.
 5      Regardless, he should not have been drinking at all.  So
 6      whatever penalty he was going to get, he would have to
 7      deal with.  I would never interfere with that.  I have
 8      other brothers that have been in trouble with the law,
 9      and I've never interfered.  They come --  Even the
10      detectives and the officers will call me and ask me,
11      "hey, your brother, John, he just did this, this and
12      this", and I will say, "he did it, he did it.  Then you
13      arrest him."  I never intervene and unfortunately, it
14      has happened several times with one of my brothers.  I
15      have never intervene.  I never ask them to give them
16      leniency.  The only time I told both of my sons is to
17      hand that card over to give it to them to let that
18      officer know that you are not going get searched and
19      that you know the law and you respect the law, because
20      my mother raised me and she is a detective.  So you
21      don't have to pull me out of my car.  It just happened
22      with this.  First of all, not to get into the traffic
23      stop, but why is he even stopped?  The call was to a
24      house.  It didn't mention anything about a blue car.
25      You don't get to pull over a car because it is leaving
```

```
 1      the area.  That is still a moot point just like the moot
 2      point that my son was drinking.  And yes, he would have
 3      had to pay those penalties.  I am not going to interfere
 4      in what he did.  He is a 19-year-old.  He just left
 5      Minnesota on a scholarship to come here and take the
 6      studies at UWM because he wanted to change his major.
 7      He makes those decisions, not me.  I just pay the bill.
 8                      MS. WILSON:        Thank you.
 9                      MS. MC KENZIE:     I have a few
10      questions.  I am going to straight to the Complaint
11      because this is really the basis for pretty much the
12      charges.
13                      MS. WILSON:        Where are you?
14                      MS. MC KENZIE:     The Complaint we
15      received.  I am looking at Page 3 of the Complaint.
16      It says --
17                      MR. PEDERSON:      It should be here
18      somewhere.  Document 5.  Page through it and find
19      Document 5.  It looks like this.
20                      MS. MC KENZIE:     I'm looking at
21      Page 3.  One of the charges against you is that --
22      basically, it states,
23              "Detective Lewandowski indicated that there
24      was no urgency to complete the follow-up and that she
25      intended to meet the other officer instead of conducting
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                        sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 587 of 805   Document 80-21      282

```
 1      the follow-up first because 'she had called me and asked
 2      me to.'  Detective Lewandowski described that her
 3      response to District 5 took precedence over the gun
 4      retrieval because that was where she was 'going to go in
 5      the first place.'  Detective Lewandowski added that the
 6      firearm retrieval was not her assignment."
 7                      THE WITNESS:      Yes.
 8                      MS. MC KENZIE:      Looking at that and
 9      seeing that the charge of "failed to use her time to
10      accomplish the mission of the department", are you
11      disagreeing with the fact that the mission of the
12      department was not to go to Ms. Beasley, but instead, to
13      do the job of gun retrieval?  Are you disputing that?
14                      THE WITNESS:      I am saying this.
15                      MS. MC KENZIE:      So let me backtrack.
16      What was, at that time, the mission of the department?
17                      THE WITNESS:      The mission for
18      Juanita Carr was to retrieve the gun.  I had nothing to
19      do with her assignment.  I didn't know there was
20      exigency in it.  She told me he shot himself and he was
21      a CCCW holder, meaning he was a permit holder.  So she
22      explained it to me, in brief, that he pulled the gun out
23      of his pocket and probably shot himself in the leg.
24      That is all she knew.  That isn't a crime to shoot
25      yourself with your own gun.  It happens all the time.
```

```
1        We don't take people's guns from them for that.  She
2        explained there was no exigency in it.  I didn't respond
3        to the hospital, I didn't know that it was more than
4        that.  I only knew that is what she had told me.  She
5        wasn't even going go to get the gun a second time.  What
6        she was going to do was put it into the follow-up, which
7        day shift would have got it.  I said to her, "hey, I
8        will go with you.  Let's go and take care of it.  I am
9        going to go to District 5 first and talk to Melanie
10       about her report and since you were just there, let's
11       make some time go by and let people get home if they are
12       going to get home.  I will go there.  It is only going
13       to be a brief conversation with her, go over her report
14       to tell her what I would file and, then, come back to
15       District 3."
16                   MS. MC KENZIE:      So you are saying
17       that was not your assignment.
18                   THE WITNESS:       That is correct.
19                   MS. MC KENZIE:     The second part says
20       here on Page --  Well, you were the driver of the car.
21       Correct?
22                   THE WITNESS:       Yes.
23                   MS. MC KENZIE:     The second part, on
24       Page 5, it says,
25                   "The department vehicle was determined to be
```

```
 1        'totaled' with a value of $4,525.  Detective

 2        Lewandowski, a second detective, and a citizen were all

 3        transported to the hospital for injuries.  Both

 4        Detective Lewandowski and the other detective were

 5        unable to return to work for a significant period of

 6        time.

 7               detective Shannon Lewandowski failed to

 8        operate the vehicle in a safe and courteous manner

 9        while complying with all traffic laws."

10        So in your assessment, you are saying you did not

11        violate this particular charge.

12                    THE WITNESS:       I didn't violate one

13        charge.

14                    MS. MC KENZIE:     I am asking you about

15        this one.

16                    THE WITNESS:       About that one.

17                    MS. MC KENZIE:     Did you operate the

18        vehicle in a safe manner?

19                    THE WITNESS:        I operated the

20        vehicle not only in a safe manner.  Juanita Carr even

21        said if I was speeding, she would have told me so.  I

22        was operating at more of a safe manner because if I

23        wouldn't have had my lights on, the cars that were

24        coming from east to west that had pulled over when they

25        saw my lights would have also been in that intersection.
```

```
 1                    MS. MC KENZIE:       So again, let me ask
 2          you, based on police procedure, were you operating your
 3          car in a safe manner?
 4                    THE WITNESS:       Yes.
 5                    MS. MC KENZIE:       Not in your assess-
 6          ment.  I understand your assessment and Juanita's
 7          assessment, but as an employee of the police department,
 8          were you operating your car in a safe manner?
 9                    THE WITNESS:       Yes.
10                    MS. WILSON:       Now, I have a follow-
11          up question to hers.  If individuals shooting themselves
12          is not a crime, then, why would either one of you go to
13          see about the gun, because one of the duties of police
14          officers is to address crimes.  So it looks like neither
15          one of you should have been going.  You should have been
16          doing police work.
17                    THE WITNESS:       First of all, when
18          there is a shooting and people are -- I don't know the
19          whole case because since then, I never -- I only knew
20          that little caption of offering my assistance to
21          Juanita.  I don't know all the semantics of the case.
22          I don't know what happened afterwards.  I don't know
23          that they were lying to her or not.  I wasn't part of
24          her case.  I know about as much as her as all I know
25          about all the other detectives' work out there.  It is
```

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | not my responsibility.  Those are your cases.  I have my     |
| 2   | cases, but if you need help, I am the first one who is       |
| 3   | going to offer the help.  I am the first one at your         |
| 4   | scene.  I am the last one usually at work.                   |
| 5   | MS. WILSON:        You are the one who                        |
| 6   | said that shooting yourself is not a crime.                  |
| 7   | THE WITNESS:        She said, "he shot                       |
| 8   | himself", so it is not a big deal and he is a permit         |
| 9   | holder.  It would be a crime if he was a felon and he        |
| 10  | had possession of a firearm, but this is what I was told     |
| 11  | from her.  He is a carry concealed weapon, he shot           |
| 12  | himself in the leg with his own gun and he doesn't want      |
| 13  | us to have the gun, because that is what I asked when        |
| 14  | the patrol sergeant walked by.  He said, "did you            |
| 15  | recover the gun?"  She said she went by herself and I am     |
| 16  | thinking, "why would you go by yourself?  That is            |
| 17  | dangerous."  She is, like, because he is just a CCW          |
| 18  | carrier and he shot himself.  So it is not a big deal."      |
| 19  | So I just took her word for it.                              |
| 20  | MS. WILSON:        I apologize.  I                           |
| 21  | thought you said it.  I am sorry.                            |
| 22  | THE WITNESS:        No.                                      |
| 23  | MS. WILSON:        I have no more                            |
| 24  | questions.                                                   |
| 25  | MR. KONRAD:        You said the                              |

```
 1      detectives are assigned to districts?
 2                   THE WITNESS:        Yes.
 3                   MR. KONRAD:         What district are you
 4      assigned to?
 5                   THE WITNESS:        Three and five.
 6      Central Division covers three and five.
 7                   MR. KONRAD:         That explains why you
 8      were going back and forth.
 9                   THE WITNESS:        I had a desk at both.
10                   MR. KONRAD:         Just so we are clear
11      on this shooting, the person who was injured reported
12      that they had shot themselves.  Correct?
13                   THE WITNESS:        I don't know what
14      they reported, what they --  Obviously, they lied
15      because they couldn't find the scene for a while.  I
16      don't know.  All I know is that day when I went to
17      District 3 to ask Juanita if she needed any help, she
18      said, "it is not a big deal.  He shot himself and he is
19      a CCW carrier."  I left it at that.
20                   MR. KONRAD:         So you didn't know
21      whether or not her statement was based upon just the
22      report that a person was shot or was it based on a more
23      fuller investigation?
24                   THE WITNESS:        My decision to offer
25      my help just stands.  Her decision in the exigency or
```

```
 1      the urgency to get it is based on her being a detective
 2      for as long as I have been a detective.  I cannot make
 3      those decisions for her.  That is her case.  Now, if a
 4      lieutenant would have said, "I want you to help her with
 5      that case", I would have said, "give me all the facts.
 6      What do we have going here?"  But I didn't.  I just
 7      offered my help.
 8                      MR. KONRAD:        Thank you.  I think
 9      we will --
10                      I understand you may have follow-up,
11      but you will have a chance for redirect after the cross.
12                      MR. MC GAVER:      Fine.
13                      MR. KONRAD:        So we will adjourn
14      and reconvene tomorrow at 8:30 in Room 301-B.
15      (WHEREUPON, THE DEPOSITION WAS CONDUCTED AT 4:57 P.M.)
16
17
18
19
20
21
22
23
24
25
```

```
1    STATE OF WISCONSIN )
                        )
2    COUNTY OF MILWAUKEE)

3

4              I, SUSAN K. TAYLOR, do hereby certify

5    that I am a stenographic reporter; that I was present at

6    the hearing in the above entitled action, and that I

7    recorded the same in shorthand; that the above and

8    foregoing is a true, correct and exact copy, in

9    longhand, of my shorthand notes taken at said hearing.

10

11             Dated this      day of      2016

12

13

14

15

16

17                            SUSAN K. TAYLOR

18                            Court Reporter

19

20

21

22

23

24

25
```

```
 1                    E X A M I N A T I O N   I N D E X
 2
```

```
 3     WITNESS                                    PAGE NO.

 4     SHANNON LEWANDOWSKI

 5     Cross-Exam by Mr. Pederson                 292
       Redirect Exam by Mr. McGaver               356
 6

 7     SEAN HANLEY

 8     Direct Exam by Mr. Pederson                363
       Cross-Exam by Mr. McGaver                  381
 9     Redirect Exam by Mr. Pederson              386
       Recross-Exam by Mr. McGaver                388
10

11     STEVEN KELLY

12     Direct Exam by Mr. Pederson                390
       Cross-Exam by Mr. McGaver                  396
13

14     ADAM ZIEGER

15     Direct Exam by Mr. Pederson                400
       Cross-Exam by Mr. McGaver                  409
16

17                          PHASE II
18
       CARIANNE YERKES
19
       Direct Exam by Mr. Pederson                440
20     Cross-Exam by Mr. McGaver                  459

21
       CHAD BOYACK
22
       Direct Exam by Mr. McGaver                 464
23

24     SHANNON LEWANDOWSKI

25     Direct Exam by Mr. McGaver                 467
       Cross-Exam by Mr. Pederson                 471
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 596 of 805   Document 80-21

```
 1              MR. KONRAD:      Good morning.  It is
 2    Thursday, August 11, 2016, approximately 8:30 a.m.  This
 3    is a continuation of the hearing in the matter of the
 4    Disciplinary Appeal of Detective Shannon Lewandowski.
 5    My name is Rudolph Konrad.  I am the hearing examiner
 6    presiding over this matter.  The Fire and Police
 7    Commission commissioners here serving on the panel are
 8    Commissioners Kathy Hein, Ann Wilson, and Angela
 9    McKenzie.
10              We are still in Phase I of the
11    proceeding.  We will begin with the cross-examination
12    of Ms. Lewandowski.
13              Take the stand.  You are still under
14    oath.
15    CROSS-EXAMINATION BY MR. PEDERSON:
16    Q    I would like to begin with you and Juanita Carr at
17         District 3.  Okay?
18    A    Okay.
19    Q    I would like to get a better understanding of how it was
20         determined that you would go to the house with her to
21         perform the search.  So my first question is, at the
22         time that you did that, did you already know that you
23         were going to go to District 5 first?
24    A    At the time that I volunteered?
25    Q    Yes.
```

```
 1   A    Yes.

 2   Q    Did you communicate that to Detective Carr?

 3   A    Yes.

 4   Q    What did you tell her?

 5   A    I said, "do you want to go and try to get the gun

 6        again?"  And she said, "yes."  I said, "I will go with

 7        you if you want", and she said, "fine."  I said, "but I

 8        have to go to District 5 first and handle some business.

 9        It shouldn't take that long and, then, we can come back

10        around and do that," and she said, "yes, that is good,

11        because I was just at the house."

12   Q    What was your expectation about when you were going to

13        get back to the house to actually attempt to search?

14                      MR. MC GAVER:       I will object.

15        The question is vague.  Are you asking about the time?

16                      MR. PEDERSON:       I am.

17                      MR. KONRAD:         What was the

18        question?

19   Q    Your plan was to go to District 5 first and, then, go to

20        the house and see if you could perform a search.  Right?

21   A    Yes.

22   Q    Did you have an expectation at the time you left

23        District 5 about when you were going to get to District

24        5, how long it was going to take you and when you were

25        eventually going to get to the house?
```

```
 1   A    No.

 2   Q    Do you have any ability to estimate, like, an hour, two

 3        hours?  Anything like that?

 4   A    Maybe half hour, 45 minutes.  I -- if I thought about

 5        it right now, that is probably what it would have taken.

 6        I don't know how long the conversation would have

 7        lasted.

 8   Q    If you got into the house and you found the gun, there

 9        would be some paperwork going.  Right?

10   A    Yes.

11   Q    Would that require some overtime?

12   A    I can't speculate because I could have went to District

13        5 and handled my business within ten minutes or it could

14        have been an hour.  I can't speculate on it.  I offered

15        my assistance to a co-worker.  She accepted it and she

16        agreed to handle it the way we did.

17   Q    You'd agree with me that at the time you left the

18        district, though, you had -- both you and Detective Carr

19        only had two hours left on your shifts.  Right?

20   A    That's correct.

21   Q    As a detective, you are expected to, the extent you are

22        able, to manage your workload so as to minimize, not

23        maximize overtime.  You'd agree with me?

24   A    That is correct.

25   Q    Let's take a step back.  You had previously indicated
```

```
 1        that there was I believe your testimony was a black male
 2        sergeant who had asked Juanita Carr about if she found
 3        the gun.  Was that your testimony?
 4   A    Yes.
 5   Q    Do you know the name of this sergeant?
 6   A    I don't.
 7   Q    But you worked in the district.  Right?
 8   A    Yes.
 9   Q    How long did you work in the district?
10   A    I guess all of my career.
11   Q    Is it unusual that you wouldn't know who the sergeant
12        was that works on the very same shift that you work?
13   A    He doesn't work on my shift.  I think he either works
14        day shift or maybe a power shift.  I have only seen him
15        in passing as a patrol sergeant.  He has nothing to do
16        with anything that I do.
17   Q    Do you know a sergeant by the name of Allen Perry?
18   A    I would have to see his face.  I don't recognize the
19        name.
20   Q    Can you name any black sergeants -- black male sergeants
21        that you are familiar with at District 3?
22   A    Harmon (phonetic).  I don't know.
23   Q    Okay.  So you just said that you don't know the
24        sergeants because they don't have anything to do with
25        what you do.  Right?
```

```
 1   A    Correct.

 2   Q    If that is the case, why is one of those sergeants

 3        getting involved in a detective's investigation and --

 4   A    You would have to ask him about that.

 5   Q    To your knowledge, is there a legitimate and bona fide

 6        reason why a patrol sergeant would regularly ask

 7        detectives about their investigations and ask them about

 8        their follow-up and ask them what they are doing

 9        regarding their investigation?

10   A    I don't know anything about regularly, like, no patrol

11        officer or sergeant, whatever, asked anything regularly.

12   Q    How often do patrol sergeants personally ask you about

13        your investigations and ask you if you performed follow-

14        up?

15   A    Not many, if any.

16   Q    Regarding Lieutenant Hanley at District 3, is it your

17        testimony that he was there, you just didn't speak to

18        him, or that he was not there?

19   A    What are you talking about?

20   Q    I can back up.  You indicated it was not Lieutenant

21        Hanley that spoke to Juanita Carr.  Right?

22                    MR. MC GAVER:        Objection.  Vague

23        as to time.

24   Q    I am still at the station.  I think that is clear.

25                    MR. KONRAD:     You are at the district
```

```
 1      before -- before Shannon Lewandowski teamed up with
 2      Juanita Carr?
 3                  MR. PEDERSON:        I am still
 4      referencing the occasion where Shannon Lewandowski
 5      served this unknown -- observed this unknown sergeant
 6      speak to Juanita Carr.
 7   A  Did I see the conversation with --
 8   Q  I am saying at or around that time, to your knowledge,
 9      was Lieutenant Hanley at the district station at all?
10   A  I have no idea.  I never saw him.
11   Q  When you left District 5, I believe you indicated before
12      you had a -- when you left District 3 on your way to
13      District 5, I believe yesterday's testimony, you said
14      you had a couple of reasons.  One, to assist Melanie
15      Beasley in a review of filing a felony and this personal
16      or this other business concerning her personal safety
17      concerns.  Right?  You had two functions?
18   A  Yes.
19   Q  My question for you now is, to your knowledge, regarding
20      the filing of the felony, when did that felony occur?
21   A  I don't recall because I didn't make it to her to talk
22      to her about it.
23   Q  The information that you were going to provide her, is
24      there a reason why it had to come from you and couldn't
25      come from a supervisor or another person at District 5?
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                        sueT@wi.rr.com
297
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 602 of 805   Document 80-21

```
 1   A   You'd have to ask Melanie that.  I don't know.  She
 2       asked for my help.  Detectives assist officers all the
 3       time and I was going there to do that.  It was in my
 4       district anyway.
 5   Q   You'd agree with me that one of the functions of
 6       supervisors at districts is to assist their officers in
 7       the very thing that you are saying you were going there
 8       to assist her with.  Right?
 9   A   I am a detective, not supervisor.  That is their
10       responsibility.  If an officer asks me for help at a
11       crime scene, especially a felony, I will offer that
12       help.  I am going to give it to them.
13   Q   I appreciate that, but that wasn't responsive to my
14       question.  Based on your knowledge and experience,
15       isn't the type of issue that you were going there to
16       assist her on was the filing of a "felony matter" is the
17       exact type of thing that supervisors are supposed to
18       assist their officers with in the district and that is
19       one of their basic functions, in fact?
20   A   My experience isn't as a supervisor or a lieutenant or a
21       sergeant.  I have never worked in that capacity.  I have
22       never been trained in that capacity.  However, felony
23       investigations are part of detectives' work, so they are
24       part of my job assignment and so if somebody needs help
25       with them, that is what I am there for.
```

```
 1   Q    Do you regularly cross from one district to another to
 2        assist officers in basic functions of their job?
 3   A    In my division, yes.  In Central, I work in Three and
 4        Five.  The majority of my assignments are in District 5.
 5   Q    You were a very busy person.  Right?  At that time.
 6        In terms of your workload and your caseload.  Right?
 7   A    I am sure I was.
 8   Q    Sure.  You knew the search needed to be done for the
 9        gun.  Right?
10   A    I guess so.
11   Q    Is it a true and accurate statement to say that you
12        decided on your own to prioritize the assistance and
13        going to see Melanie over the search for the gun?
14   A    No.
15   Q    How is that wrong?
16   A    I didn't make that decision.  Juanita did.  I offered
17        my assistance and she accepted it.  I told her I had
18        to stop at District 5 and she agreed.  It was her
19        assignment.  I didn't know the exigency of it, the
20        urgency.  I didn't know a supervisor instructed her.
21        All I knew is that she already went and I agreed to go
22        with her a second time.
23   Q    Well, if you are going to volunteer yourself, would you
24        agree with me that you bear some responsibility in
25        confirming what needs to be done, why and what the time
```

1      frame is?

2   A    No.  If she tells me -- if another coworker tells me

3         they need assistance, "hey, we are going to go do a

4         search warrant, we are going to go do a knock-and-talk,

5         can you come along with us?"  I don't ask any questions

6         at that point unless they are offering me the informa-

7         tion.

8   Q    I am going to refer to Document No. 9.  Please retrieve

9         that.  Go to the third page.  I would direct your atten-

10        tion to the third line where it says, "there was no

11        exigency."  Do you see it?

12  A    That is correct.

13  Q    I will read it.  Please follow along.

14             "There was no exigency in retrieving the gun,

15        since the victim of the shooting shot himself with his

16        own gun.  The victim is not a felon and legally owned

17        his gun when he accidentally discharged it, striking

18        himself.  There was no reason to retrieve the gun that

19        the Sergeant from District 3 requested Detective Carr

20        do.  I did not know this information at the time, only

21        that Detective Carr wanted to return to his home a

22        second time."

23        Did I read that correctly?

24  A    Yes.

25  Q    All right.  So when did you become aware of that infor-

1       mation if you didn't know it then?

        2   A   It is misconstrued that I didn't know this information

        3       at the time.  I meant the information that it was more

        4       than what Juanita said it was; a CCW holder accidentally

        5       shooting himself, that it was actually something along

        6       the lines of a domestic dispute and there was some

        7       exigency in getting it, but I didn't know any of that

        8       information.  I didn't know anything about that at the

        9       time.  Other than what that says right there, that he

        10      shot himself with his own gun and he didn't want to give

        11      the gun back.

        12  Q   If I understand your testimony, everything that you

        13      listed here, you actually did know at the time.

        14  A   Yes.

        15  Q   So you did have some knowledge of underlying facts

        16      related to the matter.  Right?

        17  A   I testified to that yesterday that I knew that.

        18  Q   And so therefore, do you ask or wonder to yourself that

        19      is it possible that perhaps this victim isn't a victim

        20      at all and in fact, is covering up, lying, about having

        21      been shot and therefore, should be important to get the

        22      gun for another reason?

        23  A   You are suggesting that I know everybody's -- other

        24      detectives' business.  You reiterated that I had my own

        25      caseload, which I did.  I am not interested in those

```
 1        details unless they ask me to be involved in their case.
 2        So you are assuming that I should know everybody's
 3        business and everybody's assignments.  If you ask me to
 4        do some follow-up, I will help you with it.  If I am
 5        assigned follow-up from a supervisor, then, I am going
 6        to reach in differently, I am going to read all the
 7        reports, I am going to question a detective who is
 8        handling it so that I know how to treat the situation.
 9        When I am going with a detective who is assigned to it,
10        that is all I need to do.
11   Q    But you would agree with me that these facts that you
12        have here, there is plenty of reasons why that may not
13        be known to you at the time, why it may be actually
14        exigent and more to the story.  You are acknowledging
15        that is true.  Right?
16   A    You are asking me to speculate about something --
17                  MS. MC KENZIE:     Can you just answer
18        the question to the best of your knowledge?  Do not
19        argue with the attorney, please.
20   A    I do not -- I don't know how to answer what you are
21        saying.  You are asking me to speculate.  I don't know.
22   Q    At some point, you had an interview with Sergeant
23        Zieger.  Right?
24   A    Yes.
25   Q    Why didn't you tell him at the time that you had this
```

```
 1      dual purpose and only told him at your interview about

 2      the single purpose of going to assist her regarding her

 3      personal issues?

 4   A  I don't remember if I omitted that.  I would have to

 5      listen to that tape over again.

 6   Q  I am presenting to you, and you should know for yourself

 7      that Sergeant Zieger testified to that, so I am asking

 8      you, you don't have the benefit of reviewing it.  I am

 9      asking you now, can you account for why you didn't,

10      according to the testimony of Sergeant Zieger?

11   A  I believe that I did say that to him.  I believe it

12      was in April, I told him the dual reason is why.  I

13      addressed both of those.  So if he is stating that I

14      didn't say it, I am not saying I agree with it.  I

15      would have to listen to it because I believe at that

16      time, which I have not even returned to work at that

17      time, I was still under treatment, I don't recall what

18      I said that day.

19   Q  Did you include in any of your written statements the

20      fact that you were aware that Juanita Carr had already

21      searched it just immediately prior to you leaving

22      District 5?

23   A  No.

24   Q  Why not?

25   A  I didn't feel there was a need to.
```

```
 1   Q   Wouldn't you agree with me that that is an important
 2       fact which justifies why you could go ahead and put off
 3       another search, because you were already there?
 4   A   If someone would have asked me, I would have told them
 5       that, but I never was asked.
 6   Q   You had been writing reports for a very long time.
 7       Right?
 8   A   Yes.
 9   Q   It is important to include all salient facts.  Would you
10       agree with me?
11   A   Yes.
12   Q   And it is important to be detail oriented?
13   A   Yes.
14   Q   So my question for you is, don't you agree with me that
15       it is an important fact that Juanita Carr had just
16       searched the house a short time before you had left
17       District 5 as it relates to why you are not going there
18       right away?
19   A   I didn't know I had to be accountable for that purpose.
20       That should have been in Juanita Carr's report.
21   Q   Is there a reason why you didn't say that in the
22       interviews -- or your interview with Adam Zieger?
23   A   I did say that.
24   Q   You are indicating that you told Adam Zieger in your
25       interview that Juanita Carr informed you that she had
```

```
 1      already searched the house once before she --

 2   A  No, that she was responsible for her assignment.

 3   Q  So, then, you would agree with me that the first time

 4      we have ever heard that Juanita Carr searched the house

 5      just before or shortly before you --  Let me back up.

 6      Would you agree with me that it was at this hearing the

 7      first time it was revealed that Juanita Carr attempted

 8      to search the house at issue shortly before the time

 9      that you met up with her and left District 5?

10   A  I don't know what Juanita Carr said in her hearing with

11      Zieger.

12   Q  I am asking, coming from you, is that the first time we

13      heard it?

14   A  From me personally, yes.

15              MR. KONRAD:        I am confused with

16      the question and answer.

17              MR. PEDERSON:      Do you want me to

18      restate it?

19              MR. KONRAD:        Exhibit 9 is October

20      of 2015, her statement.  She says that, "I didn't know

21      the situation at the time."  Then, she says only that

22      Detective Carr wanted to return to the home a second

23      time.

24              My question is, could you tell me again

25      what you meant by that sentence?
```

```
 1              THE WITNESS:      He just asked me about
 2      "we."  This is the first time we heard it and I already
 3      knew at the district, that Juanita had been to the
 4      house.  So I volunteered to go a second time and he
 5      asked me if we -- if this is the first time we heard it,
 6      all of us, and I said, "yes, I guess so."
 7              MR. KONRAD:      So your answer is the
 8      first time that all of us heard it, not the first time
 9      you heard it.
10              THE WITNESS:      The first time I
11      heard it was at the district on the 19th from Juanita
12      herself.
13              MR. KONRAD:      You said this was
14      not in any of her written statements.  Counsel, which
15      written statements are you referring to?  Her PI-21 or
16      the --
17              MR. PEDERSON:      The exhibits that
18      have been submitted, the three separate exhibits that
19      have been submitted, including Exhibit 9.
20              MR. KONRAD:      Thank you.
21      BY MR. PEDERSON:
22   Q  I would like to move forward in time to the -- when you
23      are driving in the car and on east North -- west North
24      Avenue approaching North 35th Street.  Okay?
25   A  Yes.
```

```
 1   Q    You have indicated that you turned on the emergency
 2        lights between 36th and 35th.  Is that right?
 3   A    Yes.
 4   Q    If I recall your testimony correctly yesterday, it is
 5        not that there was a car coming out in front of you for
 6        sure, but you just thought it was possible and so it was
 7        just a cautionary measure.  Is that right?
 8   A    No.  I said the car was impeding traffic in the bicycle
 9        lane and half of my lane and its brake lights came on
10        and off and so as I was approaching it, I let them know
11        on a short notice that I was coming around them.
12   Q    I guess my question, then, is that this wasn't a close
13        call or anything.  This was more of a cautionary
14        measure of, "he might pull out in a second.  I am going
15        to go ahead and do this blurp -- I think you called
16        it -- and notify him so -- just to be extra safe so he
17        doesn't pull out while I am going around him."
18   A    I felt he might be pulling out because his brake lights
19        came on and off.
20   Q    This was not a quick action by you, like, a sudden,
21        unexpected thing.  You saw this as you are coming up
22        that "he is blocking traffic, I am going to need to go
23        around him" and you took this measure just as part of a
24        calculated measure as you were approaching.  Right?
25   A    Yes.
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 612 of 805   Document 80-21   4691-029-0607

```
1   Q    If you are in a personal vehicle without the benefit of
2        emergency lights, would you agree with me that someone
3        would simply slow down, make sure there is no oncoming
4        traffic and go around the vehicle?
5   A    That is what I did in this vehicle, also except I
6        illuminated the lights.
7   Q    Why did you feel that was necessary?
8   A    I just felt it was necessary.
9   Q    Is there a reason why simply slowing down and going
10       around the vehicle was not going to be adequately safe?
11  A    It was just a little bit more safe with the lights.
12  Q    Are you trained to use your lights in this matter?
13  A    If someone is impeding traffic, we can use the lights
14       to go around them.  It is part of the horn.  The horn is
15       past the lights.  In order for me to get to the horn, I
16       have to go on the toggle switch past the lights to the
17       horn.
18  Q    Would you agree with me that you are trained to be
19       cautious in how you use emergency lights and sirens?
20  A    Yes.
21  Q    Why is that?
22  A    They are used for emergencies.
23  Q    Would you agree with me that it is possible --  Strike
24       that.  Would you agree with me that one of the reasons
25       why you are trained to be cautious is because turning on
```

```
1         lights and sirens suddenly in the midst of traffic can
2         be distracting and you can actually create a more
3         hazardous situation with people responding to it?
4    A    I never experienced turning on emergency lights and
5         people being distracted even more.  We use the lights
6         to block off streets when we have crime scenes.  We have
7         lights on at parades.  We use the lights for several
8         different non-emergency reasons.  So this was a way for
9         me, because I don't have a horn just to beep, to go
10        around the car in a safe manner and let him know not to
11        pull out.  It is just that simple.
12   Q    So if this is a calculated move on your part, you just
13        do a quick notice to him, like, a horn, why do you leave
14        it on?
15   A    I couldn't tell you.  I don't believe I did leave it on,
16        but I don't remember after I hit the car.
17   Q    It is your testimony that you were traveling approxi-
18        mately how fast at the time of the collision?
19   A    30 or less.
20   Q    Just to try to clarify something.  In your testimony,
21        you said you didn't have a horn in your vehicle.  Is
22        that right?
23   A    The horn doesn't work on there.  You use it on the
24        toggle switch.
25   Q    What function does the horn have?
```

```
 1   A    I guess none.

 2   Q    Isn't there one of those air horns on the side that is

 3        attached to the vehicle?

 4   A    I don't know what you are referring to.  Air horn?

 5   Q    Yes.  Is there another piece of equipment on the vehicle

 6        that allows you to employ it so it makes a horn noise, a

 7        regular loud horn noise?

 8   A    Yes.  On the toggle switch past the lights.

 9   Q    Is it accurate --  Do you recall stating in your PI-21

10        that you purposely left the emergency lights on?

11   A    I don't recall.

12   Q    Were you wearing your seat belt at the time of the

13        accident?

14   A    I believe so.

15   Q    Yesterday, you testified about how TAC officers

16        responded to the scene.  Do you recall that testimony?

17   A    Yes.

18   Q    If I understand your testimony correctly, you were

19        indicating that that was somehow unusual that TAC

20        officers would respond to the scene of an accident.

21        Is that right?

22   A    I actually believe I testified that it would not be

23        unusual.

24   Q    Very good.  Then, you would agree with me that TAC

25        officers, while they do have special assignments as part
```

```
 1        of TAC, they also do regular patrol as well during the
 2        course of their tour of duty.  Right?
 3   A    No, I don't believe they do patrol, but they might
 4        respond to two deceased detectives.
 5   Q    Let me ask the ultimate question so this will be easier.
 6        Would you agree with me that there is nothing unusual
 7        about the fact that there was a number of TAC officers
 8        that responded to the scene where you were in an auto
 9        accident?
10                   MS. WILSON:        I didn't hear you.
11                   MR. PEDERSON:       I tried to sum up in
12        a simple question if she would agree with me that there
13        would be nothing unusual about TAC officers responding
14        to the scene of an accident that she was involved in.
15   A    Just them responding?  Nothing unusual.
16   Q    Is there anything unusual about TAC officers being there
17        at the scene that you were involved with?
18   A    Yes.
19   Q    Can you please explain why?
20   A    Because they made statements apparently to Sergeant
21        Riley who said that I was making these statements and
22        they didn't remain on the scene.  They didn't write a
23        report.  They weren't interviewed.  If they are going to
24        take part of what I am babbling on the scene, then every
25        person who responds per SOP to a crime scene has to
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                    sueT@wi.rr.com

```
 1        write a report about what they heard or saw.

 2   Q    You indicated this was --  Strike that.  It is your

 3        testimony that every single officer at a crime scene has

 4        to file a report?

 5   A    Every officer who responds to a crime scene is supposed

 6        to write a report based on what they did or heard or saw

 7        before the end of their shift.

 8   Q    Would you agree with me that supervision has discretion

 9        on who should and should not write reports?

10   A    Yes.

11   Q    Would you agree with me that supervision has an interest

12        in getting the reports from only key personnel, espe-

13        cially when there are large numbers of officers who

14        respond just due to efficiency?

15   A    Yes.

16   Q    So would you agree with me that it is not necessarily

17        unusual that not every single officer filed a report

18        that was at that scene?

19   A    I find it highly unusual that a sergeant, specifically

20        Adam Riley, stated that he heard statements from other

21        officers on the scene.  He did not hold them, remain

22        there to be interviewed by detectives.  He didn't ask

23        them to write a report about what they heard me say,

24        so everything was, "I heard something to the effect of

25        I heard she was going to do this or that," but there is
```

```
 1        absolutely -- Sergeant Riley isn't here, Sergeant Zieger
 2        didn't seek those people out to find out who were those
 3        people on the scene who heard me say those statements?
 4        So yes, I find it troubling that I am responsible for
 5        somebody else's assignment according to how your ques-
 6        tioning goes, but here, the most important thing is
 7        something that I am saying and being held accountable
 8        to have someone get my son and those officers didn't
 9        write a report and we don't even know who they are.
10   Q    What else is unusual about the fact that the TAC
11        officers were there and what they did to you?
12   A    I don't think there is much else that I remember.
13   Q    Didn't you testify yesterday that you believe that they
14        were making up the story regarding your statements about
15        wanting to go to your son at UWM as part of a retalia-
16        tion toward you?  Wasn't that your testimony?
17   A    My testimony wasn't that they made it up.  My testimony
18        is that they said it and there was no reports done, no
19        questioning of them and the TAC officers that did show
20        up, I recognized them from TAC.  I don't know their
21        names.  There is no report done and at the same time, I
22        am responding to Melanie Beasley at District 5 for the
23        exact same problem of a TAC officer who had sexually
24        assaulted her, with a valid temporary restraining order
25        filed at her district, yet she was getting no help from
```

```
 1        supervision there and it is kind of ironic that I am
 2        being disciplined for hearsay when I am asking those TAC
 3        officers who were at the scene to write that report and
 4        be interviewed, like, I want them to tell exactly what I
 5        said and tell the truth.  It is not available.  So I am
 6        going to go see Melanie and for some reason, there is no
 7        exigency of going to help a female officer who had been
 8        sexually assaulted at the district.  Apparently, that is
 9        not important to this department.
10   Q    When did this alleged sexual assault occur?
11   A    You would have to ask Melanie Beasley on that.  However,
12        I do know that October 5, 2014, I told Lieutenant Hanley
13        and, then, Lieutenant Hanley looked his picture up on
14        the computer to see who I was talking about.  Then, I
15        gave the IP address of that computer to Sergeant Zieger
16        so he could see that he did look it up and that somehow
17        got lost.  Then, Melanie Beasley told Lieutenant Timothy
18        Leitzke for an hour on November 11 and told -- for an
19        hour and ten minutes about how she was sexually
20        assaulted, harassed and threatened by a TAC member of
21        the department, and he has not done anything about it.
22        Then she went to --
23   Q    Let me stop you there.
24             MR. KONRAD:        This line of
25        questioning, you may continue it, but the whole premise
```

```
 1    seems to be based upon the idea that there were some
 2    very exact statements made to -- of that incident.  The
 3    way I read the report, these statements were pretty
 4    ambiguous.  For example, just something about her son.
 5    She had to get her son.  I don't recall exact words.
 6    Something to the effect.  You may continue, but --
 7                    MR. PEDERSON:      I don't think the
 8    context --
 9                    MR. KONRAD:      I don't see a clear
10    accusation, nor do I see conspiracy.  You can go ahead,
11    but you should -- we should recognize the nature of
12    these statements on both sides.
13                    MR. PEDERSON:      I do have a purpose
14    that is unrelated to what the issue is that you are
15    raising right now.
16    BY MR. PEDERSON:
17  Q   I want to be clear.  The sexual assault did occur
18      months prior to when the accident occurred.  Right?
19  A   I am not sure of the date.
20  Q   But it was months.  You are indicating that she was
21      complaining about it in November of 2014.  Right?
22  A   Are you saying from the accident date?
23  Q   Yes.
24  A   Yes.
25  Q   You would agree with me that the district attorney
```

```
 1     reviewed the case where Melanie Beasley made that
 2     allegation.  Correct?
 3  A  Yes.
 4  Q  And you are aware that the DA decided not to process
 5     and issue charges in that case.  Correct?
 6  A  Yes.
 7  Q  I want to get some clarification.  Why was it so urgent
 8     at that moment, because the way you are testifying, it
 9     sounds like this just happened and you said it happened
10     at the district.  I want you to clarify those points.
11     Why was there such an urgency for you to do it at that
12     time?
13            MR. MC GAVER:      I'll object.  It is
14     vague.  What is she supposed to have been doing at that
15     time?
16            MR. PEDERSON:      I don't understand
17     the objection.
18            MR. MC GAVER:      You asked what was
19     she doing at the time?
20            MR. PEDERSON:      Yes.  I will try to
21     re-ask it.
22            MR. MC GAVER:      The question is
23     vague.
24            MR. KONRAD:      I assume the question
25     is, "why were you going to Five instead of checking on
```

```
 1        the gun?"

 2                    MR. PEDERSON:        No.  That is not the

 3        question.  I will re-ask it.

 4        BY MR. PEDERSON:

 5    Q    You just testified that you're on your way to District 3

 6        and District 5 and it is this urgent thing, or at least

 7        that is the impression I get, because she is suffering,

 8        she just -- of the sexual assault and it is a big deal.

 9        That is the impression I am getting from your testimony

10        and I want to understand why, then, at that moment is it

11        such a big deal -- the sexual assault, while terrible,

12        if it occurred, occurred months ago and there is no

13        urgency or immediacy for you personally to be going

14        doing this.  So please explain to me.

15                    MR. MC GAVER:        I am going to

16        interject another objection.  I think the question is

17        still ambiguous.  I think it is irrelevant at this

18        point.  I have let it go on for a while.  We seem to be

19        going nowhere and spinning our wheels.  My objection is

20        the question is vague, ambiguous, irrelevant.

21                    MR. KONRAD:        The question has been

22        asked and answered.  In previous testimony, she had

23        explained that she didn't because there had been a

24        previous search of the house.  There was no urgency to

25        go back immediately.  I will sustain the objection.
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 622 of 805   Document 80-21   317

```
 1        BY MR. PEDERSON:

 2   Q    So is it your testimony today that the TAC officers were

 3        involved in a conspiracy and retaliation against you due

 4        to the whole situation with Melanie Beasley's accusa-

 5        tions and that whole thing?  Is that your testimony?

 6        I can't be any more plain than that.

 7                    MR. MC GAVER:       Same objections.  I

 8        will reiterate my relevance objection.  It is the same

 9        question asked in a different manner.

10                    MR. PEDERSON:       It goes to her

11        credibility.  She's provided this testimony.  I should

12        be able to examine her on her credibility.

13                    MR. KONRAD:        I think it would

14        expose any bias she might have that might affect her

15        testimony, so go ahead.

16        BY MR. PEDERSON:

17   Q    Is that your testimony?

18   A    Can you rephrase or say this again?

19                    MR. MC GAVER:       It might be good to

20        have the court reporter read it back.

21                    MR. PEDERSON:       Sure.

22        (Question read)

23   A    No.  I said it appears that way.  Here I am, asking

24        Internal Investigations to contact those TAC officers

25        who are on the scene that overheard me say that I was
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 623 of 805   Document 80-21   318

```
 1      going to UWM or to get my son, but all there is in the
 2      report is hearsay and rumors at the district and I
 3      wanted them to nail those people down and say, "hey,
 4      what exactly did you hear?  What exactly did you see her
 5      -- her actions?"  None of that was done.  So yes, it
 6      just seems quite funny.  I am trying to get a fair
 7      judgment here and I can't even get Internal to do
 8      something fair for me.
 9                     MS. MC KENZIE:      So, then, your issue
10      is with the process and not necessarily the information
11      at this time.
12                     THE WITNESS:      That is correct.
13      BY MR. PEDERSON:
14   Q  Yesterday, you testified that you knew where your son
15      was.  Right?
16   A  That is not true.
17   Q  What did you say, then?
18   A  Depends when you are talking.  When he called me first
19      or when he told me at the hospital?
20   Q  Your testimony yesterday, my recollection, is at the
21      accident scene, you were trying to figure out where he
22      was and have somebody contact him and you were offering
23      these suggestions of different agencies where the police
24      might -- the officers around you might try to figure out
25      where he is.  Do you recall that testimony?
```

```
1    A    Yes.

2    Q    At that time, you said you got very frustrated because

3         you knew where he was.  Why don't you just go get him?

4    A    I said that?  I never said that.

5    Q    That is my recollection.

6    A    Your recollection isn't correct.

7    Q    What did you know, then?

8                   MR. MC GAVER:      The question is

9         ambiguous.  I will object.

10                  MR. KONRAD:        Could we focus on

11        what time we are talking about?  Immediately after the

12        accident?

13                  MR. PEDERSON:      I am at the accident

14        scene.

15   Q    What did you know about the location of your son?

16   A    Absolutely nothing.  Excuse me.  Other than he was on

17        the east side.

18   Q    Your testimony is therefore, from knowing he is on the

19        east side, this is what led you to just, sort of, deduce

20        that maybe he is at UWM and to contact them.  Is that

21        right?

22   A    That is not the correct order.  The first thing that was

23        asked of me was from Officer Joe Goggins who asked me

24        what the phone number was of my son.  When I couldn't

25        give him the correct phone number for whatever reason,
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                        sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 625 of 805   Document 80-21   320

```
 1          I recall asking them to call District 5 console to see
 2          if a District 5 officer was on a traffic stop, because
 3          District 5 is the east side.
 4     Q    You had the phone, didn't you?
 5     A    Juanita did, yes.
 6     Q    You didn't have your phone in your hand personally
 7          yourself?
 8     A    When are you talking about?
 9     Q    At the accident scene after the accident occurred.
10     A    I don't recall.  All I know is I had the phone because
11          I called 911 in the car, but I don't recall what
12          happened to my phone after.  I think Deb Stacey may have
13          had my phone.
14                    MR. PEDERSON:      I have a document
15          that I would like to introduce, but I only have one
16          copy.
17                    MR. MC GAVER:      If I can take a look
18          at it beforehand.
19                    MR. KONRAD:        Is this phone
20          records?
21                    MR. PEDERSON:      Yes.
22     Q    Can I ask you what your son's phone number is?
23     A    414-405-5138.
24     Q    What is your phone number?
25     A    414-405-4617.
```

```
 1                    MR. PEDERSON:      Thank you.

 2                    MS. MC KENZIE:      What is your son's

 3      number again?

 4                    THE WITNESS:       414-405-5138.

 5                    MR. PEDERSON:      This will be

 6      Exhibit 14.

 7                    MR. KONRAD:        You are stipulating

 8      to its admission?

 9                    MR. MC GAVER:      I would like to have

10      him introduce it first.

11      (A document was marked as Exhibit No. 14)

12      BY MR. PEDERSON:

13   Q   I am presenting you a document marked for identification

14      as number 14.

15   A   Yes.

16   Q   Do you see it?

17   A   Yes.

18   Q   What is it?

19   A   My phone bill.

20   Q   Is it correct to say on this phone bill, this is a bill

21      for two phone numbers?

22   A   Yes.

23   Q   These two phone numbers are the phone numbers which you

24      just provided, that is your cell number and your son

25      Jordan's cell number?
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 627 of 805   Document 80-21

1    A    Yes.

2    Q    I direct your attention to Page 19 of 20.  Do you see

3         it?

4                   MR. MC GAVER:       Does anyone mind if I

5         look on with the witness?

6                   MR. PEDERSON:       I have no objection.

7    A    Yes.

8    Q    Is it correct to say that these are the phone call logs

9         of the phone number for your son including the date of

10        January 19 --

11   A    Yes.

12   Q    -- of 2015?

13   A    Yes.

14   Q    I would direct your attention somewhere around the

15        middle where it indicates on January 19 at 2:11 a.m.

16        Do you see it?

17   A    Yes.

18   Q    Am I correct in stating that this phone record indicates

19        that your son placed a phone call to your phone number

20        at 2:11 a.m. and it lasted for two minutes?

21   A    Yes.

22   Q    Would it be correct to say this occurred approximately

23        five, six minutes or so before your accident?

24   A    Yes.

25   Q    Is this phone call where he informed you that he was

```
 1        stopped by the police?

 2    A   Yes.

 3    Q   Can you put in your own words what was indicated in that

 4        statement?  How did that conversation go?

 5    A   He said, "Mother, I am pulled over."  I said, "where you

 6        at?"  He said, "I don't know."  I said, "what are you

 7        pulled over for?"  He said, "I don't know."  I said,

 8        "when you find out, just call me back."  He is, like,

 9        "okay."  I heard some conversation on the phone and

10        eventually, he just hung up.  I tossed my phone to

11        Juanita and said, "when my son calls, just answer it.

12        Jordan got stopped."

13    Q   He said he doesn't know and that doesn't cause you

14        concern.  Is that right?

15    A   I don't understand what would be concerning about why he

16        doesn't know.

17    Q   You previously testified that you have great concerns

18        over the safety of your son when he has contact with

19        police and you are very protective of him and very

20        concerned about his safety, et cetera, so I am just

21        curious in itself that under this circumstance, he

22        notifies you he's been stopped, he can't give you any

23        details, and this doesn't concern you.

24    A   Because he doesn't know.

25    Q   I now direct your attention to Page 12 of 20.  Is it
```

```
 1        correct to say this page contains the phone record logs

 2        for your phone calls for the time period at issue?

 3   A    Yes.

 4   Q    Again, I direct your attention to about the middle of

 5        the page, just to correspond, 2:11 a.m., it states it

 6        is from "unavailable" and it lasted two minutes.  Right?

 7   A    Incoming call at 2:11.  Yes.

 8   Q    But we know just now, having looked at your son's

 9        records, that that was his phone call to you, even

10        though it states "unavailable."  Right?

11   A    Right.

12   Q    I direct you two entries down, 2:17 a.m.  Do you see it?

13   A    Yes.

14   Q    Am I correct to say that that was a phone call to your

15        son's phone?

16   A    Yes.

17   Q    I direct your attention one entry down, three minutes

18        later, 2:20 a.m.  Do you see it?

19   A    Yes.

20   Q    That was another call to your son's phone.

21   A    That is correct.

22   Q    Two entries down, 2:25 a.m., it indicates a phone call

23        from "unavailable."  Is that right?

24   A    Yes.

25   Q    Then another one from "unavailable" at 2:31?
```

```
1    A    Yes.

2    Q    And, then, another call at 2:45 to your son.  Right?

3    A    Yes.

4    Q    Please go back to Page 19.  Are you there?

5    A    Yes.

6    Q    I direct your attention to the middle of the page,

7         2:25 a.m.  The second entry for 2:25 a.m.  Do you see

8         that?

9    A    Yes.

10   Q    This is from the records of your son's phone.  Is that

11        right?

12   A    Yes.

13   Q    It indicates that at 2:25 a.m., he made a phone call to

14        your phone and that call lasted three minutes.  Right?

15   A    Yes.

16             MS. WILSON:         Excuse me.  Are you

17        saying -- since I don't have the piece of paper, are you

18        saying there was two calls made at 2:25 a.m.?

19             MR. PEDERSON:       Yes.  I will clarify

20        it with the witness.

21   Q    Looking at the records, Ms. Lewandowski, is it correct

22        that there are two entries of outgoing calls from your

23        son's phone at 2:25 a.m.?

24   A    Yes, there are.

25   Q    One is for one minute and the other is for three
```

```
 1        minutes?

 2   A    Yes.

 3   Q    Have you had a chance to look and at and review this

 4        document?

 5   A    With you just now.

 6   Q    Do you believe this to be a true and accurate copy of

 7        your phone bill and an accurate representation of the

 8        logs?

 9   A    Sure.

10                MR. PEDERSON:      I would like to move

11        it into evidence.

12                MR. MC GAVER:     No objection.

13                MR. KONRAD:       Exhibit 14 is

14        received.

15   Q    My question to you is that you have just seen that there

16        was a number of calls between your phone and his phone

17        immediately following the time of the accident.  Would

18        you agree with me on that?

19   A    Yes.

20   Q    Did you place any of those calls?

21   A    No.

22   Q    Do you have any idea who did?

23   A    Idea?  Either probably Joe Goggins or Deb Stacey or

24        William Krumnow.  I don't know.  I don't know who had my

25        phone.
```

```
 1   Q    Would you agree with me, based on your own son's
 2        testimony, that if there was a three-minute call at
 3        2:25 a.m., that that is likely when, according to his
 4        testimony, Sergeant Smith answered the phone and spoke
 5        to someone who advised him that you had been in an
 6        accident.  Right?
 7   A    I can't speculate because I don't have any idea how long
 8        he was on that traffic stop, when he got picked up.
 9        That could have been Jordan calling for me on my phone.
10        It could have -- I have no idea.  I don't know if it
11        logs in one minute or two minutes.
12                  MR. KONRAD:         I think you answered
13        the question.  You can't speculate.
14   Q    I am not asking you to speculate.  I am just asking you,
15        is that consistent with the testimony that's been
16        provided, to your knowledge?
17                  MR. MC GAVER:       I will object.  I
18        think she answered the question, that she didn't know.
19                  MR. PEDERSON:       All right.  I will
20        move on.
21        BY MR. PEDERSON:
22   Q    You were transported to the hospital, Froedtert, from
23        the scene.  Is that right?
24   A    Yes.
25   Q    Do you now know an approximate time you arrived at the
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                    sueT@wi.rr.com
                                                          328
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 633 of 805   Document 80-21

```
 1        hospital?

 2    A   No.

 3    Q   When you were at the hospital --  Strike that.  I want

 4        to ask you about the nature of your injuries.  I believe

 5        yesterday, you testified that you had two black eyes.

 6        Is that right?

 7    A   Yes.

 8    Q   When did those develop?

 9    A   About three days after.

10    Q   On the day of the incident, I am wondering, can you tell

11        me what your appearance was at the time?  If someone

12        were to look at you when you were at the hospital, what

13        would they see in terms of injuries?

14                    MR. MC GAVER:      I will object.  I

15        don't think this witness is qualified to identify the

16        nature of how her injuries appeared.

17                    MR. KONRAD:        She can describe her

18        injuries, but I don't think she can describe how they

19        appeared to others.

20                    MR. PEDERSON:      My question to her --

21        My question to her is a simple thing based on her

22        knowledge of herself.  Did she have any obvious injuries

23        to her body or anywhere.  That is my question.  I think

24        she is competent to answer that.

25                    MR. MC GAVER:      I will renew my
```

```
 1    objection.

 2                    MR. KONRAD:        What injuries did you

 3    have?

 4                    THE WITNESS:       That were visible?

 5                    MR. KONRAD:        When you were in the

 6    hospital, how do you believe you were injured?

 7                    THE WITNESS:       I had bruising and

 8    swelling on my entire chest because of the air bag blew

 9    and hit me and on my neck and I had the start of

10    swelling on my nose which ended up giving me black eyes.

11    My right foot was double or triple the size.  They took

12    photos of the foot.  I have pictures that I have taken.

13    I can get those.  I looked like I was disheveled in the

14    car accident.

15 Q  I would like to talk again.  Still at the hospital,

16    this time regarding Lieutenant Hanley.  I want to

17    clarify your testimony regarding that.  You already

18    testified you never spoke to him.  Correct?

19 A  Correct.

20 Q  Did you see him at all?

21 A  At the hospital?

22 Q  Yes.

23 A  No.

24 Q  Are you aware that he was actually at the hospital?

25 A  He said he was.
```

```
1   Q    I am asking you.  Did you have personal knowledge at

2        any time that he was actually at the hospital?

3   A    No.

4   Q    Could you please locate Document No. 10 in front of you?

5        Do you have it in front of you?

6   A    Yes.

7   Q    Go to the last page.  Is it correct to say this is one

8        of your written statements?

9   A    This is my written statement.

10  Q    I would direct your attention to the top line, last word

11       where it says "lieutenant."  Do you see it?

12  A    Yes.

13  Q    I will read it.

14                    "Lieutenant Hanley was at the hospital

15       and never asked me how I was, nor asked me what

16       happened."

17       Did I read that correctly?

18  A    Yes.

19                    MS. MC KENZIE:     What page is that?

20                    THE WITNESS:       The last page.

21                    MR. PEDERSON:      The last page.  Would

22       you like me to reread it?  I'll indicate for the record

23       that she shook her head "no."

24  Q    Can you explain that discrepancy?

25  A    Yes.  I was at the hospital January 19, 2015.  I went to
```

```
 1        IAD in April before I was even healed.  I read a report

 2        with my union representative that said that Lieutenant

 3        Sean Hanley was at the hospital and I wrote this subse-

 4        quently after November 12, 2015, several months after

 5        finding out that he was at the hospital and he never

 6        came and talked to me and he never came and talked to me

 7        at my house and has never called me on the phone to see

 8        how I was.  That is why in this report on November 12,

 9        2015 --

10   Q    I want to follow up with that and try to clarify your

11        testimony.  Is it your testimony, then, that as you sit

12        here today, you dispute or believe that he was not

13        actually there?

14   A    I am not saying he was or wasn't there.  I am saying

15        that he didn't talk to me.

16   Q    So if Lieutenant Hanley indicates that he was, in fact,

17        there, you wouldn't dispute that and say that he is

18        wrong about that or lying.

19   A    No.  If he says he was there, he was there.  He just

20        didn't talk to me.

21   Q    Very good.  Thank you.  I will now direct your attention

22        to the phone call that you placed to Lieutenant Hanley.

23        Do you know what I am referencing?

24   A    Yes.  6:38.

25   Q    Since we have the records, please get your phone
```

```
 1        records.  Go to Page 12.  Approximately five entries
 2        from the bottom, it indicates "January 19, 5:24 a.m."
 3        Do you see that?
 4   A    Yes.
 5   Q    It lists there a phone number ending "1573."  Is that
 6        right?
 7   A    Yes.
 8   Q    That is Lieutenant Hanley's personal cell phone number.
 9        Is that right?
10   A    If you say it is -- I have him in my cell phone as
11        Lieutenant Sean Hanley.  I don't memorize the numbers.
12   Q    I can follow up on that with Lieutenant Hanley, but for
13        now, I'd like you to assume that the phone number ending
14        in "1573" is Lieutenant Hanley's phone number and if it
15        is, you'd agree with me that you placed the phone call
16        to him that lasted one minute.  Is that right?
17   A    Yes.
18   Q    Then, I'd ask you to go to the next page.  And the
19        second entry --
20                    MR. KONRAD:      What was the date of
21        that phone call?
22                    MR. PEDERSON:    January 19, 5:24 a.m.
23                    MS. WILSON:      That was '14?  I
24        don't know what year.
25                    MR. PEDERSON:    2015.
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 638 of 805   Document 80-21

```
 1                    MS. WILSON:         5:20.

 2                    MR. PEDERSON:      No.  5:24 a.m.

 3    BY MR. PEDERSON:

 4    Q    Are you aware how calls that are placed out, but not

 5         answered are recorded on this log here?

 6    A    They get a minute.

 7    Q    So you would agree with me that if it says "one minute"

 8         on this phone call, it doesn't necessarily mean that you

 9         spoke to him for one minute.  It could mean that you

10         called him and he didn't answer?

11    A    That is correct.

12    Q    Then on Page 13, second entry, that entry indicates that

13         there was a phone call placed on January 19, 6:38 a.m.

14         to Lieutenant Hanley's personal cell phone from your

15         phone and this log indicates that phone call lasted

16         seven minutes.  Do I have all of that correct?

17    A    Yes.

18    Q    With those facts established, can you indicate to me,

19         why did you call Lieutenant Hanley at 5:24 a.m.?

20    A    Probably to see if he was going to come talk to me at

21         the hospital, because I was being discharged.

22    Q    What did you want to talk to him about?

23    A    The accident.

24    Q    At that time, you believed you were in a proper state

25         to have that discussion.
```

```
 1   A   I cannot say I was in a proper state, but like I
 2       explained yesterday, you just don't go home.  You have
 3       to talk to somebody and let them -- I am thinking he is
 4       going to come and see how I am at a minimum.
 5   Q   You heard Lieutenant Hanley indicate that it is depart-
 6       ment policy that they have three days to conduct the
 7       interview with you after an accident?
 8   A   I wasn't referring to the interview.  I was just
 9       referring to he is being my lieutenant, wanting to care
10       about me being in an accident.
11   Q   That was the purpose of the 5:24 call?  It was just an
12       informal conversation you wanted to have with him, more
13       of a friendly conversation?
14   A   No, not informal or friendly.  I was just involved in
15       an accident.  I wanted him to -- if he was going to come
16       and interview, talk to me, see if I was okay, let him
17       know that now I am leaving the hospital and where my gun
18       is and where my belt is.  I had a series of questions
19       for him and to let him know that now, I am leaving.
20       Does he want me to wait or does he want me to go home
21       with my family?
22   Q   You are indicating you left the hospital at around
23       5:24 a.m.?
24   A   I don't remember when I left.
25   Q   At 6:38 a.m., you placed another call to him.
```

1   A    Yes, and I was home at that time.

2   Q    How far did you live at that time?

3   A    Not far.  The border of Wauwatosa.

4   Q    Can you estimate how many minutes it might take --

5   A    I live off of 53rd and Washington Boulevard -- or I

6        used to -- and it would take five, six minutes to

7        probably get to Froedtert and, mind you, I did go to

8        District 3 from the hospital first.  Then, I went home,

9        which from District 3, my house is, like, five, six

10       blocks.

11  Q    With all of that said, are you able to provide me any

12       estimate of how long that might have taken you?

13  A    When I got released, approximately between 5:24 and 6:38

14       a.m.

15  Q    At 6:38 a.m., you got ahold of Lieutenant Hanley and

16       actually spoke to him then.  Is that right?

17  A    Yes.

18  Q    You have indicated that his report is inaccurate.  That

19       is right?

20  A    Yes.

21  Q    I don't believe in your testimony yesterday, you

22       specified exactly what you told him at that time, so I

23       would like to get that in the record.  What did you tell

24       him at that time?

25  A    When I reached him on the phone call at 6:38 a.m., I

```
1    asked him if he was going to come and talk to me at my
2    house.  I wanted to take some pain medication and I
3    wanted to go to sleep at that point.  So I didn't want
4    to take it until I knew.  He said he wasn't and I said,
5    "do you want to know what happened?"  He said, "yes, go
6    ahead.  Tell me."  I said, "I was driving with Juanita."
7    I just probably did a synopsis of it.  I don't know
8    exactly what I said, but that I was in the accident
9    going to District 5 and officers are already calling and
10   telling me that Sergeant Riley is stating that I was
11   going to intervene in a traffic stop with my son and I
12   said, "none of that is true, that Melanie is on her way
13   over to my house so if someone wants to talk to her and
14   my son is here.  You can talk to them."
15 Q  Did you take notes of your phone call with him?
16 A  No.
17 Q  So if I understand you correctly, what you are saying --
18    what your testimony is today is that you provided
19    essentially the same information that you provided in
20    your written memorandums that followed.  Right?
21 A  What memorandums are you talking about?
22 Q  Your Response to Charges, your interview, all of your
23    follow-up statements that you have made since you had
24    that phone call with Lieutenant Hanley.
25 A  I am not sure what you are saying, "all my follow-up
```

```
 1          statements."  I just made this statement about the phone
 2          call, which is a lot more elaborate than what is in that
 3          synopsis on the memo.  What specifically are you talking
 4          about?
 5     Q    You recall giving a statement to Adam Zieger.  Right?
 6     A    Yes.
 7     Q    And in that statement, which is contained in his summary
 8          which is an exhibit, certain statements of you are
 9          recorded regarding what you were doing at the time of
10          the accident.  Right?
11     A    Yes.
12     Q    I don't know if I have to rehash everything you said,
13          but what I am addressing is the fact that you were with
14          Juanita Carr, that you were going to go to District 5
15          first, et cetera, et cetera.  Right?
16     A    Yes, those two things.
17     Q    Do you understand your statements that I am referencing
18          now?
19     A    Do you want to go to the report so you can show me which
20          one specifically you are talking about?
21     Q    No, I don't.  I am asking you in total, the statements
22          that you made to Adam Zieger referencing what you were
23          doing that night and the facts and circumstances
24          surrounding it.  Do you recall your statements, in
25          general?
```

```
 1   A    Like I said, that was in April and I don't recall all
 2        the statements as I sit here today of what I said, but
 3        if you want go to the document, that is fine.  I don't
 4        remember even how long it lasted.  I know that my union
 5        representative, Shawn Lauda, was there, and I was there
 6        and Zieger and somebody else and asked me questions and
 7        I answered them.  I will be more than happy if you want
 8        to look at what statements you are referring to.  I made
 9        statements.  I don't remember all of them.
10   Q    Did you tell Lieutenant Hanley that you were traveling
11        at approximately 45 miles an hour?
12   A    Absolutely not.
13   Q    What did you tell him regarding your speed?
14   A    I am not quite sure I even told him how fast I was
15        going.  I don't think he even asked.
16   Q    Would you agree with me that your recollection of the
17        events were better closer in time to when they occurred
18        than it is today?
19   A    It is hard to say because I don't remember exactly what
20        I said in April.  That is why it is recorded, because I
21        explained to him during that interview that I had a hard
22        time expressing myself.  It said on there that I was
23        stuttering and that I was trying to make things clear to
24        him, but because of my head injury, just to bear with
25        me.  So I can't sit here and talk vaguely about a
```

| | | |
|---|---|---|
| 1 | | conversation that probably took a half hour or took an |
| 2 | | hour with a head injury back in April. |
| 3 | Q | That is fine. I have asked you if you stated you were |
| 4 | | going 45 miles an hour. You said no. And that you |
| 5 | | don't recall if you said anything about how fast you |
| 6 | | were going. Is that your testimony? |
| 7 | A | To Sean Hanley. |
| 8 | Q | During this phone call on the morning of January 19, |
| 9 | | yes. |
| 10 | A | I don't recall saying if I was going any speed, much |
| 11 | | less 45. |
| 12 | Q | Detective Hanley indicates in his report that you told |
| 13 | | him that while driving to District 5 to see Melanie |
| 14 | | Beasley, you got a phone call from your son indicating |
| 15 | | where he had been stopped by UWM police, so you were |
| 16 | | driving to the area of UWM first to find your son and he |
| 17 | | was going to call you when he found out exactly where he |
| 18 | | was. Did you make that statement? |
| 19 | A | Absolutely not. |
| 20 | Q | What statement did you make to him in regard to your son |
| 21 | | and what you were doing? |
| 22 | A | When I was explaining to him that officers were telling |
| 23 | | me that I was on my way to UWM, I told him that I was |
| 24 | | not. I was going to District 5 and I was going to deal |
| 25 | | with Melanie and I was not -- contrary to what rumors |

1     were being said, I was not going to UWM police.  First

2     of all, that doesn't even make sense because when I made

3     that phone call at 6:38 a.m. on the 19th, I already knew

4     where my son was.

5              MR. PEDERSON:      Ms. Lewandowski, I'll

6     stop you.  Restrict to yourself answering my question.

7   A   I'm sorry.  That was answering that question.  My son

8     wasn't stopped by UWM police and I already know that he

9     wasn't.  So why would I lie?  I'm, like, no.

10             MR. PEDERSON:      Ma'am, please.  The

11    question to you is not whether the question makes sense.

12    The question to you was, what did you say regarding?

13    That is it.  So restrain yourself to the question.

14            MR. KONRAD:       If you would repeat

15    what --

16            MR. PEDERSON:      I am ready to move on

17    to the next question.  That answer can stand.  I just

18    was -- she was no longer responsive, so I am moving to

19    the next question.

20    BY MR. PEDERSON:

21   Q   Lieutenant Hanley reports that you indicated that your

22    emergency lights were on, but that you were not

23    operating as an emergency vehicle.  You just had them on

24    to make cars pull over and get out of your way.  Did you

25    make that statement to him?

SUSAN K. TAYLOR       262-553-1058       COURT REPORTER
sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 646 of 805   Document 80-21   341

1  A  Absolutely not.

2  Q  What did you say to him regarding why your emergency

3     lights were on?

4  A  That there was a car impeding traffic.  I thought it

5     was going to pull out because its brake lights went on.

6     I slowed down, went around it and just wanted to alert

7     with a horn, but in order to alert with a horn, I have

8     to go past the lights, like, all one motion.  The lights

9     first, then, the siren.  I didn't leave the siren on.

10    It was a blurp.  So I moved it to the right and I went

11    around the car.

12 Q  Detective Hanley, then, reports that you stated that

13    there was probably video on North Avenue that would show

14    the accident.  Did you make that statement to him?

15 A  Yes.

16 Q  What were you referring to when you made that statement?

17 A  I was referring to three spots that I know there is

18    video.  I took a shooting there probably a month or two

19    before and I knew exactly where there would be video at

20    three different locations that would probably catch the

21    entire accident and what happened prior.  I gave him a

22    list of the three spots.

23 Q  Did it turn out that there was any video?

24 A  He said there wasn't any located at Subway.  I don't

25    know if he checked the cameras on 35th and Garfield

SUSAN K. TAYLOR         262-553-1058      COURT REPORTER
                        sueT@wi.rr.com

```
 1       which see the traffic coming north from south where
 2       Ms. Johnson was traveling and, then, there was another
 3       camera, I told him, on a church that would see me
 4       coming, traveling east.  I don't know if that was ever
 5       recovered.
 6   Q   Is it a correct statement to say that at the time that
 7       you were talking to Lieutenant Hanley, it was your
 8       belief that there was a high likelihood that there was
 9       going to be some video depicting this accident
10       occurring?
11   A   Yes.
12   Q   Would you agree with me that there are very stark
13       contrasts between what Lieutenant Hanley reported you
14       told him versus what you are testifying to that you told
15       him?
16   A   Most definitely.
17   Q   Would you agree with me that these are not the sort of
18       inconsistencies that could be explained away by a mis-
19       understanding, a simple misstatement, something like
20       that?
21   A   That is why I asked to see his memo book.
22                   MR. PEDERSON:       That doesn't answer
23       my question.
24                   THE WITNESS:       Can you repeat it?
25   Q   Sure.  My question to you was, would you agree with me
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 648 of 805   Document 80-21   343

```
1        that the contrasts, the discrepancies between those two
2        versions are so stark, that this can't be a simple
3        matter of a misunderstanding.  These are two completely
4        different versions of events.
5    A   Yes.
6    Q   When Lieutenant Hanley created this report, it is fair
7        to say that he either is lying or misrepresenting the
8        truth purposefully, or you are.  Isn't that right?
9    A   You would have to ask him that, but I am not.
10   Q   I am not asking you to speculate, but do you possess any
11       facts or knowledge as to why Lieutenant Hanley would
12       purposefully misrepresent the facts?
13   A   I went into that yesterday with the fact that I was
14       responding to District 5 with a matter that he and
15       District 5 lieutenants were already aware of and that
16       is exactly how we are trained through the early
17       intervention program; to help officers.  When they are
18       in trouble, to help each other.  That is exactly what I
19       was doing, because she was not getting that help through
20       supervision.  I felt it was very jaded.
21   Q   If you answered my question, I didn't understand it and
22       I apologize.  Do you have any facts or knowledge as to
23       what would motivate Lieutenant Hanley to misrepresent
24       the facts of your statement?
25   A   You would have to ask him that.
```

```
 1   Q   Again, that is not -- is the answer to the question --
 2   A   You are asking me to surmise and speculate again.  That
 3       is what that question is asking me; what is in his mind.
 4       You have to ask him that.
 5               MR. KONRAD:        I think the answer is
 6       "no."
 7               MR. PEDERSON:      Thank you.
 8   BY MR. PEDERSON:
 9   Q   You would agree with me that Lieutenant Hanley's version
10       of the statement would expose you to discipline.  Right?
11   A   That is correct.
12               MR. MC GAVER:      Objection.  It calls
13       for speculation.
14               MR. PEDERSON:      She has a knowledge
15       of the SOPs and the consequences and experience
16       regarding this.
17               MR. KONRAD:        She had no problem
18       answering it, so I will overrule the objection.  I am
19       going to go back and I am going to sustain the objec-
20       tion.  I am going to strike the answer.  What bothers
21       me about the question is, at what time period?  Are you
22       referring to when she gave the answers or when she saw
23       the report later?  At what point do you think she would
24       be --  You are asking her about whether she believed she
25       would be subject to discipline.  When she gave the
```

```
1          answers or when she saw the report?
2                        MR. PEDERSON:        I suppose we can go
3          with both.
4                        MR. KONRAD:          She called him.
5                        MR. PEDERSON:        Yes.
6                        MR. MC GAVER:        Then, I will object
7          on relevance grounds.  What she believed would subject
8          her to discipline doesn't matter to whether she was
9          actually subject to discipline, which is why we are
10         here.
11                       MR. PEDERSON:        Well, it goes to
12         credibility and motive to change her story.
13                       MR. KONRAD:          I think it goes to
14         the care with which a person would answer questions.  It
15         is one thing to an accident investigation calling up
16         saying, "here is what happened."  It is another thing to
17         get served with a PI-21 and you are questioned.  I think
18         one would naturally be more careful perhaps in one
19         situation than the other.  Let's go to that issue.
20                       MR. PEDERSON:        I can restate the
21         question, if I may.
22         BY MR. PEDERSON:
23    Q    Would you agree with me that if you had actually made
24         the statements that are attributed to you by Lieutenant
25         Hanley during the phone call that occurred on January
```

```
1        19, that that could potentially subject you to
2        discipline and you would have known that at the time?
3    A   Yes.
4    Q   As a matter of follow-up, isn't it also true that
5        whenever you reviewed this report as it was written by
6        Lieutenant Hanley, at that time, you became aware that
7        his version of what you said at that time could subject
8        you to discipline?
9    A   I was just more shocked.  I was more shocked than
10        anything and that's expressed on tape when I read it in
11        April and, then, I subsequently had a PI-21, saw it the
12        same day that I was questioned.
13                    MR. KONRAD:      A matter of clarifi-
14        cation.  The first time you saw Lieutenant Hanley's
15        statement was after you were served PI-21?  When is the
16        first time you saw it?
17                    THE WITNESS:      The first time I saw
18        it was the day that I was standing in the hallway going
19        to talk to Sergeant Zieger with my union representative.
20        When I read it, I cried and I was distraught and I was
21        very upset with my union representative, Shawn Lauda,
22        standing there, because I couldn't believe what he had
23        written.
24                    MR. KONRAD:      But that is the first
25        time you saw it.
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 652 of 805   Document 80-21

```
 1                    THE WITNESS:        The first time.

 2                    MS. HEIN:          How long was that

 3         between the accident?  I means, are we talking days or

 4         months?

 5                    THE WITNESS:        January to April.

 6         I had not returned to work until August.

 7         BY MR. PEDERSON:

 8    Q    At the time you had the phone call conversation with

 9         Lieutenant Hanley on January 19, what was your expecta-

10         tion of what he was going to do with the information you

11         were providing him?

12                    MR. MC GAVER:       That calls for

13         speculation.

14                    MR. PEDERSON:       I am asking her what

15         was her expectation.  She knows what is in her own mind.

16                    MR. MC GAVER:       That is my objection.

17                    MR. KONRAD:         It is overruled.

18                    Go ahead.

19    A    The question, again, was, what was I expecting to

20         happen?

21    Q    Yes.

22    A    I was expecting that my supervisor would come to my home

23         or arrange to come to the hospital while I was there to

24         ask me what happened or to see if I was okay.

25    Q    Let me stop you again.  That is not responsive.  My
```

```
 1      question was, what was your expectation regarding the
 2      phone statements that you were giving Lieutenant Hanley
 3      at that time?  What was he going to do with that infor-
 4      mation that you provided him?
 5                  MR. MC GAVER:      That calls for
 6      speculation.  She is being asked to speculate as to what
 7      Lieutenant Hanley would have done with a statement that
 8      she may or may not have made.
 9                  MR. KONRAD:        At the time you spoke
10      to the lieutenant, did you have any idea of what he
11      planned to do with the information?
12                  THE WITNESS:       No.  I called him
13      so he knew where I was.  I was leaving the hospital,
14      waiting for him to come and now going home wanting to
15      know if I can take medication or I can go to sleep or --
16      or find my gun.  I had a series of questions.  There is
17      also reports that need to be written that he has to do
18      so he can know what was going on and for the medical
19      section so I can get treatment.
20      BY MR. PEDERSON:
21   Q  You already testified that you asked him if he wanted to
22      know what happened.  Right?
23   A  Yes.
24   Q  You went into, not excruciating detail, but you gave
25      him a full summary of what happened.  Right?
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 654 of 805   Document 80-21    349

```
 1    A    I gave him a summary, yes.

 2    Q    The facts and circumstances that led to you being with

 3         Juanita Carr in that vehicle, where you were going, what

 4         your intent was, what were the other attending facts and

 5         circumstances surrounding it.  Right?

 6    A    No.

 7    Q    You were aware, as you just testified, that Lieutenant

 8         Hanley was responsible for creating an accident report.

 9         Right?

10    A    Or some form of report.  I am not sure if he is respon-

11         sible for an accident report.

12    Q    You were aware that Lieutenant Hanley would have to file

13         a report concerning information he gathers in statements

14         made from people who were involved in the accident.

15         Right?

16    A    I imagine so.

17              MR. PEDERSON:        Sorry for no segue

18         here.  I have, sort of, a few clean-up questions here.

19    Q    Do you recall indicating on your written responses to

20         charges that Ms. Johnson was under the influence of

21         THC at the time?

22    A    Yes, I received that information from the court liaison

23         that they were sending -- because I was asking why there

24         wasn't any charges for causing injury.  He said they

25         were sending her bloodwork back out because it was
```

```
 1        either positive for THC or some other unknown drug.
 2        When I wrote that, that is the information that I
 3        received from the court administration liaison that was
 4        handling my case.
 5    Q   You'd agree that you never actually reviewed the
 6        toxicology report?
 7    A   No.
 8    Q   So you have no factual knowledge of what it says or does
 9        not say?
10    A   No.
11    Q   And if I were to indicate to you that there is no
12        indication that that was even tested for, you wouldn't
13        be able to dispute that, based on your personal know-
14        ledge?
15    A   I have no idea.
16    Q   Yesterday, you testified that your son lives on Mary-
17        land?
18    A   Yes.
19    Q   In fact, he was the -- the location where he was, was on
20        Maryland.  Right?
21    A   Yesterday, I said I don't know if he was on Murray or
22        Maryland.  I don't know what -- I think it is Maryland
23        or Murray.  They are right by each other.
24    Q   So he lives in the exact area where he was stopped.
25    A   No.  That is in Shorewood.  He lives in Milwaukee.
```

```
 1   Q    How far is that?

 2   A    At least six blocks, because he lives on the -- his

 3        address is 3040 -- either Maryland or Murray, and the

 4        incident traffic stop in Shorewood is the 3600 block,

 5        so that is six blocks into a different jurisdiction.

 6   Q    You'd agree with me he was approximately six blocks

 7        from his personal residence when he was stopped by the

 8        Shorewood Police Department.

 9   A    Yes.

10                     MR. PEDERSON:      That is all I have

11        for cross.

12                     MR. MC GAVER:      I have some questions

13        for redirect, but can we take a short break?

14                     MR. KONRAD:        Sure.  Until 20

15        after.

16        (Discussion off the record)

17                     MR. KONRAD:        We are ready to

18        proceed.  Before you do your redirect, I will have the

19        commissioners ask any questions if they have any.

20                     MS. MC KENZIE:     I have a question.

21        At the time when you spoke to Lieutenant Hanley at that

22        6:38 a.m. telephone conference call that you had with

23        him, did you talk at all about your son being pulled

24        over?  Did you express that to him at all?

25                     THE WITNESS:       Yes.
```

```
1                    MS. MC KENZIE:      You did.  Okay.

2                    MS. WILSON:         That car that you

3          were involved in the accident with was going north or

4          south and you were going east.  Was the car headed north

5          or south?

6                    THE WITNESS:        Her car was headed

7          north and mine was east.

8                    MS. WILSON:         I thought yesterday,

9          that I heard something about a prostitute or something

10         about turning on the lights.  Was this the same car you

11         thought was going to pull out?

12                   THE WITNESS:      Yes.

13                   MS. WILSON:         Is the process or

14         procedure, do most detectives make their own decisions

15         about where they are going and when they are going and

16         if they are going?

17                   THE WITNESS:        If they are not on

18         assignment, yes.  Sometimes on an assignment also, if it

19         leads you to another house, you decide that is where you

20         have to continue to do the investigation and you, your-

21         self, make that decision.  Sometimes, a lieutenant is on

22         the scene.  Most of the time.  Sometimes, there is not.

23                   MS. WILSON:         So you didn't have to

24         get permission to go with Detective Carr.

25                   THE WITNESS:        No.
```

```
 1                 MS. WILSON:       You didn't have to
 2    get permission to go to the fifth district.  You can
 3    just go.
 4                 THE WITNESS:       Yes.  I can just go.
 5                 MS. WILSON:       So you never told
 6    Lieutenant Hanley that you were going to the fifth
 7    district or anybody other than Detective Carr.
 8                 THE WITNESS:       Right.
 9                 MS. WILSON:       So you regularly just
10    volunteer to go wherever with somebody if -- I don't
11    want to say you do it for everybody, but if you don't
12    have as much to do, you just volunteer, "I will go with
13    you."  Right?
14                 THE WITNESS:       It is about how you
15    handle your time.  If it is 1:00 in the morning, I am
16    not going to go to somebody's house to interview them on
17    a Monday or a Sunday and wake them up to talk to them
18    about something that I can talk to them preferably in
19    the morning or have day shift do that follow-up.  It
20    just depends.  I usually keep myself available before I
21    get an assignment to help whoever is on the assignment,
22    because we are very short-handed.  I just volunteer.
23                 MS. WILSON:       In this document,
24    nine, where it says that you didn't know the information
25    at the time, only that Detective Carr wanted to go a
```

```
 1     second time, I am confused.  Could you clarify when you
 2     and Detective Carr left, what exactly did you know about
 3     where she was going?
 4                     THE WITNESS:        I knew that the two
 5     of us were going to go to District 5 and then come back
 6     and do a second check for the gun.  She said she had
 7     already been there, but I didn't know that -- I didn't
 8     know that getting the gun was exigent or not exigent.
 9     It was her just telling me, you know, "can you come with
10     me and get the gun?  I have already been there.  Do you
11     want to go right back?"  I have to go to District 5.
12     "No, we can just go to District 5 together and come back
13     around and get it done."   I didn't know any facts of
14     the case other than she said, "a dude shot himself and
15     he is a CCW carrier.  I don't even understand why they
16     want us to get the gun."  That was the conversation we
17     had.
18                     MS. WILSON:        Did I hear you say
19     that Detective Carr had searched the house when she went
20     there the first time?
21                     MR. PEDERSON:        No, ma'am.  I might
22     have, you know, used some shorthand language.
23                     MS. WILSON:        Okay.  The other
24     question -- and he may have answered it -- how long
25     have you lived in this area?
```

```
 1                    THE WITNESS:        My whole life.

 2                    MS. WILSON:         And how long has your

 3       son lived in this area?

 4                    THE WITNESS:        Almost his whole life

 5       except a year, he went to school in Minnesota; college.

 6                    MS. WILSON:         Okay.  Thank you.

 7                    MR. KONRAD:         Okay.  There being no

 8       more questions, we will now proceed with redirect.

 9                    MR. MC GAVER:       Thank you.

10       REDIRECT EXAMINATION BY MR. MC GAVER:

11   Q   You were asked some questions about the shooting that

12       occurred -- on cross-examination, the shooting that

13       occurred on January 18 or 19, somewhere in there.  It

14       later came out, through some investigation, that the

15       shooting may have been a part of a domestic violence-

16       related incident.  When, if ever, did you find out about

17       that aspect of the investigation?

18   A   Like, months and months later when some detectives

19       called me up.  I wasn't returned to work yet.  They said

20       they had to do the follow-up to go get the gun and they

21       were complaining about it.

22   Q   Fair to say that when you rode with Detective Carr on

23       the 19th, that you weren't privy to that piece of the

24       information?

25   A   No.
```

```
 1                    MR. MC GAVER:      There's been testi-
 2        mony -- in fact, you were asked questions on cross-
 3        examination about your response to certain of these
 4        charges, labeled Exhibit 9.  Can you pull that out for
 5        me?  Tell me when you have it.
 6                    THE WITNESS:        Okay.
 7   Q    I want you to turn to the last page.  Mr. Pederson asked
 8        you some questions about the last sentence in the first
 9        paragraph.
10                    "I did not know this information at the
11        time, only that Detective Carr wanted to return to his
12        home a second time."
13        Now, the question I have is, you were asked on cross-
14        examination -- and I just want to make it very clear
15        that -- I will ask you whether the first time that you
16        presented the information about Detective Carr going to
17        this house, not one time, but two times, was at this
18        hearing or was it previous?
19   A    Can you say it again?  Sorry.
20   Q    It was probably a poorly phrased question.  This report
21        was dated October 11, 2015.  Correct?
22   A    Correct.
23   Q    And that report contains a reference to there being two
24        attempts by Detective Carr to retrieve the gun at the
25        home.  Correct?
```

```
 1    A    Yes.

 2    Q    You wrote that report.  Correct?

 3    A    Yes.

 4    Q    So you disclosed that to the department at least on

 5         October 11, 2015.  Right?

 6    A    Yes.

 7    Q    So they are not hearing about that.  No one in the room

 8         who has been privy to this report should be hearing

 9         about that for the first time.  Is that correct?

10    A    Yes.  This is at a minimum, the first time, much less

11         when she told them.

12    Q    You were also asked some questions about what you would

13         have done approaching the intersection of 35th Street

14         and North -- 36th Street and North before you got to

15         that intersection if you were driving a civilian

16         vehicle.  And what I mean by a "civilian vehicle," I

17         mean one that is not equipped with lights and siren.

18         Are you with me so far?

19    A    Yes.

20    Q    Would you have operated your horn when you saw that car

21         come out in the manner that it did, tapping its brake

22         lights as you described it?

23    A    Yes.

24    Q    Is it fair that you might have flashed your bright

25         lights if you saw the car operating in that manner
```

```
 1        driving a civilian car?

 2    A   I could have, yes.  I am sure I would have beeped my

 3        horn more and still traveled the same way.

 4    Q   You testified that you turned your lights on in order

 5        to chirp the siren or blurp the siren.  Correct?

 6    A   Yes.

 7    Q   Did you intend to leave your emergency lights on as you

 8        traveled through the intersection of 35th and North?

 9    A   No.

10    Q   Just a matter of happenstance that it happened?

11    A   It is just a matter of once I got around the car, I

12        could see through the cell phone store window the car

13        coming down 35th Street.  I could see the lights going

14        around in the glass and I knew.  That is when I looked

15        up at the green light.  I wasn't concerned about turning

16        those lights off at that time.

17    Q   What is the distance you traveled from the moment in

18        time that you turned your emergency lights on to the

19        moment of impact?

20    A   Less than a block, three-quarters of a block.

21    Q   How long would that have taken, if you remember?

22    A   I have no idea.

23    Q   You were asked about your phone records and spent a lot

24        of time on cross-examination talking about the phone

25        records that were generated on January 19, 2015.  Let
```

```
 1        me ask you.  From the two-minute phone call that you
 2        admitted and testified that you had with your son while
 3        he was in the process of being stopped by a Shorewood
 4        police officer to the point in time where your son was
 5        brought to the hospital, did you have any contact
 6        whatsoever with Jordan Lewandowski?
 7   A    None.
 8   Q    No telephone contact?
 9   A    No.
10   Q    No face-to-face contact?
11   A    No.
12   Q    No text messages?
13   A    No.
14   Q    Thank you.  The three-minute phone call that was
15        referenced in those phone records, one where, I think,
16        the testimony came out that Sergeant Smith answered the
17        phone, were you a party to that telephone conversation?
18   A    No.
19   Q    You didn't make that phone call?
20   A    No.
21   Q    The first phone call referenced in the records, the
22        5:24 a.m. phone call on January 19, 2015, do you recall
23        whether -- I think it was generated by you.  Do you
24        remember whether Lieutenant Hanley picked up the phone?
25   A    I don't recall.  I don't think so.
```

```
 1   Q   Then, as a result of the seven-minute phone call that
 2       you had with Lieutenant Hanley at 6:38 a.m., did
 3       Lieutenant Hanley ever follow up from that phone call
 4       that was generated and occurred on the same morning that
 5       the accident occurred?  Did he ever follow up?
 6   A   Like, with me or with the assignment?
 7   Q   With you.
 8   A   No, not at all.
 9   Q   Did he ever ask you anything more about that accident
10       after you hung up the phone?
11   A   No.
12   Q   Just so we are clear, the first time you heard about the
13       apparent discrepancies between your conversation with
14       Lieutenant Hanley on the phone and the AIMS report that
15       was generated by Lieutenant Hanley, when did that occur?
16   A   When I was -- had my conference with IAD and my union
17       representative minutes before I was questioned with the
18       PI-21.
19   Q   When did that take place?
20   A   In April.
21                   MR. MC GAVER:      Thank you.  Nothing
22       further.
23                   MR. KONRAD:        April, 2015?
24                   MR. MC GAVER:      Correct.
25                   MS. WILSON:        Could I ask a
```

1    question?

2                    MR. KONRAD:        Go ahead.

3                    MS. WILSON:        There was some

4    testimony that at some point, you might have passed out

5    and that you were incoherent at a point.  You stated

6    that there was some officers or TAC people or something

7    saying stuff.  Were you passed out or were you

8    incoherent or do you remember what they were saying?

9    I am trying to figure out to what coherency you were

10   that you can remember what people said.

11                   THE WITNESS:        I don't remember them

12   being on the scene at all.  I don't even remember any-

13   body really except Officer Jesse Vollrath, Officer

14   Goggins yelling at me because I was giving the wrong

15   phone number to my son, Deb Stacey and two people that

16   I know from the street that pulled me out of the car.

17   I don't remember anything else.

18                   MR. KONRAD:        Anything further?

19                   MR. MC GAVER:       No.

20                   MR. PEDERSON:       Nothing.

21   (Witness excused)

22                   MR. KONRAD:        Both sides have

23   rested this phase?

24                   MR. MC GAVER:       Yes.

25                   MR. PEDERSON:       We will --

```
 1                    MR. MC GAVER:       The Petitioner rests.

 2                    MR. PEDERSON:       I would like to call

 3        a number of witnesses in rebuttal.

 4                    MR. KONRAD:         Go ahead.

 5                    MR. PEDERSON:        Thank you.  I would

 6        first call Lieutenant Hanley.  Should we reswear or

 7        continue?

 8                    MR. KONRAD:          Just to be safe, I

 9        will swear you in again.

10                    SEAN HANLEY, having been first duly sworn

11        on oath to tell the truth, the whole truth, and nothing

12        but the truth testified as follows:

13                    MR. KONRAD:         He's sworn.

14        DIRECT EXAMINATION BY MR. PEDERSON:

15   Q    Lieutenant Hanley, you have testified yesterday in this

16        case.  Is that right?

17   A    Yes.

18   Q    I would like to direct your attention to the shooting

19        investigation that is concerned in this matter that's

20        been discussed.  Are you familiar with what I am

21        speaking of?

22   A    Yes.

23   Q    What was your part or what was your piece in relation to

24        that?

25   A    We didn't have a scene initially.  We believed the
```

| 1 | | person that was shot was lying, that went to the |
| 2 | | hospital with a detective who was also sent to the |
| 3 | | hospital. |
| 4 | Q | What did you think he was lying about, specifically? |
| 5 | A | Everything he said didn't really make sense.  He was |
| 6 | | acting as if he was trying to protect the woman that was |
| 7 | | being chased by a man and the man was wearing a face |
| 8 | | mask and the woman ran in front of his van and he |
| 9 | | stopped and got out and opened the door and the guy |
| 10 | | tries to pull her out.  That would be kind of unusual. |
| 11 | Q | Is it fair to say, then, that you had inconsistent |
| 12 | | statements and evidence that you couldn't put together |
| 13 | | to make sense?  Is that fair? |
| 14 | A | I don't know that his statements became inconsistent. |
| 15 | | He didn't really make sense.  He had a shooting wound, |
| 16 | | a gunshot wound to his right hand. |
| 17 | Q | Does the Milwaukee Police Department place a high level |
| 18 | | of priority in investigating shooting incidents? |
| 19 | A | Yes. |
| 20 | Q | Why is that? |
| 21 | A | It is the position of the department to investigate |
| 22 | | thoroughly every shooting even if the victims or |
| 23 | | witnesses are uncooperative, we try so that we can |
| 24 | | identify the people using guns, because many times, they |
| 25 | | are repeat offenders. |

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED  Filed 04/22/19  Page 669 of 805  Document 80-21    364

```
 1   Q   Can you tell me specifically at the beginning, how did

 2       you get involved?  What was your component in this?

 3   A   He showed up at St. Joseph's Hospital, which is in

 4       Central at the time.  It is in Seven, which was not in

 5       Central, but he says saying the shooting happened at

 6       17th and North, which is in Central.

 7   Q   Where is St. Joseph's Hospital?

 8   A   5000 West Chambers.

 9   Q   Again, what did you do?  Where were you, that kind of

10       thing?  Can you indicate that to us?

11   A   I responded to the hospital to find out what his story

12       was and to oversee the investigation.

13   Q   What did you observe while you were there?

14   A   Detective Troy Johnson responded to the scene.  He gave

15       me a preliminary story.  He was the only detective at

16       the hospital.

17   Q   Is there any reason why that sort of call would have

18       more than one detective?

19   A   No.

20   Q   When you were there, did you see any other detectives?

21   A   No.

22   Q   Specifically, did you ever see Juanita Carr while you

23       were there?

24   A   No.

25       (A document was marked as Exhibit No. 15)
```

```
 1   Q    Lieutenant, I have handed you a document marked for
 2        identification as number 15.  Ae you able to tell me
 3        what that document is?
 4   A    It is the CAD printout of the shooting that we were just
 5        discussing.
 6   Q    Does this document reflect who was at the scene of the
 7        hospital in terms of detectives?
 8   A    Yes.
 9   Q    Can you please indicate to me where that is?
10   A    Page 2 of 3, at 22:57, 10:57 p.m., Squad 9271 responded
11        to the hospital.
12   Q    Who is -- does 9271 relate to a specific person?
13   A    Yes.  Detective Troy Johnson.
14   Q    Do you know what Juanita Carr's squad number was that
15        evening?
16   A    9288.
17   Q    Does her squad number appear anywhere on this CAD?
18   A    No.
19   Q    Do you recall the testimony --  Strike that.  Were you
20        present for the testimony of Juanita Carr yesterday?
21   A    Yes.
22   Q    And were you also present for the testimony of Ms.
23        Lewandowski?
24   A    Yes.
25   Q    Would you agree with me that Ms. Lewandowski testified
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 671 of 805   Document 80-21   366

```
 1          that she heard over the radio that Juanita Carr called
 2          herself to the dispatcher indicating she was going to go
 3          to the hospital?
 4     A    Yes.
 5     Q    If that were true, would you expect an entry related to
 6          that to appear in this CAD?
 7     A    Yes.
 8     Q    Can you explain why it is not here if that were true?
 9     A    No.
10     Q    Just for the sake of clarity here, do you have a squad
11          number?
12     A    Yes.
13     Q    Does your squad number appear anywhere in here?
14     A    No.
15     Q    Can you explain why that is?
16     A    A lot of times, there is confusion with dispatch because
17          we are on a different channel.  We are not as driven by
18          the radio.  We usually dispatch by phone.
19                    MS. MC KENZIE:     When you say "we," do
20          you mean --
21                    THE WITNESS:      As in the detective
22          bureau at the time.  Sorry.
23          BY MR. PEDERSON:
24     Q    Did you call yourself in to dispatch to put yourself at
25          this place?
```

```
 1   A   Probably not.

 2   Q   If you did, would you expect that it -- your squad

 3       number would be here and there would be an entry

 4       correlating to that?

 5   A   Yes.

 6   Q   Did you hear Juanita Carr's testimony that she talked to

 7       you at the hospital and that you told her at that time

 8       to go search the house?

 9   A   Yes.

10   Q   Is that accurate?

11   A   No.

12   Q   Is there any doubt in your mind?

13   A   No.

14   Q   You had previously indicated that you had that conver-

15       sation with her, but it was at District 3.  Right?

16   A   Correct.

17   Q   How were you so confident that that is the case?

18   A   Because Troy Johnson was the only detective at the

19       hospital on the scene and I deliberately went to

20       District 3 to see if there was a detective not doing

21       follow-up, not involved in a case so that they could go

22       do this to try to get a consent search immediately.

23               MS. MC KENZIE:     Why not send

24   Detective Troy?

25               THE WITNESS:     Because he was at the
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
                                                                    368
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 673 of 805   Document 80-21

```
 1       hospital.  He was interviewing the shooting victim.  He

 2       also got a consent search for the van.  He recovered a

 3       holster and a couple gun magazines, but no gun, which is

 4       another reason we wanted to recover this gun.  So he had

 5       a full plate.

 6       (A document was marked as Exhibit No. 16)

 7       BY MR. PEDERSON:

 8  Q    Lieutenant, I have presented you a document marked for

 9       identification as Document 16.  Do you have that in

10       front of you?

11  A    Yes.

12  Q    Are you familiar with that document?

13  A    Yes.

14  Q    What is it?

15  A    It is a lineup for District 3 Late Shift, District 3

16       Power Shift and District 3 Early Shift.

17  Q    Does this relate to a specific date?

18  A    Late Shift is January 19.  Power Shift is January 18,

19       which would run 8:00 p.m. on the 18th to 4:00 a.m. on

20       the 19th.  And Early Shift, which is 4:00 p.m. to

21       midnight on the 18th.

22  Q    If I were to restate what you just said, is it correct

23       to say these documents here are reflecting the shift

24       assignments for District 3 going from January 18 into

25       January 19, 2015?
```

```
1    A    Yes.
2                    MS. WILSON:        Late Shift is --
3                    THE WITNESS:       Late Shift is
4         midnight to 8:00 a.m.  To be perfectly clear, some
5         districts might start at 11:00 p.m. and go to 7:00 a.m.
6         Those are the standards shifts.  I don't know what
7         District 3 does.
8                    MS. WILSON:        It is in that range,
9         given or take an hour.
10                   THE WITNESS:       Yes.
11                   MS. WILSON:        So the Power Shift
12        is --
13                   THE WITNESS:       8:00 p.m. to 4:00
14        a.m.  Some Power Shifts start at 7:00 p.m. and work to
15        3:00 a.m.  I don't know what District 3 does.
16                   MS. WILSON:        Early Shift, that is
17        4:00 p.m. to 12:00?
18                   THE WITNESS:       4:00 p.m. to 12:00
19        or 3:00 p.m. to 11:00.
20                   MS. WILSON:        Okay.  Carry on.
21        BY MR. PEDERSON:
22    Q    Have you reviewed these documents?
23    A    Yes.
24    Q    Are they true and accurate, to the best of your know-
25        ledge?
```

```
 1    A    To my knowledge, yes.

 2    Q    In review of this document -- Strike that.  Are you

 3         familiar with the personnel that are listed here on

 4         these documents?

 5    A    I am familiar with a lot of people here.  I see one

 6         mistake.

 7    Q    What do you see?

 8    A    In the CAD, Sergeant Allen Perry started out as 3214.

 9    Q    Are you referring to Document 15?

10    A    Yes.

11              MS. MC KENZIE:      Perry started off as

12         what?

13              THE WITNESS:        3214.

14              MS. WILSON:         Allen Perry.

15              THE WITNESS:        Started out as 3214.

16              MR. PEDERSON:       Take the time you

17         need to make sense of it, but let me know when you are

18         ready to communicate whatever error you think you have

19         observed.

20              THE WITNESS:        Okay.

21         BY MR. PEDERSON:

22    Q    What do you have to testify to?

23    A    I thought I saw him change his squad number in here, but

24         I don't see it now.

25              MR. PEDERSON:       The last question I
```

```
 1         was asking you is if you are familiar with personnel.

 2         I will withdraw that question and ask it differently.

 3   Q     Are you familiar with the supervisory personnel that are

 4         listed in the document on Exhibit 16?

 5   A     Yes.

 6   Q     Are you familiar with their sex and race?

 7   A     Yes.

 8   Q     In review of these documents in relation to who was

 9         assigned to work at District 3 on the evening of

10         January 18 into the morning hours of January 19, 2015,

11         were there any black male sergeants working?

12   A     Sergeant Allen Perry.

13   Q     Where is he indicated on Document 16?

14   A     He was Squad 3214.

15   Q     Am I correct that you are looking at the third page of

16         the document?

17   A     Yes.

18   Q     Roughly in the top middle where it says "Patrol

19         Sergeant"?

20   A     Yes.

21   Q     According to this document and your understanding and

22         training and experience, what was his work hours that

23         day?

24   A     He would be working -- he was a roll call sergeant, so

25         either 2:00 p.m. to 10:00 p.m. or 3:00 p.m. to 11:00
```

```
 1        p.m.

 2   Q    Is it accurate to say that he would not have been at

 3        District 3, at least in terms of working, between the

 4        hours of midnight and 2:00 a.m.?

 5   A    I believe he was at the hospital on the shooting.  He

 6        secured at District 3 at 1:44 a.m.  Actually, 1:55 a.m.,

 7        he showed up at District 3.

 8   Q    At what time?

 9   A    The way it is written, he was contacted at 1:44 a.m. by

10        dispatch, which is common.  Let me see if it shows when

11        he left the hospital.

12                  MR. KONRAD:        For the record, this

13        is referring to Exhibit 15?

14                  MR. PEDERSON:      Yes.

15   A    He was contacted by the dispatcher at 1:44 a.m., still

16        being at the hospital and he cleared from that at 2:07

17        a.m.

18   Q    You are referring to Document 15?

19   A    Yes.

20   Q    Can you tell me what page that appears on?

21   A    Appears on Page 3 of 3.

22   Q    Based on that information, is it possible that he could

23        have been at District 3 prior to 2:00 a.m. to talk to

24        Juanita Carr?

25   A    Yes.
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
273
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 678 of 805   Document 80-21

```
 1    Q    Do you recall seeing Sergeant Perry at the hospital?

 2    A    I don't remember.

 3    Q    Do you recall seeing Sergeant Perry at District 3?

 4    A    No.

 5    Q    Once again, is there a reason why you don't appear on

 6         this CAD in relation to this incident being at District

 7         3?

 8    A    It didn't go out to dispatch most likely.

 9    Q    Did you have any contact with Sergeant Perry at all in

10         relation to this?

11    A    I assume I did at the hospital.  I don't remember the

12         exact shooting for that detail, because there are a lot

13         of shootings in District 3.

14    Q    What would be your function as a lieutenant speaking

15         to a sergeant under these circumstances?

16    A    Under the circumstances, I was a bureau lieutenant, so

17         if the detective didn't have it, he would be giving us

18         the initial information of the person's name, his

19         initial story and, then, after that, I am responsible

20         for overseeing the investigative part of the scene.  He

21         is responsible for overseeing the police personnel --

22         I should say patrol personnel at the scene.

23    Q    With that given, is there anything necessarily wrong if

24         you were to approach a detective and require him to do a

25         follow-up in a matter that he had been involved in on --
```

```
 1   A    No.

 2   Q    Again, relating to the testimony yesterday, you heard

 3        testimony from Ms. Lewandowski indicating that she had

 4        been part of meetings with you and Melanie Beasley where

 5        she made reports to you regarding the alleged sexual

 6        assault.  Did you hear that testimony?

 7   A    Yes.

 8   Q    Did that ever happen?

 9   A    No.

10   Q    Did Melanie Beasley ever make a report to you?

11   A    No.

12   Q    Did Shannon Lewandowski ever advise you on Melanie

13        Beasley's behalf regarding that?

14   A    No.

15   Q    When was the first time you ever heard that -- anything

16        in relation to this?

17   A    Detective Lewandowski said October of 2014.  I don't

18        know if that is accurate.  She told me Melanie was

19        seeing somebody in TAC.  I pulled up his photo.  I don't

20        know the guy.  Everything was fine.  Then Melanie

21        approached me -- I don't know -- shortly after that and

22        said, "Shannon told me she told you," and everything was

23        fine.  I had no idea everything was not fine until I was

24        called to Internal Affairs by Detective Chris Zimmerman.

25   Q    What were you called to Internal Affairs about?
```

```
 1   A      An allegation of a sexual assault.

 2   Q      On these two occasions where you said you had these

 3          conversations with Lewandowski and Beasley, is it fair

 4          to characterize those as unofficial business and more of

 5          just friendly conversation, or no?

 6   A      Yes.

 7   Q      One matter of clarification.  Is it your testimony that

 8          you don't recall whether you asked Sergeant Perry

 9          specifically to find someone, or how does that relate

10          to you to, yourself, going to District 3 also?

11   A      I wouldn't have asked Sergeant Perry to do that.  He was

12          on the scene at the hospital.  This was an experimental

13          phase for our department to split up the investigative

14          bureau and it was very hard, as a supervisor, because my

15          desk was at District 5, but half of my people were at

16          District 3, so it was hard to know what everybody was

17          doing at any given time if they were not on assignment

18          and they are supposed to be there.  So I went to

19          District 3 to see who was not on an assignment so that

20          I could give them this assignment so they could go do it

21          immediately.

22                  MR. PEDERSON:      That is all I have.

23                  MR. KONRAD:        Commissioners?

24                  MS. MC KENZIE:     I have a question.

25          The issue that I am having now is the autonomy that
```

```
 1      detectives have.  So from the testimony that Detective
 2      Lewandowski gave, it may seem as if she or any other
 3      detective would have the autonomy to decide what is
 4      important and what is not important.  Is that
 5      necessarily the case with detectives?
 6                  THE WITNESS:       Yes and no.  If you
 7      are investigating an active shooting, typically, the
 8      most important thing for an investigation of similar
 9      importance, then, that is what you do.  But yes; if you
10      are not on an assignment, then detectives have freedom
11      to do their caseload.
12                  MS. MC KENZIE:       Detective Lewandowski
13      indicated that that was not her assignment, that was
14      Detective Carr's assignment.  So in her assessment, what
15      I got from her testimony, she could do what she wanted
16      and Carr had to follow through.  It wasn't up to her to
17      follow through because that was not her assignment.  Was
18      that your understanding?
19                  THE WITNESS:       No.  But like I said,
20      I didn't know Detective Lewandowski went with Carr on
21      this assignment.  It was incumbent, probably most likely
22      on Carr, to contact me if she was going to do anything
23      else instead because I gave her the assignment.  I
24      didn't see Detective Lewandowski at District 3.
25                  MS. MC KENZIE:       Where are you
```

1      stationed?  Are you stationed at Five even though half
2      of your people are at Three?
3                      THE WITNESS:        Yes, at the time.
4                      MS. MC KENZIE:       You did not --
5      you did not know -- at the time that you were at the
6      hospital initially with the gunshot victim, you didn't
7      know that Detective Carr had gone to the house to
8      retrieve the gun.
9                      THE WITNESS:        Detective Carr had
10     nothing to do with this investigation at this point.
11     I don't believe she went to the house or would even know
12     that somebody needed to go to the house.  That was the
13     purpose of me going to District 3; to find a detective
14     that was available to give this assignment to.  On that
15     note, when I gave this assignment to Detective Carr and
16     briefed her on the assignment and told her, you know,
17     everything.  "If you can't get consent, it is not a case
18     at this point that we are going to seek a warrant.  We
19     are looking for consent before he is discharged from the
20     hospital."
21                     MS. MC KENZIE:       When you had the
22     telephone conversation with Detective Lewandowski, the
23     one at 6:38 a.m. after the accident, did you indicate to
24     her that you would be drafting a report based on that
25     interview?

```
 1                    THE WITNESS:      I seriously doubt it.
 2    When I was at the hospital, I told both her and Detec-
 3    tive Carr that I needed to talk to them about the
 4    accident and it is kind of assumed, everybody in our
 5    department knows when they are in a vehicle accident, a
 6    supervisor has to do a report, but when she called, no.
 7    I would be shocked if I would have said that.
 8                    MS. MC KENZIE:      Normally, when you
 9    are doing that type of reporting where you are gathering
10    information and you are putting together a report, do
11    you normally have telephone conversations or do you have
12    the detective come in and sit down as you draft that
13    report?  In other words, is it normal to just have a
14    telephone conversation?
15                    THE WITNESS:      Since I had already
16    seen her on the scene and already talked to her at the
17    hospital about her welfare and not the particulars of
18    the accident, that wouldn't be unusual.  Juanita, since
19    I didn't talk to her on the phone, she didn't call me,
20    I was going to go to both of their houses, but Detective
21    Lewandowski called me, so that is why I went to
22    Juanita's house later on.
23                    MS. WILSON:      Whose supervisor
24    are you, because I got lost in the shuffle.  Are you
25    Detective Lewandowski's?  Are you her supervisor?
```

```
 1                    THE WITNESS:        At the time, I was.

 2                    MS. WILSON:         So there are times

 3         you may be different detectives' supervisor.

 4                    THE WITNESS:        I was Detective

 5         Lewandowski's supervisor, Detective Juanita Carr's,

 6         Detective Troy Johnson's.  Every detective involved in

 7         here.

 8                    MS. WILSON:         Who is -- is she

 9         Officer Beasley or is she Detective Beasley?

10                    THE WITNESS:        At that time, she was

11         a police officer.  Currently, she is a detective.

12                    MS. WILSON:         Who was her super-

13         visor at that time?

14                    THE WITNESS:        She worked out of

15         District 5, so she had patrol supervisors.  I never

16         supervised Officer Beasley.

17                    MS. WILSON:         If on that night she

18         was having a concern, was there anybody in the Fifth

19         District that could help her, because I am not sure --

20         I am not clear on what she needed help with, but it is

21         clear she needed help.

22                    THE WITNESS:        Yes.  Because even if

23         all the sergeants are on the street, the person sitting

24         in the district lieutenant's office, whether it be a

25         sergeant as the acting lieutenant or the lieutenant, is
```

```
 1        always on the premises and that would be her immediate
 2        chain of command.
 3                      MR. PEDERSON:       Nothing further.
 4                      MR. KONRAD:         Further questions?
 5        CROSS-EXAMINATION BY MR. MC GAVER:
 6    Q   Lieutenant, you indicated multiple times, I believe,
 7        that you responded to Saint Joseph's Hospital in
 8        response to the shooting.  Right?
 9    A   Yes.
10    Q   If I am not mistaken, your testimony was that at the
11        hospital, you reported there because there was no scene.
12        Correct?
13    A   Correct.
14    Q   Or at least --
15    A   Not known.
16    Q   You didn't know what the scene of the crime was.  True?
17    A   Yes.
18    Q   Is it fair that at the hospital, you were in charge of
19        that investigation --
20    A   Yes.
21    Q   -- at that point.  What squad number were you assigned
22        to on the 18th and the 19th during that shift?
23    A   9205.
24                      MS. MC KENZIE:      Squad?
25                      MR. MC GAVER:       Squad number.  I'm
```

```
 1        sorry.  I'm going a little fast and I'm not using the

 2        microphone, and I should be.

 3        BY MR. MC GAVER:

 4    Q   9205 you said?

 5    A   Yes.

 6    Q   Can you show me on Exhibit 15 where 9205 shows up?

 7    A   No.

 8    Q   Why not?

 9    A   Because I didn't go out with dispatch.

10    Q   Is it possible that Juanita Carr was at the hospital

11        and her squad number doesn't show up on this CAD report?

12    A   If she stopped by, I didn't see her and she is not in

13        any of the reports.

14    Q   Is it possible she was there?

15    A   It is possible.

16    Q   Do you know whether Shannon Lewandowski was a parti-

17        cipant in this investigation before she went out with

18        Detective Carr in that squad car?

19    A   Yes, I know.  She was not.

20    Q   She was not.  Thank you.  Do you know whether

21        Lewandowski would have been briefed about the particu-

22        lars of this particular investigation before she went

23        out with Detective Carr?

24    A   I didn't brief her.

25    Q   Do you know whether anyone else did?
```

```
 1    A    No.  I briefed Detective Carr.

 2    Q    Is the shooting that is reflected in this Exhibit 15,

 3         is that still being investigated today?

 4    A    I don't believe so.

 5    Q    Is it a closed case?

 6    A    The district attorney refused to issue charges.

 7    Q    So there was no process by the DA's office.

 8    A    No process due to lack of cooperation from the victim.

 9    Q    Is it true that squad numbers change from time to time?

10    A    Yes.

11    Q    When reviewing the CAD report, you seem to at first

12         notice an issue with Sergeant Perry, that his squad

13         number might have changed in the content of the same

14         report.  Is that true?

15    A    Yes, that can be.  If he is under fill-in on Late Shift

16         or something, it would have changed his squad number,

17         so it does happen.  Some of these CAD reports are --

18         they can become quite confusing.

19    Q    It was a little unclear when you were testifying about

20         Sergeant Allen Perry.  Is it possible that he could have

21         been at District 3 after the shooting took place at the

22         same time that Detective Carr was at District 3?

23    A    The times here show him at the hospital at 1:44 and,

24         then, still on scene at 1:55 at the hospital and, then,

25         clearing at 2:07 a.m.  So actually by this, he'd be
```

| 1 | | clearing the hospital at 2:07 a.m. |
| 2 | Q | Does that mean he could be arriving at his new desti- |
| 3 | | nation as 2:07? |
| 4 | A | This has him clearing from the hospital at 2:07. |
| 5 | Q | What does that mean? |
| 6 | A | He is leaving the hospital and he's done with this |
| 7 | | assignment.  He has himself clearing this assignment. |
| 8 | | I don't know if it is his practice to clear right when |
| 9 | | he walks out the door or --  This wouldn't be unusual |
| 10 | | for him to drive into the boundaries of District 3 and |
| 11 | | clear because the hospital is actually in District 7, |
| 12 | | but when the shooting occurs in District 3 and it is |
| 13 | | determined that it occurred in District 3, District 3 |
| 14 | | responds and takes over. |
| 15 | Q | Thank you.  You said you became aware that Melanie |
| 16 | | Beasley was seeing someone in the Tactical Enforcement |
| 17 | | Unit around October of 2014? |
| 18 | A | That is when Detective Lewandowski said she told me. |
| 19 | Q | You looked up that picture on the PeopleSoft program at |
| 20 | | that time? |
| 21 | A | Yes.  Called "roster." |
| 22 | Q | Is there a particular issue why Detective Lewandowski -- |
| 23 | | any particular reason that you can remember as to why |
| 24 | | Detective Lewandowski would have told you about a then- |
| 25 | | police officer, who worked at a different district, |

```
 1        dating someone in the Tactical Enforcement Unit in

 2        October of 2014?

 3    A   She was just, kind of, happy that Melanie seemed happy,

 4        but I wasn't a good friend with Melanie.  I really

 5        didn't care who she was dating, to be quite honest.

 6    Q   If you didn't care, why did you pull up the picture?

 7    A   She asked me to.  Detective Lewandowski asked me to.

 8    Q   Do you know whether this gentleman was married at the

 9        time he was seeing Detective Beasley?

10    A   I don't know anything about this man.  I never met him.

11                MR. MC GAVER:       Nothing further.

12                MS. WILSON:         I have a question.

13        I guess my confusion is this almost seems to be a trial

14        by Melanie Beasley, so I don't quite understand what we

15        are --  When I go to deliberation, I want to be clear on

16        the role of Melanie Beasley.  I don't think I am quite

17        clear on that yet.  Is it that we are trying to decide

18        why she was going there?  Should she have been going

19        there?  Is Melanie -- I am about to get confused because

20        we keep on talking about her.  What is it you want us to

21        think about?

22                MR. PEDERSON:       I don't know --

23                MR. KONRAD:         Maybe you can save

24        that for a closing argument.

25                MS. WILSON:         As long as I know
```

```
1    before deliberation.
2                    MR. PEDERSON:        I will address all of
3         that in my closing argument.
4                    MR. KONRAD:          Anything further?
5                    MR. PEDERSON:        Yes.
6    REDIRECT EXAMINATION BY MR. PEDERSON:
7    Q    You testified it is possible that Detective Carr could
8         have physically been at the hospital.  Right?
9    A    It is possible, but I didn't see her and she had nothing
10        to do with this investigation.
11   Q    Is it possible that she could have called over the radio
12        indicating that she was en route in response to this
13        matter and have her number not appear and have no entry
14        relating to her on this CAD?
15   A    That would be an extremely rare oversight by dispatch.
16   Q    You indicated that sometimes, squad numbers change.
17        Right?
18   A    Yes.
19   Q    Do they spontaneously change?
20   A    Not typically in the bureau.  I mean, in patrol, they
21        do.
22   Q    Let's limit it to Detective Carr.  Is there any reason
23        why in the middle of her assigned shift, her squad
24        number would just suddenly change in the CAD?
25   A    No.
```

```
 1   Q    Is there any reason why her assigned squad number was
 2        suddenly changed in the middle of her assigned shift?
 3   A    No.  In your bureau, your squad number is your squad
 4        number.  The reason it changes in patrol is the first
 5        digits of your squad number is your district.  The
 6        second digit of your squad number is your shift.  In
 7        the bureau, we don't designate by shift, so our squad
 8        numbers don't change like that in the bureau.
 9             MS. MC KENZIE:     You said "in the
10        bureau"?
11             THE WITNESS:       The investigation
12        bureau where all the detectives work out of.
13        BY MR. PEDERSON:
14   Q    When you gave the assignment to see if she could search
15        the house when you were in District 3, did Juanita Carr
16        tell you, "I just tried that"?
17   A    No.
18   Q    From your knowledge, is there any reason why she would
19        even have information that she should go --
20   A    No.  I had to brief her on the case.
21   Q    If a department member came to you and reported that
22        they had been sexually assaulted by another department
23        member off duty, what would you do?
24   A    Call Internal Affairs.
25   Q    Would you report it as a crime?
```

```
 1   A      Yes.

 2   Q      Something that should be investigated?

 3   A      Yes.

 4   Q      Is there any record of you having done that?

 5   A      No.

 6   Q      Why didn't you do that?

 7   A      Because it never happened.  I don't know if it happened.

 8          I know very little about this case.  Nothing was ever

 9          reported to me.

10   Q      Thank you.  Would you have any reason to not report it

11          if an officer came and reported to you a sexual assault?

12   A      I know not only of no reason to not report it.  I have

13          big reason to report it.

14   Q      To clarify, you never made such a report.

15   A      Correct.

16                       MR. PEDERSON:       That is all I have.

17                       MR. MC GAVER:       Just a few follow-up

18          questions.

19          RECROSS-EXAMINATION BY MR. MC GAVER:

20   Q      At the time of this shooting investigation, Troy Johnson

21          was a new detective.  Correct?

22   A      Yes.

23   Q      He was still on probation at the time.  Correct?

24   A      I don't know.

25   Q      He was new, at the very least.
```

```
 1   A    Yes.

 2   Q    If he was on probation, is it common practice to send

 3        another detective to assist him in an investigation?

 4   A    Depends on the investigation and how busy we are.  That

 5        is 90 percent of what we investigate; shootings, so to

 6        us, investigating a shooting is just another day.  It

 7        would be quite common for him to be there alone.

 8   Q    Is it possible that Juanita Carr could have volunteered

 9        to assist him in that investigation at some point with-

10        out you knowing it?

11   A    No.

12   Q    Why not?

13   A    How is it possible?

14   Q    Is it possible that conversation between Detective

15        Johnson and Detective Carr took place outside the

16        hospital and you just didn't know about it?

17   A    What conversation?

18   Q    The conversation that would have resulted in Juanita

19        Carr getting involved in that investigation.

20   A    It is a possibility.

21               MR. MC GAVER:        Nothing further.

22               MR. PEDERSON:        Nothing.

23               MR. KONRAD:          All right.  No

24        further witnesses.

25               MR. PEDERSON:        I have further
```

```
 1      witnesses.

 2      (Witness excused)

 3                  MR. PEDERSON:      I would call

 4      Lieutenant Kelly.

 5                  STEVEN KELLY, having been first duly

 6      sworn on oath to tell the truth, the whole truth, and

 7      nothing but the truth testified as follows:

 8                  MR. KONRAD:          The witness is sworn.

 9      DIRECT EXAMINATION BY MR. PEDERSON:

10  Q   Please state your name and spell your name for the

11      record.

12  A   Steven Kelly.  S-t-e-v-e-n   K-e-l-l-y.

13  Q   How are you employed?

14  A   I am a lieutenant with the Milwaukee Police Department.

15  Q   How long have you been with the police department?

16  A   21 years.

17  Q   How long have you been a lieutenant?

18  A   Three years.

19  Q   Do you recall working the evening of January 18 into

20      the early morning hours of January 19, 2015?

21  A   Yes.

22  Q   What were you assigned to at that time?

23  A   I was the supervisor with the Forensic Investigations

24      Unit.

25  Q   Do you recall a call of an accident occurring possibly
```

```
1       involving Milwaukee Police Department personnel around

2       2:00 a.m.?

3   A   Yes.

4   Q   What did you do in response to becoming aware of that

5       information?

6   A   I rode along with one of my forensic investigators to

7       the scene and went to the scene to help out.

8   Q   What scene was that?

9   A   It was an accident scene, a squad accident.

10  Q   Who were the officers involved?

11  A   The members involved were Detective Shannon Lewandowski

12      and Detective Juanita Carr.

13  Q   What did you do when you arrived at the scene?

14  A   First, I approached Lieutenant Hanley, asked if he

15      needed any help.  He asked if I could go to the hospital

16      with the members.  They were in separate medical med

17      rigs.  It would be the ambulances.  I checked with

18      Lieutenant Hanley and, then, I rode along out to the

19      hospital.

20  Q   You just said you "rode along to the hospital."  Where

21      were you?  How did that take place?

22  A   I left the forensic investigator at the scene because

23      they documented the scene with photographs and I rode

24      along in the front of one of the cabs.  I rode along in

25      the one that Detective Lewandowski was in.
```

```
 1   Q    So you are actually in the ambulance itself.

 2   A    Yes.

 3   Q    And you traveled with Lewandowski from the scene to the

 4        hospital.

 5   A    I was in the front, she was in the back.  We were in

 6        the same vehicle.

 7   Q    What happened when you got to the hospital?

 8   A    I followed the gurneys of the two med rigs.  They put

 9        Detective Lewandowski in one room and Detective Carr in

10        another room.

11   Q    How close in proximity to each other?

12   A    I couldn't give you that answer.  They were separated.

13        They weren't, like, right in a line.  One med rig

14        arrived prior to the other, so they unloaded first.

15   Q    What happened after that?

16   A    Then, I checked in with both detectives, let them know

17        that I was there, if they needed anything.  I got the

18        information that was needed for any reports that I could

19        convey to Lieutenant Hanley at a later time and, then, I

20        stayed with both of them back and forth.  I think I

21        wasn't with Detective Lewandowski when she went to get

22        x-rays.  Then she came back.  I was between both rooms

23        throughout the night until I was relieved.

24   Q    How far apart were the two rooms?

25   A    They were both corner rooms on a common corridor, so I
```

```
 1        could leave one room and go around the corner to the

 2        other.  They abutted to each other at the back of the

 3        rooms.  They didn't have access to each other, but the

 4        fronts were maybe 20, 30 feet.

 5   Q    Was there a time that you observed Lieutenant Hanley to

 6        arrive at that scene?

 7   A    There was.  I can't recall the exact time, but I know

 8        that I stayed at the scene until he got there and I

 9        briefed him with all the information I had.

10   Q    I want to be careful.  I just said "scene."  What I mean

11        is the hospital.  Was there a time when you were at the

12        hospital with the detectives and Lieutenant Hanley

13        arrived at the hospital with you there?

14   A    Yes.

15   Q    About how long were you there until he arrived?

16   A    Quite a while.

17   Q    When Lieutenant Hanley arrived, did you have any

18        communication with him?

19   A    Yes, I did.

20   Q    What did you guys talk about?

21   A    I briefed him with the room numbers that both detectives

22        were in, the current state of the injuries that the

23        doctors said they had, different type of personal

24        information that is needed for forms, medical informa-

25        tion and, then, I walked him over and showed him each
```

```
 1              room.

 2     Q    Did you make any personal observations of what Lieuten-

 3          ant Hanley did next?

 4     A    As I was waiting for my forensic investigator, because

 5          that was my ride home.  They came to take pictures of

 6          both detectives.  As I was waiting, Lieutenant Hanley

 7          at that time walked into Detective Lewandowski's room.

 8     Q    How big is this room?

 9     A    I am going to say it is probably about ten feet wide,

10          15 feet long.

11     Q    Did you see who else was in the room other than Lieuten-

12          ant Hanley and Shannon Lewandowski?

13     A    I believe she had two relatives in the room.  I think

14          one of them was her son, but he was in and out of the

15          room back and forth to use his cell phone, I think.  He

16          was at the hospital.  I remember that.

17     Q    Were you in uniform?

18     A    Full uniform.

19     Q    Same uniform you have on today?

20     A    Probably the same shirt.

21     Q    Was Lieutenant Hanley in uniform?

22     A    I don't believe he was in uniform.  I think he wears

23          a suit when he was in the detective bureau.

24     Q    If someone was casually looking at him and didn't know

25          him, they might not know that he is a police officer.
```

```
 1       Is that right?
 2  A    Someone from the hospital wouldn't know he was a police
 3       officer other than his identification that he would have
 4       had on.  He would have had a lanyard around his neck,
 5       probably with his ID.  No, a casual person wouldn't
 6       know.
 7  Q    Again, I want to go to your observations when Lieutenant
 8       Hanley enters the room.  Is this a situation where he is
 9       going in there to engage the people in there, or what
10       did you observe specifically?
11  A    The door is set up with privacy.  It has three sliding
12       glass doors, so it is wide open that if the nurses
13       enter, they can leave a curtain open, that they can see
14       in to view their patients, but still leave them to have
15       privacy by closing the doors.  Then, there is a set of
16       curtains.  I had the doors and the curtains closed for
17       their privacy in the room, and he opened one of the
18       sliding doors.  As he was entering, he pushed the
19       curtain aside, walked in and, then, he closed the
20       sliding glass door behind him, and I was out.
21  Q    Were you able to hear anything?  Were you in a position
22       to be able to do that?
23  A    No, I didn't hear anything.
24  Q    From your perspective, is there any possibility that the
25       people that were in that room could have not noticed
```

```
 1        that he was there?

 2   A    If they had their eyes closed.

 3                   MR. PEDERSON:       That is all I have.

 4                   MR. KONRAD:         Any cross?

 5                   MR. MC GAVER:       Do you want the

 6        commissioners to go first?

 7                   MR. KONRAD:         Any questions?

 8                   Go ahead.

 9   CROSS-EXAMINATION BY MR. MC GAVER:

10   Q    Were you interviewed by Detective Zieger in connection

11        with the investigation into Detective Lewandowski's

12        conduct?

13   A    No.

14   Q    Were you interviewed by anyone else in Internal Affairs

15        in connection with this case?

16   A    No.

17   Q    Did you review any reports generated by Internal Affairs

18        before testifying here today?

19   A    No.

20   Q    You supervised -- at the time of this investigation --

21        at the time of the accident, you supervised Officer

22        Vollrath.  Correct?

23   A    No.

24   Q    Did you have any personal contact -- what I mean by that

25        is conversation -- with Shannon Lewandowski at the scene
```

```
 1          of the accident?

 2     A    At the accident?

 3     Q    Yes.

 4     A    No.

 5     Q    What about in the hospital?  Did you talk to her at all?

 6     A    Yes.

 7     Q    What did you say to her?

 8     A    Well, I told her who I was and why I was there to make

 9          sure she understood there was someone from the depart-

10          ment, a supervisor there for her.  I explained to her

11          that I needed to get some personal information for a

12          report, which I think she understood.  General casual

13          things like that.  I didn't talk to her about the acci-

14          dent.  I just told her what I was there for.

15     Q    You testified that you got some information from some

16          of the physicians or nurses or hospital staff about

17          some of Shannon Lewandowski's injuries.  Is that fair?

18     A    I asked if they had anything for me.

19     Q    Did they?

20     A    They just said she has a bruised ankle and she was

21          getting x-rays.  That is all I had.

22     Q    That seems pretty vague.  Did you follow it up?

23     A    I did not.

24     Q    Do you know if anyone else did?

25     A    I don't know.
```

```
1   Q    You said there were two relatives in Lewandowski's room?

2   A    There was two people.  I thought they were relatives.

3        I remember one was her son and I don't remember who the

4        woman was.  She introduced them.

5   Q    Do you know whether Hanley was wearing a badge on the

6        exterior of his clothing at the time he was at the

7        hospital?

8   A    I didn't look for it, so I can't recall.  I can't

9        testify to that.

10  Q    Same question about the ID on the lanyard.

11  A    Again, I wouldn't be able to know if it was inside or

12       outside his jacket.  I couldn't testify to viewing it.

13  Q    Did you take any photos about what you observed in the

14       hospital?

15  A    I am sure I did.

16  Q    Did you file a report?

17  A    No.

18  Q    What would have been done with the notes?

19  A    I would have briefed Lieutenant Hanley about anything

20       that I had received from the hospital so that he could

21       put it in his report.

22  Q    Did you retain the notes?

23  A    I am sure they are somewhere.

24  Q    You don't know where they are, though?

25  A    That is three locations ago.  I can look for them if
```

```
1      you want me to, but it will take a while.

2                     MR. MC GAVER:       I don't have anything

3      further.  Thank you.

4                     MR. PEDERSON:       Nothing.

5                     MS. WILSON:         I have one question.

6      This was on January 19, 2015.  To your recollection,

7      was it snowing?  Was it cold?  Was it a nice January

8      day?

9                     THE WITNESS:        My recollection,

10     there was no snow.  It was just a normal January day.

11                    MS. WILSON:         Whoever went to the

12     hospital would have had on a jacket.  I am not talking

13     about a suit jacket.  I am talking about a Wisconsin

14     jacket, like, it was cold.

15                    THE WITNESS:        Who are you referring

16     to, ma'am?

17                    MS. WILSON:         Actually, you said

18     that Lieutenant Hanley may not have had on a uniform,

19     but he would have had on some kind of jacket.  Right?

20                    THE WITNESS:        Like a suit coat.

21     The lieutenants who work at the detective bureau, most

22     of them wear suits.  And patrol, we wear uniforms.  So

23     he would have had a suit coat on and I didn't -- in

24     prior assignments, I have seen him in suit coats, so

25     that is what I am assuming he was wearing that night,
```

        SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                                 sueT@wi.rr.com
      Case 2:16-cv-01089-WED  Filed 04/22/19  Page 704 of 805  Document 80-21    399

```
1      but I can't tell you what color it was.
2                      MR. PEDERSON:      Nothing further.
3                      MR. KONRAD:        The witness is
4      excused.
5      (Witness excused)
6                      ADAM ZIEGER, having been first duly
7      sworn on oath to tell the truth, the whole truth, and
8      nothing but the truth testified as follows:
9                      MR. KONRAD:      The witness is sworn.
10     DIRECT EXAMINATION BY MR. PEDERSON:
11  Q  Sergeant, again, you testified yesterday.  Is that
12     right?
13  A  Yes.
14  Q  You were the primary investigator in the Internal
15     Affairs investigation.  Is that right?
16  A  Yes.
17  Q  You were responsible for conducting the investigation
18     insofar as contacting department members that were at
19     the department's scene.  Is that right?
20  A  Yes.
21  Q  Did you do that?
22  A  Yes.
23  Q  Specifically, what did you do?
24  A  I contacted supervisors and officers.  Do you want me to
25     name them?
```

```
 1  Q   You don't have to, but did you contact all that you were
 2      aware that were there?
 3  A   I don't believe I contacted every single officer that
 4      responded, no.
 5  Q   Then why not?
 6  A   We briefed about the case quite a bit and a decision was
 7      made that there was no need to keep continuing to call
 8      people up.
 9  Q   Why?
10  A   We interviewed numerous people.  I located the TAC squad
11      officers that responded to the scene and acknowledged
12      that they reported the information to Lieutenant Hanley.
13      We located several officers that responded and picked up
14      her son and as I started -- I was directed to interview
15      Sergeant Riley.  After interviewing Sergeant Riley,
16      then, follow it with mentioning Tactical Squad officers,
17      that he got information from a TAC squad officer,
18      located that officer.  Kept following that officer, made
19      mention that these officers may have picked up the son,
20      which one rode to the hospital, things of that nature.
21  Q   You were specifically investigating, as part of this,
22      the allegations about potential statements that
23      Lewandowski made regarding she was on her way to pick
24      up her son, her son was at UWM.  Correct?
25  A   Part of it.
```

```
 1   Q    Was part of your job trying to determine where that
 2        information came from?
 3   A    I was directed to interview certain sergeants and
 4        because of that interview, I, then, went beyond that and
 5        started interviewing additional personnel, and that was
 6        part of the questioning.
 7   Q    Did you ever locate a specific person, a department
 8        member, who indicated that, "yes, I personally heard
 9        it myself from Shannon Lewandowski some statements
10        regarding her son and UWM"?
11   A    Yes.
12   Q    Who was that department member?
13   A    Officer William Krumnow.
14   Q    What did Officer Krumnow say?
15   A    He indicated when he arrived at the scene, Detective
16        Lewandowski handed him her cell phone and said, "go get
17        my son.  He is with a friend at UWM."
18   Q    Can you spell Krumnow?
19   A    K-r-u-m-n-o-w.
20             MS. WILSON:        You said he was with
21        what?  You said, "go get my son because he was" --
22             THE WITNESS:        He was with a friend
23        at UWM.
24        BY MR. PEDERSON:
25   Q    Did you document this in your summary?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 707 of 805   Document 80-21    402

```
 1   A    Yes.
 2                   MR. PEDERSON:      Did you locate your
 3        summary in front of you?  I believe it is Document 8.
 4        I direct your attention to Page 14.
 5                   THE WITNESS:      I am there.
 6   Q    Can you, please, review that and indicate where in your
 7        report what you just testified to?
 8   A    It is the third paragraph down.
 9   Q    It is about the middle of the page in the paragraph
10        starting, "during a non-PI-21 interview.  Is that right?
11   A    Yes.
12   Q    The second sentence beginning, "Officer Krumnow
13        described."  Is that correct?
14   A    Correct.
15   Q    I will read that.
16                   "Officer Krumnow described Detective
17        Lewandowski gave him her telephone and directed to
18        locate her son, and added he was with a friend at UWM."
19        Did I read that correctly?
20   A    Yes.
21   Q    What did Officer Krumnow tell you that he did in
22        response to this?
23   A    That he went to try to pick him up.
24   Q    What did he do?
25   A    He went to the UWM police station.
```

| 1 | Q | Did he find him there? |
|---|---|---|
| 2 | A | No. |
| 3 | | (A document was marked as Exhibit 17) |
| 4 | Q | I have presented you a document marked for identifica- |
| 5 | | tion as number 17.  Do you see it? |
| 6 | A | Yes. |
| 7 | Q | Are you familiar with this document? |
| 8 | A | Yes. |
| 9 | Q | What is it? |
| 10 | A | This is an entry where a dispatcher received a message |
| 11 | | from a squad and attaches it to the computer-aided |
| 12 | | dispatch, CAD report. |
| 13 | Q | Did you generate this document yourself? |
| 14 | A | The one I am looking at right now? |
| 15 | Q | Yes. |
| 16 | A | I generated the copy of it. |
| 17 | Q | What specifically does this relate to? |
| 18 | A | This relates to an officer sending an electronic |
| 19 | | message from their in-squad computer to a dispatcher |
| 20 | | indicating that they are changing locations to 3611 |
| 21 | | North Maryland Avenue regarding this assignment that |
| 22 | | they were assigned to. |
| 23 | Q | How did this relate to the scene of the accident at |
| 24 | | issue here? |
| 25 | A | This is a message from the squad computer of Officer |

```
 1        Stacey and Officer Krumnow indicating that they --
 2        they sent a message at 2:30 a.m. saying they were going
 3        to 3611 North Maryland Avenue.
 4   Q    You heard the testimony of Debra Stacey yesterday?
 5   A    Yes.
 6   Q    Does this document contradict the testimony you heard in
 7        any way?
 8   A    Yes.
 9   Q    How does it contradict it?
10   A    It indicates that they were going to a specific location
11        and they knew where that location was.
12   Q    So specifically that it was --  Am I correct in saying
13        that Officer Stacey's testimony yesterday was she just
14        headed to the UWM area, had no idea where Jordan
15        Lewandowski was and she was just driving around and all
16        those sorts of things.  Right?
17   A    I believe it turned out they stumbled across -- they
18        came across him.
19   Q    So this indicates that at 2:30 a.m. -- am I correct in
20        saying that this document indicates that she left the
21        scene of the accident at 2:30 a.m. and was en route
22        directly to the exact spot where she eventually located
23        him?
24   A    It indicates at 2:30 and one second, that they indicated
25        that they were now en route to 3611 North Maryland
```

```
 1          Avenue.

 2     Q    And does that correspond with the location where Jordan

 3          was eventually found?

 4     A    I don't know if that is the exact address, but it might

 5          be within the same block.  It might -- I am not sure

 6          what the exact address is.  It might have been 3616.

 7          A difference between a house or two.

 8     Q    Did you address this document in your summary?

 9     A    Yes.

10     Q    I will direct your attention to Page 3, the second full

11          paragraph beginning with, "the CAD documented."  Do you

12          see that?

13     A    Yes.

14     Q    It states,

15               "The CAD documented Squad 3482, Officer Stacey

16          and Officer Krumnow responded to the accident at 2:20

17          a.m.  At 2:30, Squad 3482 changed locations to 3611

18          North Maryland Avenue.  Message number -- and there is a

19          large number -- was entered stating 'Show us enroute to

20          3611 North Maryland AVE regarding.'"

21          Did I read that correctly?

22     A    Yes.

23     Q    Does that relate to this document?

24     A    Yes.

25                    MR. PEDERSON:      That is all I have.
```

```
 1              MR. KONRAD:        Commissioners?

 2              MS. MC KENZIE:       Just for clarity, why

 3    does this CAD document, which was submitted as 15, look

 4    like this, then, and this one --  This is a CAD

 5    document, too, is it not?

 6              THE WITNESS:        If you find in the

 7    CAD -- and I think you have it in front of you -- the

 8    actual report of this is not visual.  That message

 9    number that is in my summary is the message number in

10    the CAD, which I can look through it and I will find

11    and, then, it corresponds -- when you click on that, it

12    is a hyperlink.  It links this entry from this squad

13    directly to that assignment.  It is noted in the CAD

14    with a hyperlink that takes you to the documentation

15    for the message to and from the dispatcher.

16              MS. MC KENZIE:       This is the message?

17    The hyperlink brought you to this.

18              THE WITNESS:        Correct.

19              MS. HEIN:            Is there any way to

20    determine if it says, "en route to this address on

21    Maryland" at 2:30, but could it have been at the scene

22    of the accident that they said that, or is there any way

23    to determine it was then or that they were already

24    there?

25              THE WITNESS:        It is my under-
```

<pre>
 1          standing they reported it at the accident scene.  It is
 2          my understanding of the documentation of any messages
 3          that are sent, when the dispatcher types it into the
 4          CAD, that the 2:30 time is the time that the actual
 5          message was transmitted or sent electronically from the
 6          squad computer to the communications center and the time
 7          above that, that 20, which would be 2:30 a.m. and 51
 8          seconds, that would be the time the dispatcher was doing
 9          something with it connecting it to the CAD.  The time.
10          2:30 and one second would be the time that they
11          transmitted that.
12                    MS. HEIN:        But there is no way
13          to determine where they physically were when they trans-
14          mitted this.  You are indicating that you think it is
15          when they were leaving the accident scene, but in the
16          document -- or the CAD report, there is no actual GPS to
17          say they are at the accident scene or they are halfway
18          to Maryland Avenue or --
19                    THE WITNESS:     There is not a way to
20          determine the location that it was sent from, from that
21          report, no.
22                    MS. WILSON:      Could I follow up on
23          her question?  When any officer says, "I am around,"
24          wherever, is there is some kind of a policy that you say
25          it when you are getting ready to leave, you say it when
</pre>

```
 1      you get there or you say it two minutes before?  Is it
 2      based on case-by-case emergencies?
 3                    THE WITNESS:       When you are leaving
 4      from a scene or leaving a location and you are done, you
 5      are supposed to notify the dispatcher at that time that
 6      you are leaving the scene and done, because they need to
 7      be able to have the opportunity to send you to -- they
 8      need to have the control to be able to dispatch you to
 9      what they need to dispatch you to, so they need to know
10      your status.
11                    MR. KONRAD:        Any questions?
12                    MR. MC GAVER:      I do.  Thank you.
13      CROSS-EXAMINATION BY MR. MC GAVER:
14  Q   Did you interview Lieutenant Kelly in connection with
15      this internal investigation?
16  A   No.
17  Q   Before you filed your report dated September 9, 2015,
18      did you know he was at the hospital?
19  A   No.
20  Q   Did you know, before you filed your report, that he had
21      direct conversations with Shannon Lewandowski at the
22      hospital?
23  A   No.
24  Q   Knowing that now, would you have wanted to interview
25      him?
```

```
 1    A    I don't think so, no.

 2    Q    You testified a little bit about Officer Krumnow and

 3         Officer Krumnow's statements in your report.

 4    A    Yes.

 5    Q    Your report says -- attributes a statement from Officer

 6         Krumnow who is attributing a statement from then-

 7         Detective Lewandowski.  The quote is, "go get my son.

 8         He is with a friend at UWM."  Is that accurately

 9         reflected from your report?

10    A    Yes.

11    Q    Is there any mention of police in that statement from

12         Officer Krumnow?

13    A    I believe he, then, mentions that he was told to go

14         there and that was -- because he was asked why he was

15         told to go there and he said because that is where he

16         was told he would be.

17    Q    You said "go there."  Where was "there"?

18    A    I believe it was the UWM Police Department.

19    Q    Do you know the address of the UWM Police Department?

20    A    No.

21    Q    Do you know Jordan Lewandowski's address?

22    A    No.

23    Q    If I told you that Jordan Lewandowski lived less than

24         six blocks from the UWM Police Department, would you

25         quarrel with me?
```

```
 1   A    No idea.

 2   Q    You testified a little bit about officers clearing

 3        scenes and having that show up on a dispatch.  In

 4        practice, do officers forget to clear scenes until they

 5        arrive at another location?

 6   A    I don't think it is a practice, but I believe that you

 7        are probably asking if it happens.

 8   Q    Does it happen?

 9   A    Yes.

10   Q    Do officers occasionally forget to report their location

11        to CAD until several minutes into their arrival -- after

12        their arrival?  Does that happen?

13   A    I wouldn't think under those circumstances, that would

14        be --

15   Q    Does it ever happen?

16   A    -- it would happen, but officers often -- not often, but

17        they have a choice of either notifying if they are not

18        assigned to something, notifying the dispatcher when

19        they are en route to something or they could tell them

20        when they get there.

21                      MR. MC GAVER:      Thank you.  Nothing

22        further.

23                      MS. WILSON:        To me, "en route"

24        means I am going somewhere.  What do you use when you

25        get there?  Do you use the same thing?
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                       sueT@wi.rr.com
4a91374eb... 0411
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 716 of 805   Document 80-21

1                    THE WITNESS:        Most common would be
      2       "on scene."  En route, absolutely.  I am on my way.  "On
      3       scene" is a term that is always used for "I am here" or
      4       simply "I'm here" or "I have arrived."  But en route is
      5       us traveling to a location.
      6                    MS. WILSON:         And, then, you say
      7       something when you leave.
      8                    THE WITNESS:        Correct.
      9                    MS. WILSON:         So there is, I am
     10       going, I am here, and I am gone.
     11                    THE WITNESS:        En route, I haven't
     12       gone there yet.  I'm still going.  I still am on the
     13       way.
     14                    MS. WILSON:         But when you get
     15       there, you don't have to say anything?
     16                    THE WITNESS:        You are supposed to
     17       say that -- you either provide a --  We have a "10" code
     18       for it.
     19                    MS. WILSON:         Yes, 10-17, 10-24.
     20                    THE WITNESS:        10-23.  10-23 would
     21       be the code that an officer should give when they arrive
     22       at a location that is indicated that they are traveling
     23       to, to notify communications that they are on scene.
     24       They'd give a 10-23.  They say "10-23" on the radio and
     25       give them the squad number.  They also have the option,

     SUSAN K. TAYLOR         262-553-1058      COURT REPORTER
                             sueT@wi.rr.com
     Case 2:16-cv-01089-WED  Filed 04/22/19  Page 717 of 805  Document 80-21    412

```
 1        when they are responding, to mark --  On the computer,
 2        there is a big -- several buttons.  One of them is "on
 3        scene" and it says -- that is to notify them electron-
 4        ically that I have arrived.
 5                        MS. HEIN:          Is 3611 North
 6        Maryland the address of where the complaint -- the
 7        initial complaint to the Shorewood Police Department?
 8        Is that the same address?
 9                        THE WITNESS:       I don't think 3611
10        is the exact address, but I believe it is within a few
11        numbers.  I believe the complaint is, like, 3614 North
12        Maryland as opposed to 3611.  It might have been 3611.
13        I am going off my memory and I am not exactly sure what
14        the complaint address is.  I could probably find that in
15        my report.  We should be talking about a difference of
16        either across the street or a house over.
17                        MR. KONRAD:        Anything further?
18                        MR. PEDERSON:      No.
19                        MR. MC GAVER:      Nothing.
20                        MR. KONRAD:        You both rest?
21                        MR. PEDERSON:      Yes.
22                        MR. MC GAVER:      Yes.
23                        MR. KONRAD:        The witness is
24        excused.
25        (Witness excused)
```

SUSAN K. TAYLOR        262-553-1058        COURT REPORTER
                       sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 718 of 805   Document 80-21   413

```
 1              MR. KONRAD:        We will give you both

 2     an opportunity to present a closing statement.

 3              Mr. Pederson, would you like to give your

 4     closing?

 5              MR. PEDERSON:        I would.

 6     Commissioners, thank you for your time and attention the

 7     last day and a half.  I will do my best to sum up this

 8     hearing and the chief's position.  At beginning, I told

 9     you I expected the evidence to be somewhat simple from

10     our side, and I still maintain that is true.  The

11     chief's belief, understanding and version of events that

12     he came to believe were true and based his discipline

13     decisions on are relatively straightforward and that is

14     that Ms. Lewandowski did violate the three rules that

15     are contained in the charge and specs and in the Com-

16     plaint.

17              We believe the true facts here are that

18     Juanita Carr was never at the hospital, that that was a

19     collusory statement made after the fact, that that is a

20     fabrication that Lieutenant Hanley was at the hospital,

21     had reason to assign a detective to follow up to go to

22     this house and see if there could be a consent search

23     done.  He went to District 3 to find a detective.  The

24     detective he located was Juanita Carr.  He gave that

25     assignment to her expecting her to do it immediately,
```

```
 1      because this was a time-sensitive issue.  We needed to
 2      get it done before he was -- the shooting victim was
 3      released from the hospital.  Unbeknownst to him, there
 4      was this interaction between Detective Lewandowski and
 5      Detective Carr, not that there is anything wrong with
 6      that.  It is perfectly fine had they actually followed
 7      through in the way that they had indicated.  If
 8      Lewandowski had said, "okay, because you are going to
 9      need some help, you know, not one officer can go in
10      there, I will just go with you and we will do it
11      together and that way, you don't have to call a car out
12      of service that could otherwise be answering calls.  So
13      let's do that."  Had they done that, drove the block or
14      two, or whatever it was, to the house, they could have
15      done it immediately and maybe they would have knocked on
16      the door and there would have been no answer.  Who
17      knows?  We don't know.  All we know is it wasn't done
18      and they didn't follow the commands of their supervisor
19      and they didn't effectively and efficiently carry out
20      their duties.  Now, Juanita Carr isn't part of this, we
21      are not discussing her, but they were together.  That is
22      why I say "we."  Instead, this is the chief's under-
23      standing of the facts.  Shannon Lewandowski decides she
24      is going to go to District 5 to attend to a personal
25      matter.  That is, to offer support/comfort to her
```

```
 1        friend, Melanie Beasley.  Now, there is nothing wrong

 2        with that per se, but there is something wrong when you

 3        are traveling in the middle of a shift when you have

 4        other actual police missions, police objectives, to

 5        meet, to attend to this personal matter.  So that

 6        presents an issue.  And that is what she was doing.

 7                    The phone records support that at that

 8        exact time or, you know, the line of time, she received

 9        a call from her son and we have to assume, based on the

10        testimony, and she admits that is when she was advised

11        that her son was stopped.  She says that she wasn't

12        going to do anything at that time, but it is the chief's

13        belief she made the decision at that time to not go to

14        the house.  She's already diverted and going to District

15        5 to now, not go to District 5 and go directly to assist

16        her son.  This is based on credible evidence.  It is

17        based on, one, the supporting circumstantial evidence

18        of Sergeant Cody himself.  I will admit, it is somewhat

19        unusual that -- how Sergeant Cody handled that scene.

20        I'm not sure the Milwaukee Police Department would have

21        handled that scene the way that he did in that, you

22        know, he conducted field sobriety tests and got him to

23        blow a .09, according to him, which would be a viola-

24        tion -- he's 19 -- and, then, we are not sure even

25        if he stayed at the scene until Milwaukee police showed
```

1      up or not, I can see that is a little unusual and he
           2      couldn't recall exactly why he did what he did.  I don't
           3      know.  But one thing is absolutely certain that he was
           4      crystal clear on was that Jordan Lewandowski told them
           5      "my mom is on the way."  He didn't equivocate on that
           6      and he has no motive to lie or misrepresent.  If he did,
           7      I, frankly, believe he would have said, "I stuck around
           8      and I waited until they were there."  He has no upside,
           9      no benefit to him to make a misrepresentation on his
          10      understanding and he testified, without any equivoca-
          11      tion, "I was told Shannon Lewandowski is on her way."
          12      Now, does it prove it in and of itself?  No, it doesn't,
          13      because maybe Jordan is lying.  Right?  Maybe he just
          14      says that to every police officer he gets pulled over
          15      by to -- you know, for whatever reason; if he thinks
          16      they might be more lenient.  I don't know.  That doesn't
          17      prove Shannon Lewandowski's state of mind, but it is an
          18      important piece of circumstantial evidence, taken in
          19      conjunction with everything else, that lends some
          20      credence to the notion that she was on her way there,
          21      in fact.  The most critical piece?  Her own statement.
          22                  It is the chief's -- I will take the step
          23      back.  It is the chief's position that she was on her
          24      way to District 5.  That is clearly a violation of
          25      performing duties outside of what she is required to do

```
 1        and not affecting the mission of the department.

 2                    The chief's position regarding the

 3        emergency lights is, again, consistent with her own

 4        statement, that she was doing that to facilitate her

 5        quick trip to see her son.  Why did she want to get

 6        there quickly?  Because he is pulled over.  She wants

 7        to get there as soon as possible so she can have maximum

 8        effect of whatever she is going to do.  Now, I can't

 9        tell you what her plan was.  I don't know her state of

10        mind, but it is our position that she was on her way

11        there and it was going to benefit her son that she got

12        there as quick as possible.  So that is why she is

13        operating her lights, and that is what she told

14        Lieutenant Hanley, according to Lieutenant Hanley.

15                    So again, if that is the case, if you

16        agree with that finding, then, clearly, she is operating

17        her vehicle in an unsafe manner inconsistent with the

18        law and is unsafe because we had some testimony, I

19        believe, from Shannon Lewandowski that she thought it

20        enhanced safety.  "I have my lights on.  People know I

21        am there.  I mean, that enhances safety."  But the

22        reality is, common sense tells you and the way they are

23        trained is that is not true, that that is an element of

24        chaos in a situation out on the streets.  If you are

25        driving along and all of a sudden, lights and siren go
```

```
 1     on behind you, does that enhance safety?  No.  That
 2     creates a situation where everyone jumps, looks, pauses.
 3     That can actually cause accidents and distractions.  So
 4     for her to say this is enhancing safety is a misrepre-
 5     sentation and that is why it is not safe.  And even if
 6     you do believe it somehow enhances safety, it is
 7     contrary to law.  So it is still a violation of the SOP
 8     and the rule that she is charged with here, the guiding
 9     principle, just by the mere fact of operating an
10     emergency vehicle contrary to law.  That is a violation.
11                 The next set of facts we have to deal
12     with and the last charge is the integrity charge.  Where
13     does that come into play?  That comes into play when she
14     changes her story because up to the point -- up to that
15     point, the only two violations she's committed is the
16     operating her vehicle in an unsafe manner and not --
17     the idling, loafing charge, not carrying out the mission
18     of the department.  When she had the conversation with
19     Lieutenant Hanley, she provides one set of facts that we
20     believe are the true set of facts that we submit was, in
21     fact, what Detective Lewandowski told Lieutenant Hanley
22     and that he accurately reported in his report.  If
23     Detective Lewandowski had maintained that, she wouldn't
24     be facing an integrity charge.  That only came into play
25     when later on, she completely -- she filed responses to
```

```
 1      the charges completly changing the story.  Of course, it
 2      is her side that is consistent, but that is a point that
 3      we differ on.  And goes so far as to accuse Lieutenant
 4      Hanley of lying.  The chief police there is sufficient
 5      evidence deduced here to believe that she did change her
 6      story, that Lieutenant Hanley was telling the truth and
 7      that she did, in fact, say all of those things to him
 8      and that therefore, her changes in story was to say the
 9      lieutenant was a liar and all of that constitutes the
10      integrity charge.
11                  I told you at the very beginning in the
12      opening statement that I believe that in the end,
13      largely, your findings here are going to be a credi-
14      bility determination, and I still believe that to be
15      true.  Your decision here is going to hinge on whether
16      or not you believe Shannon Lewandowski actually reported
17      things -- said the statements that are attributed to her
18      by Lieutenant Hanley or if you believe Lieutenant Hanley
19      is lying.  That is going to be the biggest decision to
20      make here, and that is a credibility determination,
21      because all you have is two different people that were
22      the only people part of the conversation getting their
23      side of the story.
24                  Here are the things I want you to take
25      into consideration on whether to terminate that
```

credibility decision.  It is Shannon Lewandowski that
1

2         has the true motivation to lie, not Lieutenant Hanley.

3         Why does she have a motivation to lie?  Because she

4         wants to keep her job.  She doesn't want to be

5         disciplined.  She knows full well if you believe that

6         all of those statements that are attributed to her, that

7         she was on her way to pick up her son, that she was

8         operating with her lights on, not to be an emergency

9         vehicle, but just so cars would get out of her way,

10        that she was going 45 miles an hour, et cetera, that

11        she clearly is going to be disciplined.  As they say

12        oftentimes in these situations, the cover-up is worse

13        than the crime, I think that is the instance here.

14        She determined she was going to be exposed to discipline

15        for having done that, so she engages in the cover-up,

16        changes the story, tries to contort the whole thing and

17        say now, her position is that is not true.  Lieutenant

18        Hanley lied.

19                    So there is a couple of questions.  Why

20        would she lie from the very beginning?  Well, because

21        she hasn't had an opportunity to collude yet with any

22        other person; namely, Juanita Carr.  She doesn't know

23        all the facts.  She doesn't know what other people know.

24        Plus, she believes that there is a video out there.

25        Right?  That is going to show that she was in the

1          accident, that her lights were on, her rate of speed, a

          2          lot of these other sorts of things.  So that is one of

          3          her big motivations to lie -- I mean, to tell the truth,

          4          because she just can't lie, because she can't customize

          5          the fabrications to the facts, because she doesn't know

          6          what we know.  After she finds out what the department

          7          knows, that is when she starts to change the story.  So

          8          again, she has all the reasons to do that and Lieutenant

          9          Hanley has no reason.  I asked her point blank, "are you

         10          aware of any reason why he would be motivated to do

         11          that," and she said, "no."  Now I can't expect that she

         12          knows the mind of Lieutenant Hanley and should be able

         13          to read his mind and all of that, but the point remains

         14          that she has a motive, he does not.  In fact, he has

         15          every motive in the world not to lie.  Why would he

         16          subject himself to discipline himself, to take a state-

         17          ment from an officer and completely make something out

         18          of whole cloth and, then, attribute it to that so they

         19          can get in trouble?  Would Lieutenant Hanley seriously

         20          risk his career over that, because that is a career --

         21          that is something that could you could sacrifice your

         22          career on if you were caught.  It doesn't make any sense

         23          why he would do that.

         24                       Furthermore, you would also have to

         25          believe that if Shannon Lewandowski's version is true,

1          it wasn't only Lieutenant Hanley that was out to get
         2          her.  It was Lieutenant Hanley in conjunction with a
         3          number of other people.  I mean, she said that she
         4          accused Lieutenant Hanley of not reporting a sexual
         5          assault that was reported to him.  She also said that
         6          Lieutenant Leitzke did the same thing.  She said
         7          Sergeant Zieger did the same thing.  She called into
         8          question the motivations of the TAC officers who
         9          responded there.  These are mass conspiracies and, you
        10          know, I can't prove that mass conspiracies are not true,
        11          but when you make an extraordinary claim like that, it
        12          requires extraordinary evidence.  I am presenting to you
        13          there was no extraordinary evidence presented here on
        14          why she would be the victim of this mass conspiracy.
        15          So common sense has to lead you to the conclusion that
        16          these simple -- the simple answer here, no Occam's
        17          razor, the idea if there is a simple explanation, that
        18          it is usually the best and the correct explanation.
        19                      So are we to believe that she was on her
        20          way to her son and got into an accident and, then, lied
        21          to cover herself up?  A simple story?  Or are we to
        22          believe that there is a mass conspiracy that's in effect
        23          that requires the inclusion of multiple department
        24          members that we are not even sure are connected to one
        25          another.

```
 1                         And there are other pieces that call her
 2            credibility into question.  Commissioner Wilson asked
 3            about the Melanie Beasley matter and how this connected
 4            in and we went into some of those facts.  Here is why I
 5            think we had to go into that, not because I think it is
 6            relevant or important, but because I knew this was going
 7            to be a defense tactic, if you will.  This really gets
 8            complicated when the defense gets involved.  So the
 9            chief's version of events is pretty straightforward.
10            What the defense here wants to paint as part of this
11            mass conspiracy, that this is all connected with Melanie
12            Beasley and discrimination and retaliation, and so that
13            is why I had to go into those questions regarding
14            Melanie Beasley on "if someone reported sexual assault
15            to you, what would you do?"  "I would do my job.  I
16            would follow through on that."  They are police
17            officers.  That is what they do.  What possible motiva-
18            tion would Lieutenants Hanley, Leitzke or Zieger have to
19            just blow off a report of a sexual assault?  It makes no
20            sense.
21                         Furthermore, we had to get into it because
22            Shannon Lewandowski, in her testimony and in her written
23            statements, sort of, appointed herself the personal
24            bodyguard and representative of Melanie Beasley.  That
25            is not to say that in theory, that that is a bad thing.
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 729 of 805   Document 80-21   424

1          You know, department members supporting each other and
         2          being friends.  Being a police officer, just like in the
         3          military, there are very strong bonds made between
         4          department members.  I am not suggesting there is any-
         5          thing wrong that she would support her friend and help
         6          her if she thought she was getting a raw deal from
         7          administration.  That is fine.  Where it becomes a
         8          problem is when she suggests -- not just suggests, but
         9          actually states there is a conspiracy to cover up the
        10          Beasley investigation, to cover up her own investi-
        11          gation, to turn everything around on them for the sole
        12          purpose of discriminating against them because they are
        13          females.  Those are extraordinary claims.  Again, those
        14          are extraordinary claims.  We need extraordinary
        15          evidence, and there is none other than her own personal
        16          perceptions and observations and feelings, many of which
        17          are not substantiated by the record or contradicted.

        18               For example, she maintains Lieutenant Hanley
        19          was never at the hospital.  Well, let me retract that.
        20          She acknowledged it was possible that he could have been
        21          at the hospital, but she maintained that he did not
        22          speak to her, did not look in on her.  Well, we had
        23          Lieutenant Kelly come in to rebut that.  As far as I am
        24          aware, there isn't any particular accusations made
        25          against Lieutenant Kelly and his motivations.  Maybe he

```
 1    is going to be part of the conspiracy now that he's
 2    testified, but as far as we know right now, he is just
 3    a neutral party that came in and completely contradicts
 4    what Shannon Lewandowski says.  And that is consistent
 5    throughout the entire record, that her version of the
 6    events, while -- if that was her first story -- might
 7    make sense, was not consistent, is not supported by the
 8    evidence that we do have.
 9                 Now, we have a lot of questions of things
10    that we would like answered that we just can't answer
11    due to the nature of it, but we have to look at the
12    evidence that we do have and the evidence that we do
13    have, when looked at fairly, I respectfully submit,
14    indicates, quite clearly, that Lieutenant Hanley
15    accurately reported what the detective told him on the
16    early morning hours of January 19 and, then, in and of
17    itself, just that statement, even if you had no other
18    facts, in and of itself, justifies a finding of all of
19    those rule violations having occurred.
20                 It is also possible that you could decide
21    that parts of it were true and other parts of it were
22    not true.  I've talked long enough, so I won't go into
23    all the possible ways that you could find some viola-
24    tions and not others.  One, because of the time con-
25    sideration, but also, two, because again, I respectfully
```

```
 1      submit I don't think that is a reasonable conclusion.
 2      Either you believe the whole package or you don't
 3      because she's offered -- the detective has offered a
 4      version of the events that if you believe would be
 5      consistent with her not violating any rules depending on
 6      how you analyzed it.  So I won't go down that path and
 7      just urge that you believe Lieutenant Hanley and the
 8      circumstantial evidence that also supports a finding
 9      that she violated all of those rules on the bases that
10      are set forth in his report.  Thank you.
11              MR. KONRAD:        Mr. McGaver?
12              MR. MC GAVER:       Thank you.  Thank
13      you for your time and attention to this obviously very
14      important matter.  Just know it doesn't go unnoticed.
15      Nobody, nobody can credibly accuse Shannon Lewandowski
16      of being an idle cop.  She tried to stay busy.  There
17      was ample testimony she helps out with investigations
18      that are not even her own.  She helps out her fellow
19      police officers.  She involves herself in any way that
20      she can be helpful.  That is her practice.  That is her
21      policy.  That is what she does as a cop.
22              Now, on January 19, 2015, she reported
23      for duty.  She later met with then-Police Officer
24      Melanie Beasley and discovered that Officer Beasley had
25      a couple of concerns.  Now, the city has posited that
```

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 732 of 805   Document 80-21   427

```
 1      they were personal concerns.  I dispute that.  I think
 2      the stipulation of Melanie Beasley and the testimony of
 3      Shannon Lewandowski lends credibility to the fact that
 4      Shannon Lewandowski offered to assist and Beasley
 5      requested needing Shannon Lewandowski's assistance with
 6      some police reports.  Shannon Lewandowski helped out.
 7      She also helped out and provided counsel in what I would
 8      call a personnel matter, but not a personal matter.  It
 9      is no secret that Melanie Beasley was going through a
10      rough time.  Whether you believe a sexual assault
11      occurred or harassment or none of it, at least in
12      Melanie Beasley's mind, she was going through a rough
13      time and needed some help.  Shannon Lewandowski was
14      there to help her.
15                  Again, I disagree with the city's
16      position that it is a personal matter.  It is a profes-
17      sional matter.  It is a police matter.  Officers should
18      look out for one another.  And more than that, there was
19      actual police work involved.  There's assistance with
20      these reports.
21                  In any event, later on, Shannon
22      Lewandowski is pulled away from the conversation with
23      Officer Beasley because she hears something over the
24      radio.  It is something that she hears over the radio
25      that a shooting occurred and Juanita Carr was in some
```

1     way involved in the shooting.  You heard Juanita Carr's
2     testimony.  She said she reported to the hospital.  What
3     does Shannon do?  Shannon leaves Melanie Beasley and
4     makes her way to the hospital.  She gets on the phone
5     with Detective Carr and Detective Carr tells her that
6     it is a self-inflicted gun wound from a concealed carry
7     permit holder, so it is not a huge deal, that she's got
8     this wrapped up.  Lewandowski goes off and does more
9     police work, works on reports, does whatever, follows
10    up with other investigations that were pending, does
11    whatever she had to do.
12              Now, later on in the same shift,
13    Lewandowski meets up with Detective Carr and it somehow
14    comes to light that Detective Carr needs to report back
15    to, for the second time, this residence and conduct a
16    knock-and-announce search in an attempt to find the gun
17    that was used in the shooting.  It went to Detective
18    Carr, not Lewandowski, but Lewandowski volunteered to
19    assist with the caveat that, "since you were just at
20    that house, Detective Carr, let's do a quick detour so
21    I can handle my business, continue the conversation with
22    Melanie Beasley.  We are going to go to District 5 for a
23    second."  Detective Carr agreed.
24              On the way to the squad car, Shannon
25    Lewandowski gets a phone call from her son and it is a

```
 1    phone call that I am sure every parent dreads getting
 2    and unfortunately, for both Jordan Lewandowski and
 3    Shannon, it is a phone call that happens many times in
 4    that household.  Jordan Lewandowski was stopped by the
 5    police.  "Where are you?"  "I am not sure."  "What did
 6    they stop you for?"  "I am not sure."  Then you heard
 7    Shannon say that there was some conversations in the
 8    background, which, I think, justifies -- at least
 9    explains why that phone call was two minutes long.
10    It ended with Shannon saying, "let me know what happens.
11    Call me back as soon as you realize what is going on."
12    The phone call ended.  Shannon Lewandowski got in her
13    squad car with Juanita Carr and they proceeded to make
14    their way to District 5.  They never got there.  They
15    never got there because just before the intersection of
16    35th and North, Shannon Lewandowski sees a car pulling
17    out in front of her and puts on her squad car lights,
18    operates her siren, uses it as a horn and lets the car
19    know that the squad was behind her and they avoid an
20    accident there, only to enter the intersection and get
21    slammed into by a drunk driver; a drunk driver with a
22    suspended license, a drunk driver with no insurance on
23    the car, a drunk driver with faulty brakes on the car.
24    The accident wasn't Shannon Lewandowski's fault.  Nobody
25    here said it was Shannon Lewandowski's fault.  Shannon
```

| 1 | Lewandowski had the green light.  There's been no testi- |
| 2 | mony to the contrary of that.  I posit that had that |
| 3 | squad car cleared the intersection without getting into |
| 4 | that accident, the squad lights would have gone off and |
| 5 | they would have proceeded right to District 5. |
| 6 | Well, what happens in the accident? |
| 7 | Shannon Lewandowski is tossed over the center console |
| 8 | some, ends up in Juanita Carr's lap, passes out. Juanita |
| 9 | Carr is panicking, citizens are coming to aid the two |
| 10 | detectives, pulls them out of the car.  It is chaos. |
| 11 | But Jordan Lewandowski, in dealing with his situation in |
| 12 | Shorewood, he is dealing with a little chaos of his own. |
| 13 | He's pulled out of the car, performed some field |
| 14 | sobriety tests, blows into the Breathalyzer.  He is |
| 15 | underage.  He realizes that he's got some problems. |
| 16 | Where that situation ends is after Sergeant Smith |
| 17 | searches Jordan Lewandowski and has ahold of his phone, |
| 18 | the phone rings, so Sergeant Smith answers the phone and |
| 19 | it is an unidentified police officer from the Milwaukee |
| 20 | Police Department who tells the sergeant that Shannon |
| 21 | Lewandowski had been in a car accident, that she is |
| 22 | hurt.  What does Officer Smith do?  Tosses the phone and |
| 23 | the wallet back to Jordan Lewandowski, says, "your mom |
| 24 | is in a neck brace."  He clears the scene.  He doesn't |
| 25 | wait around, he doesn't order another officer to wait |

1    around.  Just vanishes.  So there is panic and chaos

    2    going on at the scene of 35th and North and there is

    3    panic and chaos going on on Maryland Street.  And that

    4    chaos is from Jordan Lewandowski, who doesn't know

    5    whether his mother is living or dead, doesn't know what

    6    happened.  He repeatedly calls his mother's cell phone.

    7    No answer.  Finally, through, it sounds from the testi-

    8    mony in this hearing, some small miracle, somebody gets

    9    ahold of Jordan Lewandowski and Officers Krumnow and

   10    Stacey go to pick him up.  He ends up at the hospital,

   11    reports to the room.  His mother is in a neck brace, at

   12    least initially.  I think she was out of the neck brace

   13    by then.  And the family is pretty much reunited, which

   14    is good.

   15              Now, there is a couple concerns that were

   16    raised by the city in their case and in their presenta-

   17    tion.  Number one is the business card that Jordan

   18    Lewandowski presented to Officer Cody Smith, as if there

   19    was something wrong with a black gentleman presenting a

   20    business card to show that his mother is a Milwaukee

   21    police detective.  You heard Shannon say, you heard

   22    Jordan say that they weren't expecting any preferential

   23    treatment because of that.  The business card was

   24    presented to make sure that a traffic stop, which is

   25    generally a very dangerous situation, didn't go poorly.

That is all there was to it.  You heard Jordan say, you
heard Shannon say, you heard Juanita say, all live
testimony from these witnesses that there was no
intention by anyone to interfere with that investigation
into the UWM Police Department -- into the Shorewood
Police stop of Jordan Lewandowski.

Now, Lieutenant Hanley reported to the
scene of the accident, did what he needed to do there
and at some point, he reports to the hospital.  I think
there is enough evidence to demonstrate that he did
report to the hospital at some point.  But you heard
from Jordan Lewandowski, you have heard from Denise
Brown, you heard from Officer Vollrath, you heard from
Shannon Lewandowski.  None of these people say they ever
witnessed Lieutenant Sean Hanley have a conversation
with Shannon Lewandowski, not a 20-or-30-minute conver-
sation at that hospital.  So now, Shannon is getting
ready to get discharged from the hospital.  She realizes
that she had not had a conversation with her supervisor
yet.  What does she do?  She goes to her district to
pick up her personal car and then to try to have an
interaction of some sort with Lieutenant Hanley, letting
him know she's okay, letting him know she's going home.
Hanley is not at the district, so what does she do?  She
waits until she gets home and makes one phone call to

```
1       him it.  Appears from the phone records, that they never
2       connected.  She makes a second phone call.  A phone call
3       occurred at 6:38.  It was a seven-minute phone call --
4       Shannon Lewandowski's accident occurred at 2:18 -- only
5       a few hours after this accident.  Her testimony --
6       a lot of testimony was that Shannon Lewandowski was
7       unconscious for a period of time, suffered from a severe
8       concussion, had other injuries.  This is only a few
9       hours after this accident.  You heard testimony about
10      officers on the scene that had conversations with
11      Shannon Lewandowski.  They were getting frustrated with
12      her because she was making no sense.  She was talking
13      nonsense.  She was giving the wrong cell phone number
14      for her son.  I think it is pretty clear that she didn't
15      quite know what was going on at that time.
16                      I think something else is quite clear.
17      I think the statement that Sean Hanley attributes to
18      Shannon Lewandowski at 6:38 in the morning, that doesn't
19      make any sense, either.  I am not sure if the statement
20      doesn't make any sense because Shannon Lewandowski was
21      just involved in a severe car accident suffering from
22      concussion symptoms and didn't know what was going on
23      and couldn't form her thoughts to follow along with the
24      conversation or what.  I am not a medical professional,
25      I don't know if that is the case, or because Lieutenant
```

```
 1        Hanley's recollection of the events isn't accurate.

 2        I don't know.  But a lot of the things that Shannon

 3        Lewandowski said in that conversation don't make sense.

 4        Why would she admit to going 45 in a 30 and speeding and

 5        violating department protocol through that intersection

 6        to her supervisor?  That doesn't make sense.  Why would

 7        she admit to going to UWM to intervene in a traffic

 8        stop, which is clearly inappropriate and clearly against

 9        department protocol?  It never happened.

10                 The lights and sirens?  Well, you have

11        heard ample testimony about why, at least in Shannon's

12        mind, the lights were activated.  I would posit that

13        there was a traffic construction in front of her.  The

14        light went on.  Had she cleared the intersection, the

15        lights would have gone off.  And when the lights went on

16        from the point of impact, it is one block, and it's a

17        short block.  This was not a long period of time.  This

18        car wasn't sitting there for minutes and minutes and

19        minutes with its lights on.

20                 You heard the city say that when you

21        see police lights in front of you, it causes chaos.  I

22        disagree.  I think when you see police lights before you

23        in a roadway, it causes you to be more careful.  When

24        you see police lights in front of you, you are not going

25        to panic and all of a sudden, run into a pole.  That
```

1    doesn't make any sense.  It doesn't create any chaos;
2    it causes drivers to be careful.  That is why officers
3    use those lights, so other drivers can use caution.

4          What does all of it mean?  It doesn't make
5    sense that Shannon Lewandowski would have given untruth-
6    ful statements in the seven-minute conversation she had
7    with her supervisor just a few hours after the accident.
8    At least not intentionally.  Several months after the
9    investigation, we see Adam Zieger's report which is not
10   made available until September 9.  That report is
11   riddled with rumors about officers hearing from other
12   unidentified officers about Shannon Lewandowski going to
13   UWM to intervene in some sort of a traffic stop.  None
14   of it is substantiated.  It is all from unidentified
15   police officers.

16          After the report was filed, after the
17   investigation is concluded, she is charged with rule
18   violations and she submitted some written responses to
19   those rule violations.  You have copies of those.
20   Shannon Lewandowski was frustrated and she is angry that
21   these accusations were made against her.  I will admit
22   at best, the written responses are -- they are harsh.
23   That is only because she is frustrated and angry at how
24   she believes she was treated by the department.  As a
25   result of this accident, which was not her fault, she's

```
 1        had to deal with lingering injuries, including -- I
 2        don't think it's ever been disputed -- some injuries to
 3        her head.
 4               It is not fair to her how this investi-
 5        gation has been treated because instead of giving an
 6        officer, especially only a few hours after the injury
 7        (sic) took place with a severe head injury, the benefit
 8        of the doubt, sending Hanley back to come interview her
 9        again, sending another officer to interview her again,
10        because some of the statements she made didn't make
11        sense.  She is charged with rule violations and she
12        is fired.  It all happened because of an accident that
13        wasn't her fault.  It is not fair, it is not right and
14        the charges should not be sustained.  Thank you.
15               MR. KONRAD:        We will now proceed
16        into --
17               MR. PEDERSON:      I am sorry.  There
18        are a number of documents that I have not moved into
19        evidence at least and I think that is at least 15, 16,
20        and 17, maybe 14.  I would move those into evidence.
21               MR. MC GAVER:      I have no objection.
22               MR. KONRAD:        Those documents will
23        be received.
24               You have one document; 12.  I assume
25        that's been withdrawn?
```

```
 1                   MR. MC GAVER:      I think -- I am not
 2          offering it as an exhibit.  To the extent that it is
 3          mentioned in the record, I don't know how you want to
 4          treat it, but it has been moved into evidence, and it
 5          will not be.
 6                   MR. KONRAD:        We will leave it in
 7          the record as not offered.  12 is not offered.  It is
 8          marked, but not offered.
 9                   MR. MC GAVER:      Thank you.
10                   MR. KONRAD:        Anything further?
11                   MR. PEDERSON:      I don't think so, no.
12                   MR. MC GAVER:      No.
13                   MR. KONRAD:        We will now proceed
14          into closed session with deliberations.  The first five
15          "just cause" standards.  Are counsel familiar with those
16          standards?
17                   MR. MC GAVER:      Yes.
18                   MR. PEDERSON:      Yes.
19                   MR. KONRAD:        Then I will forego
20          reading them into the record.
21                   In order for us to be in closed session,
22          we have to take a vote, or at least we have to record
23          any objections to closed session, so do any of the
24          commissioners have objections to going into closed
25          session?
```

```
 1              MS. WILSON:         Move to go into
 2      closed session.
 3              MR. KONRAD:         Any objection?
 4              MS. MC KENZIE:     I don't have any.
 5      I second.
 6              MS. HEIN:          No objection.
 7              MR. KONRAD:        No objection, then,
 8      we will now go into closed session for purposes of
 9      deliberations.  It is now 12:30.  We will convene at
10      1:25, or would you like to reconvene later?
11      (Discussion off the record)
12              MR. KONRAD:         I will tell the other
13      participants to be here by 1:25, one hour from now.
14      (Closed session deliberations)
15              MR. KONRAD:         We are back in
16      session.  After deliberation for Phase I of the
17      proceedings, we thank counsel for their hard work in
18      presenting the evidence to us.  After deliberation, the
19      members of the Commission have voted to sustain, by a
20      preponderance of the evidence, all three charges against
21      Detective Shannon Lewandowski.
22              I have also found, by a preponderance of
23      the evidence, that the first five "just cause" standards
24      are satisfied.  Therefore, it is appropriate now to move
25      to Phase II of the proceedings.
```

```
 1                    MR. PEDERSON:       The chief would call
 2        Assistant Chief Yerkes.
 3                    CARIANNE YERKES, having been first duly
 4        sworn on oath to tell the truth, the whole truth, and
 5        nothing but the truth testified as follows:
 6                    MR. KONRAD         The witness is sworn.
 7                    THE WITNESS:       I am sitting in for
 8        the chief.  Unfortunately, his mother-in-law passed away
 9        within the last two days and he has to travel to Texas
10        in order to attend her funeral.  Just so you are aware.
11                    MR. KONRAD:        Thank you.
12        DIRECT EXAMINATION BY MR. PEDERSON:
13   Q    Please state your name for the record and spell it.
14   A    Carianne Yerkes.  C-a-r-i-a-n-n-e.  Y-e-r-k-e-s.
15   Q    What is your position?
16   A    Assistant Chief of Police.
17   Q    That is with the Milwaukee Police Department?
18   A    Yes.
19   Q    Is it correct to say you are here today as the chief's
20        representative in terms of Phase II?
21   A    Yes.
22        (A document was marked as Exhibit No. 18)
23   Q    I have presented you a document marked for identifica-
24        tion as Exhibit 18.
25                    MR. MC GAVER:      What is the date on
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 745 of 805   Document 80-21   440

```
 1        that?
 2                      MR. PEDERSON:      Here is one for you.
 3   Q    Let's start over.  Assistant Chief, I have presented you
 4        a document marked for identification, marked as Exhibit
 5        No. 18.  Do you have that in front of you?
 6   A    Yes.
 7   Q    Are you familiar with this document?
 8   A    Yes.  It is the Discipline Review Summary.
 9   Q    Can you explain to me what that is?
10   A    This is a report that is filed after the discipline
11        review outlines what was discussed regarding the review
12        at the chief's level.
13   Q    Does this particular document relate to the case at
14        issue?
15   A    Yes, it does.
16   Q    How do you know that?
17   A    It is based off the file number and the charged member.
18   Q    Near the top, it indicates "Members Present."  Do you
19        see that box?
20   A    Yes.
21   Q    In there, it indicates a number of personnel, including
22        yourself, as well as Chief Flynn.  Is that an accurate
23        statement?
24   A    Yes.
25   Q    Can you, please, indicate what that "Members Present"
```

SUSAN K. TAYLOR          262-553-1058          COURT REPORTER
                         sueT@wi.rr.com
Case 2:16-cv-01089-WED   Filed 04/22/19   Page 746 of 805   Document 80-21   441

```
 1         box indicates?

 2    A    It indicates the executives that were present during the

 3         discipline summary that was Chief Flynn, Assistant

 4         Chiefs Harpole and Leibold, myself -- I was an inspector

 5         at the time -- Captain Shepherd, Lieutenant Leitzke and

 6         Nicole Fleck, who was our interim HR administrator at

 7         that time.

 8    Q    What is discussed at that meeting?

 9    A    The merits of the case and the discipline to be imposed.

10    Q    And what was your role?

11    A    My role is to offer my opinion and my expertise to the

12         chief prior to making discipline decisions.

13    Q    Were you present for the entire meeting where this was

14         discussed?

15    A    Yes.

16    Q    "Reviewed/Discussed."  Do you see that portion?

17    A    Yes.

18    Q    What does this portion relate to?

19    A    This goes over the documents that are provided during

20         the discipline hearing which are the charge specifica-

21         tions, the employee's hardcard, the case file history,

22         any comparables for other individuals that received

23         discipline of the same nature, the lieutenant's cover

24         which summarizes the case, the member's Response to

25         Charges and any other applicable documents.
```

```
 1   Q   You should have in front of you a pile of documents.

 2       Exhibits?

 3   A   Yes.

 4   Q   If you go through there and find Document No. 5 and

 5       Document No. 6.  Actually, all you need is number six.

 6   A   I have Document 6.

 7   Q   This has already been entered into evidence as the

 8       Charges and Specs.  Does that relate to any of the

 9       documents that are indicated that were reviewed?

10   A   Yes.  This would be what is considered the charge

11       specification which is one of the first documents

12       reviewed.

13       (A document was marked as Exhibit No. 19)

14   Q   Chief, I have handed you another document marked for

15       identification as number 19.  Do you have that in front

16       of you?

17   A   Yes.

18   Q   Are you familiar with this document?

19   A   Yes.  This is what we call the "hardcard" or the PM-5.

20   Q   Specifically on the Discipline Review Summary on the

21       charge specifications, it indicates PM-5 there.  Is that

22       what you are indicating?

23   A   Yes.

24   Q   This is a document that is reviewed in relation to that?

25   A   Yes.
```

```
 1   Q    Were both of those documents, in fact, reviewed?

 2   A    Yes.

 3   Q    The next category, according to this document, is the

 4        "Case File History."  Can you indicate to me what that

 5        document is?

 6   A    The case file history is a document that is an elec-

 7        tronic document that is produced by Internal Affairs,

 8        that outlines all the complaints sustained or not

 9        sustained against the member.

10        (A document was marked as Exhibit No. 20)

11   Q    I am handing you a document marked for identification as

12        Exhibit 20.  Are you familiar with this document?

13   A    Yes.

14   Q    What is this document?

15   A    This is the employee's case file history.

16   Q    All right.  Is that the same document that was reviewed

17        as part of the summary?

18   A    Yes.

19   Q    I think the next entry on the summary form is

20        "Comparables."  Do you see that?

21   A    Yes.

22   Q    What is that indicating?

23   A    The comparables are a list that is produced by Internal

24        Affairs of other Code of Conduct or rule violations that

25        are similar in nature and the discipline that was
```

```
 1          imposed on the member at the time.

 2          (A document was marked as Exhibit No. 21)

 3    Q     I am presenting you a document marked for identification

 4          as Exhibit 21.  Are you familiar with that document?

 5    A     Yes.  This document is the comparables regarding this

 6          case.

 7    Q     The next entry indicates "IAS Lieutenant's Cover."

 8          Is that correct?

 9    A     Yes.

10    Q     What is that?

11    A     That is the memorandum that is filed by lieutenants

12          that summarizes the sergeant's investigation and makes a

13          recommendation.

14    Q     All right.  Finally, the last entry is "Member's

15          Response to Charges."  Did I read that correctly?

16    A     Yes.

17    Q     What is that?

18    A     That is a memorandum that is filed by the member and

19          gives them the opportunity to respond to the charges.

20    Q     Were all of those documents reviewed?

21    A     Yes.

22    Q     Does it indicate that they are reviewed on this docu-

23          ment?

24    A     Yes.

25    Q     How did you do that?
```

| | | |
|---|---|---|
| 1 | A | By circling the word "yes." |
| 2 | Q | I note that there is one final category called "Other." |
| 3 | | Do you see that? |
| 4 | A | Yes. |
| 5 | Q | Is there any indication whether there was anything |
| 6 | | reviewed or not? |
| 7 | A | There is no indication that there was any other docu- |
| 8 | | ments reviewed. |
| 9 | Q | Okay.  So does that represent concerns of the reporting |
| 10 | | on this document, any error?  In other words --  Let |
| 11 | | retract that question.  Were there any other materials |
| 12 | | reviewed or considered at the meeting? |
| 13 | A | Not that I am aware of that I recall. |
| 14 | Q | So it appears that had this document been completed, it |
| 15 | | should have probably been circled "no."  Is that right? |
| 16 | | For that question? |
| 17 | A | Yes, it should have probably been circled "no." |
| 18 | Q | Do you know who prepares this document? |
| 19 | A | I believe the lieutenant prepares the document. |
| 20 | Q | Again, on your memory, there was no other materials |
| 21 | | considered. |
| 22 | A | Correct. |
| 23 | Q | Next, the document goes into breaking out some cate- |
| 24 | | gories.  We will go first.  "Employee Motivation." |
| 25 | | Is that right? |

```
 1   A    Yes.

 2   Q    Next, it says, "A-Self-Interest."  What does that mean?

 3   A    One of the just causes that is considered for discipline

 4        is employee's motivation.  Is it aggravating or is it

 5        mitigating?  This document suggestions that the employee

 6        motivation was "aggravating" and that it was based off

 7        of self-interest.

 8   Q    The next in that same box, it says "M-N/A."  What does

 9        that mean?

10   A    Mitigating -- "M-N/A" means not applicable.

11   Q    Would it be correct to say, then, at least according to

12        this document, there was no mitigating factors taken

13        into consideration there?

14   A    Yes.

15   Q    Is that consistent with your recollection of what

16        happened at the meeting?

17   A    Yes.

18   Q    When it comes to "Degree of Harm," was that considered

19        an aggravating or mitigating set of circumstances?

20   A    Aggravating.

21   Q    How so?

22   A    Based on the injuries that occurred and the amount of

23        damage to the squad car from the accident, they were

24        both aggravating circumstances.  There were serious

25        injuries and the squad car was totaled.
```

```
 1   Q    Were there any other aggravating circumstances in
 2        relation to this?
 3   A    There are when you go into "Intentional/Unintentional"
 4        and "Employee Experience," but as relates to the "Degree
 5        of Harm," the things that were specifically taken into
 6        consideration were the injuries and the amount of
 7        damage.
 8   Q    Okay.  What about lost work time?
 9   A    That would be an aggravating degree of harm because both
10        individuals lost work time.  One of the individuals is
11        still, as far as I am aware, not back to full duty.
12   Q    Was Detective Lewandowski's experience an aggravating or
13        mitigating factor?
14   A    Aggravating, based on her amount of time in service.
15   Q    Could you go into that deeper?  Why is that aggravating?
16   A    Because we give some leeway to newer officers that make
17        mistakes because they are new to the department.
18        Officers that have a significant amount of time on
19        usually should know better and know what the rules are
20        and what we expect of them.
21   Q    It says "Intentional/Unintentional."  What is that
22        category aiming toward?
23   A    The "intentional" or "unintentional" speaks to the act
24        itself, whether or not the employee made a mistake and
25        was their mistake an unintended consequence of something
```

```
 1        else that they were doing or was the mistake they made
 2        something that was an intentional act to go against a
 3        rule or a regulation?
 4     Q  Was that considered aggravated or mitigated?
 5     A  Aggravated.
 6     Q  How so?
 7     A  Because it was intentionally operating a squad as an
 8        emergency vehicle without cause, responding to a
 9        location for reasons other than department business and,
10        then, was intentionally untruthful as to her true des-
11        tination at the time of the squad accident.
12     Q  Do any one of those considerations have greater weight
13        than the other?
14     A  Yes.  The consideration as it relates specifically to
15        the untruthfulness has a greater weight.
16     Q  Why is that?
17     A  Because untruthfulness is one of the -- is an aggravat-
18        ing factor that usually results in discharge from the
19        department.
20     Q  All right.  In terms of her past record, was that con-
21        sidered aggravating or mitigating?
22     A  Aggravating.
23     Q  How so?
24     A  In 2015, behavior that could discredit the department,
25        received a district level reprimand and in 2014, has a
```

```
 1        violation of failure to treat department supervisor with
 2        respect.
 3   Q    Are you able to point to any of the documents that
 4        indicate a correlating documentation of what is being
 5        referred to there?
 6   A    I will look at the employee's case file history.  On the
 7        first page of Exhibit 20, there is a closed file from
 8        1-23-15 that was an integrity violation.  That was
 9        sustained.  It has an official reprimand.
10                     Then, on the second page is the 2014 file
11        that has a policy review as it relates to failing the
12        treat a supervisor with courtesy and professionalism.
13   Q    Is it significant that there is a specific integrity
14        violation as well?
15   A    Yes.  Integrity violations are taken very seriously.
16   Q    Finally, there is a "Notes" section on the document.
17        Do you see that?
18   A    Yes.
19   Q    It doesn't appear --  Is there anything important there
20        in terms of how this was considered or discussed among
21        the members other than the outcome?
22   A    No.  This just has the outcome of this review.
23   Q    I would like to talk about comparables for a second.
24        Those were considered during the meeting.  Is that
25        correct?
```

```
 1   A   Yes.

 2   Q   All right.  As you are aware, let's talk first about the

 3       charge relating to the -- it might be the last charge in

 4       Exhibit 6, Competence.

 5           "All department members shall render service

 6       to the community promptly and efficiently.  When not

 7       answering a call for service, member shall use their

 8       time to accomplish the mission of the department."

 9       Do you see that?

10   A   Yes.

11   Q   Do you know what the chief's decision was regarding

12       discipline on that charge?

13   A   A five-day suspension.

14   Q   Specifically as it relates to that charge, how was that

15       deemed an appropriate amount?

16   A   Based off of comparables in which -- I will have to look

17       through them.  There is probably another individual that

18       didn't go to an assignment or had some sort of similar

19       circumstances that received comparable discipline.

20   Q   I would direct your attention to the comparables

21       document.  I don't know the number.

22   A   21?

23   Q   I direct your attention to that.  In that packet in the

24       fourth page relating to Guiding Principle 1.03, I will

25       direct your attention to Dwight Copeland, if you can
```

```
1        find that.

2    A   Yes.

3    Q   Could you please --

4                    THE WITNESS:        Are we talking about

5        Page 2?  I want to make sure.

6                    MR. PEDERSON:        Unfortunately, mine

7        are loose, so I cannot give you the --

8                    MS. HEIN:        Page 2.

9                    THE WITNESS:        Thank you.

10                   MR. PEDERSON:        It indicates he

11       received five days.  That is the entry I am looking for.

12                   THE WITNESS:        Then, I have a

13       different entry.

14                   MS. HEIN:        On the bottom, what

15       does it say?  MPD -- what is the number?

16                   MS. MC KENZIE:        Do you have a little

17       number on the bottom?

18                   MR. PEDERSON:        I am referencing

19       Guiding Principle 1.03.  It is probably at the rear of

20       the packet.

21                   MR. MC GAVER:        I have Bates 0016,

22       if that helps.

23                   MS. WILSON:        What is the name?

24                   THE WITNESS:        I found it.

25   A   0016, the third entry down is,
```

```
 1                    "Police Officer Dwight Copeland failed to
 2           answer the radio while arguing with an ex-girlfriend
 3           while on duty."
 4           He received a five-day suspension.
 5    Q      I don't know if that was a specific one that was
 6           considered, but would you consider that a comparable?
 7    A      Yes.
 8    Q      How so?
 9    A      He wasn't where he was supposed to be or doing what he
10           was supposed to be doing.
11    Q      I don't know.  You tell me.  We have limited information
12           here, but what is more aggravated?  The Detective
13           Lewandowski situation or that of Officer Copeland?
14    A      I would say Detective Lewandowski's because of the
15           accident that was involved and not being where you are
16           supposed to be, doing what you are supposed to be doing.
17           That degree of harm is more aggravating than whatever
18           radio call this individual didn't respond to, which I
19           don't remember it being a significant call in which
20           somebody else was injured.
21    Q      Now, I would like to address the squad accident charge
22           which would be referencing Guiding Principle 1.05 and I
23           believe it is the first charge in the Complaint.  This
24           relates to the requirement, and I will read it.
25                    "Operators of Department vehicles shall, in
```

```
 1        all instances, operate the vehicle in a safe and courte-
 2        ous manner, comply with all traffic laws and ordinances,
 3        and wear seat belts at all times, except when doing so
 4        would endanger the safety of the operator or another, or
 5        when he/she has provided medical certification that
 6        he/she is unable to do so."
 7        Did I read that correctly?
 8    A   Yes.
 9    Q   What was the determination of the chief as to the amount
10        of discipline that was appropriate for that charge?
11    A   The chief went with significant discipline on that
12        charge, specifically because of the injuries that were
13        incurred not just by the detectives, but there were also
14        citizens that were injured, the amount of damage that
15        was done to the squad car, and the circumstances in
16        which Detective Lewandowski was operating, which was
17        with red lights on, which was not necessary for the
18        call.
19    Q   I don't think we have it quite in the record yet.  What
20        was his specific determination?
21    A   30 days.
22    Q   You have listed some reasons why that was aggravated.
23        I would direct your attention to the comparables in
24        number 21 and give you an opportunity to look at that.
25        Is it fair to say that that 30 days in comparison to
```

```
1        what we have available in the comps is greatly higher
2        than what we have here?
3   A    Yes.
4   Q    Given that context, if someone --  Let's talk about the
5        first one.  The entry for PO Lucas McAleer.  Do you see
6        it?
7   A    Yes.
8   Q    I will give you a quick moment to look at it.  Is it
9        an accurate statement to say that Officer McAleer was
10       in the legitimate pursuit of his duties and got into an
11       accident and received two days?
12  A    Yes.
13  Q    So if someone is going to receive two days while in the
14       legitimate exercise of their duties, is that a factor in
15       the disparity between 30 days and two days in terms of
16       that decision?
17  A    Yes.  The difference is for Officer McAleer, the
18       employee motivation was mitigating which was he was in
19       the line of duty acting in a manner in which he was
20       authorized to act and unfortunately, he had a squad
21       accident.  Now, there was an aggravating factor with a
22       degree of harm in which speed was a factor and we lost
23       another squad car.  However, he was doing what he was
24       supposed to be doing.  The difference between this squad
25       accident and that squad accident was that the detective
```

```
 1          wasn't where she said she was going to be and operating

 2          as an emergency vehicle, which it was not necessary to

 3          do, and the amount of injuries to herself and to her

 4          partners and to the civilians was significant.

 5    Q     Isn't it true, to the best of your knowledge, you

 6          actually lost two detectives as a result of that, that

 7          had yet to return to work.  Right?

 8    A     Correct.

 9    Q     At least full-time.

10    A     Full duty, correct.

11    Q     Is it a correct statement that they were both out on

12          medical leave doing nothing at all for about eight or

13          nine months?  Is that right?

14    A     I believe so.  I would have to actually look at the

15          record, but I know both of them lost significant amounts

16          of time from work.

17    Q     So we have a combined approximately 16 months of lost

18          time in that regard as well.  Right?

19    A     Yes.

20    Q     Finally, I would direct your attention to the

21          "Integrity" charge where it indicates,

22                  "All department, members shall be forthright

23          and candid, orally or in writing, in connection with any

24          administrative injury or report."

25          Did I read that correctly?
```

```
 1   A    Yes.

 2   Q    What was the chief's decision of the appropriate disci-

 3        pline for those charges?

 4   A    Dismissal from the department.

 5   Q    Why was that?

 6   A    Because it is an untruthfulness charge and it is an

 7        integrity violation and the integrity violation that is

 8        taken most seriously when an individual is untruthful

 9        and it was found, based on the case file, that Detective

10        Lewandowski was untruthful in her statements and was

11        discharged from the department.

12   Q    Why is it important for officers to be truthful and to

13        not have their truthfulness called into question?

14   A    Because we are keepers of the public trust.  As a member

15        of this department, you are given a lot of latitude in

16        your ability to make decisions as it relates to indi-

17        viduals' rights as it relates to investigations.  If a

18        member is going to be untruthful, how do we know that

19        member is not going to be untruthful to a citizen,

20        untruthful to an investigation, untruthful during any

21        other aspect of their job, which can have serious

22        consequences, not just for us as an employer, but for

23        the citizens as well.

24   Q    As an assistant chief, do you believe you would have

25        confidence in a department member returning to duty who
```

```
 1        had been caught in the type of lie that is at issue
 2        here?
 3    A   No, I don't.
 4    Q   Do you have any additional comments as it relates to
 5        the --  Strike that.  I would like to go through the
 6        comparables that relate to integrity.  Is there support
 7        in the comparables for a discharge on the issue of
 8        integrity?
 9    A   Yes, there is.
10    Q   What support is that?
11    A   There is several different ones.  The first one is
12        Officer Vidmar, who was discharged from the department
13        for an integrity violation as it relates to the posses-
14        sion of an inventoried bicycle.  Officer Copeland filed
15        a false official report, was discharged from the depart-
16        ment.  And Detective Gomez was discharged from the
17        department as well for an integrity violation.
18    Q   So would you say it is a fair characterization that
19        this administration has an established track record of
20        treating integrity violations most seriously and perhaps
21        even considers it one of the most dischargeable offenses
22        there are?
23    A   Yes.
24    Q   Are there any other observations that you made during
25        the meeting where this was discussed that I have not
```

```
1      covered with you?

2   A  The only other observation that I would say is when the

3      chief determines discipline, one of the things he takes

4      into account is whether or not an employee holds them-

5      selves accountable for their actions and in this case,

6      based on Response to Charges and throughout the whole

7      investigation, this employee did not hold herself

8      accountable for her actions, but instead, placed blame

9      on many other individuals in this case, and that is also

10     a factor that is considered, which is, have you held

11     yourself accountable?  Are you willing to take the

12     consequences for your actions?  If you don't, it also

13     shows somewhat of your character and leans toward the

14     integrity issue.

15                    MR. PEDERSON:      That is all I have.

16                    MR. KONRAD:       Mr. Mc Gaver, do you

17     have any cross?

18                    MR. MC GAVER:     I do.

19     CROSS-EXAMINATION BY MR. MC GAVER:

20  Q  Assistant Chief, how long was this meeting?

21  A  I don't recall.

22  Q  I will direct your attention to Exhibit 18.  Are you

23     there?

24  A  Yes.

25  Q  The time is 2:23 to 2:32.
```

| 1 | A | Yes. |
| 2 | Q | Do you have a better recollection of how long the |
| 3 | | meeting lasted now? |
| 4 | A | I don't, because it depends on whether or not this case |
| 5 | | was heard by itself or if there were other cases at this |
| 6 | | meeting. |
| 7 | Q | So there might have been more than just this case |
| 8 | | discussed in that brief, less-than-ten-minute window? |
| 9 | | Is that a possibility? |
| 10 | A | No, it is not possible this case and another case would |
| 11 | | have been discussed in less than a ten-minute window. |
| 12 | | I am not sure if there is an error.  That might be |
| 13 | | something to take a look at, but this was a significant |
| 14 | | case and it would have taken much longer than nine |
| 15 | | minutes to determine it. |
| 16 | Q | Who is ultimately responsible at the department level |
| 17 | | for making the ultimate disciplinary decision? |
| 18 | A | The chief. |
| 19 | Q | Who led the discussion at this meeting? |
| 20 | A | The discussion is led by the IA Division, either by the |
| 21 | | captain or the lieutenant, who presents the case to the |
| 22 | | chief and to the executive staff. |
| 23 | Q | From your recollection, do you remember whether or not |
| 24 | | it was determined at this meeting whether Shannon |
| 25 | | Lewandowski was at fault for the accident involved in |

```
1          this case?

2    A     I don't recall whether that was determined, whether

3          it was discussed if she was at fault.  There was dis-

4          cussion about the fact that the other driver that was

5          involved in the accident had been drinking and also had

6          a mechanical issue with the vehicle.

7    Q     Do you know whether Shannon Lewandowski has ever been

8          suspended from the department before?

9    A     Yes.

10   Q     Has she?

11   A     As far as I know, yes, according to the hardcard.

12   Q     How long?  How long was the suspension?

13   A     According to the hardcard, there was a suspension for

14         two days in 2002 and an additional suspension for one

15         day in 2002, and that is all that is on this hardcard.

16   Q     Was that suspension ultimately reversed by, I believe,

17         the chief?

18   A     Not by this chief.  There was a one-day suspension that

19         was rescinded.

20   Q     What year was that suspension?

21   A     2002.

22   Q     Has she been suspended since?

23                    THE WITNESS:       Can I look at the

24         case file?

25                    MR. MC GAVER:      Sure.
```

```
 1   A   Not that I am aware of.  According to this, the last
 2       suspension was 2002 prior to this one.
 3   Q   With regard to the first charge, what I have been
 4       calling the "detour charge."  In the comparables, in
 5       your review of the comparables, were you able to
 6       discover any harsher penalty than a five-day suspension
 7       associated with a violation of that rule?
 8   A   By "charge" --
 9   Q   Talking about the first one that Mr. Pederson led you
10       through.  I believe it is toward the back of the packet.
11       A specific example was 0016.  The rule is Core Value
12       1.00 - Competence.  The guiding principle is 1.03.  It
13       starts with MPD Bates No. 0013.  Does that help direct
14       you?
15   A   Yes.
16   Q   My question was, is there anything harsher that you have
17       seen in the comps than a five-day suspension?
18   A   For failing to render services promptly and efficiently,
19       yes.  There is a discharge from the department, there is
20       a demotion.  And the five-day is the most comparable.
21   Q   I am going to fast-forward to the integrity charge.
22       Sometimes in these cases, it's been my experience that
23       the department will receive a letter from the district
24       attorney's office, the city attorney's office or the
25       United States Attorney's Office.  Do you know whether
```

```
 1          any of those types of letters that would question
 2          Shannon Lewandowski's integrity were received by the
 3          department from any of those three entities?
 4    A     I don't know.
 5    Q     If I told you that none of those letters existed, would
 6          you quarrel with me?
 7    A     No.  I am unsure whether we asked for that letter or
 8          not.  That is why I am unsure.  As far as I know, we
 9          don't have one, but I don't know if we asked for one.
10    Q     When a member has been found to be untruthful, are there
11          any examples in the comparables where that member has
12          not been discharged from the department?
13                    THE WITNESS:        You would have to
14          give me a minute.
15                    MR. MC GAVER:       Take as much time as
16          you need.
17    A     Under the untruthfulness section, Section 1.05, there
18          are individuals that received less discipline than
19          discharge.
20                    MR. MC GAVER:       Nothing further.
21                    MR. PEDERSON:       I have no redirect.
22                    MR. KONRAD:         Commissioners with
23          any questions?  The witness is excused.
24          (Witness excused)
25                    MR. PEDERSON:       The chief rests for
```

1    Phase II.

2                    MR. MC GAVER:        Shannon Lewandowski

3    calls Officer Chad Boyack.

4                    CHAD BOYACK, having been first duly sworn

5    on oath to tell the truth, the whole truth, and nothing

6    but the truth testified as follows:

7                    MR. KONRAD:         The witness has been

8    sworn.

9    DIRECT EXAMINATION BY MR. MC GAVER:

10   Q    Please state and spell your first and last name for the

11        record.

12   A    First name is Chad.  C-h-a-d.  Last name, Boyack.

13        B-o-y-a-c-k.

14   Q    How are you employed?

15   A    I am a police officer for the City of Milwaukee.

16   Q    How long have you been so employed?

17   A    As a police officer, 19 years.

18   Q    Are you acquainted with Shannon Lewandowski?

19   A    Yes.

20   Q    How long have you known Shannon Lewandowski?

21   A    I knew her before when she was a cop in the late 90's/

22        early 2000's and I came to know her in person.  After

23        she became a detective, she came to a lot of our scenes

24        after, I think it was, '05, '06.

25   Q    I understand that you have been under subpoena for a

```
 1        while.  Have you seen any of the proceedings?

 2   A    Yes, I have.

 3   Q    Do you have an understanding that Shannon Lewandowski

 4        is now -- the alleged rule violations against Shannon

 5        Lewandowski have now been sustained by this Commission.

 6        Do you understand that?

 7   A    Yes, I do.

 8   Q    Knowing that, do you have an opinion as to whether

 9        Shannon Lewandowski can continue to serve on the

10        Milwaukee Police Department?  Or should be able to serve

11        on the Milwaukee Police Department?

12   A    I believe she should be able to.

13   Q    Why do you think that?

14   A    At all the crime scenes that I was involved with her at

15        shootings and robberies, she was always forthright with

16        me with information.  She was always candid about the

17        investigations we were involved in.  She always gave me,

18        to my knowledge, the best information regarding each

19        case and accurate and concise information regarding each

20        case.  I was always happy to see her, along with my

21        partners, happy to see her at the scene because I knew

22        that something was going to get done and the case was

23        going to be either solved and if not solved, to find out

24        what happened in the incident.

25   Q    Do you think she is a good cop?
```

| 1 | A | Yes. |
| 2 | Q | Why? |

3  A  Based off what I just previously stated.  With those

4     factors that -- not to put it in quotes, but we always

5     "got our man" and Shannon always got her man regarding

6     shootings and robberies and she would contact me or my

7     partners, via cell phone or text message, trying to get

8     a suspect that she was looking for, for a shooting and

9     not to get too far off track, she was looking for a

10    subject we were looking for -- or she was looking for,

11    Thomas Nelson, a very bad person.  The night she called

12    Officer Malone (phonetic) and I, and we ended up getting

13    the subject an hour after she asked us, that she was

14    going to be doing a search warrant with the TAC unit and

15    the subject shot up three different houses and he had a

16    gun on him and he fled from my partner and I.

17  Q  You said you have known her for a while.  You understand

18    what is going on here today.  Do you have anything else

19    to add?

20  A  I feel sad for her.  I don't know the -- everything

21    involved in this case, but I feel bad for her because

22    I know she's been through a lot and it is just -- I

23    could put myself in her shoes and I could be the one

24    sitting there if something happened to me and I just --

25    I try and make it -- equate the circumstances and I just

```
 1        feel -- I feel really bad for her.

 2                    MR. MC GAVER:        Thank you.  Nothing

 3        further.

 4                    MR. PEDERSON:        I have no cross.

 5                    MR. MC GAVER:        Any questions from

 6        the commissioners?  I don't mean to take your job,

 7        Mr. Konrad.

 8        (Witness excused)

 9                    MR. KONRAD:          Thank you.  It's

10        getting late.  The board will now deliberate in closed

11        session.

12                    MR. MC GAVER:        I didn't quite rest.

13        I would like to call Shannon Lewandowski.

14                    MR. KONRAD:          Go ahead.

15                    MR. MC GAVER:        I would like to call

16        Shannon Lewandowski.

17                    MR. KONRAD:          You are still under

18        oath.

19                    MR. MC GAVER:        Thank you.

20        DIRECT EXAMINATION BY MR. MC GAVER:

21   Q    Ms. Lewandowski, you were here.  You have an under-

22        standing of what happened and that the three charges

23        against you have been sustained.  Correct?

24   A    Yes.

25   Q    Do you believe you can still be a productive member of
```

```
1        the Milwaukee Police Department?

2    A   Yes.

3    Q   Why?

4    A   Although I don't agree with your decision, I respect it.

5        I have 17 years of very dedicated service.  I love my

6        job.  I am very well known in this community, very

7        participatory in this community.  I have lived here all

8        my life.  I resonate with a lot of the victims.  I stand

9        by everything that I said here in the last two days and

10       everything that I have said and done in the last 17

11       years.  I apologize on behalf of my son for making a bad

12       decision that day.  He is human, like anybody else.

13       Like I said, I don't agree with your decision at all,

14       but I so respect it.

15   Q   Do you have anything else to add?

16   A   That is all I have to say.

17                   MR. MC GAVER:        Nothing further.

18                   MR. PEDERSON:        I have no cross.

19                   MS. MC KENZIE:        During this whole

20       proceeding, I found it interesting how driven you were

21       when you testified to be there in your testimony for

22       that person.  I guess what I would say to you is, what

23       I need to hear is with the understanding that this is a

24       police force, you are given directives.  You are under

25       authority of another following the chain of command.
```

1    Is that -- I want to be convinced, knowing if you were
2    to be put back on the force, that this proceeding wasn't
3    in vain, that there would be some kind of acceptance,
4    acknowledgement on your part that, when given things to
5    do, the priority is not what you want, but what the
6    department wants; the people.  Can you speak to that?
7            THE WITNESS:        I guess in hind-
8    sight, given all this forum, should I question another
9    detective, who is actually senior than me, about what we
10   are doing?  Yes, I guess after this forum, but I trust
11   in Juanita's work.  I trust who she is as a detective
12   and I am always going to volunteer myself.  I have
13   volunteered myself -- I was volunteered by Melanie who
14   suffered a sexual assault on the job and it hasn't been
15   handled at that point and as part of our training, if I
16   am being told by a citizen on the street that they have
17   been sexually assaulted, I am not just going to continue
18   to go.  She counts, even though she is a police officer,
19   just as much as a citizen does.  That is where the
20   problem came.  If Juanita would have explained to me
21   this is something very exigent, I would hope she would
22   have went on her own and got somebody to help her.  I
23   wanted to help her and if I knew that that was so
24   exigent, I would have gone.  That is how I handled my
25   cases, but I went on information that I had and I was

```
 1        going to District 5 and I said, "since I am going out
 2        anyway, we can go together," because my other concern
 3        was Juanita's safety.  Streets are not safe.  And as you
 4        heard her say, she went to the door and knocked on it
 5        herself.  You just don't do that.  You don't go to a
 6        house by yourself and knock on the door.  So it is hard
 7        for me to sit here and convince you that I did something
 8        wrong because I will take culpability for my son because
 9        I raised him not to do anything like that, but I don't
10        know how to take culpability for what happened to
11        Melanie or what Juanita told me.  I want to.  Like, if
12        I knew it was exigent, I would have said, "let's go,"
13        because I didn't have to go to Five.  I could have saw
14        her after.  She would eventually be by my house anyway.
15        She ended up living with my two sons and I because she
16        was too afraid to go home.  And additionally, like Chad
17        said, my job important to me.  I don't play games at
18        work.  I am all about work.  I am all about this
19        community getting better.  I am all about leadership,
20        and leadership doesn't come in easy times.  Leadership
21        comes from a hard time.  These were hard times at
22        District 3 and 5, and they still are.  I will not walk
23        away from another female employee who is suffering.  I
24        was reaching out to everybody.  It is just like I was
25        reaching out for Juanita's well-being.  I wanted her not
```

```
 1          to go to a home by herself.  Nobody asked me to do it.

 2          I just said, "hey, do you want to go?  Let's get it.

 3          if we have overtime, if you can't do it, I will do it.

 4          It is okay to me."

 5                      MS. MC KENZIE:      Thank you.

 6                      MR. MC GAVER:       Just a follow-up to

 7          the commissioner's question.

 8          REDIRECT EXAMINATION BY MR. MC GAVER:

 9     Q    Very briefly, you understand there is a chain of command

10          in the Milwaukee Police Department.  Correct?

11     A    Yes.

12     Q    You understand you are a link in that chain.  Are you

13          with me?

14     A    Yes.

15     Q    If you are directed by a superior to do something in the

16          future in the event that this commission gives you your

17          job back, would there be problems doing that?

18     A    Not at all.

19                      MR. MC GAVER:       Thank you.  Nothing

20          further.

21                      MR. PEDERSON:       Just a matter of

22          housekeeping.  I will move the exhibits into evidence.

23          I believe it is 18 through 21.

24                      MR. KONRAD:         That is right.

25                      MR. MC GAVER:       No objection to any
```

```
 1          of those.

 2                      MR. KONRAD:          Those will be

 3          admitted.

 4                      Anything further?

 5                      MR. MC GAVER:        No.  We rest.

 6                      MR. PEDERSON:        No.

 7                      MR. KONRAD:          All right.  Thank

 8          you.  We will now deliberate in closed session in order

 9          to determine whether the good of the service requires

10          the appellant be discharged or otherwise disciplined.

11                      Do we have a motion to go into closed

12          session?

13                      MS. HEIN:            So move.

14                      MS. MC KENZIE:       Second.

15                      MR. KONRAD:          We have a motion and

16          second.  Any objections?  No objections heard, closed

17          session.

18          (Closed session deliberations)

19                      MR. KONRAD:          We are now back in

20          open session.  The panel has concluded its deliberations

21          for Phase II.  The members of the panel have decided

22          unanimously that the discipline of Detective Shannon

23          Lewandowski should be sustained in accordance chief's

24          order of discipline.  To wit, the five-day suspension

25          for failure to use time to accomplish the mission.
```

1    30-day suspension for failure to driving a department

2    vehicle in a safe manner and discharge for failure to

3    be forthright and candid in an administrative inquiry

4    report.

5            Please note the ten-day rule referenced

6    in Fire and Police Commission Rule 16(10)(f) is being

7    waived and a written decision will be provided as soon

8    as practicable.

9            We stand adjourned at 3:05 p.m.  Thank

10   you.

11   (WHEREUPON, THE PROCEEDINGS WERE ADJOURNED AT 3:05 P.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      STATE OF WISCONSIN )
                           )
 2      COUNTY OF MILWAUKEE)

 3

 4                   I, SUSAN K. TAYLOR, do hereby certify

 5      that I am a stenographic reporter; that I was present at

 6      the hearing in the above entitled action, and that I

 7      recorded the same in shorthand; that the above and

 8      foregoing is a true, correct and exact copy, in

 9      longhand, of my shorthand notes taken at said hearing.

10

11                   Dated this      day of        2016

12

13

14

15

16

17                              SUSAN K. TAYLOR

18                              Court Reporter

19

20

21

22

23

24

25
```

**'**

'05 [1] - 464:24
'06 [1] - 464:24
'14 [1] - 333:23
'Show [1] - 406:19

**0**

0013 [1] - 462:13
0016 [3] - 452:21,
452:25, 462:11
09 [1] - 416:23

**1**

1-23-15 [1] - 450:8
1.00 [1] - 462:12
1.03 [3] - 451:24,
452:19, 462:12
1.05 [2] - 453:22,
463:17
10 [2] - 331:4, 412:17
10-17 [1] - 412:19
10-23 [4] - 412:20,
412:24
10-24 [1] - 412:19
10:00 [1] - 372:25
10:57 [1] - 366:10
11 [4] - 292:2, 314:18,
357:21, 358:5
11:00 [3] - 370:5,
370:19, 372:25
12 [6] - 324:25, 332:4,
332:8, 333:1,
437:24, 438:7
12:00 [2] - 370:17,
370:18
12:30 [1] - 439:9
13 [1] - 334:12
14 [6] - 322:6, 322:11,
322:14, 327:13,
403:4, 437:20
15 [10] - 365:25,
366:2, 371:9,
373:13, 373:18,
382:6, 383:2,
394:10, 407:3,
437:19
1573 [2] - 333:5,
333:14
16 [6] - 369:6, 369:9,
372:4, 372:13,
437:19, 456:17
16(10)(f [1] - 473:6
17 [5] - 404:3, 404:5,
437:20, 468:5,
468:10
17th [1] - 365:6
18 [10] - 356:13,

369:18, 369:24,
372:10, 390:19,
440:22, 440:24,
441:5, 459:22,
471:23
18th [3] - 369:19,
369:21, 381:22
19 [25] - 323:2,
323:10, 323:15,
326:4, 331:25,
333:2, 333:22,
334:13, 340:8,
347:1, 348:9,
356:13, 359:25,
360:22, 369:18,
369:25, 372:10,
390:20, 399:6,
416:24, 426:16,
427:22, 443:13,
443:15, 464:17
19th [5] - 306:11,
341:3, 356:23,
369:20, 381:22
1:00 [1] - 354:15
1:25 [2] - 439:10,
439:13
1:44 [4] - 373:6, 373:9,
373:15, 383:23
1:55 [2] - 373:6,
383:24

**2**

2 [3] - 366:10, 452:5,
452:8
20 [8] - 323:2, 324:25,
352:14, 393:4,
408:7, 444:10,
444:12, 450:7
20-or-30-minute [1] -
433:16
2000's [1] - 464:22
2002 [4] - 461:14,
461:15, 461:21,
462:2
2014 [7] - 314:12,
315:21, 375:17,
384:17, 385:2,
449:25, 450:10
2015 [18] - 305:20,
323:12, 331:25,
332:4, 332:9,
333:25, 357:21,
358:5, 359:25,
360:22, 361:23,
369:25, 372:10,
390:20, 399:6,
409:17, 427:22,
449:24
2016 [2] - 292:2,

474:11
21 [6] - 390:16, 445:2,
445:4, 451:22,
454:24, 471:23
22:57 [1] - 366:10
2:00 [4] - 372:25,
373:4, 373:23, 391:2
2:07 [5] - 373:16,
383:25, 384:1,
384:3, 384:4
2:11 [4] - 323:15,
323:20, 325:5, 325:7
2:17 [1] - 325:12
2:18 [1] - 434:4
2:20 [2] - 325:18,
406:16
2:23 [1] - 459:25
2:25 [7] - 325:22,
326:7, 326:13,
326:18, 326:23,
328:3
2:30 [9] - 405:2,
405:19, 405:21,
405:24, 406:17,
407:21, 408:4,
408:7, 408:10
2:31 [1] - 325:25
2:32 [1] - 459:25
2:45 [1] - 326:2

**3**

3 [42] - 292:17,
295:21, 296:16,
297:12, 300:19,
317:5, 336:8, 336:9,
366:10, 368:15,
368:20, 369:15,
369:16, 369:24,
370:7, 370:15,
372:9, 373:3, 373:6,
373:7, 373:21,
373:23, 374:3,
374:7, 374:13,
376:10, 376:16,
376:19, 377:24,
378:13, 383:21,
383:22, 384:10,
384:12, 384:13,
387:15, 406:10,
414:23, 470:22
30 [6] - 309:19, 393:4,
435:4, 454:21,
454:25, 455:15
30-day [1] - 473:1
3040 [1] - 352:3
3214 [4] - 371:8,
371:13, 371:15,
372:14
3482 [2] - 406:15,

406:17
35th [8] - 306:24,
307:2, 342:25,
358:13, 359:8,
359:13, 430:16,
432:2
3600 [1] - 352:4
3611 [9] - 404:20,
405:3, 405:25,
406:17, 406:20,
413:5, 413:9, 413:12
3614 [1] - 413:11
3616 [1] - 406:6
36th [2] - 307:2,
358:14
3:00 [3] - 370:15,
370:19, 372:25
3:05 [2] - 473:9,
473:11

**4**

414-405-4617 [1] -
321:25
414-405-5138 [2] -
321:23, 322:4
45 [6] - 294:4, 339:11,
340:4, 340:11,
421:10, 435:4
4:00 [5] - 369:19,
369:20, 370:13,
370:17, 370:18

**5**

5 [41] - 292:23, 293:8,
293:19, 293:23,
293:24, 294:13,
297:11, 297:13,
297:25, 299:4,
299:18, 303:22,
304:17, 305:9,
313:22, 314:12,
317:6, 321:1, 321:2,
321:3, 337:9,
338:14, 340:13,
340:24, 344:14,
344:15, 355:5,
355:11, 355:12,
376:15, 380:15,
415:24, 416:15,
417:24, 429:22,
430:14, 431:5,
443:4, 470:1, 470:22
5000 [1] - 365:8
5018 [1] - 408:7
51 [1] - 408:7
53rd [1] - 336:5
5:20 [1] - 334:1
5:24 [8] - 333:2,
333:22, 334:2,

406:17
334:19, 335:11,
335:23, 336:13,
360:22

**6**

6 [3] - 443:5, 443:6,
451:4
6:38 [12] - 332:24,
334:13, 335:25,
336:13, 336:15,
336:25, 341:3,
352:22, 361:2,
378:23, 434:3,
434:18

**7**

7 [1] - 384:11
7:00 [2] - 370:5,
370:14

**8**

8 [1] - 403:3
8:00 [3] - 369:19,
370:4, 370:13
8:30 [1] - 292:2

**9**

9 [6] - 300:8, 305:19,
306:19, 357:4,
409:17, 436:10
90 [1] - 389:5
90's [1] - 464:21
911 [1] - 321:11
9205 [3] - 381:23,
382:4, 382:6
9271 [2] - 366:10,
366:12
9288 [1] - 366:16

**A**

A-Self-Interest [1] -
447:2
a.m [48] - 292:2,
323:15, 323:20,
325:5, 325:12,
325:18, 325:22,
326:7, 326:13,
326:18, 326:23,
328:3, 333:2,
333:22, 334:2,
334:13, 334:19,
335:23, 335:25,
336:14, 336:15,
336:25, 341:3,
352:22, 360:22,
361:2, 369:19,

370:4, 370:5,
370:14, 370:15,
373:4, 373:6, 373:9,
373:15, 373:17,
373:23, 378:23,
383:25, 384:1,
391:2, 405:2,
405:19, 405:21,
406:17, 408:7
**ability** [2] - 294:2,
457:16
**able** [15] - 294:22,
318:12, 336:11,
351:13, 366:2,
395:21, 395:22,
398:11, 409:7,
409:8, 422:12,
450:3, 462:5,
465:10, 465:12
**absolutely** [7] - 313:1,
320:16, 339:12,
340:19, 342:1,
412:2, 417:3
**abutted** [1] - 393:2
**acceptance** [1] -
469:3
**accepted** [2] - 294:15,
299:17
**access** [1] - 393:3
**acci** [1] - 397:13
**accident** [74] - 310:13,
310:20, 311:9,
311:14, 315:18,
315:22, 319:21,
320:12, 320:13,
321:9, 323:23,
327:17, 328:6,
330:14, 334:23,
335:7, 335:10,
335:15, 337:8,
338:10, 342:14,
342:21, 343:9,
346:15, 348:3,
350:8, 350:11,
350:14, 353:3,
361:5, 361:9,
378:23, 379:4,
379:5, 379:18,
390:25, 391:9,
396:21, 397:1,
397:2, 404:23,
405:21, 406:16,
407:22, 408:1,
408:15, 408:17,
422:1, 423:20,
430:20, 430:24,
431:4, 431:6,
431:21, 433:8,
434:4, 434:5, 434:9,
434:21, 436:7,

436:25, 437:12,
447:23, 449:11,
453:15, 453:21,
455:11, 455:21,
455:25, 460:25,
461:5
**accidentally** [2] -
300:17, 301:4
**accidents** [1] - 419:3
**accomplish** [2] -
451:8, 472:25
**accordance** [1] -
472:23
**according** [11] -
303:10, 313:5,
328:3, 372:21,
416:23, 418:14,
444:3, 447:11,
461:11, 461:13,
462:1
**account** [2] - 303:9,
459:4
**accountable** [5] -
304:19, 313:7,
459:5, 459:8, 459:11
**accurate** [12] - 299:11,
310:9, 327:6, 327:7,
368:10, 370:24,
373:2, 375:18,
435:1, 441:22,
455:9, 465:19
**accurately** [3] - 410:8,
419:22, 426:10
**accusa** [1] - 318:4
**accusation** [1] -
315:10
**accusations** [2] -
425:24, 436:21
**accuse** [2] - 420:3,
427:15
**accused** [1] - 423:4
**acknowledged** [2] -
401:11, 425:20
**acknowledgement** [1]
- 469:4
**acknowledging** [1] -
302:14
**acquainted** [1] -
464:18
**act** [3] - 448:23, 449:2,
455:20
**acting** [3] - 364:6,
380:25, 455:19
**action** [2] - 307:20,
474:6
**actions** [4] - 319:5,
459:5, 459:8, 459:12
**activated** [1] - 435:12
**active** [1] - 377:7
**actual** [5] - 407:8,

408:4, 408:16,
416:4, 428:19
**Adam** [6] - 304:22,
304:24, 312:20,
338:5, 338:22, 436:9
**ADAM** [1] - 400:6
**add** [2] - 466:19,
468:15
**added** [1] - 403:18
**additional** [3] - 402:5,
458:4, 461:14
**additionally** [1] -
470:16
**address** [14] - 314:15,
352:3, 386:2, 406:4,
406:6, 406:8,
407:20, 410:19,
410:21, 413:6,
413:8, 413:10,
413:14, 453:21
**addressed** [1] -
303:13
**addressing** [1] -
338:13
**adequately** [1] -
308:10
**adjourned** [1] - 473:9
**ADJOURNED** [1] -
473:11
**administration** [3] -
351:3, 425:7, 458:19
**administrative** [2] -
456:24, 473:3
**administrator** [1] -
442:6
**admission** [1] - 322:8
**admit** [4] - 416:18,
435:4, 435:7, 436:21
**admits** [1] - 416:10
**admitted** [2] - 360:2,
472:3
**advise** [1] - 375:12
**advised** [2] - 328:5,
416:10
**ae** [1] - 366:2
**Affairs** [8] - 375:24,
375:25, 387:24,
396:14, 396:17,
400:15, 444:7,
444:24
**affect** [1] - 318:14
**affecting** [1] - 418:1
**afraid** [1] - 470:16
**agencies** [1] - 319:23
**aggravat** [1] - 449:17
**aggravated** [4] -
449:4, 449:5,
453:12, 454:22
**aggravating** [14] -
447:4, 447:6,

447:19, 447:20,
447:24, 448:1,
448:9, 448:12,
448:14, 448:15,
449:21, 449:22,
453:17, 455:21
**ago** [2] - 317:12,
398:25
**agree** [38] - 294:17,
294:23, 298:5,
299:24, 302:11,
303:14, 304:1,
304:10, 304:14,
305:3, 305:6, 308:2,
308:18, 308:23,
308:24, 310:24,
311:6, 311:12,
312:8, 312:11,
312:16, 315:25,
327:18, 328:1,
333:15, 334:7,
339:16, 343:12,
343:17, 343:25,
345:9, 346:23,
351:5, 352:6,
366:25, 418:16,
468:4, 468:13
**agreed** [4] - 294:16,
299:18, 299:21,
429:23
**ahead** [10] - 304:2,
307:15, 315:10,
318:15, 337:6,
348:18, 362:2,
363:4, 396:8, 467:14
**ahold** [3] - 336:15,
431:17, 432:9
**aid** [1] - 431:9
**aided** [1] - 404:11
**aiming** [1] - 448:22
**AIMS** [1] - 361:14
**air** [3] - 310:2, 310:4,
330:8
**alert** [2] - 342:6, 342:7
**allegation** [2] - 316:2,
376:1
**allegations** [1] -
401:22
**alleged** [3] - 314:10,
375:5, 465:4
**Allen** [5] - 295:17,
371:8, 371:14,
372:12, 383:20
**allows** [1] - 310:6
**almost** [2] - 356:4,
385:13
**alone** [1] - 389:7
**ambiguous** [4] -
315:4, 317:17,
317:20, 320:9

**ambulance** [1] - 392:1
**ambulances** [1] -
391:17
**amount** [8] - 447:22,
448:6, 448:14,
448:18, 451:15,
454:9, 454:14, 456:3
**amounts** [2] - 456:15
**ample** [2] - 427:17,
435:11
**analyzed** [1] - 427:6
**Angela** [1] - 292:8
**angry** [2] - 436:20,
436:23
**ankle** [1] - 397:20
**Ann** [1] - 292:8
**announce** [1] - 429:16
**answer** [19] - 302:17,
302:20, 305:16,
306:7, 324:11,
329:24, 334:10,
341:17, 343:22,
345:1, 345:5,
345:20, 346:14,
392:12, 415:16,
423:16, 426:10,
432:7, 453:2
**answered** [10] -
317:22, 328:4,
328:12, 328:18,
334:5, 339:7,
344:21, 355:24,
360:16, 426:10
**answering** [5] - 341:6,
341:7, 345:18,
415:12, 451:7
**answers** [3] - 345:22,
346:1, 431:18
**ant** [2] - 394:3, 394:12
**anyway** [3] - 298:4,
470:2, 470:14
**apart** [1] - 392:24
**apologize** [2] -
344:22, 468:11
**apparent** [1] - 361:13
**Appeal** [1] - 292:4
**appear** [6] - 366:17,
367:6, 367:13,
374:5, 386:13,
450:19
**appearance** [1] -
329:11
**appeared** [2] - 329:16,
329:19
**appellant** [1] - 472:10
**applicable** [2] -
442:25, 447:10
**appointed** [1] - 424:23
**appreciate** [1] -
298:13

approach [1] - 374:24
approached [2] -
375:21, 391:14
approaching [4] -
306:24, 307:10,
307:24, 358:13
appropriate [4] -
439:24, 451:15,
454:10, 457:2
approxi [1] - 309:17
approximate [1] -
328:25
April [9] - 303:12,
332:1, 339:1,
339:20, 340:2,
347:11, 348:5,
361:20, 361:23
area [5] - 340:16,
351:24, 355:25,
356:3, 405:14
argue [1] - 302:19
arguing [1] - 453:2
argument [2] - 385:24,
386:3
arrange [1] - 348:23
arrival [2] - 411:11,
411:12
arrive [3] - 393:6,
411:5, 412:21
arrived [9] - 328:25,
391:13, 392:14,
393:13, 393:15,
393:17, 402:15,
412:4, 413:4
arriving [1] - 384:2
aside [1] - 395:19
aspect [2] - 356:17,
457:21
assault [12] - 314:10,
315:17, 317:8,
317:11, 375:6,
376:1, 388:11,
423:5, 424:14,
424:19, 428:10,
469:14
assaulted [5] -
313:24, 314:8,
314:20, 387:22,
469:17
assessment [1] -
377:14
assign [1] - 414:21
assigned [10] - 302:5,
302:9, 372:9,
381:21, 386:23,
387:1, 387:2,
390:22, 404:22,
411:18
assignment [28] -
298:24, 299:19,

305:2, 313:5,
353:18, 354:21,
361:6, 376:17,
376:19, 376:20,
377:10, 377:13,
377:14, 377:17,
377:21, 377:23,
378:14, 378:15,
378:16, 384:7,
387:14, 404:21,
407:13, 414:25,
451:18
assignments [5] -
299:4, 302:3,
310:25, 369:24,
399:24
assist [13] - 297:14,
298:2, 298:6, 298:8,
298:16, 298:18,
299:2, 303:2, 389:3,
389:9, 416:15,
428:4, 429:19
assistance [6] -
294:15, 299:12,
299:17, 300:3,
428:5, 428:19
Assistant [3] - 440:2,
441:3, 442:3
assistant [3] - 440:16,
457:24, 459:20
associated [1] - 462:7
assume [5] - 316:24,
333:13, 374:11,
416:9, 437:24
assumed [1] - 379:4
assuming [2] - 302:2,
399:25
AT [1] - 473:11
attached [1] - 310:3
attaches [1] - 404:11
attempt [2] - 293:13,
429:16
attempted [1] - 305:7
attempts [1] - 357:24
atten [1] - 300:9
attend [3] - 415:24,
416:5, 440:10
attending [1] - 350:4
attention [19] - 323:2,
323:14, 324:25,
325:4, 325:17,
326:6, 331:10,
332:21, 363:18,
403:4, 406:10,
414:6, 427:13,
451:20, 451:23,
451:25, 454:23,
456:20, 459:22
attorney [3] - 302:19,
315:25, 383:6

attorney's [2] - 462:24
Attorney's [1] - 462:25
attribute [1] - 422:18
attributed [2] -
346:24, 420:17,
421:6
attributes [2] - 410:5,
434:17
attributing [1] - 410:6
August [2] - 292:2,
348:6
authority [1] - 468:25
authorized [1] -
455:20
auto [1] - 311:8
autonomy [2] -
376:25, 377:3
available [5] - 314:5,
354:20, 378:14,
436:10, 455:1
AVE [1] - 406:20
Avenue [7] - 306:24,
342:13, 404:21,
405:3, 406:1,
406:18, 408:18
avoid [1] - 430:19
aware [19] - 300:25,
303:20, 316:4,
330:24, 334:4,
344:15, 347:6,
350:7, 350:12,
384:15, 391:4,
401:2, 422:10,
425:24, 440:10,
446:13, 448:11,
451:2, 462:1

B

B-o-y-a-c-k [1] -
464:13
babbling [1] - 311:24
background [1] -
430:8
bad [5] - 424:25,
466:11, 466:21,
467:1, 468:11
badge [1] - 398:5
bag [1] - 330:8
based [21] - 298:14,
312:6, 315:1, 328:1,
329:21, 351:13,
373:22, 378:24,
409:2, 414:12,
416:9, 416:16,
416:17, 441:17,
447:6, 447:22,
448:14, 451:16,
457:9, 459:6, 466:3
bases [1] - 427:9

basic [2] - 298:19,
299:2
Bates [2] - 452:21,
462:13
bear [2] - 299:24,
339:24
Beasley [30] - 297:15,
313:22, 314:11,
314:17, 316:1,
340:14, 375:4,
375:10, 376:3,
380:9, 380:16,
384:16, 385:9,
385:14, 385:16,
416:1, 424:3,
424:12, 424:14,
424:24, 425:10,
427:24, 428:2,
428:4, 428:9,
428:23, 429:3,
429:22
Beasley's [3] - 318:4,
375:13, 428:12
became [4] - 347:6,
364:14, 384:15,
464:23
become [2] - 300:25,
383:18
becomes [1] - 425:7
becoming [1] - 391:4
beep [1] - 309:9
beeped [1] - 359:2
beforehand [1] -
321:18
begin [2] - 292:11,
292:16
beginning [6] - 365:1,
403:12, 406:11,
414:8, 420:11,
421:20
behalf [2] - 375:13,
468:11
behavior [1] - 449:24
behind [3] - 395:20,
419:1, 430:19
belief [3] - 343:8,
414:11, 416:13
believes [2] - 421:24,
436:24
belt [2] - 310:12,
335:18
belts [1] - 454:3
benefit [5] - 303:8,
308:1, 417:9,
418:11, 437:7
best [7] - 302:18,
370:24, 414:7,
423:18, 436:22,
456:5, 465:18
better [5] - 292:19,

339:17, 448:19,
460:2, 470:19
between [15] - 307:2,
327:16, 336:13,
343:13, 344:1,
348:3, 361:13,
373:3, 389:14,
392:22, 406:7,
415:4, 425:3,
455:15, 455:24
beyond [1] - 402:4
bias [1] - 318:14
bicycle [2] - 307:8,
458:14
big [6] - 317:8, 317:11,
388:13, 394:8,
413:2, 422:3
biggest [1] - 420:19
bility [1] - 420:14
bill [4] - 322:19,
322:20, 327:7
bit [4] - 308:11, 401:6,
410:2, 411:2
black [7] - 295:1,
295:20, 329:5,
330:10, 372:11,
432:19
blame [1] - 459:8
blank [1] - 422:9
blew [1] - 330:8
block [8] - 309:6,
352:4, 359:20,
406:5, 415:13,
435:16, 435:17
blocking [1] - 307:22
blocks [5] - 336:10,
352:2, 352:5, 352:6,
410:24
bloodwork [1] -
350:25
blow [2] - 416:23,
424:19
blows [1] - 431:14
blurp [3] - 307:15,
342:10, 359:5
board [1] - 467:10
body [2] - 329:23,
362:13
bodyguard [1] -
424:24
bona [1] - 296:5
bonds [1] - 425:3
book [1] - 343:21
border [1] - 336:3
bothers [1] - 345:20
bottom [3] - 333:2,
452:14, 452:17
Boulevard [1] - 336:5
boundaries [1] -
384:10

**box** [3] - 441:19, 442:1, 447:8
**Boyack** [2] - 464:3, 464:12
**BOYACK** [1] - 464:4
**brace** [1] - 431:24, 432:11, 432:12
**brake** [4] - 307:9, 307:18, 342:5, 358:21
**brakes** [1] - 430:23
**break** [1] - 352:13
**breaking** [1] - 446:23
**Breathalyzer** [1] - 431:14
**brief** [3] - 382:24, 387:20, 460:8
**briefed** [7] - 378:16, 382:21, 383:1, 393:9, 393:21, 398:19, 401:6
**briefly** [1] - 471:9
**bright** [1] - 358:24
**brought** [2] - 360:5, 407:17
**Brown** [1] - 433:13
**bruised** [1] - 397:20
**bruising** [1] - 330:7
**bureau** [11] - 367:22, 374:16, 376:14, 386:20, 387:3, 387:7, 387:8, 387:10, 387:12, 394:23, 399:21
**business** [11] - 293:8, 294:13, 297:16, 301:24, 302:3, 376:4, 429:21, 432:17, 432:20, 432:23, 449:9
**busy** [3] - 299:5, 389:4, 427:16
**buttons** [1] - 413:2
**BY** [36] - 292:15, 306:21, 315:16, 317:4, 318:1, 318:16, 319:13, 322:12, 328:21, 334:3, 341:20, 345:8, 346:22, 348:7, 349:20, 356:10, 363:14, 367:23, 369:7, 370:21, 371:21, 381:5, 382:3, 386:6, 387:13, 388:19, 390:9, 396:9, 400:10, 402:24, 409:13, 440:12, 459:19, 464:9,

467:20, 471:8

# C

**C-a-r-i-a-n-n-e** [1] - 440:14
**C-h-a-d** [1] - 464:12
**cabs** [1] - 391:24
**CAD** [22] - 366:4, 366:17, 367:6, 371:8, 374:6, 382:11, 383:11, 383:17, 386:14, 386:24, 404:12, 406:11, 406:15, 407:3, 407:4, 407:7, 407:10, 407:13, 408:4, 408:9, 408:16, 411:11
**calculated** [2] - 307:24, 309:12
**camera** [1] - 343:3
**cameras** [1] - 342:25
**candid** [3] - 456:23, 465:16, 473:3
**cannot** [2] - 335:1, 452:7
**capacity** [2] - 298:21, 298:22
**Captain** [1] - 442:5
**captain** [1] - 460:21
**car** [39] - 306:23, 307:5, 307:8, 309:10, 309:16, 321:11, 330:14, 342:4, 342:11, 353:2, 353:4, 353:6, 353:10, 358:20, 358:25, 359:1, 359:11, 359:12, 362:16, 382:18, 415:11, 429:24, 430:13, 430:16, 430:17, 430:18, 430:23, 431:3, 431:10, 431:13, 431:21, 433:21, 434:21, 435:18, 447:23, 447:25, 454:15, 455:23
**card** [3] - 432:17, 432:20, 432:23
**care** [4] - 335:9, 346:14, 385:5, 385:6
**career** [4] - 295:10, 422:20, 422:22
**careful** [4] - 346:18, 393:10, 435:23, 436:2
**CARIANNE** [1] - 440:3

**carianne** [1] - 440:14
**Carr** [66] - 292:16, 293:2, 294:18, 295:2, 296:21, 297:2, 297:6, 300:19, 300:21, 303:20, 304:15, 304:25, 305:4, 305:7, 305:10, 305:22, 338:14, 350:3, 353:24, 354:7, 354:25, 355:2, 355:19, 356:22, 357:11, 357:16, 357:24, 365:22, 366:20, 367:1, 373:24, 377:16, 377:20, 377:22, 378:7, 378:9, 378:15, 379:3, 382:10, 382:18, 382:23, 383:1, 383:22, 386:7, 386:22, 387:15, 389:8, 389:15, 389:19, 391:12, 392:9, 414:18, 414:24, 415:5, 415:20, 421:22, 428:25, 429:5, 429:13, 429:14, 429:18, 429:20, 429:23, 430:13, 431:9
**Carr's** [7] - 304:20, 366:14, 368:6, 377:14, 380:5, 429:1, 431:8
**carrier** [1] - 355:15
**carry** [3] - 370:20, 415:19, 429:6
**carrying** [1] - 419:17
**cars** [2] - 341:24, 421:9
**Case** [1] - 444:4
**case** [44] - 296:2, 302:1, 316:1, 316:5, 351:4, 355:14, 363:16, 368:17, 368:21, 377:5, 378:17, 383:5, 387:20, 388:8, 396:15, 401:6, 409:2, 418:15, 432:16, 434:25, 441:13, 442:9, 442:21, 442:24, 444:6, 444:15, 445:6, 450:6, 457:9, 459:5, 459:9, 460:4,

460:7, 460:10, 460:14, 460:21, 461:1, 461:24, 465:19, 465:20, 465:22, 466:21
**case-by-case** [1] - 409:2
**caseload** [2] - 299:6, 301:25, 377:11
**cases** [3] - 460:5, 462:22, 469:25
**casual** [2] - 395:5, 397:12
**casually** [1] - 394:24
**catch** [1] - 342:20
**cate** [1] - 446:23
**category** [3] - 444:3, 446:2, 448:22
**cation** [1] - 347:14
**caught** [2] - 422:22, 458:1
**causes** [4] - 435:21, 435:23, 436:2, 447:3
**causing** [1] - 350:24
**caution** [1] - 436:3
**cautionary** [2] - 307:7, 307:13
**cautious** [2] - 308:19, 308:25
**caveat** [1] - 429:19
**CCW** [2] - 301:4, 355:15
**cell** [11] - 322:24, 322:25, 333:8, 333:10, 334:14, 359:12, 394:15, 402:16, 432:6, 434:13, 466:7
**center** [2] - 408:6, 431:7
**Central** [4] - 299:3, 365:4, 365:5, 365:6
**certain** [4] - 338:8, 357:3, 402:3, 417:3
**certification** [1] - 454:5
**certify** [1] - 474:4
**cetera** [4] - 324:20, 338:15, 421:10
**Chad** [3] - 464:3, 464:12, 470:16
**CHAD** [1] - 464:4
**chain** [4] - 381:2, 468:25, 471:9, 471:12
**Chambers** [1] - 365:8
**chance** [1] - 327:3
**change** [9] - 346:12, 371:23, 383:9, 386:16, 386:19,

386:24, 387:8, 420:5, 422:7
**changed** [4] - 383:13, 383:16, 387:2, 406:17
**changes** [4] - 387:4, 419:14, 420:8, 421:16
**changing** [2] - 404:20, 420:1
**channel** [1] - 367:17
**chaos** [8] - 418:24, 431:10, 431:12, 432:1, 432:3, 432:4, 435:21, 436:1
**character** [1] - 459:13
**characterization** [1] - 458:18
**characterize** [1] - 376:4
**charge** [24] - 381:18, 414:15, 419:12, 419:17, 419:24, 420:10, 442:20, 443:10, 443:21, 451:3, 451:12, 451:14, 453:21, 453:23, 454:10, 454:12, 456:21, 457:6, 462:3, 462:4, 462:8, 462:21
**charged** [4] - 419:8, 436:17, 437:11, 441:17
**Charges** [5] - 337:22, 442:25, 443:8, 445:15, 459:6
**charges** [1] - 316:5, 350:20, 350:24, 357:4, 383:6, 420:1, 437:14, 439:20, 445:19, 457:3, 467:22
**chased** [1] - 364:7
**check** [1] - 355:6
**checked** [3] - 342:25, 391:17, 392:16
**checking** [1] - 316:25
**chest** [1] - 330:8
**chief** [14] - 420:4, 440:1, 440:8, 442:12, 443:14, 454:9, 454:11, 457:24, 459:3, 460:18, 460:22, 461:17, 461:18, 463:25
**Chief** [6] - 440:2, 440:16, 441:3, 441:22, 442:3,

459:20
**chief's** [13] - 414:8, 414:11, 415:22, 416:12, 417:22, 417:23, 418:2, 424:9, 440:19, 441:12, 451:11, 457:2, 472:23
**Chiefs** [1] - 442:4
**chirp** [1] - 359:5
**choice** [1] - 411:17
**Chris** [1] - 375:24
**church** [1] - 343:3
**cially** - 312:13
**cipant** [1] - 382:17
**circled** [2] - 446:15, 446:17
**circling** [1] - 446:1
**circumstance** [1] - 324:21
**circumstances** [12] - 338:23, 350:2, 350:5, 374:15, 374:16, 411:13, 447:19, 447:24, 448:1, 451:19, 454:15, 466:25
**circumstantial** [3] - 416:17, 417:18, 427:8
**citizen** [3] - 457:19, 469:16, 469:19
**citizens** [3] - 431:9, 454:14, 457:23
**City** [1] - 464:15
**city** [4] - 427:25, 432:16, 435:20, 462:24
**city's** [1] - 428:15
**civilian** [3] - 358:15, 358:16, 359:1
**civilians** [1] - 456:4
**claim** [1] - 423:11
**claims** [2] - 425:13, 425:14
**clarifi** [1] - 347:13
**clarification** [2] - 316:7, 376:7
**clarify** [7] - 309:20, 316:10, 326:19, 330:17, 332:10, 355:1, 388:14
**clarity** [2] - 367:10, 407:2
**clean** [1] - 350:18
**clean-up** [1] - 350:18
**clear** [17] - 296:24, 315:9, 315:17, 339:23, 357:14, 361:12, 370:4,

380:20, 380:21, 384:8, 384:11, 385:15, 385:17, 411:4, 417:4, 434:14, 434:16
**cleared** [3] - 373:16, 431:3, 435:14
**clearing** [5] - 383:25, 384:1, 384:4, 384:7, 411:2
**clearly** [6] - 417:24, 418:16, 421:11, 426:14, 435:8
**clears** [1] - 431:24
**click** [1] - 407:11
**close** [2] - 307:12, 392:11
**Closed** [2] - 439:14, 472:18
**closed** [15] - 383:5, 395:16, 395:19, 396:2, 438:14, 438:21, 438:23, 438:24, 439:2, 439:8, 450:7, 467:10, 472:8, 472:11, 472:16
**closer** [1] - 339:17
**closing** [5] - 385:24, 386:3, 395:15, 414:2, 414:4
**cloth** [1] - 422:18
**clothing** [1] - 398:6
**co** [1] - 294:15
**co-worker** [1] - 294:15
**coat** [2] - 399:20, 399:23
**coats** [1] - 399:24
**Code** [1] - 444:24
**code** [2] - 412:17, 412:21
**Cody** [3] - 416:18, 416:19, 432:18
**coherency** [1] - 362:9
**cold** [2] - 399:7, 399:14
**college** [1] - 356:5
**collision** [1] - 309:18
**collude** [1] - 421:21
**collusory** [1] - 414:19
**color** [1] - 400:1
**Com** [1] - 414:15
**combined** [1] - 456:17
**coming** [8] - 305:12, 307:5, 307:11, 307:21, 343:1, 343:4, 359:13, 431:9
**command** [3] - 381:2, 468:25, 471:9
**commands** [1] -

415:18
**comments** [1] - 458:4
**commission** [1] - 471:16
**Commission** [4] - 292:7, 439:19, 465:5, 473:6
**commissioner** [1] - 424:2
**commissioner's** [1] - 471:7
**commissioners** [9] - 292:7, 352:19, 376:23, 396:6, 407:1, 414:6, 438:24, 463:22, 467:6
**Commissioners** [1] - 292:8
**committed** [1] - 419:15
**common** [7] - 373:10, 389:2, 389:7, 392:25, 412:1, 418:22, 423:15
**communicate** [2] - 293:2, 371:18
**communication** [1] - 393:18
**communications** [2] - 408:6, 412:23
**community** [4] - 451:6, 468:6, 468:7, 470:19
**comparable** [3] - 451:19, 453:6, 462:20
**comparables** [12] - 442:22, 444:23, 445:5, 450:23, 451:16, 451:20, 454:23, 458:6, 458:7, 462:4, 462:5, 463:11
**Comparables** [1] - 444:20
**comparison** [1] - 454:25
**Competence** [2] - 451:4, 462:12
**competent** [1] - 329:24
**complaining** [2] - 315:21, 356:21
**Complaint** [1] - 453:23
**complaint** [4] - 413:6, 413:7, 413:11, 413:14
**complaints** [1] - 444:8

**completed** [1] - 446:14
**completely** [4] - 344:3, 419:25, 422:17, 426:3
**completly** [1] - 420:1
**complicated** [1] - 424:8
**comply** [1] - 454:2
**component** [1] - 365:2
**comps** [2] - 455:1, 462:17
**computer** [7] - 314:14, 314:15, 404:11, 404:19, 404:25, 408:6, 413:1
**computer-aided** [1] - 404:11
**con** [2] - 426:24, 449:20
**concealed** [1] - 429:6
**concern** [4] - 324:14, 324:23, 380:18, 470:2
**concerned** [3] - 324:20, 359:15, 363:19
**concerning** [3] - 297:16, 324:15, 350:13
**concerns** [6] - 297:17, 324:17, 427:25, 428:1, 432:15, 446:9
**concise** [1] - 465:19
**concluded** [2] - 436:17, 472:20
**conclusion** [2] - 423:15, 427:1
**concussion** [2] - 434:8, 434:22
**Conduct** [1] - 444:24
**conduct** [2] - 335:6, 396:12, 429:15
**conducted** [1] - 416:22
**conducting** [1] - 400:17
**conference** [2] - 352:22, 361:16
**confidence** [1] - 457:25
**confident** [1] - 368:17
**confirming** [1] - 299:25
**confused** [3] - 305:15, 355:1, 385:19
**confusing** [1] - 383:18
**confusion** [2] - 367:16, 385:13
**conjunction** [2] -

417:19, 423:2
**connected** [4] - 423:24, 424:3, 424:11, 434:2
**connecting** [1] - 408:9
**connection** [4] - 396:10, 396:15, 409:14, 456:23
**consent** [5] - 368:22, 369:2, 378:17, 378:19, 414:22
**consequence** [1] - 448:25
**consequences** [3] - 345:15, 457:22, 459:12
**consider** [1] - 453:6
**consideration** [4] - 420:25, 447:13, 448:6, 449:14
**considerations** [1] - 449:12
**considered** [10] - 443:10, 446:12, 446:21, 447:3, 447:18, 449:4, 450:20, 450:24, 453:6, 459:10
**considers** [1] - 458:21
**consistent** [7] - 328:15, 418:3, 420:2, 426:4, 426:7, 427:5, 447:15
**console** [2] - 321:1, 431:7
**conspiracies** [2] - 423:9, 423:10
**conspiracy** [7] - 315:10, 318:3, 423:14, 423:22, 424:11, 425:9, 426:1
**constitutes** [1] - 420:9
**construction** [1] - 435:13
**contact** [12] - 318:24, 319:22, 320:20, 324:18, 360:5, 360:8, 360:10, 374:9, 377:22, 396:24, 401:1, 466:6
**contacted** [4] - 373:9, 373:15, 400:24, 401:3
**contacting** [1] - 400:18
**contained** [2] - 338:7, 414:15
**contains** [2] - 325:1, 357:23
**content** [1] - 383:13

context [2] - 315:8, 455:4
continuation [1] - 292:3
continue [7] - 314:25, 315:6, 353:20, 363:7, 429:21, 465:9, 469:17
continuing [1] - 401:7
contort [1] - 421:16
contradict [2] - 405:6, 405:9
contradicted [1] - 425:17
contradicts [1] - 426:3
contrary [4] - 340:25, 419:7, 419:10, 431:2
contrasts [2] - 343:13, 344:1
control [1] - 409:8
convene [1] - 439:9
conver [2] - 368:14, 433:16
conversation [27] - 294:6, 297:7, 324:4, 324:9, 335:12, 335:13, 340:1, 348:8, 355:16, 360:17, 361:13, 376:5, 378:22, 379:14, 389:14, 389:17, 389:18, 396:25, 419:18, 420:22, 428:22, 429:21, 433:15, 433:19, 434:24, 435:3, 436:6
conversations [5] - 376:3, 379:11, 409:21, 430:7, 434:10
convey [1] - 392:19
convince [1] - 470:7
convinced [1] - 469:1
cooperation [1] - 383:8
cop [4] - 427:16, 427:21, 464:21, 465:25
Copeland [4] - 451:25, 453:1, 453:13, 458:14
copies [1] - 436:19
copy [4] - 321:16, 327:6, 404:16, 474:8
Core [1] - 462:11
corner [2] - 392:25, 393:1
correct [60] - 294:20, 294:24, 296:1,

300:12, 316:2, 316:5, 319:12, 320:6, 320:22, 320:25, 322:20, 323:8, 323:18, 323:22, 325:1, 325:14, 325:21, 326:21, 330:18, 330:19, 331:7, 334:11, 334:16, 343:6, 345:11, 357:21, 357:22, 357:25, 358:2, 358:9, 359:5, 361:24, 368:16, 369:22, 372:15, 381:12, 381:13, 388:15, 388:21, 388:23, 396:22, 401:24, 403:13, 403:14, 405:12, 405:19, 407:18, 412:8, 423:18, 440:19, 445:8, 446:22, 447:11, 450:25, 456:8, 456:10, 456:11, 467:23, 471:10, 474:8
correctly [10] - 300:23, 307:4, 310:18, 331:17, 337:17, 403:19, 406:21, 445:15, 454:7, 456:25
correlating [2] - 368:4, 450:4
correspond [2] - 325:5, 406:2
corresponds [1] - 407:11
corridor [1] - 392:25
counsel [4] - 306:14, 428:7, 438:15, 439:17
counts [1] - 469:18
COUNTY [1] - 474:2
couple [5] - 297:14, 369:3, 421:19, 427:25, 432:15
course [2] - 311:2, 420:1
court [3] - 318:20, 350:22, 351:3
Court [1] - 474:18
courte [1] - 454:1
courtesy [1] - 450:12
cover [6] - 421:12, 421:15, 423:21, 425:9, 425:10,

442:23
Cover [1] - 445:7
cover-up [2] - 421:12, 421:15
covered [1] - 459:1
covering [1] - 301:20
coworker [1] - 300:2
create [2] - 309:2, 436:1
created [1] - 344:6
creates [1] - 419:2
creating [1] - 350:8
credence [1] - 417:20
credi [1] - 420:13
credibility [7] - 318:11, 318:12, 346:12, 420:20, 421:1, 424:2, 428:3
credible [1] - 416:16
credibly [1] - 427:15
cried [1] - 347:20
crime [9] - 298:11, 309:6, 311:25, 312:3, 312:5, 381:16, 387:25, 421:13, 465:14
critical [1] - 417:21
cross [11] - 292:11, 299:1, 352:11, 356:12, 357:2, 357:13, 359:24, 396:4, 459:17, 467:4, 468:18
CROSS [5] - 292:15, 381:5, 396:9, 409:13, 459:19
cross-examination [3] - 292:11, 356:12, 359:24
CROSS-EXAMINATION [5] - 292:15, 381:5, 396:9, 409:13, 459:19
crystal [1] - 417:4
culpability [2] - 470:8, 470:10
curious [1] - 324:21
current [1] - 393:22
curtain [2] - 395:13, 395:19
curtains [2] - 395:16
cussion [1] - 461:4
customize [1] - 422:4

## D

DA [1] - 316:4
DA's [1] - 383:7
damage [3] - 447:23,

448:7, 454:14
dangerous [1] - 432:25
date [6] - 315:19, 315:22, 323:9, 333:20, 369:17, 440:25
dated [2] - 357:21, 409:17
Dated [1] - 474:11
dating [2] - 385:1, 385:5
days [13] - 329:9, 335:6, 348:3, 440:9, 452:11, 454:21, 454:25, 455:11, 455:13, 455:15, 461:14, 468:9
dead [1] - 432:5
deal [7] - 317:8, 317:11, 340:24, 419:11, 425:6, 429:7, 437:1
dealing [2] - 431:11, 431:12
Deb [3] - 321:12, 327:23, 362:15
Debra [1] - 405:4
deceased [1] - 311:4
decide [4] - 353:19, 377:3, 385:17, 426:20
decided [2] - 299:12, 316:4, 472:21
decides [1] - 415:23
decision [15] - 299:16, 353:21, 401:6, 416:13, 420:15, 420:19, 421:1, 451:11, 455:16, 457:2, 460:17, 468:4, 468:12, 468:13, 473:7
decisions [4] - 353:14, 414:13, 442:12, 457:16
dedicated [1] - 468:5
deduce [1] - 320:19
deduced [1] - 420:5
deemed [1] - 451:15
deeper [1] - 448:15
defense [3] - 424:7, 424:8, 424:10
definitely [1] - 343:16
Degree [2] - 447:18, 448:4
degree [3] - 448:9, 453:17, 455:22
deliberate [2] - 467:10, 472:8

deliberately [1] - 368:19
deliberation [4] - 385:15, 386:1, 439:16, 439:18
deliberations [5] - 438:14, 439:9, 439:14, 472:18, 472:20
demonstrate [1] - 433:10
demotion [1] - 462:20
Denise [1] - 433:12
dent [1] - 397:14
depart [3] - 335:5, 397:9, 458:15
department [43] - 314:9, 314:21, 358:4, 364:21, 376:13, 379:5, 387:21, 387:22, 390:15, 400:18, 402:7, 402:12, 418:1, 419:18, 422:6, 423:23, 425:1, 425:4, 435:5, 435:9, 436:24, 448:17, 449:9, 449:19, 449:24, 450:1, 451:5, 451:8, 456:22, 457:4, 457:11, 457:15, 457:25, 458:12, 458:17, 460:16, 461:8, 462:19, 462:23, 463:3, 463:12, 469:6, 473:1
Department [17] - 352:8, 364:17, 390:14, 391:1, 410:18, 410:19, 410:24, 413:7, 416:20, 431:20, 433:5, 440:17, 453:25, 465:10, 465:11, 468:1, 471:10
department's [1] - 400:19
depicting [1] - 343:9
des [1] - 449:10
describe [2] - 329:17, 329:18
described [3] - 358:22, 403:13, 403:16
designate [1] - 387:7
desk [1] - 376:15
desti [1] - 384:2
detail [3] - 304:12,

349:24, 374:12
**details** [2] - 302:1, 324:23
**Detec** [1] - 379:2
**detective** [35] - 294:21, 298:9, 302:7, 302:9, 340:12, 342:12, 364:2, 365:14, 365:15, 365:18, 366:13, 367:21, 368:18, 368:20, 374:17, 374:24, 377:3, 378:13, 379:12, 380:6, 380:11, 388:21, 389:3, 394:23, 399:21, 414:21, 414:23, 414:24, 426:15, 427:3, 432:21, 455:25, 464:23, 469:9, 469:11
**Detective** [77] - 292:4, 293:2, 294:18, 300:19, 300:21, 305:22, 353:24, 354:7, 354:25, 355:2, 355:19, 356:22, 357:11, 357:16, 357:24, 368:24, 375:17, 375:24, 377:1, 377:12, 377:14, 377:20, 377:24, 378:7, 378:9, 378:15, 378:22, 379:20, 379:25, 380:4, 380:5, 380:6, 380:9, 382:18, 382:23, 383:1, 383:22, 384:18, 384:22, 384:24, 385:7, 385:9, 386:7, 386:22, 389:14, 389:15, 391:11, 391:12, 391:25, 392:9, 392:21, 394:7, 396:10, 396:11, 402:15, 403:16, 410:7, 415:4, 415:5, 419:21, 419:23, 429:5, 429:13, 429:14, 429:17, 429:20, 429:23, 439:21, 448:12, 453:12, 453:14, 454:16, 457:9, 458:16, 472:22

**detective's** [1] - 296:3
**detectives** [19] - 296:7, 298:2, 311:4, 312:22, 353:14, 356:18, 365:20, 366:7, 377:1, 377:5, 377:10, 387:12, 392:16, 393:12, 393:21, 394:6, 431:10, 454:13, 456:6
**detectives'** [3] - 298:23, 301:24, 380:3
**determination** [4] - 420:14, 420:20, 454:9, 454:20
**determine** [7] - 402:1, 407:20, 407:23, 408:13, 408:20, 460:15, 472:9
**determined** [5] - 292:20, 384:13, 421:14, 460:24, 461:2
**determines** [1] - 459:3
**detour** [2] - 429:20, 462:4
**develop** [1] - 329:8
**differ** [1] - 420:3
**difference** [4] - 406:7, 413:15, 455:17, 455:24
**different** [14] - 309:8, 318:9, 319:23, 342:20, 344:4, 352:5, 367:17, 380:3, 384:25, 393:23, 420:21, 452:13, 458:11, 466:15
**differently** [2] - 302:6, 372:2
**digit** [1] - 387:6
**digits** [1] - 387:5
**DIRECT** [6] - 363:14, 390:9, 400:10, 440:12, 464:9, 467:20
**direct** [21] - 300:9, 323:2, 323:14, 324:25, 325:4, 325:12, 325:17, 326:6, 331:10, 332:21, 363:18, 403:4, 406:10, 409:21, 451:20, 451:23, 451:25, 454:23, 456:20, 459:22, 462:13

**directed** [4] - 401:14, 402:3, 403:17, 471:15
**directives** [1] - 468:24
**directly** [3] - 405:22, 407:13, 416:15
**dis** [1] - 461:3
**disagree** [2] - 428:15, 435:22
**discharge** [5] - 449:18, 458:7, 462:19, 463:19, 473:2
**dischargeable** [1] - 458:21
**discharged** [10] - 300:17, 334:21, 378:19, 433:18, 457:11, 458:12, 458:15, 458:16, 463:12, 472:10
**disci** [1] - 457:2
**Disciplinary** [1] - 292:4
**disciplinary** [1] - 460:17
**discipline** [25] - 345:10, 345:25, 346:8, 346:9, 347:2, 347:8, 414:12, 421:14, 422:16, 441:10, 442:3, 442:9, 442:12, 442:20, 442:23, 444:25, 447:3, 451:12, 451:19, 454:10, 454:11, 459:3, 463:18, 472:22, 472:24
**Discipline** [2] - 441:8, 443:20
**disciplined** [4] - 314:2, 421:5, 421:11, 472:10
**disclosed** [1] - 358:4
**discover** [1] - 462:6
**discovered** [1] - 427:24
**discredit** [1] - 449:24
**discrepancies** [2] - 344:1, 361:13
**discrepancy** [1] - 331:24
**discretion** [1] - 312:8
**discriminating** [1] - 425:12
**discrimination** [1] - 424:12
**discussed** [9] - 363:20, 441:11,

442:8, 442:14, 450:20, 458:25, 460:8, 460:11, 461:3
**discussing** [2] - 366:5, 415:21
**Discussion** [2] - 352:16, 439:11
**discussion** [3] - 334:25, 460:19, 460:20
**disheveled** [1] - 330:13
**dismissal** [1] - 457:4
**disparity** [1] - 455:15
**dispatch** [11] - 367:16, 367:18, 367:24, 373:10, 374:8, 382:9, 386:15, 404:12, 409:8, 409:9, 411:3
**dispatcher** [9] - 367:2, 373:15, 404:10, 404:19, 407:15, 408:3, 408:8, 409:5, 411:18
**dispute** [5] - 301:6, 332:12, 332:17, 351:13, 428:1
**disputed** [1] - 437:2
**distance** [1] - 359:17
**distracted** [1] - 309:5
**distracting** [1] - 309:2
**distractions** [1] - 419:3
**distraught** [1] - 347:20
**district** [25] - 294:18, 295:7, 295:9, 296:25, 297:9, 298:4, 298:18, 299:1, 306:3, 306:11, 313:25, 314:8, 315:25, 316:10, 319:2, 354:2, 354:7, 380:24, 383:6, 384:25, 387:5, 433:20, 433:24, 449:25, 462:23
**District** [78] - 292:17, 292:23, 293:8, 293:19, 293:23, 294:12, 295:21, 296:16, 297:11, 297:12, 297:13, 297:25, 299:4, 299:18, 300:19, 303:22, 304:17, 305:9, 313:22, 317:5, 317:6, 321:1,

321:2, 321:3, 336:8, 336:9, 337:9, 338:14, 340:13, 340:24, 344:14, 344:15, 355:5, 355:11, 355:12, 368:15, 368:20, 369:15, 369:16, 369:24, 370:7, 370:15, 372:9, 373:3, 373:6, 373:7, 373:23, 374:3, 374:6, 374:13, 376:10, 376:15, 376:16, 376:19, 377:24, 378:13, 380:15, 380:19, 383:21, 383:22, 384:10, 384:11, 384:12, 384:13, 387:15, 414:23, 415:24, 416:14, 416:15, 417:24, 429:22, 430:14, 431:5, 470:1, 470:22
**districts** [2] - 298:6, 370:5
**diverted** [1] - 416:14
**Division** [1] - 460:20
**division** [1] - 299:3
**doctors** [1] - 393:23
**docu** [2] - 445:22, 446:7
**document** [61] - 321:14, 322:11, 322:13, 327:4, 339:3, 354:23, 365:25, 366:1, 366:3, 366:6, 369:6, 369:8, 369:12, 371:2, 372:4, 372:16, 372:21, 402:25, 404:3, 404:4, 404:7, 404:13, 405:6, 405:20, 406:8, 406:23, 407:3, 407:5, 408:16, 437:24, 440:22, 440:23, 441:4, 441:7, 441:13, 443:13, 443:14, 443:18, 443:24, 444:3, 444:5, 444:6, 444:7, 444:10, 444:11, 444:12, 444:14, 444:16, 445:2, 445:3, 445:4, 445:5, 446:10, 446:14, 446:18,

446:19, 446:23, 447:5, 447:12, 450:16, 451:21
**Document** [10] - 300:8, 331:4, 369:9, 371:9, 372:13, 373:18, 403:3, 443:4, 443:5, 444:6
**documentation** [3] - 407:14, 408:2, 450:4
**documented** [3] - 391:23, 406:11, 406:15
**documents** [14] - 369:23, 370:22, 371:4, 372:8, 437:18, 437:22, 442:19, 442:25, 443:1, 443:9, 443:11, 444:1, 445:20, 450:3
**domestic** [2] - 301:6, 356:15
**done** [23] - 299:8, 299:25, 313:18, 313:21, 314:21, 319:5, 349:7, 355:13, 358:13, 384:6, 388:4, 398:18, 409:4, 409:6, 414:23, 415:2, 415:13, 415:15, 415:17, 421:15, 454:15, 465:22, 468:10
**door** [7] - 364:9, 384:9, 395:11, 395:20, 415:16, 470:4, 470:6
**doors** [4] - 395:12, 395:15, 395:16, 395:18
**double** [1] - 330:11
**doubt** [3] - 368:12, 379:1, 437:8
**down** [12] - 308:3, 308:9, 319:3, 325:12, 325:17, 325:22, 342:6, 359:13, 379:12, 403:8, 427:6, 452:25
**draft** [1] - 379:12
**drafting** [1] - 378:24
**dreads** [1] - 430:1
**drinking** [1] - 461:5
**drive** [1] - 384:10
**driven** [2] - 367:17, 468:20
**driver** [5] - 430:21, 430:22, 430:23,

461:4
**drivers** [2] - 436:2, 436:3
**driving** [9] - 306:23, 337:6, 340:13, 340:16, 358:15, 359:1, 405:15, 418:25, 473:1
**drove** [1] - 415:13
**drug** [1] - 351:1
**drunk** [4] - 430:21, 430:22, 430:23
**dual** [2] - 303:1, 303:12
**dude** [1] - 355:14
**due** [4] - 312:14, 318:3, 383:8, 426:11
**duly** [5] - 363:10, 390:5, 400:6, 440:3, 464:4
**during** [12] - 311:1, 339:21, 340:8, 346:25, 381:22, 403:10, 442:2, 442:19, 450:24, 457:20, 458:24, 468:19
**duties** [4] - 415:20, 417:25, 455:10, 455:14
**duty** [8] - 311:2, 387:23, 427:23, 448:11, 453:3, 455:19, 456:10, 457:25
**Dwight** [2] - 451:25, 453:1

## E

**early** [4] - 344:16, 370:16, 390:20, 426:16, 464:22
**Early** [2] - 369:16, 369:20
**easier** [1] - 311:5
**east** [7] - 306:23, 320:17, 320:19, 321:3, 343:4, 353:4, 353:7
**easy** [1] - 470:20
**effect** [4] - 312:24, 315:6, 418:8, 423:22
**effectively** [1] - 415:19
**efficiency** [1] - 312:14
**efficiently** [3] - 415:19, 451:6, 462:18
**eight** [1] - 456:12
**either** [13] - 295:13,

327:23, 344:7, 351:1, 352:3, 372:25, 411:17, 412:17, 413:16, 427:2, 434:19, 460:20, 465:23
**elaborate** [1] - 338:2
**elec** [1] - 444:6
**electron** [1] - 413:3
**electronic** [1] - 404:18
**electronically** [1] - 408:5
**element** [1] - 418:23
**emergencies** [1] - 308:22, 409:2
**emergency** [16] - 307:1, 308:2, 308:19, 309:4, 309:8, 310:10, 341:22, 341:23, 342:2, 359:7, 359:18, 418:3, 419:10, 421:8, 449:8, 456:2
**employ** [1] - 310:6
**employed** [3] - 390:13, 464:14, 464:16
**Employee** [1] - 448:4
**employee** [7] - 446:24, 447:5, 448:24, 455:18, 459:4, 459:7, 470:23
**employee's** [4] - 442:21, 444:15, 447:4, 450:6
**employer** [1] - 457:22
**en** [1] - 386:12, 405:21, 405:25, 407:20, 411:19, 411:23, 412:2, 412:4, 412:11
**end** [2] - 312:7, 420:12
**endanger** [1] - 454:4
**ended** [5] - 330:10, 430:10, 430:12, 466:12, 470:15
**ending** [2] - 333:5, 333:13
**ends** [3] - 431:8, 431:16, 432:10
**Enforcement** [2] - 384:16, 385:1
**engage** [1] - 395:9
**engages** [1] - 421:15
**enhance** [1] - 419:1
**enhanced** [1] - 418:20
**enhances** [2] - 418:21, 419:6
**enhancing** [1] - 419:4

**enroute** [1] - 406:19
**enter** [2] - 395:13, 430:20
**entered** [2] - 406:19, 443:7
**entering** [1] - 395:18
**enters** [1] - 395:8
**entire** [4] - 330:8, 342:21, 426:5, 442:13
**entities** [1] - 463:3
**entitled** [1] - 474:6
**entries** [4] - 325:12, 325:22, 326:22, 333:1
**entry** [17] - 325:17, 326:7, 333:19, 334:12, 367:5, 368:3, 386:13, 404:10, 407:12, 444:19, 445:7, 445:14, 452:11, 452:13, 452:25, 455:5
**equate** [1] - 466:25
**equipment** [1] - 310:5
**equipped** [1] - 358:17
**equivoca** [1] - 417:10
**equivocate** [1] - 417:5
**error** [3] - 371:18, 446:10, 460:12
**espe** [1] - 312:12
**especially** [2] - 298:11, 437:6
**essentially** [1] - 337:19
**established** [2] - 334:18, 458:19
**estimate** [3] - 294:2, 336:4, 336:12
**et** [4] - 324:20, 338:15, 421:10
**evening** [3] - 366:15, 372:9, 390:19
**event** [2] - 428:21, 471:16
**events** [7] - 339:17, 344:4, 414:11, 424:9, 426:6, 427:4, 435:1
**eventually** [5] - 293:25, 324:10, 405:22, 406:3, 470:14
**evidence** [23] - 327:11, 364:12, 414:9, 416:16, 416:17, 417:18, 420:5, 423:12, 423:13, 425:15,

426:8, 426:12, 427:8, 433:10, 437:19, 437:20, 438:4, 439:18, 439:20, 439:23, 443:7, 471:22
**ex** [1] - 453:2
**ex-girlfriend** [1] - 453:2
**exact** [13] - 298:17, 313:23, 315:2, 315:5, 351:24, 374:12, 393:7, 405:22, 406:4, 406:6, 413:10, 416:8, 474:8
**exactly** [13] - 314:4, 319:4, 336:22, 337:8, 339:19, 340:17, 342:19, 344:16, 344:18, 355:2, 413:13, 417:2
**examination** [5] - 292:11, 356:12, 357:3, 357:14, 359:24
**EXAMINATION** [15] - 292:15, 356:10, 363:14, 381:5, 386:6, 388:19, 390:9, 396:9, 400:10, 409:13, 440:12, 459:19, 464:9, 467:20, 471:8
**examine** [1] - 318:12
**examiner** [1] - 292:5
**example** [3] - 315:4, 425:18, 462:11
**examples** [1] - 463:11
**except** [4] - 308:5, 356:5, 362:13, 454:3
**excruciating** [1] - 349:24
**excuse** [2] - 320:16, 326:16
**excused** [9] - 362:21, 390:2, 400:4, 400:5, 413:24, 413:25, 463:23, 463:24, 467:8
**executive** [1] - 460:22
**executives** [1] - 442:2
**exercise** [1] - 455:14
**Exhibit** [24] - 305:19, 306:19, 322:6, 322:11, 327:13, 357:4, 365:25, 369:6, 372:4, 373:13, 382:6, 383:2, 404:3,

440:22, 440:24, 441:4, 443:13, 444:10, 444:12, 445:2, 445:4, 450:7, 451:4, 459:22

**exhibit** [2] - 338:8, 438:2

**exhibits** [4] - 306:17, 306:18, 443:2, 471:22

**exigency** [5] - 299:19, 300:11, 300:14, 301:7, 314:7

**exigent** [6] - 302:14, 355:8, 469:21, 469:24, 470:12

**existed** [1] - 463:5

**expect** [4] - 367:5, 368:2, 422:11, 448:20

**expecta** [1] - 348:9

**expectation** [4] - 293:12, 293:22, 348:15, 349:1

**expected** [2] - 294:21, 414:9

**expecting** [4] - 348:19, 348:22, 414:25, 432:22

**Experience** [1] - 448:4

**experience** [6] - 298:14, 298:20, 345:15, 372:22, 448:12, 462:22

**experienced** [1] - 309:4

**experimental** [1] - 376:12

**expertise** [1] - 442:11

**explain** [6] - 311:19, 317:14, 331:24, 367:8, 367:15, 441:9

**explained** [6] - 317:23, 335:2, 339:21, 343:18, 397:10, 469:20

**explaining** [1] - 340:22

**explains** [1] - 430:9

**explanation** [2] - 423:17, 423:18

**expose** [2] - 318:14, 345:10

**exposed** [1] - 421:14

**express** [1] - 352:24

**expressed** [1] - 347:10

**expressing** [1] - 339:22

**extent** [2] - 294:21,

438:2

**exterior** [1] - 398:6

**extra** [1] - 307:16

**extraordinary** [6] - 423:11, 423:12, 423:13, 425:13, 425:14

**extremely** [1] - 386:15

**eyes** [3] - 329:5, 330:10, 396:2

## F

**fabrication** [1] - 414:20

**fabrications** [1] - 422:5

**face** [4] - 295:18, 360:10, 364:7

**face-to-face** [1] - 360:10

**facilitate** [1] - 418:4

**facing** [1] - 419:24

**fact** [21] - 298:19, 301:20, 303:20, 304:2, 304:15, 311:7, 313:10, 332:16, 338:13, 344:13, 351:19, 357:2, 414:19, 417:21, 419:9, 419:21, 420:7, 422:14, 428:3, 444:1, 461:4

**factor** [6] - 448:13, 449:18, 455:14, 455:21, 455:22, 459:10

**factors** [2] - 447:12, 464:4

**facts** [21] - 301:15, 302:11, 304:9, 334:18, 338:23, 344:11, 344:12, 344:22, 344:24, 350:2, 350:4, 355:13, 414:17, 415:23, 419:19, 419:20, 421:23, 422:5, 424:4, 426:18

**factual** [1] - 351:8

**failed** [1] - 414:2

**failing** [2] - 450:11, 462:18

**failure** [4] - 450:1, 472:25, 473:1, 473:2

**fair** [4] - 319:6, 319:8, 344:6, 356:22, 358:24, 364:11,

364:13, 376:3, 381:18, 397:17, 437:4, 437:13, 454:25, 458:18

**fairly** [1] - 426:13

**false** [1] - 458:15

**familiar** [14] - 295:21, 363:20, 369:12, 371:3, 371:5, 372:1, 372:3, 372:6, 404:7, 438:15, 441:7, 443:18, 444:12, 445:4

**family** [2] - 335:21, 432:13

**far** [12] - 336:2, 336:3, 352:1, 358:18, 392:24, 420:3, 425:23, 426:2, 448:11, 461:11, 463:8, 466:9

**fast** [5] - 309:18, 339:14, 340:5, 382:1, 462:21

**fast-forward** [1] - 462:21

**fault** [6] - 430:24, 430:25, 436:25, 437:13, 460:25, 461:3

**faulty** [1] - 430:23

**feelings** [1] - 425:16

**feet** [3] - 393:4, 394:9, 394:10

**fellow** [1] - 427:18

**felon** [1] - 300:16

**felony** [6] - 297:15, 297:20, 298:11, 298:16, 298:22

**felt** [3] - 307:18, 308:8, 344:20

**female** [2] - 314:7, 470:23

**females** [1] - 425:13

**few** [7] - 350:18, 388:17, 413:10, 434:5, 434:8, 436:7, 437:6

**fide** [1] - 296:5

**field** [2] - 416:22, 431:13

**fifth** [2] - 354:2, 354:6

**Fifth** [1] - 380:18

**figure** [3] - 319:21, 319:24, 362:9

**file** [12] - 312:4, 350:12, 398:16, 441:17, 442:21, 444:6, 444:15, 450:6, 450:7,

450:10, 457:9, 461:24

**File** [1] - 444:4

**filed** [10] - 312:17, 313:25, 409:17, 409:20, 419:25, 436:16, 441:10, 445:11, 445:18, 458:14

**filing** [3] - 297:15, 297:20, 298:16

**fill** [1] - 383:15

**fill-in** [1] - 383:15

**final** [1] - 446:2

**finally** [4] - 432:7, 445:14, 450:16, 456:20

**findings** [1] - 420:13

**fine** [8] - 293:7, 339:3, 340:3, 375:20, 375:23, 415:6, 425:7

**Fire** [2] - 292:6, 473:6

**fired** [1] - 437:12

**first** [58] - 292:21, 292:23, 293:8, 293:19, 305:3, 305:7, 305:12, 306:2, 306:5, 306:8, 306:10, 319:18, 320:22, 322:10, 336:8, 338:15, 340:16, 341:1, 342:9, 347:14, 347:16, 347:17, 347:24, 348:1, 355:20, 357:8, 357:15, 358:9, 358:10, 360:21, 361:12, 363:6, 363:10, 375:15, 383:11, 387:4, 390:5, 391:14, 392:14, 396:6, 400:6, 426:6, 438:14, 439:23, 440:3, 443:11, 446:24, 450:7, 451:2, 453:23, 455:5, 458:11, 462:3, 462:9, 464:4, 464:10, 464:12

**five** [13] - 323:23, 333:1, 336:6, 336:9, 438:14, 439:23, 451:13, 452:11, 453:4, 462:6, 462:17, 462:20, 472:24

**Five** [4] - 299:4, 316:25, 378:1,

470:13

**five-day** [6] - 451:13, 453:4, 462:6, 462:17, 462:20, 472:24

**flashed** [1] - 358:24

**Fleck** [1] - 442:6

**fled** [1] - 466:16

**Flynn** [2] - 441:22, 442:3

**focus** [1] - 320:10

**follow** [27] - 296:8, 296:13, 300:13, 302:4, 302:5, 332:10, 333:12, 337:23, 337:25, 347:4, 354:19, 356:20, 361:3, 361:5, 368:21, 374:25, 377:16, 377:17, 388:17, 397:22, 401:16, 408:22, 414:21, 415:18, 424:16, 434:23, 471:6

**follow-up** [12] - 296:8, 302:4, 302:5, 337:23, 337:25, 347:4, 354:19, 356:20, 368:21, 374:25, 388:17, 471:6

**followed** [3] - 337:20, 392:8, 415:6

**following** [3] - 327:17, 401:18, 468:25

**follows** [6] - 363:12, 390:7, 400:8, 429:9, 440:5, 464:6

**foot** [2] - 330:11, 330:12

**force** [2] - 468:24, 469:2

**forego** [1] - 438:19

**foregoing** [1] - 474:8

**Forensic** [1] - 390:23

**forensic** [3] - 391:6, 391:22, 394:4

**forget** [2] - 411:4, 411:10

**form** [3] - 350:10, 434:23, 444:19

**forms** [1] - 393:24

**forth** [3] - 392:20, 394:15, 427:10

**forthright** [3] - 456:22, 465:15, 473:3

**forum** [2] - 469:8, 469:10

**forward** [2] - 306:22,

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 788 of 805   Document 80-21

462:21
**fourth** [1] - 451:24
**frame** [1] - 300:1
**frankly** [1] - 417:7
**freedom** [1] - 377:10
**friend** [7] - 385:4, 402:17, 402:22, 403:18, 410:8, 416:1, 425:5
**friendly** [3] - 335:13, 335:14, 376:5
**friends** [1] - 425:2
**Froedtert** [2] - 328:22, 336:7
**front** [16] - 307:5, 331:4, 331:5, 364:8, 369:10, 391:24, 392:5, 403:3, 407:7, 430:17, 435:13, 435:21, 435:24, 441:5, 443:1, 443:15
**fronts** [1] - 393:4
**frustrated** [4] - 320:2, 434:11, 436:20, 436:23
**ful** [1] - 436:6
**full** [8] - 349:25, 369:5, 394:18, 406:10, 421:5, 448:11, 456:9, 456:10
**full-time** [1] - 456:9
**function** [2] - 309:25, 374:14
**functions** [4] - 297:17, 298:5, 298:19, 299:2
**funeral** [1] - 440:10
**funny** [1] - 319:6
**Furthermore** [2] - 422:24, 424:21
**future** [1] - 471:16

## G

**games** [1] - 470:17
**Garfield** [1] - 342:25
**gathering** [1] - 379:9
**gathers** [1] - 350:13
**gation** [2] - 425:11, 437:5
**Gaver** [1] - 459:16
**GAVER** [72] - 293:14, 296:22, 316:13, 316:18, 316:22, 317:15, 318:7, 318:19, 320:8, 321:17, 322:9, 323:4, 327:12, 328:17, 329:14, 329:25, 345:12, 346:6, 348:12,

348:16, 349:5, 352:12, 356:9, 356:10, 357:1, 361:21, 361:24, 362:19, 362:24, 363:1, 381:5, 381:25, 382:3, 385:11, 388:17, 388:19, 389:21, 396:5, 396:9, 399:2, 409:12, 409:13, 411:21, 413:19, 413:22, 427:12, 437:21, 438:1, 438:9, 438:12, 438:17, 440:25, 452:21, 459:18, 459:19, 461:25, 463:15, 463:20, 464:2, 464:9, 467:2, 467:5, 467:12, 467:15, 467:19, 467:20, 468:17, 471:6, 471:8, 471:19, 471:25, 472:5
**general** [2] - 338:25, 397:12
**generally** [1] - 432:25
**generate** [1] - 404:13
**generated** [6] - 359:25, 360:23, 361:4, 361:15, 396:17, 404:16
**gentleman** [2] - 385:8, 432:19
**girlfriend** [1] - 453:2
**given** [9] - 370:9, 374:23, 376:17, 436:5, 455:4, 457:15, 468:24, 469:4, 469:8
**glass** [3] - 359:14, 395:12, 395:20
**Goggins** [3] - 320:23, 327:23, 362:14
**Gomez** [1] - 458:16
**gories** [1] - 446:24
**GPS** [1] - 408:16
**great** [1] - 324:17
**greater** [2] - 449:12, 449:15
**greatly** [1] - 455:1
**green** [2] - 359:15, 431:1
**grounds** [1] - 346:7
**guess** [9] - 295:10, 299:10, 306:6, 307:12, 310:1, 385:13, 468:22,

469:7, 469:10
**Guiding** [3] - 451:24, 452:19, 453:22
**guiding** [2] - 419:8, 462:12
**gun** [28] - 293:5, 294:8, 295:3, 299:9, 299:13, 300:14, 300:16, 300:17, 300:18, 301:10, 301:11, 301:22, 317:1, 335:17, 349:16, 355:6, 355:8, 355:10, 355:16, 356:20, 357:24, 369:3, 369:4, 378:8, 429:6, 429:16, 466:16
**guns** [1] - 364:24
**gunshot** [2] - 364:16, 378:6
**gurneys** [1] - 392:8
**guy** [2] - 364:9, 375:20
**guys** [1] - 393:20

## H

**half** [6] - 294:4, 307:9, 340:1, 376:15, 378:1, 414:7
**halfway** [1] - 408:17
**hallway** [1] - 347:18
**hand** [2] - 321:6, 364:16
**handed** [4] - 354:22, 366:1, 402:16, 443:14
**handing** [1] - 444:11
**handle** [4] - 293:8, 294:16, 354:15, 429:21
**handled** [5] - 294:13, 416:19, 416:21, 469:15, 469:24
**handling** [2] - 302:8, 351:4
**Hanley** [84] - 296:16, 296:21, 297:9, 314:12, 314:13, 330:16, 331:14, 332:3, 332:16, 332:22, 333:11, 333:12, 334:19, 335:5, 336:15, 337:24, 339:10, 340:7, 340:12, 341:21, 342:12, 343:7, 343:13, 344:6, 344:11, 344:23, 346:25,

347:6, 348:9, 349:2, 349:7, 350:8, 350:12, 352:21, 354:6, 360:24, 361:2, 361:3, 361:14, 361:15, 363:6, 363:15, 391:14, 391:18, 392:19, 393:5, 393:12, 393:17, 394:3, 394:6, 394:12, 394:21, 395:8, 398:5, 398:19, 399:18, 401:12, 414:20, 418:14, 419:19, 419:21, 420:4, 420:6, 420:18, 421:2, 421:18, 422:9, 422:12, 422:19, 423:1, 423:2, 423:4, 424:18, 425:18, 426:14, 427:7, 433:7, 433:15, 433:22, 433:24, 434:17, 437:8
**HANLEY** [1] - 363:10
**Hanley's** [6] - 333:8, 333:14, 334:14, 345:9, 347:14, 435:1
**happenstance** [1] - 359:10
**happy** [5] - 339:7, 385:3, 465:20, 465:21
**harassed** [1] - 314:20
**harassment** [1] - 428:11
**hard** [8] - 339:19, 339:21, 376:14, 376:16, 439:17, 470:6, 470:21
**hardcard** [5] - 442:21, 443:19, 461:11, 461:13, 461:15
**Harm** [2] - 447:18, 448:5
**harm** [3] - 448:9, 453:17, 455:22
**Harmon** [1] - 295:22
**Harpole** [1] - 442:4
**harsh** [1] - 436:22
**harsher** [2] - 462:6, 462:16
**hazardous** [1] - 309:3
**he/she** [2] - 454:5, 454:6
**head** [5] - 331:23, 339:24, 340:2,

437:3, 437:7
**headed** [3] - 353:4, 353:6, 405:14
**healed** [1] - 332:1
**hear** [8] - 311:10, 319:4, 355:18, 368:6, 375:6, 395:21, 395:23, 468:23
**heard** [41] - 305:4, 305:13, 306:2, 306:5, 306:8, 306:9, 306:11, 312:1, 312:6, 312:20, 312:23, 312:24, 312:25, 313:3, 324:9, 335:5, 353:9, 361:12, 367:1, 375:2, 375:15, 402:8, 405:4, 405:6, 429:1, 430:6, 432:21, 433:1, 433:2, 433:11, 433:12, 433:13, 434:9, 435:11, 435:20, 460:5, 470:4, 472:16
**hearing** [13] - 292:3, 292:5, 305:6, 305:10, 357:18, 358:7, 358:8, 414:8, 432:8, 436:11, 442:20, 474:6, 474:9
**hears** [2] - 428:23, 428:24
**hearsay** [2] - 314:2, 319:2
**Hein** [1] - 292:8
**HEIN** [8] - 348:2, 407:19, 408:12, 413:5, 439:6, 452:8, 452:14, 472:13
**held** [2] - 313:7, 459:10
**help** [23] - 298:2, 298:10, 298:12, 298:24, 302:4, 313:25, 314:7, 344:17, 344:18, 344:19, 354:21, 380:19, 380:20, 380:21, 391:7, 391:15, 415:9, 425:5, 428:13, 428:14, 462:13, 469:22, 469:23
**helped** [2] - 428:6, 428:7
**helpful** [1] - 427:20
**helps** [3] - 427:17,

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 789 of 805   Document 80-21

427:18, 452:22
**hereby** [1] - 474:4
**herself** [10] - 306:12,
329:22, 367:2,
423:21, 424:23,
427:19, 456:3,
459:7, 470:5, 471:1
**high** [2] - 343:8,
364:17
**higher** [1] - 455:1
**highly** [1] - 312:19
**himself** [9] - 300:15,
300:18, 301:5,
301:10, 355:14,
384:7, 416:18,
422:16
**hind** [1] - 469:7
**hinge** [1] - 420:15
**history** [4] - 442:21,
444:6, 444:15, 450:6
**History** [1] - 444:4
**hit** [2] - 309:16, 330:9
**hold** [2] - 312:21,
459:7
**holder** [2] - 301:4,
429:7
**holds** [1] - 459:4
**holster** [1] - 369:3
**home** [15] - 300:21,
305:22, 335:2,
335:20, 336:1,
336:8, 348:22,
349:14, 357:12,
357:25, 394:5,
433:23, 433:25,
470:16, 471:1
**honest** [1] - 385:5
**hope** [1] - 469:21
**horn** [17] - 308:14,
308:15, 308:17,
309:9, 309:13,
309:21, 309:23,
309:25, 310:4,
310:6, 310:7, 342:7,
358:20, 359:3,
430:18
**horns** [1] - 310:2
**Hospital** [3] - 365:3,
365:7, 381:7
**hospital** [83] - 319:19,
328:22, 329:1,
329:3, 329:12,
330:6, 330:15,
330:21, 330:24,
331:2, 331:14,
331:25, 332:3,
332:5, 334:21,
335:17, 335:22,
336:8, 348:23,
349:13, 360:5,

364:2, 364:3,
365:11, 365:16,
366:7, 366:11,
367:3, 368:7,
368:19, 369:1,
373:5, 373:11,
373:16, 374:1,
374:11, 376:12,
378:6, 378:20,
379:2, 379:17,
381:11, 381:18,
382:10, 383:23,
383:24, 384:1,
384:4, 384:6,
384:11, 386:8,
389:16, 391:15,
391:19, 391:20,
392:4, 392:7,
393:11, 393:12,
393:13, 394:16,
395:2, 397:5,
397:16, 398:7,
398:14, 398:20,
399:12, 401:20,
409:18, 409:22,
414:18, 414:20,
415:3, 425:19,
425:21, 429:2,
429:4, 432:10,
433:9, 433:11,
433:17, 433:18
**hour** [13] - 294:2,
294:4, 294:14,
314:18, 314:19,
339:11, 340:1,
340:2, 340:4, 370:9,
421:10, 439:13,
466:13
**hours** [11] - 294:3,
294:19, 372:10,
372:22, 373:4,
390:20, 426:16,
434:5, 434:9, 436:7,
437:6
**house** [34] - 292:20,
293:11, 293:13,
293:20, 293:25,
294:8, 304:16,
305:1, 305:4, 305:8,
306:4, 317:24,
332:7, 336:9, 337:2,
337:13, 353:19,
354:16, 355:19,
357:17, 368:8,
378:7, 378:11,
378:12, 379:22,
387:15, 406:7,
413:16, 414:22,
415:14, 416:14,
429:20, 470:6,
470:14

**household** [1] - 430:4
**housekeeping** [1] -
471:22
**houses** [2] - 379:20,
466:15
**HR** [1] - 442:6
**huge** [1] - 429:7
**human** [1] - 468:12
**hung** [2] - 324:10,
361:10
**hurt** [1] - 431:22
**hyperlink** [3] - 407:12,
407:14, 407:17

---

## I

**IA** [1] - 460:20
**IAD** [2] - 332:1, 361:16
**IAS** [1] - 445:7
**ically** [1] - 413:4
**ID** [2] - 395:5, 398:10
**idea** [13] - 297:10,
315:1, 327:22,
327:23, 328:7,
328:10, 349:10,
351:15, 359:22,
375:23, 405:14,
411:1, 423:17
**identifica** [2] - 404:4,
440:23
**identification** [8] -
322:13, 366:2,
369:9, 395:3, 441:4,
443:15, 444:11,
445:3
**identify** [2] - 329:15,
364:24
**idle** [1] - 427:16
**idling** [1] - 419:17
**II** [4] - 439:25, 440:20,
464:1, 472:21
**illuminated** [1] - 308:6
**imagine** [1] - 350:16
**immediacy** [1] -
317:13
**immediate** [1] - 381:1
**immediately** [8] -
303:21, 317:25,
320:11, 327:17,
368:22, 376:21,
414:25, 415:15
**impact** [2] - 359:19,
435:16
**impeding** [3] - 307:8,
308:13, 342:4
**importance** [1] - 377:9
**important** [16] -
301:21, 304:1,
304:9, 304:12,
304:15, 313:6,

314:9, 377:4, 377:8,
417:18, 424:6,
427:14, 450:19,
457:12, 470:17
**imposed** [2] - 442:9,
445:1
**impression** [2] -
317:7, 317:9
**in-squad** [1] - 404:19
**inaccurate** [1] -
336:18
**inappropriate** [1] -
435:8
**incident** [6] - 315:2,
329:10, 352:4,
356:16, 374:6,
465:24
**incidents** [1] - 364:18
**include** [2] - 303:19,
304:9
**including** [4] - 306:19,
323:9, 437:1, 441:21
**inclusion** [1] - 423:23
**incoherent** [2] - 362:5,
362:8
**incoming** [1] - 325:7
**inconsistencies** [1] -
343:18
**inconsistent** [3] -
364:11, 364:14,
418:17
**incumbent** [1] -
377:21
**incurred** [1] - 454:13
**indi** [1] - 457:16
**indicate** [12] - 331:22,
334:18, 335:5,
351:11, 365:10,
366:9, 378:23,
403:6, 441:25,
444:4, 445:22, 450:4
**indicated** [19] -
294:25, 296:20,
297:11, 307:1,
312:2, 324:3,
336:18, 341:21,
368:14, 372:13,
377:13, 381:6,
386:16, 402:8,
402:15, 405:24,
412:22, 415:7, 443:9
**indicates** [22] -
323:15, 323:18,
325:22, 326:13,
332:16, 333:2,
334:12, 334:15,
340:12, 405:10,
405:19, 405:20,
405:24, 426:14,
441:18, 441:21,

442:1, 442:2,
443:21, 445:7,
452:10, 456:21
**indicating** [14] -
304:24, 310:19,
315:20, 335:22,
340:14, 350:19,
367:2, 375:3,
386:12, 404:20,
405:1, 408:14,
443:22, 444:22
**indication** [3] -
351:12, 446:5, 446:7
**individual** [3] -
451:17, 453:18,
457:8
**individuals** [5] -
442:22, 448:10,
459:9, 463:18
**inflicted** [1] - 429:6
**influence** [1] - 350:20
**infor** [2] - 300:25,
349:3
**informa** [2] - 300:6,
393:24
**informal** [2] - 335:12,
335:14
**information** [34] -
297:23, 300:20,
301:2, 301:3, 301:8,
319:10, 337:19,
348:10, 349:11,
350:13, 350:22,
351:2, 354:24,
356:24, 357:10,
357:16, 373:22,
374:18, 379:10,
387:19, 391:5,
392:18, 393:9,
393:24, 397:11,
397:15, 401:12,
401:17, 402:2,
453:11, 465:16,
465:18, 465:19,
469:25
**informed** [2] - 304:25,
323:25
**ing** [1] - 449:18
**initial** [3] - 374:18,
374:19, 413:7
**injured** [1] - 330:6,
453:20, 454:14
**injuries** [16] - 329:4,
329:13, 329:16,
329:18, 329:22,
330:2, 393:22,
397:17, 434:8,
437:1, 437:2,
447:22, 447:25,
448:6, 454:12, 456:3

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 790 of 805   Document 80-21

**injury** [6] - 339:24, 340:2, 350:24, 437:6, 437:7, 456:24
**inquiry** [1] - 473:3
**inside** [1] - 398:11
**insofar** [1] - 400:18
**inspector** [1] - 442:4
**instance** [1] - 421:13
**instances** [1] - 454:1
**instead** [5] - 316:25, 377:23, 415:22, 437:5, 459:8
**instructed** [1] - 299:20
**insurance** [1] - 430:22
**integrity** [16] - 419:12, 419:24, 420:10, 450:8, 450:13, 450:15, 457:7, 458:6, 458:8, 458:13, 458:17, 458:20, 459:14, 462:21, 463:2
**Integrity** [1] - 456:21
**intend** [1] - 359:7
**intent** [1] - 350:4
**intention** [1] - 433:4
**intentional** [2] - 448:23, 449:2
**Intentional/ Unintentional** [2] - 448:3, 448:21
**intentionally** [3] - 436:8, 449:7, 449:10
**interaction** [2] - 415:4, 433:22
**interest** [2] - 312:11, 447:7
**Interest** [1] - 447:2
**interested** [1] - 301:25
**interesting** [1] - 468:20
**interfere** [1] - 433:4
**interim** [1] - 442:6
**interject** [1] - 317:16
**internal** [1] - 409:15
**Internal** [10] - 318:24, 319:7, 375:24, 375:25, 387:24, 396:14, 396:17, 400:14, 444:7, 444:23
**intersection** [8] - 358:13, 358:15, 359:8, 430:15, 430:20, 431:3, 435:5, 435:14
**intervene** [3] - 337:11, 435:7, 436:13
**intervention** [1] - 344:17

**interview** [19] - 302:22, 303:1, 304:22, 304:25, 335:7, 335:8, 335:16, 337:22, 339:21, 354:16, 378:25, 401:14, 402:3, 402:4, 403:10, 409:14, 409:24, 437:8, 437:9
**interviewed** [6] - 311:23, 312:22, 314:4, 396:10, 396:14, 401:10
**interviewing** [3] - 369:1, 401:15, 402:5
**interviews** [1] - 304:22
**introduce** [2] - 321:15, 322:10
**introduced** [1] - 398:4
**inventoried** [1] - 458:14
**investi** [2] - 425:10, 437:4
**investigate** [2] - 364:21, 389:5
**investigated** [2] - 383:3, 388:2
**investigating** [4] - 364:18, 377:7, 389:6, 401:21
**investigation** [32] - 296:3, 296:9, 346:15, 353:20, 356:14, 356:17, 363:19, 365:12, 377:8, 378:10, 381:19, 382:17, 382:22, 386:10, 387:11, 388:20, 389:3, 389:4, 389:9, 389:19, 396:11, 396:20, 400:15, 400:17, 409:15, 425:10, 433:4, 436:9, 436:17, 445:12, 457:20, 459:7
**Investigations** [2] - 318:24, 390:23
**investigations** [7] - 296:7, 296:13, 298:23, 427:17, 429:10, 457:17, 465:17
**investigative** [2] - 374:20, 376:13
**investigator** [3] - 391:22, 394:4,

400:14
**investigators** [1] - 391:6
**involved** [25] - 296:3, 302:1, 311:14, 311:17, 318:3, 335:14, 350:14, 353:3, 365:2, 368:21, 374:25, 380:6, 389:19, 391:10, 391:11, 424:8, 428:19, 429:1, 434:21, 453:15, 460:25, 461:5, 465:14, 465:17, 466:21
**involves** [1] - 427:19
**involving** [1] - 391:1
**IP** [1] - 314:15
**ironic** [1] - 314:1
**irrelevant** [2] - 317:17, 317:20
**issue** [19] - 298:15, 305:8, 315:14, 316:5, 319:9, 325:2, 346:19, 376:25, 383:6, 383:12, 384:22, 404:24, 415:1, 416:6, 441:14, 458:1, 458:7, 459:14, 461:6
**issues** [1] - 303:3
**itself** [7] - 324:21, 392:1, 417:12, 426:17, 426:18, 448:24, 460:5

---

## J

**jacket** [5] - 398:12, 399:12, 399:13, 399:14, 399:19
**jaded** [1] - 344:20
**January** [26] - 323:10, 323:15, 331:25, 333:2, 333:22, 334:13, 340:8, 346:25, 348:5, 348:9, 356:13, 359:25, 360:22, 369:18, 369:24, 369:25, 372:10, 390:19, 390:20, 399:6, 399:7, 399:10, 426:16, 427:22
**Jesse** [1] - 362:13
**job** [11] - 298:24, 299:2, 402:1, 421:4, 424:15, 457:21,

467:6, 468:6, 469:14, 470:17, 471:17
**Joe** [2] - 320:23, 327:23
**Johnson** [7] - 343:2, 350:20, 365:14, 366:13, 368:18, 388:20, 389:15
**Johnson's** [1] - 380:6
**Jordan** [21] - 324:12, 328:9, 360:6, 405:14, 406:2, 410:21, 410:23, 417:4, 417:13, 430:2, 430:4, 431:11, 431:17, 431:23, 432:4, 432:9, 432:17, 432:22, 433:1, 433:6, 433:12
**Jordan's** [1] - 322:25
**Joseph's** [3] - 365:3, 365:7, 381:7
**Juanita** [46] - 292:16, 295:2, 296:21, 297:2, 297:6, 299:16, 301:4, 303:20, 304:15, 304:20, 304:25, 305:4, 305:7, 305:10, 306:3, 306:11, 321:5, 324:11, 337:6, 338:14, 350:3, 365:22, 366:14, 366:20, 367:1, 368:6, 373:24, 379:18, 380:5, 382:10, 387:15, 389:8, 389:18, 391:12, 414:18, 414:24, 415:20, 421:22, 428:25, 429:1, 430:13, 431:8, 433:2, 469:20, 470:11
**Juanita's** [4] - 379:22, 469:11, 470:3, 470:25
**judgment** [1] - 319:7
**jumps** [1] - 419:2
**jurisdiction** [1] - 352:5
**justifies** [3] - 304:2, 426:18, 430:8

---

## K

**K-e-l-l-y** [1] - 390:12
**k-r-u-m-n-o-w** [1] -

402:19
**Kathy** [1] - 292:8
**keep** [4] - 354:20, 385:20, 401:7, 421:4
**keepers** [1] - 457:14
**Kelly** [5] - 390:4, 390:12, 409:14, 425:23, 425:25
**KELLY** [1] - 390:5
**KENZIE** [24] - 302:17, 319:9, 322:2, 331:19, 352:20, 353:1, 367:19, 368:23, 371:11, 376:24, 377:12, 377:25, 378:4, 378:21, 379:8, 381:24, 387:9, 407:2, 407:16, 439:4, 452:16, 468:19, 471:5, 472:14
**kept** [1] - 401:18
**key** [1] - 312:12
**kind** [8] - 314:1, 364:10, 365:9, 379:4, 385:3, 399:19, 408:24, 469:3
**knock** [3] - 300:4, 429:16, 470:6
**knock-and-announce** [1] - 429:16
**knock-and-talk** [1] - 300:4
**knocked** [2] - 415:15, 470:4
**knowing** [5] - 320:18, 389:10, 409:24, 465:8, 469:1
**knowledge** [17] - 296:5, 297:8, 297:19, 298:14, 301:15, 302:18, 328:16, 329:22, 331:1, 344:11, 344:22, 345:14, 351:8, 371:1, 387:18, 456:5, 465:18
**known** [6] - 302:13, 347:2, 381:15, 464:20, 466:17, 468:6
**knows** [6] - 348:15, 379:5, 415:17, 421:5, 422:7, 422:12
**KONRAD** [82] - 292:1, 293:17, 296:25,

305:15, 305:19, 306:7, 306:13, 306:20, 314:24, 315:9, 316:24, 317:21, 318:13, 320:10, 321:19, 322:7, 327:13, 328:12, 329:17, 330:2, 330:5, 333:20, 341:14, 345:5, 345:17, 346:4, 346:13, 347:13, 347:24, 348:17, 349:9, 352:14, 352:17, 356:7, 361:23, 362:2, 362:18, 362:22, 363:4, 363:8, 363:13, 373:12, 376:23, 381:4, 385:23, 386:4, 389:23, 390:8, 396:4, 396:7, 400:3, 400:9, 407:1, 409:11, 413:17, 413:20, 413:23, 414:1, 427:11, 437:15, 437:22, 438:6, 438:10, 438:13, 438:19, 439:3, 439:7, 439:12, 439:15, 440:6, 440:11, 459:16, 463:22, 464:7, 467:9, 467:14, 467:17, 471:24, 472:2, 472:7, 472:15, 472:19
**Konrad** [2] - 292:5, 467:7
**Krumnow** [13] - 327:24, 402:13, 402:14, 402:18, 403:12, 403:16, 403:21, 405:1, 406:16, 410:2, 410:6, 410:12, 432:9
**Krumnow's** [1] - 410:3

# L

**labeled** [1] - 357:4
**lack** [1] - 383:8
**land** [1] - 351:17
**lane** [2] - 307:9
**language** [1] - 355:22
**lanyard** [2] - 395:4, 398:10

**lap** [1] - 431:8
**large** [2] - 312:13, 406:19
**largely** [1] - 420:13
**lars** [1] - 382:22
**last** [17] - 331:7, 331:10, 331:20, 331:21, 357:7, 357:8, 371:25, 414:7, 419:12, 440:9, 445:14, 451:3, 462:1, 464:10, 464:12, 468:9, 468:10
**lasted** [8] - 294:7, 323:20, 325:6, 326:14, 333:16, 334:15, 339:4, 460:3
**Late** [2] - 369:15, 383:15
**late** [5] - 369:18, 370:2, 370:3, 464:21, 467:10
**latitude** [1] - 457:15
**Lauda** [2] - 339:5, 347:21
**law** [4] - 418:18, 419:7, 419:10, 440:8
**laws** [1] - 454:2
**lead** [1] - 423:15
**leadership** [3] - 470:19, 470:20
**leads** [1] - 353:19
**leans** [1] - 459:13
**least** [16] - 317:6, 352:2, 358:4, 373:3, 381:14, 388:25, 428:11, 430:8, 432:12, 435:11, 436:8, 437:19, 438:22, 447:11, 456:9
**leave** [11] - 309:13, 309:15, 342:9, 359:7, 393:1, 395:13, 395:14, 408:25, 412:7, 438:6, 456:12
**leaves** [1] - 429:3
**leaving** [9] - 303:21, 335:17, 335:19, 349:13, 384:6, 408:15, 409:3, 409:4, 409:6
**led** [5] - 320:19, 350:2, 460:19, 460:20, 462:9
**ledge** [2] - 351:14, 370:25
**leeway** [1] - 448:16

**left** [14] - 293:22, 294:17, 294:19, 297:11, 297:12, 304:16, 305:9, 310:10, 335:22, 335:24, 355:2, 373:11, 391:22, 405:20
**legally** [1] - 300:16
**legitimate** [3] - 296:5, 455:10, 455:14
**Leibold** [1] - 442:4
**Leitzke** [4] - 314:18, 423:6, 424:18, 442:5
**lends** [2] - 417:19, 428:3
**lenient** [1] - 417:16
**less** [8] - 309:19, 340:11, 358:10, 359:20, 410:23, 460:8, 460:11, 463:18
**less-than-ten-minute** [1] - 460:8
**letter** [2] - 462:23, 463:7
**letters** [2] - 463:1, 463:5
**letting** [2] - 433:22, 433:23
**level** [4] - 364:17, 441:12, 449:25, 460:16
**lewandowski** [1] - 341:5
**Lewandowski** [104] - 292:4, 292:12, 297:1, 297:4, 326:21, 360:6, 366:23, 366:25, 375:3, 375:12, 375:17, 376:3, 377:2, 377:12, 377:20, 377:24, 378:22, 379:21, 382:16, 382:21, 384:18, 384:22, 384:24, 385:7, 391:11, 391:25, 392:3, 392:9, 392:21, 394:12, 396:25, 401:23, 402:9, 402:16, 403:17, 405:15, 409:21, 410:7, 410:23, 414:14, 415:4, 415:8, 415:23, 417:4, 417:11, 418:19, 419:21, 419:23,

420:16, 421:1, 424:22, 426:4, 427:15, 428:3, 428:4, 428:6, 428:13, 428:22, 429:8, 429:13, 429:18, 429:25, 430:2, 430:4, 430:12, 430:16, 431:1, 431:7, 431:11, 431:17, 431:21, 431:23, 432:4, 432:9, 432:18, 433:6, 433:12, 433:14, 433:16, 434:6, 434:11, 434:18, 434:20, 435:3, 436:5, 436:12, 436:20, 439:21, 453:13, 454:16, 457:10, 460:25, 461:7, 464:2, 464:18, 464:20, 465:3, 465:5, 465:9, 467:13, 467:16, 467:21, 472:23
**Lewandowski's** [16] - 379:25, 380:5, 394:7, 396:11, 397:17, 398:1, 410:21, 417:17, 422:25, 428:5, 430:24, 430:25, 434:4, 448:12, 453:14, 463:2
**liaison** [2] - 350:22, 351:3
**liar** [1] - 420:9
**license** [1] - 430:22
**lie** [9] - 341:9, 417:6, 421:2, 421:3, 421:20, 422:3, 422:4, 422:15, 458:1
**lied** [2] - 421:18, 423:20
**Lieuten** [2] - 394:2, 394:11
**lieutenant** [17] - 298:20, 331:11, 335:9, 349:10, 353:21, 366:1, 369:8, 374:14, 374:16, 380:25, 381:6, 390:14, 390:17, 420:9, 446:19, 460:21
**Lieutenant** [87] - 296:16, 296:20, 297:9, 314:12,

314:13, 314:17, 330:16, 331:14, 332:2, 332:16, 332:22, 333:8, 333:11, 333:12, 333:14, 334:14, 334:19, 335:5, 336:15, 337:24, 339:10, 341:21, 343:7, 343:13, 344:6, 344:11, 344:23, 345:9, 346:24, 347:6, 347:14, 348:9, 349:2, 349:7, 350:7, 350:12, 352:21, 354:6, 360:24, 361:2, 361:3, 361:14, 361:15, 363:6, 363:15, 390:4, 391:14, 391:18, 392:19, 393:5, 393:12, 393:17, 394:6, 394:21, 395:7, 398:19, 399:18, 401:12, 409:14, 414:20, 418:14, 419:19, 419:21, 420:3, 420:6, 420:18, 421:2, 421:17, 422:8, 422:12, 422:19, 423:1, 423:2, 423:4, 423:6, 425:18, 425:23, 425:25, 426:14, 427:7, 433:7, 433:15, 433:22, 434:25, 442:5
**Lieutenant's** [1] - 445:7
**lieutenant's** [2] - 380:24, 442:23
**Lieutenants** [1] - 424:18
**lieutenants** [3] - 344:15, 399:21, 445:11
**life** [3] - 356:1, 356:4, 468:8
**light** [4] - 359:15, 429:14, 431:1, 435:14
**lights** [50] - 307:2, 307:9, 307:18, 308:2, 308:6, 308:11, 308:12, 308:13, 308:15, 308:16, 308:19,

309:1, 309:4, 309:5, 309:7, 310:8, 310:10, 341:22, 342:3, 342:5, 342:8, 353:10, 358:17, 358:22, 358:25, 359:4, 359:7, 359:13, 359:16, 359:18, 418:3, 418:13, 418:20, 418:25, 421:8, 422:1, 430:17, 431:4, 435:10, 435:12, 435:15, 435:19, 435:21, 435:22, 435:24, 436:3, 454:17
**likelihood** [1] - 343:8
**likely** [3] - 328:3, 374:8, 377:21
**limit** [1] - 386:22
**limited** [1] - 453:11
**line** [6] - 300:10, 314:24, 331:10, 392:13, 416:8, 455:19
**lines** [1] - 301:6
**lineup** [1] - 369:15
**lingering** [1] - 437:1
**link** [1] - 471:12
**links** [1] - 407:12
**list** [2] - 342:22, 444:23
**listed** [4] - 301:13, 371:3, 372:4, 454:22
**listen** [2] - 303:5, 303:15
**lists** [1] - 333:5
**live** [3] - 336:2, 336:5, 433:2
**lived** [4] - 355:25, 356:3, 410:23, 468:7
**lives** [4] - 351:16, 351:24, 351:25, 352:2
**living** [2] - 432:5, 470:15
**loafing** [1] - 419:17
**locate** [4] - 331:4, 402:7, 403:2, 403:18
**located** [6] - 342:24, 401:10, 401:13, 401:18, 405:22, 414:24
**location** [12] - 320:15, 351:19, 405:10, 405:11, 406:2, 408:20, 409:4, 411:5, 411:10, 412:5, 412:22, 449:9

**locations** [4] - 342:20, 398:25, 404:20, 406:17
**log** [2] - 334:5, 334:15
**logs** [4] - 323:8, 325:1, 327:8, 328:11
**longhand** [1] - 474:9
**look** [20] - 314:16, 321:17, 323:5, 327:3, 329:12, 339:8, 398:8, 398:25, 407:3, 407:10, 425:22, 426:11, 428:18, 450:6, 451:16, 454:24, 455:8, 456:14, 460:13, 461:23
**looked** [6] - 314:13, 325:8, 330:13, 359:14, 384:19, 426:13
**looking** [10] - 326:21, 372:15, 378:19, 394:24, 404:14, 452:11, 466:8, 466:9, 466:10
**looks** [1] - 419:2
**loose** [1] - 452:7
**lost** [8] - 314:17, 379:24, 448:8, 448:10, 455:22, 456:6, 456:15, 456:17
**loud** [1] - 310:7
**love** [1] - 468:5
**Lucas** [1] - 455:5
**lying** [8] - 301:20, 332:18, 344:7, 364:1, 364:4, 417:13, 420:4, 420:19

## M

**M-N/A** [2] - 447:8, 447:10
**ma'am** [3] - 341:10, 355:21, 399:16
**magazines** [1] - 369:3
**maintain** [1] - 414:10
**maintained** [2] - 419:23, 425:21
**maintains** [1] - 425:18
**majority** [1] - 299:4
**male** [3] - 295:1, 295:20, 372:11
**Malone** [1] - 466:12
**man** [5] - 364:7, 385:10, 466:5

**manage** [1] - 294:22
**manner** [9] - 309:10, 318:9, 358:21, 358:25, 418:17, 419:16, 454:2, 455:19, 473:2
**mark** [1] - 413:1
**marked** [19] - 322:11, 322:13, 365:25, 366:1, 369:6, 369:8, 404:3, 404:4, 438:8, 440:22, 440:23, 441:4, 443:13, 443:14, 444:10, 444:11, 445:2, 445:3
**married** [1] - 385:8
**Mary** [1] - 351:16
**Maryland** [14] - 351:20, 351:22, 352:3, 404:21, 405:3, 405:25, 406:18, 406:20, 407:21, 408:18, 413:6, 413:12, 432:3
**mask** [1] - 364:8
**mass** [5] - 423:9, 423:10, 423:14, 423:22, 424:11
**mately** [1] - 309:18
**materials** [2] - 446:11, 446:20
**mation** [2] - 301:1, 349:4
**matter** [26] - 292:3, 292:6, 298:16, 301:16, 308:12, 344:3, 344:14, 346:8, 347:4, 347:13, 359:10, 359:11, 363:19, 374:25, 376:7, 386:13, 415:25, 416:5, 424:3, 427:14, 428:8, 428:16, 428:17, 471:21
**maximize** [1] - 294:23
**maximum** [1] - 418:7
**MC** [96] - 293:14, 296:22, 302:17, 316:13, 316:18, 316:22, 317:15, 318:7, 318:19, 319:9, 320:8, 321:17, 322:2, 322:9, 323:4, 327:12, 328:17, 329:14, 329:25, 331:19, 345:12, 346:6, 348:12,

348:16, 349:5, 352:12, 352:20, 353:1, 356:9, 356:10, 357:1, 361:21, 361:24, 362:19, 362:24, 363:1, 367:19, 368:23, 371:11, 376:24, 377:12, 377:25, 378:4, 378:21, 379:8, 381:5, 381:24, 381:25, 382:3, 385:11, 387:9, 388:17, 388:19, 389:21, 396:5, 396:9, 399:2, 407:2, 407:16, 409:12, 409:13, 411:21, 413:19, 413:22, 427:12, 437:21, 438:1, 438:9, 438:12, 438:17, 439:4, 440:25, 452:16, 452:21, 459:18, 459:19, 461:25, 463:15, 463:20, 464:2, 464:9, 467:2, 467:5, 467:12, 467:15, 467:19, 467:20, 468:17, 468:19, 471:5, 471:6, 471:8, 471:19, 471:25, 472:5, 472:14
**Mc** [1] - 459:16
**McAleer** [3] - 455:5, 455:9, 455:17
**McGaver** [1] - 427:11
**McKenzie** [1] - 292:9
**mean** [17] - 334:8, 334:9, 358:16, 358:17, 367:20, 384:2, 384:5, 386:20, 393:10, 396:24, 418:21, 422:3, 423:3, 436:4, 447:2, 447:9, 467:6
**means** [3] - 348:3, 411:24, 447:10
**meant** [2] - 301:3, 305:25
**measure** [4] - 307:7, 307:14, 307:23, 307:24
**mechanical** [1] - 461:6
**med** [3] - 391:16, 392:8, 392:13
**medical** [6] - 349:18,

391:16, 393:24, 434:24, 454:5, 456:12
**medication** [2] - 337:2, 349:15
**meet** [1] - 416:5
**meeting** [11] - 442:8, 442:13, 446:12, 447:16, 450:24, 458:25, 459:20, 460:3, 460:6, 460:19, 460:24
**meetings** [1] - 375:4
**meets** [1] - 429:13
**Melanie** [36] - 297:14, 298:1, 299:13, 313:22, 314:6, 314:11, 314:17, 316:1, 318:4, 337:12, 340:13, 340:25, 375:4, 375:10, 375:12, 375:18, 375:20, 384:15, 385:3, 385:4, 385:14, 385:16, 385:19, 416:1, 424:3, 424:11, 424:14, 424:24, 427:24, 428:2, 428:9, 428:12, 429:3, 429:22, 469:13, 470:11
**member** [17] - 314:20, 387:21, 387:23, 402:8, 402:12, 441:17, 444:9, 445:18, 451:7, 457:14, 457:18, 457:19, 457:25, 463:10, 463:11, 467:25
**member's** [1] - 442:24
**Member's** [1] - 445:14
**Members** [2] - 441:18, 441:25
**members** [11] - 391:11, 391:16, 400:18, 423:24, 425:1, 425:4, 439:19, 450:21, 451:5, 456:22, 472:21
**memo** [2] - 338:3, 343:21
**memorandum** [2] - 445:11, 445:18
**memorandums** [2] - 337:20, 337:21
**memorize** [1] - 333:11

memory [2] - 413:13, 446:20
ment [5] - 335:6, 397:10, 422:17, 445:23, 458:16
mention [2] - 401:19, 410:11
mentioned [1] - 438:3
mentioning [1] - 401:16
mentions [1] - 410:13
ments [1] - 446:8
mere [1] - 419:9
merits [1] - 442:9
message [11] - 404:10, 404:19, 404:25, 405:2, 406:18, 407:8, 407:9, 407:15, 407:16, 408:5, 466:7
messages [2] - 360:12, 408:2
met [3] - 305:9, 385:10, 427:23
microphone [1] - 382:2
middle [8] - 323:15, 325:4, 326:6, 372:18, 386:23, 387:2, 403:9, 416:3
midnight [3] - 369:21, 370:4, 373:4
midst [1] - 309:1
might [25] - 307:14, 307:18, 311:3, 318:14, 318:19, 319:24, 336:4, 336:12, 355:21, 358:24, 362:4, 370:5, 383:13, 394:25, 406:4, 406:5, 406:6, 413:12, 417:16, 426:6, 451:3, 460:7, 460:12
miles [3] - 339:11, 340:4, 421:10
military [1] - 425:3
Milwaukee [14] - 351:25, 364:17, 390:14, 391:1, 416:20, 416:25, 431:19, 432:20, 440:17, 464:15, 465:10, 465:11, 468:1, 471:10
MILWAUKEE [1] - 474:2
mind [11] - 323:4, 336:7, 345:3,

348:15, 368:12, 417:17, 418:10, 422:12, 422:13, 428:12, 435:12
mine [2] - 353:7, 452:6
minimize [1] - 294:22
minimum [2] - 335:4, 358:10
Minnesota [1] - 356:5
minute [15] - 326:25, 328:2, 328:11, 333:16, 334:6, 334:7, 334:9, 360:1, 360:14, 361:1, 434:3, 436:6, 460:8, 460:11, 463:14
minutes [21] - 294:4, 294:13, 314:19, 323:20, 323:23, 325:6, 325:17, 326:14, 327:1, 328:11, 334:16, 336:4, 336:6, 361:17, 409:1, 411:11, 430:9, 435:18, 435:19, 460:15
miracle [1] - 432:8
mis [1] - 343:18
misconstrued [1] - 301:2
misrepre [1] - 419:4
misrepresent [3] - 344:12, 344:23, 417:6
misrepresentation [1] - 417:9
misrepresenting [1] - 344:7
mission [4] - 418:1, 419:17, 451:8, 472:25
missions [1] - 416:4
misstatement [1] - 343:19
mistake [4] - 371:6, 448:24, 448:25, 449:1
mistaken [1] - 381:10
mistakes [1] - 448:17
misunderstanding [1] - 344:3
mitigated [1] - 449:4
mitigating [7] - 447:5, 447:10, 447:12, 447:19, 448:13, 449:21, 455:18
mitted [1] - 408:14
mom [2] - 417:5, 431:23

moment [5] - 316:8, 317:10, 359:17, 359:19, 455:8
Monday [1] - 354:17
month [1] - 342:18
months [10] - 315:18, 315:20, 317:12, 332:4, 348:4, 356:18, 436:8, 456:13, 456:17
mony [3] - 357:2, 431:2, 432:8
morning [9] - 292:1, 340:8, 354:15, 354:19, 361:4, 372:10, 390:20, 426:16, 434:18
most [14] - 313:6, 343:16, 353:14, 353:22, 374:8, 377:8, 377:21, 399:21, 412:1, 417:21, 457:8, 458:20, 458:21, 462:20
mother [4] - 432:5, 432:11, 432:20, 440:8
Mother [1] - 324:5
mother's [1] - 432:6
mother-in-law [1] - 440:8
motion [3] - 342:8, 472:11, 472:15
motiva [1] - 424:17
motivate [1] - 344:23
motivated [1] - 422:10
Motivation [1] - 446:24
motivation [5] - 421:2, 421:3, 447:4, 447:6, 455:18
motivations [3] - 422:3, 423:8, 425:25
motive [4] - 346:12, 417:6, 422:14, 422:15
move [10] - 306:22, 309:12, 327:10, 328:20, 341:16, 437:20, 439:1, 439:24, 471:22, 472:13
moved [3] - 342:10, 437:18, 438:4
moving [1] - 341:18
MPD [2] - 452:15, 462:13
MR [258] - 292:1, 292:15, 293:14,

293:16, 293:17, 296:22, 296:25, 297:3, 305:15, 305:17, 305:19, 306:7, 306:13, 306:17, 306:20, 306:21, 311:11, 314:24, 315:7, 315:9, 315:13, 315:16, 316:13, 316:16, 316:18, 316:20, 316:22, 316:24, 317:2, 317:4, 317:15, 317:21, 318:1, 318:7, 318:10, 318:13, 318:16, 318:19, 318:21, 319:13, 320:8, 320:10, 320:13, 321:14, 321:17, 321:19, 321:21, 322:1, 322:5, 322:7, 322:9, 322:12, 323:4, 323:6, 326:19, 327:10, 327:12, 327:13, 328:12, 328:17, 328:19, 328:21, 329:14, 329:17, 329:20, 329:25, 330:2, 330:5, 331:21, 333:20, 333:22, 333:25, 334:2, 334:3, 341:5, 341:10, 341:14, 341:16, 341:20, 343:22, 345:5, 345:7, 345:8, 345:12, 345:14, 345:17, 346:2, 346:4, 346:5, 346:6, 346:11, 346:13, 346:20, 346:22, 347:13, 347:24, 348:7, 348:12, 348:14, 348:16, 348:17, 349:5, 349:9, 349:20, 350:17, 352:10, 352:12, 352:14, 352:17, 355:21, 356:7, 356:9, 356:10, 357:1, 361:21, 361:23, 361:24, 362:2, 362:18, 362:19, 362:20, 362:22, 362:24, 362:25, 363:1, 363:2, 363:4, 363:5, 363:8,

363:13, 363:14, 367:23, 369:7, 370:21, 371:16, 371:21, 373:12, 373:14, 376:22, 376:23, 381:3, 381:4, 381:5, 381:25, 382:3, 385:11, 385:22, 385:23, 386:2, 386:4, 386:5, 386:6, 387:13, 388:16, 388:17, 388:19, 389:21, 389:22, 389:23, 389:25, 390:3, 390:8, 390:9, 396:3, 396:4, 396:5, 396:7, 396:9, 399:2, 399:4, 400:2, 400:3, 400:9, 400:10, 402:24, 403:2, 406:25, 407:1, 409:11, 409:12, 409:13, 411:21, 413:17, 413:18, 413:19, 413:20, 413:21, 413:22, 413:23, 414:1, 414:5, 427:11, 427:12, 437:15, 437:17, 437:21, 437:22, 438:1, 438:6, 438:9, 438:10, 438:11, 438:13, 438:17, 438:18, 438:19, 439:3, 439:7, 439:12, 439:15, 440:1, 440:6, 440:11, 440:12, 440:25, 441:2, 452:6, 452:10, 452:18, 452:21, 459:15, 459:16, 459:18, 459:19, 461:25, 463:15, 463:20, 463:21, 463:22, 463:25, 464:2, 464:7, 464:9, 467:2, 467:4, 467:5, 467:9, 467:12, 467:14, 467:15, 467:17, 467:19, 467:20, 468:17, 468:18, 471:6, 471:8, 471:19, 471:21, 471:24, 471:25, 472:2, 472:5, 472:6, 472:7, 472:15, 472:19

**MS** [75] - 302:17, 311:10, 319:9, 322:2, 326:16, 331:19, 333:23, 334:1, 348:2, 352:20, 353:1, 353:2, 353:8, 353:13, 353:23, 354:1, 354:5, 354:9, 354:23, 355:18, 355:23, 356:2, 356:6, 361:25, 362:3, 367:19, 368:23, 370:2, 370:8, 370:11, 370:16, 370:20, 371:11, 371:14, 376:24, 377:12, 377:25, 378:4, 378:21, 379:8, 379:23, 380:2, 380:8, 380:12, 380:17, 381:24, 385:12, 385:25, 387:9, 399:5, 399:11, 399:17, 402:20, 407:2, 407:16, 407:19, 408:12, 408:22, 411:23, 412:6, 412:9, 412:14, 412:19, 413:5, 439:1, 439:4, 439:6, 452:8, 452:14, 452:16, 452:23, 468:19, 471:5, 472:13, 472:14
**multiple** [2] - 381:6, 423:23
**Murray** [3] - 351:21, 351:23, 352:3

### N

**N/A** [2] - 447:8, 447:10
**nail** [1] - 319:3
**name** [14] - 292:5, 295:5, 295:17, 295:19, 295:20, 374:18, 390:10, 400:25, 440:13, 452:23, 464:10, 464:12
**namely** [1] - 421:22
**names** [1] - 313:21
**nation** [1] - 384:3
**naturally** [1] - 346:18
**nature** [7] - 315:11, 329:4, 329:16, 401:20, 426:11,

442:23, 444:25
**near** [1] - 441:18
**necessarily** [5] - 312:16, 319:10, 334:8, 374:23, 377:5
**necessary** [4] - 308:7, 308:8, 454:17, 456:2
**neck** [5] - 330:9, 395:4, 431:24, 432:11, 432:12
**need** [16] - 300:3, 302:10, 303:25, 307:22, 349:17, 371:17, 401:7, 409:6, 409:8, 409:9, 415:9, 425:14, 443:5, 463:16, 468:23
**needed** [13] - 299:8, 378:12, 379:3, 380:20, 380:21, 391:15, 392:17, 392:18, 393:24, 397:11, 415:1, 428:13, 433:8
**needing** [1] - 428:5
**needs** [3] - 298:24, 299:25, 429:14
**Nelson** [1] - 466:11
**neutral** [1] - 426:3
**never** [23] - 297:10, 298:21, 298:22, 304:5, 309:4, 320:4, 330:18, 331:15, 332:5, 332:6, 332:7, 351:5, 354:5, 380:15, 385:10, 388:7, 388:14, 414:18, 425:19, 430:14, 430:15, 434:1, 435:9
**new** [4] - 384:2, 388:21, 388:25, 448:17
**newer** [1] - 448:16
**next** [11] - 333:18, 341:17, 341:19, 394:3, 419:11, 444:3, 444:19, 445:7, 446:23, 447:2, 447:8
**nice** [1] - 399:7
**Nicole** [1] - 442:6
**night** [5] - 338:23, 380:17, 392:23, 399:25, 466:11
**nine** [3] - 354:24, 456:13, 460:14
**nobody** [4] - 427:15, 430:24, 471:1

**noise** [2] - 310:6, 310:7
**non** [1] - 309:8
**non-emergency** [1] - 309:8
**non-PI-21** [1] - 403:10
**none** [9] - 310:1, 319:5, 337:12, 360:7, 425:15, 428:11, 433:14, 436:13, 463:5
**nonsense** [1] - 434:13
**normal** [2] - 379:13, 399:10
**normally** [2] - 379:8, 379:11
**North** [17] - 306:23, 306:24, 342:13, 358:14, 359:8, 365:6, 404:21, 405:3, 405:25, 406:18, 406:20, 413:5, 413:11, 430:16, 432:2
**north** [4] - 343:1, 353:3, 353:4, 353:7
**nose** [1] - 330:10
**note** [3] - 378:15, 446:2, 473:5
**noted** [1] - 407:13
**notes** [4] - 337:15, 398:18, 398:22, 474:9
**Notes** [1] - 450:16
**nothing** [29] - 295:15, 311:6, 311:13, 311:15, 320:16, 361:21, 362:20, 363:11, 378:10, 381:3, 385:11, 386:9, 388:8, 389:21, 389:22, 390:7, 399:4, 400:2, 400:8, 411:21, 413:19, 416:1, 440:5, 456:12, 463:20, 464:5, 467:2, 468:17, 471:19
**notice** [3] - 307:11, 309:13, 383:12
**noticed** [1] - 395:25
**notifies** [1] - 324:22
**notify** [4] - 307:16, 409:5, 412:23, 413:3
**notifying** [2] - 411:17, 411:18
**notion** [1] - 417:20
**November** [4] - 314:18, 315:21,

332:4, 332:8
**nowhere** [1] - 317:19
**number** [55] - 311:7, 320:24, 320:25, 321:22, 321:24, 322:3, 322:14, 322:24, 322:25, 323:9, 323:19, 327:16, 333:5, 333:8, 333:13, 333:14, 362:15, 363:3, 366:2, 366:14, 366:17, 367:11, 367:13, 368:3, 371:23, 381:21, 381:25, 382:11, 383:13, 383:16, 386:13, 386:24, 387:1, 387:3, 387:4, 387:5, 387:6, 404:5, 406:18, 406:19, 407:9, 412:25, 423:3, 432:17, 434:13, 437:18, 441:17, 441:21, 443:5, 443:15, 451:21, 452:15, 452:17, 454:24
**numbers** [10] - 312:13, 322:21, 322:23, 333:11, 383:9, 386:16, 387:8, 393:21, 413:11
**numerous** [1] - 401:10
**nurses** [2] - 395:12, 397:16

### O

**oath** [7] - 292:14, 363:11, 390:6, 400:7, 440:4, 464:5, 467:18
**objec** [1] - 345:19
**object** [5] - 293:14, 316:13, 320:9, 328:17, 329:14, 346:6
**objection** [17] - 296:22, 316:17, 317:16, 317:19, 317:25, 318:8, 323:6, 327:12, 330:1, 345:12, 345:18, 348:16, 437:21, 439:3, 439:6, 439:7, 471:25
**objections** [5] - 318:7,

438:23, 438:24, 472:16
**objectives** [1] - 416:4
**observation** [1] - 459:2
**observations** [4] - 394:2, 395:7, 425:16, 458:24
**observe** [2] - 365:13, 395:10
**observed** [4] - 297:5, 371:19, 393:5, 398:13
**obvious** [1] - 329:22
**obviously** [1] - 427:13
**Occam's** [1] - 415:16
**occasion** [1] - 297:4
**occasionally** [1] - 411:10
**occasions** [1] - 376:2
**occur** [4] - 297:20, 314:10, 315:17, 361:15
**occurred** [18] - 315:18, 317:12, 321:9, 323:22, 339:17, 346:25, 356:12, 356:13, 361:4, 361:5, 384:13, 426:19, 428:11, 428:25, 434:3, 434:4, 447:22
**occurring** [2] - 343:10, 390:25
**occurs** [1] - 384:12
**October** [7] - 305:19, 314:12, 357:21, 358:5, 375:17, 384:17, 385:2
**OF** [2] - 474:1, 474:2
**offenders** [1] - 364:25
**offenses** [1] - 458:21
**offer** [3] - 298:11, 415:25, 442:11
**offered** [8] - 294:14, 299:16, 427:3, 428:4, 438:7, 438:8
**offering** [3] - 300:6, 319:22, 438:2
**office** [4] - 380:24, 383:7, 462:24
**Office** [1] - 462:25
**Officer** [2] - 320:23, 362:13, 380:9, 380:16, 396:21, 402:14, 403:12, 403:16, 403:21, 404:25, 405:1, 405:13, 406:15, 406:16, 410:2,

410:3, 410:5, 410:12, 427:23, 427:24, 428:23, 431:22, 432:18, 433:13, 453:1, 453:13, 455:9, 455:17, 458:12, 464:3, 466:12
**officer** [34] - 296:11, 298:10, 312:3, 312:5, 312:17, 313:23, 314:7, 321:2, 360:4, 380:11, 384:25, 388:11, 394:25, 395:3, 401:3, 401:17, 401:18, 402:13, 404:18, 408:23, 412:21, 415:9, 417:14, 422:17, 425:2, 431:19, 431:25, 437:6, 437:9, 458:14, 464:15, 464:17, 469:18
**Officers** [1] - 432:9
**officers** [45] - 298:2, 298:6, 298:18, 299:2, 310:15, 310:20, 310:25, 311:7, 311:13, 311:16, 312:13, 312:21, 313:8, 313:11, 313:19, 314:3, 318:2, 318:24, 319:24, 337:9, 340:22, 344:17, 362:6, 391:10, 400:24, 401:11, 401:13, 401:16, 401:19, 411:2, 411:4, 411:10, 411:16, 423:8, 424:17, 427:19, 428:17, 434:10, 436:2, 436:11, 436:12, 436:15, 448:16, 448:18, 457:12
**official** [2] - 450:9, 458:15
**often** [3] - 296:12, 411:16
**oftentimes** [1] - 421:12
**omitted** [1] - 303:4
**once** [3] - 305:1, 359:11, 374:5
**oncoming** [1] - 308:3
**one** [78] - 296:2,

297:14, 298:5, 298:19, 299:1, 308:24, 310:2, 321:15, 325:17, 325:25, 326:25, 328:11, 331:7, 333:16, 334:7, 334:9, 338:20, 342:8, 346:15, 346:18, 357:17, 358:7, 358:17, 360:15, 365:18, 371:5, 376:7, 378:23, 391:6, 391:24, 391:25, 392:9, 392:13, 393:1, 394:14, 395:17, 398:3, 399:5, 401:20, 404:14, 405:24, 407:4, 408:10, 413:2, 415:9, 416:17, 417:3, 419:19, 422:2, 423:24, 426:24, 428:18, 432:17, 433:25, 435:16, 437:24, 439:13, 441:2, 443:11, 446:2, 447:3, 448:10, 449:12, 449:17, 453:5, 455:5, 458:11, 458:21, 459:3, 461:14, 461:18, 462:2, 462:9, 463:9, 466:23
**one-day** [1] - 461:18
**ones** [1] - 458:11
**open** [3] - 395:12, 395:13, 472:20
**opened** [2] - 364:9, 395:17
**opening** [1] - 420:12
**operate** [1] - 454:1
**operated** [1] - 358:20
**operates** [1] - 430:18
**operating** [10] - 341:23, 358:25, 418:13, 418:16, 419:9, 419:16, 421:8, 449:7, 454:16, 456:1
**operator** [1] - 454:4
**operators** [1] - 453:25
**opinion** [2] - 442:11, 465:8
**opportunity** [5] - 409:7, 414:2, 421:21, 445:19,

454:24
**opposed** [1] - 413:12
**option** [1] - 412:25
**orally** [1] - 456:23
**order** [10] - 308:15, 313:24, 320:22, 342:7, 359:4, 431:25, 438:21, 440:10, 472:8, 472:24
**ordinances** [1] - 454:2
**oriented** [1] - 304:12
**otherwise** [2] - 415:12, 472:10
**ous** [1] - 454:2
**outcome** [2] - 450:21, 450:22
**outgoing** [1] - 326:22
**outlines** [2] - 441:11, 444:8
**outside** [3] - 389:15, 398:12, 417:25
**overheard** [1] - 318:25
**overrule** [1] - 345:18
**overruled** [1] - 348:17
**oversee** [1] - 365:12
**overseeing** [2] - 374:20, 374:21
**oversight** [1] - 386:15
**overtime** [3] - 294:11, 294:23, 471:3
**own** [15] - 299:12, 300:16, 301:10, 301:24, 324:3, 328:1, 348:15, 353:14, 417:21, 418:3, 425:10, 425:15, 427:18, 431:12, 469:22
**owned** [1] - 300:16

## P

**p.m** [14] - 366:10, 369:19, 369:20, 370:5, 370:13, 370:14, 370:17, 370:18, 370:19, 372:25, 373:1, 473:9
**P.M** [1] - 473:11
**package** [1] - 427:2
**packet** [3] - 451:23, 452:20, 462:10
**page** [16] - 300:9, 325:1, 325:5, 326:6, 331:7, 331:19, 331:20, 331:21, 333:18, 357:7, 372:15, 373:20, 403:9, 450:7,

450:10, 451:24
**Page** [11] - 323:2, 324:25, 326:4, 333:1, 334:12, 366:10, 373:21, 403:4, 406:10, 452:5, 452:8
**pain** [1] - 337:2
**paint** [1] - 424:10
**panel** [3] - 292:7, 472:20, 472:21
**panic** [1] - 432:1, 432:3, 435:25
**panicking** [1] - 431:9
**paper** [1] - 326:17
**paperwork** [1] - 294:9
**parades** [1] - 309:7
**paragraph** [4] - 357:9, 403:8, 403:9, 406:11
**parent** [1] - 430:1
**part** [23] - 298:23, 298:24, 307:23, 308:14, 309:12, 310:25, 311:24, 313:15, 356:15, 363:23, 374:20, 375:4, 401:21, 401:25, 402:1, 402:6, 415:20, 420:22, 424:10, 426:1, 444:17, 469:4, 469:15
**parti** [1] - 382:16
**participants** [1] - 439:13
**participatory** [1] - 468:7
**particu** [1] - 382:21
**particular** [5] - 382:22, 384:22, 384:23, 425:24, 441:13
**particulars** [1] - 379:17
**partner** [1] - 466:16
**partners** [3] - 456:4, 465:21, 466:7
**parts** [2] - 426:21
**party** [2] - 360:17, 426:3
**passed** [3] - 362:4, 362:7, 440:8
**passes** [1] - 431:8
**passing** [1] - 295:15
**past** [5] - 308:15, 308:16, 310:8, 342:8, 449:20
**path** [1] - 427:6
**patients** [1] - 395:14
**patrol** [11] - 295:15, 296:6, 296:10,

296:12, 311:1, 311:3, 374:22, 380:15, 386:20, 387:4, 399:22
**Patrol** [1] - 372:18
**pauses** [1] - 419:2
**Pederson** [3] - 357:7, 414:3, 462:9
**PEDERSON** [105] - 292:15, 293:16, 297:3, 305:17, 306:17, 306:21, 311:1, 315:7, 315:13, 315:16, 316:16, 316:20, 317:2, 317:4, 318:1, 318:10, 318:16, 318:21, 319:13, 320:13, 321:14, 321:21, 322:1, 322:5, 322:12, 323:6, 326:19, 327:10, 328:19, 328:21, 329:20, 331:21, 333:22, 333:25, 334:2, 334:3, 341:5, 341:10, 341:16, 341:20, 343:22, 345:7, 345:8, 345:14, 346:2, 346:5, 346:11, 346:20, 346:22, 348:7, 348:14, 349:20, 350:17, 352:10, 355:21, 362:20, 362:25, 363:2, 363:5, 363:14, 367:23, 369:7, 370:21, 371:16, 371:21, 371:25, 373:14, 376:22, 381:3, 385:22, 386:2, 386:5, 386:6, 387:13, 388:16, 389:22, 389:25, 390:3, 390:9, 396:3, 399:4, 400:2, 400:10, 402:24, 403:2, 406:25, 413:18, 413:21, 414:5, 437:17, 438:11, 438:18, 440:1, 440:12, 441:2, 452:6, 452:10, 452:18, 459:15, 463:21, 463:25, 467:4, 468:18, 471:21, 472:6

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 796 of 805   Document 60-21

**penalty** [1] - 462:6
**pending** [1] - 429:10
**people** [25] - 309:3, 309:5, 313:2, 313:3, 319:3, 350:14, 362:6, 362:10, 362:15, 364:24, 371:5, 376:15, 378:2, 395:9, 395:25, 398:2, 401:8, 401:10, 418:20, 420:21, 420:22, 421:23, 423:3, 433:14, 469:6
**PeopleSoft** [1] - 384:19
**per** [2] - 311:25, 416:2
**percent** [1] - 389:5
**perceptions** [1] - 425:16
**perfectly** [2] - 370:4, 415:6
**perform** [2] - 292:21, 293:20
**performed** [2] - 296:13, 431:13
**performing** [1] - 417:25
**perhaps** [3] - 301:19, 346:18, 458:20
**period** [4] - 325:2, 345:21, 434:7, 435:17
**permission** [2] - 353:24, 354:2
**permit** [1] - 429:7
**perry** [1] - 371:11
**Perry** [11] - 295:17, 371:8, 371:14, 372:12, 374:1, 374:3, 374:9, 376:8, 376:11, 383:12, 383:20
**person** [13] - 297:25, 299:5, 311:25, 346:14, 364:1, 366:12, 380:23, 395:5, 402:7, 421:22, 464:22, 466:11, 468:22
**person's** [1] - 374:18
**personal** [21] - 297:15, 297:16, 303:3, 308:1, 331:1, 333:8, 334:14, 351:13, 352:7, 393:23, 394:2, 396:24, 397:11, 415:24, 416:5, 424:23, 425:15, 428:1,

428:8, 428:16, 433:21
**personally** [5] - 296:12, 305:14, 317:13, 321:6, 402:8
**personnel** [10] - 312:12, 371:3, 372:1, 372:3, 374:21, 374:22, 391:1, 402:5, 428:8, 441:21
**perspective** [1] - 395:24
**Petitioner** [1] - 363:1
**Phase** [6] - 292:10, 439:16, 439:25, 440:20, 464:1, 472:21
**phase** [2] - 362:23, 376:13
**phone** [104] - 320:24, 320:25, 321:4, 321:6, 321:10, 321:12, 321:13, 321:19, 321:22, 321:24, 322:19, 322:20, 322:21, 322:23, 323:8, 323:9, 323:18, 323:19, 323:25, 324:9, 324:10, 325:1, 325:2, 325:9, 325:14, 325:15, 325:20, 325:22, 326:10, 326:13, 326:14, 326:23, 327:7, 327:16, 327:25, 328:4, 328:9, 332:7, 332:22, 332:25, 333:5, 333:8, 333:10, 333:13, 333:14, 333:15, 333:21, 334:8, 334:13, 334:14, 334:15, 336:25, 337:15, 337:24, 338:1, 340:8, 340:14, 341:3, 346:25, 348:8, 349:2, 359:12, 359:23, 359:24, 360:1, 360:14, 360:15, 360:17, 360:19, 360:21, 360:22, 360:24, 361:1, 361:3, 361:10, 361:14, 362:15, 367:18, 379:19, 394:15,

402:16, 416:7, 429:4, 429:25, 430:1, 430:3, 430:9, 430:12, 431:17, 431:18, 431:22, 432:6, 433:25, 434:1, 434:2, 434:3, 434:13, 466:7
**phonetic** [1] - 466:12
**phonetic)** [1] - 295:22
**photo** [1] - 375:19
**photographs** [1] - 391:23
**photos** [2] - 330:12, 398:13
**phrased** [1] - 357:20
**physically** [2] - 386:8, 408:13
**physicians** [1] - 397:16
**PI-21** [6] - 306:15, 310:9, 346:17, 347:11, 347:15, 361:18
**pick** [5] - 401:23, 403:23, 421:7, 432:10, 433:21
**picked** [4] - 328:8, 360:24, 401:13, 401:19
**picture** [3] - 314:13, 384:19, 385:6
**pictures** [2] - 330:12, 394:5
**piece** [6] - 310:5, 326:17, 356:23, 363:23, 417:18, 417:21
**pieces** [1] - 424:1
**pile** [1] - 443:1
**place** [8] - 327:20, 361:19, 364:17, 367:25, 383:21, 389:15, 391:21, 437:7
**placed** [7] - 323:19, 332:22, 333:15, 334:4, 334:13, 335:25, 459:8
**plain** [1] - 318:6
**plaint** [1] - 414:16
**plan** [2] - 293:19, 418:9
**planned** [1] - 349:11
**plate** [1] - 369:5
**play** [4] - 419:13, 419:24, 470:17
**plenty** [1] - 302:12
**pline** [1] - 457:3
**plus** [1] - 421:24

**PM-5** [2] - 443:19, 443:21
**PO** [1] - 455:5
**point** [22] - 300:6, 302:22, 317:18, 337:3, 345:23, 360:4, 362:4, 362:5, 378:10, 378:18, 381:21, 389:9, 419:14, 419:15, 420:2, 422:9, 422:13, 433:9, 433:11, 435:16, 450:3, 469:15
**points** [1] - 316:10
**pole** [1] - 435:25
**police** [38] - 319:23, 324:1, 324:19, 340:15, 341:1, 341:8, 360:4, 374:21, 380:11, 384:25, 390:15, 394:25, 395:2, 403:25, 410:11, 416:4, 416:25, 417:14, 420:4, 424:16, 425:2, 427:19, 428:6, 428:17, 428:19, 429:9, 430:5, 431:19, 432:21, 435:21, 435:22, 435:24, 436:15, 464:15, 464:17, 468:24, 469:18
**Police** [22] - 292:6, 352:8, 364:17, 390:14, 391:1, 410:18, 410:19, 410:24, 413:7, 416:20, 427:23, 431:20, 433:5, 433:6, 440:16, 440:17, 453:1, 465:10, 465:11, 468:1, 471:10, 473:6
**policy** [4] - 335:6, 408:24, 427:21, 450:11
**poorly** [1] - 357:20, 432:25
**portion** [2] - 442:16, 442:18
**posit** [2] - 431:2, 435:12
**posited** [1] - 427:25
**position** [9] - 364:21, 395:21, 414:8, 417:23, 418:2, 418:10, 421:17,

428:16, 440:15
**positive** [1] - 351:1
**posses** [1] - 458:13
**possess** [1] - 344:10
**possibility** [3] - 389:20, 395:24, 460:9
**possible** [21] - 301:19, 307:6, 308:23, 373:22, 382:10, 382:14, 382:15, 383:20, 386:7, 386:9, 386:11, 389:8, 389:13, 389:14, 418:7, 418:12, 424:17, 425:20, 426:20, 426:23, 460:10
**possibly** [1] - 390:25
**potential** [1] - 401:22
**potentially** [1] - 347:1
**power** [2] - 295:14, 369:18
**Power** [3] - 369:16, 370:11, 370:14
**practicable** [1] - 473:8
**practice** [5] - 384:8, 389:2, 411:4, 411:6, 427:20
**preferably** [1] - 354:18
**preferential** [1] - 432:22
**preliminary** [1] - 365:15
**premise** [1] - 314:25
**premises** [1] - 381:1
**prepares** [2] - 446:18, 446:19
**preponderance** [2] - 439:20, 439:22
**present** [6] - 366:20, 366:22, 414:2, 442:2, 442:13, 474:5
**Present** [2] - 441:18, 441:25
**presenta** [1] - 432:16
**presented** [8] - 357:16, 369:8, 404:4, 423:13, 432:18, 432:24, 440:23, 441:3
**presenting** [6] - 303:6, 322:13, 423:12, 432:19, 439:18, 445:3
**presents** [2] - 416:6, 460:21
**presiding** [1] - 292:6
**pretty** [5] - 315:3, 397:22, 424:9,

432:13, 434:14
**previous** [3] - 317:22, 317:24, 357:18
**previously** [4] - 294:25, 324:17, 368:14, 466:3
**primary** [1] - 400:14
**Principle** [1] - 451:24, 452:19, 453:22
**principle** [2] - 419:9, 462:12
**printout** [1] - 366:4
**prioritize** [1] - 299:12
**priority** [2] - 364:18, 469:5
**privacy** [3] - 395:11, 395:15, 395:17
**privy** [2] - 356:23, 358:8
**probation** [2] - 388:23, 389:2
**problem** [4] - 313:23, 345:17, 425:8, 469:20
**problems** [2] - 431:15, 471:17
**procedure** [1] - 353:14
**proceed** [4] - 352:18, 356:8, 437:15, 438:13
**proceeded** [2] - 430:13, 431:5
**proceeding** [3] - 292:11, 468:20, 469:2
**proceedings** [3] - 439:17, 439:25, 465:1
**PROCEEDINGS** [1] - 473:11
**process** [6] - 316:4, 319:10, 353:13, 360:3, 383:7, 383:8
**produced** [2] - 444:7, 444:23
**productive** [1] - 467:25
**profes** [1] - 428:16
**professional** [1] - 434:24
**professionalism** [1] - 450:12
**program** [2] - 344:17, 384:19
**promptly** [2] - 451:6, 462:18
**proper** [2] - 334:24, 335:1
**prostitute** [1] - 353:9

**protect** [1] - 364:6
**protective** [1] - 324:19
**protocol** [2] - 435:5, 435:9
**prove** [3] - 417:12, 417:17, 423:10
**provide** [3] - 297:23, 336:11, 412:17
**provided** [10] - 318:11, 322:24, 328:16, 337:18, 337:19, 349:4, 428:7, 442:19, 454:5, 473:7
**provides** [1] - 419:19
**providing** [1] - 348:11
**proximity** [1] - 392:11
**public** [1] - 457:14
**pull** [9] - 307:14, 307:17, 309:11, 341:24, 342:5, 353:11, 357:4, 364:10, 385:6
**pulled** [9] - 324:5, 324:7, 352:23, 362:16, 375:19, 417:14, 418:6, 428:22, 431:13
**pulling** [2] - 307:18, 430:16
**pulls** [1] - 431:10
**purpose** [7] - 303:1, 303:2, 304:19, 315:13, 335:11, 378:13, 425:12
**purposefully** [2] - 344:8, 344:12
**purposely** [1] - 310:10
**purposes** [1] - 439:8
**pursuit** [1] - 455:10
**pushed** [1] - 395:18
**put** [9] - 304:2, 324:3, 364:12, 367:24, 392:8, 398:21, 466:4, 466:23, 469:2
**puts** [1] - 430:17
**putting** [1] - 379:10

## Q

**qualified** [1] - 329:15
**quarrel** [2] - 410:25, 463:6
**quarters** [1] - 359:20
**quently** [1] - 332:4
**ques** [1] - 313:5
**questioned** [3] - 346:17, 347:12, 361:17
**questioning** [3] -

313:19, 314:25, 402:6
**questions** [22] - 300:5, 335:18, 339:6, 346:14, 349:16, 350:18, 352:12, 352:19, 356:8, 356:11, 357:2, 357:8, 358:12, 381:4, 388:18, 396:7, 409:11, 421:19, 424:13, 426:9, 463:23, 467:5
**quick** [6] - 307:20, 309:13, 418:5, 418:12, 429:20, 455:8
**quickly** [1] - 418:6
**quite** [14] - 319:6, 339:14, 383:18, 385:5, 385:14, 385:16, 389:7, 393:16, 401:6, 426:14, 434:15, 434:16, 454:19, 467:12
**quote** [1] - 410:7
**quotes** [1] - 466:4

## R

**race** [1] - 372:6
**radio** [8] - 367:1, 367:18, 386:11, 412:24, 428:24, 453:2, 453:18
**raised** [2] - 432:16, 470:9
**raising** [1] - 315:15
**ran** [1] - 364:8
**range** [1] - 370:8
**rare** [1] - 386:15
**rate** [1] - 422:1
**raw** [1] - 425:6
**rays** [2] - 392:22, 397:21
**razor** [1] - 423:17
**re** [2] - 316:21, 317:3
**re-ask** [2] - 316:21, 317:3
**reach** [1] - 302:6
**reached** [1] - 336:25
**reaching** [2] - 470:24, 470:25
**read** [19] - 300:13, 300:23, 302:6, 315:3, 318:20, 318:22, 331:13, 331:17, 332:1, 347:10, 347:20,

403:15, 403:19, 406:21, 422:13, 445:15, 453:24, 454:7, 456:25
**reading** [1] - 438:20
**ready** [5] - 341:16, 352:17, 371:18, 408:25, 433:18
**reality** [1] - 418:22
**realize** [1] - 430:11
**realizes** [2] - 431:15, 433:18
**really** [6] - 362:13, 364:5, 364:15, 385:4, 424:7, 467:1
**rear** [1] - 452:19
**reason** [24] - 296:6, 297:24, 300:18, 301:22, 303:12, 304:21, 308:9, 314:6, 320:25, 365:17, 369:4, 374:5, 384:23, 386:22, 387:1, 387:4, 387:18, 388:10, 388:12, 388:13, 414:21, 417:15, 422:9, 422:10
**reasonable** [1] - 427:1
**reasons** [7] - 297:14, 302:12, 308:24, 309:8, 422:8, 449:9, 454:22
**rebut** [1] - 425:23
**rebuttal** [1] - 363:3
**receive** [2] - 455:13, 462:23
**received** [15] - 327:14, 350:22, 351:3, 398:20, 404:10, 416:8, 437:23, 442:22, 449:25, 451:19, 452:11, 453:4, 455:11, 463:2, 463:18
**recognize** [2] - 295:18, 315:11
**recognized** [1] - 313:20
**recollection** [10] - 319:20, 320:5, 320:6, 339:16, 399:6, 399:9, 435:1, 447:15, 460:2, 460:23
**recommendation** [1] - 445:13
**reconvene** [1] - 439:10

**record** [21] - 323:18, 325:1, 331:22, 336:23, 352:16, 373:12, 388:4, 390:11, 425:17, 426:5, 438:3, 438:7, 438:20, 438:22, 439:11, 440:13, 449:20, 454:19, 456:15, 458:19, 464:11
**recorded** [4] - 334:5, 338:9, 339:20, 474:7
**records** [12] - 321:20, 325:9, 326:10, 326:21, 332:25, 333:1, 359:23, 359:25, 360:15, 360:21, 416:7, 434:1
**recover** [1] - 369:4
**recovered** [2] - 343:5, 369:2
**RECROSS** [1] - 388:19
**RECROSS-EXAMINATION** [1] - 388:19
**red** [1] - 454:17
**redirect** [4] - 352:13, 352:18, 356:8, 463:21
**REDIRECT** [3] - 356:10, 386:6, 471:8
**refer** [1] - 300:8
**reference** [1] - 357:23
**referenced** [3] - 360:15, 360:21, 473:5
**referencing** [6] - 297:4, 332:23, 338:17, 338:22, 452:18, 453:22
**referred** [1] - 450:5
**referring** [12] - 306:15, 310:4, 335:8, 335:9, 339:8, 342:16, 342:17, 345:22, 371:9, 373:13, 373:18, 399:15
**reflect** [1] - 366:6
**reflected** [2] - 383:2, 410:9
**reflecting** [1] - 369:23
**refused** [1] - 383:6
**regard** [3] - 340:20, 456:18, 462:3
**regarding** [27] - 296:9, 296:16, 297:19, 303:2, 313:14, 330:16, 330:17,

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 798 of 805   Document 80-21

338:9, 339:13,
341:12, 342:2,
345:16, 349:1,
375:5, 375:13,
401:23, 402:10,
404:21, 406:20,
418:2, 424:13,
441:11, 445:5,
451:11, 465:18,
465:19, 466:5
**regular** [2] - 310:7,
311:1
**regularly** [5] - 296:6,
296:10, 296:11,
299:1, 354:9
**regulation** [1] - 449:3
**rehash** [1] - 338:12
**reiterate** [1] - 318:8
**reiterated** [1] - 301:24
**relate** [10] - 366:12,
369:17, 376:9,
404:17, 404:23,
406:23, 441:13,
442:18, 443:8, 458:6
**related** [3] - 301:16,
356:16, 367:5
**relates** [11] - 304:17,
404:18, 448:4,
449:14, 450:11,
451:14, 453:24,
457:16, 457:17,
458:4, 458:13
**relating** [4] - 375:2,
386:14, 451:3,
451:24
**relation** [7] - 363:23,
372:8, 374:6,
374:10, 375:16,
443:24, 448:2
**relatively** [1] - 414:13
**relatives** [3] - 394:13,
398:1, 398:2
**released** [2] - 336:13,
415:3
**relevance** [2] - 318:8,
346:7
**relevant** [1] - 424:6
**relieved** [1] - 392:13
**remain** [2] - 311:22,
312:21
**remains** [1] - 422:13
**remember** [22] -
303:4, 309:16,
313:12, 335:24,
339:4, 339:9,
339:19, 359:21,
360:24, 362:8,
362:10, 362:11,
362:12, 362:17,
374:2, 374:11,

384:23, 394:16,
398:3, 453:19,
460:23
**render** [2] - 451:5,
462:18
**renew** [1] - 329:25
**repeat** [3] - 341:14,
343:24, 364:25
**repeatedly** [1] - 432:6
**rephrase** [1] - 318:18
**report** [71] - 304:20,
311:23, 312:1,
312:4, 312:6,
312:17, 312:23,
313:9, 313:21,
314:3, 315:3, 319:2,
332:1, 332:8,
336:18, 338:19,
340:12, 344:6,
345:23, 346:1,
347:5, 350:8,
350:10, 350:11,
350:13, 351:6,
357:20, 357:23,
358:2, 358:8,
361:14, 375:10,
378:24, 379:6,
379:10, 379:13,
382:11, 383:11,
383:14, 387:25,
388:10, 388:12,
388:13, 388:14,
397:12, 398:16,
398:21, 403:7,
404:12, 407:8,
408:16, 408:21,
409:17, 409:20,
410:3, 410:5, 410:9,
411:10, 413:15,
419:22, 424:19,
427:10, 429:14,
433:11, 436:9,
436:10, 436:16,
441:10, 456:24,
458:15, 473:4
**reported** [15] - 343:13,
381:11, 387:21,
388:9, 388:11,
401:12, 408:1,
419:22, 420:16,
423:5, 424:14,
426:15, 427:22,
429:2, 433:7
**Reporter** [1] - 474:18
**reporter** [2] - 318:20,
474:5
**reporting** [1] - 379:9,
423:4, 446:9
**reports** [18] - 302:7,
304:6, 312:9,

312:12, 313:18,
341:21, 342:12,
349:17, 375:5,
382:13, 383:17,
392:18, 396:17,
428:6, 428:20,
429:9, 432:11, 433:9
**represent** [1] - 446:9
**representation** [1] -
327:7
**representative** [7] -
332:2, 339:5,
347:19, 347:21,
361:17, 424:24,
440:20
**reprimand** [2] -
449:25, 450:9
**requested** [2] -
300:19, 428:5
**require** [2] - 294:11,
374:24
**required** [1] - 417:25
**requirement** [1] -
453:24
**requires** [3] - 423:12,
423:23, 472:9
**reread** [1] - 331:22
**rescinded** [1] - 461:19
**residence** [2] - 352:7,
429:15
**resonate** [1] - 468:8
**respect** [3] - 450:2,
468:4, 468:14
**respectfully** [2] -
426:13, 426:25
**respon** [1] - 350:10
**respond** [5] - 310:20,
311:4, 312:14,
445:19, 453:18
**responded** [11] -
310:16, 311:8,
365:11, 365:14,
366:10, 381:7,
401:4, 401:11,
401:13, 406:16,
423:9
**responding** [7] -
309:3, 311:13,
311:15, 313:22,
344:14, 413:1, 449:8
**responds** [2] - 311:25,
312:5, 384:14
**response** [5] - 357:3,
381:8, 386:12,
391:4, 403:22
**Response** [4] -
337:22, 442:24,
445:15, 459:6
**responses** [2] -
350:19, 419:25,

436:18, 436:22
**responsibility** [2] -
298:10, 299:24
**responsible** [7] -
305:2, 313:4, 350:8,
374:19, 374:21,
400:17, 460:16
**responsive** [3] -
298:13, 341:18,
348:25
**rest** [3] - 413:20,
467:12, 472:5
**restate** [3] - 305:18,
346:20, 369:22
**rested** [1] - 362:23
**restrain** [1] - 341:13
**restraining** [1] -
313:24
**restrict** [1] - 341:6
**rests** [2] - 363:1,
463:25
**result** [3] - 361:1,
436:25, 456:6
**resulted** [1] - 389:18
**results** [1] - 449:18
**reswear** [1] - 363:6
**retain** [1] - 398:22
**retalia** [1] - 313:15
**retaliation** [2] - 318:3,
424:12
**retract** [2] - 425:19,
446:11
**retrieve** [4] - 300:8,
300:18, 357:24,
378:8
**retrieving** [1] - 300:14
**return** [4] - 300:21,
305:22, 357:11,
456:7
**returned** [3] - 303:16,
348:6, 356:19
**returning** [1] - 457:25
**reunited** [1] - 432:13
**revealed** [1] - 305:7
**reversed** [1] - 461:16
**Review** [2] - 441:8,
443:20
**review** [11] - 297:15,
327:3, 371:2, 372:8,
396:17, 403:6,
441:11, 450:11,
450:22, 462:5
**reviewed** [14] - 316:1,
347:5, 351:5,
370:22, 443:9,
443:12, 443:24,
444:1, 444:16,
445:20, 445:22,
446:6, 446:8, 446:12
**Reviewed/**

**Discussed** [1] -
442:16
**reviewing** [2] - 303:8,
383:11
**riddled** [1] - 436:11
**ride** [1] - 394:5
**rig** [1] - 392:13
**rights** [1] - 457:17
**rigs** [2] - 391:17,
392:8
**Riley** [6] - 311:21,
312:20, 313:1,
337:10, 401:15
**rings** [1] - 431:18
**risk** [1] - 422:20
**roadway** [1] - 435:23
**robberies** [2] - 465:15,
466:6
**rode** [7] - 356:22,
391:6, 391:18,
391:20, 391:23,
391:24, 401:20
**role** [3] - 385:16,
442:10, 442:11
**roll** [1] - 372:24
**room** [16] - 358:7,
392:9, 392:10,
393:1, 393:21,
394:1, 394:7, 394:8,
394:11, 394:13,
394:15, 395:8,
395:17, 395:25,
398:1, 432:11
**rooms** [4] - 392:22,
392:24, 392:25,
393:3
**roster** [1] - 384:21
**rough** [2] - 428:10,
428:12
**roughly** [1] - 372:18
**route** [9] - 386:12,
405:21, 405:25,
407:20, 411:19,
411:23, 412:2,
412:4, 412:11
**Rudolph** [1] - 292:5
**rule** [11] - 419:8,
426:19, 436:17,
436:19, 437:11,
444:24, 449:3,
462:7, 462:11,
465:4, 473:5
**Rule** [1] - 473:6
**rules** [4] - 414:14,
427:5, 427:9, 448:19
**rumors** [3] - 319:2,
340:25, 436:11
**run** [2] - 369:15,
435:25

# S

**sacrifice** [1] - 422:21
**sad** [1] - 466:20
**safe** [9] - 307:16, 308:10, 308:11, 309:10, 363:8, 419:5, 454:1, 470:3, 473:2
**safety** [10] - 297:16, 324:18, 324:20, 418:20, 418:21, 419:1, 419:4, 419:6, 454:4, 470:3
**Saint** [1] - 381:7
**sake** [1] - 367:10
**salient** [1] - 304:9
**sation** [2] - 368:15, 433:17
**satisfied** [1] - 439:24
**save** [1] - 385:23
**saw** [15] - 297:10, 307:21, 312:1, 312:6, 345:22, 346:1, 347:11, 347:14, 347:16, 347:17, 347:25, 358:20, 358:25, 371:23, 470:13
**scene** [68] - 298:11, 310:16, 310:20, 311:8, 311:14, 311:17, 311:22, 311:24, 311:25, 312:3, 312:5, 312:18, 312:21, 313:3, 314:3, 318:25, 319:21, 320:14, 321:9, 328:23, 353:22, 362:12, 363:25, 365:14, 366:6, 368:19, 374:20, 374:22, 376:12, 379:16, 381:11, 381:16, 383:24, 391:7, 391:8, 391:9, 391:13, 391:22, 391:23, 392:3, 393:6, 393:8, 393:10, 396:25, 400:19, 401:11, 402:15, 404:23, 405:21, 407:21, 408:1, 408:15, 408:17, 409:4, 409:6, 412:2, 412:3, 412:23, 413:3, 416:19, 416:21, 416:25, 431:24,
432:2, 433:8, 434:10, 465:21
**scenes** [5] - 309:6, 411:3, 411:4, 464:23, 465:14
**school** [1] - 356:5
**se** [1] - 416:2
**Sean** [5] - 332:3, 333:11, 340:7, 433:15, 434:17
**SEAN** [1] - 363:10
**search** [16] - 292:21, 293:13, 293:20, 299:8, 299:13, 300:4, 304:3, 305:8, 317:24, 368:8, 368:22, 369:2, 387:14, 414:22, 429:16, 466:14
**searched** [5] - 303:21, 304:16, 305:1, 305:4, 355:19
**searches** [1] - 431:17
**seat** [2] - 310:12, 454:3
**second** [24] - 299:22, 300:22, 305:22, 306:4, 307:14, 326:7, 333:19, 334:12, 355:1, 355:6, 357:12, 387:6, 403:12, 405:24, 406:10, 408:10, 429:15, 429:23, 434:2, 439:5, 450:10, 450:23, 472:14, 472:16
**seconds** [1] - 408:8
**secret** [1] - 428:9
**Section** [1] - 463:17
**section** [3] - 349:19, 450:16, 463:17
**secured** [1] - 373:6
**see** [65] - 293:20, 295:18, 297:7, 299:13, 300:11, 314:6, 314:14, 314:16, 315:9, 315:10, 319:4, 321:1, 322:16, 323:2, 323:16, 325:12, 325:18, 326:7, 329:13, 330:20, 331:11, 332:7, 333:3, 334:20, 335:4, 335:16, 340:13, 343:1, 343:3, 343:21, 348:24,
359:12, 359:13, 365:20, 365:22, 368:20, 371:5, 371:7, 371:24, 373:10, 376:19, 377:24, 382:12, 386:9, 387:14, 394:11, 395:13, 404:5, 406:12, 414:22, 417:1, 418:5, 435:21, 435:22, 435:24, 436:9, 441:19, 442:16, 444:20, 446:3, 450:17, 451:9, 455:5, 465:20, 465:21
**seeing** [5] - 374:1, 374:3, 375:19, 384:16, 385:9
**seek** [2] - 313:2, 378:18
**seem** [3] - 317:18, 377:2, 383:11
**sees** [1] - 430:16
**segue** [1] - 350:17
**self** [3] - 353:21, 429:6, 447:7
**Self** [1] - 447:2
**self-inflicted** [1] - 429:6
**self-interest** [1] - 447:7
**selves** [1] - 459:5
**send** [3] - 368:23, 389:2, 409:7
**sending** [5] - 350:23, 350:25, 404:18, 437:8, 437:9
**senior** [1] - 469:9
**sense** [19] - 341:2, 341:11, 364:5, 364:13, 364:15, 371:17, 418:22, 422:22, 423:15, 424:20, 426:7, 434:12, 434:19, 434:20, 435:3, 435:6, 436:1, 436:5, 437:11
**sensitive** [1] - 415:1
**sent** [5] - 364:2, 405:2, 408:3, 408:5, 408:20
**sentation** [1] - 419:5
**sentence** [3] - 305:25, 357:8, 403:12
**separate** [2] - 306:18, 391:16
**separated** [1] - 392:12
**September** [2] -
409:17, 436:10
**sergeant** [16] - 295:2, 295:5, 295:11, 295:15, 295:17, 296:6, 296:11, 297:5, 298:21, 312:19, 372:12, 372:24, 374:15, 380:25, 400:11, 431:20
**Sergeant** [28] - 300:19, 302:22, 303:7, 303:10, 311:20, 313:1, 314:15, 328:4, 337:10, 347:19, 360:16, 371:8, 372:19, 374:1, 374:3, 374:9, 376:8, 376:11, 383:12, 383:20, 401:15, 416:18, 416:19, 423:7, 431:16, 431:18
**sergeant's** [1] - 445:12
**sergeants** [8] - 295:20, 295:24, 296:2, 296:12, 372:11, 380:23, 402:3
**series** [2] - 335:18, 349:16
**serious** [2] - 447:24, 457:21
**seriously** [5] - 379:1, 422:19, 450:15, 457:8, 458:20
**serve** [2] - 465:9, 465:10
**served** [3] - 297:5, 346:17, 347:15
**service** [6] - 415:12, 448:14, 451:5, 451:7, 468:5, 472:9
**services** [1] - 462:18
**serving** [1] - 292:7
**session** [14] - 438:14, 438:21, 438:23, 438:25, 439:2, 439:8, 439:14, 439:16, 467:11, 472:8, 472:12, 472:17, 472:18, 472:20
**set** [7] - 395:11, 395:15, 419:11, 419:19, 419:20, 427:10, 447:19
**seven** [4] - 334:16,
361:1, 434:3, 436:6
**Seven** [1] - 365:4
**seven-minute** [3] - 361:1, 434:3, 436:6
**several** [7] - 309:7, 332:4, 401:13, 411:11, 413:2, 436:8, 458:11
**severe** [3] - 434:7, 434:21, 437:7
**sex** [1] - 372:6
**sexual** [12] - 314:10, 315:17, 317:8, 317:11, 375:5, 376:1, 388:11, 423:4, 424:14, 424:19, 428:10, 469:14
**sexually** [5] - 313:23, 314:8, 314:19, 387:22, 469:17
**shall** [4] - 451:5, 451:7, 453:25, 456:22
**Shannon** [69] - 292:4, 297:1, 297:4, 375:12, 375:22, 382:16, 391:11, 394:12, 396:25, 397:17, 402:9, 409:21, 415:23, 417:11, 417:17, 418:19, 420:16, 421:1, 422:25, 424:22, 426:4, 427:15, 428:3, 428:4, 428:5, 428:6, 428:13, 428:21, 429:3, 429:24, 430:3, 430:7, 430:10, 430:12, 430:16, 430:24, 430:25, 431:7, 431:20, 432:21, 433:2, 433:14, 433:16, 433:17, 434:4, 434:6, 434:11, 434:18, 434:20, 435:2, 436:5, 436:12, 436:20, 439:21, 460:24, 461:7, 463:2, 464:2, 464:18, 464:20, 465:3, 465:4, 465:9, 466:5, 467:13, 467:16, 472:22
**Shannon's** [1] - 435:11
**Shawn** [2] - 339:5,

347:21
**Shepherd** [1] - 442:5
**Shift** [11] - 369:15, 369:16, 369:18, 369:20, 370:2, 370:3, 370:11, 370:16, 383:15
**shift** [14] - 295:12, 295:13, 295:14, 312:7, 354:19, 369:23, 381:22, 386:23, 387:2, 387:6, 387:7, 416:3, 429:12
**Shifts** [1] - 370:14
**shifts** [2] - 294:19, 370:6
**shirt** [1] - 394:20
**shocked** [3] - 347:9, 379:7
**shoes** [1] - 466:23
**shook** [1] - 331:23
**shooting** [27] - 300:15, 301:5, 342:18, 356:11, 356:12, 356:15, 363:18, 364:15, 364:18, 364:22, 365:5, 366:4, 369:1, 373:5, 374:12, 377:7, 381:8, 383:2, 383:21, 384:12, 388:20, 389:6, 415:2, 428:25, 429:1, 429:17, 466:8
**shootings** [4] - 374:13, 389:5, 465:15, 466:6
**Shorewood** [7] - 351:25, 352:4, 352:8, 360:3, 413:7, 431:12, 433:5
**short** [5] - 304:16, 307:11, 352:13, 354:22, 435:17
**short-handed** [1] - 354:22
**shorthand** [3] - 355:22, 474:7, 474:9
**shortly** [3] - 305:5, 305:8, 375:21
**shot** [6] - 300:15, 301:10, 301:21, 355:14, 364:1, 466:15
**show** [9] - 313:19, 338:19, 342:13, 382:6, 382:11, 383:23, 411:3, 421:25, 432:20

**showed** [4] - 365:3, 373:7, 393:25, 416:25
**shows** [3] - 373:10, 382:6, 459:13
**shuffle** [1] - 379:24
**sible** [1] - 350:11
**sic** [1] - 437:7
**side** [7] - 310:2, 320:17, 320:19, 321:3, 414:10, 420:2, 420:23
**sideration** [1] - 426:25
**sidered** [1] - 449:21
**sides** [2] - 315:12, 362:22
**sight** [1] - 469:8
**significant** [7] - 448:18, 450:13, 453:19, 454:11, 456:4, 456:15, 460:13
**similar** [3] - 377:8, 444:25, 451:18
**simple** [10] - 309:11, 311:12, 329:21, 343:19, 344:2, 414:9, 423:16, 423:17, 423:21
**simply** [3] - 308:3, 308:9, 412:4
**single** [4] - 303:2, 312:3, 312:17, 401:3
**sion** [1] - 458:14
**sional** [1] - 428:17
**siren** [7] - 342:9, 358:17, 359:5, 418:25, 430:18
**sirens** [3] - 308:19, 309:1, 435:10
**sit** [5] - 332:11, 339:2, 339:25, 379:12, 470:7
**sitting** [4] - 380:23, 435:18, 440:7, 466:24
**situation** [12] - 302:8, 305:21, 309:3, 318:4, 346:19, 395:8, 418:24, 419:2, 431:11, 431:16, 432:25, 453:13
**situations** [1] - 421:12
**six** [8] - 323:23, 336:6, 336:9, 352:2, 352:5, 352:6, 410:24, 443:5
**size** [1] - 330:11
**slammed** [1] - 430:21
**sleep** [1] - 337:3,

349:15
**sliding** [3] - 395:11, 395:18, 395:20
**slow** [1] - 308:3
**slowed** [1] - 342:6
**slowing** [1] - 308:9
**small** [1] - 432:8
**Smith** [6] - 328:4, 360:16, 431:16, 431:18, 431:22, 432:18
**snow** [1] - 399:10
**snowing** [1] - 399:7
**sobriety** [2] - 416:22, 431:14
**sole** [1] - 425:11
**solved** [2] - 465:23
**someone** [16] - 304:4, 308:2, 308:13, 313:8, 328:5, 329:11, 337:13, 376:9, 384:16, 385:1, 394:24, 395:2, 397:9, 424:14, 455:4, 455:13
**sometimes** [5] - 353:18, 353:21, 353:22, 386:16, 462:22
**somewhat** [3] - 414:9, 416:18, 459:13
**somewhere** [4] - 323:14, 356:13, 398:23, 411:24
**son** [49] - 313:8, 313:15, 315:4, 315:5, 319:1, 319:14, 320:15, 320:24, 322:24, 323:9, 323:19, 324:11, 324:18, 326:2, 337:11, 337:14, 340:14, 340:16, 340:20, 341:4, 341:7, 351:16, 352:23, 356:3, 360:2, 360:4, 362:15, 394:14, 398:3, 401:14, 401:19, 401:24, 402:10, 402:17, 402:21, 403:18, 410:7, 416:9, 416:11, 416:16, 418:5, 418:11, 421:7, 423:20, 429:25, 434:14, 468:11, 470:8
**son's** [8] - 321:22,

322:2, 325:8, 325:15, 325:20, 326:10, 326:23, 328:1
**sons** [1] - 470:15
**soon** [3] - 418:7, 430:11, 473:7
**SOP** [2] - 311:25, 419:7
**SOPs** [1] - 345:15
**sorry** [6] - 341:7, 350:17, 357:19, 367:22, 382:1, 437:17
**sort** [8] - 320:19, 343:17, 350:18, 365:17, 424:23, 433:22, 436:13, 451:18
**sorts** [2] - 405:16, 422:2
**sounds** [2] - 316:9, 432:7
**south** [3] - 343:1, 353:4, 353:5
**speaking** [2] - 363:21, 374:14
**speaks** [1] - 448:23
**special** [1] - 310:25
**specific** [8] - 366:12, 369:17, 402:7, 405:10, 450:13, 453:5, 454:20, 462:11
**specifica** [1] - 442:20
**specifically** [17] - 312:19, 338:3, 338:20, 364:4, 365:1, 365:22, 376:9, 395:10, 400:23, 401:21, 404:17, 405:12, 443:20, 448:5, 449:14, 451:14, 454:12
**specification** [1] - 443:11
**specifications** [1] - 443:21
**specified** [1] - 336:22
**Specs** [1] - 443:8
**specs** [1] - 414:15
**speculate** [10] - 294:12, 294:14, 302:16, 302:21, 328:7, 328:13, 328:14, 344:10, 345:2, 349:6
**speculation** [3] - 345:13, 348:13,

349:6
**speed** [4] - 339:13, 340:10, 422:1, 455:22
**speeding** [1] - 435:4
**spell** [4] - 390:10, 402:18, 440:13, 464:10
**spent** [1] - 359:23
**spinning** [1] - 317:19
**split** [1] - 376:13
**spontaneously** [1] - 386:19
**spot** [1] - 405:22
**spots** [2] - 342:17, 342:22
**Squad** [5] - 366:10, 372:14, 401:16, 406:15, 406:17
**squad** [47] - 366:14, 366:17, 367:10, 367:13, 368:2, 371:23, 381:21, 381:24, 381:25, 382:11, 382:18, 383:9, 383:12, 383:16, 386:16, 386:23, 387:1, 387:3, 387:5, 387:6, 387:7, 391:9, 401:10, 401:17, 404:11, 404:19, 404:25, 407:12, 408:6, 412:25, 429:24, 430:13, 430:17, 430:19, 431:3, 431:4, 447:23, 447:25, 449:7, 449:11, 453:21, 454:15, 455:20, 455:23, 455:24, 455:25
**St** [2] - 365:3, 365:7
**Stacey** [1] - 321:12, 327:23, 362:15, 405:1, 405:4, 406:15, 432:10
**Stacey's** [1] - 405:13
**staff** [2] - 397:16, 460:22
**stand** [4] - 292:13, 341:17, 468:8, 473:9
**standards** [4] - 370:6, 438:15, 438:16, 439:23
**standing** [5] - 347:18, 347:22, 408:1, 415:23, 467:22
**stark** [2] - 343:12, 344:2

Case 2:16-cv-01089-WED   Filed 04/22/19   Page 801 of 805   Document 80-21

**start** [4] - 330:9, 370:5, 370:14, 441:3
**started** [5] - 371:8, 371:11, 371:15, 401:14, 402:5
**starting** [1] - 403:10
**starts** [2] - 422:7, 462:13
**STATE** [1] - 474:1
**state** [9] - 334:24, 335:1, 390:10, 393:22, 417:17, 418:9, 422:16, 440:13, 464:10
**statement** [31] - 299:11, 305:20, 324:4, 331:9, 338:1, 338:5, 338:7, 340:18, 340:20, 341:25, 342:14, 342:16, 343:6, 344:24, 345:10, 347:15, 349:7, 410:5, 410:6, 410:11, 414:2, 414:19, 417:21, 418:4, 420:12, 426:17, 434:17, 434:19, 441:23, 455:9, 456:11
**statements** [35] - 303:19, 306:14, 306:15, 311:20, 311:21, 312:20, 313:3, 313:14, 315:2, 315:3, 315:12, 331:8, 337:23, 338:1, 338:8, 338:17, 338:21, 338:24, 339:2, 339:8, 339:9, 346:24, 349:2, 350:13, 364:12, 364:14, 401:22, 402:9, 410:3, 420:17, 421:6, 424:23, 436:6, 437:10, 457:10
**states** [4] - 325:5, 325:10, 406:14, 425:9
**States** [1] - 462:25
**stating** [5] - 303:13, 310:9, 323:18, 337:10, 406:19
**station** [3] - 296:24, 297:9, 403:25
**stationed** [2] - 378:1
**status** [1] - 409:10
**stay** [1] - 427:16

**stayed** [3] - 392:20, 393:8, 416:25
**stenographic** [1] - 474:5
**step** [2] - 294:25, 417:22
**STEVEN** [2] - 390:5, 390:12
**Steven** [1] - 390:12
**still** [22] - 292:10, 292:13, 296:24, 297:3, 303:17, 317:17, 330:15, 359:3, 373:15, 383:3, 383:24, 388:23, 395:14, 412:12, 414:10, 419:7, 420:14, 448:11, 467:17, 467:25, 470:22
**stipulating** [1] - 322:7
**stipulation** [1] - 428:2
**stop** [13] - 299:18, 314:23, 321:2, 328:8, 337:11, 341:6, 348:25, 352:4, 430:6, 432:24, 433:6, 435:8, 436:13
**stopped** [12] - 324:1, 324:12, 324:22, 340:15, 341:8, 351:24, 352:7, 360:3, 364:9, 382:12, 416:11, 430:4
**store** [1] - 359:12
**story** [15] - 302:14, 313:14, 346:12, 365:11, 365:15, 374:19, 419:14, 420:1, 420:6, 420:8, 420:23, 421:16, 422:7, 423:21, 426:6
**straightforward** [2] - 414:13, 424:9
**Street** [5] - 306:24, 358:13, 358:14, 359:13, 432:3
**street** [4] - 362:16, 380:23, 413:16, 469:16
**streets** [3] - 309:6, 418:24, 470:3
**strike** [1] - 345:20
**Strike** [6] - 308:23, 312:2, 329:3, 366:19, 371:2, 458:5
**striking** [1] - 300:17
**strong** [1] - 425:3

**stuck** [1] - 417:7
**stuff** [1] - 362:7
**stumbled** [1] - 405:17
**stuttering** [1] - 339:23
**subject** [9] - 345:25, 346:7, 346:9, 347:1, 347:7, 422:16, 466:10, 466:13, 466:15
**submit** [3] - 419:20, 426:13, 427:1
**submitted** [4] - 306:18, 306:19, 407:3, 436:18
**subpoena** [1] - 464:25
**subse** [1] - 332:3
**subsequently** [1] - 347:11
**substantiated** [2] - 425:17, 436:14
**Subway** [1] - 342:24
**sudden** [3] - 307:20, 418:25, 435:25
**suddenly** [3] - 309:1, 386:24, 387:2
**suffered** [2] - 434:7, 469:14
**suffering** [3] - 317:7, 434:21, 470:23
**sufficient** [1] - 420:4
**suggesting** [2] - 301:23, 425:4
**suggestions** [2] - 319:23, 447:5
**suggests** [2] - 425:8
**suit** [5] - 394:23, 399:13, 399:20, 399:23, 399:24
**suits** [1] - 399:22
**sum** [2] - 311:11, 414:7
**summarizes** [2] - 442:24, 445:12
**Summary** [2] - 441:8, 443:20
**summary** [10] - 338:7, 349:25, 350:1, 402:25, 403:3, 406:8, 407:9, 442:3, 444:17, 444:19
**Sunday** [1] - 354:17
**super** [1] - 380:12
**superior** [1] - 471:15
**supervised** [3] - 380:16, 396:20, 396:21
**supervision** [4] - 312:8, 312:11, 314:1, 344:20
**supervisor** [20] -

297:25, 298:9, 298:20, 299:20, 302:5, 348:22, 376:14, 379:6, 379:23, 379:25, 380:3, 380:5, 390:23, 397:10, 415:18, 433:19, 435:6, 436:7, 450:1, 450:12
**supervisors** [4] - 298:6, 298:17, 380:15, 400:24
**supervisory** [1] - 372:3
**support** [4] - 416:7, 425:5, 458:6, 458:10
**support/comfort** [1] - 415:25
**supported** [1] - 426:7
**supporting** [2] - 416:17, 425:1
**supports** [1] - 427:8
**suppose** [1] - 346:2
**supposed** [11] - 298:17, 312:5, 316:14, 376:18, 409:5, 412:16, 453:9, 453:10, 453:16, 455:24
**surmise** [1] - 345:2
**surrounding** [2] - 338:24, 350:5
**SUSAN** [2] - 474:4, 474:17
**suspect** [1] - 466:8
**suspended** [3] - 430:22, 461:8, 461:22
**suspension** [13] - 451:13, 453:4, 461:12, 461:13, 461:14, 461:16, 461:18, 461:20, 462:2, 462:6, 462:17, 472:24, 473:1
**sustain** [3] - 317:25, 345:19, 439:19
**sustained** [7] - 437:14, 444:8, 444:9, 450:9, 465:5, 467:23, 472:23
**swear** [1] - 363:9
**swelling** [2] - 330:8, 330:10
**switch** [3] - 308:16, 309:24, 310:8
**sworn** [10] - 363:10, 363:13, 390:6,

390:8, 400:7, 400:9, 440:4, 440:6, 464:4, 464:8
**symptoms** [1] - 434:22
**synopsis** [2] - 337:7, 338:3

---

## T

**TAC** [21] - 310:15, 310:19, 310:24, 311:1, 311:7, 311:13, 311:16, 313:10, 313:19, 313:20, 313:23, 314:2, 314:20, 318:2, 318:24, 362:6, 375:19, 401:10, 401:17, 423:8, 466:14
**tactic** [1] - 424:7
**Tactical** [3] - 384:16, 385:1, 401:16
**tape** [2] - 303:5, 347:10
**tapping** [1] - 358:21
**TAYLOR** [2] - 474:4, 474:17
**teamed** [1] - 297:1
**telephone** [7] - 352:22, 360:8, 360:17, 378:22, 379:11, 379:14, 403:17
**temporary** [1] - 313:24
**ten** [6] - 294:13, 314:19, 394:9, 460:8, 460:11, 473:5
**ten-day** [1] - 473:5
**ten-minute** [1] - 460:11
**term** [1] - 412:3
**terminate** [1] - 420:25
**terms** [8] - 299:6, 329:13, 366:7, 373:3, 440:20, 449:20, 450:20, 455:15
**terrible** [1] - 317:11
**tested** [1] - 351:12
**testi** [1] - 357:1, 431:1, 432:7
**testified** [50] - 301:17, 303:7, 310:15, 310:22, 317:5, 319:14, 324:17, 329:5, 330:18, 349:21, 350:7,

351:16, 359:4,
360:2, 363:12,
363:15, 366:25,
386:7, 390:7,
397:15, 400:8,
400:11, 403:7,
410:2, 411:2,
417:10, 426:2,
440:5, 464:6, 468:21
**testify** [4] - 313:13,
371:22, 398:9,
398:12
**testifying** [4] - 316:8,
343:14, 383:19,
396:18
**testimony** [62] - 295:1,
295:3, 296:17,
297:13, 301:12,
303:10, 307:4,
309:17, 309:20,
310:16, 310:18,
312:3, 313:16,
313:17, 317:9,
317:22, 318:2,
318:5, 318:11,
318:15, 318:17,
319:20, 319:25,
320:18, 328:2,
328:4, 328:15,
330:17, 332:11,
336:21, 337:18,
340:6, 360:16,
362:4, 366:19,
366:20, 366:22,
368:6, 375:2, 375:3,
375:6, 376:7, 377:1,
377:15, 381:10,
405:4, 405:6,
405:13, 416:10,
418:18, 424:22,
427:17, 428:2,
429:2, 433:3, 434:5,
434:6, 434:9,
435:11, 468:21
**tests** [2] - 416:22,
431:14
**Texas** [1] - 440:9
**text** [2] - 360:12, 466:7
**THC** [2] - 350:21,
351:1
**THE** [71] - 306:1,
306:10, 319:12,
322:4, 330:4, 330:7,
331:20, 343:24,
347:17, 348:1,
348:5, 349:12,
352:25, 353:6,
353:12, 353:17,
353:25, 354:4,
354:8, 354:14,

355:4, 356:1, 356:4,
357:6, 362:11,
367:21, 368:25,
370:3, 370:10,
370:13, 370:18,
371:13, 371:15,
371:20, 377:6,
377:19, 378:3,
378:9, 379:1,
379:15, 380:1,
380:4, 380:10,
380:14, 380:22,
387:11, 399:9,
399:15, 399:20,
402:22, 403:5,
407:6, 407:18,
407:25, 408:19,
409:3, 412:1, 412:8,
412:11, 412:16,
412:20, 413:9,
440:7, 452:4, 452:9,
452:12, 452:24,
461:23, 463:13,
469:7, 473:11
**then-Police** [1] -
427:23
**theory** [1] - 424:25
**therefore** [5] - 301:18,
301:21, 320:18,
420:8, 439:24
**thinking** [1] - 335:3
**thinks** [1] - 417:15
**third** [5] - 300:9,
300:10, 372:15,
403:8, 452:25
**Thomas** [1] - 466:11
**thoroughly** [1] -
364:22
**thoughts** [1] - 434:23
**threatened** [1] -
314:20
**three** [20] - 306:18,
325:17, 326:14,
326:25, 328:2,
329:9, 335:6,
342:17, 342:20,
342:22, 359:20,
360:14, 390:18,
395:11, 398:25,
414:14, 439:20,
463:3, 466:15,
467:22
**Three** [2] - 299:3,
378:2
**three-minute** [2] -
328:2, 360:14
**three-quarters** [1] -
359:20
**throughout** [3] -
392:23, 426:5, 459:6

**Thursday** [1] - 292:2
**time-sensitive** [1] -
415:1
**Timothy** [1] - 314:17
**tination** [1] - 449:11
**tion** [12] - 300:7,
300:10, 313:16,
345:20, 348:10,
393:25, 404:5,
416:24, 417:11,
424:18, 432:17,
440:24
**tioning** [1] - 313:6
**tions** [3] - 318:5,
426:24, 442:21
**tive** [1] - 379:3
**today** [10] - 318:2,
332:12, 337:18,
339:2, 339:18,
383:3, 394:19,
396:18, 440:19,
466:18
**together** [6] - 355:12,
364:12, 379:10,
415:11, 415:21,
470:2
**toggle** [3] - 308:16,
309:24, 310:8
**took** [8] - 307:23,
330:11, 340:1,
342:18, 383:21,
389:15, 437:7
**top** [3] - 331:10,
372:18, 441:18
**tossed** [2] - 324:10,
431:7
**tosses** [1] - 431:22
**total** [1] - 338:21
**totaled** [1] - 447:25
**tour** [1] - 311:2
**toward** [4] - 313:16,
448:22, 459:13,
462:10
**toxicology** [1] - 351:6
**track** [2] - 458:19,
466:9
**traffic** [16] - 307:8,
307:22, 308:4,
308:13, 309:1,
321:2, 328:8,
337:11, 342:4,
343:1, 352:4,
432:24, 435:7,
435:13, 436:13,
454:2
**trained** [6] - 298:22,
308:12, 308:18,
308:25, 344:16,
418:23
**training** [2] - 372:22,

469:15
**trans** [1] - 408:13
**transmitted** [2] -
408:5, 408:11
**transported** [1] -
328:22
**travel** [1] - 440:9
**traveled** [4] - 359:3,
359:8, 359:17, 392:3
**traveling** [7] - 309:17,
339:10, 343:2,
343:4, 412:5,
412:22, 416:3
**treat** [4] - 302:8,
438:4, 450:1, 450:12
**treated** [2] - 436:24,
437:5
**treating** [1] - 458:20
**treatment** [3] - 303:17,
349:19, 432:23
**trial** [1] - 385:13
**tried** [3] - 311:11,
387:16, 427:16
**tries** [2] - 364:10,
421:16
**trip** [1] - 418:5
**triple** [1] - 330:11
**tronic** [1] - 444:7
**trouble** [2] - 344:18,
422:19
**troubling** [1] - 313:4
**Troy** [6] - 365:14,
366:13, 368:18,
368:24, 380:6,
388:20
**true** [27] - 299:11,
302:15, 319:16,
327:6, 337:12,
347:4, 367:5, 367:8,
370:24, 381:16,
383:9, 383:14,
414:10, 414:12,
414:17, 418:23,
419:20, 420:15,
421:2, 421:17,
422:25, 423:10,
426:21, 426:22,
449:10, 456:5, 474:8
**trust** [2] - 457:14,
469:10, 469:11
**truth** [19] - 314:5,
344:8, 363:11,
363:12, 390:6,
390:7, 400:7, 400:8,
420:6, 422:3, 440:4,
440:5, 464:5, 464:6
**truthful** [1] - 457:12
**truthfulness** [1] -
457:13
**try** [10] - 293:5,

309:20, 316:20,
319:24, 332:10,
364:23, 368:22,
403:23, 433:21,
466:25
**trying** [8] - 319:6,
319:21, 339:23,
362:9, 364:6,
385:17, 402:1, 466:7
**turn** [3] - 342:23,
357:7, 425:11
**turned** [4] - 307:1,
359:4, 359:18,
405:17
**turning** [4] - 308:25,
309:4, 353:10,
359:15
**two** [44] - 294:2,
294:19, 297:17,
311:4, 322:21,
322:23, 323:20,
325:6, 325:12,
325:22, 326:18,
326:22, 328:11,
329:5, 338:16,
342:18, 344:1,
344:3, 355:4,
357:17, 357:23,
360:1, 362:15,
376:2, 392:8,
392:24, 394:13,
398:1, 398:2, 406:7,
409:1, 415:14,
419:15, 420:21,
425:25, 430:9,
431:9, 440:9,
455:11, 455:13,
455:15, 456:6,
461:14, 468:9,
470:15
**two-minute** [1] - 360:1
**type** [5] - 298:15,
298:17, 379:9,
393:23, 458:1
**types** [2] - 408:3,
463:1
**typically** [2] - 377:7,
386:20

## U

**ultimate** [2] - 311:5,
460:17
**ultimately** [2] -
460:16, 461:16
**unable** [1] - 454:6
**unanimously** [1] -
472:22
**unavailable** [4] -
325:6, 325:10,

325:23, 325:25
**unbeknownst** [1] - 415:3
**unclear** [1] - 383:19
**unconscious** [1] - 434:7
**uncooperative** [1] - 364:23
**under** [15] - 292:13, 303:17, 324:21, 350:20, 374:15, 374:16, 383:15, 407:25, 411:13, 415:22, 463:17, 464:25, 467:17, 467:21, 468:24
**underage** [1] - 431:15
**underlying** [1] - 301:15
**understood** [2] - 397:9, 397:12
**unexpected** [1] - 307:21
**unfortunately** [4] - 430:2, 440:8, 452:6, 455:20
**unidentified** [3] - 431:19, 436:12, 436:14
**uniform** [6] - 394:17, 394:18, 394:19, 394:21, 394:22, 399:18
**uniforms** [1] - 399:22
**unintended** [1] - 448:25
**unintentional** [1] - 448:23
**union** [5] - 332:2, 339:4, 347:19, 347:21, 361:16
**unit** [1] - 466:14
**Unit** [3] - 384:17, 385:1, 390:24
**United** [1] - 462:25
**unknown** [3] - 297:5, 351:1
**unless** [2] - 300:6, 302:1
**unloaded** [1] - 392:14
**unnoticed** [1] - 427:14
**unofficial** [1] - 376:4
**unrelated** [1] - 315:14
**unsafe** [3] - 418:17, 418:18, 419:16
**unsure** [2] - 463:7, 463:8
**untruth** [1] - 436:5
**untruthful** [8] - 449:10, 457:8,

457:10, 457:18, 457:19, 457:20, 463:10
**untruthfulness** [4] - 449:15, 449:17, 457:6, 463:17
**unusual** [15] - 295:11, 310:19, 310:23, 311:6, 311:13, 311:15, 311:16, 312:17, 312:19, 313:10, 364:10, 379:18, 384:9, 416:19, 417:1
**up** [78] - 296:8, 296:14, 296:20, 297:1, 301:20, 302:4, 302:5, 305:5, 305:9, 307:21, 311:11, 313:14, 313:17, 313:20, 314:13, 314:16, 324:10, 328:8, 330:10, 332:10, 333:12, 337:23, 337:25, 346:15, 347:4, 350:18, 354:17, 354:19, 356:19, 356:20, 359:15, 360:24, 361:3, 361:5, 361:10, 365:3, 368:21, 373:7, 374:25, 375:19, 376:13, 377:16, 382:6, 382:11, 384:19, 385:6, 388:17, 395:11, 397:22, 401:8, 401:13, 401:19, 401:24, 403:23, 408:22, 411:3, 414:7, 414:21, 417:1, 419:14, 421:7, 421:12, 421:15, 423:21, 425:9, 425:10, 429:8, 429:10, 429:13, 431:8, 432:10, 433:21, 466:12, 466:15, 470:15, 471:6
**upset** [1] - 347:21
**upside** [1] - 417:8
**urge** [1] - 427:7
**urgency** [4] - 299:20, 316:11, 317:13, 317:24
**urgent** [2] - 316:7, 317:6

**uses** [1] - 430:18
**UWM** [22] - 313:15, 319:1, 320:20, 340:15, 340:16, 340:23, 341:1, 341:8, 401:24, 402:10, 402:17, 402:23, 403:18, 403:25, 405:14, 410:8, 410:18, 410:19, 410:24, 433:5, 435:7, 436:13

## V

**vague** [6] - 293:15, 296:22, 316:14, 316:23, 317:20, 397:22
**vaguely** [1] - 339:25
**vain** [1] - 469:3
**valid** [1] - 313:24
**Value** [1] - 462:11
**van** [2] - 364:8, 369:2
**vanishes** [1] - 432:1
**vehicle** [22] - 308:1, 308:4, 308:5, 308:10, 309:21, 310:3, 310:5, 341:23, 350:3, 358:16, 379:5, 392:6, 418:17, 419:10, 419:16, 421:9, 449:8, 454:1, 456:2, 461:6, 473:2
**vehicles** [1] - 453:25
**version** [7] - 345:9, 347:7, 414:11, 422:25, 424:9, 426:5, 427:4
**versions** [2] - 344:2, 344:4
**versus** [1] - 343:14
**via** [1] - 466:7
**victim** [9] - 300:15, 300:16, 301:19, 369:1, 378:6, 383:8, 415:2, 423:19
**victims** [2] - 364:22, 468:8
**video** [6] - 342:13, 342:18, 342:19, 342:23, 343:9, 421:24
**Vidmar** [1] - 458:12
**viduals'** [1] - 457:17
**view** [1] - 395:14
**viewing** [1] - 398:12
**viola** [2] - 416:23, 426:23

**violate** [1] - 414:14
**violated** [1] - 427:9
**violating** [2] - 427:5, 435:5
**violation** [11] - 417:24, 419:7, 419:10, 450:1, 450:8, 450:14, 457:7, 458:13, 458:17, 462:7
**violations** [9] - 419:15, 426:19, 436:18, 436:19, 437:11, 444:24, 450:15, 458:20, 465:4
**violence** [1] - 356:15
**visible** [1] - 330:4
**visor** [1] - 380:13
**visual** [1] - 407:8
**Vollrath** [3] - 362:13, 396:22, 433:13
**volunteer** [5] - 299:23, 354:10, 354:12, 354:22, 469:12
**volunteered** [6] - 292:24, 306:4, 389:8, 429:18, 469:13
**vote** [1] - 438:22
**voted** [1] - 439:19

## W

**wait** [3] - 335:20, 431:25
**waited** [1] - 417:8
**waiting** [3] - 349:14, 394:4, 394:6
**waits** [1] - 433:25
**waived** [1] - 473:7
**wake** [1] - 354:17
**walk** [1] - 470:22
**walked** [3] - 393:25, 394:7, 395:19
**walks** [1] - 384:9
**wallet** [1] - 431:23
**wants** [5] - 337:13, 418:6, 421:4, 424:10, 469:6
**warrant** [3] - 300:4, 378:18, 466:14
**Washington** [1] - 336:5
**Wauwatosa** [1] - 336:3
**ways** [1] - 426:23
**wear** [3] - 399:22, 454:3
**wearing** [4] - 310:12,

364:7, 398:5, 399:25
**wears** [1] - 394:22
**weight** [2] - 449:12, 449:15
**welfare** [1] - 379:17
**well-being** [1] - 470:25
**WERE** [1] - 473:11
**West** [1] - 365:8
**west** [1] - 306:23
**whatsoever** [1] - 360:6
**wheels** [1] - 317:19
**WHEREUPON** [1] - 473:11
**whole** [15] - 314:25, 318:4, 318:5, 356:1, 356:4, 363:11, 390:6, 400:7, 421:16, 422:18, 427:2, 440:4, 459:6, 464:5, 468:19
**wide** [2] - 394:9, 395:12
**William** [2] - 327:24, 402:13
**willing** [1] - 459:11
**Wilson** [2] - 292:8, 424:2
**WILSON** [43] - 311:10, 326:16, 333:23, 334:1, 353:2, 353:8, 353:13, 353:23, 354:1, 354:5, 354:9, 354:23, 355:18, 355:23, 356:2, 356:6, 361:25, 362:3, 370:2, 370:8, 370:11, 370:16, 370:20, 371:14, 379:23, 380:2, 380:8, 380:12, 380:17, 385:12, 385:25, 399:5, 399:11, 399:17, 402:20, 408:22, 411:23, 412:6, 412:9, 412:14, 412:19, 439:1, 452:23
**window** [3] - 359:12, 460:8, 460:11
**WISCONSIN** [1] - 474:1
**Wisconsin** [1] - 399:13
**wit** [1] - 472:24
**withdraw** [1] - 372:2
**withdrawn** [1] - 437:25

**Witness** [6] - 362:21,
390:2, 400:5,
413:25, 463:24,
467:8
**witness** [10] - 323:5,
326:20, 329:15,
390:8, 400:3, 400:9,
413:23, 440:6,
463:23, 464:7
**WITNESS** [70] - 306:1,
306:10, 319:12,
322:4, 330:4, 330:7,
331:20, 343:24,
347:17, 348:1,
348:5, 349:12,
352:25, 353:6,
353:12, 353:17,
353:25, 354:4,
354:8, 354:14,
355:4, 356:1, 356:4,
357:6, 362:11,
367:21, 368:25,
370:3, 370:10,
370:13, 370:18,
371:13, 371:15,
371:20, 377:6,
377:19, 378:3,
378:9, 379:1,
379:15, 380:1,
380:4, 380:10,
380:14, 380:22,
387:11, 399:9,
399:15, 399:20,
402:22, 403:5,
407:6, 407:18,
407:25, 408:19,
409:3, 412:1, 412:8,
412:11, 412:16,
412:20, 413:9,
440:7, 452:4, 452:9,
452:12, 452:24,
461:23, 463:13,
469:7
**witnessed** [1] - 433:15
**witnesses** [5] - 363:3,
364:23, 389:24,
390:1, 433:3
**woman** [3] - 364:6,
364:8, 398:4
**wonder** [1] - 301:18
**wondering** [1] -
329:10
**word** [2] - 331:10,
446:1
**words** [4] - 315:5,
324:3, 379:13,
446:10
**worker** [1] - 294:15
**workload** [2] - 294:22,
299:6

**works** [3] - 295:12,
295:13, 429:9
**world** [1] - 422:15
**worse** [1] - 421:12
**wound** [3] - 364:15,
364:16, 429:6
**wrapped** [1] - 429:8
**write** [7] - 311:22,
312:1, 312:6, 312:9,
312:23, 313:9, 314:3
**writing** [2] - 304:6,
456:23
**written** [15] - 303:19,
306:14, 306:15,
331:8, 331:9,
337:20, 347:5,
347:23, 349:17,
350:19, 373:9,
424:22, 436:18,
436:22, 473:7
**wrote** [3] - 332:3,
351:2, 358:2

### X

**x-rays** [2] - 392:22,
397:21

### Y

**Y-e-r-k-e-s** [1] -
440:14
**year** [3] - 333:24,
356:5, 461:20
**years** [5] - 390:16,
390:18, 464:17,
468:5, 468:11
**yelling** [1] - 362:14
**Yerkes** [2] - 440:2,
440:14
**YERKES** [1] - 440:3
**yesterday** [19] -
301:17, 307:4,
310:15, 313:13,
319:14, 319:20,
329:5, 335:2,
336:21, 344:13,
351:16, 351:21,
353:8, 363:15,
366:20, 375:2,
400:11, 405:4,
405:13
**yesterday's** [1] -
297:13
**yourself** [13] - 299:23,
301:18, 303:6,
321:7, 341:6,
341:13, 367:24,
376:10, 404:13,
441:22, 459:11,

470:6

### Z

**ZIEGER** [1] - 400:6
**Zieger** [15] - 302:23,
303:7, 303:10,
304:22, 304:24,
305:11, 313:1,
314:15, 338:5,
338:22, 339:6,
347:19, 396:10,
423:7, 424:18
**Zieger's** [1] - 436:9
**Zimmerman** [1] -
375:24