


**WATCHDOG REPORTS | BOTH SIDES OF THE LAW | WATCHDOG REPORT**

# Police Department ignores national standards for officers accused of domestic violence

*By Gina Barton of the Journal Sentinel*

Oct. 30, 2011

When Robert Velez's wife left their home to escape his abuse, he used his Milwaukee police training - and his badge - to track her down.

First, Velez connected his missing wife to the Exel Inn hotel chain. He initially showed his badge at the Wauwatosa location, according to court and internal affairs records. Lying to the clerk, Velez said he was working undercover, looking for a suspect.

The woman wasn't checked in there, but the clerk located her in Oak Creek. She had alerted staff that her abusive husband - a cop - might come looking for her.

Nonetheless, the hotel desk clerk led Velez to his wife's room, knocked on the door, and told her to open it. If she didn't, the clerk said, he would use the master key.

She did.

Velez shoved past her into the room, where he found one of his fellow officers - whom he and his wife had known for about three years. Velez immediately began beating the man, telling him: "I'll break your f---ing neck! I'm going to kill you!"

- - - - - - 1 2 3 9

EXHIBIT 37

When his wife tried to break up the fight, Velez punched her in the face. He put the man in a headlock and dragged him down the stairs, the records say.

When Oak Creek officers arrived, Velez also fought with them. He repeated the lie about working undercover a third time and pulled back his black leather jacket to show the gun in his waistband, according to a summary of the internal investigation.

As a result of the 2001 incident, Velez was arrested for battery while armed, domestic violence battery and misconduct in public office - charges that could have landed him in prison for 5 ½ years and barred him from possessing a gun for the rest of his life.

But that didn't happen. Not only did Velez avoid prison, he was suspended from the department for just six days.

Velez is one of at least 16 Milwaukee police officers disciplined after internal investigators concluded they had committed acts of domestic violence, according to internal affairs records obtained by the Journal Sentinel during a two-year investigation. They are among 93 officers on the force who have been disciplined for violating state laws or local ordinances, according to the newspaper's analysis, the first of its kind involving the Milwaukee police.

Department leaders don't follow national standards on how to handle accusations of domestic violence against officers. Prosecutors often charge them with lesser crimes - or no crimes at all. As a result, officers who abuse their spouses or romantic partners are allowed to keep their jobs, carry loaded weapons and respond when battered women call for help, the newspaper found.

Law enforcement agencies that tolerate abusive officers endanger victims, erode the community's trust and leave themselves vulnerable to lawsuits, said Judy Munaker, an attorney who spent five years training cops about officer-related domestic violence through the state Office of Justice Assistance.

1240

## 'Protecting Their Own'

"They see it as protecting their own, but it's corruption," she said. "They need to stop protecting their own and start protecting victims."

It is impossible to tell how many domestic incidents the Milwaukee Police Department has not investigated. Last year, for example, the wife of a high-ranking commander in the Professional Performance Division, which investigates officer misconduct, called 911 in fear of her husband.

No one wrote up a report, and department officials say a recording of the emergency call does not exist.

Just three of the Milwaukee officers disciplined for abusing their spouses or romantic partners, including Velez, ended up with criminal records - but none of those convictions was for a felony or misdemeanor domestic violence, crimes that would have ended their careers by stripping them of their right to carry firearms under federal law.

Prosecutors charged Velez with only misdemeanor battery, and he pleaded no contest.

Even though he later violated a court order by contacting the victim, Milwaukee County Circuit Judge Jean DiMotto sentenced Velez to a year of probation.

He spent three days in jail.

Officer Edward McCrary was convicted of disorderly conduct after he fought with his wife and choked her cousin. He was sentenced to one day in jail.

Sgt. Charles Cross was convicted of criminal damage to property for kicking in the door of the apartment he shared with his girlfriend. He was fined $500. Prosecutors offered him a deferred prosecution agreement on the charge of domestic violence-related disorderly

------ 1241

conduct. He got treatment for depression and alcohol abuse and the charge was dismissed.

A fourth officer, Zebdee Wilson, now has a clean criminal record despite pleading guilty to violating a restraining order in 1994. His wife needed oral surgery after he punched and kicked her repeatedly in the face, court records say.

That conviction should have stopped Wilson from continuing to serve as a police officer after the federal law banning domestic violence offenders from carrying guns took effect in 1996. The ban was retroactive and applies no matter when the conviction occurred. There is no exception for police officers.

