# BOTH SIDES OF THE LAW

## Milwaukee Journal Sentinel



*Oct. 23, 2011 - First of three parts*

### At least 93 Milwaukee police officers have been disciplined for violating law

By GINA BARTON

At least 93 Milwaukee police officers — ranking from street cop to captain — have been disciplined for violating the laws and ordinances they were sworn to uphold, a Journal Sentinel investigation found.

Their offenses range from sexual assault and domestic violence to drunken driving and shoplifting, according to internal affairs records. All still work for the Police Department, where they have the authority to make arrests, testify in court and patrol neighborhoods.

Officers who run afoul of the law often aren't fired or prosecuted, the newspaper found. Consider:

At least six officers disciplined by the department for illegal behavior suffered no legal consequences whatsoever. One was Reginald Hampton, accused of sexually assaulting two women he met on duty. Another was Mark Kapusta, suspended after a woman said he pointed a gun at her head during a drunken road-rage incident. Neither officer was charged or ticketed.

Twenty-three officers got breaks from prosecutors that allowed them to avoid being convicted of serious charges — or any charges at all — as long as they didn't commit more crimes and followed prosecutors' instructions. One was Patrick Fuhrman, originally charged with a felony for a beating that sent his wife to the hospital and, according to a witness, left blood in every room of their house. A conviction on that charge could have gotten him fired from the department, banned from carrying a gun for life and imprisoned for 3½ years. Instead, he ended up with two tickets for disorderly conduct.

Nine of the 93 officers were convicted of crimes. Some even spent time behind bars. Yet when their criminal cases were concluded, they went back to their careers with the Milwaukee police.



------1283

At least one, John P. Corbett, was a police sergeant by day and an inmate by night. Convicted of driving drunk with a child in the car, Corbett did his job at the police station while on work release from jail. His 13-year-old daughter told authorities Corbett took the wheel after she got lost driving back from a tavern.

The Police Department, district attorney's office and Fire and Police Commission share responsibility for keeping officers in line.

All three fall short.

The department tolerates misconduct. Prosecutors give cops career-saving deals. The commission reduces punishments when officers break the rules. As a result, police who have crossed to the other side of the law keep the power that comes with the badge. Meanwhile, citizens have no way of knowing whether the officers responsible for protecting them have tarnished records.

None of the agencies has a comprehensive list of cops who have broken the law.

It took the Journal Sentinel nearly two years of records requests, a court case and $7,500 in fees to compile the list of 93 — which is about 5% of the force. The list doesn't include cops with juvenile records, arrests before they were hired or discipline under different department rules.

What's more, no department policy prevents officers from enforcing the same laws they've been disciplined for breaking. An intoxicated motorist may be stopped — or allowed to drive on — by one of more than 30 cops who have been arrested for drunken driving. A woman who calls 911 in fear of her husband may be met by one of more than a dozen officers with a history of domestic violence.

Cops who break the law should be fired, said Milwaukee County Sheriff David A. Clarke, who worked for the Milwaukee Police Department for 24 years. Illegal conduct undermines officers' authority and erodes the public trust, he said.

"There should be a higher standard for (an) ... employee who enforces the law than for a worker who cuts the grass," Clarke said. "There's no understanding why a cop would drive drunk. There's no understanding why a cop would be abusive to a spouse. When you start to justify and rationalize this type of behavior, it gets ugly."

The newspaper's review — the first of its kind involving the Milwaukee police — has uncovered information even those in charge of the department didn't know.

In a recorded speech to officers, the audio portion of which was obtained by the Journal Sentinel, Milwaukee Police Chief Edward Flynn said he was surprised at the large number of officers arrested for driving drunk.

"We've got an issue of conduct here that's related to culture that we need to confront and deal with," he said.

A video of the speech was shown to officers a month after a Journal Sentinel reporter shared the newspaper's key findings with a police spokeswoman and asked for an interview with the chief. In the speech, Flynn announced a new program of training, support and discipline for officers dealing with alcohol-related problems.

He also warned of the newspaper's investigation.

------1284

"I understand they are going to post ... names on their website," Flynn said during the presentation. "They are also selecting ... officers for special scrutiny in their newspaper, with the operating question being whether they should be police officers given their prior conduct."

Flynn didn't answer that question in the video. He also wouldn't answer questions about the newspaper's findings. Instead, he issued a one-sentence statement:

"We recognize that alcohol abuse, divorce and suicide are overrepresented in the law enforcement profession, and we actively educate, intervene, discipline and provide resources for our members to ensure they understand the inherent risks of the job, and the personal and professional consequences of their behavior."

