


**WATCHDOG REPORTS** | JOURNAL SENTINEL WATCHDOG REPORT

# Hundreds of assault cases misreported by Milwaukee Police Department

## City's violent crime rate lowered based on faulty data

By Ben Poston of the Journal Sentinel

May 22, 2012

When Milwaukee Police Chief Edward Flynn touted the city's fourth-straight year of falling crime in February, hundreds of beatings, stabbings and child abuse cases were missing from the count, a Journal Sentinel investigation has found.

More than 500 incidents since 2009 were misreported to the FBI as minor assaults and not included in the city's violent crime rate, the investigation found. That tally is based on a review of cases that resulted in charges - only about one-fifth of all reported crimes.

Yet the misreported cases found in 2011 alone are enough that Flynn would have been announcing a 1.1% increase in violent crime in February, instead of a 2.3% decline from the reported 2010 numbers, which also include errors.

- - - - - 1 3 0 7

Missing, for example, was the case of Crystal L. Mitchell, 21, who last May grabbed a 9-inch serrated steak knife during an argument with her uncle, stabbed him in his thigh and slashed his arm.

And the case of John F. Sanford, 57, who in December bound his 6-year-old stepson's arms and legs, covered his mouth with duct tape and struck him some 90 times with a belt, later telling him: "I was trying to make you (expletive) on yourself." A doctor at Children's Hospital found cuts and bruises all over the boy's body.

Based on FBI reporting guidelines, both should have been classified as aggravated assaults, the city's most common violent crime. Instead, they were reported as simple assaults, a category reserved for shoving matches and slaps to the face.

At the request of the Journal Sentinel, FBI crime experts reviewed these and dozens of other incidents and confirmed that they should have been labeled as aggravated assaults. In addition to the more than 500 misreported incidents, the investigation found at least 800 more that fit the same pattern but could not be confirmed through available public records. The Journal Sentinel has submitted an open records request for those cases.

The misclassified crimes included cases where perpetrators threatened to kill victims; stabbed or cut them with knives; and beat them with canes, crowbars and hammers.

Nearly one-third of the assault cases identified by the Journal Sentinel involved the abuse of children - most were struck in the head with belts and electrical cords, causing cuts, bloody eardrums and black eyes.

Instead of accurately reporting the weapons used as firearms, knives or blunt objects, the department reported them to the state and FBI in a way that avoided triggering scrutiny by those who review the numbers.

Criminologists reviewed the Journal Sentinel's findings and said they showed a pattern of misreporting that has helped drive down the city's

------1308

crime rate.

"Misreporting is cheating the public," said Michael Maltz, criminology professor at Ohio State University. He called the Journal Sentinel findings just "the tip of the iceberg."

"If they are playing fast and loose, they will do it with the cases they don't send to the prosecutor," said Maltz, senior researcher at the university's Criminal Justice Research Center. "If it's this bad at this level, how bad can it be on the cases that don't reach eye level?"

The FBI's Uniform Crime Reporting system is aimed at helping the state and FBI monitor crime and trends. A city's overall crime rate is made up of eight categories - four violent crimes (homicide, rape, robbery and aggravated assault) and four property crimes (burglary, theft, motor vehicle theft and arson).

All other incidents, such as simple assaults, are excluded from the official crime rate.

When a crime is misreported as a lesser incident, to the general public it's as if it never happened.

Sam Walker, criminology professor at the University of Nebraska-Omaha, said the Journal Sentinel's investigation identified patterns that raise questions about the department's procedures.

"That clearly indicates a systemic problem in the department - there has to be a failure of leadership," he said. "If (police) do it in one or two cases, it's not a big deal. If they do it in a large number of cases, it's suspicious and probably improper. It's something that needs to be corrected immediately."

Buoyed by a falling crime rate, Flynn became the first Milwaukee police chief in 27 years to have his contract renewed in October, receiving a second four-year term.

- - - - - - 1309

When presented with a sample of the incidents, police officials agreed they were misreported and told the Journal Sentinel that the department would revise the crime classifications in coming weeks. Flynn attributed the misreported crimes to human and computer error.

