UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

SHANNON LEWANDOWSKI

        Plaintiff,

v.                               Case No: 16-CV-1089

CITY OF MILWAUKEE

        Defendant.

## DECLARATION OF SHANNON LEWANDOWSKI

Pursuant to 28 U.S.C. § 1746, I hereby declare the following to be true under penalty of perjury:

1.      I am the Plaintiff in this case, and I give this declaration based on my personal knowledge.

2.      Defendant's sworn officers and detectives are majority male.

3.      I was hired by Defendant's Police Department in June 1999 as a police officer, and I was employed by Defendant in various positions for over 17 years. In 2005, I was promoted to detective and spent the majority of my career assigned to violent crimes.

4.      Throughout most of my career, Defendant assigned me to undesirable tasks at work because I am female and later because I complained of discrimination and retaliation.

5.      Because I would not back down from complaining about injustice and discrimination when I saw it, other department members and command staff called me derogatory names such as "pitbull" and "black cloud."

6.      At all times material herein, I performed my work duties in accordance with the

reasonable expectations of the Defendant.

7. In my performance review for 2011, my supervisor noted, "Detective Lewandowski shows exceptional skill in her thoroughness to investigate a felonious crime. Detective Lewandowski exhibits tenacity and is relentless when conducting follow-up to track down known and unknown criminals for any type of crime. Detective Lewandowski shows independence in her investigations and willingly accepts any assignment given to her without complaint. Detective Lewandowski is a reliable and dependable investigator."

8. In my performance review for 2014, a true and correct copy of which is attached as **Exhibit 7**, my supervisor noted, "Detective Lewandowski is very passionate bout [sic] her work and genuinely cares about the victims. She takes ownership of all her cases, and completes the required follow up in order to obtain criminal charges AND a convention. Detective Lewandowski is skilled at using social media to identify suspects and gather evidence against them. During this rating period, she chaired a trial in which the defendant was a high value target. At the conclusion of the trial, the defendant was found guilty of Attempt-1st Degree Intentional Homicide, and he was sentenced to 37 years in prison." He concluded by stating in part, "Detective Lewandowski is undoubtedly one of the most dedicated detectives on the department – her ability to follow through with her investigations from start to finish is impressive." The review also notes that "she was counseled by Lt. Sean Hanley about the proper way to follow the chain of command. This stemmed from an email that she sent to the Chief and other members of the command staff."

9. While employed by Defendant, I received Early Intervention Training to assist fellow officers on the Department with personal issues or situations that came up during their employment.

10.     On November 1, 2006, I submitted a memo to Captain Dubis regarding "Harassment by neighbor," a true and correct copy of which is attached as **Exhibit 1**.  I noted that "Since the summer of 2005, I have had multiple problems with my neighbor....  I have spoken to Sgt. Staton of District Three."  She added, "In August of 2006, Lawrence Poggenburg threatened my job and my reputation.  He stated to me that 'people like me do not belong on the Police Department' and would do whatever it took to either, 'make me move or get me fired, whichever comes first.'  I am a single parent and the provider for my children.  This threat caused me great concern.  Lawrence Poggenburg has continually harassed me verbally, as well as using the power of the Police Department to further harass me.  He has also used other agencies by giving me unfounded parking citations."

11.     When I obtained a temporary restraining order against Poggenburg on November 15, 2011, Defendant refused to serve it on him despite its legal obligation to do so.

12.     On November 28, 2011, I wrote a letter to Defendant's Chief of Police asking for help with my neighbor situation and detailing all the ways that his male officers had refused to help me over the years.  A true and correct copy of this letter (attached to Defendant's March 9, 2016 position statement to the Wisconsin Equal Rights Division as Exhibit 2 in ERD Case No. CR201502561, EEOC Case No. 26G201501284C) is attached as **Exhibit 2.**

13.     During 2011, Defendant's male Police Officer Daniel Culver, after going off-duty for Defendant, solicited prostitutes who later beat him up, stole his car, and set his car on fire.  When questioned about it, he lied during the internal investigation while he was on paid leave for nearly a year.  Even though the Chief fired him, Culver was reinstated by the Fire & Police Commission and remained a supervisor.  He was never criminally charged.

14.     I previously filed a complaint with Defendant's Internal Affairs Division about

Chief Edward Flynn coming to my house drunk and making unwanted sexual advances to me.

15.     On August 30, 2012, I submitted a memo to Captain Wagner about "Workplace Harassment," a true and correct copy of which is attached as **Exhibit 3**, describing the discrimination and harassment I was receiving from male detectives.  I added, "I feel endlessly persecuted because I am a female, my reputation constantly attacked, and this is distressing and would [sic] appreciate if the matter is well looked into.  In the past I have written two other complaints, which have never been formally addressed, but have been confronted by the supervisor of whom I made the complaint about.  I was later asked to transfer, and view that transfer as retaliation.  This work environment does not promote a professional atmosphere, respect or teamwork, but rather creates an environment that makes me upset, intimidated and causes me other issues that I would like to address."

16.     On August 5, 2013, I submitted a memo to Captain Wagner about continued harassment from Lawrence Poggenburg that Defendant refused to assist me with, a true and correct copy of which is attached as **Exhibit 4**.  I wrote, "Since the year 2005 I have been dealing with a harassing neighbor, a situation that most of District three, and my supervisors throughout the years have been made aware of.  I did get a restraining order in 2011, and for the first year the behavior has ceased for the most part.  However this summer, my neighbor has re-started his intentional and offensive behavior and direct this at me again."  I closed by stating, "Lawrence Poggenburg has a compulsive preoccupation with having to make contact with me whenever he sees me home, and cannot leave me or the front of my home alone as ordered.  Since I did not get any assistance from District Three Supervision in the past, and was told that this problem is a CIB problem to handle, I am coming to you to take appropriate action."  No one responded.

17.     During my employment with Defendant, I became friends with another female police officer, Melanie Beasley.  In the fall of 2014, I became aware that Beasley was having some personal issues.

18.     On or about October 5, 2014, after receiving a text from Beasley showing a paper shooting target shot up from her boyfriend, I asked her supervisor, Lt. Hanley, if that looked to him like "foreplay."

19.     I obtained permission from Lt. Hanley to go to Beasley's house while on duty to ask what was going on with her in an official capacity, and I did so.

20.     On that date, I learned that Beasley had been suffering in an abusive relationship with another Milwaukee police officer and member of a tactical unit, Robert Wilkinson, male.

21.     Beasley told me that she attempted to end the relationship numerous times after learning that Wilkinson was married but that he had made threats to her and that she was afraid for her safety.

22.     After visiting Beasley on or about October 5, 2014, I returned to the District 5 police station of Defendant to speak to Lt. Hanley, and I advised him what she had learned from Beasley, including that Beasley feared for her life from Wilkinson.

23.     I showed Lt. Hanley a picture of a used firing target that Wilkinson had sent to Beasley, and I told Lt. Hanley that she believed it was a threat against Beasley.

24.     Lt. Hanley said he also believed it was intended as a threat, and he suggested to me that Beasley get a restraining order against Wilkinson.

25.     As a supervisor at Defendant, Lt. Hanley and Lt. Leitzke are both mandatory reporters of violence by Defendant's employees.

26.     Lt. Leitzke told Beasley, "if you tell me his name, I have an obligation to report

5

it."

27. Lt. Leitzke and Wilkinson, at all times material herein, were personal friends.

28. As soon as Beasley told Lt. Leitzke that her stalker was Wilkinson, he asked Beasley if she had anything in writing and attempted to dissuade her from reporting Wilkinson.

