UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

SHANNON LEWANDOWSKI

      Plaintiff,

  v.                                 Case No: 16-CV-1089

CITY OF MILWAUKEE

      Defendant.

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.     ISSUE AND CLAIM PRECLUSION SHOULD NOT BE APPLIED HERE

Defendant erroneously claims that this Title VII and 42 U.S.C. § 1983 sex discrimination and retaliation case should be dismissed because Plaintiff exercised her right to Fire and Police Commission review of whether "good cause" existed under state law for her termination from the Milwaukee Police Department. The great weight of the case law dictates otherwise.

#### A.  Legal Standard

Whether issue or claim preclusion apply in this case depends on two criteria:  (1) whether "the question of fact or law that is sought to be precluded [was] litigated in a previous action and necessary to the judgment;" and (2) whether it is fundamentally fair to employ issue preclusion given the circumstances of the particular case at hand."  *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 773 (7th Cir. 2013) (citations omitted).  The Seventh Circuit sets forth the criteria to apply issue preclusion to "state agency judgments" in *Reed v. AMAX Coal Co.*, 971 F.3d 1295, 1300 (7th Cir. 1992), but this case does not involve a state agency—only a limited jurisdiction

commission interpreting statutes that do not include Title VII or 42 U.S.C. § 1983. A determination arising solely under one statute is not automatically binding when a similar question arises under another statute. *See Title v. Immigration and Naturalization Service*, 322 F.2d 21, 25 n. 11 (9th Cir. 1963); 2 K. Davis, Administrative Law Treatise § 18.04, at 577-78 (1958). This is because the purposes, requirements, perspective and configuration of statutes vary. The Seventh Circuit has recognized that "other well-defined federal policies, statutory or constitutional" may compete with, but not eclipse, principles of *res judicata*. *See, i.e., Batiste v. Furnco Constr. Corp.*, 503 F.2d 447, 450 (7th Cir. 1974).

In *Tipler v. E. I. Du Pont de Nemours & Co.,* 443 F.2d 125 (6th Cir. 1971), the NLRB found that the claimant had been fired for cause and dismissed the claim, and the Sixth Circuit held that the Title VII claim of racially motivated discharge was not barred by the NLRB's adjudication of the reasons for the discharge; this conclusion was based on important differences between the purposes and requirements of Title VII and the National Labor Relations Act. *Id.* at 129; *see Willis v. Chicago Extruded Metals Co.*, 358 F. Supp. 848, 851 (N.D. Ill. 1973).

### B. Preclusion Does Not Apply in This Case

The essential elements of *res judicata* are (1) a final judgment on the merits in an earlier action; (2) an identity of the cause of action in both the earlier and later actions; and (3) an identity of parties or their privies in the two actions. *Krison v. Nehls*, 767 F.2d 344, 349 (7th Cir. 1985). Here it would be inappropriate to apply preclusion to the Commission's decision.

The issue here is whether Plaintiff's dismissal violated Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1983. The Fire and Police Commission decision, conversely, dealt with an alleged violation of the police union contract and of the Wisconsin statute, § 62.13, defining "good cause." These two acts are similar, but their differences overshadow their similarities.

2

Wɪs. Sᴛᴀᴛ. § 62.13(5)(em) provides:

No subordinate may be suspended, reduced in rank, suspended and reduced in rank, or removed by the board under par. (e), based on charges filed by the board, members of the board, an aggrieved person or the chief under par. (b), unless the board determines whether there is just cause, as described in this paragraph, to sustain the charges. In making its determination, the board shall apply the following standards, to the extent applicable:

**1.** Whether the subordinate could reasonably be expected to have had knowledge of the probable consequences of the alleged conduct.

**2.** Whether the rule or order that the subordinate allegedly violated is reasonable.

**3.** Whether the chief, before filing the charge against the subordinate, made a reasonable effort to discover whether the subordinate did in fact violate a rule or order.

**4.** Whether the effort described under subd. 3. was fair and objective.

**5.** Whether the chief discovered substantial evidence that the subordinate violated the rule or order as described in the charges filed against the subordinate.

**6.** Whether the chief is applying the rule or order fairly and without discrimination against the subordinate.

**7.** Whether the proposed discipline reasonably relates to the seriousness of the alleged violation and to the subordinate's record of service with the chief's department.

The procedures for an administrative hearing on a police officer's termination are contained in

Wɪs. Sᴛᴀᴛ. § 62.13(5)(i):

Any person suspended, reduced, suspended and reduced, or removed by the board may appeal from the order of the board to the circuit court by serving written notice of the appeal on the secretary of the board within 10 days after the order is filed. Within 5 days after receiving written notice of the appeal, the board shall certify to the clerk of the circuit court the record of the proceedings, including all documents, testimony and minutes. The action shall then be at issue and shall have precedence over any other cause of a different nature pending in the court, which shall always be open to the trial thereof. The court shall upon application of the accused or of the board fix a date of trial, which shall not be later than 15 days after such application except by agreement. The trial shall be by the court and upon the return of the board, except that the court may require further return or the taking and return of further evidence by the board. The question to be determined by the court shall be: Upon the evidence is there just cause, as described under par. (em), to sustain the charges against the accused? No costs shall be allowed either party and the clerk's fees shall be paid by the city. If the order of the board is reversed, the accused shall be forthwith reinstated and entitled to pay as though in continuous service. If the order of the board is sustained it shall be final and conclusive.

3

No discovery is provided for in the statute. These legal requirements for challenging a police officer's termination pursuant to § 62.13 bear little resemblance to an administrative charge followed by a federal court lawsuit for sex discrimination, retaliation, and equal protection. In fact, the Commission refused to allow plaintiff to present evidence of sex discrimination and retaliation in her termination appeal. See F&PC I[1], p. 318.

To the extent that Defendant implies that use of the hearing procedure under § 62.13 is the ***exclusive remedy*** for Title VII and/or constitutional violations present here, that is absolutely false. *Krison v. Nehls*, 767 F.2d 344, 346 (7th Cir. 1985), does not apply—that plaintiff brought two suits regarding his duty disability application and the second was barred by the first. The Fire & Police Commission has jurisdiction to hear unfair labor practice but is ***not*** empowered to hear a civil rights claim; thus, because the federal court could ***not*** hear the unfair labor practice grievance and the state tribunal could ***not*** hear the civil rights claim, Plaintiff was forced to split her claims in *Carver v. Nall,* 172 F.3d 513, 516 (7th Cir. 1999). Claim preclusion does not operate so harshly as to bar whichever set of claims the chosen forum could not hear. *Carver,* 172 F.3d at 516, *citing Waid v. Merrill Area Pub. Sch.,* 91 F.3d 857, 865 (7th Cir. 1996), *discussing* RESTATEMENT (SECOND) OF JUDGMENTS § 26, cmt. c.

