# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

SHANNON LEWANDOWSKI,

      Plaintiff,

      v.                          Case No. 16C1089

CITY OF MILWAUKEE,

      Defendant.

## DEFENDANT'S REPLY TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

PLEASE TAKE NOTICE that Defendant City of Milwaukee, represented by City Attorney Grant F. Langley, by Assistant City Attorney Robin Pederson, hereby files this reply to plaintiff's statement of additional facts response (ECF Doc. 87) filed in response to defendant's motion for summary judgment (ECF Doc.76-80).

According to local rule, an opposing party may not file not more than 100 separately numbered statements of additional facts. Civil L. R. 56(b)(2)(B)(ii). The City objects to Lewandowski's violation of this rule by her including multiple facts per numbered paragraph, and extensive use of sub-parts without receiving permission of the Court. Defendant requests that any facts beyond the first discrete and separate 100 offered facts be disregarded by the Court.

Milwaukee Police Department Background

1. Defendant's sworn officers and detectives are majority male. [Declaration of Shannon Lewandowski dated June 20, 2019 ("Pl. Decl."), ¶ 2; Deposition of MaryNell Regan taken on January 17, 2019 and attached to the Pl. Decl. as Ex. 45 ("Regan Dep."), p. 34] The Detective Bureau has a higher percentage of males than females; "it's mostly men." [Deposition of Johnny Sgrignuoli taken on February 28, 2019 and attached to the Pl. Decl. as Ex. 46 ("Sgrignuoli Dep."), p. 96]

**No dispute.**

2. Defendant routinely holds female members of the Department to higher standards than male members, treating the female department members worse than male officers in violation of their right to Equal Protection of the laws. Defendant maintains a "good ol' boys club" atmosphere at the Department that has persisted throughout Plaintiff's career in law enforcement with the Defendant, regardless of the official policies allegedly prohibiting such conduct. [Pl. Decl., ¶¶ 179-80] Defendant continues to treat male members of the Department more favorably than females. [Pl. Decl., ¶ 186]

**Disputed. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

3. As supervisors at Defendant, male Lt. Hanley and male Lt. Leitzke are both mandatory reporters of violence by Defendant's employees. Lt. Leitzke and Wilkinson, at all times material herein, were personal friends. [Pl. Decl., ¶¶ 25, 27]

**No dispute as to first sentence. Disputed as to second sentence. Object as irrelevant.**

4. Chief Edward Flynn had an "open door" policy at Defendant. [Pl. Decl., ¶ 43 & Ex. 5; Sgrignuoli Dep., p. 17 (he denies that such a policy existed)]

**Disputed. As a paramilitary organization, Chief Flynn, along with every other Chief of Police in the history of the Milwaukee Police Department, utilized a chain of command structure of reporting within the organization.**

5. MaryNell Regan was Executive Director of the Milwaukee Fire & Police Commission from September 2, 2015, to April 23, 2018, when she resigned. She was a cabinet member of Milwaukee Mayor Tom Barrett, and she functioned as an administrator to the Fire & Police Commission. [Regan Dep., pp. 4-7, 9] Regan testified that she may have reviewed the hearing examiner's draft of his decision after Plaintiff's Fire & Police Commission hearing. [Regan Dep., p. 26]

**No dispute.**

6. The Fire & Police Commission and the Chief of Police are considered the final policymakers for the Milwaukee Police Department. [Regan Dep., pp. 9-10 & Ex. 1]

**This statement is too broad for the City concur. In some instances it is true, and in some it is not, the specific context matters.**

Shannon Lewandowski's Background with MPD

2

7. Plaintiff was hired by Defendant's Police Department in June 1999 as a police officer, and she was employed by Defendant in various positions for over 17 years. In 2005, Plaintiff was promoted to detective, and she spent the majority of her career assigned to violent crimes. [Pl. Decl., ¶ 3]

**No dispute.**

8. Throughout most of her career, Defendant assigned Plaintiff to undesirable tasks at work because she is female and later because she complained of discrimination and retaliation. [Pl. Decl., ¶ 4] Because Plaintiff would not back down from complaining about injustice and discrimination when she saw it, other department members and command staff called her derogatory names such as "pitbull" and "black cloud." [Pl. Decl., ¶ 5]

**Disputed. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

9. Plaintiff received a good performance review in 2014, the year before her termination. [Pl. Decl., ¶ 8 & Ex. 7] Sgrignuoli saw and approved the performance reviews done on Plaintiff. [Sgrignuoli Dep., p. 16]

**No dispute.**

10. While employed by Defendant, Plaintiff received Early Intervention Training to assist fellow officers on the Department with personal issues or situations that came up during their employment. [Pl. Decl., ¶ 9; Transcript of Fire & Police Commission Hearing dated August 10, 2016, Volume I, attached to the Pederson Declaration as Ex. 5 ("F&PC I"), p. 280]

**No dispute.**

11. During her employment with Defendant, Plaintiff became friends with another female police officer, Melanie Beasley. In the fall of 2014, Plaintiff became aware that Beasley was having some personal issues. [Pl. Decl., ¶ 17]

**No dispute.**

12. On or about October 5, 2014, after receiving a text from Beasley showing a paper shooting target shot up from her boyfriend, Plaintiff asked her supervisor, Lt. Hanley, if that looked to him like "foreplay." Plaintiff obtained permission from Lt. Hanley to go to Beasley's house, where Plaintiff learned that Beasley had been suffering in an abusive relationship with another Milwaukee police officer and member of a tactical unit, Robert Wilkinson. Beasley told Plaintiff that she attempted to end the relationship numerous times after learning that Wilkinson was married but that he had made threats to her and that she was afraid for her safety. [Pl. Decl., ¶¶ 18-21] Throughout October 2014, Plaintiff continued to stay in touch with Beasley and counsel her about reporting the situation to her superiors. [Pl. Decl., ¶ 29]

**Allegations as to Lt. Hanley disputed. Object as irrelevant to the instant matter. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

13. In January 2015, Plaintiff was assigned to the Power Shift at Defendant's District Three. [Pl. Decl., ¶ 74] At that time, Acting Captain John Sgrignuoli supervised the detectives, including Plaintiff. [Sgrignuoli Dep., p. 10] All detectives were part of the Criminal Investigation Bureau at that time. [Sgrignuoli Dep., pp. 10-11]

**No dispute.**

14. Acting Captain Sgrignuoli described Plaintiff as "a very hard worker, pays attention to detail, very persistent. … Goes the extra mile, very – just a thorough, very hard-working detective. … Very independent, outspoken, confident, dedicated." "I thought she was, like I said, hard-working, dedicated, very competent at her detective role." [Sgrignuoli Dep., p. 13, Conf. p. 99] Regan "was consistently told she was a good detective." [Regan Dep., p. 65]

**No dispute. The City notes that this undermines Lewandowski's own theory of her case, showing that there was not systemic discrimination or retaliation, and that one of her own identified "bad actors," Lt. Sgrignuoli, did not undermine her at her evaluations. This goes to the issue of no reasonable juror being able to find in Lewandowski's favor.**

15. On or about January 11, 2015, Plaintiff was the victim of a break-in at her home while she was present and off-duty. Plaintiff caught the suspect after a foot chase and arrested him. When the break-in suspect was taken to the Department that day, he falsely accused Plaintiff of using the "N" word against her. [Pl. Decl., ¶¶ 77-78] In a later court hearing he testified that Plaintiff did not use the "N" word in chasing and apprehending him, and he acknowledged that he had lied about it at the time of his arrest. [Pl. Decl., ¶ 127]

**The City lacks sufficient knowledge or information to confirm or deny the allegations. Object as to relevance. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

16. Throughout 2015, many of Plaintiff's fellow officers told her that she was "nuts" for complaining about discrimination and "bucking the system." Several officers told Plaintiff during that time that she would be fired. [Pl. Decl., ¶ 160]

4

**The City lacks sufficient knowledge or information to confirm or deny the allegations. Object as to relevance. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

Sex Discrimination Against Shannon Lewandowski

17. On August 5, 2013, Plaintiff submitted a memo to Captain Wagner about continued harassment from Lawrence Poggenburg that Defendant refused to assist her with. She wrote, "Since the year 2005 I have been dealing with a harassing neighbor, a situation that most of District three, and my supervisors throughout the years have been made aware of. I did get a restraining order in 2011, and for the first year the behavior has ceased for the most part. However this summer, my neighbor has re-started his intentional and offensive behavior and direct this at me again." She closed by stating, "Lawrence Poggenburg has a compulsive preoccupation with having to make contact with me whenever he sees me home, and cannot leave me or the front of my home alone as ordered. Since I did not get any assistance from District Three Supervision in the past, and was told that this problem is a CIB problem to handle, I am coming to you to take appropriate action." No one responded. [Pl. Decl., ¶ 16 & Ex. 4]

**The City lacks sufficient knowledge or information to confirm or deny the allegations. Object as to relevance; these events are too remote and too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

18. On November 1, 2006, Plaintiff submitted a memo to Captain Dubis regarding "Harassment by neighbor." She noted that "Since the summer of 2005, I have had multiple problems with my neighbor…. I have spoken to Sgt. Staton of District Three." She added, "In August of 2006, Lawrence Poggenburg threatened my job and my reputation. He stated to me that 'people like me do not belong on the Police Department' and would do whatever it took to either, 'make me move or get me fired, whichever comes first.' I am a single parent and the provider for my children. This threat caused me great concern. Lawrence Poggenburg has continually harassed me verbally, as well as using the power of the Police Department to further harass me. He has also used other agencies by giving me unfounded parking citations." [Pl. Decl., ¶ 10 & Ex. 1]

**The City lacks sufficient knowledge or information to confirm or deny the allegations. Object as to relevance; these events are too remote and too attenuated from the termination to be causally related; furthermore, it was a different administration, Chief**