But then-Gov. Tommy Thompson pardoned Wilson, erasing his conviction and saving his career.

Another provision in the federal law allows officers to carry weapons on duty despite domestic abuse restraining orders if their employers allow it.

The Milwaukee Police Department does.

What's more, the department does not have a written policy on how to handle officer-involved domestic violence - a practice that goes against recommendations by both the International Association of Chiefs of Police and the state Department of Justice. The assistant chief who oversees officer performance and discipline, Darryl Winston, said in May he had not read the state's model policy, released by the Wisconsin Department of Justice in 2009.

The model policy contains an educational component that discusses the causes of the problem and its impact on the community. It gives clear, step-by-step instructions for investigations, including lists of who should be called to the scene and what kinds of paperwork should be completed. The policy also addresses how departments should deal with abusive officers.

1242

"Ignorance is no excuse," said David R. Thomas, an instructor at Johns Hopkins University in Baltimore, who helped write a model policy for the international association.

"If they're willing to look the other way on this type of criminal activity, where does it stop?"

Milwaukee Police Chief Edward Flynn and Milwaukee County District Attorney John Chisholm declined to discuss the issue with the Journal Sentinel.

In a written statement, Chief Deputy District Attorney Kent Lovern said prosecutors handle officer-involved domestic violence cases the same as any others.

"Domestic violence victims often are forced to struggle with interests in addition to their own personal safety, including children in the household and financial distress," he wrote. "Cases involving police officers are no different, and we evaluate those cases just as we evaluate domestic violence cases involving citizens of other occupations, with a goal of achieving an appropriate measure of accountability under the circumstances."

Certified letters to Velez, McCrary and Wilson were returned, and they did not respond to emails requesting comment. Cross, via email, declined to comment.

Velez received a meritorious service award in 2010 for dragging a burning trash bin away from a building and a crowd assembled for an immigration rights march.

He also provided support during a domestic violence awareness walk in the Latino community in 2006, according to a letter in his personnel file.

Wilson received the chief's superior achievement award in 1993, the year before his criminal conviction, for rushing into a burning building

1243

and waking seven people inside. In 2002, he received a commendation for disarming and arresting a dangerous suspect.

## Far Above Norm

Domestic violence is far more common among the families of police officers than among the rest of the population, according to the U.S. Department of Justice and the National Center for Women and Policing. At least 40% of police families are affected by domestic violence, as opposed to an estimated 10% in other households.

Because of the unique stresses that result from confronting dangerous suspects, analyzing bloody crime scenes and witnessing breakdowns in the criminal justice system, police officers also experience higher rates of suicide and post-traumatic stress disorder, experts say. If officers don't learn to manage their stress and to separate their jobs from their personal lives, the results can be disastrous.

The very training that makes someone a good police officer can produce a frightening abuser, experts say.

For example, officers are trained to take control of every situation. They learn to interrogate suspects and to conduct effective surveillance. They learn how to pursue suspects and physically restrain them - in many cases, without leaving a mark. When they use force, they know how to provide legal justification.

Friends who work in the criminal justice system also tend to believe abusive officers who label their victims crazy or dishonest, according to Thomas.

"He's a master manipulator," Thomas said of an abusive officer. "He's a batterer with a PhD."

And a gun.

------1244

The law that prohibits people convicted of domestic violence from carrying firearms, known as the Lautenberg Amendment, has been

counterproductive when it comes to police officers, according to Diane Wetendorf, an Illinois-based consultant who has specialized in officer-involved domestic violence for the past 15 years.

Instead of taking guns away from abusive officers across the nation, it has made prosecutors - who work closely with cops every day - more lenient with them for fear of ruining their careers, she said.

Take the case of McCrary, now a detective.

On July 14, 1998, McCrary's then-wife fled in fear to a neighbor's house after he threw books and disconnected the phone wires when she tried to call 911, court records say. She was six months pregnant at the time.

Prosecutors agreed not to charge McCrary with a crime as long as he got counseling and stayed out of trouble. The Milwaukee County district attorney's office has offered that type of deal, known as a deferred-prosecution agreement, to at least five other current Milwaukee police officers accused of domestic violence, according to the newspaper's analysis.

But McCrary didn't live up to his side of the bargain, according to a summary of the internal investigation. He didn't go to therapy.