Milwaukee County District Attorney John Chisholm also would not discuss the problem with a reporter. His chief deputy, Kent Lovern, provided a written statement, pointing out that 70 Milwaukee officers have been charged over the past 10 years.

Of those, 42 were convicted of misdemeanors or felonies under Milwaukee County's jurisdiction, according to an analysis by the newspaper. Most of them are no longer on the force.

But the list was started in 2000, making it incomplete. About one-third of the officers identified by the newspaper were disciplined before that point.

Mayor Tom Barrett, who recruited Flynn to Milwaukee and who appoints the members of the Fire and Police Commission, also refused to meet with a reporter. He issued a statement supporting the chief and the commission.

Only Michael G. Tobin, executive director of the Fire and Police Commission, agreed to discuss the issue with the Journal Sentinel.

Significant improvements have been made to the commission — a civilian board that oversees hiring and discipline — over the past decade, he said. In 2001, the board began requiring a written psychological test for job candidates. Since 2005, it has been followed up with an in-person mental health exam.

In addition to getting a new slate of members in recent years, the commission was reorganized in 2008, Tobin said. Two independent investigators now handle citizen complaints to the commission. In the past, the commission referred complaints to the department.

The commission also has hired a research analyst who studies trends within the department, including use of force and vehicle pursuits. Some of those reports have resulted in improved training for officers, Tobin said.

As for disciplinary appeals, commissioners can't always do what they want — they must follow procedures dictated by state law, Tobin said. He believes they try their best to protect the public without violating officers' rights.

"It's not a fail-safe system," he said. "With the passage of time it could be proven that a different course of action could have been taken."

**Only on the force**

The 93 officers identified during the newspaper's two-year investigation include only those the department concluded broke the law while on the force. To compile the list, the newspaper

- - - - - - 1285

reviewed officers' disciplinary records and built a database of discipline imposed since their hire dates, which range from 1979 to 2010.

The department provided the disciplinary records over a one-year period beginning in January 2010. The list may not include incidents or discipline that occurred after the records were released. It does not include officers hired after 2010. Officers who left the force after Oct. 1 may not have been removed.

More than half the officers disciplined for violating laws or ordinances were suspended for three days or less, according to the newspaper's analysis.

Seven officers were fired but got their jobs back during the appeal process. Four were reinstated by the Fire and Police Commission; two reached agreements with chiefs to return to work; and one was rehired as the result of a settlement in a discrimination lawsuit.

Nine officers were disciplined for more than one instance of illegal behavior. Five were disciplined for breaking the law while employed as police aides — a program that gives teenagers a head start on becoming recruits — yet were allowed to become officers anyway.

No one tracks how many cops committed crimes before they were hired. A state law that keeps job applications secret and blocks access to their birth dates makes it impossible for the public to figure out that number.

Until about four years ago, applicants with multiple misdemeanor convictions could be hired as Milwaukee police officers, as long as the offenses were not domestic violence and did not occur within three years of applying.

"Now there's no magic number," Tobin said. "Every time there's even a single one, that individual gets greater scrutiny."

Several other states ban convicted drug dealers, people who have lied in court and people with recent drunken-driving convictions from working in law enforcement. Not Wisconsin. A state law here prohibits all employers — even police departments — from discriminating against applicants with misdemeanor criminal records unless their convictions are related to the job.

Which crimes are considered related to the job of policing is open to interpretation, Tobin said.

The only absolute bars to working in law enforcement here are felonies or crimes of domestic violence, because federal law precludes people convicted of those crimes from carrying guns.

Once officers are on the job, it is difficult to convict them of crimes. Experts say jurors are inherently biased in favor of police.

"Your competence and credibility sort of come with the badge," said Dennis C. Elias, who serves on the board of the American Society of Trial Consultants. "Additionally, people don't want to believe the people that we trust to protect us would ever do anything bad."

Deputy District Attorney Lovern has acknowledged that prosecutors take police credibility into consideration when deciding whether to issue charges.

"We always have to consider how a jury will react in considering evidence against a police officer," he said in January, after his office declined to charge fired officer Ladmarald Cates with an on-duty rape.

------1286

Federal authorities later launched an investigation, and the U.S. attorney's office secured an indictment against Cates on two felony charges last month. He has pleaded not guilty and is scheduled for trial Jan. 9.