"I never pretended that we were ever going to reach perfect statistical analysis here in terms of the numbers that we reported, and there isn't a police department in the United States that will represent that," Flynn said. "We are not cavalier about it. That's why we have sergeants and lieutenants, and if they are getting it wrong to a statistically significant degree, obviously we want to take a look at that."

It's an inherent problem in all major city police departments that a percentage of crimes will be miscoded when recorded, Flynn said.

Errors in crime classification don't change how cases are handled by prosecutors; records indicate many of the perpetrators were convicted of their crimes. Unlike the data sent to the state and FBI, police incident reports sent to prosecutors included a narrative that provided accurate details about weapons, threats and injuries.

While Flynn has touted a 21% overall drop in crime on his watch during the past four years, the Milwaukee County district attorney's office charged only 2.6% fewer felony cases during the same period.

According to state crime data, the city generates more than 90% of the reported violent crime and more than two-thirds of the property crime in Milwaukee County. The other 20 law enforcement agencies in the county reported a nearly 9% drop in their crime numbers during that time.

Mike Tobin, executive director of the Milwaukee Fire and Police Commission, said Flynn alerted him several months ago about problems with crime coding, including training and computer software issues.

- - - - - - 1310

The Police Department told him that they would conduct a random-sample audit, though it has not begun. Police plan to look at several hundred reports as part of that review, which will cover the past five years. The Journal Sentinel's review encompassed nearly 60,000 cases that were referred to prosecutors since 2009.

Tobin told the Journal Sentinel that depending on the results of that internal audit, he would consider having the commission launch an outside audit.

"If a mistake was made, it will be fixed," Tobin said. "Once the data is scrubbed, and if errors are identified, those will be corrected."

Mayor Tom Barrett said he is confident that the Police Department will identify and work to correct any crime reporting errors.

"It's important for the public to have the most accurate and current data as possible," he said in a statement.

Stephen Fischer, spokesman for the FBI's Criminal Justice Information Services division, called the classifications of specific incidents sent by the newspaper "questionable." Still, he said, the FBI defers "to the investigative expertise of the on-scene law enforcement personnel" on matters of crime classification.

## 3 Factors Used By FBI

In Milwaukee, aggravated assaults have made up about half of all violent crime since Flynn took charge in 2008. Among the four violent crimes, the largest percentage drop has come from aggravated assaults, falling 35% since 2007.

In each misclassified case found by the Journal Sentinel, the incident became a simple assault.

When determining whether an assault is aggravated, the FBI considers three main factors - weapon used, seriousness of injury and intent to harm.

- - - - - 1311

**Weapons.** If the perpetrator used - or threatened to use - a dangerous weapon such as a gun, knife or blunt object, it must be classified as aggravated assault.

Yet the newspaper found hundreds of incidents listed as simple assault where court and police records show a weapon was used.

In February, for example, Precious Taylor, 26, became upset with her boyfriend for talking to another woman at a party. The dispute escalated, and Taylor broke several glass-framed photos over his head, police records show.

Taylor grabbed a pan from the kitchen and hit him over the head, breaking the pan. She then grabbed a knife and stabbed her boyfriend in his arm.

Taylor told police that when her boyfriend didn't get home until 5:30 that morning, she just "snapped." She admitted to attacking him.

Police arrested Taylor for misdemeanor battery, and prosecutors charged her with disorderly conduct, use of a dangerous weapon, which carries a 90-day jail sentence.

FBI experts say the incident should have been marked as an aggravated assault.

**Injuries.** If a victim is seriously injured in a criminal incident, such as broken bones, cuts that require stitches or internal injuries, it must be classified as an aggravated assault.

However, the Journal Sentinel found more than 100 misclassified incidents in which victims suffered grave injuries.

In February 2011, for example, Clarence J. Davis, 59, invited his girlfriend over to his home on N. 29th St. Once inside the house, an intoxicated Davis punched his girlfriend in the face. Blood poured down her shirt.