29. Throughout October 2014, I continued to stay in touch with Beasley and counsel her about reporting the situation to her superiors.

30. Wilkinson told Beasley he was watching her, and "I can take you out from 1,000 yards."

31. Wilkinson sent Beasley a text message asking what she would do if he "ripped my panties off, whipped it out, and stuck it in me."

32. Wilkinson raped Beasley days later on or about November 10, 2014, while his duty gun was nearby, and he choked and threatened her if she reported him to Defendant.

33. Wilkinson also made multiple threats that he would kill Beasley, particularly if he ever found out about her starting a relationship with another man.

34. On or about October 14, 2014, while at Beasley's personal residence, I overheard Wilkinson speaking to Beasley on her speaker phone, and he said, "If you leave me, I will kill you."

35. In late 2014, I approached Lt. Hanley and told him that the abusive situation with Beasley and Wilkinson was ongoing and included death threats against Beasley, and I asked if Beasley could come speak to him directly, to which he agreed.

36. On or about December 6, 2014, I received a confidential informant tip on where to find a wanted person who was believed to be armed and dangerous and possibly suicidal. The suspect killed his wife by shooting her in the head, and he had fled after escaping by injuring an

6

officer on the Department.

37.     I could not find a warrant, though there should have been one filed.

38.     I was very worried about the possible consequences if I did not arrest him immediately, as this was shortly after the anti-police riots in Ferguson and nationwide unrest, and I wanted to avoid a "suicide by cop" situation with the suspect that might touch off similar unrest and riots in Milwaukee against the Department.

39.     On December 6, 2014, I first called Lt. Hanley to ask for assistance regarding the wanted person and explained the urgency of the situation.  He responded that he was "too busy."

40.     I then texted Lt. Lough for assistance with the warrant, but he did not respond.

41.     I then went to Metro and banged on the door for assistance; I was told they were in a meeting, and they did not assist me.

42.     I contacted other police agencies involved to obtain assistance, but they did not assist me.

43.     Finally, after making those and other unsuccessful attempts from various male members of the Department to obtain assistance, and due to the exigent circumstances, I emailed Lt. Sgrignuoli, Lt. Lough, Lt. Hanley, Capt. Smith, Lt. Armbruster and Chief Flynn in an effort to get the attention needed to obtain a warrant, availing myself of the chief's stated "open door policy".  A true and correct copy of this email is attached as **Exhibit 5**.

44.     About an hour after sending the email, I finally was given clearance to arrest the suspect, but he got away because I could not act on the tip immediately.

45.     Approximately one hour after sending the "open door" email, Lt. Hanley ordered me into his office and verbally reprimanded me for sending the email; Lt. Hanley told me I must apologize for the "open door" email because "it made the command staff angry."  I knew that I

7

had acted correctly and I refused to apologize for sending the email.

46.     On December 7, 2014, Lt. Sean Hanley wrote a memo to Captain Sgrignuoli, a true and correct copy of which is attached as **Exhibit 6**, about the "open door" email I wrote, explaining that he had counseled me about it.

47.     I learned later a male detective handling the case regarding the wanted person was derelict and neglected to obtain a warrant.  He was not disciplined or reprimanded for his dereliction of duty.

48.     I also learned that a female officer was reprimanded for not putting a warrant into the system for sexual assault.

49.     A few days after I sent the "open door" email, Lt. Sgrignuoli ("Acting Captain") confronted me in the hallway regarding the email.  Lt. Sgrignuoli asked me, "What the hell is wrong with you, why would you write the Chief?"  Lt. Sgrignuoli told me not to write any more emails to the Chief and not to "cross him" again.

50.     On or about December 10, 2014, Beasley spoke to Lt. Hanley and told him that she was afraid for her life from Wilkinson, that she thought he was going to kill her, that he was having rage issues, that his wife knew about their relationship and told Beasley he's crazy, and that Beasley should be afraid.

51.     Lt. Hanley did nothing to address Beasley's concerns.

52.     On or about December 11, 2014, Beasley spoke to her own supervisor, Lt. Leitzke, who came in while he was off duty, about the death threats, intimidation, and sexual harassment she was suffering at the hands of Wilkinson.

53.     Beasley told Lt. Leitzke that she had told Lt. Hanley about the about the death threats, intimidation, and sexual harassment she was suffering at the hands of Wilkinson, the

previous day.

54.     Lt. Leitzke told Beasley not to let Wilkinson surprise her, and that if Wilkinson came to her house, Beasley should drive away.

55.     Lt. Leitzke told Beasley that if Wilkinson ever showed up at Walmart while she was there, it was not a coincidence and she should leave right away.

56.     Lt. Leitzke encouraged Beasley not to file a report and to keep the situation secret.

57.     Lt. Leitzke hit on Beasley in the meeting.

58.     Lt. Leitzke did nothing to address Beasley's concerns.

59.     At no time after the reporting of this incident to either Lt. Hanley or Lt. Leitzke did Defendant ever take any steps to limit Wilkinson's duties, police powers or contact with the victim, Beasley. Instead, the Department retaliated against Beasley for reporting the death threats, intimidation, and sexual harassment she was suffering at the hands of Wilkinson.

60.     On or about December 12, 2014, only six days after I could not find a warrant to arrest the armed, dangerous and possibly suicidal suspect, that suspect killed himself while being arrested, as I had feared.

61.     On or about December 13, 2014, Lt. Sgrignuoli took me off my preferred shift and transferred me to a new assignment in retaliation for my "open door" email to the Chief, to work on ballistic cases under Lt. Armbruster.

62.     Lt. Sgrignuoli told me that this transfer was an "opportunity" for me.

63.     Such a change in duties would confine me to the office, and I and Lt. Armbruster agreed that the change was actually a punishment for my emailing the Chief.

64.     I also believed that the change was intended to keep me from assisting or advocating for Beasley.

9

65.     In January 2015, Beasley filed for a restraining order against Wilkinson.

66.     On or about January 1, 2015, I made a misdemeanor arrest of a female relating to the first shooting of the year.

67.     While I was attempting to finish necessary paperwork for the January 1st arrest, Lt. Sgrignuoli told me to punch out, go home, and finish the remaining paperwork in the morning because no overtime was to be paid for a misdemeanor offense. I complied.

68.     On January 1, 2015, at the direction of Lt. Sgrignuoli, Lt. Lough wrote me up for not completing the misdemeanor paperwork on the night of the January 1, 2015 arrest, despite my following Lt. Sgrignuoli's orders at the time to go home and complete the paperwork later to avoid overtime prohibited on misdemeanors. A true and correct copy of this undeserved writeup is attached as **Exhibit 8**.

69.     I asked Captain Sgrignuoli why I was written up when he told me to go home; he responded, "you don't make the rules, I do; this is what happens when you go against me."

70.     I addressed this situation with Lt. Hanley, who told me that this punishment was obviously a direct consequence to my for emailing the Chief, and thus retaliation.

71.     Further, I complained to Lt. Hanley about the treatment and threats against my career that I was experiencing from Lt. Sgrignuoli.

72.     Defendant never took action on any of my complaints about any male members of Defendant's Police Department.

73.     I made numerous verbal complaints to my other Lieutenants about harassment and retaliation I was receiving from Sgrignuoli for emailing the Chief about a male officer's dereliction of duty, but I received no assistance and was told to "lay low."