> [I]f there was a forum in which all claims arising out of the single transaction could have been brought, and the plaintiff chooses a forum of limited jurisdiction instead, then the plaintiff's other claims are barred by the doctrine of claim preclusion, because the other claims could have been brought in the forum of general jurisdiction. If, on the other hand, no such forum exists, and the plaintiff is forced to split her claims, a suit in one forum does not bar the plaintiff from also bringing suit in another. *See Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 382-83 n. 3 (1985).

*Staats v. County of Sawyer*, 220 F.3d 511, 516 (7th Cir. 2000).

In *Balcerzak v. City of Milwaukee*, 163 F.3d 993 (7th Cir. 1998), the Court cited *Jones v.*

---

[1] Transcript of the Fire & Police Commission Hearing on August 11, 2016, Volume I.

*City of Alton, Illinois*, 757 F.2d 878 (7th Cir. 1985), in which a black police officer did attempt to introduce evidence before the civil service commission and the state courts that punishments for white officers accused of similar misconduct were lighter. *Balcerzak,* 163 F.3d at 996. In *Jones*, both the commission and the courts dismissed such evidence as irrelevant. The Court held that the plaintiff had not been afforded a full and fair opportunity to litigate the issue in state court and allowed his § 1983 suit to proceed. *Jones,* 757 F.2d at 886. The same is true in this case.

The operation of Wisconsin law here would deny Plaintiff an opportunity to fully and fairly litigate her claims; there are due process limitations on when claim or issue preclusion could act as a bar in a § 1983 suit—if a litigant were denied a full and fair opportunity to litigate, subsequent relitigation would not be barred. *Balcerzak,* 163 F.3d at 996, *citing Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 482 (1982).

Plaintiff brought this lawsuit on August 15, 2016, 23ll before the Fire & Police Commission's ruling against Plaintiff on November 17, 2016, and this case is ***not*** an appeal from the Fire & Police Commission's decision. Plaintiff ***could not*** bring any separate claims for discrimination or retaliation before the Fire & Police Commission or add claims to her limited appeal from that decision. Plaintiff was not allowed to present evidence fully supporting her sex discrimination, retaliation and equal protection claims before the Commission, because they had no jurisdiction over those claims and did not consider the evidence relevant in that proceeding. As Defendant notes, "issue preclusion, where properly invoked, bars relitigation of an issue of fact or law which was previously decided in a judicial proceeding, provided that the party not seeking preclusion had a full and fair opportunity to litigate the issues sought to be precluded in the earlier proceeding. *Allen v. McCurry,* 449 U.S. 90, 94–95 (1980)." Without such an opportunity to fairly litigate her Title VII and constitutional claims, preclusion should not apply.

5

## II.    SUMMARY JUDGMENT STANDARD

FED. R. CIV. P. 56(a) states that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Boss v. Castro,* 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The Court must construe all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.,* 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, this Court must not weigh the evidence or determine witness credibility; the Seventh Circuit has held that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.,* 618 F.3d 688, 691 (7th Cir. 2010). "[W]hen an employee offers specific evidence from which the finder of fact may reasonably infer that the proffered reasons do not represent the truth, the case then turns on the credibility of the witnesses," and "[t]his credibility judgment is best left to the finder of fact." *Collier v. Budd Co.*, 66 F.3d 886 (7th Cir. 1995). "As this Court has said many times, summary judgment cannot be used to resolve swearing contests between litigants." *Payne v. Pauley,* 337 F.3d 767 (7th Cir. 2003).

Internal inconsistencies in a witness' testimony "create an issue of credibility as to which part of the testimony should be given the greatest weight" if any credit is given at all. *Bank of Ill. v. Allied Signal Safety Restraint Sys.,* 75 F.3d 1162, 1170 (7th Cir. 1996) (*quoting Tippens v. Celotex Corp.,* 805 F.2d 949, 953 (11th Cir. 1986)). The non-movant "need not match the movant witness for witness, nor persuade the court that [their] case is convincing, [they] need only come forward with appropriate evidence demonstrating that there is a pending dispute of

6

material fact." *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921 (7th Cir. 1994); *J.M. v. City of Milwaukee*, 249 F. Supp. 3d 920, 923 (E.D. Wis. 2017).

Because judging the credibility of the witnesses on the issue of motive would be required here in order to grant the motion, this Court should deny Defendant's motion.

### III. PLAINTIFF'S TITLE VII SEX DISCRIMINATION CLAIM & CONSTITUTIONAL CLAIM MUST GO TO TRIAL

Under *Ortiz v. Werner Enterprises, Inc.*, 834 F. 3d 760, 765 (7th Cir. 2016), in a Title VII case, the only question is whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's sex caused the disparate treatment and discharge. *Id.* Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence— evidence is evidence. *Id.* Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect." *Id.* Plaintiff must then present evidence that would allow a reasonable jury to find that her sex caused her disparate treatment and discharge. *Id.*

Under *Monell v. New York City Dep't. of Soc. Servs.*, 436 U.S. 658, 694 (1978), the Supreme Court decreed "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Case law recognizes three ways in which a municipality's policy can violate an individual's civil rights: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law'; or (3) an allegation that the constitutional injury was caused by a person with 'final policymaking

7

authority.'" *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995); *Phelan v. Cook County,* 463 F.3d 773, 789 (7th Cir. 2006). "If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir.2005); *see also Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir.1995) ("The usual way in which an unconstitutional policy is inferred, in the absence of direct evidence, is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers."). *Phelan*, 463 F.3d at 789. A § 1983 plaintiff may establish a municipality's liability by demonstrating that the actions of subordinate officers are sufficiently widespread to constitute the constructive acquiescence of senior policymakers. *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871-72 (2d Cir. 1992).

Here, Plaintiff's injuries were caused both by an unwritten policy of sex discrimination against women and by final policy-makers—Chief Flynn and the Fire & Police Commission, both of whom deny the accusations. The record presents a swearing contest between witnesses as to the motive for taking the adverse actions against Plaintiff. That is a question of fact for a jury to decide at trial, not for a district court to consider at summary judgment. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007). As to the individual officers, "the issue is whether they acted in a discriminatory fashion. They say in their affidavits that they did not. However, because motive and intent are subject to proof only circumstantially, summary judgment is not often a useful tool to resolve these issues. *See Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979)." *Estate of Sinthasomphone v. Milwaukee*, 878 F. Supp. 147, 151

(E.D. Wis. 1995).

As both the Title VII sex discrimination and 42 U.S.C. § 1983 equal protection claim based on sex require the same evidence, these claims are analyzed together below.