Flynn started in 2008. **Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

19. When Plaintiff obtained a temporary restraining order against Poggenburg on November 15, 2011, Defendant refused to serve it on him despite its legal obligation to do so. On November 28, 2011, Plaintiff wrote a letter to Defendant's Chief of Police asking for help with her neighbor situation and detailing all the ways that his male officers had refused to help her over the years. [Pl. Decl., ¶¶ 11-12 & Ex. 2]

**Disputed. Object as to relevance. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

20. Plaintiff previously filed a complaint with Defendant's Internal Affairs Division about Chief Edward Flynn coming to her house drunk and making unwanted sexual advances towards her. [Pl. Decl., ¶ 14; Sgrignuoli Dep., p. 14 (he denies knowing about it)]

**Disputed. The Milwaukee Police Department Internal Affairs Division has no record of any such complaint being filed. (Robin Pederson Decl., July 12, 2019 ¶3.) Object as to relevance. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

21. On or about December 6, 2014, Plaintiff received a confidential informant tip on where to find a wanted person who was believed to be armed and dangerous and possibly suicidal; Plaintiff could not find a warrant, and she was very worried about the possible consequences if she did not arrest him immediately, as this was shortly after the anti-police riots in Ferguson and nationwide unrest, and she wanted to avoid a "suicide by cop" situation with the suspect that might touch off similar unrest and riots in Milwaukee against the Department. [Pl. Decl., ¶¶ 36-38] Plaintiff first called Lt. Hanley for assistance and explained the urgency of the situation. He responded that he was "too busy." Plaintiff then texted Lt. Lough for assistance with the warrant, but he did not respond. Plaintiff then went to Metro and banged on the door for assistance; she was told they were in a meeting, and they did not assist her. Plaintiff contacted other police agencies involved to obtain assistance, but none assisted her. [Pl. Decl., ¶¶ 36-42]

**The City lacks sufficient knowledge or information to confirm or deny the allegations. Object as to relevance; these events are too remote and too attenuated from the termination to be causally related; these events do not concern any decision maker. Object**

as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.

22. Finally, after making those and other unsuccessful attempts from various male members of the Department to obtain assistance, and due to the exigent circumstances, on December 6, 2014, Plaintiff emailed Lt. Sgrignuoli, Lt. Lough, Lt. Hanley, Capt. Smith, Lt. Armbruster and Chief Flynn in an effort to get the attention needed to obtain a warrant, availing herself of the chief's stated "open door policy". About an hour after sending the email, Plaintiff finally was given clearance to arrest the suspect, but he got away because she could not act on the tip immediately. [Pl. Decl., ¶¶ 43-44 & Ex. 5] On or about December 12, 2014, only six days after Plaintiff could not find a warrant to arrest the armed, dangerous and possibly suicidal suspect, that suspect killed himself while being arrested, as Plaintiff had feared. [Pl. Decl., ¶ 60]

**The City lacks sufficient knowledge or information to confirm or deny all of the allegations. Object as to relevance; these events are too remote and too attenuated from the termination to be causally related. Object as to uncorroborated hearsay. Object as conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

23. Plaintiff learned later a male detective handling the case regarding the wanted person was derelict and neglected to obtain a warrant. He was not disciplined or reprimanded for his dereliction of duty. Plaintiff also learned that a female officer was reprimanded for not putting a warrant into the system for sexual assault. [Pl. Decl., ¶¶ 47-48]

**The City lacks sufficient knowledge or information to confirm or deny the allegations. Object as to relevance; these events are too remote and too attenuated from the termination to be causally related. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

24. On December 7, 2014, Lt. Sean Hanley wrote a memo to Captain Sgrignuoli about the "open door" email Plaintiff wrote, explaining that he had counseled her about it. [Pl. Decl., ¶ 46 & Ex. 6] Acting Captain Sgrignuoli denies discriminating against Plaintiff because she was female. [Sgrignuoli Dep., p. 50]

**No dispute.**

25. Defendant never took action on any of Plaintiff's complaints about any male members of Defendant's Police Department. [Pl. Decl., ¶ 72]

**Disputed. Object as overbroad and conclusory.**

Shannon Lewandowski's Protected Activity

26. On August 30, 2012, Plaintiff submitted a memo to male Captain Wagner about "Workplace Harassment," describing the discrimination and harassment she was receiving from male detectives [Pl. Decl., ¶ 15 & Ex. 3]

**No dispute that she submitted the memo. The City lacks sufficient knowledge or information to confirm or deny the allegations contained therein, although there had been a history of poor working relationship between Lewandowski and her peers, which was being handled on the district level by her then commander, Captain Chad Wagner. (Pederson Decl. ¶4, Ex. 24.) Object as to relevance; these events are too remote and too attenuated from the termination to be causally related. Object as to uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

27. After visiting Beasley on or about October 5, 2014, Plaintiff returned to the District 5 police station of Defendant to speak to Lt. Hanley, and Plaintiff advised him what she had learned from Beasley, including that Beasley feared for her life from Wilkinson. Plaintiff showed Lt. Hanley a picture of a used firing target that Wilkinson had sent to Beasley, and Plaintiff told Lt. Hanley that she believed it was a threat against Beasley. [Pl. Decl., ¶¶ 22-23] Lt. Hanley said he also believed it was intended as a threat, and he suggested to Plaintiff that Beasley get a restraining order against Wilkinson. Lt. Leitzke told Beasley, "if you tell me his name, I have an obligation to report it." As soon as Beasley told Lt. Leitzke that her stalker was Wilkinson, he asked Beasley if she had anything in writing and attempted to dissuade her from reporting Wilkinson. [Pl. Decl., ¶¶ 24, 26, 28] Lt. Hanley denies all of this. [F&PC I, pp. 384-85]

**The City lacks sufficient knowledge or information to confirm or deny all the allegations. Allegations as to Lt. Hanley disputed other than his denial. Object as to relevance; these events are too remote and too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as**

8

uncorroborated hearsay. **Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

28. In late 2014, Plaintiff approached Lt. Hanley and told him that the abusive situation with Beasley and Wilkinson was ongoing and included death threats against Beasley, and Plaintiff asked if Beasley could come speak to him directly, to which he agreed. [Pl. Decl., ¶ 35] Lt. Hanley denies knowing of the situation. [F&PC I, pp. 375-76]

**The City lacks sufficient knowledge or information to confirm or deny all the allegations. Allegations as to Lt. Hanley disputed other than his denial. Object as to relevance; these events are too remote and too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

29. On December 6, 2014, approximately one hour after Plaintiff sent the "open door" email, Lt. Hanley ordered Plaintiff into his office and verbally reprimanded her for sending the email; Lt. Hanley told Plaintiff she must apologize for the "open door" email because "it made the command staff angry." Plaintiff knew that she had acted correctly and refused to apologize for sending the email. [Pl. Decl., ¶ 45] Plaintiff made numerous verbal complaints to her other Lieutenants about harassment and retaliation she was receiving from Sgrignuoli for emailing the Chief about a male officer's dereliction of duty, but Plaintiff received no assistance and told to "lay low." [Pl. Decl., ¶ 73]

**The City lacks sufficient knowledge or information to confirm or deny all the allegations. Allegations as to Lt. Hanley disputed. Object as to relevance; these events are too remote and too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

30. In January 2015, Plaintiff asked Lt. Hanley about potential additional steps that could be taken to protect Beasley, who was now living with Plaintiff because she feared for her life. Plaintiff also updated Lt. Hanley about the emotional distress Beasley was experiencing from Wilkinson. [Pl. Decl., ¶ 79; F&PC I, p. 240] On or about January 15, 2015, Beasley obtained a temporary restraining order against Wilkinson with Plaintiff's assistance and support. [Pl. Decl., ¶ 82] On or about January 26, 2015, Plaintiff testified for Beasley as a witness who heard

Wilkinson tell Beasley "If you leave me, I will kill you" on or about October 14, 2014. [Pl. Decl., ¶ 104]

**The City lacks sufficient knowledge or information to confirm or deny all the allegations. No dispute that a TRO was issued, but note that a restraining order was denied after hearing. (Pederson Decl. ¶5, Ex. 25.) Allegations as to Lt. Hanley disputed. Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

31. In January 2015, Plaintiff wrote a memo to Internal Affairs and Lt. Hanley regarding death threats Wilkinson made to Beasley, and Plaintiff demanded to know why nothing was being done to protect Beasley. [Pl. Decl., ¶ 81] Plaintiff also informed male Captain Stigler about Beasley's situation, but Captain Stigler refused to listen and stated that it was none of Plaintiff's business. [Pl. Decl., ¶ 84]

**Disputed. Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

32. On or about January 18, 2015 at approximately 8 p.m., Plaintiff and Beasley were discussing Beasley's filing for and receiving a restraining order against Wilkinson in front of witnesses at the Department. [Pl. Decl., ¶ 86; F&PC I, pp. 239-40]

**The City lacks sufficient knowledge or information to confirm or deny the allegations. Object as to relevance. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

33. In March 2015, Plaintiff met with male Deputy Inspector Terrence Gordon about the retaliation and intimidation she was experiencing from Captain Sgrignuoli, her suspension, and the lies Sgrignuoli wrote about her interaction with Judge Swanson. In that meeting, Gordon told Plaintiff, "Get a lawyer. Sgrignuoli is after your reputation and career." [Pl. Decl., ¶ 126]

**Disputed. Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

34. In March 2015, Plaintiff contacted Captain Sgrignuoli to inquire why her gun was taken away and her police powers suspended, and she told Captain Sgrignuoli that she felt that she was being retaliated against. [Pl. Decl., ¶ 128] On or about March 24, 2015 and again in May 2015, Plaintiff contacted Captain Sgrignuoli to find out why she was still suspended, and she asked why she was suspended but Wilkinson was not. Sgrignuoli denied writing the complaint that led to Plaintiff's suspension and claimed to have no knowledge of why she was suspended. This contradicts a previous memo from Sgt. Hines stating that Sgrignuoli wrote the complaint for Plaintiff's suspension that was submitted to IAD. [Pl. Decl., ¶¶ 129-31]