And in October 1998, he got into another argument with his wife. When her cousin intervened, McCrary grabbed the woman by the neck, according to a criminal complaint.

"He choked her, lifted her up off the floor, and started moving her backwards toward the front door," the complaint says.

He yelled obscenities at the woman, pushed her out the door and threw out her clothes and shoes behind her, the complaint says. She had scratches on her neck and her hand was bleeding.

- - - - - - 1245

Because McCrary fell short of completing the deferred prosecution deal, prosecutors charged him with domestic violence-related

disorderly conduct in connection with the July incident. He also was charged with battery against his wife's cousin as a result of the October fight.

But under a plea agreement, the charge involving his wife was dropped and the battery charge involving her cousin was reduced to misdemeanor disorderly conduct.

McCrary pleaded no contest. Because he was not convicted of a charge in which his wife was a victim, he was not prohibited from carrying a firearm and kept his job.

Milwaukee County Circuit Judge Dominic Amato sentenced McCrary to a single day in jail.

At the sentencing hearing, McCrary apologized and said he accepted responsibility for his actions, according to a transcript.

"I didn't want it to go this far," he said. "Me and my wife, we decided that we weren't going to be together, we should have just parted without incident."

McCrary initially didn't go to counseling because his insurance didn't cover it, but he later started treatment, his attorney, Steve Kohn, said at the hearing.

McCrary was suspended from the department for 15 days for breaking the rule against violating laws or ordinances. He did not respond to interview requests. His ex-wife declined to comment. Her cousin could not be reached.

Lovern, chief deputy in the district attorney's office, said the plea deal in the cousin's case was done "in accordance with the wishes of the victim." His written statement did not address the charge involving McCrary's wife or explain why he was offered deferred prosecution in the first place.

------1246

## Police Exemption

Case 2:16-cv-01089-WED   Filed 06/21/19   Page 8 of 16   Document 86-37
http://www.printthis.clickability.com/pt/cpt?expire=&action=cpt&partnerID=394139&fb=Y&title=Police+Department+ignores+national+standards+for+o...   8/16

Domestic violence injunctions, more commonly known as restraining orders, also don't keep guns away from abusive officers in Milwaukee - and don't always lead to department discipline.

Most people with restraining orders against them lose the right to possess firearms. But the Milwaukee Police Department allows officers in that situation to "check out" their duty weapons at the beginning of each shift and return them afterward.

That is a constant source of stress for Jill Glidewell, who recently divorced Milwaukee police Detective Herb Glidewell.

"He said if I ever told the things he'd done, I'd disappear," she told the Journal Sentinel.

Nonetheless, she testified in an attempt to get a restraining order against him, detailing abuse dating back to 2006.

Milwaukee County Court Commissioner Dean B. Zemel granted the restraining order based on an incident that occurred Nov. 1, 2008, in which Jill Glidewell - a police officer herself - ended up with a damaged rotator cuff.

The week before, she had told her husband she was pregnant with their second child.

"He viciously attacked me while I was in bed," she testified later. "He got on top of me. With all his weight, he was picking me up and slamming me down as hard as he could on the bed, over and over, more than 10 times. I was screaming for him to stop and get off of me. That it was hurting me."

She grabbed the phone, but he yanked it out of her hand and started beating the barking dog with it, she said. Taking the dog and her baby daughter, she drove to the District 6 police station, barefoot, at 3 a.m.

She was too embarrassed to go inside. A friend who was on duty came out to comfort her, but didn't push her to file a report, she said.

------1247

Herb Glidewell appealed the commissioner's decision to grant the restraining order. He denied wrongdoing at a hearing before Milwaukee County Circuit Judge Francis T. Wasielewski, according to court transcripts.

"We argued often, yes," Herb Glidewell testified. "And I'm sure on all those dates, we probably did have disputes; but never, at one point, ever, was it physical. I've never harmed her, never touched her, hit her, pushed her, any of those things."

At the end of a two-day hearing, Wasielewski, who has since retired, left the restraining order in place. It is in effect until 2013. He based his decision on medical records, which showed Jill Glidewell sought treatment for the shoulder injury and told her doctor it was the result of domestic violence, the transcripts say.

Herb Glidewell is among seven police officers who have had restraining orders imposed against them by a commissioner. Of those, three orders were later dismissed - two by the women and one by a judge when the woman didn't show up at an appeal hearing.