**Five prior allegations**

Cates was indicted and fired amid allegations that he raped a woman after responding to her 911 call in July 2010. The Journal Sentinel examined the case and published an interview with the victim in January. The newspaper later found Cates had been accused of breaking the law five times before, all without being charged or losing his job. Three of the previous allegations involved sexual misconduct — two with female prisoners and one with a 16-year-old girl who said he offered her cash in exchange for sex.

Another Milwaukee cop who avoided criminal charges because prosecutors thought the evidence wouldn't stand up in court was Mark Kapusta.

Here is what the woman who encountered Kapusta at a southwest side intersection told investigators, according to a summary of the internal investigation:

She was helping her boyfriend deliver newspapers around 4:45 a.m. Jan. 20, 2006, when she turned the corner. The driver of a black pickup truck, who also had been waiting to turn, started honking his horn. He pulled behind her, swerving all over the road.

When she honked back at him, the man pulled his truck in front of her car, forcing her to stop. The man, who turned out to be Kapusta, got out of the truck, yelling. His bloodshot eyes and slurred speech told the woman he was probably drunk.

He was holding a gun.

Kapusta, who was not in uniform, approached the woman's car. Her window was partially open. He pointed his weapon through it, aiming at her head.

"Put your hands where I can see them!" he shouted. "I'm the f---ing police!"

She feared she was about to die.

But Kapusta didn't fire.

The woman told him she was going to call the police, and he went back to his truck and drove away.

The woman's boyfriend told investigators a similar story, except he said he did not see Kapusta point the gun at the woman's head, according to the summary. The document does not name the boyfriend. He could not be reached for this story.

When two sergeants showed up at Kapusta's house around 7 a.m., he didn't answer the door.

Two hours later, two detectives knocked for 10 minutes before an intoxicated Kapusta came to the door, the summary says. One of the detectives overheard Kapusta on the phone, telling his partner: "I f---ed up." Asked about it later that day, Kapusta's partner said he "did not recall" the statement.

Around noon — seven hours after the incident — Kapusta's blood-alcohol level was 0.15, nearly twice the legal limit for driving, the summary says.

------1287

Kapusta did not respond to requests for comment. Here is what he told investigators, according to the summary:

After he finished work around midnight, he had two drinks with fellow officers. Around 4:30 a.m., he was on his way home when he noticed the car behind him following too closely and too quickly. Kapusta, who was assigned to the gang unit, suspected its occupants were gang members who recognized his truck. Kapusta approached the car, showed his badge, and identified himself as a police officer, keeping his gun at his side, he said.

He instructed the woman to call 911 because he was afraid of her boyfriend. But then the couple left, so he went home.

At first, Kapusta said he went to sleep as soon as he arrived. He later changed his story to say he went home, drank five to seven shots of alcohol, and then went to sleep.

About two weeks after the incident, the woman called investigators and said she was too afraid to continue pursuing charges, the summary says. Although she denied being intimidated or threatened, she would not come to the door to discuss her decision with a detective because she was terrified, her boyfriend told police.

Without the woman's cooperation, Milwaukee County Assistant District Attorney Karen Loebel concluded she could not prove the case, the summary says.

Nannette Hegerty, police chief at the time, initially fired Kapusta. While his appeal was pending before the Fire and Police Commission, she agreed to reduce his punishment to a 60-day suspension and allow him to remain on the force, records say.

Records do not explain Hegerty's reasons for changing her mind. She could not be reached for comment.

Three years later, Kapusta received an award for distinguished service for devising a system to reduce thefts from cars.

### Domestic violence

In the years following a case in which seven police officers were convicted of beating a man at a Bay View party that was held seven years ago this week, both DA Chisholm and Chief Flynn vowed to take a hard line on officer misconduct.

That didn't happen in the case of Patrick Fuhrman, who beat his wife so badly there was blood in every room of their house, according to a summary of the internal investigation.

Fuhrman's wife and a neighbor who helped her — both police officers themselves — gave the following description of events, according to the summary:

When Fuhrman's wife got home from work on Nov. 3, 2008, she was upset because he had told her he wanted a divorce. She tried to talk with him, but the conversation turned into an argument.

Then it turned physical.

Fuhrman grabbed his wife by the neck and threw her to the ground. The force caused her to hit her head on the floor and bite her lip. He punched her several times in the head, then in the nose. While she was on the ground, he kicked her and stomped on her repeatedly, calling her a "n----- lovin' crazy whore woman."

- - - - - - 1288