- - - - - - 1312

Case 2:16-cv-01089-WED    Filed 06/21/19    Page 6 of 15    Document 86-42

Police were called to the home and saw the victim's nose was bleeding. The officer noted in the incident report that the victim's nose "appeared to be off center as it was broken." The victim was taken to Aurora Sinai Medical Center in Milwaukee, where a doctor determined she had a broken nose.

When a victim suffers serious injuries such as a broken nose, it should be marked as an aggravated assault, FBI guidelines state.

The district attorney's office charged Davis with substantial battery, a felony punishable by up to 3 1/2 years in prison. He pleaded guilty in July to a lesser charge and received two years' probation.

Milwaukee police marked the incident as simple assault.

**Intent.** If an assailant intended to cause serious injury by threatening to kill or seriously injure the victim, it must be classified as an aggravated assault.

In December 2009, for example, Antonio Hoskins came to his mother's house on N. 10th St. in a rage and began to choke his pregnant girlfriend in the bathroom. The victim, Darcye Maki, said she was about to pass out from being choked when Hoskins' mother knocked on the door.

Hoskins, then 21, punched Maki in the head and face with closed fists, yelling, "I'm gonna kill you, and I'm gonna kill that baby, too!" the incident report shows.

That statement of intent alone is enough to qualify the incident as an aggravated assault, criminologists said, but there was more.

Hoskins next grabbed a two-by-four and hit Maki 15 times in the head and back, causing bruising and a cut on her head.

"That's when he got me real good," Maki wrote in her victim impact statement. "I was on the floor screaming and crying, holding and guarding my stomach because I was two months pregnant at the time.

1313

We both knew I was pregnant. He said he was going to kill me and the baby if that is the last (thing) I do."

Maki ran out of the house and through some yards to a nearby church where she called police.

"I couldn't really breathe. My head was bleeding and I needed stitches and I had internal bruising," she wrote in the impact statement.

Hoskins pleaded guilty to misdemeanor battery in 2010 and was sentenced to 18 months' probation.

Milwaukee police labeled the crime as a simple assault.

### Incorrect Weapon Codes

On each incident report, police enter a numerical code into their computer system for the category of crime and the type of weapon used.

In hundreds of the misclassified incidents, police and court records show that a dangerous weapon was used, but police listed the numerical code for the weapon as "personal" or "other." In such cases, the coding would not trigger additional inquiry by the state or FBI when submitted.

As police departments submit monthly crime data, the Wisconsin Office of Justice Assistance performs systematic checks, agency spokeswoman Tami Jackson said. The state agency is responsible for compiling and reporting crime numbers to the FBI's Uniform Crime Reporting Program.

If an incident were reported as a simple assault, but the data showed a code for a firearm, knife or blunt object, it would be flagged as an error and sent back to the law enforcement agency for revision, Jackson said.

- - - - - - 1 3 14

Based on available public records, the Journal Sentinel could not determine whether the weapon codes were initially entered wrong,

whether they were due to a computer error or whether someone changed the code after the fact.

In September 2010, for example, Willie J. Carter, 65, became upset with his wife and pulled out a .357 caliber revolver at their north side home. He waved it around and threatened her with it, the incident report shows.

Carter pushed his 68-year-old wife to the floor and kicked her in the head and face multiple times, causing her nose and head to bleed. The police officer who responded to the scene observed a large knot on the victim's head and blood running down her chin and onto her shirt. She refused to be taken to the hospital and received treatment at the scene.

Carter was charged with felony battery - he pleaded no contest to a lesser charge last year and received 18 months' probation, court records show.

Because he threatened the victim with a gun, the incident should have been marked as an aggravated assault, FBI guidelines state.

While the police incident report mentions more than a dozen times that a handgun was used during the incident and accurately lists a weapon code for a "handgun," data sent to the state and FBI listed the weapon with generic codes: "personal" and "other."

Therefore, it was not flagged as incorrect.

Walker, the criminologist from Nebraska, said the fact that hundreds of mislabeled aggravated assaults also included inaccurate weapon codes raises the question of whether the crimes were deliberately misreported.