74.     In January 2015, I was assigned to the Power Shift at Defendant's District Three.

10

75.    On or about January 5, 2015, Beasley met with Sergeant Estacio and Sergeant Klein from Internal Affairs to discuss the abuse she suffered by Wilkinson, but they treated Beasley like a criminal during this meeting and issued a "no contact" order for Beasley as to Wilkinson, instead of taking any action against Wilkinson.

76.    Beasley called Lt. Leitzke after her meeting with Internal Affairs; he told Beasley not to document anything and leveraged a potential promotion against her in attempts to convince her to not to file a report on Wilkinson.

77.    On or about January 11, 2015, I was the victim of a break-in at my home while I was present and off-duty. I caught the suspect after a foot chase and arrested him.

78.    When the break-in suspect was taken to the Department that day, he falsely accused me of using the "N" word against me. He later recanted that allegation in court.

79.    In January 2015, I asked Lt. Hanley about potential additional steps that could be taken to protect Beasley, who was now living with me because she feared for her life. I also updated Lt. Hanley about the emotional distress Beasley was experiencing from Wilkinson.

80.    When Beasley went to Internal Affairs about the abuse she was experiencing by Wilkinson, she was told to get a restraining order and then the threat could be looked into.

81.    In January 2015, I wrote a memo to Internal Affairs and Lt. Hanley regarding death threats Wilkinson made to Beasley, and I demanded to know why nothing was being done to protect Beasley.

82.    On or about January 15, 2015, Beasley obtained a temporary restraining order against Wilkinson with my assistance and support.

83.    After receiving the temporary restraining order against Wilkinson, Beasley emailed a copy to District Five's Captain Stigler, asking for Defendant's assistance. Captain

Stigler did not help Beasley.

84. I also informed Captain Stigler about Beasley's situation, but Captain Stigler refused to listen and stated that it was none of my business.

85. Defendant never arrested Wilkinson, took away his gun, or ordered him into the district attorney's office to discuss the allegations against him, even though the assistant district attorney admitted to Beasley that there was probable cause to arrest Wilkinson based on her report.

86. On or about January 18, 2015 at approximately 8 p.m., Beasley and I were discussing Beasley's filing for and receiving a restraining order against Wilkinson in front of witnesses at the Department.

87. On or about January 19, 2015, while on I was on duty and driving to District Five to assist Beasley with her concerns about Wilkinson's death threats against her, my squad car was involved in an accident that totaled it.

88. I was seriously injured on January 19, 2015, when a drunk driver ran a red traffic light and struck the squad car I was driving and in which Detective Juanita Carr was a passenger.

89. I suffered very serious head injuries in the accident, including a concussion and lingering memory problems. In my employee report on the accident on January 28, 2015, I reported "neck & back aches, unable to sit long time. Severe headache, short term memory loss, therapy for R foot, dizziness, L knee pain." A true and correct copy of this report is attached as **Exhibit 9**. My doctor noted in a January 21, 2015 report, a copy of which is attached as **Exhibit 10**, that I suffered "multiple contusions & abrasions, concussion, whiplash, sprained R ankle." My doctor's note dated March 2, 2015, a true and correct copy of which is attached as **Exhibit 15**, described in detail my concussion symptoms and recommended treatment. Defendant

12

received all of these reports from my doctors. I also submitted a short memo to Acting Captain Sgrignuoli dated January 22, 2015, a true and correct copy of which is attached as **Exhibit 11**, requesting to be carried by the Department as Injured on Duty (IOD) status.

90.     Detective Carr, who had not complained to Defendant about discrimination, was also seriously injured in the accident.

91.     After my traffic accident, Lt. Hanley got involved in the investigation of the January accident and intentionally made false statements in the report about my accident, leading to multiple investigations of me by Defendant.

92.     Lt. Hanley did not make false statements about Detective Carr or place her under investigation.

93.     Lt. Hanley then questioned me, while I was suffering from a concussion, without providing notice that I was under investigation for alleged departmental violations related to the accident.

94.     Defendant refused to pay my medical bills from the January accident, denied me worker's compensation claim, refused to pay my medical bills, and held its investigation open for months longer than any investigations into male officers or officers who did not complain of discrimination.

95.     Defendant accepted the worker's compensation claim of Detective Carr, (who had not complained of discrimination) and paid her medical bills.

96.     I submitted a memo to the Department at its request, asking to be carried by the Defendant as being injured-on-duty until I was able to return to work, as Detective Carr was, but Defendant refused. A true and correct copy of this memo to Acting Captain Sgrignuoli is attached as **Exhibit 11**.

97.     On or about January 23, 2015, I appeared off-duty at Milwaukee County Children's Court, at the victim's request, in a public hearing of a victim's armed robbery and shooting incident crime that I solved. I obtained a copy of the court transcript from Defendant's November 11, 2015 position statement to the Wisconsin Equal Rights Division as Exhibit 7 in ERD Case No. CR201502561, EEOC Case No. 26G201501284C, a true and correct copy of which is attached hereto as **Exhibit 12**.

98.     Now-Captain Sgrignuoli wrote a memo about the court appearance containing false information negative to me.  Captain Sgrignuoli then ordered that I be investigated for allegations of misconduct.

99.     Captain Sgrignuoli wrote a false memo to IAD for the investigation, stating: "Judge Swanson apologizes for not seizing the phone or holding Detective Lewandowski in contempt as an incident like this had never happened to him before.  Judge Swanson went on to describe Detective Lewandowski's behavior as extremely unprofessional and contemptuous."

100.    A day after the January 23, 2015 court hearing, on January 24, 2015, Captain Sgrignuoli confronted me at my home and informed me that I was "making bad decisions," and stated words to the effect:

    a.      "You had a cell phone in court, and the judge called me and told me he wanted to hold you in contempt of court and decided not to as a favor."

    b.      "You called a burglary suspect the N-word."

    c.      "I am taking your gun and badge."

    d.      "You have no police powers."

    e.      "You are under suspension."

    f.      "You cannot take the Lieutenant's exam."

14

g. "You cannot testify for Beasley."

h. "You are not to possess any firearm outside of your home."

i. "You are not to make any arrests."

j. "Do you understand you cannot testify in court for Melanie either?"

101. Captain Sgrignuoli suspended me because of the court incident. Attached as **Exhibit 13** is a true and correct copy of the suspension I received as Exhibit 13 to the Defendant's November 11, 2015 position statement to the Wisconsin Equal Rights Division as Exhibit 7 in ERD Case No. CR201502561, EEOC Case No. 26G201501284C.

102. After Captain Sgrignuoli's false memo was submitted to IAD, Sergeant Hines conducted an investigation into the incident and stated in a March 24, 2015 memo repeating many of Captain Sgrignuoli's false allegations and negative information about me, "Judge Swanson stated that he did not confiscate Detective Lewandowski's phone because she was a police member and did not think it was necessary. He stated even if Detective Lewandowski was not a police member, he would not have held her in contempt but he probably would've asked for her phone."

103. Other witnesses at the court hearing on January 23, 2015, stated that I was never uncooperative and the incident was not a big deal.

104. On or about January 26, 2015, I testified for Beasley as a witness who heard Wilkinson tell Beasley "If you leave me, I will kill you" on or about October 14, 2014.

105. In retaliation for that truthful testimony in support of Beasley, in February 2015, Captain Sgrignuoli again confronted me at my house and informed me that I violated rules by testifying in court for Beasley while I was suspended. He also stated again that I could not take the Lieutenant's exam for a possible promotion.

15

106.     As a result of the threats and retaliation against me by Captain Sgrignuoli, members of my Central Division, as well as male detective Troy Johnson, distanced themselves from me for fear of retaliation against themselves.