**A. Defendant's MPD is Mostly Male.**

MPD has been male-dominated and majority male during Plaintiff's employment. Defendant's sworn officers and detectives are majority male. [PPFOF[2] ¶ 1] The Detective Bureau "is mostly men." [PPFOF ¶ 1] Defendant routinely holds female members of the Department to higher standards than male members, treating the female department members worse than male officers in violation of their right to Equal Protection of the laws. [PPFOF ¶ 2]

**B. Plaintiff Has Been Treated Worse Because of Her Gender**

      **i.      In general**

Throughout most of her career, Defendant assigned Plaintiff to undesirable tasks at work because she is female and later because she complained of discrimination and retaliation. [PPFOF ¶ 8] Other department members and command staff called her derogatory names such as "pitbull" and "black cloud." [PPFOF ¶ 8]

      **ii.      In her Personal Life**

Plaintiff has suffered sex discrimination in her personal life at the hands of the MPD for many years, going all the way up her chain of command to Chief Edward Flynn himself. On November 1, 2006, Plaintiff submitted a memo to Captain Dubis regarding "Harassment by neighbor." She noted that "Since the summer of 2005, I have had multiple problems with my neighbor…. I have spoken to Sgt. Staton of District Three." "Lawrence Poggenburg has continually harassed me verbally, as well as using the power of the Police Department to further harass me." [PPFOF ¶ 18] When Plaintiff obtained a temporary restraining order against

---

[2] "Plaintiff's Proposed Findings of Fact," ECF 87.

Poggenburg on November 15, 2011, Defendant refused to serve it on him despite its legal obligation to do so.

Plaintiff previously filed a complaint with Defendant's Internal Affairs Division about Chief Edward Flynn coming to her house drunk and making unwanted sexual advances towards her. [PPFOF ¶ 20]

### iii.    In performing her work at MPD

Plaintiff has struggled to be treated the same as male officers in the tasks integral to doing her job. On or about December 6, 2014, Plaintiff received a confidential informant tip on where to find a wanted person; Plaintiff could not find a warrant, and she was very worried about the possible consequences if she did not arrest him immediately. [PPFOF ¶ 21] Plaintiff first called Lt. Hanley for assistance but he was "too busy." Plaintiff then texted Lt. Lough for assistance with the warrant, but he did not respond. Plaintiff then went to Metro and banged on the door for assistance; they did not assist her. Plaintiff contacted other police agencies involved to obtain assistance, but none assisted her. [PPFOF ¶ 21] Finally, Plaintiff emailed Lt. Sgrignuoli, Lt. Lough, Lt. Hanley, Capt. Smith, Lt. Armbruster and Chief regarding the matter, availing herself of the chief's stated "open door policy". [PPFOF ¶¶ 22, 4] About an hour after sending the email, Plaintiff finally was given clearance to arrest the suspect, but he got away. [PPFOF ¶ 22] Six days later, that suspect killed himself while being arrested. [PPFOF ¶ 22] Plaintiff learned later a male detective handling the case regarding the wanted person was derelict and neglected to obtain a warrant, but he was not disciplined or reprimanded for his dereliction of duty. Plaintiff also learned that a female officer was reprimanded for not putting a warrant into the system for sexual assault. [PPFOF ¶ 23]

Approximately one hour after Plaintiff sent the "open door" email, Lt. Hanley ordered

Plaintiff into his office and reprimanded her for the email; he told Plaintiff she must apologize because "it made the command staff angry." Plaintiff complained to her other Lieutenants about harassment and retaliation she was receiving from Sgrignuoli for emailing the Chief, but Plaintiff received no assistance and told to "lay low." [PPFOF ¶ 29] The next day, On December 7, 2014, Lt. Sean Hanley wrote a memo to Captain Sgrignuoli about the "open door" email Plaintiff wrote, explaining that he had counseled her about it. [PPFOF ¶ 24] Defendant never acted on any of Plaintiff's complaints about male officers. [PPFOF ¶ 25]

### iv.    For helping another female officer

Plaintiff was also discriminated against for helping another female officer with her sex discrimination situation. In fall 2014, Plaintiff became aware that Melanie Beasley was having some personal issues. [PPFOF ¶ 11] Plaintiff had received Early Intervention Training from MPD to assist fellow officers on the Department. [PPFOF ¶ 10] On October 5, 2014, after receiving a text from Beasley showing a paper shooting target shot up from her boyfriend, Plaintiff asked her supervisor, Lt. Hanley, if that looked to him like "foreplay." Plaintiff obtained permission from Lt. Hanley to go to Beasley's house, where Plaintiff learned that Beasley had been suffering in an abusive relationship with another Milwaukee police officer and member of a tactical unit, Robert Wilkinson. Beasley told Plaintiff that she attempted to end the relationship numerous times after learning that Wilkinson was married but that he had made threats to her and that she was afraid for her safety. [PPFOF ¶ 12] Throughout October 2014, Plaintiff continued to stay in touch with Beasley and counsel her about reporting the situation to her superiors. [PPFOF ¶ 12] In January 2015, Plaintiff asked Lt. Hanley how to protect Beasley, who was now living with Plaintiff because she feared for her life. [PPFOF ¶ 30] On January 15, 2015, Beasley obtained a temporary restraining order against Wilkinson with Plaintiff's assistance and

support. [PPFOF ¶ 30]  On or about January 26, 2015, Plaintiff testified that she heard Wilkinson tell Beasley "If you leave me, I will kill you" the previous October.  [PPFOF ¶ 30] In January 2015, Plaintiff wrote a memo to Internal Affairs and Lt. Hanley and demanded to know why nothing was being done to protect Beasley. [PPFOF ¶ 31] Plaintiff also informed Captain Stigler about Beasley's situation, but he refused to listen.  [PPFOF ¶ 31]  On or about January 18, 2015, before her accident, Plaintiff and Beasley were discussing Beasley's filing for and receiving a restraining order against Wilkinson in front of witnesses at the Department.  [PPFOF ¶ 32]

Defendant never arrested Wilkinson, took away his gun, or ordered him into the district attorney's office to discuss the allegations against him, even though the assistant district attorney admitted to Beasley that there was probable cause to arrest Wilkinson based on her report. Instead, the Defendant's "good ol' boys club" rallied around Wilkinson and protected him, while leaving Beasley and Plaintiff to fend for themselves.  [PPFOF ¶ 87]

### v. After her January 19, 2015 squad car accident

Plaintiff also suffered sex discrimination after her squad car accident in January 2015. Plaintiff asked Detective Carr on the night of January 19, 2015 if she wanted Plaintiff's assistance in recovering the gun in the shooting case, explaining that she had to stop at District 5 first to talk to Melanie Beasley; Carr was already aware of Beasley's situation from Plaintiff and agreed.  [PPFOF ¶ 69]  Plaintiff's son, Jordan Lewandowski, called her just before the accident to tell her he had been pulled over on the east side, and that he would call her back when he had more information. Plaintiff handed her phone to Carr to answer while Plaintiff was driving. [PPFOF ¶ 70]  Plaintiff did not go to the east side to get her son or to intervene in his traffic stop. [PPFOF ¶ 70]  She was driving the speed limit and "blurped" her lights and siren to warn a car not to pull out as she drove past. [PPFOF ¶ 70]  She did not have a chance to turn off the warning

lights before she was hit by another car. [PPFOF ¶¶ 70, 71] Plaintiff regained consciousness after the accident because Carr was screaming in her ear that Plaintiff was dead. [PPFOF ¶ 71] Officer Deb Stacey testified that Plaintiff made absolutely no sense at the scene—everything she was saying was like she had a head injury; it was very apparent that Plaintiff was slurring her words and yelling to get her son. [PPFOF 72]