**Disputed. Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

35. On or about May 3, 2015, Plaintiff submitted a memo to the Chief about Lt. Armbruster instructing Plaintiff to go to court for subpoenas in response to being charged with integrity violations. [Pl. Decl., ¶¶ 135, 137 & Ex. 18]

**No dispute that she drafted the memo; disputed as to contents and allegations therein. Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

36. On or about June 1, 2015, Plaintiff submitted a memo to Captain Sgrignuoli regarding her forced unpaid medical leave instead of being considered injured on duty, requesting information on the status of the investigation, requesting specific days off, and noting that she was aware she would be transferred. [Pl. Decl., ¶ 143 & Ex. 20]

11

**No dispute that she drafted the memo; disputed as to contents and allegations therein. Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

37. On October 11, 2015, Plaintiff wrote a memo to the Chief rebutting the charges against her stemming from her January accident, noting that Beasley "requested my help with the filing of a felony case, additionally, and most importantly, to help her with the fear and stress she was experiencing while working, due to an assault by a co-worker [Wilkinson]. I explained that I would return before her shift ended at approximately 2:00 a.m., to which she agreed." [Pl. Decl., ¶ 163 & Ex. 25]

**No dispute that she drafted the memo; disputed as to contents and allegations therein. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

38. On October 13, 2015, Plaintiff wrote a memo to the Milwaukee Fire & Police Commission, titled "Discrimination, Misconduct in Office," which the Commission eventually accepted. In the memo, Plaintiff reported "intentional disparate treatment in direct action due to gender; I and others have been discriminated [sic] within this department because we are women." Plaintiff also noted that "[t]here is collusion in the ranks of the male Milwaukee Police Department" and went on to detail specific instances of discrimination. Plaintiff stated that she worked "in an oppressive environment with a different set of rules of men and women," and that "Captain Stigler has discriminated against more than one female under his supervision, with different standards for men and women." That same date, Sgt. Zieger submitted a memo to Deputy Inspector Brunson summarizing Plaintiff's memo. [Pl. Decl., ¶ 164 & Exs. 26, 27; Regan Dep., pp. 17-18 & Ex. 2, pp. 1054-56]

**No dispute that she drafted the memo; disputed as to contents and allegations therein. No dispute that Zieger wrote and submitted a memo. Object as to relevance; these events are too remote and too attenuated from the termination to be causally related. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

39. On November 13, 2015, Regan received Plaintiff's November 12, 2015 memo regarding misconduct and discrimination against Plaintiff. [Pl. Decl., ¶ 167; Regan Dep., Ex. 5] Regan testified that "I knew [Plaintiff] must have [filed previous discrimination complaints with Chief Flynn and Defendant's Internal Affairs Division] or that there was something, because the command staff told me they were nervous to have IAD investigate this complaint because she had alleged unfair treatment by IAD." [Regan Dep., p. 66]

**No dispute. In response to Lewandowski's complaints and allegations, including those against the Internal Affairs Division, calling into question their ability to conduct a fair and impartial investigation, Ms. Regan hired an independent investigator, whose report has been submitted with the City's brief, finding no discrimination or retaliation, and calling Lewandowski's veracity into question. (ECF Doc. 80-17.)**

40. On November 27, 2015, Plaintiff submitted a memo to the Chief, rebutting charges regarding her integrity stemming from her January accident. Plaintiff's memo noted specific incidents of male officers being treated far more favorably under similar circumstances, and she detailed specific errors in the investigation of her, such as Defendant failing to interview key witnesses regarding the January accident. [Pl. Decl., ¶¶ 170-71 & Ex. 31]

**No dispute that she drafted the memo; disputed as to contents and allegations therein.**

Retaliation Against Shannon Lewandowski

41. Defendant repeatedly investigated Plaintiff over the course of her career for minor offenses and even no wrongdoing at all, looking for anything with which to terminate her employment after she complained about sex discrimination in the Department. Over the course of her career at Defendant, it investigated Plaintiff nearly 40 times for unfounded and unproven allegations against her. [Pl. Decl., ¶¶ 181-82 & Ex. 34]

**Disputed. Lewandowski's facts here are disingenuous and conclusory. Most of the complaints filed against her were filed by citizens, and MPD is required to document the complaint and the results of the investigation. There is nothing unusual about an active officer's record reflecting many unfounded complaints throughout their career. Lewandowski attempts to distort the reality here. Compare Lt. Sgrignuoli's record. (ECF Doc. 86-48.)**

42. A few days after Plaintiff sent the "open door" email, Lt. Sgrignuoli ("Acting Captain") confronted her in the hallway and asked her, "What the hell is wrong with you, why would you write the Chief?" Lt. Sgrignuoli told Plaintiff not to write any more emails to the Chief and not to "cross him" again. [Pl. Decl., ¶ 49; Sgrignuoli Dep., pp. 19-21 (he denies saying any of that to Plaintiff)] Sgrignuoli also approved Plaintiff's review for 2014, which stated: "she was counseled by Lt. Sean Hanley about the proper way to follow the chain of command. This stemmed from an email that she sent to the Chief and other members of the command staff." Pl. Decl., ¶ 8 & Ex. 7]

**Disputed, except that Sgrignuoli denies these allegations. Object as to relevance;**

**these events are too remote and too attenuated from the termination to be causally related;**

**these events do not concern any decision maker. Object as uncorroborated hearsay.**

**Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

43. On or about December 13, 2014, Lt. Sgrignuoli took Plaintiff off her preferred shift and transferred her to a new assignment in retaliation for her "open door" email to the Chief, to work on ballistic cases under Lt. Armbruster. Lt. Sgrignuoli told Plaintiff that this transfer was an "opportunity" for her. Such a change in duties would confine Plaintiff to the office, and she and Lt. Armbruster agreed that the change was actually a punishment for Plaintiff's emailing the Chief. Plaintiff also believed that the change was intended to keep her from assisting or advocating for Beasley. [Pl. Decl., ¶¶ 61-64]

**Disputed. Object as to relevance; these events are too remote and too attenuated**

**from the termination to be causally related; these events do not concern any decision**

**maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent**

**that it constitutes inadmissible evidence.**

44. On or about January 1, 2015, Plaintiff made a misdemeanor arrest of a female relating to the first shooting of the year. While Plaintiff was attempting to finish necessary paperwork for the January 1st arrest, Lt. Sgrignuoli told Plaintiff to punch out, go home, and finish the remaining paperwork in the morning because no overtime was to be paid for a misdemeanor offense. Plaintiff complied. [Pl. Decl., ¶¶ 66-67; Sgrignuoli Dep., pp. 22-23 (he denies it)]

**Disputed, except that Sgrignuoli denies these allegations. Object as to relevance;**

**these events are too remote and too attenuated from the termination to be causally related;**

**these events do not concern any decision maker. Object as uncorroborated hearsay.**

**Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

14

45. On January 1, 2015, at the direction of Lt. Sgrignuoli, Lt. Lough wrote Plaintiff up for not completing the misdemeanor paperwork on the night of the January 1, 2015 arrest. Plaintiff asked Captain Sgrignuoli why she was written up when he told her to go home; he responded, "you don't make the rules, I do; this is what happens when you go against me." [Pl. Decl., ¶¶ 68-69 & Ex. 8; Sgrignuoli Dep., pp. 22-23 (he denies it)]

**Disputed, except that Sgrignuoli denies these allegations, and that Lewandowski was counseled for leaving work without completing necessary documents. Object as to relevance; these events are too remote and too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

46. Plaintiff addressed the January 1 discipline situation with Lt. Hanley, who stated that this punishment was obviously a direct consequence to Plaintiff for emailing the Chief, and thus retaliation. Further, Plaintiff complained to Lt. Hanley about the treatment and threats against Plaintiff's career that she was experiencing from Lt. Sgrignuoli. [Pl. Decl., ¶¶ 70-71]

**Disputed. Object as to relevance; these events are too remote and too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

47. After Plaintiff's traffic accident, Lt. Hanley got involved in the investigation of the January accident and intentionally made false statements in the report about Plaintiff's accident, leading to multiple investigations of Plaintiff by Defendant. [Pl. Decl., ¶ 91; F&PC I, p. 266] Lt. Hanley questioned Plaintiff, while she was suffering from a concussion, without providing notice that she was under investigation for alleged departmental violations related to the accident. [Pl. Decl., ¶ 93]

**Disputed. Hanley was not conducting a rule violations investigation but a traffic investigation; Lewandowski called Hanley, and indicated that she was fine to speak to him. (ECF Doc. 80-6, ¶¶ 5-9)**

48. Defendant refused to pay Plaintiff's medical bills from the January accident, denied her worker's compensation claim, refused to pay her medical bills, and held its investigation

open for months longer than any investigations into male officers or officers who did not complain of discrimination. [Pl. Decl., ¶ 94] After her accident, Plaintiff submitted a memo to the Department at its request, asking to be carried by the Defendant as being injured-on-duty until she was able to return to work, as Detective Carr was, but Defendant refused. [Pl. Decl., ¶ 96]

**Disputed. There is no supporting evidence that Lewandowski was disparately treated as she provides no comparator information, only conclusory statements.**

49. On or about January 23, 2015, Plaintiff appeared off-duty at Milwaukee County Children's Court, at the victim's request, in a public hearing of a victim's armed robbery and shooting incident crime that Plaintiff solved. Now-Captain Sgrignuoli wrote a memo about the court appearance containing false information negative to Plaintiff. Captain Sgrignuoli then ordered that Plaintiff be investigated for allegations of misconduct. Captain Sgrignuoli wrote a false memo to IAD for the investigation. [Pl. Decl., ¶¶ 97-99 & Ex. 12]

**Dispute that Sgrignuoli made false statements, rather he merely reported what was told to him by the judge who had called him to report Lewandowski's conduct, and then forwarded it to IAD pursuant to MPD policy. (ECF Doc. 86-13.) Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker.**

50. After Captain Sgrignuoli's false memo was submitted to IAD, Sergeant Hines conducted an investigation into the incident and stated in a March 24, 2015 memo repeating many of Captain Sgrignuoli's false allegations and negative information about the Plaintiff. Other witnesses at the court hearing on January 23, 2015, stated that Plaintiff was never uncooperative and the incident was not a big deal. On February 11, 2015, Plaintiff wrote a memo to Judge Swanson, apologizing for interrupting the proceeding and explaining the reasons that she wanted to record the hearing. [Pl. Decl., ¶¶ 102-03, 107 & Ex. 14]

**Dispute that Hines' report contained false allegations. Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker.**

51. A day after the January 23, 2015 court hearing, on January 24, 2015, Captain Sgrignuoli confronted Plaintiff at her home and informed Plaintiff that she was "making bad decisions," and stated words to the effect:
a. "You had a cell phone in court, and the judge called me and told me he wanted to hold you in contempt of court and decided not to as a favor."