In another 11 cases, officers' spouses or romantic partners filed for restraining orders that were not granted by a commissioner in the first place, either because there was not enough evidence or because those who filed for them did not follow through with the cases. One was later granted by a judge after the victim appealed.

But Herb Glidewell's attorney, Barry Book, characterized the burden of proof for restraining orders as extremely low. In the Glidewell case, the law allowed the commissioner and the judge to "err on the side of caution," he said.

Book said the timing of the application for the restraining order was suspect, since his client was served with it the same day he signed away his rights to the couple's house in a pending divorce.

- - - - - - 1248

Jill Glidewell says she would have done it sooner, but he was out of town. He wanted his name off the house because he already offered to purchase another one, she said. Property records back up her assertion, showing Herb Glidewell closed on a new house five days later.

The attorney also questioned Jill Glidewell's continued assertions of abuse, saying he suspected she was using them as ammunition in a contentious custody battle.

"I do think there are some extenuating circumstances in this particular case that call Ms. Glidewell's credibility into question," Book said. "The divorce proceedings lasted about 2 1/2 years. It was very acrimonious from the beginning."

Nearly two months before she sought the restraining order, Jill Glidewell discussed her then-husband's abusiveness with internal affairs, alleging the same mistreatment she testified about in court.

After an investigation, the Police Department referred the case to the district attorney's office. Local prosecutors often review cases against Milwaukee police officers themselves. But in this case, they asked Chris Freeman, then a Dane County assistant district attorney, to serve as a special prosecutor.

"The Glidewell case was referred to Dane County due to the appearance of a conflict, although to our knowledge, no actual conflict existed," Lovern's written statement says. It does not say what the perceived conflict was.

In a letter to the department, Freeman, who has since been promoted to deputy DA, said "three major incidents stood out as strongest for charging." One was the episode in which Jill Glidewell's shoulder was injured. In another, Herb Glidewell grabbed her by the throat and pushed her into a wall, Jill Glidewell said. The third "was an incident in which Herb Glidewell started a fire on a grill in front of the residence while he was intoxicated," Freeman's letter says. "The fire raged to such a degree that the wheels of the grill melted into the pavement."

To corroborate her statements, Jill Glidewell provided the medical records regarding her shoulder, as well as pictures of redness on her neck and of the melted grill.

Freeman did not charge Herb Glidewell with a crime.

"The reason for the lack of charges does not stem from the belief that these events did not occur as Jill Glidewell describes, but that I do believe based on the entirety of the record and reports that this case could not be proved beyond a reasonable doubt," Freeman wrote in the letter, which explained his decision to the Police Department.

Herb Glidewell was not disciplined, and his personnel record remains spotless.

His ex-wife is frustrated that he hasn't been held accountable.

"He told me, 'If you ever leave me or try to fight me, I'll ruin you,' " she said. "Criminals are afforded the right to a fair and speedy trial. Why aren't victims of domestic violence?"

Herb Glidewell primarily works burglaries and robberies, according to Book. He carries his gun while on duty. If the department ever asked Glidewell to work domestic violence cases, his attorney said that wouldn't be a problem.

"I think he is able to separate his personal situation from his professional obligations," Book said. "I have no question in my mind that if he were to investigate a domestic violence case he would do the right thing. If he had to put a dad under arrest, he would do it."

Jill Glidewell said she has never feared a suspect as much as she fears her ex-husband.

"This is the most dangerous thing I've ever done," she said of leaving him. "I live in fear every day that someone is going to shoot up my house."

------1250

Police departments that give abusive officers access to their guns need to be aware of that possibility, according to Thomas, of Johns Hopkins.

"People think you go on duty and all of the sudden there's a protective shield around you and you're not going to do anything stupid anymore? It's just ignorant," he said.

### Higher Standard Needed

While officers' attitudes about domestic violence in the community have evolved over time, most police around the country still don't take it seriously when the perpetrator is one of their own, according to experts. Handling such accusations the same as any other criminal allegation against police, as Milwaukee does, isn't good enough, experts say.

Because responding officers can be biased, one of the goals of a model policy on officer-involved domestic violence is to remove their discretion, said Thomas, who retired from the Police Department in Montgomery County, Md., in 2000. Following written guidelines step by step protects the victim, the investigator and the alleged perpetrator, he said.