"It indicates that these are not accidents," Walker said. "Somebody knows what's going on. Somebody understands the implications of reporting it this way, instead of that way. The question is: Who is making those decisions?"

- - - - - - 1 3 15

Neither Flynn nor several high-ranking police officials could provide an explanation for the discrepancy in weapon codes.

But Flynn said the department's records management system is to blame for many problems in crime coding. That system is run on software sold by Tiburon Inc., which provides records management support to about 500 police departments nationwide.

"The Tiburon system is still extraordinarily problematic," Flynn said. "It's proprietary and every single adjustment requires an additional expense. They've got a national reputation for being lousy on customer service with police departments, and we have struggled with this system."

## Case Before High Court

In 2010, the Journal Sentinel attempted to do an audit of two weeks of incident reports for offenses such as assault, burglary and theft.

The Police Department, which had produced 100 copies of incident reports for free, switched gears and sent the newspaper a letter saying the cost to obtain the additional 750 reports would be more than $4,500 and would take police more than nine months.

The Journal Sentinel challenged this as a violation of the state open records laws, arguing the law doesn't allow government agencies to charge for redacting records. A lawsuit filed in 2010 asked a judge to order the department to allow the Journal Sentinel to inspect and copy the records without prepayment of fees for redaction and without unreasonable delay.

Milwaukee County Circuit Judge Thomas Cooper ruled in favor of the Police Department in February, and the paper appealed the case to the Wisconsin Supreme Court, which heard oral arguments in April. The court is expected to rule on the case by the end of June.

– – – – – – – 1 3 1 6

Without direct access to these records, the Journal Sentinel obtained crime incident data submitted by the Police Department each month to

the Justice Assistance office through an open records request to the state agency.

That incident data, from early 2009 through February 2012, was cross-referenced with the Milwaukee County district attorney's case management database and the Wisconsin circuit court criminal database for the same period.

A reporter identified cases that were referred to the district attorney's office as felony assaults but were listed as simple assaults in the data sent to the state. The Journal Sentinel also isolated incidents referred as misdemeanor assaults in which the perpetrator used a dangerous weapon or inflicted serious injury to a victim.

Using this approach, the newspaper was able to review about 20% of the police incidents reported.

The only way to do a full audit of the Milwaukee police crime reporting numbers would be to review all the paper incident reports to determine whether those crimes were properly classified.

FBI crime data receives little official scrutiny, according to interviews with the state Justice Assistance office and the FBI.

The state conducts no audits of crime data. The FBI conducts an audit of Wisconsin law enforcement agencies once every three years, usually of fewer than 10 police departments. Even then, FBI auditors pull only a small sample of incident reports to check accuracy.

For example, during the last FBI audit in 2009, auditors examined an average of 100 incident reports for each of the law enforcement agencies reviewed.

At the request of Milwaukee police, the department was included in a regular FBI audit conducted in May. The results of that audit, which included eight other police agencies in the state, won't be released until fall, the FBI spokesman said.

------1317

## A Very Young Victim

Among more than 160 misreported felony child abuse cases flagged by the Journal Sentinel, the case of Karmari Curtis stands out.

In the fall of 2010, Corey Benson was charged with felony child abuse for beating 2-year-old Karmari, his girlfriend's son.

Benson initially told police that he was just playing rough with Karmari.

He said the two of them were wrestling on the bed when Benson did five elbow drops and two leg drops on the toddler, who then let out a deep sigh and took several labored breaths, police records show.

About five minutes later, Benson began playing with the injured boy again and shoved him hard in the back into the bedroom, causing him to collide with the corner of a box spring.

Benson heard a loud thud. He picked up Karmari and put him into bed.

He later told police that he noticed that the boy was struggling to breathe. His eyes rolled back in his head, and he was losing consciousness. Benson yelled Karmari's name to keep him from passing out.

Benson didn't call 911. He didn't tell the boy's mother, Williete Famolu, what had happened.

When Famolu returned home, Benson told her that the boy's stomach got bruised from playing football, but she saw purple bruising and noticed her son was exhausted, pale and limp in her arms.