107.     On February 11, 2015, I wrote a memo to Judge Swanson, apologizing for interrupting the proceeding and explaining the reasons that I wanted to record the hearing.  A true and correct copy of my memo is attached as **Exhibit 14**.

108.     I took FMLA leave from February 15, 2015 to May 9, 2015 for the injuries from my January accident.

109.     On or about February 6, 2015, Beasley made an official written report on Wilkinson to Sgt. Schroeder of Internal Affairs at Defendant; Defendant's Internal Affairs Division did not contact her about the complaint until on or about March 29, 2015.

110.     When IAD finally contacted Beasley about her complaints of death threats and controlling and abusive behavior by Wilkinson, they asked her dismissively, "What do you want?  A bodyguard?"

111.     After submitting her complaint, Beasley met with Internal Affairs Criminal Detective Christopher Zimmerman. During her second meeting with Detective Zimmerman, he questioned if Beasley really wanted an investigation done and threatened that if she continued to push for an investigation, that Internal Affairs would begin investigating her for wrongdoing she did not commit.

112.     Defendant never took away Wilkinson's gun, badge or police powers, it never investigated Beasley's reports that he stalked and raped her, and it never disciplined Wilkinson in any way for his outrageous behavior toward a female member of the Department.  The Department noted in a November 11, 2015 position statement in this case to the Wisconsin Equal

Rights Division: "No finding of wrongdoing was made against PO Wilkinson by [Defendant] in its employment investigation, or the district attorney's office which declined to issue charges against him based on the allegations of Ms. Beasley."

113. Instead, the Defendant's "good ol' boys club" rallied around Wilkinson and protected him, while leaving Beasley and I to fend for ourselves.

114. Captain Sgrignuoli and the Department made multiple attempts to ruin my reputation while I was out on medical leave, including:

a. In March 2015, I was forced to go to court and testify without pay. After I arrived home from court, I found a sergeant at my house, who accused her of being drunk in court and forced me to blow into an intoxometer. Despite no signs of alcohol, a POST member, Detective Isla Wallich, came to my home to discuss the incident. I was still suffering from concussion side effects resulting from her January 2015 accident.

b. While I was in court to testify in April and May 2015, the Department told one of the lawyers in a case that I was suspended. This was brought up in court. However, I was not suspended—only my police powers were suspended.

c. In another incident during which I was forced to testify in court in May and August 2015, the Department told a probation agent involved in the case that I was suspended and gave the agent my home phone number.

d. In another case, I was forced to testify while still experiencing severe health effects from a head injury suffered during my January accident. I was not able to testify successfully due to my injuries, and the case was lost. The Department accused me of being drunk in court, even though I was suffering from my head injuries and sober. Detective Carr also worked on that case, but Defendant never forced her to testify in the

17

case.

115.    In February 2015, Captain Sgrignuoli ordered me to write a memo for an involuntary transfer or face more consequences for my complaints.

116.    As a result, I contacted union president Mike Crivello, who came to my home to meet with me.

117.    While meeting with Crivello, I explained the threats, retaliation, and intimidation tactics Captain Sgrignuoli was using against me, and I also informed him about the suspension of my police and arrest rights.

118.    Crivello then talked to Sgrignuoli, who stated, "When [Plaintiff] is ready to come back she can, but she made me look bad in the eyes of the Big Guy," presumably referring to the Chief of Defendant's Police Department.

119.    On or about February 26, 2015, Defendant advised me by letter that my worker's compensation claim was still under review by Defendant's Office of Employee Benefits and the vehicle accident was under review by Defendant's Internal Affairs Division.

120.    On or about March 5, 2015, Mayor Barrett received a letter from the family of a victim (the same victim that I appeared in court off-duty and tried to audio record for the family) that I assisted and solved a crime regarding, praising me for my work in several resulting cases and recommending that I receive an award for these actions.  A true and correct copy of that letter is attached as **Exhibit 16**.

121.    I did not receive an award for my actions.

122.    Defendant continued to force me to testify without pay in court on cases of mine while I was off-duty after the January accident on unpaid leave and not injury leave.

123.    Defendant did not force Detective Carr to testify without pay, because Defendant

18

placed her on injury leave from the Department.

124.　On or about March 8, 2015, Defendant's male officer Clayton Amborn was arrested for drunken driving while he was still a probationary employee, but Captain Stigler used his rank to keep the male officer from properly getting fired according to policy. Captain Stigler did not assist female probationary officers or even female officers in general this way.

125.　On March 24, 2015, male Sgt. Hines submitted a report to Deputy Inspector Brunson regarding me, beginning, "On January 27, 2015, Captain of Police Timothy Heier instructed members of the Internal Affairs Division to investigate an allegation of misconduct on the part of Police Detective Shannon Lewandowski," noting that the allegation being investigated regarded, "On January 23, 2015, Detective Shannon Lewandowski, while off-duty, was observed recording a juvenile court proceeding with her cell phone and was argumentative with court deputies when asked to stop." In the memo, Sgt. Hines repeated lies told by Lt. Sgrignuoli in an attempt to further retaliate against me for complaining about discrimination. A true and correct copy of the memo report is attached as **Exhibit 17**.

126.　In March 2015, I met with Deputy Inspector Terrence Gordon about the retaliation and intimidation I was experiencing from Captain Sgrignuoli, my suspension, and the lies Sgrignuoli wrote about my interaction with Judge Swanson. In that meeting, Gordon told me, "Get a lawyer. Sgrignuoli is after your reputation and career."

127.　In a court hearing on or about March 12, 2015, the break-in suspect at my home in January stated in court that I did not use the "N" word in chasing and apprehending him, and he acknowledged that he had lied about it at the time of his arrest.

128.　In March 2015, I contacted Captain Sgrignuoli to inquire why my gun was taken away and my police powers suspended, and I told Captain Sgrignuoli that I felt that I was being

retaliated against.

129.    On or about March 24, 2015 and again in May 2015, I contacted Captain Sgrignuoli to find out why I was still suspended, and I asked why I was suspended but Wilkinson was not.

130.    Sgrignuoli denied writing the complaint that led to my suspension and claimed to have no knowledge of why I was suspended.

131.    This contradicts a previous memo from Sgt. Hines stating that Sgrignuoli wrote the complaint for my suspension that was submitted to IAD.

132.    On or about March 31, 2015, my fellow officer Nancy Nelson's husband made an unsubstantiated and unfounded 911 call to Defendant to report her for domestic violence. When male officers of the Department responded to the scene, they accepted her husband's lies and arrested Nancy Nelson.

133.    On or about April 8, 2015, I was notified that I was being investigated by the Department regarding my January accident for "operating a department vehicle, with emergency lights activated, while not accomplishing the mission of the department." I was then interviewed by IAD on or about April 14, 2015, as recounted in Sgt. Zieger's memo dated September 8, 2015, a true and correct copy of which is attached as **Exhibit 22**.

134.    On April 15, 2015, Defendant issued charges against me regarding integrity, referring to the January 23, 2015 court hearing at which I was off-duty.

135.    On or about April 29, 2015, Lt. Armbruster instructed me to go to court for subpoenas, contradicting earlier instructions from Captain Sgrignuoli that I was not supposed to attend court.

136.    Armbruster informed me that Sgrignuoli was ordering me to attend court, and if I

did not, I would be written up.

137.    On or about May 3, 2015, I submitted a memo to the Chief about the incident in Judge Swanson's court in response to being charged with integrity violations. A true and correct copy of my memo is attached as **Exhibit 18**.