Plaintiff's male coworkers and supervisors used her accident as an opportunity to make a sham case for her termination. Lt. Hanley testified that Sgt. Wade Grubich gave him information on the accident. [PPFOF ¶ 73] He claims he was also told by Sgt. Adam Riley that Plaintiff said she was going to UWM because her son was in a traffic stop. [PPFOF ¶ 73] Lt. Hanley did not interview either Plaintiff or Detective Carr at the scene or at the hospital because they were receiving medical treatment, but he claims he spoke to both at the scene. [PPFOF ¶ 73] When Plaintiff got home from the hospital about 6:30, she called Lt. Hanley and briefly told him what happened. She denies telling Lt. Hanley she was on her way to pick up her son at the time of the accident or that she was going 45 at the time of the crash. Plaintiff told Lt. Hanley that there were TAC officers at the scene, one of whom assaulted Officer Beasley, and they were claiming Plaintiff was driving to UWM. None of those officers wrote a report or provided their notes. [PPFOF ¶ 74] Nor did any of them testify at the Commission hearing. [PPFOF ¶ 74] Lt. Hanley claims he interviewed Carr a few days after the accident at her home; she never said anything about Plaintiff going to intervene at a traffic stop, and Carr told Lt. Hanley they were going to District 5 when the accident occurred. [PPFOF ¶ 74]

Lt. Hanley did not make false statements about Detective Carr or place her under investigation, even though she was a passenger with Plaintiff at the time of the accident. [PPFOF ¶ 88] Defendant accepted Carr's worker's compensation claim and paid her medical

13

bills. [PPFOF ¶ 88] Defendant did not force Detective Carr to testify without pay, because Defendant placed her on injury leave. [PPFOF ¶ 88]

Sgt. Adam Zeiger, the main investigator, testified that Plaintiff's statements about her use of the emergency lights would be an appropriate use of the lights. [PPFOF ¶ 75] Zieger confirmed that Plaintiff told him she was heading to see Beasley at District 5 at the time of the accident. Zieger also testified that she reported that she had a hard time articulating herself and was having issues with her short-term memory. [PPFOF ¶ 75] He did not interview Jordan Lewandowski until June 11, 2015, by phone, but Jordan did confirm that he had not arranged for Plaintiff to come and get him. [PPFOF ¶ 75] Sgt. Zieger did not complete his investigation until September 9, 2015, when he submitted his memo to Deputy Inspector Brunson. [PPFOF ¶ 75]

On April 8, 2015, Plaintiff was notified that she was being investigated for "operating a department vehicle, with emergency lights activated, while not accomplishing the mission of the department." Plaintiff was interviewed by IAD on April 14, 2015 by Sgt. Zieger. [PPFOF 77]

In August 2015, the investigation was still pending, leaving Plaintiff on unpaid leave with huge medical bills. Defendant has never taken so long to resolve an investigation into a drunken driving accident. [PPFOF ¶ 78] On October 7, 2015, Plaintiff was charged with further violations stemming from the January accident, just two days after she was requested to serve as a "Subject Matter Expert" by Defendant in another matter via email. [PPFOF ¶ 80]

On October 21, 2015, Plaintiff wrote a memo to the Chief rebutting the charges. [PPFOF ¶ 81] On November 27, 2015, Plaintiff submitted a memo to the Chief, rebutting charges regarding her integrity. Plaintiff's memo noted specific incidents of male officers being treated far more favorably under similar circumstances, and she detailed specific errors in the investigation of her. [PPFOF ¶ 40] On December 4, 2015, Sgt. Zieger wrote a memo to Deputy

14

Inspector Brunson responding to Plaintiff's November 27, 2015 memo. He noted that Plaintiff said she had proof that "Internal Affairs members, who investigated her case, are unethical and conducted a biased investigation based on gender." [PPFOF ¶ 85] Plaintiff committed no wrongdoing worthy of discipline or termination at any time in 2014 and 2015. [PPFOF ¶ 86] Defendant issued Plaintiff a 5-day suspension, a 30-day suspension, and terminated her, all for alleged infractions stemming from her January 19, 2015 squad accident. Defendant terminated Plaintiff's employment on December 16, 2015. [PPFOF ¶ 68] The Fire & Police Commission affirmed after a hearing. [Defendant's Proposed Findings of Fact ("DPFOF") ¶¶ 26, 34]

### C. Other Female Officers Suffered Sex Discrimination

#### i. Melanie Beasley

On or about October 14, 2014, Plaintiff overheard Wilkinson tell Beasley, "If you leave me, I will kill you." [Pl. Decl., ¶ 34] Wilkinson also threatened to kill Beasley. [PPFOF 98(a)] Wilkinson told Beasley he was watching her, and "I can take you out from 1,000 yards." [PPFOF 98(a)] Wilkinson sent Beasley a text message asking what she would do if he "ripped my panties off, whipped it out, and stuck it in me." Wilkinson raped Beasley days later on or about November 10, 2014, while his duty gun was nearby, and he choked and threatened her if she reported him to Defendant. [PPFOF 98(a)]

On December 10, 2014, Beasley told Lt. Hanley that she was afraid for her life from Wilkinson. Lt. Hanley did nothing. [PPFOF 98(a)] Lt. Hanley denied that anyone ever reported Beasley's sexual assault to him. [PPFOF 98(a)]

On or about December 11, 2014, Beasley spoke to Lt. Leitzke about the death threats, intimidation, and sexual harassment she was suffering from Wilkinson. Beasley said she had told Lt. Hanley about the about the death threats, intimidation, and sexual harassment the previous

15

day.  [PPFOF 98(a)] Lt. Leitzke told Beasley not to let Wilkinson surprise her, and that if Wilkinson came to her house, Beasley should drive away. Lt. Leitzke told Beasley that if Wilkinson ever showed up at Walmart while she was there, it was not a coincidence and she should leave right away. Lt. Leitzke encouraged Beasley not to file a report and to keep the situation secret. Lt. Leitzke made sexual advances to Beasley in the meeting. Lt. Leitzke did nothing to address Beasley's concerns.  [PPFOF 98(a)]  Lt. Hanley and Lt. Leitzke are both mandatory reporters of violence and were personal friends.  [PPFOF ¶ 3]

> ii.    **Nancy Nelson**

On March 31, 2015, Nancy Nelson's husband made an unsubstantiated and unfounded 911 call to Defendant to report her for domestic violence.  When male officers of the Department responded to the scene, they accepted her husband's lies and arrested her. [PPFOF 98(b)]

On June 11, 2015, Nancy Nelson was arrested for her first OWI charge, and the Department put her on desk duty and would not allow her to even ride as a passenger until she got her occupational license in October 2015.  Male officers in similar situations were not put on desk duty or stripped of their ability to ride in squad cars with other officers, and were not investigated.  [PPFOF 98(b)]