16

b. "You called a burglary suspect the N-word."
c. "I am taking your gun and badge."
d. "You have no police powers."
e. "You are under suspension."
f. "You cannot take the Lieutenant's exam."
g. "You cannot testify for Beasley."
h. "You are not to possess any firearm outside of your home."
i. "You are not to make any arrests."
j. "Do you understand you cannot testify in court for Melanie either?"
Captain Sgrignuoli suspended Plaintiff because of the court incident. [Pl. Decl., ¶¶ 100-01 & Ex. 13; Sgrignuoli Dep., pp. 32, 47 (he denies it)]

**Disputed, except that Sgrignuoli denies these allegations. Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

52. In retaliation for Plaintiff's truthful testimony in support of Beasley in the temporary restraining order hearing, in February 2015, Captain Sgrignuoli again confronted Plaintiff at her house and informed her that she violated rules by testifying in court for Beasley while Plaintiff was suspended. He also stated again that Plaintiff could not take the Lieutenant's exam. [Pl. Decl., ¶ 105; Sgrignuoli Dep., pp. 32, 48 (he denies it)]

**Disputed, except that Sgrignuoli denies these allegations. Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

53. As a result of the threats and retaliation against Plaintiff by Captain Sgrignuoli, members of her central division, as well as male detective Troy Johnson, distanced themselves from Plaintiff for fear of retaliation against themselves. [Pl. Decl., ¶ 106]

**Disputed that there were threats or retaliation; the City lacks sufficient knowledge or information to confirm or deny remaining allegations.**

54. Captain Sgrignuoli and the Department made multiple attempts to ruin Plaintiff's reputation while she was out on medical leave, including:
a. In March 2015, Plaintiff was forced to go to court and testify without pay. After she arrived home from court, Plaintiff found a sergeant at her house, who accused her of being drunk

17

in court and forced Plaintiff to blow into an intoxometer. Despite no signs of alcohol, a POST member, Detective Isla Wallich, came to Plaintiff's home to discuss the incident. Plaintiff was still suffering from concussion side effects resulting from her January 2015 accident.

b. While Plaintiff was in court to testify in April and May 2015, the Department told one of the lawyers in a case that she was suspended. This was brought up in court. However, Plaintiff was not suspended—only her police powers were suspended.

c. In another incident during which Plaintiff was forced to testify in court in May and August 2015, the Department told a probation agent involved in the case that Plaintiff was suspended and gave the agent Plaintiff's home phone number.

d. In another case, Plaintiff was forced to testify while still experiencing severe health effects from a head injury suffered during her January accident. Plaintiff was not able to testify successfully due to her injuries, and the case was lost. The Department accused Plaintiff of being drunk in court, even though Plaintiff was suffering from her head injuries and sober. Detective Carr also worked on that case, but Defendant never forced her to testify in the case.

[Pl. Decl., ¶ 114]

**Disputed. Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

55. In February 2015, Captain Sgrignuoli ordered Plaintiff to write a memo for an involuntary transfer or face more consequences for her complaints. As a result, Plaintiff contacted union president Mike Crivello; while meeting with Crivello, Plaintiff explained the threats, retaliation, and intimidation tactics Captain Sgrignuoli was using against her, and she also informed him about the suspension of Plaintiff's police and arrest rights. [Pl. Decl., ¶¶ 115-17] Crivello then talked to Sgrignuoli, who stated, "When [Plaintiff] is ready to come back she can, but she made me look bad in the eyes of the Big Guy," presumably referring to the Chief of Defendant's Police Department. [Pl. Decl., ¶ 118; Sgrignuoli Dep., p. 49 (he denies it)]

**Disputed, except that Sgrignuoli denies these allegations. Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

56. On or about March 5, 2015, Mayor Barrett received a letter from the family of a victim (the same victim that Plaintiff appeared in court off-duty and tried to audio record for the family) that Plaintiff assisted and solved a crime regarding, praising Plaintiff for her work in several resulting cases and recommending that she receive an award for these actions. Plaintiff did not receive an award for her actions. [Pl. Decl., ¶¶ 120-21 & Ex. 16]

18

**The City lacks sufficient knowledge or information to confirm or deny the allegations. Object as to relevance. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

57. Defendant continued to force Plaintiff to testify without pay in court on cases of hers while she was off-duty after the January accident on unpaid leave. [Pl. Decl., ¶ 122]

**Disputed. Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

58. On March 24, 2015, Sgt. Hines submitted a report to Deputy Inspector Brunson regarding Plaintiff, beginning, "On January 27, 2015, Captain of Police Timothy Heier instructed members of the Internal Affairs Division to investigate an allegation of misconduct on the part of Police Detective Shannon Lewandowski," nothing that the allegation being investigated regarded, "On January 23, 2015, Detective Shannon Lewandowski, while off-duty, was observed recording a juvenile court proceeding with her cell phone and was argumentative with court deputies when asked to stop." In the memo, Sgt. Hines repeated lies told by Lt. Sgrignuoli in an attempt to further retaliate against Plaintiff for complaining about discrimination. [Pl. Decl., ¶ 125 & Ex. 17; Sgrignuoli Dep., pp. 41-42]

**No dispute that the memo was prepared by Hines; dispute that it contains lies. Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

59. On April 15, 2015, Defendant issued charges against Plaintiff regarding integrity, referring to the January 23, 2015 court hearing at which Plaintiff was off-duty. [Pl. Decl., ¶ 134]

**No dispute. (Pederson Decl. ¶6, Ex. 26.) Object as to relevance; these events are too attenuated from the termination to be causally related. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

19

60. On or about April 29, 2015, Lt. Armbruster instructed Plaintiff to go to court for subpoenas, contradicting earlier instructions from Captain Sgrignuoli that Plaintiff was not supposed to attend court. Armbruster informed Plaintiff that Sgrignuoli was ordering her to attend court, and if she did not, she would be written up. [Pl. Decl., ¶¶ 135-36]

**Disputed. This does not make objective sense – no supervisor would ever instruct anyone to ignore a subpoena, this allegation defies credulity. Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

61. On or about May 22, 2015, Plaintiff was given an official reprimand as discipline for allegedly "behaving in such a way that created the appearance of impropriety." This discipline was given to Plaintiff based on false statements of Captain Sgrignuoli, who wrote lies in retaliation for Plaintiff's email to the Chief. [Pl. Decl., ¶¶ 140-41 & Ex. 19]

**No dispute that the official reprimand was given as a result of a finding of rule violation related to the charge regarding her conduct in IAS #15-0026. (Pederson Decl. ¶7, Ex. 27.) Dispute that it was retaliation. Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

62. On or about June 1, 2015, the same date that Plaintiff submitted a memo to Captain Sgrignuoli regarding her forced unpaid medical leave instead of being considered injured on duty, Defendant transferred Plaintiff without notice in retaliation for her complaints of discrimination. [Pl. Decl., ¶¶ 143-44 & Ex. 20]

**Dispute that any transfer was done as retaliation or otherwise contrary to law. The City acknowledges that the Complainant was transferred to the Fusion Center on June 2, 2015, as part of a normal monthly transfer order. (Pederson Decl. ¶8, Ex. 28.) This was necessary because she was out on an extended leave and the work in her prior ballistics assignment needed to be performed, additionally, her police powers were still suspended**

**and she could not perform the duties in the ballistics assignment without police powers. Lewandowski did not return to duty though until September 2015. (Pederson Decl. ¶9, Ex. 29.)**

63. On or about June 3, 2015, Captain Sgrignuoli and Lt. Armbruster disciplined Plaintiff for having a phone in court. After administering Plaintiff's discipline, Sgrignuoli told Plaintiff he did not like her attitude and stated, "I was prepared to give you your gun and badge back but now I am not. I don't like your attitude. How are you feeling?" Plaintiff responded that she still had headaches from her accident. Captain Sgrignuoli replied, "Hmm, now I decided that you are not getting it back. Leave my office." [Pl. Decl., ¶¶ 145-47 & Ex. 21] Acting Captain Sgrignuoli denies retaliating against Plaintiff because she engaged in protected activity. [Sgrignuoli Dep., p. 50]

**Dispute that Lewandowski was disciplined; rather she was counseled, as indicated in the document. (ECF Doc. 86-21.) Disputed the remaining allegations, except that Sgrignuoli denies these allegations. Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence**

64. In June 2015, Plaintiff told Sgt. Hines that she needed to return to work because her bills were going to collection, that she was being retaliated against, she was being made to use sick time, and not injury on duty time because of the investigation, and that her partner who was in the car with Plaintiff at the January 19 accident (but who had not complained of discrimination) was not facing similar treatment. [Pl. Decl., ¶ 153]

**The City lacks sufficient knowledge or information to confirm or deny the allegations. Object as to relevance; these events are too attenuated from the termination to be causally related. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