"If I'm accused of being involved in this activity and I didn't do it, I want a good, clear exhaustive investigation so I can be exonerated," he said.

That didn't happen in the case of Lt. David Salazar, a supervisor in the Milwaukee police's Professional Performance Division, which investigates wrongdoing by officers.

After receiving a tip that Salazar's wife called 911 during a fight with him, the Journal Sentinel made a public records request for audio recordings of all calls associated with his home address and any police reports affiliated with them.

------1251

No reports were written, according to the department's response.

The department provided only a dispatcher's log of the June 2010 incident, which confirms that Salazar's wife called for help during an argument over suspicions he was cheating. She told the dispatcher he was intoxicated and trying to break down the door.

The newspaper requested the information in August 2010. Three months later, the department said the recording of the call had been inadvertently purged from the system.

Then, in January, the story changed.

Department spokeswoman Anne E. Schwartz said that actually, the system malfunctioned and no emergency calls were recorded the entire day Salazar's wife called 911.

The supervisor called to the scene, Capt. Aaron Raap, determined Salazar "had not operated a motor vehicle, had not had physical contact with the caller and did not appear to be intoxicated," Schwartz said in an email.

Raap decided an internal investigation was not necessary, and Salazar was not reassigned or disciplined as a result of the incident, Schwartz said.

"The determination was based on Capt. Raap's years of training and experience," she said. "Police officers use their discretion every day in every situation."

The state's model policy says if no arrests are made, "the on-scene supervisor shall submit a written report explaining any and all reasons why an arrest was not made or a warrant was not sought."

Allowing officers to hide behind discretion in cases such as Salazar's is "unacceptable," Thomas said.

- - - - - - 1 2 5 2

"It's saying we're just not going to uphold the law with our own the way we do with a citizen," he said. "We should, in law enforcement, be held

to a higher standard because we're supposed to enforce the law. . . . Otherwise, it's the fox watching the henhouse."

Neither Salazar - who received a unit service award in 2009 as part of the department's homicide division - nor his wife responded to certified letters seeking comment.

Salazar continues to supervise investigations of other officers accused of wrongdoing.

## Still Investigating Cases

Officers such as Velez, convicted of the beating in the hotel room, continue to investigate domestic violence, the newspaper's investigation found. In April alone, Velez responded to domestic disputes five times - an average of more than once a week, according to the most recent records released to the newspaper.

That's another direct contradiction to the recommendations in the state's model policy. It's a recipe for destroying community confidence and placing victims at risk, the policy says.

"There are grave concerns regarding how officers who commit the crime of domestic violence respond to domestic violence calls in the community," the policy says. "Obviously, their personal conduct affects their capability to effectively deal with these situations impartially. Moreover, an officer, sympathetic to an abuser, may not adequately protect a victim."

Munaker, the former Office of Justice Assistance trainer, agreed.

"We can't let abusers investigate this. We just can't," she said.

Flynn has said fighting domestic violence is a priority for the department. In February, he rolled out a new initiative to combat the problem, targeting repeat offenders and calling for greater protection of frequent victims.

- - - - - - 1253

"A violent assault is a violent assault, and that warrants justice," he told department supervisors at the time.

*John Diedrich and Ben Poston of the Journal Sentinel staff contributed to this report.*

\*\*\*

## How To File A Complaint

Citizens who feel they have been mistreated by a police officer have two ways to file a complaint.

### To file with the Fire and Police Commission:

Go to room 706 of City Hall, 200 E. Wells St., from 8 a.m. to 4:45 p.m. Monday through Friday; call (414) 286-5000. Or visit http://city.milwaukee.gov/fpc/Complaints to download a complaint form or to view locations where forms are available.

### To file with the Police Department:

Go to or call any district station and ask for a supervisor; or call the Professional Performance Division at (414) 935-7942. For more information, visit http://city.milwaukee.gov/Police/CitizenComplaints.htm.

**About Gina Barton**

Gina Barton covers criminal justice. In 2013, she won a George Polk award for her investigation into the death of Derek Williams in Milwaukee police custody.

🐦 @writerbarton  ✉ gbarton@journalsentinel.com  📞 414-224-2125

---

**Find this article at:**
http://archive.jsonline.com/watchdog/watchdogreports/police-department-ignores-national-standards-for-officers-accused-of-domestic-violence-132868198.html

☐ Check the box to include the list of links referenced in the article.

------1254