She took him to Aurora Sinai Medical Center, and Karmari was taken to Children's Hospital where he spent the next six days in intensive care hooked up to IVs and a catheter.

------1318

"I was upset, I was sad, and I was scared for my son," Famolu said in an interview with the Journal Sentinel. "I stayed there the whole time."

The pediatrician who examined Karmari found internal injuries that were "quite severe and could have easily resulted in the death of (Karmari) had he not been brought for medical attention when he was."

Milwaukee County Assistant District Attorney Matt Torbenson said initially police couldn't determine the extent of Karmari's injuries. More than a week later, a doctor at Children's Hospital informed police that the boy's injuries were found to be the result of child abuse.

"At that point, the police certainly knew that we had a very serious, life-threatening injury," Torbenson said.

The injuries to the toddler warranted an aggravated assault designation, FBI experts said. And so did Milwaukee police officials when presented with the error.

"Why the police didn't change it, I don't know," Torbenson said. "That would be for their department to comment on."

Benson was convicted of felony child abuse this year. A sentencing hearing is set for July.

Wendy Patrickus, attorney for the victim's mother, said misreporting assaults like Karmari's demeans the pain and suffering of victims and their families.

"For this to be minimized by police in the way that it has . . . is a big deal," Patrickus said. "If this is an effort by (Milwaukee police) to make themselves look better, that's a pretty sad state of affairs."

The 2010 beating that put Karmari in the hospital - classified by police as a simple assault - was not included in the city's violent crime rate for that year.

The little boy did show up in the 2011 numbers - this time in a category that's harder to misreport.

- - - - - - 1319

Benson was left alone with Karmari again in April 2011.

This time Karmari died.

\*\*\*

## By The Numbers

- **500** Number of aggravated assaults that were incorrectly downgraded by the Milwaukee Police Department over the past three years, according to a Journal Sentinel analysis.
- **800** Number of cases that fit the same pattern but could not be confirmed through available public records.
- **214** Number of misclassified aggravated assaults that occurred in 2011.
- **-2.3%** Drop in total violent crimes from 2010 to 2011 as reported by Milwaukee police.
- **+1.1%** Increase in violent crimes from 2010 to 2011 based on the Journal Sentinel's findings.

*Source: Milwaukee County district attorney's office; Wisconsin Office of Justice Assistance; Wisconsin Circuit Court database; Journal Sentinel analysis*

\*\*\*

## Journal Sentinel Watchdog Reports

**Follow our work** on **Twitter:** @*js_watchdog*

**Search salary and other information:** *jsonline.com/dataondemand*

**Got a story tip?** Email us at watchdog@journalsentinel.com or call (414) 224-2318.

- - - - - - 1 3 2 0

**About Ben Poston**

Ben Poston is the Journal Sentinel's investigative reporter focusing on database and mapping analysis. He joined the newspaper in June 2007 and has written about weaknesses in the region's tornado warning system, inspection delays for dangerous dams and convicted felons who obtain gun hunting licenses. Previously, he worked as a data analyst at the National Institute for Computer-Assisted Reporting in Columbia, Mo. Prior to that, he worked for three years as a reporter for Cox Newspapers in Ohio. Poston worked for a year as a freelance reporter on a wrongful conviction murder case in Southeastern Missouri that was published in the St. Louis Post-Dispatch. He wrote stories from Mississippi detailing the aftermath of Hurricane Katrina that won a 2006 Best of Cox Newspapers Award. Poston holds a bachelor's degree in international studies from Miami University (Ohio) and a master's degree in journalism from the

University of Missouri, where he focused on database, mapping and social network analysis. He can be reached at bposton@journalsentinel.com or (414) 224-2572.

✉ bposton@journalsentinel.com    📞 (414) 224-2572

**Find this article at:**
http://archive.jsonline.com/watchdog/watchdogreports/hundreds-of-assault-cases-misreported-by-milwaukee-police-department-v44ce4p-152862135.html

☐ Check the box to include the list of links referenced in the article.

- - - - - - 1 3 2 1

Case 2:16-cv-01089-WED    Filed 06/21/19    Page 15 of 15    Document 86-42