138.    On or about May 6, 2015, Lt. Armbruster informed me that I had to be at work on May 10, 2015, and that if I could not return to work, I would need to see another doctor.

139.    I informed Lt. Armbruster that I was not able to afford to see another doctor because I was not receiving injured on duty pay while still under investigation regarding my accident.

140.    On or about May 22, 2015, I was given an official reprimand as discipline for allegedly "behaving in such a way that created the appearance of impropriety." A true and correct copy of this discipline (that I received as Exhibit 14 to the Defendant's November 11, 2015 position statement to the Wisconsin Equal Rights Division as Exhibit 7 in ERD Case No. CR201502561, EEOC Case No. 26G201501284C) is attached as **Exhibit 19**.

141.    This discipline was given to me based on false statements of Captain Sgrignuoli, who wrote lies in retaliation for my email to the Chief.

142.    On or about May 26, 2015, Defendant prepared a Restitution Worksheet regarding my January accident showing the drunk driver who ran a red light and hit my squad car was expected to pay the Department $4,884.22 in restitution for the value of the wrecked squad car, a damage appraisal, and towing from the accident.

143.    On or about June 1, 2015, I submitted a memo to Captain Sgrignuoli regarding my forced unpaid medical leave instead of being considered injured on duty, requesting information on the status of the investigation, requesting specific days off, and noting that I was

21

aware I would be transferred. A true and correct copy of my memo is attached as **Exhibit 20**.

144. On or about June 1, 2015, Defendant transferred me without notice in retaliation for my complaints of sex discrimination.

145. On or about June 3, 2015, Captain Sgrignuoli and Lt. Armbruster disciplined me for having a phone in court. A true and correct copy of Lt. Armbruster's June 19, 2015 memo describing this discipline is attached as **Exhibit 21** (I received this as Exhibit 15 to the Defendant's November 11, 2015 position statement to the Wisconsin Equal Rights Division as Exhibit 7 in ERD Case No. CR201502561, EEOC Case No. 26G201501284C).

146. After administering my discipline, Sgrignuoli told me he did not like my attitude and stated, "I was prepared to give you your gun and badge back but now I am not. I don't like your attitude. How are you feeling?"

147. I responded that I still had headaches from my accident. Captain Sgrignuoli replied, "Hmm, now I decided that you are not getting it back. Leave my office."

148. On or about June 11, 2015, Nancy Nelson was arrested for her first OWI charge, and the Department put her on desk duty and would not allow her to even ride as a passenger until she got her occupational license in October 2015.

149. Male officers in similar situations were not put on desk duty or stripped of their ability to ride in squad cars with other officers, and were not investigated.

150. In June 2015, I called IAD to see what date Lt. Hanley wrote on the memo quoting me about my January accident, which contained numerous lies. IAD refused to give me the date of the memo.

151. In March, April, May, June, July, and August of 2015, I called LaMonica Salles from Defendant's Human Resources about the still ongoing investigation of my January

22

accident. Salles refused to provide me with any information and refused to call IAD.

152. I attempted to call IAD's Sgt. Zeigler several times from March to July 2015. I was told that the investigation into my accident was done and on Sgt. Hines' desk.

153. I told Sgt. Hines that I needed to return to work because my bills were going to collection, that I was being retaliated against, I was being made to use sick time, and not injury on duty time because of the investigation, and that my partner who was in the car with me at the January 19 accident (but who had not complained of discrimination) was not facing similar treatment.

154. On or about June 26, 2015, I underwent knee arthroscopic debridement and chondroplasty related to the January accident.

155. As of August 2015, the investigation into my accident was still pending, leaving me on unpaid leave with huge medical bills, in retaliation for my complaints of discrimination. Defendant has never taken so long to resolve an investigation into a drunken driving accident.

156. Defendant never sent me for a psychiatric or "fit for duty" evaluation, and I never had my gun returned to me even after I returned to work.

157. On or about August 30, 2015, I was again reassigned in retaliation for her complaints of discrimination. Despite telling me that I was not able to make good decisions, Defendant assigned me to work with the ATF and FBI doing ballistics cases and to interview recruits for hiring onto the Department.

158. On September 9, 2015, Sgt. Zieger submitted a 22-page memo to Deputy Inspector Brunson regarding my January accident, noting that he did not interview my son—whom the Defendant claimed I had been driving to help at the time of the accident—until June 11, 2016, six months after the accident. The memo notes that "Mr. Lewandowski stated he tells

23

his mother when he gets 'pulled over.' Mr. Lewandowski described he called his mother, informed her he was 'pulled over,' and he would call her (Detective Lewandowski) when he was done. Detective Lewandowski responded, 'Alright, bye.' Mr. Lewandowski denied that his mother requested him (Mr. Lewandowski) to call her back when he determined where he was. Mr. Lewandowski responded that his mother did not state she wanted to meet him or tell him where she was going. Mr. Lewandowski stated, 'I would never put my mom in that position to come like get me.' Mr. Lewandowski stated he did not inform his mother that he was by UWM." Sgt. Zieger further noted that it was in fact Shorewood Police who pulled over African-American Mr. Lewandowski for a field interview. He noted that an officer on the scene of the accident stated that Plaintiff "was very incoherent" and he "thought she may have hit her head." The memo notes "Detective Beasley acknowledged she intended to meet Detective Lewandowski at District Five at about the time the accident had occurred…. Detective Beasley stated Detective Lewandowski never told her of an intention to meet her son before the accident." He noted that "Officer Goggins recalled Detective Lewandowski was disorientated [after the accident] and requested him to contact her son." The memo stated, "Detective Carr explained she had investigated a shooting in which the suspect lived on North 52nd Street, and was going to check for the firearm used in the offense. Detective Lewandowski was going to meet an officer at District Five and then go with Detective Carr to the residence so they did not have to call for another squad to meet them. Detective Lewandowski informed Detective Carr she was meeting "Melanie," but did not state why. Detective Carr stated they both left in the same vehicle from District Three. Detective Carr did not know if Lieutenant Hanley had assigned the follow up or asked if she was going to check for the firearm, or if she had spoken to Lieutenant Hanley before leaving District Three." The memo noted, "Detective Carr stated she

24

was never told by Detective Lewandowski she was trying to meet her son. Detective Carr stated if she would have observed Detective Lewandowski utilize the emergency lights without accomplishing a mission of the police department, she would have either turned them off or told Detective Lewandowski to turn them off…. Detective Carr stated she did not know exactly what Detective Lewandowski was going to handle at District Five, but she was then going to respond with Detective Carr, which would have saved time by 'not pulling other officers into their assignment.' Detective Carr stated if she knew Detective Lewandowski was going to District Five to do something not work related she would not have went, adding she was trying to 'get off work.'" "Detective Carr stated if she would have been ordered by Lieutenant Hanley to conduct the follow-up, she would have still gone to District Five first." The memo noted, "Detective Carr added, 'Detective Lewandowski was driving normal [at the time of the accident], and she didn't seem like she was responding to anything urgent.'" Finally, the memo stated: "Detective Lewandowski described why she went to meet Officer Beasley instead of aiding in the retrieval of the firearm. Detective Lewandowski stated, 'A, that wasn't my assignment to do with the gun that was just something I was going to help her with. It took precedence because that was where I was going to go in the first place.' Detective Lewandowski described the police purpose that she was serving, by going to District Five, was to help a coworker. Detective Lewandowski stated, 'My co-worker called me and asked me to come there; I'm gonna come there.'" Lastly, the memo noted, "Detective Lewandowski indicated she did not inform Lieutenant Hanley of many of the details he reported in the squad accident report, and those details were not true." A true and correct copy of this memo is attached as **Exhibit 23**.