When Nancy Nelson called 911 on or about November 29, 2015 because her husband Officer Grant Nelson was in an uncontrollable, intoxicated rage with a knife, threatening to kill her, Defendant responded by: (a) refusing to arrest Grant Nelson, even though Nancy Nelson took video of his threatening her life in an intoxicated rage and showed it to the responding officers from Defendant, and despite Wisconsin's mandatory arrest law in domestic violence situations; (b) allowing Grant Nelson to keep the knife; (c) telling him to drive somewhere else, even though he was obviously intoxicated; (d) ignoring Nancy Nelson's concerns and leaving the

16

scene without assisting her; and (e) charging Nelson with disorderly conduct and domestic violence but issuing no charges against Grant Nelson.  [PPFOF 98(b)]

### iii.    Katrina Warren

Ms. Warren filed a sexual harassment complaint from an Assistant Chief. [PPFOF 98(e)]

### iv.    MaryNell Regan

Regan "thought Chief Flynn was stalking her," and "he had made sexual advances and that he was inappropriate." [PPFOF ¶ 98(d)]  Sgrignuoli felt it was improper for Chief Flynn to make advances to Regan because "She's his boss, first of all.  Secondly, that's how he treated all women on the Police Department in my opinion." Sgrignuoli testified, "I think it lends to eroding the credibility of the police department as its lead member.  I think it supports the affair he had early on in his tenure that was well documented. … I think it also goes to his integrity. I think it also provides the appearance of impropriety."  [PPFOF ¶ 98(d)]

Regan thought that the Department's decision to investigate whether she was having an affair with Sgrignuoli was sex discrimination against her, "and I decided not to pursue that.  But do I think they would have—Do I think Chief Flynn would have surveilled a male?  Probably not."  [PPFOF 98(d)]  She testified, "I do know that I was very prepared for meetings and often Flynn didn't like that, and that irked him. … Q. …Would it be fair to say that he can sometimes be uncomfortable with women in power?  A. That's my personal opinion, yes."  [PPFOF 98(d)]

### v.    Unnamed women

Chief Flynn and his staffer, Joel Plant, "were involved in a variety of different engagements with female employees that they did not want made public."  Chief Flynn was never investigated for those indiscretions "because he ordered it otherwise." [PPFOF 98(c)]

Regan is aware "of instances in which female members of the department have actually

gotten temporary restraining orders against male members of the department." [PPFOF 98(c)]
Regan is aware of sex discrimination complaints against the department sustained by the
department and by the Equal Rights Division. [PPFOF 98(c)] Regan received a complaint from a
female employee about being reassigned off the POST team at the Department. [PPFOF 98(c)]

### D. Male officers were treated more favorably

Male employees who committed worse offenses than Plaintiff were not terminated.
[PPFOF ¶ 96] Numerous male comparators who committed infractions far more serious than
Plaintiff were not terminated. [PPFOF ¶ 96] The ranks of comparator male officers, ironically,
includes the main discriminator against Plaintiff, Acting Captain Sgrignuoli. [PPFOF ¶¶ 89-95]
As noted in DPFOF ¶¶ 49-50, from 2008 to 2018, Chief Edward Flynn was "the final decision-
maker regarding discipline decisions regarding suspension, demotion, and discharge of sworn
members of the department," and thus the common decision-maker for Plaintiff and these male
officers who were treated better than her despite committing worse violations of the rules.

### E. Defendant's Proffered Reasons for Termination are Pretextual.

Chief Flynn claims that his decision to discharge Lewandowski for her integrity violation
was based upon "the seriousness and nature of the charge, and the facts and circumstances
underlying the charge as established in the internal investigation." [DPFOF 55] The evidence
indicates, however, that he discharged Plaintiff in retaliation for her protected activity; see
PPFOF ¶¶ 17-40. Plaintiff also raised serious questions as to Chief Flynn's credibility and
truthfulness in PPFOF 92, 93, 96 & 100, which create genuine disputes of material fact as to
causation, requiring a jury trial.

Plaintiff has established enough evidence to permit a reasonable factfinder to conclude
that the plaintiff's sex caused her disparate treatment and discharge. Because judging the

credibility of the witnesses on the issue of motive would be required here in order to grant the motion, this Court should deny Defendant's motion.

## IV.    PLAINTIFF'S TITLE VII RETALIATION CLAIM MUST GO TO TRIAL

### A. Plaintiff Engaged in Protected Activity by Complaining About Sex Discrimination

The Seventh Circuit rejects any bright-line numeric rule, but when there is corroborating evidence of retaliatory motive, an interval of a few weeks or even months may provide probative evidence of the required causal nexus. "Deciding when the inference is appropriate cannot be resolved by a legal rule; the answer depends on context.... A jury, not a judge, should decide whether the inference is appropriate." *Coleman v. Donahoe*, 667 F.3d 835, 861 (7th Cir. 2012).

Even if the sequence of events alone would not be enough, this sequence of protected activity and punitive action could lend some support to a reasonable juror's inference of retaliation. *See, e.g., Hunt–Golliday v. Metropolitan Water Reclamation Dist.,* 104 F.3d 1004, 1014 (7th Cir.1997) ("Interpreting the facts in [the plaintiff's] favor, she can show a pattern of criticism and animosity by her supervisors following her protected activities ... [that] supports the existence of a causal link."). *Coleman*, 667 F.3d at 861.

#### 1.  Complaints about discrimination against herself

On November 28, 2011, Plaintiff wrote a letter to the Chief asking for help with her neighbor situation and detailing ways that male officers had refused to help her. [PPFOF ¶ 18]

On August 30, 2012, Plaintiff submitted a memo to male Captain Wagner about "Workplace Harassment," describing the discrimination and harassment she was receiving from male detectives.  [PPFOF ¶ 26]

On August 5, 2013, Plaintiff submitted a memo to Captain Wagner about continued harassment from Lawrence Poggenburg. "Since I did not get any assistance from District Three

19

Supervision in the past, and was told that this problem is a CIB problem to handle, I am coming to you to take appropriate action." No one responded. [PPFOF ¶ 17]

On December 6, 2014, approximately one hour after Plaintiff sent the "open door" email, Lt. Hanley ordered Plaintiff into his office and reprimanded her for sending the email; he told Plaintiff "it made the command staff angry." [PPFOF ¶ 29] Plaintiff complained to her other Lieutenants about harassment and retaliation she was receiving from Sgrignuoli for emailing the Chief, but Plaintiff received no assistance and told to "lay low." [PPFOF ¶ 29]

In January 2015, Plaintiff complained to Lt. Hanley about the treatment and threats against Plaintiff's career that she was experiencing from Lt. Sgrignuoli. [PPFOF ¶ 46]

In March 2015, Plaintiff met with Deputy Inspector Terrence Gordon about the retaliation and intimidation from Captain Sgrignuoli, her suspension, and the lies Sgrignuoli wrote about her interaction with Judge Swanson. Gordon told Plaintiff, "Get a lawyer. Sgrignuoli is after your reputation and career." [PPFOF ¶ 33]