65. On or about August 30, 2015, Plaintiff was again reassigned in retaliation for her complaints of discrimination. Despite telling Plaintiff that she was not able to make good decisions, Defendant assigned Plaintiff to work with the ATF and FBI doing ballistics cases and to interview recruits for hiring onto the Department. [Pl. Decl., ¶ 157]

21

**Dispute that the City engaged in retaliation or any other acts contrary to law. The City lacks sufficient knowledge or information to confirm or deny all of the allegations. Object as to relevance; these events are too attenuated from the termination to be causally related. Object as to uncorroborated hearsay. Object as conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

66. Defendant transferred many of the male officers and command staff who were the subject of Plaintiff's discrimination and retaliation complaints to Defendant's Internal Affairs Division, where they filed charges against her repeatedly. [Pl. Decl., ¶ 161]

**Disputed. Object as to relevance; these events are too attenuated from the termination to be causally related; these events do not concern any decision maker. Object as uncorroborated hearsay. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence. IAD personnel investigate complaints, they do not file them.**

67. On November 23, 2015, because Plaintiff and Beasley had recorded meetings with supervisors to document the ongoing discrimination and retaliation against them, Defendant amended its policy and prohibited recording without the consent of all parties or the approval of the Chief, contrary to Wisconsin law. [Pl. Decl., ¶ 169]

**The City lacks sufficient knowledge or information to confirm or deny the allegations. Object as to relevance; these events are too attenuated from the termination to be causally related. Object as to uncorroborated hearsay. Object as conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence. Wisconsin is a one-party recording state, but that is a rule of evidence, and has nothing to do with the policy decisions of the MPD regarding recording while on duty. The independent investigator addressed Lewandowski's recordings, and found that they called her credibility into further doubt. (ECF Doc. 80-17, 9-11.)**

22

68. Defendant issued Plaintiff a 5-day suspension, a 30-day suspension, and terminated her, all for alleged infractions stemming from her January 19, 2015 squad accident. Defendant terminated Plaintiff's employment on December 16, 2015. [Pl. Decl., ¶¶ 175-76 & Ex. 33]

**No dispute.**

Plaintiff's January 2015 Squad Car Accident

69. Plaintiff asked Detective Carr on the night of January 19, 2015 if she wanted Plaintiff's assistance in recovering the gun in the shooting case, explaining that she had to stop at District 5 first to talk to Melanie Beasley; Carr was already aware of Beasley's situation from Plaintiff and agreed. [F&PC I, pp. 163, 181, 242-44, 271; Transcript of Fire & Police Commission Hearing dated August 10, 2016, Volume II, attached to the Pederson Declaration as Ex. 5 ("F&PC II"), pp. 292-93] Plaintiff was not aware of any exigency to Carr's assignment to pick up the gun, and as detectives, they could choose what assignments to work on next. [F&PC I, pp. 283-84, 287; F&PC II, pp. 299, 353-55] Carr testified that she does not believe that Lt. Hanley directed her to return to search for the gun. [F&PC I, p. 162]

**Per the FPC Findings of Fact: Carr was ordered to go directly and get the gun; it was a time sensitive assignment. (ECF Doc. 80-6 ¶¶3-4; ECF Doc 80-5, 33-34.)**

70. Plaintiff testified that her son, Jordan Lewandowski, called her just before the accident on January 19, 2015 to tell her he had been pulled over on the east side of the city, and that he would call her back when he had more information. Plaintiff handed her phone to Carr to answer while Plaintiff was driving. [F&PC I, pp. 138, 164-65, 200, 247, 250, 271-72; F&PC II, pp. 323-24] Plaintiff did not go to the east side to get her son or to intervene in his traffic stop; she testified that her rule is that her sons must call her to let her know where they are. [F&PC I, pp. 198-98, 250-51] She was driving the speed limit and "blurped" her lights and siren to warn a car not to pull out as she drove past. [F&PC I, pp. 167, 252-54; F&PC II, pp. 307-09, 341-42] She did not have a chance to turn off the warning lights before she was hit by another car. [F&PC I, p. 254; F&PC II, p. 359 ]

**Per the FPC Findings of Fact: Lewandowski told Hanley that she was on her way to pick up her son from the UWM area. (ECF Doc. 80-6 ¶8.) Lewandowski told Hanley that she turned on her squad lights so that cars would get out of her way. (ECF Doc. 80-6 ¶8; ECF Doc. 80-5, 51-52.)**

71. On or about January 19, 2015, while on Plaintiff was on duty and driving to District Five to assist Beasley with her concerns about Wilkinson's death threats against her, Plaintiff was seriously injured when a drunk driver ran a red traffic light and struck the squad car she was driving and in which Detective Juanita Carr was a passenger. [Pl. Decl., ¶¶ 87-88; F&PC I, pp. 251-55] Plaintiff regained consciousness after the accident because Carr was screaming in her

ear that Plaintiff was dead. [F&PC I, pp. 168, 255] Plaintiff apparently called 911 after the accident but does not remember doing so. [F&PC I, p. 256]

**Per the FPC Findings of Fact: Lewandowski was headed to another district to assist**

**Beasley in a personal matter, when she changed course to UWM to assist her son, and while**

**en route she was involved in an auto collision. (ECF Doc. 80-6 ¶8.)**

72. After the accident, Officer Goggins asked Plaintiff who to call for her, and she told him to call her son, Jordan; she later learned she gave him the wrong phone numbers. [F&PC I, pp. 219, 256, 273; F&PC II, p. 320] Plaintiff saw another single mother officer with an African American son, Deb Stacey, and asked her to get her son after the accident; Stacey agreed. Officer Jesse Vollrath rode with Plaintiff to the hospital in the ambulance from the accident scene. [F&PC I, pp. 146-47, 227, 257; Pl. Decl., Ex. 23, p. 14] Officer Stacey found Jordan and brought him to Plaintiff's hospital room at Froedtert. [F&PC I, pp. 202-03, 219-20, 257-58, 278-79] Stacey testified that Plaintiff made absolutely no sense at the scene—everything she was saying was like she had a head injury; it was very apparent that Plaintiff was slurring her words and yelling to get her son. [F&PC I, pp. 217-18, 221] Plaintiff's mom, Denise Brown, who is a nurse, testified that when she saw her daughter in the hospital, Plaintiff was saying crazy things, which indicated to her that Plaintiff had a head injury. [F&PC I, pp. 234, 237]

**Per the FPC Findings of Fact: Hanley met with Lewandowski at the hospital a few**

**hours after the collision where she complained of foot pain, but seemed in good spirits and**

**had no trouble in communicating with her. (ECF Doc. 80-6 ¶7.)**

73. Lt. Sean Hanley testified that he went to the scene of Plaintiff's accident as soon as he heard about it. [F&PC I, pp. 34-35] Lt. Hanley testified that when he arrived, Sgt. Wade Grubich gave him information on the accident but did not mention Plaintiff was on her way to UWM, from which he understood that Plaintiff was not at fault. [F&PC I, pp. 36, 57] He claims he was also told by Sgt. Adam Riley that Plaintiff said she was going to UWM because her son was in a traffic stop. [F&PC I, pp. 36, 57-58] Lt. Hanley did not interview either Plaintiff or Detective Carr at the scene or at the hospital because they were receiving medical treatment, but he claims he spoke to both at the scene. [F&PC I, pp. 40, 44, 58-59] Carr did not see Lt. Hanley at the accident scene. [F&PC I, p. 170] Plaintiff did not see or talk to Lt. Hanley at the accident scene. [F&PC I, p. 258] Lt. Hanley claims he spoke to both detectives briefly at the hospital around 5:20 a.m., but Plaintiff denies seeing him or speaking to him at the hospital. [F&PC I, pp. 42-44, 259; F&PC II, pp. 330-31]

**Per the FPC Findings of Fact: Hanley reported to the scene of the collision and**

**briefly spoke to Lewandowski . (ECF Doc. 80-6 ¶¶5-6.) Hanley spoke to both Lewandowski**

**and Carr at the hospital. (ECF Doc. 80-6 ¶7.)**

24

74. When Plaintiff got home from the hospital about 6:30, she called Lt. Hanley to see if he was going to come to her home to talk to her about the accident. When he said no, she briefly told him what happened, in a phone call lasting seven minutes that was her last contact with Lt. Hanley about the accident until April. She denies telling Lt. Hanley she was on her way to pick up her son at the time of the accident or that she was going 45 m.p.h. at the time of the crash. Plaintiff told Lt. Hanley that the problem was that there were TAC officers at the accident scene, one of whom assaulted Officer Beasley, and they were claiming Plaintiff was on her way to UWM. None of those officers wrote a report or provided their notes documenting that she ever said such things. [F&PC I, pp. 45-46, 62, 71-72, 259-60, 262, 266-67, 276; F&PC II, pp. 311-12, 334, 339, 348-50, 361] Nor did any of them testify at the Fire & Police Commission hearing; see F&PC I and II] Lt. Hanley claims he interviewed Carr a few days after the accident at her home; she never said anything about Plaintiff going to intervene at a traffic stop, and Carr told Lt. Hanley they were going to District 5 when the accident occurred. [F&PC I, pp. 73-74] Lt. Hanley did not recommend discipline against either Plaintiff or Carr. [F&PC I, p. 78]

**Per the FPC Findings of Fact: Lewandowski told Hanley that she was on her way to UWM to find her son and that at the time of the collision she was going 45 MPH while using her emergency lights so that cars would get out of her way. (ECF Doc. 80-6 ¶8.). Hanley would not have given Lewandowski permission to go to the UWM area has she requested, as she should have. (ECF Doc. 80-6 ¶9.)**

75. Sgt. Adam Zeiger, the main investigator of the accident, testified that he did not make a determination of fault for the accident, and he testified that Plaintiff's statements about her use of the emergency lights would be an appropriate use of the lights. [F&PC I, pp. 100, 149-50; F&PC II, p. 400] Zeiger confirmed that Plaintiff told him she was heading to see Beasley at District 5 at the time of the accident. Zeiger also testified that it was reported to him that Plaintiff lost consciousness at the scene of the accident; she reported to him that she had a hard time articulating herself because of the nature of her injury and that she was having issues with her short-term memory. [F&PC I, pp. 122, 151-52] He did not interview Jordan Lewandowski until June 11, 2015, by phone, but Jordan did confirm that he had not arranged for Plaintiff to come and get him. [F&PC I, pp. 143-44, 155-56] Sgt. Zeiger did not complete his investigation until September 9, 2015, when he submitted his 22-page summary memo to Deputy Inspector Brunson regarding Plaintiff's January accident [F&PC I, p. 144; Pl. Decl., ¶ 158 & Ex. 23]

**Per the FPC Findings of Fact: Hanley was conducting the auto collision investigation, and had three days in which to complete it. (ECF Doc. 80-6 ¶¶5-6.)**

76. Plaintiff suffered very serious head injuries in the accident, including a concussion and lingering memory problems, documented in medical records provided to Defendant. Detective Carr, who had not complained to Defendant about discrimination, was also seriously injured in the accident, including a concussion, back and neck pain, wrist pain and headaches.