159. On September 11, 2015, Lt. Wurth submitted a memo to Deputy Inspector Brunson regarding allegations of misconduct against me. In that memo, Lt. Wurth repeated the

lie that I was responding to my son stopped by UWM Police at the time of the accident. Then she reiterated portions of Lt. Hanley's report, noting, "Detective Lewandowski intended to assist with follow-up assigned to Detective Carr, but received a call from Police Officer Melanie Beasley who had … reported to her that she was "afraid" and had asked her to come to District Five." She also noted, "Detective Lewandowski's son, Jordan Lewandowski, was interviewed and acknowledged he called to inform his mother he had been stopped by a police officer, though he denied that his mother was meeting him." Lt. Wurth stated, "Detective Lewandowski described she was going to District Five to help Officer Beasley, and there was not an urgency to complete the follow-up [on Detective Carr's case]. Detective Lewandowski added it was the third time going to District Five that shift, and she had met Officer Beasley regarding the same issue earlier in the night. Detective Lewandowski reported she was not going to meet her son, and did not tell that to Lieutenant Hanley." Despite these contradictions, Lt. Wurth recommended upholding the charges against me.

160. Throughout 2015, many of my fellow officers told me that I was "nuts" for complaining about discrimination and "bucking the system."

161. Defendant transferred many of the male officers and command staff who were the subject of my discrimination and retaliation complaints to Defendant's Internal Affairs Division, where they filed charges against me repeatedly.

162. On or about October 7, 2015, I was charged with further violations of the code of conduct stemming from the January accident. This occurred just two days after I was requested to serve as a "Subject Matter Expert" by Defendant in another matter via email, a true and correct copy of which is attached as **Exhibit 24**.

163. On October 11, 2015, I wrote a memo to the Chief rebutting the charges against

me stemming from my January accident, noting that Beasley "requested my help with the filing of a felony case, additionally, and most importantly, to help her with the fear and stress she was experiencing while working, due to an assault by a co-worker [Wilkinson]. I explained that I would return before her shift ended at approximately 2:00 a.m., to which she agreed." A true and correct copy of my memo is attached as **Exhibit 25**.

164.    On October 13, 2015, I wrote a memo to the Milwaukee Fire & Police Commission, titled "Discrimination, Misconduct in Office," which the Commission eventually accepted. In the memo, after identifying myself, I began, "This is the second attempt via memo to report the intentional disparate treatment in direct action due to gender; I and others have been discriminated [sic] within this department because we are women." I also noted that "[t]here is collusion in the ranks of the male Milwaukee Police Department" and went on to detail specific instances of discrimination. I stated that I worked "in an oppressive environment with a different set of rules of men and women," and that "Captain Stigler has discriminated against more than one female under his supervision, with different standards for men and women." I noted that Capt. Stigler went to great lengths to assist a male probationary office while ignoring "females who actually needed him to be a leader and provide a safe work environment or at least equal treatment." A true and correct copy of my memo is attached as **Exhibit 26**. That same date, Sgt. Zieger submitted a memo to Deputy Inspector Brunson summarizing my memo of October 11, 2015; a true and correct copy of Sgt. Zieger's memo is attached as **Exhibit 27**.

165.    On October 21, 2015, I wrote a memo to the Chief rebutting the charges against me of untruthfulness and threats.

166.    On October 26, 2015, I wrote a memo to Captain Salazar requesting an update on the investigation and noting that mistakes were made in recording my time off work. On

October 28, 2015, I received an email from Defendant outlining my leave status at Defendant. A true and correct copy of that email is attached as **Exhibit 28**.

167. On November 12, 2015, I submitted another memo to Defendant's Fire & Police Commission detailing additional concerns with the charges against me. A true and correct copy of that memo is attached as **Exhibit 29**. That same date, I submitted a memo to Chief Flynn regarding allegations of untruthfulness and threats. A true and correct copy of that memo is attached as **Exhibit 30**.

168. On November 20, 2015, Defendant charged me with allegations pertaining to integrity stemming from my January accident. Defendant told me to talk to Sgt. Zieger if I had questions, but he was gone.

169. On November 23, 2015, because Beasley and I had recorded meetings with supervisors to document the ongoing discrimination and retaliation against us, Defendant amended its policy and prohibited recording without the consent of all parties or the approval of the Chief, contrary to Wisconsin law. A true and correct copy of the "Lewandowski Rule" posting I found on the board at work is attached as **Exhibit 35**.

170. On November 27, 2015, I submitted a memo to the Chief, rebutting charges regarding my integrity stemming from her January accident. My memo noted that "Lieutenant Sean Hanley and Lieutenant Timothy Leitzke at that time were aware that Officer Melanie Beasley alleged the sexual assault by TEU Police Officer Robert Wilkinson. Officer Beasley often cried at work, suffered panic attacks, and had been reaching out for help." I stated that I believed I was not put on injury on duty leave because of retaliation. A true and correct copy of that memo is attached as **Exhibit 31**.

171. In my November 27, 2015 memo, I also noted specific incidents of male officers

being treated far more favorably under similar circumstances, and I detailed specific errors in the investigation of me, such as Defendant failing to interview key witnesses that might have supported my account of the January accident.

172. When Nancy Nelson called 911 on or about November 29, 2015 because her husband Grant Nelson (a fellow member of the Department) was in an uncontrollable, intoxicated rage with a knife, threatening to kill her, and complained about domestic violence and threats by her husband, Defendant responded by:

    a. Refusing to arrest Grant Nelson, even though Nancy Nelson took video of his threatening her life in an intoxicated rage and showed it to the responding officers from Defendant, and despite Wisconsin's mandatory arrest law in domestic violence situations;

    b. Allowing Grant Nelson to keep the knife that he threatened his wife with;

    c. Taking Grant Nelson outside the house and telling him to drive somewhere else, even though he was obviously intoxicated and could not drive legally; and

    d. Ignoring Nancy Nelson's concerns and leaving the scene without assisting her; and

    e. Charging Nelson with disorderly conduct and domestic violence but issuing no charges against Grant Nelson.

173. On December 4, 2015, Sgt. Zieger wrote a memo to Deputy Inspector Brunson regarding me, responding to my November 27, 2015 memo. He noted that I said I had proof that "Internal Affairs members, who investigated her case, are unethical and conducted a biased investigation based on gender." A true and correct copy of that memo is attached as **Exhibit 32**.

174. Several officers told me over the course of 2015 that I would be fired.

29

175. Defendant issued me a 5-day suspension, a 30-day suspension, and terminated me, all for alleged infractions stemming from my January 19, 2015 squad accident. A true and correct copy of Defendant's Personnel Order 2015-150 containing that information is attached as **Exhibit 33**.

176. Defendant terminated my employment on December 16, 2015.

177. Male employees of Defendant who committed worse offenses than I were not terminated.

178. Defendant's male and female employees who did not complain of discrimination but committed worse offenses were not terminated.

179. Defendant routinely holds female members of the Department to higher standards than male members, treating the female department members worse than male officers in violation of their right to Equal Protection of the laws.

180. Defendant maintains a "good ol' boys club" atmosphere at the Department that has persisted throughout my career in law enforcement with the Defendant, regardless of the official policies allegedly prohibiting such conduct.

181. Defendant repeatedly investigated me over the course of my career for minor offenses and even no wrongdoing at all, looking for anything with which to terminate my employment after I complained about sex discrimination in the Department. Attached as **Exhibit 34** is a true and correct copy of my Investigation Employee Case File History from Defendant, showing what I was investigated for.