In March 2015, Plaintiff contacted Captain Sgrignuoli to inquire why her gun was taken away and her police powers suspended, and she told Captain Sgrignuoli that she felt that she was being retaliated against. [PPFOF ¶ 34] On March 24, 2015 and again in May 2015, Plaintiff contacted Captain Sgrignuoli to find out why she was still suspended but Wilkinson was not. Sgrignuoli denied writing the complaint that led to Plaintiff's suspension and claimed to have no knowledge of why she was suspended. This contradicts a previous memo from Sgt. Hines stating that Sgrignuoli wrote the complaint for Plaintiff's suspension that was submitted to IAD. [PPFOF ¶ 34]

On May 3, 2015, Plaintiff submitted a memo to the Chief about Lt. Armbruster instructing Plaintiff to go to court for subpoenas. [PPFOF ¶ 35]

On June 1, 2015, Plaintiff sent a memo to Captain Sgrignuoli regarding her unpaid medical leave, requesting information on the status of the investigation, and noting that she knew she would be transferred. [PPFOF ¶ 36]

On October 13, 2015, Plaintiff wrote a memo to the Milwaukee Fire & Police Commission, titled "Discrimination, Misconduct in Office," which the Commission eventually accepted. Plaintiff reported "intentional disparate treatment in direct action due to gender; I and others have been discriminated [sic] within this department because we are women." Plaintiff noted that "[t]here is collusion in the ranks of the male Milwaukee Police Department" and detailed instances of discrimination. [PPFOF ¶ 38]

On October 21, 2015, Plaintiff wrote a memo to the Chief rebutting the charges against her of untruthfulness and threats. [PPFOF ¶ 81]

On October 26, 2015, Plaintiff wrote a memo to Captain Salazar requesting an update on the investigation and noting that mistakes were made in recording her time off. [PPFOF ¶ 82]

On November 12, 2015, Plaintiff submitted a memo to the Commission detailing additional concerns with the charges against her. Plaintiff also submitted a memo to Chief Flynn regarding allegations of untruthfulness and threats. [PPFOF ¶ 83] Regan testified that "I knew [Plaintiff] must have [filed previous discrimination complaints], because the command staff told me they were nervous to have IAD investigate this complaint because she had alleged unfair treatment by IAD." [PPFOF ¶ 39]

On November 27, 2015, Plaintiff submitted a memo to the Chief, noting specific incidents of male officers being treated more favorably in similar circumstances. [PPFOF ¶ 40]

### 2. Complaints about sex discrimination against Beasley

After visiting Beasley on October 5, 2014, Plaintiff advised Lt. Hanley that Beasley

feared for her life from Wilkinson. Plaintiff showed him a picture of a used firing target that Wilkinson had sent to Beasley. [PPFOF ¶ 27] Lt. Hanley also believed it was a threat, and he suggested that Beasley get a restraining order. Lt. Leitzke told Beasley, "if you tell me his name, I have an obligation to report it." As soon as Beasley told Lt. Leitzke that her stalker was Wilkinson, he asked Beasley if she had anything in writing and attempted to dissuade her from reporting Wilkinson. [PPFOF ¶ 27]

In late 2014, Plaintiff told Lt. Hanley that the abusive situation with Beasley included death threats against Beasley, and Plaintiff asked if Beasley could come speak to him directly. [PPFOF ¶ 28] Lt. Hanley denies knowing of the situation. [PPFOF ¶ 28]

In January 2015, Plaintiff asked Lt. Hanley about potential additional steps that could be taken to protect Beasley and updated him about Beasley's emotional distress. [PPFOF ¶ 30] On January 15, 2015, Beasley obtained a temporary restraining order with Plaintiff's assistance and support. [PPFOF ¶ 30] On January 26, 2015, Plaintiff testified that she heard Wilkinson tell Beasley "If you leave me, I will kill you". [PPFOF ¶ 30]

In January 2015, Plaintiff wrote a memo to Internal Affairs and Lt. Hanley, demanding to know why nothing was being done to protect Beasley. [PPFOF ¶ 31] Plaintiff also told Captain Stigler about Beasley's situation, he told her that it was none of her business. [PPFOF ¶ 31]

On October 11, 2015, Plaintiff wrote a memo to the Chief rebutting charges against her, noting that Beasley "requested my help with the filing of a felony case, additionally, and most importantly, to help her with the fear and stress she was experiencing while working, due to an assault by a co-worker. [PPFOF ¶ 37]

On January 18, 2015, Plaintiff and Beasley were discussing Beasley's restraining order against Wilkinson in front of witnesses at the Department, just before Plaintiff's accident.

[PPFOF ¶ 32]

**B. Defendant Retaliated Against Plaintiff for her Discrimination Complaints**

Defendant repeatedly investigated Plaintiff, looking for anything with which to terminate her employment after she complained about sex discrimination. [PPFOF ¶ 41]

A few days after the "open door" email, Lt. Sgrignuoli confronted Plaintiff and asked her, "What the hell is wrong with you, why would you write the Chief?" He told Plaintiff not to write any more emails to the Chief and not to "cross him" again. [PPFOF ¶ 42] Sgrignuoli also approved Plaintiff's review for 2014, which stated: "she was counseled by Lt. Sean Hanley about the proper way to follow the chain of command. This stemmed from an email that she sent to the Chief and other members of the command staff." [PPFOF ¶ 42] On December 13, 2014, Lt. Sgrignuoli transferred Plaintiff in retaliation for her "open door" email to the Chief, to work on ballistic cases under Lt. Armbruster. Lt. Sgrignuoli told her that this transfer was an "opportunity" for her, but Plaintiff and Lt. Armbruster agreed it was actually punishment for Plaintiff's emailing the Chief and intended to keep her from assisting Beasley. [PPFOF ¶ 43] On May 22, 2015, Plaintiff was given an official reprimand based on false statements of Captain Sgrignuoli in retaliation for Plaintiff's email to the Chief. [PPFOF ¶ 61]

On January 1, 2015, Plaintiff arrested a suspect in the first shooting of the year. Lt. Sgrignuoli told Plaintiff to punch out, go home, and finish the remaining paperwork in the morning because it was only a misdemeanor. Plaintiff complied. [PPFOF ¶ 44] Then, at the direction of Lt. Sgrignuoli, Lt. Lough wrote Plaintiff up for not completing the paperwork. Plaintiff asked Captain Sgrignuoli why, and he responded, "you don't make the rules, I do; this is what happens when you go against me." [PPFOF ¶ 45] Plaintiff told Lt. Hanley, who stated that this punishment was obviously a direct consequence for emailing the Chief. [PPFOF ¶ 46]

23

After Plaintiff's accident, Lt. Hanley lied in his report, leading to multiple investigations of Plaintiff. [PPFOF ¶ 47] Lt. Hanley questioned Plaintiff about the accident while she was suffering from a concussion. [PPFOF ¶ 47]