25

Plaintiff requested to be carried by the Department as Injured on Duty (IOD) status. [Pl. Decl., ¶¶ 89-90 & Exs. 9, 10, 11, 15; F&PC I, pp. 174, 191-92, 264] Acting Captain Sgrignuoli acknowledges that Plaintiff may have told him she had headaches from her accident. [Sgrignuoli Dep., p. 49] Plaintiff took FMLA leave from February 15, 2015 to May 9, 2015 for the injuries from her January accident. [Pl. Decl., ¶ 108] On or about June 26, 2015, Plaintiff underwent knee arthroscopic debridement and chondroplasty related to the January accident. [Pl. Decl., ¶ 154]

**The City lacks sufficient knowledge or information to confirm or deny the**

**allegations. Object as to relevance. Object as conclusory. Oppose consideration by the**

**Court to the extent that it constitutes inadmissible evidence.**

77. On or about April 8, 2015, Plaintiff was notified that she was being investigated by the Department regarding her January accident for "operating a department vehicle, with emergency lights activated, while not accomplishing the mission of the department." Plaintiff was then interviewed by IAD on or about April 14, 2015, regarding the allegations that she was operating her squad car while not accomplishing the mission of the department on January 19th, when she was hit by a drunk driver running a red light. [Pl. Decl., ¶¶ 88, 133 & Ex. 22] Sgt. Zieger first interviewed Plaintiff about the January accident on April 14, 2015. [F&PC I, p. 143 & Pl. Decl., Ex. 22]

**No dispute.**

78. As of August 2015, the investigation into Plaintiff's accident was still pending, leaving Plaintiff on unpaid leave with huge medical bills, in retaliation for her complaints of discrimination. Defendant has never taken so long to resolve an investigation into a drunken driving accident. Defendant never sent Plaintiff for a psychiatric or "fit for duty" evaluation, and she never had her gun returned to her even after she returned to work. [Pl. Decl., ¶¶ 150-52, 155-56]

**Dispute that the City engaged in retaliation or any other acts contrary to law.**

**Object as to uncorroborated hearsay. Object as conclusory. Oppose consideration by the**

**Court to the extent that it constitutes inadmissible evidence. Members with suspended**

**police powers are not issued a firearm for on duty use.**

79. On September 11, 2015, Lt. Wurth submitted a memo to Deputy Inspector Brunson regarding allegations of misconduct against Plaintiff. In that memo, Lt. Wurth repeated the lie that Plaintiff was responding to her son stopped by UWM Police at the time of the accident. Then she reiterated portions of Lt. Hanley's report, noting, "Detective Lewandowski intended to assist with follow-up assigned to Detective Carr, but received a call from Police Officer Melanie Beasley who had … reported to her that she was "afraid" and had asked her to come to District Five." She also noted, "Detective Lewandowski's son, Jordan Lewandowski, was interviewed

and acknowledged he called to inform his mother he had been stopped by a police officer, though he denied that his mother was meeting him." Lt. Wurth stated, "Detective Lewandowski described she was going to District Five to help Officer Beasley, and there was not an urgency to complete the follow-up [on Detective Carr's case]. Detective Lewandowski added it was the third time going to Distrctive Five that shift, and she had met Officer Beasley regarding the same issue earlier in the night. Detective Lewandowski reported she was not going to meet her son, and did not tell that to Lieutenant Hanley." Despite these contradictions, Lt. Wurth recommended upholding the charges against Plaintiff. [Pl. Decl., ¶ 159]

**Object on issue preclusion, most of these facts were established by the findings of fact by the FPC. (ECF Doc. 80-6.) Object as to relevance; these events are too attenuated from the termination to be causally related. Object as to uncorroborated hearsay. Object as conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

80. On or about October 7, 2015, Plaintiff was charged with further violations of the code of conduct stemming from the January accident, just two days after she was requested to serve as a "Subject Matter Expert" by Defendant in another matter via email. [Pl. Decl., ¶ 162 & Ex. 24]

**The City lacks sufficient knowledge or information to confirm or deny the allegations. Object as to relevance; this evidence just demonstrates that Lewandowski was permitted to continue working as normal while on suspended police powers while her discipline investigation and decision was pending. Object as to uncorroborated hearsay. Object as conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

81. On October 21, 2015, Plaintiff wrote a memo to the Chief rebutting the charges against her of untruthfulness and threats. [Pl. Decl., ¶ 165]

**The memo indicates it was filed October 12, 2015. (ECF Doc. 86-25.) The next day she filed a new memo with accusations of misconduct of many of those who work around her and involved in the investigation. (ECF Doc. 86-26.) And two more on November 12, 2015 (ECF Doc. 86-29; 86-30.)**

82. On October 26, 2015, Plaintiff wrote a memo to Captain Salazar requesting an update on the investigation and noting that mistakes were made in recording her time off work. On October 28, 2015, Plaintiff received an email from Defendant outlining her leave status at Defendant. [Pl. Decl., ¶ 166 & Ex. 28]

**No dispute that the memo was filed; no exhibit is referenced, so no further analysis can be made other than a general dispute that there were errors. The City lacks sufficient knowledge or information to confirm or deny the allegations. Object as to relevance. Object as to uncorroborated hearsay. Object as conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

**No dispute that the email outlined Lewandowski's leave status.**

83. On November 12, 2015, Plaintiff submitted another memo to Defendant's Fire & Police Commission detailing additional concerns with the charges against her. That same date, Plaintiff also submitted a memo to Chief Flynn regarding allegations of untruthfulness and threats. [Pl. Decl., ¶ 167 & Exs. 29, 30]

**No dispute that Lewandowski filed the memos. Dispute the contents thereof. Object as to uncorroborated hearsay. Object as conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

84. On November 20, 2015, Defendant charged Plaintiff with allegations pertaining to integrity, stemming from her January accident. Defendant told Plaintiff to talk to Sgt. Zieger if she had questions, but he was gone. [Pl. Decl., ¶ 168]

**Lewandowski was notified of an integrity charge on November 20, 2015, which provided her an attached summary and notified her of her right to file a written response, and to contact IAD with any questions. (ECF Doc. 80-2.)**

85. On December 4, 2015, Sgt. Zieger wrote a memo to Deputy Inspector Brunson regarding Plaintiff, responding to Plaintiff's November 27, 2015 memo. He noted that Plaintiff said she had proof that "Internal Affairs members, who investigated her case, are unethical and conducted a biased investigation based on gender." [Pl. Decl., ¶ 173 & Ex. 32]

**No dispute. This was an accurate statement. (*See* ECF Doc. 86-31.)**

86. Plaintiff committed no wrongdoing worthy of discipline or termination at any time during her employment by Defendant in 2014 and 2015. [Pl. Decl., ¶ 183]

**Disputed. The Chief of Police and FPC found otherwise. (ECF Doc. 80-6.) As did the Wisconsin Circuit Court. Object as conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

Comparators Who Were Treated Better

87. Defendant never arrested Wilkinson, took away his gun, or ordered him into the district attorney's office to discuss the allegations against him, even though the assistant district attorney admitted to Beasley that there was probable cause to arrest Wilkinson based on her report. Instead, the Defendant's "good ol' boys club" rallied around Wilkinson and protected him, while leaving Beasley and Plaintiff to fend for themselves. [Pl. Decl., ¶¶ 85, 112-13]

**Object as to relevance. There is no production of evidence that this alleged comparator was similarly situated to Lewandowski as it relates to her integrity charge, for which she was terminated. Object as to uncorroborated hearsay. Object as conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

88. Lt. Hanley did not make false statements about Detective Carr or place her under investigation, even though she was a passenger with Plaintiff at the time of the accident. [Pl. Decl., ¶ 92] Defendant accepted the worker's compensation claim of Detective Carr, (who had not complained of discrimination) and paid her medical bills. [Pl. Decl., ¶ 95] Defendant did not force Detective Carr to testify without pay, because Defendant placed her on injury leave from the Department. [Pl. Decl., ¶ 123]

**Object as to relevance. There is no production of evidence that this alleged comparator was similarly situated to Lewandowski as it relates to her integrity charge, for which she was terminated. Object as to uncorroborated hearsay. Object as conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

89. Plaintiff learned in late 2017 and early 2018 a rumor that married Captain Sgrignuoli had been having a secret, illicit affair with the married female Executive Director of the Fire and Police Commission (MaryNell Regan) at the time he was investigating Plaintiff following her January 2015 traffic accident. [Pl. Decl., ¶ 189]