182. Over the course of my career at Defendant, it investigated me nearly 40 times for unfounded and unproven allegations against me.

183. I committed no wrongdoing worthy of discipline or termination at any time during

my employment by Defendant in 2014 and 2015.

184. On or about September 10, 2015, I filed a sex discrimination and retaliation complaint against Defendant with the Wisconsin Equal Rights Division ("ERD"), designated as ERD Case No. CR201502561, and cross-filed with the U.S. Equal Employment Opportunity Commission ("EEOC") as EEOC Case No. 26G201501284C. The EEOC issued me a Notice of Right to Sue for this case on May 16, 2016, which I received on May 18, 2016.

185. On or about December 21, 2015, I filed a sex discrimination and retaliation complaint against Defendant with the ERD, designated as ERD Case No. CR201503613, and cross-filed with the EEOC as EEOC Case No. 26G201600334C. The EEOC issued me a Notice of Right to Sue for this case on June 23, 2016, which I received on June 27, 2016.

186. Defendant continues to treat male members of the Department more favorably than females.

187. Lt. Dennis Trzcinski was fired from Defendant for submitting fraudulent time cards showing overtime he had not worked and thus stealing overtime pay, but Defendant's Fire & Police Commission reinstated Trzcinski with a demotion from lieutenant to sergeant, so that he remained a supervisor of police officers.

188. In late April 2016, a family took their dog Coco to Pet U, owned and operated by Trzcinski, while they went away for the weekend. Sunday night the owners got the call that Coco had died of old age. The Milwaukee Journal Sentinel reported the owner's reaction in a story on April 20, 2016: "They brought Coco in on a cart. They had a blanket up to his neck. I folded the blanket over and I just seen [sic] blood everywhere." "I was angry, and I was mad. Because they lied to us and they did not protect my baby," said the dog's owner. The article noted, "According to vet records, Coco died of blood loss. He had puncture wounds, cracked ribs

and bruising." Two days later, in a story reported by the Milwaukee Journal Sentinel on April 22, 2016, Kristin Iselin said she boarded her dog Allie Saturday, planning to pick her up Sunday. Iselin said she got a call Saturday night that her dog had gotten loose. The dog was picked up by Milwaukee County Sheriff's deputies Saturday around midnight. Pet U owner Angela Trzcinski picked Allie up Sunday morning. Iselin said the owners of Pet U, Milwaukee Police Sergeant Dennis Trzcinski and his wife, told her Allie had injured her paw, but wasn't in pain and was walking fine. She was surprised to see her dog's condition Sunday. "She wasn't able to walk, she was limping, she was crying, her fur was a mess, she had burrs all over," explained Iselin. Iselin said the owners had a different story each time she spoke with them. She claims they refused to refund her money, even though the dog was not boarded at their facility. Iselin said they also refused to pay veterinary bills. Trzcinski was never disciplined by Defendant for these off-duty actions, including his lies to clients and the public about what had happened.

189. I heard in late 2017 and early 2018 a rumor that married Captain Sgrignuoli had been having a secret, illicit affair with the married female Executive Director of the Fire and Police Commission (MaryNell Regan) at the time he was investigating me following my January 2015 traffic accident.

190. During this time, Captain Sgrignuoli was caught requesting to view surveillance footage at Regan's office for "personal reasons not related to any official police business or investigation," violating Department policies Integrity 3.00; Guiding Principle 3.06 and Competence 1.00; and Guiding Principle 1.03."

191. At the time he was caught improperly viewing the surveillance video, Captain Sgrignuoli had eight (8) "sustained offenses for other violations." An official record noted that "This is the member's first offense of using their official position to unnecessarily interfere in the

32

personal business of another," for which he received a 3-day suspension without pay, and "This is the member's second offense of failing to use time to accomplish the mission of the department," for which he had previously received a 2-day suspension without pay.

192.    In February 2018, Chief Flynn publicly accused Regan, as Executive Director of the Fire & Police Commission, of asking him to interfere with the investigation into Captain Sgrignuoli's misconduct in public office (improperly viewing the surveillance video of Regan's office) and asking Flynn to reduce or eliminate Captain Sgrignuoli's punishment for that offense.

193.    Captain Sgrignuoli's discipline for his proven misconduct was substantially less than my discipline for the same alleged misconduct he falsely accused me of, including "failing to use time to accomplish the mission of the department," especially when prior discipline records are considered.

194.    While Regan was working to reduce Captain Sgrignuoli's discipline, she was working to prosecute and sustain Captain Sgrignuoli's false allegations of misconduct against me, which led to my termination and confirmation of my termination by the Fire & Police Commission that Regan headed.

195.    Sgrignuoli recently retired early from Defendant.

196.    Attached as **Exhibit 36** is a true and correct copy of an online article dated December 13, 2007 I found in the Associated Press titled "Brother of deported officer wins back his Milwaukee police job."  The article details Officer Alex Ayala's failure to report to the Department that his little brother had stolen their dead cousin's identity in order to work as an officer; he was fired by the Chief for lying during an investigation but reinstated by the Fire & Police Commission.

197.    Attached as **Exhibit 37** is a true and correct copy of an online article I found

dated October 30, 2011 from the Milwaukee Journal Sentinel titled, "Police Department ignores national standards for officers accused of domestic violence." The article details Officer Robert Velez's domestic violence against his wife and dishonesty to other officers and minor resulting discipline of only a 6-day suspension. It also describes another 15 Milwaukee police officers who committed acts of domestic violence while members of the Department and lightly disciplined: Officer Edward McCrary, Sgt. Charles Cross, Zebdee Wilson, Det. Herb Glidewell (not disciplined at all), Lt. David Salazar, and others. Further, the article notes that 93 officers on the Milwaukee Police Department had been disciplined for violating state or local laws.

198. Attached as **Exhibit 38** is a true and correct copy of an article I found dated November 22, 2013 from the Milwaukee Journal Sentinel titled "Officer's lie for warrant costs city $1 million." It describes Milwaukee Det. Rodolfo Gomez, Jr.'s lies to obtain a warrant that resulted in grave injuries to a civilian. It also describes a subsequent charge of felony misconduct in public office against Gomez for beating a suspect in a death investigation, after he remained on the force.

199. Attached as **Exhibit 39** is a true and correct copy of an online article I found dated July 18, 2018 from the Milwaukee Journal Sentinel titled "Milwaukee cop says she doesn't trust her department on domestic violence." It describes the female officer's failure "to report assaults by her live-in boyfriend [Milwaukee Fire Capt. Leon Butts, Jr.] for months because she doesn't trust her own department to take domestic violence seriously."

200. Attached as **Exhibit 40** is a true and correct copy of an online article I found dated October 23, 2011 from the Milwaukee Journal Sentinel titled "Both Sides of the Law." The article notes that "[a]t least 93 Milwaukee police officers have been disciplined for violating the laws and ordinances they were sworn to uphold," ranging from "sexual assault and domestic

34

violence to drunk driving and theft. All 93 remained employed by the Department at the time of the article. They include Patrick Fuhrman, "originally charged with a felony for a beating that sent his wife to the hospital and, according to a witness, left blood in every room of their house," who ended up with only two citations for disorderly conduct.