Defendant refused to pay Plaintiff's medical bills, denied her worker's compensation claim, and held its investigation open for months longer than any investigations into male officers or officers who did not complain. [PPFOF ¶ 48] Plaintiff submitted a memo to the Department at its request, asking to be carried as injured-on-duty until she was able to return to work, as Detective Carr was (who had not complained of discrimination), but Defendant refused. [PPFOF ¶ 48] Lt. Hanley did not make false statements about Detective Carr or place her under investigation, even though she was in the accident. [PPFOF ¶ 88] Defendant accepted Carr's worker's comp claim and paid her medical bills. [PPFOF ¶ 88] Defendant did not force Carr to testify without pay, because it placed her on injury leave. [PPFOF ¶ 88]

On January 23, 2015, Plaintiff appeared at Milwaukee County Children's Court, at the victim's request, in a public hearing. Now-Captain Sgrignuoli wrote a memo about the court appearance containing false information negative to Plaintiff. [PPFOF ¶ 49] Sergeant Hines investigated and wrote a March 24, 2015 memo repeating many of Captain Sgrignuoli's false allegations. On February 11, 2015, Plaintiff wrote a memo to Judge Swanson, apologizing for interrupting the proceeding and explaining why she wanted to record the hearing. [PPFOF ¶ 50] On January 24, 2015, Captain Sgrignuoli confronted Plaintiff at her home and informed her that she was "making bad decisions," and stated words to the effect: (a) "You had a cell phone in court, and the judge called me and told me he wanted to hold you in contempt of court and decided not to as a favor;" (b) "You called a burglary suspect the N-word;" (c) "I am taking your gun and badge;" (d) "You have no police powers;" (e) "You are under suspension;" (f) "You cannot take the

24

Lieutenant's exam;" (g) "You cannot testify for Beasley;" (h) "You are not to possess any firearm outside of your home;" (i) "You are not to make any arrest;" and (j) "Do you understand you cannot testify in court for Melanie either?" [PPFOF ¶ 51] On March 24, 2015, Sgt. Hines submitted a report to Deputy Inspector Brunson, repeating lies told by Lt. Sgrignuoli in an attempt to further retaliate against Plaintiff for complaining about discrimination. [PPFOF ¶ 58] On April 15, 2015, Defendant issued charges against Plaintiff regarding integrity, referring to the January 23, 2015 hearing. [PPFOF ¶ 59] On June 3, 2015, Captain Sgrignuoli and Lt. Armbruster disciplined Plaintiff over the court hearing, and Sgrignuoli told Plaintiff, "I was prepared to give you your gun and badge back but now I am not. I don't like your attitude. How are you feeling?" Plaintiff responded that she still had headaches from her accident. Captain Sgrignuoli replied, "Hmm, now I decided that you are not getting it back. Leave my office." [PPFOF ¶ 63]

In retaliation for Plaintiff's support of Beasley in the temporary restraining order hearing, in February 2015, Captain Sgrignuoli again confronted Plaintiff at her house and informed her that she violated rules by testifying in court for Beasley while Plaintiff was suspended. He stated again that Plaintiff could not take the Lieutenant's exam. [PPFOF ¶ 52]

Captain Sgrignuoli and the Department made multiple attempts to ruin Plaintiff's reputation while she was out on medical leave, including: (a) in March 2015, Plaintiff was forced to go to court and testify without pay. After she arrived home from court, Plaintiff found a sergeant at her house, who accused her of being drunk in court. (b) While Plaintiff was in court to testify in April and May 2015, the Department told one of the lawyers in a case that she was suspended, but only her police powers were suspended; (c) Plaintiff was forced to testify in court in May and August 2015, and the Department told a probation agent involved in the case that Plaintiff was suspended and gave the agent Plaintiff's home phone number; (d) Plaintiff was not able to testify successfully in a case due

to her injuries, and the case was lost. Detective Carr also worked on that case, but Defendant never forced her to testify. [PPFOF ¶¶ 54, 57]

In February 2015, Captain Sgrignuoli ordered Plaintiff to write a memo for an involuntary transfer or face more consequences for her complaints. Plaintiff contacted union president Mike Crivello and explained the threats, retaliation, and intimidation tactics Captain Sgrignuoli was using against her. [PPFOF ¶ 55] Crivello then talked to Sgrignuoli, who stated, "When [Plaintiff] is ready to come back she can, but she made me look bad in the eyes of the Big Guy," referring to the Chief. [PPFOF ¶ 55]

On March 5, 2015, Mayor Barrett received a letter from the family of a victim (the same victim that Plaintiff appeared in court off-duty and tried to audio record for the family) that Plaintiff assisted and solved a crime regarding, praising Plaintiff for her work and recommending that she receive an award. Plaintiff did not receive an award. [PPFOF ¶ 56]

On April 29, 2015, Lt. Armbruster instructed Plaintiff to go to court for subpoenas, contradicting earlier instructions from Captain Sgrignuoli, and he informed her that Sgrignuoli was ordering her to attend court or be written up. [PPFOF ¶ 60]

On June 1, 2015, the same date that Plaintiff submitted a memo to Captain Sgrignuoli regarding her forced unpaid medical leave instead of being considered injured on duty, Defendant transferred Plaintiff in retaliation for her complaints of discrimination. [PPFOF ¶ 62]

In June 2015, Plaintiff told Sgt. Hines that she needed to return to work because her bills were going to collection, that she was being retaliated against, she was being made to use sick time and not injury on duty time because of the investigation, and that her partner who was in the car with Plaintiff was not facing similar treatment. [PPFOF 64]

As of August 2015, the investigation into Plaintiff's accident was still pending, leaving

Plaintiff on unpaid leave with huge medical bills, in retaliation for her complaints of discrimination. Defendant has never taken so long to resolve an investigation into a drunken driving accident.  [PPFOF 78]

On August 30, 2015, Plaintiff was again reassigned in retaliation for her complaints of discrimination. [PPFOF ¶ 65]

On October 7, 2015, Plaintiff was charged with further violations of the code of conduct stemming from the January accident, just two days after she was requested to serve as a "Subject Matter Expert" by Defendant in another matter. [PPFOF ¶ 80]

Defendant transferred many of the male officers who were the subject of Plaintiff's complaints to Internal Affairs, where they filed charges against her repeatedly.  [PPFOF ¶ 66]

On November 23, 2015, because Plaintiff and Beasley had recorded meetings with supervisors to document the ongoing discrimination and retaliation against them, Defendant amended its policy to prohibit recording without the consent of all parties or the approval of the Chief.  [PPFOF ¶ 67]

Defendant issued Plaintiff a 5-day suspension, a 30-day suspension, and terminated her on December 15, 2015, all stemming from her January 19, 2015 squad accident.  [PPFOF ¶ 68]

Plaintiff learned in late 2017 and early 2018 a rumor that married Captain Sgrignuoli had been having a secret affair with the married female Executive Director of the Fire and Police Commission (MaryNell Regan) at the time he was investigating Plaintiff following her January 2015 traffic accident. [PPFOF ¶¶ 89-95] At the time he was caught improperly viewing a surveillance video, Captain Sgrignuoli had eight (8) "sustained offenses for other violations." An official record noted that "This is the member's first offense of using their official position to unnecessarily interfere in the personal business of another," for which he received a three-day

suspension without pay, and "This is the member's second offense of failing to use time to accomplish the mission of the department," for which he had previously received a two-day suspension without pay. Chief Flynn assessed the suspensions totaling five days against Sgrignuoli. [PPFOF ¶ 91] Captain Sgrignuoli's discipline was substantially less than Plaintiff's discipline for the same alleged misconduct he falsely accused Plaintiff of, including "failing to use time to accomplish the mission of the department". [PPFOF ¶ 91]