**Object as to relevance. Object as to uncorroborated hearsay. Oppose consideration**

**by the Court to the extent that it constitutes inadmissible evidence.**

90. Defendant launched an investigation through Sgt. Hines into whether Sgrignuoli and Regan were having an affair while she was Director of the Fire & Police Commission. Sgrignuoli learned this information when "I saw it on TV," and he believes Chief Flynn "was responsible for releasing that information to the public," because "it was all part of his stalking, and I think it was part of his response to the pushback he'd received from the Fire and Police Commission about hiring particular people to serve on his staff and circumvent the process and not getting support from the Commission. I think he was pouting." [Sgrignuoli Dep. Conf., pp. 76-77, 79, 91; Regan Dep., pp. 74-75 & Exs. 7, 8]

**Object as to relevance. Object as to uncorroborated hearsay. Object as conclusory.**

**Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

91. On January 13, 2017, Captain Sgrignuoli was caught requesting to view surveillance footage at Regan's office for "personal reasons not related to any official police business or investigation," violating Department policies Integrity 3.00; Guiding Principle 3.06 and Competence 1.00; and Guiding Principle 1.03." At the time he was caught improperly viewing the surveillance video, Captain Sgrignuoli had eight (8) "sustained offenses for other violations." An official record noted that "This is the member's first offense of using their official position to unnecessarily interfere in the personal business of another," for which he received a three-day suspension without pay, and "This is the member's second offense of failing to use time to accomplish the mission of the department," for which he had previously received a two-day suspension without pay. Chief Flynn assessed the suspensions totaling five days against Sgrignuoli. [Pl. Decl., ¶ 191; Sgrignuoli Dep. Conf., pp. 54-55, 57, 64-65 & Ex. 4] Captain Sgrignuoli's discipline for his proven misconduct was substantially less than Plaintiff's discipline for the same alleged misconduct he falsely accused Plaintiff of, including "failing to use time to accomplish the mission of the department," especially when prior discipline records are considered. [Pl. Decl., ¶ 193]

**Object as to relevance. There is no production of evidence that this alleged**

**comparator was similarly situated to Lewandowski as it relates to her integrity charge, for**

**which she was terminated. Lewandowski was suspended for five days for failure to use time**

**to accomplish the mission of the department. (ECF Doc. 80-3.) Object as to uncorroborated**

**hearsay. Object as conclusory. Oppose consideration by the Court to the extent that it**

**constitutes inadmissible evidence.**

30

92. In February 2018, Chief Flynn publicly accused Regan, as Executive Director of the Fire & Police Commission, of asking him to interfere with the investigation into Captain Sgrignuoli's misconduct in public office (improperly viewing the surveillance video of Regan's office) and asking Flynn to reduce or eliminate Captain Sgrignuoli's punishment for that offense. [Pl. Decl., ¶ 192; Sgrignuoli Dep. Conf., p. 94; Regan Dep., p. 53 (she denies it)]

**Object as to relevance. There is no production of evidence that this alleged comparator was similarly situated to Lewandowski as it relates to her integrity charge, for which she was terminated. Object as to uncorroborated hearsay. Object as conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

93. Regan testified, "I never intervened on Sgrignuoli's behalf. I intervened on my behalf." "Q. Do you know why he made this statement about you attempting to intervene on Sgrignuoli's behalf? A. I think he was—what's the right word—lying." "In your experience working with Chief Flynn, is he an honest person? A. In my opinion, he is not." [Regan Dep., pp. 76-77] Later, "[t]he idea that a file was leaked and that the investigation remained open and the fact that I had been surveilled was sent to the district attorney for review" by Chief Morales for "[m]isappropriation of resources" by Flynn. [Regan Dep., p. 77]

**Object as to relevance. There is no production of evidence that this alleged comparator was similarly situated to Lewandowski as it relates to her integrity charge, for which she was terminated. Object as to uncorroborated hearsay. Object as conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

94. While Regan was allegedly working to reduce Captain Sgrignuoli's discipline, she was working to prosecute and sustain Captain Sgrignuoli's false allegations of misconduct against Plaintiff, which led to Plaintiff's termination and confirmation of Plaintiff's termination by the Fire & Police Commission that Regan headed. [Pl. Decl., ¶ 194]

**Disputed. The basis of the termination and confirmation are set forth in the decision of the FPC. (ECF Doc. 80-6.) Object as to uncorroborated hearsay. Object as conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

95. In mid-February 2019, new Police Chief Morales rescinded the 5-day suspension of Sgrignuoli after Chief Flynn departed Defendant. [Sgrignuoli Dep. Conf., pp. 55-56, 69]

**Chief Morales rescinded two days without pay for the charge of failing to use time to accomplish the mission of the department, and reduced to an official reprimand three days of suspension for use of official position to unnecessarily interfere in the personal business of another. (Pederson Decl. ¶10, Ex. 30.)**

96. Male employees of Defendant who committed worse offenses than Plaintiff were not terminated. [Pl. Decl., ¶ 177] Plaintiff identifies numerous male comparators who committed infractions far more serious than what Plaintiff was accused of and fired for, but were not terminated. [Pl. Decl., ¶¶ 13, 124, 187-88, 196-202 and Exs. 36-41. These include Daniel Culver, Clayton Amborn (who received command assistance that female officers did not), Lt. Dennis Trzcinski, Captain Sgrignuoli, Alex Ayala, Robert Velez, Officer Edward McCrary, Sgt. Charles Cross, Zebdee Wilson, Det. Herb Glidewell, Lt. David Salazar, Det. Rodolfo Gomez, Jr., Patrick Fuhrman, Assistant Chief Raymond Banks, Reginald Hampton, Mark Kapusta, John Corbett, Robert A Brown, II, Scott D. Charles, Det. Edward McCrary, Asst. Chief Darryl Winston, Lt. Steven Kelly (who testified at my Fire & Police Commission hearing against me), Bradley R. Dall, and Joshua Albert. Regan testified as to Culver that "there was something where the prosecution's case wasn't very strong because the witnesses weren't called and neither was the office" called to testify at the Fire & Police Commission hearing, "and so the board felt that the allegations lacked proof." "But what he did, if have proven to be true, yeah, I think is terrible." [Regan Dep., pp. 86-87]

**Lewandowski's opinion on what is "far worse" is not relevant. Object as to relevance. There is no production of evidence that these alleged comparators were similarly situated to Lewandowski as it relates to her integrity charge, for which she was terminated. Object as to uncorroborated hearsay. Object as conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

97. Defendant's male and female employees who did not complain of discrimination but committed worse offenses were not terminated. [Pl. Decl., ¶ 178]

**Object as to relevance. There is no production of evidence that these alleged comparators were similarly situated to Lewandowski as it relates to her integrity charge, for which she was terminated. Object as to uncorroborated hearsay. Object as conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

Sex Discrimination Against Other Female Employees

98. Other female employees at Defendant suffered sex discrimination at work:

a. Melanie Beasley.

i. On or about October 14, 2014, while at Beasley's home, Plaintiff overheard Wilkinson speaking to Beasley on her speaker phone, and he said, "If you leave me, I will kill you." [Pl. Decl., ¶ 34] Wilkinson also made multiple threats that he would kill Beasley, particularly if he ever found out about her starting a relationship with another man. [Pl. Decl., ¶ 33] Wilkinson told Beasley he was watching her, and "I can take you out from 1,000 yards."

ii. On or about December 10, 2014, Beasley spoke to Lt. Hanley and told him that she was afraid for her life from Wilkinson, that she thought he was going to kill her, that he was having rage issues, that his wife knew about their relationship and told Beasley he's crazy, and that Beasley should be afraid. Lt. Hanley did nothing to address Beasley's concerns. [Pl. Decl., ¶¶ 50-51] Lt. Hanley denied that Plaintiff or Beasley ever reported Beasley's sexual assault to him. [F&PC I, p. 375]

iii. On or about December 11, 2014, Beasley spoke to her own supervisor, Lt. Leitzke, who came in while he was off duty, about the death threats, intimidation, and sexual harassment she was suffering at the hands of Wilkinson. Beasley told Lt. Leitzke that she had told Lt. Hanley about the about the death threats, intimidation, and sexual harassment she was suffering at the hands of Wilkinson, the previous day. [Pl. Decl., ¶¶ 52-53] Lt. Leitzke told Beasley not to let Wilkinson surprise her, and that if Wilkinson came to her house, Beasley should drive away. Lt. Leitzke told Beasley that if Wilkinson ever showed up at Walmart while she was there, it was not a coincidence and she should leave right away. Lt. Leitzke encouraged Beasley not to file a report and to keep the situation secret. Lt. Leitzke made sexual advances to Beasley in the meeting. Lt. Leitzke did nothing to address Beasley's concerns. [Pl. Decl., ¶¶ 54-58]

b. Nancy Nelson.

i. On or about March 31, 2015, fellow officer Nancy Nelson's husband made an unsubstantiated and unfounded 911 call to Defendant to report her for domestic violence. When male officers of the Department responded to the scene, they accepted her husband's lies and arrested Nancy Nelson. [Pl. Decl., ¶ 132]

ii. On or about June 11, 2015, Nancy Nelson was arrested for her first OWI charge, and the Department put her on desk duty and would not allow her to even ride as a passenger until she got her occupational license in October 2015. Male officers in similar situations were not put on desk duty or stripped of their ability to ride in squad cars with other officers, and were not investigated. [Pl. Decl., ¶¶ 148-49]

iii. When Nancy Nelson called 911 on or about November 29, 2015 because her husband Grant Nelson (a fellow member of the Department) was in an uncontrollable, intoxicated rage with a knife, threatening to kill her, and complained about domestic violence and threats by her husband, Defendant responded by:

a. Refusing to arrest Grant Nelson, even though Nancy Nelson took video of his threatening her life in an intoxicated rage and showed it to the responding officers from Defendant, and despite Wisconsin's mandatory arrest law in domestic violence situations;

b. Allowing Grant Nelson to keep the knife that he threatened his wife with;

c. Taking Grant Nelson outside the house and telling him to drive somewhere else, even though he was obviously intoxicated and could not drive legally;

d. Ignoring Nancy Nelson's concerns and leaving the scene without assisting her; and

e. Charging Nelson with disorderly conduct and domestic violence but issuing no charges against Grant Nelson.