201.     Attached as **Exhibit 41** is a true and correct copy of an online article I found dated October 4, 2018 from the Milwaukee Journal Sentinel titled "Milwaukee police official promoted to assistant chief despite sexual harassment complaints." The article notes that Assistant Chief Raymond Banks "harassed a female officer for years, making sexual comments, calling her at home to proposition her and barging into her office uninvited," and the officer was so traumatized that she had to take medical leave. She reported his sexual harassment to Internal Affairs and to the Fire & Police Commission, resulting only in Banks' promotion to Assistant Chief and in further retaliation against her.

202.     In my answers to Defendant's First Set of Interrogatories, I listed "comparator information demonstrating that male officers committing violations of the Defendant's Rules of Conduct the same as or worse than Plaintiff were treated more favorably than Plaintiff:"

a.       Reginald Hampton was accused of sexually assaulting two women he met on duty. Fire & Police Commission overturned and gave him 60 days. I worked with him in District 7 and have news accounts of his conduct.

b.       Mark Kapusta pointed a gun a woman's head in a drunken road rage. Woman was delivering papers and when Kapusta honked at her and she honked back, held a gun and aimed the gun at the woman's head. Kapusta admitted to being drunk and when questioned changed his story. FPC reduced firing to 60 days and he remained on the force. I have news accounts of his conduct.

c.      Patrick Fuhrman, charged with felony beating that sent his wife to a hospital, ended up with a disorderly conduct ticket. He beat his wife, throwing her on the floor and leaving her with bruises on her face, legs, elbows and shoulders, and she needed stitches. Fuhrman admitted to the abuse, stated that he was sorry, and kept his job with a plea bargain. Fuhrman along with 14 other Milwaukee police benefited from deferred prosecution.  He was in my class and at District I worked in; his wife worked at the same district.  He also got into an altercation at work with another officer in District 3 and was not disciplined.  I also have news accounts of his conduct.

d.      John Corbett was convicted of drunk driving with a child in the car, had his 13 year old daughter drive the auto.  I worked with him in District 3 and he had a drinking problem, and I have news accounts of his conduct.

e.      Robert A Brown, II, fought with his girlfriend in 1998 and was to finish anger management classes which he did not, and he blamed it on an oversight.

f.      Scott D. Charles was accused of on-duty sexual misconduct; he was promoted to Sergeant after that and was a supervisor.

g.      Robert Velez's wife fled from her home to escape abuse in 2011, and Robert Velez then punched her and her boyfriend in the face threatening to kill them; he was arrested for battery and misconduct in public office and was suspended for only 6 days.  He was in my class and I have news accounts of his conduct.

h.      Detective Edward McCrary was charged with disorderly conduct when he fought his wife and choked her cousin. He kept his job even though he never held up his part of the plea bargain to get therapy. I worked with him and he

36

was put on desk duty for domestic violence.

i.      Sergeant Charles Cross kicked in the apartment door he shared with his girlfriend and got his charges dismissed if he got help. I heard about this conduct from other officers and I have news accounts of his conduct.

j.      Zebedee Wilson violated a restraining order in 1994 and his wife needed surgery after he kicked and punched her in the face, but Tommy Thompson, the governor, erased the conviction and he kept his law enforcement career. I have news accounts of his conduct.

k.      Darryl Winston was the assistant chief who oversaw performance and discipline. He was caught in sexual misconduct on and off the job with young boys. I knew about this from other officers.

l.      Herb Glidewell had a restraining order against him for domestic violence by his wife, Jill Riley, until 2013. While on duty, Herb Glidwell was home without knowledge of his supervisors. I know that Herb Glidwell committed perjury in 2010 in formal court proceedings. He was protected by the department and never disciplined. I know both parties.

m.      Lt. David Salazar was investigating wrongdoings by other officers when he was a suspect in a domestic abuse allegation with his wife. The dispatch reports that his wife called and stated that Salazar was drunk and breaking in the door. Then the recordings were purged from the system and the story changed. The allowance of officers to hide behind the discretion of many of the DV cases is unacceptable. He continues to investigate officers of wrongdoing. He was my Captain in 2015 when he was sent to the Intelligence Division.

37

n. Chief Edward Flynn stated that domestic violence is a priority for the department, rolling out an initiative to combat the problem, targeting repeat offenders and calling for greater protection of frequent victims. He has essentially done nothing to combat the problem except issuing this statement.

o. Lt. Steven Kelly was demoted to Sergeant in 2017 after kicking and spitting on someone. Fire & Police Commission Executive Director Mary Nell Regan did nothing about it. Kelly was disciplined for not being civil to a coworker. Chief Flynn suspended Kelly for 5 days for not treating other employees properly, using profanity laced language, and his schedule had to be changed to accommodate other employees that he harassed. Kelly lied in my case; he never came to the hospital and talked to me although he claimed that he did. I also have news accounts of his conduct.

p. Lt. Dennis Turczinski, lied on his time cards and stole overtime. He also lied about his dog kennel business, but continues to have a job. I knew him and I also have news accounts of his conduct.

q. Alex Ayala lied to ICE and PPD regarding his brother Oscar Ayala using a dead cousin's name. He was never fired, and served no suspension. I knew him and worked with him, and I also have news accounts of his conduct.

r. Bradley R. Dall sexually harassed women on the job was demoted and then promoted again and not fired. I knew him and he supervised me and sexually harassed me as well. I know that one of his victims wrote a complaint to the Fire & Police Commission after she was forced to quit the department.

s. Joshua Albert tased a police aide in the face on duty and was not disciplined for

it.  I have news accounts of his conduct.

203.    Attached as **Exhibit 42** is a true and correct copy of an online article I found dated May 22, 2012 from the Milwaukee Journal Sentinel titled "Hundreds of assault cases misreported by Milwaukee Police Department."  The article notes that Chief Flynn misreported hundreds of violent assault cases as minor, showing "a systemic problem in the department—there has to be a failure of leadership."  Misreporting the cases made crime appear to go down so that Chief Flynn's four-year contract was renewed.

204.    Attached as **Exhibit 43** is a true and correct copy of an online article I found dated June 12, 2012 from the Milwaukee Journal Sentinel titled "MPD staff routinely changed crime codes."  The article notes further information on Chief Flynn's misreporting hundreds of violent assault cases as minor, making violent crime appear to go down so that Chief Flynn's four-year contract was renewed.

205.    Attached as **Exhibit 44** is a true and correct copy of an online article I found dated November 24, 2012 from the Milwaukee Journal Sentinel titled "Flawed Milwaukee crime numbers festered for years."  The article notes "Police Chief Edward Flynn swept into Milwaukee almost five years ago, promising to modernize the department with a data-driven approach, using timely information to analyze crime trends and deploy officers to hot spots." "Since then, Flynn has publicly touted the city's falling crime numbers more than a dozen times, a downward trend that helped him become the first chief appointed to a second term in nearly three decades.  Those numbers were deeply flawed and the department knew it.  But it didn't bother to tell the public."  The department "failed to correct the problems … until they were exposed this year by the Journal Sentinel."

206.    Attached as **Exhibit 45** is a true and correct copy of the deposition of MaryNell

39

Regan taken on January 17, 2019 and Exhibits 1, 2, 5, 6, 7, 8 & 9.

207.    Attached as **Exhibit 46** is a true and correct copy of the deposition of Johnny Sgrignuoli taken on February 28, 2019.  Pages 54-106 and Exhibit 4 are marked confidential and attached separately.

Dated this 21st day of June, 2019.


_s/ Shannon Lewandowski_
Shannon Lewandowski, Plaintiff

HEINS EMPLOYMENT LAW PRACTICE LLC
200 South Executive Drive, Suite 101
Brookfield, WI  53005
(262) 241-8444 voice
e-mail: jheins@heinslawoffice.com