**C. Defendant's Proffered Reasons for Termination are Pretextual.**

Chief Flynn claims that his decision to discharge Lewandowski for her integrity violation was based upon "the seriousness and nature of the charge, and the facts and circumstances underlying the charge as established in the internal investigation." [DPFOF 55] The evidence indicates, however, that he discharged Plaintiff in retaliation for her protected activity and previous complaints of discrimination; see PPFOF ¶¶ 17-40. Plaintiff also raised serious questions as to Chief Flynn's credibility and truthfulness in PPFOF 92, 93, 96 & 100, which create genuine disputes of material fact as to causation, requiring a jury trial.

**D. Other Officers Complained About Discrimination & Were Retaliated Against**

**1. Melanie Beasley**

On January 5, 2015, Beasley met with Internal Affairs to discuss the abuse she suffered by Wilkinson, but they issued a "no contact" order for Beasley as to Wilkinson instead. [PPFOF ¶ 99(a)] Lt. Hanley or Lt. Leitzke never took any steps to limit Wilkinson's duties, police powers or contact with the victim. Instead, they retaliated against Beasley for reporting the death threats, intimidation, and sexual harassment. [PPFOF ¶ 100(a)]

Beasley called Lt. Leitzke after her meeting with Internal Affairs; he told Beasley not to document anything and leveraged a potential promotion against her in attempts to convince her

to not to file a report on Wilkinson.  [PPFOF ¶¶ 99(a), 100(a)]

When Beasley went to Internal Affairs about Wilkinson, she was told to get a restraining order. [PPFOF ¶ 99(a)] Lt. Hanley denies that. [PPFOF ¶ 99(a)] On January 15, 2015, Beasley obtained a temporary restraining order against Wilkinson with Plaintiff's help.  [PPFOF ¶ 99(a)] Beasley emailed a copy to Captain Stigler for assistance, but he refused. [PPFOF ¶ 100(a)]

On February 6, 2015, Beasley made an official report on Wilkinson to Internal Affairs; but Internal Affairs did not contact her until March 29, 2015. [PPFOF ¶ 100(a)] When IAD finally contacted Beasley, they asked her dismissively, "What do you want? A bodyguard?" [PPFOF ¶ 100(a)] During Beasley's meeting with Detective Zimmerman, he questioned if she really wanted an investigation done and threatened that if she continued to push for an investigation, Internal Affairs would begin investigating her.  [PPFOF ¶ 100(a)]

Melanie Beasley "frequently called" Regan about her discrimination complaints. [PPFOF ¶ 99(a)]

**2.  Nancy Nelson**

On December 8, 2015, Nancy Nelson filed a detailed, five-page sex discrimination complaint against the Department with the Fire & Police Commission.  [PPFOF ¶ 99(b)]

On June 11, 2015, after Nancy Nelson's first arrest for an OWI charge, the Department put her on desk duty and would not allow her to even ride as a passenger until she got her occupational license in October 2015. Male officers in similar situations were not put on desk duty, stripped of their ability to ride in squad cars, or investigated.  [PPFOF ¶ 98(b)]

When Nancy Nelson called 911 on or about November 29, 2015 because her husband Officer Grant Nelson was in an uncontrollable, intoxicated rage with a knife, threatening to kill her, Defendant responded by: (a) refusing to arrest Grant Nelson, even though Nancy Nelson

took video of his threatening her life in an intoxicated rage and showed it to the responding officers, and despite Wisconsin's mandatory arrest law in domestic violence situations; (b) allowing Grant Nelson to keep the knife; (c) telling him to drive somewhere else, even though he was obviously intoxicated; (d) ignoring Nancy Nelson's concerns and leaving the scene without assisting her; and (e) charging her with disorderly conduct and domestic violence but issuing no charges against Grant Nelson.  [PPFOF 98(b)]

### 3. MaryNell Regan

Regan complained to the mayor and the City Attorney that someone in the Police Department was following her, but no one took any action. "I was told by the mayor's office that they did talk to Flynn and told him to leave me alone, to stop following me—stop investigating me." [PPFOF 99(c)] When asked about the conclusion of the investigation, Regan testified, "I believe Captain Sgrignuoli got discipline, but I do know for a fact that the file wasn't closed. And it wasn't closed until Alfonso Morales became chief."  [PPFOF ¶ 99(c)] Regan accused Chief Flynn of abusing his police powers by investigating her.  [PPFOF ¶ 99(c)]

The mayor's chief of staff called Regan on a Friday and asked for her resignation because "the mayor wants to take the commission in a different direction," and she submitted her resignation the following Monday.  [PPFOF ¶ 100(c)]

### 4. Johnny Sgrignuoli

Chief Flynn retaliated against Sgrignuoli by suspending him for only five days (which Sgrignuoli could not appeal or learn why he received the suspension) and demoting him after he had Sgrignuoli investigated for an alleged affair with Regan. The suspension also halted Sgrignuoli's advancement possibilities. [PPFOF 100(b)] Sgrignuoli has now resigned from the Department.  [PPFOF ¶ 100(b)]  Sgrignuoli thinks he never should have been investigated for

viewing the video at City Hall, and Assistant Chief Bill Jessup and Inspector Tom Stigler both told him that.  [PPFOF ¶ 100(b)]

Sgrignuoli testified, "I think that all of the—all of [the Chief's] extracurricular activities caught up to him.  I think that a lot of what the Common Council was becoming aware of and the Commission was becoming aware of, which was public to a lot of people, there was no secret. … The fact that he was absent for the last two months, and yet remained on the payroll, that was interesting. So, yeah, I think it's no coincidence that he and then Assistant Chief Jessup, Joe Plant made a quick exit, Inspector Stigler made a quick exit.  Everyone who could leave did." [PPFOF ¶ 100(b)]

### E.  Defendant Did not Retaliate Against Officers Who Did Not Engage in Protected Activity

Employees who did not complain of discrimination but committed worse offenses were not terminated.  [PPFOF ¶ 97]

## CONCLUSION

For these reasons, this Court should deny the Defendant's Motion for Summary Judgment and allow this case to proceed to a jury trial on the merits.

Dated this 25th day of June, 2019.

HEINS EMPLOYMENT LAW PRACTICE LLC
Counsel for the Plaintiff

*s/ Janet L. Heins*      .

Janet L. Heins, State Bar No. 1000677

HEINS EMPLOYMENT LAW PRACTICE LLC
200 South Executive Drive, Suite 101
Brookfield, WI  53005
(262) 241-8444 voice
e-mail: jheins@heinslawoffice.com

31