33

[Pl. Decl., ¶ 172]

c. Unnamed women.

i. Chief Edward Flynn and his staffer, Joel Plant, "were involved in a variety of different engagements with female employees that they did not want made public." Chief Flynn was never investigated for any of those indiscretions, in Sgrignuoli's opinion, "because he ordered it otherwise." [Sgrignuoli Dep. Conf., pp. 58, 94-95]

ii. Regan is aware "of instances in which female members of the department have actually gotten temporary restraining orders against male members of the department." [Regan Dep., p. 67] Regan is aware of sex discrimination complaints against the Milwaukee Police Department that were sustained by the department and by the Wisconsin Equal Rights Division. [Regan Dep., pp. 73-74] Regan received a telephone complaint from a female employee about being reassigned off the POST team at the Department. [Regan Dep., p. 31]

d. MaryNell Regan.

i. Regan told Sgrignuoli that "she thought Chief Flynn was stalking her," and she told him "he had made sexual advances and that he was inappropriate" to her. [Sgrignuoli Dep., p. 72] Sgrignuoli testified that he felt it was improper for Chief Flynn to making advances to Regan because "She's his boss, first of all. Secondly, that's how he treated all women on the Police Department in my opinion." Sgrignuoli testified, "I think it lends to eroding the credibility of the police department as its lead member. I think it supports the affair he had early on in his tenure that was well documented. … I think it also goes to his integrity. I think it also provides the appearance of impropriety. And certainly I don't think it's a characteristic of a good, sound, ethical leader." [Sgrignuoli Dep. Conf., pp. 81-82]

ii. Regan thought that the Department's decision to investigate whether she was having an affair with Sgrignuoli was sex discrimination against her, "and I decided not to pursue that. But do I think they would have—Do I think Chief Flynn would have surveilled a male? Probably not." [Regan Dep., p. 59] She testified, "I do know that I was very prepared for meetings and often Flynn didn't like that, and that irked him. … Q. …Would it be fair to say that he can sometimes be uncomfortable with women in power? A. That's my personal opinion, yes." [Regan Dep., p. 62]

e. Katrina Warren filed a complaint against Defendant for sexual harassment from an Assistant Chief. [Regan Dep., p. 32]

**Object as to relevance; Lewandowski's Title VII claim requires her to show that her termination was due to sex discrimination or retaliation; these alleged other acts are not relevant to that claim; nor has Lewandowski met her burden of showing a custom, policy, or practice for her *Monell* claim. Object as to uncorroborated hearsay. Object as conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

Other Female Employees' Protected Activity

34

99. Other female employees at Defendant engaged in protected activity:

a. Melanie Beasley.

i. On or about January 5, 2015, Beasley met with Sergeant Estacio and Sergeant Klein from Internal Affairs to discuss the abuse she suffered by Wilkinson, but they treated Beasley like a criminal during this meeting and issued a "no contact" order for Beasley as to Wilkinson, instead of taking any action against Wilkinson. [Pl. Decl., ¶ 75]

ii. Beasley called Lt. Leitzke after her meeting with Internal Affairs; he told Beasley not to document anything and leveraged a potential promotion against her in attempts to convince her to not to file a report on Wilkinson. [Pl. Decl., ¶ 76]

iii. When Beasley went to Internal Affairs about the abuse she was experiencing by Wilkinson, she was told to get a restraining order and then the threat could be looked into. [Pl. Decl., ¶ 80] Lt. Hanley denies telling Beasley to get a temporary restraining order. [F&PC I, p. 68] On or about January 15, 2015, Beasley obtained a temporary restraining order against Wilkinson with Plaintiff's assistance and support. [Pl. Decl., ¶ 82]

iv. Melanie Beasley "frequently called" Regan about her discrimination complaints at Defendant. Regan told Beasley that "we would not normally take a personnel complaint absent command staff telling us that they believe they had a conflict of interest." [Regan Dep., pp. 35-36]

b. Nancy Nelson.

i. On December 8, 2015, Nancy Nelson filed a detailed, five-page sex discrimination complaint against the Department with the Fire & Police Commission. [Regan Dep., Ex. 6]

c. MaryNell Regan.

i. Regan complained to the mayor and to the City Attorney that she felt someone in the Police Department from Internal Affairs was following her, but no one took any action to help her on the complaint. She testified, "I was told by the mayor's office that they did talk to Flynn and told him to leave me alone, to stop following me—stop investigating me." [Regan Dep., pp. 42-43, 46] When asked about the conclusion of the investigation, Regan testified, "I believe Captain Sgrignuoli got discipline, but I do know for a fact that the file wasn't closed. And it wasn't closed until Alfonso Morales became chief." [Regan Dep., pp. 50, 83] Morales became Chief while Regan was still Executive Director of the Fire & Police Commission. [Regan Dep., p. 85]

ii. Regan accused Chief Flynn of abusing his police powers by investigating her. [Regan Dep., pp. 56-57]

iii. Regan testified that she "listened to parts of [Plaintiff's] radio show on WNOV where she made allegations against a lot of different people." [Regan Dep., p. 65]

**Object as to relevance; Lewandowski's Title VII claim requires her to show that her termination was due to sex discrimination or retaliation; these alleged other acts are not relevant to that claim; nor has Lewandowski met her burden of showing a custom, policy, or practice for her *Monell* claim. Object as to uncorroborated hearsay. Object as**

35

**conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible**

**evidence.**

Retaliation Against Other Employees

100. Defendant retaliated against other employees for protected activity:
a. Melanie Beasley.
i. Beasley called Lt. Leitzke after her meeting with Internal Affairs on January 5, 2015; he told Beasley not to document anything and leveraged a potential promotion against her in attempts to convince her to not to file a report on Wilkinson. [Pl. Decl., ¶ 76]
ii. At no time after the reporting of this incident to either Lt. Hanley or Lt. Leitzke did Defendant ever take any steps to limit Wilkinson's duties, police powers or contact with the victim, Beasley. Instead, the Department retaliated against Beasley for reporting the death threats, intimidation, and sexual harassment she was suffering at the hands of Wilkinson. [Pl. Decl., ¶ 59]
iii. After receiving the temporary restraining order against Wilkinson, Beasley emailed a copy to District Five Captain Stigler, asking for Defendant's assistance. Captain Stigler did not help Beasley. [Pl. Decl., ¶ 83]
iv. On or about February 6, 2015, Beasley made an official written report on Wilkinson to Sgt. Schroeder of Internal Affairs at Defendant; Defendant's Internal Affairs Division did not contact her about the complaint until on or about March 29, 2015. [Pl. Decl., ¶ 109]
v. When IAD finally contacted Beasley about her complaints of death threats and controlling and abusive behavior by Wilkinson, they asked her dismissively, "What do you want? A bodyguard?" [Pl. Decl., ¶ 110]
vi. After submitting her complaint about Wilkinson, Beasley met with Internal Affairs Criminal Detective Christopher Zimmerman. During her second meeting with Detective Zimmerman, he questioned if Beasley really wanted an investigation done and threatened that if she continued to push for an investigation, that Internal Affairs would begin investigating her for wrongdoing she did not commit. [Pl. Decl., ¶ 111]
b. Captain Johnny Sgrignuoli.
i. Chief Flynn retaliated against Sgrignuoli by suspending him for only five days (which meant that Sgrignuoli could not appeal it or learn any information about why he received the suspension) and transferring him to a less prestigious position after he had Sgrignuoli investigated for an alleged affair with Regan. The suspension also halted Sgrignuoli's advancement possibilities to Inspector within the department. [Sgrignuoli Dep. Conf., pp. 83-85, 87-88] Sgrignuoli has now resigned from the Department. [Pl. Decl., ¶ 195]
ii. Sgrignuoli thinks he never should have been investigated for viewing the video at City Hall, and Assistant Chief Bill Jessup and Inspector Tom Stigler both told him that. [Sgrignuoli Dep. Conf., p. 100] Sgrignuoli testified to his opinion as to why Chief Flynn resigned abruptly as he did, saying "I think that all of the—all of his extracurricular activities caught up to him. I think that a lot of what the Common Council was becoming aware of and the Commission was becoming aware of, which was public to a lot of people, there was no secret. … The fact that he was absent for the last two months, and yet remained on the payroll, that was interesting. So, year, I think it's no coincidence that he and then Assistant Chief Jessup, Joe Plant made a quick exit, Inspector Stigler made a quick exit. Everyone who could leave did. Assistant Chief Harpole

36

made a quick exit out of the run for Chief," referring to Chief Flynn's allies at the Department. [Sgrignuoli Dep. Conf., pp. 103-04]

    c. MaryNell Regan.

    i. The mayor's chief of staff called Regan on a Friday and asked for her resignation because "the mayor wants to take the commission in a different direction," and she submitted her resignation the following Monday. [Regan Dep., pp. 80-81 & Ex. 9]

**Object as to relevance; Lewandowski's Title VII claim requires her to show that her termination was due to sex discrimination or retaliation; these alleged other acts are not relevant to that claim; nor has Lewandowski met her burden of showing a custom, policy, or practice for her *Monell* claim. Object as to uncorroborated hearsay. Object as conclusory. Oppose consideration by the Court to the extent that it constitutes inadmissible evidence.**

Dated and signed at Milwaukee, Wisconsin 12 day of July, 2019.

GRANT F. LANGLEY
City Attorney

s/ ROBIN A. PEDERSON
Assistant City Attorney
State Bar No. 01045759
Attorneys for Defendant
Milwaukee City Attorney's Office
800 City Hall
200 East Wells Street
Milwaukee, WI 53202
Telephone: (414) 286-2601
Fax: (414) 286-8550
Email: rpederson@milwaukee.gov

1032-2016-1768:260812